# EXHIBIT A

US008927592B2

(12) **United States Patent**　　　　　　　(10) **Patent No.:**　　**US 8,927,592 B2**

Gupta　　　　　　　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Jan. 6, 2015**

(54) **ANTITUMORAL USE OF CABAZITAXEL**

(75) Inventor: **Sunil Gupta**, Chester Springs, PA (US)

(73) Assignee: **Aventis Pharma SA**, Antony (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/456,720**

(22) Filed: **Apr. 26, 2012**

(65) **Prior Publication Data**

US 2012/0301425 A1　　　Nov. 29, 2012

**Related U.S. Application Data**

(63) Continuation of application No. PCT/IB2010/054866, filed on Oct. 27, 2010.

(60) Provisional application No. 61/389,969, filed on Oct. 5, 2010, provisional application No. 61/383,933, filed on Sep. 17, 2010, provisional application No. 61/369,929, filed on Aug. 2, 2010, provisional application No. 61/355,888, filed on Jun. 17, 2010, provisional application No. 61/355,834, filed on Jun. 17, 2010, provisional application No. 61/293,903, filed on Jan. 11, 2010, provisional application No. 61/256,160, filed on Oct. 29, 2009.

(51) **Int. Cl.**

| *A61K 31/337* | (2006.01) |
|---|---|
| *A61K 31/573* | (2006.01) |
| *A61K 31/164* | (2006.01) |
| *A61K 31/56* | (2006.01) |
| *A61K 45/06* | (2006.01) |

(52) **U.S. Cl.**

CPC ............. *A61K 31/337* (2013.01); *A61K 31/164* (2013.01); *A61K 31/56* (2013.01); *A61K 31/573* (2013.01); *A61K 45/06* (2013.01)

USPC ...................................................... **514/449**

(58) **Field of Classification Search**

CPC .......................... A61K 31/337; A61K 31/573

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,438,072 | A | 8/1995 | Bobee et al. |
|---|---|---|---|
| 5,847,170 | A | 12/1998 | Bouchard et al. |
| 5,889,043 | A | 3/1999 | Bouchard et al. |
| 5,962,705 | A | 10/1999 | Didier et al. |
| 6,160,135 | A | 12/2000 | Bouchard et al. |
| 6,331,635 | B1 | 12/2001 | Bouchard et al. |
| 6,346,543 | B1 | 2/2002 | Bissery et al. |
| 6,372,780 | B2 | 4/2002 | Bouchard et al. |
| 6,387,946 | B1 | 5/2002 | Bouchard et al. |
| 6,403,634 | B1 | 6/2002 | Bissery |
| 7,241,907 | B2 | 7/2007 | Didier et al. |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 2002/0038038 | A1 | 3/2002 | Bouchard et al. |
| 2004/0126379 | A1 | 7/2004 | Adolf et al. |
| 2005/0065138 | A1* | 3/2005 | Didier et al. ................. 514/173 |
| 2005/0070496 | A1 | 3/2005 | Borovac et al. |

| 2008/0279923 | A1 | 11/2008 | Bradke et al. |
|---|---|---|---|
| 2010/0311825 | A1 | 12/2010 | Rortais et al. |
| 2011/0105598 | A1 | 5/2011 | Gurjar et al. |
| 2011/0144362 | A1 | 6/2011 | Billot et al. |
| 2011/0160159 | A1 | 6/2011 | Ryan |
| 2011/0177970 | A1 | 7/2011 | Chauchereau et al. |
| 2011/0237540 | A1 | 9/2011 | Crawford et al. |
| 2012/0077845 | A1 | 3/2012 | Dalton et al. |
| 2012/0115806 | A1 | 5/2012 | Magherini |

FOREIGN PATENT DOCUMENTS

| EP | 0817779 | 1/2000 |
|---|---|---|
| EP | 2177630 | 4/2010 |
| FR | 2732340 | 10/1996 |
| WO | WO 94/18164 | 8/1994 |
| WO | WO 96/30355 | 10/1996 |
| WO | WO 96/30356 | 10/1996 |
| WO | WO 00/10547 | 3/2000 |
| WO | WO 2005/028462 | 3/2005 |
| WO | WO 2006/062811 | 6/2006 |
| WO | WO 2010/117668 | 10/2010 |
| WO | WO 2010/128258 | 11/2010 |
| WO | WO 2011/051894 | 5/2011 |
| WO | WO 2011/063421 | 5/2011 |
| WO | WO 2011/124669 | 10/2011 |
| WO | WO 2011/130317 | 10/2011 |
| WO | WO 2011/130566 | 10/2011 |

OTHER PUBLICATIONS

Mita et al. Clinical Cancer Research, 2009, vol. 15, pp. 723-730.*
Tannock et al. N. Engl. J. Med., 2004, vol. 351, pp. 1502-1512.*
Beardsley et al. Current Opinions in Supportive and Palliative Care, Sep. 2008, vol. 2, pp. 161-166.*

(Continued)

*Primary Examiner* — James D Anderson

(74) *Attorney, Agent, or Firm* — Kelly L. Bender

(57)　　　　　　　　　**ABSTRACT**

The invention relates to a compound of formula:



which may be in base form or in the form of a hydrate or a solvate, in combination with prednisone or prednisolone, for its use as a medicament in the treatment of prostate cancer, particularly metastatic prostate cancer, especially for patients who are not catered for by a taxane-based treatment.

**30 Claims, 7 Drawing Sheets**

(56) **References Cited**

OTHER PUBLICATIONS

Parkin, et al., Global Cancer Statistics, (2002), CA Cancer J. Clin., (2005), vol. 55, pp. 74-108.

Hellerstedt, et al., The Current State of Hormonal Therapy for Prostate Cancer, CA Cancer J. Clin.,(2002), vol. 52, pp. 154-179.

Horwitz et al., External Beam Radiation Therapy for Prostate Cancer, CA Cancer J. Clin., (2000); vol. 50, pp. 349-375.

Pienta et al., Advances in Prostate Cancer Chemotherapy: A New Era Begins, CA Cancer J. Clin, (2005), vol. 55, pp. 300-318.

Cabral, Factors Determining Cellular Mechanisms of Resistance to Antimitotic Drugs, Drug Resistance Updates, (2001), vol. 4 No. 1, pp. 3-8.

Dumontet, et al., Mechanisms of Action of and Resistance to Antitubulin Agents: Microtubule Dynamics, Drug Transport and Cell Death, J. Clin. Onc., (1999), vol. 17, No. 3, pp. 1061-1070.

Haleblian, et al., Characterization of Habits and Crystalline Modification of Solids and Their Pharmaceutical Applications, J. Pharm. Sci., (1975), pp. 1269-1288.

Melzack, The McGill Pain Questionnaire: Major Properties and Scoring Methods; Pain, vol. 1, (1975), pp. 277-299.

Berry, et al., Quality of Life and Pain in Advanced Stage Prostate Cancer: Results of a Southwest Oncology Group Randomized Trial Comparing Docetaxel and Estramustine to Mitoxantrone and Prednisone, Journal of Clinical Oncology, (2006), vol. 24, No. 18, pp. 2828-2835.

Fizaz, et al., New agents in Metastatic Prostate Cancer, Eur. J. Cancer. 2009, vol. 45, Supp. 1., pp. 379-380.

http://clinicaltrials.gov/archive/NCT00417079/2006__12__28, View of NCT00417079 on Dec. 28, 2006—XRP6258 Plus Prednisone Compared to Miitoxantrone Plus Predisone in Hormaone Refractory Metastatic Prostate Cancer (TROPIC). Retrieved on Feb. 8, 2012.

de Bono, et al., Prednisone Plus Cabazitaxel or Mitoxantrone for Metastatic Castration-Resistant Prostate Cancer Progressing after Docetaxel Treatment: a Randomised Open-Label Trial, Lancet, vol. 376, No. 9747, (2010), pp. 1147-1154.

Galsky, et al., Cabazitaxel, Nature Reviews—Drug Discovery, vol. 9, (2010), pp. 677-678.

International Search Report for WO2011/051894 dated May 5, 2011.

Jevtana Prescribing Information, pp. 1-25, Jun. 17, 2010.

Antonarakis & Eisenberger, Phase III Trials with Docetaxel-Based Combinations for Metastatic Castration-Resistant Prostate Cancer. Time to Learn From Past Experiences, 31(14) J. Clin. Oncol., 1709-12 (2013).

Armstrong & George, New Drug Development in Metastatic Prostate Cancer, Urologic Oncol. Seminars & Orig. Invest., 430-437 (2008).

Beer et al., Double-Blinded Randomized Study of High-Dose Calcitriol Plus Docetaxel compared with Placebo Plus Docetaxel in Androgen-Independent Prostate Cancer: A Report from the ASCENT Investigators, 25(6) J. Clin. Oncol., 669-674 (2007).

Berry et al., Phase III Study of Mitoxantrone Plus Low Dose Prednisone Versus Low Dose Prednisone Alone in Patients with Asymptomatic Hormone Refractory Prostate Cancer, 168(6) J. Urol., 2439-43 (2002).

Booth et al., From the Analyst's Couch: Oncology Trials 2 Nature Reviews Drug Discovery, 609-610 (Aug. 2003).

Cabral, Factors Determining Cellular Mechanisms of Resistance to Antimitotic Drugs, 4 Drug Resistance Updates, 3-8 (2001).

Carducci et al., A Phase 3 Randomized Controlled Trial of the Efficacy and Safety of Atrasentan in Men with Metastatic Hormone-Refractory Prostate Cancer, 110(9) Cancer, 1959-66 (2007).

D'Amico, US Food and Drug Administration Approval of Drugs for the Treatment of Prostate Cancer: A New Era Has Begun, J. Clin. Oncol., 32(4) 362-364 (2014).

Di Lorenzo et al., Combination of Bevacizumab and Docetaxel in Docetaxel-Pretreated Hormone-Refractory Prostate Cancer: A Phase 2 Study, 54(5) Europ. Urol., 1089-1096 (2008).

Diéras et al., Larotaxel in Combination with Trastuzumab in Patients with HER2+ Metastatic Breast Cancer: Interim Analysis of an Open Phase II Label Study, 26 (15S) J. Clin. Oncol. (Meeting Abstracts) Suppl. 1070 (May 2008).

Diéras et al., Phase II Multicenter Study of Larotaxel (XRP9881), a Novel Taxoid, in Patients with Metastatic Breast Cancer Who Previously Received Taxane-Based Therapy, 19 Annals of Oncol., 1255-1260 (2008).

Dumontet & Sikic, Mechanisms of Action of and Resistance to Antitubulin Agents: Microtubule Dynamics, Drug Transport, and Cell Death, 17(3) J. Clin. Oncol., 1061-1070 (1999).

Halabi et al., Prostate-Specific Antigen Changes as Surrogate for Overall Survival in Men with Metastatic Castration-Resistant Prostate Cancer Treated with Second Line Therapy, 31(31) J. Clin. Oncol., 3944-50 (2013).

Higano et al., Phase 1/2 Dose-Escalation Study of a GM-CSF-Secreting, Allogeneic, Cellular Immunotherapy for Metastatic Hormone-Refractory Prostate Cancer, 113(5) Cancer, 975-984 (Sep. 1, 2008).

Kaur et al., Suramin 's Development, What Did We Learn, 20 Investigational New Drugs, 209-219 (2002).

Kola & Landis, Can the Pharmaceutical Industry Reduce Attrition Rate?, 3 Nature Reviews Drug Discovery, 711-15 (2004) (previously cited).

Mackinnon et al., Molecular Biology Underlying the Clinical Heterogeneity of Prostate Cancer: An Update, 133 (7) Arch. Pathol. Lab. Med., 1033-40 (Jul. 2009).

Michaelson et al., Randomized, Placebo-Controlled, Phase III Trial of Sunitinib Plus Prednisone Versus Prednisone Alone in Progressive, Metastatic, Castration-Resistant Prostate Cancer, 32(2) J. Clin. Oncol., 76-82 (2014).

Mulcahy, Phase 3 Trial of Immunotherapy for Metastatic Prostate Cancer Terminated, Medscape Medical News (Oct. 17, 2099), [retrieved on Jun. 26, 2014] from: http://www.medscape.com/viewarticle/582220.

Ramiah et al., Clinical Endpoints for Drug Development in Prostate Cancer, 18 Curr. Opin. Urol., 303-308 (2008).

Slovin et al., Ipilimumab Alone or in Combination with Radiotherapy in Metastatic Castration-Resistant Prostate Cancer: Results from an Open-Label, Multicenter Phase I/II Study, 24 Annals of Oncol., 1813-1828 (2013).

Small et al., Randomized Phase II Study Comparing 4 Monthly Doses of Ipilimumab (MDX-010) as a Single Agent or in Combination with a Single Dose of Docetaxel in Patients with Hormone-Refractory Prostate Cancer, 24(18S) J. Clin. Oncol. (Meeting Abstracts) S4609 (Jun. 2006).

Small et al., Granulocyte Macrophage Colony Stimulating Factor-Secreting Allogeneic Cellular Immunotherapy for Hormone-Refractory Prostate Cancer, 13 Clin. Cancer Res., 3883-3891 (2007).

Sternberg et al., Larotaxel with Cisplatin in the First-Line Treatment of Locally Advanced/Metastatic Urothelial Tract or Bladder Cancer: A Randomized, Active-Controlled, Phase III Trial, 85 Oncol., 208-215 (2013).

Susman, ASCO: Calcitriol Fails in ASCENT-2 Prostate CA Trial, MedPage Today (Jun. 9, 2010), [retrieved on Jun. 27, 2014] from: http://www.medpagetoday.com/MeetingCoverage/ASCO/20575.

Van Cutsem et al., A Phase III Study Comparing Larotaxel to 5-FU (Continuous Intravenous 5-FU or Capecitabine) in Patients with Advanced Pancreatic Cancer (APC) Previously Treated with a Gemcitabine Containing Regimen, 21 (6S) Annals of Oncol. Oral Presentations, O-0007 (Jul. 2010).

Van Hook et al., Ortersnel for the Treatment of Prostate Cancer, 10(5) Future Oncol., 803-811 (2014).

Wiechec & Hanson, The Effect of Genetic Variability on Drug response in Convention Breast Cancer Treatment, 625 Eur. J. Pharmacol., 122-130 (2009).

Williams, Discontinued Drugs in 2008: Oncology Drugs, 18(11) Expert. Opin. Investig. Drugs 1581-1594 (2009).

Wirth & Froschermaier, The Antiandrogen Withdrawal Syndrome, 25 (Suppl. 2) Urol Res., S67-71 (1997).

Zatloukal et al., Randomized Multicenter Phase II Study of Larotaxel (XRP9881) in Combination with Cisplatin or Gemcitabine as First-Line Chemotherapy in Nonirradiable Stage IIIB or Stage IV Non-Small Cell Lung Cancer, 3 J. Thorac. Oncol. 894-901 (2008).

Zielinski & Chi, Custirsen (OGX-011): A Second-Generation Antisense Inhibitor of Clusterin in Development for the Treatment of Prostate Cancer, 8(1) Future Oncol., 1239-1251 (2012).

US 8,927,592 B2

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Novacea, Inc. SEC Form 8-K at 1.02, (2008) [retrieved on Jun. 27, 2014] from: http://www.sec.gov/Archives/edgar/data/1178711/000119312508077953/d8k.htm.

Sanofi-Aventis SEC Form 20-F (Dec. 31, 2006) at 39, [retrieved on Jun. 27, 2014] from: http://www.sec.gov/Archives/edgar/data/1121404/000119312507072848/d20f.htm.

Avastin (bevacizumab), Prescribing Information (Label) Jul. 2009.

Yervoy (ipilimumab), Prescribing Information (Label), Dec. 2013.

A Randomized, Open-Label, Phase 3 Study of Larotaxel IV Every 3 Weeks Versus Capecitabine (Xeloda®) Tablets Twice Daily for 2 Weeks in 3-Week Cycles in Patients with Metastatic Breast Cancer (MBC) Progressing After Taxanes and Anthracycline Therapy (EFC6089) (2012), [retrieved on Jun. 27, 2014] from: http://en.sanofi.com/img/content/study/EFC6089__summary.pdf.

Bristol-Myers Squibb Reports Results for Phase 3 Trial of Yervoy® (Ipilimumab) in Previously-Treated Castration Resistant Prostate Cancer, Press Release Sep. 12, 2013 [retrieved on Jun. 27, 2014] from: http://news.bms.com/press-release/rd-news/bristol-myers-squibb-reports-results-phase-3-trial-yervoy/ipilimumab-previousl.

Clinical Trials.gov, Satraplatin in Hormone Refractory Prostate Cancer Patients Previously Treated with one Cytotoxic Chemotherapy Regimen [retrieved on Jun. 27, 2014] from: https://clinicaltrials.gov/ct2/show/NCT00069745?term=SPARC&cond=prostate&rank=3.

Clinical Trials.gov, Larotaxel every 3 weeks vs. capecitabine in patients with metastatic breast cancer progressing after taxanes and anthracycline therapy [retrieved on Jun. 24, 2014] from: https://clinicaltrials.gov/ct2/show/NCT00081796?term=larotaxel&rank=7.

Clinical Trials.gov, Larotaxel plus cisplatin vs. gemcitabine plus cisplatin in first line treatment of patients with locally advanced/metastatic bladder cancer [retrieved on Jun. 24, 2014] from: https://clinicaltrials.gov/ct2/show/NCT00625664?term=larotaxel&rank=4.

Clinical Trials.gov, Larotaxel vs. 5-FU or capecitabine in patients with pancreatic cancer previously treated with gemcitabine [retrieved on Jun. 24, 2014] from: https://clinicaltrials.gov/ct2/show/NCT00417209? term=larotaxel&rank=2.

Press Release: OncoGenex Announces Top-Line Survival results of Phase 3 Synergy Trial Evaluating Custirsen for Metastatic Castration-Resistant Prostate Cancer, PRNewswire Apr. 28, 2014.

Press Release: Roche Provides Update on Phase III study of Avastin in Men with Late Stage Prostate Cancer, Media Release Mar. 12, 2010 [retrieved on Jun. 27, 2014] from: http://www.roche.com/media/media_releases/med-cor-2010-03-12.htm.

Press Release: Takeda Announces Termination of Orteronel (TAK-700) Development for Prostate Cancer in Japan, U.S.A. and Europe, Jun. 19, 2014 [retrieved on Jun. 27, 2014] from: http://www.takeda.com/news/2014/20140619__6615.html.

Jevtana NDA Clinical Overview, excerpt, (2014), pp 2-13.

Cisternino, et al., Nonlinear Accumulation in the Brain of the New Taxoid TXD258 Following Saturation of P-Glycoprotein at the Blood-Brain Barrier in Mice and Rats, British Journal of Pharmacology, (2003), vol. 138, pp. 1367-1375.

Pivot, et al., Multicenter Phase 2 Study of XRP6258 in Taxane-Resistant Metastatic Breast Cancer (MBC) Patients (pts). Breast Cancer Research and Treatment, (2005), vol. 94, No. Suppl. 1, p. S68, Abst. 1084.

Attard, et al., Update on Tubulin-Binding Agents, Pathologic Biologie, vol. 54, (2006), pp. 72-84.

Beardsley, et al., Systemic Therapy After First-Line Docetaxel in Metastic Castration-Resistant Prostate Cancer, Current Opinion in Supportive and Palliative Care, (2008), vol. 2, No. 3, pp. 161-166.

Pivot, et al., A Multicenter Phase II Study of XRP6258 Administered as a 1-h i.v. Infusion Every 3 Weeks in Taxane-Resistant Metastatic Breast Cancer Patients, Annals of Oncology, vol. 19, No. 9, pp. 1547-1552, (2008).

The National Horizon Scanning Centre of National Institute for Health Research, Cabazitaxel (XRP-6258) for Hormone Refractory, Metastatic Prostate Cancer—Second Line After Docetaxel, University of Birmingham, pp. 1-6, (2009).

Sanofi-Aventis Press Release: 2006: In a Difficult Environment, Another Year of Growth in Adjusted EPS Excluding Selected Items, (Feb. 13, 2007), pp. 1-31.

Buonerba, et al., Docetaxel Rechallenge in Castration-Resistant Prostate Cancer: Scientific Legitimacy of Common Clinical Practice, European Urology, (2010), vol. 58, No. 4, pp. 636-637.

Di Lorenzo, et al., Castration-Resistant Prostate Cancer: Current and Emerging Treatment Strategies, Drugs, (2010), vol. 70, No. 8, pp. 983-1000.

Yoo, et al., XRP6258—Induced Gene Expression Patterns in Head and Neck Cancer Carcinoma, Laryngoscope, (2010), vol. 120, No. 6, pp. 1114-1119.

Shabafrouz, et al., New Drugs at the Horizon for Men With Prostate Cancer, Revue Medicale Suisse, (2010), vol. 6, No. 250, pp. 1057-1058 & 1060-1061.

Dorff, Cabazitaxel in Prostate Cancer: Stretching a String, Lancet, (2010), vol. 376, No. 9747, pp. 1119-1120.

Bouchet, et al., Cabazitaxel, a New Taxane With Flavorable Properties, Drugs of Today, (2010), vol. 46, No. 10, pp. 735-742.

Pal, et al., Critical Appraisel of Cabazitaxel in the Management of Advanced Prostate Cancer, Clinical Interventions in Aging, (2010), vol. 5, pp. 395-402.

Sartor, et al., Improving Outcomes With Recent Advances in Chemotherapy for Castrate-Resistant Prostate Cancer, Clinical Genitourinary Cancer, (2010), vol. 8, No. 1, pp. 23-28.

Pouessel, et al., Actualities in Prostate Cancer in ASCO Annual Meeting 2010, Bulletin du Cancer. (2010), vol. 97, No. 12, pp. 1563-1572.

Richards, Improved Survival in Second-Line Advanced Prostate Cancer Treated With Cabazitaxel, Nature Reviews Clinical Oncology, (2010), vol. 7, No. 12, p. 671.

De Bono, et al., Cabazitaxel or Mitoxantrone With Prednisone in Patients With Metastatic Castration-Resistant Prostate Cancer (mCRPC) Previously Treated With Docetaxel: Final Results of a Multinational Phase III Trial (TROPIC), 46th Annu Meet Am Soc Clin Oncol (ASCO), J. Clin. Oncology, (2010) 28:15S (Suppl), Abst 4508.

Denis, et al., Phase I and Pharmacokinetic Study of RPR116258A, A Novel Taxane Derivative, Administered Intravenously over 1 hour every 3 weeks, Clinical Cancer Research, vol. 6, (2000), (Supplement), Abstract 568, p. 4579s.

Lortholary, et al., Phase I and Pharmacokinetics (PK) Study of RPR 116258A Given as 1-hour Infusion in Patients (pts) With Advanced Solid Tumors, Clinical Cancer Research, vol. 6, (2000), (Supplement), Abstract 569, pp. 4579s-4580s.

Oudard, et al., Cabazitaxel Plus Prednisone/Prednisolone Significantly Increases Overall Survival Compared to Mitoxantrone Plus Prednisone/Prednisolone in Patients With Metastatic Castration-Resistant Prostate Cancer (MCRPC) Previously Treated With Docetaxel: Final Results With Updated Overall Survival of a Multinational Phase III Trial (TROPIC), Ann. of Oncology, vol. 21, (Suppl. 8), p. viii272, (2010), Abstract 871PD.

Kris, et al., Clinical Cancer Advances 2010: Annual Report on Progress Against Cancer From the American Society of Clinical Oncology, J Clin Oncology, (2010), vol. 28, No. 36, pp. 5327-5347, 947.

Drug Data Report, Antimitotic Drugs, (2003), vol. 25, No. 6, p. 550, (2003).

Drug Data Report, Cabazitaxel, (2010). vol. 32, No. 10, pp. 999-1017 at p. 1012.

Sanofi-Aventis Press Release: Resilient Sales and Business EPS in Q3 2010, (Oct. 28, 2010), pp. 1-24.

Sanofi-Aventis Press Release: EPS Growth in Q2 2010, (Jul. 29, 2010), pp. 1-27.

ClinicalTrials.gov, Safety and Pharmacokintic Study of Cabazitaxel in Patients With Advanced Solid Tumors and Liver Impairment, Web site, (2010), pp. 1-7 [retrieved on Jan. 6, 2014].

Sanofi-Aventis Press Release: Q1 2010: A Good First Quarter, (Apr. 29, 2010), pp. 1-19.

**US 8,927,592 B2**

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

ClinicalTrials.gov, Effect of Cabazitaxel on the QTc Interval in Cancer Patients (QT-Cab), Web site, (2010) Mar. 24, pp. 1-7 [retrieved on Jan. 6, 2014].
Sanofi-Aventis Press Release: Sanofi-Aventis Delivers Double-Digit EPS Growth in 2009 as the Transformation Program Progresses, (Feb. 10, 2010), pp. 1-26.
ClinicalTrials.gov, A Study to Evaluate the Effects of Combining Cabazitaxel With Cisplatin Given Every 3 Weeks in Patients With Advanced Solid Cancer, Web Site, (Jul. 22, 2009), pp. 1-7 [retrieved on Jan. 6, 2014].
Sanofi-Aventis Press Release: Sanofi-Aventis Delivers 2008 Results Above Guidance, (2009), Feb. 11, pp. 1-27.
Numata, et al., The Preliminary Results of Docetaxel-Prednisolone Combination Therapy for the Japanese Pateients With Hormone-Refractory Prostate Cancer, Acta Urol. Jpn., vol. 53, pp. 93-97, (2007).
Miura, et al., A Case of Hormone-Refractory Prostate Cancer (HRPC) With Tumor Fever Responding to Docetaxel Plus Prednisolone Therapy, Jpn J Cancer Chemother, vol. 33, No. 6, pp. 841-844, (2006).
Shimazui, et al., Three-Weekly Docetaxel With Prednisone is Feasible for Japanese Patients With Hormone-Refractory Prostate Cancer: A Retrospective Comparative Study With Weekly Docetaxel Alone, Jpn J Clin Oncol, (2007), vol. 37, No. 8, pp. 603-808.
Kola, et al., Can the Pharmaceutical Industry Reduce Attrition Rates?, Nature Reviews Drug Discovery, vol. 3, (2004), pp. 711-715.
Dimasi, et al., Trends in Risks Associated With New Drug Development: Success Rates for Investigational Drugs, Nature, vol. 87, No. 3, pp. 272-277, (2010).
Bertold, et al., Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer: Updated Survival in the TAX 327 Study, Journal of Clinical Oncology, vol. 26, No. 2, (2008) pp. 242-245.

Merck Index 14th 2006, No. 190, p. 36, Agomelatine.
Tan, Novel Agents in the Treatment of Hormone-Independent Metastatic Prostate Cancer, Actas Urol Esp., (2007), vol. 31, No. 6, pp. 660-685 (followed by non-verified English translation).
El Docetaxel Asociado a la Prednisona Mejora et Cancer de Prostate, [Retrieved from the internet on Oct. 26, 2012] Retrieved from http://www.rnedicinageriatrica.com.ar/viewnews.php?id=EEpVVFZVppsBCjOavj.
Dres, et al., Treatment alternatives for advanced prostate cancer, [Retrieved from the internet on Jul. 29, 2014] Retrieved from http://www.intramed.net/contenidover.asp?contenidoID=37957 (followed by non-verified English translation).
Taxotere (Docetaxel) Mejora Significativamente la Supervivencia de los Pacientes con Cancer de Prostate Avanzado, PMFARMA Espana, (2007).
Docetexel Reduce el Riesgo de Muerte en Pacientes con Cancer de Prostate Metastatico Androgeno Independiente, [Retrieved from the internet on Jul. 29, 2014]. Retrieved from http://www.intramed.net/contenidover.asp?contenidoID=31823 (followed by non-verified English translation).
Cancer de Prostata Diseminado, Quimioterapia. [Retrieved from the internet on Jul. 29, 2014]. Retrieved from http://www.guiasalud.es/egpc/cancer_prostata/resumida/apartado06/otros02.html, pp. 1-9.
Revision Sistematica y Modelo Economico de Efectividad Clinica y Coste-Efectividad de Docetaxel en Combinacion con Prednisona/Prednisolona para el Tratamiento de Cancer de Prostata Metastasico Refractario a Hormonas, [Retrieved from the internet on Jul. 29, 2014].          Retrieved          from          http://www.sefh.es/sefnboletin/vernoticiaboletin.php?id=2663.
Figg et al., Cabazitaxel Filling One of the Gaps in the Treatment of prostate Cancer. Cancer Biology & Therapy, vol. 10. No. 12, pp. 1233-1234, (2010).
Mirtsching, Prostate Cancer Clinical Trials in Dallas; Texas Area. [Retrieved from the Internet on Aug. 19, 2014]. Retrieved from http://www.healthcentral.com/prostate/c/5618/14589/dallas-texas-area, pp. 3-4.

* cited by examiner

**U.S. Patent**          Jan. 6, 2015          Sheet 1 of 7          US 8,927,592 B2



**FIG. 1**



**FIG. 2**

| Factor | Patient number | Hazard ratio (95% CI) |
|---|---|---|
| All randomized patients | 755 | 0.70 (0.59–0.83) |
| ECOG status: 0,1 | 694 | 0.68 (0.57–0.82) |
| ECOG status: 2 | 61 | 0.81 (0.48–1.38) |
| Measurable disease: No | 350 | 0.72 (0.55–0.93) |
| Measurable disease: Yes | 405 | 0.68 (0.54–0.85) |
| No. of prior chemotherapies: 1 | 528 | 0.67 (0.55–0.83) |
| No. of prior chemotherapies: ≥2 | 227 | 0.75 (0.55–1.02) |
| Age: <65 years | 295 | 0.81 (0.61–1.08) |
| Age: ≥65 years | 460 | 0.62 (0.50–0.78) |
| Rising PSA at baseline: No | 159 | 0.88 (0.61–1.26) |
| Rising PSA at baseline: Yes | 583 | 0.65 (0.53–0.80) |
| Total docetaxel dose: <225 mg/m$^2$ | 59 | 0.96 (0.49–1.86) |
| Total docetaxel dose: ≥225 to 450 mg/m$^2$ | 206 | 0.60 (0.43–0.84) |
| Total docetaxel dose: ≥450 to 675 mg/m$^2$ | 217 | 0.83 (0.60–1.16) |
| Total docetaxel dose: ≥675 to 900 mg/m$^2$ | 131 | 0.73 (0.48–1.10) |
| Total docetaxel dose: ≥900 mg/m$^2$ | 134 | 0.53 (0.47–0.90) |
| Progression during docetaxel treatment | 219 | 0.68 (0.57–0.82) |
| Progression <3 months after docetaxel | 339 | 0.70 (0.55–0.91) |
| Progression ≥3 months after docetaxel | 192 | 0.75 (0.51–1.11) |

◄■ Favors Cabazitaxel | Favors Mitoxantrone ■►

Hazard ratio and 95% confidence interval

**FIG. 3**



**FIG. 4**



**FIG. 5**



**FIG. 6**



**FIG. 7**

US 8,927,592 B2

1

## ANTITUMORAL USE OF CABAZITAXEL

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of International Application No. PCT/IB2010/054866, filed Oct. 27, 2010, which claims the benefit of priority of U.S. Provisional Application No. 61/256,160, filed Oct. 29, 2009, U.S. Provisional Application No. 61/293,903, filed Jan. 11, 2010, U.S. Provisional Application No. 61/355,834, filed Jun. 17, 2010, U.S. Provisional Application No. 61/355,888, filed Jun. 17, 2010, U.S. Provisional Application No. 61/369,929, filed Aug. 2, 2010, U.S. Provisional Application No. 61/383,933, filed Sep. 17, 2010, and U.S. Provisional Application No. 61/389,969, filed Oct. 5, 2010, all of which are incorporated herein by reference.

The present invention relates to a novel antitumoral use of cabazitaxel in the treatment of prostate cancer, which may be metastatic, especially for patients who are not catered for by a taxane-based treatment. In particular, the present invention relates to the use of cabazitaxel in the treatment of patients with castration resistant metastatic prostate cancer, who have been previously treated with a docetaxel based regimen, an unmet medical need.

### BACKGROUND

Prostate cancer affects a large proportion of the male population worldwide: 680 000 cases worldwide in 2002; it is predicted that there will be 900 000 new cases per year up to 2010 (*CA Cancer J. Clin.,* 2005, 55, 74-108). It is the most frequently occurring cancer in men after lung cancer.

Prostate cancer is generally treated at the start by depriving the androgenic hormones, i.e. by surgical excision of the testicles The Current State of Hormonal Therapy for Prostate Cancer J. Clin., May 2002; 52: 154-179, or by radiotherapy treatment External beam radiation therapy for prostate cancer CA Cancer J. Clin., November 2000; 50: 349-375. Treatments with antiandrogens or hormone manipulations are associated with responses of short duration and without any improvement in the survival time.

The use of cytotoxic chemotherapy is not a routine treatment, whereas its role in alleviating the symptoms and reducing the levels of PSA (prostate-specific antigen) is established. No monotherapy has obtained a degree of response of greater than 30%; combinations with an effect on PSA levels were tested. No effect on the survival time was seen and, what is more, the toxicity of these treatments, particularly on elderly patients, is problematic since, in addition to their tumour, they are generally suffering from related health problems and have a limited reserve of bone marrow.

Until now, the chemotherapies were limited to cyclophosphamide, anthracyclines (doxorubicin or mitoxantrone) and estramustine, and the effects of these treatments are relatively mediocre. Palliative effects were observed in patients following the administration of corticoids alone or of mitoxantrone with either prednisone or hydrocortisone. Following Phase II trials, the combination of mitoxantrone with corticoids was recognized as the reference treatment for hormone-resistant prostate cancer. More recently, treatments with docetaxel in combination with estramustine or prednisone have made it possible to treat cancers that are resistant to hormone deprivation Advances in Prostate Cancer Chemotherapy: A New Era Begins CA Cancer J. Clin., September 2005; 55: 300-318, the survival was improved by 2.4 months.

2

It is generally accepted that the responses in advanced prostate cancers are difficult to evaluate on account of the heterogeneity of the disease and the lack of consensus regarding the treatment response criteria. Many patients with metastatic prostate cancer have no measurable disease, but have symptoms dominated by bone metastases. Measurement of the PSA level has been found to be a means for evaluating novel candidates and also the measurement of the tumour when this is possible, the measurement of bone tumours, the quality of life and the measurement of the pain.

Furthermore, cancer may become resistant to the agents used, in particular to taxanes, which limits the possible treatment options. Several taxane resistance mechanisms have been described (expression of P-glycoprotein P-gp, mdr-1 gene, modified metabolism of taxane, mutation of the tubulin gene, etc.): see *Drug Resistance Updates* 2001, 4(1), 3-8; J. Clin. Onc. 1999, 17(3), 1061-1070.

The technical problem that the invention intends to solve is that of providing a novel therapeutic option for treating prostate cancer, especially for patients who are not catered for by a taxane-based treatment, such as patients with castration resistant metastatic prostate cancer who have been previously treated with docetaxel (sold under the brand name Taxotere®) based regimen, an unmet medical need.

Four clinical trials on cabazitaxel are known since April 2006. Three monotherapy tests have made it possible to determine the maximum tolerated dose and the toxicities at the limit doses: these tests were performed on breast, sarcoma and prostate tumours. Doses of 10-30 mg/m² every three hours were used. A phase II trial was performed on patients with a breast cancer, who had previously received taxanes and anthracyclines as adjuvant (i.e. after a surgery) or as a first-line treatment. The response levels were 14.6% as adjuvant and 9.5% as second-line treatment.

### SUMMARY

The invention relates to a novel antitumoral pharmaceutical therapeutic use comprising cabazitaxel of formula



The invention also relates to methods of treating patients with prostate cancer comprising administering an effective amount of the antitumoral agent cabazitaxel to said patient.

This antitumoral agent may be in the form of anhydrous base, a hydrate or a solvate, intended for treating prostate cancer, in particular for treating patients who are not catered for by a taxane-based treatment, such as patients who have been previously treated with a docetaxel-based regimen. This compound is preferably administered to a patient with advanced metastatic disease. In particular, the compound is

US 8,927,592 B2

3

administered to a patient with castration resistant prostate cancer. Cabazitaxel is preferably administered in combination with a corticoid chosen especially from prednisone and prednisolone. This corticoid is preferably administered at a daily dose of 10 mg orally.

In some aspects of the invention, cabazitaxel is administered in combination with prednisone for its use as a medicament in the treatment of patients with hormone-refractory prostate cancer who have been previously treated with docetaxel based regimen.

In some aspects of the invention, cabazitaxel is administered at a dose (defined for each administration) of between 20 and 25 mg/m². Cabazitaxel may be in the form of an acetone solvate. More particularly, the acetone solvate of cabazitaxel contains between 5% and 8% and preferably between 5% and 7% by weight of acetone.

In some aspects of the invention, cabazitaxel may be administered by intravenous infusion at a dose of between 15 and 25 mg/m², this administration cycle of the antitumour agent being repeated at an interval of 3 weeks between each cabazitaxel administration, which interval may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding cabazitaxel administration.

In some embodiments, the effective amount of cabazitaxel produces at least one therapeutic effect selected from the group consisting of increase in overall survival, partial response, reduction in tumor size, reduction in metastasis, complete remission, partial remission, stable disease, or complete response.

The present invention also relates to a pharmaceutical composition that treats patients with prostate cancer comprising a clinically proven safe and effective amount of cabazitaxel.

Further embodiments of the invention comprise methods or using, treating, promoting, and providing cabazitaxel.

The present invention also relates to packages and articles of manufacture.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 displays the Kaplan-Meier curves of the overall survival in a cabazitaxel study.

FIG. 2 displays the Kaplan-Meier curves of progression-free survival in a cabazitaxel study.

FIG. 3 shows an intention-to-treat analysis of overall survival in subgroups of patients defined by baseline characteristics. Hazard ratios<1 favor the cabazitaxel group, while those >1 favor the mitoxantrone group. CI denotes confidence intervals.

FIG. 4 graphically depicts the proportion of patients with changes in ECOG performance status from baseline during treatment (safety population). The "Improved" column represents PS2 at baseline changed to 0 or 1 during treatment. The "stable" column represents no change, and the "Worse" column represents PS2 at baseline and changed to ≥3, or 0 or 1 at baseline changed to ≥2 during treatment.

FIG. 5 graphically depicts the proportion of patients with changes from baseline in the Present Pain Intensity score during treatment (ITT). The "Improved" column represents patients in which the PPI score during treatment was lower versus baseline. The "Stable" column represents no change, and the "Worse" column represents patients with >1 unit increase in PPI score during treatment versus baseline.

FIG. 6 graphically presents the mean area under the curve for PPI and analgesic scores by treatment cycle.

FIG. 7 graphically presents the mean AUC analgesic score.

DETAILED DESCRIPTION

Definitions

Effective amount, as used herein, means an amount of a pharmaceutical compound, such as cabazitaxel, that produces an effect on the cancer to be treated.

4

Clinically proven, as used herein, means clinical efficacy results that are sufficient to meet FDA approval standards.

Castration resistant prostate cancer, as used herein, is synonymous with hormone-refractory prostate cancer.

"Patient," as used herein, includes both human and animals. In one embodiment, a patient is a human.

Cabazitaxel belongs to the taxoid family and has the formula:



The chemical name of cabazitaxel is 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonyl-amino-2-hydroxy-3-phenylpropionate. Cabazitaxel is synonymously known as (2α,5β,7β,10β,13α)-4-acetoxy-13-({(2R,3S)-3-[(tertbutoxycarbonyl)amino]-2-hydroxy-3-phenylpropanoyl}oxy)-1-hydroxy-7,10-dimethoxy-9-oxo-5,20-epoxytax-11-en-2-yl benzoate.

This compound and a preparative method thereof is described in WO 96/30355, EP 0 817 779 B1 and U.S. Pat. No. 5,847,170, which are hereby incorporated herein by reference.

Cabazitaxel may be administered in base form (cf. above formula), or in the form of a hydrate. It may also be a solvate, i.e. a molecular complex characterized by the incorporation of the crystallization solvent into the crystal of the molecule of the active principle (see in this respect page 1276 of J. Pharm. Sci. 1975, 64(8), 1269-1288). In particular, it may be an acetone solvate, and, more particularly, may be the solvate described in WO 2005/028462. It may be an acetone solvate of cabazitaxel containing between 5% and 8% and preferably between 5% and 7% by weight of acetone (% means content of acetone/content of acetone+cabazitaxel×100). An average value of the acetone content is 7%, which approximately represents the acetone stoichiometry, which is 6.5% for a solvate containing one molecule of acetone. The procedure described below allows the preparation of an acetone solvate of cabazitaxel:

940 ml of purified water are added at 20±5° C. (room temperature) to a solution of 207 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate at about 92% by weight in about 2 liters of acetone, followed by seeding with a suspension of 2 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate isolated from acetone/water in a mixture of 20 ml of water and 20 ml of acetone. The resulting mixture is stirred for about 10 to 22 hours, and 1.5 liters of purified water

US 8,927,592 B2

5

6

are added over 4 to 5 hours. This mixture is stirred for 60 to 90 minutes, and the suspension is then filtered under reduced pressure. The cake is washed on the filter with a solution prepared from 450 ml of acetone and 550 ml of purified water, and then oven-dried at 55° C. under reduced pressure (0.7 kPa) for 4 hours. 197 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate acetone containing 0.1% water and 7.2% acetone (theoretical amount: 6.5% for a stoichiometric solvate) are obtained.

Cabazitaxel may be administered parenterally, such as via intravenous administration. A galenical form of cabazitaxel suitable for administration by intravenous infusion is that in which the cabazitaxel is dissolved in water in the presence of excipients chosen from surfactants, cosolvents, glucose or sodium chloride, etc. For example, a galenical form of cabazitaxel may be prepared by diluting a premix solution of cabazitaxel contained in a sterile vial (80 mg of cabazitaxel+2 ml of solvent+Polysorbate 80) with a sterile vial containing a solution of 6 ml of water and ethanol (13% by weight of 95% ethanol) in order to obtain 8 ml of a solution ready to be rediluted in a perfusion bag. The concentration of cabazitaxel in this ready-to-redilute solution is about 10 mg/ml. The perfusion is then prepared by injecting the appropriate amount of this ready-to-redilute solution into the perfusion bag containing water and glucose (about 5%) or sodium chloride (about 0.9%).

Cabazitaxel may be administered in combination with a corticoid, such as prednisone or prednisolone, as two distinct pharmaceutical preparations.

Accordingly, one aspect of the invention is a method of treating prostate cancer comprising administering to a patient in need thereof an effective amount of cabazitaxel in combination with a corticoid, such as prednisone or prednisolone.

The combination is administered repeatedly according to a protocol that depends on the patient to be treated (age, weight, treatment history, etc.), which can be determined by a skilled physician. In one aspect of the invention, cabazitaxel is administered by perfusion to the patient according to an intermittent program with an interval between each administration of 3 weeks, which may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding administration. The median number of cycles is 6. The prednisone or prednisolone may be administered daily, for example in the form of one dosage intake per day, throughout the duration of the treatment. Examples of doses for the two antitumoral agents are given in the "Example" section. The currently recommended dose is 25 mg/m² of cabazitaxel administered as a on-hour infusion and 10 mg per day of prednisone or prednisolone administered orally.

In some aspects of the invention, the patient to be treated has prostate cancer that is resistant to hormone therapy (i.e., hormone refractory) and has previously been treated with docetaxel. In some aspects, the patient has prostate cancer that progressed during or after treatment with docetaxel. In some aspects, the patient was previously treated with at least 225 mg/m² cumulative dose of docetaxel. In a particular aspect, the patient showed progression of their disease in the six months following hormone therapy or during docetaxel treatment or after docetaxel treatment. In another particular aspect, the patient showed progression of their disease in the three months following hormone therapy or after docetaxel treatment.

In some aspects of the invention, the patient to be treated has a measurable tumour and may show progression of the disease via a metastatic lesion of the viscera or of a soft tissue of at least 1 cm determined by MRI or by an axial tomographic scan (CT scan).

In some aspects of the invention, the patient to be treated has an unmeasurable tumour and may show an increase in the PSA level with three measurements at a 1-week interval or the appearance of new lesions.

In some aspects of the invention, the patient to be treated has undergone castration by orchidectomy or with LHRH agonists, elimination of the androgens or monotherapy with estramustine.

In a preferred aspect, the life expectancy of the patient to be treated should be at least 2 months.

In some aspects, the treatment does not include patients who have previously received mitoxantrone, or who have received less than 225 mg/m² of docetaxel, or who have undergone a radiotherapy that has eliminated more than 40% of the marrow, who have received a treatment within the 4 weeks preceding the test, who have a neuropathy or a stomatitis, involving the brain or the meninges, who have shown severe hypersensitivity to polysorbate or to prednisone, whose blood analysis shows an appreciable decrease in neutrophils, haemoglobin or platelets, an increase in bilirubin and/or liver enzymes and creatinine, or who have heart problems or an infection requiring antibiotics.

An aspect of the invention comprises increasing the survival of a patient with hormone refractory metastatic prostate cancer, comprising administering a clinically proven effective amount of cabazitaxel to the patient in combination with prednisone or prednisolone. In a particular aspect, the patient has previously been treated with a docetaxel-containing regimen.

Cabazitaxel may be administered in combination with a medication to prevent or control nausea and vomiting or to prevent or control hypersensitivity to the cabazitaxel treatment. Preferably, a patient is pre-medicated with the medication, for example, at least 30 minutes prior to administering each dose of cabazitaxel.

One aspect of the invention comprises a method of reducing the risk of a severe hypersensitivity reaction in a patient with prostate cancer being treated with cabazitaxel, comprising administering to the patient a medication to prevent hypersensitivity prior to the administration of cabazitaxel.

Severe hypersensitivity reactions to cabazitaxel can occur and may include generalized rash/erythema, hypotension and bronchospasm. Patients should be observed closely for hypersensitivity reactions, especially during the first and second infusions. Hypersensitivity reactions may occur within a few minutes following the initiation of the infusion of cabazitaxel, thus facilities and equipment for the treatment of hypotension and bronchospasm should be available. If severe hypersensitivity reaction occurs, cabazitaxel infusion should be immediately discontinued and appropriate therapy should be administered. Examples of medications which may be used to prevent hypersensitivity to the cabazitaxel treatment include antihistamines, such as dexchlorpheniramine (for example 5 mg), and diphenhydramine (for example 25 mg) or equivalent antihistamines; and corticosteroids, such as dexamethasone (for example 8 mg) or an equivalent steroid.

Nevertheless, cabazitaxel should not be given to and may be contraindicated in patients who have a history of severe hypersensitivity reactions to cabazitaxel. Depending on the formulation administered, cabazitaxel may also be contraindicated in patients who have a history of hypersensitivity reactions to other drugs formulated with polysorbate 80.

7

One aspect of the invention comprises an article of manufacture comprising:

a) a packaging material;

b) cabazitaxel, and

c) a label or package insert contained within the packaging material indicating that severe hypersensitivity reactions can occur.

Gastrointestinal symptoms, such as, for example nausea, vomiting, and diarrhea, may occur with the treatment of cabazitaxel. Mortality related to diarrhea and electrolyte imbalance has been reported. Therefore, patients may also be rehydrated and treated with anti-diarrheal or anti-emetic medications as needed. Treatment delay or dosage reduction may be necessary if patients experience Grade≥3 diarrhea.

Accordingly, the methods of the invention include administering a medication to prevent hypersensitivity or a medication to prevent or control nausea and vomiting in combination with cabazitaxel.

Examples of medications which may be used to prevent or control nausea and vomiting include histamine $H_2$ antagonists and antiemetics, such as ondansetron, granisetron and dolesetron.

A possible side effect of the treatment with cabazitaxel is neutropenia, which is characterized by a reduced number of neutrophils. Unfortunately, a number of neutropenia deaths have been reported. Therefore, frequent blood counts should be obtained or performed to monitor for neutropenia. If neutropenia occurs, cabazitaxel treatment may be discontinued, and restarted when neutrophil counts recover to a level of >1,500/mm³. Cabazitaxel should not be given to a patient with a neutrophil counts≤1,500 cells/mm³.

The present invention therefore also relates to a method of treating prostate cancer with cabazitaxel comprising administering cabazitaxel to the patient, monitoring blood counts in the patient, and measuring neutrophil levels. In one aspect, the method further comprises discontinuing cabazitaxel treatment if neutropenia occurs, and optionally restarting cabazitaxel treatment when neutrophil counts recover to a level of >1,500/mm³. In one aspect, the monitoring comprises taking a blood sample from the patient.

Determining neutrophil counts can be performed according to procedures well know to those skilled in the art.

One aspect of the invention is a method of reducing the risk of neutropenia complications comprising administering cabazitaxel in combination with an agent useful for treating neutropenia. Such a neutropenia treatment agent is, for example, a hematopoietic growth factor which regulates the production and function of neutrophils such as a human granulocyte colony stimulating factor, (G-CSF). In a particular aspect of the invention, the neutropenia is complicated neutropenia. Complicated neutropenia includes febrile neutropenia, prolonged neutropenia, or neutropenic infection. In a preferred embodiment, the neutropenia treatment agent is administered prior to the administration of cabazitaxel.

A particular aspect of the invention comprises a method of reducing the risk of neutropenia complications in a patient with prostate cancer being treated with cabazitaxel, comprising monitoring blood counts in the patient at regular intervals during treatment of the patient with cabazitaxel; reducing the dose of cabazitaxel if the patient experiences febrile neutropenia or prolonged neutropenia; discontinuing cabazitaxel treatment if the patient's neutrophil count is ≤1,500 cells/mm³; and optionally restarting cabazitaxel treatment when the patient's neutrophil counts recover to a level≥1,500 cells/mm³.

In a particular aspect, primary prophylaxis with G-CSF should be considered in patients with high-risk clinical fea-

8

tures (age>65 years, poor performance status, previous episodes of febrile neutropenia, extensive prior radiation ports, poor nutritional status, or other serious co-morbidities) that predispose them to increased complications from prolonged neutropenia. Therapeutic use of G-CSF and secondary prophylaxis should be considered in all patients considered to be at increased risk for neutropenia complications.

In another aspect, the monitoring of complete blood counts is performed on a weekly basis during cycle 1 and before each treatment cycle thereafter so that the dose can be adjusted, if needed. Therefore, another aspect for reducing the risk of neutropenia complications comprises, monitoring blood counts in the patient and adjusting the dose of cabazitaxel. An example of a dose modification is described in Example 2.

One aspect of the invention comprises an article of manufacture comprising:

a) a packaging material;

b) cabazitaxel, and

c) a label or package insert contained within the packaging material indicating that cabazitaxel should not be given to patients with neutrophil counts of ≤1,500 cells/mm³.

Cases of renal failure should be identified and managed aggressively, accordingly to procedures known to those skilled in the art. Renal failure may be associated with sepsis, dehydration, or obstructive uropathy. Furthermore, impaired hepatic function (e.g., total bilirubin≥ULN, or AST and/or ALT≥1.5×ULN) may increase cabazitaxel concentrations, and cabazitaxel should not be given to patients with hepatic impairment.

Cabazitaxel may cause fetal harm when administered to a pregnant woman.

Prednisone or prednisolone administered at 10 mg daily does not affect the pharmacokinetics of cabazitaxel.

Cabazitaxel is primarily metabolized through CYP3A. Concomitant administration of strong CYP3A inhibitors (for example, ketoconazole, itraconazole, clarithromycin, atazanavir, indinavir, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin, voriconazole) may increase cabazitaxel concentrations. Therefore co-administration of cabazitaxel with strong CYP3A inhibitors should be avoided. Caution should be exercised with concomitant use of moderate CYP3A inhibitors. One aspect of the invention is a method of treating a patient for prostate cancer comprising determining whether the patient is undergoing treatment with a CYP3A inhibitor, discontinuing treatment with a CYP3A inhibitor, and then administering cabazitaxel to the patient.

Concomitant administration of strong CYP3A inducer (e.g., phenyloin, carbamazepine, rifampin, rifabutin, rifapentin, phenobarbital) may decrease cabazitaxel concentrations. Therefore co-administration of cabazitaxel with strong CYP3A inducers should be avoided. Therefore, one aspect of the invention is a method of treating a patient for prostate cancer comprising determining whether the patient is undergoing treatment with a CYP3A inducer, discontinuing treatment with a CYP3A inducer, and administering cabazitaxel to the patient.

In addition, patients should also refrain from taking St. John's Wort.

In some aspects of the invention, the cabazitaxel is administered in an amount to provide an AUC of about 991 ng·h/mL (CV 34%).

In some aspects of the invention, the cabazitaxel is administered in an amount to provide an $C_{max}$ of about 226 ng·h/mL (CV 107%).

In some aspects of the invention, the cabazitaxel is administered in an amount to provide a plasma clearance of 48.5 L/h (CV 39%).

9

10

One aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that the mean $C_{max}$ of cabazitaxel in patients with metastatic prostate cancer was 226 ng/mL (CV 107%).

Another aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that the mean AUC of cabazitaxel in patients with metastatic prostate cancer was 991 ng·h/mL (CV 34%).

Another aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that cabazitaxel has a plasma clearance of 48.5 L/h (CV 39%).

A variety of educational materials may be employed to ensure proper prescribing, dispensing, and patient compliance according to the methods described herein. For example, a variety of literature and other materials, such as, for example, prescribing information, package inserts, medications guides, physician information sheets, healthcare professional information sheets, medical journal advertisements, and product websites may describe the risks and benefits of taking cabazitaxel.

The invention also concerns a package comprising cabazitaxel and a label, said label comprising one or more messages that:

a) the efficacy and safety of cabazitaxel in combination with prednisone were evaluated in patients with hormone refractory metastatic prostate cancer previously treated with a docetaxel containing regimen; or

b) a total of 755 patients were randomized to receive either cabazitaxel 25 mg/m³ every 3 weeks for a maximum of 10 cycles with prednisone mg orally daily, or to receive mitoxantrone 12 mg/m² intravenously every 3 weeks for a maximum of 10 cycles with prednisone 10 mg orally daily; or

c) the median number of cycles was 6 in the cabazitaxel group and 4 in the mitoxantrone group.

The invention also concerns a package comprising cabazitaxel and a label, said label comprising one or more messages that:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are ≤1,500 cells/mm³.

The invention also concerns a method of promoting the use of cabazitaxel the method comprising the step of conveying to a recipient at least one message selected from:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are ≤1,500 cells/mm³;

d) severe hypersensitivity can occur; or

e) severe hypersensitivity can occur and may include generalized rash/erythema, hypotension and brochospasm; or

f) discontinue cabazitaxel immediately if severe reactions occur; or

g) discontinue cabazitaxel immediately if severe reactions occur and administer appropriate therapy; or

h) cabazitaxel is contraindicated in patients with a history of severe hypersensitivity reactions to cabazitaxel or drugs formulated with polysorbate 80.

The invention also concerns a method of providing cabazitaxel, wherein said cabazitaxel is provided along with information indicating that:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are ≤1,500 cells/mm³;

d) severe hypersensitivity can occur; or

e) severe hypersensitivity can occur and may include generalized rash/erythema, hypotension and brochospasm; or

f) discontinue cabazitaxel immediately if severe reactions occur; or

g) discontinue cabazitaxel immediately if severe reactions occur and administer appropriate therapy; or

h) cabazitaxel is contraindicated in patients with a history of severe hypersensitivity reactions to cabazitaxel or drugs formulated with polysorbate 80.

Example 1

A clinical study was performed wherein patients received either treatment with cabazitaxel or the reference treatment based on mitoxantrone each combined with prednisone or prednisolone.

More specifically, patients over 18 years of age with metastatic castration resistant metastatic prostate cancer either measurable by RECIST criteria or non-measurable disease with rising PSA levels or appearance of new lesions, ECOG (Eastern Cooperative Oncology Group) performance stage 0-2, and adequate organ function (patients had to have neutrophils>1,500 cells/mm³, platelets>100,000 cells/mm³, hemoglobin>10 g/dL, creatinine<1.5× upper limit of normal (ULN), total bilirubin<1×ULN, AST<1.5×ULN, and ALT<1.5×ULN) who had had prior hormone therapy, chemotherapy, and radiotherapy, but had progressive during or after docetaxel treatment (cumulative dose≥225 mg/m²) were randomized to 10 mg/day of prednisone with either mitoxantrone 12 mg/m² or cabazitaxel 25 mg/m², both administered every 3 weeks.

Patients with a history of congestive heart failure, or myocardial infarction within the last 6 months, or patients with uncontrolled cardiac arrhythmias, angina pectoris, and/or hypertension were not included in the study.

720 patients were planned to be included in the clinical study: 360 in each cabazitaxel+prednisone and mitoxantrone+prednisone group. Seven hundred and fifty-five patients (755) (median age 68; 84% white) were actually enrolled, 378 in the cabazitaxel and prednisone/prednisolone group and 377 in the mitoxantrone and prednisone/prednisolone group. The maximal number of treatment cycles was 10 for cabazitaxel and 10 for mitoxantrone. The median number of treatment cycles was 6 for cabazitaxel and 4 for mitoxantrone. The median prior dose of docetaxel treatment was 576 mg/m² for the cabazitaxel group and 529 mg/m² for the mitoxantrone group. Median follow-up was 12.8 months.

The measurements of the results are performed via the same tests as at inclusion. MRI and spiral computed tomographic (CT) scans are preferably used.

US 8,927,592 B2

| 11 | 12 |

The results are evaluated according to the following criteria (cf RECIST guideline):

overall survival (OS): the time from inclusion to the study to the date of death

complete response (CR): disappearance of the lesions

partial response (PR): at least 30% reduction of the largest diameter of the lesion

progression (PD): at least 20% increase in the sum of the largest diameter of the lesion or appearance of one or more new lesions

stable disease (SD): reduction of the tumour insufficient to be included in PR and increase of the tumour insufficient to be included in PD.

The confirmations of the measurements are made at least 4 weeks after the response criterion has been established for the first time.

The progression-free survival (PFS) is the time from inclusion in the study and the date of progression or death when the progression is either an increase of the PSA, or of the tumour, or of the pain.

It was found that the combination of cabazitaxel and prednisone is a well-tolerated combination with the safety profile of taxanes. At the dose investigated in this trial (LD2: 25 mg/m$^2$ cabazitaxel+10 mg/m$^2$/day prednisone), patients receiving cabazitaxel demonstrated statistically significant longer overall survival (OS) compared to mitoxantrone (p<0.0001). The hazard ratio was 0.70 (95% CI. 0.59, 0.83) in favor of cabazitaxel corresponding to a 30% reduction in risk of death. The median survival for patients in the cabazitaxel group was 15.1 months in comparison to 12.7 months in the mitoxantrone group. Notably, the extension of survival was observed irrespective of ECOG performance status, number of prior chemotherapy regimens and age. Benefit was also seen in the third of patients who were docetaxel-refractory and had progressed during docetaxel therapy.

The data related to the treated patients are given in Table 1:

TABLE 1

| Efficacy analysis (intention-to-treat) | | | |
|---|---|---|---|
| | | CbzP N = 378 Median (months) | MP N = 377 Median (months) |
| Overall survival | Median (months) | 15.1 | 12.7 |
| | Hazard ratio (95% CI) | 0.70 (0.59; 0.83) | |
| | p-value[1] | 0.0001 | |
| PFS | Median (months) | 2.8 | 1.4 |
| | Hazard ratio (95% CI) | 0.74 (0.64-0.86) | |
| | p-value[1] | 0.0001 | |
| Tumor response rate | | 14.4% | 4.4% |
| p-value[2] | | 0.0005 | |
| Time to Tumor (months) | Progression Median | 8.8 | 5.4 |
| | p-value | <0.001 | |
| PSA Response rate | | 39.2% | 17.8% |
| p-value[2] | | 0.0002 | |
| PSA PFS | Median (months) | 6.4 | 3.1 |
| | Hazard ratio (95% CI) | 0.75 (0.63-0.90) | |
| | p-value[1] | 0.0010 | |
| Pain Response rate | | 9.2% | 7.8% |
| p-value[2] | | 0.6526 | |

TABLE 1-continued

| Efficacy analysis (intention-to-treat) | | | |
|---|---|---|---|
| | | CbzP N = 378 Median (months) | MP N = 377 Median (months) |
| Pain PFS | Median (months) | Not reached | 11.1 |
| | Hazard ratio (95% CI) | 0.91 (0.69-1.19) | |
| | p-value[1] | 0.5192 | |

[1]Log-rank test,
[2]Chi-square test
CbzP: cabazitaxel with prednisone
MP: mitoxantrone with prednisone

Progression free survival (PFS) defined as the earliest progression in tumor, PSA or pain was also statistically significantly longer in the cabazitaxel group compared to the mitoxantrone group (p<0.0001, hazard ratio=0.74 (95% CI, 0.64, 0.86), and the median progression-free survival was 2.8 months versus 1.4 months. Response rates and PFS for PSA and tumor assessments were statistically significant in favor of cabazitaxel, while response rate and PFS for pain did not show a statistically significant difference.

The most frequent Grade 3/4 toxicities were neutropenia observed with a higher frequency in the cabazitaxel group with 81.7% compared to the mitoxantrone group with 58.0%. Rates of febrile neutropenia were 7.5% in the cabazitaxel group and 1.3% in the mitoxantrone group.

The most common (≥20%) grade 1-4 adverse reactions were anemia, leukopenia, neutropenia, thrombocytopenia, diarrhea, fatigue, nausea, vomiting, asthenia, and constipation.

The most common (≥5%) grade 3-4 adverse reactions in patients who received cabazitaxel were neutropenia, leukopenia, anemia, febrile neutropenia, diarrhea, fatigue, and asthenia.

Subgroup analyses by risk factors and a multivariate analysis showed that OS outcomes were consistent and robust in favor of cabazitaxel as shown in the herebelow table:

TABLE 2

| | MP | | CbzP | | |
|---|---|---|---|---|---|
| | N (%) | Median OS (mos) | N (%) | Median OS (mos) | CbzP vs MP HR (95% CI) |
| ITT | 377 (100) | 12.7 | 378 (100) | 15.1 | 0.70 (0.59-0.83) |
| PD while on D | 103 (27) | 12.0 | 113 (30) | 14.2 | 0.65 (0.47-0.90) |
| PD after last D dose, ≤3 mos | 180 (48) | 10.3 | 158 (42) | 13.9 | 0.70 (0.54-0.90) |
| PD after last D dose, >3 mos | 91 (24) | 17.7 | 103 (27) | 17.5 | 0.78 (0.53-1.14) |

mos = months
D = Docetaxel

US 8,927,592 B2

13 | 14

TABLE 3

Incidence of Reported Adverse Reactions[1] and Hematologic Abnormalities in ≥5% of Patients Receiving cabazitaxel in Combination with Prednisone or Mitoxantrone in Combination with Prednisone

| | Cabazitaxel 25 mg/m$^2$ every 3 weeks with prednisone 10 mg daily n = 371 | | Mitoxantrone 12 mg/m$^2$ every 3 weeks with prednisone 10 mg daily n = 371 | |
|---|---|---|---|---|
| | Grade 1-4 n (%) | Grade 3-4 n (%) | Grade 1-4 n (%) | Grade 3-4 n (%) |
| Any Adverse Reaction | | | | |
| Blood and Lymphatic System Disorders | | | | |
| Neutropenia[2] | 347 (94%) | 303 (82%) | 325 (87%) | 215 (58%) |
| Febrile Neutropenia | 27 (7%) | 27 (7%) | 5 (1%) | 5 (1%) |
| Anemia[2] | 361 (98%) | 39 (11%) | 302 (82%) | 18 (5%) |
| Leukopenia[2] | 355 (96%) | 253 (69%) | 343 (93%) | 157 (42%) |
| Thrombocytopenia[2] | 176 (48%) | 15 (4%) | 160 (43%) | 6 (2%) |
| Cardiac Disorders | | | | |
| Arrhythmia[3] | 18 (5%) | 4 (1%) | 6 (2%) | 1 (<1%) |
| Gastrointestinal Disorders | | | | |
| Diarrhea | 173 (47%) | 23 (6%) | 39 (11%) | 1 (<1%) |
| Nausea | 127 (34%) | 7 (2%) | 85 (23%) | 1 (<1%) |
| Vomiting | 83 (22%) | 6 (2%) | 38 (10%) | 0 |
| Constipation | 76 (20%) | 4 (1%) | 57 (15%) | 2 (<1%) |
| Abdominal Pain[4] | 64 (17%) | 7 (2%) | 23 (6%) | 0 |
| Dyspepsia[5] | 36 (10%) | 0 | 9 (2%) | 0 |
| General Disorders and Administration Site Conditions | | | | |
| Fatigue | 136 (37%) | 18 (5%) | 102 (27%) | 11 (3%) |
| Asthenia | 76 (20%) | 17 (5%) | 46 (12%) | 9 (2%) |
| Pyrexia | 45 (12%) | 4 (1%) | 23 (6%) | 1 (<1%) |
| Peripheral Edema | 34 (9%) | 2 (<1%) | 34 (9%) | 2 (<1%) |
| Mucosal Inflammation | 22 (6%) | 1 (<1%) | 10 (3%) | 1 (<1%) |
| Pain | 20 (5%) | 4 (1%) | 18 (5%) | 7 (2%) |
| Infections and Infestations | | | | |
| Urinary Tract Infection[6] | 29 (8%) | 6 (2%) | 12 (3%) | 4 (1%) |
| Pneumonia[7] | 12 (3%) | 9 (2%) | 4 (1%) | 3 (<1%) |
| Investigations | | | | |
| Weight Decreased | 32 (9%) | 0 | 28 (8%) | 1 (<1%) |
| Metabolism and Nutrition Disorders | | | | |
| Anorexia | 59 (16%) | 3 (<1%) | 39 (11%) | 3 (<1%) |
| Dehydration | 18 (5%) | 8 (2%) | 10 (3%) | 3 (<1%) |
| Musculoskeletal and Connective Tissue Disorders | | | | |
| Back Pain | 60 (16%) | 14 (4%) | 45 (12%) | 11 (3%) |
| Arthralgia | 39 (11%) | 4 (1%) | 31 (8%) | 4 (1%) |
| Pain in Extremity | 30 (8%) | 6 (2%) | 27 (7%) | 4 (1%) |
| Muscle Spasms | 27 (7%) | 0 | 10 (3%) | 0 |
| Bone Pain | 19 (5%) | 3 (<1%) | 19 (5%) | 9 (2%) |
| Musculoskeletal Pain | 18 (5%) | 2 (<1%) | 20 (5%) | 3 (<1%) |
| Nervous System Disorders | | | | |
| Peripheral Neuropathy[8] | 50 (13%) | 3 (<1%) | 12 (3.2%) | 3 (<1%) |
| Dysgeusia | 41 (11%) | 0 | 15 (4%) | 0 |
| Dizziness | 30 (8%) | 0 | 21 (6%) | 2 (<1%) |
| Headache | 28 (8%) | 0 | 19 (5%) | 0 |
| Renal and Urinary Tract Disorders | | | | |
| Hematuria | 62 (17%) | 7 (2%) | 13 (4%) | 1 (<1%) |
| Dysuria | 25 (7%) | 0 | 5 (1%) | 0 |
| Respiratory, Thoracic and Mediastinal Disorders | | | | |
| Dyspnea | 43 (12%) | 4 (1%) | 16 (4%) | 2 (<1%) |
| Cough | 40 (11%) | 0 | 22 (6%) | 0 |
| Skin and Subcutaneous Tissue Disorders | | | | |
| Alopecia | 37 (10%) | 0 | 18 (5%) | 0 |

US 8,927,592 B2

15

16

**TABLE 3-continued**

Incidence of Reported Adverse Reactions[1] and Hematologic Abnormalities in ≥5% of Patients Receiving cabazitaxel in Combination with Prednisone or Mitoxantrone in Combination with Prednisone

| | Cabazitaxel 25 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | | Mitoxantrone 12 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | |
|---|---|---|---|---|
| | Grade 1-4 n (%) | Grade 3-4 n (%) | Grade 1-4 n (%) | Grade 3-4 n (%) |
| Vascular Disorders | | | | |
| Hypotension | 20 (5%) | 2 (<1%) | 9 (2%) | 1 (<1%) |
| Median Duration of Treatment | 6 cycles | | 4 cycles | |

[1]Graded using NCI CTCAE version 3
[2]Based on laboratory values, cabazitaxel: n = 369, mitoxantrone: n = 370.
[3]Includes atrial fibrillation, atrial flutter, atrial tachycardia, atrioventricular block complete, bradycardia, palpitations, supraventricular tachycardia, tachyarrhythmia, and tachycardia.
[4]Includes abdominal discomfort, abdominal pain upper, abdominal tenderness, and GI pain.
[5]Includes gastroesophageal reflux disease and reflux gastritis.
[6]Includes urinary tract infection enterococcal and urinary tract infection fungal.
[7]Includes bronchopneumonia, lobar pneumonia, and pneumonia *klebsiella*.
[8]Includes peripheral motor neuropathy and peripheral sensory neuropathy.

**TABLE 4**

| Patient Characteristics | | |
|---|---|---|
| | MP (n = 377) | CBZP (n = 378) |
| Age (years) | | |
| Median [range] | 67 [47-89] | 68 [46-92] |
| ≥65 (%) | 57.0 | 64.9 |
| ECOG PS (%) | | |
| 0, 1 | 91.2 | 92.6 |
| 2 | 8.8 | 7.4 |
| PSA* (ng/mL) | | |
| Median [range] | 127.5 [2-11220] | 143.9 [2-7842] |
| Measurability of disease (%) | | |
| Measurable | 54.1 | 53.2 |
| Non-measurable | 45.9 | 46.8 |
| Disease site (%) | | |
| Bone | 87.0 | 80.2 |
| Lymph node | 44.8 | 45.0 |
| Visceral | 24.9 | 24.9 |
| Pain at Baseline, no. (%) | 168 (44.6) | 174 (46.0) |
| Previous Therapy, no. (%) | | |
| Hormonal | 375 (99.5) | 375 (99.2) |
| No. of Chemotherapy Regimens | | |
| 1 | 268 (71.1) | 260 (68.8) |
| 2 | 79 (21.0) | 94 (24.9) |
| >2 | 30 (8.0) | 24 (6.3) |
| Radiation | 222 (58.9) | 232 (61.4) |
| Surgery | 205 (54.4) | 198 (52.4) |
| Biologic Agent | 36 (9.5) | 26 (6.9) |
| Previous docetaxel regimens, n (%) | | |
| 1 | 327 (86.7) | 316 (83.6) |
| 2 | 43 (11.4) | 53 (14.0) |
| >2 | 7 (1.9) | 9 (2.4) |
| Median total previous docetaxel dose (mg/m²) | 529.2 | 576.6 |

**TABLE 4-continued**

| Patient Characteristics | | |
|---|---|---|
| | MP (n = 377) | CBZP (n = 378) |
| Disease progression relative to docetaxel administration, n (%) | | |
| During treatment | 104 (27.6) | 115 (30.4) |
| <3 months from last dose | 181 (48.0) | 158 (41.8) |
| ≥3 months from last dose | 90 (23.9) | 102 (27.0) |
| Unknown | 2 (0.5) | 3 (0.8) |
| Median time from last docetaxel dose to disease progression (months) | 0.7 | 0.8 |

The primary reason for treatment discontinuation in both groups was disease progression (Table 5). The median delivered relative dose intensity was 96.1% in the cabazitaxel group and 97.3% in the mitoxantrone group. In the cabazitaxel group, >75% of patients received >90% of the planned dose intensity. Overall, 5.1% of mitoxantrone treatment courses were dose reduced compared with 9.8% of cabazitaxel treatment courses; 6.3 and 7% of all treatment courses were delayed by 9 days or less, and 1.6 and 2.3% of courses were delayed by more than 9 days for mitoxantrone and cabazitaxel respectively (See Table 5).

**TABLE 5**

| Treatment Received and Reasons for Discontinuation in the Intention-to-Treat Population.* | | |
|---|---|---|
| | Mitoxantrone (N = 377) | Cabazitaxel (N = 378) |
| Patients receiving study treatment, no. (%) | 371 (98.4) | 371 (98.1) |
| Patients completing planned ten cycles of study treatment, no. (%) | 46 (12.2) | 105 (27.8) |

US 8,927,592 B2

17

### TABLE 5-continued

Treatment Received and Reasons for Discontinuation in the Intention-to-Treat Population.*

| | Mitoxantrone (N = 377) | Cabazitaxel (N = 378) |
|---|---|---|
| Discontinuation of study treatment, no. (%) | 325 (86.2) | 266 (70.4) |
| Reasons for discontinuation of study treatment, no. (%) | | |
| Disease progression | 267 (70.8) | 180 (47.6) |
| Adverse event | 32 (8.5) | 67 (17.7) |
| Non-compliance with protocol | | 1 (0.3) |
| Lost to follow-up | 2 (0.5) | 0 |
| Patient's request | 17 (4.5) | 8 (2.1) |
| Other | 7 (1.9) | 10 (2.7) |
| No. of treatment cycles, median (range)† | 4 (1-10) | 6 (1-10) |
| Relative dose intensity, median % (range)† | 97.3 (42.5-106.0) | 96.1 (49.0-108.2) |
| Treatment delays, no. of cycles (%)‡ | | |
| ≤9 days | 110 (6.3) | 157 (7.0) |
| >9 days | 28 (1.6) | 51 (2.3) |
| Dose reductions, no. of cycles (%)‡ | 88 (5.1) | 221 (9.8) |

The results of this study are further illustrated to FIGS. **1**, **2**, and **3**.

### Example 2

Table 6 illustrates an example of a dosage modification for adverse reactions in patients treated with cabazitaxel

### TABLE 6

| Toxicity | Dosage Modification |
|---|---|
| Prolonged grade ≥3 neutropenia (greater than 1 week) despite appropriate medication including G-CSF | Delay treatment until neutrophil count is >1,500 cells/mm³, then reduce dosage of cabazitaxel to 20 mg/m². Use G-CSF for secondary prophylaxis. |
| Febrile neutropenia | Delay treatment until improvement or resolution, and until neutrophil count is >1,500 cells/mm³, then reduce dosage of cabazitaxel to 20 mg/m². Use G-CSF for secondary prophylaxis. |
| Grade ≥3 diarrhea or persisting diarrhea despite appropriate medication, fluid and electrolytes replacement | Delay treatment until improvement or resolution, then reduce dosage of cabazitaxel to 20 mg/m². |

Discontinue cabazitaxel treatment if a patient continues to experience any of these reactions at 20 mg/m².

### Example 3

### Performance Status and Pain Scores During Treatment

Methods

ECOG PS, pain measures, and analgesic consumption were assessed prior to every treatment cycle and at the end of study treatment.

Pain assessments: Present Pain Intensity (PPI) scale from the McGill-Melzack questionnaire (Melzack R. Pain

18

1975; 1:277-99). Mean Analgesic Score (AS) derived from analgesic consumption (in morphine equivalents) was calculated for the one-week period prior to each evaluation. Area under the curve (AUC) of PPI and AS was calculated by the trapezoid formula. Cumulative AUC of PPI and AS was calculated up to the last cycle of data available for each patient. Average AUC of the treatment groups was compared from Cycle 1 to Cycle 10.

Results

Performance status remained stable in most patients during the treatment period and was similar between groups. See FIG. **4**.

Overall, PPI scores were comparable; improving from baseline in 21.3% of men in the CbzP group and 18.2% in the MP group. See FIG. **5**.

The CbzP group had a lower mean area under the curve (AUC) of PPI, suggesting less severe pain especially during cycles 7-10. See FIG. **6**.

Analgesic use was comparable between the groups (lower mean AUC of AS means lower pain medication use). See FIG. **7**.

Conclusion

Despite longer treatment with CbzP no worsening in ECOG PS was seen.

Present Pain Intensity score improved in 21% of men in CbzP vs. 18% in MP arm. Assessment of pain scores suggested less severe pain in the CbzP group during treatment.

Pain medication use was similar between groups.

### Example 4

A population pharmacokinetic analysis was conducted in 170 patients with solid tumors at doses ranging from 10 to 30 mg/m² weekly or every 3 weeks.

Based on the population pharmacokinetic analysis, after an intravenous dose of cabazitaxel 25 mg/m² every 3 weeks, the mean $C_{max}$ in patients with metastatic prostate cancer was 226 ng/mL (CV 107%) and was reached at the end of the 1-hour infusion ($T_{max}$). The mean AUC in patients with metastatic prostate cancer was 991 ng·h/mL (CV 34%). No major deviation from the dose proportionality was observed from 10 to 30 mg/m² in patients with advanced solid tumors. The volume of distribution (Vss) was 4,864 L (2,643 L/m² for a patient with a median BSA of 1.84 m²) at steady state.

Based on the population pharmacokinetic analysis, cabazitaxel has a plasma clearance of 48.5 L/h (CV 39%; 26.4 Uh/m² for a patient with a median BSA of 1.84 m²) in patients with metastatic prostate cancer. Following a 1-hour intravenous infusion, plasma concentrations of cabazitaxel can be described by a 3-compartment PK model with α-, β-, and γ-half-lives of 4 minutes, 2 hours, and 95 hours, respectively.

What is claimed is:

**1**. A method for treating a patient with prostate cancer that has progressed during or after treatment with docetaxel, comprising administering to said patient a dose of 20 to 25 mg/m² of cabazitaxel, or a hydrate or solvate thereof, in combination with a corticoid.

**2**. The method according to claim **1**, where the prostate cancer is an advanced metastatic disease.

**3**. The method according to claim **1**, where the cabazitaxel is in the form of an acetone solvate.

**4**. The method according to claim **3**, in which the acetone solvate contains between 5% and 8% by weight of acetone.

**5**. The method according to claim **1**, comprising repeating the administration of cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

US 8,927,592 B2

19

**6**. The method according to claim **1**, wherein the cabazitaxel is in base form.

**7**. The method according to claim **1**, wherein said cabazitaxel, or hydrate or solvate thereof, is administered in an amount to provide an AUC of about 991 ng·h/mL (CV 34%).

**8**. The method according to claim **1**, wherein said cabazitaxel, or hydrate or solvate thereof, is administered in an amount to provide an $C_{max}$ of about 226 ng·h/mL (CV 107%).

**9**. The method according to claim **1** wherein said cabazitaxel, or hydrate or solvate thereof, is administered in an amount to provide a plasma clearance of 48.5 L/h (CV 39%).

**10**. The method according to claim **1**, further comprising monitoring blood counts and measuring neutrophil levels in the patient.

**11**. The method according to claim **10**, further comprising discontinuing cabazitaxel treatment in a patient with a neutrophil count of ≤1,500 cells/mm³.

**12**. The method according to claim **1**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

**13**. The method according to claim **1**, wherein the corticoid is selected from the group consisting of prednisone and prednisolone.

**14**. The method according to claim **13**, where the prednisone or prednisolone is administered at a dose of 10 mg/day.

**15**. The method according to claim **14**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m².

**16**. The method according to claim **14**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

**17**. The method according to claim **1**, where the prostate cancer is a castration resistant or hormone-refractory prostate cancer.

**18**. The method according to claim **17**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

**19**. The method according to claim **17**, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

20

**20**. The method according to claim **1**, wherein the prostate cancer is a castration resistant or hormone-refractory, metastatic prostate cancer.

**21**. The method according to claim **20**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m².

**22**. The method according to claim **20**, where cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

**23**. The method according to claim **20**, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

**24**. The method according to claim **1**, wherein the prostate cancer is a castration resistant or hormone-refractory, metastatic prostate cancer, and wherein the corticoid is selected from the group consisting of prednisone and prednisolone, and wherein the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

**25**. The method according to claim **24**, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

**26**. The method according to claim **1**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m².

**27**. A method of increasing the survival of a patient with a castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel, comprising administering a dose of 20 to 25 mg/m² of cabazitaxel, or hydrate or solvate thereof, to the patient in combination with prednisone or prednisolone.

**28**. The method according to claim **27**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

**29**. The method according to claim **27**, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

**30**. The method according to claim **27**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m².

*    *    *    *    *

### Disclaimer

**8,927,592 B2** — Sunil Gupta, Chester Springs, PA (US). ANTITUMORAL USE OF CABAZITAXEL. Patent dated January 6, 2015. Disclaimer filed December 8, 2017, by the assignee AVENTIS PHARMA S.A.

Hereby disclaims the complete claims 7, 11, 14-16, and 26 of said patent.

*(Official Gazette, April 20, 2021)*

(12) **INTER PARTES REVIEW CERTIFICATE** (2298th)

**United States Patent**
Gupta

(10) **Number:**      **US 8,927,592 K1**
(45) **Certificate Issued:**    **Aug. 23, 2021**

(54) **ANTITUMORAL USE OF CABAZITAXEL**

(75) Inventor:   **Sunil Gupta**

(73) Assignee:   **SANOFI MATURE IP**

**Trial Number:**

IPR2016-00712 filed Mar. 15, 2016

**Inter Partes Review Certificate for:**

Patent No.:   **8,927,592**
Issued:       **Jan. 6, 2015**
Appl. No.:    **13/456,720**
Filed:        **Apr. 26, 2012**

The results of IPR2016-00712 are reflected in this inter partes review certificate under 35 U.S.C. 318(b).

**INTER PARTES REVIEW CERTIFICATE**
**U.S. Patent 8,927,592 K1**
**Trial No. IPR2016-00712**
**Certificate Issued Aug. 23, 2021**

**1**

AS A RESULT OF THE INTER PARTES
REVIEW PROCEEDING, IT HAS BEEN
DETERMINED THAT:

Claims **1-5**, **8-10**, **12**, **13**, **17-25** and **27-30** are cancelled.

**31**. (substitute for claim **27**) *A method of increasing survival comprising administering to a patient in need thereof (i) an antihistamine, (ii) a corticoid, (iii) an $H_2$ antagonist, and (iv) a dose of 20 to 25 mg/m² of cabazitaxel, or a hydrate or solvate thereof, wherein said antihistamine, said corticoid, and said $H_2$ antagonist are administered prior to said dose of 20 to 25 mg/m² of cabazitaxel, or hydrate or solvate thereof, in combination with prednisone or prednisolone, wherein said patient has castration resis-*

**2**

*tant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel.*

**32**. (substitute for claim **28**) *The method according to claim* **31**, *where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².*

**33**. (substitute for claim **29**) *The method according to claim* **31**, *comprising repeating the administration of said antihistamine, said corticoid, said $H_2$ antagonist, and said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.*

**34**. (substitute for claim **30**) *The method according to claim* **31**, *where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m².*

Claims **7**, **11**, **14-16** and **26** are disclaimed.

\* \* \* \* \*

# EXHIBIT B

US010583110B2

(12) **United States Patent**   (10) **Patent No.:**   **US 10,583,110 B2**
Gupta   (45) **Date of Patent:**   **Mar. 10, 2020**

(54) **ANTITUMORAL USE OF CABAZITAXEL**

(71) Applicant: **Aventis Pharma S.A.**, Antony (FR)

(72) Inventor: **Sunil Gupta**, Lexington, MA (US)

(73) Assignee: **SANOFI MATURE IP**, Paris (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/627,962**

(22) Filed: **Jun. 20, 2017**

(65) **Prior Publication Data**

US 2018/0125810 A1   May 10, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/575,566, filed on Dec. 18, 2014, now abandoned, which is a continuation of application No. 13/456,720, filed on Apr. 26, 2012, now Pat. No. 8,927,592, which is a continuation of application No. PCT/IB2010/054866, filed on Oct. 27, 2010.

(60) Provisional application No. 61/389,969, filed on Oct. 5, 2010, provisional application No. 61/383,933, filed on Sep. 17, 2010, provisional application No. 61/369,929, filed on Aug. 2, 2010, provisional application No. 61/355,888, filed on Jun. 17, 2010, provisional application No. 61/355,834, filed on Jun. 17, 2010, provisional application No. 61/293,903, filed on Jan. 11, 2010, provisional application No. 61/256,160, filed on Oct. 29, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 31/337* | (2006.01) |
| *A61K 31/164* | (2006.01) |
| *A61K 31/56* | (2006.01) |
| *A61K 31/573* | (2006.01) |
| *A61K 45/06* | (2006.01) |
| *A61K 38/19* | (2006.01) |

(52) **U.S. Cl.**

CPC .......... *A61K 31/337* (2013.01); *A61K 31/164* (2013.01); *A61K 31/56* (2013.01); *A61K 31/573* (2013.01); *A61K 38/193* (2013.01); *A61K 45/06* (2013.01)

(58) **Field of Classification Search**

CPC . A61K 31/337; A61K 31/573; A61K 31/4402
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,814,470 | A | 3/1989 | Colin et al. |
| 5,005,588 | A | 4/1991 | Rubin |
| 5,438,072 | A | 8/1995 | Bobee et al. |
| 5,698,582 | A | 12/1997 | Bastart et al. |
| 5,714,512 | A | 2/1998 | Bastart et al. |
| 5,750,561 | A | 5/1998 | Bastart et al. |
| 5,847,170 | A | 12/1998 | Bouchard et al. |
| 5,889,043 | A | 3/1999 | Bouchard et al. |
| 5,962,705 | A | 10/1999 | Didier et al. |
| 6,160,135 | A | 12/2000 | Bouchard et al. |
| 6,331,635 | B1 | 12/2001 | Bouchard et al. |
| 6,346,543 | B1 | 2/2002 | Bissery et al. |
| 6,372,780 | B2 | 4/2002 | Bouchard et al. |
| 6,387,946 | B1 | 5/2002 | Bouchard et al. |
| 6,403,634 | B1 | 6/2002 | Bissery |
| 7,074,821 | B1 | 7/2006 | Bouchard et al. |
| 7,241,907 | B2 | 7/2007 | Didier et al. |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 8,378,128 | B2 | 2/2013 | Billot et al. |
| 8,846,959 | B2 | 9/2014 | Billot et al. |
| 8,927,592 | B2 | 1/2015 | Gupta |
| 2002/0038038 | A1 | 3/2002 | Bouchard et al. |
| 2004/0126379 | A1 | 7/2004 | Adolf et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1849311 A | 10/2006 |
| EP | 0817779 B1 | 1/2000 |

(Continued)

OTHER PUBLICATIONS

Winquist (The Canadian Journal of Urology, Feb. 2008, vol. 15, No. 1, pp. 3942-3949) (Year: 2008).*

(Continued)

*Primary Examiner* — James D. Anderson

(74) *Attorney, Agent, or Firm* — Kelly L. Bender

(57) **ABSTRACT**

The invention relates to a compound of formula:



which may be in base form or in the form of a hydrate or a solvate, in combination with prednisone or prednisolone, for its use as a medicament in the treatment of prostate cancer, particularly metastatic prostate cancer, especially for patients who are not catered for by a taxane-based treatment.

**6 Claims, 7 Drawing Sheets**

# US 10,583,110 B2

Page 2

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2005/0065138 | A1 | 3/2005 | Didier et al. |
| 2005/0070496 | A1 | 3/2005 | Borovac et al. |
| 2005/0244413 | A1 | 11/2005 | Adolf et al. |
| 2008/0076780 | A1 | 3/2008 | Curwen et al. |
| 2008/0279923 | A1 | 11/2008 | Bradke et al. |
| 2010/0311825 | A1 | 12/2010 | Rortais et al. |
| 2011/0105598 | A1 | 5/2011 | Gurjar et al. |
| 2011/0144362 | A1 | 6/2011 | Billot et al. |
| 2011/0160159 | A1 | 6/2011 | Ryan |
| 2011/0177072 | A1 | 7/2011 | Chauchereau et al. |
| 2011/0237540 | A1 | 9/2011 | Crawford et al. |
| 2012/0077845 | A1 | 3/2012 | Dalton et al. |
| 2012/0115806 | A1 | 5/2012 | Magherini |
| 2012/0301425 | A1 | 11/2012 | Gupta |
| 2015/0118182 | A1 | 4/2015 | Gupta |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2177630 A1 | 4/2010 |
| FR | 2732340 A1 | 10/1996 |
| JP | 2007505866 A | 3/2007 |
| WO | WO-9418164 A1 | 8/1994 |
| WO | WO-9630355 A1 | 10/1996 |
| WO | WO-9630356 A1 | 10/1996 |
| WO | WO-0010547 A2 | 3/2000 |
| WO | WO-2005002846 A1 | 1/2005 |
| WO | WO-2005028462 A1 | 3/2005 |
| WO | WO-2006062811 A2 | 6/2006 |
| WO | WO-2010117668 A1 | 10/2010 |
| WO | WO-2010128258 A1 | 11/2010 |
| WO | WO-2011051894 A1 | 5/2011 |
| WO | WO-2011063421 A1 | 5/2011 |
| WO | WO-2011124669 A1 | 10/2011 |
| WO | WO-2011130317 A2 | 10/2011 |
| WO | WO-2011130566 A2 | 10/2011 |

### OTHER PUBLICATIONS

Tropic Listing (http://clinicaltrials.gov/archive/NCT00417079/2006_12_28. View of NCT00417079 on Dec. 28, 2006, 3 pages) (Year: 2006).*

Mita (Clin. Cancer Res., Jan. 15, 2009, vol. 15, No. 2, pp. 723-730) (Year: 2009).*

Attard (Pathologie Biologie, 2006, vol. 54, pp. 72-84) (Year: 2006).*

Pivot (Annals of Oncology, 2008, vol. 19, pp. 1547-1552) (Year: 2008).*

Beardsley (Curr. Opin. Support Palliat. Care, 2008, vol. 2, pp. 161-166) (Year: 2008).*

Taxol (Paclitaxel) Label (Mead Johnson, Feb. 10, 2000, pp. 1-43) (Year: 2000).*

Takenaka et al. (International Journal of Urology, 2008, vol. 15, pp. 106-109) (Year: 2008).*

Hudis et al. (J. Clin. Oncol., 1996, vol. 14, pp. 58-65) (Year: 1996).*

Tannock et al. (N. Engl. J. Med., 2004, vol. 351, pp. 1502-1512) (Year: 2004).*

Declaration of Alton Oliver Sartor, M.D., as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 23, 2016.

Curriculum Vitae for A. Oliver Sartor, M.D., dated Feb. 23, 2016.

Reply Declaration of Alton Oliver Sailor, M.D., as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Apr. 20, 2017.

Reply Declaration of Dr. Rahul Seth, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.

*Sanofi-Aventis* v. *Fresenius Kabi USA*, Civil Action No. 14-7869, United States District Court, District of New Jersey, Sealed Opinion of Dec. 19, 2017 (redacted).

Declaration Transcript of Dr. Oliver Sartor, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Feb. 13, 2017.

Declaration Transcript of Dr. Oliver Sartor, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated May 8, 2017.

*Sanofi-Aventis* v. *Fresenius Kabi USA*, Civil Action No. 14-7869, United States District Court, District of New Jersey, Excerpts from Markman Hearing held on Jan. 23, 2016, pp. 1-9, 90-105.

*Sanofi-Aventis* v. *Fresenius Kabi USA*, Civil Action No. 14-7869, United States District Court, District of New Jersey, Defendants Joint Responsive Claim Construction Brief, entered Dec. 3, 2015.

*Sanofi-Aventis* v. *Fresenius Kabi USA*, Civil Action No. 14-7869, United States District Court, District of New Jersey, Joint Claim Construction and Prehearing Statement, dated Oct. 2, 2015.

Declaration of Mr. Robert McSorley, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.

Declaration of Art Lathers, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 22, 2016.

Declaration Transcript of Rahul Seth, DO, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 9, 2016.

Declaration of Patricia Matthews, RN, BSN, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jan. 16, 2017.

*Sanofi-Aventis* v. *Fresenius Kabi USA*, Civil Action No. 14-7869, United States District Court, District of New Jersey, Amended Claim Construction Opinion, Oct. 7, 2016.

Declaration Transcript of Michael Edward Tate, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 6, 2017.

*Sanofi-Aventis* v. *Mylan Laboratories Limited*, Civil Action No. 15-3392, United States District Court, District of New Jersey, Defendant's Answer to the Complaint, Separate Defenses and Counterclaims, 2015.

*Sanofi-Aventis* v. *ONCO Therapies*, United States District Court, District of New Jersey, Complaint for Patent Infringement, May 15, 2015.

Public Deposition of Robert McSorley, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Apr. 19, 2017.

Final Written Decision, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Sep. 21, 2017.

*Aventis Pharma S.A.* v. *Mylan Laboratories Limited*, Case No. 2018-1203, United States Court of Appeals for the Federal Circuit, Brief for Appellant, dated Mar. 15, 2018.

Patent Owner's Contingent Motion to Amend as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 23, 2016.

Patent Owner's Response as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 23, 2016.

Preliminary Response by Patent Owner pursuant to 37 CFR 42.107 as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 24, 2016.

*Sanofi* v. *Glenmark Pharmaceuticals*, Civil Action No. 14-264-RGA, United States District Court, District of Delaware, Trial Opinion dated Aug. 31, 2016.

*Sanofi* v. *Lupin Atlantic Holdings*, Civil Action No. 15-415-RGA, United States District Court, District of Delaware, Trial Opinion dated Oct. 23, 2017.

*Sanofi* v. *Watson Laboratories Inc.*, Case 2016-2722, U.S. Court of Appeals for the Federal Circuit, Opinion dated Nov. 9, 2017.

(56)  **References Cited**

OTHER PUBLICATIONS

*Aventis Pharma S.A.* v. *Mylan Laboratories Limited*, Case No. 2018-1203, United States Court of Appeals for the Federal Circuit, Reply Brief for Appellant, dated May 18, 2018.

*Aventis Pharma S.A.* v. *Mylan Laboratories Limited*, Case No. 2018-1203, United States Court of Appeals for the Federal Circuit, Responsive Brief, dated Apr. 24, 2018.

A Promising R&D Portfolio, Well Positioned to Deliver Future Growth, Sanofi-Aventis Press Release, Sep. 2007, pp. 1-11.

A Randomized, Open-label, Phase 3 Study of Larotaxel IV Every 3 Weeks Versus Capecitabine (Xeloda®) Tablets Twice Daily for 2 Weeks in 3 Week Cycles in Patients with Metastatic Breast Cancer (MBC) Progressing After Taxanes and Anthracycline Therapy (EFG6089), 2012 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://en.sanofi.com/img/content/study/EFC_6089_summary.pdf).

Abrams et al., New Chemotherapeutic Agents for Breast Cancer, Cancer Suppl. 74(3), pp. 1164-1176, 1994.

Abraxane (paclitaxel) Label (May 2007).

Actavis LLC's Detailed Factual and Legal Basis for its Paragraph IV Certification that U.S. Pat. No. 8,927,592 is invalid, Unenforceable and/or Not Infringed by the [] Described in Actavis' NDA No. 207970 (2015) (redacted).

Actavis Prednisone Label (2015).

Adam's LLC'S Detailed Factual and Legal Basis for its Paragraph IV Certification that U.S. Pat. No. 8,927,592 is invalid, Unenforceable and/or Not Infringed by the [] Described in Actavis' NDA No. 207970 (2015) (redacted).

Alimta (pemetrexed) Label (Sep. 2008).

American Cancer Society Cancer Facts & Figures 2005.

American Cancer Society Cancer Facts & Figures 2009.

American Cancer Society Cancer Facts & Figures 2011.

American Cancer Society, Off-Label Drug Use, What is Off-Label Drug Use?, [retrieved from https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/chemotherapy/off-label-drug-use.html] (2017).

Andean Patent Manual. Andean Community secretary, OMPI, EPO, 2004. Section 9.4.

Anonymous, "Early study shows cabazitaxel may be more effective than docetaxel in some patients with advanced prostate cancer," American Society of Clinical Oncology, Inc., posted Apr. 3, 2015 by The ASCO Post, retrieved from internet Oct. 30, 2018 from URL http://http://www.ascopost.com/News/23626.

Antonarakis E.S., et al., "Phase III Trials with Docetaxel-Based Combinations for Metastatic Castration-Resistant Prostate Cancer," Journal of Clinical Oncology, 2013, vol. 31 (14), pp. 1709-1712.

Antonarakis et al., Novel Targeted Therapeutics for Metastatic Castration-Resistant Prostate Cancer, 291(1) Cancer Lett. 1-13 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4029098/ (published online Aug. 29, 2009).

Apotex, Detailed Statement for ANDA 207736, 2015 (redacted).

Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), 31st Edition, 2011.

Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), 36th Edition, 2016.

Araujo J.C., et al., "Overall Survival (OS) and Safety of Dasatinib/docetaxel Versus Docetaxel in Patients With Metastatic Castration-resistant Prostate Cancer (mCRPC): Results From the Randomized Phase III Ready Trial," Journal of Clinical Oncology, Feb. 2013, vol. 31 (6), Abstract LBA8, 3 pages as retrieved from http://ascopubs.org/doi/10.1200/jco.2013.31.6_suppl.lba8 on Oct. 30, 2018.

Archimbaud; Y., "Mouse plasma and tumor pharmacokinetics of TXD258, a new taxoid", American Association for Cancer Research, 91st Annual Meeting, Apr. 1-5, 2000, vol. 41, Abstract 1373, p. 215.

Armstrong A.J., et al., "New Drug Development in Metastatic Prostate Cancer," Urologic Oncology, 2008, vol. 26 (4), pp. 430-437.

Armstrong and Carducci, New Drugs in Prostate Cancer, 16 Curr. Opin. Urol. 138-45 (2006).

Avastin (bevacizumab), Prescribing Information (Label), Jul. 2009.

Bahl A., et al., Final quality of life and safety data for patients with metastatic castration-resistant prostate cancer treated with cabazitaxel in the UK early access programme (EAP) (NCT01254279), BJU International. vol. 116, pp. 880-887 (2015).

Bahl A., et al., 'Impact of cabazitaxel on 2-year survival and palliation of tumour-related pain in men with metastatic castration-resistant prostate cancer treated in the TROPIC trial,' Annals of Oncology, vol. 24 No. 9, pp. 2402-2408 (2013).

Baselga et al., Phase II Study of Weekly Intravenous Trastuzumab (Herceptin) in Patients with HER2/neu-Overexpressing Metastatic Breast Cancer, Semin. in Oncol. vol. 26 No. 4, Suppl. 12, pp. 78-83, 1999.

Baselga J., et al., 'Phase II study of efficacy, safety, and pharmacokinetics of trastuzumab monotherapy administered on a 3-weekly schedule,' Journal of Clinical Oncology vol. 23 No. 10, pp. 2162-2171 (2005).

Bedikian A.Y., et al., 'Phase 3 study of docosahexaenoic acid-paclitaxel versus dacarbazine in patients with metastatic malignant melanoma,' Annals of Oncology vol. 22 No. 4, pp. 787-793 (2011).

Beer et al., Phase II Study of KOS-862 in Patients with Metastatic Androgen Independent Prostate Cancer Previously Treated with Docetaxel, 25 Invest. New Drugs 565-70 (2007).

Beer T.M., et al., "Double-Blinded Randomized Study of High-Dose Calcitriol Plus Docetaxel Compared with Placebo Plus Docetaxel in Androgen-Independent Prostate Cancer: A Report from the Ascent Investigators," Journal of Clinical Oncology, 2007, vol. 25 (6), pp. 669-674.

Beeram M. et al., 'A phase I and pharmacokinetic (PK) study of the novel taxane BMS 184476 administered as a 1-hour intravenous (IV) infusion weekly,' Proceedings of ASCO vol. 20, p. 106a, Abstract 421 (2001).

Berry D.L., et al., "Quality of Life and Pain in Advanced Stage Prostate Cancer: Results of a Southwest Oncology Group Randomized Trial Comparing Docetaxel and Estramustine to Mitoxantrone and Prednisone," Journal of Clinical Oncology, 2006, vol. 24 (18), pp. 2828-2835.

Berry W., et al., "Phase III Study of Mitoxantrone Plus Low Dose Prednisone Versus Low Dose Prednisone Alone in Patients with Asymptomatic Hormone Refractory Prostate Cancer," The Journal of Urology, 2002, vol. 168 (6), pp. 2439-2443.

Berthold D.R., et al., "Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer: Updated Survival in the TAX 327 Study," Journal of Clinical Oncology, Jan. 10, 2008, vol. 26 (2), pp. 242-245.

Berthold Dr., et al., "Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer: Updated Survival in the Tax 327 Study," Journal of Clinical Oncology, 2008, vol. 26 (2), pp. 242-245.

Bissery et al., Experimental Antitumor Activity of Taxotere (RP 56976, NSC 628503), a Taxol Analogue, Cancer Research 51 pp. 4845-4852, 1991.

Bissery M.C., et al., "Preclinical Evaluation of TXD258, A New Taxoid," Proceedings of the American Association for Cancer Research, 2000, vol. 41, p. 214, Abstract No. 1364.

Booth B., et al., "Oncology's Trials," Nature Reviews, Drug Discovery, 2003, vol. 2 (8), pp. 609-610.

Bouchet B.P., et al., "Cabazitaxel, a New Taxane with Favorable Properties," Drugs of Today (Barcelona, Spain, 2010, vol. 46 (10), pp. 735-742.

BPI's Detailed Factual and Legal Bases in Support of its Paragraph IV Certification for Cabazitaxel Solution. IV, 2015 (redacted).

Brady, Urological Institute Johns Hopkins Medical Institutions, New Drugs for Prostate Cancer: Chemotherapy Transformed, vol. VI, 1-2, 2003.

Bristol-Myers Squibb, 'In the pipeline Dec. 31, 2014,' URL: http://www.bms.com/research/pipeline/Pages/default.aspx. Retrieved on Aug. 5, 2016.

Bristol-Myers Squibb Reports Results for Phase 3 Trial of Yervoy (Ipilimumab) in Previously•Treated Castration Resistant Prostate Cancer, Press Release Sep. 12, 2013 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL:http://news.bms.com/press-release/rd-news/bristol-myers-squibb-reports-results-phase-3-trial-yervoy-ipilimumab-previous).

(56) **References Cited**

OTHER PUBLICATIONS

Brooks, FDA Grants Expanded Indication for Enzalutamide (Xtandi) MEDSCAPE, 2004 (http://www.medscape.com/viewarticle/831548) (retrieved on Mar. 13, 2017).

Buonerba C., et al., "Docetaxel Rechallenge in Castration-Resistant Prostate Cancer: Scientific Legitimacy of Common Clinical Practice," European Urology, 2010, vol. 58 (4), pp. 636-637.

Butler M.S., et al., "Natural Products to Drugs: Natural Product-Derived Compounds in Clinical Trials," Natural Product Reports, 2008, vol. 25 (3), pp. 475-516.

Byrn, S.R., et al., 'Solid-state chemistry of drugs,' 2nd edition, SSCI, Inc., pp. 12-13, 233 and 516-517 (1999).

Cabazitaxel (XRP-6258) for hormone refractory, metastatic prostate cancer second line after docetaxel, National Horizon Scanning Centre, National Institute for Health Research, University of Birmingham, Apr. 2009, pp. 1-5.

Cabral F., et al., "Factors Determining Cellular Mechanisms of Resistance to Antimitotic Drugs," Drug Resistance Updates, 2001, vol. 4 (1), pp. 3-8.

Cabrespine, et al., Randomized Phase II Study Comparing Paclitaxel and Carboplatin Versus Mitoxantrone in Patients with Hormone-Refractory Prostate Cancer, Urology, 67(2), 354-359 (2006).

Caffo et al., Pemetrexed as Second-Line Chemotherapy for Castration-Resistant Prostate Cancer After Docetaxel Failure: Results from a Phase II Study, 31(2) Urol. Oncol. 180-86 (2013).

Camptosar (irinotecan) Label (Jul. 2005).

Cancer de Prostata Diseminado, Quimioterapia, [Retrieved on Jul. 29, 2014] pp 1-9. Retrieved from the internet: (URL:http://www.guiasalud.es/egpc/cancer_Prostata/resumida/apartado06/otros02.html).

Cancer Therapy Evaluation Program Common Toxicity Criteria, Version 2.0, DCTD, NCI, NIH, DHHS. revised Mar. 1998, published Apr. 30, 1999, pp. 1-35.

Canil C.M., et al., "Is There a Role For Chemotherapy in Prostate Cancer?," British Journal of Cancer, 2004, vol. 91, pp. 1005-1011.

Canil et al., Randomized Phase II Study of Two Doses of Gefitinib in Hormone-Refractory Prostate Cancer: A Trial of the National Cancer Institute of Canada-Clinical Trials Group, 23(3) J. Clin. Oncol. 455-60 (2005).

Carducci M.A., 'Atrasentan, an endothelin-receptor antagonist for refractory adenocarcinomas: safety and pharmacokinetics,' Journal of Clinical Oncology vol. 20 No. 8, pp. 2171-2180 (2002).

Carducci M.A., et al., "A Phase 3 Randomized Controlled Trial of the Efficacy and Safety of Atrasentan in Men with Metastatic Hormone-Refractory Prostate Cancer," Cancer, 2007, vol. 110 (9), pp. 1959-1966.

Carlson et al., Breast Cancer-Clinical Practice Guidelines in Oncology, 7(2) J. National Comprehensive Cancer Network 122-92 (2009).

Carlson R.O., et al., "New Tubulin Targeting Agents Currently in Clinical Development," Expert Opinion on Investigational Drugs, 2008, vol. 17 (5), pp. 707-722.

CBO Promotional Spending for Prescription Drugs, pp. 1-8, Dec. 2, 2009.

Chemotherapy for Prostate Cancer, American Cancer Society, Retrieved from the internet on Oct. 6, 2016 at https://www.cancer.org/cancer/prostate-cancer/treating/chemotherapy.html.

Chen et al., Gefitinib Treatment is Highly Effective in Non-Small-Cell Lung Cancer Patients Failing Previous Chemotherapy in Taiwan: A Prospective Phase II Study, J. Chemother. 17(6) pp. 679-684, 2005.

Chen, Optimal Adaptive Group Sequential Design for Phase II Clinical Trials A Bayesian Decision Theoretic Approach. ProQuest LLC, 2008, 134 pages.

Cisternino S., et al., "Nonlinear Accumulation in the Brain of the New Taxoid Txd258 Following Saturation of P-Glycoprotein at the Blood-Brain Barrier in Mice and Rats," British Journal of Pharmacology, 2003, vol. 138 (7), pp. 1367-1375.

ClinicalTrials.gov, A Study to Evaluate the Effects of Combining Cabazitaxel with Cisplatin Given Every 3 Weeks in Patients With

Advanced Solid Cancer, Jul. 22, 2009, pp. 1-7 [retrieved on Jan. 6, 2014 from https://clinicaltrials.gov/ct2/show/NCT00925743?cond=NCT00925743&amp;rank=1].

ClinicalTrials.gov, BMS-184476 in treating patients with advanced solid tumors, p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=BMS-184476&amp;Search=Search.

ClinicalTrials.gov, 'BMS-188797,' p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=BMS-188797&amp;Search=Search.

ClinicalTrials.gov, 'BMS-275183,' p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=BMS-275183&amp;Search=Search.

ClinicalTrials.gov, Effect of Cabazitaxel on the QTc Interval in Cancer Patients (QT-Cab), Web site, Mar. 24, 2010, pp. 1-7 [retrieved on Jan. 6, 2014].

ClinicalTrials.gov, Efficacy and Safety of BG00012 in MS (Sep. 14, 2005), https://clinicaltrials.gov/archive/NCT00168701/2005_09_14, pp. 1-6.

ClinicalTrials.gov, Larotaxel every 3 weeks vs. capecitabine patients with metastatic breast cancer progressing after taxanes and anthracycline therapy [retrieved on Jun. 24, 2014] Retrieved from the Internet (URL: https://clinicaltrials.gov/show/NCT000081796?term=larotaxel&rank=7).

ClinicalTrials.gov, Larotaxel plus cisplatin vs gemcitabine plus cisplatin in first line treatment of patients wtth locally advanced/metastatic bladder cancer [retrieved on Jun. 24, 2014]. Retrieved from the Internet (URL: https://clinicaltrials.gov/ct2/show/NCT00625664?term=larotaxel&rank=4).

ClinicalTrials.gov, Larotaxel vs. 5-FU or capecitabine in patients with pancreatic cancer previously treated with gemcitabine [retrieved Jun. 24, 2014] Retrieved from the Internet (URL: https://clinicaltrials.gov/c2/show/NCT00417209?Term=larotaxel&rank=2).

ClinicalTrials.gov, MST-997, p. 1, retrieved on Aug. 5, 2015 https://clinicaltrials.gov/ct2/results?term=MST-997&amp;Search=Search.

ClinicalTrials.gov, Patient Preference Between Cabazitaxel and Docetaxel in Metastatic Castrate-Resistant Prostate Cancer (CABA-DOC), Retrieved from the internet on Dec. 21, 2016 at https://clinicaltrials.gov/ct2/show/study/NCT02044354.

ClinicalTrials.gov, Protocol Registration Preview, A study to evaluate the effects of combining cabazitaxel with cisplatin given every 3 weeks in patients with advanced solid cancer, Website, pp. 1-3, retrieved on Nov. 12, 2009.

ClinicalTrials.gov, Safety and Pharmacokinetic Study of Cabazitaxel in Patients With Advanced Solid Tumors and Liver Impairment Web site, 2010, pp. 1-7 [retrieved on Jan. 6, 2014].

ClinicalTrials.gov, Satraplatin in Hormone Refractory Prostate Cancer Patients Previously Treated with one Cytotoxic Chemotherapy Regimen [retrieved on Jun. 27, 2014]. Retrieved from the Internet:( URL: https://clinicaltrials.gov/ct2/show/NCT00069745?term=SPARC &cond=prostate&rank=3).

ClinicalTrials.gov, Tesetaxel, p. 1-2, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=tesetaxel&amp;Search=Search.

ClinicalTrials.gov, TL-310, p. 1, retrieved on Aug. 5, 2015 on https://clinicaltrials.gov/ct2/results?term=TL-310&amp;Search=Search.

ClinicalTrials.gov, TPI-287, p. 1-2, as retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=TPI-287&amp;Search=Search.

ClinicalTrials.gov, XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC), Archived Oct. 23, 2008, (https://web.archive.org/web/20081023121613/http://clinicaltrials.gov/ct2/show/NCT00417079) (last accessed: Mar. 14, 2017).

Cobleigh et al., Multinational Study of the Efficacy and Safety of Humanized Anti-HER2 Monoclonal Antibody in Women who have HER2-Overexpressing Metastatic Breast Cancer that has Progressed After Chemotherapy for Metastatic Disease, J. Clin. Oncol. 17(9), pp. 2639-2648, 1999.

Collins R., et al., "A Systematic Review and Economic Model of the Clinical Effectiveness and Cost-Effectiveness of Docetaxel in Combination With Prednisone or Prednisolone for the Treatment of

## US 10,583,110 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Hormone-Refractory Metastatic Prostate Cancer," Health Technology Assessment, 2007, 11 (2), pp. 1-179.
U.S. Appl. No. 61/256,160, filed Oct. 29, 2009.
U.S. Appl. No. 61/293,903, filed Jan. 11, 2010.
U.S. Appl. No. 61/355,834, filed Jun. 17, 2010.
Dagher et al., Approval Summary: Docetaxel in Combination with Prednisone for the Treatment of Androgen-Independent Hormone-Refractory Prostate Cancer, Clinical Cancer Research 8147-51 (2004).
Dagher R., et al., "Approval Summary: Docetaxel in Combination with Prednisone for the Treatment of Androgen-Independent Hormone-Refractory Prostate Cancer," Clinical Cancer Research, 2004, vol. 10 (24), pp. 8147-8151.
D'Amico A.V., et al., "US Food and Drug Administration Approval of Drugs for the Treatment of Prostate Cancer: A New Era has Begun," Journal of Clinical Oncology, 2014, vol. 32 (4), pp. 362-364.
Daniel Zuccerinho, Patents of Invention, Ed. Abele do Perrot, 1999.
De Bono, et al., Cabazitaxel or Mitoxantrone With Prednisone in Patients With Metastatic Castration-Resistant Prostate Cancer (mCRPC) Previously Treated With Docetaxel: Final Results of a Multinational Phase III Trial (TROPIC), 46th Annual Meet American Society Clinical Oncology (ASCO), Journal of Clinical Oncology, 2010, 28:15S (Suppl), Abstract 4508.
De Bono et al., Phase III non-inferiority study of cabazitaxel (C) 20 mg/m2 (C20) versus 25 mg/m2 (C25) in patients (pts) with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel (D), ASCO Annual Meeting 2016, pp. 1-2, 2016.
De Bono, et al., Prednisone Plus Cabazitaxel or Mitoxantrone for Metastatic Castration-Resistant Prostate Cancer Progressing after Docetaxel Treatment a Randomised Open-Label Trial, Lancet, 2010, vol. 376, No. 9747, pp. 1147-1154.
De Bono J.S., et al., "Cabazitaxel or Mitoxantrone with Prednisone in Patients with Metastatic Castration-Resistant Prostate Cancer (mCRPC) Previously Treated with Docetaxel Final Results of a Multinational Phase III Trial (TROPIC)," Journal of Clinical Oncology, 2010, vol. 28, pp. 155.
De Bono J.S., et al., 'Open-label phase II study evaluating the efficacy and safety of two doses of pertuzumab in castrate chemotherapy-naive patients with hormone-refractory prostate cancer,' Journal of Clinical Oncology, vol. 25 No. 3, pp. 257-262 (2007).
Deakin and Williams, Histamine H2-Receptor Antagonists in Peptic Ulcer Disease, Efficacy in Healing Peptic Ulcers, 44(5) Drugs 709-19 (1992).
Denis L.J, et al., "Phase I and Pharmacokinetic Study of RPR116258A. A Novel Taxane Derivative, Administered Intravenously over 1 hour every 3 weeks," Clinical Cancer Research, 2000, vol. 6, pp. 4579s, Abstract 568.
Detailed Factual and Legal Bases for Breckenridge's Paragraph IV Certification that U.S. Pat. No. 8,927,592 Is Invalid, Unenforceable and/or Will Not Be infringed, 2015 (redacted).
Detailed Statement of the Factual and Legal Bases for Onco Therapies Limited's Paragraph IV Certification with Respect to U.S. Pat. No. 8,927,592, 2015 (redacted).
Dieras et al., Larotaxel in Combination with Trastuzumab in Patients with HER2+ Metastatic Breast Cancer: Interim Analysis of an Open Phase II Label Study, 26 (15S), J. Clin. Oncol. (Meeting Abstracts), Suppl. 1070, May 2008.
Dieras V., et al., "Phase II Multicenter Study of Larotaxel (Xrp9881), a Novel Taxoid, in Patients with Metastatic Breast Cancer Who Previously Received Taxane-Based Therapy," Annals of Oncology, 2006, vol. 19 (7), pp. 1255-1260.
Dilorenzo G., et al., "Castration-Resistant Prostate Cancer: Current and Emerging Treatment Strategies," Drugs, 2010, vol. 70 (8), pp. 983-1000.
Dilorenzo G., et al., "Combination of Bevacizumab and Docetaxel in Docetaxel-Pretreated Hormone-Refractory Prostate Cancer: A Phase 2 Study," European Urology, 2008, vol. 54 (5), pp. 1089-1096.

Dimasi J.A., et al., "Economics of New Oncology Drug Development," Journal of Clinical Oncology, 2007, vol. 25 (2), pp. 209-216.
Dimasi J.A., et al., "Trends in Risks Associated with New Drug Development Success Rates for Investigational Drugs," Clinical Pharmacology and Therapeutics, 2010, vol. 87 (3), pp. 272-277.
Docetaxel Label (Mar. 2012).
Docetaxel Reduce el Riesgo de Muerte en Pacientes con cancer de Prostata metastatico Androgeno Independiente, [Retrieved on Jul. 29, 2014]. Retrieved from the internet: (URL: http://www.intramed.net/contenidover.asp?contenidoID=31823) (followed by non-verified English translation).
Docetaxel (Taxotere) y Cancer de Próstata. Retrieved from the internet: (URL: http://www.newsmedical.net/health/docetaxel-(taxotere)-and-prostate-cancer-(spanish).aspx).
Doenicke et al., Premedication with H1 and H2 blocking agents reduces the incidence of postoperative nausea and vomiting, Inflam. Res., 53, Suppl. 2, 51-58, (2004).
Dorff T.B., et al., "Cabazitaxel in Prostate Cancer: Stretching a String," Lancet, 2010, vol. 376 (9747), pp. 1119-1120.
Dres, et al., Treatment alternatives for advanced prostate cancer, [Retrieved from the internet on Jul. 29, 2014] Retrieved from http://www.intramed.net/contenidoverasp?contenidID=37957 (followed by non-verified English translation), 3 pages.
Drug Data Report, Antimitotic Drugs, 2003, vol. 25, No. 6, pp. 550.
Drug Data Report Cabazitaxel, 2010, vol. 32, No. 10, pp. 999-1017 at p. 1012.
Dumontet C., et al., "Mechanisms of Action of and Resistance to Antitubulin Agents: Microtubule Dynamics, Drug Transport, and Cell Death," Journal of Clinical Oncology, 1999, vol. 17 (3), pp. 1061-1070.
Eisenberger, M., et al., Phase III Study comparing a reduced dose of cabazitaxel (20 mg/m2) and the currently approved dose (25 mg/m2) in postdocetaxel patients with metastatic castration-resistant prostate cancer—PROSELICA, J. Clin. Oncol., vol. 35, as downloaded from http://ascopubs.org/journal/jcoon Sep. 22, 2017, 13 pages.
Eisenhauer E.A., et al., "Phase I Cancer Clinical Trials: A Practical Guide," Basics of Phase I Design: First-in-Man Studies, Oxford University Press, 2006, pp. 42-80.
El Docetaxel Asociado a la Prodnisona Mejora el Cancer de Prostata, [Retrieved from the internet on Oct. 26, 2012] Retrieved from internet:(URL: http://www.medicinageriatrica.com.ar/viewnews.php?id=E.EpVVFZVppsBCjOavj).
El-Maraghi and Eisenhauer, Review of Phase II Trial Designs Used in Studies of Molecular Targeted Agents: Outcomes and Predictors of Success in Phase III, J. Clin. Oncol. 26 (2008) 1346-1354.
Emcyt (estramustine) Label (Jun. 2007).
Engels, F.K., et al., 'Potential for improvement of docetaxel-based chemotherapy: a pharmacological review,' British Journal of Cancer, vol. 93, pp. 173-177 (2005).
Erbitux (cetuximab) Label (Jul. 2009).
Esper and Redman, Supportive Care, Pain Management, and Quality of Life in Advanced Prostate Cancer, 26(2) Urologic Clinics of North America 375-89 (1999).
Estramustine, Chemocare.com, retrieved from the internet at http://chemocare.com/chemotherapy/drug-info/estramustine.aspx on Mar. 8, 2017.
European Medicine Agency, ICH Topic E8 General Considerations for Clinical Trials (Mar. 1998).
Factual and Legal Bases for Accord's ANDA Certification That Each Claim of U.S. Pat. No. 8,927,592 is Invalid, Unenforceable, and/or Will Not Be Infringed by Accord's Cabazitaxel Injection Product Described in ANDA 207693 (2015) (redacted).
Factual and Legal Basis for Dr. Reddy's Laboratories, Ltd.'s and Dr. Reddy's Laboratories, Inc.'s Assertion of Invalidity, Unenforceability and/or Non-Infringement of U.S. Pat. No. 8,927,592, 2015 (redacted).
FDA Approves New Drug for Advanced Prostate Cancer (May 15, 2013), retrieved from http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm352363.htm, retrieved on Oct. 6, 2016.
FDA Center for Drug Evaluation and Research, Clinical Pharmacology and Biopharmaceutics Review(s), Application No. 201023 (Cabazitaxel NDA), 2010, pp. 1-71.

(56)        **References Cited**

OTHER PUBLICATIONS

FDA, Challenge and Opportunity on the Critical Path to New Medical Products, 1-31 (Mar. 2004).
FDA News Release, FDA Approves New Indication for Taxotere—Prostate Cancer (May 19, 2004) as retrieved from http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2004/ucm108301.htm.
FDA News release, FDA Approves New Treatment for Advanced Prostate Cancer, 2010, pp. 1-2, [Retrieved on Jul. 29, 2015]. Retrieved from the internet (URL: http://www.fda.gov.newsevents/newsroom/pressannouncements/ucm216143.htm].
FDA Notice International Conference on Harmonisation; Guidance on Impurities: Residual Solvents, 62(247) Federal Register 67377-388 (Dec. 24, 1997).
Feuerstein A., et al., 'Oncology Micro-Cap Stocks: Caveat Emptor!' Journal of the National Cancer Institute, vol. 103, issue 20 pp. 1488-1489 (2011).
Figg W.D., et al., "Cabazitaxel: Filling One of the Gaps in the Treatment of Prostate Cancer," Cancer Biology & Therapy, 2010, vol. 10 (12), pp. 1233-1234.
Final Office Action dated Sep. 16, 2013 for U.S Appl. No. 13/456,720, filed Apr. 26, 2012.
Fizaz K., et al., "New agents in Metastatic Prostate Cancer," European Journal of Cancer, 2009, vol. 45 (1), pp. 379-380.
Fizazi K., 'Phase III, randomized, placebo-controlled study of docetaxel in combination with zibotentan in patients with metastatic castration-resistant prostate cancer,' Journal of Clinical Oncology vol. 31 No. 14, pp. 1740-1747 (2013).
Fresenius Kabi USA, LLC's Detailed Statement of the Factual and Legal Bases of Fresenius Kabi USA, LLC's Opinion that U.S. Pat. No. 8,927,592 Is Invalid, Unenforceable or Not infringed, 2015 (redacted).
Fujisaka et al., Phase 1 Study of Atrasentan (ABT627), Novel Endothelin Receptor-A Antagonist, in Japanese Patients with Hormone Refractory Prostate Cancer, 24(18S) J. Clin. Oncol. (Abstr. 14602) (2006).
Fukuoka M., 'Multi-institutional randomized phase II trial of Gefitinib for previously treated patients with advanced non-small-cell lung cancer,' Journal of clinical oncology, vol. 21, No. 12, pp. 2237-2246 (2003).
Fumoleau et al., Phase I and Pharmacokinetics (PK) Study of RPR116258A Given as a Weekly 1-Hour Infusion at Day 1, Day 8, Day 15, Day 22 Every 5 Weeks in Patients (pts) with Advanced Solid Tumors, 7(11) Clin. Cancer Res. 3710s (2001).
Gad, Clinical Trials Handbook (John Wiley & Sons. Inc.), 2009 Regulatory Requirements for Investigational New Drug, pp. 23-69.
Gallagher M.L., et al., 'Phase I clinical and pharcokinetic (PK) trial of the novel taxane BMS-184476 administered as a 1-hour IV infusion in combination with cisplatin every 21 days,' Proceedings of ASCO vol. 20, Abstract 420, (2001).
Galletti E., et al., "Paclitaxel and Docetaxel Resistance: Molecular Mechanisms and Development of New Generation Taxanes," Chemmedchem, 2007, vol. 2 (7), pp. 920-942.
Galsky M.D., et al., "Cabazitaxel," Nature Reviews, Drug Discovery, 2010, vol. 9 (9), pp. 677-678.
Garcia et al., Gemcitabine and Docetaxel in Metastatic, Castrate-Resistant Prostate Cancer, 117(4) Cancer 752-57 (2011).
Gayther, et al., The Frequency of Germ-line Mutations in the Breast Cancer Predisposition Genes BRCA1 and BRCA2 in Familial Prostate Cancer, Cancer Res. 60 (2000) 4513-4518.
Gemzar (gemcitabine) Label Apr. 2006.
Genentech Provides Update on Phase III Study of Avastin in Men with Late Stage Prostate Cancer (Mar. 12, 2010), Business Wire, as retrieved from http://www.businesswire.com/news/home/20100311007023/en/Genentech-Update-Phase-III-Study-Avastin-Men on Oct. 12, 2016.
Gianni et al., Nonlinear Pharmacokinetics and Metabolism of Paclitaxel and Its Pharmacokinetic/Pharmacodynamic Relationships in Humans, 13(1) J. Clin. Oncol. 180-90 (1995).
Gleevec (imatinib) Label (May 2009).

Glenmark's Detailed Statement of the Factual and Legal Basis for its Opinion that U.S. Pat. No. 8,927,592 is invalid, unenforceable and/or will not be infringed by Glenmark's manufacture, use, offer for sale or sale of Glenmark's [], 2015 (redacted).
Goetz et al., "Phase I: and Pharmacokinetic Study of RPR116258A, a Novel Taxane Derivative, Administered Intravenously Over 1 Hour Every 3 Weeks," Clinical Pharmacology, 2001, vol. 20, pp. 106a.
Goffin J., et al., 'Objective responses in patients with malignant melanoma or renal cell cancer in early clinical studies do not predict regulatory approval,' Clin. Cancer Res. 11, pp. 5928-5934 (2005).
Greene et al., Who is the Average Patient Presenting with Prostate Cancer?, 66(5 Suppl.) Urology 76-82 (2005).
Guidance for Industry Population Pharmacokinetics, U.S. Department of Health and Human Services, Food and Drug Administration, CDER, CBER, Feb. 1999, 35 Pages.
Gujarat Cancer & Research Institute Annual Report, Aug. 29, 2008, pp. 1-152.
Hait W.N., et al., "Rational Design and Pre-clinical Pharmacology of Drugs for Reversing Multidrug Resistance," Biochemical Pharmacology, Jan. 1992, vol. 43 (1), pp. 103-107.
Halabi S., et al., "Prostate-Specific Antigen Changes as Surrogate for Overall Survival in Men with Metastatic Castration-Resistant Prostate Cancer Treated with Second-Line Chemotherapy," Journal of Clinical Oncology, vol. 31 (31), pp. 3944-3950.
Haleblian, "Characterization of Habits and Crystalline Modification of Solids and Their Pharmaceutical Applications," Journal of Pharmaceutical Sciences, 1975, vol. 64 (8), pp. 1269-1288.
Hande, The Importance of Drug Scheduling in Cancer Chemotherapy: Etoposide as an Example, 1(4) The Oncologist 234-29 (1996).
Hellerstedt B.A., et al., "The Current State of Hormonal Therapy for Prostate Cancer," CA a Cancer Journal for Clinicians, 2002, vol. 52 (3), pp. 154-179.
Herceptin (trastuzumab) Label Jan. 2008.
Higano C.S., et al., "Phase 1/2 Dose-Escalation Study of a Gm-Csf-Secreting, Allogeneic, Cellular Immunotherapy for Metastatic Hormone-Refractory Prostate Cancer," Cancer, 2008, vol. 113 (5), pp. 975-984.
Holen et al., Phase I Study Using Continuous Intravenous (CI) KOS-862 (Epothilone D) in Patients with Solid Tumors, 22(14S) J. Clin. Oncol. Abstr. 2024 (2004).
Hope, J., 'Last Hope' drug for Prostate Cancer Patients is axed from the NHS, DailyMail.com, Retrieved from http://www.dailymail.co.uk/health/article-2903235/Last-hope-drug-prostate-cancer-patients-axed-NHS-doctors-call-travesty.html on Oct. 20, 2016.
Horwitz E.M., et al., "External Beam Radiation Therapy for Prostate Cancer," CA a Cancer Journal for Clinicians, 2000, vol. 50 (6), pp. 349-379.
Hospers, et al., PET Imaging of Steroid Receptor Expression in Breast and Prostate Cancer, Curr. Pharm. Des. 14 (2008) 3020-3032.
How XTANDI works, as retrieved from https://www.xtandi.com/how-xtandi-works on Oct. 6, 2016, pp. 1-2.
How ZYTIGA (abiraterone acetate) works, https://www.zytiga.com/about-zytiga/how-zytiga-works, pp. 1-6 as retrieved on Nov. 16, 2016.
How ZYTIGA (abiraterone acetate) Works, Retrieved from the internet on Nov. 16, 2016 at https://www.zytigo.com/about-zytiga/how-zytiga-works.
Hycamtin (topotecan) Label Jun. 2006.
In a Difficult Environment, Another Year of Growth in Adjusted EPS Excluding Selected Items, Sanofi-Aventis Press Release, 2006 (Feb. 13, 2007), pp. 1-31.
In the United States District Court for the District of New Jersey, Case 3:15-cv-03392-MAS-LHG, Defendant's Answer to the Complaint, Separate Defenses and Counterclaims, Mylan Laboratories Limited v. Aventis Pharma S.A, 20 pages, dated Jul. 16, 2015.
Institut National du Cancer, Register of French cancer clinical trials, Sanofi-Aventis TROPIC, Feb. 29, 2008, ("INDC website"), pp. 1-2.
International Preliminary Report on Patentability for Application No. PCT/IB2010/054866, dated Nov. 14, 2011, 14 pages.
International Search Report and Written Opinion issued in WO2011/051894 dated May 5, 2011, 11 pages.

# US 10,583,110 B2

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

Iressa (gefitinib) Label (Jul. 2004).
IXEMPRA Prescribing Information (Labelling), 2007, pp. 1-34.
Jevtana (cabazitaxel) Label (Sep. 2016).
Jevtana (cabazitaxel) Label (Jun. 2015).
Jevtana label 2010—Prescribing Information, pp. 1-25, (retrieved on May 14, 2013). Retrieved from the Internet:( URL: http:products.sanofi.us/jevtana/jevtana.html).
Jevtana National Drug Monograph, pp. 1-14, 2011.
Jevtana NDA Clinical Overview, Excerpt, 2014, pp. 12-13.
Joffe et al., Quality of Informed Consent in Cancer Clinical Trials: A Cross-Sectional Survey, 358 The Lancet 1772-77 (2001).
Jozwiakowski, Alteration of the Solid State of the Drug Substance: Polymorphs, Solvates, and Amorphous Forms, Ch. 15, Water Insoluble Drug Formulation edited by Liu, First Edition, (2000) 525-568.
Kant J., et al., "A Chemoselective Approach to Functionalize the C-10 Position of 10-Deacetylbaccatin III Synthesis and Biological Properties of Novel C-10 Taxol® Analogues," Tetrahedron Letters, 1994, vol. 35 (31), pp. 5543-5546.
Kaur M., et al., "Suramin's Development: What Did We Learn?," Investigational New Drugs, 2002, vol. 20 (2), pp. 209-219.
Kawaguchi, et al., H2 Blockers Increase Risk of Docetaxel-Induced Skin Toxicity, Reactions 1257 (Jun. 20, 2009).
Kelland et al., Comparative in vitro cytotoxicity of taxol and Taxotere against cisplatin-sensitive and -resistant human ovarian carcinoma cell lines, Cancer Chemother. Pharmacol. (1992) 444-450.
Ketoconazole in Advanced Prostate Cancer: Have Tolerability Concerns Been Overstated? Drug Ther. Perspect. 15 (2000) (http://www.medscape.com/viewarticle/406391) (last accessed: Mar. 14, 2017).
Kingston D.G., et al., "Tubulin-Interactive Natural Products as Anticancer Agents," Journal of Natural Products, 2009, vol. 72 (3), pp. 507-515.
Kish J.A., et al., "The Treatment Challenge of Hormone-refractory Prostate Cancer," Cancer Control, Nov.-Dec. 2001, vol. 8 (6), pp. 487-495.
Klein et al., SWOG-9510: Evaluation of Topotecan in Hormone Refractory Prostate Cancer: A Southwest Oncology Group Study, 52(4) The Prostate 264-68 (2002).
Kobayashi K., et al., "Phase I Study of Suramin Given by Intermittent Infusion Without Adaptive Control in Patients With Advanced Cancer," Journal of Clinical Oncology, Sep. 1995, vol. 13 (9), pp. 2196-2207.
Kola I., et al., "Can the Pharmaceutical Industry Reduce Attrition Rates?," Nature Reviews, Drug Discovery, 2004, vol. 3 (8), pp. 711-715.
Koletsky A.,et al., "Developing Treatments for Hormone-Refractory Prostate Cancer," US Oncology Review, 2008, vol. 4(1), pp. 46-49.
Kris M.G., et al., "Clinical Cancer Advances 2010: Annual Report on Progress Against Cancer from the American Society of Clinical Oncology," Journal of Clinical Oncology, 2010, vol. 28 (36), pp. 5327-5347, 947.
Latif et al., Phase II Study of Oral Bis(Aceto) Ammine Dichloro (Cyclohexamine) Platinum (IV) (JM-216, BMS-1892751) Given Daily x5 in Hormone Refractory Prostate Cancer (HRPC), Investig. New Drugs 79-84 (2005).
Lin et al., A Phase II Trial of Imatinib Mesylate in Patients with Biochemical Relapse of Prostate Cancer After Definitive Local Therapy, 98 BJU Int'l. 763-69 (2006).
Lokich and Anderson, Dose Intensity for Bolus Versus Infusion Chemotherapy Administration: Review of the Literature for 27 Anti-Neoplastic Agents, 8(1) Ann. Oncol. 15-25 (1997).
Lortholary et al., "Phase I and Pharmacokinetics (PK) Study of RPR 116258A Given as 1-hour Infusion inPatients (pts) with Advanced Solid Tumors," Clinical Cancer Research, 2000, vol. 6, pp. 4579s-4580s.
Ma, et al., A Statistical Analysis of the Magnitude and Composition of Drug Promotion in the United States in 1998, Clin. Therap. 25 (2003) 1503-1517.

MacKinnon A.C., et al., "Molecular Biology Underlying the Clinical Heterogeneity of Prostate Cancer: An Update," Archives of Pathology & Laboratory Medicine, 2009, vol. 133 (7), pp. 1033-1040.
Malhotra et al., Cabazitaxel: A Novel Drug for Hormone-Refractory Prostate Cancer, Mini-Reviews in Medicinal Chemistry, 2013, 13, No. 2, pp. 1-6.
Malik Z., et al., '931P—Cabazitaxel (CBZ) + prednisone (P: CBZP) in patients (pts) with metastatic castration-resistant prostate cancer (mCRPC) previously treated with doce . . . ' Poster presented at ESMO Congress 2012.
Malik Z.I., et al., 'Cabazitaxel (Cbz) + prednisone (P) in patients (pts) with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel (D): interim results from compassionate-use programme (CUP) and early-access programme (EAP),' Poster 931P presented at European Society for Medical Oncology, Vienna Austria, Sep. 28-Oct. 2, 2012.
Malik Z.I., et al., 'Cabazitaxel (CBZ) + Prednisone (P; CBZP) in Patients (PTS) With Metastatic Castration-Resistant Prostate Cancer (MCRPC) Previously Treated With Docetaxel (D): Interim Results From Compassionate-Use Programme (CUP) and Early-Access Programme (EAP),' Poster 931P, Annals of Oncology vol. 23, Suppl. 9 Abstract Book of the ESMO 2012 Congress, pp. 1-6 (2012).
Manchanda, et al., The Effects and Role of Direct-to-Physician Marketing in the Pharmaceutical Industry: An Integrative Review, Yale J. Health Pol'y L. & Ethics 5 (2005) 785-822.
Manual of Patent Examining Procedure §2107.03 (IV), 2008, 2100-36 (8th Ed.).
McKeage et al., A Phase I and Pharmacology Study of an Oral Platinum Complex, JM216: Dose-Dependent Pharmacokinetics with Single-Dose Administration, Cancer Chemother. Pharmacol. 451-8 (1995).
McLeod H.L., et al., "Evaluation of the Linearity of Docetaxel Pharmacokinetics," Cancer Chemotherapy and Pharmacology, Jun. 1998, vol. 42 (2), pp. 155-159.
Melzack R., et al., "The McGill Pain Questionnaire: Major Properties and Scoring Methods," Pain, 1975, vol. 1(3), pp. 277-299.
Merck Index 14th 2006, No. 190, pp. 35, Agomelatine.
Michael, et al., Prostate Cancer Chemotherapy in the Era of Targeted Therapy, Prostate Cancer Prostatic Dis. 13-16 (2009).
Michaelson M.D., et al., "Randomized, Placebo-Controlled, Phase III Trial of Sunitinib Plus Prednisone Versus Prednisone Alone in Progressive, Metastatic, Castration-Resistant Prostate Cancer," Journal of Clinical Oncology, 2014, vol. 32 (2), pp. 76-82.
Mitsching, Prostate Cancer Clinical Trials in Dallas, Texas Area, [Retrieved from the internet on Aug. 19, 2014], pp. 3-4, Retrieved from the internet: (URL: http://www.heallhcentral.com/prostate/c/5618/14589/dallas-texas-area).
Mitoxantrone, Chemocare.com, retrieved from the internet at http://chemocare.com/chemotherapy/drug-info/Mitoxantrone.aspx on Mar. 8, 2017.
Miura N., et al., "A Case of Hormone-Refractory Prostate Cancer (Hrpc) with Tumor Fever Responding to Docetaxel Plus Prednisolone Therapy," Jpn. J. Cancer Chemother., 2006, vol. 33 (6), pp. 841-844.
Mokbel, Concise Notes in Oncology for MRCP and MRCS, 2005, (Radcliffe Publishing Ltd.) Drug Pharmacology and Clinical Trials, pp. 6-7.
Mononen et al., Two Percent of Finnish Prostate Cancer Patients Have a Germ-Line Mutation in the Hormone-Binding Domain of the Androgen Receptor Gene, 60(22) Cancer Research 6479-81 (2000).
Morant et al., Capecitabine in Hormone-Resistant Metastatic Prostatic Carcinoma—a Phase II Trial, Brit. J. Cancer 1312-17 (2004).
Morgan C.J., et al., "Impact of Prednisone on Toxicities and Survival in Metastatic Castration-resistant Prostate Cancer: a Systematic Review and Meta-analysis of Randomized Clinical Trials," Critical Reviews in Oncology/Hematology, Jun. 2014, vol. 90 (3), pp. 253-261.
Motzer et al., Activity of SU11248, a Multitargeted Inhibitor of Vascular Endothelial Growth Factor Receptor and Platelet-Derived Growth Factor Receptor, in Patients with Metastatic Renal Cell Carcinoma, 24(1), J. Clin. Oncol. 16-24 (2006).

# US 10,583,110 B2
Page 8

(56)         **References Cited**

OTHER PUBLICATIONS

Moul, The Evolving Definition of Advanced Prostate Cancer, Rev. Urol. S10-S17 (2004).

Mubiru et al., Nonhuman Primates as Models for Studies of Prostate Specific Antigen and Prostatic Diseases, 68(14) Prostate 1-16 (2008).

Mulcahy, Phase 3 Trial of Immunotherapy for Metastatic Prostate Cancer Terminated, Medscape Medical News, Oct. 17, 2009, [retrieved on Jun. 26, 2014] Retrieved from the internet: (URL: http://www.medscape.com/viewarticle/582220).

Mylan Petition for Inter Partes Review of U.S. Pat. No. 8,927,592, pp. 1-65 with Exhibit 1002 (Declaration of Dr. Rahul Seth,) 2016, pp. 1-109.

Nagore et al., Antineoplastic Therapy-Induced Palmar Plantar Erythrodysesthesia ('Hand-Foot') Syndrome, Incidence, Recognition and Management, I(4) Am. J. Clin. Dermatol. 225-34 (2000).

National Cancer Institute, Common Terminology Criteria for Adverse Events v3.0 (Aug. 2006).

National Cancer Institute, Common Toxicity Criteria for Adverse Events v2.0 (Apr. 1999).

National Cancer Institute, Common Toxicity Criteria Manual Version 2.0 (Jun. 1, 1999).

National Comprehensive Cancer Network (NCCN Clinical Practice Guidelines in Oncology , Prostate Cancer) V.1 (2009), pp. 1-46.

National Comprehensive Cancer Network (NCCN Clinical Practice Guidelines in Oncology, Breast Cancer) V.1 (2009), pp. 1-122.

NCCN Antiemesis Guidelines, Internet Archive https://web.archive.org/web/20081001233326/http://www.nccn.org/professionals/physician_gls/PDF/antiemesis.pdf)(Oct. 1, 2008) (last accessed: Mar. 14, 2017).

NCI, NIH-Funded Study Shows Increased Survival in Men With Metastatic Prostate Cancer Who Receive Chemotherapy When Starting Hormone Therapy [retrieved on Aug. 4, 2015]. Retrieved from the Internet: (URL: http://www.nih.gov/news/health/dec2013/nci-05.htm).

New Hope in Advanced Prostate Cancer Alberta Saskatchewan and Ontario Fund Coverage for Jevtana (Cabazitaxel), Retrieved from the internet on Dec. 22, 2016 at https://www.newswire.ca/news-releases/new-hope-in-advanced-prostate-cancer-alberta-saskatchewan-and-ontario-fund-coverage-for-jevtana-cabazitaxel-510872011.html.

Newman S.P., et al., "The Therapeutic Potential of a Series of Orally Bioavailable Anti-angiogenic Microtubule Disruptors as Therapy for Hormone-independent Prostate and Breast Cancers," British Journal of Cancer, Dec. 2007, vol. 97 (12), pp. 1673-1682.

Nexavar (sorafenib) Label (Nov. 2007).

Niho et al., First-Line Single Agent Treatment with Gefitinib in Patients with Advanced Non-Small-Cell Lung Cancer: A Phase II Study, 24(1) J. Clin. Oncol. 64-69 (2006).

Nobili S.,et al., "Pharmacological Strategies for Overcoming Multidrug Resistance," Current Drug Targets, 2006, vol. 7 (7), pp. 861-879.

Non-Final Office Action dated Apr. 16, 2014 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.

Non-Final Office Action dated Jan. 16, 2013 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.

Normanno, N., et al., "Target-based Therapies in Breast Cancer: Current Status and Future Perspectives," Endocrine-Related Cancer, Sep. 2009, vol. 16 (3), pp. 675-702.

Notice of Allowance dated Aug. 4, 2014 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.

Notice of Allowance dated Nov. 14, 2014 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.

NOVACEA, Inc, SEC Form 8-K at 1.02, 2008 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://www.sec.gov/Archives/edgar/data/1178711/000119312508077953/d8k.htm).

Novantrone Gets FDA Nod for Use in Advanced Prostate Cancer, Cancer Network (Dec. 1, 1996), http://www.cancernetwork.com/articles/novantrone-gets-fda-nod-use-advanced-prostate-cancer, retrieved on Dec. 22, 2016.

Novantrone (mitoxantrone) Prescribing information (Label), 2012, pp. 1-37.

Novantrone (mitoxantrone) Label (Aug. 2008).

Numata K., et al., "The Preliminary Results of Docetaxel-Prednisolone Combination Therapy for the Japanese Patients with Hormone-Refractory Prostate Cancer," Acta Urol. Jpn., 2007, vol. 53 (2), pp. 93-97.

Numata K., et al., Urological Bulletin, 2007, vol. 53 (2), pp. 93-96.

Omlin et al., Analysis of Side Effect Profile of Alopecia, Nail Changes, Peripheral Neuropathy, and Dysgeusia in Prostate Cancer Patients Treated With Docetaxel and Cabazitaxel, 13(4) Clin. Genitourin. Cancer 1-4 (2015).

Opposition ALAFAR (Nov. 2012): Index Merck 14th. Merck & Co. USA. NI, 2006. No. 0000190 (ALAFAR refers to a specific compound, which is agomelatine).

Oudard, et al., Cabazitaxel Plus Prednisone/Prednisolone Significantly Increases Overall Survival Compared to Mitoxantrone Plus Prednisone/Prednisolone in Patients With Metastatic Castration-Resistant Prostate Cancer (MCRPC) Previously Treated With Docetaxel: Final Results With Updated Overall Survival of a Multinational Phase III Trial (TROPIC), Ann. of Oncology, 2010, vol. 21, (Suppl. 8), pp. viii272, Abstract 871IPD.

Oudard S., et al., "Multicenter Randomized Phase II Study of Two Schedules of Docetaxel, Estramustine, and Prednisone Versus Mitoxantrone Plus Prednisone in Patients With Metastatic Hormone-refractory Prostate Cancer," Journal of Clinical Oncology, May 2005, vol. 23 (15), pp. 3343-3351.

Padhani et al., The RECIST Criteria: Implications for Diagnostic Radiologists, Br. J. Radiol. 983-86 (2001).

Pal S.K., et al., "Critical Appraisal of Cabazitaxel in the Management of Advanced Prostate Cancer," Clinical Interventions in Aging, 2010, vol. 5, pp. 395-402.

Parkin D.M., et al., "Global Cancer Statistics, 2002," Ca: A Cancer Journal for Clinicians, 2005, vol. 55 (2), pp. 74-108.

Passalacqua et al., The Clinical Safety of H1-Receptor Antagonists, An EAACI Position Paper, Allergy 666-75 (1996).

Pazdur, Endpoints for Assessing Drug Activity in Clinical Trials, 13(suppl 2) The Oncologist 19-21 (2008).

Pazdur R., et al., "The Taxoids: Paclitaxel (Taxol) and Docetaxel (Taxotere)," Cancer Treatment Reviews, Oct. 1993, vol. 19 (4), pp. 351-386.

PDR Medical Dictionary at 102, 416 (2d ed. 2000).

Perez-Soler et al., Determinants of Tumor Response and Survival with Erlotinib in Patients with Non-Small-Cell Lung Cancer, 22(16) J. Clin. Oncol. 3238-47 (2004).

Perjeta (pertuzumab) Label Jun. 2012.

Petitioner's Opposition to Patent owner's Motion to Amend under 37 CFR 42.121 as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.

Petitioner's Reply as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.

Petrylak, D.P., et al., 'A Phase 3 Study to Evaluate the Efficacy and Safety of Docetaxel and Prednisone (DP) with or without Lenalidomide (LEN) in Patients with Castrate-Resistant Prostate Cancer (CRPC): The Mainsail Trial,' Annals of Oncology, Abstract LBA24 from Abstract Book of 37th European Society for Medical Oncology Congress Vienna, Austria, vol. 23, Suppl. 9, 2012.

Phase III Trial, NCI Dictionary of Cancer Terms, Retrieved from cancer.gov, [retrieved on Apr. 2, 2015].

Pienta K.J., et al., "Advances in Prostate Cancer Chemotherapy: A New Era Begins," CA a Cancer Journal for Clinicians, 2005, vol. 55 (5), pp. 300-318 and 323-325.

Pivot, et al., Inpharma, Abstract 1659 (Oct. 11, 2008).

Pivot X., et al. , "Multicenter Phase 2 Study of XRP6258 in Taxane Resistant Metastatic Breast Cancer (MBC) Patients (pts)," Breast Cancer Research and Treatment, 2005, vol. 94 (1), pp. S68, Abstract 138.

Pouessel D., et al., "Actualities in Prostate Cancer in ASCO Annual Meeting 2010," Bulletin Du Cancer, 2010, vol. 97 (12), pp. 1563-1572.

Prednisone Label (Apr. 2008).

(56)          **References Cited**

OTHER PUBLICATIONS

Press Release: OncoGenex Announces Top Line Survival Results of Phase 3 SYNERGY Trial Evaluating Custirsen for Metastatic Castration-Resistant, Prostate Cancer, PRNewswire Apr. 28, 2014.

Press Release Roche Provides Update on Phase III Study of Avastin in Men with Late Stage Prostate Cancer, Media Release Mar. 12, 2010 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://www.roche.com/media/media_releases/med-cor-2010-03-12.htm).

Press Release: Takeda Announces Termination of Orteronel (TAK-700) Development for Prostate Cancer in Japan., U.S.A. and Europe, Jun. 19, 2014 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://www.takeda.com/news/2014/20140619_6615. html).

Process 06-IP-89, Retrieved from the internet : URL: (http://intranet. comunidadandina.org/Documentos/Procesos/209-IP-2005.doc); and Process 36-IP-2004 (http://www.notinet.com.co/serverfiles/servicios/archivos/30jul04/ca36-04.htm).

Prostate Cancer Treatment, Jevtana (cabazitaxel) Injection, Retrieved from the internet on Dec. 19, 2016 at http://www.jevtana.com/treatment.

PROVENGE (sipuleucel-T) Label, 2010.

Sharom, F.J., "ABC Multidrug Transporters: Structure, Function and Role in Chemoresistance," Pharmacogenomics, Jan. 2008, vol. 9 (1), pp. 105-127.

Tannock, et al., Docetaxel Plus Prednisone Improves Survival in Men With Advanced Prostate Cancer, Cancer Treatment Reviews, (2005), vol. 31. pp. 403-407.

Quinn et al., Docetaxel and Atrasentan Versus Docetaxel and Placebo for Men with Advanced Castration-Resistant Prostate Cancer (SWOG S0421): A Randomized Phase 3 Trial, Lancet 893-900 (2013).

Ramanathan et al.,, "A Phase II Study of Milataxel: A Novel Taxane Analogue in Previously Treated Patients With Advanced Colorectal Cancer," Cancer Chemotherapy and Pharmacology, 2008, vol. 61 (3), pp. 453-458.

Ramiah V., et al., "Clinical Endpoints for Drug Development in Prostate Cancer," Current Opinion in Urology, 2008, vol. 18 (3), pp. 303-308.

Random House Webster's College Dictionary, 2001 Second Revised and Updated Random House Edition (2003), p. 1393.

Ratain and Sargent, Optimising the Design of Phase II Oncology Trials: The Importance of Randomisation, Eur. J. Cancer 275-280 (2009).

Ratain M.J., et al., "Critical Role of Phase I Clinical Trials in Cancer Treatment. American Society of Clinical Oncology," Journal of Clinical Oncology, Feb. 1997, vol. 15 (2), pp. 853-859.

Ratain M.J., Phase II Oncology Trials: Let's Be Positive, Clinical Cancer Research, Aug. 2005 vol. 11 (16), pp. 5661-5662.

Ratain, M.J. et al., Statistical and Ethical Issues in the Design and Conduct of Phase I and II Clinical Trials of New Anticancer Agents, 85(20) J. Nat'l Cancer Inst. 1637-43 (1993) .

Reck et al., An Open-Label, Multi Centre, Phase II, Non-Comparative Trial of ZD1839 Monotherapy in Chemotherapy-Naive Patients with Stage IV or Stage III Non-Operable Non-Small Cell Lung Cancer (NSCLC), 23(16S) J. Clin. Oncol. 7098 (2005).

Reese et al., A Phase II Trial of Irinotecan in Hormone-Refractory Prostate Cancer, 16(4) Investig. New Drugs 353-59 (1999).

Revision Sistematica y Modelo Economico de Efectividad Glinica y Goste•Efectividad de Docetaxel en Combinacion con Prednisona / Prednisolona para el Tratamiento de Cancer de Prostata Metastasico Refradario a Homonas. [Retrieved from the internet on Jul. 29, 2014]. Retrieved from the internet:( URL: http://www.sefh.es/sefhboletin/vernoticiaboletin.php?id=2663).

Richards L., et al., "Improved Survival in Second-Line Advanced Prostate Cancer Treated with Cabazitaxel," Nature Reviews Clinical Oncology, 2010, vol. 7 (12), p. 671.

Risbridger G.P., et al., "Breast and Prostate Cancer: More Similar than Different," Nature Reviews Cancer, Mar. 2010, vol. 10 (3), pp. 205-212.

Risinger A.L., et al., "The Taccalonolides: Microtubule Stabilizers That Circumvent Clinically Relevant Taxane Resistance Mechanisms," Cancer Research, Nov. 2008, vol. 68 (21), pp. 8881-8888.

Rodrigues G., et al., "Open Clinical Uro-Oncology Trials in Canada," The Canadian Journal of Urology, 2007, vol. 14 (6), pp. 3779-3786.

Rosenberg et al., Activity of Second-Line Chemotherapy in Docetaxel-Refractory Hormone-Refractory Prostate Cancer Patients, Randomized Phase 2 Study of Ixabepilone or Mitoxantrone and Prednisone, 110(3) Cancer 556-63 (2007).

Ross R.W., et al., "Inherited Variation in the Androgen Pathway Is Associated With the Efficacy of Androgen-deprivation Therapy in Men With Prostate Cancer," Journal of Clinical Oncology, Feb. 2008, vol. 26 (6), pp. 842-847.

Rothenstein J.M., et al., "Company Stock Prices Before and After Public Announcements Related to Oncology Drugs," Journal of the National Cancer Institute, Oct. 2011, vol. 103 (20), pp. 1507-1512.

Saad et al., Randomized Phase II Trial of Custirsen (OGX-011) in Combination with Docetaxel or Mitoxantrone as Second-Line Therapy in Patients with Metastatic Castrate-Resistant Prostate Cancer Progressing After First-Line Docetaxel: CUOG Trial P-06c, 17(17) Clin. Cancer Res. 5765-73 (2011).

Sandoz Inc.'s Detailed Statement of the Factual and Legal Bases for Its Opinion That U.S. Pat. Nos. 5,847,170, 7,241,907 & 8,927,592 Are Invalid, Unenforceable and/or Not Infringed by the Manufacture, Use, Importation, Sale or Offer for Sale of the Sandoz Product, pp. 7-18 [Redacted].

Sanofi Oncology website, Oct. 2008, pp. 1-2. Retrieved from the internet, URL: https://www.sanofi.ma/fr/nous-connaitre/solutions-de-sante/oncologie.

Sanofi-Aventis Annual Report SEC Form 20-F 2010, 335 pages.

Sanofi-Aventis Annual Report SEC Form 20-F 2011, 335 pages.

Sanofi-Aventis Annual Report SEC Form 20-F 2012, 458 pages.

Sanofi-Aventis Annual Report SEC Form 20-F 2013, 304 pages.

Sanofi-Aventis Annual Report SEC Form 20-F 2014, 413 pages.

Sanofi-Aventis Annual Report SEC Form 20-F 2015, 233 pages.

Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 1 of 4.

Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 2 of 4.

Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 3 of 4.

Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 4 of 4.

Sanofi-Aventis Annual Report SEC Form 20-F, Dec. 2006, pp. 1-301.

Sanofi-aventis Annual Report SEC Form 20-F, Dec. 2007, pp. 1-283.

Sanofi-aventis Annual Report SEC Form 20-F, Dec. 2008, pp. 1-320.

Sanofi-Aventis Annual Report SEC Form 20-F (Dec. 31, 2006) at 39, [retrieved on Jun. 27, 2014] Retrieved from the internet: (URL: http://www.sec.gov/Archives/edgar/data/1121404/000119312507072848/d20f.htm).

Sanofi-Aventis Annual Review, 2008, pp. 1-28, URL: https://ddd.uab.cat/pub/infanu/34542/iaSANAVEa2008ieng.pdf.

Sanofi-Aventis Press Release: EPS Growth in Q2 2010, (Jul. 29, 2010), pp. 1-27.

Sanofi-Aventis Press Release, Jevtana (cabazitaxel) Injection Now Available in the U.S., (Jul. 19, 2010).

Sanofi-Aventis Press Release: "Phase III Data Showing Improved Survival with Jevtana® (cabazitaxel) injection in Second-Line Advanced Prostate Cancer Published in the Lancet,", retrieved on Oct. 30, 2018 from http://www.news.sanofi.us/press-releases?item=118536&amp;printable.

Sanofi-Aventis Press Release: Q1 2010: A Good First Quarter, (Apr. 29, 2010), pp. 1-19.

Sanofi-Aventis Press Release: Resilient Sales and Business EPS in Q3 2010, (Oct. 28, 2010), pp. 1-24.

Sanofi-Aventis Press Release: Sanofi-Aventis Delivers 2008 Results Above Guidance, Feb. 11, 2009, pp. 1-27.

Sanofi-Aventis Press Release: Sanofi•Aventis Delivers Double-Digit EPS Growth in 2009 as the Transformation Program Progresses, Feb. 10, 2010, pp. 1-26.

Sartor et al., Cabazitaxel vs. Docetaxel in Chemotherapy-Naïve (CN) Patients with Metastatic Castration-Resistant Prostate Cancer (mCRPC): A Three Arm Phase III Study (FIRSTANA), J. Clin. Oncol. Abstr. 5006 (2016).

(56)        **References Cited**

OTHER PUBLICATIONS

Sartor O., et al., "Cabazitaxel vs docetaxel in chemotherapy-naïve patients with metastatic castration-resistant prostate cancer: A three-arm phase III study (FIRSTANA)," ASCO Annual meeting 2016, slides 1-22.

Sartor O., et al., "Improving Outcomes with Recent Advances in Chemotherapy for Castrate-Resistant Prostate Cancer," Clinical Genitourinary Cancer, 2010, vol. 8 (1), pp. 23-28.

Sartor O., et al., "Novel Therapeutic Strategies for Metastatic Prostate Cancer in the Post-Docetaxel Setting," The Oncologist, Nov. 2011, vol. 16 (11), pp. 1487-1497.

Sartor O., "State-of-the-Art Management for the Patient with Castration-Resistant Prostate Cancer in 2012," American Society of Clinical Oncology Educational Book, Jan. 2012, vol. 32, pp. 289-291.

Sessa et al., Phase I Clinical and Pharmacokinetic Studies of the Taxoid Derivative RPR 109881A Administered as a 1-Hour or 3-Hour Infusion in Patients with Advanced Solid Tumors, Annals of Oncol. 1140-50 (2002).

Sessa et al., Phase I Clinical and Pharmacokinetic Study of the Oral Platinum Analogue JM216 Given Daily for 14 Days, Annals of Oncol. 1315-22 (1998).

Shabazuy K., et al., "New Drugs at the Horizon for Men with Prostate Cancer," Revue Medicale Suisse, 2010, vol. 6 (250), pp. 1057-1058 and 1060-1061.

Sheiner L.B., "Learning versus confirming in clinical drug development," Clinical Pharmacology & Therapeutics, Mar. 1997, vol. 61(3), pp. 275-291.

Shelley M., et al., "Docetaxel Plus Prednisone Improves Survival in Men with Advanced Prostate Cancer," Cancer Treatment Reviews, 2005, vol. 31 (5), pp. 403-407.

Shepard D.R., et al., "Estimation of the Effect of Food on the Disposition of Oral 5-Fluorouracil in Combination with Eniluracil," Cancer Chemotherapy and Pharmacology, May 2002, vol. 49(5), pp. 398-402.

Shimazui T., et al., "Three-Weekly Docetaxel with Prednisone is Feasible for Japanese Patients with Hormone-Refractory Prostate Cancer: A Retrospective Comparative Study with Weekly Docetaxel Alone," Journal of Clinical Oncology, 2007, vol. 37 (8), pp. 603-608.

Signs and Symptoms of Prostate Cancer, American Cancer Society, Retrieved from the internet on Nov. 19, 2016 at http://www.cancer.org/cancer/prostatecancer/detailedguide/prostate-cancer-signs-symptoms.

Singh A.K., et al., "Interpreting Results of Clinical Trials: A Conceptual Framework," Clinical Journal of the American Society of Nephrology, Sep. 2008, vol. 3(5), pp. 1246-1252.

Slovin S.F., et al., "Ipilimumab Alone or in Combination with Radiotherapy in Metastatic Castration-Resistant Prostate Cancer: Results from an Open-Label, Multicenter Phase I/II Study," Annals of Oncology, 2013, vol. 24 (7), pp. 1813-1821.

Small E., et al., "Randomized Phase II Study Comparing 4 Monthly Doses of Ipilimumab (MDX-010) as a Single Agent or in Combination with a Single Dose of Docetaxel in Patients with Hormone-Refractory Prostate Cancer," Journal of Clinical Oncology (Meeting Abstracts), 2006, vol. 24 (18S), pp. S4609.

Small E.J., et al., "Granulocyte Macrophage Colony Stimulating Factor-Secreting Allogeneic Cellular Immunotherapy for Hormone-Refractory Prostate Cancer," Clinical Cancer Research, 2007, vol. 13, pp. 3883-3891.

Small E.J., et al., "Randomized Study of Three Different Doses of Suramin Administered with a Fixed Dosing Schedule in Patients with Advanced Prostate Cancer: Results of Intergroup 0159, Cancer and Leukemia Group B 9480," Journal of Clinical Oncology, Aug. 2002, vol. 20(16), pp. 3369-3375.

Small et al., A Phase II Trial of Gefitinib in Patients with Non-Metastatic Hormone-Refractory Prostate Cancer, 100 BJU Int'l. 765-69 (2007).

Sonpavde et al., Sunitinib Malate for Metastatic Castration-Resistant Prostate Cancer Following Docetaxel-Based Chemotherapy, 21(2) Ann. Oncol. 319-24 (2010).

Gottesman M.M., "Mechanisms of Cancer Drug Resistance," Annual Review of Medicine, Feb. 2002, vol. 53, pp. 615-627.

MSN's Detailed Statement of the Factual and Legal Bases for Its Opinion That U.S. Pat. No. 8,927,592 B2 Is Invalid, pp. 9-29 [Redacted].

Spigel D.R., 'Single-Agent Gefitinib in Patients with Untreated Advanced Non-Small-Cell Lung Cancer and Poor Performance Status: A Minnie Pearl Cancer Research Network Phase II Trial,' Clinical Lung Cancer, vol. 7, No. 2, pp. 127-132 (2005).

Stedman's Medical Dictionary, pp. 168, 360, 376, 537, and 1215, 27th Edition, 2000.

Sternberg C.N., et al., "Larotaxel with Cisplatin in the First-Line Treatment of Locally Advanced/Metastatic Urothelial Tract or Bladder Cancer: A Randomized, Active-Controlled, Phase III Trial (Cilab)," Oncology, 2013, vol. 85 (4), pp. 208-215.

Straub et al., Intravenous Hydrophobic Drug Delivery: A Porous Particle Formulation of Paclitaxel (AI-850), 22(3) Pharm. Res. 347-55 (2005).

Sullivan P.W., et al., "Quality of Life as a Potential Predictor for Morbidity and Mortality in Patients with Metastatic Hormone-Refractory Prostate Cancer," Quality of Life Research, Oct. 2006, vol. 15(8), pp. 1297-1306.

Susman, Asgo: Calcitriol Fails in ASCENT-2 Prostate CA Trial, MedPage Today, Jun. 9, 2010 [retrieved on Jun. 27, 2014], Retrieved from the Internet:(URL:http://www.medpagetoday.com/MeetingCoverage/ASC0/20575).

Sutent (sunitinib malate) Label (Apr. 2008).

Szmulewitz R.Z., et al., "Playing Russian Roulette with Tyrosine Kinase Inhibitors," Clinical Pharmacology & Therapeutics, 2013, vol. 93(3), pp. 242-244.

Takeda M., et al., "The Establishment of two Pacilitaxel Resistant Cancer Cell Lines and the Mechanism of Pacilitaxel Resistance With Two Cell Lines," The Prostate, 2007, vol. 67 (9), pp. 955-967.

Tan, "Novel Agents in the Treatment of Hormone-Independent Metastatic Prostate Cancer," Actas Urológicas Españolas, 2007, vol. 31 (6), pp. 660-685 (followed by English translation).

Tannock I., et al., "Treatment of Metastatic Prostatic Cancer with Low-Dose Prednisone: Evaluation of Pain and Quality of Life as Pragmatic Indices of Response," Journal of Clinical Oncology, 1989, vol. 7 (5), pp. 590-597.

Tannock I.F., et al., "Chemotherapy with Mitoxantrone Plus Prednisone or Prednisone Alone for Symptomatic Hormone-Resistant Prostate Cancer: A Canadian Randomized Trial with Palliative End Points," Journal of Clinical Oncology, 1996, vol. 14 (6), pp. 1756-1764.

Tarceva (erlotinib) Label (Apr. 2009).

Taxotere (Docetaxel) mejora significativamente la supervivencia de los pacientes con cancer de prostata avanzado. Retrieved from the Internet: (URL: http://www.pmfarma.es/noticias/7074-taxotere-docetaxelmejora-significativamente-la-supervivencia-de-los-pacientes-con-cancer-de-prostataavanzado).

Taxotere (Docetaxel) Significantly Improves the Survival of Patients With Advanced Prostate Cancer, Feb. 2007, sanofi-aventis Press Release; pp. 1-4.

Taxotere Patient Information Leaflet and Prescribing Information (Label), May 2004, pp. 1-35.

Taxotere Patient Information Leaflet and Prescribing Information (Label), Oct. 2006, pp. 1-55.

Taxotere Prescribing Information (Label), Sep. 2007, pp. 1-57.

Taylor B.S., et al., "Integrative Genomic Profiling of Human Prostate Cancer," Cancer cell, 2010, vol. 18(1), pp. 11-22.

Ten Tije et al., Pharmacological Effects of Formulation Vehicles: Implications for Cancer Chemotherapy, 42(7) Clin. Pharmacokinet. 665-85 (2003).

The National Horizon Scanning Centre of National Institute for Health Research, Cabazitaxel (XRP-6258) for Hormone Refractory, 2009, Metastatic Prostate Cancer—Second line After Docataxel, University of Birmingham, pp. 1-6.

Torisel (temsirolimus) Label (May 2007).

Trudeau et al., Docetaxel in Patients with Metastatic Breast Cancer: A Phase II Study of the National Cancer Institute of Canada—Clinical Trials Group, J. Clin. Oncol., 422-428 (1996).

# US 10,583,110 B2

Page 11

(56)         **References Cited**

OTHER PUBLICATIONS

Tufts Cost Study as retrieved on Feb. 1, 2017 from http://csdd.tufts.edu/news/complete_story/pr_tufts_csdd_2014_cost_study, pp. 1-3, 2014.

Un farmaco contra el cancer de prostata demuestra una alta eficacia. Retrieved from the internet: (URL: http://www.dimedicina.com/enfermedades/urologicas/actualidad/un-farmaco-contra-elcancer-de-prostata-demuestra-una-alta-eficacia).

Undevia S.D., et al., "Pharmacokinetic Variability of Anticancer Agents," Nature Reviews Cancer, Jun. 2005, vol. 5 (6), pp. 447-458.

Van Cutsem., et al., A Phase III Study Comparing Larotaxel vs 5-FU (Continuous Intravenous 5-FU or Capecitabine) in Patients with Advanced Pancreatic Cancer (APC) Previously Treated with a Gemcitabine Containing Regimen, 21(6S) Annals of Oncol. Oral Presentations, O-0007, Jul. 2010.

Van Hook K., et al., "Orteronel for the Treatment of Prostate Cancer," Future Oncology, 2014, vol. 10 (5), pp. 803-811.

Van Ruitenbeek P., et al., 'Histamine H1-receptor blockade in humans affects psychomotor performance but not memory,' Journal of psychopharmacology, vol. 22 No. 6, pp. 663-672 (2008).

Van Tellingen, O., et al., "Cremophor EL Causes (pseudo-) Non-Linear Pharmacokinetics of Paclitaxel in Patients," British Journal of Cancer, Sep. 1999, vol. 81 (2), pp. 330-335.

Verweij, et al., Paclitaxel (Taxol) and Docetaxel (Taxotere): Not Simply Two of a Kind, Ann. Oncol. 495-505 (1994).

View of NCT00417079 on 2008_08_31-XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metasiatic Prostate Cancer, (retrieved on Apr. 6, 2015). Retrieved from the internet: (URL: https://clinicaltrials.gov/archive/NCT00417079/2008_08_31).

Vogel et al., Efficacy and Safety of Trastuzumab as a Single Agent in First-Line Treatment of HER2-Overexpressing Metastatic Breast Cancer, 20(3) J. Clin. Oncol. 719-26 (2002).

Vogelzang N.J., et al., "A Phase II Trial of Suramin Monthly x 3 for Hormone-Refractory Prostate Carcinoma," Cancer, 2003, vol. 100 (1), pp. 65-71.

Von Hoff D.D and Turner J., "Response Rates, Duration of Response, and Dose Response Effects in Phase I Studies of Antineoplastics," Investigational New Drugs, Feb. 1991, vol. 9 (1), pp. 115-122.

Vrignaud et al., Preclinical Antitumor Activity of Cabazitaxel, a Semisynthetic Taxane Active in Taxane-Resistant Tumors, 19(11) Clin. Cancer Res. 2973-83 (2013).

Vrignaud et al., Preclinical Profile of Cabazitaxel, Drug Des. Devel. & Ther. 1851-67 (2014).

Wazana, Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift?, JAMA 283 (2000) 373-380.

What is Prostate Cancer?, Jevatana (cabazitaxel) Injection, Retrieved from the internet on Sep. 19, 2016 at http://www.jevtana.com/what-is-prostate-cancer.

What is PROVENGE Immunotherapy?, Retrieved from the internet on Oct. 5, 2016 at http://www.provenge.com/advanced-prostate-cancer-immunotherapy.aspx.

Why ZYTIGA? (abiraterone acetate), Retrieved from the internet on Oct. 6, 2016 at https://www.zytigo.com/about-zytigo/why-zytiga.

Wiechec E., et al., "The Effect of Genetic Variability on Drug Response in Convention Breast Cancer Treatment," European Journal of Pharmacology, 2009, vol. 625 (1-3), pp. 122-130.

Williams R., 'Discontinued drugs in 2007: oncology drugs,' Expert Opinion Investig. Drugs, vol. 17 No. 12, pp. 1791-1816, (2008).

Williams R., et al., "Discontinued Drugs in 2008: Oncology Drugs," Expert Opinion on Investigational Drugs, 2009, vol. 18 (11), pp. 1581-1594.

Wils, P., et al., "Polarized transport of docetaxel and vinblastine mediated by Pglycoprotein in human intestinal epithelial cell monolayers," Biochemical Pharmacology, 48(7):1528-30 (1994).

Wirth, et al., "The Antiandrogen Withdrawal Syndrome," Urol. Res., 1997, 25 (Suppl. 2), pp. S67-S71.

Wirth M.P., "Hormone-refractory Prostate Cancer: What Have We Learned?," BJU International, Jul. 2007, vol. 100 (Suppl 2), pp. 56-59.

World Health Organization WHO Handbook for Reporting Results of Cancer Treatment, Geneva, 1979, pp. 1-46.

Xeloda (capecitabine) Label Feb. 2003.

XOFIGO (radium Ra 223 dichloride) Label (May 2013).

Xtandi Clinical Trials & Results, How Xtandi May Help, Retrieved from the internet on Oct. 6, 2016 at https://www.xtandi.com/xtandi-clinical-trials.

Xtandi (enzalutamide) Label (Aug. 2012).

Yervoy (ipilimumab), Prescribing Information (Label), Dec. 2013.

Yoo G.H., et al., "XRP6258-Induced Gene Expression Patterns in Head and Neck Cancer Carcinoma," The Laryngoscope, 2010, vol. 120 (6), pp. 1114-1119.

Zatloukal P., et al., "Randomized Multicenter Phase II Study of Larotaxel (XRP9881) in Combination with Cisplatin or Gemcitabine as First-Line Chemotherapy in Nonirradiable Stage IIIB or Stage IV Non-Small Cell Lung Cancer," Journal of Thoracic Oncology, 2008, vol. 3(8), pp. 894-901.

Zhu, et al., Does "Clock" Matter in Prostate Cancer, Cancer Epidemiol. Biomarkers Prev. 3-5 (2006).

Ziada et al., The Use of Trastuzumab in the Treatment of Hormone Refractory Prostate Cancer; Phase II Trial, 60(4) The Prostate 332-37 (2004).

Zielinski A., et al., "Custirsen (OGX-011): a Second-Generation Antisense Inhibitor of Clusterin in Development for the Treatment of Prostate Cancer," Future Oncology, 2012, vol. 8 (10), pp. 1239-1251.

Zytiga (abiraterone acetate) Label (Apr. 2011).

Sanofi Mature IP v. Mylan Laboratories Limited, Case No. 2018-1203, United States Court of Appeals for the Federal Circuit, Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2016-00712, Decision dated Feb. 5, 2019, 12 pages.

Lenz, H.J., Management and Preparedness for Infusion and Hypersensitivity Reactions, The Oncologist, 12:601-609, 2007.

R008407, Non Final Office Action issued by the U.S. Patent and Trademark Office in U.S. Appl. No. 16/251,143, filed Jan. 18, 2019, dated Mar. 1, 2019.

R008406, Patent Owner's Responsive Brief on the Effect of the CAFC Decision on Patent Owner's Motion to Amend as submitted in the U.S. Patent and Trademark Office before the Patent Trial and Appeal Board Case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 7, 2019, 30 pages.

R008408, Petitioner Mylan's Reply Brief on Remand Pursuant to Paper No. 108 as submitted in the U.S. Patent and Trademark Office before the Patent Trial and Appeal Board Case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 21, 2019, 12 pages.

R008409, Final Written Decision on Remand issued in the Patent Trial and Appeal Board Case IPR2016-00712, U.S. Pat. No. 8,927,592 dated Oct. 22, 2019.

R008410, Final Rejection issued by the U.S. Patent and Trademark Office in U.S. Appl. No. 16/251,143, filed Jan. 18, 2019, dated Aug. 12, 2019.

* cited by examiner



**FIG. 1**



**FIG. 2**

| Factor | Patient number | Hazard ratio (95% CI) |
|---|---|---|
| All randomized patients | 755 | 0.70 (0.59–0.83) |
| ECOG status: 0,1 | 694 | 0.68 (0.57–0.82) |
| ECOG status: 2 | 61 | 0.81 (0.48–1.38) |
| Measurable disease: No | 350 | 0.72 (0.55–0.93) |
| Measurable disease: Yes | 405 | 0.68 (0.54–0.85) |
| No. of prior chemotherapies: 1 | 528 | 0.67 (0.55–0.83) |
| No. of prior chemotherapies: ≥2 | 227 | 0.75 (0.55–1.02) |
| Age: <65 years | 295 | 0.81 (0.61–1.08) |
| Age: ≥65 years | 460 | 0.62 (0.50–0.78) |
| Rising PSA at baseline: No | 159 | 0.88 (0.61–1.26) |
| Rising PSA at baseline: Yes | 583 | 0.65 (0.53–0.80) |
| Total docetaxel dose: <225 mg/m$^2$ | 59 | 0.96 (0.49–1.86) |
| Total docetaxel dose: ≥225 to 450 mg/m$^2$ | 206 | 0.60 (0.43–0.84) |
| Total docetaxel dose: ≥450 to 675 mg/m$^2$ | 217 | 0.83 (0.60–1.16) |
| Total docetaxel dose: ≥675 to 900 mg/m$^2$ | 131 | 0.73 (0.48–1.10) |
| Total docetaxel dose: ≥900 mg/m$^2$ | 134 | 0.53 (0.47–0.90) |
| Progression during docetaxel treatment | 219 | 0.68 (0.57–0.82) |
| Progression <3 months after docetaxel | 339 | 0.70 (0.55–0.91) |
| Progression ≥3 months after docetaxel | 192 | 0.75 (0.51–1.11) |

Favors Cabazitaxel | Favors Mitoxantrone

Hazard ratio and 95% confidence interval
0   0.5   1   1.5   2

**FIG. 3**



**FIG. 4**



**FIG. 5**



**FIG. 6**



**FIG. 7**

US 10,583,110 B2

1

### ANTITUMORAL USE OF CABAZITAXEL

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/575,566, filed Dec. 18, 2014, which is a continuation of U.S. application Ser. No. 13/456,720, filed Apr. 26, 2012, which is a continuation of International Application No. PCT/IB2010/054866, filed Oct. 27, 2010, which claims the benefit of priority of U.S. Provisional Application No. 61/256,160, filed Oct. 29, 2009, U.S. Provisional Application No. 61/293,903, filed Jan. 11, 2010, U.S. Provisional Application No. 61/355,834, filed Jun. 17, 2010, U.S. Provisional Application No. 61/355,888, filed Jun. 17, 2010, U.S. Provisional Application No. 61/369,929, filed Aug. 2, 2010, U.S. Provisional Application No. 61/383,933, filed Sep. 17, 2010, and U.S. Provisional Application No. 61/389, 969, filed Oct. 5, 2010, all of which are incorporated herein by reference.

The present invention relates to a novel antitumoral use of cabazitaxel in the treatment of prostate cancer, which may be metastatic, especially for patients who are not catered for by a taxane-based treatment. In particular, the present invention relates to the use of cabazitaxel in the treatment of patients with castration resistant metastatic prostate cancer, who have been previously treated with a docetaxel based regimen, an unmet medical need.

#### BACKGROUND

Prostate cancer affects a large proportion of the male population worldwide: 680 000 cases worldwide in 2002; it is predicted that there will be 900 000 new cases per year up to 2010 (*CA Cancer J. Clin.*, 2005, 55, 74-108). It is the most frequently occurring cancer in men after lung cancer.

Prostate cancer is generally treated at the start by depriving the androgenic hormones, i.e. by surgical excision of the testicles The Current State of Hormonal Therapy for Prostate Cancer CA Cancer J. Clin., May 2002; 52: 154-179, or by radiotherapy treatment External beam radiation therapy for prostate cancer CA Cancer J. Clin., November 2000; 50: 349-375. Treatments with antiandrogens or hormone manipulations are associated with responses of short duration and without any improvement in the survival time.

The use of cytotoxic chemotherapy is not a routine treatment, whereas its role in alleviating the symptoms and reducing the levels of PSA (prostate-specific antigen) is established. No monotherapy has obtained a degree of response of greater than 30%; combinations with an effect on PSA levels were tested. No effect on the survival time was seen and, what is more, the toxicity of these treatments, particularly on elderly patients, is problematic since, in addition to their tumour, they are generally suffering from related health problems and have a limited reserve of bone marrow.

Until recently, the chemotherapies used were limited to cyclophosphamide, anthracyclines (doxorubicin or mitoxantrone) and estramustine, and the effects of these treatments are relatively mediocre. Palliative effects were observed in patients following the administration of corticoids alone or of mitoxantrone with either prednisone or hydrocortisone. Following Phase II trials, the combination of mitoxantrone with corticoids was recognized as the reference treatment for hormone-resistant prostate cancer. More recently, treatments with docetaxel in combination with estramustine or prednisone have made it possible to treat cancers that are

2

resistant to hormone deprivation Advances in Prostate Cancer Chemotherapy: A New Era Begins CA Cancer J. Clin., September 2005; 55: 300-318, the survival was improved by 2.4 months.

It is generally accepted that the responses in advanced prostate cancers are difficult to evaluate on account of the heterogeneity of the disease and the lack of consensus regarding the treatment response criteria. Many patients with metastatic prostate cancer have no measurable disease, but have symptoms dominated by bone metastases. Measurement of the PSA level has been found to be a means for evaluating novel candidates and also the measurement of the tumour when this is possible, the measurement of bone tumours, the quality of life and the measurement of the pain.

Furthermore, cancer may become resistant to the agents used, in particular to taxanes, which limits the possible treatment options. Several taxane resistance mechanisms have been described (expression of P-glycoprotein P-gp, mdr-1 gene, modified metabolism of taxane, mutation of the tubulin gene, etc.): see *Drug Resistance Updates* 2001, 4(1), 3-8; J. Clin. Onc. 1999, 17(3), 1061-1070.

The technical problem that the invention intends to solve is that of providing a novel therapeutic option for treating prostate cancer, especially for patients who are not catered for by a taxane-based treatment, such as patients with castration resistant metastatic prostate cancer who have been previously treated with docetaxel (sold under the brand name Taxotere®) based regimen, an unmet medical need.

Four clinical trials on cabazitaxel are known since April 2006. Three monotherapy tests have made it possible to determine the maximum tolerated dose and the toxicities at the limit doses: these tests were performed on breast, sarcoma and prostate tumours. Doses of 10-30 mg/m² every three hours were used. A phase II trial was performed on patients with a breast cancer, who had previously received taxanes and anthracyclines as adjuvant (i.e. after a surgery) or as a first-line treatment. The response levels were 14.6% as adjuvant and 9.5% as second-line treatment.

#### SUMMARY

The invention relates to a novel antitumoral pharmaceutical therapeutic use comprising cabazitaxel of formula



The invention also relates to methods of treating patients with prostate cancer comprising administering an effective amount of the antitumoral agent cabazitaxel to said patient.

This antitumoral agent may be in the form of anhydrous base, a hydrate or a solvate, intended for treating prostate cancer, in particular for treating patients who are not catered

US 10,583,110 B2

3

for by a taxane-based treatment, such as patients who have been previously treated with a docetaxel-based regimen. This compound is preferably administered to a patient with advanced metastatic disease. In particular, the compound is administered to a patient with castration resistant prostate cancer. Cabazitaxel is preferably administered in combination with a corticoid chosen especially from prednisone and prednisolone. This corticoid is preferably administered at a daily dose of 10 mg orally.

In some aspects of the invention, cabazitaxel is administered in combination with prednisone for its use as a medicament in the treatment of patients with hormone-refractory prostate cancer who have been previously treated with docetaxel based regimen.

In some aspects of the invention, cabazitaxel is administered at a dose (defined for each administration) of between 20 and 25 mg/m². Cabazitaxel may be in the form of an acetone solvate. More particularly, the acetone solvate of cabazitaxel contains between 5% and 8% and preferably between 5% and 7% by weight of acetone.

In some aspects of the invention, cabazitaxel may be administered by intravenous infusion at a dose of between 15 and 25 mg/m², this administration cycle of the antitumour agent being repeated at an interval of 3 weeks between each cabazitaxel administration, which interval may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding cabazitaxel administration.

In some embodiments, the effective amount of cabazitaxel produces at least one therapeutic effect selected from the group consisting of increase in overall survival, partial response, reduction in tumor size, reduction in metastasis, complete remission, partial remission, stable disease, or complete response.

The present invention also relates to a pharmaceutical composition that treats patients with prostate cancer comprising a clinically proven safe and effective amount of cabazitaxel.

Further embodiments of the invention comprise methods or using, treating, promoting, and providing cabazitaxel.

The present invention also relates to packages and articles of manufacture.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 displays the Kaplan-Meier curves of the overall survival in a cabazitaxel study.

FIG. 2 displays the Kaplan-Meier curves of progression-free survival in a cabazitaxel study.

FIG. 3 shows an intention-to-treat analysis of overall survival in subgroups of patients defined by baseline characteristics. Hazard ratios <1 favor the cabazitaxel group, while those >1 favor the mitoxantrone group. CI denotes confidence intervals.

FIG. 4 graphically depicts the proportion of patients with changes in ECOG performance status from baseline during treatment (safety population). The "Improved" column represents PS2 at baseline changed to 0 or 1 during treatment. The "stable" column represents no change, and the "Worse" column represents PS2 at baseline and changed to ≥3, or 0 or 1 at baseline changed to ≥2 during treatment.

FIG. 5 graphically depicts the proportion of patients with changes from baseline in the Present Pain Intensity score during treatment (ITT). The "Improved" column represents patients in which the PPI score during treatment was lower versus baseline. The "Stable" column represents no change, and the "Worse" column represents patients with >1 unit increase in PPI score during treatment versus baseline.

4

FIG. 6 graphically presents the mean area under the curve for PPI and analgesic scores by treatment cycle.

FIG. 7 graphically presents the mean AUC analgesic score.

DETAILED DESCRIPTION

Definitions

Effective amount, as used herein, means an amount of a pharmaceutical compound, such as cabazitaxel, that produces an effect on the cancer to be treated.

Clinically proven, as used herein, means clinical efficacy results that are sufficient to meet FDA approval standards.

Castration resistant prostate cancer, as used herein, is synonymous with hormone-refractory prostate cancer.

"Patient," as used herein, includes both human and animals. In one embodiment, a patient is a human.

Cabazitaxel belongs to the taxoid family and has the formula:



The chemical name of cabazitaxel is 4α-acetoxy-2α-benzoyloxy-5,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonyl-amino-2-hydroxy-3-phenylpropionate. Cabazitaxel is synonymously known as (2α,5β,7β, 10β,13α)-4-acetoxy-13-({(2R,3S)-3-[(tertbutoxycarbonyl)amino]-2-hydroxy-3-phenylpropanoyl}oxy)-1-hydroxy-7,10-dimethoxy-9-oxo-5,20-epoxytax-11-en-2-yl benzoate.

This compound and a preparative method thereof is described in WO 96/30355, EP 0 817 779 B1 and U.S. Pat. No. 5,847,170, which are hereby incorporated herein by reference. Cabazitaxel may be administered in base form (cf. above formula), or in the form of a hydrate. It may also be a solvate, i.e. a molecular complex characterized by the incorporation of the crystallization solvent into the crystal of the molecule of the active principle (see in this respect page 1276 of J. Pharm. Sci. 1975, 64(8), 1269-1288). In particular, it may be an acetone solvate, and, more particularly, may be the solvate described in WO 2005/028462. It may be an acetone solvate of cabazitaxel containing between 5% and 8% and preferably between 5% and 7% by weight of acetone (% means content of acetone/content of acetone+cabazitaxel×100). An average value of the acetone content is 7%, which approximately represents the acetone stoichiometry, which is 6.5% for a solvate containing one molecule of acetone. The procedure described below allows the preparation of an acetone solvate of cabazitaxel:

5

940 ml of purified water are added at 20±5° C. (room temperature) to a solution of 207 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate at about 92% by weight in about 2 litres of acetone, followed by seeding with a suspension of 2 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate isolated from acetone/water in a mixture of 20 ml of water and 20 ml of acetone. The resulting mixture is stirred for about 10 to 22 hours, and 1.5 litres of purified water are added over 4 to 5 hours. This mixture is stirred for 60 to 90 minutes, and the suspension is then filtered under reduced pressure. The cake is washed on the filter with a solution prepared from 450 ml of acetone and 550 ml of purified water, and then oven-dried at 55° C. under reduced pressure (0.7 kPa) for 4 hours. 197 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate acetone containing 0.1% water and 7.2% acetone (theoretical amount: 6.5% for a stoichiometric solvate) are obtained.

Cabazitaxel may be administered parenterally, such as via intravenous administration. A galenical form of cabazitaxel suitable for administration by intravenous infusion is that in which the cabazitaxel is dissolved in water in the presence of excipients chosen from surfactants, cosolvents, glucose or sodium chloride, etc. For example, a galenical form of cabazitaxel may be prepared by diluting a premix solution of cabazitaxel contained in a sterile vial (80 mg of cabazitaxel+2 ml of solvent+Polysorbate 80) with a sterile vial containing a solution of 6 ml of water and ethanol (13% by weight of 95% ethanol) in order to obtain 8 ml of a solution ready to be rediluted in a perfusion bag. The concentration of cabazitaxel in this ready-to-redilute solution is about 10 mg/ml. The perfusion is then prepared by injecting the appropriate amount of this ready-to-redilute solution into the perfusion bag containing water and glucose (about 5%) or sodium chloride (about 0.9%).

Cabazitaxel may be administered in combination with a corticoid, such as prednisone or prednisolone, as two distinct pharmaceutical preparations.

Accordingly, one aspect of the invention is a method of treating prostate cancer comprising administering to a patient in need thereof an effective amount of cabazitaxel in combination with a corticoid, such as prednisone or prednisolone.

The combination is administered repeatedly according to a protocol that depends on the patient to be treated (age, weight, treatment history, etc.), which can be determined by a skilled physician. In one aspect of the invention, cabazitaxel is administered by perfusion to the patient according to an intermittent program with an interval between each administration of 3 weeks, which may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding administration. The median number of cycles is 6. The prednisone or prednisolone may be administered daily, for example in the form of one dosage intake per day, throughout the duration of the treatment. Examples of doses for the two antitumoral agents are given in the "Example" section. The currently recommended dose is 25 mg/m² of cabazitaxel administered as an one-hour infusion and 10 mg per day of prednisone or prednisolone administered orally.

In some aspects of the invention, the patient to be treated has prostate cancer that is resistant to hormone therapy (i.e., hormone refractory) and has previously been treated with

6

docetaxel. In some aspects, the patient has prostate cancer that progressed during or after treatment with docetaxel. In some aspects, the patient was previously treated with at least 225 mg/m² cumulative dose of docetaxel. In a particular aspect, the patient showed progression of their disease in the six months following hormone therapy or during docetaxel treatment or after docetaxel treatment. In another particular aspect, the patient showed progression of their disease in the three months following hormone therapy or after docetaxel treatment.

In some aspects of the invention, the patient to be treated has a measurable tumour and may show progression of the disease via a metastatic lesion of the viscera or of a soft tissue of at least 1 cm determined by MRI or by an axial tomographic scan (CT scan).

In some aspects of the invention, the patient to be treated has an unmeasurable tumour and may show an increase in the PSA level with three measurements at a 1-week interval or the appearance of new lesions.

In some aspects of the invention, the patient to be treated has undergone castration by orchidectomy or with LHRH agonists, elimination of the androgens or monotherapy with estramustine.

In a preferred aspect, the life expectancy of the patient to be treated should be at least 2 months.

In some aspects, the treatment does not include patients who have previously received mitoxantrone, or who have received less than 225 mg/m² of docetaxel, or who have undergone a radiotherapy that has eliminated more than 40% of the marrow, who have received a treatment within the 4 weeks preceding the test, who have a neuropathy or a stomatitis, involving the brain or the meninges, who have shown severe hypersensitivity to polysorbate or to prednisone, whose blood analysis shows an appreciable decrease in neutrophils, haemoglobin or platelets, an increase in bilirubin and/or liver enzymes and creatinine, or who have heart problems or an infection requiring antibiotics.

An aspect of the invention comprises increasing the survival of a patient with hormone refractory metastatic prostate cancer, comprising administering a clinically proven effective amount of cabazitaxel to the patient in combination with prednisone or prednisolone. In a particular aspect, the patient has previously been treated with a docetaxel-containing regimen.

Cabazitaxel may be administered in combination with a medication to prevent or control nausea and vomiting or to prevent or control hypersensitivity to the cabazitaxel treatment. Preferably, a patient is pre-medicated with the medication, for example, at least 30 minutes prior to administering each dose of cabazitaxel.

One aspect of the invention comprises a method of reducing the risk of a severe hypersensitivity reaction in a patient with prostate cancer being treated with cabazitaxel, comprising administering to the patient a medication to prevent hypersensitivity prior to the administration of cabazitaxel.

Severe hypersensitivity reactions to cabazitaxel can occur and may include generalized rash/erythema, hypotension and bronchospasm. Patients should be observed closely for hypersensitivity reactions, especially during the first and second infusions. Hypersensitivity reactions may occur within a few minutes following the initiation of the infusion of cabazitaxel, thus facilities and equipment for the treatment of hypotension and bronchospasm should be available. If severe hypersensitivity reaction occurs, cabazitaxel infusion should be immediately discontinued and appropriate therapy should be administered. Examples of medications

US 10,583,110 B2

7

8

which may be used to prevent hypersensitivity to the cabazitaxel treatment include antihistamines, such as dexchloropheniramine (for example 5 mg), and diphenhydramine (for example 25 mg) or equivalent antihistamines; and corticosteroids, such as dexamethasone (for example 8 mg) or an equivalent steroid.

Nevertheless, cabazitaxel should not be given to and may be contraindicated in patients who have a history of severe hypersensitivity reactions to cabazitaxel.

Depending on the formulation administered, cabazitaxel may also be contraindicated in patients who have a history of hypersensitivity reactions to other drugs formulated with polysorbate 80.

One aspect of the invention comprises an article of manufacture comprising:

a) a packaging material;

b) cabazitaxel, and

c) a label or package insert contained within the packaging material indicating that severe hypersensitivity reactions can occur.

Gastrointestinal symptoms, such as, for example nausea, vomiting, and diarrhea, may occur with the treatment of cabazitaxel. Mortality related to diarrhea and electrolyte imbalance has been reported. Therefore, patients may also be rehydrated and treated with anti-diarrheal or anti-emetic medications as needed. Treatment delay or dosage reduction may be necessary if patients experience Grade ≥3 diarrhea.

Accordingly, the methods of the invention include administering a medication to prevent hypersensitivity or a medication to prevent or control nausea and vomiting in combination with cabazitaxel.

Examples of medications which may be used to prevent or control nausea and vomiting include histamine $H_2$ antagonists and antiemetics, such as ondansetron, granisetron and dolesetron.

A possible side effect of the treatment with cabazitaxel is neutropenia, which is characterized by a reduced number of neutrophils. Unfortunately, a number of neutropenia deaths have been reported. Therefore, frequent blood counts should be obtained or performed to monitor for neutropenia. If neutropenia occurs, cabazitaxel treatment may be discontinued, and restarted when neutrophil counts recover to a level of >1,500/mm³. Cabazitaxel should not be given to a patient with a neutrophil count ≤1,500 cells/mm³.

The present invention therefore also relates to a method of treating prostate cancer with cabazitaxel comprising administering cabazitaxel to the patient, monitoring blood counts in the patient, and measuring neutrophil levels. In one aspect, the method further comprises discontinuing cabazitaxel treatment if neutropenia occurs, and optionally restarting cabazitaxel treatment when neutrophil counts recover to a level of >1,500/mm³. In one aspect, the monitoring comprises taking a blood sample from the patient.

Determining neutrophil counts can be performed according to procedures well know to those skilled in the art.

One aspect of the invention is a method of reducing the risk of neutropenia complications comprising administering cabazitaxel in combination with an agent useful for treating neutropenia. Such a neutropenia treatment agent is, for example, a hematopoietic growth factor which regulates the production and function of neutrophils such as a human granulocyte colony stimulating factor, (G-CSF). In a particular aspect of the invention, the neutropenia is complicated neutropenia. Complicated neutropenia includes febrile neutropenia, prolonged neutropenia, or neutropenic infec-

tion. In a preferred embodiment, the neutropenia treatment agent is administered prior to the administration of cabazitaxel.

A particular aspect of the invention comprises a method of reducing the risk of neutropenia complications in a patient with prostate cancer being treated with cabazitaxel, comprising monitoring blood counts in the patient at regular intervals during treatment of the patient with cabazitaxel; reducing the dose of cabazitaxel if the patient experiences febrile neutropenia or prolonged neutropenia; discontinuing cabazitaxel treatment if the patients neutrophil count is ≤1,500 cells/mm³; and optionally restarting cabazitaxel treatment when the patients neutrophil counts recover to a level ≤1,500 cells/mm³.

In a particular aspect, primary prophylaxis with G-CSF should be considered in patients with high-risk clinical features (age >65 years, poor performance status, previous episodes of febrile neutropenia, extensive prior radiation ports, poor nutritional status, or other serious co-morbidities) that predispose them to increased complications from prolonged neutropenia. Therapeutic use of G-CSF and secondary prophylaxis should be considered in all patients considered to be at increased risk for neutropenia complications.

In another aspect, the monitoring of complete blood counts is performed on a weekly basis during cycle 1 and before each treatment cycle thereafter so that the dose can be adjusted, if needed. Therefore, another aspect for reducing the risk of neutropenia complications comprises monitoring blood counts in the patient and adjusting the dose of cabazitaxel. An example of a dose modification is described in Example 2.

One aspect of the invention comprises an article of manufacture comprising:

a) a packaging material;

b) cabazitaxel, and

c) a label or package insert contained within the packaging material indicating that cabazitaxel should not be given to patients with neutrophil counts of ≤1,500 cells/mm³.

Cases of renal failure should be indentified and managed aggressively, accordingly to procedures known to those skilled in the art. Renal failure may be associated with sepsis, dehydration, or obstructive uropathy. Furthermore, impaired hepatic function (e.g., total bilirubin ≥ULN, or AST and/or ALT ≥1.5×ULN) may increase cabazitaxel concentrations, and cabazitaxel should not be given to patients with hepatic impairment.

Cabazitaxel may cause fetal harm when administered to a pregnant woman.

Prednisone or prednisolone administered at 10 mg daily does not affect the pharmacokinetics of cabazitaxel.

Cabazitaxel is primarily metabolized through CYP3A. Concomitant administration of strong CYP3A inhibitors (for example, ketoconazole, itraconazole, clarithromycin, atazanavir, indinavir, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin, voriconazole) may increase cabazitaxel concentrations. Therefore co-administration of cabazitaxel with strong CYP3A inhibitors should be avoided. Caution should be exercised with concomitant use of moderate CYP3A inhibitors. One aspect of the invention is a method of treating a patient for prostate cancer comprising determining whether the patient is undergoing treatment with a CYP3A inhibitor, discontinuing treatment with a CYP3A inhibitor, and then administering cabazitaxel to the patient.

Concomitant administration of strong CYP3A inducer (e.g., phenytoin, carbamazepine, rifampin, rifabutin, rifa-

US 10,583,110 B2

9

pentin, phenobarbital) may decrease cabazitaxel concentrations. Therefore co-administration of cabazitaxel with strong CYP3A inducers should be avoided. Therefore, one aspect of the invention is a method of treating a patient for prostate cancer comprising determining whether the patient is undergoing treatment with a CYP3A inducer, discontinuing treatment with a CYP3A inducer, and administering cabazitaxel to the patient.

In addition, patients should also refrain from taking St. John's Wort.

In some aspects of the invention, the cabazitaxel is administered in an amount to provide an AUC of about 991 ng·h/mL (CV 34%).

In some aspects of the invention, the cabazitaxel is administered in an amount to provide an $C_{max}$ of about 226 ng·h/mL (CV 107%).

In some aspects of the invention, the cabazitaxel is administered in an amount to provide a plasma clearance of 48.5 L/h (CV 39%).

One aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that the mean $C_{max}$ of cabazitaxel in patients with metastatic prostate cancer was 226 ng/mL (CV 107%).

Another aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that the mean AUC of cabazitaxel in patients with metastatic prostate cancer was 991 ng·h/mL (CV 34%).

Another aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that cabazitaxel has a plasma clearance of 48.5 L/h (CV 39%).

A variety of educational materials may be employed to ensure proper prescribing, dispensing, and patient compliance according to the methods described herein. For example, a variety of literature and other materials, such as, for example, prescribing information, package inserts, medications guides, physician information sheets, healthcare professional information sheets, medical journal advertisements, and product websites may describe the risks and benefits of taking cabazitaxel.

The invention also concerns a package comprising cabazitaxel and a label, said label comprising one or more messages that:

a) the efficacy and safety of cabazitaxel in combination with prednisone were evaluated in patients with hormone refractory metastatic prostate cancer previously treated with a docetaxel containing regimen; or

b) a total of 755 patients were randomized to receive either cabazitaxel 25 mg/m³ every 3 weeks for a maximum of 10 cycles with prednisone mg orally daily, or to receive mitoxantrone 12 mg/m² intravenously every 3 weeks for a maximum of 10 cycles with prednisone 10 mg orally daily; or

c) the median number of cycles was 6 in the cabazitaxel group and 4 in the mitoxantrone group.

The invention also concerns a package comprising cabazitaxel and a label, said label comprising one or more messages that:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

10

c) cabazitaxel should not be given if neutrophil counts are ≤1,500 cells/mm³.

The invention also concerns a method of promoting the use of cabazitaxel the method comprising the step of conveying to a recipient at least one message selected from:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are ≤1,500 cells/mm³;

d) severe hypersensitivity can occur; or

e) severe hypersensitivity can occur and may include generalized rash/erythema, hypotension and brochospasm; or

f) discontinue cabazitaxel immediately if severe reactions occur; or

g) discontinue cabazitaxel immediately if severe reactions occur and administer appropriate therapy; or

h) cabazitaxel is contraindicated in patients with a history of severe hypersensitivity reactions to cabazitaxel or drugs formulated with polysorbate 80.

The invention also concerns a method of providing cabazitaxel, wherein said cabazitaxel is provided along with information indicating that:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are ≤1,500 cells/mm³;

d) severe hypersensitivity can occur; or

e) severe hypersensitivity can occur and may include generalized rash/erythema, hypotension and brochospasm; or

f) discontinue cabazitaxel immediately if severe reactions occur; or

g) discontinue cabazitaxel immediately if severe reactions occur and administer appropriate therapy; or

h) cabazitaxel is contraindicated in patients with a history of severe hypersensitivity reactions to cabazitaxel or drugs formulated with polysorbate 80.

Example 1

A clinical study was performed wherein patients received either treatment with cabazitaxel or the reference treatment based on mitoxantrone each combined with prednisone or prednisolone.

More specifically, patients over 18 years of age with metastatic castration resistant metastatic prostate cancer either measurable by RECIST criteria or non-measurable disease with rising PSA levels or appearance of new lesions, ECOG (Eastem Cooperative Oncology Group) performance stage 0-2, and adequate organ function (patients had to have neutrophils ≥1,500 cells/mm³, platelets >100,000 cells/mm³, hemoglobin >10 g/dL, creatinine <1.5×upper limit of normal (ULN), total bilirubin <1×ULN, AST <1.5×ULN, and ALT <1.5×ULN) who had had prior hormone therapy, chemotherapy, and radiotherapy, but had progressive during or after docetaxel treatment (cumulative dose ≥225 mg/m²) were randomized to 10 mg/day of prednisone with either mitoxantrone 12 mg/m² or cabazitaxel 25 mg/m², both administered every 3 weeks.

Patients with a history of congestive heart failure, or myocardial infarction within the last 6 months, or patients with uncontrolled cardiac arrhythmias, angina pectoris, and/or hypertension were not included in the study.

US 10,583,110 B2

| 11 | 12 |

720 patients were planned to be included in the clinical study: 360 in each cabazitaxel+prednisone and mitoxantrone+prednisone group. Seven hundred and fifty-five patients (755) (median age 68; 84% white) were actually enrolled, 378 in the cabazitaxel and prednisone/prednisolone group and 377 in the mitoxantrone and prednisone/prednisolone group. The maximal number of treatment cycles was 10 for cabazitaxel and 10 for mitoxantrone. The median number of treatment cycles was 6 for cabazitaxel and 4 for mitoxantrone. The median prior dose of docetaxel treatment was 576 mg/m$^2$ for the cabazitaxel group and 529 mg/m$^2$ for the mitoxantrone group. Median follow-up was 12.8 months.

The measurements of the results are performed via the same tests as at inclusion. MRI and spiral computed tomographic (CT) scans are preferably used.

The results are evaluated according to the following criteria (cf RECIST guideline):

overall survival (OS): the time from inclusion to the study to the date of death complete response (CR): disappearance of the lesions

partial response (PR): at least 30% reduction of the largest diameter of the lesion progression (PD): at least 20% increase in the sum of the largest diameter of the lesion or appearance of one or more new lesions

stable disease (SD): reduction of the tumour insufficient to be included in PR and increase of the tumour insufficient to be included in PD.

The confirmations of the measurements are made at least 4 weeks after the response criterion has been established for the first time.

The progression-free survival (PFS) is the time from inclusion in the study and the date of progression or death when the progression is either an increase of the PSA, or of the tumour, or of the pain.

It was found that the combination of cabazitaxel and prednisone is a well-tolerated combination with the safety profile of taxanes. At the dose investigated in this trial (LD2: 25 mg/m$^2$ cabazitaxel+10 mg/m$^2$/day prednisone), patients receiving cabazitaxel demonstrated statistically significant longer overall survival (OS) compared to mitoxantrone (p<0.0001). The hazard ratio was 0.70 (95% CI. 0.59, 0.83) in favor of cabazitaxel corresponding to a 30% reduction in risk of death. The median survival for patients in the cabazitaxel group was 15.1 months in comparison to 12.7 months in the mitoxantrone group. Notably, the extension of survival was observed irrespective of ECOG performance status, number of prior chemotherapy regimens and age. Benefit was also seen in the third of patients who were docetaxel-refractory and had progressed during docetaxel therapy.

The data related to the treated patients are given in Table 1:

TABLE 1

| Efficacy analysis (intention-to-treat) | | | |
| --- | --- | --- | --- |
| | | CbzP N = 378 Median (months) | MP N = 377 Median (months) |
| Overall survival | Median (months) | 15.1 | 12.7 |
| | Hazard ratio (95% CI) | 0.70 (0.59; 0.83) | |
| | p-value[1] | 0.0001 | |

TABLE 1-continued

| Efficacy analysis (intention-to-treat) | | | |
| --- | --- | --- | --- |
| | | CbzP N = 378 Median (months) | MP N = 377 Median (months) |
| PFS | Median (months) | 2.8 | 1.4 |
| | Hazard ratio (95% CI) | 0.74 (0.64-0.86) | |
| | p-value[1] | 0.0001 | |
| | Tumor response rate | 14.4% | 4.4% |
| | p-value[2] | 0.0005 | |
| Time to Tumor Progression Median (months) | | 8.8 | 5.4 |
| | p-value | <0.001 | |
| | PSA Response rate | 39.2% | 17.8% |
| | p-value[2] | 0.0002 | |
| PSA PFS | Median (months) | 6.4 | 3.1 |
| | Hazard ratio (95% CI) | 0.75 (0.63-0.90) | |
| | p-value[1] | 0.0010 | |
| | Pain Response rate | 9.2% | 7.8% |
| | p-value[2] | 0.6526 | |
| Pain PFS | Median (months) | Not reached | 11.1 |
| | Hazard ratio (95% CI) | 0.91 (0.69-1.19) | |
| | p-value[1] | 0.5192 | |

[1]Log-rank test;
[2]Chi-square test
CbzP: cabazitaxel with prednisone
MP: mitoxantrone with prednisone

Progression free survival (PFS) defined as the earliest progression in tumor, PSA or pain was also statistically significantly longer in the cabazitaxel group compared to the mitoxantrone group (p<0.0001, hazard ratio=0.74 (95% CI, 0.64, 0.86), and the median progression-free survival was 2.8 months versus 1.4 months. Response rates and PFS for PSA and tumor assessments were statistically significant in favor of cabazitaxel, while response rate and PFS for pain did not show a statistically significant difference.

The most frequent Grade 3/4 toxicities were neutropenia observed with a higher frequency in the cabazitaxel group with 81.7% compared to the mitoxantrone group with 58.0%. Rates of febrile neutropenia were 7.5% in the cabazitaxel group and 1.3% in the mitoxantrone group.

The most common (≥20%) grade 1-4 adverse reactions were anemia, leukopenia, neutropenia, thrombocytopenia, diarrhea, fatigue, nausea, vomiting, asthenia, and constipation.

The most common (≥5%) grade 3-4 adverse reactions in patients who received cabazitaxel were neutropenia, leukopenia, anemia, febrile neutropenia, diarrhea, fatigue, and asthenia.

Subgroup analyses by risk factors and a multivariate analysis showed that OS outcomes were consistent and robust in favor of cabazitaxel as shown in the herebelow table:

TABLE 2

| | MP | | CbzP | | |
| --- | --- | --- | --- | --- | --- |
| | N (%) | Median OS (mos) | N (%) | Median OS (mos) | CbzP vs MP HR (95% CI) |
| ITT | 377 (100) | 12.7 | 378 (100) | 15.1 | 0.70 (0.59-0.83) |
| PD while on D | 103 (27) | 12.0 | 113 (30) | 14.2 | 0.65 (0.47-0.90) |

US 10,583,110 B2

## 13

### TABLE 2-continued

| | MP | | CbzP | | |
|---|---|---|---|---|---|
| | N (%) | Median OS (mos) | N (%) | Median OS (mos) | CbzP vs MP HR (95% CI) |
| PD after last D dose, ≤3 mos | 180 (48) | 10.3 | 158 (42) | 13.9 | 0.70 (0.54-0.90) |
| PD after last D dose, >3 mos | 91 (24) | 17.7 | 103 (27) | 17.5 | 0.78 (0.53-1.14) |

mos = months
0 = Docetaxel

### TABLE 3

Incidence of Reported Adverse Reactions[1] and Hematologic Abnormalities in ≥5% of Patients Receiving cabazitaxel in Combination with Prednisone or Mitoxantrone in Combination with Prednisone

| | Cabazitaxel 25 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | | Mitoxantrone 12 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | |
|---|---|---|---|---|
| Any Adverse Reaction | Grade 1-4 n (%) | Grade 3-4 n (%) | Grade 1-4 n (%) | Grade 3-4 n (%) |
| Blood and Lymphatic System Disorders | | | | |
| Neutropenia[2] | 347 (94%) | 303 (82%) | 325 (87%) | 215 (58%) |
| Febrile Neutropenia | 27 (7%) | 27 (7%) | 5 (1%) | 5 (1%) |
| Anemia[2] | 361 (98%) | 39 (11%) | 302 (82%) | 18 (5%) |
| Leukopenia[2] | 355 (96%) | 253 (69%) | 343 (93%) | 157 (42%) |
| Thrombocytopenia[2] | 176 (48%) | 15 (4%) | 160 (43%) | 6 (2%) |
| Cardiac Disorders | | | | |
| Arrhythmia[3] | 18 (5%) | 4 (1%) | 6 (2%) | 1 (<1%) |
| Gastrointestinal Disorders | | | | |
| Diarrhea | 173 (47%) | 23 (6%) | 39 (11%) | 1 (<1%) |
| Nausea | 127 (34%) | 7 (2%) | 85 (23%) | 1 (<1%) |
| Vomiting | 83 (22%) | 6 (2%) | 38 (10%) | 0 |
| Constipation | 76 (20%) | 4 (1%) | 57 (15%) | 2 (<1%) |
| Abdominal Pain[4] | 64 (17%) | 7 (2%) | 23 (6%) | 0 |
| Dyspepsia[5] | 36 (10%) | 0 | 9 (2%) | 0 |
| General Disorders and Administration Site Conditions | | | | |
| Fatigue | 136 (37%) | 18 (5%) | 102 (27%) | 11 (3%) |
| Asthenia | 76 (20%) | 17 (5%) | 46 (12%) | 9 (2%) |
| Pyrexia | 45 (12%) | 4 (1%) | 23 (6%) | 1 (<1%) |
| Peripheral Edema | 34 (9%) | 2 (<1%) | 34 (9%) | 2 (<1%) |
| Mucosal Inflammation | 22 (6%) | 1 (<1%) | 10 (3%) | 1 (<1%) |
| Pain | 20 (5%) | 4 (1%) | 18 (5%) | 7 (2%) |
| Infections and Infestations | | | | |
| Urinary Tract Infection[6] | 29 (8%) | 6 (2%) | 12 (3%) | 4 (1%) |
| Pneumonia[7] | 12 (3%) | 9 (2%) | 4 (1%) | 3 (<1%) |
| Investigations | | | | |
| Weight Decreased | 32 (9%) | 0 | 28 (8%) | 1 (<1%) |
| Metabolism and Nutrition Disorders | | | | |
| Anorexia | 59 (16%) | 3 (<1%) | 39 (11%) | 3 (<1%) |
| Dehydration | 18 (5%) | 8 (2%) | 10 (3%) | 3 (<1%) |
| Musculoskeletal and Connective Tissue Disorders | | | | |
| Back Pain | 60 (16%) | 14 (4%) | 45 (12%) | 11 (3%) |
| Arthralgia | 39 (11%) | 4 (1%) | 31 (8%) | 4 (1%) |
| Pain in Extremity | 30 (8%) | 6 (2%) | 27 (7%) | 4 (1%) |
| Muscle Spasms | 27 (7%) | 0 | 10 (3%) | 0 |
| Bone Pain | 19 (5%) | 3 (<1%) | 19 (5%) | 9 (2%) |
| Musculoskeletal Pain | 18 (5%) | 2 (<1%) | 20 (5%) | 3 (<1%) |

## 14

### TABLE 3-continued

Incidence of Reported Adverse Reactions[1] and Hematologic Abnormalities in ≥5% of Patients Receiving cabazitaxel in Combination with Prednisone or Mitoxantrone in Combination with Prednisone

| | Cabazitaxel 25 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | | Mitoxantrone 12 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | |
|---|---|---|---|---|
| Any Adverse Reaction | Grade 1-4 n (%) | Grade 3-4 n (%) | Grade 1-4 n (%) | Grade 3-4 n (%) |
| Nervous System Disorders | | | | |
| Peripheral Neuropathy[8] | 50 (13%) | 3 (<1%) | 12 (3.2%) | 3 (<1%) |
| Dysgeusia | 41 (11%) | 0 | 15 (4%) | 0 |
| Dizziness | 30 (8%) | 0 | 21 (6%) | 2 (<1%) |
| Headache | 28 (8%) | 0 | 19 (5%) | 0 |
| Renal and Urinary Tract Disorders | | | | |
| Hematuria | 62 (17%) | 7 (2%) | 13 (4%) | 1 (<1%) |
| Dysuria | 25 (7%) | 0 | 5 (1%) | 0 |
| Respiratory, Thoracic and Mediastinal Disorders | | | | |
| Dyspnea | 43 (12%) | 4 (1%) | 16 (4%) | 2 (<1%) |
| Cough | 40 (11%) | 0 | 22 (6%) | 0 |
| Skin and Subcutaneous Tissue Disorders | | | | |
| Alopecia | 37 (10%) | 0 | 18 (5%) | 0 |
| Vascular Disorders | | | | |
| Hypotension | 20 (5%) | 2 (<1%) | 9 (2%) | 1 (<1%) |
| Median Duration of Treatment | 6 cycles | | 4 cycles | |

[1]Graded using NCI CTCAE version 3
[2]Based on laboratory values, cabazitaxel: n = 369, mitoxantrone: n = 370.
[3]Includes atrial fibrillation, atrial flutter, atrial tachycardia, atrioventricular block complete, bradycardia, palpitations, supraventricular tachycardia, tachyarrhythmia, and tachycardia.
[4]Includes abdominal discomfort, abdominal pain lower, abdominal pain upper, abdominal tenderness, and GI pain.
[5]Includes gastroesophageal reflux disease and reflux gastritis.
[6]Includes urinary tract infection enterococcal and urinary tract infection fungal.
[7]Includes bronchopneumonia, lobar pneumonia, and pneumonia klebsiella.
[8]Includes peripheral motor neuropathy and peripheral sensory neuropathy.

### TABLE 4

Patient Characteristics

| | MP (n = 377) | CBZP (n = 378) |
|---|---|---|
| Age (years) | | |
| Median [range] | 67 [47-89] | 68 [46-92] |
| ≥65 (%) | 57.0 | 64.9 |
| ECOG PS (%) | | |
| 0, 1 | 91.2 | 92.6 |
| 2 | 8.8 | 7.4 |
| PSA* (ng/mL) | | |
| Median [range] | 127.5 [2-11220] | 143.9 [2-7842] |
| Measurability of disease (%) | | |
| Measurable | 54.1 | 53.2 |
| Nonmeasurable | 45.9 | 46.8 |
| Disease site (%) | | |
| Bone | 87.0 | 80.2 |
| Lymph node | 44.8 | 45.0 |
| Visceral | 24.9 | 24.9 |
| Pain at Baseline, no. (%) | 168 (44.6) | 174 (46.0) |
| Previous Therapy, no. (%) | | |
| Hormonal | 375 (99.5) | 375 (99.2) |
| No. of Chemotherapy | | |

US 10,583,110 B2

| 15 | 16 |

TABLE 4-continued

| Patient Characteristics | | |
| --- | --- | --- |
| | MP (n = 377) | CBZP (n = 378) |
| Regimens | | |
| 1 | 268 (71.1) | 260 (68.8) |
| 2 | 79 (21.0) | 94 (24.9) |
| >2 | 30 (8.0) | 24 (6.3) |
| Radiation | 222 (58.9) | 232 (61.4) |
| Surgery | 205 (54.4) | 198 (52.4) |
| Biologic Agent | 36 (9.5) | 26 (6.9) |
| Previous docetaxel regimens, n (%) | | |
| 1 | 327 (86.7) | 316 (83.6) |
| 2 | 43 (11.4) | 53 (14.0) |
| >2 | 7 (1.9) | 9 (2.4) |
| Median total previous docetaxel dose (mg/m$^2$) | 529.2 | 576.6 |
| Disease progression relative to docetaxel administration, n (%) | | |
| During treatment | 104 (27.6) | 115 (30.4) |
| <3 months from last dose | 181 (48.0) | 158 (41.8) |
| ≥3 months from last dose | 90 (23.9) | 102 (27.0) |
| Unknown | 2 (0.5) | 3 (0.8) |
| Median time from last docetaxel dose to disease progression (months) | 0.7 | 0.8 |

The primary reason for treatment discontinuation in both groups was disease progression (Table 5). The median delivered relative dose intensity was 96.1% in the cabazitaxel group and 97.3% in the mitoxantrone group. In the cabazitaxel group, >75% of patients received >90% of the planned dose intensity. Overall, 5.1% of mitoxantrone treatment courses were dose reduced compared with 9.8% of cabazitaxel treatment courses; 6.3 and 7% of all treatment courses were delayed by 9 days or less, and 1.6 and 2.3% of courses were delayed by more than 9 days for mitoxantrone and cabazitaxel respectively (See Table 5).

TABLE 5

| Treatment Received and Reasons for Discontinuation in the Intention-to-Treat Population.* | | |
| --- | --- | --- |
| | Mitoxantrone (N = 377) | Cabazitaxel (N = 378) |
| Patients receiving study treatment, no. (%) | 371 (98.4) | 371 (98.1) |
| Patients completing planned ten cycles of study treatment, no. (%) | 46 (12.2) | 105 (27.8) |
| Discontinuation of study treatment, no. (%) | 325 (86.2) | 266 (70.4) |
| Reasons for discontinuation of study treatment, no. (%) | | |
| Disease progression | 267 (70.8) | 180 (47.6) |
| Adverse event | 32 (8.5) | 67 (17.7) |
| Non-compliance with protocol | 0 | 1 (0.3) |
| Lost to follow-up | 2 (0.5) | 0 |
| Patient's request | 17 (4.5) | 8 (2.1) |
| Other | 7 (1.9) | 10 (2.7) |
| No. of treatment cycles, median (range)† | 4 (1-10) | 6 (1-10) |
| Relative dose intensity, median % (range)† | 97.3 (42.5-106.0) | 96.1 (49.0-108.2) |
| Treatment delays, no. of cycles (%)‡ | | |
| ≤9 days | 110 (6.3) | 157 (7.0) |

TABLE 5-continued

| Treatment Received and Reasons for Discontinuation in the Intention-to-Treat Population.* | | |
| --- | --- | --- |
| | Mitoxantrone (N = 377) | Cabazitaxel (N = 378) |
| >9 days | 28 (1.6) | 51 (2.3) |
| Dose reductions, no. of cycles (%)‡ | 88 (5.1) | 221 (9.8) |

The results of this study are further illustrated to FIGS. **1**, **2**, and **3**.

Example 2

Table 6 illustrates an example of a dosage modification for adverse reactions in patients treated with cabazitaxel

TABLE 6

| Toxicity | Dosage Modification |
| --- | --- |
| Prolonged grade ≥3 neutropenia greater than 1 week) despite appropriate medication including G-CSF | Delay treatment until neutrophil count is >1,500 cells/mm$^3$, then reduce dosage of cabazitaxel to 20 mg/m$^2$. Use G-CSF for secondary prophylaxis. |
| Febrile neutropenia | Delay treatment until improvement or resolution, and until neutrophil count is >1,500 cells/mm$^3$, then reduce dosage of cabazitaxel to 20 mg/m$^2$. Use G-CSF for secondary prophylaxis. |
| Grade >3 diarrhea or persisting diarrhea despite appropriate medication, fluid and electrolytes replacement | Delay treatment until improvement or resolution, then reduce dosage of cabazitaxel to 20 mg/m$^2$. |

Discontinue cabazitaxel treatment if a patient continues to experience any of these reactions at 20 mg/m$^2$.

Example 3

Performance Status and Pain Scores During Treatment

Methods

ECOG PS, pain measures, and analgesic consumption were assessed prior to every treatment cycle and at the end of study treatment.

Pain assessments: Present Pain Intensity (PPI) scale from the McGill-Melzack questionnaire (Melzack R. Pain 1975; 1:277-99). Mean Analgesic Score (AS) derived from analgesic consumption (in morphine equivalents) was calculated for the one-week period prior to each evaluation. Area under the curve (AUC) of PPI and AS was calculated by the trapezoid formula. Cumulative AUC of PPI and AS was calculated up to the last cycle of data available for each patient. Average AUC of the treatment groups was compared from Cycle 1 to Cycle 10.

Results

Performance status remained stable in most patients during the treatment period and was similar between groups. See FIG. **4**.

Overall, PPI scores were comparable; improving from baseline in 21.3% of men in the CbzP group and 18.2% in the MP group. See FIG. **5**.

The CbzP group had a lower mean area under the curve (AUC) of PPI, suggesting less severe pain especially during cycles 7-10. See FIG. **6**.

US 10,583,110 B2

17 18

Analgesic use was comparable between the groups (lower mean AUC of AS means lower pain medication use). See FIG. **7**.

CONCLUSION

Despite longer treatment with CbzP no worsening in ECOG PS was seen.

Present Pain Intensity score improved in 21% of men in CbzP vs. 18% in MP arm.

Assessment of pain scores suggested less severe pain in the CbzP group during treatment.

Pain medication use was similar between groups.

Example 4

A population pharmacokinetic analysis was conducted in 170 patients with solid tumors at doses ranging from 10 to 30 $mg/m^2$ weekly or every 3 weeks.

Based on the population pharmacokinetic analysis, after an intravenous dose of cabazitaxel 25 $mg/m^2$ every 3 weeks, the mean $C_{max}$ in patients with metastatic prostate cancer was 226 ng/mL (CV 107%) and was reached at the end of the 1-hour infusion ($T_{max}$). The mean AUC in patients with metastatic prostate cancer was 991 ng·h/mL (CV 34%). No major deviation from the dose proportionality was observed from 10 to 30 $mg/m^2$ in patients with advanced solid tumors. The volume of distribution (Vss) was 4,864 L (2,643 $L/m^2$ for a patient with a median BSA of 1.84 $m^2$) at steady state.

Based on the population pharmacokinetic analysis, cabazitaxel has a plasma clearance of 48.5 L/h (CV 39%; 26.4 $L/h/m^2$ for a patient with a median BSA of 1.84 $m^2$) in patients with metastatic prostate cancer. Following a 1-hour intravenous infusion, plasma concentrations of cabazitaxel can be described by a 3-compartment PK model with $\alpha$-, $\beta$-, and $\gamma$-half-lives of 4 minutes, 2 hours, and 95 hours, respectively.

What is claimed is:

**1**. A method of increasing survival comprising administering to a patient in need thereof (1) cabazitaxel, or a hydrate of solvate thereof, as a new cycle every three weeks and (2) dexchlorpheniramine administered at a dose of 5 mg, dexamethasone administered at a dose of 8 mg, and an H2 antagonist, each administered prior to the administration of said cabazitaxel, or hydrate of solvate thereof, wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

**2**. The method according to claim **1**, wherein the dexchlorpheniramine, dexamethasone, and H2 antagonist are administered 30 minutes prior to the administration of said cabazitaxel, or hydrate of solvate thereof.

**3**. The method according to claim **2**, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15-25 $mg/m^2$.

**4**. The method according to claim **3**, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 25 $mg/m^2$.

**5**. The method according to claim **3**, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 20 $mg/m^2$.

**6**. The method according to claim **3**, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15 $mg/m^2$.

\* \* \* \* \*

# EXHIBIT C

US010716777B2

(12) **United States Patent**
Gupta

(10) Patent No.: **US 10,716,777 B2**
(45) Date of Patent: *Jul. 21, 2020

(54) **ANTITUMORAL USE OF CABAZITAXEL**

(71) Applicant: **Sanofi Mature IP**, Paris (FR)

(72) Inventor: **Sunil Gupta**, Lexington, MA (US)

(73) Assignee: **SANOFI MATURE IP**, Paris (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/743,411**

(22) Filed: **Jan. 15, 2020**

(65) **Prior Publication Data**

US 2020/0155497 A1     May 21, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/627,962, filed on Jun. 20, 2017, now Pat. No. 10,583,110, which is a continuation of application No. 14/575,566, filed on Dec. 18, 2014, now abandoned, which is a continuation of application No. 13/456,720, filed on Apr. 26, 2012, now Pat. No. 8,927,592, which is a continuation of application No. PCT/IB2010/054866, filed on Oct. 27, 2010.

(60) Provisional application No. 61/389,969, filed on Oct. 5, 2010, provisional application No. 61/383,933, filed on Sep. 17, 2010, provisional application No. 61/369,929, filed on Aug. 2, 2010, provisional application No. 61/355,888, filed on Jun. 17, 2010, provisional application No. 61/355,834, filed on Jun. 17, 2010, provisional application No. 61/293,903, filed on Jan. 11, 2010, provisional application No. 61/256,160, filed on Oct. 29, 2009.

(51) **Int. Cl.**
| *A61K 31/337* | (2006.01) |
| *A61K 31/164* | (2006.01) |
| *A61K 31/56* | (2006.01) |
| *A61K 31/573* | (2006.01) |
| *A61K 45/06* | (2006.01) |
| *A61K 38/19* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *A61K 31/337* (2013.01); *A61K 31/164* (2013.01); *A61K 31/56* (2013.01); *A61K 31/573* (2013.01); *A61K 38/193* (2013.01); *A61K 45/06* (2013.01)

(58) **Field of Classification Search**
CPC ................................................. A61K 31/337
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,814,470 A | 3/1989 | Colin et al. |
| 5,005,588 A | 4/1991 | Rubin |
| 5,438,072 A | 8/1995 | Bobee et al. |
| 5,698,582 A | 12/1997 | Bastart et al. |
| 5,714,512 A | 2/1998 | Bastart et al. |
| 5,750,561 A | 5/1998 | Bastart et al. |
| 5,847,170 A | 12/1998 | Bouchard et al. |
| 5,889,043 A | 3/1999 | Bouchard et al. |
| 5,962,705 A | 10/1999 | Didier et al. |
| 6,160,135 A | 12/2000 | Bouchard et al. |
| 6,331,635 B1 | 12/2001 | Bouchard et al. |
| 6,346,543 B1 | 2/2002 | Bissery et al. |
| 6,372,780 B2 | 4/2002 | Bouchard et al. |
| 6,387,946 B1 | 5/2002 | Bouchard et al. |
| 6,403,634 B1 | 6/2002 | Bissery |
| 7,074,821 B1 | 7/2006 | Bouchard et al. |
| 7,241,907 B2 | 7/2007 | Didier et al. |
| 7,772,274 B1 | 8/2010 | Palepu |
| 8,378,128 B2 | 2/2013 | Billot et al. |
| 8,846,959 B2 | 9/2014 | Billot et al. |
| 8,927,592 B2 | 1/2015 | Gupta |

(Continued)

FOREIGN PATENT DOCUMENTS

| CN | 1849311 A | 10/2006 |
| EP | 0817779 B1 | 1/2000 |

(Continued)

OTHER PUBLICATIONS

A Promising R&D Portfolio, Well Positioned to Deliver Future Growth, Sanofi-Aventis Press Release, Sep. 2007, pp. 1-11.
A Randomized, Open-label, Phase 3 Study of Larotaxel IV Every 3 Weeks Versus Capecitabine (Xeloda®) Tablets Twice Daily for 2 Weeks in 3 Week Cycles in Patients with Metastatic Breast Cancer (MBC) Progressing After Taxanes and Anthracycline Therapy (EFG6089), 2012 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://en.sanofi.com/img/content/study/EFC_6089_summary.pdf).

(Continued)

*Primary Examiner* — James D. Anderson
(74) *Attorney, Agent, or Firm* — Kelly L. Bender

(57) **ABSTRACT**

The invention relates to a compound of formula:



which may be in base form or in the form of a hydrate or a solvate, in combination with prednisone or prednisolone, for its use as a medicament in the treatment of prostate cancer, particularly metastatic prostate cancer, especially for patients who are not catered for by a taxane-based treatment.

**6 Claims, 7 Drawing Sheets**

**US 10,716,777 B2**

Page 2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 10,583,110 | B2 | 3/2020 | Gupta |
| 2002/0038038 | A1 | 3/2002 | Bouchard et al. |
| 2004/0126379 | A1 | 7/2004 | Adolf et al. |
| 2005/0065138 | A1 | 3/2005 | Didier et al. |
| 2005/0070496 | A1 | 3/2005 | Borovac et al. |
| 2005/0244413 | A1 | 11/2005 | Adolf et al. |
| 2008/0076780 | A1 | 3/2008 | Curwen et al. |
| 2008/0279923 | A1 | 11/2008 | Bradke et al. |
| 2010/0311825 | A1 | 12/2010 | Rortais et al. |
| 2011/0105598 | A1 | 5/2011 | Gurjar et al. |
| 2011/0144362 | A1 | 6/2011 | Billot et al. |
| 2011/0160159 | A1 | 6/2011 | Ryan |
| 2011/0177970 | A1 | 7/2011 | Chauchereau et al. |
| 2011/0237540 | A1 | 9/2011 | Crawford et al. |
| 2012/0077845 | A1 | 3/2012 | Dalton et al. |
| 2012/0115806 | A1 | 5/2012 | Magherini |
| 2012/0301425 | A1 | 11/2012 | Gupta |
| 2015/0118182 | A1 | 4/2015 | Gupta |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 2177630 | A1 | 4/2010 |
| FR | 2732340 | A1 | 10/1996 |
| JP | 2007505866 | A | 3/2007 |
| WO | WO-9418164 | A1 | 8/1994 |
| WO | WO-9630355 | A1 | 10/1996 |
| WO | WO-9630356 | A1 | 10/1996 |
| WO | WO-0010547 | A2 | 3/2000 |
| WO | WO-2005002846 | A1 | 1/2005 |
| WO | WO-2005028462 | A1 | 3/2005 |
| WO | WO-2006062811 | A2 | 6/2006 |
| WO | WO-2010117668 | A1 | 10/2010 |
| WO | WO-2010128258 | A1 | 11/2010 |
| WO | WO-2011051894 | A1 | 5/2011 |
| WO | WO-2011063421 | A1 | 5/2011 |
| WO | WO-2011124669 | A1 | 10/2011 |
| WO | WO-2011130317 | A2 | 10/2011 |
| WO | WO-2011130566 | A2 | 10/2011 |

OTHER PUBLICATIONS

Abrams et al., New Chemotherapeutic Agents for Breast Cancer, Cancer Suppl. 74(3), pp. 1164-1176, 1994.
Abraxane (paclitaxel) Label (May 2007).
Actavis LLC's Detailed Factual and Legal Basis for its Paragraph IV Certification that U.S. Pat. No. 8,927,592 is invalid, Unenforceable and/or Not Infringed by the [ ] Described in Actavis' NDA No. 207970 (2015) (redacted).
Actavis Prednisone Label (2015).
Adam's LLC's Detailed Factual and Legal Basis for its Paragraph IV Certification that U.S. Pat. No. 8,927,592 is invalid, Unenforceable and/or Not Infringed by the [ ] Described in Actavis' NDA No. 207970 (2015) (redacted).
Alimta (pemetrexed) Label (Sep. 2008).
American Cancer Society Cancer Facts & Figures 2005.
American Cancer Society Cancer Facts & Figures 2009.
American Cancer Society Cancer Facts & Figures 2011.
American Cancer Society, Off-Label Drug Use, What is Off-Label Drug Use?, [retrieved from https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/chemotherapy/off-label-drug-use.html] (2017).
Andean Patent Manual. Andean Community secretary, OMPI, EPO, 2004. Section 9.4.
Anonymous, "Early study shows cabazitaxel may be more effective than docetaxel in some patients with advanced prostate cancer," American Society of Clinical Oncology, Inc., posted Apr. 3, 2015 by The ASCO Post, retrieved from internet Oct. 30, 2018 from URL http://www.ascopost.com/News/23626.
Antonarakis E.S., et al., "Phase III Trials with Docetaxel-Based Combinations for Metastatic Castration-Resistant Prostate Cancer," Journal of Clinical Oncology, 2013, vol. 31 (14), pp. 1709-1712.

Antonarakis et al., Novel Targeted Therapeutics for Metastatic Castration-Resistant Prostate Cancer, 291(1) Cancer Lett. 1-13 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4029098/ (published online Aug. 29, 2009).
Apotex, Detailed Statement for ANDA 207736, 2015 (redacted).
Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), 31st Edition, 2011.
Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), 36th Edition, 2016.
Araujo J.C., et al., "Overall Survival (OS) and Safety of Dasatinib/docetaxel Versus Docetaxel in Patients With Metastatic Castration-resistant Prostate Cancer (mCRPC): Results From the Randomized Phase III Ready Trial," Journal of Clinical Oncology, Feb. 2013, vol. 31 (6), Abstract LBA8, 3 pages as retrieved from http://ascopubs.org/doi/10.1200/jco.2013.31.6_suppl.lba8 on Oct. 30, 2018.
Archimbaud; Y., "Mouse plasma and tumor pharmacokinetics of TXD258, a new taxoid", American Association for Cancer Research, 91st Annual Meeting, Apr. 1-5, 2000, vol. 41, Abstract 1373, p. 215.
Armstrong A.J., et al., "New Drug Development in Metastatic Prostate Cancer," Urologic Oncology, 2008, vol. 26 (4), pp. 430-437.
Armstrong and Carducci, New Drugs in Prostate Cancer, 16 Curr. Opin. Urol. 138-45 (2006).
Attard G., et al., "Update on Tubulin-Binding Agents," Pathologie-Biologie, 2006, vol. 54 (2), pp. 72-84.
Avastin (bevacizumab), Prescribing Information (Label), Jul. 2009.
*Aventis Pharma S.A.* v. *Mylan Laboratories Limited,* Case No. 2018-1203, United States Court of Appeals for the Federal Circuit, Brief for Appellant, dated Mar. 15, 2018.
*Aventis Pharma S.A.* v. *Mylan Laboratories Limited,* Case No. 2018-1203, United States Court of Appeals for the federal Circuit, Reply Brief for Appellant, dated May 18, 2018.
*Aventis Pharma S.A.* v. *Mylan Laboratories Limited,* Case No. 2018-1203, United States Court of Appeals for the federal Circuit, Responsive Brief, dated Apr. 24, 2018.
Bahl A., et al., Final quality of life and safety data for patients with metastatic castration-resistant prostate cancer treated with cabazitaxel in the UK early access programme (EAP) (NCT01254279), BJU International. vol. 116, pp. 880-887 (2015).
Bahl A., et al., 'Impact of cabazitaxel on 2-year survival and palliation of tumour-related pain in men with metastatic castration-resistant prostate cancer treated in the TROPIC trial,' Annals of Oncology, vol. 24 No. 9, pp. 2402-2408 (2013).
Baselga et al., Phase II Study of Weekly Intravenous Trastuzumab (Herceptin) in Patients with HER2/neu-Overexpressing Metastatic Breast Cancer, Semin. in Oncol. vol. 26 No. 4, Suppl. 12, pp. 78-83, 1999.
Baselga J., et al., 'Phase II study of efficacy, safety, and pharmacokinetics of frastuzumab monotherapy administered on a 3-weekly schedule,' Journal of Clinical Oncology vol. 23 No. 10, pp. 2162-2171 (2005).
Beardsley E.K., et al., "Systemic Therapy After First-Line Docetaxel in Metastatic Castration-Resistant Prostate Cancer," Current Opinion in Supportive and Palliative Care, 2008, vol. 2 (3), pp. 161-166.
Bedikian A.Y., et al., 'Phase 3 study of docosahexaenoic acid-paclitaxel versus dacarbazine in patients with metastatic malignant melanoma,' Annals of Oncology vol. 22 No. 4, pp. 787-793 (2011).
Beer et al., Phase II Study of KOS-862 in Patients with Metastatic Androgen Independent Prostate Cancer Previously Treated with Docetaxel, 25 Invest. New Drugs 565-70 (2007).
Beer T.M., et al., "Double-Blinded Randomized Study of High-Dose Calcitriol Plus Docetaxel Compared with Placebo Plus Docetaxel in Androgen-Independent Prostate Cancer: A Report from the Ascent Investigators," Journal of Clinical Oncology, 2007, vol. 25 (6), pp. 669-674.
Beeram M. et al., 'A phase I and pharmacokinetic (PK) study of the novel taxane BMS 184476 administered as a 1-hour intravenous (IV) infusion weekly.' Proceedings of ASCO vol. 20, p. 106a, Abstract 421 (2001).
Berry D.L., et al. , "Quality of Life and Pain in Advanced Stage Prostate Cancer: Results of a Southwest Oncology Group Random-

# US 10,716,777 B2

Page 3

(56) **References Cited**

OTHER PUBLICATIONS

ized Trial Comparing Docetaxel and Estramustine to Mitoxantrone and Prednisone," Journal of Clinical Oncology, 2006, vol. 24 (18), pp. 2828-2835.

Berry W., et al., "Phase III Study of Mitoxantrone Plus Low Dose Prednisone Versus Low Dose Prednisone Alone in Patients with Asymptomatic Hormone Refractory Prostate Cancer," The Journal of Urology, 2002, vol. 168 (6), pp. 2439-2443.

Berthold D.R., et al., "Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer: Updated Survival in the TAX 327 Study," Journal of Clinical Oncology, Jan. 10, 2008, vol. 26 (2), pp. 242-245.

Bissery et al., Experimental Antitumor Activity of Taxotere (RP 56976, NSC 628503), a Taxol Analogue, Cancer Research 51 pp. 4845-4852, 1991.

Bissery M.C., et al., "Preclinical Evaluation of TXD258, A New Taxoid," Proceedings of the American Association for Cancer Research, 2000, vol. 41, pp. 214, Abstract No. 1364.

Booth B., et al., "Oncology's Trials," Nature Reviews, Drug Discovery, 2003, vol. 2 (8), pp. 609-610.

Bouchet B.P., et al., "Cabazitaxel, a New Taxane with Favorable Properties," Drugs of Today (Barcelona, Spain, 2010, vol. 46 (10), pp. 735-742.

BPI's Detailed Factual and Legal Bases in Support of its Paragraph IV Certification for Cabazitaxel Solution. IV, 2015 (redacted).

Brady, Urological Institute Johns Hopkins Medical Institutions, New Drugs for Prostate Cancer: Chemotherapy Transformed, vol. VI, 1-2, 2003.

Bristol-Myers Squibb, 'In the pipeline Dec. 31, 2014,' URL: http://www.bms.com/research/pipleline/Pages/default.aspx. Retrieved on Aug. 5, 2016.

Bristol-Myers Squibb Reports Results for Phase 3 Trial of Yervoy (Ipilimumab) in Previously•Treated Castration Resistant Prostate Cancer, Press Release Sep. 12, 2013 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL:http://news.bms.com/press-release/rd-news/bristol-myers-squibb-reports-results-phase-3-trial-yervoy-ipilimumab-previous).

Brooks, FDA Grants Expanded Indication for Enzalutamide (Xtandi) Medscape, 2004 (http://www.medscape.com/viewarticle/831548) (retrieved on Mar. 13, 2017).

Buonerba C., et al., "Docetaxel Rechallenge in Castration-Resistant Prostate Cancer: Scientific Legitimacy of Common Clinical Practice," European Urology, 2010, vol. 58 (4), pp. 636-637.

Butler M.S., et al., "Natural Products to Drugs: Natural Product-Derived Compounds in Clinical Trials," Natural Product Reports, 2008, vol. 25 (3), pp. 475-516.

Byrn, S.R., et al., 'Solid-state chemistry of drugs,' 2nd edition, SSCI, Inc., pp. 12-13, 233 and 516-517 (1999).

Cabazitaxel (XRP-6258) for hormone refractory, metastatic prostate cancer second line after docetaxel, National Horizon Scanning Centre, National Institute for Health Research, University of Birmingham, Apr. 2009, pp. 1-5.

Cabral F., et al., "Factors Determining Cellular Mechanisms of Resistance to Antimitotic Drugs," Drug Resistance Updates, 2001, vol. 4 (1), pp. 3-8.

Cabrespine, et al., Randomized Phase II Study Comparing Paclitaxel and Carboplatin Versus Mitoxantrone in Patients with Hormone-Refractory Prostate Cancer, Urology, 67(2), 354-359 (2006).

Caffo et al., Pemetrexed as Second-Line Chemotherapy for Castration-Resistant Prostate Cancer After Docetaxel Failure: Results from a Phase II Study, 31(2) Urol. Oncol. 180-86 (2013).

Camptosar (irinotecan) Label (Jul. 2005).

Cancer de Prostata Diseminado, Quimioterapia, [Retrieved on Jul. 29, 2014] pp. 1-9. Retrieved from the internet: (URL:http://www.guisalud.es/egpc/cancer_Prostata/resumida/apartado06/otros02.html).

Cancer Therapy Evaluation Program Common Toxicity Criteria, Version 2.0, DCTD, NCI; NIH, DHHS. revised Mar. 1998, published Apr. 30, 1999, pp. 1-35.

Canil C.M., et al., "Is There a Role for Chemotherapy in Prostate Cancer?," British Journal of Cancer, 2004, vol. 91, pp. 1005-1011.

Canil et al., Randomized Phase II Study of Two Doses of Gefitinib in Hormone-Refractory Prostate Cancer: A Trial of the National Cancer Institute of Canada—Clinical Trials Group, 23(3) J. Clin. Oncol. 455-60 (2005).

Carducci M.A., 'Atrasentan, an endothelin-receptor antagonist for refractory adenocarcinomas: safety and pharmacokinetics,' Journal of Clinical Oncology vol. 20 No. 8, pp. 2171-2180 (2002).

Carducci M.A., et al., "A Phase 3 Randomized Controlled Trial of the Efficacy and Safety of Atrasentan in Men with Metastatic Hormone-Refractory Prostate Cancer," Cancer, 2007, vol. 110 (9), pp. 1959-1966.

Carlson et al., Breast Cancer—Clinical Practice Guidelines in Oncology, 7(2) J. National Comprehensive Cancer Network 122-92 (2009).

Carlson R.O., et al., "New Tubulin Targeting Agents Currently in Clinical Development," Expert Opinion on Investigational Drugs, 2008, vol. 17 (5), pp. 707-722.

CBO Promotional Spending for Prescription Drugs, pp. 1-8, Dec. 2, 2009.

Chemotherapy for Prostate Cancer, American Cancer Society, Retrieved from the internet on Oct. 6, 2016 at https://www.cancer.org/cancer/prostate-cancer/treating/chemotherapy.html.

Chen et al., Gefitinib Treatment is Highly Effective in Non-Small-Cell Lung Cancer Patients Failing Previous Chemotherapy in Taiwan: A Prospective Phase II Study, J. Chemother. 17(6) pp. 679-684, 2005.

Chen, Optimal Adaptive Group Sequential Design for Phase II Clinical Trials A Bayesian Decision Theoretic Approach. ProQuest LLC, 2008, 134 pages.

Cisternino S., et al., "Nonlinear Accumulation in the Brain of the New Taxoid Txd258 Following Saturation of P-Glycoprotein at the Blood-Brain Barrier in Mice and Rats," British Journal of Pharmacology, 2003, vol. 138 (7), pp. 1367-1375.

ClinicalTrials.gov, A Study to Evaluate the Effects of Combining Cabazitaxel with Cisplatin Given Every 3 Weeks in Patients With Advanced Solid Cancer, Jul. 22, 2009, pp. 1-7 [retrieved on Jan. 6, 2014 from https://clinicaltrials.gov/ct2/show/NCT00925743?cond=NCT00925743&amp;rank=1].

ClinicalTrials.gov, BMS-184476 in treating patients with advanced solid tumors, p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=BMS-184476&amp;Search=Search.

ClinicalTrials.gov, 'BMS-188797,' p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=BMS-188797&amp;Search=Search.

ClinicalTrials.gov, 'BMS-275183,' p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=BMS-275183&amp;Search=Search.

ClinicalTrials.gov, Effect of Cabazitaxel on the QTc Interval in Cancer Patients (QT-Cab), Web site, Mar. 24, 2010, pp. 1-7 [retrieved on Jan. 6, 2014].

ClinicalTrials.gov, Efficacy and Safety of BG00012 in MS (Sep. 14, 2005), https://clinicaltrials.gov/archive/NCT00168701/2005_09_14, pp. 1-6.

ClinicalTrials.gov, Larotaxel every 3 weeks vs. capecitabine patients with metastatic breast cancer progressing after taxanes and anthracycline therapy [retrieved on Jun. 24, 2014] Retrieved from the Internet (URL.: https://clinicaltrials.gov/show/NCTOC0081796?term=larotaxel&rank=7).

ClinicalTrials.gov, Larotaxel plus cisplatin vs gemcitabine plus cisplatin in first line treatment of patients with locally advanced/metastatic bladder cancer [retrieved on Jun. 24, 2014]. Retrieved from the Internet (URL: https://clinicaltrials.gov/ct2/show/NCT00625664?term=larotaxel&rank=4).

ClinicalTrials.gov, Larotaxel vs. 5-FU or capecitabine in patients with pancreatic cancer previously treated with gemcitabine [retrieved Jun. 24, 2014] Retrieved from the Internet (URL: https://clinicaltrials.gov/c2/show/NCT00417209?Term=larotaxel&rank=2).

ClinicalTrials.gov, MST-997, p. 1, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=MST-997&amp;Search=Search.

# US 10,716,777 B2

Page 4

(56) **References Cited**

OTHER PUBLICATIONS

ClinicalTrials.gov, Patient Preference Between Cabazitaxel and Docetaxel in Metastatic Castrate-Resistant Prostate Cancer (CABADOC), Retrieved from the internet on Dec. 21, 2016 at https://clinicaltrials.gov/ct2/show/study/NCT02044354.

ClinicalTrials.gov, Protocol Registration Preview, A study to evaluate the effects of combining cabazitaxel with cisplatin given every 3 weeks in patients with advanced solid cancer, Website, pp. 1-3, retrieved on Nov. 12, 2009.

ClinicalTrials.gov, Safety and Pharmacokinetic Study of Cabazitaxel in Patients With Advanced Solid Tumors and Liver Impairment Web site, 2010, pp. 1-7 [retrieved on Jan. 6, 2014].

ClinicalTrials.gov, Satraplatin in Hormone Refractory Prostate Cancer Patients Previously Treated with one Cytotoxic Chemotherapy Regimen [retrieved on Jun. 27, 2014]. Retrieved from the Internet:( URL: https://clinicaltrials.gov/ct2/show/NCT00069745?term=SPARC &cond=prostate&rank=3).

ClinicalTrials.gov, Tesetaxel, pp. 1-2, retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=tesetaxel&amp;Search=Search.

ClinicalTrials.gov, TL-310, p. 1, retrieved on Aug. 5, 2015 on https://clinicaltrials.gov/ct2/results?term=TL-310&amp;Search=Search.

ClinicalTrials.gov, TPI-287, pp. 1-2, as retrieved on Aug. 5, 2015 from https://clinicaltrials.gov/ct2/results?term=TPI-287&amp;Search=Search.

ClinicalTrials.gov, XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC), Archived Oct. 23, 2008, (https://web.archive.org/web/20081023121613/http://clinicaltrials.gov/ct2/show/NCT00417079) (last accessed: Mar. 14, 2017).

Cobleigh et al., Multinational Study of the Efficacy and Safety of Humanized Anti-HER2 Monoclonal Antibody in Women who have HER2-Overexpressing Metastatic Breast Cancer that has Progressed After Chemotherapy for Metastatic Disease, J. Clin. Oncol. 17(9), pp. 2639-2648, 1999.

Collins R., et al., "A Systematic Review and Economic Model of the Clinical Effectiveness and Cost-Effectiveness of Docetaxel in Combination With Prednisone or Prednisolone for the Treatment of Hormone-Refractory Metastatic Prostate Cancer,"Health Technology Assessment, 2007, 11 (2), pp. 1-179.

U.S. Appl. No. 61/256,160, filed Oct. 29, 2009.

U.S. Appl. No. 61/293,903, filed Jan. 11, 2010.

U.S. Appl. No. 61/355,834, filed Jun. 17, 2010.

Curriculum Vitae for A. Oliver Sartor, M.D., dated Feb. 23, 2016.

Dagher et al., Approval Summary: Docetaxel in Combination with Prednisone for the Treatment of Androgen-Independent Hormone-Refractory Prostate Cancer, Clinical Cancer Research 8147-51 (2004).

Dagher R., et al., "Approval Summary: Docetaxel in Combination with Prednisone for the Treatment of Androgen-Independent Hormone-Refractory Prostate Cancer," Clinical Cancer Research, 2004, vol. 10 (24), pp. 8147-8151.

D'Amico A.V., et al., "US Food and Drug Administration Approval of Drugs for the Treatment of Prostate Cancer: A New Era has Begun," Journal of Clinical Oncology, 2014, vol. 32 (4), pp. 362-364.

De Bono, et al., Cabazitaxel or Mitoxantrone With Prednisone in Patients With Metastatic Castration-Resistant Prostate Cancer (mCRPC) Previously Treated With Docetaxel: Final Results of a Multinational Phase III Trial (TROPIC), 46th Annual Meet American Society Clinical Oncology (ASCO), Journal of Clinical Oncology, 2010, 28:15S (Suppl), Abstract 4508.

De Bono et al., Phase III non-inferiority study of cabazitaxel (C) 20 mg/m2 (C20) versus 25 mg/m2 (C25) in patients (pts) with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel (D), ASCO Annual Meeting 2016, pp. 1-2, 2016.

De Bono, et al., Prednisone Plus Cabazitaxel or Mitoxantrone for Metastatic Castration-Resistant Prostate Cancer Progressing after

Docetaxel Treatment a Randomised Open-Label Trial, Lancet, 2010, vol. 376, No. 9747, pp. 1147-1154.

De Bono J.S., et al., "Cabazilaxel or Mitoxantrone with Prednisone in Patients with Metastatic Castration-Resistant Prostate Cancer (mCRPC) Previously Treated with Docetaxel Final Results of a Multinational Phase III Trial (TROPIC)," Journal of Clinical Oncology, 2010, vol. 28, pp. 155.

De Bono J.S., et al., 'Open-label phase II study evaluating the efficacy and safety of two doses of pertuzumab in castrate chemotherapy-naïve patients with hormone-refractory prostate cancer,' Journal of Clinical Oncology, vol. 25 No. 3, pp. 257-262 (2007).

Deakin and Williams, Histamine H2-Receptor Antagonists in Peptic Ulcer Disease, Efficacy in Healing Peptic Ulcers, 44(5) Drugs 709-19 (1992).

Declaration of Alton Oliver Sartor, M.D., as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 23, 2016.

Declaration of Art Lathers, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 22, 2016.

Declaration of Mr. Robert McSorley, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.

Declaration of Patricia Matthews, RN, BSN, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jan. 16, 2017.

Declaration Transcript of Dr. Oliver Sartor, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Feb. 13, 2017.

Declaration Transcript of Dr. Oliver Sartor, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated May 8, 2017.

Declaration Transcript of Michael Edward Tate, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 6, 2017.

Declaration Transcript of Rahul Seth, DO, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 9, 2016.

Denis L.J, et al., "Phase I and Pharmacokinetic Study of RPR116258A. A Novel Taxane Derivative, Administered Intravenously over 1 hour every 3 weeks," Clinical Cancer Research, 2000, vol. 6, pp. 4579s, Abstract 568.

Detailed Factual and Legal Bases for Breckenridge's Paragraph IV Certification that U.S. Pat. No. 8,927,592 is Invalid, Unenforceable and/or will not be infringed, 2015 (redacted).

Detailed Statement of the Factual and Legal Bases for Onco Therapies Limited's Paragraph IV Certification with Respect to U.S. Pat. No. 8,927,592, 2015 (redacted).

Dieras et al., Larotaxel in Combination with Trastuzumab in Patients with HER2+ Metastatic Breast Cancer: Interim Analysis of an Open Phase II Label Study, 26 (15S), J. Clin. Oncol. (Meeting Abstracts), Suppl. 1070, May 2008.

Dieras V., et al., "Phase II Multicenter Study of Larotaxel (Xrp9881), a Novel Taxoid, in Patients with Metastatic Breast Cancer Who Previously Received Taxane-Based Therapy," Annals of Oncology, 2006, vol. 19 (7), pp. 1255-1260.

DiLorenzo G., et al., "Castration-Resistant Prostate Cancer: Current and Emerging Treatment Strategies," Drugs, 2010, vol. 70 (8), pp. 983-1000.

DiLorenzo G., et al., "Combination of Bevacizumab and Docetaxel in Docetaxel-Pretreated Hormone-Refractory Prostate Cancer: A Phase 2 Study," European Urology, 2008, vol. 54 (5), pp. 1089-1096.

Dimasi J.A., et al., "Economics of New Oncology Drug Development," Journal of Clinical Oncology, 2007, vol. 25 (2), pp. 209-216.

(56) **References Cited**

OTHER PUBLICATIONS

Dimasi J.A., et al., "Trends in Risks Associated with New Drug Development Success Rates for Investigational Drugs," Clinical Pharmacology and Therapeutics, 2010, vol. 87 (3), pp. 272-277.

Docetaxel Label (Mar. 2012).

Docetaxel Reduce el Riesgo de Muerte en Pacientes con cancer de Prostata metastatico Androgeno Independiente, [Retrieved on Jul. 29, 2014]. Retrieved from the internet: (URL: http://www.intramed.net/contenidoverasp?contenidoID=31823) (followed by non-verified English translation).

Doenicke, et al., Premedication with H1 and H2 blocking agents reduces the incidence of postoperative nausea and vomiting, Inflam. Res., 53, Suppl. 2, 51-58, (2004).

Dorff T.B., et al., "Cabazitaxel in Prostate Cancer: Stretching a String," Lancet, 2010, vol. 376 (9747), pp. 1119-1120.

Dres, et al., Treatment alternatives for advanced prostate cancer, [Retrieved from the internet on Jul. 29, 2014] Retrieved from http://www.intramed.net/contenidover.asp?contenidoID=37957 (followed by non-verified English translation), 3 pages.

Drug Data Report, Antimitotic Drugs, 2003, vol. 25, No. 6, pp. 550.

Drug Data Report Cabazitaxel, 2010, vol. 32, No. 10, pp. 999-1017 at p. 1012.

Dumontet C., et al., "Mechanisms of Action of and Resistance to Antitubulin Agents: Microtubule Dynamics, Drug Transport, and Cell Death," Journal of Clinical Oncology, 1999, vol. 17 (3), pp. 1061-1070.

Eisenberger, M., et al., Phase III Study comparing a reduced dose of cabazitaxel (20 mg/m2) and the currently approved dose (25 mg/m2) in postdocetaxel patients with metastatic castration-resistant prostate cancer—PROSELICA, J. Clin. Oncol., vol. 35, as downloaded from http://ascopubs.org/journal/jcoon Sep. 22, 2017, 13 pages.

Eisenhauer E.A., et al., "Phase I Cancer Clinical Trials: A Practical Guide," Basics of Phase I Design: First-in-Man Studies, Oxford University Press, 2006, pp. 42-80.

El Docetaxel Asociado a la Prodnisona Mejora el Cancer de Prostata, [Retrieved from the internet on Oct. 26, 2012] Retrieved from internet:(URL: http://www.medicinageriatrica.com.ar/viewnews.php?id=E.EpVVFZVppsBCjOavj).

El-Maraghi and Eisenhauer, Review of Phase II Trial Designs Used in Studies of Molecular Targeted Agents: Outcomes and Predictors of Success in Phase III, J. Clin. Oncol. 26 (2008) 1346-1354.

Emcyt (estramustine) Label (Jun. 2007).

Engels, F.K., et al., 'Potential for improvement of docetaxel-based chemotherapy: a pharmacological review,' British Journal of Cancer, vol. 93, pp. 173-177 (2005).

Erbitux (cetuximab) Label (Jul. 2009).

Esper and Redman, Supportive Care, Pain Management, and Quality of Life in Advanced Prostate Cancer, 26(2) Urologic Clinics of North America 375-89 (1999).

Estramustine, Chemocare.com, retrieved from the internet at http://chemocare.com/chemotherapy/drug-info/estramustine.aspx on Mar. 8, 2017.

European Medicine Agency, ICH Topic E8 General Considerations for Clinical Trials (Mar. 1998).

Factual and Legal Bases for Accord's ANDA Certification That Each Claim of U.S. Pat. No. 8,927,592 is Invalid, Unenforceable, and/or will not be Infringed by Accord's Cabazitaxel Injection Product Described in ANDA 207693 (2015) (redacted).

Factual and Legal Basis for Dr. Reddy's Laboratories, Ltd.'s and Dr. Reddy's Laboratories, Inc.'s Assertion of Invalidity, Unenforceability and/or Non-Infringement of U.S. Pat. No. 8,927,592, 2015 (redacted).

FDA Approves New Drug for Advanced Prostate Cancer (May 15, 2013), retrieved from http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm352363.htm, retrieved on Oct. 6, 2016.

FDA Center for Drug Evaluation and Research, Clinical Pharmacology and Biopharmaceutics Review(s), Application No. 201023 (Cabazitaxel NDA), 2010, pp. 1-71.

FDA, Challenge and Opportunity on the Critical Path to New Medical Products, 1-31 (Mar. 2004).

FDA News Release, FDA Approves New Indication for Taxotere—Prostate Cancer (May 19, 2004) as retrieved from http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2004/ucm108301.htm.

FDA News release, FDA Approves New Treatment for Advanced Prostate Cancer, 2010, pp. 1-2, [Retrieved on Jul. 29, 2015]. Retrieved from the internet (URL: http://www.fda.gov.newsevents/newsroom/pressannouncements/ucm216143.htm].

FDA Notice International Conference on Harmonisation; Guidance on Impurities: Residual Solvents, 62(247) Federal Register 67377-388 (Dec. 24, 1997).

Feuerstein A., et al., 'Oncology Micro-Cap Stocks: Caveat Emptor!' Journal of the National Cancer Institute, vol. 103, issue 20 pp. 1488-1489 (2011).

Figg W.D., et al., "Cabazitaxel: Filling One of the Gaps in the Treatment of Prostate Cancer," Cancer Biology & Therapy, 2010, vol. 10 (12), pp. 1233-1234.

Final Office Action dated Aug. 12, 2019 for U.S Appl. No. 16/251,143, filed Jan. 18, 2019.

Final Office Action dated Sep. 16, 2013 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.

Final Office Action dated Apr. 24, 2019 for U.S. Appl. No. 15/627,962, filed Jun. 20, 2017.

Final Written Decision, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Sep. 21, 2017.

Final Written Decision on Remand issued in the Patent Trial and Appeal Board Case IPR2016-00712, U.S. Pat. No. 8,927,592 on Oct. 22, 2019.

Fizaz K., et al., "New agents in Metastatic Prostate Cancer," European Journal of Cancer, 2009, vol. 45 (1), pp. 379-380.

Fizazi K., 'Phase III, randomized, placebo-controlled study of docetaxel in combination with zibotentan in patients with metastatic castration-resistant prostate cancer,' Journal of Clinical Oncology vol. 31 No. 14, pp. 1740-1747 (2013).

Fresenius Kabi USA, LLC's Detailed Statement of the Factual and Legal Bases of Fresenius Kabi USA, LLC's Opinion that U.S. Pat. No. 8,927,592 is Invalid, Unenforceable or Not infringed, 2015 (redacted).

Fujisaka et al., Phase 1 Study of Atrasentan (ABT627), Novel Endothelin Receptor-A Antagonist, in Japanese Patients with Hormone Refractory Prostate Cancer, 24(18S) J. Clin. Oncol. (Abstr. 14602) (2006).

Fukuoka M., 'Multi-institutional randomized phase II trial of Gefitinib for previously treated patients with advanced non-small-cell lung cancer,' Journal of clinical oncology, vol. 21, No. 12, pp. 2237-2246 (2003).

Fumoleau et al., Phase 1 and Pharmacokinetics (PK) Study of RPR116258A Given as a Weekly 1-Hour Infusion at Day 1, Day 8, Day 15, Day 22 Every 5 Weeks in Patients (pts) with Advanced Solid Tumors, 7(11) Clin. Cancer Res. 3710s (2001).

Gad, Clinical Trials Handbook (John Wiley & Sons. Inc.), 2009 Regulatory Requirements for Investigational New Drug, pp. 23-69.

Gallagher M.L., et al., 'Phase I clinical and pharcokinetic (PK) trial of the novel taxane BMS-184476 administered as a 1-hour IV infusion in combination with cisplatin every 21 days,' Proceedings of ASCO vol. 20, Abstract 420, (2001).

Galletti E., et al., "Paclitaxel and Docetaxel Resistance: Molecular Mechanisms and Development of New Generation Taxanes," Chemmedchem, 2007, vol. 2 (7), pp. 920-942.

Galsky M.D., et al., "Cabazitaxel," Nature Reviews, Drug Discovery, 2010, vol. 9 (9), pp. 677-678.

Garcia et al., Gemcitabine and Docetaxel in Metastatic, Castrate-Resistant Prostate Cancer, 117(4) Cancer 752-57 (2011).

Gayther, et al., The Frequency of Germ-line Mutations in the Breast Cancer Predisposition Genes BRCA1 and BRCA2 in Familial Protate Cancer, Cancer Res. 60 (2000) 4513-4518.

Gemzar (gemcitabine) Label Apr. 2006.

Genentech Provides Update on Phase III Study of Avastin in Men with Late Stage Prostate Cancer (Mar. 12, 2010), Business Wire, as

## US 10,716,777 B2

Page 6

(56)          **References Cited**

OTHER PUBLICATIONS

retrieved from http://www.businesswire.com/news/home/20100311007023/en/Genentech-Update-Phase-III-Study-Avastin-Men on Oct. 12, 2016.

Gianni et al., Nonlinear Pharmacokinetics and Metabolism of Paclitaxel and its Pharmacokinetic/Pharmacodynamic Relationships in Humans, 13(1) J. Clin. Oncol. 180-90 (1995).

Gleevec (imatinib) Label (May 2009).

Glenmark's Detailed Statement of the Factual and Legal Basis for its Opinion that U.S. Pat. No. 8,927,592 is invalid, unenforceable and/or will not be infringed by Glenmark's manufacture, use, offer for sale or sale of Glenmark's [ ], 2015 (redacted).

Goetz et al., "Phase I: and Pharmacokinetic Study of RPR116258A, a Novel Taxane Derivative, Intravenously Over 1 Hour Every 3 Weeks," Clinical Pharmacology, 2001, vol. 20, pp. 106a.

Goffin J., et al., 'Objective responses in patients with malignant melanoma or renal cell cancer in early clinical studies do not predict regulatory approval,' Clin. Cancer Res. 11, pp. 5928-5934 (2005).

Gottesman M.M., "Mechanisms of Cancer Drug Resistance," Annual Review of Medicine, Feb. 2002, vol. 53, pp. 615-627.

Greene et al., Who is the Average Patient Presenting with Prostate Cancer?, 66(5 Suppl.) Urology 76-82 (2005).

Guidance for Industry Population Pharmacokinetics, U.S. Department of Health and Human Services, Food and Drug Administration, CDER, CBER, Feb. 1999, 35 Pages.

Gujarat Cancer & Research Institute Annual Report, Aug. 29, 2008, pp. 1-152.

Hait W.N., et al., "Rational Design and Pre-clinical Pharmacology of Drugs for Reversing Multidrug Resistance," Biochemical Pharmacology, Jan. 1992, vol. 43 (1), pp. 103-107.

Halabi S., et al., "Prostate-Specific Antigen Changes as Surrogate for Overall Survival in Men with Metastatic Castration-Resistant Prostate Cancer Treated with Second-Line Chemotherapy," Journal of Clinical Oncology, 2013, vol. 31 (31), pp. 3944-3950.

Haleblian, "Characterization of Habits and Crystalline Modification of Solids and Their Pharmaceutical Applications," Journal of Pharmaceutical Sciences, 1975, vol. 64 (8), pp. 1269-1288.

Hande, The Importance of Drug Scheduling in Cancer Chemotherapy: Etoposide as an Example, 1(4) The Oncologist 234-29 (1996).

Hellerstedt B.A., et al., "The Current State of Hormonal Therapy for Prostate Cancer," CA A Cancer Journal for Clinicians, 2002, vol. 52 (3), pp. 154-179.

Herceptin (trastuzumab) Label Jan. 2008.

Higano C.S., et al., "Phase 1/2 Dose-Escalation Study of a Gm-Csf-Secreting, Allogeneic, Cellular Immunotherapy for Metastatic Hormone-Refractory Prostate Cancer," Cancer, 2008, vol. 113 (5), pp. 975-984.

Holen et al., Phase I Study Using Continuous Intravenous (CI) KOS-862 (Epothilone D) in Patients with Solid Tumors, 22(14S) J. Clin. Oncol. Abstr. 2024 (2004).

Hope, J., 'Last Hope' drug for Prostate Cancer Patients is axed from the NHS, DailyMail.com, Retrieved from http://www.dailymail.co.uk/health/article-2903235/Last-hope-drug-prostate-cancer-patients-axed-NHS-doctors-call-travesty.html on Oct. 20, 2016.

Horwitz E.M., et al., "External Beam Radiation Therapy for Prostate Cancer," CA A Cancer Journal for Clinicians, 2000, vol. 50 (6), pp. 349-379.

Hospers, et al., PET Imaging of Steroid Receptor Expression in Breast and Prostate Cancer, Curr. Pharm. Des. 14 (2008) 3020-3032.

How Xtandi works, as retrieved from https://www.xtandi.com/how-xtandi-works on Oct. 6, 2016, pp. 1-2.

How Zytiga (abiraterone acetate) works, https://www.zytiga.com/about-zytiga/how-zytiga-works, pp. 1-6 as retrieved on Nov. 16, 2016.

How Zytiga (abiraterone acetate) Works, Retrieved from the internet on Nov. 16, 2016 at https://www.zytigo.com/about-zytiga/how-zytiga-works.

Hudis, et al., Phase II and Pharmacologic Study of Docetaxel as Initial Chemotherapy for Metastatic Breast Cancer, J. Clin. Oncol., 14(1), 58-65 (1996).

Hycamtin (topotecan) Label Jun. 2006.

In a Difficult Environment, Another Year of Growth in Adjusted EPS Excluding Selected Items, Sanofi-Aventis Press Release, 2006 (Feb. 13, 2007), pp. 1-31.

In The United States District Court for the District of New Jersey, Case 3:15-cv-03392-MAS-LHG, Defendant's Answer to the Complaint, Separate Defenses and Counterclaims, *Mylan Laboratories Limited v. Aventis Pharma S.A*, 20 pages, dated Jul. 16, 2015.

Institut National du Cancer, Register of French cancer clinical trials, Sanofi-Aventis TROPIC, Feb. 29, 2008, ("INDC website"), pp. 1-2.

International Preliminary Report on Patentability for Application No. PCT/IB2010/054866, dated Nov. 14, 2011, 14 pages.

International Search Report and Written Opinion issued in WO2011/051894 dated May 5, 2011, 11 pages.

Iressa (gefitinib) Label (Jul. 2004).

Ixempra Prescribing Information (Labelling), 2007, pp. 1-34.

Jevtana (cabazitaxel) Label (Sep. 2016).

Jevtana (cabazitaxel) Label (Jun. 2015).

Jevtana label 2010—Prescribing Information, pp. 1-25, (retrieved on May 14, 2013). Retrieved from the Internet( URL: http/products.sanofi.us/jevtana/jevtana.html).

Jevtana National Drug Monograph, pp. 1-14, 2011.

Jevtana NDA Clinical Overview, Excerpt, 2014, pp. 12-13.

Joffe et al., Quality of Informed Consent in Cancer Clinical Trials: A Cross-Sectional Survey, 358 The Lancet 1772-77 (2001).

Jozwiakowski, Alteration of the Solid State of the Drug Substance: Polymorphs, Solvates, and Amorphous Forms, Ch. 15, Water Insoluble Drug Formulation edited by Liu, First Edition, (2000) 525-568.

Kant J., et al, "A Chemoselective Approach to Functionalize the C-10 Position of 10-Deacetylbaccatin III Synthesis and Biological Properties of Novel C-10 Taxol® Analogues," Tetrahedron Letters, 1994, vol. 35 (31), pp. 5543-5546.

Kaur M., et al., "Suramin's Development: What Did We Learn?," Investigational New Drugs, 2002, vol. 20 (2), pp. 209-219.

Kawaguchi, et al., H2 Blockers Increase Risk of Docetaxel-Induced Skin Toxicity, Reactions 1257 (Jun. 20, 2009).

Kelland et al., Comparative in vitro cytotoxicity of taxol and Taxotere against cisplatin-sensitive and-resistant human ovarian carcinoma cell lines, Cancer Chemother. Pharmacol. (1992) 444-450.

Ketoconazole in Advanced Prostate Cancer: Have Tolerability Concerns Been Overstated? Drug Ther. Perspect. 15 (2000) (http://www.medscape.com/viewarticle/406391) (last accessed: Mar. 14, 2017).

Kingston D.G., et al., "Tubulin-Interactive Natural Products as Anticancer Agents," Journal of Natural Products, 2009, vol. 72 (3), pp. 507-515.

Kish J.A., et al., "The Treatment Challenge of Hormone-refractory Prostate Cancer," Cancer Control, Nov.-Dec. 2001, vol. 8 (6), pp. 487-495.

Klein et al., SWOG-9510: Evaluation of Topotecan in Hormone Refractory Prostate Cancer: A Southwest Oncology Group Study, 52(4) The Prostate 264-68 (2002).

Kobayashi K., et al., "Phase I Study of Suramin Given by Intermittent Infusion Without Adaptive Control in Patients With Advanced Cancer," Journal of Clinical Oncology, Sep. 1995, vol. 13 (9), pp. 2196-2207.

Kola I., et al., "Can the Pharmaceutical Industry Reduce Attrition Rates?," Nature Reviews, Drug Discovery, 2004, vol. 3 (8), pp. 711-715.

Koletsky A.,et al., "Developing Treatments for Hormone-Refractory Prostate Cancer," US Oncology Review, 2008, vol. 4(1), pp. 46-49.

Kris M.G., et al., "Clinical Cancer Advances 2010: Annual Report on Progress Against Cancer from the American Society of Clinical Oncology," Journal of Clinical Oncology, 2010, vol. 28 (36), pp. 5327-5347, 947.

Latif et al., Phase II Study of Oral Bis(Aceto) Ammine Dichloro (Cyclohexamine) Platinum (IV) (JM-216, BMS-1892751) Given Daily x5 in Hormone Refractory Prostate Cancer (HRPC), Investig. New Drugs 79-84 (2005).

US 10,716,777 B2

Page 7

(56)           **References Cited**

OTHER PUBLICATIONS

Lenz, H.J., Management and Preparedness for Infusion and Hypersensitivity Reactions, The Oncologist, 12:601-609, 2007.

Lin et al., A Phase II Trial of Imatinib Mesylate in Patients with Biochemical Relapse of Prostate Cancer After Definitive Local Therapy, 98 BJU Int'l. 763-69 (2006).

Lokich and Anderson, Dose Intensity for Bolus Versus Infusion Chemotherapy Administration: Review of the Literature for 27 Anti-Neoplastic Agents, 8(1) Ann. Oncol. 15-25 (1997).

Lortholary et al., "Phase I and Pharmacokinetics (PK) Study of RPR 116258A Given as 1-hour Infusion in Patients (pts) with Advanced Solid Tumors," Clinical Cancer Research, 2000, vol. 6, pp. 4579s-4580s.

Ma, et al., A Statistical Analysis of the Magnitude and Composition of Drug Promotion in the United States in 1998, Clin. Therap. 25 (2003) 1503-1517.

Mackinnon A., et al., "Molecular Biology Underlying the Clinical Heterogeneity of Prostate Cancer: An Update," Archives of Pathology & Laboratory Medicine, 2009, vol. 133 (7), pp. 1033-1040.

Malhotra et al., Cabazitaxel: A Novel Drug for Hormone-Refractory Prostate Cancer, Mini-Reviews in Medicinal Chemistry, 2013, 13, No. 2, pp. 1-6.

Malik Z., et al., '931P—Cabazitaxel (CBZ) + prednisone (P: CBZP) in patients (pts) with metastatic castration-resistant prostate cancer (mCRPC) previously treated with doce . . . ' Poster presented at ESMO Congress 2012.

Malik Z.I., et al., 'Cabazitaxel (CBZ) + Prednisone (P; CBZP) in Patients (PTS) With Metastatic Castration-Resistant Prostate Cancer (MCRPC) Previously Treated With Docetaxel (D): Interim Results From Compassionate-Use Programme (CUP) and Early-Access Programme (EAP),' Poster 931P, Annals of Oncology vol. 23, Suppl. 9 Abstract Book of the ESMO 2012 Congress, pp. 1-6 (2012).

Malik Z.I., et al., 'Cabazitaxel (CBZ) + prednisone (P) in patients (pts) with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel (D): interim results from compassionate-use programme (CUP) and early-access programme (EAP),' Poster 931P presented at European Society for Medical Oncology, Vienna Austria, Sep. 28-Oct. 2, 2012.

Manchanda, et al., The Effects and Role of Direct-to-Physician Marketing in the Pharmaceutical Industry: An Integrative Review, Yale J. Health Pol'y l. & Ethics 5 (2005) 785-822.

Manual of Patent Examining Procedure §2107.03 (IV), 2008, 2100-36 (8th Ed).

McKeage et al., A Phase I and Pharmacology Study of an Oral Platinum Complex, JM216: Dose-Dependent Pharmacokinetics with Single-Dose Administration, Cancer Chemother. Pharmacol. 451-8 (1995).

McLeod H.L., et al., "Evaluation of the Linearity of Docetaxel Pharmacokinetics," Cancer Chemotherapy and Pharmacology, Jun. 1998, vol. 42 (2), pp. 155-159.

Melzack R., et al., "The McGill Pain Questionnaire: Major Properties and Scoring Methods," Pain, 1975, vol. 1(3), pp. 277-299.

Merck Index 14th 2006, No. 190, pp. 35, Agomelatine.

Michael, et al., Prostate Cancer Chemotherapy in the Era of Targeted Therapy, Prostate Cancer Prostatic Dis. 13-16 (2009).

Michaelson M.D., et al. , "Randomized, Placebo-Controlled. Phase III Trial of Sunitinib Plus Prednisone Versus Prednisone Alone in Progressive, Metastatic, Castration-Resistant Prostate Cancer," Journal of Clinical Oncology, 2014, vol. 32 (2), pp. 76-82.

Mirtsching, Prostate Cancer Clinical Trials in Dallas, Texas Area, [Retrieved from the internet on Aug. 19, 2014], pp. 3-4, Retrieved from the internet: (URL: http://www.heallhcentral.com/prostate/c/5618/14589/dallas-texas-area).

Mita A.C., et al., "Phase I and Pharmacokinetic Study of Xrp6258 (Rpr 116258A), a Novel Taxane, Administered as a 1-Hour Infusion Every 3 Weeks in Patients with Advanced Solid Tumors," Clinical Cancer Research, 2009, vol. 15 (2), pp. 723-730.

Mitoxantrone, Chemocare.com, retrieved from the internet at http://chemocare.com/chemotherapy/drug-info/Mitoxantrone.aspx on Mar. 8, 2017.

Miura N., et al., "A Case of Hormone-Refractory Prostate Cancer (Hrpc) with Tumor Fever Responding to Docetaxel Plus Prednisolone Therapy," Jpn. J. Cancer Chemother., 2006, vol. 33 (6), pp. 841-844.

Mokbel, Concise Notes in Oncology for MRCP and MRCS, 2005, (Radcliffe Publishing Ltd.) Drug Pharmacology and Clinical Trials, pp. 6-7.

Mononen et al., Two Percent of Finnish Prostate Cancer Patients Have a Germ-Line Mutation in the Hormone-Binding Domain of the Androgen Receptor Gene, 60(22) Cancer Research 6479-81 (2000).

Morant et al., Capecitabine in Hormone-Resistant Metastatic Prostatic Carcinoma—a Phase II Trial, Brit. J. Cancer 1312-17 (2004).

Morgan C.J., et al., "Impact of Prednisone on Toxicities and Survival in Metastatic Castration-resistant Prostate Cancer: a Systematic Review and Meta-analysis of Randomized Clinical Trials," Critical Reviews in Oncology/Hematology, Jun. 2014, vol. 90 (3), pp. 253-261.

Motzer et al., Activity of SU11248, a Multitargeted Inhibitor of Vascular Endothelial Growth Factor Receptor and Platelet-Derived Growth Factor Receptor, in Patients with Metastatic Renal Cell Carcinoma, 24(1), J. Clin. Oncol. 16-24 (2006).

Moul, The Evolving Definition of Advanced Prostate Cancer, Rev. Urol. S10-S17 (2004).

Mubiru et al., Nonhuman Primates as Models for Studies of Prostate Specific Antigen and Prostatic Diseases, 68(14) Prostate 1-16 (2008).

Mulcahy, Phase 3 Trial of Immunotherapy for Metastatic Prostate Cancer Terminated, Medscape Medical News, Oct. 17, 2009, [retrieved on Jun. 26, 2014] Retrieved from the internet: (URL: http://www.medscape.com/viewarticle/582220).

Mylan Petition for Inter Partes Review of U.S. Pat. No. 8,927,592, pp. 1-65 with Exhibit 1002 (Declaration of Dr. Rahul Seth,) 2016, pp. 1-109.

Nagore et al., Antineoplastic Therapy-Induced Palmar Plantar Erythrodysesthesia ('Hand-Foot') Syndrome, Incidence, Recognition and Management, 1(4) Am. J. Clin. Dermatol. 225-34 (2000).

National Cancer Institute, Common Terminology Criteria for Adverse Events v3.0 (Aug. 2006).

National Cancer Institute, Common Toxicity Criteria for Adverse Events v2.0 (Apr. 1999).

National Cancer Institute, Common Toxicity Criteria Manual Version 2.0 (Jun. 1, 1999).

National Comprehensive Cancer Network (NCCN Clinical Practice Guidelines in Oncology , Prostate Cancer) V.1 (2009), pp. 1-46.

National Comprehensive Cancer Network (NCCN Clinical Practice Guidelines in Oncology, Breast Cancer) V.1 (2009), pp. 1-122.

NCCN Antiemesis Guidelines, Internet Archive https://web.archive.org/web/20081001233326/http://www.nccn.org/professionals/physician_gls/PDF/antiemesis.pdf) (Oct. 1, 2008) (last accessed: Mar. 14, 2017).

NCI, NIH-Funded Study Shows Increased Survival in Men With Metastatic Prostate Cancer Who Receive Chemotherapy When Starting Hormone Therapy [retrieved on Aug. 4, 2015]. Retrieved from the Internet: (URL: http://www.nih.gov/news/health/dec2013/nci-05.htm).

New Hope in Advanced Prostate Cancer Alberta Saskatchewan and Ontario Fund Coverage for Jevtana (Cabazitaxel), Retrieved from the internet on Dec. 22, 2016 at https://www.newswire.ca/news-releases/new-hope-in-advanced-prostate-cancer-alberta-saskatchewan-and-ontario-fund-coverage-for-jevtana-cabazitaxel-510872201.html.

Newman S.P., et al., "The Therapeutic Potential of a Series of Orally Bioavailable Anti-angiogenic Microtubule Disruptors as Therapy for Hormone-independent Prostate and Breast Cancers," British Journal of Cancer, Dec. 2007, vol. 97 (12), pp. 1673-1682.

Nexavar (sorafenib) Label (Nov. 2007).

Niho et al., First-Line Single Agent Treatment with Gefitinib in Patients with Advanced Non-Small-Cell Lung Cancer: A Phase II Study, 24(1) J. Clin. Oncol. 64-69 (2006).

Nobili S.,et al., "Pharmacological Strategies for Overcoming Multidrug Resistance," Current Drug Targets, 2006, vol. 7 (7), pp. 861-879.

**US 10,716,777 B2**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

Non-Final Office Action dated Apr. 16, 2014 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.
Non-Final Office Action dated Jan. 16, 2013 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.
Normanno, N., et al., "Target-based Therapies in Breast Cancer: Current Status and Future Perspectives," Endocrine-Related Cancer, Sep. 2009, vol. 16 (3), pp. 675-702.
Notice of Allowance dated Aug. 4, 2014 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.
Notice of Allowance dated Nov. 14, 2014 for U.S. Appl. No. 13/456,720, filed Apr. 26, 2012.
Novacea, Inc, SEC Form 8-K at 1.02, 2008 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http:/www.sec.gov/ Archives/edgar/data/1178711/000119312508077953/d8k.htm).
Novantrone (mitoxantrone) Label (Aug. 2008).
Novantrone Gets FDA Nod for Use in Advanced Prostate Cancer, Cancer Network (Dec. 1, 1996), http://www.cancernetwork.com/ articles/novantrone-gets-fda-nod-use-advanced-prostate-cancer, retrieved on Dec. 22, 2016.
Novantrone (mitoxantrone) Prescribing information (Label), 2012, pp. 1-37.
Numata K., et al., "The Preliminary Results of Docetaxel-Prednisolone Combination Therapy for the Japanese Patients with Hormone-Refractory Prostate Cancer," Acta Urol. Jpn., 2007, vol. 53 (2), pp. 93-97.
Numata K., et al., Urological Bulletin, 2007, vol. 53 (2), pp. 93-96.
Omlin et al., Analysis of Side Effect Profile of Alopecia, Nail Changes, Peripheral Neuropathy, and Dysgeusia in Prostate Cancer Patients Treated With Docetaxel and Cabazitaxel, 13(4) Clin. Genitourin. Cancer 1-4 (2015).
Opposition Alafar (Nov. 2012): Index Merck 14th. Merck & Co. USA. NI, 2006. No. 0000190 (Alafar refers to a specific compound, which is agomelatine).
Oudard, et al., Cabazitaxel Plus Prednisone/Prednisolone Significantly Increases Overall Survival Compared to Mitoxantrone Plus Prednisone/Prednisolone in Patients With Metastatic Castration-Resistant Prostate Cancer (MCRPC) Previously Treated With Docetaxel: Final Results With Updated Overall Survival of a Multinational Phase III Trial (TROPIC), Ann. of Oncology, 2010, vol. 21, (Suppl. 8), pp. viii272, Abstract 871IPD.
Oudard S., et al., "Multicenter Randomized Phase II Study of Two Schedules of Docetaxel, Estramustine, and Prednisone Versus Mitoxantrone Plus Prednisone in Patients With Metastatic Hormone-refractory Prostate Cancer," Journal of Clinical Oncology, May 2005, vol. 23 (15), pp. 3343-3351.
Padhani, et al., The RECIST Criteria: Implications for Diagnostic Radiologists, Br. J. Radiol. 983-86 (2001).
Pal S.K., et al., "Critical Appraisal of Cabazitaxel in the Management of Advanced Prostate Cancer," Clinical Interventions in Aging, 2010, vol. 5, pp. 395-402.
Parkin D.M., et al., "Global Cancer Statistics, 2002," Ca: A Cancer Journal for Clinicians, 2005, vol. 55 (2), pp. 74-108.
Passalacqua et al., The Clinical Safety of H1-Receptor Antagonists, An EAACI Position Paper, Allergy 666-75 (1996).
Patent Owner's Contingent Motion to Amend as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 23, 2016.
Patent Owner's Response as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Dec. 23, 2016.
Patent Owner's Responsive Brief on the Effect of the CAFC Decision on Patent Owner's Motion to Amend as submitted in the U.S. Patent and Trademark Office before the Patent Trial and Appeal Board Case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 7, 2019, 30 pages.
Pazdur, Endpoints for Assessing Drug Activity in Clinical Trials, 13(suppl 2) The Oncologist 19-21 (2008).

Pazdur R., et al., "The Taxoids: Paclitaxel (Taxol) and Docetaxel (Taxotere)," Cancer Treatment Reviews, Oct. 1993, vol. 19 (4), pp. 351-386.
PDR Medical Dictionary at 102, 416 (2d ed. 2000).
Perez-Soler et al., Determinants of Tumor Response and Survival with Erlotinib in Patients with Non-Small-Cell Lung Cancer, 22(16) J. Clin. Oncol. 3238-47 (2004).
Perjeta (pertuzumab) Label Jun. 2012.
Petitioner Mylan's Reply Brief on Remand Pursuant to Paper No. 108 as submitted in the U.S. Patent and Trademark Office before the Patent Trial and Appeal Board Case IPR2016-00712,U.S. Pat. No. 8,927,592, dated Jun. 21, 2019, 12 pages.
Petitioner Mylan's Brief Addressing the Effect of CAFC Decision on Patent Owner's Motion to Amend pursuant to Paper No. 108 as submitted in the U.S. Patent and Trademark Office before the Patent Trial and Appeal Board Case IPR2016-00712, U.S. Pat. No. 8,927,592, dated May 10, 2019, 30 pages.
Petitioners Opposition to Patent owner's Motion to Amend under 37 CFR 42.121 as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.
Petitioner's Reply as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.
Petrylak, D.P., et al., 'A Phase 3 Study to Evaluate the Efficacy and Safety of Docetaxel and Prednisone (DP) with or without Lenalidomide (LEN) in Patients with Castrate-Resistant Prostate Cancer (CRPC): The Mainsail Trial,' Annals of Oncology, Abstract LBA24 from Abstract Book of 37th European Society for Medical Oncology Congress Vienna, Austria, vol. 23, Suppl. 9, 2012.
Phase III Trial, NCI Dictionary of Cancer Terms, Retrieved from cancer.gov, [retrieved on Apr. 2, 2017].
Pienta K.J., et al., "Advances in Prostate Cancer Chemotherapy: A New Era Begins," CA A Cancer Journal for Clinicians, 2005, vol. 55 (5), pp. 300-318 and 323-325.
Pivot, et al., Inpharma, Abstract 1659 (Oct. 11, 2008).
Pivot X., et al., "Multicenter Phase 2 Study of XRP6258 in Taxane Resistant Metastatic Breast Cancer (MBC) Patients (pts)," Breast Cancer Research and Treatment, 2005, vol. 94 (1), pp. S68, Abstract 138.
Pivot X., et al., "A Multicenter Phase II Study of Xrp6258 Administered as a 1-H I.V. Infusion Every 3 Weeks in Taxane-Resistant Metastatic Breast Cancer Patients," Annals of Oncology, 2008, vol. 19 (9), pp. 1547-1552.
Pouessel D., et al., "Actualities in Prostate Cancer in ASCO Annual Meeting 2010," Bulletin Du Cancer, 2010, vol. 97 (12), pp. 1563-1572.
Prednisone Compared to Mitoxantrone Plus Predisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC), [Retrieved on Feb. 8, 2012]. Retrieved from the Internet (URL: http ://clinicaltrials. gov/archive/NCT00417079/2006_12_28, View of NCT00417079 on 2006_12_28-XRP6258Plus).
Prednisone Label (Apr. 2008).
Preliminary Response by Patent Owner pursuant to 37 CFR 42.107 as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Jun. 24, 2016.
Press Release: OncoGenex Announces Top Line Survival Results of Phase 3 SYNERGY Trial Evaluating Custirsen for Metastatic Castration-Resistant, Prostate Cancer, PRNewswire Apr. 28, 2014.
Press Release Roche Provides Update on Phase III Study of Avastin in Men with Late Stage Prostate Cancer, Media Release Mar. 12, 2010 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://www.roche.com/media/media_releases/med-cor-2010-03-12.htm.)
Press Release: Takeda Announces Termination of Orteronel (TAK-700) Development for Prostate Cancer in Japan., U.S.A. and Europe, Jun. 19, 2014 [retrieved on Jun. 27, 2014] Retrieved from the Internet: (URL: http://www.takeda.com/news/2014/20140619_6615. html).
Prostate Cancer Treatment, Jevatana (cabazitaxel) Injection, Retrieved from the internet on Dec. 19, 2016 at http://www.jevtana.com/ treatment.

**US 10,716,777 B2**

Page 9

(56)                **References Cited**

OTHER PUBLICATIONS

Provenge (sipuleucel-T) Label, 2010.
Public Deposition of Robert McSorley, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Apr. 19, 2017.
Quinn et al., Docetaxel and Atrasentan Versus Docetaxel and Placebo for Men with Advanced Castration-Resistant Prostate Cancer (SWOG S0421): A Randomized Phase 3 Trial, Lancet 893-900 (2013).
Ramanathan et al., "A Phase II Study of Milataxel: A Novel Taxane Analogue in Previously Treated Patients With Advanced Colorectal Cancer," Cancer Chemotherapy and Pharmacology, 2008, vol. 61 (3), pp. 453-458.
Ramiah V., et al., "Clinical Endpoints for Drug Development in Prostate Cancer," Current Opinion in Urology, 2008, vol. 18 (3), pp. 303-308.
Random House Webster's College Dictionary, 2001 Second Revised and Updated Random House Edition (2003), p. 1393.
Ratain and Sargent, Optimising the Design of Phase II Oncology Trials: The Importance of Randomisation, Eur. J. Cancer 275-280 (2009).
Ratain M.J., et al., "Critical Role of Phase I Clinical Trials in Cancer Treatment. American Society of Clinical Oncology," Journal of Clinical Oncology, Feb. 1997, vol. 15 (2), pp. 853-859.
Ratain M.J., Phase II Oncology Trials: Let's Be Positive, Clinical Cancer Research, Aug. 2005 vol. 11 (16), pp. 5661-5662.
Ratain, M.J. et al., Statistical and Ethical Issues in the Design and Conduct of Phase I and II Clinical Trials of New Anticancer Agents, 85(20) J. Nat'l Cancer Inst. 1637-43 (1993).
Reck et al., An Open-Label, Multi Centre, Phase II, Non-Comparative Trial of ZD1839 Monotherapy in Chemotherapy-Naive Patients with Stage IV or Stage III Non-Operable Non-Small Cell Lung Cancer (NSCLC), 23(16S) J. Clin. Oncol. 7098 (2005).
Reese et al., A Phase II Trial of Irinotecan in Hormone-Refractory Prostate Cancer, 16(4) Investig. New Drugs 353-59 (1999).
Reply Declaration of Alton Oliver Sartor, M.D., as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Apr. 20, 2017.
Reply Declaration of Dr. Rahul Seth, as submitted in U.S. Patent and Trademark Office before the Patent Trial and Appeal Board case IPR2016-00712, U.S. Pat. No. 8,927,592, dated Mar. 14, 2017.
Revision Sistematica y Modelo Economico de Efectividad Glinica y Goste•Efectividad de Docetaxel en Combinacion con Prednisona/ Prednisolona para el Tratamiento de Cancer de Prostata Metastasico Refradario a Homonas. [Retrieved from the internet on Jul. 29, 2014]. Retrieved from the internet:( URL: http://www.sefh.es/ sefhboletin/vernoticiaboletin.php?id=2663).
Richards L., et al., "Improved Survival in Second-Line Advanced Prostate Cancer Treated with Cabazitaxel," Nature Reviews Clinical Oncology, 2010, vol. 7 (12), p. 671.
Risbridger G.P., et al., "Breast and Prostate Cancer: More Similar than Different," Nature Reviews Cancer, Mar. 2010, vol. 10 (3), pp. 205-212.
Risinger A.L., et al., "The Taccalonolides: Microtubule Stabilizers That Circumvent Clinically Relevant Taxane Resistance Mechanisms," Cancer Research, Nov. 2008, vol. 68 (21), pp. 8881-8888.
Rodrigues G., et al., "Open Clinical Uro-Oncology Trials in Canada," The Canadian Journal of Urology, 2007, vol. 14 (6), pp. 3779-3786.
Rosenberg et al., Activity of Second-Line Chemotherapy in Docetaxel-Refractory Hormone-Refractory Prostate Cancer Patients, Randomized Phase 2 Study of Ixabepilone or Mitoxantrone and Prednisone, 110(3) Cancer 556-63 (2007).
Ross R.W., et al., "Inherited Variation in the Androgen Pathway is Associated With the Efficacy of Androgen-deprivation Therapy in Men With Prostate Cancer," Journal of Clinical Oncology, Feb. 2008, vol. 26 (6), pp. 842-847.
Rothenstein J.M., et al., "Company Stock Prices Before and After Public Announcements Related to Oncology Drugs," Journal of the National Cancer Institute, Oct. 2011, vol. 103 (20), pp. 1507-1512.

Saad et al., Randomized Phase II Trial of Custirsen (OGX-011) in Combination with Docetaxel or Mitoxantrone as Second-Line Therapy in Patients with Metastatic Castrate-Resistant Prostate Cancer Progressing After First-Line Docetaxel: CUOG Trial P-06c, 17(17) Clin. Cancer Res. 5765-73 (2011).
Sanofi-Aventis v. Fresenius Kabi USA, Civil Action No. 14-7869, United States District Court, District of New Jersey, Excerpts from Markman Hearing held on Jan. 23, 2016, pp. 1-9, 90-105.
Sanofi Mature IP v. Mylan Laboratories Limited, Case No. 2018-1203, United States Court of Appeals for the Federal Circuit, Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2016-00712, Decision dated Feb. 5, 2019, 12 pages.
Sanofi Oncology website, Oct. 2008, pp. 1-2. Retrieved from the internet, URL: https://www.sanofi.ma/fr/nous-connaitre/solutions-de-sante/oncologie.
Sanofi v. Glenmark Pharmaceuticals, Civil Action No. 14-264-RGA, United States District Court, District of Delaware, Trial Opinion dated Aug. 31, 2016.
Sanofi v. Lupin Atlantic Holdings, Civil Action No. 15-415-RGA, United States District Court, District of Delaware, Trial Opinion dated Oct. 23, 2017.
Sanofi v. Watson Laboratories Inc., Case 2016-2722, U.S. Court of Appeals for the Federal Circuit,Opinion dated Nov. 9, 2017.
Sanofi-Aventis Annual Report SEC Form 20-F 2010, 335 pages.
Sanofi-Aventis Annual Report SEC Form 20-F 2011, 335 pages.
Sanofi-Aventis Annual Report SEC Form 20-F 2012, 458 pages.
Sanofi-Aventis Annual Report SEC Form 20-F 2013, 304 pages.
Sanofi-Aventis Annual Report SEC Form 20-F 2014, 413 pages.
Sanofi-Aventis Annual Report SEC Form 20-F 2015, 233 pages.
Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 1 of 4.
Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 2 of 4.
Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 3 of 4.
Sanofi-Aventis Annual Report SEC Form 20-F 2016—Part 4 of 4.
Sanofi-Aventis Annual Report SEC Form 20-F, Dec. 2006, pp. 1-301.
Sanofi-aventis Annual Report SEC Form 20-F, Dec. 2007, pp. 1-283.
Sanofi-aventis Annual Report SEC Form 20-F, Dec. 2008, pp. 1-320.
Sanofi-Aventis Annual Report SEC Form 20-F (Dec. 31, 2006) at 39, [retrieved on Jun. 27, 2014] Retrieved from the internet: (URL: http://www.sec.gov/Archives/edgar/data/1121404/000119312507072848/d20f.htm).
Sanofi-Aventis Annual Review, 2008, pp. 1-28, URL: https://ddd.uab.cat/pub/infanu/34542/iaSANAVEa2008ieng.pdf.
Sanofi-Aventis Press Release: EPS Growth in Q2 2010, (Jul. 29, 2010), pp. 1-27.
Sanofi-Aventis Press Release, Jevtana (cabazitaxel) Injection Now Available in the U.S., (Jul. 19, 2010).
Sanofi-Aventis Press Release: "Phase III Data Showing Improved Survival with Jevtana® (cabazitaxel) injection in Second-Line Advanced Prostate Cancer Published in The Lancet,", retrieved on Oct. 30, 2018 from http://www.news.sanofi.us/press-releases?item=118536&amp;printable.
Sanofi-Aventis Press Release: Q1 2010: A Good First Quarter, (Apr. 29, 2010), pp. 1-19.
Sanofi-Aventis Press Release: Resilient Sales and Business EPS in Q3 2010, (Oct. 28, 2010), pp. 1-24.
Sanofi-Aventis Press Release: Sanofi-Aventis Delivers 2008 Results Above Guidance, Feb. 11, 2009, pp. 1-27.
Sanofi-Aventis Press Release: Sanofi•Aventis Delivers Double-Digit EPS Growth in 2009 as the Transformation Program Progresses, Feb. 10, 2010, pp. 1-26.
Sanofi-Aventis v. Fresenius Kabi USA, Civil Action No. 14-7869, United States District Court, District of New Jersey, Amended Claim Construction Opinion, Oct. 7, 2016.
Sanofi-Aventis v. Fresenius Kabi USA, Civil Action No. 14-7869, United States District Court, District of New Jersey, Defendants Joint Responsive Claim Construction Brief, entered Dec. 3, 2015.
Sanofi-Aventis v. Fresenius Kabi USA, Civil Action No. 14-7869, United States District Court, District of New Jersey, Joint Claim Construction and Prehearing Statement, dated Oct. 2, 2015.

**US 10,716,777 B2**

Page 10

(56)         **References Cited**

OTHER PUBLICATIONS

*Sanofi-Aventis* v. *Fresenius Kabi USA,* Civil Action No. 14-7869, United States District Court, District of New Jersey, Sealed Opinion of Dec. 19, 2017 (redacted).

*Sanofi-Aventis* v. *Mylan Laboratories Limited,* Civil Action No. 15-3392, United States District Court, District of New Jersey, Defendant's Answer to the Complaint, Separate Defenses and Counterclaims, 2015.

*Sanofi-Aventis* v. *ONCO Therapies,* United States District Court, District of New Jersey, Complaint for Patent Infringement, May 15, 2015.

Sartor et al., Cabazitaxel vs. Docetaxel in Chemotherapy-Naïve (CN) Patients with Metastatic Castration-Resistant Prostate Cancer (mCRPC): A Three Arm Phase III Study (FIRSTANA), J. Clin. Oncol. Abstr. 5006 (2016).

Sartor O., et al., "Cabazitaxel vs docetaxel in chemotherapy-naïve patients with metastatic castration-resistant prostate cancer: A three-arm phase III study (FIRSTANA)," ASCO Annual meeting 2016, slides 1-22.

Sartor O., et al., "Improving Outcomes with Recent Advances in Chemotherapy for Castrate-Resistant Prostate Cancer," Clinical Genitourinary Cancer, 2010, vol. 8 (1), pp. 23-28.

Sartor O., et al., "Novel Therapeutic Strategies for Metastatic Prostate Cancer in the Post-Docetaxel Setting," The Oncologist, Nov. 2011, vol. 16 (11), pp. 1487-1497.

Sartor O., "State-of-the-Art Management for the Patient with Castration-Resistant Prostate Cancer in 2012," American Society of Clinical Oncology Educational Book, Jan. 2012, vol. 32, pp. 289-291.

Sessa et al., Phase I Clinical and Pharmacokinetic Studies of the Taxoid Derivative RPR 109881A Administered as a 1-Hour or 3-Hour Infusion in Patients with Advanced Solid Tumors, Annals of Oncol. 1140-50 (2002).

Sessa et al., Phase I Clinical and Pharmacokinetic Study of the Oral Platinum Analogue JM216 Given Daily for 14 Days, Annals of Oncol. 1315-22 (1998).

Shabafrouz K., et al., "New Drugs at the Horizon for Men with Prostate Cancer," Revue Medicale Suisse, 2010, vol. 6 (250), pp. 1057-1058 and 1060-1061.

Sharom, F.J., "ABC Multidrug Transporters: Structure, Function and Role in Chemoresistance," Pharmacogenomics, Jan. 2008, vol. 9 (1), pp. 105-127.

Sheiner L.B., "Learning versus confirming in clinical drug development," Clinical Pharmacology & Therapeutics, Mar. 1997, vol. 61(3), pp. 275-291.

Shelley M., et al., "Docetaxel Plus Prednisone Improves Survival in Men with Advanced Prostate Cancer," Cancer Treatment Reviews, 2005, vol. 31 (5), pp. 403-407.

Shepard D.R., et al., "Estimation of the Effect of Food on the Disposition of Oral 5-Fluorouracil in Combination with Eniluracil," Cancer Chemotherapy and Pharmacology, May 2002, vol. 49(5), pp. 398-402.

Shimazui T., et al., "Three-Weekly Docetaxel with Prednisone is Feasible for Japanese Patients with Hormone-Refractory Prostate Cancer: A Retrospective Comparative Study with Weekly Docetaxel Alone," Journal of Clinical Oncology, 2007, vol. 37 (8), pp. 603-608.

Signs and Symptoms of Prostate Cancer, American Cancer Society, Retrieved from the internet on Nov. 19, 2016 at http://www.cancer.org/cancer/prostatecancer/detailedguide/prostate-cancer-signs-symptoms.

Singh A.K., et al., "Interpreting Results of Clinical Trials: A Conceptual Framework," Clinical Journal of the American Society of Nephrology, Sep. 2008, vol. 3(5), pp. 1246-1252.

Slovin S.F., et al., "Ipilimumab Alone or in Combination with Radiotherapy in Metastatic Castration-Resistant Prostate Cancer: Results from an Open-Label, Multicenter Phase I/II Study," Annals of Oncology, 2013, vol. 24 (7), pp. 1813-1821.

Small E., et al., "Randomized Phase II Study Comparing 4 Monthly Doses of Ipilimumab (MDX-010) as a Single Agent or in Combination with a Single Dose of Docetaxel in Patients with Hormone-Refractory Prostate Cancer," Journal of Clinical Oncology (Meeting Abstracts), 2006, vol. 24 (18S), pp. S4609.

Small E.J., et al., "Granulocyte Macrophage Colony Stimulating Factor-Secreting Allogeneic Cellular Immunotherapy for Hormone-Refractory Prostate Cancer," Clinical Cancer Research, 2007, vol. 13, pp. 3883-3891.

Small E.J., et al., "Randomized Study of Three Different Doses of Suramin Administered with a Fixed Dosing Schedule in Patients with Advanced Prostate Cancer: Results of Intergroup 0159, Cancer and Leukemia Group B 9480," Journal of Clinical Oncology, Aug. 2002, vol. 20(16), pp. 3369-3375.

Small et al., A Phase II Trial of Gefitinib in Patients with Non-Metastatic Hormone-Refractory Prostate Cancer, 100 BJU Int'l. 765-69 (2007).

Sonpavde et al., Sunitinib Malate for Metastatic Castration-Resistant Prostate Cancer Following Docetaxel-Based Chemotherapy, 21(2) Ann. Oncol. 319-24 (2010).

Spigel D.R., 'Single-Agent Gefitinib in Patients with Untreated Advanced Non-Small-Cell Lung Cancer and Poor Performance Status: A Minnie Pearl Cancer Research Network Phase II Trial,' Clinical Lung Cancer, vol. 7, No. 2, pp. 127-132 (2005).

Stedman's Medical Dictionary, pp. 168, 360, 376, 537, and 1215, 27th Edition, 2000.

Sternberg C.N., et al., "Larotaxel with Cisplatin in the First-Line Treatment of Locally Advanced/Metastatic Urothelial Tract or Bladder Cancer: A Randomized, Active-Controlled, Phase III Trial (Cilab)," Oncology, 2013, vol. 85 (4), pp. 208-215.

Straub et al., Intravenous Hydrophobic Drug Delivery: A Porous Particle Formulation of Paclitaxel (AI-850), 22(3) Pharm. Res. 347-55 (2005).

Sullivan P.W., et al., "Quality of Life as a Potential Predictor for Morbidity and Mortality in Patients with Metastatic Hormone-Refractory Prostate Cancer," Quality of Life Research, Oct. 2006, vol. 15(8), pp. 1297-1306.

Susman, ASGO: Calcitriol Fails in ASCENT-2 Prostate CA Trial, MedPage Today, Jun. 9, 2010 [retrieved on Jun. 27, 2014], Retrieved from the Internet( URL:http://www.medpagetoday.com/MeetingCoverage/ASCO/20575).

Sutent (sunitinib malate) Label (Apr. 2008).

Szmulewitz R.Z., et al., "Playing Russian Roulette with Tyrosine Kinase Inhibitors," Clinical Pharmacology & Therapeutics, 2013, vol. 93(3), pp. 242-244.

Takeda M., et al., "The Establishment of two Pacilitaxel Resistant Cancer Cell Lines and the Mechanism of Pacilitaxel Resistance With Two Cell Lines," The Prostate, 2007, vol. 67 (9), pp. 955-967.

Takenaka, et al., Combination Chemotherapy for Weekly Docetaxel and Estramustine for Hormone Refractory Prostate Cancer in Japanese Patients, Int. J. Urol.,vol. 15 (1), 106-109 (2008).

Tan, "Novel Agents in the Treatment of Hormone-Independent Metastatic Prostate Cancer," Actas Urológicas Españolas, 2007, vol. 31 (6), pp. 660-685 (followed by English translation).

Tannock, et al., Docetaxel Plus Prednisone Improves Survival in Men With Advanced Prostate Cancer, Cancer Treatment Reviews, (2005), vol. 31. pp. 403-407.

Tannock I., et al., "Treatment of Metastatic Prostatic Cancer with Low-Dose Prednisone: Evaluation of Pain and Quality of Life as Pragmatic Indices of Response," Journal of Clinical Oncology, 1989, vol. 7 (5), pp. 590-597.

Tannock I.F., et al., "Chemotherapy with Mitoxantrone Plus Prednisone or Prednisone Alone for Symptomatic Hormone-Resistant Prostate Cancer: A Canadian Randomized Trial with Palliative End Points," Journal of Clinical Oncology, 1996, vol. 14 (6), pp. 1756-1764.

Tannock I.F., et al., "Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer," The New England Journal of Medicine, 2004, vol. 351 (15), pp. 1502-1512.

Tarceva (erlotinib) Label (Apr. 2009).

Taxol Paclitaxel, LABEL Mead Johnson, Feb. 10, 2000, pp. 1-43.

Taxotere (Docetaxel) mejora significativamente la supervivencia de los pacientes con cancer de prostata avanzado, 2007. Retrieved from the Internet: (URL: http://www.pmfarma.es/noticias/7074-taxotere-docetaxelmejora-significativamente-la-supervivencia-de-los-pacientes-con-cancer-de-prostataavanzado).

(56)  **References Cited**

OTHER PUBLICATIONS

Taxotere (Docetaxel) Significantly Improves the Survival of Patients With Advanced Prostate Cancer, Feb. 2007, sanofi-aventis Press Release; pp. 1-4.

Taxotere Patient Information Leaflet and Prescribing Information (Label), May 2004, pp. 1-35.

Taxotere Patient Information Leaflet and Prescribing Information (Label), Oct. 2006, pp. 1-55.

Taxotere Prescribing Information (Label), Sep. 2007, pp. 1-57.

Taylor B.S., et al., "Integrative Genomic Profiling of Human Prostate Cancer," Cancer cell, 2010, vol. 18(1), pp. 11-22.

Ten Tije et al., Pharmacological Effects of Formulation Vehicles: Implications for Cancer Chemotherapy, 42(7) Clin. Pharmacokinet. 665-85 (2003).

The National Horizon Scanning Centre of National Institute for Health Research, Cabazitaxel (XRP-6258) For Hormone Refractory, 2009, Metastatic Prostate Cancer—Second line After Docataxel, University of Birmingham, pp. 1-6.

Torisel (temsirolimus) Label (May 2007).

Trudeau, et al., Docetaxel in Patients with Metastatic Breast Cancer: A Phase II Study of the National Cancer Institute of Canada—Clinical Trials Group, J. Clin. Oncol., 422-428 (1996).

Tufts Cost Study as retrieved on Feb. 1, 2017 from http://csdd.tufts.edu/news/complete_story/pr_tufts_csdd_2014_cost_study, pp. 1-3, 2014.

Undevia S.D., et al., "Pharmacokinetic Variability of Anticancer Agents," Nature Reviews Cancer, Jun. 2005, vol. 5 (6), pp. 447-458.

Van Cutsem., et al., A Phase III Study Comparing Larotaxel to 5-FU (Continuous Intravenous 5-FU or Capecitabine) in Patients with Advanced Pancreatic Cancer (APC) Previously Treated with a Gemcitabine Containing Regimen, 21(6S) Annals of Oncol. Oral Presentations, O-0007, Jul. 2010.

Van Hook K., et al., "Orteronel for the Treatment of Prostate Cancer," Future Oncology, 2014, vol. 10 (5), pp. 803-811.

Van Ruitenbeek P., et al., 'Histamine H1-receptor blockade in humans affects psychomotor performance but not memory,' Journal of psychopharmacology, vol. 22 No. 6, pp. 663-672 (2008).

Van Tellingen, O., et al., "Cremophor EL Causes (pseudo-) Non-Linear Pharmacokinetics of Paclitaxel in Patients," British Journal of Cancer, Sep. 1999, vol. 81 (2), pp. 330-335.

Verweij, et al., Paclitaxel (Taxol) and Docetaxel (Taxotere): Not Simply Two of a Kind, Ann. Oncol. 495-505 (1994).

View of NCT00417079 on 2008_08_31-XRP6258 Plus Predisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metasiattc Prostate Cancer, (retrieved on Apr. 6, 2015). Retrieved from the internet (URL: https://clinicaltrials.gov/archive/NCT00417079/2008_08_31).

Vogel et al., Efficacy and Safety of Trastuzumab as a Single Agent in First-Line Treatment of HER2-Overexpressing Metastatic Breast Cancer, 20(3) J. Clin. Oncol. 719-26 (2002).

Vogelzang N.J., et al., "A Phase II Trial of Suramin Monthly x 3 for Hormone-Refractory Prostate Carcinoma," Cancer, 2003, vol. 100 (1), pp. 65-71.

Von Hoff D.D and Turner J., "Response Rates, Duration of Response, and Dose Response Effects in Phase I Studies of Antineoplastics,"Investigational New Drugs, Feb. 1991, vol. 9 (1), pp. 115-122.

Vrignaud et al., Preclinical Antitumor Activity of Cabazitaxel, a Semisynthetic Taxane Active in Taxane-Resistant Tumors, 19(11) Clin. Cancer Res. 2973-83 (2013).

Vrignaud et al., Preclinical Profile of Cabazitaxel, Drug Des. Devel. & Ther. 1851-67 (2014).

Wazana, Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift?, JAMA 283 (2000) 373-380.

What is Prostate Cancer?, Jevatana (cabazitaxel) Injection, Retrieved from the internet on Sep. 19, 2016 at http://www.jevtana.com/what-is-prostate-cancer.

What is PROVENGE Immunotherapy?, Retrieved from the internet on Oct. 5, 2016 at http://www.provenge.com/advanced-prostate-cancer-immunotherapy.aspx.

Why ZYTIGA? (abiraterone acetate), Retrieved from the internet on Oct. 6, 2016 at https://www.zytigo.com/about-zytigo/why-zytiga.

Wiechec E., et al., "The Effect of Genetic Variability on Drug Response in Convention Breast Cancer Treatment," European Journal of Pharmacology, 2009, vol. 625 (1-3), pp. 122-130.

Williams R., 'Discontinued drugs in 2007: oncology drugs,' Expert Opinion Investig. Drugs, vol. 17 No. 12, pp. 1791-1816, (2008).

Williams R., et al., 'Discontinued Drugs in 2008: Oncology Drugs," Expert Opinion on Investigational Drugs, 2009, vol. 18 (11), pp. 1581-1594.

Wils, P., et al., "Polarized transport of docetaxel and vinblastine mediated by Pglycoprotein in human intestinal epithelial cell monolayers," Biochemical Pharmacology, 48(7):1528-30 (1994).

Winquist E., et al., "Open Clinical Uro-Oncology Trials in Canada," The Canadian Journal of Urology, 2008, vol. 15 (1), pp. 3942-3949.

Wirth, et al., "The Antiandrogen Withdrawal Syndrome," Urol. Res., 1997, 25 (Suppl. 2), pp. S67-S71.

Wirth M.P., "Hormone-refractory Prostate Cancer: What Have We Learned?," BJU International, Jul. 2007, vol. 100 (Suppl 2), pp. 56-59.

World Health Organization WHO Handbook for Reporting Results of Cancer Treatment, Geneva, 1979, pp. 1-46.

Xeloda (capecitabine) Label Feb. 2003.

Xofigo (radium Ra 223 dichloride) Label (May 2013).

Xtanti Clinical Trials & Results, How Xtanti May Help, Retrieved from the internet on Oct. 6, 2016 at https://www.xtanti.com/xtanti-clinical-trials.

Xtanti (enzalutamide) Label (Aug. 2012).

Yervoy (ipilimumab), Prescribing Information (Label), Dec. 2013.

Yoo G.H., et al., "XRP6258-Induced Gene Expression Patterns in Head and Neck Cancer Carcinoma," The Laryngoscope, 2010, vol. 120 (6), pp. 1114-1119.

Zatloukal P., et al., "Randomized Multicenter Phase II Study of Larotaxel (XRP9881) in Combination with Cisplatin or Gemcitabine as First-Line Chemotherapy in Nonirradiable Stage IIIB or Stage IV Non-Small Cell Lung Cancer," Journal of Thoracic Oncology, 2008, vol. 3(8), pp. 894-901.

Zhu, et al., Does "Clock" Matter in Prostate Cancer, Cancer Epidemiol. Biomarkers Prev. 3-5 (2006).

Ziada et al., The Use of Trastuzumab in the Treatment of Hormone Refractory Prostate Cancer; Phase II Trial, 60(4) The Prostate 332-37 (2004).

Zielinski A., et al., "Custirsen (OGX-011): a Second-Generation Antisense Inhibitor of Clusterin in Development for the Treatment of Prostate Cancer," Future Oncology, 2012, vol. 8 (10), pp. 1239-1251.

Zytiga (abiraterone acetate) Label (Apr. 2011).

Sanofi Mature IP's Reply Brief dated May 8, 2020, Appeal from the USPTO, PTAB in IPR2016-00712, United States Court of Appeals for the Federal Circuit Case No. 2020-1302, Mylan Laboratories Limited vs. Sanofi Mature IP.

Mylan Laboratories Limited's Opening Brief dated Apr. 10, 2020, Appeal from the USPTO, PTAB in IPR2016-00712, United States Court of Appeals for the Federal Circuit Case No. 2020-1302, Mylan Laboratories Limited vs. Sanofi Mature IP.



**FIG. 1**



**FIG. 2**

| Factor | Patient number | Hazard ratio (95% CI) |
|---|---|---|
| All randomized patients | 755 | 0.70 (0.59–0.83) |
| ECOG status: 0,1 | 694 | 0.68 (0.57–0.82) |
| ECOG status: 2 | 61 | 0.81 (0.48–1.38) |
| Measurable disease: No | 350 | 0.72 (0.55–0.93) |
| Measurable disease: Yes | 405 | 0.68 (0.54–0.85) |
| No. of prior chemotherapies: 1 | 528 | 0.67 (0.55–0.83) |
| No. of prior chemotherapies: ≥2 | 227 | 0.75 (0.55–1.02) |
| Age: <65 years | 295 | 0.81 (0.61–1.08) |
| Age: ≥65 years | 460 | 0.62 (0.50–0.78) |
| Rising PSA at baseline: No | 159 | 0.88 (0.61–1.26) |
| Rising PSA at baseline: Yes | 583 | 0.65 (0.53–0.80) |
| Total docetaxel dose: <225 mg/m$^2$ | 59 | 0.96 (0.49–1.86) |
| Total docetaxel dose: ≥225 to 450 mg/m$^2$ | 206 | 0.60 (0.43–0.84) |
| Total docetaxel dose: ≥450 to 675 mg/m$^2$ | 217 | 0.83 (0.60–1.16) |
| Total docetaxel dose: ≥675 to 900 mg/m$^2$ | 131 | 0.73 (0.48–1.10) |
| Total docetaxel dose: ≥900 mg/m$^2$ | 134 | 0.53 (0.47–0.90) |
| Progression during docetaxel treatment | 219 | 0.68 (0.57–0.82) |
| Progression <3 months after docetaxel | 339 | 0.70 (0.55–0.91) |
| Progression ≥3 months after docetaxel | 192 | 0.75 (0.51–1.11) |

← Favors Cabazitaxel        Favors Mitoxantrone →

0       0.5       1       1.5       2

Hazard ratio and 95% confidence interval

# FIG. 3



**FIG. 4**



**FIG. 5**



**FIG. 6**



**FIG. 7**

US 10,716,777 B2

1

# ANTITUMORAL USE OF CABAZITAXEL

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/627,962, filed Jun. 20, 2017, which is a continuation of U.S. application Ser. No. 14/575,566, filed Dec. 18, 2014, which is a continuation of U.S. application Ser. No. 13/456, 720, filed Apr. 26, 2012, which is a continuation of International Application No. PCT/IB2010/054866, filed Oct. 27, 2010, which claims the benefit of priority of U.S. Provisional Application No. 61/256,160, filed Oct. 29, 2009, U.S. Provisional Application No. 61/293,903, filed Jan. 11, 2010, U.S. Provisional Application No. 61/355,834, filed Jun. 17, 2010, U.S. Provisional Application No. 61/355,888, filed Jun. 17, 2010, U.S. Provisional Application No. 61/369,929, filed Aug. 2, 2010, U.S. Provisional Application No. 61/383, 933, filed Sep. 17, 2010, and U.S. Provisional Application No. 61/389,969, filed Oct. 5, 2010, all of which are incorporated herein by reference.

The present invention relates to a novel antitumoral use of cabazitaxel in the treatment of prostate cancer, which may be metastatic, especially for patients who are not catered by a taxane-based treatment. In particular, the present invention relates to the use of cabazitaxel in the treatment of patients with castration resistant metastatic prostate cancer, who have been previously treated with a docetaxel based regimen, an unmet medical need.

## BACKGROUND

Prostate cancer affects a large proportion of the male population worldwide: 680 000 cases worldwide in 2002; it is predicted that there will be 900 000 new cases per year up to 2010 (CA Cancer J. Clin., 2005, 55, 74-108). It is the most frequently occurring cancer in men after lung cancer.

Prostate cancer is generally treated at the start by depriving the androgenic hormones, i.e. by surgical excision of the testicles The Current State of Hormonal Therapy for Prostate Cancer CA Cancer J. Clin., May 2002; 52: 154-179, or by radiotherapy treatment External beam radiation therapy for prostate cancer CA Cancer J. Clin., November 2000; 50: 349-375. Treatments with antiandrogens or hormone manipulations are associated with responses of short duration and without any improvement in the survival time.

The use of cytotoxic chemotherapy is not a routine treatment, whereas its role in alleviating the symptoms and reducing the levels of PSA (prostate-specific antigen) is established. No monotherapy has obtained a degree of response of greater than 30%; combinations with an effect on PSA levels were tested. No effect on the survival time was seen and, what is more, the toxicity of these treatments, particularly on elderly patients, is problematic since, in addition to their tumour, they are generally suffering from related health problems and have a limited reserve of bone marrow.

Until recently, the chemotherapies used were limited to cyclophosphamide, anthracyclines (doxorubicin or mitoxantrone) and estramustine, and the effects of these treatments are relatively mediocre. Palliative effects were observed in patients following the administration of corticoids alone or of mitoxantrone with either prednisone or hydrocortisone. Following Phase II trials, the combination of mitoxantrone with corticoids was recognized as the reference treatment for hormone-resistant prostate cancer. More recently, treatments with docetaxel in combination with estramustine or pred-

2

nisone have made it possible to treat cancers that are resistant to hormone deprivation Advances in Prostate Cancer Chemotherapy: A New Era Begins CA Cancer J. Clin., September 2005; 55: 300-318, the survival was improved by 2.4 months.

It is generally accepted that the responses in advanced prostate cancers are difficult to evaluate on account of the heterogeneity of the disease and the lack of consensus regarding the treatment response criteria. Many patients with metastatic prostate cancer have no measurable disease, but have symptoms dominated by bone metastases. Measurement of the PSA level has been found to be a means for evaluating novel candidates and also the measurement of the tumour when this is possible, the measurement of bone tumours, the quality of life and the measurement of pain.

Furthermore, cancer may become resistant to the agents used, in particular to taxanes, which limits the possible treatment options. Several taxane resistance mechanisms have been described (expression of P-glycoprotein P-gp, mdr-1 gene, modified metabolism of taxane, mutation of the tubulin gene, etc.): see Drug Resistance Updates 2001, 4(1), 3-8; J. Clin. Onc. 1999, 17(3), 1061-1070.

The technical problem that the invention intends to solve is that of providing a novel therapeutic option for treating prostate cancer, especially for patients who are not catered for by a taxane-based treatment, such as patients with castration resistant metastatic prostate cancer who have been previously treated with docetaxel (sold under the brand name Taxotere®) based regimen, an unmet medical need.

Four clinical trials on cabazitaxel are known since April 2006. Three monotherapy tests have made it possible to determine the maximum tolerated dose and the toxicities at the limit doses: these tests were performed on breast, sarcoma and prostate tumours. Doses of 10-30 mg/m$^2$ every three hours were used. A phase II trial was performed on patients with a breast cancer, who had previously received taxanes and anthracyclines as adjuvant (i.e. after a surgery) or as a first-line treatment. The response levels were 14.6% as adjuvant and 9.5% as second-line treatment.

## SUMMARY

The invention relates to a novel antitumoral pharmaceutical therapeutic use comprising cabazitaxel of formula



The invention also relates to methods of treating patients with prostate cancer comprising administering an effective amount of the antitumoral agent cabazitaxel to said patient.

US 10,716,777 B2

3

This antitumoral agent may be in the form of anhydrous base, a hydrate or a solvate, intended for treating prostate cancer, in particular for treating patients who are not catered for by a taxane-based treatment, such as patients who have been previously treated with a docetaxel-based regimen. This compound is preferably administered to a patient with advanced metastatic disease. In particular, the compound is administered to a patient with castration resistant prostate cancer. Cabazitaxel is preferably administered in combination with a corticoid chosen especially from prednisone and prednisolone. This corticoid is preferably administered at a daily dose of 10 mg orally.

In some aspects of the invention, cabazitaxel is administered in combination with prednisone for its use as a medicament in the treatment of patients with hormone-refractory prostate cancer who have been previously treated with docetaxel based regimen.

In some aspects of the invention, cabazitaxel is administered at a dose (defined for each administration) of between 20 and 25 mg/m². Cabazitaxel may be in the form of an acetone solvate. More particularly, the acetone solvate of cabazitaxel contains between 5% and 8% and preferably between 5% and 7% by weight of acetone.

In some aspects of the invention, cabazitaxel may be administered by intravenous infusion at a dose of between 15 and 25 mg/m², this administration cycle of the antitumour agent being repeated at an interval of 3 weeks between each cabazitaxel administration, which interval may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding cabazitaxel administration.

In some embodiments, the effective amount of cabazitaxel produces at least one therapeutic effect selected from the group consisting of increase in overall survival, partial response, reduction in tumor size, reduction in metastasis, complete remission, partial remission, stable disease, or complete response.

The present invention also relates to a pharmaceutical composition that treats patients with prostate cancer comprising a clinically proven safe and effective amount of cabazitaxel.

Further embodiments of the invention comprise methods or using, treating, promoting, and providing cabazitaxel.

The present invention also relates to packages and articles of manufacture.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 displays the Kaplan-Meier curves of the overall survival in a cabazitaxel study.

FIG. 2 displays the Kaplan-Meier curves of progression-free survival in a cabazitaxel study.

FIG. 3 shows an intention-to-treat analysis of overall survival in subgroups of patients defined by baseline characteristics. Hazard ratios <1 favor the cabazitaxel group, while those >1 favor the mitoxantrone group. CI denotes confidence intervals.

FIG. 4 graphically depicts the proportion of patients with changes in ECOG performance status from baseline during treatment (safety population). The "Improved" column represents PS2 at baseline changed to 0 or 1 during treatment. The "stable" column represents no change, and the "Worse" column represents PS2 at baseline and changed to 3, or 0 or 1 at baseline changed to 2 during treatment.

FIG. 5 graphically depicts the proportion of patients with changes from baseline in the Present Pain Intensity score during treatment (ITT). The "Improved" column represents patients in which the PPI score during treatment was lower

4

versus baseline. The "Stable" column represents no change, and the "Worse" column represents patients with >1 unit increase in PPI score during treatment versus baseline.

FIG. 6 graphically presents the mean area under the curve for PPI and analgesic scores by treatment cycle.

FIG. 7 graphically presents the mean AUC analgesic score.

## DETAILED DESCRIPTION

### Definitions

Effective amount, as used herein, means an amount of a pharmaceutical compound, such as cabazitaxel, that produces an effect on the cancer to be treated.

Clinically proven, as used herein, means clinical efficacy results that are sufficient to meet FDA approval standards.

Castration resistant prostate cancer, as used herein, is synonymous with hormone-refractory prostate cancer.

"Patient," as used herein, includes both human and animals. In one embodiment, a patient is a human.

Cabazitaxel belongs to the taxoid family and has the formula:



The chemical name of cabazitaxel is 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl    (2R,3S)-3-tert-butoxycarbonyl-amino-2-hydroxy-3-phenylpropionate.    Cabazitaxel is synonymously known as (2α,5β,7β,10β,13α)-4-acetoxy-13-({(2R,3S)-3-[(tertbutoxycarbonyl)amino]-2-hydroxy-3-phenylpropanoyl}oxy)-1-hydroxy-7,10-dimethoxy-9-oxo-5,20-epoxytax-11-en-2-yl benzoate.

This compound and a preparative method thereof is described in WO 96/30355, EP 0 817 779 B1 and U.S. Pat. No. 5,847,170, which are hereby incorporated herein by reference. Cabazitaxel may be administered in base form (cf. above formula), or in the form of a hydrate. It may also be a solvate, i.e. a molecular complex characterized by the incorporation of the crystallization solvent into the crystal of the molecule of the active principle (see in this respect page 1276 of J. Pharm. Sci. 1975, 64(8), 1269-1288). In particular, it may be an acetone solvate, and, more particularly, may be the solvate described in WO 2005/028462. It may be an acetone solvate of cabazitaxel containing between 5% and 8% and preferably between 5% and 7% by weight of acetone (% means content of acetone/content of acetone+cabazitaxel×100). An average value of the acetone content is 7%, which approximately represents the acetone stoichiometry,

5

which is 6.5% for a solvate containing one molecule of acetone. The procedure described below allows the preparation of an acetone solvate of cabazitaxel:

940 ml of purified water are added at 20±5° C. (room temperature) to a solution of 207 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β, 10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate at about 92% by weight in about 2 litres of acetone, followed by seeding with a suspension of 2 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate isolated from acetone/water in a mixture of 20 ml of water and 20 ml of acetone. The resulting mixture is stirred for about 10 to 22 hours, and 1.5 litres of purified water are added over 4 to 5 hours. This mixture is stirred for 60 to 90 minutes, and the suspension is then filtered under reduced pressure. The cake is washed on the filter with a solution prepared from 450 ml of acetone and 550 ml of purified water, and then oven-dried at 55° C. under reduced pressure (0.7 kPa) for 4 hours. 197 g of 4α-acetoxy-2α-benzoyloxy-5β,20-epoxy-1β-hydroxy-7β,10β-dimethoxy-9-oxo-11-taxen-13α-yl (2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate acetone containing 0.1% water and 7.2% acetone (theoretical amount: 6.5% for a stoichiometric solvate) are obtained.

Cabazitaxel may be administered parenterally, such as via intravenous administration. A galenical form of cabazitaxel suitable for administration by intravenous infusion is that in which the cabazitaxel is dissolved in water in the presence of excipients chosen from surfactants, cosolvents, glucose or sodium chloride, etc. For example, a galenical form of cabazitaxel may be prepared by diluting a premix solution of cabazitaxel contained in a sterile vial (80 mg of cabazitaxel+2 ml of solvent+Polysorbate 80) with a sterile vial containing a solution of 6 ml of water and ethanol (13% by weight of 95% ethanol) in order to obtain 8 ml of a solution ready to be redituted in a perfusion bag. The concentration of cabazitaxel in this ready-to-redilute solution is about 10 mg/ml. The perfusion is then prepared by injecting the appropriate amount of this ready-to-redilute solution into the perfusion bag containing water and glucose (about 5%) or sodium chloride (about 0.9%).

Cabazitaxel may be administered in combination with a corticoid, such as prednisone or prednisolone, as two distinct pharmaceutical preparations.

Accordingly, one aspect of the invention is a method of treating prostate cancer comprising administering to a patient in need thereof an effective amount of cabazitaxel in combination with a corticoid, such as prednisone or prednisolone.

The combination is administered repeatedly according to a protocol that depends on the patient to be treated (age, weight, treatment history, etc.), which can be determined by a skilled physician. In one aspect of the invention, cabazitaxel is administered by perfusion to the patient according to an intermittent program with an interval between each administration of 3 weeks, which may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding administration. The median number of cycles is 6. The prednisone or prednisolone may be administered daily, for example in the form of one dosage intake per day, throughout the duration of the treatment. Examples of doses for the two antitumoral agents are given in the "Example" section. The currently recommended dose is 25 mg/m² of cabazitaxel administered as a on-hour infusion and 10 mg per day of prednisone or prednisolone administered orally.

6

In some aspects of the invention, the patient to be treated has prostate cancer that is resistant to hormone therapy (i.e., hormone refractory) and has previously been treated with docetaxel. In some aspects, the patient has prostate cancer that progressed during or after treatment with docetaxel. In some aspects, the patient was previously treated with at least 225 mg/m² cumulative dose of docetaxel. In a particular aspect, the patient showed progression of their disease in the six months following hormone therapy or during docetaxel treatment or after docetaxel treatment. In another particular aspect, the patient showed progression of their disease in the three months following hormone therapy or after docetaxel treatment.

In some aspects of the invention, the patient to be treated has a measurable tumour and may show progression of the disease via a metastatic lesion of the viscera or of a soft tissue of at least 1 cm determined by MRI or by an axial tomographic scan (CT scan).

In some aspects of the invention, the patient to be treated has an unmeasurable tumour and may show an increase in the PSA level with three measurements at a 1-week interval or the appearance of new lesions.

In some aspects of the invention, the patient to be treated has undergone castration by orchidectomy or with LHRH agonists, elimination of the androgens or monotherapy with estramustine.

In a preferred aspect, the life expectancy of the patient to be treated should be at least 2 months.

In some aspects, the treatment does not include patients who have previously received mitoxantrone, or who have received less than 225 mg/m² of docetaxel, or who have undergone a radiotherapy that has eliminated more than 40% of the marrow, who have received a treatment within the 4 weeks preceding the test, who have a neuropathy or a stomatitis, involving the brain or the meninges, who have shown severe hypersensitivity to polysorbate or to prednisone, whose blood analysis shows an appreciable decrease in neutrophils, haemoglobin or platelets, an increase in bilirubin and/or liver enzymes and creatinine, or who have heart problems or an infection requiring antibiotics.

An aspect of the invention comprises increasing the survival of a patient with hormone refractory metastatic prostate cancer, comprising administering a clinically proven effective amount of cabazitaxel to the patient in combination with prednisone or prednisolone. In a particular aspect, the patient has previously been treated with a docetaxel-containing regimen.

Cabazitaxel may be administered in combination with a medication to prevent or control nausea and vomiting or to prevent or control hypersensitivity to the cabazitaxel treatment. Preferably, a patient is pre-medicated with the medication, for example, at least 30 minutes prior to administering each dose of cabazitaxel.

One aspect of the invention comprises a method of reducing the risk of a severe hypersensitivity reaction in a patient with prostate cancer being treated with cabazitaxel, comprising administering to the patient a medication to prevent hypersensitivity prior to the administration of cabazitaxel.

Severe hypersensitivity reactions to cabazitaxel can occur and may include generalized rash/erythema, hypotension and bronchospasm. Patients should be observed closely for hypersensitivity reactions, especially during the first and second infusions. Hypersensitivity reactions may occur within a few minutes following the initiation of the infusion of cabazitaxel, thus facilities and equipment for the treatment of hypotension and bronchospasm should be available.

US 10,716,777 B2

7                                          8

If severe hypersensitivity reaction occurs, cabazitaxel infusion should be immediately discontinued and appropriate therapy should be administered. Examples of medications which may be used to prevent hypersensitivity to the cabazitaxel treatment include antihistamines, such as dexchlorpheniramine (for example 5 mg), and diphenhydramine (for example 25 mg) or equivalent antihistamines; and corticosteroids, such as dexamethasone (for example 8 mg) or an equivalent steroid.

Nevertheless, cabazitaxel should not be given to and may be contraindicated in patients who have a history of severe hypersensitivity reactions to cabazitaxel. Depending on the formulation administered, cabazitaxel may also be contraindicated in patients who have a history of hypersensitivity reactions to other drugs formulated with polysorbate 80.

One aspect of the invention comprises an article of manufacture comprising:
a) a packaging material;
b) cabazitaxel, and
c) a label or package insert contained within the packaging material indicating that severe hypersensitivity reactions can occur.

Gastrointestinal symptoms, such as, for example nausea, vomiting, and diarrhea, may occur with the treatment of cabazitaxel. Mortality related to diarrhea and electrolyte imbalance has been reported. Therefore, patients may also be rehydrated and treated with anti-diarrheal or anti-emetic medications as needed. Treatment delay or dosage reduction may be necessary if patients experience Grade 3 diarrhea.

Accordingly, the methods of the invention include administering a medication to prevent hypersensitivity or a medication to prevent or control nausea and vomiting in combination with cabazitaxel.

Examples of medications which may be used to prevent or control nausea and vomiting include histamine $H_2$ antagonists and antiemetics, such as ondansetron, granisetron and dolesetron.

A possible side effect of the treatment with cabazitaxel is neutropenia, which is characterized by a reduced number of neutrophils. Unfortunately, a number of neutropenia deaths have been reported. Therefore, frequent blood counts should be obtained or performed to monitor for neutropenia. If neutropenia occurs, cabazitaxel treatment may be discontinued, and restarted when neutrophil counts recover to a level of >1,500/mm$^3$. Cabazitaxel should not be given to a patient with a neutrophil count ≤1,500 cells/mm$^3$.

The present invention therefore also relates to a method of treating prostate cancer with cabazitaxel comprising administering cabazitaxel to the patient, monitoring blood counts in the patient, and measuring neutrophil levels. In one aspect, the method further comprises discontinuing cabazitaxel treatment if neutropenia occurs, and optionally restarting cabazitaxel treatment when neutrophil counts recover to a level of >1,500/mm$^3$. In one aspect, the monitoring comprises taking a blood sample from the patient.

Determining neutrophil counts can be performed according to procedures well know to those skilled in the art.

One aspect of the invention is a method of reducing the risk of neutropenia complications comprising administering cabazitaxel in combination with an agent useful for treating neutropenia. Such a neutropenia treatment agent is, for example, a hematopoietic growth factor which regulates the production and function of neutrophils such as a human granulocyte colony stimulating factor, (G-CSF). In a particular aspect of the invention, the neutropenia is complicated neutropenia. Complicated neutropenia includes febrile neutropenia, prolonged neutropenia, or neutropenic infection. In a preferred embodiment, the neutropenia treatment agent is administered prior to the administration of cabazitaxel.

A particular aspect of the invention comprises a method of reducing the risk of neutropenia complications in a patient with prostate cancer being treated with cabazitaxel, comprising monitoring blood counts in the patient at regular intervals during treatment of the patient with cabazitaxel; reducing the dose of cabazitaxel if the patient experiences febrile neutropenia or prolonged neutropenia; discontinuing cabazitaxel treatment if the patient's neutrophil count is ≤1,500 cells/mm$^3$; and optionally restarting cabazitaxel treatment when the patient's neutrophil counts recover to a level ≥1,500 cells/mm$^3$.

In a particular aspect, primary prophylaxis with G-CSF should be considered in patients with high-risk clinical features (age >65 years, poor performance status, previous episodes of febrile neutropenia, extensive prior radiation ports, poor nutritional status, or other serious co-morbidities) that predispose them to increased complications from prolonged neutropenia. Therapeutic use of G-CSF and secondary prophylaxis should be considered in all patients considered to be at increased risk for neutropenia complications.

In another aspect, the monitoring of complete blood counts is performed on a weekly basis during cycle 1 and before each treatment cycle thereafter so that the dose can be adjusted, if needed. Therefore, another aspect for reducing the risk of neutropenia complications comprises monitoring blood counts in the patient and adjusting the dose of cabazitaxel. An example of a dose modification is described in Example 2.

One aspect of the invention comprises an article of manufacture comprising:
a) a packaging material;
b) cabazitaxel, and
c) a label or package insert contained within the packaging material indicating that cabazitaxel should not be given to patients with neutrophil counts of 1,500 cells/mm$^3$.

Cases of renal failure should be indentified and managed aggressively, accordingly to procedures known to those skilled in the art. Renal failure may be associated with sepsis, dehydration, or obstructive uropathy. Furthermore, impaired hepatic function (e.g., total bilirubin≥ULN, or AST and/or ALT≥1.5×ULN) may increase cabazitaxel concentrations, and cabazitaxel should not be given to patients with hepatic impairment.

Cabazitaxel may cause fetal harm when administered to a pregnant woman.

Prednisone or prednisolone administered at 10 mg daily does not affect the pharmacokinetics of cabazitaxel.

Cabazitaxel is primarily metabolized through CYP3A. Concomitant administration of strong CYP3A inhibitors (for example, ketoconazole, itraconazole, clarithromycin, atazanavir, indinavir, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin, voriconazole) may increase cabazitaxel concentrations. Therefore co-administration of cabazitaxel with strong CYP3A inhibitors should be avoided. Caution should be exercised with concomitant use of moderate CYP3A inhibitors. One aspect of the invention is a method of treating a patient for prostate cancer comprising determining whether the patient is undergoing treatment with a CYP3A inhibitor, discontinuing treatment with a CYP3A inhibitor, and then administering cabazitaxel to the patient.

Concomitant administration of strong CYP3A inducer (e.g., phenytoin, carbamazepine, rifampin, rifabutin, rifa-

US 10,716,777 B2

9

pentin, phenobarbital) may decrease cabazitaxel concentrations. Therefore co-administration of cabazitaxel with strong CYP3A inducers should be avoided. Therefore, one aspect of the invention is a method of treating a patient for prostate cancer comprising determining whether the patient is undergoing treatment with a CYP3A inducer, discontinuing treatment with a CYP3A inducer, and administering cabazitaxel to the patient.

In addition, patients should also refrain from taking St. John's Wort.

In some aspects of the invention, the cabazitaxel is administered in an amount to provide an AUC of about 991 ng·h/mL (CV 34%).

In some aspects of the invention, the cabazitaxel is administered in an amount to provide an $C_{max}$ of about 226 ng·h/mL (CV 107%).

In some aspects of the invention, the cabazitaxel is administered in an amount to provide a plasma clearance of 48.5 L/h (CV 39%).

One aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that the mean $C_{max}$ of cabazitaxel in patients with metastatic prostate cancer was 226 ng/mL (CV 107%).

Another aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that the mean AUC of cabazitaxel in patients with metastatic prostate cancer was 991 ng·h/mL (CV 34%).

Another aspect of the invention is a package comprising cabazitaxel and a label, in a position which is visible to prospective purchasers, comprising a printed statement which informs prospective purchasers that cabazitaxel has a plasma clearance of 48.5 L/h (CV 39%).

A variety of educational materials may be employed to ensure proper prescribing, dispensing, and patient compliance according to the methods described herein. For example, a variety of literature and other materials, such as, for example, prescribing information, package inserts, medications guides, physician information sheets, healthcare professional information sheets, medical journal advertisements, and product websites may describe the risks and benefits of taking cabazitaxel.

The invention also concerns a package comprising cabazitaxel and a label, said label comprising one or more messages that:

a) the efficacy and safety of cabazitaxel in combination with prednisone were evaluated in patients with hormone refractory metastatic prostate cancer previously treated with a docetaxel containing regimen; or

b) a total of 755 patients were randomized to receive either cabazitaxel 25 mg/m² every 3 weeks for a maximum of 10 cycles with prednisone mg orally daily, or to receive mitoxantrone 12 mg/m² intravenously every 3 weeks for a maximum of 10 cycles with prednisone 10 mg orally daily; or

c) the median number of cycles was 6 in the cabazitaxel group and 4 in the mitoxantrone group.

The invention also concerns a package comprising cabazitaxel and a label, said label comprising one or more messages that:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

10

c) cabazitaxel should not be given if neutrophil counts are 1,500 cells/mm³.

The invention also concerns a method of promoting the use of cabazitaxel the method comprising the step of conveying to a recipient at least one message selected from:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are 1,500 cells/mm³;

d) severe hypersensitivity can occur; or

e) severe hypersensitivity can occur and may include generalized rash/erythema, hypotension and brochospasm; or

f) discontinue cabazitaxel immediately if severe reactions occur; or

g) discontinue cabazitaxel immediately if severe reactions occur and administer appropriate therapy; or

h) cabazitaxel is contraindicated in patients with a history of severe hypersensitivity reactions to cabazitaxel or drugs formulated with polysorbate 80.

The invention also concerns a method of providing cabazitaxel, wherein said cabazitaxel is provided along with information indicating that:

a) neutropenic deaths have been reported; or

b) frequent blood counts should be obtained to monitor for neutropenia; or

c) cabazitaxel should not be given if neutrophil counts are 1,500 cells/mm³;

d) severe hypersensitivity can occur; or

e) severe hypersensitivity can occur and may include generalized rash/erythema, hypotension and brochospasm; or

f) discontinue cabazitaxel immediately if severe reactions occur; or

g) discontinue cabazitaxel immediately if severe reactions occur and administer appropriate therapy; or

h) cabazitaxel is contraindicated in patients with a history of severe hypersensitivity reactions to cabazitaxel or drugs formulated with polysorbate 80.

Example 1

A clinical study was performed wherein patients received either treatment with cabazitaxel or the reference treatment based on mitoxantrone each combined with prednisone or prednisolone.

More specifically, patients over 18 years of age with metastatic castration resistant metastatic prostate cancer either measurable by RECIST criteria or non-measurable disease with rising PSA levels or appearance of new lesions, ECOG (Eastern Cooperative Oncology Group) performance stage 0-2, and adequate organ function (patients had to have neutrophils >1,500 cells/mm³, platelets >100,000 cells/mm³, hemoglobin >10 g/dL, creatinine <1.5× upper limit of normal (ULN), total bilirubin <1×ULN, AST<1.5×ULN, and ALT<1.5×ULN) who had had prior hormone therapy, chemotherapy, and radiotherapy, but had progressive during or after docetaxel treatment (cumulative dose 225 mg/m²) were randomized to 10 mg/day of prednisone with either mitoxantrone 12 mg/m² or cabazitaxel 25 mg/m², both administered every 3 weeks.

Patients with a history of congestive heart failure, or myocardial infarction within the last 6 months, or patients with uncontrolled cardiac arrhythmias, angina pectoris, and/or hypertension were not included in the study.

US 10,716,777 B2

**11**

720 patients were planned to be included in the clinical study: 360 in each cabazitaxel+prednisone and mitoxantrone+prednisone group. Seven hundred and fifty-five patients (755) (median age 68; 84% white) were actually enrolled, 378 in the cabazitaxel and prednisone/prednisolone group and 377 in the mitoxantrone and prednisone/prednisolone group. The maximal number of treatment cycles was 10 for cabazitaxel and 10 for mitoxantrone. The median number of treatment cycles was 6 for cabazitaxel and 4 for mitoxantrone. The median prior dose of docetaxel treatment was 576 mg/m$^2$ for the cabazitaxel group and 529 mg/m$^2$ for the mitoxantrone group. Median follow-up was 12.8 months.

The measurements of the results are performed via the same tests as at inclusion. MRI and spiral computed tomographic (CT) scans are preferably used.

The results are evaluated according to the following criteria (cf RECIST guideline):

overall survival (OS): the time from inclusion to the study to the date of death complete response (CR): disappearance of the lesions

partial response (PR): at least 30% reduction of the largest diameter of the lesion progression (PD): at least 20% increase in the sum of the largest diameter of the lesion or appearance of one or more new lesions

stable disease (SD): reduction of the tumour insufficient to be included in PR and increase of the tumour insufficient to be included in PD.

The confirmations of the measurements are made at least 4 weeks after the response criterion has been established for the first time.

The progression-free survival (PFS) is the time from inclusion in the study and the date of progression or death when the progression is either an increase of the tumour, or of the pain.

It was found that the combination of cabazitaxel and prednisone is a well-tolerated combination with the safety profile of taxanes. At the dose investigated in this trial (LD2: 25 mg/m$^2$ cabazitaxel+10 mg/m$^2$/day prednisone), patients receiving cabazitaxel demonstrated statistically significant longer overall survival (OS) compared to mitoxantrone (p<0.0001). The hazard ratio was 0.70 (95% Cl. 0.59, 0.83) in favor of cabazitaxel corresponding to a 30% reduction in risk of death. The median survival for patients in the cabazitaxel group was 15.1 months in comparison to 12.7 months in the mitoxantrone group. Notably, the extension of survival was observed irrespective of ECOG performance status, number of prior chemotherapy regimens and age. Benefit was also seen in the third of patients who were docetaxel-refractory and had progressed during docetaxel therapy.

The data related to the treated patients are given in Table 1:

**12**

TABLE 1

| Efficacy analysis (intention-to-treat) | | | |
|---|---|---|---|
| | | CbzP N = 378 Median (months) | MP N = 377 Median (months) |
| Overall survival | Median (months) | 15.1 | 12.7 |
| | Hazard ratio (95% CI) | 0.70 (0.59; 0.83) | |
| | p-value[1] | 0.0001 | |
| PFS | Median (months) | 2.8 | 1.4 |
| | Hazard ratio (95% CI) | 0.74 (0.64-0.86) | |
| | p-value[1] | 0.0001 | |
| Tumor response rate | | 14.4% | 4.4% |
| p-value[2] | | 0.0005 | |
| Time to Tumor Progression Median (months) | | 8.8 | 5.4 |
| | p-value | <0.001 | |
| PSA Response rate | | 39.2% | 17.8% |
| p-value[2] | | 0.0002 | |
| PSA PFS | Median (months) | 6.4 | 3.1 |
| | Hazard ratio (95% CI) | 0.75 (0.63-0.90) | |
| | p-value[1] | 0.0010 | |
| Pain Response rate | | 9.2% | 7.8% |
| p-value[2] | | 0.6526 | |
| Pain PFS | Median (months) | Not reached | 11.1 |
| | Hazard ratio (95% CI) | 0.91 (0.69-1.19) | |
| | p-value[1] | 0.5192 | |

[1]Log-rank test,
[2]Chi-square test
CbzP: cabazitaxel with prednisone
MP: mitoxantrone with prednisone

Progression free survival (PFS) defined as the earliest progression in tumor, PSA or pain was also statistically significantly longer in the cabazitaxel group compared to the mitoxantrone group (p<0.0001, hazard ratio=0.74 (95% Cl, 0.64, 0.86), and the median progression-free survival was 2.8 months versus 1.4 months. Response rates and PFS for PSA and tumor assessments were statistically significant in favor of cabazitaxel, while response rate and PFS for pain did not show a statistically significant difference.

The most frequent Grade ¾ toxicities were neutropenia observed with a higher frequency in the cabazitaxel group with 81.7% compared to the mitoxantrone group with 58.0%. Rates of febrile neutropenia were 7.5% in the cabazitaxel group and 1.3% in the mitoxantrone group.

The most common 20%) grade 1-4 adverse reactions were anemia, leukopenia, neutropenia, thrombocytopenia, diarrhea, fatigue, nausea, vomiting, asthenia, and constipation.

The most common 5%) grade 3-4 adverse reactions in patients who received cabazitaxel were neutropenia, leukopenia, anemia, febrile neutropenia, diarrhea, fatigue, and asthenia.

Subgroup analyses by risk factors and a multivariate analysis showed that OS outcomes were consistent and robust in favor of cabazitaxel as shown in the herebelow table:

TABLE 2

| | MP | | CbzP | | |
|---|---|---|---|---|---|
| | N (%) | Median OS (mos) | N (%) | Median OS (mos) | CbzP vs MP HR (95% CI) |
| ITT | 377 (100) | 12.7 | 378 (100) | 15.1 | 0.70 (0.59-0.83) |
| PD while on D | 103 (27) | 12.0 | 113 (30) | 14.2 | 0.65 (0.47-0.90) |
| PD after last D dose, ≤3 mos | 180 (48) | 10.3 | 158 (42) | 13.9 | 0.70 (0.54-0.90) |
| PD after last D dose, >3 mos | 91 (24) | 17.7 | 103 (27) | 17.5 | 0.78 (0.53-1.14) |

mos = months
D = Docetaxel

US 10,716,777 B2

**13**  **14**

TABLE 3

Incidence of Reported Adverse Reactions[1] and Hematologic Abnormalities
in ≥5% of Patients Receiving cabazitaxel in Combination with
Prednisone or Mitoxantrone in Combination with Prednisone

| | Cabazitaxel 25 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | | Mitoxantrone 12 mg/m² every 3 weeks with prednisone 10 mg daily n = 371 | |
|---|---|---|---|---|
| | Grade 1-4 n (%) | Grade 3-4 n (%) | Grade 1-4 n (%) | Grade 3-4 n (%) |
| Any Adverse Reaction | | | | |
| Blood and Lymphatic System Disorders | | | | |
| Neutropenia[2] | 347 (94%) | 303 (82%) | 325 (87%) | 215 (58%) |
| Febrile Neutropenia | 27 (7%) | 27 (7%) | 5 (1%) | 5 (1%) |
| Anemia[2] | 361 (98%) | 39 (11%) | 302 (82%) | 18 (5%) |
| Leukopenia[2] | 355 (96%) | 253 (69%) | 343 (93%) | 157 (42%) |
| Thrombocytopenia[2] | 176 (48%) | 15 (4%) | 160 (43%) | 6 (2%) |
| Cardiac Disorders | | | | |
| Arrhythmia[3] | 18 (5%) | 4 (1%) | 6 (2%) | 1 (<1%) |
| Gastrointestinal Disorders | | | | |
| Diarrhea | 173 (47%) | 23 (6%) | 39 (11%) | 1 (<1%) |
| Nausea | 127 (34%) | 7 (2%) | 85 (23%) | 1 (<1%) |
| Vomiting | 83 (22%) | 6 (2%) | 38 (10%) | 0 |
| Constipation | 76 (20%) | 4 (1%) | 57 (15%) | 2 (<1%) |
| Abdominal Pain[4] | 64 (17%) | 7 (2%) | 23 (6%) | 0 |
| Dyspepsia[5] | 36 (10%) | 0 | 9 (2%) | 0 |
| General Disorders and Administration Site Conditions | | | | |
| Fatigue | 136 (37%) | 18 (5%) | 102 (27%) | 11 (3%) |
| Asthenia | 76 (20%) | 17 (5%) | 46 (12%) | 9 (2%) |
| Pyrexia | 45 (12%) | 4 (1%) | 23 (6%) | 1 (<1%) |
| Peripheral Edema | 34 (9%) | 2 (<1%) | 34 (9%) | 2 (<1%) |
| Mucosal Inflammation | 22 (6%) | 1 (<1%) | 10 (3%) | 1 (<1%) |
| Pain | 20 (5%) | 4 (1%) | 18 (5%) | 7 (2%) |
| Infections and Infestations | | | | |
| Urinary Tract Infection[6] | 29 (8%) | 6 (2%) | 12 (3%) | 4 (1%) |
| Pneumonia[7] | 12 (3%) | 9 (2%) | 4 (1%) | 3 (<1%) |
| Investigations | | | | |
| Weight Decreased | 32 (9%) | 0 | 28 (8%) | 1 (<1%) |
| Metabolism and Nutrition Disorders | | | | |
| Anorexia | 59 (16%) | 3 (<1%) | 39 (11%) | 3 (<1%) |
| Dehydration | 18 (5%) | 8 (2%) | 10 (3%) | 3 (<1%) |
| Musculoskeletal and Connective Tissue Disorders | | | | |
| Back Pain | 60 (16%) | 14 (4%) | 45 (12%) | 11 (3%) |
| Arthralgia | 39 (11%) | 4 (1%) | 31 (8%) | 4 (1%) |
| Pain in Extremity | 30 (8%) | 6 (2%) | 27 (7%) | 4 (1%) |
| Muscle Spasms | 27 (7%) | 0 | 10 (3%) | 0 |
| Bone Pain | 19 (5%) | 3 (<1%) | 19 (5%) | 9 (2%) |
| Musculoskeletal Pain | 18 (5%) | 2 (<1%) | 20 (5%) | 3 (<1%) |
| Nervous System Disorders | | | | |
| Peripheral Neuropathy[8] | 50 (13%) | 3 (<1%) | 12 (3.2%) | 3 (<1%) |
| Dysgeusia | 41 (11%) | 0 | 15 (4%) | 0 |
| Dizziness | 30 (8%) | 0 | 21 (6%) | 2 (<1%) |
| Headache | 28 (8%) | 0 | 19 (5%) | 0 |
| Renal and Urinary Tract Disorders | | | | |
| Hematuria | 62 (17%) | 7 (2%) | 13 (4%) | 1 (<1%) |
| Dysuria | 25 (7%) | 0 | 5 (1%) | 0 |
| Respiratory, Thoracic and Mediastinal Disorders | | | | |
| Dyspnea | 43 (12%) | 4 (1%) | 16 (4%) | 2 (<1%) |
| Cough | 40 (11%) | 0 | 22 (6%) | 0 |
| Skin and Subcutaneous Tissue Disorders | | | | |
| Alopecia | 37 (10%) | 0 | 18 (5%) | 0 |

US 10,716,777 B2

**15**

TABLE 3-continued

Incidence of Reported Adverse Reactions[1] and Hematologic Abnormalities in ≥5% of Patients Receiving cabazitaxel in Combination with Prednisone or Mitoxantrone in Combination with Prednisone

| | Cabazitaxel 25 mg/m$^2$ every 3 weeks with prednisone 10 mg daily n = 371 | | Mitoxantrone 12 mg/m$^2$ every 3 weeks with prednisone 10 mg daily n = 371 | |
|---|---|---|---|---|
| | Grade 1-4 n (%) | Grade 3-4 n (%) | Grade 1-4 n (%) | Grade 3-4 n (%) |
| Vascular Disorders | | | | |
| Hypotension | 20 (5%) | 2 (<1%) | 9 (2%) | 1 (<1%) |
| Median Duration of Treatment | 6 cycles | | 4 cycles | |

[1]Graded using NCI CTCAE version 3
[2]Based on laboratory values, cabazitaxel: n = 369, mitoxantrone: n = 370.
[3]Includes atrial fibrillation, atrial flutter, atrial tachycardia, atrioventricular block complete, bradycardia, palpitations, supraventricular tachycardia, tachyarrhythmia, and tachycardia.
[4]Includes abdominal discomfort, abdominal pain lower, abdominal pain upper, abdominal tenderness, and GI pain.
[5]Includes gastroesophageal reflux disease and reflux gastritis.
[6]Includes urinary tract infection enterococcal and urinary tract infection fungal.
[7]Includes bronchopneumonia, lobar pneumonia, and *pneumonia klebsiella*.
[8]Includes peripheral motor neuropathy and peripheral sensory neuropathy.

TABLE 4

Patient Characteristics

| | MP (n = 377) | CBZP (n = 378) |
|---|---|---|
| Age (years) | | |
| Median [range] | 67 [47-89] | 68 [46-92] |
| ≥65 (%) | 57.0 | 64.9 |
| ECOG PS (%) | | |
| 0, 1 | 91.2 | 92.6 |
| 2 | 8.8 | 7.4 |
| PSA* (ng/mL) | | |
| Median [range] | 127.5 [2-11220] | 143.9 [2-7842] |
| Measurability of disease (%) | | |
| Measurable | 54.1 | 53.2 |
| Non-measurable | 45.9 | 46.8 |
| Disease site (%) | | |
| Bone | 87.0 | 80.2 |
| Lymph node | 44.8 | 45.0 |
| Visceral | 24.9 | 24.9 |
| Pain at Baseline, no. (%) | 168 (44.6) | 174 (46.0) |
| Previous Therapy, no. (%) | | |
| Hormonal | 375 (99.5) | 375 (99.2) |
| No. of Chemotherapy Regimens | | |
| 1 | 268 (71.1) | 260 (68.8) |
| 2 | 79 (21.0) | 94 (24.9) |
| >2 | 30 (8.0) | 24 (6.3) |
| Radiation | 222 (58.9) | 232 (61.4) |
| Surgery | 205 (54.4) | 198 (52.4) |
| Biologic Agent | 36 (9.5) | 26 (6.9) |
| Previous docetaxel regimens, n (%) | | |
| 1 | 327 (86.7) | 316 (83.6) |
| 2 | 43 (11.4) | 53 (14.0) |
| >2 | 7 (1.9) | 9 (2.4) |
| Median total previous docetaxel dose (mg/m$^2$) | 529.2 | 576.6 |

**16**

TABLE 4-continued

Patient Characteristics

| | MP (n = 377) | CBZP (n = 378) |
|---|---|---|
| Disease progression relative to docetaxel administration, n (%) | | |
| During treatment | 104 (27.6) | 115 (30.4) |
| <3 months from last dose | 181 (48.0) | 158 (41.8) |
| ≥3 months from last dose | 90 (23.9) | 102 (27.0) |
| Unknown | 2 (0.5) | 3 (0.8) |
| Median time from last docetaxel dose to disease progression (months) | 0.7 | 0.8 |

The primary reason for treatment discontinuation in both groups was disease progression (Table 5). The median delivered relative dose intensity was 96.1% in the cabazitaxel group and 97.3% in the mitoxantrone group. In the cabazitaxel group, >75% of patients received >90% of the planned dose intensity. Overall, 5.1% of mitoxantrone treatment courses were dose reduced compared with 9.8% of cabazitaxel treatment courses; 6.3 and 7% of all treatment courses were delayed by 9 days or less, and 1.6 and 2.3% of courses were delayed by more than 9 days for mitoxantrone and cabazitaxel respectively (See Table 5).

TABLE 5

Treatment Received and Reasons for Discontinuation in the Intention-to-Treat Population.*

| | Mitoxantrone (N = 377) | Cabazitaxel (N = 378) |
|---|---|---|
| Patients receiving study treatment, no. (%) | 371 (98.4) | 371 (98.1) |
| Patients completing planned ten cycles of study treatment, no. (%) | 46 (12.2) | 105 (27.8) |
| Discontinuation of study treatment, no. (%) | 325 (86.2) | 266 (70.4) |

US 10,716,777 B2

17

TABLE 5-continued

Treatment Received and Reasons for Discontinuation
in the Intention-to-Treat Population.*

| | Mitoxantrone (N = 377) | Cabazitaxel (N = 378) |
|---|---|---|
| Reasons for discontinuation of study treatment, no. (%) | | |
| Disease progression | 267 (70.8) | 180 (47.6) |
| Adverse event | 32 (8.5) | 67 (17.7) |
| Non-compliance with protocol | 0 | 1 (0.3) |
| Lost to follow-up | 2 (0.5) | 0 |
| Patient's request | 17 (4.5) | 8 (2.1) |
| Other | 7 (1.9) | 10 (2.7) |
| No. of treatment cycles, median (range)† | 4 (1-10) | 6 (1-10) |
| Relative dose intensity, median % (range)† | 97.3 (42.5-106.0) | 96.1 (49.0-108.2) |
| Treatment delays, no. of cycles (%) ‡ | | |
| ≤9 days | 110 (6.3) | 157 (7.0) |
| >9 days | 28 (1.6) | 51 (2.3) |
| Dose reductions, no. of cycles (%) ‡ | 88 (5.1) | 221 (9.8) |

The results of this study are further illustrated to FIGS. 1, 2, and 3.

## Example 2

Table 6 illustrates an example of a dosage modification for adverse reactions in patients treated with cabazitaxel

TABLE 6

| Toxicity | Dosage Modification |
|---|---|
| Prolonged grade ≥3 neutropenia (greater than 1 week) despite appropriate medication including G-CSF | Delay treatment until neutrophil count is >1,500 cells/mm³, then reduce dosage of cabazitaxel to 20 mg/m² Use G-CSF for secondary prophylaxis. |
| Febrile neutropenia | Delay treatment until improvement or resolution, and until neutrophil count is >1,500 cells/mm³, then reduce dosage of cabazitaxel to 20 mg/m². Use G-CSF for secondary prophylaxis. |
| Grade ≥3 diarrhea or persisting diarrhea despite appropriate medication, fluid and electrolytes replacement | Delay treatment until improvement or resolution, then reduce dosage of cabazitaxel to 20 mg/m². |

Discontinue cabazitaxel treatment if a patient continues to experience any of these reactions at 20 mg/m².

## Example 3

Performance Status and Pain Scores During Treatment

Methods

ECOG PS, pain measures, and analgesic consumption were assessed prior to every treatment cycle and at the end of study treatment.

Pain assessments: Present Pain Intensity (PPI) scale from the McGill-Melzack questionnaire (Melzack R. Pain 1975; 1:277-99). Mean Analgesic Score (AS) derived from analgesic consumption (in morphine equivalents) was calculated for the one-week period prior to each evaluation. Area under the curve (AUC) of PPI and AS was calculated by the trapezoid formula. Cumulative AUC of PPI and AS was calculated up to the last cycle

18

of data available for each patient. Average AUC of the treatment groups was compared from Cycle 1 to Cycle 10.

Results

Performance status remained stable in most patients during the treatment period and was similar between groups. See FIG. 4.

Overall, PPI scores were comparable; improving from baseline in 21.3% of men in the CbzP group and 18.2% in the MP group. See FIG. 5.

The CbzP group had a lower mean area under the curve (AUC) of PPI, suggesting less severe pain especially during cycles 7-10. See FIG. 6.

Analgesic use was comparable between the groups (lower mean AUC of AS means lower pain medication use). See FIG. 7.

## CONCLUSION

Despite longer treatment with CbzP no worsening in ECOG PS was seen.

Present Pain Intensity score improved in 21% of men in CbzP vs. 18% in MP arm. Assessment of pain scores suggested less severe pain in the CbzP group during treatment.

Pain medication use was similar between groups.

## Example 4

A population pharmacokinetic analysis was conducted in 170 patients with solid tumors at doses ranging from 10 to 30 mg/m² weekly or every 3 weeks.

Based on the population pharmacokinetic analysis, after an intravenous dose of cabazitaxel 25 mg/m² every 3 weeks, the mean $C_{max}$ in patients with metastatic prostate cancer was 226 ng/mL (CV 107%) and was reached at the end of the 1-hour infusion ($T_{max}$). The mean AUC in patients with metastatic prostate cancer was 991 ng·h/mL (CV 34%). No major deviation from the dose proportionality was observed from 10 to 30 mg/m² in patients with advanced solid tumors. The volume of distribution (Vss) was 4,864 L (2,643 L/m² for a patient with a median BSA of 1.84 m²) at steady state.

Based on the population pharmacokinetic analysis, cabazitaxel has a plasma clearance of 48.5 L/h (CV 39%; 26.4 L/h/m² for a patient with a median BSA of 1.84 m²) in patients with metastatic prostate cancer. Following a 1-hour intravenous infusion, plasma concentrations of cabazitaxel can be described by a 3-compartment PK model with α-, β-, and γ-half-lives of 4 minutes, 2 hours, and 95 hours, respectively.

What is claimed is:

1. A method of increasing survival comprising administering to a patient in need thereof a dose of 20 to 25 mg/m² of cabazitaxel, or a hydrate or solvate thereof, in combination with an $H_2$ antagonist, wherein the $H_2$ antagonist is administered to the patient prior to administering the dose of cabazitaxel, and wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

2. The method of claim 1, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m².

3. The method of claim 1, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m².

US 10,716,777 B2

**19**

**20**

**4**. The method of claim **1**, where the $H_2$ antagonist is administered at least 30 minutes prior to administering the dose of cabazitaxel.

**5**. The method of claim **4**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

**6**. The method of claim **4**, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

\* \* \* \* \*

# EXHIBIT D

IW 7520518

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**March 20, 2015**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE
RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS
OF:

**APPLICATION NUMBER:** *13/456,720*
**FILING DATE:** *April 26, 2012*
**PATENT NUMBER:** *8,927,592*
**ISSUE DATE:** *January 06, 2015*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

**M. TARVER**
**Certifying Officer**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/456,720 | 04/26/2012 | Sunil GUPTA | FR2009/121 US CNT | 1083 |

5487          7590          01/16/2013
ANDREA Q. RYAN
SANOFI
55 Corporate Drive
MAIL CODE: 55A-505A
BRIDGEWATER, NJ 08807

| EXAMINER | |
|---|---|
| ANDERSON, JAMES D | |
| ART UNIT | PAPER NUMBER |
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/16/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

USPatent.E-Filing@sanofi.com
andrea.ryan@sanofi.com

PTOL-90A (Rev. 04/07)

SA_JEV_0001684

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 13/456,720 | GUPTA, SUNIL |
| | Examiner | Art Unit | |
| | JAMES D. ANDERSON | 1629 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on <u>07 January 2013</u>.

2a) ☐ This action is **FINAL**.      2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5) ☒ Claim(s) <u>1-33</u> is/are pending in the application.

    5a) Of the above claim(s) <u>20-23 and 25-33</u> is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>1-19 and 24</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☒ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some * c) ☐ None of:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____.

        3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

## Attachment(s)

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08)
   Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 13/456,720                                       Page 2
Art Unit: 1629

## DETAILED ACTION

### *Formal Matters*

Claims 1-33 are presented for examination.

### *Election/Restrictions*

Applicant's election of Group I, claims 1-19 and 24, in the reply filed on 1/7/2013 is acknowledged.  Because applicant did not distinctly and specifically point out the supposed errors in the restriction requirement, the election has been treated as an election without traverse (MPEP § 818.03(a)).

Claims 20-23 and 25-33 are withdrawn from further consideration pursuant to 37 CFR 1.142(b) as being drawn to a nonelected invention, there being no allowable generic or linking claim. Election was made **without** traverse in the reply filed on 1/7/2013.

### *Priority*

This application is a continuation of International Application No. PCT/IB2010/054866, filed October 27, 2010, which claims the benefit of priority of U.S. Provisional Application No. 61/256,160, filed October 29, 2009, U.S. Provisional Application No. 61/293,903, filed January 11, 2010, U.S. Provisional Application No. 61/355,834, filed June 17, 2010, U.S. Provisional Application No. 61/355,888, filed June 17, 2010, U.S. Provisional Application No. 61/369,929, filed August 2, 2010, U.S. Provisional Application No. 61/383,933, filed September 17, 2010, and U.S. Provisional Application No. 611389,969, filed October 5, 2010.

Application/Control Number: 13/456,720                                    Page 3
Art Unit: 1629

## *Information Disclosure Statement*

No Information Disclosure Statement has been filed in the instant application. The Examiner reminds Applicant of his/her duty to disclose information material to patentability as defined in 37 CFR 1.56.

## *Specification*

The disclosure is objected to because of the following informalities: At page 7, first paragraph, Applicant makes reference to "WO 2005/02846" as describing acetone solvates of cabazitaxel. It is unclear what WIPO document this is referring to as the number is incomplete. WIPO publications contain a six digit number, not a 5 digit number. It doesn't appear that Applicant has left off the leading "0" as WO 2005/002846 is directed to methods of producing a fire protection glazing, not acetone solvates.

Appropriate correction is required.

## *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any

inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Claims 1-5, 8-19, and 24 are rejected under 35 U.S.C. 103(a) as being unpatentable over **Mita** *et al*. (Clinical Cancer Research, 2009, vol. 15, pages 723-730) (Published Online January 15, 2009) in view of **Tannock** *et al*. (N. Engl. J. Med., 2004, vol. 351, pages 1502-1512).

### *Claimed Invention*

The instant claims are drawn to treating prostate cancer in a patient comprising administering to said patient cabazitaxel (XRP6258) in combination with prednisone or prednisolone.

### *Teachings of Mita et al.*

Mita et al. disclose a Phase I and pharmacokinetic study of cabazitaxel (XRP6258), administered as a 1-hour intravenous infusion every 3 weeks in patients with advanced solid tumors.  See Abstract.

Mita et al. disclose that cabazitaxel (XRP6258) has shown broad spectrum antitumor activity in mice bearing s.c. implanted human xenografts, including Du-145 prostate cancers.  See page 724, left column, first full paragraph.

Application/Control Number: 13/456,720 Page 5
Art Unit: 1629

Mita et al. disclose that the encouraging spectrum of antitumor activity of XRP6258 in experimental tumor models, particularly its notable activity against docetaxel-resistant, Pgp-expressing malignancies, served as a rationale to clinical evaluations. See page 724, left column, second full paragraph.

Regarding claims 8-11, Mita et al. disclose that XRP6258 was administered as a 1-hour i.v. infusion every 3 weeks at a starting dose of 10 mg/m2, with subsequent incremental increases to 15, 20, and 25 mg/m2 dose levels. See page 724, right column, "Drug administration" and "Dose escalation".

Regarding claims 14-16, Mita et al. disclose pharmacokinetic variables observed in patients at all tested dose levels, including AUC, Cmax, and clearance falling within the scope of the instant claims. See Table 5.

Regarding claims 17-19, Mita et al. disclose monitoring blood neutrophil counts, i.e., absolute neutrophil counts (ADC), and that at the highest dose level (25 mg/m2), the ADC was ≤ 1,500 cells/mm3 (990) and at that dose level there were cases of Grade 3 and Grade 4 neutropenia. Mita et al. disclose that the rate of dose limiting toxicity (DLT) exceeded the predefined limits of tolerability at the 25 mg/m2 dose level. See Table 3; page 726, left column, second full paragraph.

Regarding anticancer activity, Mita et al. disclose that evidence of anticancer activity was observed in a patient with **prostate cancer metastatic to liver and bones** whose disease had progressed through surgical castration, bicalutamide, diethyl stilbestrol, and mitoxantrone and prednisone. Further evidence of anticancer activity was observed in a patient with **hormone- and docetaxel- refractory prostate cancer metastatic to bone and iliac lymph nodes**. See page 727, left column, "Anticancer activity".

SA_JEV_0001689

Application/Control Number: 13/456,720                                    Page 6
Art Unit: 1629

Mita et al. differ from the instant claims in that while Mita et al. unequivocally teach, suggest, and motivate the administration of carbazitaxel to treat prostate cancer, including metastatic, hormone- and docetaxel-refractory prostate cancer, Mita et al. does not disclose combining carbazitaxel with prednisone.

### Teachings of Tannock et al.

Tannock et al. disclose that mitoxantrone plus prednisone reduces pain and improves quality of life in men with advanced, hormone-refractory prostate cancer, but it does not improve survival.  Tannock et al. disclose a study comparing the effects of docetaxel combined with prednisone to mitoxantrone combined with prednisone.  See Title; Abstract.

Regarding claim 8, Tannock et al. disclose that prednisone was administered at a dose of 5 mg twice daily, thus teaching administration of prednisone at a dose of 10 mg/day.  See Abstract; page 1504, left column, "Randomization and Treatment".

Regarding claims 17-19, Tannock et al. disclose that a dose reduction or treatment delay was stipulated for patient who had an absolute neutrophil count of less than 1500 per cubic millimeter (for those receiving weekly docetaxel).  See page 1504, right column, first full paragraph.

Tannock et al. disclose that when given with prednisone, treatment with docetaxel every 3 weeks led to superior survival and improved rates of response in terms of pain, serum PSA level, and quality of life, as compared to mitoxantrone plus prednisone, and conclude that docetaxel plus prednisone is the preferred

SA_JEV_0001690

Application/Control Number: 13/456,720                                   Page 7
Art Unit: 1629

option for most patients with hormone-refractory prostate cancer.  See Abstract;

page 1511, right column, last paragraph.

## Principles of Law

"In rejecting claims under 35 U.S.C. § 103, the examiner bears the initial

burden of presenting a *prima facie* case of obviousness. Only if that burden is met,

does the burden of coming forward with evidence or argument shift to the

applicant." *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1993) (citations omitted).

In order to determine whether a prima facie case of obviousness has been

established, we consider the factors set forth in *Graham v. John Deere Co.*, 383

U.S. 1, 17 (1966): (1) the scope and content of the prior art; (2) the differences

between the prior art and the claims at issue; (3) the level of ordinary skill in the

relevant art; and (4) objective evidence of nonobviousness, if present.

"The combination of familiar elements according to known methods is likely

to be obvious when it does no more than yield predictable results." *KSR Int'l Co.*

*v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). "In determining whether obviousness

is established by combining the teachings of the prior art, 'the test is what the

combined teachings of the references would have suggested to those of ordinary

skill in the art.'" *In re GPAC Inc.*, 57 F.3d 1573, 1581 (Fed. Cir. 1995).

"[I]in a section 103 inquiry, 'the fact that a specific [embodiment] is taught

to be preferred is not controlling, since all disclosures of the prior art, including

unpreferred embodiments, must be considered.'" *Merck & Co. Inc. v. Biocraft*

*Laboratories Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) (quoting *In re Lamberti*, 545

F.2d 747, 750, 192 USPQ 278, 280 (CCPA 1976).)

Application/Control Number: 13/456,720                                      Page 8
Art Unit: 1629

*Analysis & Examiner's Determination of Obviousness*

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to combine the teachings of the references so as to administer cabazitaxel in combination with prednisone as taught by Mita et al. in view of the teachings of Tannock et al.

One would have been motivated to do so because Mita et al. teach that cabazitaxel is effective in treating prostate cancer metastatic to liver and bones whose disease had progressed through surgical castration, bicalutamide, diethyl stilbestrol, and mitoxantrone and prednisone and hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes when administered as a single agent. The motivation to add prednisone to such treatment is clearly seen in Tannock et al., who teach that administration of the taxane, docetaxel, in combination with prednisone is effective in treating hormone-refractory prostate cancer. As such, the skilled artisan would predict that addition of prednisone to the treatment regimen of Mita et al. would also be effective in treating hormone-refractory prostate cancer, including prostate cancers refractory to docetaxel therapy.

Claims 6-7 are rejected under 35 U.S.C. 103(a) as being unpatentable over **Mita** *et al.* (Clinical Cancer Research, 2009, vol. 15, pages 723-730) (Published Online January 15, 2009) in view of **Tannock** *et al.* (N. Engl. J. Med., 2004, vol. 351, pages 1502-1512) as applied to claims 1-5, 8-19, and 24 above, and further in view of **Didier** *et al.* (US 2005/0065138 A1; Published Mar. 24, 2005).

Application/Control Number: 13/456,720                                    Page 9
Art Unit: 1629

Mita et al. and Tannock et al. teach as applied to claims 1-5, 8-19, and 24,
supra, which teachings are herein incorporated by reference in their entirety.
Claims 6-7 differ from Mita et al. and Tannock et al. in that the references do not
disclose an acetone solvate of carbazitaxel.

### Teachings of Didier et al.

Didier et al. disclose acetone solvates of carbazitaxel.  *See* Abstract; Claims.

Didier et al. disclose acetone solvates containing between 5% and 8% of
acetone.  *See* page 1, [0020].

### Analysis & Examiner's Determination of Obviousness

It would have been *prima facie* obvious to one of ordinary skill in the art at
the time the invention was made to combine the teachings of the references so as to
administer the acetone solvate of cabazitaxel in combination with prednisone as
taught by Mita et al. in view of the teachings of Tannock et al. and Dinier et al.

The skilled artisan would expect that the acetone solvate of carbazitaxel
would possess the same anticancer properties as the free base compound.  As both
carbazitaxel and the acetone solvate thereof were known in the art, selection of
either one for use in treating prostate cancer would have been prima facie obvious
to the skilled artisan.

### Conclusion

If applicants should amend the claims, a complete and responsive reply will
clearly identify where support can be found in the disclosure for each amendment.
Applicants should point to the page and line numbers of the application

SA_JEV_0001693

Application/Control Number: 13/456,720                                   Page 10
Art Unit: 1629

corresponding to each amendment, and provide any statements that might help to
identify support for the claimed invention (e.g., if the amendment is not supported
in *ipsis verbis*, clarification on the record may be helpful). Should applicants
present new claims, applicants should clearly identify where support can be found
in the disclosure

        Any inquiry concerning this communication or earlier communications from
the examiner should be directed to JAMES ANDERSON whose telephone number
is (571)272-9038.  The examiner can normally be reached on MON-FRI 9:00 am -
5:00 pm EST.

        If attempts to reach the examiner by telephone are unsuccessful, the
examiner's supervisor, Jeffrey Lundgren can be reached on 571-272-5541.  The
fax phone number for the organization where this application or proceeding is
assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR
only.  For more information about the PAIR system, see http://pair-
direct.uspto.gov. Should you have questions on access to the Private PAIR system,
contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you
would like assistance from a USPTO Customer Service Representative or access to
the automated information system, call 800-786-9199 (IN USA OR CANADA) or
571-272-1000.

_____/James D. Anderson/_____
**James D. Anderson, Ph.D.**

## *Remarks*

In the Office Action, the Examiner noted that claims 1 to 33 are pending in the application, that claims 20 to 23 and 25 to 33 are withdrawn from consideration, and that claims 1 to 19 and 24 are rejected.

The specification is amended to replace the reference "WO2005/02846" with "WO2005/028462" to correct an inadvertent typographical error.  A copy of the WO2005/028462 publication is provided herewith with the attached IDS, for the convenience of the Examiner.

Claim 1 is amended to more specifically define the patient.  Support for this amendment can be found throughout the specification and in the original claims, for example in original claims 3, 5 and 12.

Claims 3, 5 and 12 are cancelled without prejudice.

Claim 13 is amended to change its dependency from herein cancelled claim 12 to claim 1, from which claim 12 originally depended.

Claims 20 to 23 and 25 to 33, which are directed to non-elected subject matter, are cancelled without prejudice.

No new matter is added by these amendments.

Applicant reserves the right to file one or more continuation, continuation-in-part, or divisional applications on the deleted subject matter.

As presently amended, claims 1, 2, 4, 6 to 11, 13 to 19 and 24 are pending in this application.

## *Discussion of Objection to the Specification*

The specification is objected to for the given reason that "[a]t page 7, first paragraph, Applicant makes reference to 'WO 2005/02846' as describing acetone solvates of cabazitaxel.  It is unclear what WIPO document this is referring to as the number is incomplete." (Office Action, page 3).

The objection to the specification is believed overcome in view of the above-described amendment wherein the WIPO reference number has been corrected. Reconsideration and withdrawal of this objection are therefore respectfully requested.

– 6 –

SA_JEV_0001697

### *Discussion of Rejection under 35 U.S.C. § 103(a)*

Claims 1 to 5, 8 to 19 and 24 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Mita et al. (Clin Cancer Res, 2009, 15(2) pp. 723-730, hereinafter "Mita") in view of Tannock et al. (N Eng J Med, 2004, 351, pp. 1502-1512, hereinafter "Tannock"). This rejection is traversed.

It is the Examiner's position that one would have been motivated to "combine the teachings of the references so as to administer cabazitaxel in combination with prednisone" because "Mita et al. teach that cabazitaxel is effective in treating prostate cancer metastatic to liver and bones whose disease has progressed through surgical castration, bicalutamide, dietheryl stilbestrol, and mitoxantrone and predisone and hormone- and docetaxel-refractory prostate caner metastatic to bone and iliac lymph nodes when administered as a single agent." (Office Action, page 8). Further, it is the Examiner position that the "motivation to add prednisone to such treatment is clearly seen in Tannock et al., who teach that administration of the taxane, docetaxel, in combination with prednisone is effective in treating hormone-refractory prostate cancer." (Id.).

To render a claimed invention obvious under 35 U.S.C. § 103, the cited reference themselves, coupled with the knowledge generally available in the art at the time of the invention, must contain some suggestion or incentive that would have motivated the skilled artisan to combine or modify them in the manner necessary to arrive at the claimed invention (*See,* MPEP § 2143.01). In addition, the proposed combination or modification must have had a reasonable expectation of success, determined from the vantage point of the skilled artisan at the time the invention was made. (*See,* MPEP § 2143.02). Finally, the prior art references must teach or suggest all limitations of the claims; i.e., each of the limitations must "be found in the prior art, and not be based on applicant's disclosure." (MPEP § 2143).

Applicant submits that the claimed elements of the present invention were not known in the prior art and the combination of Mita and Tannock would not have provided a reasonable expectation of predictable results. Accordingly, Applicant respectfully submits that any presumption of obviousness based on the combination of these references is not warranted.

SA_JEV_0001698

The present application, which describes the results from a Phase III clinical trial, demonstrates that administration of cabazitaxel in combination with prednisone to patients with hormone refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen resulted in a statistically significant longer overall survival compared to patients receiving a mitoxantrone plus prednisone. (See, Specification, p. 18).

The primary Mita reference describes Phase I and pharmacokinetic studies of cabazitaxel in a limited number of patients with a variety of solid tumors.  The studies were designed to evaluate the safety and dosage of cabazitaxel, but "preliminary evidence of antitumor activity" was to be documented.  (Mita at 724, left column).  While eight of the twenty-five patients has prostate tumors (Id. at 725, Table 1), Mita indicated that evidence of anticancer activity was noted in two patients, including one patient with "hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes." (Id. at 727).  However, it is important to note that Mita nowhere suggests that one skilled in the art should use cabazitaxel for the treatment of prostate cancer based on these results, as the efficacy data provided is only "preliminary" evidence.  Accordingly, given the extremely limited nature of the patients described in Mita and the complexity of treatment of cancer, one skilled in the art would not have the requisite reasonable expectation that the results of this phase 1 trial would translate to patients with hormone refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen when evaluated in a statistically relevant setting (such as a Phase III trial).

The secondary reference Tannock describes positive results of a comparison study of docetaxel or mitoxantrone plus prednisone in patients with advanced prostate cancer.  Purportedly in view of this reference, the Examiner argues that "the skilled artisan would predict that addition of prednisone to the treatment regimen of Mita et al. would also be effective in treating hormone-refractory prostate cancer, including prostate cancers refractory to docetaxel therapy" (Office Action, page 8, emphasis added).

Applicants again note that Mita simply provides insufficient evidence to show that cabazitaxel is effective for treating hormone-refractory prostate cancer.

- 8 -

SA_JEV_0001699

Moreover, Mita clearly indicates that "routine use of corticosteroids…were not permitted." (Mita at p. 724, right column). Furthermore, there is nothing in Tannock which would provide one skilled in the art with the reasonable expectation (or even prediction as asserted in the Office Action), that a combination comprising docetaxel would have any similar effectiveness when used in combination with cabazitaxel. The Office Action provides no evidence or even arguments explaining why one skilled in the art would reasonably have such an expectation, especially in patients with docetaxel-resistant prostate cancer.

Therefore, Applicant respectfully submits that, based on the preliminary and limited nature of description of effectiveness with respect to cabazitaxel in patients and the lack of evidence of any correlation between docetaxel- and cabazitaxel-based prednisone combinations, the present claims would be non-obvious to one skilled in art over the combination of Mita and Tannock.  Accordingly, reconsideration and withdrawal of this obviousness-based rejection are respectfully requested.

Claims 6 and 7 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Mita, in view of Tannock as applied to claims 1 to 5, 8 to 19 and 24 and further in view of Didier et al. (US2005/0065138).

Didier et al. which is cited for allegedly teaching "acetone solvates of cabazitaxel" and "acetone solvates containing between 5% and 8% if acetone" (Office Action, page 9), dose not remedy the deficiencies of Mita and Tannock, as described above.  Accordingly, Didier et al., in combination with Mita and Tannock does not render claims 6 and 7 obvious.  Reconsideration and withdrawal of this rejection of claims 6 and 7 are therefore respectfully requested.

### *Conclusion*

There being no remaining issues, this application is believed in condition for favorable reconsideration and early allowance, and such actions are earnestly solicited.

In the event the Examiner wishes to contact the undersigned regarding any matter, please call (collect if necessary) the telephone number listed below.

- 9 -

SA_JEV_0001700

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment to Deposit Account No. **18-1982**.

Respectfully submitted,

/Kelly L. Bender/
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi US
U.S. Patent Operations
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **uspatent.e-filing@sanofi.com**
Telephone: (908) 981-**6782**
Telefax:      (908) 981-7832
Sanofi US Ref. FR2009/121 US CNT

Date:  July 16, 2013

SA_JEV_0001701



# Prednisone plus cabazitaxel or mitoxantrone for metastatic castration-resistant prostate cancer progressing after docetaxel treatment: a randomised open-label trial

Johann Sebastian de Bono, Stéphane Oudard, Mustafa Ozguroglu, Steinbjørn Hansen, Jean-Pascal Machiels, Ivo Kocak, Gwenaëlle Gravis, Istvan Bodrogi, Mary J Mackenzie, Liji Shen, Martin Roessner, Sunil Gupta, A Oliver Sartor, for the TROPIC Investigators

## Summary

**Background** Cabazitaxel is a novel tubulin-binding taxane drug with antitumour activity in docetaxel-resistant cancers. We aimed to compare the efficacy and safety of cabazitaxel plus prednisone with those of mitoxantrone plus prednisone in men with metastatic castration-resistant prostate cancer with progressive disease after docetaxel-based treatment.

**Methods** We undertook an open-label randomised phase 3 trial in men with metastatic castration-resistant prostate cancer who had received previous hormone therapy, but whose disease had progressed during or after treatment with a docetaxel-containing regimen. Participants were treated with 10 mg oral prednisone daily, and were randomly assigned to receive either 12 mg/m² mitoxantrone intravenously over 15–30 min or 25 mg/m² cabazitaxel intravenously over 1 h every 3 weeks. The random allocation schedule was computer-generated; patients and treating physicians were not masked to treatment allocation, but the study team was masked to the data analysis. The primary endpoint was overall survival. Secondary endpoints included progression-free survival and safety. Analysis was by intention to treat. This study is registered with ClinicalTrials.gov, NCT00417079.

**Findings** 755 men were allocated to treatment groups (377 mitoxantrone, 378 cabazitaxel) and were included in the intention-to-treat analysis. At the cutoff for the final analysis (Sept 25, 2009), median survival was 15·1 months (95% CI 14·1–16·3) in the cabazitaxel group and 12·7 months (11·6–13·7) in the mitoxantrone group. The hazard ratio for death of men treated with cabazitaxel compared with those taking mitoxantrone was 0·70 (95% CI 0·59–0·83, p<0·0001). Median progression-free survival was 2·8 months (95% CI 2·4–3·0) in the cabazitaxel group and 1·4 months (1·4–1·7) in the mitoxantrone group (HR 0·74, 0·64–0·86, p<0·0001). The most common clinically significant grade 3 or higher adverse events were neutropenia (cabazitaxel, 303 [82%] patients vs mitoxantrone, 215 [58%]) and diarrhoea (23 [6%] vs one [<1%]). 28 (8%) patients in the cabazitaxel group and five (1%) in the mitoxantrone group had febrile neutropenia.

**Interpretation** Treatment with cabazitaxel plus prednisone has important clinical antitumour activity, improving overall survival in patients with metastatic castration-resistant prostate cancer whose disease has progressed during or after docetaxel-based therapy.

**Funding** Sanofi-Aventis.

## Introduction

Prostate cancer is the second most common cause of cancer death in men in the USA[1] and the third most common cause of death in developed countries.[2] For patients with metastatic prostate cancer, androgen deprivation therapy improves symptoms, but patients invariably develop progressive disease.[3] On the basis of an improvement in survival compared with mitoxantrone plus prednisone in patients with metastatic castration-resistant prostate cancer,[4,5] docetaxel in combination with prednisone is standard first-line chemotherapy in this setting. No treatment has been approved by the US Food and Drug Administration, however, for patients whose disease progresses after docetaxel treatment. Mitoxantrone is often administered because of its favourable effects on quality-of-life outcomes.[4,6] However, no intervention improves survival in this disease setting.

Cabazitaxel (XRP6258; TXD258; RPR116258A) is a tubulin-binding taxane drug as potent as docetaxel in cell lines.[7] Additionally, the drug has antitumour activity in models resistant to paclitaxel and docetaxel.[8,9] Phase 1 and 2 clinical studies have shown that neutropenia is the primary dose-limiting toxicity, and the recommended phase 2 doses were 20 and 25 mg/m², with antitumour activity in solid tumours including docetaxel-refractory metastatic castration-resistant prostate cancer.[9,10] We undertook a randomised, multicentre, multinational, phase 3 trial (SFGC6193; TROPIC) with the aim of assessing whether cabazitaxel plus prednisone improves overall survival compared with mitoxantrone plus prednisone in men with metastatic castration-resistant prostate cancer who had progressed after docetaxel-based chemotherapy.

Lancet 2010; 376: 1147–54

See Editorial page 1145

See Comment page 1141

See Perspectives page 1153

Royal Marsden NHS Foundation Trust and The Institute of Cancer Research, Sutton, UK (J S de Bono FRCP); Toulouse University, New Orleans, LA, USA (A O Sartor MD); Hôpital Européen Georges Pompidou, Paris, France (S Oudard MD); Istanbul University, Istanbul, Turkey (M Ozguroglu MD); Odense University Hospital, Odense, Denmark (S Hansen MD); Cliniques Universitaires Saint-Luc, Université Catholique de Louvain, Brussels, Belgium (J-P Machiels MD); Masaryk Memorial Cancer Institute, Brno, Czech Republic (I Kocak MD); Institut Paoli-Calmette, Hôpital de Jour, Marseille, France (G Gravis MD); Orszagos Onkologiai Intezet, Kemoterapia C, Budapest, Hungary (I Bodrogi MD); London Health Sciences Centre, London, ON, Canada (M J Mackenzie MD); and Sanofi-Aventis, Malvern, PA, USA (L Shen MD, S Gupta MD, M Roessner MS)

Correspondence to:
Dr Johann Sebastian de Bono, Royal Marsden NHS Foundation Trust and The Institute of Cancer Research, Downs Road, Sutton, Surrey SM2 5PT, UK
Johann.de-bono@icr.ac.uk

SA_JEV_0001736



Figure 1: Trial profile

| | Mitoxantrone (n=377) | Cabazitaxel (n=378) |
|---|---|---|
| **Age** | | |
| Median (years) | 67 (61–72) | 68 (62–73) |
| ≥75 years | 70 (19%) | 65 (18%) |
| **Ethnic origin** | | |
| White | 314 (83%) | 317 (84%) |
| Asian | 12 (3%) | 25 (7%) |
| Black | 20 (5%) | 20 (5%) |
| Other | 21 (6%) | 15 (4%) |
| ECOG performance status 0 or 1 | 344 (91%) | 350 (93%) |
| **Extent of disease** | | |
| Metastatic | 355 (94%) | 364 (96%) |
| Bone metastases | 328 (87%) | 303 (80%) |
| Visceral metastases | 94 (25%) | 94 (25%) |
| Locoregional recurrence | 20 (5%) | 14 (4%) |
| Unknown | 1 (<1%) | 0 |
| Median serum PSA concentration (µg/L)* | 127·5 (44·0–416·0) | 143·9 (51·1–416·0) |
| Serum PSA concentration ≥20 µg/L | 322 (86%) | 329 (87%) |
| Measurable disease | 264 (54%) | 201 (53%) |
| Pain at baseline | 168 (45%) | 174 (46%) |
| **Previous therapy** | | |
| Hormonal | 373 (99%) | 375 (99%) |
| **Number of chemotherapy regimens** | | |
| 1 | 258 (71%) | 260 (69%) |
| 2 | 79 (21%) | 94 (25%) |
| >2 | 30 (8%) | 24 (6%) |
| Radiation | 222 (59%) | 232 (61%) |
| Surgery | 208 (54%) | 198 (57%) |
| Biological agent | 36 (10%) | 26 (7%) |
| **Number of previous docetaxel regimens** | | |
| 1 | 327 (87%) | 316 (84%) |
| 2 | 43 (11%) | 53 (14%) |
| >2 | 7 (2%) | 9 (2%) |
| Total previous docetaxel dose (mg/m²) | 529·2 (389·9–787·7) | 576·6 (408·4–761·2) |
| **Disease progression relative to docetaxel administration** | | |
| During treatment | 104 (28%) | 115 (30%) |
| <3 months from last dose | 161 (43%) | 158 (42%) |
| ≥3 months from last dose | 90 (24%) | 102 (27%) |
| Unknown | 2 (1%) | 3 (1%) |
| Median time from last docetaxel dose to disease progression (months) | 0·7 (0·0–2·9) | 0·8 (0·1–3·1) |

Data are median or number of patients (%) or median (IQR). *Serum PSA concentrations were available for 370 mitoxantrone and 371 cabazitaxel patients. †Previous anticancer therapies included docetaxel. Patients given a second anticancer regimen and a subsequent anticancer regimen received docetaxel in both regimens. ‡One patient in the docetaxel group did not receive previous orchiectomy or hormone therapy. ECOG=Eastern Cooperative Oncology Group. PSA=prostate-specific antigen.

Table 1: Baseline characteristics and treatment history of patients in the intention-to-treat population

## Methods

### Patients

This randomised open-label phase 3 study was undertaken at 146 centres in 26 countries. Patients had pathologically proven prostate cancer with documented disease progression during or after completion of docetaxel treatment. Eligible patients were aged at least 18 years, with an Eastern Cooperative Oncology Group (ECOG) performance status of 0–2. Patients who had previous mitoxantrone therapy, radiotherapy to 40% or more of the bone marrow, or cancer therapy (other than luteinising-hormone-releasing hormone [LHRH] analogues) within 4 weeks before enrolment were excluded. Patients with measurable disease were required to have documented disease progression by Response Evaluation Criteria in Solid Tumors (RECIST)* with at least one visceral or soft-tissue metastatic lesion. Patients with non-measurable disease were required to have rising serum prostate-specific antigen (PSA) concentrations (at least two consecutive increases relative to a reference value measured at least a week apart) or the appearance of at least one new demonstrable radiographic lesion.

Additional inclusion criteria were: previous and ongoing castration by orchiectomy or LHRH agonists, or both; antiandrogen withdrawal followed by progression had to have taken place at least 4 weeks (6 weeks for bicalutamide) before enrolment; adequate haematological,

hepatic, renal, and cardiac function; and a left-ventricular ejection fraction of more than 50% assessed by multi-gated radionuclide angiography or echocardiogram.

SA_JEV_0001737

Articles

| | Mitoxantrone (n=377) | Cabazitaxel (n=378) |
|---|---|---|
| Patients receiving study treatment | 371 (98%) | 371 (98%) |
| Patients completing planned ten cycles of study treatment | 46 (12%) | 105 (28%) |
| Discontinuation of study treatment | 335 (89%) | 266 (70%) |
| Reasons for discontinuation of study treatment | | |
| Disease progression | 267 (71%) | 180 (48%) |
| Adverse event | 32 (8%) | 67 (18%) |
| Non-compliance with protocol | 0 | 1 (<1%) |
| Lost to follow-up | 2 (1%) | 0 |
| Patient request | 17 (5%) | 3 (1%) |
| Other | 9 (2%) | 10 (3%) |
| Median number of treatment cycles | 4 (2–7) | 6 (3–10) |
| Median relative dose intensity (%)* | 97.3% (90.0–99.3) | 96.1% (90.1–98.9) |
| Treatment delays, number of cycles† | | |
| 49 days | 110 (6%) | 157 (7%) |
| >0 days | 28 (2%) | 53 (2%) |
| Dose reductions, number of cycles† | 32 (5%) | 221 (10%) |

Data are number of patients or cycles (%) or median (IQR). *Assessed in patients who received study treatment. †Percentage is of total number of treatment cycles (1715 for mitoxantrone and 2655 for cabazitaxel).

Table 2: Treatment received and reasons for discontinuation in the intention-to-treat population*

Concomitant use of bisphosphonates was allowed if the dose had been stable for 12 weeks before enrolment. Patients receiving LHRH agonists were mandated to continue this treatment during the study. Additional exclusion criteria were active grade 2 or higher peripheral neuropathy or stomatitis, other serious illness (including secondary cancer), or a history of hypersensitivity to polysorbate 80-containing drugs or prednisone.

On the basis of emerging guidelines recommending the delivery of 12 weeks of treatment before adjustment of therapy for metastatic castration-resistant prostate cancer, an amendment was made to the trial protocol after 59 patients had been enrolled to exclude patients previously receiving a cumulative docetaxel dose lower than 225 mg/m². The study was undertaken in accordance with principles of the Declaration of Helsinki and Good Clinical Practice guidelines, and with local ethics committee approval. Written informed consent was obtained from all participants.

## Procedures

All patients received oral prednisone 10 mg daily (or similar doses of prednisolone where prednisone was unavailable). Patients were centrally randomly assigned to receive cabazitaxel 25 mg/m² intravenously over 1 h or mitoxantrone 12 mg/m² intravenously over 15–30 min on day 1 of each 21-day cycle, and were stratified for disease measurability (measurable vs non-measurable) and ECOG performance status (0–1 vs 2). A contract research organisation was responsible for randomising



Figure 2: Overall survival
(A) Kaplan-Meier estimates of the probability of survival in patients in all patients randomly assigned to treatment with cabazitaxel plus prednisone or mitoxantrone plus prednisone. The points on the curves show censored observations. (B) Intention-to-treat analysis of overall survival in subgroups of patients defined by baseline characteristics. Hazard ratios (HRs) lower than 1 favour the cabazitaxel group and greater than 1 favour the mitoxantrone group.

patients using an interactive voice response system and for the computer-generated random allocation schedule, but had no other involvement in the trial. A dynamic allocation method was used to avoid treatment assignment imbalances within a centre. Patients and

NSC00001-XP_____27400801A_1>

SA_JEV_0001738

Articles



**Figure 3 Progression-free survival**

Kaplan-Meier estimates of the probability of progression-free survival in all patients randomly assigned to treatment with mitoxantrone plus prednisone or mitoxantrone plus prednisone. The points on the curves show censored observations. Progression-free survival was established from the date of randomisation to whichever event occurred first—prostate-specific antigen progression, radiological progression, symptomatic progression, or death. HR=hazard ratio.

Number at risk

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mitoxantrone | 377 | 135 | 62 | 27 | 8 | 6 | 2 |
| Cabazitaxel | 378 | 168 | 90 | 51 | 15 | 4 | 0 |

treating physicians were not masked to treatment allocation, but the study team was masked to the data analysis. Premedication, consisting of single intravenous doses of an antihistamine, corticosteroid (dexamethasone 8 mg or equivalent), and histamine H₁ antagonist (except cimetidine), was administered 30 min or more before cabazitaxel. Antiemetic prophylaxis was given at physicians' discretion.

Treatment was continued for a maximum of ten cycles to minimise risk of mitoxantrone-induced cardiac toxicity, while allowing for comparable exposure to the study treatment and a similar schedule of evaluation. Patients were followed up until the cutoff date for analysis or until death (whichever occurred first). Treatment delays of up to 2 weeks were allowed, with one dose reduction (cabazitaxel 20 mg/m² or mitoxantrone 10 mg/m²) per patient. Prophylactic granulocyte colony-stimulating factor was not allowed during the first cycle, but was allowed (at physicians' discretion) after first occurrence of either neutropenia lasting 7 days or more or neutropenia complicated by fever or infection.

Pretreatment evaluations included a medical history, ECOG performance status, physical examination, laboratory screening, serum PSA concentration, CT, bone scan, electrocardiography, and assessment of left-ventricular ejection fraction. Pain and analgesic consumption were assessed at baseline. Pain was assessed with the McGill-Melzack present pain intensity (PPI) scale⁵ and analgesic use was derived from consumption normalised to morphine equivalents.⁵

Physical examinations and blood tests were repeated before each infusion of study drug and at the end of treatment. Complete blood counts were taken on days 1, 8, and 15 of each treatment cycle and repeated when clinically indicated. Patients who progressed or started another anticancer therapy were followed up every 3 months; patients who withdrew before documented disease progression were followed up every 6 weeks for the first 6 months and thereafter every 3 months.

The primary endpoint of overall survival was calculated from date of randomisation to death. Secondary endpoints included a composite endpoint of progression-free survival, defined as the time between randomisation and the first date of progression as measured by PSA progression, tumour progression, pain progression, or death. Other secondary endpoints were PSA response (reduction in serum PSA concentration of ≥50% in patients with a baseline value of ≥20 μg/L); PSA progression (increase of ≥25% over nadir PSA concentration provided that the increase in the absolute PSA value was ≥5 μg/L for men with no PSA response, or ≥50% over nadir for PSA responders); objective tumour response for patients with measurable disease based on RECIST; pain response (for patients with median PPI score of ≥2 or mean analgesic score of ≥10 points at baseline, or both), which was defined as a reduction of 2 points or more from baseline median PPI score without increasing analgesic score, or decreases of more than 50% in analgesic use without an increase in pain, maintained for 3 or more weeks;⁵ pain progression (increase in median PPI score of ≥1 point from the reference value or an increase of ≥25% in the mean analgesic score or requirement for palliative radiotherapy);⁵ and time to tumour progression, defined as the number of months from randomisation until evidence of progressive disease (RECIST).

Adverse events, biochemistry, haematology, vital signs, and electrocardiograms were monitored throughout the study. Left-ventricular ejection fraction was monitored throughout the study in mitoxantrone-treated patients, but only if clinically indicated in those who received cabazitaxel. All adverse events were graded according to National Cancer Institute Common Terminology Criteria for adverse events (version 3.0).⁵

## Statistical analysis

SAS (version 9.1.3) was used for all analyses. The study required an estimated sample size of 720 patients (360 per group) to detect a 25% reduction in the hazard ratio (HR) for death in the cabazitaxel group relative to the mitoxantrone group with 90% power, with a two-sided log-rank test at a significance level of 0.05 and on the assumption of 8 months median overall survival in the mitoxantrone group. We planned for the final analysis to take place when 511 deaths had occurred. Analysis of the primary endpoint was for the intention-to-treat population (all patients randomly assigned to treatment groups).

SA_JEV_0001739

| | Mitoxantrone | Cabazitaxel | Hazard ratio (95% CI) | p value for comparison |
|---|---|---|---|---|
| Tumour response rate* | | | | |
| Number of evaluable patients | 204 | 201 | .. | |
| Response rate (%) | 4·4% (1·6–7·3) | 14·4% (9·6–19·3) | .. | 0·0005 |
| PSA response rate† | | | | |
| Number of evaluable patients | 325 | 378 | .. | |
| Response rate (%) | 17·8% (13·7–72·0) | 39·2% (33·9–44·5) | .. | 0·0002 |
| Pain response rate‡ | | | | |
| Number of evaluable patients | 162 | 174 | .. | |
| Response rate (%) | 7·7% (3·7–11·8) | 9·2% (4·9–13·5) | .. | 0·63 |
| Progression | | | | |
| Number of patients in intention-to-treat analysis | 377 | 378 | .. | |
| Median time to tumour progression (months) | 5·4 (2·2–10·6) | 8·8 (7·9–12·0) | 0·61 (0·49–0·76) | <0·0001 |
| Median time to PSA progression (months) | 3·1 (0·8–9·1) | 6·4 (2·2–9·1) | 0·75 (0·63–0·90) | 0·0001 |
| Median time to pain progression (months) | Not reached | 11·1 (2·3–not reached) | 0·91 (0·69–1·19) | 0·52 |

*Tumour response was evaluated only for patients with measurable disease according to Response Evaluation Criteria in Solid Tumours. †Prostate-specific antigen (PSA) response was defined as a 50% or more reduction in serum PSA concentration, established only for patients with a serum PSA concentration of 20 ng/L or more at baseline, confirmed by a repeat PSA measurement after at least 3 weeks. ‡Pain response was established only for patients with median present pain intensity (PPI) score of 2 or more or mean analgesic score (AS) of 10 points or more at baseline, or both, and was defined as a two-point or greater reduction from baseline median PPI score without an increased PPI or a decrease in PPI or a three-point or more increase in the PPI score maintained for at least 3 weeks. Data for 266 patients in the cabazitaxel group and 269 patients in the mitoxantrone group were censored as a result of more than two PPI or AS assessments or both, being missed during the same week (under a complete evaluation cycle) or less (AS values changed pain perception).

Table 2: Response to treatment and disease progression

Safety analyses included patients who received at least part of one dose of study drug.

We analysed overall survival using the Kaplan-Meier method, with log-rank comparisons stratified according to disease measurability (measurable versus non-measurable) and ECOG performance status (0–1 versus 2). HRs and 95% CIs were calculated with a Cox proportional hazards model (for both primary and secondary analyses). Overall survival data were censored at the last date the patient was known to be alive or at the analysis cutoff date, whichever was earlier. Progression-free survival and progression of tumour, PSA, and pain were compared between treatments by log-rank testing.

A planned futility analysis of progression-free survival was done after 225 patients had a progression event. Additionally, an interim analysis of the primary efficacy endpoint of overall survival was planned after 307 events, but was actually done after 365 events with an adjusted significance level of 0·016, on the basis of the O'Brien-Fleming type I error spending function. A two-sided significance level of 0·0452 was used for the final analysis. Although the study team was masked to treatment allocation and patient outcomes throughout the trial, an independent contract statistician provided unmasked results to an independent data monitoring committee with the appropriate analyses for assessment.

This study is registered at ClinicalTrials.gov, NCT00417079.

### Role of the funding source

The chief investigators (JSB and AOS) designed the trial protocol and analysed the data, with input from the sponsor, who funded the trial. The decision to submit the report for publication was made by the chief investigators, who drafted and then finalised the report with the help of a medical writer. The sponsor funded editorial assistance and reviewed the final draft before submission.

### Results

Between Jan 2, 2007, and Oct 23, 2008, 755 patients were randomly assigned to treatment groups (378 cabazitaxel and 377 mitoxantrone; figure 1). The treatment groups were well balanced at baseline with respect to demographic and disease characteristics and previous treatments (table 1). Roughly 50% of patients had measurable soft-tissue disease and 25% had visceral (poor prognosis) disease. The median dose of docetaxel received before the study was 576·6 mg/m² (IQR 408·4–761·2) in the cabazitaxel group and 529·2 mg/m² (380·9–787·2) in the mitoxantrone group. Overall, 59 (8%) patients had received a cumulative dose of docetaxel less than 225 mg/m² and 482 (65%) received a cumulative dose of 450 mg/m² or more. About 70% of patients had progressive disease either during or within 3 months of completing docetaxel treatment, including about 30% of patients who had disease progression during docetaxel treatment (table 1). The median time from last docetaxel dose to disease progression, before trial participation, was 0·8 months (IQR 0·0–3·1) for the cabazitaxel group and 0·7 months (0·0–2·9) for the mitoxantrone group.

Patients in the cabazitaxel group were on study treatment longer—a median of six treatment cycles compared with four cycles—and were more likely to complete study treatment than were those in the

SA_JEV_0001740

Articles

| | Mitoxantrone (n=371) | | Cabazitaxel (n=371) | |
|---|---|---|---|---|
| | All grades | Grade ≥3 | All grades | Grade ≥3 |
| **Haematological†** | | | | |
| Neutropenia | 325 (88%) | 215 (58%) | 347 (94%) | 303 (87%) |
| Febrile neutropenia | .. | 5 (1%) | .. | 28 (8%) |
| Leukopenia | 342 (92%) | 157 (42%) | 355 (96%) | 253 (69%) |
| Anaemia | 302 (82%) | 18 (5%) | 361 (97%) | 39 (11%) |
| Thrombocytopenia | 160 (43%) | 6 (2%) | 176 (47%) | 15 (4%) |
| **Non-haematological** | | | | |
| Diarrhoea | 39 (11%) | 3 (<1%) | 173 (47%) | 23 (6%) |
| Fatigue | 102 (27%) | 11 (3%) | 136 (37%) | 18 (5%) |
| Asthenia | 46 (12%) | 9 (2%) | 76 (20%) | 17 (5%) |
| Back pain | 45 (12%) | 11 (3%) | 60 (16%) | 14 (4%) |
| Nausea | 85 (23%) | 1 (<1%) | 127 (34%) | 7 (2%) |
| Vomiting | 38 (10%) | 0 | 84 (23%) | 7 (2%) |
| Haematuria | 13 (4%) | 2 (1%) | 62 (17%) | 7 (2%) |
| Abdominal pain | 13 (4%) | 0 | 43 (12%) | 7 (2%) |
| Pain in extremity | 27 (7%) | 4 (1%) | 30 (8%) | 6 (2%) |
| Dyspnoea | 17 (5%) | 3 (1%) | 44 (12%) | 5 (1%) |
| Constipation | 57 (15%) | 2 (1%) | 76 (20%) | 4 (1%) |
| Pyrexia | 23 (6%) | 1 (<1%) | 45 (12%) | 4 (1%) |
| Arthralgia | 31 (8%) | 4 (1%) | 39 (11%) | 4 (1%) |
| Urinary-tract infection | 11 (3%) | 3 (1%) | 27 (7%) | 4 (1%) |
| Pain | 18 (5%) | 7 (2%) | 20 (5%) | 4 (1%) |
| Dysuria | 19 (5%) | 9 (2%) | 20 (5%) | 3 (1%) |

Data are number of patients (%). †Toxic effects were graded according to the National Cancer Institute Common Terminology Criteria for Adverse Events (version 3.0)... *Table 4: Adverse events reported in patients who received at least one dose of study treatment*

mitoxantrone group (table 2). In the cabazitaxel group, 282 (76%) patients received more than 90% of the planned dose intensity, compared with 301 (81%) in the mitoxantrone group. The primary reason for treatment discontinuation in both groups was disease progression (table 2). Dose reductions were reported for 45 (12%) patients in the cabazitaxel group and 15 (4%) mitoxantrone-treated patients, and treatment delays occurred in 104 (28%) and 56 (15%) patients, respectively. Overall, 5% of mitoxantrone treatment courses were dose reduced compared with 10% of cabazitaxel treatment courses; delays to treatment were similar in both groups (table 2). Per protocol, crossover to cabazitaxel was not allowed for the mitoxantrone group, although 44 (12%) patients in this group received treatment with tubulin-binding drugs at progression.

The median follow-up for both treatment groups combined was 12·8 months (IQR 7·8–16·9). At the cutoff date for the final analysis (Sept 25, 2009), 234 deaths had occurred in the cabazitaxel group and 279 in the mitoxantrone group. The Kaplan-Meier analysis showed an overall survival benefit in favour of cabazitaxel (figure 2). Median overall survival was 15·1 months

(95% CI 14·1–16·3) versus 12·7 months (11·6–13·7). This result corresponds to a 30% reduction in relative risk of death (HR 0·70, 95% CI 0·59–0·83, p<0·0001). Subgroup analyses of survival consistently favoured cabazitaxel (figure 2), with no significant interactions between prognostic factors and treatment response.

Median progression-free survival (a composite endpoint) was 2·8 months (95% CI 2·4–3·0) in the cabazitaxel group and 1·4 months (1·4–1·7) in the mitoxantrone group (figure 3; HR 0·74, 95% CI 0·64–0·86, p<0·0001). Patients treated with cabazitaxel had significantly higher rates of tumour response and PSA response than did those who received mitoxantrone (table 3). Significant improvements in time to tumour progression and time to PSA progression were also noted in the cabazitaxel group, (table 3). Pain response rates were similar in the two groups; there was no significant difference between the treatment groups in time to pain progression. Similar proportions of patients in each group had either reductions or increases in pain (data not shown).

The most common toxic effects of cabazitaxel were haematological; the most frequent haematological grade 3 or higher adverse events were neutropenia, leukopenia, and anaemia (table 4). The most common non-haematological grade 3 or higher adverse event was diarrhoea, which was managed expectantly. Grade 3 peripheral neuropathy was uncommon (reported in three [1%] patients in each group). Overall, peripheral neuropathy (all grades) was reported during the study in 52 (14%) patients in the cabazitaxel group and 12 (3%) in the mitoxantrone group. Peripheral oedema (all grades) occurred in 34 (9%) patients in each group.

18 (5%) patients treated with cabazitaxel and nine (2%) treated with mitoxantrone died within 30 days of the last infusion. Table 5 summarises causes of death in patients who received at least one dose of study drug (the safety population). The most frequent cause of death in the cabazitaxel group was neutropenia and its clinical consequences. Analysis of the incidence of neutropenia and diarrhoea by subgroups suggested differences in rates of adverse events by age, previous radiotherapy, and geographical region (webappendix p 1).

## Discussion

Cabazitaxel is the first drug to improve survival in patients with metastatic, castration-resistant prostate cancer with progressive disease after docetaxel-based treatment, resulting in a 30% reduction in the risk of death and an improved median overall survival compared with mitoxantrone (panel). Currently, these patients have few therapeutic options, with no treatment able to prolong survival in this setting. The analysis of survival in subgroups defined by prognostic factors supports the robustness of the primary endpoint, favouring cabazitaxel over mitoxantrone, even in patients with disease progression during docetaxel treatment and in those who received high cumulative doses of docetaxel. Cabazitaxel

SA_JEV_0001741

treatment also improved median progression-free survival and time to tumour progression and resulted in higher rates of tumour and PSA response than did mitoxantrone. Further studies are now planned to evaluate the effect of cabazitaxel on quality of life in men with castration-resistant prostate cancer. Nevertheless, these data have led to the approval of cabazitaxel by the US Food and Drug Administration for second-line treatment of metastatic castration-resistant prostate cancer. Importantly, in this trial addressing an unmet medical need, patients had poor prognosis disease, with 25% having visceral metastases and about 50% having measurable disease. These factors, as well as infiltration of bone marrow by tumour and previous treatment, could account for the high rates of neutropenia and febrile neutropenia in the control group of this trial. By way of historical comparison, with the same dose and schedule of mitoxantrone, but in a first-line setting, the incidence of grade 3–4 neutropenia was 22% in the TAX327 study compared with 58% grade 3 or higher in our trial. Nonetheless, despite the compromised bone-marrow reserve of this patient population, more than 75% of patients received more than 90% of the planned dose intensity.

Cabazitaxel-treated patients had a higher risk of death within 30 days of the last drug dose than did mitoxantrone-treated patients, and three times as many patients on cabazitaxel had a dose reduction. Moreover, the rate of febrile neutropenia in the cabazitaxel group was 8%, suggesting that cabazitaxel treatment requires careful monitoring and management of emerging symptoms. Dose modifications (delay or reductions) as well as prophylactic treatment with granulocyte colony-stimulating factor in high-risk selected patients are potential risk-mitigation strategies that could be considered to manage these toxic effects (webappendix p 2). Pharmacogenomic studies correlating the presence of key single nucleotide polymorphisms associated with slow cabazitaxel clearance (in genes such as CYP3A4 and CYP3A5) and drug toxicity are also warranted and could allow prospective patient identification. Nevertheless, although dose reduction to 20 mg/m² might decrease myelotoxicity, this change could also decrease benefit from cabazitaxel. To elucidate this possibility, future studies would need to evaluate the non-inferiority and safety of 20 mg/m² of cabazitaxel compared with 25 mg/m². Moreover, cumulative neurotoxicity was not reported. Cabazitaxel hypersensitivity reactions were prevented by use of the prescribed prophylactic regimen; further studies to assess whether cabazitaxel can be safely administered with lower doses of steroids or anti-histamines are nonetheless warranted.

Crucially, the subgroup of patients in the intention-to-treat population (29%) who had progressive disease during docetaxel treatment before participating in this trial derived a significant overall survival benefit from cabazitaxel. Moreover, 45% of patients who had disease progression within 3 months of completing docetaxel

| | Mitoxantrone (n=371) | Cabazitaxel (n=371) |
|---|---|---|
| Total deaths during the study | 375 (76%) | 327 (82%) |
| Deaths ≤30 days after last dose of study drug | 9 (2%) | 18 (5%) |
| Causes of death ≤30 days after last dose of study drug | | |
| Disease progression | 8 (2%) | 0 |
| Adverse events | | |
| Neutropenia and clinical consequences/sepsis | 1 (<1%) | 7 (2%) |
| Cardiac | 0 | 5 (1%) |
| Dyspnoea† | 1 (<1%) | 0 |
| Dehydration/electrolyte imbalance | 0 | 1 (<1%) |
| Renal failure | 0 | 3 (1%) |
| Cerebral haemorrhage | 0 | 1 (<1%) |
| Unknown cause | 0 | 1 (<1%) |
| Motor vehicle accident | 1 (<1%) | 0 |
| Deaths >30 days after last dose of study drug | 366 (72%) | 309 (56%) |

Data are number of patients (%). *Includes three patients whose death was reported as a consequence related to disease progression. †Dyspnoea was reported as the cause of death during the study, but the investigator regarded the death as related to disease progression.

Table 5: Deaths in patients who received at least one dose of study treatment

treatment also had an overall survival benefit. These data suggest that cabazitaxel imparts a survival benefit to patients unlikely to benefit from further docetaxel treatment, in keeping with preclinical data showing that cabazitaxel has antitumour activity in docetaxel refractory models.

### Panel: Research in context

#### Systematic review

We obtained background evidence by searching Medline and Embase for English-language articles and conference abstracts using the search terms prostate cancer (metastatic, hormone-refractory, castration-resistant), mitoxantrone, docetaxel, and cabazitaxel (XRP6258, TXD258, RPR116258A).

#### Interpretation

Men with metastatic castration-resistant prostate cancer are typically treated with docetaxel plus prednisone. No treatments, however, have been approved for patients with disease progression after these treatments. Cabazitaxel is a taxane tubulin-binding drug with antitumour activity in docetaxel refractory models. In this phase 3 trial of cabazitaxel versus mitoxantrone, both administered with prednisone, we show a significant 2·4-month median overall survival advantage in favour of cabazitaxel and prednisone in men with metastatic castration-resistant prostate cancer with progressive disease after docetaxel and prednisone treatments. These data support regulatory approval of cabazitaxel in the USA. On the basis of these results, cabazitaxel will become a standard of care for treatment of prostate cancer in this setting. Neutropenia is a common toxic effect of this drug in view of the risk of neutropenic sepsis this agent should be administered with appropriate caution and monitoring.

SA_JEV_0001742

A limitation to studies of novel agents after docetaxel treatment is the absence of a standard definition for docetaxel resistance. Definition of disease progression for patients with metastatic castration-resistant prostate cancer remains challenging and is often based on combinations of measures such as rising serum PSA concentrations, new or enlarging radiological lesions, or appearance of symptoms. Studies to evaluate the clinical use of novel analytically validated circulating biomarkers such as circulating tumour cells or the caspase-cleaved cytokeratin product M30 are urgently needed to improve the early identification of disease progression and definitions of docetaxel-resistant disease.

In conclusion, we show that treatment with cabazitaxel plus prednisone has important clinical antitumour activity, improving overall survival in patients with metastatic castration-resistant prostate cancer progressing during or after docetaxel-based therapy. Cabazitaxel is the first treatment to prolong survival in the post-docetaxel setting. We now envision that if patients with metastatic castration-resistant prostate cancer have progressive disease after 12 weeks of docetaxel treatment, as recommended by the amended Prostate Cancer Clinical Trials Working Group guidelines, then cabazitaxel treatment will be the standard of care. Trials assessing cabazitaxel administration both in chemotherapy-naive patients and in patients with early evidence of tumour progression on docetaxel, for example with rising circulating tumour cell counts, are now warranted.

**Contributors**

LSB and SO were the trial chief investigators and participated in trial design, patient accrual, and report drafting and completion. SG, MO, SH, J-PM, HF, CG, IB, and MJM contributed to patient accrual. LS and MR contributed to statistical analyses. SG contributed to trial design, conduct, and analyses.

**Conflicts of interest**

Sanofi-Aventis funded this clinical trial. LSB, AOS, SO, and SH have served as paid consultants for Sanofi-Aventis. LS, MR, and SG are employees of Sanofi-Aventis.

**Acknowledgments**

We thank the men and their families who participated in the study and the study coordinators and investigators. Editorial assistance was provided by Julie Gray and Kirk Anderson of Adelphi Communications. [...] was supported by Sanofi-Aventis.

**References**

1 Jemal A, Siegel R, Ward E, Hao Y, Xu J, Thun MJ. Cancer statistics, 2009. CA Cancer J Clin 2009; 59: 225–49.

2 American Cancer Society. Global cancer facts and figures 2007. http://www.cancer.org/acs/groups/content/@nho/documents/document/globalfactsandfigures2007rev2p.pdf (accessed Sept 14, 2010).

3 Eisenberger MA, Simon R, O'Dwyer PJ, Friedman HA. A reevaluation of nonhormonal cytotoxic chemotherapy in the treatment of prostatic carcinoma. J Clin Oncol 1985; 3: 827–41.

4 Tannock IF, de Wit R, Berry WR, et al, on behalf of the TAX 327 Investigators. Docetaxel plus prednisone or mitoxantrone plus prednisone for advanced prostate cancer. N Engl J Med 2004; 351: 1502–12.

5 Petrylak DP, Tangen CM, Hussain MH, et al. Docetaxel and estramustine compared with mitoxantrone and prednisone for advanced refractory prostate cancer. N Engl J Med 2004; 351: 1513–20.

6 Berry DL, Moinpour CM, Jiang CS, et al. Quality of life and pain in advanced stage prostate cancer: results of a Southwest Oncology Group randomized trial comparing docetaxel and estramustine to mitoxantrone and prednisone. J Clin Oncol 2006; 24: 2828–35.

7 Rosenberg JE, Weinberg VK, Kelly WK, et al. Activity of second line chemotherapy in docetaxel-refractory hormone-refractory prostate cancer patients: randomized phase 2 study of ixabepilone or mitoxantrone and prednisone. Cancer 2007; 110: 556–63.

8 Tannock IF, Osoba D, Stockler MR, et al. Chemotherapy with mitoxantrone plus prednisone or prednisone alone for symptomatic hormone-resistant prostate cancer: a Canadian randomized trial with palliative end points. J Clin Oncol 1996; 14: 1756–64.

9 Attard G, Greystoke A, Kaye S, de Bono J. Update on tubulin-binding agents. Pathol Biol (Paris) 2006; 54: 72–84.

10 Aller AW, Kraus LA, Bissery MC. In vitro activity of TXD258 in chemotherapeutic-resistant tumour cell lines. Proc Am Assoc Cancer Res 2000; 41: 303 (abstr 1923).

11 Bissery M-C, Bouchard H, Riou JF, et al. Preclinical evaluation of TXD258, a new taxoid. Proc Am Assoc Cancer Res 2000; 41: 214 (abstr 1364).

12 Mita AC, Denis LJ, Rowinsky EK, et al. Phase I and pharmacokinetic study of XRP6258 (RPR 116258A), a novel taxane, administered as a 1-hour infusion every 3 weeks in patients with advanced solid tumors. Clin Cancer Res 2009; 15: 723–30.

13 Pivot X, Koralewski P, Hidalgo JL, et al. A multicenter phase II study of XRP6258 administered as a 1 h i.v. infusion in taxane-resistant metastatic breast cancer patients. Ann Oncol 2008; 19: 1547–52.

14 Therasse P, Arbuck SG, Eisenhauer EA, et al. New guidelines to evaluate the response to treatment in solid tumors. European Organization for Research and Treatment of Cancer, National Cancer Institute of the United States, National Cancer Institute of Canada. J Natl Cancer Inst 2000; 92: 205–16.

15 Mcleach R. The McGill Pain Questionnaire: major properties and scoring methods. Pain 1975; 1: 277–99.

16 Cancer Therapy Evaluation Program. Common Terminology Criteria for Adverse Events. Version 3.0. Published August 9, 2006. http://ctep.cancer.gov/protocolDevelopment/electronic_applications/ctc.htm (accessed Sept 14, 2010).

17 Medical Dictionary for Regulatory Activities (MedDRA) Version 12.0. http://www.meddramsso.com/index.asp (accessed Sept 14, 2010).

18 Scher HI, Halabi S, Tannock I, et al. Design and end points of clinical trials for patients with progressive prostate cancer and castrate levels of testosterone: recommendations of the Prostate Cancer Clinical Trials Working Group. J Clin Oncol 2008; 26: 1148–59.

19 de Bono JS, Scher HI, Montgomery RB, et al. Circulating tumor cells predict survival benefit from treatment in metastatic castration-resistant prostate cancer. Clin Cancer Res 2008; 14: 6302–09.

20 Kraemer G, Schwarz S, Häcker M, Havelka AM, Linder S. Docetaxel induces apoptosis in hormone refractory prostate carcinomas during multiple treatment cycles. Br J Cancer 2006; 94: 1592–98.

SA_JEV_0001743

XP-002623319



Cabazitaxel

## FRESH FROM THE PIPELINE

# Cabazitaxel

*Matthew D. Galsky, Argyris Dritselis, Peter Kirkpatrick and William K. Oh*

In June 2010, the taxane anticancer drug cabazitaxel (Jevtana; Sanofi–Aventis), in combination with prednisone, was approved by the US Food and Drug Administration (FDA) for the treatment of patients with hormone-refractory metastatic prostate cancer who had been previously treated with a regimen containing the taxane docetaxel.

Prostate cancer is a leading cause of cancer mortality, with estimates indicating that it was responsible for ~27,000 deaths in 2009 in the United States alone[1]. Androgen-deprivation therapy is initially effective for most patients with metastatic prostate cancer, but resistance usually develops. At present, the standard of care for metastatic castration-resistant prostate cancer (CRPC) — also commonly referred to as hormone-refractory prostate cancer — is chemotherapy with the taxane anticancer drug docetaxel (Taxotere; Sanofi–Aventis), in combination with the steroid prednisone[2]. Docetaxel-based chemotherapy has shown a survival benefit of ~2–3 months compared with the previous standard therapy, the DNA-damaging agent mitoxantrone in combination with prednisone[2].

Until recently, no other treatment options that could improve survival for patients with metastatic CRPC were approved. However, this year, two such therapies have been approved in the United States: the immunotherapy sipuleucel-T (Provenge; Dendreon)[3] and the taxane cabazitaxel (Jevtana; Sanofi–Aventis).

### Basis of discovery

The taxanes are a class of anticancer drugs that act by binding to microtubules — highly dynamic cytoskeletal polymers composed of α-tubulin and β-tubulin heterodimers — which have a key role in cell division[4]. The binding of taxanes to tubulin promotes the assembly of tubulin into microtubules and simultaneously inhibits disassembly, thereby stabilizing microtubule dynamics[4]. Suppression of microtubule dynamics results in the blockade of mitosis, leading to cell death[4].

The pioneering taxane paclitaxel (FIG. 1a), which was isolated from the bark of the yew tree in the 1960s, was approved in 1992 and is still used to treat various cancers[4]. Docetaxel (FIG. 1a), a semisynthetic analogue that has more potent activity than paclitaxel, was first approved by the FDA in 1996 for advanced breast cancer, and subsequently for the treatment of metastatic CRPC in 2004.

An important limitation of these two drugs is that they have high substrate affinity for multidrug-resistance proteins, in particular the ATP-dependent drug efflux pump P-glycoprotein (P-gp; also known as

ABCB1)[4,5]. Expression of P-gp by cancer cells can be responsible for both constitutive and acquired resistance to taxanes, and so efforts to synthesize taxane derivatives that are not strong substrates for P-gp have been pursued[5].

### Drug properties

Cabazitaxel (FIG. 1b) is a semisynthetic taxane that was selected for development on the basis of its poor affinity for P-gp compared with docetaxel and paclitaxel[5,6]. It showed activity in both docetaxel-sensitive and docetaxel-resistant cancers in preclinical testing and in initial clinical trials, providing the rationale for further clinical development in cancers such as metastatic CRPC[5,6].

### Clinical data

The efficacy and safety of cabazitaxel in combination with prednisone were evaluated in a randomized, open-label trial involving 755 patients with hormone-refractory metastatic prostate cancer who had previously received a treatment regimen that contained docetaxel[7,8]. The patients were randomized to receive prednisone 10 mg orally daily with either cabazitaxel 25 mg per m² intravenously every 3 weeks for a maximum of 10 cycles (n = 378), or mitoxantrone 12 mg per m² intravenously every 3 weeks for a maximum of 10 cycles (n = 377)[7,8]. The primary end point was overall survival; secondary end points included tumour response rate[7,8].

Patients receiving cabazitaxel had statistically significantly longer overall survival compared with those receiving mitoxantrone[7,8]. The median survival time of patients in the cabazitaxel group was 15.1 months compared with 12.7 months for patients in the mitoxantrone group[7,8]. The investigator-assessed tumour response rate was 14.4% for patients in the cabazitaxel group compared with 4.4% for patients in the mitoxantrone group[7].

### Indications

Cabazitaxel is approved by the FDA in combination with prednisone for the treatment of patients with hormone-refractory metastatic prostate cancer previously treated with a docetaxel-containing treatment regimen[7]. »



**Figure 1 | Taxane anticancer drugs. a |** Structures of the natural product paclitaxel and the semisynthetic derivative docetaxel. **b |** Structure of cabazitaxel, which is prepared by semisynthesis starting with a precursor extracted from yew-tree needles[5,7].

**Paclitaxel**
R¹ = Ph
R² = Ac
R³ = H

**Docetaxel**
R¹ = BuO
R² = H
R³ = H

**Cabazitaxel**
(2α,5β,7β,10β,13α)-4-acetoxy-13-{[(2R,3S)-3-{[(tertbutoxycarbonyl)amino]-2-hydroxy-3-phenylpropanoyl]oxy}-1-hydroxy-7,10-dimethoxy-9-oxo-5,20-epoxytax-11-en-2-yl benzoate-propan-2-one(1:1); C₄₅H₅₇NO₁₄•C₃H₆O; M_r = 894.01

© 2010 Macmillan Publishers Limited. All rights reserved

SA_JEV_0001805

# NEWS & ANALYSIS

## ANALYSIS | PROSTATE CANCER

Analysing issues for the treatment of metastatic prostate cancer are Matthew D. Galsky, M.D., Assistant Professor of Medicine and Urology, and William K. Oh, M.D., Chief, Division of Hematology and Medical Oncology, Mount Sinai School of Medicine, New York, USA.

The landscape of treatment options for patients with CRPC is rapidly changing. A clinical state that was once characterized as both 'hormone refractory' and 'chemotherapy resistant' has been proven to be neither, with novel therapeutics exploiting diverse mechanisms of action offering new insights into the biology of prostate cancer and new hope for patients.

The role of continued signalling through the androgen receptor in CRPC has long been appreciated clinically, and recent studies has underlined its importance; for example, showing upregulation of genes involved in androgen synthesis in metastatic tumour samples, as well as persistently elevated intratumoral androgen levels despite castration[4,5]. Improved understanding of the androgen axis in CRPC has been translated into proof-of-principle studies showing significant clinical activity with more potent and selective inhibitors of androgen signalling. For example, the cytochrome P450 family 17, subfamily a, polypeptide 1 (CYP17A1) inhibitor abiraterone (which blocks production of adrenal and intratumoral androgens)[11,12] and the anti-androgen MDV3100 (which is highly potent and was developed in cell lines harbouring androgen receptor amplifications)[13,14] have shown impressive activity as measured by post-treatment declines in prostate-specific antigen and regression of measurable disease in Phase I and II studies in CRPC. Both of

these agents are in Phase III trials in patients with chemotherapy-naive CRPC, as well as those who have disease progression after docetaxel chemotherapy, and the results are eagerly awaited.

Activating the host immune system against prostate cancer cells with sipuleucel-T — which consists of autologous dendritic cells that have been exposed ex vivo to a recombinant fusion protein of prostatic acid phosphatase and granulocyte–macrophage colony-stimulating factor — has also proved successful. In a Phase III trial of sipuleucel-T involving 512 patients with asymptomatic or minimally symptomatic metastatic CRPC, this immunotherapy was associated with statistically significant increases in survival compared with placebo (median 25.8 months versus 21.7 months)[15], which, together with earlier trials, provided the basis for its approval by the FDA in April 2010 (REF. 5).

Although these advances are promising, new approaches are needed for patients with inherent or acquired resistance to these agents and to the current first-line drug, docetaxel. Cabazitaxel is a novel semisynthetic taxane that retained activity against docetaxel-resistant tumours in preclinical and early clinical trials. This activity was confirmed in the Phase III TROPIC study, in which cabazitaxel demonstrated a survival benefit (median 2.4 months) compared with mitoxantrone in patients with metastatic CRPC who had disease progression after docetaxel treatment[6] — the first agent to do so — providing the basis for its FDA approval in June 2010.

The past year has therefore witnessed more drugs approved for CRPC, and more promising drugs in late-stage trials, than in the past few decades. Challenges for the immediate future will include defining optimal

sequencing and combinations of therapies, as well as refining the selection of patients for treatments that are most likely to be beneficial. Although the absolute survival benefit of each newly approved therapy has been modest, exposure to multiple lines of active therapy may ultimately have a significant cumulative impact on the natural history of CRPC, as has been observed with other solid tumours.

Matthew D. Galsky and William K. Oh are at the Mount Sinai School of Medicine, Box 1079, One Gustave L. Levy Place, New York, New York 10029-6574, USA.

Argyris Dritsalis is at IMS Health, 7 Harewood Avenue, London NW1 6JB, UK.

Peter Kirkpatrick is at Nature Reviews Drug Discovery.

e-mails: matthew.galsky@mssm.edu; william.oh@mssm.edu; Argyris.Dritsalis@imshealth.com; p.kirkpatrick@nature.com

doi:10.1038/nrd3254

1. Jemal, A. Cancer statistics, 2009. CA Cancer J. Clin. 59, 225–249 (2009).
2. Oh, W. K. & Schurko, B. Docetaxel chemotherapy remains the standard of care in castration-resistant prostate cancer. Nature Clin. Pract. Oncol. 5, 506–507 (2008).
3. Higano, C. S. et al. Sipuleucel-T. Nature Rev. Drug Discov. 9, 513–514 (2010).
4. Jordan, M. A. & Wilson, L. Microtubules as a target for anticancer drugs. Nature Rev. Cancer 4, 253–265 (2004).
5. Mita, A. C. et al. Phase I and pharmacokinetic study of XRP6258 (RPR 116258A), a novel taxane, administered as a 1-hour infusion every 3 weeks in patients with advanced solid tumors. Clin. Cancer Res. 15, 723–730 (2009).
6. Pivot, X. et al. A multicenter phase II study of XRP6258 administered as a 1-h i.v. infusion every 3 weeks in taxane-resistant metastatic breast cancer patients. Ann. Oncol. 19, 1547–1552 (2008).
7. US Food and Drug Administration. FDA labeling information — Jevtana [cabazitaxel]. FDA website [online]. http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/201023lbl.pdf (2010).
8. De Bono, J. S. et al. Cabazitaxel or mitoxantrone with prednisone in patients with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel: final results of a multinational phase III trial (TROPIC). J. Clin. Oncol. 28 (Suppl. 15), 4508 (2010).
9. Montgomery, R. B. et al. Maintenance of intratumoral androgens in metastatic prostate cancer: a mechanism for castration-resistant tumor growth. Cancer Res. 68, 4447–4454 (2008).
10. Locke, J. A. et al. Androgen levels increase by intratumoral de novo steroidogenesis during progression of castration-resistant prostate cancer. Cancer Res. 68, 6407–6415 (2008).
11. Danila, D. C. et al. Phase II multicenter study of abiraterone acetate plus prednisone therapy in patients with docetaxel-treated castration-resistant prostate cancer. J. Clin. Oncol. 28, 1496–1501 (2010).
12. Reid, A. H. et al. Significant and sustained antitumor activity in post-docetaxel, castration-resistant prostate cancer with the CYP17 inhibitor abiraterone acetate. J. Clin. Oncol. 28, 1489–1495 (2010).
13. Scher, H. I. et al. Antitumour activity of MDV3100 in castration-resistant prostate cancer: a phase 1–2 study. Lancet 375, 1437–1446 (2010).
14. Tran, C. et al. Development of a second-generation antiandrogen for treatment of advanced prostate cancer. Science 324, 787–790 (2009).
15. Kantoff, P. W. et al. Sipuleucel-T immunotherapy for castration-resistant prostate cancer. N. Engl. J. Med. 363, 411–422 (2010).
16. IMS MIDAS (IMS Health, 2010).
17. Hauber, A. et al. JP Morgan Europe Research (JP Morgan Cazenove, 24 May 2010).

Competing interests statement
W. K. O. declares competing financial interests; see web version for details.

### Box 1 | The market for taxane anticancer drugs

Analysing the market for taxane anticancer drugs is Argyris Dritsalis, IMS Health, London, UK.

Sales of plant-derived anticancer drugs, which include the taxanes and the vinca alkaloids, were valued at US$4.8 billion in the past 12 months in the United States, Japan and the five major European markets (Germany, France, UK, Spain and Italy), and have grown by about 16% in the past 5 years[16]. Within this market, the taxane docetaxel (Taxotere; Sanofi-Aventis), which is used in the treatment of several cancers including prostate cancer, is the largest-selling product with sales of $2.6 billion[16]. Gonadotropin-releasing hormone analogues and anti-androgens — two other drug classes used in prostate cancer treatment — had sales of $2.6 billion and $0.91 billion, respectively[16].

The taxane cabazitaxel (Jevtana; Sanofi-Aventis) was approved in the United States in June 2010 for use in combination with prednisone in patients with metastatic hormone-refractory prostate cancer who have previously been treated with a docetaxel-based treatment regimen. Cabazitaxel is also undergoing regulatory review in the European Union for the same indication. Analysts predict that initial annual sales of cabazitaxel in metastatic hormone-refractory prostate cancer will be around 70 million euros in 2011, rising to 514 million euros by 2020 (REF. 17).

© 2010 Macmillan Publishers Limited. All rights reserved

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/456,720 | 04/26/2012 | Sunil GUPTA | FR2009/121 US CNT | 1083 |

| | |
|---|---|
| 5487      7590      09/16/2013 | EXAMINER |
| ANDREA Q. RYAN | |
| SANOFI | ANDERSON, JAMES D |
| 55 Corporate Drive | |
| MAIL CODE: 55A-505A | ART UNIT · PAPER NUMBER |
| BRIDGEWATER, NJ 08807 | 1629 |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/16/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

USPatent.E-Filing@sanofi.com
andrea.ryan@sanofi.com

PTOL-90A (Rev. 04/07)

SA_JEV_0002128

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 13/456,720 | GUPTA, SUNIL |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | JAMES D. ANDERSON | 1629 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on *7/16/2013*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5)☒ Claim(s) *1,2,4,6-11,13-19 and 24* is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *1,2,4,6-11,13-19 and 24* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

**Certified copies:**

    a)☐ All    b)☐ Some \*    c)☐ None of the:

    1.☐ Certified copies of the priority documents have been received.

    2.☐ Certified copies of the priority documents have been received in Application No. _____.

    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    \* See the attached detailed Office action for a list of the certified copies not received.

## Attachment(s)

1)☐ Notice of References Cited (PTO-892)

2)☒ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date *7/16/2013*.

3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

SA_JEV_0002129

Application/Control Number: 13/456,720                                    Page 2
Art Unit: 1629

The present application is being examined under the pre-AIA first to invent
provisions.

## DETAILED ACTION

### *Formal Matters*

Applicants' response and amendments to the claims, filed 7/16/2013, are
acknowledged and entered.  Claims 3, 5, 12, 20-23, and 25-33 have been cancelled
by Applicant.   Claims 1-2, 4, 6-11, 13-19, and 24 are pending and under
examination.

### *Response to Arguments*

Any previous rejections and/or objections to claims 3, 5, 12, 20-23, and 25-33
are withdrawn as being moot in light of Applicant's cancellation of the claims.

Applicants' arguments, filed 7/16/2013, have been fully considered but they
are not deemed to be persuasive.  Rejections and/or objections not reiterated from
previous office actions are hereby withdrawn.   The following rejections and/or
objections are either reiterated or newly applied.  They constitute the complete set
presently being applied to the instant application.

SA_JEV_0002130

Application/Control Number: 13/456,720                                        Page 3
Art Unit: 1629

### *Information Disclosure Statement*

Receipt is acknowledged of the Information Disclosure Statement filed 7/16/2013. The Examiner has considered the references cited therein to the extent that each is a proper citation. Please see the attached USPTO Form 1449.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Application/Control Number: 13/456,720                          Page 4
Art Unit: 1629

Claims 1-2, 4, 8-12, 13-19, and 24 remain rejected under 35 U.S.C. 103(a) as being unpatentable over **Mita *et al*.** (Clinical Cancer Research, 2009, vol. 15, pages 723-730) (Published Online January 15, 2009) in view of **Tannock *et al*.** (N. Engl. J. Med., 2004, vol. 351, pages 1502-1512).

*Claimed Invention*

The amended claims are drawn to treating prostate cancer in a patient comprising administering to said patient cabazitaxel (XRP6258) in combination with prednisone or prednisolone, wherein the patient has hormone refractory prostate cancer and wherein the patient has been previously treated with a docetaxel containing regimen.

*Teachings of Mita et al.*

Mita *et al*. disclose a Phase I and pharmacokinetic study of cabazitaxel (XRP6258), administered as a 1-hour intravenous infusion every 3 weeks in patients with advanced solid tumors. *See* Abstract.

Mita *et al*. disclose that cabazitaxel (XRP6258) has shown broad spectrum antitumor activity in mice bearing s.c. implanted human xenografts, including Du-145 prostate cancers. *See* page 724, left column, first full paragraph.

Mita *et al*. disclose that the encouraging spectrum of antitumor activity of XRP6258 in experimental tumor models, **particularly its notable activity**

SA_JEV_0002132

Application/Control Number: 13/456,720                                    Page 5
Art Unit: 1629

**against docetaxel-resistant, Pgp-expressing malignancies**, served as a rationale to clinical evaluations. *See* page 724, left column, second full paragraph.

Regarding claims 8-11, Mita *et al.* disclose that XRP6258 was administered as a 1-hour i.v. infusion every 3 weeks at a starting dose of 10 mg/m2, with subsequent incremental increases to 15, 20, and 25 mg/m2 dose levels. *See* page 724, right column, "Drug administration" and "Dose escalation".

Regarding claims 14-16, Mita *et al.* disclose pharmacokinetic variables observed in patients at all tested dose levels, including AUC, Cmax, and clearance falling within the scope of the instant claims. *See* Table 5.

Regarding claims 17-19, Mita *et al.* disclose monitoring blood neutrophil counts, *i.e.*, absolute neutrophil counts (ADC), and that at the highest dose level (25 mg/m2), the ADC was ≤ 1,500 cells/mm3 (990) and at that dose level there were cases of Grade 3 and Grade 4 neutropenia. Mita *et al.* disclose that the rate of dose limiting toxicity (DLT) exceeded the predefined limits of tolerability at the 25 mg/m2 dose level. *See* Table 3; page 726, left column, second full paragraph.

Regarding anticancer activity, Mita et al. disclose that evidence of anticancer activity was observed in a patient with **prostate cancer metastatic to liver and bones** whose disease had progressed through surgical castration, bicalutamide, diethyl stilbestrol, and mitoxantrone and prednisone. Further evidence of anticancer activity was observed in a patient with **hormone- and docetaxel-**

**refractory prostate cancer metastatic to bone and iliac lymph nodes**. *See* page 727, left column, "Anticancer activity".

Mita *et al.* differ from the instant claims in that while Mita *et al.* unequivocally teach, suggest, and motivate the administration of carbazitaxel to treat prostate cancer, including metastatic, hormone- and docetaxel-refractory prostate cancer, Mita *et al.* does not disclose combining carbazitaxel with prednisone.

*Teachings of Tannock et al.*

Tannock *et al.* disclose that mitoxantrone plus prednisone reduces pain and improves quality of life in men with advanced, hormone-refractory prostate cancer, but it does not improve survival. Tannock *et al.* disclose a study comparing the effects of docetaxel combined with prednisone to mitoxantrone combined with prednisone. *See* Title; Abstract.

Regarding claim 8, Tannock *et al.* disclose that prednisone was administered at a dose of 5 mg twice daily, thus teaching administration of prednisone at a dose of 10 mg/day. *See* Abstract; page 1504, left column, "Randomization and Treatment".

Regarding claims 17-19, Tannock *et al.* disclose that a dose reduction or treatment delay was stipulated for patient who had an absolute neutrophil count of

SA_JEV_0002134

less than 1500 per cubic millimeter (for those receiving weekly docetaxel).  See page

1504, right column, first full paragraph.

Tannock *et al.* disclose that when given with prednisone, treatment with

docetaxel every 3 weeks led to superior survival and improved rates of response in

terms of pain, serum PSA level, and quality of life, as compared to mitoxantrone

plus prednisone, and conclude that **docetaxel plus prednisone is the preferred**

**option for most patients with hormone-refractory prostate cancer.**  *See*

Abstract; page 1511, right column, last paragraph.


## Principles of Law

"In rejecting claims under 35 U.S.C. § 103, the examiner bears the initial

burden of presenting a *prima facie* case of obviousness. Only if that burden is met,

does the burden of coming forward with evidence or argument shift to the

applicant." *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1993) (citations omitted). In

order to determine whether a prima facie case of obviousness has been established,

we consider the factors set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966):

(1) the scope and content of the prior art; (2) the differences between the prior art

and the claims at issue; (3) the level of ordinary skill in the relevant art; and (4)

objective evidence of nonobviousness, if present.

"The combination of familiar elements according to known methods is likely

to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v.*

*Teleflex Inc.*, 550 U.S. 398, 416 (2007). "In determining whether obviousness is established by combining the teachings of the prior art, 'the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.'" *In re GPAC Inc.*, 57 F.3d 1573, 1581 (Fed. Cir. 1995).

"[I]in a section 103 inquiry, 'the fact that a specific [embodiment] is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered.'" *Merck & Co. Inc. v. Biocraft Laboratories Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) (quoting *In re Lamberti*, 545 F.2d 747, 750, 192 USPQ 278, 280 (CCPA 1976).)

*Analysis & Examiner's Determination of Obviousness*

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to combine the teachings of the references so as to administer cabazitaxel in combination with prednisone as taught by Mita et al. in view of the teachings of Tannock et al. to patients with hormone-refractory prostate cancer previously treated with docetaxel.

One would have been motivated to do so because Mita et al. teach that cabazitaxel is effective in treating prostate cancer metastatic to liver and bones whose disease had progressed through surgical castration, bicalutamide, diethyl stilbestrol, and mitoxantrone and prednisone and **hormone- and docetaxel-refractory prostate cancer** metastatic to bone and iliac lymph nodes when

Application/Control Number: 13/456,720                                    Page 9
Art Unit: 1629

administered as a single agent.  The motivation to add prednisone to such treatment is clearly seen in Tannock *et al.*, who teach that administration of the taxane, docetaxel, in combination with prednisone is effective in treating hormone-refractory prostate cancer.  As such, the skilled artisan would predict that addition of prednisone to the treatment regimen of Mita *et al.* would also be effective in treating hormone-refractory prostate cancer, including prostate cancers refractory to docetaxel therapy.


Claims 6-7 are rejected under 35 U.S.C. 103(a) as being unpatentable over **Mita *et al.*** (Clinical Cancer Research, 2009, vol. 15, pages 723-730) (Published Online January 15, 2009) in view of **Tannock *et al.*** (N. Engl. J. Med., 2004, vol. 351, pages 1502-1512) as applied to claims 1-2, 4, 8-12, 13-19, and 24 above, and further in view of **Didier *et al.*** (US 2005/0065138 A1; Published Mar. 24, 2005).


Mita et al. and Tannock et al. teach as applied to claims 1-2, 4, 8-12, 13-19, and 24, supra, which teachings are herein incorporated by reference in their entirety.  Claims 6-7 differ from Mita et al. and Tannock et al. in that the references do not disclose an acetone solvate of carbazitaxel.


*Teachings of Didier et al.*

Didier et al. disclose acetone solvates of carbazitaxel.  *See* Abstract; Claims.

SA_JEV_0002137

Application/Control Number: 13/456,720                                    Page 10
Art Unit: 1629

Didier et al. disclose acetone solvates containing between 5% and 8% of acetone. *See* page 1, [0020].


*Analysis & Examiner's Determination of Obviousness*

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to combine the teachings of the references so as to administer the acetone solvate of cabazitaxel in combination with prednisone as taught by Mita et al. in view of the teachings of Tannock et al. and Dinier et al.

The skilled artisan would expect that the acetone solvate of carbazitaxel would possess the same anticancer properties as the free base compound. As both carbazitaxel and the acetone solvate thereof were known in the art, selection of either one for use in treating prostate cancer would have been prima facie obvious to the skilled artisan.


*Response to Arguments*

Applicant submits that the claimed elements of the present invention were not known in the prior art and the combination of Mita and Tannock would not have provided a reasonable expectation of predictable results. Accordingly, Applicant respectfully submits that any presumption of obviousness based on the combination of these references is not warranted. In support of the above, Applicants present the following arguments.

SA_JEV_0002138

Application/Control Number: 13/456,720                                    Page 11
Art Unit: 1629

Applicant argues that Mita nowhere suggests that one skilled in the art should use cabazitaxel for the treatment of prostate cancer based on these results, as the efficacy data provided is only "preliminary" evidence. Accordingly, given the extremely limited nature of the patients described in Mita and the complexity of treatment of cancer, Applicant argues that one skilled in the art would not have the requisite reasonable expectation that the results of this phase 1 trial would translate to patients with hormone refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen when evaluated in a statistically relevant setting (such as a Phase III trial).

This is argument is not persuasive because as taught by Mita and admitted by Applicants, Mita indicated that evidence of anticancer activity was noted in two patients, including one patient with "hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes." It is well established in the art that Phase I clinical trials are used as a basis for continuing Phase II and Phase III clinical trials. Given the documented evidence of anti-cancer activity in the Phase I trial taught by Mita against hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes, the skilled artisan would have been imbued with at least a reasonable expectation of success in treating such prostate cancer. This is clearly evidenced by Mita who in fact demonstrate that carbazitaxel is clinically effective in treating hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes. In response to Applicants' assertion that

SA_JEV_0002139

that Mita nowhere suggests that one skilled in the art should use cabazitaxel for the treatment of prostate cancer based on these results, as the efficacy data provided is only "preliminary" evidence, this is precisely what Mita suggests. Mita in fact explicitly states, "[T]he general tolerability and encouraging antitumor activity in taxane-refractory patients warrant further evaluations of XRP6258 [cabazitaxel]". See Abstract.

Applicant next argues that there is nothing in Tannock which would provide one skilled in the art with the reasonable expectation (or even prediction as asserted in the Office Action), that a combination comprising docetaxel would have any similar effectiveness when used in combination with cabazitaxel. Applicants assert that the Office Action provides no evidence or even arguments explaining why one skilled in the art would reasonably have such an expectation, especially in patients with docetaxel-resistant prostate cancer.

In response, the Examiner respectfully submits that Tannock teaches that docetaxel plus prednisone treatment led to superior survival and improved rates of response in terms of pain, serum PSA level, and quality of life, as compared to mitoxantrone plus prednisone, and conclude that **docetaxel plus prednisone is the preferred option for most patients with hormone-refractory prostate cancer**. Based on this teaching, the skilled artisan would clearly and unequivocally be motivated to administer docetaxel plus prednisone to treating hormone-refractory prostate cancer. Taken together with the teachings of Mita, the

SA_JEV_0002140

skilled artisan would have been motivated to substitute cabazitaxel for docetaxel in

such as treatment regimen because Mita teaches that cabazitaxel is superior to

docetaxel in many aspects including lower affinity for P-gp, a linear PK profile, and

better tolerance and administration profile. Mita further teaches that cabazitaxel is

effective in treating hormone- and docetaxel-refractory prostate cancer metastatic to

bone and iliac lymph nodes. Thus, when viewed in combination, Mita et al. and

Tannock et al. teach, suggest, and clearly motivate the administration of

cabazitaxel and prednisone to treat patients with hormone- and docetaxel-refractory

prostate cancer as presently claimed.

### *Conclusion*

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of

time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire

THREE MONTHS from the mailing date of this action. In the event a first reply is

filed within TWO MONTHS of the mailing date of this final action and the advisory

action is not mailed until after the end of the THREE-MONTH shortened statutory

period, then the shortened statutory period will expire on the date the advisory

action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be

calculated from the mailing date of the advisory action. In no event, however, will

the statutory period for reply expire later than SIX MONTHS from the mailing date
of this final action.


   If applicants should amend the claims, a complete and responsive reply will
clearly identify where support can be found in the disclosure for each amendment.
Applicants should point to the page and line numbers of the application
corresponding to each amendment, and provide any statements that might help to
identify support for the claimed invention (e.g., if the amendment is not supported
in *ipsis verbis*, clarification on the record may be helpful). Should applicants present
new claims, applicants should clearly identify where support can be found in the
disclosure

   Any inquiry concerning this communication or earlier communications from
the examiner should be directed to JAMES ANDERSON whose telephone number is
(571)272-9038. The examiner can normally be reached on MON-FRI 9:00 am - 5:00
pm EST.

   If attempts to reach the examiner by telephone are unsuccessful, the
examiner's supervisor, Jeffrey Lundgren can be reached on 571-272-5541. The fax
phone number for the organization where this application or proceeding is assigned
is 571-273-8300.

Application/Control Number: 13/456,720                                    Page 15
Art Unit: 1629

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR

only. For more information about the PAIR system, see http://pair-direct.uspto.gov.

Should you have questions on access to the Private PAIR system, contact the

Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like

assistance from a USPTO Customer Service Representative or access to the

automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.


_____/James D. Anderson/_____
**James D. Anderson, Ph.D.**
*Primary Patent Examiner*, Art Unit 1629
UNITED STATES PATENT AND TRADEMARK OFFICE
400 Dulany Street
Alexandria, VA 22314-5774
Tel. No.: (571) 272-9038

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of                                   Examiner:    **James D. Anderson**
**GUPTA, et al.**
                                             Art Unit:     **1629**
Application No.:   **13/456,720**

Filed:         **April 26, 2012**                      Conf. No.    **1083**

Title:         **NOVEL ANTITUMORAL USE OF CABAZITAXEL**

Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT
UNDER 37 C.F.R. §1.56

      Submitted herewith on Form PTO/SB/08 is a listing of documents known to Applicant in order to comply with Applicant's duty of disclosure pursuant to 37 C.F.R. §1.56.

      The submission of the document herewith, which is not a statutory bar, is not intended as an admission that such document constitutes prior art against the claims of the present application or that such document is considered material to patentability as defined in 37 C.F.R. §1.56(b). Applicant does not waive any right to take any action which would be appropriate to antedate or otherwise remove as a competent reference any document which is determined to be a *prima facie* art reference against the claims of the present application.

TIMING OF THE DISCLOSURE

      The listed documents are being submitted in compliance with 37 C.F.R. §1.97(b), as the submission is before the mailing of a first Office Action after the filing of request for continued examination under §1.114.

      A concise explanation of the relevance of some or all of the items listed on the attached Form PTO/SB/08 is as follows:

      Listed references FR2732340 and WO96/30356 are in the French language. U.S. Patent No. 5,889,043 (also listed) is an English language family member of FR2732340 and WO96/30356, and is believed to have similar content as FR2732340 and WO96/30356.

Shabafrouz et al. is in a non-English language.  An English language abstract of
Shabafrouz et al. is as follows: "Despite major progress in the understanding of biological
mechanisms underlying metastatic prostate cancer, the treatment of men with advanced
prostate cancer remains challenging.  Several randomized controlled trials with promising
or positive results are underway or just released.  Here we discuss new treatments
which might be used in clinic in the near future: hormonal treatments (Abiraterone and
MDV3100), a new chemotherapy (Cabazitaxel), a cellular vaccine (Sipuleucel-T), anti-
angiogenic drugs (Bevacizumab, Aflibercept), a new radioactive treatment (Alpharadin)
and a new bone-protective agent (Deno-sumab)."

Pouessel et al. is in a non-English language.  An English language abstract of
Pouessel et al. is as follows: "In urologic oncology, prostate cancer represented, even
this year, a wide part during the ASCO 2010 meeting.  In the non metastatic diseases,
two phase III trials confirmed the benefit of radiotherapy combined with hormonotherapy
in locally advanced stage.  For patients with metastatic hormonoresistan cancer, two
randomized trials will probably change the daily practice in the next months.  On the one
hand, denosumab versus zoledronate decreased significantly the risk of skeletal-related
events in bone metastases.  On the other hand, compared with mitoxantrone, cabazitaxel
in docetaxel pretreated patients improved overall survival. On the contrary, docetaxel in
monotherapy remains the standard of care in first line chemotherapy in castration
refractory metastatic prostate cancer.  Indeed, in two trials, combination of bevacizumab
or calcitriol with docetaxel showed no benefit for patients with more toxicities. Finally,
docetaxel-based chemotherapy was again evaluated in two other situations: biological
recurrence, and hormono-sensitive metastatic stage. Preliminary results of tolerance
were presented this year.  No doubt that communications during future ASCO meetings
would reporte In urologic oncology, prostate cancer represented, even this year, a wide
part during the ASCO 2010 meeting.  In the non metastatic diseases, two phase III trials
confirmed the benefit of radiotherapy combined with hormonotherapy in locally advanced
stage.  For patients with metastatic hormonoresistant cancer, two randomized trials will
probably change the daily practice in the next months.  On the one hand, denosumab
versus zoledronate decreased significantly the risk of skeletal-related events in bone
metastases.  On the other hand, compared with mitoxantrone, cabazitaxel in docetaxel
pretreated patients improved overall survival. On the contrary, docetaxel in monotherapy
remains the standard of care in first line chemotherapy in castration refractory metastatic
prostate cancer.  Indeed, in two trials, combination of bevacizumab or calcitriol with
docetaxel showed no benefit for patients with more toxicities. Finally, docetaxel-based

-2-

SA_JEV_0002273

chemotherapy was again evaluated in two other situations: biological recurrence, and hormono-sensitive metastatic stage. Preliminary results of tolerance were presented this year. No doubt that communications during future ASCO meetings would reported definitive results of efficiency of these phase III studies."

Miura et al. is in a non-English language. An English language title and abstract of Miura et al. are as follows: "A case of Hormone-Refractory Prostate Cancer (HRPC) with Tumor Fever Responding to Docetaxel Plus Prednisolone Therapy," and "We have experienced a patient with tumor fever from hormone-refractory prostate cancer (HRPC) who was treated successfully using docetaxel plus prednisolone therapy. A 65-year-old male was diagnosed with prostate cancer (T4 N1 M1b). He received androgen-ablation therapy. But six months later he was confirmed to show failure of the previous hormone therapy and disease progression even after anti-androgen withdrawal. Then docetaxel plus prednisolone therapy was started. After two courses of this therapy, the PSA level decreased by 50% or more, and after ten courses an improvement was seen on the bone scan. The patient has survived for twelve months after starting docetaxel plus prednisolone therapy, without serious adverse effects."

The Director is authorized to charge any fees required by this paper or credit any overpayment to Account No. **18-1982**.

Respectfully submitted,

/Kelly L. Bender/
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi US
U.S. Patent Operations
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **uspatent.e-filing@Sanofi.com**
Telephone: (908) 981-**6782**
Telefax:     (908) 981-7832
Sanofi US Ref. FR2009/121 US CNT

Date: March 17, 2014

SA_JEV_0002274

### *Remarks*

In the Office Action, the Examiner noted that claims 1, 2, 4, 6 to 11, 13 to 19 and 24 are pending in the application, and that claims 1, 2, 4, 6 to 11, 13 to 19 and 24 are rejected.

Support for the amendments to claim 1 can be found throughout the specification, for example on page 8, lines 14 to 16 (second full paragraph).

Claim 2 is amended to place said claim in conventional US claim format.

Claim 8 is amended to place said claim in conventional US claim format and to change the dependency of said claim in view of the amendments to claim 1,

Support for new claims 34 to 44 can be found throughout the specification and in the original claims, for example on page 4, and in original claims 1 to 12.

No new matter is added by these amendments.

Applicant reserves the right to file one or more continuation, continuation-in-part, or divisional applications on the deleted subject matter.

As presently amended, claims 1, 2, 4, 6 to 11, 13 to 19, 24 and 34 to 44 are pending in this application.

### *Discussion of Rejection under 35 U.S.C. § 103(a)*

The rejection of claims 1, 2, 4, 8 to 12, 13 to 19 and 24 under 35 U.S.C. § 103(a) as being allegedly unpatentable over Mita et al. (Clin Cancer Res, 2009, 15(2) pp. 723-730, hereinafter "Mita") in view of Tannock et al. (N Eng J Med, 2004, 351, pp. 1502-1512, hereinafter "Tannock") has been maintained. This rejection is traversed.

It is the Examiner's position that one would have been motivated to "combine the teachings of the references so as to administer cabazitaxel in combination with prednisone" because "Mita et al. teach that cabazitaxel is effective in treating prostate cancer metastatic to liver and bones whose disease has progressed through surgical castration, bicalutamide, dietheryl stilbestrol, and mitoxantrone and predisone and hormone- and docetaxel-refractory prostate caner metastatic to bone and iliac lymph nodes when administered as a single agent." (Office Action, page 8). Further, it is the Examiner position that the "motivation to add prednisone to such treatment is clearly seen in Tannock et al., who teach that administration of the

SA_JEV_0002275

taxane, docetaxel, in combination with prednisone is effective in treating hormone-refractory prostate cancer." (Office Action, page 9).

To render a claimed invention obvious under 35 U.S.C. § 103, the cited reference themselves, coupled with the knowledge generally available in the art at the time of the invention, must contain some suggestion or incentive that would have motivated the skilled artisan to combine or modify them in the manner necessary to arrive at the claimed invention (*See,* MPEP § 2143.01). In addition, the proposed combination or modification must have had a reasonable expectation of success, determined from the vantage point of the skilled artisan at the time the invention was made. (*See,* MPEP § 2143.02). Finally, the prior art references must teach or suggest all limitations of the claims; i.e., each of the limitations must "be found in the prior art, and not be based on applicant's disclosure." (MPEP § 2143).

Applicant submits that the claimed elements of the present invention were not known in the prior art and the combination of Mita and Tannock would not have provided a reasonable expectation of predictable results. Accordingly, Applicant respectfully submits that any presumption of obviousness based on the combination of these references is not warranted.

The present application, which describes the results from a Phase III clinical trial, demonstrates that administration of cabazitaxel in combination with prednisone to patients with hormone refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen resulted in a statistically significant longer overall survival compared to patients receiving a mitoxantrone plus prednisone. (*See,* Specification, p. 18).

The primary Mita reference describes Phase I and pharmacokinetic studies of cabazitaxel in a limited number of patients with a variety of solid tumors. The studies were designed to evaluate the safety and dosage of cabazitaxel, but "preliminary evidence of antitumor activity" was to be documented. (Mita at 724, left column). While eight of the twenty-five patients had prostate tumors (Id. at 725, Table 1), Mita indicated that evidence of anticancer activity was noted in two patients, including one patient with "hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes." (Id. at 727).

The evidence of anticancer activity in a single patient does not provide an expectation that the claimed method would successfully treat prostate cancer. First, the antitumor activity observed in Mita could have been entirely due to chance (i.e.

- 7 -

SA_JEV_0002276

the patient's tumor regressed spontaneously), rather than an effect of cabazitaxel, because that study was not statistically powered to determine whether the observed efficacy was due to the drug. Indeed, no antitumor activity was seen in the majority of the patients treated. Moreover, it is important to note that Mita nowhere suggests that one skilled in the art should use cabazitaxel for the treatment of prostate cancer based on these results, as the efficacy data provided is only "preliminary" evidence.

Second, cancer research, and in particular clinical trials of antitumor drugs, is highly unpredictable. (See e.g., Kola et al. stating "[a]pproximately 62% of all compounds that enter Phase II trials undergo attrition, and again the highest rate of attrition at this phase is in the oncology field: more than 70% of oncology compounds fail in this phase," *Nature Reviews Drug Discovery*, 2004, Vol 3., pp. 711-715 at 712, cited in attached IDS). Accordingly, given the extremely limited nature of the patients described in Mita and the unpredictability and complexity of treatment of cancer, one skilled in the art would not have the requisite reasonable expectation that patients with hormone refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen, could be successfully treated by the claimed method.

Nevertheless, the Examiner asserts that "[g]iven the documented evidence of anti-cancer activity in the Phase I trial taught by Mita against hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes, the skilled artisan would have been imbued with at least a reasonable expectation of success in treating such prostate cancer." (Office Action, page 11). Applicants respectfully disagree.

As noted by the Examiner at page 12 of the Office Action, the abstract of Mita states that "the general tolerability and encouraging antitumor activity in taxane-refractory patients warrant further evaluations of XRP6258 [cabiztaxel]." Even assuming, *arguendo*, that this statement gives a general *incentive* to evaluate cabazitaxel in these taxane-refractory patients, none of the cited references provide the requisite evidence of *predictability* in the treatment of such cancer patients. Absent evidence of predictability, Mita cannot provide a reasonable expectation of success in the treatment of prostate cancer in taxane-refractory patients.

Therefore, Applicant respectfully submits that, based on Mita's preliminary and limited nature of description of effectiveness with respect to cabazitaxel in patients and the lack of evidence of a reasonable correlation between docetaxel-

SA_JEV_0002277

and cabazitaxel- based prednisone combinations, the present claims would be non-obvious to one skilled in art over the combination of Mita and Tannock. Accordingly, reconsideration and withdrawal of this obviousness-based rejection are respectfully requested.

The rejection of claims 6 and 7 under 35 U.S.C. § 103(a) as being allegedly unpatentable over Mita, in view of Tannock as applied to claims 1 to 5, 8 to 19 and 24 and further in view of Didier et al. (US2005/0065138) has been maintained.

Didier et al. which is cited for allegedly teaching "acetone solvates of cabazitaxel" and "acetone solvates containing between 5% and 8% of acetone" (Office Action, page 9), dose not remedy the deficiencies of Mita and Tannock, as described above. Accordingly, Didier et al., in combination with Mita and Tannock, does not render claims 6 and 7 obvious. Reconsideration and withdrawal of this rejection of claims 6 and 7 are therefore respectfully requested.

### Conclusion

There being no remaining issues, this application is believed in condition for favorable reconsideration and early allowance, and such actions are earnestly solicited.

In the event the Examiner wishes to contact the undersigned regarding any matter, please call (collect if necessary) the telephone number listed below.

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment to Deposit Account No. **18-1982**.

Respectfully submitted,

/Kelly L. Bender/
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi US
U.S. Patent Operations
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **uspatent.e-filing@sanofi.com**
Telephone: (908) 981-**6782**
Telefax:     (908) 981-7832
Sanofi US Ref. FR2009/121 US CNT

Date: March 17, 2014

SA_JEV_0002278

## Amendment Pursuant to 37 C.F.R. § 1.121

**In the Claims:**

1.     (Currently amended)  A method for treating prostate cancer in a patient in
need thereof comprising administering to said patient <u>an effective amount of a</u>
compound of formula



which may be in base form or in the form of a hydrate or a solvate,

in combination with <u>a corticoid</u>~~prednisone or prednisolone, wherein said patient has~~
~~hormone refractory metastatic prostate cancer and wherein said patient has been~~
~~previously treated with a docetaxel containing regimen~~.

2.     (Currently amended)  The method according to claim 1, where ~~the treated~~
~~patients are~~ <u>said patient is</u> not catered for by a taxane-based treatment.

3.     (Cancelled)

4.     (Original)  The method according to claim 1, where the prostate cancer is an
advanced metastatic disease.

5.     (Cancelled)

SA_JEV_0002279

6.    (Original)  The method according to claim 1, where the compound is in the form of an acetone solvate.

7.    (Original)  The method according to claim 6, in which the acetone solvate contains between 5% and 8% by weight of acetone.

8.    (Currently amended)  The method according to claim 35claim 1, where the compound is administered at a dose of between 15 and 25 mg/m$^2$, and the prednisone or prednisolone being is administered at a dose of 10 mg/day.

9.    (Original)  The method according to claim 8, where the compound is administered at a dose of 25 mg/m$^2$.

10.   (Original)  The method according to claim 1, comprising repeating the administration of such compound as a new cycle every 3 weeks.

11.   (Original)  The method according to claim 10, wherein the median number of cycles is 6.

12.   (Cancelled)

13.   (Previously presented)  The method according to claim 1, where the compound is cabazitaxel.

14.   (Original)  The method according to claim 1, wherein said compound is administered in an amount to provide an AUC of about 991 ng•h/mL (CV 34%).

SA_JEV_0002280

15.   (Original)   The method according to claim 1, wherein said compound is administered in an amount to provide an $C_{max}$ of about 226 ng·h/mL (CV 107%).

16.   (Original)   The method according to claim 1 wherein said compound is administered in an amount to provide a plasma clearance of 48.5 L/h (CV 39%).

17.   (Original)  The method according to claim 1, further comprising monitoring blood counts and measuring neutrophil levels in the patient.

18.   (Original)  The method according to Claim 17, wherein said monitoring comprises taking a blood sample from the patient.

19.   (Original)  The method according to Claim 18, further comprising discontinuing cabazitaxel treatment in a patient with a neutrophil count of ≤1,500 cells/mm$^3$.

20. - 23.  (Cancelled)

24.   (Original)   A method of increasing the survival of a patient with hormone refractory metastatic prostate cancer, comprising administering a clinically proven effective amount of a compound as defined in claim 1 to the patient in combination with prednisone or prednisolone.

25. – 33.      (Cancelled)

34.   (New)  The method according to claim 1, where the compound is administered at a dose of 25 mg/m$^2$.

SA_JEV_0002281

35.    (New)  The method according to claim 1, wherein the corticoid is selected
       from the group consisting of prednisone and prednisolone.

36.    (New)  The method according to claim 1, wherein said patient has been
       previously treated with a docetaxel-based regimen.

37.    (New)  The method according to claim 36, where the compound is
       administered at a dose of 25 mg/m$^2$.

38.    (New)  The method according to claim 36, comprising repeating the
       administration of said compound as a new cycle every 3 weeks.

39.    (New)  The method according to claim 1, where the prostate cancer is a
       castration resistant prostate cancer or hormone-refractory prostate cancer.

40.    (New)  The method according to claim 39, where the compound is
       administered at a dose of 25 mg/m$^2$.

41.    (New)  The method according to claim 39, comprising repeating the
       administration of said compound as a new cycle every 3 weeks.

42.    (New)  The method according to claim 1, wherein said patient has been
       previously treated with a docetaxel-based regimen and where the prostate
       cancer is a castration resistant prostate cancer or hormone-refractory prostate
       cancer.

43.    (New)  The method according to claim 42, where the compound is
       administered at a dose of 25 mg/m$^2$.

44.    (New)  The method according to claim 42, comprising repeating the
       administration of said compound as a new cycle every 3 weeks.

SA_JEV_0002282

UNIVERSITYOF
BIRMINGHAM

NHS
National Institute for
Health Research



NHSC National Horizon Scanning Centre

# Cabazitaxel (XRP-6258) for hormone refractory, metastatic prostate cancer – second line after docetaxel

# April 2009



This technology summary is based on information available at the time of research and a limited literature search. It is not intended to be a definitive statement on the safety, efficacy or effectiveness of the health technology covered and should not be used for commercial purposes.

**The National Horizon Scanning Centre Research Programme is part of the National Institute for Health Research**

SA_JEV_0002311

April 2009

**National Horizon Scanning Centre**
News on emerging technologies in healthcare

# Cabazitaxel (XRP-6258) for hormone refractory, metastatic prostate cancer – second line after docetaxel

**Target group**
- Hormone refractory prostate cancer (HRPC): metastatic – second line; after docetaxel-based treatment.

**Technology description**

Cabazitaxel (XRP-6258) is a taxane anti-neoplastic agent. It works by disrupting the microtubular network that is essential for mitotic and interphase cellular functions and causes inhibition of cell division and cell death. Cabazitaxel in combination with prednisone is intended to provide a further treatment option for patients with progressive disease following or during docetaxel-based treatment. Cabazitaxel is administered by intravenous (IV) infusion at $25mg/m^2$ every 3 weeks.

**Innovation and/or advantages**

There is no approved agent for men with metastatic HRPC who have progressed during or after a first-line chemotherapy treatment. Cabazitaxel has shown a promising safety profile and activity in patients progressing after docetaxel therapy.

**Developer**

Sanofi-aventis.

**Availability, launch or marketing dates, and licensing plans:**

In phase III clinical trials.

**NHS or Government priority area**

This topic is relevant to the NHS Cancer Plan (2000) and Cancer Reform Strategy (2007).

**Relevant guidance**
- NICE technology appraisal. Docetaxel for the treatment of hormone refractory metastatic prostate cancer. 2006[1].
- NICE clinical guideline. Prostate cancer: diagnosis and treatment. 2008[2].
- NICE cancer service guidance. Improving outcomes in urological cancers - Manual. 2002[3].
- NICE interventional procedure guidance. High dose rate brachytherapy for prostate cancer. 2006[4].
- NICE interventional procedure guidance. Cryotherapy as a primary treatment for prostate cancer. 2005[5].
- NICE interventional procedure guidance. Low dose rate brachytherapy for localised prostate cancer. 2005[6].
- NICE interventional procedure guidance. Cryotherapy for recurrent prostate cancer. 2005[7].
- NICE interventional procedure guidance. High-intensity focused ultrasound for prostate cancer. 2005[8].

- Department of Health Service guideline. Advice on the development of low dose rate (permanent seed implant) brachytherapy services for localised prostate cancer in England. 2006[9].
- The Royal College of Pathologists. Service guidance. Dataset for tumours of the urinary collecting system (Renal pelvis, ureter, bladder and urethra). 2007[10].

2

SA_JEV_0002312

Case 1:20-cv-00804-RGA   Document 268-1   Filed 04/15/22   Page 140 of 764 PageID #: 4421

- European Association on Prostate Cancer. Guidelines on prostate cancer. 2007[11].

## Clinical need and burden of disease

Prostate cancer is the most common cancer diagnosed in men in the UK, with 31,135 new cases registered in 2005 in England and Wales[12]. More than 60% of cases are diagnosed in men over the age of 70. There were 9,052 registered deaths from prostate cancer in England and Wales in 2006[13], accounting for approximately 13% of male cancer deaths. It is estimated that most of these deaths occur in patients with HRPC[1], although epidemiological data for HRPC is limited. Metastatic disease occurs in 55-60% of prostate cancer patients, for whom androgen deprivation is the main treatment. However, this is essentially palliative and all patients will eventually become resistant to hormone therapy at which point the prognosis becomes extremely poor (median survival 7-15 months[14]).

## Existing comparators and treatments

The aim of treatment for men with metastatic HRPC that has progressed during or after a docetaxel-based treatment, is to improve symptoms, slow progression of the disease and prolong life. Clinical management is acknowledged to be multimodal rather than sequential, and patients may receive a combination of palliative treatments[1].

Management options include:
- Additional hormonal therapy (e.g. diethylstilbestrol).
- Mitoxantrone with or without steroids - widely used for patients who are fit for chemotherapy (not licensed for this indication).
- Docetaxel (Taxotere) re-challenge in patients initially responsive to docetaxel.

## Efficacy and safety

| Trial | TROPIC, NCT00417079[15]: XRP-6258 with prednisone vs. mitoxantrone with prednisone; phase III. |
|---|---|
| Sponsor | Sanofi-aventis. |
| Status | Ongoing. |
| Location | EU (inc UK), USA, Canada and other countries. |
| Design | Randomised, open-label. |
| Participants and schedule | n=720; prostate cancer previously treated with docetaxel; documented progression of disease; surgical or hormone-induced castration; life expectancy > 2 months ECOG PS[a] 0-2. Randomised to mitoxantrone (IV) and prednisone (oral) or XRP-6258 (IV) and prednisone (oral), every 3 weeks until disease progression, death, unacceptable toxicity, or for a maximum of 10 cycles. |
| Follow-up | Maximum 2 years. |
| Primary outcome | Overall survival. |
| Secondary outcomes | Progression free survival, overall response rate, prostate-specific antigen (PSA) response/ progression, pain response/ progression, overall safety, and pharmacokinetics. |
| Expected reporting date | May 2010. |

[a] The ECOG PS (Eastern Cooperative Oncology Group Performance Status) scale assesses a patient's disease progression, living abilities, and determines appropriate treatment and prognosis. The scale runs from 0-5 with: 0=asymptomatic; 1=symptomatic but completely ambulatory; 2=symptomatic, <50% in bed during the day; 3=Symptomatic, >50% in bed, but not bedbound; 4=bedbound; 5=death.

3

SA_JEV_0002313

April 2009

**National Horizon Scanning Centre**
News on emerging technologies in healthcare

**Estimated cost and cost impact[b]**

The cost of cabazitaxel is not yet known. The cost of 6 cycles (18 weeks) of docetaxel at a dose of 75mg/m$^2$ IV every 21 days for metastatic HRPC is £5,262[16].

**Potential or intended impact – speculative**

Patients

☑ Reduced morbidity    ☑ Increased length of survival    ☐ Improved quality of life for patients and/or carers

☐ Quicker, earlier or more accurate diagnosis or identification of disease    ☐ Other:    ☐ None identified

Services

☑ Increased use: e.g. length of stay, out-patient visits    ☐ Service reorganisation required    ☐ Staff or training required

☐ Decreased use    ☐ Other:    ☐ None identified

Costs

☐ Increased unit cost compared to alternative    ☐ Increased costs: more patients coming for treatment    ☐ Increased costs: capital investment needed

☑ New costs: Additional therapeutic option    ☐ Savings:    ☐ Other:

**References**

[1] National Institute for Health and Clinical Excellence. Docetaxel for the treatment of hormone-refractory metastatic prostate cancer. Technology Appraisal TA101. London: NICE; June 2006.

[2] National Institute for Health and Clinical Excellence. Prostate cancer: diagnosis and treatment. Clinical guideline CG58. London: NICE; February 2008.

[3] National Institute for Health and Clinical Excellence. Improving outcomes in urological cancers - Manual. Cancer service guidance. London: NICE; September 2002.

[4] National Institute for Health and Clinical Excellence. High dose rate brachytherapy for prostate cancer. Interventional procedure guidance IPG174. London: NICE; May 2006.

[5] National Institute for Health and Clinical Excellence. Cryotherapy as a primary treatment for prostate cancer. Interventional procedure guidance IPG145. London: NICE; November 2005.

[6] National Institute for Health and Clinical Excellence. Low dose rate brachytherapy for localised prostate Cancer. Interventional procedure guidance IPG145. London: NICE; November 2005.

[7] National Institute for Health and Clinical Excellence. Cryotherapy for recurrent prostate cancer. Interventional procedure guidance IPG119. London: NICE; May 2005.

[8] National Institute for Health and Clinical Excellence. High-intensity focused ultrasound for prostate cancer. Interventional Procedure Guidance IPG118. London: NICE; May 2005.

[9] Department of Health Service guideline. Advice on the development of low dose rate (permanent seed implant) brachytherapy services for localised prostate cancer in England. November 2006.

[10] The Royal College of Pathologists. Service guidance. Dataset for tumours of the urinary collecting system (Renal pelvis, ureter, bladder and urethra). January 2007.

[11] European Association on Prostate Cancer. Guidelines on prostate cancer. March 2007

[12] Cancer Research UK. UK prostate cancer incidence statistics 2009. http://info.cancerresearchuk.org/cancerstats/types/prostate/incidence/ Accessed 17 March 2009.

[13] Cancer Research UK. UK prostate cancer mortality statistics 2009. http://info.cancerresearchuk.org/cancerstats/types/prostate/mortality/ Accessed 17 March 2009.

[14] Dowling AJ, Tannock IF. Systemic treatment for prostate cancer. Cancer Treat Rev. 1998; 24:283-301.

[15] ClinicalTrials.gov. XRP6258 plus prednisone compared to mitoxantrone plus prednisone in hormone refractory metastatic prostate cancer (TROPIC). http://www.clinicaltrials.gov/ct2/show/NCT00417079?term=XRP-6258&rank=1#locn Accessed 08 April

[b] Costings based on an average surface area 1.75m$^2$.

4

April 2009

**National Horizon Scanning Centre**
News on emerging technologies in healthcare

2009.

[16] National Institute for Health and Clinical Excellence. Prostate cancer (hormone-refractory) – docetaxel: analysis of cost impact London: NICE; September 2006. http://www.nice.org.uk/guidance/index.jsp?action=download&o=33354 Accessed 08 April 2009.

The National Institute for Health Research National Horizon Scanning Centre Research Programme is funded by the Department of Health.
The views expressed in this publication are those of the author and not necessarily those of the NHS, the NIHR or the Department of Health

The National Horizon Scanning Centre,
Department of Public Health and Epidemiology
University of Birmingham, Edgbaston, Birmingham, B15 2TT, England
Tel: +44 (0)121 414 7831 Fax +44 (0)121 414 2269
www.pcpoh.bham.ac.uk/publichealth/horizon

SA_JEV_0002315

**NIHR**
*National Institute for Health Research*

# Horizon Scanning Centre

Home | About Us | Outputs | News | Suggest a topic | Contact Us

Search: [eg. Home o Oncology, Baby o Cancer]    Search HSC    - More Search Options

## Cabazitaxel (XRP-6258) for prostate cancer - hormone refractory, metastatic - second line

Cancer and Palliative Care

Date of publication: 1st April 2009

📄 Download this report

### Technology description:

Cabazitaxel (XRP-6258) is a taxane anti-neoplastic agent. It works by disrupting the microtubular network that is essential for mitotic and interphase cellular functions and causes inhibition of cell division and cell death. Cabazitaxel in combination with prednisone is intended to provide a further treatment option for patients with progressive disease following or during docetaxel-based treatment. Cabazitaxel is administered by intravenous (IV) infusion at 25mg/m2 every 3 weeks.

Like most websites, we use cookies to give you the best possible experience on our website. If you continue without changing your settings, we'll assume you're happy to receive cookies. You can learn more about changing your settings in our Privacy Policy.

Accept Cookies

Clinical Interventions in Aging

Dovepress

open access to scientific and medical research



REVIEW

# Critical appraisal of cabazitaxel in the management of advanced prostate cancer

Sumanta Kumar Pal[1]
Przemyslaw Twardowski[1]
Oliver Sartor[2]

[1]Division of Genitourinary
Malignancies, Department of
Medical Oncology and Experimental
Therapeutics, City of Hope
Comprehensive Cancer Center, Los
Angeles, CA, USA; [2]Departments
of Urology and Medicine, Tulane
University School of Medicine,
New Orleans, LA, USA

**Abstract:** Docetaxel remains a cornerstone of therapy for the patient with metastatic castration-resistant prostate cancer (CRPC). However, the landscape of CRPC therapy is changing rapidly – recently, data from the phase III TROPIC study revealed a survival advantage with the novel taxane cabazitaxel/prednisone (compared with mitoxantrone/prednisone) in a cohort of 755 men with docetaxel-refractory metastatic CRPC. Interestingly, cabazitaxel bears substantial structural similiarity to docetaxel but appears to be mechanistically distinct. In preclinical studies, the agent has antitumor activity in a variety of docetaxel-refractory in vitro and in vivo models. Subsequent to phase I testing in advanced solid tumors (where neutropenia was identified as a dose-limiting toxicity), the agent was assessed in a phase II trial in advanced, taxane-refractory breast cancer and in the aforementioned phase III TROPIC study. This review describes in detail the preclinical and clinical development of cabazitaxel.

**Keywords:** cabazitaxel, castration resistant prostate cancer, Jevtana, breast cancer, taxane

## Introduction

In 2010, it is estimated that prostate cancer will account for 28% of newly diagnosed cancers among males in the United States.[1] A large majority of these cases (approximately 92%) will be diagnosed at a local or regional stage, with 5-year survival rates approaching 100%. However, for individuals who are diagnosed with (or subsequently develop) metastatic prostate cancer the prognosis remains limited.[2] Until recently, the treatment algorithm for metastatic disease remained relatively simple. Observations by Huggins et al in 1941 suggested that castration could induce regression of prostatic tumors.[3,4] Thereafter, permutations of synthetic luteinizing hormone releasing hormone (LHRH) agonists and antiandrogen therapy supplanted surgical intervention.[5–8] Upon failure of these therapies, further options were limited until recently. Two large, randomized phase III trials demonstrated an overall survival (OS) advantage with docetaxel compared to mitoxantrone-based regimens.[9,10] Beyond docetaxel, strategies such as crossing over to mitoxantrone-based regimens appear to be of limited efficacy.[11,12]

Clinical data have amassed over the past several years that now position several agents in either the pre- or postdocetaxel space (and potentially both) in the prostate cancer treatment paradigm.[13] The phase III IMPACT trial assessed sipuleucel-T, an autologous cellular vaccine, in a largely chemotherapy-naïve cohort of patients with castration-resistant prostate cancer (CRPC).[14] Relative to placebo, sipuleucel-T significantly prolonged OS (25.8 vs 21.7 months, $P = 0.04$), leading to Food and Drug Administration (FDA) approval of this agent. As an alternative, several novel endocrine therapies have shown substantial efficacy in the setting of CRPC. Promising phase II

Correspondence: Sumanta Kumar Pal
Division of Genitourinary Malignancies,
Department of Medical Oncology
and Experimental Therapeutics, City
of Hope Comprehensive Cancer Center,
Los Angeles, CA, USA
Tel +1 (626) 256-4673
Fax +1 (626) 301-8233
Email spal@coh.org

Clinical Interventions in Aging 2010:5 395–402

**395**

© 2010 Pal et al, publisher and licensee Dove Medical Press Ltd. This is an Open Access article which permits unrestricted noncommercial use, provided the original work is properly cited.

SA_JEV_0002406

Pal et al

Dovepress

data for abiraterone, MDV3100, and TAK700 have led to the design of large, randomized trials.[15–21] Notably, a placebo-controlled, phase III study enrolling patients with docetaxel-refractory CRPC demonstrated a survival advantage with abiraterone therapy.[22] Just as these novel therapies challenge the paradigm of 'castration resistance' in the setting of CRPC (Figure 1), clinical data for the novel taxane cabazitaxel suggest that a chemotherapeutic strategy may be effective even after failure of docetaxel. Herein, the development and clinical implementation of cabazitaxel are reviewed in detail.

## Mechanism of action/preclinical data

Whereas vinca alkaloids inhibit incorporation of tubulin into microtubules, the taxanes appear to inhibit microtubule disassembly.[23–25] Although the microtubular binding mechanism of cabazitaxel does not appear to be distinct from docetaxel or paclitaxel, the agent is structurally distinct. As noted in Figure 2, hydroxyl groups present in docetaxel are replaced with methoxy groups in cabazitaxel.

Bissery et al reported preclinical data suggesting the in vitro activity of cabazitaxel.[26] Four cell lines were assessed, including P388 (lymphoblastic leukemia), HL60 (promyelocytic leukemia), KB (cervical adenocarcinoma), and Calc18 (breast carcinoma). With a 4-day exposure to the drug, cytotoxicity was noted with relatively low cabazitaxel concentrations ($IC_{50}$ = 3–29 ng/mL). In accompanying in vivo models, the agent was noted to have significant antitumor activity. In murine tumor xenografts (colon C38 and pancreas P03), cabazitaxel elicited complete tumor

regressions. Two schedules of the drug were assessed: 1) a day 1 and 5 schedule with a dose of 58 mg/kg and 2) thrice daily dosing on a day 1 to 5 schedule at 12 mg/kg. The maximally tolerated dose (MTD) was 4.8-fold higher using the former schedule. Notably, in cell lines resistant to a variety of other cytotoxic agents (ie, anthracyclines, vinca alkaloids, and the older taxanes), cabazitaxel was noted to still induce tumor regression.

The activity of cabazitaxel was subsequently documented in human tumor xenografts using a variety of intravenous schedules.[27] In 3 human colorectal cell lines (HCT-116, HCT-8, and HT-29), high antitumor activity was observed. For instance, on a thrice daily schedule given every 3 days, cabazitaxel induced a 3.34 log cell kill (LCK) at the total highest nontoxic dose (THNTD), 36 mg/kg. In lung models, dosing at the THNTD yielded 2.7 LCK in the NCI-H460 cell line, and 2.2 LCK in the A549 cell line. As observed in murine tumor xenograft studies, multiple cases of complete regression were observed using human tumor xenografts. Notably, long-term tumor-free survival (exceeding 133 days) and complete tumor regression were observed in pancreatic xenografts (MIA PaCa-2), head and neck xenografts (SR475), and prostate xenografts (DU145, a cell line that represents a hormone-resistant entity established from a prostate cancer brain metastasis).[28]

## Pharmacokinetics/pharmacodynamics

Pharmacokinetic parameters associated with cabazitaxel were first documented in animal studies.[29] Using [14]C-labeled cabazitaxel, doses of 15, 30, and 90 mg/m[2] were delivered to



**Figure 1** Existing and evolving paradigms in the treatment of metastatic prostate cancer.
**Abbreviation:** LHRH, luteinizing hormone releasing hormone.

SA_JEV_0002407

**Figure 2** The chemical structure of cabazitaxel ($C_{45}H_{57}NO_{14}\cdot C_3H_6O$, MW = 894.01). Highlighted in red are methoxy side chains that substitute hydroxyl groups found in docetaxel.

mice as either 1-minute or 1-hour infusions. Radioactivity was measured in the blood, plasma, and brain. There was a correlation between dose and plasma exposure within the aforementioned dosing range, whereas brain exposure increased more than proportionally over the same range. The peak of brain concentrations occurred between 2 minutes and 1 hour post-infusion. Parallel assessments performed in dogs using a dose of 15 mg/m[2] over 80 minutes suggested lesser brain exposure as compared to mice. Of note, brain concentrations of [14]C-labeled cabazitaxel were detectable up to 168 hours after infusion in mice, and for up to 24 hours in dogs. This ability to concentrate in the brain is not typical for other taxanes.

The role of P-glycoprotein (P-gp) in the accumulation of cabazitaxel in the brain was assessed more extensively in a report by Cisternino et al.[30] Again using [14]C-labeled cabazitaxel, doses ranging between 15 and 90 mg/m[2] were delivered to mice, and doses of either 15 or 60 mg/m[2] were delivered to rats. It was noted that brain uptake of cabazitaxel was enhanced when concentrations exceeded 11 µM. These saturable kinetics suggested the role of a critical transporter (ie, P-gp) in transporting cabazitaxel across the blood–brain barrier (BBB) upon a certain threshold (saturation was found to be at 13 µM). To further test this hypothesis, animals were concomitantly dosed with the P-gp inhibitor verapamil. Verapamil co-administration led to a 2.9-fold and 4.7-fold increase in brain uptake in mice and rats, respectively. Harnessing these pharmacokinetic properties, the activity of cabazitaxel has been documented in brain tumor models.[31] Using SF-295 and U251 human glioblastoma cell lines, both orthotopic and subcutaneous murine xenografts

were generated. Cabazitaxel treatment led to complete regression in the majority of subcutaneously implanted tumors. Furthermore, in orthotopic models, cabazitaxel led to complete tumor regression in 4 out of 10 U251 tumors.

A phase I clinical trial of 3-weekly cabazitaxel enrolled patients with advanced solid malignancies refractory to conventional treatments.[32] With respect to prior therapy, patients were limited to less than 2 prior chemotherapy regimens for metastatic disease and radiation affecting less than 25% of the available hematopoietic reserve. A starting dose of 10 mg/m[2] was selected, representing one-tenth the severe toxic dose in mice ($STD_{10}$). Given that the $STD_{10}$ in mice corresponded to a plasma level of 10.8 µg/mL, pharmacokinetic monitoring was performed during the first course of therapy and dose-escalation was to be terminated for plasma levels beyond this value.

In total, 25 patients were treated with 102 courses of 3-weekly cabazitaxel at 4 dose levels, ranging from 10 mg/m[2] to 25 mg/m[2].[32] A total of 22 patients had received prior chemotherapy (88%), and 8 patients had received prior taxane-based therapy (32%). Although a diverse array of tumor types was enrolled, the largest subgroup comprised patients with prostate cancer (8 patients, 32%). A median of 4 cycles (range 1–9) was administered. Pharmacokinetic analyses suggested that cabazitaxel absorption best fit a triphasic model. A rapid initial phase was followed by a longer intermediate phase ($t_{1/2}$ = 2.5 minutes and 1.3 hours, respectively). Finally, a prolonged terminal phase ($t_{1/2}$ = 77.3 hours) was observed.

The dose-limiting toxicity (DLT) of cabazitaxel was neutropenia, with 1 case of febrile neutropenia and 2 cases

SA_JEV_0002408

of grade 4 neutropenia occurring at a dose of 25 mg/m². Accordingly, the recommended phase II dose emerging from this study was 20 mg/m².[32] Notably, support with granulocyte colony-stimulating factor (G-CSF) or granulocyte macrophage colony-stimulating factor was not utilized in these studies, although it was ultimately administered in patients incurring grade 4 neutropenia. Nonhematologic toxicities were generally mild in nature; the most commonly encountered adverse events were diarrhea (52%), nausea (40%), and vomiting (15%). Only 1 grade 3 nonhematologic event was recorded – diarrhea in a patient dosed at 15 mg/m² (resolving shortly after therapy with loperamide). In this initial clinical experience, 2 confirmed partial responses were observed, both in patients with prostate cancer. One patient had previously received mitoxantrone, while the other had progressed on docetaxel. An unconfirmed partial response was observed in a patient with bladder cancer, and minor responses were seen in 2 patients with osteosarcoma and prostate cancer, respectively. Stable disease (SD) was recorded as a best response in 12 patients (48%).

## Phase II data in breast cancer

A phase II study in breast cancer was originally designed as a randomized 3-arm study to explore 2 distinct dosing regimens of cabazitaxel and to further assess the activity of the novel taxane larotaxel. (the activity of larotaxel has been documented in phase I and II studies in breast and lung cancer).[33–36] Due to poor accrual, it was ultimately modified to be a single-arm study evaluating cabazitaxel alone in patients with taxane-resistant metastatic breast cancer. In the setting of patients who had received adjuvant or neoadjuvant taxane therapy, resistance was defined as metastatic progression within 12 months of systemic therapy. For patients with metastatic disease, the definition was more complex; resistance was characterized as: 1) progressive disease (PD) representing the best response to treatment, 2) PD occurring within 4 months after first- or second-line therapy (after an initial clinical benefit), or 3) SD representing the best response if a taxane had been administered for 3 or more months. Patients were treated initially with a dose of 20 mg/m², which was escalated to 25 mg/m² in those patients who did not incur a significant adverse event during the first cycle of therapy. Patients who were HER2-positive were allowed to enroll if they had progressed on a trastuzumab-based regimen; otherwise, the study was limited to HER2-negative patients.

The study was powered to assess objective response rate (ORR) by Response Evaluation Criteria in Solid Tumors (RECIST) guidelines, with secondary endpoints including duration of response, time to progression, and OS.[36] The study was stratified by the number of lines of previous taxane-based therapy. Stratum 1 consisted of 47 patients who had progressed after either first-line systemic therapy for advanced disease or adjuvant/neoadjuvant taxanes; stratum 2 consisted of 20 patients who had progressed on second-line therapy for advanced disease. The median age of enrolled patients was 53 years, with an expected distribution of hormone receptor-positive and HER2-positive tumors (52% and 27%, respectively). The majority of patients had received prior chemotherapy for advanced disease, with only 1 patient having received adjuvant therapy. Seven patients (10%) had received multiple forms of taxane therapy.

Among treated patients, the ORR was 14% (95% confidence interval [CI], 7%–24%), with no differences between the two pre-defined strata (14% for stratum 1 and 12% for stratum 2).[36] The median duration of response was 7.6 months (range 2.6–18.7 months). A significant proportion of patients also exhibited SD as a best response (38%). Two patients were noted to have a complete response to cabazitaxel therapy. Mirroring the phase I experience, the most common grade 3/4 toxicity incurred was neutropenia, present in 73% of the patients. Two patients developed febrile neutropenia, while 3 patients developed neutropenic infections. Two deaths were recorded within 30 days of on-study therapy; both were secondary to nonhematologic toxicities. In the first patient, death occurred due to respiratory failure that was possibly related to study therapy, and in the second patient, the cause of death was unknown. The results for cabazitaxel in breast cancer have drawn multiple comparisons to the novel epithilone ixabepilone, which also impacts microtubule function and has been assessed in phase III trials in this disease.[37]

## Phase III data

The information garnered from phase I and II studies, encompassing multiple malignancies, were used to inform the design of the phase III TROPIC trial comparing cabazitaxel/prednisone with mitoxantrone/prednisone in patients with docetaxel-refractory prostate cancer.[38] The study itself represented somewhat of a paradigm shift, given the absence of prior phase II studies assessing cabazitaxel specifically in the setting of prostate cancer. However, no viable therapeutic options were available to the docetaxel-refractory patient at the time the study was initiated, generating a substantial area of need. Furthermore, abundant preclinical data in docetaxel-refractory cell lines and an initial clinical demonstration of safety and efficacy in solid tumors supported this larger undertaking.

submit your manuscript | www.dovepress.com

Dovepress

SA_JEV_0002409

In TROPIC, progression on docetaxel was defined by RECIST in patients with measurable disease, or by 2 consecutive prostate-specific antigen (PSA) rises (at least 1 week apart) in patients with nonmeasurable disease.[38] Orchiectomy or prior pharmacologic androgen deprivation was mandated, and patients who were receiving LHRH agonists were instructed to continue taking them during protocol therapy.

Ultimately, 755 men were randomized (378 to cabazitaxel and 377 to mitoxantrone) in a total of 26 countries. The median age of the study population was 68 years, and the majority of patients were Caucasian (84%).[38] Although enrollment was originally conducted irrespective of the amount of prior docetaxel therapy, the study was ultimately modified to exclude patients who had received a cumulative dose of less than 225 mg/m$^2$. This amendment was made in light of guidelines suggesting that castrate-resistant prostate cancer therapy be maintained for a period of at least 3 cycles prior to instituting any change. The mean docetaxel dose in the experimental arm was 576.6 mg/m$^2$, compared with 529.2 mg/m$^2$ in the control arm. A substantial proportion of patients progressed on docetaxel therapy either during treatment (29%) or within 3 months of its completion (45%); the mean time from the last docetaxel dose to disease progression was 0.8 months in the experimental arm and 0.9 months in the control arm. Although most patients had bony metastases (84%), a considerable proportion did have visceral metastases (25%).

Whereas the phase II experience in breast cancer initiated 3-weekly dosing of cabazitaxel at 20 mg/m$^2$, in TROPIC, patients were initiated at 25 mg/m$^2$. Patients randomized to receive mitoxantrone were started on a conventional dose of 12 mg/m$^2$ every 3 weeks. Both arms received prednisone 10 mg oral daily. In order to limit the risk of mitoxantrone-induced cardiac dysfunction, therapy on both arms was limited to a total of 10 cycles. While growth factor support was not allowed at the initiation of therapy, it was permitted to treat extended neutropenia (>7 days), neutropenic infection, or neutropenic fever.

The primary endpoint of the study was OS, with a secondary endpoint of progression-free survival (PFS). PFS was defined by the occurrence of one of several clinical events, including PSA progression, radiographic progression, progression of pain (measured by the McGill-Melzack present pain intensity scale, PPI) or death. The study met its primary endpoint, with an improvement in OS of 2.4 months favoring cabazitaxel therapy (15.1 vs 12.7 months; hazard ratio [HR] 0.70, 95% CI 0.59–0.83, $P < 0.001$). The benefit

of cabazitaxel for survival appeared to extend across the majority of subgroups assessed, including subgroups divided by performance status (ECOG 0-1 or ECOG 2), measureable disease (absent or present), number of previous chemotherapeutic agents (1 or ≥2), age (<65 or ≥65), and pain (at baseline, absent or present). Furthermore, subset analyses favored cabazitaxel across groups divided by cumulative docetaxel dose. Cumulative PFS (using the composite endpoint) was also improved with cabazitaxel therapy (2.8 vs 1.4 months, HR 0.74, 95% CI 0.64–0.86, $P < 0.0001$), although time to pain progression (as defined by the PPI inventory) did not significantly improve. PSA response rate was 39.2% vs 17.8% ($P = 0.002$) and median time to PSA progression was 6.1 vs 3.1 months ($P = 0.001$), both favoring cabazitaxel.

Mirroring the phase I and II experiences, the most common toxicity associated with cabazitaxel therapy was neutropenia. Grade ≥ 3 neutropenia occurred in 82% of cabazitaxel patients, with 8% of patients developing febrile neutropenia. Common nonhematologic toxicities in patients receiving cabazitaxel included diarrhea, fatigue, and asthenias (all grades: 47%, 37%, and 20%, respectively). A total of 18 patients (5%) died within 30 days of the last cabazitaxel infusion, compared with 9 patients (2%) receiving mitoxantrone therapy within the same time frame. In the cabazitaxel arm, 7 patients (2%) died of complications related to neutropenia, while 5 patients (1%) died of cardiac causes.

## Safety considerations

Several factors may influence the toxicities associated with cabazitaxel therapy. In the TROPIC trial, diarrhea appeared to be more prevalent in older patients (55.7% vs 44.5% in patients aged ≥75 or <75, respectively; $P < 0.1$) and in patients who had previously received radiotherapy (50.0% vs 41.4% in patients with and without prior exposure, respectively).[39] The most prevalent toxicity, neutropenia, occurred at a frequency 6.6% higher in patients aged ≥65 compared with those <65. Furthermore, the incidence of neutropenia varied significantly by region, with rates of neutropenia in North America exceeding those in the Europe. Analyses are currently underway to determine the extent of growth factor use both in the study population at large and within these subgroups (notably, cycle 1 prophylaxis with growth factors was not allowed in the TROPIC protocol). Until these data are available, the currently available FDA label suggests the use of primary prophylaxis with G-CSF in those patients who are considered high risk, as delineated in Table 1.

submit your manuscript | www.dovepress.com

SA_JEV_0002410

Dovepress

**Table 1** Special precautions for use of cabazitaxel

| Toxicity | Description |
|---|---|
| Neutropenia | Neutropenic deaths have been reported with cabazitaxel therapy. Administration of G-CSF may be considered to reduce the risks of neutropenic complications. Primary prophylaxis should be considered in high-risk groups defined by the following features:<br>• Age >65 years<br>• Extensive prior radiation<br>• Poor nutrition<br>• Previous febrile neutropenia<br>• Poor performance status<br>• Other serious medical co-morbidities |
| Diarrhea | Mortality related to diarrhea has been reported with cabazitaxel. Hydration, antiemetics and antidiarrheals should be used to treat symptoms; however, for grade >3 diarrhea, dose reduction should be considered. |
| Hepatic impairment | Cabazitaxel should not be used in the setting of hepatic impairment; these patients were excluded from current trials of cabazitaxel therapy. |
| Hypersensitivity | Given that severe hypersensitivity reactions have been observed with cabazitaxel, premedication with $H_2$-antagonists and corticosteroids is recommended. |

**Abbreviation:** G-CSF, granulocyte colony-stimulating factor.

As yet, there are no head-to-head trials comparing docetaxel and cabazitaxel, making it challenging to juxtapose both the efficacy and toxicity of these agents. Nonetheless, the rates of neuropathy with cabazitaxel were relatively low, only 1% of patients reporting a grade 3/4 event (14% for all grades).[38] It should be noted that patients with grade 2 or higher peripheral neuropathy in association with docetaxel were excluded from TROPIC, confounding any comparisons with this agent. Another important distinction between cabazitaxel and docetaxel is the premedication regimen proposed for each. In SWOG 9916 and TAX 327, patients receiving 3-weekly docetaxel received 60 mg and 24 mg of oral dexamethasone divided over 3 doses, respectively.[9,10] In contrast, patients receiving cabazitaxel in the TROPIC study received 8 mg of intravenous dexamethasone in conjunction with an antihistamine and $H_2$-antagonist.[38] In the setting of certain co-morbidities (ie, diabetes), the latter regimen may be preferable.

## Conclusions

Therapy with cabazitaxel in docetaxel-refractory CRPC has already been adopted as a category 1 recommendation in National Comprehensive Cancer Network Criteria.[40]

However, the challenge that lies ahead is multifold. Given the efficacy of cabazitaxel in the heavily pretreated population in the TROPIC study, could cabazitaxel potentially be moved forward in the current therapeutic algorithm for prostate cancer (Figure 1)? Furthermore, underway are numerous clinical studies assessing synergy of docetaxel with a range of agents. Some of the reports thus far have been sobering. For instance, the phase III Cancer and Leukemia Group B (CALGB) 90401 trial showed no OS benefit with the addition of bevacizumab to docetaxel.[41] Nonetheless, several other phase III efforts are underway, including studies pairing docetaxel with the endothelin antagonists zibotentan and atrasentan, and the antiangiogenic/immunomodulatory agent lenalidomide.[42–44] With its efficacy now demonstrated, the investigator may be inclined to assess cabazitaxel in the same combinations currently being investigated with docetaxel. The research community is cautioned to perform appropriate preclinical and clinical safety testing prior to embarking on larger efforts assessing such combinations. Several ongoing clinical trials of cabazitaxel both alone and in combination with other cytotoxic agents are denoted in Table 2. Furthermore, cabazitaxel/prednisone (dosed at both 20 and 25 mg/m$^2$) will be compared to docetaxel/prednisone (at a standard dose of 75 mg/m$^2$) as first-line chemotherapy

**Table 2** Listed studies evaluating the clinical efficacy and safety of cabazitaxel[47–50]

| Identifier | Planned enrollment | Primary objective |
|---|---|---|
| NCT01140607 | 75 | To determine the MTD and safety of cabazitaxel when administered every 3 weeks in patients with advanced solid tumors with varying degrees of hepatic impairment. |
| NCT00925743 | 30 | To determine the DLT of cabazitaxel in combination with cisplatin when administered every 3 weeks in patients with advanced solid tumors. |
| NCT01001221 | 30 | To determine the MTD and DLT of cabazitaxel in combination with gemcitabine when administered every 3 weeks in patients with advanced solid tumors. To determine the antitumor activity of cabazitaxel with gemcitabine in an expanded cohort (treated at the determined MTD) as assessed by objective response. |
| NCT01087021 | 45 | To determine the potential effect on QTcF interval (QTc Fridericia) of cabazitaxel in patients with advanced solid tumors. |

**Abbreviations:** DLT, dose-limiting toxicity; MTD, maximally tolerated dose.

submit your manuscript | www.dovepress.com

Dovepress

SAJ_JEV_0002411

in metastatic CRPC. The primary endpoint in this study is OS. Problematic in the trial design is the fact patients progressing on docetaxel (but not cabazitaxel) will have a known effective salvage therapy.

The role of docetaxel in distinct settings of prostate cancer may similarly guide clinical implementation of cabazitaxel. For instance, CALGB 90203 is a randomized, phase III effort comparing 6 cycles of neoadjuvant docetaxel therapy preceding prostatectomy with prostatectomy alone in the setting of high-risk, localized disease.[45] If the trial yields promising results, the application of cabazitaxel as neoadjuvant therapy could be explored. Further, it remains to be seen whether cabazitaxel has specific activity in the context of aggressive prostatic cancer histologies, such as tumors bearing neuroendocrine features. Available clinical data suggest limited efficacy of docetaxel and other standard cytotoxic agents in this setting.[46] Questions remain about the dosing regimen chosen in the TROPIC study; ie, could toxicity have been mitigated by starting with a dose of 20 mg/m$^2$? As previously noted, this represented the initial dose utilized in a phase II study of cabazitaxel in breast cancer. In that study, allowance of dose escalation to 25 mg/m$^2$ was contingent upon completion of the first cycle of therapy with no toxicity. The aforementioned phase III first line trial in metastatic CRPC will help to address this issue.

Finally, it is not known yet whether the activity of cabazitaxel in docetaxel-refractory CRPC will translate to other tumor types. The previously noted phase II study assessing the agent in taxane-refractory advanced breast cancer may stimulate further trials in this disease.[36] Furthermore, urothelial carcinoma, lung cancer, ovarian cancer, and countless other malignancies where taxanes have a described clinical benefit may represent new domains where cabazitaxel therapy could be examined.

## Acknowledgments

Dr Pal's efforts are supported by the NIH Loan Repayment Plan (LRP), the CBCRP 15IB-0140 (California Breast Cancer Research Program Junior IDEA Award) and NIH K12 2K12CA001727-16A1. The authors would also like to acknowledge the generous support of Nancy and Ira Norris.

## Disclosure

Sumanta Kumar Pal, MD: Honoraria: Glaxo-Smith-Kline, Pfizer, Sanofi-Aventis, Novartis; Research Support: Amgen; Consulting: Novartis, Genentech; Przemyslaw Twardowski, MD: Honoraria: Sanofi-Aventis; Oliver Sartor, MD: Research Support: Sanofi-Aventis, Johnson & Johnson; Consulting: Sanofi-Aventis, Johnson & Johnson, Medivation.

## References

1. Jemal A, Siegel R, Xu J, Ward E. Cancer Statistics, Wiley Subscription Services, Inc., A Wiley Company; 2010.
2. Wayland H, Kelvin AM, Michael G, Ashesh BJ, Peter JR, Viraj AM. Stage IV prostate cancer: survival differences in clinical T4, nodal and metastatic disease. *J Urol*. 2010;184(2):512–518.
3. Huggins C, Hodges CV. Studies on prostatic cancer. I. The effect of castration, of estrogen and of androgen injection on serum phosphatases in metastatic carcinoma of the prostate. *Cancer Res*. 1941;1(4):293–297.
4. Huggins C, Stevens RE Jr, Hodges CV. Studies on prostate cancer: II. The effects of castration on advanced carcinoma of the prostate gland. *Arch Surg*. 1941;43(2):209–223.
5. Aragon-Ching JB, Williams KM, Gulley JL. Impact of androgen-deprivation therapy on the immune system: implications for combination therapy of prostate cancer. *Front Biosci*. 2007;12:4957–4971.
6. Eisenberger M, O'Dwyer P, Friedman M. Gonadotropin hormone-releasing hormone analogues: a new therapeutic approach for prostatic carcinoma. *J Clin Oncol*. 1986;4(3):414–424.
7. Scher H, Kelly W. Flutamide withdrawal syndrome: its impact on clinical trials in hormone-refractory prostate cancer. *J Clin Oncol*. 1993;11(8):1566–1572.
8. Scher H, Liebertz C, Kelly W, et al. Bicalutamide for advanced prostate cancer: the natural versus treated history of disease. *J Clin Oncol*. 1997;15(8):2928–2938.
9. Petrylak DP, Tangen CM, Hussain MH, et al. Docetaxel and estramustine compared with mitoxantrone and prednisone for advanced refractory prostate cancer. *N Engl J Med*. 2004;351(15):1513–1520.
10. Tannock IF, de Wit R, Berry WR, et al. Docetaxel plus prednisone or mitoxantrone plus prednisone for advanced prostate cancer. *N Engl J Med*. 2004;351(15):1502–1512.
11. Berthold DR, Pond GR, de Wit R, Eisenberger M, Tannock IF. Survival and PSA response of patients in the TAX 327 study who crossed over to receive docetaxel after mitoxantrone or vice versa. *Ann Oncol*. 2008;19(10):1749–1753.
12. Armstrong AJ, Garrett-Mayer E, de Wit R, Tannock I, Eisenberger M. Prediction of survival following first-line chemotherapy in men with castration-resistant metastatic prostate cancer. *Clinical Cancer Research*. 2010;16(1):203–211.
13. Longo DL. New therapies for castration-resistant prostate cancer. *N Engl J Med*. 363(5):479–481.
14. Kantoff PW, Higano CS, Shore ND, et al. Sipuleucel-T immunotherapy for castration-resistant prostate cancer. *N Engl J Med*. 363(5):411–422.
15. NCT00887198: Abiraterone acetate in asymptomatic or mildly symptomatic patients with metastatic castration-resistant prostate cancer. http://www.clinicaltrials.gov. Accessed 2009 Jul 29.
16. NCT00638690: Abiraterone acetate in castration-resistant prostate cancer previously treated with docetaxel-based chemotherapy. http://www.clinicaltrials.gov. Accessed 2009 Jul 29.
17. NCT01193257: A phase 3, randomized, double-blind, multicenter trial comparing orteronel plus prednisone with placebo plus prednisone in patients with metastatic castration-resistant prostate cancer that has progressed during or following docetaxel-based therapy. http://www.clinicaltrials.gov. Accessed 2010 Oct 2.
18. Attard G, Reid AHM, A'Hern R, et al. Selective inhibition of CYP17 with abiraterone acetate is highly active in the treatment of castration-resistant prostate cancer. *J Clin Oncol*. 2009;27(23):3742–3748.
19. Attard G, Reid AHM, Yap TA, et al. Phase I clinical trial of a selective inhibitor of CYP17, abiraterone acetate, confirms that castration-resistant prostate cancer commonly remains hormone driven. *J Clin Oncol*. 2008;26(28):4563–4571.

SA_JEV_0002412

20. Scher HI, Beer TM, Higano CS, et al. Antitumour activity of MDV3100 in castration-resistant prostate cancer: a phase 1–2 study. *Lancet.* 2010 Apr 4;375(9724):1437–1446.

21. NCT00974311: AFFIRM: a multinational phase 3, randomized, double-blind, placebo-controlled efficacy and safety study of oral MDV3100 in patients with progressive castration-resistant prostate cancer previously treated with docetaxel-based chemotherapy. http://www.clinicaltrials.gov. Accessed 2010 Oct 2.

22. de Bono JS, Logothetis C, Fizazi K, et al. Abiraterone acetate plus low dose prednisone improves overall survival in patients with metastatic castration-resistant prostate cancer (CRPC) who have progressed after docetaxel-based chemotherapy: results of COU-AA-301, a randomized double-blind placebo-controlled phase 3 study. 2010 European Society for Medical Oncology (ESMO) Annual Meeting on 2010 Oct 11.

23. Kumar N. Taxol-induced polymerization of purified tubulin. Mechanism of action. *J Biol Chem.* 1981;256(20):10435–10441.

24. Caplow M, Zeeberg B. Dynamic properties of microtubules at steady state in the presence of taxol. *Eur J Biochem.* 1982;127(2): 319–324.

25. White J, Rao G. Effects of a microtubule stabilizing agent on the response of platelets to vincristine. *Blood.* 1982;60(2):474–483.

26. Bissery M-C, Bouchard H, Riou J, Vrignaud P, Combeau C, Bourzat JD. Preclinical evaluation of TXD258, a new taxoid. Proceedings of the American Association for Cancer Research. 2000:41. Abstract 1364.

27. Vrignaud P, Lejeune P, Chaplin D, Lavelle F, Bissery M-C. In vivo efficacy of TXD258, a new taxoid, against human tumor xenografts. Proceedings of the American Association for Cancer Research. 2000: 41. Abstract 1365.

28. Stone KR, Mickey DD, Wunderli H, Mickey GH, Paulson DF. Isolation of a human prostate carcinoma cell line (DU 145). *Int J Cancer.* 1978;21(3):274–281.

29. Archimbaud Y, Gires P, Pellerin R, Nichele G, Poulet D. Pharmacokinetics of a new taxoid, 14C-TXD258, in blood, plasma and brain of the mouse, rat and dog. Proceedings of the American Association for Cancer Research. 2000:41. Abstract 1375.

30. Cisternino S, Bourasset F, Archimbaud Y, Semiond D, Sanderink G, Scherrmann JM. Nonlinear accumulation in the brain of the new taxoid TXD258 following saturation of P-glycoprotein at the blood-brain barrier in mice and rats. *Br J Pharmacol.* 2003;138(7):1367–1375.

31. Dykes D, Sarsat J, Bissery M-C. Efficacy evaluation of TXD258, a taxoid compound against orthotopic and subcutaneous glioblastomas. Proceedings of the American Association for Cancer Research. 2000: 41. Abstract 1916.

32. Mita AC, Denis LJ, Rowinsky EK, et al. Phase I and pharmacokinetic study of XRP6258 (RPR 116258A), a novel taxane, administered as a 1-hour infusion every 3 weeks in patients with advanced solid tumors. *Clin Cancer Res.* 2009;15(2):723–730.

33. Dieras V, Limentani S, Romieu G, et al. Phase II multicenter study of larotaxel (XRP9881), a novel taxoid, in patients with metastatic breast cancer who previously received taxane-based therapy. *Ann Oncol.* 2008;19(7):1255–1260.

34. Metzger-Filho O, Moulin C, de Azambuja E, Ahmad A. Larotaxel: broadening the road with new taxanes. *Expert Opin Investig Drugs.* 2009;18(8):1183–1189.

35. Yamamoto N, Boku N, Minami H. Phase I study of larotaxel administered as a 1-h intravenous infusion every 3 weeks to Japanese patients with advanced solid tumours. *Cancer Chemother Pharmacol.* 2009;65(1):129–136.

36. Pivot X, Koralewski P, Hidalgo JL, et al. A multicenter phase II study of XRP6258 administered as a 1-h i.v. infusion every 3 weeks in taxane-resistant metastatic breast cancer patients. *Ann Oncol.* 2008; 19(9):1547–1552.

37. Hortobagyi GN, Gomez HL, Li RK, et al. Analysis of overall survival from a phase III study of ixabepilone plus capecitabine versus capecitabine in patients with MBC resistant to anthracyclines and taxanes. *Breast Cancer Res Treat.* 2010;122(2):409–418.

38. De Bono JS, Oudard S, Ozguroglu M, et al. Prednisone plus cabazitaxel or mitoxantrone for metastatic castration-resistant prostate cancer progressing after docetaxel treatment: a randomised open-label trial. *Lancet.* 2010;376(9747):1147–1154.

39. De Bono JS, Oudard S, Ozguroglu M, et al. Prednisone plus cabazitaxel or mitoxantrone for metastatic castration-resistant prostate cancer progressing after docetaxel treatment: a randomised open-label trial. 376(9747):Web Appendix 1.

40. NCCN Clinical Practice Guidelines in Oncology: Prostate Cancer (v.2.2009). http://www.nccn.org Accessed. 2009 Jul 29.

41. Kelly WK, Halabi S, Carducci MA, et al. A randomized, double-blind, placebo-controlled phase III trial comparing docetaxel, prednisone, and placebo with docetaxel, prednisone, and bevacizumab in men with metastatic castration-resistant prostate cancer (mCRPC): survival results of CALGB 90401. *J Clin Oncol (Meeting Abstracts).* 2010; 28 Suppl 18:LBA4511.

42. NCT00617669: A phase III, randomised, double-blind, placebo-controlled study to assess the efficacy and safety of 10 mg ZD4054 (zibotentan) in combination with docetaxel in comparison with docetaxel in patients with metastatic hormone-resistant prostate cancer. http://www.clinicaltrials.gov. Accessed 2010 Oct 7.

43. NCT00134056: Phase III study of docetaxel and atrasentan versus docetaxel and placebo for patients with advanced hormone refractory prostate cancer. http://www.clinicaltrials.gov. Accessed 2010 Oct 7.

44. NCT00988208: A phase 3 study to evaluate the efficacy and safety of docetaxel and prednisone with or without lenalidomide in subjects with castrate-resistant prostate cancer. http://www.clinicaltrials.gov. Accessed 2010 Oct 7.

45. NCT00430183: Randomized phase III study of neo-adjuvant docetaxel and androgen deprivation prior to radical prostatectomy versus immediate radical prostatectomy in patients with high-risk, clinically localized prostate cancer. http://www.clinicaltrials.gov. Accessed 2010 Nov 7.

46. Culine S, El Demery M, Lamy P-J, Iborra F, Avancès C, Pinguet F. Docetaxel and cisplatin in patients with metastatic androgen independent prostate cancer and circulating neuroendocrine markers. *J Urol.* 2007;178(3):844–848.

47. NCT01140607: Phase I safety and pharmacokinetic study of XRP6258 (cabazitaxel) in advanced solid tumor patients with varying degrees of hepatic impairment. http://www.clinicaltrials.gov. Accessed 2010 Oct 5.

48. NCT00925743: A dose-escalation study of the safety, tolerability, and pharmacokinetics of cabazitaxel in combination with cisplatin administered every 3 weeks in subjects with advanced solid malignancies. http://www.clinicaltrials.gov. Accessed 2010 Oct 5.

49. NCT01001221: A dose-escalation, single arm, combination study of cabazitaxel with gemcitabine to determine the safety, and pharmacokinetics in subjects with advanced solid malignancies. http://www.clinicaltrials.gov. Accessed 2010 Oct 5.

50. NCT01087021: QT-Cab: an open-label study to investigate the effect of cabazitaxel on the QTc interval in cancer patients. http://www.clinicaltrials.gov. Accessed 2010 Oct 5.

Clinical Interventions in Aging

Dovepress

**Publish your work in this journal**

Clinical Interventions in Aging is an international, peer-reviewed journal focusing on evidence-based reports on the value or lack thereof of treatments intended to prevent or delay the onset of maladaptive correlates of aging in human beings. This journal is indexed on PubMed Central, MedLine, the American Chemical Society's 'Chemical Abstracts Ser-

vice' (CAS), Scopus and the Elsevier Bibliographic databases. The manuscript management system is completely online and includes a very quick and fair peer-review system, which is all easy to use. Visit http://www.dovepress.com/testimonials.php to read real quotes from published authors.

Submit your manuscript here: http://www.dovepress.com/clinical-interventions-in-aging-journal

SA_JEV_0002413



Review

# Improving Outcomes With Recent Advances in Chemotherapy for Castrate-Resistant Prostate Cancer

## Oliver Sartor, Michael Halstead, Leah Katz

## Abstract

The FDA's approval of docetaxel in 2004 created a clear mandate for clinical researchers to create new therapies effective for metastatic castrate-resistant prostate cancer (mCRPC) patients with progression post-docetaxel. In 2010, the first trial to prolong survival in this setting was announced using a cabazitaxel, a novel taxane. This therapeutic agent was specifically designed to have activity in model systems resistant to conventional taxanes. After phase I testing, with observation of clinically significant activity in patients with advanced cancers, cabazitaxel/prednisone was tested in a large phase III trial enrolling patients with mCRPC who had disease progression despite prior docetaxel therapy. This phase III trial TROPIC (Treatment of Hormone-Refractory Metastatic Prostate Cancer Previously Treated With a Taxotere-Containing Regimen), using mitoxantrone/prednisone as a control arm, demonstrated a significant improvement in survival (the primary endpoint). Both subset analyses and secondary endpoints (response rates and time to progression) were supportive of the survival findings. This trial was pivotal for the FDA's approval of the new drug application for cabazitaxel. This review focuses on both the pre-clinical and clinical development of cabazitaxel.

*Clinical Genitourinary Cancer*, Vol. 8, No. 1, 23-28, 2010; DOI: 10.3816/CGC.2010.n.004
Keywords: Cabazitaxel, Docetaxel, Hormone-refractory, TROPIC

## Introduction

On June 17, 2010 the US Food and Drug Administration (FDA) approved a new agent (cabazitaxel) for the treatment of advanced prostate cancer patients with progressive disease despite previous docetaxel treatment. The indications and package insert for cabazitaxel are quite specific and based on the large prospective randomized international "TROPIC" (Treatment of Hormone-Refractory Metastatic Prostate Cancer Previously Treated With a Taxotere-Containing Regimen) trial, sponsored by sanofi-aventis. These data were initially presented at the March 2010 American Society of Oncology (ASCO) Genitourinary Cancer Symposia[1] and now the trial results have been published in the peer-reviewed literature.[2] An FDA-approved package insert is now available[3] and this document, in combination with the data published to date, provide an excellent overview on this topic.

## The Unmet Need in the Post-Docetaxel Space

Patients with metastatic "hormone-refractory" (more recently and properly termed "castrate-resistant") prostate cancer (CPRC)

Tulane Medical School New Orleans, LA

Submitted: Oct 18, 2010; Revised: Nov 1, 2010; Accepted: Nov 3, 2010

Address for correspondence: Oliver Sartor, MD, Tulane University Cancer Center, 1511 Dufossat St., New Orleans, LA 70115
Fax: 504-988-5059; e-mail: osartor@tulane.edu

progressing after docetaxel have had few therapeutic options. Since the approval of docetaxel in 2004 and before the approval of cabazitaxel, there was no clear standard of care for this difficult to treat patient population. Over the course of the past 6 years, many of the post-docetaxel patients have been enrolled on clinical trials, treated with FDA-approved "off-label" chemotherapeutics such as mitoxantrone; glucocorticoids such as dexamethasone; given palliative external beam radiation; or administered intravenous radiopharmaceuticals such as $^{153}$Sm EDTMP or $^{89}$Sr.

Recent clinical trials in this "space" have used a variety of control groups. In the cabazitaxel/prednisone trial, the control arm was mitoxantrone/prednisone. The abiraterone/prednisone trial used prednisone alone as the control. The MDV3100 trial control group simply used a placebo as the control. Based on these disparate control arms in patients with post-docetaxel progressive prostate cancer in near contemporaneous trials, one can easily see the lack of consensus regarding standard of care in this difficult-to-treat group of patients.

The first large prospective randomized trial for second-line chemotherapy for metastatic CRPC patients was the SPARC (Satraplatin Against Refractory Cancer) trial comparing satraplatin/prednisone to a placebo/prednisone.[4] This trial reported an improvement in progression-free survival (PFS) in the experimental arm, however, the overall survival (OS) was not distinct between the control and experimental therapy. Approximately 51% of the patients had been pretreated with docetaxel, however, it is notewor-


CIG media group, lp

This article might include the discussion of investigational and/or unlabeled uses of drugs and/or devices that might not be approved by the FDA.
Electronic forwarding or copying is a violation of US and international copyright laws.
Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by CIG Media Group, LP, ISSN #1558-7673, provided the appropriate fee is paid directly to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923 USA. www.copyright.com 978-750-8400.

SA_JEV_0002416

## Advances in Chemotherapy for Castrate-Resistant Prostate Cancer

**Table 1** Baseline Patient Characteristics Per Protocol in TROPIC

| Characteristic | MP (n = 377) | CBZP (n = 378) |
|---|---|---|
| **Age, Years** | | |
| Median (range) | 67 (47-89) | 68 (46-92) |
| ≥ 65, % | 57.0 | 64.9 |
| **ECOG PS, %** | | |
| 0, 1 | 91.2 | 92.6 |
| 2 | 8.8 | 7.4 |
| **PSA,[a] ng/mL** | | |
| Median (range) | 127.5 (2-11220) | 143.9 (2-7842) |
| **Measurability of Disease** | | |
| Measurable | 54.1 | 53.2 |
| Non-measurable | 45.9 | 46.8 |
| **Disease Site, %** | | |
| Bone | 87.0 | 80.2 |
| Lymph node | 44.8 | 45.0 |
| Visceral | 24.9 | 24.9 |

[a]PSA, ng/mL.
Abbreviations: CBZP = cabazitaxel; ECOG = Eastern Cooperative Oncology Group; MP = melphalan/prednisone; PS = performance status; PSA = prostate specific antigen; TROPIC = treatment of hormone-refractory metastatic prostate cancer previously treated with a taxotere-containing regimen

**Table 2** Pre-Protocol Treatment in TROPIC

| Treatment Characteristic | MP (n = 377) | CBZP (n = 378) |
|---|---|---|
| **Chemotherapy, %** | | |
| 1 regimen | 71.1 | 68.8 |
| 2 regimens | 21.0 | 24.9 |
| ≥ 3 regimens | 8.0 | 6.3 |
| **Docetaxel-Containing Regiments Administered** | | |
| 1 regimen | 86.7 | 83.6 |
| 2 regimens | 11.4 | 14.0 |
| ≥ 3 regimens | 1.9 | 2.4 |
| **Total Prior Docetaxel Dose, mg/m²** | | |
| Median | 529.2 | 576.6 |
| **Months From Last Docetaxel Dose to Progression** | | |
| Median | 0.70 | 0.80 |

Abbreviations: CBZP = cabazitaxel; MP = melphalan/prednisone; TROPIC = treatment of hormone-refractory metastatic prostate cancer previously treated with a taxotere-containing regimen

thy that the SPARC trial was not strictly a post-docetaxel trial as it included a number of patients who progressed after other prior chemotherapies (such as mitoxantrone). The median survival was 14.1 months in each arm of SPARC, which was informative as this was the first large experience in this patient population.

### Pre-Clinical Background for Cabazitaxel

Cabazitaxel is a novel taxane chemotherapy that is similar to, but distinct from, docetaxel. It is complex structure consisting of synthetically-modified natural product with 2 additional methoxy groups added onto the docetaxel structure. It has also been known as RPR116258A, TXD258, or XRP6258. Cabazitaxel was specifically designed to overcome docetaxel resistance using various preclinical model systems. Early mechanistic studies demonstrated that cabazitaxel was as potent as docetaxel in cold-induced tubulin depolymerization assays.[5] In cell lines or xenografts that were resistant to docetaxel and other chemotherapies, however, it was demonstrated that cabazitaxel was more effective in growth inhibition as compared with docetaxel.[5,6] One aspect of its in vitro activity that may or may not have relevance to the mechanism of action is that cabazitaxel is a poor substrate for the drug efflux pump termed PgP (MDR1) which mediates multidrug resistance in a number of in vitro models.[5] Given the lack of efficacy of MDR1 inhibitors in multiple previous clinical trials,[7] it is not yet clear if MDR1 is relevant in explaining the activity of cabazitaxel in the clinic. Cabazitaxel was specifically shown to be highly active at a nontoxic dose in a mouse xenograft model using the prostate cell line DU145.[6] Taken together, the finding that cabazitaxel is as potent as docetaxel in "sensitive" model systems but more active than docetaxel in

model systems that were refractory, lead to the initiation of clinical testing for this novel taxane.

### Phase I Data

Three phase I studies have been performed in heavily pretreated cell tumor patients. These studies were termed V101, V102, and V103 and treated a total of 74 patients and only 1 was published in the peer-reviewed literature.[3,6,8,9] Two of the studies used doses of 10-30 mg/m² as 1 hour intravenous (I.V.) infusion every 3 weeks (V101 and V103), whereas the V102 study examined a weekly dosing regimen for 4 weeks followed by 1 week of rest. In the weekly-dosing regimen 1.5-12 mg/m² were used. With regard to maximal tolerated dosed (MTD) the V101 and V103 studies indicated that doses of 25-30 mg/m² were the MTD, whereas the weekly-dosing study suggested that the 12 mg/m² dose was the MTD. The dose-limiting toxicities were typically related to diarrhea and/or neutropenia. A recommended dose of 20-25 mg/m² was chosen for the 3-week dosing scheduling in subsequent trials. As discussed below, the TROPIC trial used 25 mg/m² as a starting dose.

Cabazitaxel is primarily metabolized in the liver (> 95%) with the CYP3A4/5 isoenzyme accounting for 80%-90% of the metabolism. A smaller amount is metabolized by CYP2C8. Cabazitaxel is the main circulating form after I.V. injection but a variety of additional metabolites are also observed, some of which are active.[3] Cabazitaxel is mainly excreted in the feces as numerous metabolites; the renal excretion is < 5%. Though phase I studies are not designed for evaluation of drug efficacy, partial responses were noted in heavily pretreated patients with castrate-resistant metastatic prostate cancer and metastatic breast cancer.[8]

### Introduction to the TROPIC Trial

In the TROPIC trial, all patients progressed despite previous treatment with docetaxel. Initially the TROPIC trial protocol

SA_JEV_0002417

| **Table 3** Pre-Protocol Treatment in TROPIC | MP | CBZP | HR (95% CI) | *P* Value |
|---|---|---|---|---|
| **Tumor Assessment** | | | | |
| Response rate,[a] % | 4.4 | 14.4 | — | .0005 |
| Median TTP, months | 5.4 | 8.8 | 0.61 (0.49-0.76) | < .0001 |
| **PSA Assessment** | | | | |
| Response rate,[a] % | 17.8 | 39.2 | — | .0002 |
| Median TTP, months | 3.1 | 6.4 | 0.75 (0.63-0.90) | .001 |
| **Pain Assessment** | | | | |
| Response rate,[a] % | 7.8 | 9.2 | — | .6286 |
| Median TTP, months | NR | 11.1 | 0.91 (0.69-1.19) | .5192 |

[a]Determined only for subjects with at baseline measurable disease, PSA ≥ 20 ng/mL, or pain, respectively.

Abbreviations: CBZP = cabazitaxel; MP = melphalan/prednisone; NR = not reached; PSA = prostate specific antigen; TROPIC = treatment of hormone-refractory metastatic prostate cancer previously treated with a taxotere-containing regimen; TTP = time to progression



**Figure 1** TROPIC: Overall Survival

|  | MP | CBZP |
|---|---|---|
| Median OS | 12.7 | 15.1 |
| Hazard Ratio | 0.70 | |
| 95% CI | 0.59-0.83 | |
| *P* Value | < .0001 | |

Number at Risk

| | | | | | | |
|---|---|---|---|---|---|---|
| MP | 377 | 300 | 188 | 67 | 11 | 1 |
| CBZP | 378 | 321 | 231 | 90 | 28 | 4 |

Abbreviations: CBZP = cabazitaxel; MP = melphalan/prednisone; OS = overall survival; TROPIC = treatment of hormone-refractory metastatic prostate cancer previously treated with a taxotere-containing regimen

pretreatment docetaxel dose was unspecified, but the protocol was amended to require a minimal docetaxel dose of at least 225 mg/m². The trial was conducted in 26 countries (Argentina, Belgium, Brazil, Canada, Chile, Czech Republic, Denmark, Finland, France, Germany, Hungary, India, Italy, Korea, Mexico, Netherlands, Russia, Singapore, Slovakia, South Africa, Spain, Sweden, Taiwan, Turkey, UK, and USA) with 146 participating sites. The first patient was enrolled in January 2007 and the last in September 2009.

Inclusion criteria included both castrate-resistant and metastatic prostate cancer with documented disease progression during or after docetaxel. For individuals with measurable disease, the documented progression of disease had to occur by Response Evaluation Criteria in Solid Tumors (RECIST) criteria, and for those individuals with non-measurable disease either documentation of a rising prostate specific antigen (PSA) level or the appearance of new lesions would be acceptable for trial entry. Rising PSA was defined as at least 2 consecutive PSA rises documented over a baseline reference level, and each assay had to be taken at least 1 week apart. Other inclusion criteria included a life expectancy of > 2 months and an Eastern Cooperative Oncology Group (ECOG) performance status of 0-2. Exclusion criteria included previous treatment with mitoxantrone, previous radiation therapy to > 40% of the bone marrow, known brain metastases, or a history of severe hypersensitivity to polysorbate 80 containing drugs. Adequate organ function was required; patients could not be enrolled with neutrophils ≤ 1.5 × 10⁹/L, hemoglobin ≤ 10 g/dL, platelets ≤ 100 × 10⁹/L, total bilirubin ≥ upper limit of normal (ULN), aspartate aminotransferase (AST ≥ 1.5 × ULN, alanine aminotransferase (ALT) ≥ 1.5 × ULN, or creatinine ≥ 1.5 × ULN. Ventricular injection fractions had to be > 50% and the patient had to be off active treatment on any other clinical trial within 30 days of the study enrollment.

The primary endpoint was to determine whether cabazitaxel in combination with prednisone would improve OS when compared with mitoxantrone in combination with prednisone. The prespecified statistical analysis plan (SAP) was for 360 patients to

be enrolled on each arm resulting in a 90% power to detect a 25% reduction in risk of death when using a 2-sided 0.05 α level when there were 511 deaths on study. There were 2 planned interim analyses in the SAP. The first was for futility after 225 PFS events and the second interim analysis was to be conducted for efficacy and potential early stoppage at the time of 307 deaths.

Secondary endpoints included a composite PFS endpoint (defined as the first occurrence of any of the following events: tumor progression per RECIST, PSA progression, pain progression, or death because of any cause. Additional secondary endpoint included response rate in measurable tumors, PSA, pain and time to progression for PSA, pain, and measurable tumors. Given the nature of the composite endpoint for PFS, the pain, tumor measurements, and PSA endpoints were heavily censored at the time of the final analysis. Additionally the overall safety of cabazitaxel in combination with prednisone was assessed using the National Cancer Institute common toxicity criteria for adverse events.

Patients were randomized 1:1 in an open-label study to either I.V. cabazitaxel at a dose of 25 mg/m² or mitoxantrone at a dose of 12 mg/m²; all patients were treated with low-dose prednisone (5 mg twice daily); treatment with luteinizing hormone-releasing hormone analogues was maintained. Both cabazitaxel and mitoxantrone are administered intravenously once every 3 weeks. Given the potential for cardiotoxicity in the mitoxantrone arm, the administration of mitoxantrone was limited to 10 cycles. Given a desire to have balance in the 2 arms regarding duration of chemotherapeutic treatment, cabazitaxel treatments were also limited to 10 cycles. Treatment was continued until disease progression, death, unacceptable toxicity, or a maximum 10 cycles.

Cabazitaxel was administered intravenously over 1 hour. Because of the risk of allergic type reactions, I.V. premedication included an antihistamine (dexchlorpheniramine 5 mg, diphenhydramine 25 mg, or other antihistamine), glucocorticoid (dexamethasone 8 mg or equivalent steroid), and an H2 antagonist (ranitidine or other H2

SA_JEV_0002418

## Advances in Chemotherapy for Castrate-Resistant Prostate Cancer



**Figure 2** Subgroup Analyses of Overall Survival

| Factor | Hazard Ratio (95% CI) | ← Favors CBZP | Favors MP → |
|---|---|---|---|
| All patients | 0.70 (0.59-0.83) | | |
| ECOG status: 0, 1 | 0.68 (0.57-0.82) | | |
| ECOG status: 2 | 0.81 (0.48-1.38) | | |
| Measurable disease: No | 0.72 (0.55-0.93) | | |
| Measurable disease: Yes | 0.68 (0.54-0.85) | | |
| Number of prior chemo: 1 | 0.67 (0.55-0.83) | | |
| Number of prior chemo: ≥ 2 | 0.75 (0.55-1.02) | | |
| Age: < 65 | 0.81 (0.61-1.08) | | |
| Age: ≥ 65 | 0.62 (0.50-0.78) | | |
| Rising PSA: No | 0.88 (0.61-1.26) | | |
| Rising PSA: Yes | 0.65 (0.53-0.80) | | |
| Total docetaxel dose: < 225 mg/m² | 0.96 (0.49-1.86) | | |
| Total docetaxel dose: ≥ 225 to 450 mg/m² | 0.60 (0.43-0.84) | | |
| Total docetaxel dose: ≥ 450 to 675 mg/m² | 0.83 (0.60-1.16) | | |
| Total docetaxel dose: ≥ 675 to 900 mg/m² | 0.73 (0.48-1.10) | | |
| Total docetaxel dose: ≥ 900 mg/m² | 0.51 (0.33-0.79) | | |
| Progression: During last docetaxel treatment | 0.65 (0.47-0.90) | | |
| Progression: < 3 months since last docetaxel dose | 0.70 (0.55-0.91) | | |
| Progression: ≥ 3 months since last docetaxel dose | 0.75 (0.51-1.11) | | |

Abbreviations: CBZP = cabazitaxel; ECOG = Eastern Cooperative Oncology Group; MP = melphalan/prednisone; PSA = prostate-specific antigen

antagonist, with the exception of cimetidine). These premedications were administered by I.V. infusion at least 30 minutes before cabazitaxel dose. Unlike other FDA-approved taxanes, cabazitaxel does not require oral steroid pretreatment.

New cycles of therapy did not start until absolute neutrophils counts were ≥ 1500/mm³, platelet counts ≥ 75,000/mm³, and non-hematological toxicities resolved to grade ≤ 1. The dose of cabazitaxel was reduced to 20 mg/m² for febrile neutropenia or for grade > 3 neutropenia lasting > 1 week despite granulocyte colony-stimulating factor (G-CSF).

It was recommended that the patients receive G-CSF if neutropenia lasted for more than 1 week. A dose that had been reduced for toxicity was not to have been re-escalated. Only 1 dose reduction was allowed per patient. If more than 1 dose reduction was required, the patient was removed from the study.

### Characteristics of the Patients Enrolled in the TROPIC Trial

With regards to the patient characteristics of baseline, as shown in Table 1, the median age and other characteristics were well balanced. Two factors of note are that the number of patients with measurable disease is higher than might be expected on a prostate cancer protocol given the requirement for RECIST criteria progression at the time of trial entry. In addition, the number of patients with visceral metastases was nearly 25%, which is higher than might have been anticipated but in this case it is almost certainly as result of the advance state of the patients under treatment.

With regard to previous treatment, the median previous docetaxel doses that are shown in Table 2 were approximately 7 for patients treated with cabazitaxel or mitoxantrone (assuming cycles using a median of 75 mg/m²). It is also important to recognize that many of the patients who entered into the trial (approximately 30%) had 2 or more chemotherapy regimens before trial entry. The TROPIC trial is not a second-line chemotherapy trail but rather one designed to evaluate progression patients who are progression post-docetaxel.

### TROPIC Trial Results

As shown in Figure 1, the intent-to-treat analysis of the OS was positive and favored cabazitaxel. The median OS in the mitoxantrone plus prednisone group was 12.7 months versus 15.1 months for the cabazitaxel arm. The hazard ratio (HR) was 0.70 ($P < .0001$). As typical for such an analysis, the median represents one point in time. Other time points on the curve were more or less strikingly positive than the median, depending on the time frame examined.

With regard to the subset analyzes for survival (Figure 2), the OS advantage for cabazitaxel was consistent across various subsets including ECOG performance status and measureable disease. One aspect of the subset analysis that was of special interest was the subset of patients who had progressed during (as opposed to after) their last docetaxel treatment. Here the hazard ratio was 0.65 ($P = .009$). These data indicate that even patients with disease progression during last docetaxel clearly had a very strong survival benefit from treatment. Another interesting subset was the group of patients that

SA_JEV_0002419

received > 900 mg/m[2] of previous docetaxel (12 or more cycles); here the HR was 0.52. Conversely for the small group of patients with < 225 mg/m[2] of previous docetaxel, the HR approximated 1.00 indicating little benefit. The patients who progressed while on docetaxel therapy clearly benefited from cabazitaxel treatment (HR = 0.65), indicating that overall benefit was not simply a result to treating those patients who had stopped docetaxel for reasons unrelated to progression.

The composite endpoint of median PFS was 2.8 months in the cabazitaxel group and 1.4 months in the mitoxantrone treated patients (*P* < .0001). As shown in Table 3, the tumor response rate was higher in the cabazitaxel arm with 14.4% versus 4.4% of the patients having a documented response as measured by RECIST criteria (*P* = .0005). The PSA response rate was 17.8% in the mitoxantrone versus 39.2% of patients in the cabazitaxel arm (*P* = .002). The pain response rate was not distinct between the 2 arms (7.7% and 9.2%, respectively). Examining individual components of progression is fraught with dangers because of high censoring rates but the median time to PSA progression was 3.1 months for mitoxantrone and 6.4 months for cabazitaxel.

The median number of cycles for cabazitaxel was 6 as compared with 4 for mitoxantrone; 29.4% of the cabazitaxel patients received 10 cycles of therapy versus 13.5% of the mitoxantrone patients. Dose reductions were reported for 12% of the cabazitaxel patients and 4% of the patients treated with mitoxantrone. Treatment delays were present in 28% of the cabazitaxel and 15% of the mitoxantrone patients. Treatment emergent adverse events for cabazitaxel are important to recognize and those grade 3-4 events reported in 1.9% or more of patients are shown in Table 4. The risk of "febrile neutropenia" was 7.5%. Grade 3 or worse diarrhea was encountered in approximately 6% of patients. Other side effects at the grade 3-4 level were less common; neuropathy at a grade 3-4 level was < 1%. The complete blood counts (CBCs) were monitored weekly on the TROPIC trial which is distinct from other phase 3 trials that have been reported. Grade 3 or worse neutropenia was recorded in 81.7% of patients in the cabazitaxel arm and 58% of patients in the mitoxantrone arm. The mitoxantrone arm in TAX327, the upfront chemotherapy trial using mitoxantrone at the same dose and schedule was 22%.[10] This difference was probably related to both the frequency of the CBC ascertainment as well as the heavily pretreated nature of the patients in the TROPIC trial.

Some acute hypersensitivity reactions to docetaxel are attributed to polysorbate 80 which is required for solubilization of the otherwise water insoluble compound.[3] The dose of polysorbate 80 for cabazitaxel (given at 25 mg/m[2]) is only 1/3 that of docetaxel (given at 75 mg/m[2]) and this may be reason why the cabazitaxel risk of hypersensitivity appears to be lower than reported in other trials. In the TROPIC trail, the risk of severe hypersensitivity reaction was < 2%.

Approximately 5% of the worldwide treated patients died of side effects attributable to the drug, however in North America, the death rate was < 1% of the treated patients on the cabazitaxel arm.[11] Infections and renal failure were responsible for the majority of the deaths related to adverse events. It is clear that meticulous attention to both neutropenia and hydration status is required for physicians using this drug. Use of growth factors such as G-CSF should follow ASCO guidelines. One issue of importance however, is that the FDA-approved label for cabazitaxel indicated that G-CSF is appropriate to use in those patients over 65-years of age, those with previous episodes of febrile neutropenia, those with poor performance status, extensive previous radiation ports, poor nutritional status, or other serious comorbidities.[3]

## Perspective

Cabazitaxel is the first drug to be approved for the treatment of patients with post-docetaxel progressive metastatic CRPC. It will not be the last, abiraterone will be expected to have FDA approval in the spring of 2011 and this oral hormonal agent will be an important addition to current treatment options. Some have stated that the chemotherapy era for prostate cancer will be over once the newer hormonally active agents are incorporated into our armamentarium. It is unlikely to be the case as those patients receiving the newer hormonal agents will not be cured of their disease and various ligand-independent mechanisms of hormonal resistance, such as androgen receptor splice variants, have recently been identified.[12]

Logical questions now arise as to how to optimally combine and sequence the active agents that will soon be available for CRPC. More studies are clearly needed. The protocol "Cougar 302" (NCT00887198) will address the activity of abiraterone in the pre-docetaxel metastatic CRPC setting. This study will likely be positive and could quickly move abiraterone into the pre-chemotherapy "space".

At this time, cabazitaxel is likely to stay in the post-docetaxel "space" given the design of TROPIC and the current FDA label. One study that can change that scenario will commence in the not too distant future. A "front-line" randomized chemotherapy comparison between docetaxel and cabazitaxel for patients with metastatic CRPC is in the advanced planning stages. Overall survival will be the primary endpoint. We note however, that docetaxel pretreated patients will have an effective and proven regimen available for use at the time of disease progression; whereas no therapy has been shown to be effective in the post-cabazitaxel setting. Given this imbalance, it is not clear that such a trial design is be detect superiority for cabazitaxel.

## Disclosures

Oliver Sartor has received research support from Cougar Biotechnology, Inc. and sanofi-aventis. He has also has served as a paid consultant or has been on the Advisory Board of Johnson & Johnson Services, Inc. sanofi-aventis; and is a member of the Speaker's Bureau for sanofi-aventis. All other authors report that they have no relevant relationships to disclose.

## References

1. Sartor O, Oudard S, Ozguroglu M, et al. Cabazitaxel or mitoxantrone with prednisone in patients with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel: Final results of a multinational phase III trial (TROPIC). 2010 Genitourinary Cancers Symposium, Abstract 9.
2. De Bono JS, Oudard S, Ozguroglu M, et al. Prednisone plus cabazitaxel or mitoxantrone for metastatic castration-resistant prostate cancer progressing after docetaxel treatment: a randomised open-label trial. *Lancet* 2010; 376:1147-54.
3. US Food and Drug Administration (FDA) cabazitaxel package insert. Available at: http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/201023lbl.pdf

SA_JEV_0002420

RESEARCH
# HIGHLIGHTS

CHEMOTHERAPY

# Improved survival in second-line advanced prostate cancer treated with cabazitaxel

New data on cabazitaxel have led to FDA approval for its use in second-line treatment of metastatic castration-resistant prostate cancer. The TROPIC trial, led by Johann de Bono, compared the treatment outcomes of cabazitaxel and mitoxantrone in patients with progressive disease and found that cabazitaxel conferred a 30% reduction in the risk of death and increased median overall survival by 2.4 months.

Docetaxel in combination with prednisone is standard first-line chemotherapy in patients with hormone-refractory, castration-resistant metastatic prostate cancer. However, therapeutic options are limited for patients who have disease progression after docetaxel-based chemotherapy. In this setting, mitoxantrone is often used to treat disease and alleviate symptoms, such as pain, and to improve patients' quality of life. Nevertheless, no treatments have been able to prolong survival in this population.

Cabazitaxel, a novel microtubule inhibitor, has demonstrated antitumor activity in phase I and II clinical trials in patients with docetaxel-refractory solid tumors—including metastatic castration-resistant prostate cancer. In light of these findings, de Bono and colleagues compared the safety and efficacy of prednisone-based regimens combined with either mitoxantrone or cabazitaxel. The investigators carried out a randomized phase III trial enrolling 755 patients (from 146 centers in 26 countries) with castration-resistant prostate cancer who had disease progression after treatment with docetaxel.

Between 2 January 2007 and 23 October 2008, patients participating in the TROPIC trial received 10 mg of oral prednisone daily and either 12 mg/m$^2$ mitoxantrone intravenously over 15–30 mins ($n = 377$) or 25 mg/m$^2$ cabazitaxel intravenously over 1 h ($n = 378$) every 3 weeks. The cabazitaxel dose was selected to limit the primary treatment-related toxic effect of neutropenia, according to data from phase I and II studies. Treatment was continued for a maximum of 10 cycles (to minimize the risk of cardiac toxic effects associated with mitoxantrone).

Overall survival was the primary end point. Time to progression was also measured as indicated by either prostate-specific antigen progression, pain progression, tumor progression, or death. In addition, the amount of pain the patients experienced and the incidence of treatment-related side effects were monitored. Median follow up for both treatment groups combined was 12.8 months.

At the cutoff for final analysis (25 September 2009), 234 deaths were recorded in the cabazitaxel group and 279 deaths in the mitoxantrone group. The median overall survival was 15.1 months in patients treated with cabazitaxel compared with 12.7 months in patients treated with mitoxantrone. This result corresponds to a 30% reduction in relative risk of death for patients receiving cabazitaxel. The median progression-free survival was also superior in the cabazitaxel group (2.8 months versus 1.4 months in the mitoxantrone group).

Significant improvements in prostate-specific antigen response and tumor response were recorded in the cabazitaxel group. However, there was no significant difference in pain experienced by patients or time-to-pain progression between the two treatment groups.

Patients in the cabazitaxel group received a median of six treatment cycles compared with four cycles in the mitoxantrone group. The main reason for treatment discontinuation in both groups was disease progression.

The most common severe (grade 3 or higher) adverse event observed was neutropenia, which was more frequent in patients treated with cabazitaxel than



those treated with mitoxantrone. Indeed, the most frequent cause of death in the cabazitaxel group was neutropenia and its clinical consequences.

The researchers suggest that patients treated with cabazitaxel should be monitored for adverse effects. Moreover, strategies such as prophylactic treatment with granulocyte colony-stimulating factor or modifying the cabazitaxel dose could be used to manage these toxic effects.

Nevertheless, the most significant finding is the overall survival benefit in patients with castration-resistant prostate cancer who had disease progression after treatment with docetaxel. Cabazitaxel is the first agent to achieve such an outcome in this patient population.

"We believe that cabazitaxel should now be standard therapy," de Bono comments. He adds "combinations with abiraterone and trials of cabazitaxel versus docetaxel in the first-line setting are now warranted."

*Lisa Richards*

**Original article** de Bono, J. S. *et al.* Prednisone plus cabazitaxel or mitoxantrone for metastatic castration-resistant prostate cancer progressing after docetaxel treatment: a randomised open-label trial. *Lancet* **376**, 1147–1154 (2010)

© 2010 Macmillan Publishers Limited. All rights reserved

SA_JEV_0002434


ASCO University

Published on *Meeting Library* (http://meetinglibrary.asco.org)

Home > 44106-74

# 44106-74

Cabazitaxel or mitoxantrone with prednisone in patients with metastatic castration-resistant prostate cancer (mCRPC) previously treated with docetaxel: Final results of a multinational phase III trial (TROPIC).

**Subcategory:**
Prostate Cancer
**Session Type and Session Title:**

Oral Abstract Session, Genitourinary Cancer (Prostate)

**Abstract Number:**

4508^

**Citation:**

J Clin Oncol 28:15s, 2010 (suppl; abstr 4508^)

**Author(s):**

J. S. De Bono, S. Oudard, M. Ozguroglu, S. Hansen, J. H. Machiels, L. Shen, P. Matthews, A. O. Sartor, for the TROPIC Investigators; Drug Development Unit, Royal Marsden NHS Foundation Trust and The Institute of Cancer Research, Sutton, United Kingdom; Hôpital Européen Georges Pompidou, Paris, France; Istanbul University, Istanbul, Turkey; Odense University Hospital, Odense, Denmark; Cliniques Universitaires Saint-Luc, Université Catholique de Louvain, Brussels, Belgium; sanofi-aventis, Malvern, PA; Tulane University, New Orleans, LA

**Background:** The treatment of mCRPC following docetaxel (D) therapy failure due to progressive disease (PD) or toxicity is an unmet medical need. TROPIC evaluated the efficacy and safety of the novel taxane cabazitaxel (Cbz) in men with mCRPC previously treated with D. **Methods:** Men with mCRPC, ECOG PS 0-2, and adequate organ function who had prior hormone therapy, chemotherapy, and radiotherapy, but had PD during or after D (cumulative dose $\geq$225 mg/m$^2$) were randomized to 10 mg/day of prednisone with either mitoxantrone 12 mg/m$^2$ (MP) or Cbz 25 mg/m$^2$ (CbzP), both administered 3-weekly. The primary endpoint was overall survival (OS). Secondary endpoints were progression- free survival (PFS- composite of tumor, PSA, or pain progression; or death); response; time to progression (TTP) for tumor, PSA, pain; and safety. The study had 90% power to detect a 25% lower hazard rate for death in the CbzP group after 511 events (2-sided α= 0.05). **Results:** From Jan 2007 to Oct 2008, 755 men (median age 68 yr; 84% white) were randomized. Patients' characteristics were well balanced. Median prior D dose was 576 mg/m$^2$ for CbzP and 529 mg/m$^2$ for MP. Median follow-up was 12.8 mos. Median number of cycles was 6 for CbzP and 4 for MP. In the

SA_JEV_0004072

primary ITT analysis, the CbzP group had a statistically significantly longer OS compared with MP (p<0.0001). PFS, response rates, and TTP (by RECIST and PSA) also statistically significantly favored CbzP. Subgroup analyses by risk factors and a multivariate analysis showed that OS outcomes were consistent and robust in favor of CbzP. Most frequent Gr 3/4 toxicity was neutropenia (81.7% CbzP; 58.0% MP); rates of febrile neutropenia were 7.5% and 1.3%, respectively. **Conclusions:** Men with mCRPC progressing after D benefit from CbzP treatment with longer OS, TTP by tumor assessments and PSA, and higher response rates.

| Population | MP | | CbzP | | CbzP vs. MP |
|---|---|---|---|---|---|
| | N (%) | Median OS (mos) | N (%) | Median OS (mos) | HR (95%CI) |
| ITT | 377 (100) | 12.7 | 378 (100) | 15.1 | 0.70 (0.59-0.83) |
| PD while on D | 103 (27) | 12.0 | 113 (30) | 14.2 | 0.65 (0.47-0.90) |
| PD after last D dose | | | | | |
| <3 mos | 180 (48) | 10.3 | 158 (42) | 13.9 | 0.70 (0.54-0.90) |
| ≥3 mos | 91 (24) | 17.7 | 103 (27) | 17.5 | 0.78 (0.53-1.14) |

**Source URL:** http://meetinglibrary.asco.org/content/44106-74

SA_JEV_0004073

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/456,720 | 04/26/2012 | Sunil GUPTA | FR2009/121 US CNT | 1083 |

5487        7590        04/16/2014
ANDREA Q. RYAN
SANOFI
55 Corporate Drive
MAIL CODE: 55A-505A
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/16/2014 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

USPatent.E-Filing@sanofi.com
andrea.ryan@sanofi.com

PTOL-90A (Rev. 04/07)

SA_JEV_0004261

| *Office Action Summary* | Application No.<br>13/456,720 | Applicant(s)<br>GUPTA, SUNIL | |
|---|---|---|---|
| | Examiner<br>JAMES D. ANDERSON | Art Unit<br>1629 | AIA (First Inventor to File)<br>Status<br>No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on *3/17/2014*.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**  2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) *1,2,4,6-11,13-19,24 and 34-44* is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) *1,2,4,6-11,13-19,24 and 34-44* is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a) ☐ All  b) ☐ Some**  c) ☐ None of the:
  1. ☐ Certified copies of the priority documents have been received.
  2. ☐ Certified copies of the priority documents have been received in Application No. _____.
  3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
  Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date. _____.
4) ☐ Other: _____.

SA_JEV_0004262

Application/Control Number: 13/456,720                                      Page 2
Art Unit: 1629

The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Formal Matters*

Applicants' response and amendments to the claims, filed 3/17/2014, are

acknowledged and entered.  Claims 34-44 are newly added.  Claims 1-2, 4, 6-11, 13-

19, 24, and 34-44 are pending and under examination.


### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee

set forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since

this application is eligible for continued examination under 37 CFR 1.114, and the

fee set forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous

Office action has been withdrawn pursuant to 37 CFR 1.114.  Applicant's

submission filed on 3/17/2014 has been entered.


### *TrackOne Request*

Applicants' request for prioritized examination under 37 CFR 1.102(e), filed

3/17/2014, has been received and **__APPROVED__**.

SA_JEV_0004263

Application/Control Number: 13/456,720                              Page 3
Art Unit: 1629

**The instant application will undergo prioritized examination**. The application will be accorded special status throughout its entire course of prosecution until one of the following occurs:

A. **filing a petition for extension of time** to extend the time period for filing a reply;

B. **filing an amendment to amend the application to contain more than four independent claims**, more than thirty total claims, or a multiple dependent claim;

C. **filing a request for continued examination**;

D. filing a notice of appeal;

E. filing a request for suspension of action;

F. mailing of a notice of allowance;

G. mailing of a final Office action;

H. completion of examination as defined in 37 CFR 41.102; or

I. abandonment of the application

### *Response to Arguments*

Applicants' arguments, filed 3/17/2014, have been fully considered but they are not deemed to be persuasive.  <u>Rejections and/or objections not reiterated from previous office actions are hereby withdrawn</u>.  The following rejections and/or

Application/Control Number: 13/456,720                                      Page 4
Art Unit: 1629

objections are either reiterated or newly applied.  They constitute the complete set

presently being applied to the instant application.


### *Information Disclosure Statement*

It appears that Applicants intended to file an Information Disclosure

Statement with the reply filed 3/17/2014 as numerous NPL and foreign references

were supplied and the transmittal letter states "Submitted herewith on Form

PTO/SB/08 is a listing of documents known to Applicant in order to comply with

Applicant's duty of disclosure pursuant to 37 C.F.R. §1.56".

However, the Office did not receive a PTO-SB-08 listing the supplied

references and no IDS is listed as being submitted on the EFS Acknowledgement

Receipt.

Accordingly, unless a supplied reference has been cited by the Examiner, it

has not been considered by the Office.


### *Claim Rejections - 35 USC § 112, 2nd Paragraph*

The following is a quotation of 35 U.S.C. 112(b):

(b)    CONCLUSION.—The specification shall conclude with one or more claims
particularly pointing out and distinctly claiming the subject matter which the inventor or
a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

The specification shall conclude with one or more claims particularly pointing out and
distinctly claiming the subject matter which the applicant regards as his invention.

Application/Control Number: 13/456,720                                      Page 5
Art Unit: 1629

Claim 2 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.

Claim 2 recites that the method of claim 1, where said patient "is not catered for by a taxane-based treatment". However, claim 1 requires administration of cabazitaxel, which is a taxane. As such, it is unclear how the patients of claim 1 cannot be catered for by a taxane-based treatment when claim 1 <u>requires</u> administration of a taxane.

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

Claims 1-2, 4, 10, 13, 24, 35-36, 38-39, 41-42, and 44 are rejected under pre-AIA 35 U.S.C. 102(b) as being anticipated by **Beardsley *et al*.** (Current Opinions in Supportive and Palliative Care, September 2008, vol. 2, pages 161-166).

SA_JEV_0004266

Application/Control Number: 13/456,720                                      Page 6
Art Unit: 1629

Beardsley et al. teach that there is an urgent need for systemic treatment options for patients with castration-resistant prostate cancer who have progressed after receiving first-line docetaxel chemotherapy.  See Abstract.

Beardsley et al. teach that XRP6258, i.e., cabazitaxel, is a semi-synthetic taxoid compound with low affinity for the P-glycoprotein drug efflux transporter and cytotoxic in cell lines with acquired resistance to paclitaxel or docetaxel.  Beardsley et al. teach that a phase II study of XRP6258 was conducted in patients with docetaxel refractory metastatic breast cancer and an objective response rate of 14% was observed.  See page 163, right column, "Taxanes".

Beardsley et al. teach that given its activity in the docetaxel refractory setting described above (docetaxel refractory metastatic breast cancer), this agent [XRP6258] is **"currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment."** *Id.*

Beardsley et al. thus anticipate administering cabazitaxel in combination with prednisone to patients with castration-resistant metastatic prostate cancer previously treated with docetaxel-containing treatment as presently claimed as they teach that a Phase III trial of such treatment is "currently being invenstigated".

SA_JEV_0004267

Application/Control Number: 13/456,720                                   Page 7
Art Unit: 1629

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or
> described as set forth in section 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such that the subject matter as a
> whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability
> shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering

patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the

subject matter of the various claims was commonly owned at the time any

inventions covered therein were made absent any evidence to the contrary.

Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor

and invention dates of each claim that was not commonly owned at the time a later

invention was made in order for the examiner to consider the applicability of 35

U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35

U.S.C. 103(a).


Claims 1-2, 4, 8-11, 13-19, 24, and 34-44 are rejected under 35 U.S.C. 103(a)

as being unpatentable over **Mita *et al*.** (Clinical Cancer Research, 2009, vol. 15,

pages 723-730) (Published Online January 15, 2009) in view of **Tannock *et al*.** (N.

Engl. J. Med., 2004, vol. 351, pages 1502-1512) and **Beardsley *et al*.** (Current

Opinions in Supportive and Palliative Care, September 2008, vol. 2, pages 161-166).

Application/Control Number: 13/456,720                                    Page 8
Art Unit: 1629

*Claimed Invention*

The amended claims are drawn to treating prostate cancer in a patient comprising administering to said patient an effective amount of cabazitaxel (XRP6258) in combination with a corticoid (e.g., prednisone or prednisolone). Dependent claims recite the limitations wherein the patient has hormone refractory prostate cancer and/or wherein the patient has been previously treated with a docetaxel containing regimen.

*Teachings of Mita et al.*

Mita *et al.* disclose a Phase I and pharmacokinetic study of cabazitaxel (XRP6258), administered as a **1-hour intravenous infusion every 3 weeks** in patients with advanced solid tumors, thus expressly teaching a 3 week cycle as recited in claims 10, 38, 41, and 44. *See* Abstract.

Mita *et al.* disclose that cabazitaxel (XRP6258) has shown broad spectrum antitumor activity in mice bearing s.c. implanted human xenografts, including Du-145 prostate cancers. *See* page 724, left column, first full paragraph.

Mita *et al.* disclose that the encouraging spectrum of antitumor activity of XRP6258 in experimental tumor models, **particularly its notable activity against <u>docetaxel-resistant,</u> Pgp-expressing malignancies**, served as a rationale to clinical evaluations. *See* page 724, left column, second full paragraph.

SA_JEV_0004269

Regarding claims 8-9, 34, 37, 40, and 43, Mita *et al.* disclose that XRP6258 was administered as a 1-hour i.v. infusion every 3 weeks at a starting dose of 10 mg/m2, with subsequent incremental increases to 15, 20, and **25 mg/m² dose levels**. *See* page 724, right column, "Drug administration" and "Dose escalation".

Regarding claims 14-16, Mita *et al.* disclose pharmacokinetic variables observed in patients at all tested dose levels, including AUC, Cmax, and clearance falling within the scope of the instant claims. *See* Table 5.

Regarding claims 17-19, Mita *et al.* disclose monitoring blood neutrophil counts, *i.e.*, absolute neutrophil counts (ADC), and that at the highest dose level (**25 mg/m²**), the ADC was $\leq$ 1,500 cells/mm3 (990) and at that dose level there were cases of Grade 3 and Grade 4 neutropenia. Mita *et al.* disclose that the rate of dose limiting toxicity (DLT) exceeded the predefined limits of tolerability at the 25 mg/m2 dose level. *See* Table 3; page 726, left column, second full paragraph.

Regarding anticancer activity, Mita et al. disclose that evidence of anticancer activity was observed in a patient with **prostate cancer metastatic to liver and bones** whose disease had progressed through surgical castration, bicalutamide, diethyl stilbestrol, and mitoxantrone and prednisone. Further evidence of anticancer activity was observed in a patient with **hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes**. *See* page 727, left column, "Anticancer activity".

Application/Control Number: 13/456,720                               Page 10
Art Unit: 1629

Mita *et al.* differ from the instant claims in that while Mita *et al.* unequivocally teach, suggest, and motivate the administration of carbazitaxel to treat prostate cancer, including metastatic, hormone- and docetaxel-refractory prostate cancer, Mita *et al.* does not disclose combining carbazitaxel with a corticoid such as prednisone.


*Teachings of Tannock et al.*

Tannock *et al.* disclose that mitoxantrone plus prednisone reduces pain and improves quality of life in men with advanced, hormone-refractory prostate cancer, but it does not improve survival.  Tannock *et al.* disclose a study comparing the effects of docetaxel combined with prednisone to mitoxantrone combined with prednisone.  *See* Title; Abstract.

Regarding claim 8, Tannock *et al.* disclose that **prednisone was administered at a dose of 5 mg twice daily**, thus teaching administration of prednisone at a dose of 10 mg/day.  *See* Abstract; page 1504, left column, "Randomization and Treatment".

Regarding claims 17-19, Tannock *et al.* disclose that a dose reduction or treatment delay was stipulated for patient who had an absolute neutrophil count of less than 1500 per cubic millimeter (for those receiving weekly docetaxel).  See page 1504, right column, first full paragraph.

SA_JEV_0004271

Application/Control Number: 13/456,720                                    Page 11
Art Unit: 1629

Tannock *et al.* disclose that when given with prednisone, treatment with docetaxel every 3 weeks led to superior survival and improved rates of response in terms of pain, serum PSA level, and quality of life, as compared to mitoxantrone plus prednisone, and conclude that **docetaxel plus prednisone is the preferred option for most patients with hormone-refractory prostate cancer**. *See* Abstract; page 1511, right column, last paragraph.

*Teachings of Beardsley et al.*

Beardsley et al. disclose that there is an urgent need for systemic treatment options for patients with castration-resistant prostate cancer who have progressed after receiving first-line docetaxel chemotherapy.  See Abstract.

Beardsley et al. disclose that XRP2658, i.e., cabazitaxel, is a semi-synthetic taxoid compound with low affinity for the P-glycoprotein drug efflux transporter and cytotoxic in cell lines with acquired resistance to paclitaxel or docetaxel.  Beardsley et al. disclose that a phase II study of XRP6258 was conducted in patients with docetaxel refractory metastatic breast cancer and an objective response rate of 14% was observed.  See page 163, right column, "Taxanes".

Beardsley et al. disclose that given its activity in the docetaxel refractory setting described above (docetaxel refractory metastatic breast cancer), this agent [XRP6258] is **"currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with**

SA_JEV_0004272

prednisone **to** **mitoxantrone** **with** **prednisone** **in** **patients** **with** **castrate**
**resistant** **metastatic** **prostate** **cancer** **previously** **treated** **with** **docetaxel-**
**containing** **treatment.**" *Id.*

*Principles of Law*

"In rejecting claims under 35 U.S.C. § 103, the examiner bears the initial

burden of presenting a *prima facie* case of obviousness. Only if that burden is met,

does the burden of coming forward with evidence or argument shift to the

applicant." *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1993) (citations omitted). In

order to determine whether a prima facie case of obviousness has been established,

we consider the factors set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966):

(1) the scope and content of the prior art; (2) the differences between the prior art

and the claims at issue; (3) the level of ordinary skill in the relevant art; and (4)

objective evidence of nonobviousness, if present.

"The combination of familiar elements according to known methods is likely

to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v.*

*Teleflex Inc.*, 550 U.S. 398, 416 (2007). "In determining whether obviousness is

established by combining the teachings of the prior art, 'the test is what the

combined teachings of the references would have suggested to those of ordinary skill

in the art.'" *In re GPAC Inc.*, 57 F.3d 1573, 1581 (Fed. Cir. 1995).

SA_JEV_0004273

Application/Control Number: 13/456,720                                    Page 13
Art Unit: 1629

"[I]in a section 103 inquiry, 'the fact that a specific [embodiment] is taught to

be preferred is not controlling, since all disclosures of the prior art, including

unpreferred embodiments, must be considered.'" *Merck & Co. Inc. v. Biocraft*

*Laboratories Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) (quoting *In re Lamberti*, 545

F.2d 747, 750, 192 USPQ 278, 280 (CCPA 1976).)


<u>*Analysis & Examiner's Determination of Obviousness*</u>

It would have been *prima facie* obvious to one of ordinary skill in the art at

the time the invention was made to combine the teachings of the references so as to

administer cabazitaxel in combination with prednisone as taught by Mita et al. in

view of the teachings of Tannock et al. to patients with hormone-refractory prostate

cancer previously treated with docetaxel.

One would have been motivated to do so because Mita et al. teach that

cabazitaxel is effective in treating prostate cancer metastatic to liver and bones

whose disease had progressed through surgical castration, bicalutamide, diethyl

stilbestrol, and mitoxantrone and prednisone and **hormone- and docetaxel-**

**refractory prostate cancer** metastatic to bone and iliac lymph nodes when

administered as a single agent.  The motivation to add prednisone to such

treatment is clearly seen in Tannock *et al.*, who teach that administration of the

taxane, docetaxel, in combination with prednisone is effective in treating hormone-

refractory prostate cancer.  As such, the skilled artisan would predict that addition

SA_JEV_0004274

of prednisone to the treatment regimen of Mita *et al.* would also be effective in treating hormone-refractory prostate cancer, including prostate cancers refractory to docetaxel therapy.  In fact, Beardsley et al. disclose that as early as September 2008, XRP6258 (cabazitaxel) is **"currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment."**

Claims 6-7 are rejected under 35 U.S.C. 103(a) as being unpatentable over **Mita *et al.*** (Clinical Cancer Research, 2009, vol. 15, pages 723-730) (Published Online January 15, 2009) in view of **Tannock *et al.*** (N. Engl. J. Med., 2004, vol. 351, pages 1502-1512) and and **Beardsley *et al.*** (Current Opinions in Supportive and Palliative Care, September 2008, vol. 2, pages 161-166) as applied to claims 1-2, 4, 8-11, 13-19, 24, and 34-44 above, and further in view of **Didier *et al.*** (US 2005/0065138 A1; Published Mar. 24, 2005).

Mita et al. and Tannock et al. teach as applied to claims 1-2, 4, 8-11, 13-19, 24, and 34-44, supra, which teachings are herein incorporated by reference in their entirety.  Claims 6-7 differ from Mita et al. and Tannock et al. in that the references do not disclose an acetone solvate of carbazitaxel.

SA_JEV_0004275

Application/Control Number: 13/456,720                                      Page 15
Art Unit: 1629

*Teachings of Didier et al.*

Didier et al. disclose acetone solvates of carbazitaxel.  *See* Abstract; Claims.

Didier et al. disclose acetone solvates containing between 5% and 8% of acetone.  *See* page 1, [0020].

*Analysis & Examiner's Determination of Obviousness*

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to combine the teachings of the references so as to administer the acetone solvate of cabazitaxel in combination with prednisone as taught by Mita et al. in view of the teachings of Tannock et al., Beardsley et al., and Dinier et al.

The skilled artisan would expect that the acetone solvate of carbazitaxel would possess the same anticancer properties as the free base compound.  As both carbazitaxel and the acetone solvate thereof were known in the art, selection of either one for use in treating prostate cancer would have been prima facie obvious to the skilled artisan.

*Response to Arguments*

Applicant again submits that the claimed elements of the present invention were not known in the prior art and the combination of Mita and Tannock would not have provided a reasonable expectation of predictable results. Accordingly,

Application/Control Number: 13/456,720                                    Page 16
Art Unit: 1629

Applicant respectfully submits that any presumption of obviousness based on the combination of these references is not warranted.  In support of the above, Applicants present the following arguments.

Applicant argues that the primary Mita reference describes Phase I and pharmacokinetic studies of cabazitaxel in a limited number of patients with a variety of solid tumors. The studies were designed to evaluate the safety and dosage of cabazitaxel, but "preliminary evidence of antitumor activity" was to be documented. (Mita at 724, left column). While eight of the twenty-five patients had prostate tumors (Id. at 725, Table 1), Mita indicated that evidence of anticancer activity was noted in two patients, including one patient with "hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes." (Id. at 727).   Applicant asserts that the evidence of anticancer activity in a single patient does not provide an expectation that the claimed method would successfully treat prostate cancer.   In support of this assertion, Applicant argues that the antitumor activity observed in Mita could have been entirely due to chance (i.e., the patient's tumor regressed spontaneously), rather than an effect of cabazitaxel, because that study was not statistically powered to determine whether the observed efficacy was due to the drug. Moreover, Applicant argues that it is important to note that Mita nowhere suggests that one skilled in the art should use cabazitaxel for the treatment of prostate cancer based on these results, as the efficacy data provided is only "preliminary" evidence.

SA_JEV_0004277

Application/Control Number: 13/456,720                          Page 17
Art Unit: 1629

     In response, the Examiner respectfully submits that Mita et al. clearly and unequivocally suggests that one skilled in the art should in fact use cabizitaxel for the treatment of taxane-refractory prostate cancer.

> **Conclusion:** The recommended phase II dose of XRP6258 on this schedule is 20 mg/m². The general tolerability and encouraging antitumor activity in taxane-refractory patients warrant further evaluations of XRP6258.

> In conclusion, XRP6258 is a new taxane characterized by convenient administration with less premedication, linear PKs, and a favorable safety profile for hematologic toxicity and hypersensitivity reaction. XRP6258 is a weak P-gp substrate in preclinical models, which seems to correlate with a greater potency and possibly an extended spectrum of antitumor activity in the clinic, including those patients who have shown taxane resistance. Therefore, the results of this study support broad disease-directed evaluations of XRP6258 on this administration schedule, which are ongoing.

Thus, Mita et al. not only explicitly state that further evaluations of cabazitaxel are warranted (and in fact "ongoing") but even provide a recommended Phase II dose for cabizitaxel.  Further, Beardsley et al. disclose that a phase II study of XRP6258, i.e., cabazitaxel, was conducted in patients with docetaxel refractory metastatic breast cancer and an objective response rate of 14% was observed.  See page 163, right column, "Taxanes".  Beardsley et al. also disclose that given its activity in the docetaxel refractory setting described above (docetaxel refractory metastatic breast cancer), this agent [XRP6258] is **"currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment."**

Application/Control Number: 13/456,720                                    Page 18
Art Unit: 1629

Applicant next argues that cancer research, and in particular clinical trials of antitumor drugs, is highly unpredictable. (See e.g., Kola et al. stating "[a]pproximately 62% of all compounds that enter Phase II trials undergo attrition, and again the highest rate of attrition at this phase is in the oncology field: more than 70% of oncology compounds fail in this phase," Nature Reviews Drug Discovery, 2004, Vol 3., pp. 711-715 at 712, cited in attached IDS). Accordingly, given the extremely limited nature of the patients described in Mita and the unpredictability and complexity of treatment of cancer, Applicant asserts that one skilled in the art would not have the requisite reasonable expectation that patients with hormone refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen, could be successfully treated by the claimed method.

Applicant argues that as noted by the Examiner, the abstract of Mita states that "the general tolerability and encouraging antitumor activity in taxane-refractory patients warrant further evaluations of XRP6258 [cabiztaxel]." Even assuming, arguendo, that this statement gives a general incentive to evaluate cabazitaxel in these taxane-refractory patients, Applicants argue that none of the cited references provide the requisite evidence of predictability in the treatment of such cancer patients. Absent evidence of predictability, Applicant asserts that Mita cannot provide a reasonable expectation of success in the treatment of prostate cancer in taxane-refractory patients.  Therefore, Applicant submits that, based on

SA_JEV_0004279

Application/Control Number: 13/456,720                                        Page 19
Art Unit: 1629

Mita's preliminary and limited nature of description of effectiveness with respect to cabazitaxel in patients and the lack of evidence of a reasonable correlation between docetaxel and cabazitaxel-based prednisone combinations, the present claims would be non- obvious to one skilled in art over the combination of Mita and Tannock.

In response, the Examiner respectfully submits that a guarantee of success is not the standard of obviousness. Rather, all that is required is at least a "reasonable expectation of success". Obviousness does not require absolute predictability, however, at least some degree of predictability is required. Evidence showing there was no reasonable expectation of success may support a conclusion of nonobviousness. *In re Rinehart,* 531 F.2d 1048, 189 USPQ 143 (CCPA 1976). In this case, given the fact that Mita et al. demonstrate activity of cabazitaxel against taxane-resistant prostate cancer and unequivocally teach, suggest, and motivate treating taxane-resistant prostate cancer with cabazitaxel, the claimed invention is clearly prima facie obvious. The "evidence" Applicant relies on (Nature Reviews Drug Discovery, 2004, Vol 3., pp. 711-715 at 712) regarding there being no reasonable expectation of success says nothing whatsoever about cabazitaxel and is therefore not persuasive. As the structurally related docetaxel is used clinically for the treatment of prostate cancer, the skilled artisan would have clearly been imbued with a reasonable expectation that cabazitaxel, which has demonstrated activity in treating taxane-resistant prostate cancer in a Phase I trial, would be effective in treating prostate cancer as presently claimed. In fact, Beardsley et al.

SA_JEV_0004280

disclose that a phase II study of XRP6258, i.e., cabazitaxel, was conducted in patients with docetaxel refractory metastatic breast cancer and an objective response rate of 14% was observed.   See page 163, right column, "Taxanes". Beardsley et al. also disclose that given its activity in the docetaxel refractory setting described above (docetaxel refractory metastatic breast cancer), this agent [XRP6258] is **"currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment."**  Here, all Applicant has done is take the next logical step in the development of cabazitaxel for the treatment of taxane-resistant prostate cancers that is expressly suggested by Mita et al. and in fact stated by Beardsley et al. as "currently being investigated" in September 2008.  In other words, Applicant is basing the patentability of the claimed invention solely on the results obtained from carrying out the Phase III trial that Beardsley et al. states was "currently being investigated" more than 1 year before Applicant's invention.   It is well established in the art that Phase I clinical trials are used as a basis for continuing Phase II and Phase III clinical trials.  Given the documented evidence of anti-cancer activity in the Phase I trial taught by Mita against hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes, the documented evidence of <u>objective response</u> in patients with docetaxel refractory

SA_JEV_0004281

Application/Control Number: 13/456,720                                              Page 21
Art Unit: 1629

metastatic breast cancer in a Phase II trial, and the express teaching that a Phase III trial in patients with **castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment,** the skilled artisan would have clearly been imbued with at least a reasonable expectation of success in treating such prostate cancer with cabazitaxel. This is clearly evidenced by Mita who in fact demonstrate that carbazitaxel is clinically effective in treating hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes and Beardsley et al. who document evidence of objective response in patients with docetaxel refractory metastatic breast cancer in a Phase II trial.


### *Conclusion*

If applicants should amend the claims, a complete and responsive reply will clearly identify where support can be found in the disclosure for each amendment. Applicants should point to the page and line numbers of the application corresponding to each amendment, and provide any statements that might help to identify support for the claimed invention (e.g., if the amendment is not supported in *ipsis verbis*, clarification on the record may be helpful). Should applicants present new claims, applicants should clearly identify where support can be found in the disclosure

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JAMES ANDERSON whose telephone number is

SA_JEV_0004282

Application/Control Number: 13/456,720                                         Page 22
Art Unit: 1629

(571)272-9038.  The examiner can normally be reached on MON-FRI 9:00 am - 5:00

pm EST.

     If attempts to reach the examiner by telephone are unsuccessful, the

examiner's supervisor, Jeffrey Lundgren can be reached on 571-272-5541.  The fax

phone number for the organization where this application or proceeding is assigned

is 571-273-8300.

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR

only.  For more information about the PAIR system, see http://pair-direct.uspto.gov.

Should you have questions on access to the Private PAIR system, contact the

Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like

assistance from a USPTO Customer Service Representative or access to the

automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.


     /James D. Anderson/
**James D. Anderson, Ph.D.**
*Primary Patent Examiner*, Art Unit 1629
UNITED STATES PATENT AND TRADEMARK OFFICE
400 Dulany Street
Alexandria, VA 22314-5774
Tel. No.: (571) 272-9038

# Systemic therapy after first-line docetaxel in metastatic castration-resistant prostate cancer

Emma K. Beardsley and Kim N. Chi

BC Cancer Agency, Vancouver, Canada

Correspondence to Dr Kim N. Chi, BC Cancer Agency, 600 West 10th Avenue, Vancouver, British Columbia, Canada V5Z 4E6
Tel: +1 604 877 6000; fax: +1 604 877 0585;
e-mail: kchi@bccancer.bc.ca

Current Opinion in Supportive and Palliative Care 2008, 2:161–166

**Purpose of review**
There is an urgent need for systemic treatment options for patients with castration-resistant prostate cancer who have progressed after receiving first-line docetaxel chemotherapy. The purpose of this article is to review recent developments in this area.

**Recent findings**
Retreatment with docetaxel has been employed with evidence of activity in selected populations. Mitoxantrone, the previous first-line standard based on its palliative effect, has also been used with clinical responses observed; however, the symptom benefit in this setting has not been established. Several classes of cytotoxic agents have been tested including platinum agents (satraplatin), epothilones (ixabepilone and patupilone) and taxanes (XRP-6258). A number of targeted therapies have also been clinically evaluated including inhibitors of cytoprotective chaperones (OGX-011) and the vascular endothelial growth factor receptor (sorafenib, sunitinib, and cediranib). An area generating great interest has been the development of agents that target the androgen receptor axis more effectively (MDV3100 and abiraterone) with encouraging early phase trial results.

**Summary**
There is no accepted standard systemic treatment for patients with castration resistant prostate cancer and progressive disease after docetaxel. Novel agents are in phase II and III clinical testing in this setting.

**Keywords**
antineoplastic agents, prostate cancer, second-line therapy

Curr Opin Support Palliat Care 2:161–166
© 2008 Wolters Kluwer Health | Lippincott Williams & Wilkins
1751-4258

## Introduction

Castration-resistant prostate cancer (CRPC), also termed hormone refractory prostate cancer (HRPC), is defined as a rising serum prostate-specific antigen (PSA) in the face of castrate levels of testosterone. CRPC is an incurable condition projected to cause almost 30 000 deaths in America alone in 2008 [1]. Significant morbidity in the form of pain and fatigue are associated with this condition and the goals of treatment emphasize symptom control in addition to prolongation of life.

The current first-line standard of care for patients with symptomatic or progressive disease is docetaxel-based chemotherapy. This follows the publication of two phase III randomized trials [2,3], which demonstrated a survival advantage of docetaxel-based chemotherapy over the previous standard treatment being mitoxantrone [4]. Symptomatic and quality of life benefits were also observed to be associated with docetaxel.

With the identification of effective first-line therapy for CRPC, there is now a need for further treatment options after docetaxel. The average duration of treatment was 6–7 months in these studies and with a median survival of 18.2 months, progression-free survival (PFS) of 6.3 months and median time to pain progression of 3.5–5.6 months; there still remains significant opportunity for additional therapies. To date, for patients with progressive disease after first-line docetaxel, there is no accepted standard of treatment. This review will describe the most recent developments in this field and the novel therapeutics currently in clinical trials for patients with disease progression after or during docetaxel chemotherapy.

## Cytotoxic chemotherapy

Given the paucity of current treatment options in the second-line setting, docetaxel is commonly reused or mitoxantrone chemotherapy. Clinical trials of satraplatin,

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

SA_JEV_0004287

162 Renal and urological problems

epothilones and newer taxane agents are ongoing, and are highlighted here.

### Retreatment with docetaxel

Retreatment with docetaxel has been a treatment strategy that has been evaluated. Chemo naïve patients who achieved a PSA of less than 4 ng/ml and met the criteria for PSA response during first-line docetaxel treatment [5] were invited to enroll in a study of intermittent docetaxel rechallenge on progression [6*]. Patients recommenced docetaxel when their PSA increased by 50% from post chemotherapy nadir and was more than 2 ng/ml or if they had other evidence of progression. Of the 250 patients who commenced first-line treatment, 56 were eligible with 45 consenting to participate and 33 evaluable for response. Of the patients who resumed docetaxel treatment after a 'chemotherapy holiday' of mean 18 weeks, 45.5% patients responded with a PSA decline of at least 30% and 45.5% met criteria for stable PSA for at least 12 weeks. This study indicates that retreatment with docetaxel could result in continued responses; however, this was a highly selected population (33 of the initial 250 patients). All had a prior excellent response to docetaxel, with a low PSA and short intervals between courses of treatment. They also had better prognostic indices compared with those not eligible for intermittent treatment.

A retrospective review [7*] of the baseline characteristics and outcomes of patients retreated with docetaxel after first-line use has recently been reported. From 393 patients receiving first-line docetaxel, 25 (6%) patients were retreated with docetaxel with a median interval of 11.8 months between end of first-line and commencement of second-line treatment. PSA declines of at least 30 and 50% occurred in 13 (52%) and 8 (32%) patients, respectively. Median overall survival was 9.6 months from the commencement of second-line docetaxel. Another retrospective review of patients retreated with second-line single agent docetaxel reported similar response rates [8*] for patients who responded to first-line docetaxel with 11 of 26 patients (42%) having had a PSA decline of at least 50%.

Thus, docetaxel re-treatment is a reasonable option in a selected subgroup of patients who have previously tolerated first-line therapy. Patients who appear to benefit include those who have had a previous response to treatment and have few adverse prognostic markers at the initiation of treatment.

### Mitoxantrone

Being the previous standard of care prior to 2004, mitoxantrone has been utilized post docetaxel. Retrospective studies have reported modest activity with PSA response rates in 10–20% of patients in this setting [9,10]. Retrospective crossover results of the practice changing

TAX 327 trial [3] were reported in abstract form in 2007 [11*]. Of 45 patients with data available who received mitoxantrone after docetaxel, a PSA response (≥50% reduction) occurred in only 9%.

The low level of activity of mitoxantrone in this setting is also highlighted in two randomized phase II trials with mitoxantrone as the control arm. Patients progressing within 60 days of docetaxel treatment were randomized to either mitoxantrone or ixabepilone [12*]. The mitoxantrone arm induced a PSA response in 20% of patients, with a median treatment duration of 2.3 months, a 63% rate of grade 3 and 4 neutropenia and median survival of 9.8 months. Similarly, mitoxantrone was the control arm in an abstract presented in 2007 [13]. Patients progressing during or within 90 days of docetaxel treatment were randomized to one of three treatment arms. Results of the mitoxantrone arm reported a median number of two cycles being delivered, with a time to progression of 1.1 months. No PSA responses were seen and the grade 3 and 4 febrile neutropenia rate was 31%.

From these data, although mitoxantrone has been observed to induce PSA responses ranging from 0 to 20% in the post docetaxel setting, time to progression is generally brief and toxicity is clinically significant with no clear data on any palliative effect. Mitoxantrone therefore should only be considered in this patient population if active treatment is preferred in symptomatic patients when clinical trials are not an option.

### Satraplatin

Satraplatin is an orally bioavailable platinum compound which in phase II studies demonstrated activity and an acceptable toxicity profile in patients with CRPC. A phase III study (SPARC) was conducted comparing satraplatin in combination with prednisone vs. placebo and prednisone [14*]. The study's coprimary end points were PFS and overall survival. PFS was determined via evidence of radiological progression, symptomatic progression or death and not by PSA increases. Nine hundred and fifty patients with CRPC progressing through a minimum of two courses of one prior cytotoxic chemotherapy (51% had received prior docetaxel) were randomized in a 2:1 ratio. The satraplatin arm resulted in significantly better PSA response (25.4 vs. 12.2%; $P < 0.001$), pain response (24.2 vs. 13.8%; $P < 0.005$) and time to pain progression (66.1 vs. 22.3 weeks; $P < 0.001$). Median PFS was 11 vs. 9.7 weeks, with a 33% reduction in the overall risk of disease progression [hazard ratio = 0.67; 95% confidence interval (CI) 0.57–0.77; $P < 0.001$]. Although statistically significant, the clinical significance of this difference in PFS is open to interpretation. Additionally, overall survival was subsequently shown to not differ between the two arms

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

SA_JEV_0004288

(61.3 vs. 61.4 weeks, hazard ratio = 0.97, 95% CI 0.83–1.13, $P = 0.80$).

## Epothilones

Epothilones, which include epothilones A, B, and D, were originally identified as metabolites secreted by the myxobacterium *Sorangium cellulosum*. Like taxanes, the principal mechanism of anticancer activity is through microtubule stabilization resulting in mitotic arrest at the G2 and M phase of the cell cycle and eventual apoptosis. Despite a similar mode of action, preclinical studies have shown that the epothilones are more potent inducers of tubulin polymerization than paclitaxel and inhibit cell growth across a broad panel of taxane-sensitive and taxane-resistant human tumor cell lines [15]. Epothilone B (patupilone, EPO906; Novartis, Basel, Switzerland), its semisynthetic derivative ixabepilone (BMS-247550; Bristol-Myers-Squibb, New York, USA), and epothilone D (KOS-862; Kosan Biosciences, California, USA) have been studied in the postdocetaxel setting.

Ixabepilone was investigated as second-line treatment in 82 patients with metastatic prostate cancer unresponsive to paclitaxel, docetaxel or hormone therapy [12²]. This multicenter trial randomized patients to either ixabepilone 35 mg/m² every 3 weeks or mitoxantrone 14 mg/m² and prednisone 5 mg twice daily. Median survival was similar in both groups (10.4 months with ixabepilone and 9.8 months with mitoxantrone and prednisone) and PSA responses were observed in 17% of the ixabepilone-treated patients and in 20% of mitoxantrone-treated patients. Neutropenia was the most common grade 3 and 4 toxicity occurring in 54% of ixabepilone- and 63% of mitoxantrone patients.

A phase II trial of weekly ixabepilone has been reported in abstract form [16²]. Of the 69 patients enrolled, 37 of these had prior exposure to taxanes. Patients were treated with intravenous (i.v.) ixabepilone 20 mg/m² weekly for 3 of every 4 weeks. Grade 3 and 4 neutropenia was observed in five out of 37 (14%) of the prior taxane-treated patients. Neuropathy and fatigue were the other most common grade 3 and 4 toxicities, both occurring in five out of 37 patients previously treated with taxane. PSA and objective responses were observed in 22 and 27% of patients, respectively.

Epothilone D has been investigated in a phase II trial following docetaxel treatment. Beer *et al.* [17²] reported on 38 patients treated with 100 mg/m² i.v. weekly for 3 of every 4 weeks. PSA response rates were low at 5.3 and 73% of patients required dose reduction or cessation of treatment because of toxicity.

A phase II study of patupilone administered weekly in 37 patients has been reported in abstract form [18].

Twenty-nine of these patients had received a maximum of one prior chemotherapy regimen. PSA values were available in 30 patients, and eight (22%) had a partial PSA response. The two most common side effects were diarrhea, with 19% of patients having grade 3 and 4 symptoms and grade 1 and 2 peripheral neuropathy in 19%.

Another multicenter phase II study with patupilone was recently reported [19²²] with patupilone administered on a once every 3-week schedule as preclinical data indicated that higher less frequent dosing was more efficacious with potentially reduced toxicity. In this trial, patients had to have progressive disease during or within 6 months of docetaxel. At the time of reporting, data were available for 40 patients who had received a median of four cycles of treatment and 38 patients were evaluable for PSA response. PSA declines of at least 30 and 50% were seen in 20 out of 38 (53%) and 18 out of 38 (47%) patients. No grade 3 and 4 hematological toxicities were observed and grade 3 and 4 adverse events at 8 mg/m² dosing included fatigue (21%) and diarrhea (12%).

Despite much initial enthusiasm for the epothilones, in this chemotherapy-pretreated population both ixabepilone and KOS-862 have resulted in significant toxicity and a low level of activity. Patupilone administered on a once every 3-week schedule has promise and mature data are awaited from the ongoing phase II study.

## Taxanes

XRP2658 (Sanofi-Aventis, Paris, France) is a semisynthetic taxoid compound with low affinity for the P-glycoprotein drug efflux transporter and cytotoxic in cell lines with acquired resistance to paclitaxel or docetaxel [20]. A phase II study of XRP6258 was conducted in patients with docetaxel refractory metastatic breast cancer and an objective response rate of 14% was observed. Two patients achieving a complete response with a median response duration of 7.6 months.

A phase II trial with XRP6258 has not been performed in patients with CRPC; however, given its activity in the docetaxel refractory setting described above, this agent is currently being investigated in a phase III multicenter, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment. The aim is to recruit 720 patients with a projected completion date of May 2010.

## Targeted therapy

A number of targeted agents have been tested in patients with CRPC in the postdocetaxel setting. This includes agents that target cytoprotective chaperone proteins,

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

SA_JEV_0004289

184 Renal and urological problems

angiogenesis through the vascular endothelial growth factor pathway, apoptosis associated proteins, mTOR and the androgen receptor axis. Several of these agents are entering randomized clinical testing and are highlighted here.

## Custirsen

Clusterin is a cytoprotective chaperone protein that promotes cell survival and confers broad-spectrum treatment resistance. Clusterin is overexpressed in prostate cancer and expression increases after therapeutic interventions [21]. Custirsen (OGX-011; Oncogenex Technologies Inc., Vancouver, Canada) is a 2′-methoxyethyl-modified phosphorothioate antisense oligonucleotide that is complementary to clusterin mRNA and inhibits clusterin expression *in vitro*, *in vivo*, and in humans [22]. Recently published preclinical work supports the principle that custirsen can lead to the resensitization of previously docetaxel-resistant prostate cancer cells [23*].

A phase II trial evaluating the safety and efficacy of custirsen in combination with either docetaxel or mitoxantrone as second-line treatment for patients with CRPC has been recently presented [24**]. Eligible patients had progressed during or within 6 months of docetaxel treatment. All patients received 640 mg i.v. weekly of custirsen and patients randomized to docetaxel and prednisone or mitoxantrone and prednisone. Forty-two patients received at least one cycle on study. Sixteen patients (38%) had prior progressive disease whilst receiving first-line docetaxel and therefore this was a relatively refractory population. In the docetaxel and mitoxantrone arms, PSA declines of at least 50% were seen in 60 and 27% of patients and pain response in 67 and 50%, respectively. A randomized study of docetaxel with or without custirsen is planned in this patient group.

## Vascular endothelial growth factor receptor targeting agents

Vascular endothelial growth factor and vascular endothelial growth factor receptor (VEGF/VEGFR) activation has been implicated in the androgen-independent progression of prostate cancer. Elevation of VEGF has been correlated with poor prognosis and disease progression [25] and inhibition of the VEGF and VEGFR pathways in experimental models induces an antitumor effect. Sorafenib and sunitinib are orally administered agents that potently inhibit the tyrosine kinase activity of VEGFR, as well as a number of other kinases. Both agents are already approved for use in metastatic renal cell cancer.

Dahut *et al.* [26**] have published the results of the first stage of a two-stage phase II trial evaluating sorafenib in 22 patients, 59% of whom had received one prior chemotherapy treatment. The primary objective was to determine if sorafenib was associated with a 4-month

probability of PFS (including PSA progression) in 50% of patients. There was little concordance amongst the progression criteria, with 21 out of 22 patients reported as progressing; however, 13 out of 21 progressed on PSA criteria alone with no evidence of clinical or radiological progression. Interestingly, two patients who met criteria for PSA progression were found to have reduction of bone metastatic lesions at the time of PSA progression. Subsequent in-vitro studies have suggested a sorafenib-induced increase in PSA independent of its cytotoxic effects and thus PSA may not be reflective of disease progression with this class of agents. The trial was amended to remove PSA increase as a progression criteria and the second stage of this trial has accrued.

A study investigating sunitinib has been recently presented [27*]. This trial used clinical and radiological determinants of progression, with the primary objective being to determine if sunitinib therapy was associated with a clinical PFS of 12 weeks in more than 30% of patients. All patients had received one or two prior chemotherapies including docetaxel. A 12-week PFS was attained in 78.9% of patients. Forty-seven percent of patients discontinued therapy because of toxicity and there were two possibly drug-related deaths. A phase III study has been initiated which will randomize patients with CRPC progressing after docetaxel to receive either sunitinib or placebo in a 2:1 fashion. The primary endpoint is overall survival and a planned 819 patients are to be enrolled.

## Targeting the androgen receptor

The term 'HRPC' has been replaced with the term 'castrate resistant' as current preclinical and clinical data illustrate that the androgen receptor (AR) is expressed and continues to mediate androgen signaling even after failure of androgen ablation therapy [28]. The mechanisms of high expression and continued AR activation are multifactorial and result in several potential targets for inducing treatment responses via manipulation of AR activation [29]. Two new agents in clinical trials are targeting various mechanisms of AR activation: MDV3100 (Medivation Inc., San Franciso, California, USA) and abiraterone acetate (Couger Biotechnology Inc., Los Angeles, California, USA).

MDV3100 is a potent novel small AR antagonist that prevents nuclear translocation and DNA binding of AR, and posses no agonistic activity. A first-in-men, multicenter phase I and II dose-escalation study was recently reported and demonstrates encouraging clinical results. Treatment has been well tolerated and early results indicate that 13 of 14 patients followed for more than 4 weeks have had PSA declines including patients previously treated with docetaxel. The trial is ongoing and continues to accrue [30**].

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

SA_JEV_0004290

Abiraterone acetate is an orally available inhibitor of 17α-hydroxylase and C$_{17,20}$-lyase, both of which are necessary for androgen synthesis from cholesterol precursors. Data from several ongoing phase II trials have been very persuasive with a high rate of response occurring in patients with progression after first-line docetaxel therapy. In a recent presentation of results on 28 patients who had previously received docetaxel, 40% of patients were noted to have a PSA decline of at least 50% [31**].

Of 18 patients with measurable disease, four (22%) had a partial response. Eleven patients remained on therapy for more than 6 months and the median time to progression was an impressive 167 days. Treatment was well tolerated with only grade 1–2 adverse events. A randomized, double-blind, placebo-controlled trial of abiraterone and prednisone has been initiated. Patients are being randomized 2:1 in favor of abiraterone with a planned 1158 patients to be enrolled. The trial is powered to detect a difference in median overall survival of 15 months in the abiraterone group vs. 13 months in the placebo group (hazard ratio = 0.80).

## Conclusion

There is no accepted standard systemic therapy for patients who progress after docetaxel therapy. In the absence of proven therapy, foremost consideration needs to be given to palliation of symptoms through adequate analgesia and radiotherapy. Docetaxel retreatment may be an option for a subset of patients who have tolerated and responded to first-line docetaxel therapy. Mitoxantrone has become a de-facto second-line treatment but its benefit has not been clearly demonstrated in this setting. A number of chemotherapy and targeted therapy agents are being tested in phase II and III clinical trials and their results are eagerly awaited.

## References and recommended reading

Papers of particular interest, published within the annual period of review, have been highlighted as:
* of special interest
** of outstanding interest

Additional references related to this topic can also be found in the Current World Literature section in this issue (pp. 223–225).

1 American Cancer Society. Cancer reference information, What are the key statistics about prostate cancer? 2007. [Accessed 17 March 2008].

2 Petrylak DP, Tangen CM, Hussain MH, et al. Docetaxel and estramustine compared with mitoxantrone and prednisone for advanced refractory prostate cancer. N Engl J Med 2004; 351:1513–1520.

3 Tannock IF, de Wit R, Berry WR, et al. Docetaxel plus prednisone or mitoxantrone plus prednisone for advanced prostate cancer. N Engl J Med 2004; 351:1502–1512.

4 Tannock IF, Osoba D, Stockler MR, et al. Chemotherapy with mitoxantrone plus prednisone or prednisone alone for symptomatic hormone-resistant prostate cancer: a Canadian randomized trial with palliative end points. J Clin Oncol 1996; 14:1756–1764.

5 Beer TM, Ryan CW, Venner PM, et al. Double-blinded randomized study of high-dose calcitriol plus docetaxel compared with placebo plus docetaxel in androgen-independent prostate cancer: a report from the ASCENT investigators. J Clin Oncol 2007; 25:669–674.

6 Beer TM, Ryan CW, Venner PM, et al. Intermittent chemotherapy in patients
* with metastatic androgen independent prostate cancer: results from ASCENT, a double-blinded, randomized comparison of high-dose calcitriol plus docetaxel with placebo plus docetaxel. Cancer 2008; 112:326–330.
The first study to prospectively study the use of intermittent docetaxel chemotherapy.

7 Jankovic B, Beardsley E, Chi KN. Retreatment with docetaxel as second-line
* chemotherapy in patients with metastatic hormone refractory prostate cancer (HRPC) after previous docetaxel: a population based analysis [abstract #138]. 2008 ASCO Genitourinary Symposium; 2008.
A retrospective analysis reviewing the activity of and patient population in which docetaxel is being reused in current clinical practice.

8 Eymard J, Oudard S, Gravis G, et al. Second-line chemotherapy with doc-
* etaxel (D) in men treated with docetaxel-based regimen for metastatic hormone-refractory prostate cancer (mHRPC) [abstract #249]. 2007 Prostate Symposium; 2007.
Further retrospective review of docetaxel retreatment, highlighting the need for newer treatment options.

9 Michels J, Montemurro T, Murray N, et al. First- and second-line chemotherapy
* with docetaxel or mitoxantrone in patients with hormone-refractory prostate cancer: does sequence matter? Cancer 2006; 106 1041–1046.

10 Oh WK, Manola J, Babcia V, et al. Response to second-line chemotherapy in patients with hormone refractory prostate cancer receiving two sequences of mitoxantrone and taxanes. Urology 2006; 67:1235–1240.

11 Berthold DR, Pond G, De Wit R, et al. Survival and PSA response of patients
* in the TAX 327 study who crossed over to receive docetaxel after mitoxantrone or vice versa [abstract #225]. 2007 ASCO Prostate symposium; 2007.
A retrospective follow-up of the practice changing TAX 327 trial, exploring the utility of docetaxel and mitoxantrone in second-line treatment.

12 Rosenberg JE, Weinberg VK, Kelly WK, et al. Activity of second-line
* chemotherapy in docetaxel-refractory hormone-refractory prostate cancer patients: randomized phase 2 study of ixabepilone or mitoxantrone and prednisone. Cancer 2007; 110:556–563.
The first study of 3-weekly ixabepilone in second-line treatment revealing similar activity to mitoxantrone and significant toxicity. This study highlights the limited activity of mitoxantrone in second-line treatment.

13 Berger ER, Okeawa T, Hart L, et al. Results of a randomized phase II study of
* ixabuten in hormone-refractory prostate cancer patients that have failed first-line docetaxel treatment [abstract #5068]. J Clin Oncol 2007;25(18S).

14 Sternberg CN, Petrylak O, Witjes F, et al. Satraplatin (S) demonstrates
** significant clinical benefits for the treatment of patients with HRPC: results of a randomized phase III trial [abstract #5019]. J ClinOncology 2007; 25(18S).
A large randomized trial of an oral platinum agent vs. prednisone alone. This was a negative study in regards to overall survival with a debatable clinically significant progression free survival benefit.

15 Altmann KH. Recent developments in the chemical biology of epothilones. Curr Pharm Des 2005; 11:1595–1613.

16 Widing G, Chao Y, DiPaola RP, et al. E3803: Updated results on phase II study
* of a weekly schedule of BMS-247550 for patients with castrate refractory prostate cancer (CRPC) [abstract #5070]. J Clin Oncol 2006; 2S.
The first weekly trial of ixabepilone, revealing reduced toxicity to the 3-weekly regimen, but limited efficacy.

17 Beer TM, Higano CS, Saleh M, et al. Phase II study of KOS-862 in patients
* with metastatic androgen independent prostate cancer previously treated with docetaxel. Invest New Drugs 2007; 25:565–570.
The trial signifies the end of investigating KOS-862 in this patient population due to excess toxicity and limited activity.

18 Hussain A, Dipaola RS, Baron AD, et al. A phase IIa trial of weekly EPO906 in patients with hormone-refractory prostate cancer (HPRC) [abstract #4568]. J Clin Oncol 2004; 22(14S).

19 Chi KN, Beardsley EK, Venner PM, et al. A phase II study of patupilone in
** patients with metastatic hormone refractory prostate cancer (HRPC) who have progressed after docetaxel. J Clin Oncol 2008; 26S:168.
The first trial of 3-weekly patupilone revealing efficacy and tolerable toxicity, maturation of results is awaited before a decision regarding a phase III trial is made.

20 Pivot X, Koralewski P, Hidalgo JL, et al. A multicenter phase II study of XRP5299 administered as a 1-h i.v. infusion every 3 weeks in taxane-resistant metastatic breast cancer patients. Ann Oncol 2008.

21 July LV, Akbari M, Zellweger T, et al. Clusterin expression is significantly enhanced in prostate cancer cells following androgen withdrawal therapy. Prostate 2002; 50:179–188.

22 Chi KN, Eisenhauer E, Fazli L, et al. A phase I pharmacokinetic and pharmacodynamic study of OGX-011, a 2′-methoxyethyl antisense oligonucleotide to clusterin, in patients with localized prostate cancer. J Natl Cancer Inst 2005; 97:1287–1296.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

188 Renal and urological problems

23 Sowery RD, Hadaschik BA, So AI, et al. Clusterin knockdown using the antisense oligonucleotide OGX-011 re-sensitizes docetaxel-refractory prostate cancer PC-3 cells to chemotherapy. BJU Int 2008 [Epub ahead of print].
Encouraging preclinical evidence of OGX-011 activity in prostate cancer cells predisposed to docetaxel.

24 Saad F, Hotte SJ, North SA, et al. A phase II randomized study of custirsen (OGX-011) combination therapy in patients with poor-risk hormone refractory prostate cancer (HRPC) who relapsed on or within six months of 1st-line docetaxel therapy [abstract #5002]. J Clin Oncol 2008; 26.
Clinical validation of preclinical activity of OGX-011 in docetaxel refractory prostate cancer. A phase II trial is to proceed following those results.

25 George DJ, Halabi S, Shepard TF, et al. Prognostic significance of plasma vascular endothelial growth factor levels in patients with hormone-refractory prostate cancer treated on Cancer and Leukemia Group B 9480. Clin Cancer Res 2001; 7:1932–1936.

26 Dahut WL, Scripture C, Posadas E, et al. A phase II clinical trial of sorafenib in androgen-independent prostate cancer. Clin Cancer Res 2008; 14:209–214.
The first report of sorafenib in past docetaxel treated prostate cancer. This report not only informed us about the efficacy and tolerability of sorafenib, it also questioned the use of PSA as a clinical end point in assessing targeted treatments.

27 Smith M, Kantoff P, Regen M, et al. Phase II study of sunitinib malate in men with advanced prostate cancer [abstract #198] 2008 Genitourinary ASCO abstract; 2008.
The first study of sunitinib in docetaxel pretreated prostate cancer. From this study, a phase III trial is recruiting.

28 Linja MJ, Savinainen KJ, Saramaki OR, et al. Amplification and overexpression of androgen receptor gene in hormone-refractory prostate cancer. Cancer Res 2001; 61:3550–3555.

29 Scher HI, Buchanan G, Gerald W, et al. Targeting the androgen receptor: improving outcomes for castration-resistant prostate cancer. Endocr Relat Cancer 2004; 11:459–476.

30 Scher HI, Beer TM, Higano CS, et al. Phase I/II study of MDV3100 in patients [oral] with progressive castration-resistant prostate cancer (CRPC) [abstract #5006]. J Clin Oncol 2008; 26.
The first in man, study of the use of this novel small antiandrogen. Early results are encouraging, and future updates are keenly awaited.

31 De Bono JS, Attard G, Reid AH, et al. Antitumor activity of abiraterone acetate (AA), a CYP17 inhibitor of androgen synthesis, in chemotherapy naive and docetaxel pretreated castration resistant prostate cancer (CRPC) [abstract #5005]. J Clin Oncol 2008; 26.
Abiraterone acetate is a new agent targeting the androgen receptor. Results in phase II trials in docetaxel pretreated patients have been persuasive and a phase III trial is accruing.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

In re Application No.: 13/456,720          )
                                           :   Examiner: James D. ANDERSON
First Named Inventor:                      )
                                           :   Group Art Unit: 1629
SUNIL GUPTA                                )
                                           :   Confirmation No.: 1083
Filed: April 26, 2012                      )
                                           :
For:  NOVEL ANTITUMORAL USE OF             )
      CABAZITAXEL                          :

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### Declaration Under 37 C.F.R. § 1.132 of Alton Oliver Sartor, M.D.

I, Alton Oliver Sartor, M.D., declare as follows:

1.      I am the Laborde Professor of Cancer Research in the Medicine and

Urology Departments of Tulane University School of Medicine.  I am also the Medical Director

and Associate Director for Clinical Programs of the Tulane Cancer Center.

2.      I received my M.D. from Tulane University in 1982.  I completed an

internship at the University of Pennsylvania before training in internal medicine at Tulane

University School of Medicine.  I then completed a fellowship at the National Cancer Institute

("NCI") in Bethesda, Maryland in 1989.  From 1989-1990 I was a Senior Staff Fellow at the

Laboratory of Cellular Development and Oncology, National Institutes of Dental Research

before serving as a Senior Investigator at the NCI until 1993.

3.      In 1993 I returned to Louisiana to serve as Associate Professor of

Medicine at the Louisiana State University ("LSU") Medical School in Shreveport, L.A. and

then moved to the LSU Health Sciences Center in New Orleans, L.A. in 1998 as the Patricia

1

SA_JEV_0004332

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

Powers Strong Professor of Oncology, Stanley S. Scott Cancer Center Director, and

Hematology/Oncology Section Chief. I became the Co-Director of the Louisiana Cancer

Research Consortium at its origin in 2002.

      4.     In 2006 I left LSU and joined the Lank Center for Genitourinary Oncology

at the Dana Farber Cancer Research Institute and Harvard Medical School. In 2008 I joined

Tulane University. Further information regarding my academic background and work

experience can be found in my curriculum vitae, a copy of which is attached as Exhibit 1.

      5.     During the course of my career, my interests have focused on treating

prostate cancer, particularly in patients who have failed initial therapy. I have published more

than 250 scholarly articles, including many on clinical trials of novel agents to treat prostate

cancer. These publications have been cited more than 10,000 times.

      6.     I have been appointed to numerous scientific committees. I am currently

serving as Chairman of the Tulane Cancer Center Strategic Planning Committee; Medical Chair

of the Genitourinary Committee of NRG Oncology (the world's largest radiation oncology

research group); and served as an FDA Public Workshop Panelist in 2013 on Clinical Trial

Design Issues - Drug & Device Development for Localized Prostate Cancer.

      7.     I have served on the editorial boards of scientific journals such as The

Prostate, Urology, and Personalized Medicine in Oncology. I am currently Editor-in-Chief of the

Clinical Genitourinary Cancer journal.

      8.     I continue to treat patients at the Tulane Cancer Center and Urology Multi-

Disciplinary Clinic. I see approximately 25-50 patients per week with urologic malignancies.

Currently about 1000 patients are under my care, mostly with prostate cancer. From 2005-2014,

I have been named one of the "Best Doctors in America" by Best Doctors, Inc.

2

SA_JEV_0004333

Sanofi Ref. FR2009/121 US CNT                      US Application No. 13/456,720

     9.     I was a principal investigator ("PI") or co-PI on numerous prospective international clinical trials evaluating new therapies for patients with advanced prostate cancer, including five pivotal trials that have led to FDA approvals.  I was a co-PI on the TROPIC phase III study comparing cabazitaxel plus prednisone to mitoxantrone plus prednisone in patients with metastatic castration-resistant prostate cancer ("mCRPC") previously treated with a docetaxel-containing treatment, a study sponsored by Sanofi.  I am currently a co-PI on another phase III clinical trial of cabazitaxel, also sponsored by Sanofi.

     10.     I have significant experience in the clinical evaluation of cancer treatments, evaluation of novel treatments for patients with prostate cancer that have failed initial therapies, and treatment of patients with advanced prostate cancer.  Therefore, I believe that I am qualified to render the opinions set forth in this declaration.

     11.     I have read the Office Action dated April 16, 2014 ("Office Action") and the cited references.  Among other rejections, I understand that the Office Action rejects the claims pending in the captioned application as unpatentable over the following references:

     a.     Beardsley *et al.*, *Systemic Therapy After First-Line Docetaxel in Metastatic Castration-Resistant Prostate Cancer*, 2 Current Opinion in Supportive & Palliative Care 161-66 (2008) ("Beardsley");

     b.     Mita *et al.*, *Phase I and Pharmacokinetic Study of XRP6258 (RPR 116258A), a Novel Taxane, Administered as a 1-Hour Infusion Every 3 Weeks in Patients with Advanced Solid Tumors*, 15(2) Clinical Cancer Res. 723-30 (2009) ("Mita");

SA_JEV_0004334

Sanofi Ref. FR2009/121 US CNT                     US Application No. 13/456,720

c.    Tannock *et al.*, *Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer*, 351 New Eng. J. Med. 1502-12 (2004) ("Tannock"); and

d.    US Patent Application Publication No. 2005/0065138, which names Eric Didier as an inventor ("Didier").

12.    I have read US Patent Application No. 13/456,720 ("the '720 application"), which I believe corresponds to US Patent Application Publication No. 2012/0301425 ("the '425 publication").

13.    I have reviewed a copy of the pending claims in the '720 application with proposed amendments. I understand that the claims will be filed in the Patent and Trademark Office as part of the response to the Office Action.

14.    I understand that the earliest priority date for the '720 application is October 29, 2009 ("the relevant time"). In the paragraphs below, I will refer to the state of the art in the areas of cancer research, clinical evaluation of anti-tumor drugs, and treatment of prostate cancer at that time. I will explain how a person of ordinary skill in the art at that time would have understood the references cited in the Office Action and how such a person would have interpreted certain clinical results. My opinions would not change if the priority date were October 27, 2010.

15.    In my opinion, a person of ordinary skill in the art would be an oncologist. As noted above, I have practiced oncology for nearly 30 years and have taught clinical oncology for over 20 years. As such, I am intimately familiar with how a practicing oncologist would evaluate clinical evidence.

SA_JEV_0004335

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

16.    The claims are directed toward the use of cabazitaxel to treat mCRPC. In my opinion, the success of such a treatment would not have been predictable to a skilled worker during the relevant time.

17.    As described below, the art was full of promising early clinical results that failed to predict whether therapies would ultimately provide a clinically meaningful benefit to the desired patient populations. mCRPC was known to be a particularly challenging and unpredictable indication. The disclosure of the references cited in the Office Action did not provide sufficient guidance to overcome that unpredictability.

I.    **Unpredictability of Clinical Success in Developing Chemotherapeutic Treatments of Prostate Cancer**

18.    In 2004 Kola & Landis reported that the failure rate in phase II trials of oncology drugs was more than 70%. Kola & Landis, *Can the Pharmaceutical Industry Reduce Attrition Rates?*, 3 Nature Reviews Drug Discovery 711-15, 712 (Aug. 2004).

19.    Booth *et al.* report that cancer drugs have a lower than average success rate than other therapeutic areas at phase III. Booth *et al.*, *From the Analyst's Couch: Oncology's Trials*, 2 Nature Reviews Drug Discovery 609-10, 609 (Aug. 2003). "[E]arly development trials do not seem to be very predictive of success rates for later development . . . ." *Id.* "Phase II trials in oncology do not show significant predictability for Phase III outcomes." *Id.* at 610. When studies more often fail than succeed, calling positive results reasonably expected is simply scientifically wrong, and persons of ordinary skill familiar with this evidence would not disagree.

20.    A person of ordinary skill would have understood that the attrition rate in phase III trials of mCRPC therapies was particularly high. The cancer treatments described

5

SA_JEV_0004336

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

below are real-life examples of how difficult it would have been to predict clinical success for a novel therapy.

A.    **Larotaxel**

21.    Larotaxel is another taxane developed by Sanofi. It showed promise in phase I studies with objective responses in several tumor types. Zatloukal *et al.*, *Randomized Multicenter Phase II Study of Larotaxel (XRP9881) in Combination with Cisplatin or Gemcitabine as First-Line Chemotherapy in Nonirradiable Stage IIIB or Stage IV Non-Small Cell Lung Cancer*, 3 J. Thorac. Oncol. 894-901, 895 (2008) ("Zatloukal").

22.    Larotaxel had also shown activity in taxoid-resistant tumors in preclinical studies. Diéras *et al.*, *Phase II Multicenter Study of Larotaxel (XRP9881), a Novel Taxoid, in Patients with Metastatic Breast Cancer Who Previously Received Taxane-Based Therapy*, 19 Annals of Oncol. 1255-60, 1255 (2008). Activity was "demonstrated in cell lines expressing the multidrug-resistant phenotype and in *mdr*-expressing murine tumor models." *Id.*

23.    Larotaxel was evaluated in a phase II trial in metastatic breast cancer patients previously treated with a taxane. *Id.* The patients were stratified by resistance to taxane therapy. *Id.* at 1256. The primary endpoint was overall response rate ("ORR"). *Id.* In the non-resistant group, the ORR was 42%, and in the resistant group the ORR was 19%. *Id.* at 1257. One taxane-resistant patient (of 67 treated, 43 per protocol) exhibited a complete response, and 12 resistant patients exhibited a partial response. *Id.* The safety profile was reported as "similar to that of the taxanes." *Id.* at 1259. Neutropenia and diarrhea were some of the most significant toxicities. *Id.* at 1258-59.

24.    At the 2008 American Society of Clinical Oncology ("ASCO") annual meeting, an interim analysis was presented of a phase II trial evaluating larotaxel in combination

SA_JEV_0004337

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

with trastuzumab in patients with metastatic breast cancer. Diéras *et al., Larotaxel (L) in*
*Combination with Trastuzumab in Patients with HER2+ Metastatic Breast Cancer (MBC):*
*Interim Analysis of an Open Phase II Label Study*, 26 (15S) J. Clin. Oncol. (Meeting Abstracts)
Suppl. 1070 (May 2008). The authors reported "good activity in pretreated [patients] with high
tumor burden" and "manageable toxicity." *Id.*

      25.    Larotaxel was also evaluated in a phase II trial in combination with
cisplatin or gemcitabine as a first line therapy in non-small cell lung cancer. Zatloukal at 894-95.
The response rates were 26.7% and 18.2% respectively. *Id.* at 894, 897. The authors concluded
that both "combinations were effective and manageable, however all measured efficacy
parameters (response rate, progression free survival, and survival) seemed to favor the
combination with cisplatin." *Id.* at 894.

      26.    Based on these phase II results, three phase III studies were initiated:

- Larotaxel every 3 weeks vs. capecitabine in patients with metastatic breast cancer
  progressing after taxanes and anthracycline therapy.
  (https://clinicaltrials.gov/ct2/show/NCT00081796?term=larotaxel&rank=7).

- Larotaxel vs. 5-FU in patients with pancreatic cancer previously treated with
  gemcitabine. (https://clinicaltrials.gov/ct2/show/NCT00417209?term=larotaxel&rank=2).

- Larotaxel plus cisplatin vs. gemcitabine plus cisplatin in first line treatment of patients
  with locally advanced/metastatic bladder cancer.
  (https://clinicaltrials.gov/ct2/show/NCT00625664?term=larotaxel&rank=4)

      27.    Larotaxel did not meet the primary endpoint, overall survival, in the phase
III study in pancreatic cancer. Van Cutsem *et al., A Phase III Study Comparing Larotaxel to 5-*
*FU (Continuous Intravenous 5-FU or Capecitabine) in Patients with Advanced Pancreatic*
*Cancer (APC) Previously Treated with a Gemcitabine Containing Regimen*, 21(6S) Annals of
Oncol. Oral Presentations O-007 (July 2010). Patients treated with larotaxel had a higher
incidence of toxicities, including diarrhea, alopecia, sensory neuropathy, myalgia, and

7

SA_JEV_0004338

neutropenia than patients treated with 5-FU. *Id.* The main hematological toxicities in patients treated with larotaxel were neutropenia and complicated neutropenia. *Id.*

28.     Larotaxel was not shown to be superior to the comparator capecitabine in the phase III breast cancer study. Sanofi-Aventis SEC Form 20-F (Dec. 31, 2006) at 39, *available at* http://www.sec.gov/Archives/edgar/data/1121404/000119312507072848/d20f.htm. The progression free survival was longer in the capecitabine group, and overall survival was not statistically different between the study arms. *A Randomized, Open-Label, Phase 3 Study of Larotaxel IV Every 3 Weeks Versus Capecitabine (Xeloda®) Tablets Twice Daily for 2 Weeks in 3-Week Cycles in Patients with Metastatic Breast Cancer (MBC) Progressing After Taxanes and Anthracycline Therapy (EFC6089), available at* http://en.sanofi.com/img/content/study/EFC6089_summary.pdf  (last visited June 24, 2014). Larotaxel had higher incidence of neutropenia and more permanent withdrawals from treatment due to an adverse event. *Id.*

29.     During the phase III study in bladder cancer, the data monitoring committee recommended reducing the dose of larotaxel and cisplatin in part due to the incidence of toxicity, mainly infections. Sternberg *et al.*, *Larotaxel with Cisplatin in the First-Line Treatment of Locally Advanced/Metastatic Urothelial Tract or Bladder Cancer: A Randomized, Active-Controlled, Phase III Trial (CILAB)*, 85 Oncology 208-15, 210-11 (2013). In light of the necessary dose adjustment and the lack of larotaxel efficacy versus comparators in the phase III trials in pancreatic cancer and breast cancer, "it was deemed unlikely that the [bladder cancer] trial would meet its primary efficacy endpoint." *Id.* The study was prematurely discontinued. Preliminary data indicated that treatment with larotaxel/cisplatin was associated with worse

8

SA_JEV_0004339

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

progression free survival than the comparator; there was no difference in overall survival. *Id.* at 213.

30.    After three phase III failures, Sanofi decided to stop clinical development of larotaxel even though the company regarded the initial clinical data as promising. The preclinical and phase I-II data failed to predict efficacy and a manageable side-effect profile in larger treatment populations. Although not in prostate cancer, it is of particular interest that a phase II study in breast cancer patients previously treated with taxanes failed to predict clinical efficacy and safety in a phase III breast cancer trial, or any other phase III trial.

### B.    Failures in CRPC

31.    In addition to the unpredictability and failures discussed above, there were a number of drugs that failed in phase III studies in CRPC despite promising phase II results in the same indication.

32.    Kaur *et al.* report on the disappointing clinical results of suramin, a polysulphonated naphthylurea, in androgen independent (i.e., castration-resistant) prostate cancer. Kaur *et al.*, *Suramin's Development: What Did We Learn?*, 20 Investigational New Drugs 209-19, 209 (2002). An early phase II trial showed promising results; of 38 patients enrolled, three exhibited complete responses, three exhibited partial responses, and five patients had PSA[1] declines of 75% or more. *Id.* at 210. A phase III trial comparing suramin plus hydrocortisone to placebo plus hydrocortisone showed statistically significant PSA and pain relief advantages, but no survival advantages and some toxicity, leading the FDA to decline

---

[1] PSA, or prostate specific antigen, is a protein produced by cells of the prostate gland that is often elevated in men with prostate cancer. However, a number of benign conditions can also cause a man's PSA levels to rise, such as benign prostatic hyperplasia (enlargement of the prostate).

9

SA_JEV_0004340

approval. *Id.* The authors note that the early results might have been misleading because of the failure to fully consider the effect of anti-androgen withdrawal, the fluctuation of PSA by factors independent of antitumor effect, and the palliative and anti-tumor activity of hydrocortisone itself. *Id.* at 217.

33.   Beardsley reports that the SPARC trial, evaluating satraplatin plus prednisone against placebo plus prednisone in men with CRPC progressing after prior chemotherapy, showed an increase in progression free survival ("PFS") with satraplatin, but not overall survival. Beardsley at 162-63; *Satraplatin in Hormone Refractory Prostate Cancer Patients Previously Treated with One Cytotoxic Chemotherapy Regimen,* https://clinicaltrials.gov/ct2/show/NCT00069745?term=SPARC&cond=prostate&rank=3 (first received Sept. 30, 2003, last updated Aug. 1 2012). Beardsley states that "the clinical significance of this difference in PFS is open to interpretation." Beardsley at 162. Phase II studies in patients with CRPC had demonstrated considerable activity and acceptable toxicity. *Id.*

34.   Carducci *et al.* report that atrasentan, a selective endothelial-A receptor antagonist, failed to delay disease progression in patients with mCRPC in a phase III trial. Carducci *et al., A Phase 3 Randomized Controlled Trial of the Efficacy and Safety of Atrasentan in Men with Metastatic Hormone-Refractory Prostate Cancer*, 110(9) Cancer 1959-66, 1959, 1962 (2007). A phase II trial demonstrated a significant effect on PSA, bone alkaline phosphatase, and other markers of bone remodeling in men with mCRPC. *Id.* at 1960. The phase II study showed a nonsignificant trend in delaying disease progression. *Id.* That trend did not translate into positive phase III results; the primary endpoint was not met, and there was no difference in survival. *Id.* at 1962-63. Atrasentan in combination with docetaxel was later

SA_JEV_0004341

Sanofi Ref. FR2009/121 US CNT                         US Application No. 13/456,720

evaluated in a phase III clinical trial in mCRPC patients, which did not show an increase in

overall survival.  Antonarakis & Eisenberger, *Phase III Trials with Docetaxel-Based*

*Combinations for Metastatic Castration-Resistant Prostate Cancer: Time to Learn From Past*

*Experiences*, 31(14) J. Clin. Oncol. 1709-12, 1710 (2013) ("Antonarakis & Eisenberger").

        35.    A randomized phase II study of DN-101, a high dose oral formulation of

calcitriol, in combination therapy with docetaxel compared to placebo plus docetaxel reported an

association of DN-101 with improved survival and no increase in the toxicity of docetaxel.  Beer

*et al.*, *Double-Blinded Randomized Study of High-Dose Calcitriol Plus Docetaxel Compared*

*with Placebo Plus Docetaxel in Androgen-Independent Prostate Cancer: A Report from the*

*ASCENT Investigators*, 25(6) J. Clin. Oncol. 669-74, 669-70, 673 (2007).  Although the addition

of calcitriol did not produce a statistically significant improvement in PSA response, the authors

cautioned that "it is worthwhile to consider the limitations of the PSA response as a predictor of

survival benefit that have come to light since ASCENT was designed." *Id.* at 673.  These results

led to the initiation of a phase III trial (ASCENT-2) comparing DN-101 plus weekly docetaxel to

the standard 3-weekly regimen of docetaxel. *Id.* However, in the phase III trial DN-101 failed to

meet the primary endpoint of prolonging overall survival.  Williams, *Discontinued Drugs in*

*2008: Oncology Drugs*, 18(11) Expert Opin. Investig. Drugs 1581-94, 1593 (2009); *see also*

Novacea, Inc. SEC Form 8-K at 1.02  (April 4, 2008), *available at*

http://www.sec.gov/Archives/edgar/data/1178711/000119312508077953/d8k.htm ("In

November 2007, Novacea and Schering terminated the ASCENT-2 of Asentar™ due to an

unexplained balance of deaths between the treatment and control arms of the trial").  At the 2010

annual meeting of ASCO, Ian Tannock, M.D., Ph.D. was quoted as saying, "[w]hat we can learn

from ASCENT-2 is that even large randomized phase II trials may be poor predictors of results

11

SA_JEV_0004342

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

in phase III." Susman, *ASCO: Calcitriol Fails in ASCENT-2 Prostate CA Trial*, MedPage Today

(June 9, 2010), http://www.medpagetoday.com/MeetingCoverage/ASCO/20575.

　　　　　36.　　In October 2008 Cell Genesys, Inc. announced the termination of a phase

III clinical trial comparing its immunotherapy GVAX to docetaxel plus prednisone in

asymptomatic, mCRPC patients because of a lack of effect on survival. Mulcahy, *Phase 3 Trial*

*of Immunotherapy for Metastatic Prostate Cancer Terminated*, Medscape (October 17, 2008),

http://www.medscape.com/viewarticle/582220. The study was terminated after an unplanned

futility analysis by the data monitoring committee indicated that the trial had less than a 30%

chance of meeting its primary endpoint. *Id.* In August 2008 Cell Genesys had terminated

another phase III trial of GVAX (VITAL-2). *Id.* VITAL-2 compared the combination of GVAX

plus docetaxel to docetaxel plus prednisone in symptomatic mCRPC patients. *Id.* The study was

terminated due to an imbalance of deaths, with more deaths in the GVAX arm. *Id.* Two phase

I/II studies in patients with mCRPC had indicated that GVAX provided a survival benefit over

predicted survival. Higano *et al., Phase 1/2 Dose-Escalation Study of a GM-CSF-Secreting,*

*Allogeneic, Cellular Immunotherapy for Metastatic Hormone-Refractory Prostate Cancer,*

113(5) Cancer 975-84, 983 (2008) (Survival "exceeded the expected survival times by 5 and 13

months in 2 of the 3 dose groups and matched predicted survival in the third."); Small *et al.,*

*Granulocyte Macrophage Colony-Stimulating Factor Secreting Allogeneic Cellular*

*Immunotherapy for Hormone-Refractory Prostate Cancer*, 13 Clin. Cancer Res. 3883-91, 3888

(2007) (one patient with a complete response and survival time exceeded the predicted survival).

　　　　　37.　　In March 2010 Roche reported that a phase III trial of its endothelial

growth factor-specific angiogenesis inhibitor Avastin® (bevacizumab) in combination with

docetaxel and prednisone did not increase overall survival compared to docetaxel plus

12

SA_JEV_0004343

Sanofi Ref. FR2009/121 US CNT                     US Application No. 13/456,720

prednisone in men with CRPC. *Roche Provides Update on Phase III study of Avastin in Men with Late Stage Prostate Cancer*, Media Release (March 12, 2010), http://www.roche.com/media/media_releases/med-cor-2010-03-12.htm. At the time, Avastin[®] was approved for metastatic colorectal cancer, non-squamous non-small cell lung cancer, and metastatic breast cancer as a combination therapy and for glioblastoma as a single agent. July 2009 Avastin[®] Labeling. A phase II study of bevacizumab and docetaxel in mCRPC patients previously treated with docetaxel had reported 55% of patients with a "major" PSA response and 37.5% with objective responses. Di Lorenzo *et al., Combination of Bevacizumab and Docetaxel in Docetaxel-Pretreated Hormone-Refractory Prostate Cancer: A Phase 2 Study*, 54 Europ. Urol. 1089-96, 1089, 1092 (2008).

      38.     Sunitinib, an inhibitor of vascular endothelial growth factor receptors, platelet-derived growth factor receptors, and other receptor tyrosine kinases, is approved for treatment of advanced renal cell carcinoma, gastrointestinal stromal tumors, and pancreatic neuroendocrine tumors. Michaelson *et al., Randomized, Placebo-Controlled, Phase III Trial of Sunitinib Plus Prednisone Versus Prednisone Alone in Progressive, Metastatic, Castration-Resistant Prostate Cancer*, 32(2) J. Clin. Oncol. 76-83, 76-77 (2014). Three phase II trials of sunitinib in progressive mCRPC "suggested antitumor activity" and an acceptable safety profile. *Id.* at 77. A phase III study was performed comparing sunitinib plus prednisone to prednisone alone in men with progressive mCRPC after docetaxel-based chemotherapy. *Id.* The study was terminated early based on the recommendation of the data monitoring committee after a second interim analysis determined that a difference in overall survival, the primary endpoint, was statistically improbable. *Id.* at 77. Patient tolerability was described as "poor" with 27% of patients halting sunitinib treatment before disease progression because of toxicity. *Id.* at 80.

SA_JEV_0004344

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

    39.    BMS's recombinant, human monoclonal antibody Yervoy® (ipilimumab) is approved for the treatment of unresectable or metastatic myeloma.  December 2013 Yervoy® Labeling.  A phase I/II study evaluating ipilimumab alone or in combination with radiotherapy in patients with mCRPC "suggested clinical antitumor activity with disease control and manageable AEs [adverse events]."  Slovin *et al., Ipilimumab Alone or in Combination with Radiotherapy in Metastatic Castration-Resistant Prostate Cancer: Results from an Open-Label, Multicenter Phase I/II Study*, 24 Annals of Oncol. 1813-21, 1813 (2013).  Eight patients receiving ipilimumab and radiotherapy had PSA declines greater than or equal to 50%, and one had a complete response with a duration of over 11.3 months.  *Id.*  Another phase II study comparing ipilimumab as a single agent to combination therapy with docetaxel in CRPC patients reported three patients in each arm with a PSA decrease of more than 50%.  Small *et al., Randomized Phase II Study Comparing 4 Monthly Doses of Ipilimumab (MDX-010) as a Single Agent or in Combination with a Single Dose of Docetaxel in Patients with Hormone-Refractory Prostate Cancer*, 24(18S) J. Clin. Oncol. (Meeting Abstracts) S4609 (June 2006).  The authors concluded that further studies in prostate cancer were warranted.  *Id.*  In September 2013 BMS reported that a phase III, double-blind study comparing ipilimumab to placebo following radiation in patients with advanced mCRPC who had previously received treatment with docetaxel showed no statistically significant improvement in overall survival, the primary endpoint.  *Bristol-Myers Squibb Reports Results for Phase 3 Trial of Yervoy® (Ipilimumab) in Previously-Treated Castration Resistant Prostate Cancer*, Business Wire NewsHQ Press Release (September 12, 2013), http://news.bms.com/press-release/rd-news/bristol-myers-squibb-reports-results-phase-3-trial-yervoy-ipilimumab-previous.  The phase II data did not translate into phase III success.

SA_JEV_0004345

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

40.    In April 2014 OncoGenex announced that custirsen plus docetaxel and
prednisone in first line therapy did not provide a statistically significant improvement in overall
survival in men with mCRPC compared to docetaxel plus prednisone alone. *OncoGenex
Announces Top-Line Survival Results of Phase 3 SYNERGY Trial Evaluating Custirsen for
Metastatic Castrate-Resistant Prostate Cancer*, Acquire Media Press Release (April 28, 2014),
http://ir.oncogenex.com/releasedetail.cfm?ReleaseID=842949. A phase II trial evaluating
custirsen plus docetaxel and prednisone compared to docetaxel plus prednisone in patients with
chemotherapy-naïve mCRPC had indicated an increase in overall survival with custirsen, and
19% of patients had a partial response. Zielinski & Chi, *Custirsen (OGX-011): A Second-
Generation Antisense Inhibitor of Clusterin in Development for the Treatment of Prostate
Cancer*, 8(1) Future Oncol. 1239-51, 1245-46 (2012). A phase II trial evaluating custirsen plus
docetaxel in mCRPC patients previously treated with docetaxel also reported 15% of patients as
having a partial response and 40% of patients as having a PSA response. *Id.* at 1246.

41.    In June 2014 Takeda announced that it was terminating development of
orteronel, an inhibitor of 17,20 -lyase, after two disappointing phase III trials in mCRPC.
*Takeda Announces Termination of Orteronel (TAK-700) Development for Prostate Cancer in
Japan, U.S.A. and Europe*, Takeda Latest News Release (June 19, 2014),
http://www.takeda.com/news/2014/20140619_6615.html. The first reported phase III trial was
in men with mCRPC that had progressed during or following chemotherapy. *Id.* An interim
analysis indicated that orteronel plus prednisone would not likely meet the primary endpoint of
overall survival. *Id.* The second phase III failure was in men with mCRPC who had not
previously received chemotherapy. *Id.* There was no statistically significant improvement in
overall survival, one of the primary endpoints. *Id.* These failures came after at least six phase I

15

SA_JEV_0004346

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

and II studies in patients with CRPC.  Van Hook *et al., Orteronel for the Treatment of Prostate Cancer*, 10(5) Future Oncol. 803-11, 807 (2014).  A phase II study of orteronel plus docetaxel and prednisone in mCRPC patients reported an overall objective response rate of 56%, with 72% of men experiencing a PSA decline of more than or equal to 50%.  *Id.* at 805-06.  A phase I/II study of orteronel in chemotherapy naïve mCRPC patients with or without prednisone reported an objective response rate of 19% with 41-63% of patients experiencing a PSA decline of more than or equal to 50% depending on dose and the addition of prednisone.  *Id.* at 807.

      42.    Antonarakis and Eisenberger report on the failure of eight phase III clinical trials in patients with mCRPC.  These trials were of eight different combination therapies with docetaxel: bevacizumab, aflibercept, atrasentan, zibotentan, dasatinib, GVAX, lenalidomide, and calcitriol.  Antonarakis & Eisenberger at 1709-10.  The authors suggest that these late stage failures could be reduced if more stringent standards were required in phase II before proceeding to phase III.  *Id.* at 1711 ("[P]hase III trials should not be pursued without the prior conduct of at least one phase II study that has met a prespecified rationally selected primary end point and its predefined metric for success . . . .").

      43.    A person of ordinary skill would have understood, as can be seen from the above mentioned studies, that it would have been extremely difficult to predict whether a compound would provide a clinically meaningful benefit such as prolongation of survival in mCRPC patients while providing a reasonable side effect profile, even after positive phase II results in the same indication.  This understanding was true in 2009 and remains true today.

16

SA_JEV_0004347

Sanofi Ref. FR2009/121 US CNT                     US Application No. 13/456,720

## II.   Disclosure of Cited Art

### A.   Beardsley

44.     Beardsley is a review article describing research developments on a wide variety of different approaches to treating mCRPC. Of the eleven compounds discussed, only one is a taxane: cabazitaxel.

45.     Beardsley states that XRP6258 (cabazitaxel) "is a semi-synthetic taxoid compound with low affinity for the P-glycoprotein ("P-gp") drug efflux transporter and cytotoxic in cell lines with acquired resistance to paclitaxel or docetaxel." Beardsley at 163. The P-gp drug efflux transporter is a protein that removes toxins, such as drugs, from cells. *See, e.g.,* Cabral, *Factors Determining Cellular Mechanisms of Resistance to Antimitotic Drugs,* 4 Drug Resistance Updates 3-8, 3 (2001) ("Cabral"). It was hypothesized that one cause of taxane resistance was a proliferation of P-gp in resistant cells, which pumped the drug out of the cell before it could have an effect. *See id.*

46.     Beardsley discloses that a phase II study of cabazitaxel was conducted in patients with docetaxel-refractory metastatic breast cancer, with an objective response rate of 14%. Beardsley at 163. Two patients reportedly achieved a complete response with a median response duration of 7.6 months. *Id.*

47.     Beardsley notes that "given its activity in the docetaxel refractory setting" of the phase II study in breast cancer, cabazitaxel was being investigated in a phase III trial "comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment." *Id.* The doses of cabazitaxel and prednisone are not disclosed.

17

SA_JEV_0004348

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

48.     Beardsley does not report any results from a phase III study on cabazitaxel or any clinical data from administration of cabazitaxel to patients with prostate cancer. In fact, this article simply catalogues the various approaches being used or studied at that time.

**B.    Mita**

49.     Mita describes the results of a phase I and pharmacokinetic study of cabazitaxel administered as a 1-hour infusion every three weeks in patients with advanced solid tumors. The objectives of the study were to characterize the toxicities of cabazitaxel without premedication, determine the maximum tolerated dose and recommended dose for phase II studies, characterize the pharmacokinetic profile of cabazitaxel, and to document preliminary evidence of antitumor activity. Mita at 724. Phase I studies are not designed for, and therefore cannot provide a person of ordinary skill with a reasonable expectation of, efficacy in a treatment population.

50.     Mita discloses that cabazitaxel was more potent than docetaxel in a broad array of cancer cell lines with acquired resistance to docetaxel. *Id.* at 723-24. Although a substrate for the ATP-dependent drug efflux pump P-gp, cabazitaxel is described as a weaker substrate than docetaxel. *Id.* at 723.

51.     Mita states that cabazitaxel has "shown a broad spectrum of antitumor activity in mice." *Id.* at 724. However, cabazitaxel did not retain activity against Calc18/TXT and P388/VCR tumors, which Mita describes as expressing higher levels of *ABCB1* mRNA, the mRNA coding for P-gp. *Id.* This finding casts doubt on the role of P-gp in cabazitaxel's ability to overcome resistance to docetaxel.

52.     Twenty-five patients received cabazitaxel in four dose levels: 10 mg/m$^2$, 15 mg/m$^2$, 20 mg/m$^2$, and 25 mg/m$^2$. *Id.* at 726. The patients had a variety of documented

18

SA_JEV_0004349

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

advanced solid malignancies "refractory to conventional treatment." *Id.* at 724. Twenty-two

patients (88%) had previously received chemotherapy with eight patients having received prior

taxane-based therapy. *Id.* at 726. Prior anticancer therapy had to be completed at least 28 days

before study enrollment, 42 days for nitrosureas and mitomycin C. *Id.* at 724. Eight of the

twenty-five patients had prostate cancer. *Id.* at 725.

   53. Mita reports that neutropenia was the principal toxicity of cabazitaxel. *Id.*

at 726. Severe neutropenia was reported at the 25 mg/m$^2$ level, with grade 4 events occurring in

8 of the 19 (42%) evaluable courses. *Id.* Diarrhea was reported in 52% of patients, nausea in

40%, and vomiting in 16%. *Id.* Mita suggests that the gastric toxicities may be caused by

accumulation of cabazitaxel in enterocytes that constitutively express P-gp because cabazitaxel is

a poorer substrate for the transporter pump than docetaxel. *Id.* at 728.

   54. Evidence of anti-cancer activity due to cabazitaxel was noted in two

prostate cancer patients with confirmed partial responses. *Id.* at 727. The first patient was an 80

year old male with prostate cancer metastatic to the liver and bones whose disease had

progressed through castration, bicalutamide, diethyl stilbestrol, and mitoxantrone and

prednisone. *Id.* He declined further treatment after his sixth course. *Id.* I note that he had never

received docetaxel, thus cabazitaxel was his first taxane.

   55. The second patient was a 50 year old male with hormone and docetaxel-

refractory prostate cancer metastatic to bone and iliac lymph nodes. *Id.* Progressive disease was

noted after eight courses. *Id.*

   56. Mita states that the "preliminary antitumor activity reported" still "needs

to be confirmed." *Id.* at 729.

19

SA_JEV_0004350

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

### C.    Tannock

57.    Tannock reports the results of a phase III study comparing docetaxel plus prednisone with mitoxantrone plus prednisone in metastatic hormone-refractory prostate cancer, also commonly referred to as mCRPC.  Treatment with 75 mg/m$^2$ of docetaxel every three weeks plus 10 mg daily prednisone led to superior survival and improved rates of response "in terms of pain, serum PSA level, and quality of life" as compared to 12 mg/m$^2$ of mitoxantrone every three weeks plus 10 mg daily prednisone.  Tannock at 1502.  Cabazitaxel is not mentioned in this publication.

58.    Eligible patients had histologically or cytological confirmed adenocarcinoma of the prostate with clinical or radiologic evidence of metastatic disease, had disease progression during hormonal therapy, and were receiving primary androgen-ablation as a maintenance therapy. *Id.* at 1503.  At least four weeks had to have elapsed between withdrawal of the antiandrogens, six weeks in the case of bicalutamide, and enrollment, so as to "avoid the possibility of confounding as a result of the response to antiandrogen withdrawal." *Id.*

59.    The primary endpoint was overall survival.  Secondary endpoints included reductions in pain, improvement in the quality of life, reduction in serum PSA levels of at least 50% and objective tumor responses. *Id.* at 1504.  In the discussion section, Tannock states, "[m]ore important, we found a significant improvement in overall survival for docetaxel as compared with mitoxantrone." *Id.* at 1511.

### III.    Prior Art Treatment of Prostate Cancer

60.    mCRPC is an incurable condition.  The goals of treatment emphasize symptom control and overall survival.  Beardsley at 161.  Docetaxel plus prednisone became the standard of care in large part because two phase-III trials demonstrated a survival advantage over

SA_JEV_0004351

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

mitoxantrone plus prednisone. *See, e.g., id.* Mitoxantrone plus prednisone had been previously

shown not to improve survival over prednisone alone. Berry *et al., Phase III Study of*

*Mitoxantrone Plus Low Dose Prednisone Versus Low Dose Prednisone Alone in Patients with*

*Asymptomatic Hormone Refractory Prostate Cancer,* 168 J. Urol. 2439-43, 2439, 2442 (2002).

      61.     Unfortunately, as the '720 application explains, it was known that

patients' cancer will eventually progress after docetaxel treatment because their cancer develops

resistance to docetaxel therapy. Several mechanisms of resistance have been described in the

literature. Cabral at 3-8; Dumontet & Sikic, *Mechanisms of Action of and Resistance to*

*Antitubulin Agents: Microtubule Dynamics, Drug Transport, and Cell Death,* 17(3) J. Clin.

Oncol. 1061-1070 (1999). Even today, the mechanisms of taxane resistance are not well

understood, and it may be a combination of changes to cancer cells exposed to docetaxel that

gives rise to the resistance.

      62.     Beardsley noted in 2008 that there was an "urgent need for systemic

treatment options for patients with castration-resistant prostate cancer who have progressed after

receiving first-line docetaxel chemotherapy." Beardsley at 161. Beardsley describes a variety of

treatments proposed for mCRPC in 2008, including satraplatin, four epothilones, custirsen,

sorafenib, sunitinib, abiraterone, and MDV3100 (enzalutamide). None of these treatments

succeeded in meeting that clinical need before the earliest filing date of the '720 application.

**IV.**    **The Treatment of mCRPC with Cabazitaxel**

      63.     The urgent need described by Beardsley was not met until the FDA

approval of Jevtana (cabazitaxel) in 2010, based on a phase III clinical trial (the TROPIC study)

that demonstrated a statistically significant improvement in overall survival compared to

mitoxantrone plus prednisone.

SA_JEV_0004352

64.     As co-PI on the TROPIC study, I presented to the ASCO Genitourinary Cancers Symposium as the first public presentation of the mature phase III data.  The response to the data was very positive.  The results were unexpected, and many physicians expressed surprise given that there was virtually no data available prior to that time in mCRPC.  For the first time, patients with mCRPC progressing on or after docetaxel treatment had an opportunity to prolong life.

65.     Prior to these results, the person of ordinary skill in the art could not reasonably predict whether cabazitaxel would provide a clinically meaningful benefit in palliation or survival in mCRPC patients, particularly not for those patients progressing after docetaxel treatment, based on the results reported in Mita or Beardsley.  In fact, the typical response was one of surprise at the positive results.

66.     As the '720 application describes, metastatic prostate cancer is particularly difficult to evaluate because of the heterogeneity of the disease and the lack of consensus regarding the treatment response criteria.  '425 Publication at [0007]; Mackinnon *et al.*, *Molecular Biology Underlying the Clinical Heterogeneity of Prostate Cancer: An Update*, 133 Arch. Pathol. Lab. Med. 1033-40, 1033 (2009) ("Mackinnon"); Armstrong & George, *New Drug Development in Metastatic Prostate Cancer*, 26 Urologic Oncol.: Seminars & Original Investigations 430-37, 430 (2008) ("Armstrong & George").  There are currently no biomarkers indicating which prostate cancer patients will respond to particular therapies.  Many patients do not have measurable disease, and therefore alternative markers such as PSA are needed to evaluate response.  '425 Publication at [0007].  However, even PSA is notorious for not being able to predict survival.

22

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

67.    A skilled artisan would have known that changes in PSA are not necessarily indicative of efficacy. Beardsley at 164 (noting that PSA may not be reflective of disease progression with vascular endothelial growth factor receptor targeting agents); *see* Berry at 2439 (reporting a significantly greater decrease in PSA levels without a statistically significant increase in overall survival for mitoxantrone); Tannock at 1502 (reporting statistically significant improvements in rates of PSA response in patients taking docetaxel weekly compared to mitoxantrone, but no difference in overall survival). Susan Halabi, myself, and others found that "the benefits of cabazitaxel in mediating a survival benefit are not fully captured by early PSA changes." Halabi *et al.*, *Prostate-Specific Antigen Changes as Surrogate for Overall Survival in Men with Metastatic Castration-Resistant Prostate Cancer Treated with Second-Line Chemotherapy*, 31(31) J. Clin. Oncol. 3944-50, 3944 (2013).

68.    The primary endpoint leading to FDA approval of docetaxel for the treatment of mCRPC,[2] and all post-docetaxel treatments has been overall survival. D'Amico, *US Food and Drug Administration Approval of Drugs for the Treatment of Prostate Cancer: A New Era Has Begun*, 32(4) J. Clin. Oncol. 362-64 (2014). "[T]he only validated phase III endpoint in advanced prostate cancer, particularly CRPC, is overall survival." Ramiah *et al.*, *Clinical Endpoints for Drug Development in Prostate Cancer*, 18 Curr. Opin. Urol. 303-08, 307 (2008). Accordingly, the person of ordinary skill was seeking a therapy that prolonged overall survival in a patient population with an acceptable side effect profile.

69.    But, as Ramiah *et al.* have emphasized, "[i]n phase II trials, however, it remains a challenge to select the ideal intermediate endpoint to gauge the efficacy of novel

---

[2] The exception is denosumab, also approved for osteoporosis, which is used to decrease the rate of skeletal-related events in bone-metastatic CRPC patients. This is a palliative benefit and does not influence survival.

SA_JEV_0004354

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

agents. The lack of proven surrogates, the heterogeneity of PFS definitions, the unknown effects

of novel agents on PSA production, and the variability in patient-reported outcomes make many

of these endpoints problematic." *Id.* Indeed, Armstrong and George report that one of the

challenges to drug development in mCRPC is "the lack of established surrogates for overall

survival." Armstrong & George at 430-31. Seeking to explain the high rate of phase III failures

in mCRPC continuing in 2013, Antonarakis and Eisenberger also recognized that "there are

currently no established surrogate end points for overall survival in men with mCRPC, [and] new

efforts should focus on identification and validation of alternative intermediate biomarkers of

clinical benefit . . . ." Antonarakis & Eisenberger at 1711.

70.    It follows that phase I and II data, including responses in PSA levels and

measurable lesions, would not have allowed a person of ordinary skill in the art to predict

whether a patient would have ultimately lived longer or tolerated the medication long enough to

see such a survival benefit.

## V.    Interpretation of Cited Art

71.    As noted above, I have reviewed the references cited in the Office Action.

In my opinion, these references, alone or in combination, would not give a person of ordinary

skill at the relevant time a reasonable expectation that cabazitaxel could successfully treat

mCRPC. Indeed, based on the evidence and experience in the field, such a skilled person would

more reasonably expect failure than success.

### A.    Phase I Data in Mita

72.    Mita evaluated twenty-five patients, eight of which had prostate cancer.

This trial was not powered sufficiently to detect a survival or palliative benefit in prostate cancer.

Nor did it report statistically significant results.

24

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

73.     The 80 year old man with a partial response had previously been treated with bicalutamide, an antiandrogen, in addition to other therapies.  Prior treatment needed to have ceased 28 days prior to enrollment in this phase I study, but it was known that bicalutamide withdrawal could cause a response.  Wirth & Froschermaier, *The Antiandrogen Withdrawal Syndrome*, 25 (Suppl. 2 ) Urol. Res. S67-71, S67-68 (1997).  This is why the phase III trial with docetaxel described in Tannock required at least six weeks to have elapsed after bicalutamide treatment before enrollment.  Tannock at 1503 ("so as to avoid the possibility of confounding . . . the response to antiandrogen withdrawal").

74.     The 80 year old man had not been previously treated with docetaxel and was therefore not docetaxel-refractory.  In addition, he declined further treatment after his sixth course, indicating that the side effects might not have been acceptable.

75.     The 50 year old man with a partial response is the **only** docetaxel-refractory patient in Mita to have a partial response after cabazitaxel treatment.  Progressive disease was noted after eight courses.  A person of ordinary skill would not have found this result in a single patient sufficient to predict whether cabazitaxel would have provided a clinical benefit in palliation or survival for a population of mCRPC patients progressing after docetaxel therapy, or whether cabazitaxel would have had a risk-benefit ratio such that it would have been considered a treatment for the disease.

76.     These two patients are essentially a case study with cabazitaxel.  The responses could be an anomaly, reflecting certain qualities in each patient's particular cancer.  A person of ordinary skill would not take partial responses in two patients and extrapolate to predict the ability of cabazitaxel to provide a meaningful clinical benefit, e.g., prolongation of survival, for a patient population with mCRPC.  In light of the voluminous phase III failures in

25

SA_JEV_0004356

Sanofi Ref. FR2009/121 US CNT                     US Application No. 13/456,720

this indication, a person of ordinary skill would not expect success in a phase III trial given this data, and indeed would predict that such a trial would more likely fail than succeed.

     77.    Indeed, when I was on the faculty at Harvard in 2007 I had difficulty opening the TROPIC phase III study of cabazitaxel in mCRPC patients progressing after docetaxel therapy at the Lank Center for Genitourinary Oncology because the evidence of activity was considered too preliminary by those at the institution.

### B.    Phase II Data in Beardsley

     78.    Beardsley reports data from a phase II clinical trial of cabazitaxel in docetaxel-refractory breast cancer patients.  A person of ordinary skill in the art would not assume that data in breast cancer patients would translate to prostate cancer patients.  They are distinct tissue types, and even within each type of cancer there is substantial heterogeneity. Mackinnon at 1033; Wiechec & Hansen, *The Effect of Genetic Variability on Drug Response In Conventional Breast Cancer Treatment*, 625 Eur. J. Pharmacol. 122-30 (2009).  A person of ordinary skill would not have given weight to these phase II results in evaluating the use of cabazitaxel for mCRPC.

### C.    Use of Prednisone in Tannock

     79.    Tannock does not indicate whether the use of prednisone contributes to any palliative or survival benefit because docetaxel alone is not compared to docetaxel plus prednisone.  Therefore it would not have suggested that prednisone improved therapy with docetaxel or that prednisone would have improved therapy with cabazitaxel.  Consequently, a person of ordinary skill would not add prednisone to an oncologic agent, including a taxane, based on this article.

SA_JEV_0004357

Sanofi Ref. FR2009/121 US CNT                              US Application No. 13/456,720

## VI.   Conclusion

   80.   A person of ordinary skill would not have had a reasonable expectation of success in using cabazitaxel to provide a clinically meaningful benefit, e.g., prolongation of life with acceptable toxicity, in patients with mCRPC in light of the phase I data or phase II data in breast cancer described above for several reasons:

- Anecdotal responses in particular patients can be, and often are, due to factors peculiar to those patients and do not represent a generalizable finding in a heterogeneous population of patients. As noted above, there are innumerable examples of patients in phase I or phase II studies showing significant responses with drugs that go on to fail completely in phase III clinical studies.

- As the FDA has recognized, a meaningfully beneficial clinical endpoint (e.g., improving survival in mCRPC patients refractory to docetaxel) is not typically predefined in phase I or phase II clinical studies. Consequently, as a matter of statistics and good clinical practice, a person of ordinary skill would draw no definite conclusions regarding the efficacy of a drug after a phase I or II trial unless those trials were exceptionally large or conducted in cancers where phase III trials are not feasible. Moreover, phase II studies are generally not sufficiently powered to determine whether the risk-benefit ratio justifies the use of a compound. Many drugs showing significant activity fail because the risks to patients outweigh the benefits of the drug (*see, e.g.,* the discussion of the taxane Larotaxel above). This last point cannot be emphasized enough: **a treatment that is too toxic to the patient is no treatment at all.** Finally, as phase II studies

27

SA_JEV_0004358

are not usually designed to evaluate alternative therapies, one cannot conclude that an experimental drug is superior to conventional therapy.

* Finally, cancers are biologically distinct. A drug that works for one tumor type will usually not work for another. A phase III study in the target tumor type (in this case prostate cancer) is typically required before any conclusion can be drawn regarding a compound's efficacy against that tumor.

81. Indeed, prediction of a positive phase III study in mCRPC has been described as "an impossible endeavor." Antonarakis & Eisenberger at 1711. A person of ordinary skill in the art would have understood that clinical development in oncology is inherently unpredictable. In particular, they would have also understood that amongst the high level of late stage failures in oncology, mCRPC has proven to be a particularly difficult indication to predict success. That understanding is as true today as it was when the patent application was filed.

82. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine and imprisonment, or both, Under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

SA_JEV_0004359

Sanofi Ref. FR2009/121 US CNT                    US Application No. 13/456,720

_____
Alton Oliver Sartor, M.D.

Date: _____ July 14, 2014 _____

29

SA_JEV_0004360

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Application of: **Gupta et al.** | Examiner: **James ANDERSON** |
| | Art Unit: **1629** |
| Application No.: **13/456,720** | Conf No. **1083** |
| Filed: **April 26, 2012** | |
| Title: **NOVEL ANTITUMORAL USE OF CABAZITAXEL** | |

Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

### REPLY TO OFFICE ACTION PURSUANT TO 37 C.F.R. § 1.111

This paper is in response to the Office Action dated April 16, 2014 (the "Office Action"), having a response due by July 16, 2014.  This response is timely filed.

Entry of the following amendments and consideration of the following remarks are respectfully requested.

Amendments to the claims start on page 2.

Remarks to amendments and the outstanding office action begin on page 7.

SA_JEV_0004391

<u>Amendment Pursuant to 37 C.F.R. § 1.121</u>

**In the Claims:**

1.      (Currently amended)  A method for treating ~~prostate cancer in~~ a patient <u>with</u>
<u>prostate cancer that has progressed during or after treatment with docetaxel,</u> ~~in need~~
~~thereof~~ comprising administering to said patient <u>a dose of 20 to 25 mg/m$^2$ of</u>
<u>cabazitaxel, or a hydrate or solvate thereof,</u> ~~an effective amount of a compound of~~
~~formula~~



~~which may be in base form or in the form of a hydrate or a solvate,~~

in combination with a corticoid.


2. – 3. (Cancelled)


4.      (Original)  The method according to claim 1, where the prostate cancer is an
advanced metastatic disease.


5.      (Cancelled)


6.      (Currently amended)  The method according to claim 1, where the <u>cabazitaxel</u>
~~compound~~ is in the form of an acetone solvate.


- 2 -

SA_JEV_0004392

7.    (Original)   The method according to claim 6, in which the acetone solvate contains between 5% and 8% by weight of acetone.

8.    (Currently amended)   The method according to claim 35, where ~~the compound is administered at a dose of between 15 and 25 mg/m$^2$, and~~ the prednisone or prednisolone is administered at a dose of 10 mg/day.

9.    (Currently amended)   The method according to claim 8, where the cabazitaxel, or hydrate or solvate thereof, ~~compound~~ is administered at a dose of 25 mg/m$^2$.

10.   (Currently amended)  The method according to claim 1, comprising repeating the administration of cabazitaxel, or hydrate or solvate thereof, ~~such compound~~ as a new cycle every 3 weeks.

11. -12. (Cancelled)

13.   (Currently amended)  The method according to claim 1, wherein the ~~compound is~~ cabazitaxel is in base form.

14.   (Currently amended)   The method according to claim 1, wherein said ~~compound~~ cabazitaxel, or hydrate or solvate thereof, is administered in an amount to provide an AUC of about 991 ng•h/mL (CV 34%).

15.   (Currently amended)   The method according to claim 1, wherein said ~~compound~~ cabazitaxel, or hydrate or solvate thereof, is administered in an amount to provide an $C_{max}$ of about 226 ng•h/mL (CV 107%).

16.   (Currently amended)   The method according to claim 1 wherein said ~~compound~~ cabazitaxel, or hydrate or solvate thereof, is administered in an amount to provide a plasma clearance of 48.5 L/h (CV 39%).

SA_JEV_0004393

17.   (Original)  The method according to claim 1, further comprising monitoring blood counts and measuring neutrophil levels in the patient.

18.   (Cancelled)

19.   (Currently amended)  The method according to Claim 17Claim 18, further comprising discontinuing cabazitaxel treatment in a patient with a neutrophil count of ≤1,500 cells/mm$^3$.

20. - 23. (Cancelled)

24.   (Currently amended)  A method of increasing the survival of a patient with a castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel, comprising administering a clinically proven effective amount dose of 20 to 25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof, a compound as defined in claim 1 to the patient in combination with prednisone or prednisolone.

25. – 33.   (Cancelled)

34.   (Currently amended)  The method according to claim 1, where the compound cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

35.   (Previously presented)  The method according to claim 1, wherein the corticoid is selected from the group consisting of prednisone and prednisolone.

36. (Cancelled)

- 4 -

SA_JEV_0004394

37.    (Currently amended)  The method according to claim 24~~claim 36~~, where the ~~compound~~ cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

38.    (Currently amended)  The method according to claim 24~~claim 36~~, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, ~~compound~~ as a new cycle every 3 weeks.

39.    (Currently amended)  The method according to claim 1, where the prostate cancer is a castration resistant ~~prostate cancer~~ or hormone-refractory prostate cancer.

40.    (Currently amended)   The method according to claim 39, where the cabazitaxel, or hydrate or solvate thereof, ~~compound~~ is administered at a dose of 25 mg/m$^2$.

41.    (Currently amended)  The method according to claim 39, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, ~~compound~~ as a new cycle every 3 weeks.

42.    (Currently amended)  The method according to claim 1, wherein ~~said patient has been previously treated with a docetaxel-based regimen and where~~ the prostate cancer is a castration resistant ~~prostate cancer~~ or hormone-refractory, metastatic prostate cancer.

43.    (Currently amended)  The method according to claim 42, where cabazitaxel, or hydrate or solvate thereof, ~~the compound~~ is administered at a dose of 25 mg/m$^2$.

44.    (Currently amended)  The method according to claim 42, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, ~~compound~~ as a new cycle every 3 weeks.

SA_JEV_0004395

45.    (New)   The method according to claim 1, wherein the prostate cancer is a castration resistant or hormone-refractory, metastatic prostate cancer, and wherein the corticoid is selected from the group consisting of prednisone and prednisolone, and wherein the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

46.    (New)   The method according to claim 45, comprising repeating the administration of said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

47.    (New)  The method according to claim 1, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

48.    (New)  The method according to claim 8, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

49.    (New)  The method according to claim 24, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

50.    (New)  The method according to claim 42, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

SA_JEV_0004396

### *Remarks*

In the Office Action, the Examiner noted that claims 1, 2, 4, 6 to 11, 13 to 19, 24 and 34 to 44 are pending in the application, and that claims 1, 2, 4, 6 to 11, 13 to 19, 24, and 34 to 44 are rejected.

Support for the amendments to the claims can be found throughout the specification, for example on page 4, lines 19 to 25; page 6, lines 8 to 9 and line 13 to page 7 line 4; page 8, line 33 to page 9, line 1; in Examples 1 and 2, and in the claims as originally filed.

Support for new claims 45 to 50 can be found throughout the specification, for example on page 4, lines 19 to 28, Examples 1 and 2, and in the original claims.

Claims 2, 11, 18 and 36 are cancelled without prejudice.

Claim 19 is amended to change its dependency from herein cancelled claim 18 to claim 17.

No new matter is added by these amendments.

Applicant reserves the right to file one or more continuation, continuation-in-part, or divisional applications on the deleted subject matter.

As presently amended, claims 1, 4, 6 to 10, 13 to 17, 19, 24, 34 to 35, 37 to 50 are pending in this application.

### *Interview Summary*

Applicant would like to thank Examiner James Anderson for his time on July 10, 2014 during the interview between the Examiner, Dr. Oliver Sartor, and Applicant's representatives Ms. Gaslonde, Mr. Mandra, and Ms. Bender. During the interview, participants discussed rejections raised in the Office Action dated April 16, 2014 and the draft 37 CFR §1.132 Declaration of Dr. Oliver Sartor. In addition, Dr. Sartor discussed the unpredictable nature of taxanes and prostate cancer treatments and the unexpected results of the invention. During the interview and in the Applicant-Initiated Interview Summary, the Examiner indicated that amending the independent claims to recite 1) treatment of prostate cancer in patients who had progressed during or after docetaxel treatment and 2) administering a dose of 20 to 25 mg/m$^2$ cabazitaxel or a hydrate or solvate thereof in combination with a corticoid would be allowable.

SA_JEV_0004397

### *Discussion of Information Disclosure Statement*

In the Office Action, it is noted that "[i]t appears that Applicants intended to file an Information Disclosure Statement with the reply filed 3/17/2014 as numerous NPL and foreign references were supplied...[h]owever the Office did not receive a PTO-SB-08 listing the supplied references." (at page 4).

Applicant confirms that an Information Disclosure Statement was intended to be submitted with the NPL and foreign references and cover letter thereto submitted on March 17, 2014 and that the corresponding FORM PTO-SB-08 has not been submitted therewith, through error. The PTO-SB-08 corresponding to the NPL and foreign documents submitted on March 17, 2014 was subsequently submitted on April 29, 2014. Applicant thanks the Examiner for identifying this mistake, and respectfully requests his consideration of this previously submitted Information Disclosure Statement.

For the sake of clarity, Applicant notes that a new Supplemental Information Disclosure Statement is being submitted concurrently herewith.

### *Discussion of Rejection under 35 U.S.C. § 112, second paragraph*

Claim 2 is rejected under 35 U.S.C. § 112, second paragraph, as being, the Examiner alleges, indefinite for the stated reason that ""[c]laim 2 recites a method of claim 1, where said patient 'is not catered for by a taxane-based treatment.' However, claim 1 requires administration of cabazitaxel, which is a taxane. As such, it is unclear how the patients of claim 1 cannot be catered for by a taxane-based treatment when claim 1 requires administration of a taxane" (Office Action, page 5).

Without acquiescing to the propriety of the rejection, and solely to advance prosecution, claim 2 has been cancelled. The rejection of claim 2 under 35 U.S.C. § 112, first paragraph is therefore rendered moot.

### *Discussion of Rejection under 35 U.S.C. § 102(b)*

Claims 1 to 2, 4, 10, 13, 24, 35 to 36, 38 to 39, 41 to 42, and 44 are rejected under 35 U.S.C. § 102(b) as being, the Examiner alleges, anticipated by Beardsley et al. (Current Opinion in Supportive and Palliative Care, 2008, vol. 2, pp. 161 to

- 8 -

SA_JEV_0004398

166, hereinafter "Beardsley"). It is the Examiner's position that Beardsley "anticipate[s] administering cabazitaxel in combination with prednisone to patients with castration-resistant metastatic prostate cancer previously treated with docetaxel-containing treatment as presently claimed." (Office Action, page 6).

For an anticipation rejection, each and every element of a claim must identically appear in a single prior art reference. *See, Gechter v. Davidson*, 116 F.3d 1454, 1457, 43 USPQ2d 1030, 1032 (Fed. Cir. 1997).

In support of this rejection, the Office Action refers to Beardsley's statement that XRP6258 is "currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment." (Beardsley at 163). Importantly, the doses of cabazitaxel and prednisone are not disclosed in Beardsley.

Accordingly, it is respectfully submitted that Beardsley does not teach each and every element of the rejected claims, as previously presented, for at least the reason that Beardsley does not describe *any dose* of cabazitaxel, let alone an *effective* amount of cabazitaxel.

Nevertheless, without agreeing to the propriety of this rejection, independent claims 1 and 24 have been amended as proposed by the Examiner to include a dose amount of cabazitaxel, which element is not described in Beardsley. Accordingly, reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(b) are therefore respectfully requested.

### Discussion of Rejection under 35 U.S.C. § 103(a)

Claims 1, 2, 4, 8 to 11, 13 to 19, 24, and 34 to 44 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Mita et al. (Clin Cancer Res, 2009, 15(2) pp. 723-730, hereinafter "Mita") in view of Tannock et al. (N Eng J Med, 2004, 351, pp. 1502-1512, hereinafter "Tannock") and Beardsley. This rejection is respectfully traversed.

It is the Examiner's position that one would have been motivated to "combine the teachings of the references so as to administer cabazitaxel in combination with prednisone" because Mita allegedly teach that "cabazitaxel is effective in treating

- 9 -

prostate cancer metastatic to liver and bones whose disease has progressed through surgical castration, bicalutamide, dietheryl stilbestrol, and mitoxantrone and prednisone and hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes when administered as a single agent." (Office Action, page 13). Further, it is the Examiner position that the "motivation to add prednisone to such treatment is clearly seen in Tannock et al., who teach that administration of the taxane, docetaxel, in combination with prednisone is effective in treating hormone-refractory prostate cancer." (*Id.*). Beardsley is relied upon in the Office Action for the given reason that it "disclose[s] that there is an urgent need for systemic treatment options for patients with castrate-resistant prostate cancer who have progressed after receiving first-line docetaxel therapy" and that cabazitaxel is "currently being investigated in a phase III multi-center, randomized superiority trial." (Office Action, pages 11 and 14).

It has long been held that "[t]he factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors, also known as objective indicia of non-obviousness," (*Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd., 533 F.3d 1353, 1356 (Fed. Cir. 2008)*; citing *Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966))*. Indeed, to render a claimed invention obvious under 35 U.S.C. § 103, the cited reference themselves, coupled with the knowledge generally available in the art at the time of the invention, must contain some suggestion or incentive that would have motivated the skilled artisan to combine or modify them in the manner necessary to arrive at the claimed invention (*See*, MPEP § 2143.01). In addition, the proposed combination or modification must have had a reasonable expectation of success, determined from the vantage point of the skilled artisan at the time the invention was made. (*See*, MPEP § 2143.02).

The present application, which describes the results from a Phase III clinical trial, demonstrates that administration of cabazitaxel in combination with prednisone to patients with hormone-refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen resulted in a statistically significant longer overall survival compared to patients receiving a mitoxantrone plus prednisone. (*See*, Specification, p. 18).

SA_JEV_0004400

The primary Mita reference describes Phase I and pharmacokinetic studies of cabazitaxel in a limited number of patients with a variety of solid tumors. The studies were designed to evaluate the safety and dosage of cabazitaxel, but "preliminary evidence of antitumor activity" was to be documented. (Mita at 724, bottom left column, top left column). While eight of the twenty-five patients had prostate tumors (*Id.* at 725, Table 1), Mita indicated that evidence of anticancer activity was noted in two patients, including one patient with "hormone- and docetaxel-refractory prostate cancer metastatic to bone and iliac lymph nodes." (*Id.* at 727).

The evidence of anticancer activity in a single patient does not provide an expectation that the claimed method would successfully treat prostate cancer. Indeed, no antitumor activity was seen in the majority of the patients treated. Moreover, it is important to note that Mita nowhere suggests that one skilled in the art should use cabazitaxel for the treatment of prostate cancer based on these results, as the efficacy data provided is only "preliminary" evidence.

Second, cancer research, and in particular clinical trials of antitumor drugs, is highly unpredictable. (*See e.g.,* Kola et al. stating "[a]pproximately 62% of all compounds that enter Phase II trials undergo attrition, and again the highest rate of attrition at this phase is in the oncology field: more than 70% of oncology compounds fail in this phase," *Nature Reviews Drug Discovery*, 2004, Vol 3., pp. 711-715 at 712, cited in attached IDS). Accordingly, given the extremely limited nature of the patients described in Mita and the unpredictability and complexity of treatment of cancer, one skilled in the art would not have the requisite reasonable expectation that patients with hormone-refractory metastatic prostate cancer, who were previously treated with a docetaxel-containing regimen, could be successfully treated by the claimed method.

As noted by the Examiner at page 17 of the Office Action, the abstract of Mita states that "the general tolerability and encouraging antitumor activity in taxane-refractory patients warrant further evaluations of XRP6258 [cabiztaxel]." Even assuming, *arguendo*, that this statement gives a general *incentive* to evaluate cabazitaxel in these taxane-refractory patients, none of the cited references provide the requisite evidence of *predictability* in the treatment of such cancer patients. Absent evidence of predictability, Mita cannot provide a reasonable expectation of success in the treatment of prostate cancer in taxane-refractory patients.

SA_JEV_0004401

Cited reference Beardsley is a review article describing research developments on a wide variety of different approaches to treating metastatic castration-resistant prostate cancer ("mCRPC"). Beardsley notes that "given its activity in the docetaxel refractory setting" of the phase II study in breast cancer, cabazitaxel was being investigated in a phase III trial "comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrate resistant metastatic prostate cancer previously treated with docetaxel-containing treatment." (*Id.*). As previously noted, the doses of cabazitaxel and prednisone are not disclosed. Beardsley does not report any results from a phase III study on cabazitaxel or any clinical data from administration of cabazitaxel to patients with prostate cancer. Beardsley nevertheless expresses that there is an "urgent need for systemic treatment options for patients with castration-resistant prostate cancer who have progressed after receiving first-line docetaxel chemotherapy." (Abstract).

Tannock reports the results of a phase III study comparing docetaxel plus prednisone with mitoxantrone plus prednisone in metastatic hormone-refractory prostate cancer, also commonly referred to as mCRPC. Tannock does not mention cabazitaxel or the effective treatment of a patient with prostate cancer that has progressed during or after treatment with docetaxel. Accordingly, nothing in Tannock would provide one skilled in the art with the reasonable expectation that a combination of cabazitaxel with prednisone would successfully treat a patient with prostate cancer that has progressed during or after treatment with docetaxel.

Applicant therefore submits that the claimed invention as a whole was not known in the prior art, that the combination of Mita, Tannock, and Beardsley would not have provided a reasonable expectation of predictable results, and that the results of the claimed invention were unexpected and urgently needed.

In this regard, Applicant submits contemporaneously herewith a Declaration of Dr. Alton Oliver Sartor, M.D. under 37 CFR §1.132 demonstrating the unpredictable nature of taxanes and clinical treatment or prostate cancer. More specifically, Dr. Sartor explains that, in his opinion, the references cited in the Office Action, "would not give a person of ordinary skill at the relevant time a reasonable expectation that cabazitaxel could successfully treat mCRPC." (at para. 71). Dr. Sartor demonstrates that it would have been extremely difficult to predict a clinical success for the treatment of prostate cancer, even after a Phase I or Phase II study, and in particular in patients previously treated with a docetaxel-containing treatment

SA_JEV_0004402

(see. e.g., para. 18 to 43 of the 132 Declaration). Dr. Sartor further indicates that although Beardsley describes the "urgent need for systemic treatment options for patients with castration-resistant prostate cancer who have progressed after receiving first-line docetaxel chemotherapy," none of the treatments proposed by Beardsley met this clinical need before the effective filing date of the instant application, and that this urgent need was not met until the FDA approved Jevtana (cabazitaxel) in view of the results of the instant invention (see, e.g., para. 62 to 63 of the 132 Declaration). Finally, Dr. Sartor further demonstrates that the results of the claimed invention were truly unexpected to those skilled in the art (see, e.g., para. 64 to 70).

For the foregoing reasons, claims 1, 4, 6 to 10, 13 to 17, 19, 24, 34 to 35, 37 to 45, and as presented amended, as well as new claims 46 to 50, are unobvious over the combination of Mita, Tannock, and Beardsley. Therefore, reconsideration and withdrawal of the instant rejection under 35 U.S.C. § 103(a) are respectfully requested.

Claims 6 and 7 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Mita, in view of Tannock and Beardsley as applied to claims 1 to 2, 4, 8 to 11, 13 to 19, 24, and 34 to 44, and further in view of Didier et al. (US2005/0065138).

Didier et al., which is cited for allegedly teaching "acetone solvate[] of cabazitaxel" and "acetone solvate[] containing between 5% and 8% of acetone" (Office Action, page 15), dose not remedy the deficiencies of Mita, Tannock and Beardsley, as described above and discussed in Dr. Sartor's Declaration under 37 CFR §1.132. Accordingly, Didier et al., in combination with Mita, Tannock, and Beardsley does not render claims 6 and 7 obvious. Reconsideration and withdrawal of this rejection of claims 6 and 7 are therefore respectfully requested.

### ***Conclusion***

There being no remaining issues, this application is believed in condition for favorable reconsideration and early allowance, and such actions are earnestly solicited.

In the event the Examiner wishes to contact the undersigned regarding any matter, please call (collect if necessary) the telephone number listed below.

SA_JEV_0004403

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment to Deposit Account No. **18-1982**.

Respectfully submitted,

/Kelly L. Bender/
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi US
U.S. Patent Operations
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **uspatent.e-filing@sanofi.com**
Telephone: (908) 981-**6782**
Telefax:     (908) 981-7830
Sanofi US Ref. FR2009/121 US CNT

Date:  July 16, 2014

- 14 -

SA_JEV_0004404

IntraMed - Artículos - Alternativas terapéuticas para el cáncer de próstata avanzado

**IntraMed**

Inicio  Secciones  Campus Virtual  Journal  Eventos  Foros  Servicios

## Artículos

Buscando el tratamiento más eficaz | 30 NOV 05

# Alternativas terapéuticas para el cáncer de próstata avanzado

Cuando se agregó prednisona al tratamiento con docetaxel cada tres semanas, se observó una sobrevida superior comparado con el tratamiento de mitoxantrona más prednisona.

TWEET

*Autor: Dres. Tannock IF, de Wit R, Berry WR, Horti J. Fuente: Department of Medical Oncology and Hematology, Princess Margaret Hospital and University of Toronto, Toronto, ON, Canada. N Engl J Med. 2004 Oct 7;351(15):1502-12*

### Antecedentes

Mitoxantrona más prednisona reduce el dolor y mejora la calidad de vida en hombres con cáncer de próstata avanzado refractario a hormonas, pero no aumenta la sobrevida. Comparamos ese tratamiento con docetaxel más prednisona en hombres con esta enfermedad.

### Métodos

Entre marzo de 2000 y junio de 2002, se administraron 5 mg de prednisona dos veces por día a 1.006 hombres con cáncer de próstata avanzado, refractario a hormonas. Se les aplicó aleatoriamente 12 mg de mitoxantrona por metro cuadrado de superficie corporal cada tres semanas, 75 mg de docetaxel por metro cuadrado cada tres semanas o 30 mg de docetaxel por semana por cinco o seis semanas. El objetivo primario fue la sobrevida global. Los objetivos secundarios fueron el dolor, los niveles de antígeno prostático específico (PSA) y calidad de vida. Se realizaron todas las comparaciones estadísticas con la mitoxantrona.

### Resultados

Comparados con los hombres del grupo de la mitoxantrona, los hombres del grupo al que se le administró docetaxel cada tres semanas, tuvieron una tasa de riesgo para la muerte de 0.76 (intervalo de confianza 95%, 0.62 a 0.94; P=0.009 por la prueba log-rank estratificada) y aquéllos a los que se les administró docetaxel semanalmente, tuvieron una tasa de riesgo para la muerte 0.91 (intervalo de confianza 95%, 0.75 a 1.11; P=0.36). La sobrevida promedio fue de 16,5 meses en el grupo de la mitoxantrona, 18,9 meses en el grupo medicado con docetaxel cada tres semanas y 17,4 meses en el grupo de docetaxel semanal. En los tres grupos, 32%, 45% y 48 % de pacientes respectivamente, registraron al menos una reducción del 50% en el nivel de PSA sérico (P<0.001 para las dos comparaciones con mitoxantrona); 22%, 35% (P=0.01) y 31% (P=0.08) experimentaron reducciones predefinidas del dolor; y 13%, 22% (P=0.009) y 23% (P=0.005) mejoraron la calidad de vida. Fueron comunes los efectos adversos en los grupos que recibieron docetaxel.

### Conclusiones

Cuando se agregó prednisona al tratamiento con docetaxel cada tres semanas, se observó una sobrevida superior y mayores tasas de respuesta en términos de dolor, nivel de PSA sérico y calidad de vida, comparado con el tratamiento de mitoxantrona más prednisona.

TWEET

**Los más...**

Leídos  Comentados  ☆ Favoritos

1. A 14 años de la trágica muerte del Dr. René Favaloro
2. "En medicina hay que justificar lo que se hace, las "opiniones" generan epidemias"
3. Insuficiencia suprarrenal
4. Insuficiencia cardíaca: diagnóstico y tratamiento
5. Recomendaciones para el tratamiento de la hipertensión arterial

1. Probióticos en el tratamiento del Síndrome de Intestino Irritable y otras patologías digestivas
2. Más de 100 expertos en VIH mueren en el vuelo MH17 derribado en Ucrania
3. Conductas en Gastroenterología
4. Recomendaciones para el tratamiento de la hipertensión arterial
5. Dura crítica a la política de la FIFA sobre trauma de cráneo

1. Recomendaciones para el tratamiento de la hipertensión arterial
2. Insuficiencia cardíaca: diagnóstico y tratamiento
3. Síndromes coronarios agudos
4. Conductas en Gastroenterología
5. Análisis de orina en emergencias

**Foros**

Narrativa y Medicina
Kinesiología y Fisioterapia
Prevención Cardiovascular
Medicina Legal

SA_JEV_0004831



### Comentarios

Usted debe estar registrado para expresar su opinión. Si ya es usuario de IntraMed o desea registrarse como nuevo usuario, ingrese aquí

Enfermería
Neurología
Jerga Médica
Salud Mental
Tocoginecología
Clínica Médica
Cirugía
Pediatría
Cardiología
Búsqueda Bibliográfica

→ Foros



**Contenidos**
Artículos
Noticias
Puntos de vista
Entrevistas
Biblioteca Virtual
Encuestas
Investigaciones
Arte & Cultura
Tecnología

**Campus Virtual**
Acceso
Agenda de cursos
Preguntas frecuentes
Acerca del Campus

**IntraMed Journal**
Número actual
Archivo
Enviar trabajos

**Comunidad**
Eventos
Foros

**Servicios**
Ayuda
Vademecum
Páginas Profesionales
Tarjetas Virtuales

Contáctenos | Quienes somos

  

COMSCORE

Términos y condiciones de uso | Todos los derechos reservados |

  Copyright 1997-2014

SA_JEV_0004832

Treatment alternatives for advanced prostate cancer

When prednisone was added to docetaxel treatment every three weeks, improved survival in comparison with mitoxantrone plus prednisone treatment was observed.

*Author: Drs Tannock IF, de Wit R, Berry WR, Horti J. Source: Department of Medical Oncology and Hematology, Princess Margaret Hospital and University of Toronto, Toronto, ON, Canada. N Engl J Med. 2004 Oct 7;351(15):1502-12*

**Background**

Mitoxantrone plus prednisone reduces pain and improves quality of life in men with advanced hormone-refractory prostate cancer, but does not improve survival.
We compared this treatment with docetaxel plus prednisone in men with this disease.

**Methods**

Between March 2000 and June 2002, 5 mg of prednisone was administered twice daily to 1,006 men with hormone-refractory metastatic prostate cancer. They were randomized to receive 12 mg of mitoxantrone per square metre of body surface area every three weeks, 75 mg of docetaxel per square metre every three weeks or 30 mg of docetaxel weekly for five or six weeks. The primary endpoint was overall survival. The secondary endpoints were pain, prostate specific antigen (PSA) levels and quality of life. All statistical comparisons with mitoxantrone were performed.

**Results**

Compared with the men in the mitoxantrone group, the men in the group receiving docetaxel every three weeks had a mortality risk of 0.76 (95% confidence interval, 0.62 to 0.94; P=0.009 by the stratified log-rank test) and those receiving docetaxel weekly had a mortality risk of 0.91 (95% confidence interval, 0.75 to 1.11; P=0.36). Mean survival was 16.5 months in the mitoxantrone group, 18.9 months in the group treated with docetaxel every three weeks and 17.4 months in the docetaxel weekly group. In the three groups, 32%, 45% and 48% of patients respectively had a 50% reduction in serum PSA (P<0.001 for the two comparisons with mitoxantrone); 22%, 35% (P=0.01) and 31% (P=0.08) experienced predefined reductions in pain; and 13%, 22% (P=0.009) and 23% (P=0.005) had improved quality of life. Adverse effects were common in the groups receiving docetaxel.

**Conclusions**

When prednisone was added to docetaxel-based treatment every three weeks, improved survival and greater response rates in terms of pain, serum PSA and quality of life, compared with the mitoxantrone plus prednisone treatment, were observed.

SA_JEV_0004833

# EXHIBIT E

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/627,962 | 06/20/2017 | Sunil GUPTA | FR2009/121 US CNT3 | 5732 |

5487        7590        03/15/2018

ANDREA Q. RYAN
SANOFI
55 Corporate Drive
MAIL CODE: 55A-525
BRIDGEWATER, NEW JERSEY 08807
UNITED STATES OF AMERICA

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/15/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

GlobalPatent.eFlow@Sanofi.com
andrea.ryan@sanofi.com
eFlow@frasappmoss112.pharma.aventis.com

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. 15/627,962 | | Applicant(s) GUPTA, Sunil | |
|---|---|---|---|---|
| | Examiner JAMES D ANDERSON | | Art Unit 1629 | AIA Status No |

All participants (applicant, applicants representative, PTO personnel):

(1) <u>JAMES D. ANDERSON</u>.                    (3) <u>DANIEL MINION</u>.

(2) <u>KELLY BENDER</u>.                              (4) _____.

Date of Interview: <u>12 March 2018</u>.

Type:     ☐ Telephonic   ☐ Video Conference
          ☑ Personal [copy given to:  ☐ applicant   ☐ applicant's representative]

Exhibit shown or demonstration conducted:   ☐ Yes   ☑ No.
    If Yes, brief description: _____.

Issues Discussed   ☐101   ☐112   ☐102   ☐103   ☑Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: <u>34-49</u>.

Identification of prior art discussed: <u>NONE</u>.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

<u>See Continuation Sheet</u>.

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

|  | /James D. Anderson/ Primary Examiner, Art Unit 1629 |
|---|---|

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) 1.133 Interviews
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

---

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiners responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicants correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
- Application Number (Series Code and Serial Number)
- Name of applicant
- Name of examiner
- Date of interview
- Type of interview (telephonic, video-conference, or personal)
- Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
- An indication whether or not an exhibit was shown or a demonstration conducted
- An identification of the specific prior art discussed
- An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable. Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
- The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,-
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicants record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiners version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, Interview Record OK on the paper recording the substance of the interview along with the date and the examiners initials.

Continuation of Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: The Examiner granted this interview prior to examination because this application is a CON of an application that was previously allowed and is presently undergoing litigation. The Examiner agreed with Applicants that it would be helpful to discuss the issues being litigated in the parent case in relation to the present claims. In this regard, discussion focused on the differences between the present claims and those of the parent case, most specifically Claim 44. It is Applicants' intent to amend at least Claim 44 prior to examination to recite limitations pertaining to increasing overall survival of the patient. Whether such a limitation is recited in the preamble or elsewhere in the claim has not been decided.

Applicants also discussed the "intent" of the treatment, e.g., if the claim recited that the cabazitaxel is administered with the intent of increasing overall survival, one skilled in the art could not have that intent without having an expectation of success and one skilled in the art could not have an expectation of success without data from a clinical trial, e.g., the TROPIC Trial, that cabazitaxel increases overall survival.

The Examiner indicated that the issues in the present case will likely mirror those in the parent case, particularly with regard to claim construction, i.e., whether a recitation of increasing overall survival of a patient is construed as a claim limitation.

No agreement was reached at this time. The Examiner indicated that he will, in the first Office Action, provide a detailed discussion of his claim construction/interpretation so any disagreements on claim interpretation can be addressed during prosecution.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of **GUPTA**                    Examiner:      **James D. Anderson**

                                                  Art Unit:      **1629**

Application No.:  **15/627,962**

Filed:            **June 20, 2017**          Conf. No.      **5732**

Title:                **NOVEL ANTITUMORAL USE OF CABAZITAXEL**

Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

## SUPPLEMENTAL PRELIMINARY AMENDMENT

Before examining the above-indicated application on the merits, kindly enter the following amendments.

Amendments to the claims start on page 2.

Remarks to amendments begin on page 4.

### *Remarks*

Claim 37 is amended to incorporate the limitations of claim 39. Claim 39 is cancelled without prejudice.

Support for the amendment to claim 44 can be found in the Specification, for example, on page 4, lines 31 to 32; page 18, line 30 to page 19, line 15; and in Figure 1. Claims 48 and 49 are cancelled without prejudice.

No new matter has been added by these amendments.

Applicants reserve the right to pursue the cancelled subject matter in one or more continuation, continuation-in-part, or divisional applications.

As currently amended, claims 34 to 38 and 40 to 47 are pending in this application.

### *Interview Summary*

Applicant would like to thank Examiner James Anderson for his time on March 12, 2018, during the interview between the Examiner, Danial Minion, and the undersigned. During the interview, participants discussed the pending claims and the claims of US Patent No. 8,927,592, which patent is subject to an *Inter Partes Review*. As noted in the Interview Summary mailed March 15, 2018, Applicants offered to amend claim 44 as provided herewith.

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment to Deposit Account No. **18-1982**.

Respectfully submitted,

_____/Kelly L. Bender/_____
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi
Global IP Patent Department
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **GlobalPatent.eFlow@sanofi.com**
Telephone: (908) 981-**6782**
Telefax:    (908) 981-7830
Sanofi Ref. FR2009/121 US CNT3
Date:   May 25, 2018

Sanofi Ref. FR2009/121 US CNT3                                    US Application No. 15/627,962

**Claim amendments**:

1. - 33.  (Cancelled)

34.  (Previously presented)  A method of treatment comprising administering (i) an antihistamine, (ii) a corticoid, (iii) an $H_2$ antagonist, and (iv) and an effective amount of cabazitaxel, or a hydrate or solvate thereof, to a patient with castration resistant, metastatic prostate cancer that has progressed during or after treatment with docetaxel, wherein said antihistamine, said corticoid, and said $H_2$ antagonist are administered prior to said effective amount of cabazitaxel, or hydrate or solvate thereof, and wherein said cabazitaxel, or a hydrate or solvate thereof, is administered intravenously at a dose of 15 mg/m$^2$.

35. (Previously presented)  The method according to claim 34, wherein the cabazitaxel is administered in combination with prednisone at a dose of 10 mg/day.

36.  (Previously presented)  The method according to claim 35, further comprising repeating the administration of said antihistamine, said corticoid, said $H_2$ antagonist, and said effective amount of cabazitaxel, or hydrate or solvate thereof, intravenously as a new cycle every three weeks.

37.  (Currently amended)  A method of reducing the risk of a severe hypersensitivity reaction in a patient with prostate cancer beginning treatment with cabazitaxel as a new cycle every three weeks comprising administering to said patient (i) an antihistamine, (ii) a corticoid, and (iii) an $H_2$ antagonist prior to the administration of said cabazitaxel, wherein the antihistamine is dexchlorpheniramine administered at a dose of 5 mg and the corticoid is dexamethasone administered at a dose of 8 mg.

38.  (Previously presented)  The method according to claim 37, wherein the antihistamine, corticoid, and $H_2$ antagonist are administered 30 minutes prior to the administration of said cabazitaxel.

39.  (Cancelled)

40.  (Previously presented)  The method according to claim 39, wherein the dose of said cabazitaxel is 15-25 mg/m$^2$.

41.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 25 mg/m$^2$.

42.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 20 mg/m$^2$.

43.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 15 mg/m$^2$.

44.  (Currently amended) A method of treatment comprising administering (i) an antihistamine, (ii) a corticoid, (iii) an H$_2$ antagonist, and (iv) a clinically proven effective amount of cabazitaxel, or a hydrate or solvate thereof, to a patient with castration resistant, metastatic prostate cancer that has progressed during or after treatment with docetaxel and with the intent of increasing survival of said patient, wherein said antihistamine, said corticoid, and said H$_2$ antagonist are administered prior to said clinically proven effective amount of cabazitaxel.

45.  (Previously presented) The method according to claim 44, wherein said clinically proven effective amount of cabazitaxel is a dose of 20-25 mg/m$^2$ cabazitaxel administered in combination with prednisone at a dose of 10 mg/day.

46.  (Previously presented) The method according to claim 45, wherein the cabazitaxel is administered at a dose of 25 mg/m$^2$.

47.  (Previously presented) The method according to claim 45, wherein the cabazitaxel is administered at a dose of 20 mg/m$^2$.

48.  – 49.  (Cancelled)

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/627,962 | 06/20/2017 | Sunil GUPTA | FR2009/121 US CNT3 | 5732 |

5487          7590          07/17/2018

ANDREA Q. RYAN
SANOFI
55 Corporate Drive
MAIL CODE: 55A-525
BRIDGEWATER, NEW JERSEY 08807
UNITED STATES OF AMERICA

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/17/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

GlobalPatent.eFlow@Sanofi.com
andrea.ryan@sanofi.com
eFlow@frasappmoss112.pharma.aventis.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 15/627,962 | Applicant(s) GUPTA, Sunil | |
|---|---|---|---|
| | Examiner JAMES D ANDERSON | Art Unit 1629 | AIA Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>5/25/2018</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL.**   2b) ☑ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims\***

5) ☑ Claim(s) <u>34-38 and 40-47</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☑ Claim(s) <u>37-38</u> is/are allowed.

7) ☑ Claim(s) <u>34-36 and 40-47</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov**.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some\*\*   c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date <u>3/8/2018 and 5/25/2018</u>

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 15/627,962                                      Page 2
Art Unit: 1629

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Formal Matters*

Applicants' preliminary amendments to the claims, filed 1/29/2018 and 5/25/2018, have

been received and entered.

Claims 1-33 were cancelled and claims 34-49 were newly added in the amendments filed

1/29/2018.

Claims 39 and 48-49 were cancelled in the amendments filed 5/25/2018.

Claims 34-38 and 40-47 are pending and under examination.

### *Priority*

This application is a continuation of U.S. Application No. 14/575,566, filed December 18,

2014, which is a continuation of U.S. Application No. 13/456,720, filed April 26, 2012, which is

a continuation of International Application No. PCT/IB2010/054886, filed October 27, 2010,

which claims the benefit of priority of U.S. Provisional Application No. 61/256,160, filed October

29, 2009, U.S. Provisional Application No. 61/293,903, filed January 11, 2010, U.S. Provisional

Application No. 61/355,834, filed June 17, 2010, U.S. Provisional Application No. 61/355,888,

filed June 17, 2010, U.S. Provisional Application No. 61/389,929, filed August 2, 2010, U.S.

Provisional Application No. 61/383,933, filed September 17, 2010, and U.S. Provisional

Application No. 61/389,969, filed October 5, 2010.

Application/Control Number: 15/627,962                                    Page 3
Art Unit: 1629

Applicant's claim for the benefit of a prior-filed application under 35 U.S.C. 119(e) or

under 35 U.S.C. 120, 121, 365(c), or 386(c) is acknowledged. Applicant has not complied with

one or more conditions for receiving the benefit of an earlier filing date under 35 U.S.C. 119(e)

as follows:

The later-filed application must be an application for a patent for an invention which is also

disclosed in the prior application (the parent or original nonprovisional application or provisional

application). The disclosure of the invention in the parent application and in the later-filed

application must be sufficient to comply with the requirements of 35 U.S.C. 112(a) or the first

paragraph of pre-AIA 35 U.S.C. 112, except for the best mode requirement.  See *Transco Products,*

*Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 32 USPQ2d 1077 (Fed. Cir. 1994)

The disclosure of the prior-filed application, U.S. Provisional Application No. 61/256,160,

filed October 29, 2009, fails to provide adequate support or enablement in the manner provided by

35 U.S.C. 112(a) or pre-AIA 35 U.S.C. 112, first paragraph for one or more claims of this

application.  The '160 Provisional Application does not disclose or describe administering

cabazitaxel in combination with a premedication comprising an antihistamine, a corticoid, and an

H2 antagonist.

U.S. Provisional Application No. 61/293,903, filed January 11, 2010, provides written

support for administering cabazitaxel in combination with a premedication comprising an

antihistamine, a corticoid, and an H2 antagonist. See page 7, lines 2-12.

Accordingly, the earliest effective U.S. filing date afforded the instant claims is **January**

**11, 2010**.

Application/Control Number: 15/627,962                                    Page 4
Art Unit: 1629

### *Information Disclosure Statement*

Receipt is acknowledged of the Information Disclosure Statements filed 3/8/2018 and

5/25/2018.  The Examiner has considered the references cited therein to the extent that each is a

proper citation.  Please see the attached USPTO Form 1449.

### *Prosecution History*

In view of the extensive litigation involved in U.S. Application No. 13/456,720, which

issued as U.S. Patent No. 8,927,592 on 1/6/2015, a review of the prosecution history and findings

of the Patent Trial and Appeal Board (PTAB) as they apply to the present case are in order.

Allowed Claim 1 of the '720 application recited:

> 1. A method for treating a patient with prostate cancer that
> has progressed during or after treatment with docetaxel, com-
> prising administering to said patient a dose of 20 to 25 mg/m²
> of cabazitaxel, or a hydrate or solvate thereof, in combination
> with a corticoid.

Allowed Claim 27 of the '720 application recited:

> 27. A method of increasing the survival of a patient with a
> castration resistant or hormone refractory, metastatic prostate
> cancer that has progressed during or after treatment with
> docetaxel, comprising administering a dose of 20 to 25
> mg/m² of cabazitaxel, or hydrate or solvate thereof, to the
> patient in combination with prednisone or prednisolone.

In allowing the claims of the '720 application, the Examiner was persuaded by Applicants'

arguments and factual evidence that it is surprising and unexpected that a combination of

cabazitaxel and a corticoid are clinically effective in the treatment of prostate cancer that has

progressed during or after treatment with docetaxel. Specifically, the 37 CFR 1.132 Declaration of

Dr. Sartor filed 7/16/2014 in the '720 application provided convincing evidence that while the art

was full of promising early clinical results, these failed to predict whether therapies would

Application/Control Number: 15/627,962                                             Page 5
Art Unit: 1629

ultimately provide a clinically meaningful benefit to the desired patient populations and that

mCRPC was known to be a particularly challenging and unpredictable indication.

       Although not expressly stated during prosecution or allowance of the '720 application, the

Examiner was construing "treating a patient" (Claim 1) and "increasing survival of a patient"

(Claim 27) as claim limitations. However, the PTAB considered "treating a patient" (Claim 1) and

"increasing survival of a patient" (Claim 27) as mere recitations of an intended use/intended result

and not claim limitations.  In this regard, the PTAB construed "a method for treating a patient" in

claim 1 as a non-limiting statement of the purpose of the claimed method. At most, the PTAB

considered the phrase would be construed as "a method intended to benefit a patient." (Citing

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F,3d 1368, 1375-76 (Fed. Cir.

2001) (The preamble language "a method of treating a patient," "does not result in a manipulative

difference in the steps of the claim," and the recited method steps "are performed the same way

regardless [of] whether or not the patient experiences a [therapeutic effect].")). Likewise, the

PTAB construed the preamble of Claim 27 as a non-limiting statement of the purpose of the

claimed method for the same reasons as discussed for Claim 1. The PTAB issued a Final Written

Decision finding that Claims 1-5 and 7-30 of the '592 are unpatentable. An Appeal, Appellants

did not appeal the finding that Claims 1-5 and 7-30 of the '592 are unpatentable.  Rather,

Appellants appealed the Board's denial of Appellants' motion to amend Claims 27-30 via

introduction of proposed substitute Claims 31-34. Claim 31, proposed as a substitute for original

Claim 27, is reproduced below, with strikethroughs showing the subject matter deleted from Claim

27, and underlining showing the subject matter added.

31.     A method of increasing [the] survival [of a patient]
comprising administering to a patient in need thereof (i)
an antihistamine, (ii) a corticoid, (iii) an H₂ antagonist,
and (iv) a dose of 20 to 25 mg/m² of cabazitaxel, or a
hydrate or solvate thereof, wherein said antihistamine,
said corticoid, and said H₂ antagonist are administered
prior to said dose of 20 to 25 mg/m² of cabazitaxel, or
hydrate or solvate thereof, in combination with
prednisone or prednisolone, wherein said patient has
[with a] castration resistant or hormone refractory,
metastatic prostate cancer that has progressed during or
after treatment with docetaxel [, comprising
administering a dose of 20 to 25 mg/m² of cabazitaxel, or
a hydrate or solvate thereof, to the patient in combination
with prednisone or prednisolone].

Instant Claim 34 differs from proposed substitute Claim 31 above in that it recites "[A] method of treatment", not "[A] method of increasing survival", and recites the cabazitaxel is administered intravenously at a dose of 15 mg/m2, not a dose of 20 to 25 mg/m2.

Instant Claim 37 differs from proposed substitute Claim 31 above in that it recites "[A] method of reducing the risk of a severe hypersensitivity reaction in a patient", not "[A] method of increasing survival", and recites the cabazitaxel is administered as a new cycle every three weeks and the antihistamine is dexchlorpheniramine administered at a dose of 5 mg and the corticoid is dexamethasone administered at a dose of 8 mg.

Instant Claim 44 differs from proposed substitute Claim 31 above in that it recites "[A] method of treatment" but also recites the administration is "with the intent of increasing survival of said patient", and recites "a clinically proven effective amount of cabazitaxel", which in dependent Claim 45 is recited to be a dose of 20-25 mg/m2.

Accordingly, Appellants' arguments in their Appeal of the PTAB's Final Decision are clearly material to patentably of the instant claims. On the one hand, if the PTAB's Final Decision is upheld by the Federal Circuit, the instant claims would likely be unpatentable. On the other hand, if the PTAB's Final Decision is reversed, the instant claims would likely be patentable.

Application/Control Number: 15/627,962                                    Page 7
Art Unit: 1629

Unfortunately, the Examiner cannot suspend prosecution of the instant case to wait for a decision

of the Federal Circuit.  As such, the Examiner has considered Appellants' arguments as presented

in their Appeal of the PTAB's Final Decision as they apply to the present claims.  The Examiner,

agrees with the PTAB that administering a premedication comprising an antihistamine, a corticoid,

and an H2 antagonist prior to administering the taxane cabazitaxel would have been *prima facie*

to one of ordinary skill in the art at the time the invention was made.


### *Claim Construction/Broadest Reasonable Interpretation (BRI) of the Claims*

Claim Construction

Only the following claim terms require express construction.

1. Claims 34 and 44: "A method of treatment"

The preamble phrases in claims 34 and 44, "a method of treatment", is a non-limiting

statement of the purpose of the claimed methods, or at most, is construed as "a method intended

to benefit a patient."  *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F,3d 1368,

1375-76 (Fed. Cir. 2001) (The preamble language "a method of treating a patient," "does not result

in a manipulative difference in the steps of the claim," and the recited method steps "are performed

the same way regardless [of] whether or not the patient experiences a [therapeutic effect].")).

2. Claim 37: "A method of reducing the risk of a severe hypersensitivity reaction"

The preamble phrase in claim 37, "A method of reducing the risk of a severe

hypersensitivity reaction", is a non-limiting statement of the purpose of the claimed method, or at

most, is construed as "a method intended to reduce the risk of a severe hypersensitivity reaction."

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F,3d 1368, 1375-76 (Fed. Cir.

2001) (The preamble language "a method of treating a patient," "does not result in a manipulative

difference in the steps of the claim," and the recited method steps "are performed the same way

regardless [of] whether or not the patient experiences a [therapeutic effect].")).


                3. Claim 44: "…and with the intent of increasing survival of said patient"

The phrase in claim 44, "and with the intent of increasing survival of said patient"", is a

clear non-limiting statement of the purpose or intent of the claimed method, or at most, is construed

as "a method intended to increase survival of said patient."


Broadest Reasonable Interpretation (BRI)

        Independent method claim 34 is limited to the step(s) of:

- Intravenously administering a 15 mg/m2 dose of cabazitaxel (or its hydrate or
  solvate)

- Administering an antihistamine, a corticoid, and an H2 antagonist prior to
  administering the cabazitaxel

- To a castration resistant, metastatic prostate cancer (mCRPC) patient that has
  progressed during or after treatment with docetaxel.


        Independent method claim 37 is limited to the step(s) of:

- Administering the antihistamine dexchlorpheniramine at a dose of 5 mg, the
  corticoid dexamethasone at a dose of 8 mg, and an H2 antagonist prior to
  administering cabazitaxel

- To a patient with prostate cancer.

Independent method claim 44 is limited to the step(s) of:

- Administering a clinically proven effective amount of cabazitaxel (or its hydrate or solvate)

- Administering an antihistamine, a corticoid, and an H2 antagonist prior to administering the cabazitaxel

- To a castration resistant, metastatic prostate cancer (mCRPC) patient that has progressed during or after treatment with docetaxel.

The recited method steps, although they must have utility, are performed without regard to whether the claimed methods result in a clinically effective treatment.

## *Claim Rejections - 35 USC § 112 – 2nd Paragraph*

The following is a quotation of 35 U.S.C. 112(b):

(B) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"The primary purpose of this requirement of definiteness of claim language is to ensure that the scope of the claims is clear so the public is informed of the boundaries of what constitutes infringement of the patent.  A secondary purpose is to provide a clear measure of what applicants regard as the invention so that it can be determined whether the claimed invention meets all the criteria for patentability and whether the specification meets the criteria of 35 U.S.C. 112, first paragraph with respect to the claimed invention.", (see MPEP § 2173).

Claims 35-36 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Claim 35 depends from Claim 34 and recites that the cabazitaxel is administered in combination with prednisone. As prednisone is a "corticoid" as recited in Claim 34, it is unclear if prednisone is *the* corticoid recited in Claim 34 or is separate and distinct from the corticoid recited in Claim 34. In other words, it is unclear if Claim 35 encompasses, for example, administration of (i) an antihistamine, (ii) a corticoid that is <u>not</u> prednisone, (iii) an H2 antagonist, (v) cabazitaxel, and (vi) prednisone.

Claims 40-43 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Claim 40 depends from cancelled Claim 39. Claims 41-43 depend from Claim 40. As the rejected claims depend from a cancelled claim, the metes and bounds of the claims are *a priori* unclear.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Application/Control Number: 15/627,962                                                    Page 11
Art Unit: 1629

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Claims 34 and 44-47 are rejected under 35 U.S.C. 103(a) as being unpatentable over **WINQUIST** (The Canadian Journal of Urology, February 2008, vol. 15, no. 1, pages 3942-3949) and **TROPIC LISTING** (http://clinicaltrials.gov/archive/NCT00417079/2006_12_28. View of NCT00417079 on 12/28/2006) in view of **MITA** (Clin. Cancer Res., January 15, 2009, vol. 15, no. 2, pages 723-730), **ATTARD** (Pathologie Biologie, 2006, vol. 54, pages 72-84), **PIVOT** (Annals of Oncology, 2008, vol. 19, pages 1547-1552), and **BEARDSLEY** (Curr. Opin. Support Palliat. Care, 2008, vol. 2, pages 161-166), and further in view of **TAXOL (Paclitaxel) LABEL** (Mead Johnson, February 10, 2000, pages 1-43), **TAKENAKA *ET AL*.** (International Journal of Urology, 2008, vol. 15, pages 106-109), and **HUDIS *ET AL*.** (J. Clin. Oncol., 1996, vol. 14, pages 58-65).

*Teachings of WINQUIST*

Winquist is a February 2008 disclosure of open, uro-oncology clinical trials in Canada. See page 3942.

Winquist discloses a randomized Phase III clinical trial coordinated by Sanofi-Aventis involving treatment of mCRPC patients previously treated with docetaxel (the TROPIC Study). Id. at page 3948.

Winquist discloses the administration of a 25 mg/m2 dose of cabazitaxel to mCRPC patients: "A randomized, open-label multicenter study of XRP-6258 [cabazitaxel] at 25 mg/m2 in combination with prednisone every 3 weeks compared to mitoxantrone in combination with prednisone for the treatment of hormone-refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen". Id. The primary endpoint is overall survival. Id.

With regard to independent Claims 34 and 44, Winquist does not disclose expressly that the prostate cancer "progressed during or after treatment with docetaxel". However, that progression after treatment with docetaxel is implicit and would have been understood to a person of ordinary skill in the art (POSA), i.e., the treatment of hormone-refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen with cabazitaxel is a clear implication that the hormone-refractory metastatic prostate cancer "progressed during or after treatment with docetaxel".

_Teachings of THE TROPIC LISTING_

The TROPIC Listing discloses the same phase III clinical trial reported in Winquist (the Sanofi-Aventis TROPIC Study), a "randomized, open-label, multi-center study comparing the safety and efficacy of XRP6258 [cabazitaxel] plus prednisone to mitoxantrone plus prednisone in the treatment of hormone refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen". The TROPIC Listing, like Winquist, discloses that cabazitaxel is to be administered every three weeks and that expected patient enrollment is 720 patients. The

TROPIC Listing expressly states that patients must have a "[documented progression of disease (demonstrating at least one visceral or soft tissue metastatic lesion, including a new lesion) . . . [or] rising PSA levels or appearance of [a] new lesion," after previous treatment with docetaxel. The primary outcome, as also reported in Winquist, is overall survival. The TROPIC Listing notes the start date of the clinical trial was December 2006.

With regard to independent claims 34 and 44, the TROPIC Listing, unlike Winquist, does not disclose an administration dose of cabazitaxel.


Mita, Attard, Pivot, and Beardsley are cited to show the state of the art of cabazitaxel, e.g., dosing regimens, toxicity, etc. at the time the invention was made.


*Teachings of MITA*

Mita discloses the purpose of their Phase I and Pharmacokinetic study is to assess the feasibility of administering XRP6258 [cabazitaxel], a new taxane with a low affinity for the multidrug resistance protein, as a 1-hour i.v. infusion every 3 weeks. The study also sought to determine the maximum tolerated dose and the recommended dose, to describe the pharmacokinetic (PK) behavior of the compound, and to seek preliminary evidence of anticancer activity. See Abstract, "Purpose".

Twenty-five patients with advanced solid malignancies were treated with 102 courses of XRP6258 at four dose levels ranging from 10 to 25 mg/m2. Dose escalation was based on the occurrence of dose-limiting toxicity (DLT) at each dose level, provided that PK variables were favorable. Id., "Experimental Design".

With regard to independent Claims 34 and 44 and dependent Claims 45-46, Mita discloses administration of a 15 mg/m2 dose to one prostate cancer patient and a 25 mg/m2 dose to a docetaxel-refractory prostate cancer patient. See page 727, left col., second paragraph.

Mita discloses the recommended phase II dose of XRP6258 on this schedule is 20 mg/m2. See Abstract, "Conclusion".

Mita discloses XRP6258 seems advantageous when compared with docetaxel and paclitaxel. Its solubility is comparable with that of docetaxel, allowing a polysorbate-based formulation that does not require cremophor and, therefore, results in reduced incidence of hypersensitivity reaction. Based on the results of this study, Mita discloses that XRP6258 administration does not require premedication, thus resulting in significant administration and convenience advantages. An acceptable toxicity profile, mainly the low neurotoxicity and manageable hematologic toxicity at the recommended dose on this schedule, as well as the low incidence of fluid retention and alopecia, also favors XRP6258. See page 729, paragraph bridging left and right columns.

### _Teachings of ATTARD_

Attard is a review article reporting, inter alia, on a phase I dosing study for cabazitaxel, which was originally reported in Mita (supra). See page 75, left column, second paragraph.

As discussed supra, Mita discloses administration of a 15 mg/m2 dose to one prostate cancer patient and a 25 mg/m2 dose to a docetaxel-refractory prostate cancer patient. Attard reports that Mita's phase I cabazitaxel study showed two objective responses in CRPC patients, and noted that one of the patients was docetaxel refractory (25 mg/m2 dose). Id.

Attard also describes cabazitaxel (XRP6258) as showing improvement over paclitaxel and docetaxel with "higher therapeutic indices" and "activity against resistant tumors". See page 74, paragraph bridging left and right columns; Table 3.

### _Teachings of PIVOT_

Pivot discloses a Phase II clinical trial of cabazitaxel administered to docetaxel-resistant metastatic breast cancer patients administered as a 1-hour intravenous infusion every 3 weeks. Pivot administered an initial cabazitaxel dose of 20 mg/m2, then escalated the dose to 25 mg/m2 in patients who did not experience a significant adverse event during the first treatment cycle. See page 1548, right column, 3rd paragraph.

Pivot discloses the overall response rate was 14% (two complete, eight partial responses) and median overall survival was 12.3 months. See Abstract, "Results".

Pivot discloses that hypersensivity reactions occurred in 4 patients, with Grades 3-5 hypersensitivity reactions occurring in 3 patients. See Table 2.

### _Teachings of BEARDSLEY_

Beardsley reports on a phase II clinical trial of cabazitaxel administered to docetaxel-resistant metastatic breast cancer patients, first reported in Pivot (supra). See page 163, right column, "Taxanes".

Pivot administered an initial cabazitaxel dose of 20 mg/m2, then escalated the dose to 25 mg/m2 in patients who did not experience a significant adverse event during the first treatment cycle. Beardsley reports that the objective response rate to cabazitaxel treatment in docetaxel-

refractory metastatic breast cancer patients was 14% in the Pivot study. See page 163, right

column, 4th paragraph).

Beardsley further reports that while a phase II clinical trial with cabazitaxel had not been

performed in CRPC patients, "given its activity in the docetaxel refractory setting described above,

this agent is currently being investigated in a phase III multi-center, randomized superiority trial

comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with

castration resistant metastatic prostate cancer previously treated with docetaxel-containing

treatment." See page 163, right column, 5th Paragraph.


Winquist and Tropic Listing in view of Mita, Attard, Pivot, and Beardsley disclose the

independent method claim steps:

- Intravenously administering a clinically effective dose, e.g., 15 mg/m2 to 25

  mg/m2of cabazitaxel (or its hydrate or solvate)

- To a castration resistant, metastatic prostate cancer (mCRPC) patient that has

  progressed during or after treatment with docetaxel.


Independent Claims 34 and 44 differ from Winquist, Tropic Listing, Mita, Attard, Pivot, and

Beardsley in so far as the references do not disclose administration of a premedication comprising

an antihistamine, a corticoid, and an H2 antagonist to patients undergoing cabazitaxel therapy.


*Teachings of TAXOL PRODUCT LABEL*

Taxol Product Label teaches "[A]ll patients should be premedicated prior to TAXOL

administration in order to prevent severe hypersensitivity reactions. Such premedication may

Application/Control Number: 15/627,962                                    Page 17
Art Unit: 1629

consist of dexamethasone [a corticoid] 20 mg PO administered approximately 12 and 6 hours

before TAXOL, diphenhydramine (or its equivalent) [an antihistamine] 50 mg I.V. 30 to 60

minutes prior to TAXOL, and cimetidine (300 mg) or ranitidine (50 mg) [H2 antagonists] I.V. 30

to 60 minutes before TAXOL." TAXOL Label at page 39, last paragraph.


*Teachings of TAKENAKA ET AL.*

Takenaka describes a study administering 30 mg/m2 docetaxel in combination with

estramustine for the treatment of mCRPC.  Takenaka states that "[d]examethasone 24 mg [a

corticoid], diphenhydramine 50 mg [an antihistamine], and ranitidine 50 mg [H2 antagonist] were

administered before the [docetaxel] infusion to prevent a hypersensitivity reaction". See page 106,

right column, 3rd paragraph.


*Teachings of HUDIS ET AL.*

Hudis reports on docetaxel treatment in metastatic breast cancer patients where, after

observing two HSRs among the first six patients, "a variety of pretreatment regimens that

incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an H2 blocker]

were used". See page 59, right column, 4[th] paragraph.


*Principles of Law*

 A claimed invention is unpatentable if the differences between the claimed subject matter

and the prior art are such that the subject matter as a whole would have been obvious at the time

the invention was made to a person having ordinary skill in the art to which the subject matter

pertains. 35 U.S.C. § 103(a).

Application/Control Number: 15/627,962                                           Page 18
Art Unit: 1629

"In rejecting claims under 35 U.S.C. § 103, the examiner bears the initial burden of

presenting a *prima facie* case of obviousness. Only if that burden is met, does the burden of coming

forward with evidence or argument shift to the applicant." *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed.

Cir. 1993) (citations omitted). In order to determine whether a prima facie case of obviousness has

been established, we consider the factors set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17

(1966): (1) the scope and content of the prior art; (2) the differences between the prior art and the

claims at issue; (3) the level of ordinary skill in the relevant art; and (4) objective evidence of

nonobviousness, if present.

"The combination of familiar elements according to known methods is likely to be obvious

when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

416 (2007). "In determining whether obviousness is established by combining the teachings of the

prior art, 'the test is what the combined teachings of the references would have suggested to those

of ordinary skill in the art.'" *In re GPAC Inc.*, 57 F.3d 1573, 1581 (Fed. Cir. 1995).

"[I]in a section 103 inquiry, 'the fact that a specific [embodiment] is taught to be preferred

is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must

be considered.'" *Merck & Co. Inc. v. Biocraft Laboratories Inc.*, 874 F.2d 804, 807 (Fed. Cir.

1989) (quoting *In re Lamberti*, 545 F.2d 747, 750, 192 USPQ 278, 280 (CCPA 1976).)


*Examiner's Analysis and Conclusion of Obviousness*

A claimed invention is unpatentable if the differences between the claimed invention and

the prior art are such that the claimed invention as a whole would have been obvious to one of

ordinary skill in the relevant art. 35 U.S.C. § 103. Whether a claimed invention would have been

obvious is a question of law, based on factual determinations regarding the scope and content of

Application/Control Number: 15/627,962                                      Page 19
Art Unit: 1629

the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in

the pertinent art, and any objective indicia of non-obviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550

U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

      In *KSR*, the Supreme Court criticized a rigid approach to determining obviousness based

on the disclosures of individual prior-art references, with little recourse to the knowledge,

creativity, and common sense that an ordinarily skilled artisan would have brought to bear when

considering combinations or modifications. *KSR*, 550 U.S. at 415-22. Rejecting a blinkered focus

on individual documents, the Court required an analysis that reads the prior art in context, taking

account of "demands known to the design community," "the background knowledge possessed by

a person having ordinary skill in the art," and "the inferences and creative steps that a person of

ordinary skill in the art would employ." *Id.* at 418. This "expansive and flexible approach," *id.* at

415, is consistent with the Courts' pre-*KSR* decisions acknowledging that the inquiry "not only

permits, but *requires,* consideration of common knowledge and common sense." *DyStar*

*Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir.

2006).   As *KSR* established, the knowledge of such an artisan is part of the store of public

knowledge that must be consulted when considering whether a claimed invention would have been

obvious.

      In recognizing the role of common knowledge and common sense, the Courts have

emphasized the importance of a factual foundation to support a party's claim about what one of

ordinary skill in the relevant art would have known. *See, e.g.*, *Mintz v. Dietz & Watson, Inc.*, 679

F.3d 1372, 1377 (Fed. Cir. 2012); *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328

(Fed. Cir. 2009). One form of evidence to provide such a foundation, perhaps the most reliable

because not litigation-generated, is documentary evidence consisting of prior art in the area.

As discussed *supra*, Winquist and Tropic Listing in view of Mita, Attard, Pivot, and Beardsley disclose the independent method claim steps of:

- Intravenously administering a clinically effective dose, e.g., 15 mg/m2 to 25 mg/m2of cabazitaxel (or its hydrate or solvate)

- To a castration resistant, metastatic prostate cancer (mCRPC) patient that has progressed during or after treatment with docetaxel.

A preponderance of the evidence establishes that a POSA would have had good reason to combine the teachings of Winquist and the TROPIC Listing and would have read the two references together. Winquist and the TROPIC Listing disclose the same treatment method being used in the same clinical trial for treating the same patient population - the Sanofi-Aventis TROPIC Study. It was known in the art that anticancer activity against docetaxel-resistant, castration-resistant prostate cancer was observed in patients treated with cabazitaxel, further reinforcing a POSA's understanding that Winquist and the TROPIC Listing should be read together as administering 25 mg/m2 cabazitaxel (and prednisone) to treat the same docetaxel-refractory mCRPC patient population. See Attard, Pivot, and Beardsley. Beardsley also makes reference to Pivot's phase II clinical study of cabazitaxel among docetaxel-refractory metastatic breast cancer patients as providing motivation for the TROPIC Study, further reinforcing the point. Therefore, a POSA in 2008 would have known that Winquist and the TROPIC Listing disclosed the same ongoing Phase III clinical trial – the TROPIC Study – and would have read the two references together.

The POSA would have had a reasonable expectation of success in achieving the claimed method. A POSA would have concluded from Winquist and the TROPIC Listing, in view of the knowledge of a POSA (as exemplified by Mita, Attard, Pivot, and Beardsley), that a "clinically proven effective amount" of cabazlitaxel such as 15-25 mg/m2 administered with prednisone every

3 weeks would have anti-cancer activity in docetaxel-refractory mCRPC patients.  Thus, evidence

of anti-cancer activity in the target patient population – not clinical efficacy – equates to "success"

in this context.  Notably, the instant claims do not recite a treatment method that has achieved (i)

FDA approval (e.g., a "clinically proven" treatment), ii) a successful phase III trial, or (iii) an

actual increase in survival of a patient.  *Allergan, Inc. v. Sandoz, Inc*., 726 F,3d 1286, 1292 (Fed,

Cir. 2013) ("There is no requirement that one of ordinary skill have a reasonable expectation of

success in developing Combigan®. Rather, the person of ordinary skill need only have a

reasonable expectation of success of developing the claimed invention."); *Astrazeneca LP v.

Apotex, Inc*., 633 F.3d 1042, 1064-65 (Fed. Cir. 2010) (lacking FDA approval does not

demonstrate lack of drug utility)).

A POSA would have had a reasonable expectation of successfully achieving the claimed

treatment method based upon the teachings of Winquist and the TROPIC Listing, in view of Mita,

Attard, Pivot, and Beardsley, and the knowledge of a POSA. Winquist teaches administration of a

25 mg/m2 dose of cabazitaxel in combination with prednisone, the same 25 mg/m2 dose taught by

Mita as exhibiting "anti-cancer activity" when administering cabazitaxel to a docetaxel-refractory

metastatic prostate cancer patient. Mita notes a significant decrease in prostate-specific antigen in

the docetaxel-refractory patient, one of the same measures reported in the TROPIC Study as a

Secondary Outcome Measure.

Further, in 2008 a POSA would have known (i) anti-cancer activity had been observed in

a docetaxel-refractory mCRPC patient treated with cabazitaxel (Attard, Mita), (ii) the safety profile

of cabazitaxel was "very favorable" compared to paclitaxel and docetaxel (Pivot), (iii) cabazitaxel

was known to target the same tubulin binding site as docetaxel, shown to be effective in breast and

prostate cancers (Attard), (iv) cabazitaxel's 14% objective response rate in docetaxel-refractory

metastatic breast cancer patients was a motivation for carrying out the phase III clinical trial in

mCRPC patients previously treated with docetaxel (Beardsley, Pivot), and (v) assessing overall

survival was the "primary endpoint" of the TROPIC Study reported in Winquist and the TROPIC

Listing (Winquist, TROPIC Listing).  Winquist also taught a POSA that, as of October 23, 2008,

the phase III TROPIC Study had been ongoing since December 2006, an indicator that the trial

was experiencing favorable outcomes.

Regarding administration at a dose of 15 mg/m2 (Claim 34) or "a clinically proven

effective amount" (Claim 44) of cabazitaxel, e.g., 20-25 mg/m2 (Claims 45-47), [I]n the case

where the claimed ranges "overlap or lie inside ranges disclosed by the prior art" a prima facie

case of obviousness exists. In re Wertheim, 541 F.2d 257, 191 USPQ 90 (CCPA 1976); In re

Woodruff, 919 F.2d 1575, 16 USPQ2d 1934 (Fed. Cir. 1990). Similarly, a prima facie case of

obviousness exists where the claimed ranges or amounts do not overlap with the prior art but are

merely close. Titanium Metals Corp. of America v. Banner, 778 F.2d 775, 783, 227 USPQ 773,

779 (Fed. Cir. 1985). "[W]here the general conditions of a claim are disclosed in the prior art, it is

not inventive to discover the optimum or workable ranges by routine experimentation." In re Aller,

220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955).

Here, the combined teachings of Winquist and the TROPIC Listing, in view of the

knowledge of a POSA (as exemplified by Mita, Attard, Pivot, and Beardsley), provide the general

conditions for intravenously administering cabazitaxel to cancer patients.  In a Phase I clinical

trial, Mita administered doses ranging from 10 mg/m2 to 25 mg/m2.  In subsequent Phase II and

Phase III clinical trials, cabazitaxel was administered in doses ranging from 20 mg/m2 to 25

mg/m2.  As it is routine and commonplace in the art of drug administration to alter drug dosing

based on therapeutic activity, toxicity, and patient population, it would have been prima facie

obvious to a POSA to administer cabazitaxel in a therapeutic dose within the ranges disclosed in the cited prior art, e.g., 10 mg/m2 to 25 mg/m2.

Accordingly, the Examiner has concluded that it would have been *prima facie* obvious to a POSA at the time of the invention to intravenously administer a clinically effective dose, e.g., 15 mg/m2 to 25 mg/m2of cabazitaxel (or its hydrate or solvate) to a castration resistant, metastatic prostate cancer (mCRPC) patient that has progressed during or after treatment with docetaxel.

Turning now to the administration of a premedication comprising (i) an antihistamine, (ii) a corticoid, and (iii) an H2 antagonist, the recited premedication regimen was well known as a prophylactic treatment for potential hypersensitivity reactions (HSRs) in paclitaxel (Taxol) and docetaxel (Taxotere) therapies. "[A]ll patients should be premedicated prior to TAXOL administration in order to prevent severe hypersensitivity reactions. Such premedication may consist of dexamethasone 20 mg PO administered approximately 12 and 6 hours before TAXOL, diphenhydramine (or its equivalent) 50 mg I.V. 30 to 60 minutes prior to TAXOL, and cimetidine (300 mg) or ranitidine (50 mg) I.V. 30 to 60 minutes before TAXOL." TAXOL Label at page 39, last paragraph. Takenaka describes a study administering 30 mg/m2 docetaxel in combination with estramustine for the treatment of mCRPC. Takenaka states that "[d]examethasone 24 mg [a corticoid], diphenhydramine 50 mg [an antihistamine], and ranitidine 50 mg [H2 antagonist] were administered before the [docetaxel] infusion to prevent a hypersensitivity reaction". See page 106, right column, 3rd paragraph. Hudis reports on docetaxel treatment in metastatic breast cancer patients where, after observing two HSRs among the first six patients, "a variety of pretreatment regimens that incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an H2 blocker] were used". See page 59, right column, 4th paragraph.

A POSA would have been motivated to use the same prior art taxane premedication regimen to decrease the risk of HSRs associated with cabazitaxel treatment. For example, Pivot discloses that hypersensivity reactions occurred in 4 patients, with Grades 3-5 hypersensitivity reactions occurring in 3 patients. See Table 2. Although the rate of HSRs may have been lower when compared to paclitaxel and docetaxel therapy, a POSA would still have been motivated to prevent severe hypersensitivity reactions to cabazitaxel therapy by using a more thorough premedication regimen than the stand alone antihistamine disclosed in Pivot. See KSR, 550 U.S. at 420 (claimed subject matter may be proved obvious when "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."). Here, there existed at the time of invention a known problem of hypersensitivity reactions occurring in some patients treated with taxanes, including cabazitaxel. There also existed in the art an obvious solution to reducing the risks of such hypersensitivity reactions – premedicating a patient with (i) an antihistamine, (ii) a corticoid, and (iii) an H2 antagonist. Accordingly, a POSA would have considered the use of the claimed pretreatment regimen of a corticosteroid, an antihistamine, and an H2 antagonist as a well-known option for prevention of taxane-induced HSRs.

The Examiner recognizes that Mita discloses that "[b]ased on the results of this study, [cabazitaxel] does not require premedication, thus resulting in significant administration and convenience advantages". See page 729. However, Mita was a relatively small dosing and PK study, and does not teach that premedication should *not* be administered, only that cabazitaxel does not *require* premedication based on the results of "this study". Mita should also be read in the context of later studies, for example the Pivot Phase II clinical trial of cabazitaxel administered to docetaxel-resistant metastatic breast cancer patients, where Pivot discloses that hypersensitivity

reactions occurred in 4 patients, with Grades 3-5 hypersensitivity reactions occurring in 3 patients, *even though those patients had been pretreated with an antihistamine*. See Table 2. Notwithstanding the earlier statement in Mita that cabazitaxel does not require premedication, Pivot, in a later Phase II clinical trial, indeed premedicated patients with an antihistamine. Thus, the POSA would understand that, at the time of the invention, it was not that hypersensitivity reactions never occur in patients treated with cabazitaxel, only that they occur less frequently than with other taxanes such as paclitaxel and docetaxel.

Preventing HSRs is a paramount concern of oncologists treating patients with taxanes as evidenced by the fact that when administering a taxane-based chemotherapeutic agent, a POSA at the time of the invention routinely administered a premedication comprising a corticosteroid, an antihistamine, and an H2 antagonist prior to the administration of a taxane to prevent/reduce the risk of HSRs. As administration of cabazitaxel was known in the art to cause hypersensitivity reactions in at least some patients (Pivot), it would have been *prima facie* obvious to a POSA to premedicate patients being treated with cabazitaxel with the known premedication regimen of a corticosteroid, an antihistamine, and an H2 antagonist. Alternatively, when treating patients with cabazitaxel, the POSA would know to look for hypersensitivity reactions in the treated patients, as hypersensitivity reactions were a known side-effect of cabazitaxel administration as evidenced by Pivot. If patients developed hypersensitivity reactions, it would have been *prima facie* obvious to the POSA to premedicate patients prior to subsequent cabazitaxel dosing. Alternatively, to prevent potential hypersensitivity reactions, it would have been *prima facie* obvious to the POSA to premedicate patients prior to initial cabazitaxel dosing.

Accordingly, the Examiner has concluded that it would have been *prima facie* obvious to a POSA at the time of the invention to intravenously administering a clinically effective dose, e.g.,

15 mg/m2 to 25 mg/m2of cabazitaxel (or its hydrate or solvate) to a castration resistant, metastatic

prostate cancer (mCRPC) patient that has progressed during or after treatment with docetaxel and

to premedicate a patient with a known, clinically used premedication for preventing

hypersensitivity reactions in patients treated with taxanes, comprising an antihistamine, a

corticoid, and an H2 antagonist.

Claims 35 and 36 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

**WINQUIST** (The Canadian Journal of Urology, February 2008, vol. 15, no. 1, pages 3942-3949)

and **TROPIC LISTING** (http://clinicaltrials.gov/archive/NCT00417079/2006_12_28. View of

NCT00417079 on 12/28/2006) in view of **MITA** (Clin. Cancer Res., January 15, 2009, vol. 15,

no. 2, pages 723-730), **ATTARD** (Pathologie Biologie, 2006, vol. 54, pages 72-84), **PIVOT**

(Annals of Oncology, 2008, vol. 19, pages 1547-1552), and **BEARDSLEY** (Curr. Opin. Support

Palliat. Care, 2008, vol. 2, pages 161-166), and further in view of **TAXOL (Paclitaxel) LABEL**

(Mead Johnson, February 10, 2000), **TAKENAKA *ET AL.*** (International Journal of Urology,

2008, vol. 15, pages 106-109), and **HUDIS *ET AL.*** (J. Clin. Oncol., 1996, vol. 14, pages 58-65)

as applied to claims 34 and 44-47 above, and further in view of **TANNOCK *ET AL.*** (N. Engl. J.

Med., 2004, vol. 351, pages 1502-1512).

The teachings of Winquist, Tropic Listing, Mita, Attard, Pivot, Beardsley, Taxol Label,

Takenaka et al., and Hudis et al. are as applied to Claims 34 and 44-47 supra, which teachings are

herein incorporated by reference in their entirety.

Application/Control Number: 15/627,962                                          Page 27
Art Unit: 1629

Claim 35 depends from Claim 34 and recites that the cabazitaxel is administering in combination with prednisone at a dose of 10 mg/day.  As discussed supra, both Winquist and Tropic Listing disclose administration of cabazitaxel in combination with prednisone to mCRPC patients previously treated with docetaxel.  Neither Winquist nor Tropic Listing disclose the dose of prednisone.

Claim 36 depends from Claim 35 and recites that the administration of antihistamine, corticoid, H2 antagonist, and cabazitaxel is repeated as a new cycle every 3 weeks.  As discussed supra, both Winquist and Tropic Listing disclose administration of cabazitaxel in combination with prednisone to mCRPC patients previously treated with docetaxel "every 3 weeks".

*Teachings of TANNOCK ET AL.*

Tannock et al. disclose that mitoxantrone plus prednisone reduces pain and improves quality of life in men with advanced, hormone-refractory prostate cancer, but it does not improve survival. Tannock et al. disclose a study comparing the effects of docetaxel combined with prednisone to mitoxantrone combined with prednisone. See Title; Abstract.

Tannock et al. disclose that prednisone was administered at a dose of 5 mg twice daily, thus teaching administration of prednisone at a dose of 10 mg/day. See Abstract; page 1504, left column, "Randomization and Treatment".

Tannock et al. disclose that when given with prednisone, treatment with docetaxel every 3 weeks led to superior survival and improved rates of response in terms of pain, serum PSA level, and quality of life, as compared to mitoxantrone plus prednisone, and conclude that docetaxel plus prednisone is the preferred option for most patients with hormone-refractory prostate cancer. See Abstract; page 1511, right column, last paragraph.

*Examiner's Analysis and Conclusion of Obviousness*

The Examiner's analysis and conclusions of obviousness as applied to claims 34 and 44-47 supra are herein incorporated by reference in their entirety.

Regarding Claim 35, which requires administration of prednisone at a dose of 10 mg/day, Winquist and Tropic Listing disclose administration of cabazitaxel in combination with prednisone to mCRPC patients previously treated with docetaxel. Prednisone was known in the art to be administered at a dose of 10 mg/day (5 mg twice daily) in combination with docetaxel every 3 weeks to patients with hormone-refractory prostate cancer. A POSA at the time of the invention would have had a reasonable expectation of success administering the prednisone taught in Winquist and Tropic Listing at a dose of 10 mg/day as this was a known, therapeutic dose of prednisone for use in combination with a taxane (docetaxel) in the treatment of patients with hormone-refractory prostate cancer.

Regarding Claim 36, which requires the administration of antihistamine, corticoid, H2 antagonist, and cabazitaxel is repeated as a new cycle every 3 weeks, cycling taxane therapy every 3 weeks was routine and commonplace in the art at the time of the invention. For example, both Winquist and Tropic Listing disclose administration of cabazitaxel in combination with prednisone to mCRPC patients previously treated with docetaxel "every 3 weeks". Accordingly, a POSA would have had a reasonable expectation of success administering the antihistamine, corticoid, H2 antagonist, and cabazitaxel as a new cycle every 3 weeks.

### *Allowable Subject Matter*

Claims 37 and 38 are allowed.

The following is a statement of reasons for the indication of allowable subject matter: The prior art does not teach or reasonably suggest a combination of dexchlorpheniramine and dexamethasone at the recited doses as a premedication prior to administration of taxanes. Taxol Product Label teaches administration of a premedication comprising dexamethasone 20 mg PO administered approximately 12 and 6 hours before TAXOL, diphenhydramine (or its equivalent) 50 mg I.V. 30 to 60 minutes prior to TAXOL, and cimetidine (300 mg) or ranitidine (50 mg) I.V. 30 to 60 minutes before TAXOL. Takenaka teaches administering dexamethasone 24 mg, diphenhydramine 50 mg, and ranitidine 50 mg before the[docetaxel infusion to prevent a hypersensitivity reaction.

As discussed supra, it would have been prima facie obvious to a POSA to administer a known premedication comprising an antihistamine, a corticoid, and an H2 antagonist prior to administration of cabazitaxel. It would not, however, have been obvious to a POSA to use a dose of dexamethasone 2.5-3 times lower than the dose used in the prior art in combination with an antihistamine (dexchlorpheniramine) at the dose claimed (5 mg), which was not known to be used as a premedication in taxane-based therapy.

### *Conclusion*

If applicants should amend the claims, a complete and responsive reply will clearly identify where support can be found in the disclosure for each amendment. Applicants should point to the page and line numbers of the application corresponding to each amendment, and provide any statements that might help to identify support for the claimed invention (e.g., if the amendment is

not supported in *ipsis verbis*, clarification on the record may be helpful). Should applicants present

new claims, applicants should clearly identify where support can be found in the disclosure

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to JAMES D ANDERSON whose telephone number is (571)272-9038.  The

examiner can normally be reached on Monday-Friday, 8:30 am - 5:00 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

Jeffrey Lundgren can be reached on 571-272-5541.  The fax phone number for the organization

where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR system,

see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system,

contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like

assistance from a USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/James D. Anderson/
Primary Examiner, Art Unit 1629

UNITED STATES PATENT AND TRADEMARK OFFICE
400 Dulany Street
Alexandria, VA 22314-5774
Tel. No.: (571) 272-9038

<u>**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**</u>

In re Application of **GUPTA**                     Examiner:     **James D. Anderson**

                                                  Art Unit:     **1629**

Application No.:   **15/627,962**

Filed:             **June 20, 2017**              Conf. No.     **5732**

Title:             **NOVEL ANTITUMORAL USE OF CABAZITAXEL**


Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450


<u>REPLY TO OFFICE ACTION PURSUANT TO 37 C.F.R. § 1.111</u>

This paper is in response to the Office Action issued July 17, 2018, in the above-identified application (hereinafter, "Office Action"), having a response due by October 17, 2018.  The period for response is extended three months to expire January 17, 2019, pursuant to the Petition for Extension of Time under 37 C.F.R. 1.136(a) submitted herewith.  This response is timely filed.


Entry of the following amendments and consideration of the following remarks are respectfully requested.


Amendments to the claims start on page 2.


Remarks to amendments and the outstanding office action begin on page 3.

Sanofi Ref. FR2009/121 US CNT3                                    US Application No. 15/627,962

**Claim amendments:**

1. - 36.  (Cancelled)

37.  (Previously Presented)  A method of reducing the risk of a severe hypersensitivity reaction in a patient with prostate cancer beginning treatment with cabazitaxel as a new cycle every three weeks comprising administering to said patient (i) an antihistamine, (ii) a corticoid, and (iii) an $H_2$ antagonist prior to the administration of said cabazitaxel, wherein the antihistamine is dexchlorpheniramine administered at a dose of 5 mg and the corticoid is dexamethasone administered at a dose of 8 mg.

38.  (Previously presented)  The method according to claim 37, wherein the antihistamine, corticoid, and $H_2$ antagonist are administered 30 minutes prior to the administration of said cabazitaxel.

39.  (Cancelled)

40.  (Currently amended)  The method according to <u>claim 38</u> ~~claim 39~~, wherein the dose of said cabazitaxel is 15-25 mg/m$^2$.

41.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 25 mg/m$^2$.

42.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 20 mg/m$^2$.

43.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 15 mg/m$^2$.

44. – 49.  (Cancelled)

### *Remarks*

In the Office Action, the Examiner noted that claims 34 to 38 and 40 to 47 are pending in the application, that claims 34 to 36 and 40 to 47 are rejected, and that claims 37 to 38 are allowed.

Claim 40 is amended to change its dependency from claim 39 to claim 38.

Claims 34 to 36 and 44 to 47 are cancelled without prejudice.

No new matter is added by these amendments.

Applicant reserves the right to file one or more continuation, continuation-in-part, or divisional applications on the deleted subject matter.

As presently amended, claims 37, 38, and 40 to 43 are pending in this application.

### *Discussion of Rejections under 35 U.S.C. § 112, second paragraph*

Claims 35 to 36 are rejected under 35 U.S.C. § 112, second paragraph, as being allegedly indefinite for the stated reason that "Claim 35 depends from Claim 34 and recites that the cabazitaxel is administered in combination with prednisone. As prednisone is a 'corticoid' as recited in Claim 34, it is unclear if prednisone is *the* corticoid recited in Claim 34 or is separate and distinct from the corticoid recited in Claim 34." (Office Action, page 10).

Without acquiescing to the propriety of the rejection, and solely to advance prosecution, claims 35 to 36 have been cancelled. The rejection of claims 35 to 36 under 35 U.S.C. § 112, second paragraph is therefore rendered moot.

Claims 40 to 43 are rejected under 35 U.S.C. § 112, second paragraph, as being allegedly indefinite for the given reason that "Claim 40 depends from cancelled Claim 39. Claims 41 to 43 depend from Claim 40. As the rejected claims depend from a cancelled claim, the metes and bounds of the claims are *a priori* unclear." (Office Action, page 10).

This rejection is believed overcome in view of the above-described amendment to claim 40, changing its dependency from cancelled claim 39 to allowed claim 38. Reconsideration and withdrawal of the 35 U.S.C. § 112, second paragraph rejection of claims 40 to 43 are therefore respectfully requested.

## *Discussion of Rejections under 35 U.S.C. § 103(a)*

Claims 34 and 44 to 47 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Winquist (The Canadian Journal of Urology, Feb. 2008, vol. 15, no. 1, pp 3942-3949, hereinafter "Winquist"), the Tropic Listing (http://clinicaltrials.gov/archive/NCT00417079/2006_12_28, View of NCT00417079 on 12/28/2006, hereinafter "Tropic Listing"), in view of Mita *et al.* (Clin Cancer Res, 2009, 15(2) pp. 723-730, hereinafter "Mita"), Attard *et al.* (Pathologie Biologie, 2006, vol 54, pp. 72-84, hereinafter "Attard"), Pivot *et al.* (Annals of Oncology, 2008, 19, pp. 1547-1552, hereinafter "Pivot"), and Beardsley *et al.* (Curr Opin Support Palliat Care, 2008, 2, pp. 161-166, hereinafter "Beardsley"), hereinafter "Berthold"), and further in view of Taxol (Paclitaxel) Label (Mead Johnsons, February 10, 2000, pp. 1-43, hereinafter "Taxol Label"), Takenaka *et al.*, (International Journal of Urology, 2008, vol 15, pp. 106-109, hereinafter "Takenaka"), and Hudis *et al.* (J. Clin Oncology., 1996, vol 14, pp. 58-65).

Without acquiescing to the propriety of this rejection, and solely to advance prosecution, claims 34 and 44 to 47 have been cancelled.  The rejection of claims 34 and 44 to 47 under 35 U.S.C. § 103(a) is therefore rendered moot.

Claims 35 and 36 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Winquist and the Tropic Listing, in view of Mita, Attard, Pivot, and Beardsley, and further in view of the Taxol Label, Takenaka, and Hudis, and further in view of Tannock *et al.* (N. Engl. J. Med., 2004, vol. 351, pp. 1502-1512).

Without acquiescing to the propriety of this rejection, and solely to advance prosecution, claims 35 and 36 have been cancelled.  The rejection of claims 35 and 36 under 35 U.S.C. § 103(a) is therefore rendered moot.

## *Allowable Subject Matter*

Applicants acknowledge with appreciation the Examiner's indication that "[c]laims 37 and 38 are allowed."  (Office Action, page 29).

In view of the allowance of claims 37 and 38, it is respectfully submitted that presently amended claims 40 to 43, which depend either directly or ultimately upon allowed claims, should also be allowable in dependent form.

### *Conclusion*

There being no remaining issues, this application is believed in condition for favorable reconsideration and early allowance, and such actions are earnestly solicited.

In the event the Examiner wishes to contact the undersigned regarding any matter, please call (collect if necessary) the telephone number listed below.

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment to Deposit Account No. **18-1982**.

Respectfully submitted,

/Kelly L. Bender/ _____
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi
Global IP Department
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **GlobalPatent.eFlow@sanofi.com**
Telephone: (908) 981-**6782**
Telefax:    (908) 981-7830
Sanofi Ref. FR2009/121 US CNT2
Date:   January 16, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address:  COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/627,962 | 06/20/2017 | Sunil GUPTA | FR2009/121 US CNT3 | 5732 |

5487          7590          04/24/2019

ANDREA Q. RYAN
SANOFI
55 Corporate Drive
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/24/2019 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

GlobalPatent.eFlow@Sanofi.com
andrea.ryan@sanofi.com
eFlow@frasappmoss112.pharma.aventis.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 15/627,962 | GUPTA, Sunil |
| | Examiner | Art Unit | AIA (FITF) Status |
| | JAMES D ANDERSON | 1629 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>1/16/2019</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☑ This action is **FINAL.**          2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>37-38 and 40-43</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) <u>37-38 and 40-43</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**   c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date <u>1/16/2019 and 2/7/2019</u>.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 15/627,962                                      Page 2
Art Unit: 1629

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Formal Matters*

Applicants' response and amendments to the claims, filed 1/16/2019, are acknowledged and entered.

Claims 34-36 and 44-49 have been cancelled by Applicant.

Claims 37-38 and 40-43 are pending and under examination.

### *Response to Arguments*

Any previous rejections and/or objections to claims 34-36 and 44-49 are withdrawn as being moot in light of Applicant's cancellation of the claims.

Applicants' arguments, filed 1/16/2019, have been fully considered but they are moot in light of the new grounds of rejection set forth herein, which are necessitated by Applicants' filing of an IDS on 1/16/2019. Rejections and/or objections not reiterated from previous office actions are hereby withdrawn. The following rejections and/or objections are either reiterated or newly applied. They constitute the complete set presently being applied to the instant application.

### *Allowable Subject Matter*

The indicated allowability of claims 37 and 38 is withdrawn in view of the newly discovered reference(s) to CABRESPINE ET AL. (2006) and NCCN Clinical Practice Guidelines

Application/Control Number: 15/627,962                                    Page 3
Art Unit: 1629

in Oncology: Antiemesis (2008), which were newly cited in the IDS filed 1/16/2019. Rejections

based on the newly cited reference(s) follow.

### *Information Disclosure Statement*

Receipt is acknowledged of the Information Disclosure Statements filed 1/16/2019 and

2/7/2019. The Examiner has considered the references cited therein to the extent that each is a

proper citation. Please see the attached USPTO Forms 1449.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as
> set forth in section 102 of this title, if the differences between the subject matter sought to be
> patented and the prior art are such that the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary skill in the art to which said subject matter
> pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the claims

under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was

commonly owned at the time any inventions covered therein were made absent any evidence to

the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor

and invention dates of each claim that was not commonly owned at the time a later invention was

made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35

U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Claims 37-38 and 40-43 are rejected under 35 U.S.C. 103(a) as being unpatentable over

**WINQUIST** (The Canadian Journal of Urology, February 2008, vol. 15, no. 1, pages 3942-3949)

and **TROPIC LISTING** (http://clinicaltrials.gov/archive/NCT00417079/2006_12_28. View of

NCT00417079 on 12/28/2006) in view of **PIVOT** (Annals of Oncology, 2008, vol. 19, pages

1547-1552) and **NATIONAL COMPREHENSIVE CANCER NETWORK (NCCN)**

**ANTIEMESIS GUIDELINES** (2008, page 1-31) (cited by Applicants in IDS filed 1/16/2019),

and further in view of **TAXOL (Paclitaxel) LABEL** (Mead Johnson, February 10, 2000, pages 1-

43), **TAKENAKA *ET AL*.** (International Journal of Urology, 2008, vol. 15, pages 106-109),

**HUDIS *ET AL*.** (J. Clin. Oncol., 1996, vol. 14, pages 58-65), and **CABRESPINE *ET AL*.**

(Urology, 2006, vol. 67, pages 354-359) (cited by Applicants in IDS filed 1/16/2019).


*Teachings of WINQUIST*

 Winquist is a February 2008 disclosure of open, uro-oncology clinical trials in Canada. See

page 3942.

 Winquist discloses a randomized Phase III clinical trial coordinated by Sanofi-Aventis

involving treatment of mCRPC patients previously treated with docetaxel (the TROPIC Study).

Id. at page 3948.

 Winquist discloses the administration of a 25 mg/m2 dose of cabazitaxel to mCRPC

patients: "A randomized, open-label multicenter study of XRP-6258 [cabazitaxel] at 25 mg/m2 in

combination with prednisone every 3 weeks compared to mitoxantrone in combination with

prednisone for the treatment of hormone-refractory metastatic prostate cancer previously treated

with a Taxotere [docetaxel]-containing regimen". Id. The primary endpoint is overall survival. Id.

Application/Control Number: 15/627,962                                                    Page 5
Art Unit: 1629

*Teachings of THE TROPIC LISTING*

The TROPIC Listing discloses the same phase III clinical trial reported in Winquist (the Sanofi-Aventis TROPIC Study), a "randomized, open-label, multi-center study comparing the safety and efficacy of XRP6258 [cabazitaxel] plus prednisone to mitoxantrone plus prednisone in the treatment of hormone refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen". The TROPIC Listing, like Winquist, discloses that cabazitaxel is to be administered every three weeks and that expected patient enrollment is 720 patients. The TROPIC Listing expressly states that patients must have a "[documented progression of disease (demonstrating at least one visceral or soft tissue metastatic lesion, including a new lesion) . . . [or] rising PSA levels or appearance of [a] new lesion," after previous treatment with docetaxel. The primary outcome, as also reported in Winquist, is overall survival. The TROPIC Listing notes the start date of the clinical trial was December 2006.

*Teachings of PIVOT*

Pivot discloses a Phase II clinical trial of cabazitaxel administered to docetaxel-resistant metastatic breast cancer patients administered as a 1-hour intravenous infusion every 3 weeks. Pivot administered an initial cabazitaxel dose of 20 mg/m2, then escalated the dose to 25 mg/m2 in patients who did not experience a significant adverse event during the first treatment cycle. See page 1548, right column, 3rd paragraph.

Pivot discloses the overall response rate was 14% (two complete, eight partial responses) and median overall survival was 12.3 months. See Abstract, "Results".

**Pivot discloses that hypersensivity reactions occurred in 4 patients, with Grades 3-5 hypersensitivity reactions occurring in 3 patients.** See Table 2.

Application/Control Number: 15/627,962                                    Page 6
Art Unit: 1629

      Pivot teaches administration of an antihistamine as part of a premedication regimen: "Patients received i.v. antihistaminic anti-H1 premedication 30 min before study drug administration". See page 1548.

      Pivot discloses additional premedications, **such as antiemetics**, were provided to patients in need thereof: "In case of nausea/vomiting, patients could receive preventive antiemetic treatment in compliance with the conventional antiemetic protocol of the center, for subsequent cycles". Id. Pivot administers cabazitaxel in a 3 week cycle (id. at 1547), and administers premedication "before study drug administration" and "for subsequent cycles".


*Teachings of NCCN*

      Pivot does not limit the antiemetic regimens used to treat nausea and vomiting but states that any "conventional antiemetic protocol" could be used. See page 1548.  It would have been obvious to use an antiemetic protocol comprising, e.g.,  an H2 antagonist and a corticoid because both drugs had known uses in antiemetic treatment and because both drugs had previously been used in pretreatment regimens for the two FDA-approved taxanes on the market, paclitaxel and docetaxel.

      For example, the 2008 National Comprehensive Cancer Network Antiemetic Guidelines ("NCCN") detail common treatment options in cancer centers' conventional antiemetic protocols. NCCN recommends the use of dexamethasone (a corticoid) and H2 antagonists in the treatment of chemotherapy-related nauseas and vomiting.

      NCCN expressly identifies the use of dexamethasone for high, moderate, and even low emetic risk chemotherapy, and recommends the antiemetic treatment "start before chemotherapy", **including administering a dose of 8 mg dexamethasone as recited in the instant claims on**

**Days 2-4 for "High" emetic risk or Days 2-3 for "Moderate" emetic risk**. See pages 6-8.

NCCN also describes a method of antiemetic treatment called "breakthrough treatment", to be

used in subsequent cycles when nausea and vomiting is induced in an earlier cycle. See page 15.

Breakthrough treatment involves giving a combination of drugs chosen from a set of equivalents.

See page 22. NCCN explains that "Multiple concurrent agents…may be necessary," and lists

"corticosteroids" among the drugs that "may be required". See pages 22-23.

NCCN also suggests the addition of H2 antagonists to the same antiemetic regimen: "If

patient has dyspepsia consider antacid therapy (H2 blocker or proton pump inhibitor).". See page

15.

*Teachings of TAXOL PRODUCT LABEL*

Taxol Product Label teaches "[A]ll patients should be premedicated prior to TAXOL

administration in order to prevent severe hypersensitivity reactions. Such premedication may

consist of dexamethasone [a corticoid] 20 mg PO administered approximately 12 and 6 hours

before TAXOL, diphenhydramine (or its equivalent) [an antihistamine] 50 mg I.V. 30 to 60

minutes prior to TAXOL, and cimetidine (300 mg) or ranitidine (50 mg) [H2 antagonists] I.V. 30

to 60 minutes before TAXOL." TAXOL Label at page 39, last paragraph.

*Teachings of TAKENAKA ET AL.*

Takenaka describes a study administering 30 mg/m2 docetaxel in combination with

estramustine for the treatment of mCRPC.  Takenaka states that "[d]examethasone 24 mg [a

corticoid], diphenhydramine 50 mg [an antihistamine], and ranitidine 50 mg [H2 antagonist] were

administered before the [docetaxel] infusion to prevent a hypersensitivity reaction". See page 106,

right column, 3rd paragraph.


### Teachings of HUDIS ET AL.

Hudis reports on docetaxel treatment in metastatic breast cancer patients where, after

observing two HSRs among the first six patients, "a variety of pretreatment regimens that

incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an H2 blocker]

were used". See page 59, right column, 4th paragraph.


### Teachings of CABRESPINE ET AL.

Regarding administering the antihistamine dexchlorpheniramine at a dose of 5 mg as part

of a taxane-chemotherapy premedication regime, Cabrespine et al. (cited by Applicants in IDS

filed 1/16/2019) teach administration of paclitaxel and carboplatin to patients with hormone-

refractory prostate cancer.  See Abstract. Cabrespine et al. teach premedications were administered

intravenously 30 minutes before each paclitaxel infusion and consisted of 20 mg methylprednisone

[a corticoid], 5 mg dexchlorpheniramine [an antihistamine], and 300 mg cimetidine or 50 mg

ranitidine [H2 antagonists]. See page 355, left column, "Treatment Plan".


### Principles of Law

A claimed invention is unpatentable if the differences between the claimed subject matter

and the prior art are such that the subject matter as a whole would have been obvious at the time

the invention was made to a person having ordinary skill in the art to which the subject matter

pertains. 35 U.S.C. § 103(a).

"In rejecting claims under 35 U.S.C. § 103, the examiner bears the initial burden of

presenting a *prima facie* case of obviousness. Only if that burden is met, does the burden of coming

forward with evidence or argument shift to the applicant." *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed.

Cir. 1993) (citations omitted). In order to determine whether a prima facie case of obviousness has

been established, we consider the factors set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17

(1966): (1) the scope and content of the prior art; (2) the differences between the prior art and the

claims at issue; (3) the level of ordinary skill in the relevant art; and (4) objective evidence of

nonobviousness, if present.

"The combination of familiar elements according to known methods is likely to be obvious

when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

416 (2007). "In determining whether obviousness is established by combining the teachings of the

prior art, 'the test is what the combined teachings of the references would have suggested to those

of ordinary skill in the art.'" *In re GPAC Inc.*, 57 F.3d 1573, 1581 (Fed. Cir. 1995).

"[I]in a section 103 inquiry, 'the fact that a specific [embodiment] is taught to be preferred

is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must

be considered.'" *Merck & Co. Inc. v. Biocraft Laboratories Inc.*, 874 F.2d 804, 807 (Fed. Cir.

1989) (quoting *In re Lamberti*, 545 F.2d 747, 750, 192 USPQ 278, 280 (CCPA 1976).)


*Examiner's Analysis and Conclusion of Obviousness*

A claimed invention is unpatentable if the differences between the claimed invention and

the prior art are such that the claimed invention as a whole would have been obvious to one of

ordinary skill in the relevant art. 35 U.S.C. § 103. Whether a claimed invention would have been

obvious is a question of law, based on factual determinations regarding the scope and content of

Application/Control Number: 15/627,962                                                     Page 10
Art Unit: 1629

the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in

the pertinent art, and any objective indicia of non-obviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550

U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

      In *KSR*, the Supreme Court criticized a rigid approach to determining obviousness based

on the disclosures of individual prior-art references, with little recourse to the knowledge,

creativity, and common sense that an ordinarily skilled artisan would have brought to bear when

considering combinations or modifications. *KSR*, 550 U.S. at 415-22. Rejecting a blinkered focus

on individual documents, the Court required an analysis that reads the prior art in context, taking

account of "demands known to the design community," "the background knowledge possessed by

a person having ordinary skill in the art," and "the inferences and creative steps that a person of

ordinary skill in the art would employ." *Id.* at 418. This "expansive and flexible approach," *id.* at

415, is consistent with the Courts' pre-*KSR* decisions acknowledging that the inquiry "not only

permits, but *requires,* consideration of common knowledge and common sense." *DyStar*

*Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir.

2006).   As *KSR* established, the knowledge of such an artisan is part of the store of public

knowledge that must be consulted when considering whether a claimed invention would have been

obvious.

      In recognizing the role of common knowledge and common sense, the Courts have

emphasized the importance of a factual foundation to support a party's claim about what one of

ordinary skill in the relevant art would have known. *See, e.g.*, *Mintz v. Dietz & Watson, Inc.*, 679

F.3d 1372, 1377 (Fed. Cir. 2012); *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328

(Fed. Cir. 2009). One form of evidence to provide such a foundation, perhaps the most reliable

because not litigation-generated, is documentary evidence consisting of prior art in the area.

A preponderance of the evidence establishes that a POSA would have had good reason to combine the teachings of Winquist and the TROPIC Listing and would have read the two references together. Winquist and the TROPIC Listing disclose the same treatment method being used in the same clinical trial for treating the same patient population - the Sanofi-Aventis TROPIC Study. Therefore, a POSA in 2008 would have known that Winquist and the TROPIC Listing disclosed the same ongoing Phase III clinical trial – the TROPIC Study – and would have read the two references together.

Turning now to the administration of a premedication comprising (i) an antihistamine (dexchlorpheniramine at a dose of 5 mg), (ii) a corticoid (dexamethasone at a dose of 8 mg), and (iii) an H2 antagonist prior to the administration of cabazitaxel, the premedication regimens comprising  (i) an antihistamine, (ii) a corticoid, and (iii) an H2 antagonist were well known as prophylactic treatments for potential hypersensitivity reactions (HSRs)/ and/or nausea/vomiting in taxane-based chemotherapy.

Pivot discloses that hypersensivity reactions occurred in 4 patients, with Grades 3-5 hypersensitivity reactions occurring in 3 patients. See Table 2. **Pivot teaches administration of an antihistamine as part of a premedication regimen**: "Patients received i.v. antihistaminic anti-H1 premedication 30 min before study drug administration". See page 1548. Pivot discloses additional premedications, **such as antiemetics**, were provided to patients in need thereof: "In case of nausea/vomiting, patients could receive preventive antiemetic treatment in compliance with the conventional antiemetic protocol of the center, for subsequent cycles". Id. Pivot administers cabazitaxel in a 3 week cycle (id. at 1547), and administers premedication "before study drug administration" and "for subsequent cycles".

While Pivot dose not disclose which antihistamine was administered, dexchlorpheniramine was a known antihistamine administered at a dose of 5 mg as part of a premedication to patients undergoing treatment with a taxane. See Cabrespine et al.

"[A]ll patients should be premedicated prior to TAXOL administration in order to prevent severe hypersensitivity reactions. Such premedication may consist of **dexamethasone** 20 mg PO administered approximately 12 and 6 hours before TAXOL, diphenhydramine (**or its equivalent**) [antihistamine] 50 mg I.V. 30 to 60 minutes prior to TAXOL, and cimetidine (300 mg) or ranitidine (50 mg) [H2 antagonists] I.V. 30 to 60 minutes before TAXOL." TAXOL Label at page 39, last paragraph.

Takenaka describes a study administering 30 mg/m2 docetaxel in combination with estramustine for the treatment of mCRPC. Takenaka states that "**[d]examethasone** 24 mg [a corticoid], diphenhydramine 50 mg [an antihistamine], and ranitidine 50 mg [H2 antagonist] were administered before the [docetaxel] infusion to prevent a hypersensitivity reaction". See page 106, right column, 3rd paragraph.

Hudis reports on docetaxel treatment in metastatic breast cancer patients where, after observing two HSRs among the first six patients, "a variety of pretreatment regimens that incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an H2 blocker] were used". See page 59, right column, 4th paragraph.

Cabrespine et al. (cited by Applicants in IDS filed 1/16/2019) teach administration of paclitaxel and carboplatin to patients with hormone-refractory prostate cancer. See Abstract. Cabrespine et al. teach premedications were administered intravenously 30 minutes before each paclitaxel infusion and consisted of 20 mg methylprednisone [a corticoid], **5 mg**

**dexchlorpheniramine** [an antihistamine], and 300 mg cimetidine or 50 mg ranitidine [H2 antagonists]. See page 355, left column, "Treatment Plan".

A POSA would have been motivated to use a similar prior art taxane premedication regimen to decrease the risk of HSRs and/or nausea/vomiting associated with cabazitaxel treatment.  For example, Pivot discloses that hypersensivity reactions occurred in 4 patients, with Grades 3-5 hypersensitivity reactions occurring in 3 patients. See Table 2. Although the rate of HSRs may have been lower when compared to paclitaxel and docetaxel therapy, a POSA would still have been motivated to prevent severe hypersensitivity reactions to cabazitaxel therapy by using a more thorough premedication regimen than the stand alone antihistamine disclosed in Pivot.  See KSR, 550 U.S. at 420 (claimed subject matter may be proved obvious when "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.").  Here, there existed at the time of invention a known problem of hypersensitivity reactions and/or nausea/vomiting occurring in some patients treated with taxanes, including cabazitaxel.  There also existed in the art an obvious solution to reducing the risks of such hypersensitivity reactions – premedicating a patient with (i) an antihistamine, (ii) a corticoid, and (iii) an H2 antagonist. Accordingly, a POSA would have considered the use of the claimed pretreatment regimen of a corticosteroid, an antihistamine, and an H2 antagonist as a well-known option for prevention of taxane-induced HSRs.

Preventing HSRs is a paramount concern of oncologists treating patients with taxanes as evidenced by the fact that when administering a taxane-based chemotherapeutic agent, a POSA at the time of the invention routinely administered a premedication comprising a corticosteroid, an antihistamine, and an H2 antagonist prior to the administration of a taxane to prevent/reduce the risk of HSRs. As administration of cabazitaxel was known in the art to cause hypersensitivity

reactions and nausea/vomiting in at least some patients (Pivot) and Pivot expressly teaches administration of an antihistamine as a premedication and additional premedications, **such as antiemetics**, were provided to patients in need thereof: "In case of nausea/vomiting, patients could receive preventive antiemetic treatment in compliance with the conventional antiemetic protocol of the center, for subsequent cycles", it would have been *prima facie* obvious to a POSA to premedicate patients being treated with cabazitaxel with the known premedication regimen of a corticosteroid, an antihistamine, and an H2 antagonist. Alternatively, when treating patients with cabazitaxel, the POSA would know to look for hypersensitivity reactions and nausea/vomiting as side effects in the treated patients, as hypersensitivity reactions and/or nausea/vomiting were known side-effects of cabazitaxel administration as evidenced by Pivot.  If patients developed hypersensitivity reactions and/or nausea/vomiting, it would have been *prima facie* obvious to the POSA to premedicate patients prior to subsequent cabazitaxel dosing cycles. Alternatively, to prevent potential hypersensitivity reactions and/or nausea/vomiting, it would have been *prima facie* obvious to the POSA to premedicate patients prior to initial cabazitaxel dosing.

A POSA would have been well versed in premedications intended to be administered to cancer patients undergoing treatment with a taxane as evidenced by the cited prior art and could readily and predictably adjust the premedication (active agents and/or dosing) within known parameters using no more than common knowledge and common sense.

Accordingly, the Examiner has concluded that it would have been *prima facie* obvious to a POSA at the time of the invention to intravenously administer a clinically effective dose, e.g., 15 mg/m2 to 25 mg/m2of cabazitaxel to a patient with prostate cancer and to premedicate a patient with known, clinically used premedications for preventing hypersensitivity reactions and/or

Application/Control Number: 15/627,962                                      Page 15
Art Unit: 1629

nausea and vomiting in patients treated with taxanes, comprising an antihistamine, a corticoid, and

an H2 antagonist.


### *Conclusion*

Applicant's submission of an information disclosure statement under 37 CFR 1.97(c) with

the fee set forth in 37 CFR 1.17(p) on 1/16/2019 prompted the new ground(s) of rejection presented

in this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP § 609.04(b).

Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS

from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of

the mailing date of this final action and the advisory action is not mailed until after the end of the

THREE-MONTH shortened statutory period, then the shortened statutory period will expire on

the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be

calculated from the mailing date of the advisory action.  In no event, however, will the statutory

period for reply expire later than SIX MONTHS from the mailing date of this final action.

If applicants should amend the claims, a complete and responsive reply will clearly identify

where support can be found in the disclosure for each amendment. Applicants should point to the

page and line numbers of the application corresponding to each amendment, and provide any

statements that might help to identify support for the claimed invention (e.g., if the amendment is

not supported in *ipsis verbis*, clarification on the record may be helpful). Should applicants present

new claims, applicants should clearly identify where support can be found in the disclosure

Application/Control Number: 15/627,962                                        Page 16
Art Unit: 1629

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to JAMES D ANDERSON whose telephone number is (571)272-9038.  The

examiner can normally be reached on Monday-Friday, 8:30 am - 5:00 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

Jeffrey Lundgren can be reached on 571-272-5541.  The fax phone number for the organization

where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR system,

see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system,

contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like

assistance from a USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/James D. Anderson/
Primary Examiner, Art Unit 1629

UNITED STATES PATENT AND TRADEMARK OFFICE
400 Dulany Street
Alexandria, VA 22314-5774
Tel. No.: (571) 272-9038

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
### (Submitted Only via EFS-Web)

| Application Number | 15/627,962 | Filing Date | 2017-06-20 | Docket Number (if applicable) | FR2009/121 US CNT3 | Art Unit | 1629 |
|---|---|---|---|---|---|---|---|
| First Named Inventor | Sunil GUPTA | | | Examiner Name | James D. Anderson | | |

This is a **Request for Continued Examination (RCE) under 37 CFR 1.114** of the above-identified application.
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application.  The Instruction Sheet for this form is located at WWW.USPTO.GOV

### SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

☐ Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    ☐ Other _____

☒ Enclosed

    ☒ Amendment/Reply

    ☒ Information Disclosure Statement (IDS)

    ☐ Affidavit(s)/ Declaration(s)

    ☐ Other

### MISCELLANEOUS

☐ Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a  period of months _____
    (Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

☐ Other _____

### FEES

☒ **The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to
Deposit Account No  181982

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

| X  Patent Practitioner Signature |
| --- |
| Applicant Signature |

EFS - Web 2.1.16

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | |
|---|---|---|
| Signature | /Kelly L. Bender/ | Date (YYYY-MM-DD) | 2019-10-24 |
| Name | Kelly L. Bender | Registration Number | 52610 |

This collection of information is required by 37 CFR 1.114.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of **GUPTA**

Examiner:   **James D. Anderson**

Art Unit:   **1629**

Application No.:   **15/627,962**

Filed:   **June 20, 2017**

Conf. No.   **5732**

Title:   **NOVEL ANTITUMORAL USE OF CABAZITAXEL**

Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

## SUBMISSION ACCOMPANYING REQUEST FOR
## CONTINUED EXAMINATION (RCE) UNDER 37 C.F.R. § 1.114(c)

This paper and the accompanying Request for Continued Examination ("RCE") are in response to the Final Office Action issued April 24, 2019, (hereinafter, "Final Office Action"), by the United States Patent and Trademark Office setting a three-month period for response set to expire on July 24, 2019.  The period for response is extended three months to expire October 24, 2019, pursuant to the Petition for Extension of Time under 37 C.F.R. 1.136(a) submitted herewith.  This response is timely filed.

Entry of the following amendments and consideration of the following remarks are respectfully requested.

Amendments to the claims start on page 2.

Remarks to amendments and the outstanding office action begin on page 3.

Sanofi Ref. FR2009/121 US CNT3                                      US Application No: 15/627,962

**Claim amendments**:


1. - 36.  (Cancelled)


37.  (Currently amended)  A method of ~~reducing the risk of a severe hypersensitivity reaction in a patient with prostate cancer beginning treatment with~~ increasing survival comprising administering to a patient in need thereof (1) cabazitaxel as a new cycle every three weeks ~~comprising administering to said patient (i)~~ and (2) an antihistamine, ~~(ii)~~ a corticoid, and ~~(iii)~~ an H$_2$ antagonist each administered prior to the administration of said cabazitaxel, wherein the antihistamine is dexchlorpheniramine administered at a dose of 5 mg and the corticoid is dexamethasone administered at a dose of 8 mg, and wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.


38.  (Previously Presented)  The method according to claim 37, wherein the antihistamine, corticoid, and H$_2$ antagonist are administered 30 minutes prior to the administration of said cabazitaxel.


39.  (Cancelled)


40.  (Previously Presented)  The method according to claim 38, wherein the dose of said cabazitaxel is 15-25 mg/m$^2$.


41.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 25 mg/m$^2$.


42.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 20 mg/m$^2$.


43.  (Previously presented)  The method according to claim 40, wherein the dose of said cabazitaxel is 15 mg/m$^2$.


44. – 49.  (Cancelled)

Sanofi Ref. FR2009/121 US CNT3                                    US Application No: 15/627,962

### *Remarks*

In the Office Action, the Examiner noted that claims 37 to 38 and 40 to 43 are pending in the application and that claims 37 to 38 and 40 to 43 are rejected.

Support for the amendment to claim 37 can be found throughout the specification and in the Original Claims.

No new matter is added by these amendments.

Applicant reserves the right to file one or more continuation, continuation-in-part, or divisional applications on the deleted subject matter.

As presently amended, claims 37, 38, and 40 to 43 are pending in this application.


### *Discussion of Rejections under 35 U.S.C. § 103(a)*

Claims 37 to 38 and 40 to 43 are rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Winquist (The Canadian Journal of Urology, Feb. 2008, vol. 15, no. 1, pp 3942-3949, hereinafter "Winquist"), the Tropic Listing (http://clinicaltrials.gov/archive/NCT00417079/2006_12_28, View of NCT00417079 on 12/28/2006, hereinafter "Tropic Listing"), in view of Pivot *et al.* (Annals of Oncology, 2008, 19, pp. 1547-1552, hereinafter "Pivot"), and National Comprehensive Cancer Network (NCCN) Antiemesis Guidelines (2008, pp. 1 to 31, hereinafter the "NCCN Antiemesis Guidelines"); and further in view of Taxol (Paclitaxol) Label (Mead Johnsons, February 10, 2000, pp. 1-43, hereinafter "Taxol Label"), Takenaka *et al.*, (International Journal of Urology, 2008, vol 15, pp. 106-109, hereinafter "Takenaka"), Hudis *et al.* (J. Clin Oncology., 1996, vol 14, pp. 58-65), and Cabrespine et al. (Urology, 2006, 67, pp. 3549359, hereinafter "Cabrespine").  This rejection is respectfully traversed.

It has long been held that "[t]he factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors, also known as objective indicia of non-obviousness," (*Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd., 533 F.3d 1353, 1356 (Fed. Cir. 2008)*; citing *Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966))*.  Indeed, to render a claimed invention obvious under 35 U.S.C. § 103, the cited reference themselves, coupled with the knowledge generally available in the art at the time of the invention, must contain some suggestion or incentive that would have motivated the skilled artisan to combine or modify them in the manner necessary to arrive

at the claimed invention (*See*, MPEP § 2143.01).  In addition, the proposed combination or modification must have had a reasonable expectation of success, determined from the vantage point of the skilled artisan at the time the invention was made. (*See*, MPEP § 2143.02).

Applicant submits that the claimed invention as a whole was not known in the prior art, and that the combination of Winquist and the Tropic Listing, in view of, Pivot and the NCCN Antiemesis Guidelines, and further in view of the Taxol Label, Takenaka, Hudis, and Cabrespine would not have provided a reasonable expectation of predictable results.

Claim 1, as currently amended, is directed to a method of increasing survival comprising administering to a patient in need thereof (1) cabazitaxel as a new cycle every three weeks and (2) an antihistamine, a corticoid, and an $H_2$ antagonist prior to the administration of said cabazitaxel, wherein the antihistamine is dexchlorpheniramine administered at a dose of 5 mg and the corticoid is dexamethasone administered at a dose of 8 mg, and wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

The primary references cited by the Examiner, Winquist and the Tropic Listing, briefly describe an ongoing Phase III clinical study of cabazitaxel, known as the Tropic Study.  Neither of these references, however, describe any premedication with an antihistamine, (ii) a corticoid, or (iii) an $H_2$ antagonist when administering cabazitaxel, let alone the exact premedication regimen of the instant claims.  It should also be noted that neither of the primary references, nor any of the other cited references, describe any results of the Tropic Study.

In view of the above-described deficiencies, it is alleged in the Final Office Action that one skilled in the art would have combined the primary references with six additional references and make numerous modifications to both the primary and secondary references to arrive at one or more of the rejected claims.

More specifically, it is alleged in the Final Office Action that "[a]lthough the rate of [hypersensitivity reactions] may have been lower when compared to paclitaxel and docetaxel therapy, a POSA would still have been motivated to prevent severe hypersensitivity reactions to cabazitaxel therapy by using a more thorough premedication regimen than the stand alone antihistamine disclosed in Pivot."  (Office Action, p. 13).

While Pivot indicates that "treatment emergent grades 3–5 non-hematological AEs probably or possibly related to study treatment were also <u>rare</u>," it is concluded therein that "[t]he safety profile of XRP6258 was very favorable when compared with the known safety

profile of the marketed taxanes or other compound under development." (Pivot at 1150, 1151, emphasis added).   Nowhere does Pivot state that any particular premedication would be necessary, let alone a more thorough premedication than provided in the study described therein, and certainly not a more thorough premedication than FDA-approved for docetaxel (i.e., a single-component premedication of dexamethasone, *See* Taxotere label).

Indeed, in the Mita study, which was specifically designed to "characterize the toxicities of [cabazitaxel] administered without premedication," among other objectives, the investigators concluded that "[b]ased on the results of this study, [cabazitaxel] administration does not require premedication, thus resulting in significant administration and convenience advantages." (Mita, Clinic Cancer Res, 15(2) (2009) pp. 723-730 at 724, 729).

Next, the NCCN Antiemesis Guidelines are relied upon in the Final Office Action for allegedly recommending that "antiemetic treatment 'start before chemotherapy', including administering a dose of 8 mg dexamethasone as recited in the instant claims on Days 2-4 for 'High' emetic risk or Days 2-3 for 'Moderate' emetic risk." (pp. 6 to 7).   Importantly, the NCCN Antiemesis Guidelines do not disclose cabazitaxel, nor do they recommend any premedication with respect to cabazitaxel.   Even with respect to other chemotherapy agents, the NCCN Antiemesis Guidelines note that the taxoids docetaxel and paclitaxel present **low emetic risk** for which only a single-component premedication is recommended, absent breakthrough nausea/vomiting (*See*, slides AE-4 to AE-5).   The NCCN Antiemesis Guidelines do not even recommend $H_2$ antagonists as part of a premedication for low emetic risk chemotherapies, and only references $H_2$ antagonists in the "breakthrough emesis" section, which does not discuss premedication, but rather concerns giving medications following chemotherapy.   (See, slide MS-7 to MS-8). Specifically, $H_2$ antagonists are recommended (along with proton pump inhibitors) if a patient experiences dyspepsia following chemotherapy. (*Id.* at MS-8).   Applicant is unaware of any teaching in the prior art that cabazitaxel administration causes dyspepsia. Accordingly, nothing in the NCCN Amtiemesis Guidelines would have motivated one skilled in the art to combine an $H_2$ antagonist with dexamethasone as a premedication to cabazitaxel in view of Pivot's conclusion that the safety profile cabazitaxel was very favorable when compared with the known safety profile of the marketed taxanes.

As noted in the Final Office Action, the cited Taxol label recommends a three-component premedication regimen prior to Taxol administration "in order to prevent severe hypersensitive reactions." (p. 7).   In contrast, while docetaxel is contraindicated in patients

having a history of severe hypersensitivity reactions to Taxotere and to drugs formulated with polysorbate 80, the docetaxel prescribing information recommends a single-component premedication of dexamethasone alone.   The Final Office Action fails to provide reasoned statements explaining why one skilled in the art would have been motivated to select Taxol's three-component premedication regimen for further modification rather than the single component premedication of regimen of docetaxel, especially with respect to patients who have previously been treated with docetaxel and would have been understood to have tolerated such treatment.

Takenaka is cited for allegedly describing a study of a combination of docetaxel with estramustine in which dexamethasone, diphenhydramine, and ranitidine were administered prior to docetaxel infusion "to prevent a hypersensitivity reaction."   (p. 8). However, Takenaka et al., conclude that "[t]he high toxicity of this protocol suggests that the regimen and/or timing should be altered for Japanese patients." (abstract).  In view of the negative results, Takenaka would not have provided one skilled in the art with the requisite motivation to use the premedication regimen described therein in combination with cabazitaxel.

Hudis is similarly cited for the given reason that it "reports on docetaxel treatment in metastatic breast cancer patients where, after observing two HSR's among the first six patients, 'a variety of pretreatment regimens that incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an H2 blocker] were used'." (Final Office Action, p. 8).   Hudis concludes that "[f]requent HSR may warrant prophylactic premedication" (at abstract).  There is nothing in the cited references that would suggest that cabazitaxel caused frequent hypersensitivity reactions that would motivate one skilled in the art to incorporate the premedication regimen of Hudis with a reasonable expectation of success. In fact, the prior art taught the opposite, i.e., that such hypersensitivity reactions were "rare" following cabazitaxel administration (Pivot at 1150) and that "[cabazitaxel] administration does not require premedication" (Mita at 729).

Finally, the Examiner relies upon Cebrespine for teaching the "administration of paclitaxel and carboplatin to patients with hormone refractory prostate cancer… [wherein] premedications were administered intravenously 30 minutes before each paclitaxel infusion and consisted of 20 mg methylprednisone [a corticoid], 5 mg dexchlorpheniramine [an antihistamine], and 300 mg cimetidine or 50 mg rantidine [H2 antagonists]." (Final Office Action, p. 8).   Nevertheless, Cabrespine does not disclose cabazitaxel, and does not provide a rationale for the premedication described therein such

that one skilled in the art would be motivated to combine the premedication with cabazitaxel.

It is concluded in the Final Office Action that "a POSA at the time of the invention routinely administered a premedication comprising a corticosteroid, an antihistamine, and an H2 antagonist prior to the administration of a taxane to prevent/reduce the risk of HSRs." (p. 13). Even assuming *arguendo* that a "POSA would have been well versed in premedication to be administered to cancer patients undergoing treatment with a taxane," as alleged in the Final Office Action, such knowledge is insufficient to support a rejection under 35 U.S.C. § 103(a). Indeed, the cited references taken together fail to provide the requisite motivation to administer an antihistamine, a corticoid, and an H2 antagonist when administering cabazitaxel, in view of Pivot's teaching that the safety profile cabazitaxel was very favorable when compared with the known safety profile of the marketed taxanes. As none of the cited references contradict Pivot's safety findings, one skilled in the art would not be motivated to use a more complex premedication than which was FDA-approved for docetaxel.

Nevertheless, without acquiescing to instant rejection, claim 37 is amended to include the element of increasing survival. As none of the cited references, either alone or in combination, gave the results of the Tropic Study, such references could not have provided one skilled in the art with a reasonable expectation that carrying out the steps of the instant claims would result in increased survival.

For the foregoing reasons, claims 37, 38, and 40 to 43 are unobvious over the combination of Winquist, the Tropic Listing, Pivot, the NCCN Antiemesis Guidelines, the Taxol Label, Hudis, and Cabrespine because one or ordinary skill in the art would not have been motivated to combine or modify the cited references in the manner necessary to arrive at the claimed invention with a reasonable expectation of success. Therefore, reconsideration and withdrawal of the instant rejection under 35 U.S.C. § 103(a) are respectfully requested.

### *Conclusion*

There being no remaining issues, this application is believed in condition for favorable reconsideration and early allowance, and such actions are earnestly solicited.

In the event the Examiner wishes to contact the undersigned regarding any matter, please call (collect if necessary) the telephone number listed below.

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment to Deposit Account No. **18-1982**.

Respectfully submitted,

/Kelly L. Bender/
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi
Global IP Department
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: Sanofi-Patents@docket.cpaglobal.com
Telephone:   (908) 981-**6782**
Telefax:     (908) 981-7830
Sanofi Ref. FR2009/121 US CNT3
Date:   October 24, 2019



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 5487 | 7590 | 01/13/2020 |

ANDREA Q. RYAN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

DATE MAILED: 01/13/2020

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/627,962 | 06/20/2017 | Sunil GUPTA | FR2009/121 US CNT3 | 5732 |

TITLE OF INVENTION: NOVEL ANTITUMORAL USE OF CABAZITAXEL

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 04/13/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

## PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |
|---|---|---|---|

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 5487 | 7590 | 01/13/2020 |
|---|---|---|

ANDREA Q. RYAN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/627,962 | 06/20/2017 | Sunil GUPTA | FR2009/121 US CNT3 | 5732 |

TITLE OF INVENTION: NOVEL ANTITUMORAL USE OF CABAZITAXEL

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 04/13/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| ANDERSON, JAMES D | 1629 | 514-449000 |

| 1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).<br><br>☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.<br><br>☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.** | 2. For printing on the patent front page, list<br>(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,<br>(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.<br><br>1 _____<br><br>2 _____<br><br>3 _____ |
|---|---|

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

| (A) NAME OF ASSIGNEE | (B) RESIDENCE: (CITY and STATE or COUNTRY) |
|---|---|

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required) ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

| Authorized Signature | _____ | Date | _____ |
|---|---|---|---|
| Typed or printed name | _____ | Registration No. | _____ |

PTOL-85 Part B (08-18) Approved for use through 01/31/2020    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/627,962 | 06/20/2017 | Sunil GUPTA | FR2009/121 US CNT3 | 5732 |

5487        7590        01/13/2020
ANDREA Q. RYAN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

DATE MAILED: 01/13/2020

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| **Notice of Allowability** | **Application No.** 15/627,962 | **Applicant(s)** GUPTA, Sunil | |
|---|---|---|---|
| | **Examiner** JAMES D ANDERSON | **Art Unit** 1629 | **AIA (FITF) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to RCE filed 10/24/2019.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 37-38 and 40-43 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   - a) ☐All     b) ☐ Some     *c) ☐ None of the:
     1. ☐ Certified copies of the priority documents have been received.
     2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
     3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 10/24/2019 and 12/6/2019.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/James D. Anderson/
Primary Examiner, Art Unit 1629

Application/Control Number:15/627,962                                      Page2
Art Unit:1629

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this application is eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on 10/24/2019 has been entered.

### *Claim Status*

Applicants' response and amendments to the claims, filed 10/24/2019, have been received and entered.

No claims were cancelled or newly added.

Claims 37-38 and 40-43 are pending and allowed.

### *Information Disclosure Statement*

The information disclosure statements (IDSs) submitted on 10/24/2019 and 12/6/2019 were filed after the mailing date of the Final Office Action on 4/24/2019.  The submissions are in compliance with the provisions of 37 CFR 1.97.  Accordingly, the information disclosure statements are being considered by the examiner.

Application/Control Number:15/627,962                                          Page3
Art Unit:1629

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in an interview with Kelly Bender on January 3, 2020.

The application has been amended as follows:

Claim 37 (Amended) A method of increasing survival comprising administering to a patient in need thereof (1) cabazitaxel as a new cycle every three weeks and (2) dexchlorpheniramine administered at a dose of 5 mg ~~an antihistamine, (II) a corticoid~~ dexamethasone administered at a dose of 8 mg, and ~~(III)~~ an H2 antagonist, each administered prior to the administration of said cabazitaxel, ~~wherein the antihistamine is dexchlorpheniramine administered at a dose of 5 mg and the corticoid is dexamethasone administered at a dose of 8 mg, and~~ wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

Claim 38 (Amended) The method according to claim 37, wherein the <u>dexchlorpheniramine</u> ~~antihistamine~~, <u>dexamethasone</u> ~~corticoid~~, and H2 antagonist are administered 30 minutes prior to the administration of said cabazitaxel.

Application/Control Number:15/627,962                                                      Page4
Art Unit:1629

### Reasons for Allowance

The following is an examiner's statement of reasons for allowance: Applicants'
amendments to Claim 37 overcome the rejections of record.  Specifically, Applicants have
amended Claim 37 to recite "[A]  method of increasing survival comprising administering to a
patient in need thereof…".  The issue of whether a preamble reciting a method of "increasing
survival" was limiting was addressed in the grandparent application (13/456,720), which issued as
U.S. Patent No. 8,927,592.  In an *inter partes* review of issued Claims 1-5 and 7-30 of the '592
patent, Patent Owner proposed a Contingent Motion to enter proposed substitute claims 31-34.
Proposed Claim 31 recited "[A] method of increasing survival comprising administering to a
patient in need thereof….", which Patent Owners argued is limiting as a "statement of intentional
purpose for how the method is to be performed" (citing *Jansen v. Rexall Sundown, Inc*., 342 F.3d
1329, 1333 (Fed. Cir. 2003).  The  BPAI denied Patent Owner's contingent motion to amend on
the basis that the preamble was not limiting because it merely provides additional description of
the patient in need of treatment and not an "intentional purpose" for how the treatment method is
to be practiced in a defined patient population.  Patent Owners appealed the Board's denial of its
motion to amend to the CAFC, which agreed with Patent Owners that the preamble of Claim 31 is
limiting based on their decisions in *Rapoport v. Dement*, 254 F.3d 1053 (Fed. Cir. 2001) and
*Jansen*.  Specifically, the CAFC held that:

> *Jansen* and *Rapoport* support a conclusion that the pre-
> amble is limiting here.[8]  As in *Rapoport*, the phrase "pa-
> tient in need thereof" from proposed claim 31 relies on the
> preamble for antecedent basis. 254 F.3d at 1059.  And, as
> in *Jansen*, the preamble expresses the "intentional pur-
> pose[―increasing survival―]for which the method must be
> performed." 342 F.3d at 1333.  We therefore "interpret the
> nearly parallel language in the ['592] patent claims in the
> same way." *Id*.

The CAFC noted that their conclusion is also consistent with the specification of the '529 patent, which emphasizes increasing survival as an important aspect of the invention.  The CAFC remanded to the BPAI and stated that the Board should treat the preamble as an additional limitation of proposed Claim 31.

On remand, the Board adopted the construction of the preamble of Claim 31 "as an additional limitation of" the claim that "require[s] 'increasing survival'" as the "intentional purpose. ,. for which the [recited] method must be performed." *Sanofi*, 757 F. App'x at 993-94 (quoting *Jansen v. Rexall Sundown, Inc*., 342F.3d 1329,1333 (Fed. Cir. 2003)). In evaluating whether the proposed claims were obvious, the Board noted that "proving the obviousness of the challenged claims does not require proving that performing the method recited in the proposed claims would actually increase survival, but it does require proving that a person of ordinary skill in the art reasonably would have expected the performance of the recited method to increase survival."  After weighing all of the evidence, the Board found that the preponderance of evidence of record does not show that, at the time of the effective filing date of the '592 patent, a person of ordinary skill in the art reasonably would have expected the treatment regimen recited in the proposed claims to have resulted in an increase in patient survival. Accordingly, they concluded that the evidence of record does not establish the obviousness of the proposed claims on any ground.

The Examiner adopts the claim construction of the CAFC and the BPAI that the preamble of instant Claim 37 is an additional limitation of the claim that requires "increasing survival" as the "intentional purpose…for which the [recited] method must be performed."  After weighing all of the evidence, the Examiner has determined, as the BPAI did, that a preponderance of evidence of record does not show that, at the time of the effective filing date of the present application, a

Application/Control Number:15/627,962                                        Page6
Art Unit:1629

person of ordinary skill in the art reasonably would have expected the treatment regimen recited

in the instant claims to have resulted in an increase in patient survival in patients with castration

resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

The claims are further distinguished from the prior art of record because they require

administration of a three-component premedication regimen (5 mg dexchlorpheniramine + 8 mg

dexamethasone + an H2 antagonist) administered prior to the administration of cabazitaxel.  The

prior art does not teach or reasonably suggest administration of such a premedication regimen prior

to administration of cabazitaxel.

Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee.   Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

### *Conclusion*

**Claims 37-38 and 40-43 are allowed**.

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to JAMES D ANDERSON whose telephone number is (571)272-9038.  The

examiner can normally be reached on Monday-Friday, 8:30 am - 5:00 pm.

Examiner interviews are available via telephone, in-person, and video conferencing using

a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged   to   use   the   USPTO   Automated   Interview   Request   (AIR)   at

http://www.uspto.gov/interviewpractice.

Application/Control Number:15/627,962                                   Page7
Art Unit:1629

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

Jeffrey Lundgren can be reached on 571-272-5541.  The fax phone number for the organization

where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR system,

see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system,

contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like

assistance from a USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/James D. Anderson/
Primary Examiner, Art Unit 1629

# EXHIBIT F

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of **GUPTA**

Examiner:  **James D. Anderson**

Art Unit:  **1629**

Application No.:  **Not yet assigned**

Filed:  **Concurrently Herewith**

Conf. No.  **Not yet assigned**

Title:  **NOVEL ANTITUMORAL USE OF CABAZITAXEL**

Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

### PRELIMINARY AMENDMENT

Before examining the above-indicated application on the merits, kindly enter the following amendments.

Amendments to the specification start on page 2.

Amendments to the claims start on page 3.

Remarks to amendments begin on page 4.

Sanofi Ref. FR2009/121 US CNT5

**Specification amendments:**

      Please replace the paragraph beginning on page 7, line 8 of the specification with the following rewritten paragraph:

This compound and a preparative method thereof is described in WO 96/30355, EP 0 817 779 B1 and US 5 847 170, which are hereby incorporated herein by reference. Cabazitaxel may be administered in base form (cf. above formula), or in the form of a hydrate. It may also be a solvate, i.e. a molecular complex characterized by the incorporation of the crystallization solvent into the crystal of the molecule of the active principle (see in this respect page 1276 of *J. Pharm. Sci.* 1975, *64*(8), 1269-1288). In particular, it may be an acetone solvate, and, more particularly, may be the solvate described in WO 2005/028462 2005/02846. It may be an acetone solvate of cabazitaxel containing between 5% and 8% and preferably between 5% and 7% by weight of acetone (% means content of acetone/content of acetone+cabazitaxel × 100). An average value of the acetone content is 7%, which approximately represents the acetone stoichiometry, which is 6.5% for a solvate containing one molecule of acetone. The procedure described below allows the preparation of an acetone solvate of cabazitaxel:

Sanofi Ref. FR2009/121 US CNT5

**Claim amendments**:

1. – 21. (Cancelled)

22.     (New)  A method of increasing survival comprising administering to a patient in need thereof a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, in combination with an H$_2$ antagonist, wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

23.  (New)  The method of claim 22, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

24.  (New)  The method of claim 22, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

25.  (New)  The method of claim 22, where the H$_2$ antagonist  is administered at least 30 minutes prior to administering the dose of cabazitaxel.

26.  (New)  The method of claim 25, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

27.  (New)  The method of claim 25, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

Sanofi Ref. FR2009/121 US CNT5

## ***Remarks***

Support for new claims 22 to 27 can be found throughout the Specification, for example on page 4, lines 1 to 32; and page 10, line 11 to page 11, line 5; and in the original claims.

Claims 1 to 21 are cancelled without prejudice.

The Specification is amended to replace the reference "WO2005/02846" with "WO2005/028642" to correct an obvious typographical error.

No new matter has been added by these amendments.

Applicants reserve the right to pursue the cancelled subject matter in one or more continuation, continuation-in-part, or divisional applications.

As currently amended, claims 22 to 27 are pending in this application.

The Director is hereby authorized to charge any additional fees which may be required by this paper, or credit any overpayment, to Deposit Account No. **18-1982**.


Respectfully submitted,


/Kelly L. Bender/
Kelly Bender, Reg. No. 52,610
Attorney for Applicant

Sanofi
Global IP Patent Department
55 Corporate Drive
Mail Code: 55A-505A
Bridgewater, New Jersey 08807
email: **uspatent.e-filing@sanofi.com**
Telephone: (908) 981-**6782**
Telefax:    (908) 981-7830
Sanofi Ref. FR2009/121 US CNT5
Date:   January 14, 2020

U<small>NITED</small> S<small>TATES</small> P<small>ATENT AND</small> T<small>RADEMARK</small> O<small>FFICE</small>

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/743,411 | 01/15/2020 | Sunil GUPTA | FR2009/121-US CNT5 | 2021 |

5487          7590          04/01/2020
ANDREA Q. RYAN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/01/2020 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

Sanofi-Patents@docket.cpaglobal.com
andrea.ryan@sanofi.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 16/743,411 | Applicant(s) GUPTA, Sunil | |
|---|---|---|---|
| | Examiner JAMES D ANDERSON | Art Unit 1629 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>1/15/2020</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**   2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>22-27</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>22-27</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**   c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>1/15/2020 and 2/28/2020</u>
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

Application/Control Number: 16/743,411                                        Page 2
Art Unit: 1629

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.


### *TrackOne*

Applicants' request for prioritized examination under 37 CFR 1.102(e) filed 1/15/2020

has been received, entered, and granted *per* the Decision mailed 2/26/2020.


### *Formal Matters*

Applicants' preliminary amendments to the claims, filed 1/15/2020, have been received

and entered.

Claims 1-21 have been cancelled.

Claims 22-27 are newly added.

Claims 22-27 are pending and under examination.


### *Priority*

This application is a continuation of U.S. Application No. 15/627,962, filed June 20, 2017,

which is a continuation of U.S. Application No. 14/575,566, filed December 18, 2014, which is a

continuation of U.S. Application No. 13/456,720, filed April 26, 2012, which is a continuation of

International Application No. PCT/IB2010/054866, filed October 27, 2010, which claims the

benefit of priority of U.S. Provisional Application No. 61/256,160, filed October 29, 2009, U.S.

Provisional Application No. 61/293,903, filed January 11, 2010, U.S. Provisional Application No.

61/355,834, filed June 17, 2010, U.S. Provisional Application No. 61/355,888, filed June 17, 2010,

U.S. Provisional Application No. 61/369,929, filed August 2, 2010, U.S. Provisional Application

No. 61/383,933, filed September 17, 2010, and U.S. Provisional Application No. 61/389,969, filed

October 5, 2010.

### *Information Disclosure Statement*

Receipt is acknowledged of the Information Disclosure Statements filed 1/15/2020 and

2/28/2020.  The Examiner has considered the references cited therein to the extent that each is a

proper citation.

Lined-through references were not considered by the Examiner because they are

incomplete citations, i.e., missing source information, date of publication/retrieval, etc.

Please see the attached USPTO Forms 1449.

### *Claim Rejections - 35 USC § 112 – 2nd Paragraph*

The following is a quotation of 35 U.S.C. 112(b):

(B)   CONCLUSION.—The specification shall conclude with one or more claims
particularly pointing out and distinctly claiming the subject matter which the inventor or a
joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

The specification shall conclude with one or more claims particularly pointing out and
distinctly claiming the subject matter which the applicant regards as his invention.

"The primary purpose of this requirement of definiteness of claim language is to ensure

that the scope of the claims is clear so the public is informed of the boundaries of what constitutes

infringement of the patent.  A secondary purpose is to provide a clear measure of what applicants

regard as the invention so that it can be determined whether the claimed invention meets all the

Application/Control Number: 16/743,411                                           Page 4
Art Unit: 1629

criteria for patentability and whether the specification meets the criteria of 35 U.S.C. 112, first

paragraph with respect to the claimed invention.", (see MPEP § 2173).

Claims 22-24 and 26-27 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

Independent Claim 22 recites an active method step of "…administering…a dose of 20 to

25 mg/m2 cabazitaxel, or a hydrate or solvate thereof, in combination with an H2 antagonist…".

The metes and bounds of the claims are unclear because a person of ordinary skill in the art would

not be apprised of the scope intended by "in combination with an H2 antagonist".

It is unclear, for example, whether "…administering…a dose of 20 to 25 mg/m2

cabazitaxel, or a hydrate or solvate thereof, *in combination with an H2 antagonist…*" requires that

the dose of cabazitaxel and the H2 antagonist are administered together physically and/or

temporally.  For example, it is not apparent whether the dose of cabazitaxel and the H2 antagonist

are required to be in the same composition.  Alternatively, it is not apparent whether the dose of

cabazitaxel is administered separately and distinctly from the H2 antagonist and "in combination

with" is intended to mean that the cabazitaxel and H2 antagonist are present together in the body

of the patient.

### *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine

grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or

improper timewise extension of the "right to exclude" granted by a patent and to prevent possible

harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where

Application/Control Number: 16/743,411                                              Page 5
Art Unit: 1629

the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159.  See MPEP §§ 706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

<u>U.S. Patent No. 8,927,592</u>

Claims 22-27 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 31-34 of U.S. Patent No. 8,927,592.

Application/Control Number: 16/743,411                                          Page 6
Art Unit: 1629

Although the claims at issue are not identical, they are not patentably distinct from each

other because the proposed substitute claims in the '592 patent, <u>which have been granted pursuant</u>

<u>the Board of Patent Appeals and Interferences decision dated 10/22/2019</u>, recite:

> 31. A method of increasing survival comprising administering
> to a patient in need thereof (i) an antihistamine, (ii) a corticoid,
> (iii) an H₂ antagonist, and (iv) a dose of 20 to 25 mg/m² of
> cabazitaxel, or a hydrate or solvate thereof, wherein said
> antihistamine, said corticoid, and said H₂ antagonist are
> administered prior to said dose of 20 to 25 mg/m² of
> cabazitaxel, or hydrate or solvate thereof, in combination with
> prednisone or prednisolone, wherein said patient has castration
> resistant or hormone refractory, metastatic prostate cancer that
> has progressed during or after treatment with docetaxel.
>
> 32. The method according to claim 31, where the cabazitaxel,
> or hydrate or solvate thereof, is administered at a dose of 25
> mg/m².
>
> 33. The method according to claim 31, comprising repeating the
> administration of said antihistamine, said corticoid, said H₂
> antagonist, and said cabazitaxel, or hydrate or solvate thereof,
> as a new cycle every 3 weeks.
>
> 34. The method according to claim 31, where the cabazitaxel,
> or hydrate or solvate thereof, is administered at a dose of 20
> mg/m².

Accordingly, both the instant claims and those of the '592 patent encompass administering a dose

of 20 to 25 mg/m² cabazitaxel, or a hydrate or solvate thereof, in combination with an H₂ antagonist

to patients with castration resistant metastatic prostate cancer that has progressed during or after

treatment with docetaxel.

While the Examiner acknowledges that the patentability of the above Claims 31-34 of the

'592 patent remains subject to Appeal and an Appeal to the CAFC has in fact been submitted by

Mylan Laboratories Limited, <u>they are the presently allowed claims of the '592 patent at the time</u>

<u>of this Office Action</u>.

Application/Control Number: 16/743,411                                                    Page 7
Art Unit: 1629

<u>U.S. Patent No. 10,583,110</u>

Claims 22-27 are rejected on the ground of nonstatutory double patenting as being

unpatentable over claims 1-6 of U.S. Patent No. 10,583,110.

Although the claims at issue are not identical, they are not patentably distinct from each

other because the '110 patent claims recite:

> 1. A method of increasing survival comprising administering to a patient in need thereof (1) cabazitaxel, or a hydrate of solvate thereof, as a new cycle every three weeks and (2) dexchlorpheniramine administered at a dose of 5 mg, dexamethasone administered at a dose of 8 mg, and an H2 antagonist, each administered prior to the administration of said cabazitaxel, or hydrate of solvate thereof, wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.
>
> 2. The method according to claim 1, wherein the dexchlorpheniramine, dexamethasone, and H2 antagonist are administered 30 minutes prior to the administration of said cabazitaxel, or hydrate of solvate thereof.
>
> 3. The method according to claim 2, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15-25 mg/m².
>
> 4. The method according to claim 3, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 25 mg/m².
>
> 5. The method according to claim 3, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 20 mg/m².
>
> 6. The method according to claim 3, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15 mg/m².

Accordingly, both the instant claims and those of the '110 patent encompass administering a dose

of 20 to 25 mg/m² cabazitaxel, or a hydrate or solvate thereof, in combination with an $H_2$ antagonist

to patients with castration resistant metastatic prostate cancer that has progressed during or after

treatment with docetaxel.

### *Claims Free of the Prior Art*

Instant Claims 22-27 are not subject to any prior art rejections under 35 U.S.C. 102 and/or

35 U.S.C. 103. The closest prior art are WINQUIST[1] and TROPIC LISTING[2]. Winquist and the

TROPIC Listing together disclose the same treatment protocol described in Example 1 of the

present Specification ("the TROPIC Study").

Specifically, Winquist discloses the administration of a 25 mg/m$^2$ dose of cabazitaxel to

mCRPC patients: "A randomized, open-label multicentre study of XRP-6258 [cabazitaxel] at 25

mg/m$^2$ in combination with prednisone every 3 weeks compared to mitoxantrone in combination

with prednisone for the treatment of hormone-refractory metastatic prostate cancer previously

treated with a Taxotere [docetaxel]-containing regimen." Winquist at page 3948. The primary

endpoint is overall survival. *Id.*

The TROPIC Listing discloses the same phase III clinical trial reported in Winquist (the

Sanofi-Aventis TROPIC Study), a "randomized, open-label, multi-center study comparing the

safety and efficacy of XRP6258 [cabazitaxel] plus prednisone to mitoxantrone plus prednisone in

the treatment of hormone refractory metastatic prostate cancer previously treated with a Taxotere

[docetaxel]-containing regimen." TROPIC Listing, 1. The TROPIC Listing, like Winquist,

discloses that cabazitaxel is to be administered every three weeks and that expected patient

enrollment is 720 patients. *Id.* at 1-2. The TROPIC Listing expressly states that patients must have

a "[d]ocumented progression of disease (demonstrating at least one visceral or soft tissue

metastatic lesion, including a new lesion) . . . [or] rising PSA levels or appearance of [a] new

lesion," after previous treatment with docetaxel. *Id.* at 2. The primary outcome, as also reported in

---

[1] Eric Winquist et al., *Open clinical uro-oncology trials in Canada*, THE CANADIAN JOURNAL OF
UROLOGY, 15(1), 3942-49 (February 2008)
[2] Sanofi-Aventis, *XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone
Refractory Metastatic Prostate Cancer (TROPIC)*, CLINICALTRIALS.GOV (October 23, 2008)

Application/Control Number: 16/743,411                                    Page 9
Art Unit: 1629

Winquist, is overall survival. *Id.* at 1. The TROPIC Listing notes the start date of the clinical trial

was December 2006. *Id.* at 2. The TROPIC Listing, unlike Winquist, does not disclose an

administration dose of cabazitaxel. *Id.*

Neither Winquist nor The TROPIC Listing disclose administering cabazitaxel "in

combination with an $H_2$ antagonist" as required by the instant claims.

The prosecution history of the present family of patent applications is extensive due at least

in part to U.S. Application No. 13/456,720, filed April 26, 2012, which issued as U.S. Patent No.

8,927,592. Briefly, when the Examiner allowed the '720 application he stated in the Reasons for

Allowance that it is surprising and unexpected that the then claimed combination of cabazitaxel

and a corticoid are clinically effective in the treatment of prostate cancer that has progressed during

or after treatment with docetaxel. Specifically, the 37 CFR 1.132 Declaration of Dr. Sartor filed

7/16/2014 in that application provided convincing evidence that while the art was full of promising

early clinical results, these failed to predict whether therapies would ultimately provide a clinically

meaningful benefit to the desired patient populations and that mCRPC was known to be a

particularly challenging and unpredictable indication.

An *inter partes* review of claims 1-5 and 7-30 of U.S. Patent No. 8,927,592 was requested

by petitioner Mylan Laboratories Limited and the Board of Patent Appeals and Interferences

(BPAI) rendered a Final Written Decision on 4/14/2017, determining that claims 1-5 and 7-30 of

the '592 patent are unpatentable (substantially in light of the teachings of Winquist and The

TROPIC Listing) and denying Patent Owner's Contingent Motion to Amend claims 27-30. Patent

Owners appealed to the CAFC on 11/17/2017 the Board's denial of its motion to amend claims

27-30.  The CAFC concluded, *inter alia*, that the Board applied the wrong claim construction in

its analysis, vacated its denial of the motion and remanded for further proceedings consistent with

its opinion.

Material to the present claim construction, Patent Owner's motion to amend its claims

included substituting proposed claims 31-34 for claims 27-30. Proposed substitute Claim 31

recited:

> 31. A method of increasing survival comprising administering
> to a patient in need thereof (i) an antihistamine, (ii) a corticoid,
> (iii) an $H_2$ antagonist, and (iv) a dose of 20 to 25 mg/m$^2$ of
> cabazitaxel, or a hydrate or solvate thereof, wherein said
> antihistamine, said corticoid, and said $H_2$ antagonist are
> administered prior to said dose of 20 to 25 mg/m$^2$ of
> cabazitaxel, or hydrate or solvate thereof, in combination with
> prednisone or prednisolone, wherein said patient has castration
> resistant or hormone refractory, metastatic prostate cancer that
> has progressed during or after treatment with docetaxel.

The Court held that *Jansen* and *Rapoport* supported a conclusion that the preamble of proposed

Claim 31 is limiting. As in *Rapoport*, the phrase "patient in need thereof" from proposed Claim 31

relies on the preamble for antecedent basis. And, as in *Jansen*, the preamble expresses the

"intentional purpose [—increasing survival—] for which the method must be performed." The

Court therefore "interpret the nearly parallel language in the ['592] patent claims in the same way."

Notably, the Court emphasized that their conclusion is also consistent with the specification

of the '529 patent, which emphasizes increasing survival as an important aspect of the invention.

Example 1 of the patent, for instance, describes a clinical study where patients with castration

resistant metastatic prostate cancer who had previously been treated with docetaxel received either

treatment with cabazitaxel or mitoxantrone (an antitumor antibiotic), each combined with either

prednisone or prednisolone. In discussing the results of this study, the '529 patent highlights that

patients in the cabazitaxel group demonstrated increased overall survival rates compared to

patients treated with mitoxantrone and prednisone. The CAFC held that the Board erred by treating

the preamble as non-limiting and on remand, instructed the Board to treat the preamble as an additional limitation of proposed Claim 31.

The Examiner adopts the claim construction of the CAFC and construes the preamble of independent Claim 22, i.e., "[A] method of increasing survival…", as expressing an intentional purpose for which the method must be performed.  As noted by the BPAI on remand, "…proving the obviousness of the challenged claims does not require proving that performing the method recited in the proposed claims would actually increase survival, but it does require proving that a person of ordinary skill in the art reasonably would have expected the performance of the recited method to increase survival."

Here, a preponderance of the evidence weighs against a *prima facie* finding of obviousness of the claimed invention.  While it is true that a Phase III clinical trial of cabazitaxel in a dose encompassed by the instant claims (25 mg/m$^2$) in hormone refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel] was started prior to Applicants' earliest effective filing date (e.g., as taught in WINQUIST and The TROPIC Listing), a person of ordinary skill in the art, while ***hopeful*** that the trial would be successful and increase survival of patients, would not reasonably have expected that cabazitaxel would increase survival of patients treated in the TROPIC Study.

### *Conclusion*

If applicants should amend the claims, a complete and responsive reply will clearly identify where support can be found in the disclosure for each amendment. Applicants should point to the page and line numbers of the application corresponding to each amendment, and provide any statements that might help to identify support for the claimed invention (e.g., if the amendment is

not supported in *ipsis verbis*, clarification on the record may be helpful). Should applicants present new claims, applicants should clearly identify where support can be found in the disclosure.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JAMES D ANDERSON whose telephone number is (571)272-9038. The examiner can normally be reached on Monday-Friday, 8:30 am - 5:00 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jeffrey Lundgren can be reached on 571-272-5541. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/James D. Anderson/
Primary Examiner, Art Unit 1629

UNITED STATES PATENT AND TRADEMARK OFFICE
400 Dulany Street
Alexandria, VA 22314-5774
Tel. No.: (571) 272-9038



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 5487 | 7590 | 06/09/2020 |
|---|---|---|

LISA P. RASMUSSEN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

DATE MAILED: 06/09/2020

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/743,411 | 01/15/2020 | Sunil GUPTA | FR2009/121-US CNT5 | 2021 |

TITLE OF INVENTION: NOVEL ANTITUMORAL USE OF CABAZITAXEL

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 09/09/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 02/11)

## PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |

**INSTRUCTIONS:** This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

5487          7590          06/09/2020

LISA P. RASMUSSEN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/743,411 | 01/15/2020 | Sunil GUPTA | FR2009/121-US CNT5 | 2021 |

TITLE OF INVENTION: NOVEL ANTITUMORAL USE OF CABAZITAXEL

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 09/09/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| ANDERSON, JAMES D | 1629 | 514-085000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE          (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required) ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____  Date _____

Typed or printed name _____  Registration No. _____

PTOL-85 Part B (08-18) Approved for use through 01/31/2020          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/743,411 | 01/15/2020 | Sunil GUPTA | FR2009/121-US CNT5 | 2021 |

5487        7590        06/09/2020

LISA P. RASMUSSEN
SANOFI
55 CORPORATE DRIVE
MAIL CODE: 55A-525
BRIDGEWATER, NJ 08807

| EXAMINER |
|---|
| ANDERSON, JAMES D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

DATE MAILED: 06/09/2020

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | **Application No.** 16/743,411 | **Applicant(s)** GUPTA, Sunil | |
|---|---|---|---|
| | **Examiner** JAMES D ANDERSON | **Art Unit** 1629 | **AIA (FITF) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>Amendments filed 4/3/2020</u>.

     ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>22-27</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

     **Certified copies:**

     a) ☐All     b) ☐ Some     *c) ☐ None of the:

         1. ☐ Certified copies of the priority documents have been received.

         2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

         3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

     * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

     ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

     **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>4/17/2020 and 5/14/2020</u>.

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☑ Examiner's Amendment/Comment

6. ☑ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

/James D. Anderson/
Primary Examiner, Art Unit 1629

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Claim Status*

Applicants' response and amendments to the claims, filed 4/3/2020, have been received and entered.

Claims 22-27 are pending and allowed.

### *Information Disclosure Statement*

The information disclosure statements (IDSs) submitted on 4/17/2020 and 5/14/2020 were filed after the mailing date of the Non-Final Office Action on 4/1/2020.  The submissions are in compliance with the provisions of 37 CFR 1.97.   Accordingly, the information disclosure statements are being considered by the examiner.  Please refer to the attached USPTO Forms 1449.

### *Terminal Disclaimer*

The Terminal Disclaimers filed 4/3/2020 have been received, entered, and approved.

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance:

For clarity of the record, the Examiner will address his claim construction/broadest reasonable interpretation of the following limitations:

i) "[A] method of increasing survival comprising administering to a patient in need thereof…" and

ii) "…wherein the H2 antagonist is administered to the patient prior to administering the dose of cabazitaxel…".

Respecting i), the Examiner adopts the claim construction of the CAFC and PTAB in the *inter partes* review of US Patent No. 8,927,592 (IPR2016-00712).   This claim construction was discussed in Office Action mailed 4/1/2020 (pages 10-11) and is herein incorporated by reference. Briefly, the Examiner adopts the claim construction of the CAFC and PTAB and construes the preamble of independent Claim 22, i.e., "[A] method of increasing survival...", as expressing an intentional purpose for which the method must be performed. As noted by the BPAI on remand, "…proving the obviousness of the challenged claims does not require proving that performing the method recited in the proposed claims would actually increase survival, but it does require proving that a person of ordinary skill in the art reasonably would have expected the performance of the recited method to increase survival."  Prior to Applicants' earliest effective filing date, a person of ordinary skill in the art would <u>not</u> have had a reasonable expectation that administration of cabazitaxel to patients having castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel would increase survival of such patients.

Respecting ii), the Examiner construes "…wherein the $H_2$ antagonist is administered to the patient prior to administering the dose of cabazitaxel…" to mean that an $H_2$ antagonist is administered as a "pre-medication" to prevent or control nausea and vomiting in a patient who will be administered cabazitaxel.  See Specification at page 10, lines 17-20; page 11, lines 26-28.  Put another way, it is unreasonable to construe "…wherein the $H_2$ antagonist is administered to the patient prior to administering the dose of cabazitaxel…" to encompass an $H_2$ antagonist being administered to a patient days, weeks, or months prior to administering a dose of cabazitaxel. Rather, the broadest reasonable interpretation of "prior to administering the dose of cabazitaxel",

Application/Control Number: 16/743,411                                      Page 4
Art Unit: 1629

*consistent with the disclosure and known use of a "pre-medication"*, is administration of the $H_2$ antagonist as a "pre-medication" up to a few hours prior to administering the dose of cabazitaxel.

Finally, it is the position of the Examiner that Applicants have demonstrated unexpected results, specifically that administration of a dose of 20 to 25 mg/m$^2$ cabazitaxel to patients with castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel increases the overall survival and progression-free survival of the treated patients. While cabazitaxel was administered in combination with prednisone or prednisolone in Applicants' examples, which co-administration of prednisone or prednisolone is not a requirement of the instant claims, it was the dose of 20 to 25 mg/m$^2$ cabazitaxel that led to increased survival, <u>not</u> the administration of prednisone or prednisolone. Such is evidenced by the fact that Applicants compared cabazitaxel + prednisone or prednisolone to mitoxantrone + prednisone or prednisolone. The overall survival (15.1 months vs. 12.7 months) and progression-free survival (2.8 months vs. 1.4 months) of patients treated with cabazitaxel + prednisone or prednisolone were increased in a statistically significant manner compared to the survival of patients treated with mitoxantrone + prednisone or prednisolone. See Table 1. Accordingly, Applicants' results are considered commensurate in scope with the claimed invention.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Application/Control Number: 16/743,411                                                      Page 5
Art Unit: 1629

*Conclusion*

**Claims 22-27 are allowed**.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JAMES D ANDERSON whose telephone number is (571)272-9038. The examiner can normally be reached on Monday-Friday, 8:30 am - 5:00 pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jeffrey Lundgren can be reached on 571-272-5541. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/James D. Anderson/
Primary Examiner, Art Unit 1629

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SANOFI-AVENTIS U.S. LLC, et al.,

                              Plaintiffs,

               v.                                          Civil Action No. 20-804-RGA

ACTAVIS LLC et al.,

                              Defendants.


<u>MEMORANDUM OPINION</u>

Jack B. Blumenfeld, Derek J. Fahnestock, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, DE; William E. Solander, Daniel J. Minion (argued), Whitney L Meier, Brian W. Frino, VENABLE LLP, New York, NY; Michael S. Scerbo, Roger J. McLaughlin, VENABLE LLP, New York, NY; Attorneys for Plaintiffs.

John W. Shaw, Karen E. Keller, David M Fry, Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, DE; Daryl L. Wiesen, Emily Rapalino, Kevin DeJong, Tara Melillo, GOODWIN PROCTER LLP, Boston, MA; Tiffany Mahmood, Joel L. Broussard, GOODWIN PROCTER LLP, New York, NY; Matthew R. Reed (argued), Wilson Sonsini Goodrich & Rosati,  Palo Alto, CA; Attorneys for Defendants.

January 5, 2021

/s Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is a Claim Construction dispute concerning U.S. Patent No. 10,583,110 ("the

'110 Patent") and U.S. Patent No. 10,716,777 ("the '777 Patent").  The parties submitted a Joint

Claim Construction Brief (D.I. 183) and I heard oral argument via Skype on December 17, 2020.

(D.I. 205).  At the hearing, the parties agreed to a construction that resolved two of the three

disputed terms: "a method of increasing survival" and "to a patient in need thereof."  All that

remains is to construe "increasing survival."

## I.   Background

The patents-in-suit disclose methods of treating metastatic castration-resistant prostate

cancer with cabazitaxel. (D.I. 183 at 1).  Claim 1 of the '110 Patent recites a method of

administering cabazitaxel "as a new cycle every three weeks" and dexchlorpheniramine,

dexamethasone and an H2 antagonist, "each administered prior to the administration of said

cabazitaxel." '110 Patent 18:8-18.  Claim 1 of the '777 Patent discloses a method using a "dose

of 20 to 25 mg/m$^2$ of cabazitaxel" with an $H_2$ antagonist "wherein the $H_2$ antagonist is

administered to the patient prior to administering the dose of cabazitaxel." '777 Patent 18: 54-

61.[1]

---

[1] Why the '777 Patent, which is a continuation of the '110 Patent, refers to $H_2$ rather than H2 is
unexplained.

2

The parties also have an ongoing dispute with respect to U.S. Patent No. 8,927,592 ("the '592 Patent"). The PTAB's remand decision addressing the '592 Patent is currently on appeal to the Federal Circuit. (D.I. 183 at 2).

## II.    Legal Standard

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim

construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (internal quotation marks omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## III.    Construction of Disputed Term

The parties dispute construction of one term that appears in claim 1 of the '110 and '777 Patents. Claim 1 of the '110 Patent reads:

1. A method of *increasing survival* comprising administering to a patient in need thereof (1) cabazitaxel, or a hydrate of solvate thereof, as a new cycle every three weeks and (2) dexchlorpheniramine administered at a dose of 5 mg, dexamethasone administered at a dose of 8 mg, and an H2 antagonist, each administered prior to the administration of said cabazitaxel, or hydrate or solvate thereof, wherein said patient

4

has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

('110 Patent 18:8-16 (disputed term italicized)).

Claim 1 of the '777 Patent reads:

1. A method of *increasing survival* comprising administering to a patient in need thereof a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, in combination with an $H_2$ antagonist, wherein the $H_2$ antagonist is administered to the patient prior to administering the dose of cabazitaxel, and wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

('777 Patent 18:54-61 (disputed term italicized)).

- **"Increasing Survival"**

    a. *Plaintiff's proposed construction:* prolonging life as compared to no treatment or palliative treatment

    b. *Defendants' proposed construction:* Increasing any of:
    - overall survival
    - tumor progression-free survival
    - pain progression-free survival, or
    - prostate-specific antigen (PSA) progression-free survival

    c. *Court's construction:* Increasing any of:
    - overall survival
    - tumor progression-free survival
    - pain progression-free survival, or
    - prostate-specific antigen (PSA) progression-free survival

Plaintiffs argue that the term "increasing survival" would be readily understood by a POSA as "prolonging life." (D.I. 183 at 23). In support of their definition, Plaintiffs first offer a medical dictionary definition of "survival" referring to the "persistence of life." (*Id.* at 32). With respect to the intrinsic evidence, Plaintiffs argue that the specification supports their construction based on how the term "survival" is used in the cited studies. (*Id.* at 34-36). Both the '110 and the '777 Patents cite to treatments with docetaxel wherein "the survival was improved by 2.4 months." (*Id.* at 35 (citing '110 Patent 1:65-67, 2:1-4; '777 Patent 1:66-67, 2:1-5)). When

5

discussing the TROPIC study, both patents state that "the median survival for patients in the

cabazitaxel group was 15.1 months in comparison to 12.7 months in the mitoxantrone group.

Notably, the extension of survival was observed irrespective of ECOG performance status,

number of prior chemotherapy regimens and age."[2] '110 Patent 11:46-50; '777 Patent 11:43-47.

Lastly, Plaintiffs assert that their position on "increasing survival" has been consistent

throughout related proceedings. They assert that they successfully disclaimed Defendants'

construction (or any construction broader than the one they propose) during the prosecution of

the related '592 Patent. (D.I. 183 at 36-39)  Plaintiffs cite to several submissions to the PTAB

and the Federal Circuit in which they offered the same construction of "increasing survival."

(*See* D.I. 184, Ex. L at 8, Ex. M at 6, Ex. N at 5).[3]  Additionally, they cite several statements in

Plaintiffs' briefs to the Federal Circuit which they say function as disclaimers of scope. (D.I. 183

at 38)  Twice in the cited materials Aventis states that it has "clearly disavowed" any reading of

"increasing survival" that is not limited to prolonging life. (*Id.*)  Further, Plaintiffs' brief states

that "a physician administering cabazitaxel, premedication, and prednisone according to claim 31

[of the '592 Patent] to shrink a tumor, stabilize disease, or to reduce pain, but without the

---

[2] Eastern Cooperative Oncology Group (ECOG) performance status is a scale used by doctors that seems to assess the work and self-care abilities of a patient.

[3] Plaintiff argues that the Federal Circuit resolved the construction of "increasing survival" on consideration of the '592 Patent. (D.I. 183 at 33-34). I disagree. In *Sanofi Mature IP*, the Federal Circuit held that the preamble to claim 31 of the '592 Patent was limiting. *Sanofi Mature IP v. Mylan Labs Ltd.*, 757 F. App'x 988, 994 (Fed. Cir. 2019).  In the context of the preamble, the Court held that "the proposed claims would now clearly require 'increasing survival'" but did not construe the term "increasing survival" alone. *Id.*  The fact that the Court faulted Mylan for "conflat[ing] concepts of curing cancer or sending it into remission with longer survival while the cancer remains intact" when addressing Mylan's argument that the claimed doses need not "have any effect on the patient" does not amount to a claim construction of "increasing survival." *Id.*

intention of prolonging life, is not practicing the claimed method." (*Id.* (citing D.I. 184, Ex. N at 6)).

Defendants argue that the specification, which should be given dispositive weight, is clear – it defined four measures of survival. (D.I 183 at 40).  Where the claims do not limit "survival" to "overall survival," the limitation of "overall survival" should not be imported from the specification. (*Id.* at 42).[4]  Defendants also take issue with the asserted disavowals of scope. (*Id.* at 43).  First, Defendants argue that "prolonging life" includes progression free survival so the statements cited above cannot disclaim the inclusion of progression free survival. (*Id.* at 45). Second, Defendants argue that to the extent Plaintiff has disavowed anything, what it has disavowed is the inclusion of non-time-based measurements (tumor-shrinkage, pain reduction, etc.) rather than the other, time-based survival measures discussed in the specification. (*Id.* at 45).

I agree with Defendants' construction.  Beginning with the specification, the patents-in-suit discuss two forms of survival: "overall survival" and "progression free survival." '110 Patent 11:20-22, 33-36; '777 Patent 11:19-21, 32-35. Progression free survival (or "PFS") is defined as "the time from inclusion in the study and the date of progression or death when the progression is either an increase of the PSA, or of the tumour, or of the pain." '110 Patent 11:33-36.  The only instance Plaintiffs point to where "survival" is used to refer exclusively to "overall survival" is a citation to a review article in the specification. (D.I. 183 at 35).  Further, Plaintiffs cite no

---

[4] I take Defendants' argument to be that "prolonging life" is equivalent to only focusing on "overall survival" as defined in the '110 and '777 Patents. '110 Patent 11:20-22; '777 Patent 11:19-20. This understanding is consistent with Plaintiffs' position that survival excludes "progression free survival."

support for the comparative aspect of their construction in the specification: "as compared to no treatment or palliative treatment."  As such, I find little support for Plaintiffs' position in the specification.

The disavowals cited by Plaintiffs do not meet the standard necessary to rewrite the definitions offered in the specification. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (stating that "we have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness").  Twice Plaintiffs claim they "clearly disavowed" the administration of the claimed method in the '592 Patent without the intent of "prolonging life," but I am not convinced this amounted to a clear disclaimer of progression free survival as defined in the patents-in-suit. (D.I. 183 at 38).  The cited briefs appear to argue that adding the language "increasing survival" to the claims of the '592 Patent is what amounted to the disclaimer. (D.I. 184, Ex. M at 7, Ex. N at 1). This is plainly not a clear disclaimer of any form of PFS discussed in the specification.  Lastly, I agree that Plaintiffs' final cited disclaimer does not sufficiently address the time-based aspect of progression-free survival to constitute a disavowal of PFS metrics. (D.I. 183 at 38, 45).

I acknowledge that the Court of Appeals has clearly held that statements in an IPR proceeding may act as a disclaimer.  *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359-62 (Fed. Cir. 2017).  I do not think any reasonable reading of *Aylus* would suggest that statements made in briefs on appeal to federal courts also may act as prosecution disclaimer.[5]  To

---

[5] There might be other doctrines, such as judicial estoppel, that could have some applicability to statements made to courts.

8

the extent Plaintiffs cite statements in briefs to the Court of Appeals, I hold that they cannot be the basis for prosecution disclaimer.

I also note the reversal of the usual positions in this case, even as related solely to the IPR proceedings, which can be the basis for prosecution disclaimer. That is, usually it is the alleged infringer that is arguing for prosecution disclaimer, and the patentee that is arguing against disclaimer. This scenario makes sense in connection with one of the deep roots of the prosecution disclaimer doctrine—that it prevents the patentee from reclaiming what it had to give up in order to get issuance of the patent. *See id.* at 1359. When the positions are the other way around, the patentee is essentially arguing that it can amend the claims during an IPR without going through the process for amendment. Perhaps such ad hoc amendment during the pendency of district court proceedings in ANDA litigation—which is only forward-looking—is not a particular problem, but in non-ANDA litigation, the court would have to address the question of retroactivity, including when exactly the disclaimer became sufficient to act as a disclaimer. At least with an amendment, the date of the change in scope (if any) is known. Thus, assuming that post-issuance prosecution disclaimer asserted by the patentee is permissible, and, based on *Aylus*, I think it is, such disclaimer still has to meet the exacting standard for disavowal. I do not think it does so here.

For the reasons set forth above, I will adopt Defendants' construction of "increasing survival" which is: "Increasing any of, overall survival, tumor progression-free survival, pain progression-free survival, or prostate-specific antigen (PSA) progression-free survival."

## IV.    Conclusion

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion, including the terms agreed to at the Markman hearing.

9

# EXHIBIT H

757 Fed.Appx. 988
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals, Federal Circuit.

SANOFI MATURE IP, Appellant

v.

MYLAN LABORATORIES LIMITED, Appellee

2018-1203
|
Decided: February 5, 2019

**Synopsis**

**Background:** Patentee's assignee sought review of decision
of the Patent Trial and Appeal Board that denied assignee's
contingent motion to amend certain claims at issue in an inter
partes review requested by a competitor.

**Holdings:** The Court of Appeals, O'Malley, Circuit Judge,
held that:

[1] Board's error in placing burden on patentee's assignee to
prove that its proposed amended claims were patentable was
not harmless error, and

[2] preamble of one of patentee's assignee's proposed claims
was limiting.

Vacated and remanded.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (3)

[1]    **Patents**    Harmless error

Patent Trial and Appeal Board's error in inter
partes review in placing burden on patentee's
assignee to prove that its proposed amended
claims were patentable was not harmless
error; while the Board at time suggested that
competitor had established certain facts, it also

noted other failures of proof and gaps in
competitor's expert testimony.

1 Cases that cite this headnote

[2]    **Patents**    Inter partes review

Preamble of patent assignee's proposed amended
claim, on inter partes review of patent for
castration-resistant metastatic prostate cancer,
was limiting; the phrase "patient in need thereof"
from the proposed claim relied on the preamble
for the antecedent basis, and the preamble
expressed the intentional purpose, i.e., increasing
survival, for which the method had to be
performed.

1 Cases that cite this headnote

[3]    **Patents**    In general; utility

US Patent 8,927,592. Construed.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2016-00712.

**Attorneys and Law Firms**

Daniel John Minion, Venable LLP, New York, NY, argued
for appellant. Also represented by William E. Solander,
Katherine Adams, Dominick A. Conde, Whitney Lynn Meier.

Matthew R. Reed, Wilson, Sonsini, Goodrich & Rosati, PC,
Palo Alto, CA, argued for appellee. Also represented by
Steven William Parmelee, Michael T. Rosato, Jad Allen Mills,
Seattle, WA; Wendy L. Devine, San Francisco, CA.

Before Prost, Chief Judge, O'Malley and Stoll, Circuit
Judges.

**Opinion**

O'Malley, Circuit Judge.

**\*989**  This appeal involves U.S. Patent No. 8,927,592
("the '592 patent"), which is assigned to Sanofi Mature IP
("Sanofi"). [1] In an inter partes review requested by Mylan
Laboratories Limited, the U.S. Patent Trial and Appeal
Board ("Board") invalidated claims 1–5 and 7–30 of the

'592 patent. *Mylan Labs. Ltd. v. Aventis Pharma S.A.*, IPR2016-712, 2017 WL 4221400, at *2 (P.T.A.B. Sept. 21, 2017) ("*'592 Decision*"). The Board also denied Sanofi's contingent motion to amend claims 27–30. *Id.* Sanofi appeals the Board's denial of its motion. Because we conclude that the Board improperly placed the burden of proof on Sanofi to establish that its proposed claims were patentable and applied the wrong claim construction in its analysis, we *vacate* its denial of the motion and *remand* for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. The '592 Patent

According to the '592 patent, prostate cancer is generally treated with hormone deprivation. '592 patent, col. 1, ll. 35–43. This can include surgery, *e.g.* castration. *Id.* But if prostate cancer metastasizes, *i.e.* spreads to other parts of the body, then castration is ineffective. And while other forms of hormone deprivation exist, the '592 patent explains that they do not "improve[ ] ... survival time." *Id.* at col 1, ll. 40–43. Chemotherapy drugs, such as docetaxel, are therefore used, in combination with estramustine or prednisone, to treat castration resistant, metastatic prostate cancers. *Id.* at col. 1, ll. 62–65. Even then, however, patients can become resistant to docetaxel treatments. *Id.* at col. 2, ll. 11–13. These patients are then left with "limit[ed] ... possible treatment options." *Id.*

The '592 patent purports to provide these patients—"patients with castration resistant metastatic prostate cancer who have been previously treated with docetaxel"—with a new treatment option. *Id.* at col. 2, ll. 18–24. This treatment involves administering an antitumoral agent, cabazitaxel, in combination with a corticoid such as prednisone or prednisolone. *Id.* at col. 3, ll. 1–5.

### B. Procedural History

On March 15, 2016, Mylan petitioned for inter partes review of claims 1–5 and 7–30 of the '592 patent. The Board instituted review on all challenged claims.

#### 1. Sanofi Proposes Substitute Claims

On December 23, 2016, Sanofi filed an opposed motion to amend its claims by substituting proposed claims 31–34 for claims 27–30. *See, e.g.,* J.A. 655 ("If original Claim 27 is found unpatentable, the Board is requested to replace it with proposed substitute Claim 31."). Proposed substitute claim 31 recites:

> 31. *A method of increasing survival comprising administering to a patient in need thereof* (i) an antihistamine, (ii) a corticoid, (iii) an H2 antagonist, and (iv) a dose of 20 to 25 mg/ m2 of cabazitaxel, **\*990** or a hydrate or solvate thereof, wherein said antihistamine, said corticoid, and said H2 antagonist are administered prior to said dose of 20 to 25 mg/ m2 of cabazitaxel, or hydrate or solvate thereof, in combination with prednisone or prednisolone, *wherein said patient has* castration *resistant or hormone refractory,* metastatic prostate cancer *that has progressed during or after treatment with* docetaxel.

J.A. 681 (emphases added).

Proposed claim 31, like claim 27, requires administering cabazitaxel, in combination with prednisone or prednisolone, to a patient with castration resistant or hormone refractory metastatic prostate cancer who has progressed during or after treatment with docetaxel. But, as the Board noted, "[s]ubstitute claim 31 amends the preamble [of claim 27] to recite a 'method of increasing survival' followed by 'comprising administering to a patient in need thereof.' " *'592 Decision, 2017 WL 4221400, at *28*. Proposed claim 31 also limits claim 27 by requiring the administration of an antihistamine, a corticoid, and an H2 antagonist prior to administering the cabazitaxel. *Id.*

Proposed claims 32–34 depend directly from proposed claim 31. These dependent claims do not differ from claims 28–30 in any way that is relevant to this appeal. [2]

### 2. The Board's Decision

On September 21, 2017, the Board issued its final written decision. First, the Board invalidated claims 1–5 and 7–30 of the *'592 patent* for obviousness. *'592 Decision*, 2017 WL 4221400, at *2. Sanofi has not appealed this aspect of the Board's decision. Additionally, the Board denied Sanofi's contingent motion to amend because, according to the Board, Sanofi failed to establish that its proposed claims would be patentable. *Id.* at *28.

In addressing Sanofi's motion, the Board concluded that the preamble of proposed claim 31 was the only phrase requiring explicit construction. *Id.* at *29. Sanofi argued that the preamble—"[a] method of increasing survival"—was a "statement of intentional purpose for how the method is to be performed," as we described in *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003). *Id.* The Board disagreed, distinguishing *Jansen* in favor of *Bristol–Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375–78 (Fed. Cir. 2001). *Id.* at *30 ("*Bristol–Myers Squibb* is relevant precedent and stands for the proposition that a method of treatment preamble stating the intended purpose of the treatment does not impose a result limitation on the recited method step."). The Board therefore concluded that the preamble of proposed claim 31 should not be treated as limiting because it merely provides "additional description," as in *Bristol-Myers Squibb*, rather than an "intentional purpose for how the treatment method is to be practiced," as in *Jansen*. *Id.* (internal quotation marks omitted). And, while Sanofi invited the Board to treat its claim construction arguments as a disclaimer, the Board declined to do so. *Id.* (citing *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014) ).

On the merits, Sanofi argued "that the prior art d[id] not disclose or suggest that 20–25 mg/m2 of cabazitaxel in combination with prednisone or prednisolone would increase overall survival," as required by the preamble to claim 31. *Id.* at 31. The Board rejected this argument based on its construction **\*991** of proposed claim 31, *i.e.* that the preamble was not limiting. *Id.*

Sanofi also argued that a skilled artisan would not have been motivated to use the claimed premedication regimen —administration of an antihistamine, a corticoid, and an H2 antagonist—prior to cabazitaxel therapy. *Id.* The Board rejected this argument as well. *Id.*

On October 4, 2017, we issued our en banc decision in *Aqua Products, Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (en banc). A few days later, the Board offered Sanofi additional time to request rehearing in view of *Aqua Products*. J.A. 16653–54. Sanofi did not request rehearing.

Sanofi timely filed a notice of appeal from the Board's final written decision. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

### II. DISCUSSION

Sanofi argues that the Board erroneously placed the burden of proof on Sanofi to show that its proposed claims would be patentable. Sanofi also appeals the Board's construction of proposed claim 31, along with the Board's ultimate conclusion that the proposed claims would be unpatentable. For the following reasons, we agree that the Board erred in requiring Sanofi to prove that its proposed claims would be patentable and in construing the proposed claims.

### A. Burden of Proof

 **[1]**   In an inter partes review, the petitioner bears the burden of proving that proposed amended claims are unpatentable. *Aqua Prods.*, 872 F.3d at 1327–28. But in deciding whether Sanofi could amend its claims here, the Board expressly required Sanofi to prove that its proposed substitute claims were patentable. *'592 Decision*, 2017 WL 4221400, at *28 ("As the moving party, [Sanofi] bears the burden of proving patentability of each proposed substitute claim ... we conclude that [Sanofi] has not met its burden with respect to the proposed substitute claims."). This was error. *See Aqua Prods.*, 872 F.3d at 1327–28.

Even so, Mylan maintains that the Board's error was harmless because the Board "found that [Mylan] satisfied the burden of showing the proposed substitute claims are unpatentable by a preponderance of the evidence." Appellee Br. at 58. We disagree. While the Board at times suggested Mylan had "establish[ed]" certain facts, it also noted other failures of proof and gaps in Mylan's expert testimony. *'592 Decision*, 2017 WL 4221400, at *31–32. We therefore decline to speculate as to how the Board would resolve this case under the correct legal standard. *See, e.g., Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1357 (Fed. Cir.

2018) (vacating and remanding for the Board to reconsider the evidence after *Aqua Products*); *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017), *as amended on reh'g in part* (Mar. 15, 2018) (same); *Silver Peak Sys., Inc. v. Matal*, 698 F. App'x 1036 (Fed. Cir. 2017) (same).

Mylan also contends that remand is inappropriate because Sanofi did not seek rehearing of the Board's decision. But Sanofi was not required to request rehearing. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1377 (Fed. Cir. 2016) ("Nowhere does the statute granting parties the right to appeal a final written decision in an [inter partes review] require that the party first file a request for rehearing before the Board...."); *see also* 35 U.S.C. § 141(c). Sanofi therefore did not waive this issue. And, to the extent Mylan's argument is premised on administrative exhaustion, **\*992** it is similarly unpersuasive. *Compare Darby v. Cisneros*, 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) ("[W]here the [Administrative Procedure Act] applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."), *with* 35 U.S.C. § 141(c) (imposing no such requirement). We therefore vacate the Board's denial of Sanofi's contingent motion to amend and remand for proceedings consistent with our decision in *Aqua Products*.

B. Claim Construction

We review the Board's conclusions of law *de novo* and its findings of fact for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). This framework also applies to claim construction. *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 751 (Fed. Cir. 2016). We therefore conduct a *de novo* review of the Board's determination of the broadest reasonable interpretation of the claims, reviewing any underlying factual findings for substantial evidence. [3] *Id.*

A claim's preamble may be limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ). But, generally, "a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only

to state a purpose or intended use for the invention.' " *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) ).

**[2]** Sanofi argues that the preamble of proposed claim 31 is limiting based on our decisions in *Rapoport v. Dement*, 254 F.3d 1053 (Fed. Cir. 2001) and *Jansen*. We agree.

In *Rapoport*, the claims recited "[a] method for treatment of sleep apneas comprising administration of a therapeutically effective regimen of a Formula I azapirone compound ... to a patient in need of such treatment." 254 F.3d at 1056. After noting the parties' agreement that the preamble should be limiting, we concurred, explaining that the preamble—"[a] method for treatment of sleep apneas"—was limiting there because "without treating the phrase 'treatment of sleep apneas' as a claim limitation, the phrase 'to a patient in need of such treatment' would not have a proper antecedent basis." *Id.* at 1059. We then concluded that the most natural interpretation of "[a] method for treatment of sleep apneas" in this context was that the method—administering a certain compound—must be practiced to achieve the purpose stated in the preamble. *Id.* at 1058–61 (construing the preamble phrase "treatment of sleep apneas" and then concluding that a certain reference did not anticipate because it was not "administered to patients suffering from sleep apnea with the intent to cure the underlying condition"); *see also Jansen*, 342 F.3d at 1333 (discussing *Rapoport*).

**\*993** Although it was undisputed in *Rapoport* that the preamble was limiting, when confronted with similar claims in *Jansen*, we reached the same result. In *Jansen*, the relevant claim recited:

> 1. *A method of treating or preventing macrocytic-megaloblastic* anemia in humans which anemia is caused by either folic acid deficiency or by vitamin B12 deficiency which comprises administering a daily oral dosage of a vitamin preparation *to a human in need thereof* comprising at least about 0.5 mg. of vitamin B12 and at least about 0.5 mg. of folic acid.

*Jansen*, 342 F.3d at 1330 (emphases added). Based in part on this claim language, and *Rapoport*, we reasoned that the preamble—"[a] method of treating or preventing macrocytic-

megaloblastic anemia"—was limiting because it articulated the "purpose for which the method must be performed." *Id.* at 1333.

*Jansen* and *Rapoport* support a conclusion that the preamble is limiting here. [4] As in *Rapoport*, the phrase "patient in need thereof" from proposed claim 31 relies on the preamble for antecedent basis. 254 F.3d at 1059. And, as in *Jansen*, the preamble expresses the "intentional purpose[—increasing survival—]for which the method must be performed." 342 F.3d at 1333. We therefore "interpret the nearly parallel language in the ['592] patent claims in the same way." *Id.*

Our conclusion is also consistent with the specification of the '529 patent, which emphasizes increasing survival as an important aspect of the invention. Example 1 of the patent, for instance, describes a clinical study where patients with castration resistant metastatic prostate cancer who had previously been treated with docetaxel received either treatment with cabazitaxel or mitoxantrone (an antitumor antibiotic), each combined with either prednisone or prednisolone. '529 patent at col. 10, ll. 30–34, 44–45. In discussing the results of this study, the '529 patent highlights that patients in the cabazitaxel group demonstrated increased *overall survival* rates compared to patients treated with mitoxantrone and prednisone. *Id.* at col. 11, ll. 26–37 ("The median survival for patients in the cabazitaxel group was 15.1 months in comparison to 12.7 months in the mitixantrone group."); *see also id.* at col 1, ll. 40–43 (criticizing various prior art hormone deprivation therapies because they did not "improve[ ] ... survival time").

Mylan's attempts to distinguish *Jansen* and *Rapoport* are unpersuasive, and its reliance on *Bristol-Myers Squibb* is misplaced. In *Bristol-Myers Squibb*, we concluded that the claim language "strongly suggest[ed] the independence of the preamble from the body of the claim." *Bristol-Myers Squibb*, 246 F.3d at 1375. But here, the claim language suggests the opposite. Indeed, there is a direct link between the claim as a whole and the preamble, which provides an antecedent basis for "in need thereof." *See Rapoport*, 254 F.3d at 1059.

Mylan's reliance on the '529 patent's prosecution history is also unavailing. According to Mylan, the decision to delete the phrases "effective amount" and "clinically proven effective amount" from claim 1 and claim 24 (issued as claim 27), respectively, **\*994** reflected an "accept[ance] that the claimed methods did not require 'an effect on the cancer to be treated.' " Appellee Br. at 27. Mylan therefore argues that the claims do not require the administered doses to have any effect on the patient. *Id.* But these phrases were deleted to specify the clinically effective doses, not to suggest that their effects were irrelevant. J.A. 4111–16; J.A. 1859. And Mylan conflates concepts of curing cancer or sending it into remission with longer survival while the cancer remains intact. Regardless, the proposed claims would now clearly require "increasing survival." J.A. 681. [5]

Ultimately, the patent owner's proposed claim 31 closely mirrors language from cases, such as *Jansen* and *Rapoport*, which we have treated as limiting. The Board erred by treating the preamble here as non-limiting. On remand, the Board should therefore treat the preamble as an additional limitation of proposed claim 31.

### III. CONCLUSION

For the reasons stated above, we *vacate* the Board's denial of Sanofi's contingent motion to amend and its construction of the proposed substitute claims and we *remand* for further consideration consistent with this opinion.

**VACATED AND REMANDED**

### COSTS

No costs.

**All Citations**

757 Fed.Appx. 988

### Footnotes

1    This appeal was originally filed by Aventis Pharma S.A. On January 24, 2019, Aventis filed an unopposed motion to substitute Sanofi Mature IP, which acquired the '592 patent during this appeal, as the named party in this case. On January 28, 2019, we granted this request. Thus, although Aventis was the original named party, we will refer to Sanofi throughout this opinion for clarity.

2    Proposed claims 32 and 34 are substantively identical to claims 28 and 30. Proposed claim 33, however, additionally requires the cabazitaxel regimen to be administered with an antihistamine, corticoid, and H2 antagonist. J.A. 682.

3    The U.S. Patent and Trademark Office has indicated it intends to apply the *Phillips* claim construction standard to petitions filed on or after November 13, 2018. *See Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board*, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (to be codified at 37 C.F.R. pt. 42). Because Mylan filed its petition before November 13, 2018, we apply the broadest reasonable interpretation standard here (as the Board did below).

4    To the extent the Board disregarded *Jansen* simply because it was on appeal from a district court, *'529 Decision*, 2017 WL 4221400 at *30 ("*Jansen* is distinguishable from the present case because it was an infringement case...."), it erred. Claim construction standards vary between district court litigations and inter partes reviews, but basic principles of construction do not. *Cf. Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015).

5    Alternatively, Sanofi argues that the prosecution history here supports its proposed construction because its contingent motion to amend constitutes a clear and unmistakable disclaimer of any embodiments lacking the purpose limitation. Mylan argues that this is not clear disclaimer. Regardless of whether Sanofi's motion to amend constitutes a clear and unmistakable disclaimer, we conclude that it is at least relevant to the inquiry and favors treating the preamble as limiting. *Cf. Bristol-Myers*, 246 F.3d at 1375 ("[T]his is not a case in which a new use of a process should be considered to be a limitation because that new use distinguishes the process over the prior art....").

---

**End of Document**        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

Trials@uspto.gov                                                    Paper 9
Tel: 571-272-7822                                    Entered: September 22, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

MYLAN LABORATORIES LIMITED,
Petitioner,

v.

AVENTIS PHARMA S.A.,
Patent Owner.
_____

Case IPR2016-00712
Patent 8,927,592 B2
_____


Before BRIAN P. MURPHY, TINA E. HULSE, and
CHRISTOPHER M. KAISER, *Administrative Patent Judges.*


MURPHY, *Administrative Patent Judge.*


DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2016-00712
Patent 8,927,592 B2

# I.     INTRODUCTION

Mylan Laboratories Limited ("Petitioner") filed a Petition requesting
an *inter partes* review of claims 1–5 and 7–30 of U.S. Patent No. 8,927,592
(Ex. 1001, "the '592 patent").  Paper 3 ("Pet.").  Aventis Pharma S.A.
("Patent Owner") filed a Preliminary Response to the Petition.  Paper 7
("Prelim. Resp.").  We have statutory authority under 35 U.S.C. § 314(a),
which provides that an *inter partes* review may not be instituted "unless . . .
there is a reasonable likelihood that the petitioner would prevail with respect
to at least 1 of the claims challenged in the petition."

Petitioner challenges claims 1–5 and 7–30 of the '592 patent as
unpatentable under 35 U.S.C. § 103(a).  Pet. 13–14.  Based on the arguments
and evidence presented in the Petition and Preliminary Response, we
determine there is a reasonable likelihood Petitioner would prevail with
respect to at least one of the claims challenged in the Petition.  Therefore, we
institute an *inter partes* review.

## A.  Related Proceedings

Petitioner and Patent Owner identify the following as related district
court proceedings in the District of New Jersey regarding the '592 patent:
*Sanofi-Aventis U.S. LLC v. Mylan Laboratories Limited*, C. A. No. 15-
03392; *Sanofi-Aventis U.S. LLC v. Apotex Corp*, C. A. No. 15-01835;
*Sanofi-Aventis U.S. LLC v. Breckenridge Pharmaceutical, Inc.*, C. A. No.
15-01836; *Sanofi-Aventis U.S. LLC v. Accord Healthcare, Inc.*, C. A. No.
15-02520; *Sanofi-Aventis U.S. LLC v. BPI Labs, LLC*, C. A. No. 15-02521;
*Sanofi-Aventis U.S. LLC v. Dr. Reddy Laboratories, Inc*., C. A. No. 15-
02522; *Sanofi-Aventis U.S. LLC v. Glenmark Generics Inc.*, C. A. No. 15-
02523; *Sanofi-Aventis U.S. LLC v. Fresenius Kabi USA, LLC*, C. A. No. 15-

IPR2016-00712
Patent 8,927,592 B2

02631; *Sanofi-Aventis U.S. LLC v. Actavis LLC*, C. A. No. 15-03107; *Sanofi-Aventis U.S. LLC v. BPI Labs, LLC*, C. A. No. 15-02521.  Pet. 12; Paper 6, 2–3.

Petitioner further identifies IPR2016-00627 directed to the compound cabazitaxel, U.S. Patent No. 5,847,170.  *Id.*  We note that we have denied institution in IPR2016-00627 (Paper 10).

### B.  *Proposed Grounds of Unpatentability*

Petitioner advances ten grounds of unpatentability under 35 U.S.C. § 103(a) in relation to the challenged claims in the '592 patent:

| Reference[s] | Statutory Basis | Challenged Claims |
|---|---|---|
| Winquist (Ex. 1009)[1] and TROPIC Listing (Ex. 1008)[2] | § 103 | 1, 2, 5, 7–9, 12, 13, 17–20, 22–25, 27–29 |
| Winquist, TROPIC Listing, and Didier (Ex. 1011)[3] | § 103 | 3, 4 |
| Winquist, TROPIC Listing, and Mita (Ex. 1012)[4] | § 103 | 7–9 |

[1] Eric Winquist et al., *Open clinical uro-oncology trials in Canada*, The Canadian Journal of Urology, 15(1), 3942–49 (February 2008) ("Winquist"). Ex. 1009.

[2] Sanofi-Aventis, *XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC)*, ClinicalTrials.gov (October 23, 2008) ("TROPIC Listing").  Ex. 1008.

[3] U.S. Patent No. 7,241,907 B2 issued July 10, 2007 to Didier et al. ("Didier").  Ex. 1011.

[4] Alain C. Mita et al., *Phase I and Pharmacokinetic Study of XRP6258 (RPR116258A), a Novel Taxane, Administered as a 1-Hour Infusion Every 3 Weeks in Patients with Advanced Solid Tumors*, Clin. Cancer Res. 2009:15(2), 723–730 (January 15, 2009) ("Mita").  Ex. 1012.

IPR2016-00712
Patent 8,927,592 B2

| Reference[s] | Statutory Basis | Challenged Claims |
|---|---|---|
| Winquist, TROPIC Listing, and Tannock (Ex. 1013)[5] | § 103 | 10, 11, 14, 16 |
| Winquist, TROPIC Listing, and Pivot (Ex. 1010)[6] | § 103 | 21, 26, 30 |
| Winquist, TROPIC Listing, Pivot, and Tannock | § 103 | 15 |
| Winquist and Pivot | § 103 | 1, 2, 5, 7–9, 12, 13, 17–30 |
| Winquist, Pivot, and Didier | § 103 | 3, 4 |
| Winquist, Pivot, and Mita | § 103 | 7–9 |
| Winquist, Pivot, and Tannock | § 103 | 10, 11, 14–16 |

Pet. 13–14.  Petitioner supports its challenge with a Declaration by Dr. Rahul Seth ("Seth Declaration").  Ex. 1002.

### C. The '592 Patent

The '592 patent, titled "Antitumoral Use of Cabazitaxel," issued January 6, 2015, from an application filed April 26, 2012.  Ex. 1001.  The '592 patent claims priority through an international application to a series of provisional applications, the earliest of which is dated October 29, 2009.  Ex. 1001, (60), (63).  The '592 patent is directed to the use of cabazitaxel in

---

[5] Ian F. Tannock et al., *Docetaxel plus Prednisone or Mitoxantrone plus Prednisone for Advanced Prostate Cancer*, N. Engl. J. Med., 351:15, 1502–1512 (October 7, 2004) ("Tannock").  Ex. 1013.

[6] X. Pivot et al., *A multicenter phase II study of XRP6258 administered as a 1-h i.v. infusion every 3 weeks in taxane-resistant metastatic breast cancer patients*, Annals of Oncology, 19, 1547–1552 (April 23, 2008) ("Pivot").  Ex. 1010.

IPR2016-00712
Patent 8,927,592 B2

the treatment of prostate cancer, particularly metastatic castration resistant prostate cancer ("mCRPC").  *Id.* at 1:19–26.  Because cancer cells may develop resistance to docetaxel (Taxotere®[7]), administering cabazitaxel is intended to treat prostate cancer in patients with advanced metastatic disease that has progressed despite previous treatment with a docetaxel-based regimen.  *Id.* at 2:61–67.  Cabazitaxel is preferably administered in combination with a corticoid, such as prednisone or prednisolone, at a daily dose of 10 mg orally.  *Id.* at 3:2–5.

The chemical name for cabazitaxel is 4α-acetoxy-2α-benzoyloxy-5β, 20-epoxy-lβ-hydroxy-7β,10β-dimethoxy-9-oxo-ll-taxen-13α-yl(2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate.  *Id.* at 4:28–31. Cabazitaxel is a taxane compound, the chemical structure of which is shown below:



*Id.* at 4:8–26.  Example 1 of the '592 patent describes a large-scale comparative clinical trial of mCRPC patients, whose disease had progressed during or after docetaxel treatment, being treated with either 25 mg/m$^2$ of

---

[7] Taxotere® is the brand name for docetaxel.  We also refer to "Taxotere" in this Decision.

IPR2016-00712
Patent 8,927,592 B2

cabazitaxel or 12 mg/m$^2$ mitoxantrone, and 10 mg/day of prednisone. *Id.* at 10:30–48. Patients receiving cabazitaxel and prednisone demonstrated a median overall survival that was 2.4 months longer than those receiving mitoxantrone and prednisone. *Id.* at 11:28–37, 11:45–54. The claimed method is directed to administering an effective amount of cabazitaxel and a corticoid to prostate cancer patients whose disease has progressed in spite of previous docetaxel treatment. *Id.* at 5:33–67, 18:54–58, 20:25–30.

### D. Challenged Claims

Petitioner challenges claims 1–5 and 7–30 of the '592 patent. Independent claims 1 and 27 are illustrative and are reproduced below:

> 1. A method for treating a patient with prostate cancer that has progressed during or after treatment with docetaxel, comprising administering to said patient a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, in combination with a corticoid.

> 27. A method of increasing the survival of a patient with a castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel, comprising administering a dose of 20 to 25 mg/m2 of cabazitaxel, or hydrate or solvate thereof, to the patient in combination with prednisone or prednisolone.

## II.    ANALYSIS

### A. Claim Construction

We determine that only the following claim terms require express construction for purposes of this Decision. *See, e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'") (citation omitted).

6

IPR2016-00712
Patent 8,927,592 B2

### 1. Claim 1: "A method for treating a patient"

Petitioner argues that the preamble phrase in claim 1, "a method for treating," is a non-limiting statement of the purpose of the claimed method, or, at most, should be construed as "a method intended to benefit a patient." Pet. 17–19.  Patent Owner opposes, arguing that the preamble is limiting and should be construed to mean "a method that produces a therapeutic effect in a patient."  Prelim.  Resp. 15–18.  We agree with Petitioner for the reasons expressed below.

"Whether to treat a preamble term as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent."  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (internal quotation marks omitted).  "Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble generally is not limiting."  *Symantic Corp. v. Computer Assoc. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008).  However, "a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal quotation marks omitted).  "Conversely, a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  *Id.* (internal quotation marks omitted).

Petitioner correctly notes that the phrase "a method for treating" does not provide antecedent basis for a limitation recited in the body of the claim

IPR2016-00712
Patent 8,927,592 B2

and is not necessary to give meaning to the recited method steps.  Only the portion of the preamble reciting "a patient with prostate cancer that has progressed during or after treatment with docetaxel" provides antecedent basis for the step of administering to "said patient" the recited dosage of cabazitaxel and a corticoid.  *See Tom Tom, Inc. v. Adolph*, 790 F.3d 1315, 1323–24 (Fed. Cir. 2015) (portion of preamble that "provides a necessary structure for claim 1 does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention.").  Although "a method of treating a patient" expresses the purpose of administering an effective amount of cabazitaxel (20 to 25 mg/m$^2$) and a corticoid to a patient (*see* Prelim. Resp. 16), the quoted language "does not result in a manipulative difference in the steps of the claim" and "does not change those amounts or otherwise limit the claim."  *See Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375–76 (Fed. Cir. 2001).

As Petitioner points out, not every patient necessarily demonstrates a therapeutic effect from the method of treatment.  Pet. 19–20 (citing Ex. 1001, Fig. 1 overall survival rate); Ex. 1001, 16:43–44 ("The primary reason for treatment discontinuation in both groups was disease progression (Table 5.)").  Moreover, the recited method steps "are performed the same way regardless [of] whether or not the patient experiences a [therapeutic effect]."  *Bristol-Myers Squibb*, 246 F.3d at 1375.  Therefore, neither the claim language nor the description of the claimed invention in the '592 patent supports construing the "method of treating a patient" portion of the preamble to require producing a therapeutic effect in a patient.

8

IPR2016-00712
Patent 8,927,592 B2

Patent Owner cites to the prosecution history of the '592 patent, particularly patent Applicants' reliance on evidence of therapeutic efficacy to distinguish the claimed invention from the prior art of record, in support of its argument that the "method of treating a patient" portion of the preamble is limiting.  Prelim. Resp. 17–18 (citing Ex. 1004, 21, 93, 169–175, 184–85, 286, 2014).  Patent Applicants relied on evidence of therapeutic efficacy to argue that the claims were not obvious because i) a person of ordinary skill in the art ("POSA")[8] would not have had a reasonable expectation of successfully treating prostate cancer patients with cabazitaxel, and ii) the therapeutic efficacy of treating prostate cancer patients with cabazitaxel and prednisone was, in fact, unexpected.  Ex. 1004, 146–49, 168–179, 184–85, 285–286, 2013–14.  Patent Applicants, however, did not cite to or rely on the preamble language of claim 1 to distinguish the claimed invention from the prior art.  *Id.*  And the Examiner clearly stated his Reasons for Allowance, which acknowledge patent applicants' arguments and evidence of non-obviousness, i.e., "surprising and unexpected" clinical results.  *Id.* at 21, 93.  The Examiner's Reasons for Allowance do not reference or implicate the preamble language or necessitate construing the "method of treating a patient" portion of the preamble as a claim limitation.

Therefore, based on the current record, we determine that the preamble phrase "a method for treating a patient" in claim 1 is a non-

---

[8] The parties' are in general agreement on the level of skill in the art—an oncologist with experience treating metastatic prostate cancer and related medical training and experience.  Pet. 9–10; Prelim. Resp. 11.  Any differences are not material to our Decision.

IPR2016-00712
Patent 8,927,592 B2

limiting statement of the purpose of the claimed method.  At most, the phrase would be construed as "a method intended to benefit a patient."

### 2. Claim 27: "A method of increasing the survival of a patient"

Petitioner argues that the preamble phrase in claim 27, "[a] method of increasing the survival of [a patient]," is a non-limiting statement of the purpose of the claimed method or, at most, should be construed as "a method intended to increase the survival of a patient."  Pet. 19–20.  Patent Owner opposes, arguing that the preamble is limiting and should be construed to mean "a method that prolongs the life of a patient as compared to no treatment or palliative treatment, where that method has been demonstrated to provide a statistically significant increase in overall survival."  Prelim. Resp. 19.  We agree with Petitioner for the same reasons expressed above regarding "a method for treating a patient" in claim 1.

Therefore, based on the current record, we determine that the preamble phrase in claim 27, "a method of increasing the survival of a patient," is a non-limiting statement of the purpose of the claimed method. At most, the phrase would be construed as "a method intended to increase the survival of a patient."

### B. Ground 1: Asserted Obviousness of Claims 1, 2, 5, 7–9, 12, 13, 17–20, 22–25, and 27–29 over Winquist and the TROPIC Listing

Petitioner asserts that the subject matter of claims 1, 2, 5, 7–9, 12, 13, 17–20, 22–25, and 27–29 of the '592 patent would have been obvious to a POSA based on the combined teachings of Winquist and the TROPIC Listing in view of the knowledge of a POSA.  Pet. 25–38.  Patent Owner opposes.  Prelim. Resp. 23–35.  We address the parties' arguments below.

10

IPR2016-00712
Patent 8,927,592 B2

### 1. Winquist

Winquist (Ex. 1009) is a February 2008 disclosure of open, uro-oncology clinical trials in Canada.  Ex. 1009, 3942.  The format of each entry is the same; a descriptive title of the clinical trial followed by an identification of the trial and the entity coordinating it, the trial design, patient population, sample size, and primary endpoint.  *Id.*  Winquist discloses a randomized Phase III clinical trial coordinated by Sanofi-Aventis involving treatment of mCRPC patients previously treated with docetaxel.  *Id.* at 3948.  Winquist describes the clinical trial as a "study of XRP-6258 [cabazitaxel] at 25 mg/m$^2$ in combination with prednisone every 3 weeks compared to mitoxantrone in combination with prednisone for the treatment of hormone-refractory metastatic prostate cancer previously treated with a Taxotere-containing regimen."  *Id.*   The primary endpoint is overall survival.  *Id.*

With regard to independent claims 1 and 27 of the '592 patent, Winquist does not disclose that the prostate cancer "has progressed during or after treatment with docetaxel."  *Id.*; Pet. 25–26.

### 2. The TROPIC  Listing

The TROPIC Listing (Ex. 1008) was published in the ClinicalTrials.gov database of the National Library of Medicine, and it was archived by The Internet Archive on October 23, 2008.  Ex. 1026, Exh. A.  The TROPIC Listing discloses the same Phase III clinical trial as Winquist, a "randomized, open-label, multi-center study comparing the safety and efficacy of XRP6258 [cabazitaxel] plus prednisone to mitoxantrone plus prednisone in the treatment of hormone refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen."  Ex.

11

IPR2016-00712
Patent 8,927,592 B2

1008, 1; Ex. 1002 ¶ 118.  The TROPIC Listing discloses that cabazitaxel is to be administered every three weeks.  Ex. 1008, 1.  Patients must have a "[d]ocumented progression of disease (demonstrating at least one visceral or soft tissue metastatic lesion, including a new lesion) . . . [or] rising PSA levels or appearance of [a] new lesion." *Id*. at 1–2.  The primary objective of the TROPIC clinical trial is overall survival.  *Id*. at 1.  The TROPIC Listing notes the start date of the clinical trial was December 2006.  *Id.* at 2.

With regard to independent claims 1 and 27 in the '592 patent, the TROPIC Listing does not expressly disclose an administration dose.  *Id.*; Pet. 7.

### 3. Independent Claims 1 and 27

A claimed invention is unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103(a).  Obviousness under 35 U.S.C. § 103 requires an assessment of (1) the "'level of ordinary skill in the pertinent art,'" (2) the "'scope and content of the prior art,'" (3) the "'differences between the prior art and the claims at issue,'" and (4) "'secondary considerations'" of nonobviousness such as "'commercial success, long-felt but unsolved needs, failure of others, etc.'"  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).  A party who petitions the Board for a determination of obviousness must show that "'a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing

12

IPR2016-00712
Patent 8,927,592 B2

so.'" *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).  We assess Petitioner's evidence and argument according to this standard.

Petitioner argues that the TROPIC Listing discloses the only limitation of claims 1 and 27 not expressly disclosed in Winquist, namely that the patient's prostate cancer "has progressed during or after treatment with docetaxel." Pet. 26–27 (citing Ex. 1002 ¶¶ 118–119).  Patent Owner does not directly contest the assertion in its Preliminary Response, instead relying on its preamble-as-claim-limitation argument that neither Winquist nor the TROPIC Listing provides any data to show that cabazitaxel would have produced a therapeutic effect in patients.  Prelim. Resp. 23–24.  We have rejected Patent Owner's proposed preamble claim construction in section II.A, above.  Petitioner also provides sufficient evidence to support its assertion that a POSA would have had reason to combine the teachings of Winquist and the TROPIC Listing because the two references disclose the same treatment method being used in the same clinical trial.  Pet. 26–27 (citing Ex. 1002 ¶¶ 118–120).

The parties present sharply divergent testimonial and documentary evidence of whether a POSA would have had a reasonable expectation of successfully treating prostate cancer patients (claim 1) and mCRPC patients (claim 27) by administering 25 mg/m$^2$ cabazitaxel and a corticoid, the treatment protocol disclosed in Winquist and the TROPIC Listing.  Pet. 27–29, 33–34, 52–55 (citing, *inter alia*, Ex. 1002 ¶¶ 66–72, 98, 120–22, 132, 133, 169–170, 221–224; Ex. 1008; Ex. 1009; Ex. 1021; Ex. 1022;); Prelim. Resp. 24–44 (citing, *inter alia*, Ex. 1004, 167—182, 184–190; Ex. 2001

13

IPR2016-00712
Patent 8,927,592 B2

¶¶ 31, 32, 37–40, 42–52, 102–107, 110–114, 116–119, 129–134).  For
example, Petitioner relies on the disclosure and teachings of Attard,[9] a
review article reporting on a Phase I dosing study for cabazitaxel, for the
proposition that "it was known in the art that anticancer activity against
docetaxel-resistant, castration-resistant prostate cancer was observed in
patients treated with cabazitaxel."  Pet. 27 (citing Ex. 1002 ¶¶ 66–69; Ex.
1021, 74–75).  Petitioner further relies on the disclosure and teachings of
Beardsley.[10]  Beardsley reports on a Phase II clinical trial of cabazitaxel
administered to docetaxel-resistant metastatic breast cancer patients,
originally reported in Pivot (Ex. 1010), for the proposition that the 14%
objective response rate was "known to have motivated a Phase III clinical
study of cabazitaxel among metastatic prostate cancer patients."  *Id.* at 28
(citing Ex. 1002 ¶¶ 70–72; Ex. 1022, 163).

    Patent Owner contests Petitioner's reasonable expectation of success
arguments and evidence, particularly the teachings of Attard and Beardsley.
Patent Owner supports its position with new testimonial evidence from Dr.
Alton Oliver Sartor, M.D.  *See e.g.* Prelim. Resp. 27–28 (citing Ex. 2001
¶¶ 31, 32, 37–40, 81–83 regarding Attard), 37–38 (citing Ex. 2001 ¶¶ 108–
09 regarding Beardsley).[11]  For example, Patent Owner relies on Dr. Sartor's

---

[9] Gerhardt Attard et al., *Update on tubulin-binding agents*, Pathologie
Biologie 54, 72–84 (Elsevier 2006) ("Attard").  Ex. 1021.
[10] Emma K. Beardsley and Kim N. Chi, *Systemic therapy after first-line
docetaxel in metastatic castration-resistant prostate cancer*, Curr. Opin.
Support Palliat. Care 2, 161–66 (Wolters Kluwer Health 2008)
("Beardsley").  Ex. 1022.
[11] Patent Owner argues that Petitioner has not persuasively addressed Dr.
Sartor's prosecution declaration under 37 C.F.R. § 1.132, in support of
Patent Owner's assertion that the Phase III clinical results in Example 1 of

14

IPR2016-00712
Patent 8,927,592 B2

Declaration testimony for the proposition that "a therapeutic benefit was unpredictable because of the heterogeneity of the disease and the complexity of resistance to both hormone therapy and docetaxel therapy." *Id.* at 28 (citing Ex. 1004, 180–81, 184–87; Ex. 2001 ¶¶ 31–32, 37–40). The parties' competing testimonial and documentary evidence also bears on the question of whether the TROPIC clinical trial results were "unexpected" and the weight to be given Patent Owner's objective evidence of nonobviousness.

At this stage of the proceeding, we find the parties have raised disputed issues of material fact regarding the obviousness inquiries of a reasonable expectation of success and unexpected results. Under such circumstances, "a genuine issue of material fact created by such testimonial evidence will be viewed in the light most favorable to the petitioner solely for purposes of deciding whether to institute an *inter partes* review." 37 C.F.R. § 42.108(c). Therefore, based on the present record, we determine that Petitioner's arguments and evidence in support of Ground 1 are sufficient to institute an *inter partes* review with respect to claims 1 and 27. The parties will have the opportunity to cross-examine the respective declarants and submit additional evidence during the trial. 81 Fed. Reg. 18,750, 18,755 (third column) (April 1, 2016).

Patent Owner also argues that Petitioner has failed to comply with 37 C.F.R. § 42.104(b)(2), which requires a petitioner to "specify . . . the patents or printed publications relied upon for each ground," by relying on

---

the '592 patent were unpredictable. Prelim. Resp. 28–30. Petitioner, however, cites to Dr. Seth's Declaration responding directly to Dr. Sartor's statements regarding unexpected results. Pet. 57 (citing Ex. 1002 ¶¶ 213–15).

15

IPR2016-00712
Patent 8,927,592 B2

background references outside Ground 1.  Prelim. Resp. 26.  Patent Owner
argues that Petitioner improperly attempts to supply missing claim
limitations from such background references.  *Id.*  Patent Owner suggests
denial of the Petition for failure to comply with our rules.  *Id.*

  Contrary to Patent Owner's argument, Petitioner does not rely on
references other than Winquist and the TROPIC Listing for disclosure of the
method steps recited in claims 1 and 27.  Pet. 35–36, 38 (claim charts for
claims 1 and 27).  Petitioner does, however, rely on the teachings of other
references, particularly Attard and Beardsley, to support Petitioner's
obviousness assertion that a POSA would have had a reasonable expectation
of successfully treating prostate cancer patients (claim 1) and mCRPC
patients (claim 27) based on the method steps disclosed in Winquist and the
TROPIC Listing.  Pet. 27–29, 33–34, 52–55.  Therefore, for clarity, we
exercise our discretion to recast Petitioner's Ground 1 as one of obviousness
over Winquist and the TROPIC Listing in view of Attard and Beardsley.  35
U.S.C. § 314(a); *see SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307,
1312–13 (Fed. Cir. 2015) (noting that governing statutory provisions do not
limit the Board's authority to proceed with AIA trial proceedings only on the
specific statutory grounds alleged in the petition); *see also In re Cuozzo
Speed Techs., LLC*, 793 F.3d 1268, 1273 (Fed. Cir. 2015) ("Nor does the
IPR statute expressly limit the Board's authority at the final decision stage to
the grounds alleged in the IPR petition."), *aff'd*, *Cuozzo Speed Techs., LLC
v. Lee*, 136 S. Ct. 2131, 2139–2140 (2016) ("[O]ne important congressional
objective . . . [is] giving the Patent Office significant power to revisit and
revise earlier patent grants.").

IPR2016-00712
Patent 8,927,592 B2

### 4. Dependent Claims 7–9

Claims 7–9 depend from claim 1 and recite pharmacokinetic ("PK") parameters produced by administration of 20–25 mg/m$^2$ of cabazitaxel. Claims 7–9 recite that cabazitaxel is "administered in an amount to provide" either "an AUC of about 991 ng·h/mL (CV 34%)" (claim 7), "an $C_{max}$ of about 226 ng·h/mL (CV 107%)" (claim 8), or "a plasma clearance of 48.5L/h (CV 39%)" (claim 9). Ex. 1001, 19:3–11. Winquist and the TROPIC Listing do not disclose or reference any pharmacokinetic parameters resulting from the treatment protocol. Petitioner argues that the recited PK parameters "inherently follow as a direct result of administering cabazitaxel at 25 mg/m$^2$" and, therefore, would have been obvious in view of Winquist's disclosure of a 25mg/m$^2$ dose of cabazitaxel. Pet. 30–31 (citing Ex. 1002 ¶¶ 56, 124).

We agree with Patent Owner that Petitioner's inherency assertion is not sufficiently supported. Dr. Seth's conclusions, drawn from a description of PK analysis in the '592 patent, are not sufficiently explained to satisfy the high standard required for inherency in an obviousness context. The Federal Circuit has cautioned that inherency "must be carefully circumscribed in the context of obviousness," because, *inter alia*, "[o]bviousness cannot be predicated on what is unknown." *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014) (citing *In re Rijckaert*, 9 F.3d 1531, 1533–34 (Fed. Cir. 1993), and quoting *In re Shetty*, 566 F.2d 81, 86 (C.C.P.A. 1977)). Patent Owner also shows that infusion time impacts $C_{max}$ and AUC, and differences in formulation also may impact the recited PK distribution ranges. Prelim. Resp. 44–45 (citing Ex. 2061, 188 (Col. 1 ¶ 2); Ex. 2094, 674 (Table IV); Ex. 2089, 347). Petitioner and Dr. Seth do not

17

IPR2016-00712
Patent 8,927,592 B2

address how infusion times or formulation may affect PK distribution profiles.

For the reasons given above, we determine Petitioner has not shown a reasonable likelihood of prevailing with respect to the asserted obviousness of claims 7–9 of the '592 patent in Ground 1.

### 5. *Dependent Claims 2, 5, 12, 13, 17–20, 22–25, 28, and 29*

Petitioner argues that the remaining dependent claims recite additional limitations that would have been obvious to a POSA based on Winquist and the TROPIC Listing. Pet. 29–32, 34–38. Petitioner supports its arguments with claim charts containing citations to Winquist, the TROPIC Listing, and Dr. Seth's Declaration. *Id.* at 36–38. Patent Owner does not address the remaining dependent claims in dispute.

Based on the present record, we determine Petitioner has provided sufficient argument and evidence in support of Ground 1 to institute an *inter partes* review with respect to dependent claims 2, 5, 12, 13, 17–20, 22–25, 28, and 29 of the '592 patent.

### 6. *Conclusion*

Based on the present record, we determine Petitioner has provided sufficient argument and evidence in support of Ground 1 to institute an *inter partes* review with respect to claims 1, 2, 5, 12, 13, 17–20, 22–25, and 27–29 of the '592 patent.

### C. *Ground 2: Asserted Obviousness of Claims 3 and 4 over Winquist, the TROPIC Listing, and Didier*

Claim 3 depends from independent claim 1. Claim 3 recites cabazitaxel "in the form of an acetone solvate." Ex. 1001, 18:61–62. Claim

18

4 depends from claim 3 and further recites "the acetone solvate contains between 5% and 8% by weight of acetone." *Id.* at 18:63–64.

Petitioner acknowledges that Winquist and the TROPIC Listing do not disclose an acetone solvate form of cabazitaxel. Pet. 38. Petitioner, however, relies on Didier's teaching of the preparation of an acetone solvate of cabazitaxel, where the "mean value of the content of acetone is 7%." *Id.* at 38–39 (citing Ex. 1011, 2:39–42). Didier also states that cabazitaxel "exhibits noteworthy anticancer and antileukemic properties." Ex. 1011, 1:22–23. Petitioner, relying on Dr. Seth's testimony, argues that a POSA would have had strong reasons to prepare cabazitaxel in solvate form, to "enable the drug's dissolution into an aqueous solution suitable for intravenous infusion into a patient." Pet. 39 (citing Ex. 1002 ¶ 142). Dr. Seth references Liu,[12] which teaches that highly lipophilic paclitaxel has to be in soluble form for intravenous ("i.v.") administration, in support of his opinion. Ex. 1002 ¶¶ 79–80.

Patent Owner challenges Petitioner's evidence, particularly Liu, as failing to support a motivation to combine the references to select Didier's acetone solvate form of cabazitaxel for use in the i.v. treatment method disclosed by the combination of Winquist and the TROPIC Listing. Prelim. Resp. 50–51. Patent Owner argues that Liu does not support Dr. Seth's opinion because, when the lipophilicity of a drug such as cabazitaxel presents a formulation problem, Liu suggests the use of surfactants and liposomes rather than alteration of the solid state form of the drug compound

---

[12] Liu, *Water-Insoluble Drug Formulation*, Chapter 15, 525–568 (CRC Press 2000) ("Liu"). Ex. 1025.

IPR2016-00712
Patent 8,927,592 B2

(e.g., forming a solvate) to achieve the requisite solubility. *Id.* (citing Ex. 1025, 527; Ex. 2069). Patent Owner further argues that Liu's list of pre-formulation solvents are not suitable for pharmaceutical preparations and do not support Petitioner's asserted motivation to combine.

The parties have once more raised disputed issues of material fact that we view in the light most favorable to Petitioner based on the present record. *See* 37 C.F.R. § 42.108(c). Therefore, at this stage of the proceeding, we determine that Petitioner has provided sufficient argument and evidence in support of Ground 2 to institute an *inter partes* review with respect to claims 3 and 4. The parties will have the opportunity to cross-examine the respective declarants and submit additional evidence during the trial.

### D. Ground 3:  Asserted Obviousness of Claims 7–9 Over Winquist, the TROPIC Listing, and Mita

In Ground 3, Petitioner argues that the PK limitations of claims 7–9 of the '592 patent would have been obvious to a POSA based on Winquist, the TROPIC Listing, and Mita. Petitioner notes that Mita expressly discloses AUC and $C_{max}$ concentrations, and a plasma clearance rate, that fall within the ranges recited in the claims. Pet. 40–41 (citing Ex. 1002 ¶¶ 104, 145–148; Ex. 1012, 729). Petitioner argues that the PK distribution ranges recited in claims 7–9 are minor, obvious limitations in view of the prior art. *Id.* Patent Owner does not address the substance of Ground 3 in its Preliminary Response, apart from invoking its arguments regarding claims 1 and 27 in Ground 1. Prelim. Resp. 52.

IPR2016-00712
Patent 8,927,592 B2

Based on the present record, we determine Petitioner has provided sufficient argument and evidence in support of Ground 3 to institute an *inter partes* review with respect to claims 7–9 of the '592 patent.

### E. Grounds 4–6: Asserted Obviousness of Claims 10, 11, 14–16, 21, 26, and 30

Ground 4 concerns dependent claims 10 and 11, directed to monitoring neutrophil levels in a patient, and dependent claims 14 and 16, directed to specific doses of the corticoid (10 mg/day) or cabazitaxel (25 mg/m$^2$), respectively. Ground 5 concerns dependent claims 21, 26, and 30, directed to a cabazitaxel dose of 20 mg/m$^2$. Ground 6 concerns dependent claim 15, directed to a cabazitaxel dose of 20 mg/m$^2$. Petitioner supports its assertions of obviousness in Grounds 4–6 with citations to the respective prior art references and Dr. Seth's Declaration. Pet. 41–45 (citing Ex. 1002 ¶¶ 61, 150, 152–154, 157, 158, 160; Ex. 1008, 1; Ex. 1009, 3948; Ex. 1010, 1547, 1548, 1550; Ex. 1013, 1502–1504). Patent Owner does not address the substance of Grounds 4–6 in its Preliminary Response, apart from invoking its arguments regarding claims 1 and 27 in Ground 1. Prelim. Resp. 52.

Based on the present record, we determine Petitioner has provided sufficient argument and evidence in support of Ground 3 to institute an *inter partes* review with respect to claims 10, 11, 14–16, 21, 26, and 30 of the '592 patent.

### F. Grounds 7–10

Grounds 7–10 all rely on Winquist and Pivot to support Petitioner's assertions of obviousness over claims 1–5 and 7–30. As stated above, Pivot

21

IPR2016-00712
Patent 8,927,592 B2

is the Phase II breast cancer study on which Beardsley reported and to which Petitioner cites as additional background information in support of Ground 1.  Pet. 27, 34.  Therefore, in view of our clarification of Ground 1 as one of obviousness over Winquist and the TROPIC Listing in view of Attard and Beardsley, and given Petitioner's citation to Pivot in further support of Ground 1, we exercise our discretion and decline to institute review based on Grounds 7–10 advanced by Petitioner.  35 U.S.C. § 314(a); 37 C.F.R. § 42.108(a).

### III.   CONCLUSION

Petitioner has demonstrated a reasonable likelihood of prevailing with respect to claims 1–5 and 7–30 of the '592 patent challenged in this Petition. At this stage of the proceeding, the Board has not made a final determination as to the patentability of the instituted claims.  Our final decision will be based on the full record developed during trial.

### IV.   ORDER

Accordingly, it is

ORDERED that pursuant to 35 U.S.C. § 314, an *inter partes* review of the '592 patent is instituted on the following grounds:

Claims 1, 2, 5, 12, 13, 17–20, 22–25, and 27–29 as obvious over Winquist and the TROPIC Listing in view of Attard and Beardsley;

Claims 3 and 4 as obvious over Winquist, the TROPIC Listing, and Didier;

Claims 7–9 as obvious over Winquist, the TROPIC Listing, and Mita;

IPR2016-00712
Patent 8,927,592 B2

Claims 10, 11, 14, and 16 as obvious over Winquist, the
TROPIC Listing, and Tannock;

Claims 21, 26, and 30 as obvious over Winquist, the TROPIC
Listing, and Pivot; and

Claim 15 as obvious over Winquist, the TROPIC Listing, Pivot,
and Tannock;

FURTHER ORDERED that *inter partes* review is commenced on the
entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R.
§ 42.4, notice is hereby given of the institution of a trial; and

FURTHER ORDERED that the *inter partes* review is limited to the
grounds of unpatentability listed above, and no other grounds of
unpatentability are authorized for *inter partes* review.

23

IPR2016-00712
Patent 8,927,592 B2


For PETITIONER:

Steven W. Parmelee
Michael T. Rosato
Jad A. Mills
WILSON SONSINI GOODRICH & ROSATI
sparmelee@wsgr.com
mrosato@wsgr.com
jmills@wsgr.com


For PATENT OWNER:

Dominic A. Conde
Whitney L. Meier
FITZPATRICK CELLA HARPER & SCINTO
dconde@fchs.com
wmeier@fchs.com

# EXHIBIT J

Paper No. _
Date Filed: December 23, 2016

Filed on behalf of: Aventis Pharma S.A.

By:

Dominick A. Conde
dconde@fchs.com
(212) 218-2100

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

————————————

**MYLAN LABORATORIES LIMITED**
**Petitioner,**
**v.**
**AVENTIS PHARMA S.A.**
**Patent Owner.**

————————————

Case IPR2016-00712
U.S. Patent No. 8,927,592

————————————

**PATENT OWNER'S CONTINGENT MOTION TO AMEND**

# TABLE OF CONTENTS

I.     Introduction......................................................................................1

II.    Claim Listing ...................................................................................1

III.   Written Description Support For Substitute Claims.........................2

    A.    Claim 31 .................................................................................3

    B.    Claim 32 .................................................................................5

    C.    Claim 33 .................................................................................5

    D.    Claim 34 .................................................................................6

IV.    Level Of Ordinary Skill In The Art..................................................6

V.     Claim Construction ..........................................................................6

    A.    The Preamble of Claim 31 Is Limiting ..................................6

        1.    Claim Language Shows that the Preamble Is
            Limiting...........................................................................7

        2.    Patent Owner Is Relying on Increased Survival to
            Distinguish Prior Art.....................................................8

    B.    "A method of increasing survival".........................................8

    C.    "antihistamine," "corticoid," and "$H_2$ antagonist" ...............9

VI.    The Substitute Claims Are Patentable Over The Prior Art ...........10

    A.    The Substitute Claims Are Novel .......................................10

    B.    The Substitute Claims Are Nonobvious..............................10

        1.    No Prior Art Disclosed or Suggested 20-25 mg/m$^2$
            of Cabazitaxel in Combination with Prednisone or
            Prednisolone Would Increase Overall Survival.....................10

            a.    There Is No Cabazitaxel Survival Data  in
                the Prior Art ...................................................11

i

b.    Partial Responses in Tumor Size and
       Changes in PSA Levels Do Not Provide
       Evidence of Increased Survival .....................................13

c.    Docetaxel's Survival Benefit in
       Chemotherapy- Naïve Patients Is of Little
       Relevance to Whether Claims 31-34 Were
       Obvious .........................................................................17

2.   A POSA Would Not Have Been Motivated to Use
     the Claimed Premedication Regimen with
     Cabazitaxel ...................................................................................18

a.    The Prior Art Teaches Away from the
       Claimed Premedication Regimen Prior to
       Cabazitaxel ...................................................................18

b.    A POSA Would Not Have Been Motivated
       to Employ the Claimed Premedication
       Based on Docetaxel and Paclitaxel.................................20

c.    The Prior Art Teaches Away from the Use
       of $H_2$ Antagonists with Cabazitaxel...............................23

3.   Objective Indicia Support Nonobviousness.............................24

VII.   Conclusion .............................................................................................25

# TABLE OF AUTHORITIES

## Cases

*In re Omeprazole Patent Litig.*,
    536 F.3d 1361 (Fed. Cir. 2008) ....................................................................19

*Jansen v. Rexall Sundown Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003) .......................................................................7

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) .......................................................................8

*Rapoport v. Dement*,
    254 F.3d 1053 (Fed. Cir. 2001) .......................................................................7

*Sanofi v. Glenmark Pharms. Inc.*,
    No. 14-264, 2015 WL 5092631 (D. Del. Aug. 28, 2015) ..............................7

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) .......................................................................3

## Statutes

35 U.S.C. § 316(d) ......................................................................................................1

## Rules

37 C.F.R. § 42.121 ......................................................................................................1

37 C.F.R. § 42.22(a)(2) ..............................................................................................1

## I.    <u>Introduction</u>

Aventis Pharma, S.A. moves pursuant to 37 C.F.R. § 42.121 to amend U.S.

Patent No. 8,927,592 contingent upon the outcome of the instituted Grounds of

IPR2016-00712.  If original Claim 27 is found unpatentable, the Board is requested

to replace it with proposed substitute Claim 31.  If original Claim 28 is found

unpatentable, the Board is requested replace it with proposed substitute Claim 32.

If original Claim 29 is found unpatentable, the Board is requested to replace it with

proposed substitute Claim 33.  If original Claim 30 is found unpatentable, the

Board is requested to replace it with proposed substitute Claim 34.  *See* 37 C.F.R.

§ 42.22(a)(2); 35 U.S.C. § 316(d).

## II.    <u>Claim Listing</u>

A complete listing of the proposed claim amendments is provided in

Appendix 1 hereto.  No more than one substitute claim is proposed for each

canceled claim.  37 C.F.R. § 42.121(a)(3).  The proposed substitute claims add

elements to the claims and do not remove any limitations; therefore they are not

broader than the original claims.  35 U.S.C. § 316(d)(3); 37 C.F.R. § 42.121(a)(2).

Claim 31 has been amended so that the preamble (now a "method of

increasing survival") is a limitation of the claim.  Claim 31 still requires

administering a dose of 20-25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof,

in combination with prednisone or prednisolone to a patient with hormone-

1

refractory or castration resistant, metastatic prostate cancer that has progressed during or after treatment with docetaxel.  Claim 31 is further limited over original Claim 27 by the requirement of administering an antihistamine, a corticoid, and an $H_2$ antagonist prior to administering the 20-25 mg/m$^2$ of cabazitaxel.  Because Claim 31 adds limitations and does not remove any limitations, it is narrower than original Claim 27.

Dependent Claims 32-34 incorporate new limitations by virtue of their dependence on substitute Claim 31.  Claim 33 is further amended to require that administration of the antihistamine, corticoid, and $H_2$ antagonist also occur as a new cycle every three weeks.  Thus, Claims 32-34 are narrower than each corresponding original claim.

## III.  <u>Written Description Support For Substitute Claims</u>

Each of the proposed substitute claims are supported by the original disclosure of the '592 patent (Exh. 1004 at 2360-403 ("'720 application")) as well as International Application No. PCT/IB2010/054866 ("'866 application") filed on October 27, 2010 (Exh. 2230), Provisional Application No. 61/293,903 ("'903 application") (Exh. 1006) filed on January 11, 2010, and Provisional Application No. 61/355,834 ("'834 application") (Exh. 1007) filed on June 17, 2010.  Based on the original disclosure of the '720, '866, '834, and '903 applications, one of

ordinary skill would understand that the inventor was in possession of Claims 31-

34. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561-62 (Fed. Cir. 1991).

A.   **Claim 31**

Claim 31 recites a method for increasing the survival of a patient in need

thereof that has castration resistant or hormone-refractory metastatic prostate

cancer that has progressed during or after docetaxel therapy.  This method is

described in detail in Example 1 of the specification of the '720, '866, '834, and

'903 applications.  Example 1 describes a clinical study where patients with

metastatic castration resistant prostate cancer ("mCRPC") with progressive disease

after docetaxel therapy received a statistically significant overall survival benefit

when treated with cabazitaxel in combination with prednisone or prednisolone as

compared to palliative mitoxantrone therapy.  Exh. 1004 at 2385-86; Exh. 2230 at

13:31-15:7; Exh. 1007 at 14:1-15:11; Exh. 1006 at 7:33-8:37; *see also* Exh. 1004

at 2376-77; Exh. 2230 at 7:13-15; Exh. 1007 at 7:3-5; Exh. 1006 at 6:9-10 ("In

another aspect, the patient has prostate cancer that progressed during or after

treatment with docetaxel."); Exh. 1004 at 2378; Exh. 2230 at 8:6-9; Exh. 1007 at 7:

34-37 ("increasing the survival of a patient with hormone refractory metastatic

prostate cancer, comprising administering a clinically proven effective amount of

cabazitaxel to the patient in combination with prednisone or prednisolone.  . . .

[T]he patient has been previously treated with a docetaxel-containing regimen").

3

The '720, '866, '834 and '903 applications also disclose administering a dosage of 20-25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, in combination with prednisone or prednisolone.   Exh. 1004 at 2372 ("between 20 and 25 mg/m$^2$," "anhydrous base, a hydrate or a solvate," "in combination with a corticoid chosen especially from prednisone and prednisolone"); Exh. 2230 at 3:6-9, 3:18-20; Exh. 1007 at 3:6-21; Exh. 1006 at 3:6-16.

The '720, '866, '834, and '903 applications also disclose administering a premedication regimen of an antihistamine, a corticoid, and an H$_2$ antagonist.  The applications state that "cabazitaxel may be administered in combination with a medication to prevent or control nausea and vomiting or to prevent or control hypersensitivity."  Exh. 1004 at 2378; Exh. 2230 at 8:11-14; Exh. 1007 at 8:1-2; Exh. 1006 at 7:2-3.  "Preferably, a patient is pre-medicated . . . at least 30 minutes prior to administering each dose of cabazitaxel."  Exh. 1004 at 2378; Exh. 2230 at 8:12-14; Exh. 1007 at 8:2-4; Exh. 1006 at 7:3-5.  The '720, '866, '834, and '903 applications list antihistamines and corticosteroids as examples of premedications to prevent hypersensitivity.  Exh. 1004 at 2378; Exh. 2230 at 8:26-30; Exh. 1007 at 8:16-20; Exh. 1006 at 7:9-12.  These applications also list H$_2$ antagonists as an example of a premedication that can be used to prevent nausea and vomiting.  Exh. 1004 at 2379; Exh. 2230 at 9:11-16; Exh. 1007 at 9:5-6; Exh. 1006 at 7:7-8.

### B.   Claim 32

Claim 32 recites a 25 mg/m$^2$ dose of cabazitaxel.  Example 1 of the '720,

'866, '834, and '903 applications describes using a 25 mg/m$^2$ dose of cabazitaxel

in combination with prednisone or prednisolone to increase overall survival of

mCRPC patients with progressive disease after docetaxel therapy as compared to

patients receiving mitoxantrone therapy.  Exh. 1004 at 2385-86; Exh. 2230 at

13:31-15:7; Exh. 1007 at 14:1-15:11; Exh. 1006 at 7:36-8:37.

### C.   Claim 33

Claim 33 recites repeating the administration of the antihistamine, corticoid,

H$_2$ antagonist, and cabazitaxel every three weeks.  The '720, '866, '834, and '903

applications disclose administering cabazitaxel as a new cycle every three weeks in

combination with prednisone or prednisolone, which can be administered daily.

Exh. 1004 at 2376 ("cabazitaxel is administered by perfusion to the patient

according to an intermittent program with an interval between each administration

of 3 weeks"); Exh. 2230 at 7:3-5; Exh. 1007 at 6:31-32; Exh. 1006 at 5:38-6:4.

Example 1 describes a study wherein cabazitaxel was given every three weeks in

combination with daily prednisone.  Exh. 1004 at 2385; Exh. 2230 at 13:31-15:7;

Exh. 1007 at 14:1-15:11; Exh. 1006 at 7:36-8:2.  As described above for Claim 31,

the '720, '866, '843, and '903 applications also describe premedicating patients

with an antihistamine, a corticoid, and an H$_2$ antagonist before "each dose of

cabazitaxel." Exh. 1004 at 2378; Exh. 2230 at 8:12-14; Exh. 1007 at 8:2-4; Exh.

1006 at 7:3-5. Thus, each application describes administering a premedication

before each dose of cabazitaxel as a new cycle every three weeks.

### D.     Claim 34

Claim 34 recites a 20 mg/m$^2$ dose of cabazitaxel. The '720, '866, '834, and

'903 applications disclose administering a dose of 20-25 mg/m$^2$ of cabazitaxel.

Exh. 1004 at 2372; Exh. 2230 at 3:18-19; Exh. 1007 at 3:20-21; Exh. 1006 at 3:15-

16. Example 2 in the '720, '866, and '834 applications also describe dosage

modification to 20 mg/m$^2$ of cabazitaxel for adverse reactions. Exh. 1004 at 2394;

Exh. 2230 at 21:5-12; Exh. 1007 at 18:17-19:10.

## IV.     Level Of Ordinary Skill In The Art

A POSA would be an oncologist or medical doctor specializing in oncology

and would have experience in the treatment of prostate cancer, including metastatic

prostate cancer, in evaluating therapies for prostate cancer, and would have access

to information regarding pharmacokinetics and mechanisms of drug resistance.

Exh. 2176 at ¶28.

## V.     Claim Construction

### A.     The Preamble of Claim 31 Is Limiting

By virtue of the claim language and Patent Owner's reliance to distinguish

prior art, the preamble of Claim 31 is a claim limitation.

6

### 1.   Claim Language Shows that the Preamble Is Limiting

The body of the claim refers to administering a treatment "to a patient in need thereof."  "Thereof" in the body of the claim refers to "increasing survival" in the preamble.  The Federal Circuit has held that where the preamble sets forth the objective of the method and the body of claim directs that the method be performed on someone "in need," the preamble is a statement of intentional purpose for how the method is to be performed, and is therefore limiting.  *Jansen v. Rexall Sundown Inc*., 342 F.3d 1329, 1333 (Fed. Cir. 2003); *see also Sanofi v. Glenmark Pharms. Inc*., No. 14-264, 2015 WL 5092631, at *5 (D. Del. Aug. 28, 2015) (finding the preamble gives life and meaning to "a patient in need thereof" in the body of the claim).  The *Jansen* court found the preamble was limiting because the language "to a human in need thereof" gave "life and meaning" to the preamble's statement of purpose.  342 F.3d at 1333*; see also Rapoport v. Dement*, 254 F.3d 1053, 1059-60 (Fed. Cir. 2001) ("Moreover, without treating the phrase 'treatment of sleep apneas' as a claim limitation, the phrase 'to a patient in need of such treatment' would not have a proper antecedent basis.").  Therefore, Claim 31's requirement that the drugs described in the claim be administered to a patient "in need thereof" gives life and meaning to the preamble, and indicates that the preamble is part of the claim.

### 2.    Patent Owner Is Relying on Increased Survival to Distinguish Prior Art

Where an applicant relies on the preamble language for patentability, the preamble is limiting. *MBO Labs., Inc. v. Becton, Dickinson & Co*., 474 F.3d 1323, 1330 (Fed. Cir. 2007).  Here, Aventis is expressly amending the language of claim 27 to add the preamble as a limitation of the claim contingent upon a potential future finding by the Board that the original claim is unpatentable.  The amendment relies on the finding of increased survival with 20-25 mg/m$^2$ of cabazitaxel in combination with prednisone administered in the TROPIC study to mCRPC patients that had progressed during or after treatment with docetaxel to distinguish prior art cited by the Board and Petitioner.  This provides further support that the preamble of Claim 31 is a limitation of the claim.

### B.    "A method of increasing survival"

Example 1 of the specification demonstrates that in a phase III clinical trial, cabazitaxel therapy provided a statistically significant increase in overall survival compared to palliative mitoxantrone therapy, a therapy that is equivalent to no therapy at all with respect to prolonging the life of a patient.  Exh. 1001 at Table 1; *see* Exh. 2176 at ¶¶36, 87.  In light of this data, a POSA would understand the phrase "a method of increasing survival" to mean "a method that prolongs the life of a patient as compared to no treatment or palliative treatment."  *See also* Exh. 2176 at ¶¶230-33.

8

### C.   "antihistamine," "corticoid," and "H$_2$ antagonist"

Antihistamines, corticoids, and H$_2$ antagonists were all well understood classes of drugs to a POSA.  Exh. 2176 at ¶234.

Antihistamines were understood to be drugs that are antagonistic to the production of histamine through action on either the H$_1$ or H$_2$ receptors.  Exh. 2223 at 3.  However, as explained by Dr. Sartor, "antihistamine" was commonly used in the art to specifically refer to drugs that target the H$_1$ histamine receptor and were used to prevent or lessen the severity of allergic reactions.  Exh. 2176 at ¶235. This is consistent with the specification, which lists "antihistamines" and "H$_2$ antagonists" separately and provides two examples of antihistamines, dexchlorpheniramine and diphenhydramine, both of which are H$_1$ antagonists. Exh. 1001 at 6:56-60; Exh. 2213 at 664; Exh. 2144 at 667.  Thus, a POSA reviewing the '592 patent would understand that "antihistamine" as used in the claim is referring to a drug that is antagonistic to the H$_1$ histamine receptor.  Exh. 1001 at 6:56-60, 7:19-22; Exh. 2176 at ¶235.

A POSA would understand "H$_2$ antagonist" as used in the claims to mean a drug that is antagonistic to the H$_2$ histamine receptor.  Exh. 2223 at 3; Exh. 2176 at ¶236.

A POSA would understand "corticoid" as used in the claims to mean a steroid produced in the adrenal cortex and synthetic analogues of these steroids.

Exh. 2223 at 4; Exh. 2176 at ¶237.

## VI.    The Substitute Claims Are Patentable Over The Prior Art

### A.    The Substitute Claims Are Novel

Petitioner did not propose any Grounds based on anticipation, and Aventis is not aware of a single reference that discloses the method of independent Claim 31. For example, Aventis is not aware of a reference disclosing that cabazitaxel in combination with prednisone increases survival in patients with mCRPC. Aventis is also not aware of a reference that discloses administering an antihistamine, a corticoid, and a $H_2$ antagonist prior to administration of cabazitaxel.

### B.    The Substitute Claims Are Nonobvious

As stated above, Aventis is not aware of prior art disclosing all the elements of Claim 31. *See also* Exh. 2176 at ¶229. For the reasons described below, considering the entirety of the prior art, including the references relied on in the Petition, a POSA would not have reasonably expected that the administration of 20-25 mg/m$^2$ of cabazitaxel in combination with prednisone or prednisolone according to Claim 31 would increase survival of mCRPC patients progressing during or after docetaxel. Additionally, a POSA would not have been motivated to use the three-component premedication regimen of Claim 31 with cabazitaxel.

#### 1.    No Prior Art Disclosed or Suggested 20-25 mg/m$^2$ of Cabazitaxel in Combination with Prednisone or Prednisolone Would Increase Overall Survival

Unlike original Claims 27-30 for which the Board found "a method of

increasing the survival of a patient" either nonlimiting or reflecting an intent of the treatment (Paper 9 at 10), here the preamble "a method of increasing survival" is clearly a limitation of Claims 31-34.  Consequently, for the amended claims to be found obvious, the prior art must teach that the claimed method increases the survival of a patient.  The obviousness analysis for Claims 31-34 therefore differs from that undertaken by the Board with respect to original Claims 27-30 in light of the Board's claim construction.

### a.    There Is No Cabazitaxel Survival Data in the Prior Art

The phase I studies of cabazitaxel, including the study reported in Mita and Attard, were uncontrolled studies in patients with a variety of solid tumors.  Exh. 1012 at 723; Exh. 2147 at CabRef0002985; Exh. 2224 at 2.  Phase I studies in general, and these studies in particular, were not designed to evaluate the activity of cabazitaxel in any particular indication or its effect on the survival of patients, which can only be measured in a comparative study.  *Id*.; Exh. 2080 at 19-20; Exh. 2176 at ¶¶71-72, 231; Exh. 2177 at 152:6-12 (Mylan's expert, Dr. Rahul Seth agreeing that Mita was not designed to determine the efficacy of cabazitaxel in a specific patient population).   Indeed, none of the phase I studies even discuss survival as an outcome.  In fact, a patient in Lortholary died from neutropenic sepsis, indicating there was a risk that cabazitaxel could shorten life instead of prolonging it.  Exh. 2147 at CabRef0002986; *see also* Exh. 2176 at ¶163.

11

Similarly the phase II study in breast cancer reported in Pivot was an uncontrolled single arm study. Exh. 1010 at 1547. As Dr. Seth acknowledged, Pivot was not designed to evaluate either the efficacy of cabazitaxel in metastatic prostate cancer patients after docetaxel progression or the associated risks. Exh. 2177 at 152:20 -153:4. Although Pivot reports the median overall survival of the taxane resistant metastatic breast cancer patients as 12.3 months, Pivot does not conclude that cabazitaxel had any impact on how long the patients lived, nor could it have without a comparative arm. Exh. 1010 at 1551.

As Dr. Seth agreed, a POSA in 2009 aware of the phase I and phase II data from Mita and Pivot would be looking for a larger study for the use of cabazitaxel in patients with mCRPC progressing after treatment with docetaxel in order to characterize the benefits versus risks of cabazitaxel in those patients. Exh. 2177 at 153:12-25. Without having this information, a POSA could not have reasonably expected that cabazitaxel would increase survival in such patients.

The Winquist and the TROPIC Listing also do not provide any data on increased survival with cabazitaxel. Exh. 1008; Exh. 1009; Exh. 2176 at ¶¶238-39. These references merely state that the primary endpoint of the TROPIC study is overall survival; in other words that the study is designed to determine whether cabazitaxel in combination with prednisone prolongs the life of mCRPC patients previously treated with docetaxel as compared to palliative mitoxantrone therapy.

12

Exh. 1008 at 1; Exh. 1009 at 3948.  However, no results of the study were reported.

> **b.**  **Partial Responses in Tumor Size and Changes in PSA Levels Do Not Provide Evidence of Increased Survival**

It was well understood by January 2010 that a randomized controlled clinical study with sufficient power was necessary to determine whether a therapy provided a survival benefit.  *See* Exh. 2080 at 19-20; Exh. 2005 at 431; Exh. 2176 at ¶231. Therefore, by definition the single arm uncontrolled phase I and II studies for cabazitaxel could not have determined whether cabazitaxel prolonged overall survival.  It was also understood that tumor responses and PSA reductions were not validated surrogates for overall survival in CRPC.  Exh. 2030 at 303; Exh. 2177 at 94:7-16 (Dr. Seth agreeing that there are no surrogates).  In fact, there were no validated surrogate endpoints because (i) measuring changes in bone scans was difficult, (ii) changes in prostate specific antigen ("PSA") levels were not necessarily associated "with clinically important or approvable endpoints such as overall survival or pain palliation," and (iii) systems for measuring solid tumor response were not applicable to the site of most prostate metastases, bone.  Exh. 2030 at 303; *see also* Exh. 2005 at 431 ("Overall survival remains the necessary primary endpoint in phase III clinical studies in men with CRPC, given the uncertain validity of other surrogate measures for clinical benefits.").

That objective responses in tumor size and PSA reduction could not be used for a POSA to form a reasonable expectation regarding whether a therapy would increase survival is demonstrated by the large number of different therapies discussed below. These therapies led to reported reductions in PSA levels and tumor size, but failed to prolong overall survival in phase III studies. Tellingly, many of these studies had more patients with responses than reported for cabazitaxel in prostate cancer.

For example, suramin reduced PSA levels in phase I and phase II studies with three patients having complete tumor responses, yet the drug did not increase overall survival in a phase III CRPC study. Exh. 2020 at 209-10.

A phase I study of satraplatin reported an mCRPC patient with complete relief of tumour pain, and a phase II CRPC study reported 10 patients with a partial PSA response and 2 patients with tumor reductions, yet the drug did not increase overall survival in a phase III chemotherapy treated mCRPC study. Exh. 2194 at 1319; Exh. 2110 at 79; Exh. 1022 at 162-63.

Atrasentan reduced PSA levels in phase I and II mCRPC studies, yet failed to increase overall survival in a phase III mCRPC study. Exh. 2190 at 2171; Exh. 2191; Exh. 2010 at 1960, 1962-63.

DN-101 plus docetaxel significantly increased PSA response rate as compared to docetaxel plus placebo with a "promising improvement" in survival

and no increase in toxicity, yet did not improve overall survival in a phase III mCRPC study.  Exh. 2006 at 669, 672-73; Exh. 2043 at 1593; Exh. 2127 at 2.

Phase I/II studies of GVAX in mCRPC reported a complete response and six patients with PSA decreases, but development was terminated after two phase III mCRPC studies failed to show an effect on overall survival.  Exh. 2034 at 3884, 3888, 3890; Exh. 2018 at 983; Exh. 2027 at 1.

By 2006, more than 200 compounds had entered clinical development for use in advanced prostate cancer, but none other than docetaxel was shown to increase overall survival.  *See* Exh. 2148 at 138.  Even after the filing of the '592 patent, failure to show a benefit in overall survival in CRPC continued.  Exh. 2176 at ¶¶103-09.  Antonarakis and Eisenberger report eight failed phase III trials in patients with mCRPC of different combination therapies with docetaxel.  Exh. 2004 at 1709-10.  The authors state that "accurate prediction of a positive phase III study is an impossible endeavor."  *Id*. at 1711.

Additionally, with respect to breast cancer, Ratain 2005 notes that for a breast cancer study with an objective response rate higher than 10%, such as for cabazitaxel reported in Pivot, the positive predictive value was only 25%.  Exh. 2145 at 5661, Table 1.  A POSA would understand this to mean that there was only a 25% chance of succeeding in a phase III ***breast cancer*** study and receiving approval, let alone a study in patients with mCRPC.  *Id*. at Table 1; Exh. 2177 at

15

84:6-18, 87:10-18; Exh. 2176 at ¶132.  Three to one odds of failure in the same tumor type undermines any assertion that success is predictable in a different tumor type.

In addition, the fact that cabazitaxel is a taxane does not mean that it provides a survival benefit.  Indeed, Booth notes that survival is "exceedingly tough to prove in populations with refractory, progressive tumours."  Exh. 1015 at 609.  The taxane larotaxel, for example, produced tumor responses in both lung cancer and taxane-resistant metastatic breast cancer patients in phase I-II studies, yet failed to provide a survival benefit in three separate phase III trials: taxane resistant metastatic breast cancer, pancreatic cancer, and bladder cancer.  Exh. 1021 at 75; Exh. 2015 at 1255-56; Exh. 2040 at vi13; Exh. 2003 at 3; Exh. 2134 at 45/305; Exh. 2036 at 210-11, 213.  Thus, a POSA would not have reasonably expected cabazitaxel to prolong survival in mCRPC patients that had already failed docetaxel based on the fact that it was a taxane.  Exh. 2176 at ¶¶56-69.

These failed studies demonstrate that the partial responses in two mCRPC patients reported in Mita, only one of which was in a docetaxel-refractory patient, and the 14% tumor response rate from Pivot, if a POSA were to even consider breast cancer data to be informative for the treatment of mCRPC, failed to provide a POSA with a reasonable expectation that cabazitaxel therapy could prolong overall survival of mCRPC patients who had failed docetaxel therapy.

16

Lastly, the fact that the TROPIC study was being performed (as disclosed in Winquist and TROPIC Listing references relied on by Mylan) did not add any information regarding whether cabazitaxel therapy would prolong life. As Dr. Seth stated, the TROPIC study was to "determine ultimately what is better" between cabazitaxel and palliative mitoxantrone therapy. Exh. 2177 at 186:7-187:4. The numerous phase III failures discussed above show that merely running a phase III trial was not reasonably predictive of an increase in overall survival.

c.   **Docetaxel's Survival Benefit in Chemotherapy-Naïve Patients Is of Little Relevance to Whether Claims 31-34 Were Obvious**

The only survival data Mylan and Dr. Seth rely on to support allegations that a POSA would have reasonably expected an increase in overall survival by administering cabazitaxel in combination with prednisone is from a study of ***docetaxel*** in mCRPC patients. Petition at 33 (citing Attard's discussion of the TAX327 trial); Exh. 1002 at ¶110 (citing Exh. 1013). Importantly, the survival benefit with docetaxel reported in the Tannock 2004 publication (the TAX327 study) was in ***a different group of patients***, *i.e.*, patients who had not already progressed during or after docetaxel therapy. Exh. 1013 at 1503. Dr. Seth agreed that whether docetaxel provides a survival benefit in patients with metastatic prostate cancer who had disease progression during hormonal therapy is a different question from whether docetaxel would provide a survival benefit in patients with

metastatic prostate cancer who worsened during or after docetaxel treatment.  Exh.

2177 at 48:17-24.  Dr. Seth also agreed that there are differences between patients

who have only progressed on hormonal therapy as compared to patients who have

progressed on docetaxel, and that chemotherapy-naïve (*i.e.*, not previously treated

with chemotherapy) patients will tolerate chemotherapy better than docetaxel-

treated patients.  *Id*. at 48:25-49:4, 50:7-24.  Mylan does not explain why a similar

survival benefit would be expected using a different drug in different patients.

### 2. A POSA Would Not Have Been Motivated to Use the Claimed Premedication Regimen with Cabazitaxel

No prior art reference, including Winquist and the TROPIC Listing, disclose

the use of a premedication regimen with cabazitaxel, and a POSA would not have

been motivated to combine either reference with the premedication regimen of

Claim 31.  Exh. 1008; Exh. 1009 at 3948.  If anything, the prior art suggested such

a combination would be unnecessary, or that a different combination should be

used, as discussed below.

### a. The Prior Art Teaches Away from the Claimed Premedication Regimen Prior to Cabazitaxel

Premedication regimens are employed to either reduce or lessen the

incidence of certain side effects associated with intravenous administration of

certain drugs.  Exh. 2176 at ¶¶241-42.  For example, premedications can be used

when there is a concern over allergic responses to intravenous administration

referred to in the art as hypersensitivity reactions. *Id*. at ¶242. Additionally, corticoids can be used to reduce fluid retention. *Id*.; Exh. 1024 at 5.

Because the art does not suggest a concern over hypersensitivity reactions or fluid retention with respect to cabazitaxel administration, a POSA would not have been motivated to administer a premedication. Where a problem had not been previously recognized in the art, the solution to that problem is not obvious. *See In re Omeprazole Patent Litig*., 536 F.3d 1361, 1380 (Fed. Cir. 2008) (use of subcoating not obvious where a POSA would not have inferred a need for it).

In the phase I Mita and Fumoleau studies, no premedication was given for hypersensitivity reactions, and no severe hypersensitivity reactions occurred. Exh. 1012 at 724, 728; Exh. 2224 at 2; Exh. 2176 at ¶¶243-45, 248. In Mita, two patients experienced transient hypersensitivity reactions that did not reoccur without premedication, and in the Fumoleau study there were 3 cases of mild hypersensitivity reaction. Exh. 1012 at 727; Exh. 2224 at 2. Mita concludes, "[b]ased on the results of this study, [cabazitaxel] does not require premedication, thus resulting in significant administration and convenience advantages." Exh. 1012 at 729. Mita also notes that the "low incidence of fluid retention . . . also favors [cabazitaxel]." *Id*. at 727; *see also* Exh 2224 at 2. Thus, Mita led a POSA away from premedicating patients prior to cabazitaxel administration.

In the phase I Lortholary study, cabazitaxel was given with an antihistamine

premedication and no hypersensitivity reactions or fluid retention were reported. Exh. 2147 at CabRef0002895. Similarly, an antihistamine premedication was used in the phase II breast cancer study reported in Pivot. Exh. 1010 at 1548. Hypersensitivity reactions occurred in only 1% of treatment cycles, with severe events being rare. *Id*. at 1550. No severe fluid retention adverse events occurred. *Id*. Pivot does not discuss additional premedications. *Id*. at 1551; *see also* Exh. 2176 at ¶¶247, 250.

Thus, nothing in the cabazitaxel art suggested a need for further premedication and, therefore, a POSA would not have been motivated to utilize the three component premedication of Claim 31 prior to cabazitaxel administration. If anything, the prior art suggested that no premedication, or a different regimen than that recited in the proposed claims, would have been desired.

> **b.** **A POSA Would Not Have Been Motivated to Employ the Claimed Premedication Based on Docetaxel and Paclitaxel**

Assuming (1) a POSA would have considered using any premedication regimen for cabazitaxel, and (2) a POSA would follow the logic of Dr. Seth as to why a POSA would coadminister 10 mg prednisone (*see, e.g.*, Exh. 1002 at ¶¶126, 152), a POSA would have looked to the FDA-approved use of docetaxel. Doing so, however, would not have led a POSA to utilize the claimed premedication.

While premedication with the corticoid dexamethasone is required for the

administration of docetaxel to prevent hypersensitivity reactions and fluid

retention, a POSA would understand that the levels of hypersensitivity reactions

and fluid retention associated with docetaxel were far greater than those observed

with cabazitaxel.  Exh. 2176 at ¶¶252-54.  Hypersensitivity reactions were reported

in 17.6% of patients with metastatic breast cancer in a phase III study of docetaxel

in the absence of premedication, yet was only reduced to 15.2% in patients who

underwent a *3-day* premedication regimen.  Exh. 1024 at 15; Exh. 2176 at ¶253.

Similarly, severe reactions were reduced from 2.6% to 2.2% with premedication.

*Id*.  Significantly, the overall incidence of fluid retention actually increased in

those patients with 3-day premedication (59.7% to 64.1%), with severe cases being

reduced from 8.9% to 6.5%.   *Id*.  In contrast, only 6% of patients experienced

hypersensitivity reactions of any grade in the Pivot phase II metastatic breast

cancer study with cabazitaxel following a single injection of an antihistamine with

only 9% of patients experiencing fluid retention (with no severe cases reported).

Exh. 1010 at 1550; *see also* Exh. 2176 at ¶249.

In light of this data suggesting a much lower incidence of hypersensitivity

and fluid retention, a POSA would have little reason to utilize this apparently

minimally-effective premedication regimen for cabazitaxel, especially in light of

the explicit teaching of Mita that cabazitaxel administration "does not require

premedication, thus resulting in a significant administration and convenience

advantage" for cabazitaxel.  Exh. 1012 at 729; Exh. 2176 at ¶¶246, 254.

A POSA would have understood that the lower incidence of hypersensitivity reactions associated with cabazitaxel as compared to docetaxel was due in part to the relative potency of the drugs.  According to the Taxotere® (docetaxel) label, hypersensitivity reactions from docetaxel administration were due in part to the presence of polysorbate 80 in the formulation.  Exh. 1024 at 1, 10, 35.  While a POSA would have been aware that cabazitaxel was also formulated with polysorbate 80 in the same concentration, cabazitaxel was being studied at the time at doses of 20-25 mg/m$^2$, much less than the FDA-approved doses of 75 mg/m$^2$ for docetaxel.  *Id*. at 1, 35; Exh. 1010 at 1548; Exh. 1012 at 724.  Accordingly, a POSA would have understood that a patient would only be receiving approximately one-third of the amount of polysorbate 80 with cabazitaxel compared to docetaxel.  Exh. 2176 at ¶255. A POSA would not be motivated, therefore, to premedicate cabazitaxel patients in the same way, certainly not with additional agents such as an antihistamine.

The same is also true with respect to any consideration of the premedication used for paclitaxel.  Although the Taxol® label describes a premedication regimen of an antihistamine, a corticoid, and an H$_2$ antagonist prior to administration of Taxol®, it was commonly believed that the high level of hypersensitivity reactions reported with paclitaxel administration (41% despite premedication) was

22

attributable to the presence of Cremophor in the formulation.  Exh. 2093 at 1, 27;

Exh. 2089 at 347; Exh. 2225 at 18 (no premedication required for paclitaxel

formulated without Cremophor).  As noted in Mita, formulations of cabazitaxel

"do[] not require Cremophor and, therefore, result[] in reduced incidence of

hypersensitivity."  Exh. 1012 at 729.  In light of this and the fact that the incidence

of hypersensitivity reactions for cabazitaxel either without a premedication or with

only an antihistamine was far lower than that seen for paclitaxel with a three

component premedication, a POSA would not have been motivated to use the

premedication of Claim 31 for cabazitaxel.  Exh. 2176 at ¶256.

### c.   The Prior Art Teaches Away from the Use of $H_2$ Antagonists with Cabazitaxel

$H_2$ antagonists are used to prevent conditions associated with increased

stomach acid such as reflux or stomach ulcers.  Exh. 2223 at 3; Exh. 2228 at 710;

Exh. 2176 at ¶257.  However, these conditions were not reported to be associated

with cabazitaxel.  Exh. 2176 at ¶257.  Therefore a POSA would not have seen a

need for an $H_2$ antagonist with cabazitaxel to prevent adverse events associated

with high levels of stomach acid.  *Id*. at ¶257, 262.

Furthermore, a POSA would have been aware that the Taxotere[®] label did

not include a recommendation to use $H_2$ antagonists as a premedication.  Exh. 1024

at 1.  To the contrary, a study by Kawaguchi *et al.* suggested that premedication

with $H_2$ antagonists before docetaxel treatment was associated with an increased

23

risk of hand and foot syndrome, a painful, dose limiting toxicity, and facial erythema, or reddening of the skin in the face.  Exh. 2227; Exh. 2176 at ¶258. There is no proven effective treatment for this side effect, and in some cases the only option for patients is a reduction in dosage of their current chemotherapy or a complete discontinuation of the regimen.  Exh. 2226 at 231; Exh. 2176 at ¶259. The effects can continue even after the patient has ceased chemotherapy.  *See* Exh. 2226 at 227, 229.

Thus, given the possibility that cabazitaxel could cause adverse events similar to docetaxel, a POSA would not want to risk worsening this side effect by administering an $H_2$ antagonist until it had been shown necessary.  Exh. 2176 at ¶¶260-62.  As discussed above, there was no such suggestion in the prior art to administer an $H_2$ antagonist with cabazitaxel.  *Id*. at ¶262.

### 3.    Objective Indicia Support Nonobviousness

In light of the lack of survival data reported for cabazitaxel, the fact that reductions in PSA levels and tumor size were not validated surrogates for overall survival, and the numerous failures of other therapies to provide a survival benefit in phase III studies, it was unexpected that 20-25 mg/m$^2$ of cabazitaxel in combination with prednisone would prolong overall survival of mCRPC patients previously treated with docetaxel as shown in the TROPIC study reported in Example 1.  *Supra* Sections VI.B.1.a-c; Exh. 2176 at ¶¶184-90, 209-10.

24

Cabazitaxel in combination with prednisone was the first therapy to show a survival benefit in patients previously treated with docetaxel and therefore meet the long-felt need where others had failed. Exh. 2216 at 8150; Exh. 2071 at 1; Exh. 1022 (discussing variety of approaches); *supra* Section VI.B.1.b; Exh. 2176 at ¶¶196-202, 204-07.

Jevtana® has received industry praise.[1]  Exh. 2059 at 1; Exh 2071 at 1, 3; Exh. 2115 at 2. Furthermore, Jevtana is a commercially successful product with U.S. net sales exceeding $934 million and a competitive share of the post-docetaxel mCRPC market.  Exh. 2149 at ¶¶27-30, 35, Schedules 3-4. Dr. Sartor confirms that physicians prescribe Jevtana® because of the clinical benefits demonstrated by the claimed methods, particularly increasing survival. Exh. 2176 at ¶¶219, 221; *see also* Exh. 2149 at ¶¶24-25, 30.

## VII.  <u>Conclusion</u>

For the foregoing reasons, Aventis respectfully requests that the Board grant Aventis's contingent motion to amend.

---

[1] The clinical use of Jevtana®, as described in the FDA-approved labeling, embodies Claims 31-34.  Exh. 2150 at 1 (indication, 25 mg/m$^2$ cabazitaxel every three weeks in combination with oral prednisone, premedication before each dose with an antihistamine, a corticosteroid, an $H_2$ antagonist), 4 (cabazitaxel dose reductions to 20 mg/m$^2$), 19-20 (overall survival); Exh. 2176 at ¶¶192-95, 240.

December 23, 2016                    Respectfully submitted,

   /Dominick A. Conde/

Dominick A. Conde (Reg. No. 33,856)
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY 10104-3800
Tel: (212) 218-2100

*Attorney for Patent Owner,*
*Aventis Pharma S.A.*

## APPENDIX 1

31.    (substitute for Claim 27, if found unpatentable) A method of increasing [the] survival [of a patient] comprising administering to a patient in need thereof (i) an antihistamine, (ii) a corticoid, (iii) an $H_2$ antagonist, and (iv) a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, wherein said antihistamine, said corticoid, and said $H_2$ antagonist are administered prior to said dose of 20 to 25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof, in combination with prednisone or prednisolone, wherein said patient has [with a] castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel [, comprising administering a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, to the patient in combination with prednisone or prednisolone].

32.    (substitute for Claim 28, if found unpatentable) The method according to claim 31 [27], where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

33.    (substitute for Claim 29, if found unpatentable) The method according to claim 31 [27], comprising repeating the administration of said antihistamine, said corticoid, said H$_2$ antagonist, and said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

34.    (substitute for Claim 30, if found unpatentable) The method according to claim 31 [27], where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e)(4), I certify that a copy of the foregoing

PATENT OWNER'S CONTINGENT MOTION TO AMEND was served on

December 23, 2016 by causing it to be sent by email to counsel for Petitioner at the

following email addresses:

sparmelee@wsgr.com

mrosato@wsgr.com

jmills@wsgr.com


December 23, 2016                    Respectfully submitted,


                                     /Dominick A. Conde/

                                    Dominick A. Conde (Reg. No. 33,856)
                                    FITZPATRICK, CELLA, HARPER & SCINTO
                                    1290 Avenue of the Americas
                                    New York, NY 10104-3800
                                    Tel: (212) 218-2100

# EXHIBIT K

Paper No. _____
Filed:  _____

Filed on behalf of: Mylan Laboratories Limited
By:   Steven W. Parmelee
        Michael T. Rosato
        Jad A. Mills
        Wilson Sonsini Goodrich & Rosati

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————————

MYLAN LABORATORIES LIMITED,
Petitioner,

v.

AVENTIS PHARMA SA,
Patent Owner.
————————————————

IPR2016-00712

Patent No. 8,927,592
————————————————

**PETITIONER'S OPPOSITION TO PATENT OWNER'S
MOTION TO AMEND UNDER 37 C.F.R. § 42.121**

# **TABLE OF CONTENTS**

**Page**

I. OVERVIEW OF WHY AVENTIS'S MOTION SHOULD BE DENIED ........................................................................................... 1

II. AVENTIS'S VARYING CLAIM CONSTRUCTIONS ............................... 1

III. CLAIM CONSTRUCTION ........................................................................... 2

    A.   Claim 31: "administering to a patient in need thereof" ...................... 2

    B.   Aventis's Construction: "a method that prolongs the life of a patient as compared to no treatment or palliative treatment" ..................................................................................... 5

    C.   Aventis's Construction: Clinically Proven Survival Benefit ............................................................................................ 6

    D.   Claims 31, 33: Administration of the pretreatment regimen "prior to said dose" of cabazitaxel ......................................... 6

IV. AVENTIS'S MOTION FAILS TO OVERCOME THE PRIOR ART ................................................................................................................. 7

    A.   Aventis's Erroneous "Increasing Survival" Analysis ........................ 7

        1.   The Prior Art Need Not Disclose Inherent Results .................. 8

        2.   The Prior Art Teaches the Method Is Intended to Increase Survival ............................................................... 9

    B.   The Premedication Regimen is Obvious in View of the Prior Art ......................................................................................... 10

        1.   Winquist/TROPIC Listing in view of Pivot and NCCN ................................................................................... 10

            a.   Pivot discloses antihistamine/antiemetic pretreatment regimen in combination with cabazitaxel .................................................................... 11

            b.   NCCN discloses a conventional antiemetic protocol comprising a corticosteroid and an $H_2$ antagonist ................................................................. 12

2.    Winquist/TROPIC Listing in view of Pivot and
any one of Takenaka, Hudis, Trudeau, or the Taxol
Label ........................................................................................... 15

3.    Consent Form in view of Pivot and any one of
NCCN, Takenaka, Hudis, Trudeau, or the Taxol
Label ........................................................................................... 19

4.    The TROPIC Study Anticipates Claims 31-34 ........................ 21

5.    Mita further renders the substitute claims obvious
in combination with any of the above Grounds ....................... 22

6.    The Prior Art Does Not Teach Away From $H_2$
Antagonists .............................................................................. 23

V.    PATENT OWNER'S "OBJECTIVE INDICIA" ARE
UNAVAILING. ........................................................................................... 24

VI.    CONCLUSION ........................................................................................... 25

## I.     OVERVIEW OF WHY AVENTIS'S MOTION SHOULD BE DENIED

Petitioner opposes Aventis Pharma S.A.'s ("Aventis") Contingent Motion to Amend (Paper 22 ("Mot.")). Aventis fails to meet its burden to show it is entitled to amended claims. 37 C.F.R. § 42.20(e)); *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1323 (Fed. Cir. 2016). Neither the proposed amendment of the preamble nor the prior art pretreatment regimen render the proposed amended claims patentable. Accordingly, Aventis's Motion should be *denied*.

## II.    AVENTIS'S VARYING CLAIM CONSTRUCTIONS

Aventis may propose only one substitute claim for each canceled claim unless Aventis demonstrates good cause for multiplicative substitutions. 37 C.F.R. §42.121(a)(3), (c); *Idle Free Sys., Inc. v. Bergstrom, Inc.*, Case IPR2012-00027, Paper 26 at 11 ("Idle Free"). Aventis acknowledges this limit (Mot., 1), but functionally ignores it by providing at least four different preamble meanings:

**Reflecting a purpose of the treatment:**

- "A method *of* increasing survival…." [Appendix 1]

- "a method *for* increasing the survival of a patient in need thereof" [3]

- "[T]he preamble is a statement of intentional purpose …." [7]

**Requiring a particular result in an individual patient:**

- "method that prolongs the life of a ***patient*** as compared to no treatment…." [8].

- "prior art must teach…method increases the survival of a ***patient***." [10-11].

**Requiring knowledge of statistical population data:**

- "No Prior Art Disclosed…Cabazitaxel…Would Increase ***Overall Survival***."[10]

- "***clinical study with sufficient [statistical] power*** was necessary…." [13].

- Drug must "increase overall survival in a *phase III*…study." [14-15].

**Requiring FDA approval:**

- Drug must "succeed[] in phase III…study *and receiv[e] approval*. [15].

This strategy attempts to draft ambiguity into the claims to further Aventis's strategy of asserting that present-day performance of the Winquist/TROPIC Listing regimen infringes the claims while arguing that prior art disclosure of the same regimen fails to invalidate the claims. The Board should hold Aventis to proving the proposed claims, as drafted and under their broadest reasonable interpretation, are patentable.

## III. CLAIM CONSTRUCTION

In a motion to amend, a Patent Owner must ensure that the metes and bounds of the proposed claims are clearly set forth. *Idle Free* at 7. The Board interprets unexpired claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131, 2134-35 (2016).

### A. Claim 31: "administering to a patient in need thereof"

The Board already construed "a method of increasing the survival of a patient" as "a non-limiting statement of the purpose of the claimed method." Paper 9 at 10. This same construction should be applied to the language "a method of increasing survival." EX1043, ¶40. The Board should adopt the plain meaning: "thereof" refers to the elements of the "administering" step that surround it as opposed to the preamble that is more distant. Thus, the plain meaning of the phrase "administering to a patient in need thereof (i) [A], (ii) [B], (iii) [C], and [D]"

means *administering to a patient in need of the administration of (i) [A], (ii) [B], (iii) [C], and (iv) [D]*.

Even if "thereof" refers to the preamble, this would simply mean that [A], [B], [C], and [D] should be *administered to a patient in need of a method of increasing survival*. The claim further specifies that "said patient" in need thereof has mCRPC that has progressed during or after treatment with docetaxel. Both Dr. Sartor and Dr. Seth have testified that this disease inevitably leads to death of the patient and that any post-docetaxel mCRPC patient in 2008 had a recognized need for increased survival. EX2173, ¶162; 1043, ¶10. Thus, the preamble at most gives a more generic description of the patient, not some required mental state. Under either interpretation, the preamble is not limiting because none of it is necessary to provide antecedent basis for any step or to breathe life into the claim. Pet., 18.

Aventis asserts that the preamble is limiting if a phrase in the body "gives life and meaning to the preamble." Mot., 7. Even if correct, this does not mean that the claims at issue here import the same intentionality requirement that existed in *Jansen*. The *Jansen* construction applied to the issued claim language and specification of that patent based on the doctrine of prosecution history estoppel in a district court. *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1332 (Fed. Cir. 2003). The intentionality limitation existed because it was necessary to define the patient population receiving the drug. *Id.*

In contrast, here, to the extent the element "patient in need" gives life to the preamble phrase "a method of increasing survival," it does so by describing whose survival is at issue: an individual patient, not a population of patients. In other

words, *Jansen* precludes Aventis's proposal that the preamble imposes claim requirements that the method result in an increase in overall survival in a population of **patients**. This is consistent with the language of the preamble referring to "increasing survival," not "overall survival" or "median survival."

Neither *Rapoport* nor *Glenmark* are contrary. In *Rapoport*, there was no dispute that the preamble was limiting because otherwise the claim term "'to a patient in need of **such treatment**' would not have proper antecedent basis." *Rapoport v. Dement*, 254 F.3d 1053, 1059 (2001). The intentionality requirement was based on the specific language of the claim and specification at issue and not based on an overgeneralization that limiting claim preambles necessarily imports intentionality as a limitation of the claim. *Id*. Similarly, the intentionality requirement in *Glenmark* was based on the specific language of that claim and the fact that the preamble provided necessary antecedent basis for several claim terms that otherwise lacked a complete description of the type of patient to be given the medication. *Sanofi v. Glenmark Pharms. Inc.*, No. 14-264, 2015 WL 5092631, at *10 (D. Del. Aug. 28, 2015).

Aventis also argues that the preamble is limiting because Aventis "relies on" increased survival to "distinguish prior art." Mot., 8. Aventis thus invites the Board to treat its claim construction arguments prospectively as a prosecution disclaimer. However, such disclaimer does not arise from arguments made in the same proceeding. *See Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014); *see also In re Lockwood*, 2017 U.S. App. LEXIS 2483 at *11 (Fed. Cir. Feb. 13, 2017). The Board should disregard Aventis's circular logic.

Even if Aventis is correct that the preamble requires that the administrator have an intention to increase survival, the claim language does not specify that the mental intention be exclusive, based on a clinical study finding a statistically significant increase in survival, or based on FDA approval, as opposed to simply having "evidence of a diagnosis and a knowing need" of increasing survival, and that increasing survival is "desired or appreciated." *Jansen*, 342 F.3d at 1335.

## B.  Aventis's Construction: "a method that prolongs the life of a patient as compared to no treatment or palliative treatment"

Aventis's proposed construction fails for lack of written description and enablement and renders claims 31-34 unpatentable. Pre-AIA 35 U.S.C.§112, ¶1. The specification provides no survival comparison of cabazitaxel versus "no treatment." Likewise, Aventis' assertion that mitoxantrone treatment is "equivalent to no therapy" with respect to prolonging life" is not taught by the patent.

The specification also does not describe or enable comparing the survival of an individual patient against a counterfactual of receiving mitoxantrone or no treatment. Furthermore, at least some patients appear to have had their lives shortened by cabazitaxel. *See* Pet., 19-20. Dr. Sartor admits that even today, he cannot guarantee that the methods of the '592 patent will increase the survival of any particular patient. EX1041, 115:19-116:2; *see also* EX1043, ¶38. Accordingly, the '592 patent neither discloses a method that actually "prolongs the life of a patient," as opposed to at most intending or hoping to do so, nor does it enable the practice of such a method.

Moreover, there is no way to actually know whether the survival of an individual patient has been prolonged by the administration of the claimed

protocol. Pet., 20; EX1043, ¶¶36-39. Thus, Aventis's proposed claim construction is indefinite under Pre-AIA 35 U.S.C. §112, ¶2. *See Telebrands Corp. v. Tinnus Enter., LLC*, PGR2015-00018, Paper 75, at 16-19 ("a claim is indefinite when it contains words or phrases whose meaning is unclear." (quoting *In re Packard*, 751 F.3d 1307, 1313 (Fed. Cir. 2014))); *Ex Parte Miyazaki*, 2008 WL5105055, 89 USPQ2d 1207, 1211-12 (PTAB Nov. 19, 2008 (precedential) (claim is indefinite in PTO proceedings if "amenable to two or more plausible claim constructions").

### C.    Aventis's Construction: Clinically Proven Survival Benefit

According to Aventis, the preamble "a method of increasing survival" adds a limitation to the claims requiring proof of a statistical survival benefit in a phase III human clinical trial. *See* Mot., 13 ("clinical study with sufficient [statistical] ***power*** was necessary…." As Aventis asserts that this proof element distinguishes over the prior art, Aventis takes the position that the inventive step is the knowledge that the prior art method works. However, this construction renders claims 31-34 unpatentable under 35 U.S.C. § 101. When the "inventive step" of a method is simply knowing about a correlation between the steps of the method and the effect of the method, the claim is directed to patent ineligible subject matter. *See Mayo Collaborative v. Prometheus Labs.*, 132 S. Ct. 1289, 1297-98 (2012). Accordingly, claims 31-34, as construed by Aventis, are unpatentable.

### D.    Claims 31, 33: Administration of the Pretreatment Regimen "Prior to Said Dose" of Cabazitaxel

Claim 31 recites a method comprising administration of cabazitaxel and three other drugs, wherein the three other drugs are administered "prior to said dose" of cabazitaxel. The claim uses the open-ended term "comprising" and thus

does not exclude methods comprising each of these steps in addition to others. Thus, under the broadest reasonable interpretation, claim 31 is satisfied by administration of the three other drugs before a dose of 20- 25 mg/m$^2$ of cabazitaxel, even if the patient has previously received an earlier dose of cabazitaxel without first receiving all three of the other drugs. EX1043, ¶42.

Claim 33 depends from claim 31 and adds the further limitation that the administration steps in claim 31 are repeated in a new cycle every three weeks. Claim 33 also uses the open-ended term "comprising," permitting the method to be practiced even when other elements are also included. Thus, under the broadest reasonable interpretation, claim 33 is satisfied by administration of the three other drugs before a dose of 20 to 25 mg/m$^2$ of cabazitaxel when these steps are repeated as a new cycle every three weeks, even if the patient has previously received an earlier dose of cabazitaxel without first receiving all three of the other drugs. EX1043, ¶43.This construction is consistent with the specification. *See In re Am. Acad. of Sci. Tech. Ctr.,* 367 F.3d 1359, 1369 (Fed. Cir. 2004) (preferred embodiment not to be read into broader claim language).

## IV.   AVENTIS'S MOTION FAILS TO OVERCOME THE PRIOR ART

As demonstrated below and as further supported by the Declarations of Dr. Rahul Seth and Robert McSorley (EX1043 and EX1044), Aventis has failed to demonstrate that the amended claims are patentable in view of the prior art.

### A.   Aventis's Erroneous "Increasing Survival" Analysis

As discussed in Section III.B, Aventis incorrectly construes the preamble as "a method that prolongs the life of a patient as compared to no treatment or

palliative treatment." Based on this incorrect construction, Aventis further errs in concluding that "for the amended claims to be found obvious, the prior art must teach that the claimed method increases the survival of a patient" and in arguing that the teachings of the prior art are insufficient . Mot., 11-18. Aventis's argument fails because (1) the prior art need not teach an inherent property of a claimed method; (2) the prior art provided sufficient disclosure to perform the method as claimed.

  1. <u>The Prior Art Need Not Disclose Inherent Results</u>

  Identifying or disclosing an inherent result of a prior art method of administering a drug cannot confer patentability. *In re Montgomery*, 677 F.3d 1375, 1381 (Fed. Cir. 2012) (efficacy requirement satisfied by prior art disclosure of the steps of the method because "efficacy is inherent in carrying out the claim steps"); *King Pharmaceuticals, Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1275-76 (Fed. Cir. 2010) ("[M]erely discovering and claiming a new benefit of an old process cannot render the process again patentable"); *PharmaStem Therapeutics Inc. v. Viacell Inc.*, 491 F.3d 1342, 1364 (Fed. Cir. 2007) ("As we have explained, however, providing proof sufficient to justify conducting in vivo procedures on humans, while useful, is not a test of patentability.").

  Moreover "informing someone of the correlation cannot confer patentability absent a functional relationship between the informing and administering steps." *In re Kao*, 639 F.3d 1057, 1072 (Fed. Cir. 2011). To hold otherwise would

improperly "remove from the public that which is in the public domain by virtue of its inclusion in, or obviousness from, the prior art." *Kao*, 639 F.3d at 1073.

The '592 patent teaches that increasing survival is an inherent property of administering 25 mg/m$^2$ of cabazitaxel to a patient previously treated with a docetaxel-containing regimen. *See* Pet., 2-3, 52; EX1002, ¶¶44, 46, 95-96, 121; EX1001 at 6:28-34, 11:29-32. Neither Aventis nor Dr. Sartor has disputed the inherency of the efficacy. Accordingly, even if claim 31 did require an increase in survival, this inherent property need not be taught in the prior art.

2.    The Prior Art Teaches the Method Is Intended to Increase Survival

Even if the preambles of claims 31-34 required that a purpose of the method includes increasing survival, this too is satisfied by the prior art. For example, TROPIC Listing discloses that the "primary objective" of the open-label study was "survival." EX1008. Tannock disclosed that docetaxel provided a survival benefit to mCRPC patients, and Mita, Attard, and Pivot disclosed that cabazitaxel had anti-cancer activity similar to docetaxel except that it retained greater potency in patients that had progressed during or after docetaxel. *See* EX1013, 1502; *see also* EX1010, 1547; EX1012, 727; EX1021, 75. Thus, as Dr. Seth explained, it would have been obvious to the POSA that a purpose of the Winquist/TROPIC Listing regimen was to prolong survival of the cabazitaxel-treated patients. EX1002, ¶132; *see also* EX1008, 1 ("primary objective is overall survival"); EX1009, 3948

("primary endpoint … overall survival"). Performance of the trial and reporting the data were merely routine procedures. EX1041, 132:15-134:18; EX1002, ¶122.

Both Dr. Sartor and Dr. Seth testified that when they administer a taxane to a patient, one objective is almost always that it increase survival. EX1041, 114:3-16; EX2177, 134:1-7. Dr. Sartor specifically testified that increased survival is his hope when he administers taxanes today, and that this was his same hope when he administered cabazitaxel in 2008. EX1041, 114:3-115:4. He testified that, even today, cabazitaxel merely has the potential to increase survival of a patient. *Id.* at 115:19-116:9. Dr. Seth confirmed that patients entering a phase III trial for mCRPC generally intend to "live longer and better" from participating in the trial, particularly those patients who know they are receiving the sponsor's drug because the treatment groups are unblinded. EX1043, ¶39. Dr. Seth testified that the POSA would have understood from TROPIC Listing that physicians were enrolling their patients in a phase III trial of the taxane cabazitaxel with an intention, but not a guarantee or promise, of prolonging the life of at least some patients. *Id*.

## B.  The Premedication Regimen is Obvious in View of the Prior Art

Aventis attempts to distinguish the prior art Winquist/TROPIC Listing regimen by adding a pre-treatment regimen. However, this pretreatment regimen was well-known in the art for use with both paclitaxel and docetaxel, the two previously-marketed members of cabazitaxel's taxane class. EX1043, ¶¶44-46.

### 1.  Winquist/TROPIC Listing in view of Pivot and NCCN

As described in the Petition (6-7, 25-29, 32-34), Winquist (EX1009) and TROPIC Listing (EX1008) are two descriptions of the same cabazitaxel regimen, and together they disclose and enable a regimen for treating and increasing survival of a patient by administering 25 mg/m$^2$ cabazitaxel in combination with prednisone to patients that have mCRPC that has progressed during or after treatment with docetaxel in a new cycle every three weeks. EX1008, 1-2; EX1009 at 3948; EX1002, ¶¶115-22, 131-35. Pivot, Mita, Beardsley, and Attard further demonstrate the obviousness of the claimed regimen and also provide motivation to administer a 20 mg/m$^2$ dose to patients having difficulty tolerating the 25 mg/m$^2$ dose. Pet., 43-44; EX1021, 74-75; EX1022, 163; EX1010, 1547; EX1012, 723, 727, 729; EX1002, ¶¶155-58. These references are sufficient to render each of original claims 27-30 obvious.

Proposed claims 31-34 would amend claims 27-30 to add a pretreatment regimen that includes a corticoid, an antihistamine, and an H$_2$ antagonist — a limitation that adds nothing new or nonobvious to the existing claims that are invalid for reasons addressed in the Petition and Reply. The POSA would have had motivation to combine the Winquist/TROPIC Listing regimen with a pretreatment regimen that includes a corticoid, an antihistamine, and an H$_2$ antagonist and would have had a reasonable expectation of successfully thereby practicing the claimed invention. EX1043, ¶¶44-46, 57-72.

### a. Pivot discloses antihistamine/antiemetic pretreatment regimen in combination with cabazitaxel

Pivot teaches administration of an antihistamine as part of a premedication regimen: "Patients received i.v. antihistaminic anti-H1 premedication 30 min

- 11 -

before study drug administration." EX1010 at 1548. Furthermore, Pivot discloses that additional premedications, such as antiemetics, were provided to patients in need thereof: "In case of nausea/vomiting, patients could receive preventive antiemetic treatment in compliance with the conventional antiemetic protocol of the center, for subsequent cycles." *Id*. Pivot administers cabazitaxel in a 3 week cycle (*id*. at 1547), and administers premedication "before study drug administration" and "for subsequent cycles." EX1043, ¶47.

The POSA would have had good reason to use a premedication regimen including antihistamines and antiemetics, as disclosed in Pivot, to prevent allergic reactions and to treat nausea arising from cabazitaxel administration. EX1043, ¶48. Pivot discloses that "allergic reaction" was "the most frequent grade 3/4 non-hematological" adverse event, occurring in 4% of patients receiving cabazitaxel. EX1010 at 1551. Additionally, one patient had to be withdrawn from the study due to a grade 4 allergic reaction. *Id*. at 1550. A person of ordinary skill would understand that the use of pretreatments, as disclosed by Pivot, would be desirable to minimize the risk of allergic reactions. EX1043, ¶48.

Pivot also discloses that nausea and vomiting were among the most frequent non-hematological adverse events. EX1010 at 1550. Thus, a person of ordinary skill would also have good reason to use an antiemetic protocol before cabazitaxel administration, as taught by Pivot. EX1043, ¶¶49, 63.

> **b.** **NCCN discloses a conventional antiemetic protocol comprising a corticosteroid and an H$_2$ antagonist**

Pivot does not limit the antiemetic regimens used to treat nausea and vomiting but states that any "conventional antiemetic protocol" could be used.

- 12 -

EX1010 at 1548. As discussed below, it would have been obvious to use an antiemetic protocol comprising an $H_2$ antagonist and a corticoid because both drugs had known uses in antiemetic treatment and because both drugs had previously been used in pretreatment regimens for the two FDA-approved taxanes on the market, paclitaxel and docetaxel.

For example, the 2008 National Comprehensive Cancer Network Antiemetic Guidelines ("NCCN," EX1045) detail common treatment options used in cancer centers' conventional antiemetic protocols. EX1043, ¶¶51, 57. NCCN recommends the use of dexamethasone (a corticoid) and $H_2$ antagonists in the treatment of chemotherapy-related nausea and vomiting. As described by Dr. Seth, NCCN was published in 2008, more than 1 year before the earliest claimed priority date for the '592 patent. *Id.* Accordingly, NCCN is prior art under 35 U.S.C. 102(b).

NCCN expressly identifies the use of dexamethasone for high, moderate, and even low emetic risk chemotherapy, and recommends that the antiemetic treatment "start before chemotherapy." EX1045, 6-8; EX1043, ¶58. NCCN also describes a method of antiemetic treatment called "breakthrough treatment," to be used in subsequent cycles when nausea or vomiting is induced in an earlier cycle. EX1045, 15. Breakthrough treatment involves giving a combination of drugs chosen from a set of equivalents. *Id.* at 22. NCCN explains that "Multiple concurrent agents … may be necessary," and lists "corticosteroids" among the drugs that "may be required." *Id.*, 22-23; EX1043, ¶59.

NCCN also suggests the addition of $H_2$ antagonists to the same antiemetic regimen: "If patient has dyspepsia consider antacid therapy ($H_2$ blocker or proton

pump inhibitor)." EX1045 at 15. As explained by Dr. Seth, $H_2$ antagonists are a form of anti-heartburn medication that reduce the production of gastric acid. EX1043, ¶59. NCCN explains that $H_2$ antagonists should be used in an antiemetic regimen "because patients sometimes have difficulty discriminating heartburn from nausea." EX1045 at 23. As Dr. Seth further explains, excess stomach acidity can increase pain when vomiting occurs, as the higher acid concentration interacts with the patient's esophagus. EX1043, ¶60. This benefit would further encourage use of an $H_2$ antagonist in patients receiving nausea-inducing cabazitaxel therapy.

The combined antiemetic use of antihistamine $H_1$ and $H_2$ antagonists was also known more generally. *See* EX1049 at S154 ("[p]remedication with H1 and H2 blocking agents significantly reduces the incidence of postoperative nausea and vomiting."). Two common $H_2$ antagonists—ranitidine (Zantac®) and cimetidine (Tagamet®)—were shown to provide antiemetic benefit. *Id*. Accordingly, the antiemetic effect of $H_2$ antagonists and their combinability with $H_1$ antihistamine was corroborated through controlled studies. EX1043, ¶61; *see also* EX1045 at 20 (describing use of "antihistamines" in antiemetic treatments).

The POSA would have been motivated to use dexamethasone and an $H_2$ antagonist in a conventional antiemetic protocol, as suggested by NCCN, in combination with an antihistamine, disclosed in Pivot, prior to administration of cabazitaxel. EX1010, 1548. Moreover, the POSA would have had a reasonable expectation of success in adding an $H_2$ antagonist and a corticoid to Pivot's antihistamine premedication regimen, as this combination was well-known for taxane pretreatment regimens. EX1043, ¶62; *see also* EX2093, 24; EX1046, 106;

1047, 425; EX1048, 59. Accordingly, use of the claimed premedication regimen in combination with cabazitaxel and prednisone for the treatment of mCRPC as recited in substitute claims 31-34 would have been obvious in view of any of the instituted grounds in further view of Pivot and NCCN.

2.    Winquist/TROPIC Listing in view of Pivot and any one of Takenaka, Hudis, Trudeau, or the Taxol Label

Contrary to Aventis's arguments, a person of ordinary skill would also have been motivated to use the prior art taxane premedication regimen to decrease the risk of hypersensitivity reactions ("HSRs"). Aventis admits that it was known to administer an antihistamine, a corticoid, and an $H_2$ antagonist to prevent HSR in patients undergoing taxane treatment. Mot., 22. For example, the Taxol Label states that "to avoid the occurrence of severe hypersensitivity reactions, all patients treated with TAXOL should be premedicated with corticosteroids (such as dexamethasone), diphenhydramine [an antihistamine] and $H_2$ antagonists (such as cimetidine or ranitidine)." EX2093 at 24. Dr. Sartor agrees that this "broad type of regimen had been kicked around" by 2008. EX1041, 211:22-23; EX1043, ¶55, 64.

Aventis argues that the need for this regimen was solely "attributable to the presence of Cremophor in the formulation" of paclitaxel; however, this is not the case. In fact, multiple references that qualify as §102(b) prior art teach the use of the same regimen to prevent HSRs to docetaxel, the formulation of which (like cabazitaxel) contains polysorbate 80 instead of Cremophor. Mot., 22 EX1043, ¶65.

For example, Takenaka *et al*. ("Takenaka," EX1046), published in January of 2008, describes a study administering 30 mg/m$^2$ docetaxel for the treatment of mCRPC. EX1043, ¶52; EX1046 at 106. Takenaka states that "[d]examethasone 24

mg, diphenhydramine 50 mg, and ranitidine 50 mg were administered before the [docetaxel] infusion to prevent a hypersensitivity reaction." *Id*. These constitute a corticoid, an antihistamine, and an $H_2$ antagonist, respectively. EX1043, ¶66; EX1001, 6:56-61, 7:15-21. Notably, the full, three-part pretreatment regimen was indicated and used despite a nearly two-third reduction in docetaxel dose (compared to 75 mg/m$^2$), contradicting Aventis's argument that the POSA would not use the pretreatment regimen with a 25 mg/m$^2$ of cabazitaxel because of a presumed lower concentration of polysorbate 80. EX1043, ¶¶65-66.

Premedication regimens comprising the same three categories of drug were also reported in other prior art docetaxel publications. For example, Trudeau (EX1047) reported HSRs were common without pretreatment, but "the use of [the paclitaxel-type] premedication regimen of oral dexamethasone and IV $H_1$ and $H_2$ blockers prevented significant HSRs." *Id*. at 422, 425. EX1043, ¶¶53, 67.

Hudis *et al*. (EX1048) similarly studied docetaxel in metastatic breast cancer. EX1048 at 58. After observing two HSRs, "a variety of pretreatment regimens that incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an $H_2$ blocker] were used." *Id*. at 59. Accordingly, a person of ordinary skill would have considered the use of the claimed pretreatment regimen of a corticosteroid, an antihistamine, and an $H_2$ antagonist as a well-known option for prevention of taxane-induced HSRs. EX1043, ¶¶54, 65.

Aventis incorrectly contends that Mita and the side effects of the pretreatment regimen would have taught away from the pretreatment regimen. This argument ignores that a larger phase II study of cabazitaxel was disclosed in Pivot.

- 16 -

Notwithstanding the earlier statement in Mita, Pivot expressly used a pretreatment regimen to reduce allergic reactions. Pivot discloses that when administering cabazitaxel, the most common grade 3–5 non-hematological adverse event was HSR. EX1010 at 1550. As Dr. Seth explains, a 4% rate of serious (grade 3 or higher) HSR would be of concern to a person of ordinary skill, and would warrant the use of the claimed pretreatment regimen. EX1043, ¶68. Furthermore, Pivot discloses a treatment-related death "due to shock with respiratory failure" and a patient withdrawal due to "grade 4 allergic reaction" (EX1010 at 1550), both of which a person of ordinary skill would understand may be due to HSR. EX1043, ¶68. Accordingly, Pivot would motivate the use of a premedication regimen including a corticoid, an antihistamine, and an $H_2$ antagonist to mitigate HSRs in patients receiving cabazitaxel administration.

Dr. Sartor agrees that a 4% rate of grade 3 or higher HSRs would have been serious enough to merit the use of preventative premedications. EX1041, 215:6-216:19. Dr. Sartor further explains that, when considering premedications for taxanes, preventing HSRs is of paramount concern: "I think when you're looking at safety, you really want to be very cautious because, I mean, the last thing you want to do is give the drug to somebody and they have a hypersensitivity reaction and die. And that's a true disaster." EX1041 at 211:23-212:4. In particular, the HSR rate disclosed by Pivot (4%) would provide a strong motivation to use premedication, because, as Dr. Sartor explains, "4 percent of people with a bad hypersensitivity is a crazy high number, scares the hell out of me." EX1041 at

216:15-19. Dr. Sartor further explains that none of the claimed premedications are dangerous, and that not using them could lead to death of a patient:

> Q. Aren't H2 antagonists extremely risky medications?
>
> A. No. Why would you say that?
>
> Q. What about Benadryl? Is that an extremely risky medication?
>
> A. No.
>
> Q. What about dexamethasone?
>
> A. In the way we use it, it's not extremely risky. And it's all about the risk/benefit anyway. We always incur risks. We're going to incur risks when we go get on the elevator. But, you know, it's about the proper amount of risk and the benefit that it can be prescribed. Hypersensitivity reactions -- I don't want to be too distracting, but I had a guy nearly die. … Anyway, the bottom line is it's a serious matter because we're talking about real health here. When I look at the safety of Benadryl, I've had people get sleepy on Benadryl. I've never had any real harm done.

EX1041 at 217:20-219:5. Dr. Sartor also confirmed that "when we administer an agent known to be associated with hypersensitivity reactions, if there's a method to help control those, then we use that," and that prevention of HSRs is the main reason he administers the premedication regimen with cabazitaxel. *Id*. at 211:5-8, 231:12-22. Thus, Dr. Sartor's testimony undermines Aventis's teaching away arguments and confirms that preventing HSRs in patients receiving cabazitaxel would motivate a person of ordinary skill to practice the claimed methods, including the premedication regimen, with a reasonable expectation of success.

Dr. Seth's and Dr. Sartor's testimony is corroborated by the Consent Form that Sanofi was required to provide participants with in the TROPIC Study. ███

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ EX2182, 2, 5-6; EX2234, ¶¶2-6.

Accordingly, the administration of the premedication regimen when administering cabazitaxel and prednisone for the treatment and increasing of survival of mCRPC patients, as recited in substitute claims 31-34, would have been obvious to a person of ordinary skill in the art in view of the Winquist/TROPIC Listing regimen, Pivot, and any one of Takenaka, Hudis, Trudeau, and the Taxol Label. EX1043, ¶68.

3.   Consent Form in view of Pivot and any one of NCCN, Takenaka, Hudis, Trudeau, or the Taxol Label

Ms. Matthews, a Sanofi employee, testified that EX2182 is the Consent Form that was provided to the investigators in the TROPIC study to provide the minimum information that must be given to the patients. EX2234, ¶¶2-5. Dr. Sartor confirmed that he actually distributed the form to patients in the TROPIC study (EX1041 at 134:19-136:3), which study involved over 700 patients worldwide. EX1009, 3948; EX2055, 1147. ██████████████████████████

████████████████████████████████████ EX2182 at 8. The form was distributed in 2007 and 2008. EX1041, 136:4-8, 138:19-25; *see also* EX1008; EX1009. Dr. Sartor testified that the patients were allowed to take a copy of the Consent Form home and to show it to others, including physicians, with no confidentiality obligations. EX1041, 139:2-25. Accordingly, it is a printed publication. *See In re Wyer,* 655 F.2d 221 (CCPA 1981); *see also Massachusetts Institute of Technology v. AB Fortia,* 774 F.2d 1104, 1108-09 (Fed. Cir. 1985)

(Paper orally presented to between 50 and 500 members of the public, with written copies actually distributed to six persons without restriction, is a printed publication); *Garrett Corporation v. United States*, 422 F.2d 874 (Ct. Cl. 1970) (Publications include documents accessible to the "class of persons concerned with the art"). Because distribution occurred more than one year before the earliest priority date, the Consent Form is prior art under 35 U.S.C. § 102(b). EX1043, ¶56.



EX1043, ¶¶56, 70-71.

As discussed above, Pivot teaches the use of an antiemetic/antihistamine premedication regimen with cabazitaxel, and the prior art teaches the use of $H_2$ antagonists and corticoids in such a premedication for their benefits as antiemetics (*see* section IV.B.1.b, discussing NCCN), for the prevention of HSRs (*see* section IV.B.2, discussing Takenaka, Hudis, Trudeau, and the Taxol Label), or both. Thus, it would have been obvious to use an antihistamine, a corticoid, and an $H_2$ antagonist ███████████████████████████████████████ ████████████████████████ in view of the teachings of Pivot and any one of NCCN, Takenaka, Hudis, Trudeau, or the Taxol Label. Accordingly, substitute

claims 31-34 would have been obvious to a person of ordinary skill in view of the Consent Form, Pivot, and any one of NCCN, Takenaka, Hudis, Trudeau, or the Taxol Label. EX1043, ¶72.

4.     The TROPIC Study Anticipates Claims 31-34.

Claims 31-34 are anticipated under 35 U.S.C. § 102(b) by the public use of the claimed methods in the TROPIC Study, as evidenced by De Bono *et al*. (EX2055). De Bono describes the protocol of the TROPIC Study. EX2055 at 1147. It discloses that patients with mCRPC that had progressed after docetaxel treatment were treated with cabazitaxel and prednisone. *Id*. Patients in the cabazitaxel arm "were treated with 10 mg oral prednisone daily," in combination with "25 mg/m2 cabazitaxel intravenously over 1 h every 3 weeks." *Id*. Dose reductions to 20 mg/m$^2$ were also allowed. *Id*. at 1153. The treatment improved overall survival compared to mitoxantrone. *Id*. at 1147. A premedication regimen of "an antihistamine, corticosteroid, (dexamethasone 8 mg or equivalent), and histamine H2-antagonist … was administered 30 min or more before cabazitaxel." *Id*. at 1150. It was a "randomised open-label phase 3 study…undertaken at 146 centres in 26 countries" (*id*. at 1148), including centers in the USA. *Id*. at 1147. Patients were enrolled in the TROPIC study "[b]etween Jan 2, 2007, and Oct 23, 2008" (*id*. at 1151), and treatment of the last patients ended in September 2009. *Id*. at 1147.

As substitute claims 31-34 are entitled to a priority date of no earlier than January 11, 2010 (Mot. at 6), De Bono evidences that the methods of substitute claims 31-34 were "in public use … in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The

public and non-confidential nature of this use is corroborated by Dr. Sartor, a co-principal investigator of the TROPIC study. Dr. Sartor testified that the patients in the study knew which treatment they were receiving, were under no confidentiality obligations to keep the treatment secret, and received a copy of the Consent Form that they were permitted to share with their physicians and others. EX1041, 98:11-100:4, 126:6-10, 207:3-208:17, 232:17-25. The Consent Form given to the patients confirms that patients were permitted to disclose their treatment regimen. *See* Section IV.B.3; EX2182; EX2234, ¶¶2-5. As discussed in Section IV.B.1 above and in the Petition, Winquist and TROPIC Listing similarly disclosed the critical elements of the claimed method.

The experimental use exception does not apply to this public use because the alleged invention was "ready for patenting" before 2009. *See SmithKline Beecham Corp. v. Apotex Corp.*, 365 F.3d 1306, 1316 (Fed. Cir. 2004). Aventis bears the burden of showing that the use was restricted and thus experimental. *See TP Laboratories v. Professional Positioners, Inc.*, 724 F. 2d 965, 971 (Fed. Cir.1984) (Patent Owner must overcome *prima facie* case of public use); *Strong v. General Electric Company*, 434 F. 2d 1042 (5th Cir. 1970) (Patent Owner "must show that the use was an experimental, restricted use").

5.   Mita further renders the substitute claims obvious in combination with any of the above Grounds

Aventis asserts that Mita would have "led a POSA away from premedicating patients prior to cabazitaxel administration." Mot., 19. Although Mita states that cabazitaxel "does not require premedication" (EX1012 at 729), it does not forbid or discourage it. Indeed, Mita immediately qualifies the statement in two ways.

- 22 -

First, Mita adds that cabazitaxel may be administered with "less premedication," not "no premedication." *Id*. Second, Mita teaches that both HSR and emesis pretreatments were administered prior to cabazitaxel administrations in patients in need thereof: "No prophylactic treatment to prevent hypersensitivity reaction or emesis was administered during the first course. These treatments were provided for subsequent courses, if clinically indicated." *Id*. at 724. Accordingly, a person of ordinary skill would conclude from Mita's teaching that premedication for emesis and allergic reactions may be used in patients in need thereof. EX1043, ¶¶73-74. As discussed in Section IV.B.1, Pivot and NCCN disclose the use of a pretreatment regimen comprising a corticoid, an antihistamine, and an $H_2$ blocker as prophylaxis for HSR and emesis in patients receiving cabazitaxel.

The other references described by Aventis (Fumoleau, Lortholary, and Pivot) do not support its case. Fumoleau provides no teaching beyond that of Mita. Lortholary and Pivot actually undermine Aventis's position because they teach the use of premedication regimens that include antihistamines and antiemetics in combination with docetaxel. EX1043, ¶75.

6.   The Prior Art Does Not Teach Away From $H_2$ Antagonists

Aventis asserts that the prior art teaches away from the use of $H_2$ antagonists, arguing that they are too dangerous to use in combination with cabazitaxel and other taxanes. Mot., 23-24. Notably, the reference Aventis relies on does not confirm the significance of any observed correlation. *See* EX2227. Moreover, this study teaches that, contrary to Aventis's arguments, many doctors used $H_2$ blockers with docetaxel despite it not being required on the label.

- 23 -

Furthermore, Aventis's own expert disagrees with Aventis's theory that $H_2$ antagonists are dangerous. The Sartor Declaration suggests that $H_2$ blockers would be too risky to use "without an identified need." EX2176, ¶262. But when questioned, Dr. Sartor was incredulous at the idea that $H_2$ blockers were risky:

Q. Aren't H2 antagonists extremely risky medications?
A. No. Why would you say that?

EX1041 at 217:20-22. As explained by Dr. Seth, $H_2$ blockers are safe, effective, over-the-counter drugs (such as Zantac®), and the prevention of HSR and the benefits of decreased emesis (*see* §IV.B, *supra*) would easily outweigh whatever negligible risk, if any, they would pose. EX1043, ¶¶76-77.

## V. PATENT OWNER'S "OBJECTIVE INDICIA" ARE UNAVAILING.

Aventis's "objective indicia" do not demonstrate nonobviousness of the original claims nor any added limitations in the substitute claims. For all forms of objective evidence, a party "must establish a nexus between the evidence and the merits of the claimed invention." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (quotation omitted). Furthermore, where "the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011).

Because Aventis's contingent motion presumes that claims 27-30 are found unpatentable based on the instituted grounds, it was Aventis's burden to demonstrate nexus between its proposed objective indicia and a novel element of the proposed amended claims. Aventis did not meet that burden, and instead merely asserted that the same objective indicia it argued in its POR regarding the

canceled claims should instead be attributed to the proposed amended claims. Mot., 24-25. Tellingly, Aventis fails to explain how any of the proposed indicia are caused by the pretreatment regimen or some "intentionality" to increase survival.

Indeed, Dr. Sartor testified that he understood the invention of the '592 patent to be cabazitaxel (which is in the prior art), and that "cabazitaxel is at the heart of" the treatment method because "[n]o cabazitaxel, nothing else happens." EX1041, 142:14-144:5, 211:9-14. He testified that the dose and the patient population were the critical elements. *Id.* at 150-153. He agreed that the Winquist/TROPIC Listing regimen disclosed these critical elements. *Id.* at 62:8-18, 65:9-18. None of the alleged objective indicia even purports to have a nexus to any new element of the proposed claims, or even to "intentionality" or to the pretreatment regimen. Thus, Aventis's assertions of objective indicia all fail.

Moreover, as explained by Dr. McSorley, Aventis's sales and market share evidence do not demonstrate commercial success. *See* EX1044, ¶¶34-51 (improper market constraints), 32-65 (biased study design), 74-104 (insignificant sales) 105-24 (no nexus), 125-30 (other patents blocked research); *see also* Reply, Section IX. Instead, Aventis merely demonstrates that cabazitaxel's competitors in the mCRPC market are not only viewed as superior to cabazitaxel, but also as superior to docetaxel. Thus, cabazitaxel's market share merely reflects a treatment pattern of "leaving nothing on the table" and using competing drugs indicated for increasing survival post-docetaxel as early as possible (even before docetaxel). EX1043, ¶34.

## VI.    CONCLUSION

For the reasons set forth above, Mylan asks that Aventis's Motion be *denied*.

Respectfully submitted,

Dated:  14 March 2017          /Steven W. Parmelee /

Steven W. Parmelee, Lead Counsel
Reg. No. 31,990

## <u>CERTIFICATE OF SERVICE</u>
37 CFR §42.6(e)(i)

I certify that, on 14 March 2017, this Reply and all newly cited exhibits were served on Patent Owner at the following service electronic addresses:

| | |
|---|---|
| Dominick A. Conde | dconde@fchs.com |
| Whitney Meier | wmeier@fchs.com |
| Daniel J. Minion | dminion@fchs.com |
| Joshua I. Rothman | jrothman@fchs.com |
| William E. Solander | wsolander@fchs.com |
| Jason A. Leonard | jleonard@fchs.com |

Dated: 14 March 2017          / Steven W. Parmelee /
                    Steven W. Parmelee, Reg. No. 31,990

# EXHIBIT L

Paper No. _
Date Filed: April 20, 2017

Filed on behalf of: Aventis Pharma S.A.

By:

Dominick A. Conde
dconde@fchs.com
(212) 218-2100

## UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

## BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

## MYLAN LABORATORIES LIMITED
### Petitioner,
### v.
## AVENTIS PHARMA S.A.
### Patent Owner.

————————————

Case IPR2016-00712
U.S. Patent No. 8,927,592

————————————

## PATENT OWNER'S REPLY IN SUPPORT OF
## THE CONTINGENT MOTION TO AMEND

## TABLE OF CONTENTS

I.  The Preamble of Claim 31 Is Limiting................................................................1

II.  Claims 31-34 Comply with 35 U.S.C. § 112....................................................3

III.  Claims 31-34 Are Non-obvious.........................................................................4

    A.  There Was No Reasonable Expectation of Increased Survival.............................................................................................4

    B.  The Claimed Premedication Regimen Is Not Obvious.........................5

        1.  No Motivation for Hypersensitivity Reactions.........................5

        2.  No Motivation for Nausea or Vomiting....................................7

        3.  Exhibit 2182 Is Not Prior Art.................................................11

IV.  The TROPIC Study Is Not Public Use.............................................................11

V.  Conclusion .......................................................................................................12

PUBLIC VERSION

# TABLE OF AUTHORITIES

**Cases**

*Coal. for Affordable Drugs V LLC v. Biogen MA Inc*.,
 IPR2015-01136, Paper 23 (P.T.A.B. Sept. 2, 2015) ......................................5

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc*.,
 471 F.3d 1369 (Fed. Cir. 2006) ..................................................12

*In re Omeprazole Patent Litig*.,
 536 F.3d 1361 (Fed. Cir. 2008) ..................................................12

*Jansen v. Rexall Sundown, Inc*.,
 342 F.3d 1329 (Fed. Cir. 2003) ....................................................2

*Janssen Pharmaceutica NV v. Eon Labs Mfg. Inc*.,
 134 Fed. App'x 425 (Fed. Cir. Jun. 13, 2005)...............................12

*King Pharms., Inc. v. Eon Labs, Inc*.,
 616 F.3d 1267 (Fed. Cir. 2010) ....................................................3

*Personal Web Techs., LLC, v. Apple, Inc*.,
 848 F.3d 987 (Fed. Cir. 2017) ......................................................8

*Sanofi v. Glenmark Pharms. Inc*.,
 No. 14-264, 2015 WL 5092631 (D. Del. Aug. 28, 2015) ...............2

*Sanofi v. Glenmark Pharms., Inc., USA*,
 204 F. Supp. 3d 665 (D. Del. 2016) ............................................12

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc*.,
 511 F.3d 1186 (Fed. Cir. 2008) ..................................................11

**Statutes**

35 U.S.C. § 101 ...................................................................................3

35 U.S.C. § 112 ...................................................................................3

PUBLIC VERSION

Patent Owner Aventis Pharma S.A.'s Contingent Motion to Amend (Paper 22, "Motion") (1) clarifies that the preamble "A method of increasing survival" is a limitation of the amended claims, and (2) adds a 3-component premedication limitation that is nowhere disclosed or suggested in the prior art for cabazitaxel. For the reasons discussed below, Aventis's proposed claim construction should be adopted and Claims 31-34 found patentable over the additional art cited by Mylan.

## I.    The Preamble of Claim 31 Is Limiting

Aventis presented a single construction of "A method of increasing survival" in Section V.B of the Motion: "a method that prolongs the life of a patient as compared to no treatment or palliative treatment."  Mylan attempts to create ambiguity by excerpting and modifying other portions of the Motion to present allegedly different meanings.  Paper 44 ("Opp.") at 1-2.[1]  But Mylan confuses the issue of how a POSA would understand the phrase "increasing survival" with the type of clinical evidence a POSA needed to reasonably expect that the claimed methods would work for their intended purpose: increasing survival.

Mylan provides no support for its assertion that "a patient in need thereof" means a patient in need of the recited cabazitaxel therapy rather than in need of increased survival.  Nor does Mylan explain how a patient would be in need of that therapy without an intended purpose.  Opp. at 2-3.  Mylan's construction is also at

---

[1]Aventis does not assert that the claims require FDA approval or a phase III study.

PUBLIC VERSION

odds with *Jansen* where "in need thereof" referred to the need for "treating or preventing macrocytic-megaloblastic anemia," not a need for the claimed vitamin regimen. *Jansen v. Rexall Sundown, Inc*., 342 F.3d 1329, 1330, 1333 (Fed. Cir. 2003). Pursuant to *Jansen*, the *Sanofi v. Glenmark* court also held that "in need thereof" referred to a need for decreased risk of hospitalization, not the drug itself. *Sanofi v. Glenmark Pharms. Inc*., No. 14-264, 2015 WL 5092631, at *2, 5-6 (D. Del. Aug. 28, 2015). Similarly, here, "a patient in need thereof" refers to a patient in need of increased survival, not merely a need for cabazitaxel.

Mylan cannot distinguish *Jansen* based on prosecution history estoppel because the key language was, as here, in the *Jansen* claim: a person "in need." 342 F.3d at 1333. Although the decision was "bolstered" by the prosecution history, it was not the determining factor. *See id*. Nor does Claim 31's description of the patient alter the application of *Jansen*. In *Sanofi v. Glenmark*, the claim described the patient "in need thereof" at length, yet the claim was held to require administering the drug to that patient with the intent recited in the preamble. 2015 WL 5092631, at *2, 5-6.

Mylan asserts that if the claims require an intention to increase survival, that intention need not be exclusive, nor require anything beyond a mere desire or appreciation for increased survival. Opp. at 5. But increasing survival is the only purpose in Claim 31. And, *Jansen* held that the preamble was more than a

2

"statement of effect that may or may not be desired or appreciated," or somehow nonexclusive, rather it was "a statement of the intentional purpose for which the method must be performed."  342 F.3d at 1333.

## II.    Claims 31-34 Comply with 35 U.S.C. § 112

Mylan's Section 112 arguments rest on the faulty premise that determining whether cabazitaxel prolongs survival in a patient requires a study wherein a single patient on cabazitaxel therapy is compared to that same patient receiving mitoxantrone or no therapy.  Opp. at 5-6.  No such example is required because Example 1 shows that mCRPC patients progressing during or after docetaxel lived longer because they received 20-25 mg/m$^2$ of cabazitaxel in combination with prednisone as compared to palliative mitoxantrone therapy, and that this regimen increases the life expectancy of such patients.  Exh. 2259 at ¶6; Exh. 2177 at 56:24-57:2, 63:13-65:12 (Mylan's expert, Dr. Seth: "Yes, this is what the data showed from that study; that you would live longer compared to mitoxantrone, prednisone."); Exh. 2258 at 85:18-86:7.  This is sufficient written description.[2] Indeed, clinical studies analyzing overall survival are performed for the very purpose of determining whether a regimen prolongs survival of individual patients. Exh. 2259 at ¶¶4-5.

_____

[2] The methods also satisfy 35 U.S.C. § 101 as transformative of the body.  *King Pharms., Inc. v. Eon Labs, Inc*., 616 F.3d 1267, 1277-78 (Fed. Cir. 2010).

PUBLIC VERSION

Dr. Seth also agreed that a POSA can reasonably conclude whether the administration of cabazitaxel has prolonged the life of a patient; thus the claims are both enabled and not indefinite.  Exh. 2177 at 63:5-65:17; 68:9-69:12; *see also* Exh. 2259 at ¶¶4-6.  Mylan's argument that the patent lacks a comparison to no therapy is undermined by Dr. Seth, who acknowledged that the TROPIC study almost "could have been done against a placebo and it would have had the same data."  Exh. 2177 at 43:2-10; Exh. 2259 at ¶7 (comparison to no therapy subsumed in a comparison to palliative therapy).

## III.   <u>Claims 31-34 Are Non-obvious</u>

### A.   <u>There Was No Reasonable Expectation of Increased Survival</u>

Mylan argues that "[i]dentifying or disclosing an inherent result of a prior art method" does not confer patentability.  Opp. at 8.  However, this argument presumes that the claimed methods were already in the prior art.  As Dr. Seth acknowledged, they are not.  Exh. 2258 at 138:20-139:6.  Thus, inherency of increasing survival is not relevant to whether the amended claims are patentable in view of the prior art.

As the Motion explains, the prior art did not provide enough information for a POSA to reasonably expect administration of cabazitaxel according to Claims 31-34 to increase survival of an mCRPC patient.  Mot. at 10-18.  Dr. Seth acknowledged that the TROPIC study was conducted to determine "ultimately

4

what is better," because at the time the answer was unknown.  Exh. 2177 at 186:7-187:4.  Thus, he contradicts Mylan's assertion that the mere disclosure of the primary endpoint (overall survival) discloses the study results.  Opp. at 9; *see also* Exh. 2259 at ¶¶8-9.  Dr. Sartor explains that a POSA cannot intend or expect to increase the survival of a patient without survival evidence.  Exh. 2259 at ¶¶9, 11-12.  At most, Dr. Sartor and others may have hoped that cabazitaxel therapy would prolong life in TROPIC because there were no life-prolonging options.  *Id.* at ¶10.  But, "[a] hope may or may not come true and does not establish that [a drug] is useful for treating" patients.  *See Coal. for Affordable Drugs V LLC v. Biogen MA Inc.*, IPR2015-01136, Paper 23 at 10 (P.T.A.B. Sept. 2, 2015).

## B.    The Claimed Premedication Regimen Is Not Obvious

As discussed in the Motion (at 18-24) and below, a POSA would not have been motivated to use the claimed premedication with cabazitaxel.  None of Mylan's references demonstrates otherwise.  Mylan's proposed combinations include Winquist, the TROPIC Listing, or Exhibit 2182.  These references, however, do not provide a motivation to practice the claimed methods because none identifies premedications.  Exh. 1009 at 3948; Exh. 1008; Exh. 2182 at 2-3.

### 1.    No Motivation for Hypersensitivity Reactions

Mita, the only prior art study of cabazitaxel that included prostate cancer patients, was designed to determine whether premedications were required.  *See*

PUBLIC VERSION

Exh. 1012 at 724.  Yet, no premedications for hypersensitivity were given, and the authors concluded that "administration does not require premedication." *Id*. at 729; Exh. 2259 at ¶¶16-17.  The Taxol® label, Pivot, Takenaka, Hudis and Trudeau would not have motivated a POSA to employ the claimed premedication for hypersensitivity reactions over this clear teaching away.

Reliance on Taxol®'s premedication is misplaced because it was the specific surfactant (Cremophor) used to formulate Taxol® that caused the high levels of hypersensitivity reactions, not the drug itself.  Mot. at 22-23; Exh. 2259 at ¶20.  Recognizing that cabazitaxel did not require this surfactant, Mylan points to outdated docetaxel studies that used Taxol®'s premedication.  Opp. at 15-16.  A POSA investigating whether and what premedication to use for cabazitaxel, however, would not have turned to the small, Japanese Takenaka study of weekly docetaxel in combination with estramustine that began prior to the FDA approval of docetaxel in prostate cancer.  Exh. 2259 at ¶¶23-25; *see* Exh. 1046 at 106.

By 2009, a POSA would have known that the FDA had determined that dexamethasone alone had been established as safe for use with higher doses of docetaxel than used by Takenaka.  Exh. 1024 at 1; Exh. 2259 at ¶¶22-23.  Therefore, to the extent a POSA would look to docetaxel for a premedication for cabazitaxel, he or she would have selected the FDA-approved regimen of a corticoid alone, not one-off use of the Taxol® premedication in Takenaka.  *Id.*;

6

Exh. 2177 at 113:2-15, 118:13-119:5 (Dr. Seth: "POSAs would use the same premedication on docetaxel in cabazitaxel before TROPIC came out . . . .").

Trudeau and Hudis are even older docetaxel studies in breast cancer from 1996 employing a variety of premedications. Exh. 1047 at 423-24; Exh. 1048 at 60-61; Exh. 2259 at ¶¶26-27, 29.[3] Both studies reported hypersensitivity reactions in more than 50% of patients. Exh. 1047 at 424; Exh. 1048 at 61. These levels are far higher than the 6% of patients having any hypersensitivity reaction in Pivot, teaching that less premedication was necessary for cabazitaxel than docetaxel, not more. Exh. 2259 at ¶28. In fact, Pivot concludes that cabazitaxel was "well tolerated" and that the safety profile is more favorable than Taxol® and Taxotere®. Exh. 1010 at 1547, 1551. A POSA would understand that this means a consequent need for less premedication with cabazitaxel. Exh. 2259 at ¶¶18-19, 28; Exh. 2177 at 115:11-19 (from Mita cabazitaxel thought to cause less hypersensitivity than docetaxel).

### 2.   No Motivation for Nausea or Vomiting

Mylan alternatively asserts that a POSA would have used the claimed premedications to prevent or treat nausea. Opp. at 12. But, Dr. Seth stated that

---

[3] Mylan's assertion that a POSA would use the claimed premedication before cabazitaxel is undercut by these studies starting without premedication, only adding one when a problem was identified. Exh. 1047 at 423; Exh. 1048 at 59.

PUBLIC VERSION

nausea and vomiting are related to hypersensitivity reactions. Exh. 2258 at 127:6-16. Thus, the arguments above regarding hypersensitivity apply equally to Mylan's nausea arguments. Mylan's references at most indicate that a POSA *could* happen to use the three drugs of Claim 31. But that is legally insufficient; the question is whether a POSA would have been motivated to use all three as claimed. *Personal Web Techs., LLC, v. Apple, Inc*., 848 F.3d 987, 993-94 (Fed. Cir. 2017).

Pivot and the NCCN Guidelines on Antiemesis ("Guidelines") would not have motivated a POSA to use the claimed premedication for nausea. Pivot does not disclose any antiemetic regimen. Exh. 2259 at ¶¶34-35. As Dr. Seth acknowledged, Pivot discloses a "'very favorable' safety profile compared to docetaxel for . . . nausea, vomiting," which a POSA would have extrapolated to patients with prostate cancer. Exh. 1043 at ¶31; Exh. 2258 at 73:2-15. Mylan does not explain why a POSA would have been motivated to use nausea premedication with cabazitaxel when it was reported to be better tolerated than docetaxel, which did not require the use of an antiemetic. *See* Exh. 2259 at ¶¶31, 36, 39; Exh. 1024 at 1; Exh. 2177 at 113:13-22.

Moreover, docetaxel is a low emetic risk drug according to the Guidelines, and Dr. Seth stated that cabazitaxel would have been expected to be a low risk drug as well. Exh. 1045 at 11; Exh. 2258 at 125:16-25. The Guidelines list three

8

possible regimens for such drugs without preference.  Exh. 1045 at 8.  Daily dexamethasone alone is one, however, the Guidelines elsewhere say that "[d]examethasone should not be added when the chemotherapy regimen already includes a corticosteroid," discouraging the addition of dexamethasone to the cabazitaxel regimen of Winquist that also contained prednisone.  *Id*. at 8, 14; Exh. 2259 at ¶38.  Additionally, Claim 33 requires administration of the corticoid as a new cycle every three weeks, which is different than the daily dexamethasone schedule in the Guidelines.   Exh. 2259 at ¶39.

An antihistamine is only optionally included in the Guidelines for the low risk drugs with a different medication in case of muscle spasms, while $H_2$ antagonists are not listed for low risk drugs at all.  Exh. 1045 at 8; Exh. 2259 at ¶¶ 40-41.  Indeed, before Dr. Seth was aware of the amended claims he stated that the premedications a POSA could use for nausea were Zofran®, Compazine®, and Kytril®, none of which are a corticoid, an antihistamine, or an $H_2$ antagonist.  Exh. 2177 at 127:17-23; Exh. 2258 at 121:15-122:3; Exh. 2259 at ¶¶38, 40, 43. Thus, with respect to a premedication prior to cabazitaxel administration, the Guidelines do not motivate the use of another corticoid let alone a corticoid in combination with an antihistamine and an $H_2$ antagonist.

In an attempt to overcome this deficiency, Mylan instead focuses on "breakthrough treatment."  Opp. at 13.  But "breakthrough treatment" for nausea is

9

irrelevant because it occurs after chemotherapy, not "prior to" as required by Claims 31-34.  Exh. 2259 at ¶37.  Regardless, none of Mylan's references motivate a POSA to treat nausea after chemotherapy by using the claimed premedication. The Guidelines list twelve different medications that can be given for breakthrough antiemetic therapy and distinguish antihistamines from newer, more effective drugs (e.g., 5HT3 antagonists) that were in common use by 2009.  Exh. 1045 at 9, 20; Exh. 2259 at ¶¶44, 47.  Doenicke would not have been meaningful to a POSA because it relates to post-operative nausea, and anesthesia drugs were known to increase histamine levels, which explains the use of antihistamines.  Exh. 1049 at S156-57; Exh. 2259 at ¶46.  Regardless, Doenicke also notes that "5-HT3 receptor antagonists are superior to conventional antiemetic agents."  *Id*. at S157.  Thus, if a POSA had looked to breakthrough treatments to deal with a concern about nausea with the use of cabazitaxel, he or she would have likely used a 5-HT3 antagonist, not the claimed premedication.  *See* Exh. 2259 at ¶¶47-49.

Moreover, the Guidelines do not list $H_2$ antagonists among the twelve different agents that can be given for breakthrough antiemetic therapy.  Exh. 1045 at 9.  $H_2$ antagonists are only discussed separately as a consideration for breakthrough patients with dyspepsia.  *Id*. at 15, 23.  However, dyspepsia was not considered to be a concern with the use of either docetaxel or cabazitaxel at the time and was not reported for cabazitaxel.  *See* Exh. 1010 at 1550; Exh. 1012 at

10

726-27; Exh. 2259 at ¶45; Exh. 2258 at 131:12-22.  The Guidelines thus would not have motivated a POSA to use an $H_2$ antagonist to treat nausea or dyspepsia.

### 3.   Exhibit 2182 Is Not Prior Art

Mylan presents no evidence that Exhibit 2182 was distributed to any patients.  Exhibit 2182 is stamped "strictly confidential" and was given to *investigators* to provide information for the informed consent forms.  Exhibit 2234 at ¶¶2-5; *see also* Exh. 2258 at 140:7-10 (assuming the IRB would have created its own form).  Contrary to Mylan's assertions, Dr. Sartor did not testify about Exhibit 2182, only about a consent form for his institution, which is not a part of this proceeding.  *See* Exh. 1041 at 134:19-139:25.  Even if Exhibit 2182 was given to patients, it is not prior art because a POSA exercising reasonable diligence could not have obtained a copy of the document from any public resource.  *See SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1195 (Fed. Cir. 2008).  There is no evidence that consent forms were presented to, handed out, or otherwise made available to an oncologist who did not happen to be treating a patient on the study.

## IV.   The TROPIC Study Is Not Public Use

TROPIC was not a public use of the inventions of Claims 31-34.  First, patients receiving cabazitaxel on the TROPIC study did not have knowledge of the invention to disseminate because (1) they did not actually receive Exhibit 2182 as discussed above, (2) Exhibit 2182 does not describe the claimed premedication,

PUBLIC VERSION

nor is there evidence that any patient knew it, and (3) the patients would not have understood that cabazitaxel was life-prolonging prior to the results of the study. *See* Exh. 2182 at 6 (██████████████████████████████████████████████ ██████████); Exh. 2259 at ¶¶8-9, 12; *Janssen Pharmaceutica NV v. Eon Labs Mfg. Inc*., 134 Fed. App'x 425, 431 (Fed. Cir. Jun. 13, 2005) (that invention was not disclosed to patients weighs against finding public use).  Second, even if TROPIC was public, the "experimental character . . . negated any statutory bar." *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc*., 471 F.3d 1369, 1381 (Fed. Cir. 2006); *Sanofi v. Glenmark Pharms., Inc., USA*, 204 F. Supp. 3d 665, 698 (D. Del. 2016) ("[A] clinical trial seeking to test a particular treatment hypothesis seems to be the quintessential experimental use.").

Lastly, Claims 31-34 were not ready for patenting because there is no evidence indicating that anyone involved with TROPIC (including the inventor) had determined that the claimed methods would work for their intended purpose (i.e., increasing survival).  Mot. at 10-18, 24; Exh. 2259 at ¶¶8-9, 12; *see* Exh. 2177 at 78:17-25 (POSA cannot predict success of a phase III study); *In re Omeprazole Patent Litig*., 536 F.3d 1361, 1373-74 (Fed. Cir. 2008).

## V.   <u>Conclusion</u>

For the foregoing reasons, Aventis respectfully requests that the Board grant Aventis's Contingent Motion to Amend.

PUBLIC VERSION

April 20, 2017                          Respectfully submitted,

                                         /Dominick A. Conde/

                                        Dominick A. Conde (Reg. No. 33,856)
                                        FITZPATRICK, CELLA, HARPER & SCINTO
                                        1290 Avenue of the Americas
                                        New York, NY 10104-3800
                                        Tel: (212) 218-2100

                                        *Attorney for Patent Owner,*
                                        *Aventis Pharma S.A.*

13

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e)(4), I certify that a copy of the foregoing

PATENT OWNER'S REPLY IN SUPPORT OF THE CONTINGENT MOTION

TO AMEND was served on April 20, 2017 by causing it to be sent by email to

counsel for Petitioner at the following email addresses:

sparmelee@wsgr.com

mrosato@wsgr.com

jmills@wsgr.com

mreed@wsgr.com

namjadi@wsgr.com

wdevine@wsgr.com


April 20, 2017                              Respectfully submitted,


                                            /Dominick A. Conde/

                                            Dominick A. Conde (Reg. No. 33,856)
                                            FITZPATRICK, CELLA, HARPER & SCINTO
                                            1290 Avenue of the Americas
                                            New York, NY 10104-3800
                                            Tel: (212) 218-2100

14

# EXHIBIT M

trials@uspto.gov                          IPR2016-00712, Paper No. 98
571-272-7822                                        July 20, 2017


UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

MYLAN LABORATORIES LIMITED,
Petitioner,

v.

AVENTIS PHARMA S.A.,
Patent Owner.

————————

Case IPR2016-00712
Patent 8,927,592 B2

————————

Held: June 13, 2017

————————


BEFORE:  BRIAN P. MURPHY, TINA E. HULSE, and
CHRISTOPHER M. KAISER, Administrative Patent Judges.


The above-entitled matter came on for hearing on Tuesday, June
13, 2017, commencing at 2:00 p.m., at the U.S. Patent and
Trademark Office, 600 Dulany Street, Alexandria, Virginia.

Case IPR2016-00712
Patent 8,927,592 B2

APPEARANCES:

ON BEHALF OF THE PETITIONER:

        MATTHEW R. REED, ESQUIRE
        JAD A. MILLS, ESQUIRE
        STEVEN PARMELEE, ESQUIRE
        Wilson, Sonsini, Goodrich & Rosati, P.C.
        650 Page Mill Road
        Palo Alto, California  94304


ON BEHALF OF PATENT OWNER:

        WILLIAM E. SOLANDER, ESQUIRE
        DANIEL J. MINION, ESQUIRE
        Fitzpatrick, Cella, Harper & Scinto
        1290 Avenue of the Americas
        New York, New York  10104-3800

Case IPR2016-00712
Patent 8,927,592 B2

1            P R O C E E D I N G S

2                    -   -   -   -   -

3            JUDGE MURPHY:  Good afternoon.  We will now

4    hear arguments in IPR2016-00712, Mylan Laboratories versus

5    Aventis Pharma.  The case concerns patentability of the claim in

6    U.S. patent number 8,927,592.  I'm Judge Murphy.  We also have

7    Judge Hulse and Judge Kaiser appearing remotely.

8            Would counsel for the parties please introduce

9    yourselves.

10            MR. REED:  Thank you and good afternoon.  Matthew

11   Reed on behalf of petitioner, Mylan Laboratories Limited.  With

12   me today are lead counsel, Steven Parmelee and my colleague Jad

13   Mills.

14            JUDGE MURPHY:  Welcome, counsel.  Thank you.

15            MR. REED:  Also present is Ms. Vinny Lee, in-house

16   counsel at Mylan.

17            JUDGE MURPHY:  Welcome to the Board.  Thank

18   you, Mr. Reed.

19            MR. SOLANDER:  Good afternoon, Your Honor.  My

20   name is William Solander on behalf of the patent owner, Aventis.

21   With me is Daniel Minion and our lead counsel, Dominick

22   Conde, and we are assisted today by Ms. Whitney Meier and

23   Ms. Katherine Adams.

24            JUDGE MURPHY:  Thank you, Mr. Solander.

25   Welcome, counsel.  Per our oral hearing order, each side will

3

Case IPR2016-00712
Patent 8,927,592 B2

1   have 60 minutes in total.  Petitioner has the burden of proving

2   patentability by a preponderance.  So Mr. Reed, you will begin.

3   You may reserve rebuttal time both to address the opposition as

4   well as the contingent motion to amend.  Mr. Solander, you also

5   may reserve rebuttal time if you wish, but only for addressing the

6   contingent motion to amend.  Understood?

7           MR. SOLANDER:  Yes.

8           JUDGE MURPHY:  The hearing is open to the public.

9   We'll have a full transcript prepared in due course.  Do be

10  mindful of that.  A couple of reminders and one kind of question

11  or advice for counsel for petitioner, but when you start, because

12  Judge Hulse and Judge Kaiser are remote, they do have your

13  demonstratives, but they cannot see them when you put them up

14  on the screen in this hearing room.  They don't have a camera that

15  accesses the screen.  So it's particularly important for you to take

16  your time and identify the demonstratives as you go through so

17  that everyone can follow with you, our court reporter can get a

18  good transcript, et cetera.

19          Now, counsel for petitioner, Mr. Reed, we identified

20  two slides, 33 and 34, that have the confidentiality legend on

21  them.  This is a public hearing.  So what I would urge you to do is

22  not rely on them if you can help it and try and talk around them

23  and don't put them up on the screen because it is a public hearing.

24  Is that acceptable?

4

Case IPR2016-00712
Patent 8,927,592 B2

1    MR. REED:  Yes, Your Honor.  And I would just note

2    that we were informed that the audio-visual equipment is actually

3    not working today.  So we weren't planning to publish any of our

4    demonstratives.  And we were hoping that all three members of

5    the panel would have hard copies or at least soft copies that they

6    can access during the argument.

7    JUDGE MURPHY:  We do have electronic copies.  I

8    printed out hard copies, but if you have a hand-up copy, I'm

9    happy to take it.

10   MR. REED:  Yeah, we do have hand-up copies.  It

11   would be a little hard to hand to Judge Hulse and Judge Kaiser.

12   JUDGE MURPHY:  Right.

13   MR. REED:  We've also provided a copy to the court

14   reporter.

15   JUDGE MURPHY:  Thank you.  Okay.  So counsel, we

16   have, I don't know if you have appeared in this hearing room, but

17   we have a countdown clock behind us.  So when you select how

18   much time you wish, I'll set it to that time and it will count down.

19   You'll get a two-minute yellow light followed by the red light for

20   your warning.  Mr. Reed, do you wish to reserve some rebuttal?

21   MR. REED:  Yes, Your Honor, I would like to reserve

22   20 minutes for rebuttal.  And that just so happens to be the

23   amount of time that's already displayed on the clock.

24   JUDGE MURPHY:  Funny how that works.

25   MR. REED:  I guess I got it right at least so far.

5

Case IPR2016-00712
Patent 8,927,592 B2

1    JUDGE MURPHY:  Whenever you are ready, please

2  begin.

3    MR. REED:  Thank you.  And I will try to refer to the

4  slides.  I appreciate the opportunity to address the Board today,

5  and I'll first explain why the current claims of the '592 patent are

6  unpatentable including the six grounds on which the Board

7  instituted review.  And in rebuttal, in the remaining time, I will

8  explain why patent owner's proposed substitute claims are

9  unpatentable.

10    Going through the slides somewhat briefly, slide 3 sets

11  forth the six grounds on which the Board instituted review.  The

12  '592 patent includes only two independent claims, claims 1 and

13  27, both of which are included in ground 1.  The primary

14  references for ground 1 with Winquist and the TROPIC listing.

15  And in its institution decision, the Board exercised its discretion

16  to include Winquist and the TROPIC listing in view of Attard and

17  Beardsley.

18    Ground 1 covers the majority of the claims at issue.

19  Each of grounds 2 through 5 covers dependent claims and

20  includes the Winquist and TROPIC listing references plus one

21  additional reference each, and of course ground 6 covers one last

22  dependent claim and is basically a combination of grounds 4 and

23  5.

24    Before we get into the grounds and looking quickly at

25  slide 4, the prior art is a serious problem for patent owner here.

6

Case IPR2016-00712
Patent 8,927,592 B2

1    There are several aspects of this problem, but in simple terms,

2    patent owner starts at the wrong place and ends at the wrong

3    place.  I say that patent owner starts at the wrong place because it

4    often refers to cabazitaxel as the invention.  The compound

5    cabazitaxel is not the invention.  That was, in fact, covered by a

6    completely different patent.

7              JUDGE MURPHY:  Well, we have method of treatment

8    claims, right?  Not compound claims.

9              MR. REED:  That's exactly right.  And in fact,

10   treatment of prostate cancer with cabazitaxel is not the invention.

11   Treatment of post docetaxel metastatic castration-resistant

12   prostate cancer with cabazitaxel plus prednisone is not even the

13   invention.  It's a method of treating.  These other aspects are

14   unquestionably found in the prior art.  So they start at the wrong

15   place.

16             And I say that they end at the wrong place because they

17   run afoul of the legal standard for obviousness.  Patent owner

18   does that in the context most specifically of a reasonable

19   expectation of success by trying to focus on the results of a prior

20   art method confusing the appropriate standard of patentability

21   with such things as successful phase III clinical trial results or

22   regulatory approval by FDA.  They overlook the fact that this

23   claim does not contain any novel elements of the claims or

24   objective indicia.  That incorrect approach is at the heart of the

25   parties' dispute.

7

Case IPR2016-00712
Patent 8,927,592 B2

1        JUDGE MURPHY:  Well, I think I agree that's the heart

2    of the dispute.  So why don't you take me through your view of

3    the claim.  In particular, we had the decision to institute ruling

4    where the preamble was determined to be nonlimiting.  Patent

5    owner has not contested that in the response.  So what are we to

6    make of the preamble at this point when assessing the reasonable

7    expectation of success?

8        MR. REED:  For purposes of the current claims, and if

9    we could turn to slide 8, we see the language of the two

10   independent claims, claims 1 and 27, set forth.  And as you note,

11   the Board instituted and decided that the two preambles were not

12   limitations.  They were nonlimiting.  And the differences between

13   the rest of the language of these two claims could be

14   characterized as somewhat slight.  There are differences between

15   the types of prostate cancer here and differences in the corticoid,

16   the final element of the claims.

17       JUDGE MURPHY:  Well, the preambles are different,

18   right?

19       MR. REED:  The preambles are certainly different but

20   they are nonlimiting.  So to the extent that they are directed to

21   different patient populations, claim 1 is a patient who has been

22   diagnosed with prostate cancer and who has progressed during or

23   after treatment with docetaxel.  And then claim 27, likewise,

24   includes a patient who is diagnosed with castration-resistant or

8

Case IPR2016-00712
Patent 8,927,592 B2

1    hormone refractory metastatic prostate cancer that has progressed

2    during or after treatment with docetaxel.

3        So in terms of the patient population here, there is a

4    slight difference.  But in terms of the limitations that could have

5    been found in the preamble, they do not get imported into the

6    claims.  They are not part of the elements that must be met in

7    order to prove obviousness.

8        JUDGE MURPHY:  So how does that impact the test

9    for reasonable expectation?  The patent owner has put in a huge

10   amount of evidence directed to therapeutic efficacy, successful

11   treatment results particularly in phase III.  The phase III protocol

12   is prior art.  The results aren't.  So they are emphasizing the

13   results.

14       So my question for you is, based on the case law, what

15   is the appropriate standard for assessing and weighing that

16   evidence against these claims?

17       MR. REED:  Quite frankly, we respectfully submit that

18   that evidence is irrelevant.  There is no therapeutic efficacy

19   requirement as a part of the current claims.  For purposes of this

20   initial discussion, I'm going to limit myself to the current claims.

21   We may have further discussion on the same topic when we get

22   to the rebuttal and we address the proposed substitute claims.  But

23   for purposes of the current claims, our position is that therapeutic

24   efficacy is absolutely not a claim element, and the evidence that

9

Case IPR2016-00712
Patent 8,927,592 B2

1    petitioner -- or that patent owner has submitted to try and rebut

2    the showing of what is present in the prior art is simply irrelevant.

3          JUDGE MURPHY:  So in your view, let's take claim 1,

4    right, I have claim 1 at least up on my screen, your slide 9 --

5    excuse me, claims 1 and claims 27.

6          MR. REED:  I think it's slide 8, just so the record is

7    clear.

8          JUDGE MURPHY:  Yeah, that's what we want.  So just

9    take claim 1.  In terms of the appropriate test in obviousness,

10    what is the successful result of the claimed method that a person

11    of ordinary skill needs to have a reasonable expectation of?

12          MR. REED:  So they have to have a reasonable

13    expectation of combining these references to achieve the claimed

14    invention.  And the claimed invention here are the four elements

15    that remain if you take out the preamble.  So it's a patient with

16    prostate cancer that's progressed during or after treatment with

17    docetaxel.  It is administering 20 to 25 milligrams per meter

18    squared of cabazitaxel or a hydrate or solvate thereof, and doing

19    so in combination with a corticoid.  Every one of those elements

20    is disclosed in the prior art.

21          JUDGE MURPHY:  Is there any dispute about that in

22    terms of what the Winquist and TROPIC listing discloses versus

23    claim 1?

24          MR. REED:  I think the extent of the dispute might

25    reference the language that says progressed during or after

10

Case IPR2016-00712
Patent 8,927,592 B2

1   treatment with docetaxel, where the Winquist reference teaches

2   treating patients who are post docetaxel patients.  It doesn't

3   explicitly say in Winquist that those patients have progressed

4   during or after treatment with docetaxel, simply that they are now

5   being treated after having previously been treated with docetaxel.

6   And slide 10 illustrates this.  It includes the excerpt there of the

7   Winquist reference and it explicitly talks about how that is

8   directed to patients that were previously treated with docetaxel.

9   So it doesn't explicitly say that has progressed, but it's implied.

10   The only reason a patient would be treated with cabazitaxel after

11   having previously been treated with docetaxel is if that patient

12   has progressed.

13            JUDGE MURPHY:  Was there expert testimony on that

14   point?

15            MR. REED:  There is.  In fact, turning to slide 11, both

16   experts, both sides' experts addressed this issue.  Petitioner's

17   expert, Dr. Seth, explicitly points out that if docetaxel had been

18   effective at stopping progression, second-line treatment would be

19   unnecessary.  We wouldn't be treating with cabazitaxel if the

20   docetaxel had been effective.  Similarly, the patent owner's

21   expert, Dr. Sartor, testified at deposition that if a patient had not

22   progressed, he would not be treating that patient.

23            JUDGE MURPHY:  So the notion that is a disclosure

24   that a patient had previously been treated with docetaxel and was

25   now being treated with cabazitaxel in terms of the prior art

Case IPR2016-00712
Patent 8,927,592 B2

1   disclosures, your argument is that it, by definition, must mean

2   that there was progression either during or after the docetaxel

3   treatment?

4            MR. REED:  Absolutely.  And lest there be any doubt

5   about that, the TROPIC listing is even more explicit.  It removes

6   any doubt at all.  Turning to slide 12, the TROPIC listing set forth

7   the inclusion criteria for those who could participate in this

8   clinical trial.  And it explicitly states that a patient must have

9   documented progression of disease.  This is in addition to

10   everything else in the TROPIC listing.  It lists the type of prostate

11   cancer and it lists the fact that cabazitaxel is being administered

12   in combination with prednisone.

13            So that's why we are looking at an obviousness

14   combination here between Winquist and the TROPIC listing.

15   You put those two together and as the Board, we think, correctly

16   found in the institution decision, combining those is, to put it in

17   layman terms, a no-brainer because they both describe the same

18   listing.  They both refer to the same --

19            JUDGE MURPHY:  Let me ask you about that.  Is

20   example 1 in the patent, is there a dispute that example 1 in the

21   patent discloses essentially -- not essentially.  It does disclose the

22   TROPIC study including the data and results?

23            MR. REED:  I don't think there is a dispute about that.  I

24   think example 1 is setting forth both the protocol which had

25   previously been disclosed and then the results.  So the big

12

Case IPR2016-00712
Patent 8,927,592 B2

1   question here is were those results necessary in order to get the

2   patent in the first place.

3          JUDGE MURPHY:  Well, didn't the examiner cite them

4   in his reasons for allowance, the data?

5          MR. REED:  Patent owner cited to this idea of efficacy

6   being necessary.  There was another thing that was cited here, and

7   it had to do with the dose, 20 to 25 milligrams that had to be

8   added in by amendment.  But the appreciation of what the method

9   that was a hundred percent disclosed would achieve is something

10  that is not necessary to patentability.

11         In fact, in the petition at page 52 we quoted the *In re:*

12  *Montgomery* case which says, quote, it is well established that a

13  patent may be secured and typically is secured before the

14  conclusion of clinical trials.  And this is entirely consistent with

15  petitioner's position that we didn't need to wait until the results of

16  that phase III trial in order to get the patent.  In that same case,

17  the Federal Circuit cites with approval the Patent Office's

18  procedure that, quote, if an applicant has initiated human clinical

19  trials for a therapeutic product or process, office personnel should

20  presume that the applicant has established that the subject matter

21  of that trial is reasonably predictive of having the asserted

22  therapeutic utility.

23         So it's not proving the therapeutic efficacy.  It's having a

24  reasonable expectation.  That is the appropriate standard for

25  patentability.  That's what should be focused on here, both by the

13

Case IPR2016-00712
Patent 8,927,592 B2

1   Board and by the parties in their arguments today.  Not whether it

2   was successful in its phase III trial.  Not whether or not it

3   received approval from FDA.

4         JUDGE MURPHY:  With regard to *In re: Montgomery*

5   in particular, I read that case.  What is your response to my two

6   questions, which are, one, it's distinguishable because it was

7   inherent anticipation?  You are arguing obviousness.  Not

8   inherent anticipation.  And two, when I read the case there were

9   statements that the patent involved in *In re: Montgomery* did not

10  disclose any clinical trial data.  It didn't have the results.

11  Whereas, the patent here does have results.

12        MR. REED:  The first question about whether that was

13  an anticipatory reference or in here obviousness combination is,

14  quite frankly, a red herring.  Patent owner pointed that out in the

15  papers that were submitted to the Board, but the fact that it was in

16  the context of anticipation does not change the fact that patents

17  are issued before clinical trial results are in.

18        And the second point, the fact that human clinical trials

19  had been initiated is reasonably predictive of having that

20  therapeutic utility.

21        JUDGE MURPHY:  Are we bound by such a finding?

22  Is that what you are saying?  Are we legally bound in this case by

23  that statement?

24        MR. REED:  I do believe that that Federal Circuit

25  authority stands for the proposition that in this case, in the context

14

Case IPR2016-00712
Patent 8,927,592 B2

1   of obviousness, a reasonable expectation of success has been

2   established.

3          JUDGE MURPHY:  But it wasn't an obviousness case.

4          MR. REED:  It certainly wasn't.  It was anticipation for

5   sure.  Here we are talking about obviousness of two references

6   combined having every element.  And the question really boils

7   down to not so much was there a motivation to combine, because

8   I think the patent owner conceded that.  It's whether there is a

9   reasonable expectation of achieving the claimed invention.  And

10  here the reasonable expectation comes from the fact that human

11  clinical trials had been initiated.

12          In fact, they were reported in the Attard reference which

13  the Board added as part of this ground 1.  There were results

14  showing that cabazitaxel had anticancer activity in prostate

15  cancer patients who were post docetaxel.  There was evidence of

16  anticancer activity.  In other words, this reasonable expectation is

17  based on the fact that there were human clinical trial results.  That

18  goes beyond what was disclosed in *Montgomery*.

19          Further, the later phase II trial that occurred, it's

20  reported in the Pivot reference and it's discussed in Beardsley.

21  Beardsley is the reference that the Board explicitly added to the

22  ground 1 references.  In Beardsley there's a discussion of the fact

23  that this cabazitaxel compound was administered to breast cancer

24  patients and that it had efficacy and that based on that efficacy in

25  breast cancer, a phase III trial had begun in prostate cancer.  Now,

15

Case IPR2016-00712
Patent 8,927,592 B2

1  it's all fine and well for us years later to be looking backwards

2  and imagining what would we have thought based on the Attard

3  reference, based on Beardsley.  But Beardsley herself explicitly

4  states that at least in part the phase III clinical trial was begun

5  based on the results of what was done in phase II in breast cancer.

6         So we do have evidence of activity in prostate cancer

7  and in fact, docetaxel refractory prostate cancer.  And we do have

8  evidence of activity in breast cancer in a phase II trial, so much so

9  that it was part of the reason to move forward to a phase III.  That

10  is a reasonable expectation of success.

11         Now, that's not yet successful phase III clinical trial

12  data, and it is not yet FDA approval, but those are the wrong end

13  points.  That's why I said at the beginning they start at the wrong

14  place and they end at the wrong place.  They start with

15  cabazitaxel as a compound many times over.  They end at the

16  wrong place by trying to hold us to you've got to get to proving to

17  a level satisfactory to FDA with successful phase III clinical trials

18  that this will be efficacious in patients.  So they have it wrong

19  both coming and going, so to speak.

20         JUDGE HULSE:  Counsel, can I ask a quick question.

21  Are you saying that any time that there is a phase III clinical trial

22  that there must be a reasonable expectation of success?

23         MR. REED:  I am not saying that quite as boldly as you

24  just characterized it.  What I am saying is that in this case where

25  not only were there phase I and phase II trials and results, but also

16

Case IPR2016-00712
Patent 8,927,592 B2

1   phase III initiated with this activity that was noted in both of the

2   phase I and II trials, and given what the Manual of Patent

3   Examining Procedure tells us about reasonably predictive of

4   therapeutic utility, that there was certainly a reasonable

5   expectation of success given the combination of Winquist and the

6   TROPIC listing.

7              JUDGE HULSE:  And what is your response to patent

8   owner's argument that the phase I, that the Mita phase I study

9   really only showed just a single patient, that that's not really --

10             MR. REED:  Well, it's a number of patients.  There

11   were 25 patients total, eight of whom had prostate cancer.  Of

12   those eight, two showed that there was anticancer activity.  One

13   of those two happened to be post docetaxel.  So it is a small

14   number, but it is evidence showing that a person of ordinary skill

15   in the art would consider to be a sufficient basis to find a

16   reasonable expectation of achieving this claimed invention.

17             JUDGE HULSE:  So any time you get to a phase III

18   study, though, isn't it true that you would always have positive

19   results in your phase I and phase II trials?

20             MR. REED:  Honestly, I'm not sure.  I don't know that it

21   is necessary to have positive results in phase I and phase II.  And

22   I take small issue with the word "successful."  That's something

23   that I think patent owner has been introducing repeatedly here.

24   What do you call a successful phase I?  What do you call a

25   successful phase II?  And as you'll hear from patent owner, what

17

Case IPR2016-00712
Patent 8,927,592 B2

1   do you call a successful phase III trial?  That is, I think, a

2   different question than whether you have a reasonable

3   expectation of success.

4          I think that successful trial is something that might be

5   subjective.  Patent owner's expert, Dr. Sartor, was involved in a

6   trial.  It was a trial that took cabazitaxel and tried to show that it

7   would be appropriate for first-line use.  It did not end up getting

8   FDA approval, but he considers that to be a successful trial.  He

9   did not consider that to be a failure.  So what you consider to be a

10   successful trial or not, I think, is maybe a question that is better

11   left to the regulatory people.

12          What we are focused on here is in patentability

13   questions, whether there was a reasonable expectation of success

14   in achieving the claimed invention.  And since there is no

15   efficacy requirement, this goes back to your perhaps first or

16   second question, Judge Murphy, the reasonable expectation of

17   achieving the claimed invention does not even have a therapeutic

18   efficacy requirement.

19          So when the Board instituted and made the decision that

20   those preambles were not limiting, they got it just right.  And

21   there were at least a few reasons why.  Looking at slide 9, two

22   aspects of the Board's initial decision to institute are worth

23   keeping in mind.  First not every patient necessarily demonstrates

24   a therapeutic effect from the method of treatment.  I think both

25   sides' experts are in agreement on the fact that not every patient

18

Case IPR2016-00712
Patent 8,927,592 B2

1  benefits from this claimed method.  And second, the method steps

2  are performed the same way regardless of whether a patient

3  benefits.

4          Curiously, during his deposition, Dr. Sartor, patent

5  owner's expert, brought up the situation where halfway through a

6  participant in this TROPIC study, the phase III clinical trial for

7  cabazitaxel, if halfway through that one particular patient's course

8  of treatment the data came in, the results came in, he insisted that

9  up until then you could have no intention of treating that patient

10  successfully because you just didn't know, and without the

11  knowledge that came later, you were unable to be practicing these

12  claims.

13          He said then if the data came in mid-course, you get this

14  treatment every three weeks and it lasts five or eight courses, if

15  the data came in, the next treatment the doctor would have the

16  knowledge and thus could have the intention of treating.  So now

17  all of a sudden this exact same patient receiving the exact same

18  treatment, the method being identical in Dr. Sartor's mind would

19  be practicing the invention.  And he answered the question as to

20  whether this only depended on what was in the physician's mind.

21  His answer was absolutely.

22          That cannot be the test for patentability.  That, I think,

23  underscores how the patent owner has approached this entire '592

24  reasonable expectation of success analysis.  They have held us to

25  a bar which is not the bar for patentability.

19

Case IPR2016-00712
Patent 8,927,592 B2

1        So if I could, I would like to move briefly to the

2    question of the other grounds.  Ground 1 is based on Winquist

3    and the TROPIC listing.  But each of the other grounds includes

4    an additional reference.  For instance, on slide 19, this addresses

5    ground 2 that relates to claims 3 and 4.  And the difference in

6    these two claims is that these two claims deal with acetone

7    solvate, an acetone solvate of cabazitaxel, a particular form.

8        The additional reference here, Didier, is a patent that

9    happens to be owned by patent owner here that explicitly teaches

10   an acetone solvate of cabazitaxel with between 5 to about

11   7 percent by weight of acetone.  This falls squarely within claims

12   3 and 4.  And the elements of claim 3 and 4, then, are taught by

13   Didier.  And the question becomes whether there's a motivation.

14   And patent owner's sole argument here is that there is no

15   motivation to combine Didier with Winquist and the TROPIC

16   listing.

17       As we set out in the petition, however, it's well known

18   in the art that nonaqueous solvates such as acetone could be used

19   to improve water solubilityof otherwise water-insoluble drugs.

20   And patent owner argues that the background art would not

21   motivate selecting acetone for a solvate of cabazitaxel, but this

22   argument ignores the fact that the existence of other options, the

23   availability of other options does not teach away.  Rather,

24   because Didier itself explicitly teaches making an acetone

20

Case IPR2016-00712
Patent 8,927,592 B2

1    solvate, we think there is both motivation to combine and

2    reasonable expectation of success.

3            JUDGE MURPHY:  What was the dosage of the drug in

4    Didier, if you recall?

5            MR. REED:  The dosage?

6            JUDGE MURPHY:  In other words, did they have a

7    particular concentration or it was just about solvating --

8            MR. REED:  It's closer to the compound patent than the

9    method of treatment patent.  This is kind of an intervening patent.

10   In terms of time, there was initially the compound and then there

11   was the acetone solvate which was a form of the cabazitaxel.

12   And then the third kind of in time is this method of treatment

13   patent.

14           And that's a good point.  In terms of timing, recall that

15   that compound, the first patent in this chain, the '170 patent issued

16   in 1998.  And the method of treatment patent could have been

17   applied for as early as 1998 or presumably earlier than that.  The

18   fact that they didn't even apply for their patent until 2009, it's too

19   little too late.  Effectively what they are trying to do is come in

20   here and salvage a patent that if they were going to apply for it,

21   they should have applied for it years before they ever did.

22           So the ground 3 covers claims 7, 8 and 9.  This is on

23   slide 21.  These claims 7, 8 and 9 each deal with a different

24   pharmacokinetic parameter.  They include the maximum

21

Case IPR2016-00712
Patent 8,927,592 B2

1    concentration of the drug or Cmax, the total area under the curve

2    or AUC and plasma clearance or CL.

3           Now, the values that correspond to the claimed values

4    are disclosed in the Mita reference.  Dr. Seth did some unit

5    conversion for one of these, and he set forth in the table the

6    values disclosed in Mita.  That is his table towards the bottom of

7    slide 21.  And those parameters, each of those pharmacokinetic

8    parameters falls squarely within the claimed range of values in

9    claims 7, 8 and 9.  In short, Mita in combination with Winquist

10    and the TROPIC listing, renders claims 7 to 9 obvious.

11           So then there's ground 4.  I'm turning to slide 23.  Two

12    claims of the '592 patent are directed to a 10-milligram per day

13    dose of prednisone.  In other words, a particular dose.  Prednisone

14    in combination with cabazitaxel was taught by both Winquist and

15    the TROPIC listing.  Here we have the specified 10 milligrams

16    per day dose.  And then in addition, there are two claims directed

17    to monitoring blood during the course of treatment, the neutrophil

18    levels, to be precise, and then discontinuing treatment when those

19    levels drop to a dangerous point.

20           And the Tannock reference, which is the additional

21    prior art reference for ground 4, teaches each of these steps in the

22    context of docetaxel treatment of metastatic castration-resistant

23    prostate cancer.  So Tannock was, in the context of docetaxel,

24    doing exactly what is now claimed in claims 10, 11, 14 and 16 in

25    the realm of cabazitaxel.

22

Case IPR2016-00712
Patent 8,927,592 B2

1        Moving to slide 25 and ground 5, there are three claims

2   that recite a specific dosage of cabazitaxel, 20 milligrams per

3   meter squared.  This is as opposed to some other claims that are

4   limited to 25 milligrams per meter squared and the independent

5   claims which say 20 to 25, the range.  So this exact dosage of

6   20 milligrams per meter squared, of course, is what was used in

7   the Pivot phase II clinical trial.  This was in the context of

8   metastatic breast cancer.  And Beardsley had taught that it was

9   this phase II clinical trial that had served as the motivation for the

10  phase III clinical trial, of course.  And Pivot teaches the use of 20

11  milligrams per meter squared of cabazitaxel in patients with less

12  tolerance for this chemotherapy.

13       Now, just a side note that might be jumping ahead just a

14  little bit, but patent owner has suggested that you had to have data

15  in order to get this patent, the '592 patent depends on the clinical

16  trial results of the TROPIC study.  The TROPIC study used a

17  dosage of 25 milligrams per meter squared.  They did not have

18  any results for a 20 milligram per meter squared dosage.  So if

19  patent owner were correct that the results are necessary, they

20  haven't enabled this patent because they presented no results for

21  20 milligrams per meter squared.

22       Now, slide 6 -- sorry, ground 6, slide 27 addresses one

23  final independent claim.  It's claim 15.  And this claim is kind of a

24  combination of some of the others.  It includes both the

25  20-milligram per meter squared dosage and then it also includes

23

Case IPR2016-00712
Patent 8,927,592 B2

1    the 10-milligram per day dosage of prednisone.  So these two

2    dosages are both set out in claim 15.  And those two parameters,

3    those two sets of dosage figures are rendered obvious by

4    Winquist and the TROPIC listing in combination with Pivot

5    which teaches the 20 milligrams per meter squared and Tannock

6    which teaches the 10 milligrams per day of prednisone.

7              Slide 28 is addressed specifically to the argument patent

8    owner makes in response to grounds 4 and 6 with respect to the

9    prednisone dosage.  But patent owner's prednisone arguments

10   ignore the prior art which includes the express disclosure in

11   Winquist and the TROPIC listing of prednisone in combination

12   with cabazitaxel, the express teaching of Tannock wherein 10

13   milligrams per day of prednisone is administered in combination

14   with docetaxel, the fact that mitoxantrone was routinely

15   combined with prednisone.  In fact, in this TROPIC listing, the

16   phase III study, mitoxantrone in combination with prednisone

17   was the comparator arm.  Dr. Sartor himself described

18   mitoxantrone in combination with prednisone as the de facto

19   standard therapy for treating prostate cancer patients who

20   progressed after docetaxel.

21             JUDGE MURPHY:  That was earlier than the priority

22   date he was referring to?

23             MR. REED:  Certainly, yes, before they started the

24   phase III trial, he considered mitoxantrone in combination with

24

Case IPR2016-00712
Patent 8,927,592 B2

1  prednisone to be the de facto standard therapy for post docetaxel

2  castration-resistant metastatic prostate cancer patients.

3      Finally, other dosages could have been chosen, but --

4  other than the 10 milligrams per day, but 10 milligrams per day

5  was the most common dose for treatment of prostate cancer.

6      So unless the Board has questions, I would like to move

7  to secondary considerations.

8      JUDGE MURPHY:  Let me just ask if Judge Hulse or

9  Judge Kaiser has questions at this point before we move on.

10     JUDGE HULSE:  None for me, thanks.

11     JUDGE KAISER:  No, none here.

12     JUDGE MURPHY:  All right, Mr. Reed, go ahead.

13     MR. REED:  Thank you.  So with respect to secondary

14  considerations, and this is referring to slide 29, keep in mind that

15  the burden of production is on patent owner to establish these

16  secondary considerations.  And patent owner must establish a

17  nexus.  That is, establish that any secondary consideration

18  evidence traces its basis to a novel element in the claim.  Not to

19  something in the prior art.

20     In our reply brief, we addressed all of the secondary

21  considerations asserted by patent owner.  Here I think I have only

22  time to touch on a few.  So let's start with on slide 30, the idea of

23  lack of nexus and unexpected results.  This is perhaps the most

24  important of the secondary considerations.  In fact, I think the

25

Case IPR2016-00712
Patent 8,927,592 B2

1    Board identified this in the institution decision as one that was of

2    particular interest.

3           Let me start by pointing out that there are eight different

4    patents listed for patent owner's product Jevtana.  It includes the

5    patent covering the compound, the cabazitaxel compound, the

6    '170 patent and seven others, one of which is this '592 patent at

7    issue here.  Patent owner has not demonstrated and in fact, hasn't

8    even undertaken to try to demonstrate that any of the purported

9    secondary consideration evidence that it presents traces back to a

10   novel element in the '592 patent specifically.

11          Now, with respect to unexpected results, first recognize

12   that the closest prior art --

13          JUDGE MURPHY:  Let me ask you this.  There is at

14   least some case law that suggests we should presume a nexus if

15   patent owner establishes that their secondary indicia evidence, if

16   you will, in this case, the results of the phase III trial study, can

17   be read on the claim.  And so how does that factor in to the

18   importance of identifying the nexus to a particular novel element

19   of this claim versus, you know, whatever other patents they have?

20          MR. REED:  I think what you need to look at here is the

21   fact that we are not talking just about the '592 patent being the

22   only patent that covers the product.  We are talking about a whole

23   portfolio of patents that covers this product, arguably.  That's

24   patent owner's position.  That's why they are all listed --

26

Case IPR2016-00712
Patent 8,927,592 B2

1       JUDGE MURPHY:  Well, this patent is a method of

2    treatment patent, and their evidence is directed to the results of

3    the clinical trial that is the actual method of treatment in a large

4    study, in a controlled study.  Why isn't that enough to establish a

5    nexus?

6       MR. REED:  So two points in response to that.  First

7    off, their expert, Mr. Tate, who offered opinions about

8    commercial success in particular, disavowed any opinion

9    regarding nexus.  So he has not submitted any evidence

10   supporting a nexus.  And their technical --

11      JUDGE MURPHY:  Well, he is a business person,

12   right?

13      MR. REED:  That's right.  And he points to the

14   technical expert, Dr. Sartor.  Dr. Sartor, whether deliberately or

15   not, repeatedly confuses what is patented.  At times he talks about

16   it as if it were cabazitaxel.  He talks about what a person of

17   ordinary skill in the art understood or didn't understand about

18   cabazitaxel and is the source of the evidence that patent owner

19   relies on to suggest that there is a nexus.  So the fact that they are

20   pointing broadly and somewhat vaguely to cabazitaxel as the

21   source of these secondary considerations --

22      JUDGE MURPHY:  But that's not how I understand the

23   evidence.  I understand their argument and evidence to be pointed

24   to the use of cabazitaxel in an actual method of treatment with,

27

Case IPR2016-00712
Patent 8,927,592 B2

1    quote, unexpected results, at least in their view, unexpected

2    results.

3           MR. REED:  Yeah, so the question really becomes, if

4    you are evaluating whether there are unexpected results, then

5    what is it that it should be unexpected over.  If you have certain

6    information and based on that information you expect certain

7    results, in other words, if you have a reasonable expectation of

8    achieving the claimed invention, then results that come out might

9    not be unexpected.  And whether they meet the FDA's regulatory

10   hurdle or not is not the appropriate measuring stick to use to

11   determine whether the results were unexpected.

12          This is another conflation of the standard for

13   patentability with the standard for regulatory approval.  And in

14   particular, with respect to the results of the phase III trial that they

15   call unexpected, those results need to be looked at in context.

16   Even if the -- so our position is that the closest prior art is

17   cabazitaxel --

18          JUDGE MURPHY:  Let me ask you a question about

19   that, because two things, they have failure of other drugs,

20   tubulin-binding mechanism-type drugs, whether they were

21   taxanes or nontaxanes, that they suggest were failures to achieve

22   the kind of results that Jevtana in the phase III clinical trial

23   attained.  That's one.  And two, the evidence of FDA fast-track

24   approval once the results came in.  And they point to that, patent

25   owner points to that and says, well, hey look, don't take our word

28

Case IPR2016-00712
Patent 8,927,592 B2

1  for it.  When the results came in at the end of the phase III or

2  toward the end of the phase III, the FDA was impressed enough

3  to fast-track it for approval.  And that tells you, so says patent

4  owner, that the results truly were unexpected.  What is your

5  response to those two things, failure of other drugs in phase III,

6  similar mechanism and also the FDA fast-track?

7        MR. REED:  So taken in reverse order, the idea of the

8  fast-track being evidence that it was unexpected, I don't think that

9  that's the right bar.  Respectfully, the idea that because FDA

10  considers something appropriate for fast-track approval does not

11  inform the question of patentability at all as an initial --

12        JUDGE MURPHY:  Why not?  Why isn't it just

13  evidence that the results may have been unexpected to a person of

14  ordinary skill, who I understand is a practicing oncologist, right?

15  There's no debate about that.

16        MR. REED:  And it may be that that fits a little better in

17  the idea of unmet need than unexpected results.  Regardless, if

18  what we are looking at is an improvement of overall survival of

19  2.4 months, which is what the TROPIC study results reported,

20  2.4 months compared to -- even if we go back to docetaxel as the

21  closest prior art, which we argue it's not, the closest prior art is

22  Winquist and TROPIC which taught this method with

23  cabazitaxel.  But going back to docetaxel, looking at docetaxel,

24  what we have is a demonstrated improvement in overall survival

25  of 2.4 months.  I think it is a coincidence, but it's the identical

29

Case IPR2016-00712
Patent 8,927,592 B2

1    increase in overall survival.  So what you ask yourself, is it

2    unexpected that a taxane, a second-line therapy taxane,

3    cabazitaxel, would show the same increase in overall survival as

4    the first taxane?

5            JUDGE MURPHY:  Well, but it's not the same because

6    it's post docetaxel.

7            MR. REED:  Exactly, but we already have evidence

8    from Attard and from Beardsley showing that in the

9    post-docetaxel environment you are seeing activity.  That is what

10   was reported in Attard, in the Mita reference.  You are already

11   seeing this post-docetaxel activity.  So there is something

12   different about it.  You know that already.  That is the prior art.

13   And when you are looking at whether it's unexpected then that it

14   would increase it about 2.4 months, it has activity post docetaxel.

15   If it had increased by ten months, maybe we would be having a

16   different conversation.  But in terms of post-docetaxel activity

17   already being known and understood, the increase in overall

18   survival of the same amount of time is not an unexpected result.

19           I'm eating into my rebuttal time now.

20           JUDGE MURPHY:  Your choice.  Do you want to

21   continue for another couple of minutes and I'll just take it off --

22           MR. REED:  I would prefer to reserve that time, if I

23   may.

24           JUDGE MURPHY:  Okay.

25           MR. REED:  Thank you.

30

Case IPR2016-00712
Patent 8,927,592 B2

1       JUDGE MURPHY:  So Mr. Reed, 19 minutes.

2       MR. SOLANDER:  Judge, can I please have

3  30 minutes.

4       JUDGE MURPHY:  Thirty?

5       MR. SOLANDER:  Yes.  Well, 30 minutes on the

6  clock.  We are going to reserve five minutes for rebuttal.

7  Mr. Minion is going to handle the motion to amend.  So he'll use

8  the other 25 minutes of my time, if that's okay.

9       JUDGE MURPHY:  Sure.  If that's how you want to

10  split it up, that's fine with me.

11       MR. SOLANDER:  Good afternoon, Your Honors.

12  Again, my name is William Solander.  I can now see you over

13  there.  I was hiding behind the podium before.  It's good to see

14  everyone.

15       Your Honors, I'm going to start with the question that

16  Judge Murphy asked about reasonable expectation of success and

17  how it relates to the preamble.  It is true that the preamble is not a

18  limitation in this case.  And that means that Mylan does not have

19  to show that that limitation is found within the prior art.  But that

20  does not relieve them of the obligation to show that there was a

21  reasonable expectation of success that this method would provide

22  a benefit.  And the case I, think, that sets it out better than I ever

23  could is the *DePuy Spine* case.  It says while predictability is a

24  touchstone of obviousness, predictability refers not only to the

25  expectation that the prior art elements are capable of being

31

Case IPR2016-00712
Patent 8,927,592 B2

1    physically combined, in other words, that you could take the

2    Winquist and the clinicaltrials.gov listing and physically combine

3    them to create a method, but that the combination would have

4    worked for its intended purpose.  This patent is directed to a

5    method for treating prostate cancer.

6              JUDGE MURPHY:  Let me stop you there.  *DePuy*

7    *Spine*, it's a medical device.  It's a combination of

8    physical/mechanical elements.  It's not a method of treatment.

9    What is your best method of treatment case that you cited that

10   you think supports --

11             MR. SOLANDER:  I think the best one is the *Coalition*

12   *For Affordable Drugs*.

13             JUDGE MURPHY:  How about a Federal Circuit case.

14             MR. SOLANDER:  It's not a Federal Circuit case, Your

15   Honor.

16             JUDGE MURPHY:  I know it isn't.  I'm asking you for

17   a Federal Circuit case.

18             MR. SOLANDER:  Let me think about it, Your Honor.

19   I'll get back to you, I promise.  I think, but in terms of what the

20   success is here, let me just say what we are not saying it is.  We

21   are not saying that success requires a phase III clinical trial.  We

22   are not saying that success requires FDA approval.  We have

23   never said that.  Our brief doesn't say that.  That's a strawman

24   argument that's being knocked down here.

32

Case IPR2016-00712
Patent 8,927,592 B2

1          What we say success is in terms of a method for treating

2    cancer is that you find a drug and a method that provides a benefit

3    to the patient that outweighs the risk to that patient.  And that, if

4    we look at my slides, I hope everybody has them, Your Honors,

5    and if you look at slide 4, this is cross-examination of Mylan's

6    expert, Dr. Seth.  I think we handed up a paper copy.

7          JUDGE MURPHY:  I'm with you.

8          MR. SOLANDER:  Okay, slide 4.  So we asked

9    Dr. Seth, If you don't believe that the benefits outweigh the risks,

10   you would never give the drug to the patient?  And that's at all.

11   And he said, yeah, in 2009 a POSA would feel that way too,

12   right.

13         So at a minimum a method of treating a patient requires

14   that the benefits of the method outweigh the risks to the patient.

15   If you flip it --

16         JUDGE MURPHY:  Let me ask you a question about

17   that.  So the question I have is doesn't the fact that Winquist and

18   the TROPIC listing are prior art which disclosed the phase III

19   protocol, including the dose.  Why isn't that evidence that there

20   would be -- there's already been, if you will, an assessment that

21   the benefits may outweigh the risks.  So you are going to go

22   forward with the clinical trial.

23         MR. SOLANDER:  I disagree that that assessment has

24   been made.  It's the purpose of running that clinical trial in

25   prostate cancer.  If they had run the trial -- and again, we are not

33

Case IPR2016-00712
Patent 8,927,592 B2

1   requiring a phase III trial.  If there was a phase II trial here in

2   prostate cancer that allowed somebody to characterize the

3   benefits and the risks of the patients or even a phase I trial in

4   prostate cancer that was large enough to permit that assessment,

5   then I would agree with Your Honor.

6          But we also asked Dr. Seth, does Mita and Pivot -- this

7   is the same page at the bottom.  Does Mita and Pivot permit a

8   POSA to characterize the risks and benefits of giving cabazitaxel

9   to prostate cancer patients?  And Dr. Seth said, and I'm

10  summarizing a little bit here, he said there's not enough data in

11  those two studies to make that characterization.  I don't have

12  enough data.  I need a larger study before I could tell you if I

13  could characterize the risks and benefits of cabazitaxel in prostate

14  cancer patients.

15         The Mita study was simply too small.  If I could take

16  you, please, to slide 5 and just talk about the Mita study for a

17  moment, the Mita study was a dose-ranging study in patients

18  having a variety of cancers.  And as Dr. Seth agreed, Mita was

19  not designed to determine the efficacy of cabazitaxel in a specific

20  patient population.  It wasn't designed to do that.  There was no

21  corticoid administered to any of the patients.  And of the 25

22  patients, eight of them had prostate cancer.  There were two

23  partial responses that were observed, both of them prostate

24  cancer, one of them in a patient that had docetaxel refractory

34

Case IPR2016-00712
Patent 8,927,592 B2

1  cancer.  And I'll talk about what a partial response is in a minute,

2  but it is a shrinkage of the tumor and a PSA response.

3       But importantly, at the 25 milligrams per meter squared

4  dose, three of the seven patients had a dose-limiting toxicity.  In

5  this case it was neutropenia, which is a life-threatening low blood

6  count.  So there was a significant amount of risk that was

7  observed in those patients and a benefit in one patient.  And what

8  Dr. Seth said is I looked at that study and I can't tell you whether

9  the risks outweigh the benefits or sorry, whether the benefits

10  outweigh the risks in giving your patient prostate cancer.

11       JUDGE KAISER:  Can I interrupt you for a second.  It

12  seems to me like the only place in the claim language that you get

13  this idea of the benefits need to exceed the risks is in the method

14  for treating language; is that right?

15       MR. SOLANDER:  Your Honor, we are saying that that

16  is the measure of success for reasonable expectation of success.

17  It's very rare that the success that you are measuring is found

18  within a claim.  If, for example, you are talking about a

19  compound claim and whether you would reasonably expect

20  success, it's almost never that you find the language of the

21  success in the claims.  The whole patent is directed to oncologists

22  to provide a method for treating prostate cancer.  If all you had

23  come up with was a method that was more risky for a patient than

24  providing benefits, you wouldn't have had an invention at all.

35

Case IPR2016-00712
Patent 8,927,592 B2

1       So there has to have been a motivation to do what

2   Mr. Reed suggests, and that is take these two documents,

3   combine them in such a way as to fill in all of the blanks and then

4   actually give it to a patient with prostate cancer.  There has to

5   have been a motivation to do that.  The only reason that you

6   would do it, Dr. Seth says this, is because the benefits of giving

7   that treatment outweigh the risks.

8       JUDGE KAISER:  How do you square that with the

9   preamble not being a limitation?  I mean, the method of treating

10  language is only in the preamble.

11      MR. SOLANDER:  Well, I square that by saying if the

12  preamble was a limitation, there would be an additional burden

13  on them to go back into the prior art and show a method of

14  treatment.  What we are saying is that you have a method that all

15  of the elements are found in the prior art in different references.

16  So we are talking about obviousness.  Not anticipation.  You have

17  to combine those references and you have to do so with a

18  reasonable expectation of success.

19      The question is the success of what?  The *DePuy Spine*

20  case says, well, agreed it's a medical devices case, but it says you

21  have to look at the intended purpose of the invention.  The

22  intended purpose of the invention here, as defined by the

23  specification and everything else, is to provide a benefit to cancer

24  patients.

25      JUDGE KAISER:  Okay.

36

Case IPR2016-00712
Patent 8,927,592 B2

1  JUDGE HULSE:  I'm looking at the *DePuy Spine* case

2  and the intended purpose language is really focused on the

3  teaching away aspect.  And I think petitioner pointed that out.

4  Could you expand on that a little bit as to why this is applicable.

5  MR. SOLANDER:  Your Honor, I think I have gotten

6  off track.  I think what that case stands for is the proposition that

7  when you combine even mechanical elements, they may be

8  simple to combine.  What I'm focused on is the argument by

9  Mr. Reed that it's a 100 percent no-brainer to combine these two

10  references because they concern the same study.  What I'm saying

11  is that the law always imposes upon a combination of references

12  a -- the question of whether or not there would be a motivation to

13  make that combination.  And I say in this particular case the

14  motivation has to be a reasonable expectation of a successful

15  treatment for prostate cancer.  We are not saying it has to be a

16  phase III.  We are not saying it has to be an FDA-approved

17  treatment.  All we are saying is that the benefits of that treatment

18  have to outweigh the risks or else you would never even give it to

19  a patient and you will never have had an invention.

20  JUDGE MURPHY:  But when you say a successful

21  treatment, aren't you imputing a therapeutic efficacy limitation?

22  MR. SOLANDER:  Not at all.

23  JUDGE MURPHY:  What do you mean not at all?  Let

24  me ask you this.  Do you agree there's no therapeutically effective

25  amount limitation in the claim?

37

Case IPR2016-00712
Patent 8,927,592 B2

1    MR. SOLANDER:  I agree.  You have said that there's

2    no therapeutically effective amount limitation.

3    JUDGE MURPHY:  And there's no efficacy limitation

4    that I see in the claim.  So what is the success of the method that

5    is claimed?

6    MR. SOLANDER:  What I'm saying is the success has

7    to be -- and it can be based on evidence that's far less than a

8    phase III trial.  So if you had a phase II trial in prostate cancer, for

9    example, and you show that the benefits to the patients were

10   outweighing the risks, the benefits not necessarily in overall

11   survival, it could mean that they live longer, they live better, it

12   could be a palliative benefit, if there was some reason why a

13   person of ordinary skill in the art would be motivated to combine

14   the two references in order to give that method to a prostate

15   cancer patient, that's what I'm talking about here.  I'm not talking

16   about the limitation where some presumed efficacy benefit.  It

17   doesn't have to be a particular benefit.  It just has to outweigh the

18   risks to the patient or else it's not an invention, as I was saying.

19   You haven't invented anything if you've got a method that doesn't

20   work.

21   JUDGE MURPHY:  Why doesn't Beardsley state -- you

22   know, I recognize it was phase II in metastatic breast cancer.  Not

23   prostate cancer.  But there at least is a statement that suggests

24   there was sufficient activity, if you will, in the phase I cabazitaxel

25   study to basically skip a phase II based on the phase II in breast

38

Case IPR2016-00712
Patent 8,927,592 B2

1   cancer and go right to a phase III in metastatic prostate cancer.

2   So why isn't -- in Beardsley, that's how I take Beardsley just

3   reading the reference on its face.  Why isn't something like that

4   sufficient for a person of ordinary skill in the art?

5         MR. SOLANDER:  I think what Beardsley says is that

6   we haven't seen evidence that would discourage us from doing

7   this.  We haven't yet shown, for example, if in the -- if we look at

8   Pivot for a second, and I think we should -- maybe we should

9   look at Pivot before I go and answer that question.  If we look at

10   Pivot, what did it say?  This is all summarized on page 8.  I think

11   it's important because you have to take the Beardsley statement in

12   the context of Pivot which is what an expert would do or a POSA

13   would do.

14         So if you look at slide 8 where we talk about Pivot, it's a

15   single arm study.  There's no comparative arm.  Measurable

16   disease was required.  Most of the time in prostate cancer patients

17   there is no measurable disease.  In fact, I think the testimony is

18   it's quite rare.  It started at 20 milligrams per meter squared.  And

19   in Pivot, 72 percent of the patients could not escalate to

20   25 milligrams per meter squared because of toxicity.  And in fact,

21   grade 3 and 4 neutropenia was observed in 73 percent of those

22   patients, grade 3 and 4 being the most severe type of neutropenia

23   requiring immediate cessation of treatment.  And they had a

24   14 percent objective tumor response rate.  So there was evidence

25   of activity in this breast cancer study.

39

Case IPR2016-00712
Patent 8,927,592 B2

1        So what they are saying, I think, in Beardsley, if you
2   look in light of what was said about Pivot, is that Pivot did not
3   tell us to stop.  We haven't yet -- if we had a study in which the
4   risks outweigh the benefits to the patients, then it probably would
5   not be justified to go forward.  But since we haven't yet gotten a
6   stop sign and we are seeing evidence of activity, it's worth trying
7   to see if it works in prostate cancer patients.  And if it works in
8   prostate cancer patients to the extent that it outweighs the risks to
9   those patients.

10       I mean, these are very desperately ill men, it's true, but
11  the tolerance for side effects is not unlimited.  And what you see
12  in the prior art with the number of failures that Your Honor
13  discussed with Mr. Reed, a lot of them failed because of the
14  toxicity.  So the toxic effects aren't unlimited.  If you are giving it
15  to a patient and you are essentially killing them sooner than they
16  would die anyways, that's not providing them a benefit.  That
17  wouldn't outweigh the benefit in most cases.

18       So looking at the Beardsley statement on line 9 that they
19  refer to, it is not an expectation of success.  It's just saying we are
20  justified because we haven't been stopped yet in going forward
21  into the TROPIC study.

22       JUDGE MURPHY:  Well, but isn't it a little more than
23  that?  I mean, Beardsley is basically saying, particularly when
24  you read it in context with Winquist and TROPIC saying, okay,
25  as of the priority date, I now know that Beardsley was correct that

40

Case IPR2016-00712
Patent 8,927,592 B2

1   a phase III trial was underway, and I actually have the protocol,

2   including the dosage for what's actually being given to patients.  I

3   mean, why isn't that evidence of an expectation of some clinical

4   benefit outweighing the risks because these patients are going to

5   die, right?  I mean, they are post docetaxel.  They are docetaxel

6   refractory, right?  So my understanding, the experts agree that at

7   that point there are extremely limited options --

8           MR. SOLANDER:  They are terminally ill patients.

9   And that's why the end point of the study was overall survival.

10  Not a cure.

11          JUDGE MURPHY:  So if you have that kind of a

12  patient, and I get it, that's really hard to treat, but if the prior art

13  includes the protocol from your own study and Beardsley says,

14  you know, this looks like it might work, that phase III trial is

15  ongoing, it tells a person of ordinary skill that at the dosage level

16  that's in the claim it is, in fact, being administered to patients.

17  Why isn't that evidence that a person of skill would read that and

18  say that must be a benefit that outweighs the risk because the

19  risks can be high because this person is probably going to die

20  anyway?

21          MR. SOLANDER:  I think, Your Honor, what I think

22  most people would take from the fact that a clinical trial was

23  ongoing the exact opposite conclusion.  I think they would reach

24  the conclusion that it is unknown whether or not these patients are

25  going to benefit from this drug or not, and we are going to try to

41

Case IPR2016-00712
Patent 8,927,592 B2

1    find out if they do.  That's what they would take from a listing of

2    a clinical study and enrollment in a study.  And of course when

3    patients are enrolled in a study, they are often told that we don't

4    know whether this study is going to benefit you or not.  We don't

5    know.  You may suffer significant side effects and you may die.

6    We just don't know.  We haven't seen anything that tells us you

7    are going to suffer those significant effects.  That's what they are

8    saying about Beardsley.  We haven't been told, no, stop.  But we

9    don't know whether the efficacy in these very desperately ill men

10   that suffer from this type of prostate cancer is going to outweigh

11   the risks to them from the neutropenia and other things that are

12   observed in the study.

13          If you look at what Dr. Seth said about Pivot -- so he

14   looked at the actual data.  We showed it to him.  He's looked at it.

15   Of course he studied it.  This is found on page 10 --

16          JUDGE MURPHY:  Slide 10?

17          MR. SOLANDER:  Slide 10, I'm sorry.  And he says,

18   Pivot was not designed to evaluate the effectiveness of

19   cabazitaxel.  Right.  Pivot was not designed to determine the risks

20   associated with cabazitaxel treatment in prostate cancer.  Right.

21   And then we said the activity of cabazitaxel's effectiveness in

22   prostate cancer could be different than it is in breast cancer.  And

23   he said, yes, of course, any compound can act differently from

24   different cancers, breast or prostate.  And as Dr. Sartor explains

25   in his declaration and we explained in our brief, the biology of the

42

Case IPR2016-00712
Patent 8,927,592 B2

1   cancers is different.  So you would not expect that any activity in

2   breast cancer would translate to activity in prostate cancer.

3         JUDGE KAISER:  So when would there be a

4   reasonable expectation of success?  I guess the caricature of

5   petitioner's argument is any time there's a phase III study started,

6   there is a reasonable expectation of success.  And they answered

7   the question and said, no, we don't really mean that.  But that's

8   sort of the logical extension of their argument.  The logical

9   extension of your argument is until a phase III study is completed

10   and has shown that the FDA needs to approve this treatment now,

11   there is no reasonable expectation of success.  Why is that a

12   caricature of your argument and not a correct characterization of

13   it?

14         MR. SOLANDER:  Your Honor, I think if a phase I

15   study had been done in prostate cancer that permitted

16   somebody -- not this one, but permitted a person of ordinary skill

17   in the art to say that the risks to the patients, the prostate cancer

18   patients in that study outweighed the benefits, that would suffice.

19   Same with phase II study that provided that same evidence.

20         And indeed, in some therapeutic areas, oncology not

21   being one of them, animal tests might be sufficient to get -- to

22   have a reasonable expectation of success.  But given the backdrop

23   of all the failures and the unpredictability in this particular art, the

24   fact that you are using a taxane after a taxane, so for whatever

25   reason -- and it is unknown to this day why prostate cancer

43

Case IPR2016-00712
Patent 8,927,592 B2

1    patients become resistant to docetaxel, that is conceded by the

2    other side.  That can be found on page 2 of our slides.  There are

3    theories as to why this occurs, but it's unknown why patients

4    become resistant.

5           So if their point is correct that docetaxel and cabazitaxel

6    would be expected to act similarly because of their chemical

7    structure similarity, then one would expect that cabazitaxel would

8    also not work in patients that become resistant to docetaxel,

9    another taxane.  And the fact that it does, I think, is surprising.  I

10   think that's why you need more than an animal study.  You need a

11   clinical study in order to demonstrate that because nobody knows

12   why the resistance occurs in prostate cancer patients.

13          If I could talk about the Winquist and clinicaltrials.gov

14   listings, just a few points on those, and those are summarized on

15   slide 13, these studies, I think it's undisputed, they don't contain

16   any data.  They don't talk about the dose of prednisone.  They

17   don't talk about the particular formulation.  They don't talk about

18   the infusion time.  They don't talk about the pharmacokinetic

19   properties.  They don't talk about the neutrophil levels.

20          JUDGE MURPHY:  Well, let me ask you this.  Is there

21   any dispute that any limitation in claim 1 or claim 27, the two

22   independent claims, is not disclosed in those two references?

23   They say every limitation is disclosed.  Arguably the progression

24   would have to be inferred, but, hey, the whole point is they are

25   docetaxel refractory.

44

Case IPR2016-00712
Patent 8,927,592 B2

1        MR. SOLANDER:  I dispute that all of the limitations
2   are found in one reference.
3        JUDGE MURPHY:  Not in one reference.  The two
4   references.
5        MR. SOLANDER:  So if you take the two references
6   and you combine them, Your Honor, I believe that is true.  I think
7   that you can check every claim box in each of the references.  But
8   you have to combine them, that is correct.
9        JUDGE MURPHY:  And there's no therapeutic efficacy
10  requirement or effective amount limitation either.
11       MR. SOLANDER:  Your Honor, there's no limitation to
12  therapeutic efficacy or effective amount.  There is a reasonable
13  expectation of success that requires some benefit over risk to
14  patient, yes.
15       JUDGE MURPHY:  So I'm struggling with this, right,
16  because I would -- it would be different if we had a method of
17  treatment claim that claimed the therapeutically effective amount
18  or effective amount or therapeutically effective for increasing
19  survival or however you want to say it.  And in several of the
20  cases cited, cyclobenzaprine being one of them, there's always an
21  efficacy limitation.  And what I'm struggling with is how to sort
22  that out in this case because your evidence is directed to some
23  type of efficacy.  But there's no efficacy at all required in the
24  claim.

45

Case IPR2016-00712
Patent 8,927,592 B2

1        MR. SOLANDER:  Your Honor, I think it goes back to

2   the first principals of the obviousness analysis.  And that is if you

3   were forced to combine references, you are in the obviousness

4   realm, and the reason that -- because I think it's the famous

5   *Rosemont* case that said these are not games played with pieces of

6   paper.  These are things in real life.  So it's a listing on a website

7   and it's a publication in Canada that gives scant details about a

8   method that's being investigated.

9        JUDGE MURPHY:  It's not scant details.  It discloses

10  every element of the claim.  I mean, we didn't draft the claims.

11  The problem I'm having is the limitations that are in the claim and

12  that are not in the claim versus how to match that against your

13  evidence.

14       MR. SOLANDER:  And what I'm saying, Your Honor,

15  our evidence is relevant because when you have to combine those

16  references, you need a reason to do it.  You have to have a reason

17  to do it and then give it to a patient.  That's the point.  So you

18  have to combine the references and you would want to give it to a

19  patient.  And you wouldn't do that without some evidence that

20  you are not going to harm the patient more than you'll benefit

21  them.

22       JUDGE MURPHY:  In our initial decision we said in

23  view of Winquist and the TROPIC listing -- excuse me, Winquist

24  and the TROPIC listing in view of Beardsley and Attard,

25  particularly Beardsley, which to me is kind of an express

46

Case IPR2016-00712
Patent 8,927,592 B2

1  suggestion or an express recognition that this is, in fact,

2  happening that you've got enough -- you've seen enough

3  anticancer activity in the phase I, you've seen enough in the

4  phase II with breast cancer, it's basically saying -- and they

5  skipped right to a phase III, and that phase III trial is now

6  ongoing where the dosage of the drug is being administered to

7  patients.  I keep coming back to that because if I have to consider

8  that as their best argument against a claim that doesn't have an

9  efficacy limitation, it seems to me their standard of proof is lower

10  with this type of claim, if you will, than in a more traditionally

11  phrased claim.

12       MR. SOLANDER:  Your Honor, I think the problem

13  we have here is the evidence that we've adduced from Mylan's

14  expert.  He has said, I looked at Mita, I can't characterize the risk

15  and the benefit ratio.  I have looked at the data in Pivot.  Not

16  Beardsley, but the data, the actual data which is what a person of

17  ordinary skill in the art would do in this case.  I have looked at

18  the data.  I can't characterize the risk and benefit ratio.

19       Then we got to the TROPIC listings and we said -- what

20  he said about the TROPIC study is he said, look, I don't have

21  enough data.  I need the data from a larger study.  I have showed

22  you that quote which is found by Dr. Seth.  He says I need more

23  data.  So I need to go look -- and the only more data that's going

24  to come out is the TROPIC study.  That's in our patent.  That's not

47

Case IPR2016-00712
Patent 8,927,592 B2

1    prior art.  I need more data to characterize the risk and the benefit

2    of the method.

3            And he also said -- and I think this is very important in

4    his deposition, he said -- and this is found in our observations,

5    observation number 1.  He said the Winquist and TROPIC studies

6    don't even give me enough information to carry out the study.

7    Those two listings, I can't even design and carry out the study to

8    determine the more data that I need.

9            And then we asked him, and this is more relevant to

10   unexpected properties, but we asked him, Could you predict the

11   outcome of that?  And he says clear as day on slide 14, no, I

12   cannot predict the outcome of a phase III study.  So he says I

13   need more data than Mita and Pivot.  This is a skilled physician

14   looking at the actual data and says I can't tell you.

15           JUDGE MURPHY:  But whether a phase III study

16   would be, quote, successful, that's not the test.

17           MR. SOLANDER:  I understand that.  But he's saying I

18   need more data.  There was no more data.  The only more data

19   was going to come from this phase III study.  Yes, we could have

20   had a phase II.  I agree.  He says I couldn't even design the

21   phase III.

22           JUDGE KAISER:  He needs more data to do what?

23           MR. SOLANDER:  He needs more data to assess the

24   risk versus benefit.  You don't know whether the method works at

25   all.  It could harm the patients more than it benefits them.  So he

48

Case IPR2016-00712
Patent 8,927,592 B2

1   says, I would never give a drug to a patient without knowing it

2   had a positive benefit/risk ratio.  Then he says, I have looked at

3   Mita and Pivot, the data, I can't tell, I can't characterize the

4   risk/benefit ratio of those two studies.  I need more data.

5          The only data that ever comes out is in TROPIC.  He

6   says that I don't have enough information in the Winquist listings

7   to even carry out the study and I don't know whether the study

8   would have worked.

9          Your Honor, if I could just turn real quick to the

10  20 milligrams per meter squared claim because it's a slightly

11  different argument on that.  And it was just pointed out to me that

12  Mr. Reed, I think, mentioned this.  We had a therapeutically

13  effective amount in view of the TROPIC results in the claims,

14  and the examiner made us substitute in the dosage amounts.

15          JUDGE MURPHY:  Let me ask you about that.  I read

16  the prosecution history.  And the way I read it, there was an

17  interview, and the interview summary says add, I think it was, the

18  progression level.  It didn't say take out the effective amount

19  limitations.  But the effective amount limitations were, in fact,

20  removed from the claims before issuing.  But then the examiner

21  allowed the claims, gave reasons for allowance and pointed to the

22  clinical efficacy of the method.  So I'm scratching my head saying

23  what am I supposed to do with this?

49

Case IPR2016-00712
Patent 8,927,592 B2

1    MR. SOLANDER:  My understanding is the examiner,

2    whether it's reflected in the interview or not, suggested that that

3    change be made.

4    JUDGE MURPHY:  Well it's not in the record.  You

5    didn't point it out to me, because I read the file history and

6    nobody pointed it out to me.

7    MR. SOLANDER:  I understand, Your Honor.  You are

8    right, the examiner did rely on the clinical data after interview

9    with Dr. Sartor.

10    JUDGE MURPHY:  There was a declaration and

11    results.  I understand that.  What is not at all clear to me is that

12    the examiner appreciated that the effective amount limitations

13    were removed, which I come back to as kind of a seminal issue

14    that we need to resolve.

15    MR. SOLANDER:  I understand, Your Honor.  All I

16    know is what I know.  I know what's in the record doesn't suggest

17    why that happened.  I agree with you.

18    Now if we could turn for a moment to slide 15 which

19    has the 20 milligrams per meter squared dose, in each of -- so we

20    asked Dr. Seth about these claims as well, the 20-milligram dose.

21    And he pointed to example 1 in the patent itself, the '592 patent,

22    and he said even given the assertions of utility for that dose in the

23    patent, in the example it says you can use 20 milligrams per meter

24    squared.  If a patient is suffering neutropenia, you reduce it to that

25    level and continue treatment.  He says, I would not have thought

50

Case IPR2016-00712
Patent 8,927,592 B2

1   about giving 20 milligrams per meter squared.  So in view of all

2   the prior art and in view of the assertions made in the patent

3   itself, he is still skeptical of the 20 milligrams per meter squared

4   dose as being an effective dose.  And I think that, again, Your

5   Honor, that shows that there was no reasonable expectation of

6   success at all on the 20 milligrams per meter squared dose.

7               JUDGE MURPHY:  So what is the impact then of

8   Pivot?  I mean, Pivot, again, this is a different indication,

9   metastatic breast cancer, but it does disclose administering the 20

10  milligram per meter squared dose.

11              MR. SOLANDER:  I hang my hat on the difference in

12  the cancers, Your Honor.  I think breast cancer is just not

13  probative of what will happen in prostate cancer.  Obviously it's

14  all women, different age groups, and the cancer biologies are just

15  different.  And as Dr. Sartor points out, there are very few drugs

16  that are approved to treat both.  It just is a different cancer.

17              JUDGE MURPHY:  Okay.

18              MR. SOLANDER:  Thank you, Your Honors.  If there

19  are any further questions?

20              JUDGE HULSE:  No.

21              MR. SOLANDER:  Thank you.

22              MR. MINION:  Good afternoon, Your Honors.  I would

23  like to reserve five minutes.

24              JUDGE MURPHY:  How much time do you want?

25              MR. MINION:  Twenty-five minutes.

Case IPR2016-00712
Patent 8,927,592 B2

1       JUDGE MURPHY:  Okay.

2       MR. MINION:  It's Daniel Minion, Your Honors.  So

3  we have, Aventis proposes four claims.  I'm on slide 18 of our

4  deck now.  This is the claim 31, proposed claim 31 in the event

5  that original claim 27 is held unpatentable.  There are four claims

6  in total that are being proposed in our contingent motion to

7  amend.

8       As we set forth in our motion, claim 31 is fully set forth

9  in the specification or fully supported by the 903 application.

10  That's the January 2010 application.  It retains all of the

11  limitations of original claim 27.  So it does not enlarge the scope

12  in any way.  And the same is true for claims 32 through 34 which

13  mirror the dependent claims, original dependent claims 28

14  through 30.

15       Now, there are two important narrowing amendments to

16  the claims here, and on slide 19 we have the first.  And the claims

17  now require the administration of an antihistamine, a corticoid

18  and an H2 antagonist prior to the administration of cabazitaxel.

19  In our brief we refer to that as the three-component premedication

20  regimen.  And I'm going to get to the premedication aspect of this

21  claim in a moment, but I would like to start with the limitation

22  that I have highlighted on claim 20.  And that is the amendment

23  to the claim --

24       JUDGE MURPHY:  You mean slide 20?

Case IPR2016-00712
Patent 8,927,592 B2

1         MR. MINION:  Yes, sorry, slide 20.  And that is the

2    phrase, "to a patient in need thereof."  And the Federal Circuit, in

3    *Janssen* and *Rappaport* have held that where the method or the

4    preamble of a claim sets forth the objective of a method, here a

5    method of increasing survival, and the body of the claim directs

6    that that method be directed to a patient in need, it is an

7    intentional -- a statement of intentional purpose of the claim and

8    is therefore a limitation.

9         So put another way, if the preamble language is not a

10   claim limitation, the phrase "to a patient in need thereof" has no

11   proper antecedent basis.

12        JUDGE MURPHY:  So let's assume we take your point.

13   What is the actual limitation?  It's still not an efficacy limitation,

14   right?  It's an intent limitation that you need to administer the

15   dose to a patient who needs an increase in survival.

16        MR. MINION:  I believe it's both, Your Honor.

17        JUDGE MURPHY:  How can it be both?

18        MR. MINION:  It's both because if you look at the

19   cases --

20        JUDGE MURPHY:  *Janssen* doesn't say it's both.

21   *Janssen* says it's an intent limitation.

22        MR. MINION:  Intent limitation added through the

23   phrase "to a patient in need thereof."  But it doesn't change the

24   fact that you now have a limitation in the preamble, a claim

25   limitation on the preamble of a method of increasing survival.  If

53

Case IPR2016-00712
Patent 8,927,592 B2

1    the preamble is a claim limitation, you are going to have an

2    efficacy requirement.  But I'll submit to you, Your Honor, it

3    doesn't really make a difference.

4              JUDGE MURPHY:  I don't read *Janssen* as saying that.

5    I read *Janssen* as saying that there has to be knowledge that the

6    patient needs to have their life, their expected survival increased.

7    And the response to that from your adversary is, well, that's what

8    it means to be docetaxel refractory.

9              MR. MINION:  It's an intentional -- it's a statement of

10   intentional purpose.  So there is a scienter element on the POSA.

11   And as Dr. Sartor explains it, a POSA can neither expect nor

12   intend to increase survival without evidence that the

13   chemotherapeutic agent actually does so.  A POSA simply does

14   not treat a patient, a prostate cancer patient with a drug of

15   unknown safety and efficacy with the intent of prolonging their

16   life.  That's simply not the way that medicine works.

17             You need to have some sort of expectation that you are

18   going to provide the patient with a survival benefit in order to

19   have that intention to do so.  That's why I say, Your Honor, that I

20   don't think it really makes a difference whether we are talking

21   about an intention to increase survival or an expectation to

22   increase survival.  But I think it all comes back to the point, and

23   when we are talking about the preamble being a limitation, of

24   course we are -- Aventis is proposing these claims in the event

25   that the original claims are found unpatentable.  And we submit

54

Case IPR2016-00712
Patent 8,927,592 B2

1    that bringing the question of whether there is a reasonable

2    expectation of increased survival into the prima facie case

3    distinguishes these claims from the prior art.  And certainly in

4    such cases you generally see that the preamble is held to be a

5    limitation.  So I think any way you slice it, whether you are

6    talking about the preamble being a requirement of efficacy or

7    overall the claim requiring an intention to prolonged survival, I

8    think you come to the same place.

9           Now, as to patentability, I would like to begin with --

10          JUDGE MURPHY:  Just so I'm clear, you are saying

11   that that expectation is something more than just a clinical

12   benefit.  It's in fact, an expectation of increasing the patient's

13   survival, a docetaxel-resistant patient's survival?

14          MR. MINION:  That's correct.  And I would like to

15   begin in patentability and I would like to turn -- I can read from

16   them so you don't have to get both slides going, but the first

17   substantive slide I believe you will see from Mr. Reed when he

18   responds, the fourth bullet point -- this is his Section 101, Mylan's

19   Section 101 argument.  I'll read it: A claim to performing a prior

20   art method with knowledge of its results is not patentable under

21   35 USC Section 101.

22          And we see from their motion for observations on

23   Dr. Sartor's cross-examination, they cite to Dr. Sartor's testimony.

24   And I think you heard a little bit from Mr. Reed earlier that the

25   difference -- what Dr. Sartor said is the difference between now

55

Case IPR2016-00712
Patent 8,927,592 B2

1   and prior to the results of TROPIC are of course the knowledge

2   that cabazitaxel is an effective drug.  That was gained through the

3   TROPIC study.  And what Mylan asserts is gaining that

4   knowledge, specifically the knowledge that cabazitaxel increases

5   overall survival is not an inventive step and therefore, the claims

6   are unpatentable under Section 101.

7          That argument fails, however, because you can see

8   straight from their slide we are not talking about a method that is

9   in the prior art.  These claims are decidedly -- the methods of the

10   amended claims are decidedly not in the prior art.  There is no

11   single piece of prior art that discloses the claimed premedication

12   regimen with cabazitaxel in any form whatsoever.  And the same

13   is true for their inherency argument, Mylan's inherency argument.

14   The same slide, bullet 3, inherent results of a prior art method

15   cannot render the method patentable.

16          Judge Murphy, you alluded to the *In re: Montgomery*

17   case.  This is not a case of inherent anticipation.  We are in the

18   realm of obviousness.  There must be some reasonable

19   expectation of success.  Here we submit that that is increased

20   survival because of the limitation.

21          Now, we submit that there simply was not enough

22   evidence in the prior art to have a reasonable expectation of

23   increased survival.  And all that a POSA could have done would

24   be hope that TROPIC would turn out to increase survival.  And

25   that's really as far as Dr. Seth would go at deposition.

Case IPR2016-00712
Patent 8,927,592 B2

1    And I'm looking at slide 21 now.  We cite 13 different

2    instances in our motion for cross-examination of Dr. Seth of

3    times where he used the word "hope."  This is in response to my

4    repeated questioning of whether a POSA in 2009 would have

5    expected cabazitaxel to increase survival in patients based on the

6    prior art.  And you see two examples here.  I think a POSA in

7    2009 would hope that you would increase survival.  I think a

8    POSA in 2008 or '9 would just hope the cabazitaxel would

9    increase --

10    JUDGE MURPHY:  Which slide are you on, 21?

11    MR. MINION:  Slide 21, Your Honor.  And of course a

12    hope is not enough.  This Board has held a hope may or may not

13    come true and does not establish that a drug is useful for treating

14    patients.

15    And Mr. Solander has discussed the limitations of the

16    clinical data that was available in the prior art, but I want to talk a

17    little bit about increasing survival.  And what we know is that in

18    2009 a controlled clinical study was required in order to

19    determine whether a therapy increased survival.  And as Dr. Seth

20    said at deposition, that's what TROPIC was.  TROPIC was

21    designed to ultimately determine which was better between

22    cabazitaxel and prednisone and mitoxantrone and prednisone.

23    Why is that?  So if we look at slide 22, the reason is, as

24    Dr. Seth testified, there were no surrogate end points for

25    increasing survival in MCRPC patients.  Right.  And that's

57

Case IPR2016-00712
Patent 8,927,592 B2

1   consistent with the prior art at the time.  Here we have Armstrong

2   2008, overall survival remains the necessary primary end point in

3   phase III clinical studies in men with CRPC given the uncertain

4   validity of other surrogate measures for clinical benefit.

5           So what does that mean?  Well, it means that if you see

6   PSA reductions, if you see tumor responses, if you see

7   progression-free survival, that doesn't tell you that you are

8   increasing survival.  It doesn't translate from one to the other.

9   And that's what Dr. Seth testified, admitted to on slide 23.

10   Progression-free survival does not translate into overall survival.

11   Tumor response rates do not translate into overall survival.  A

12   POSA cannot look at two patients with prostate cancer that have

13   PSA reductions and tumor responses and reasonably conclude

14   from that, reasonably expect from that that they can use that agent

15   to prolong the life of a patient.

16           And we see this concept play out over and over in the

17   prior art.  And I have some examples on slide 24.  So this is -- all

18   of this information is in the prior art.  And we have several

19   examples of drugs in phase I, phase II prostate cancer studies that

20   showed PSA reductions and in many cases complete or partial

21   tumor responses.  But when it came time for that phase III study

22   where they asked the question do these agents increase overall

23   survival, across the board the answer was no.  That did not

24   translate.  There was anticancer activity, tumor responses, PSA

Case IPR2016-00712
Patent 8,927,592 B2

1    reductions in phase I and phase II.  You get to phase III and you

2    look at overall survival, and they all failed.

3            JUDGE MURPHY:  So you are saying under the

4    amended claims, essentially a phase III trial is required before

5    you could have -- a POSA could have a reasonable expectation of

6    success?

7            MR. MINION:  I don't know if I'm going that far, Your

8    Honor.  All I'm saying is --

9            JUDGE MURPHY:  It sounds like you are.

10           MR. MINION:  In this slide here as we have in the

11   bottom, we have two patients with a PSA reduction and a partial

12   tumor response based on the other data that was available at the

13   time.  You had by 2006 -- by 2006 there were 200 compounds

14   that had entered clinical development for the treatment of

15   advanced prostate cancer.  Only docetaxel ever showed an

16   increase in overall survival.  So based on all of these failures, it

17   takes --

18           JUDGE MURPHY:  You said docetaxel?

19           MR. MINION:  Docetaxel is the only one as of 2006.

20   So based on these failures, I think what I said before in the

21   beginning, I didn't say a phase III study.  I said a controlled

22   clinical study.  And that could be a phase II study.  You could

23   have a controlled phase II study that does provide you an

24   expectation of increased survival.  I think that was the language

25   that Armstrong 2008 used, Your Honor.

Case IPR2016-00712
Patent 8,927,592 B2

1    JUDGE MURPHY:  What impact does it have with

2    regard to the amended claim?  Winquist and the TROPIC listing

3    state that the phase III trial for cabazitaxel in the intent to treat

4    population, that the primary end point is overall survival.

5    Obviously no data, but it tells you, at least it tells a person of skill

6    the intent of this trial is to assess overall survival in the

7    comparator study.  Does that have any impact with regard to the

8    amended claim?

9        MR. MINION:  I don't believe it does.  I don't think it

10   gets you to --

11       JUDGE MURPHY:  Tell me why.

12       MR. MINION:  Even for the investigators in TROPIC,

13   their intent in running that study was not to increase the overall

14   survival in their patients or prolong the life of their patients.  In

15   fact, if we look at slide 25, Your Honor, it's a long --

16       JUDGE MURPHY:  I'm not talking about the

17   investigators.  I'm talking about what the prior art says.  I mean,

18   to an objective reading of the prior art to a POSA.  I mean, I'm

19   looking at the TROPIC Listing in Exhibit 1008 and it says, quote,

20   primary outcome measures: Overall survival defined as the time

21   interval from the date of randomization to the date of death due to

22   any cause.

23       So we refer to that, the primary end point or outcome

24   for the study is whether or not there's an overall survival -- well,

25   overall survival is measured, is there an increase in overall

60

Case IPR2016-00712
Patent 8,927,592 B2

1    survival.  Isn't that the point of that statement or is it not the

2    point?

3            MR. MINION:  The point of the statement is Dr. Seth

4    said the point of TROPIC was to determine whether there was an

5    increase in overall survival.  We are asking the question of was

6    there a reasonable expectation of increased survival in TROPIC.

7    And I asked Dr. Seth at deposition, I said, If you had a patient of

8    yours and you were enrolling them in TROPIC, what would you

9    have said to him or her?  Him, sorry.  And on slide 25 he

10   answered.  He said, So as a former principal investigator in trials

11   and sending patients off to trials, and in fact, I sent a few patients

12   over to Sloan for the trial, you are hoping that this trial will give

13   you a benefit.  You are telling the patient -- I'm telling the patient,

14   you have a terminal disease.  We can try this or we can try this

15   new drug especially for phase III trials.  You are hoping that you

16   are going to get a response from the trial.

17           You are hoping that if a patient goes in the clinical trial,

18   they may get the clinical drug and they may do really well.  And

19   we are talking about, you put a patient in the trial, some of the

20   patients are going to be on the mitoxantrone arm, half of them

21   are -- you cannot expect or intend to increase the -- prolong the

22   life of a patient that way.

23           And his answer at the end, Then you are hoping that the

24   drug actually works.  Works.  You are hoping that.  You keep

25   saying the word -- you use the word "expectation."  I'm using the

61

Case IPR2016-00712
Patent 8,927,592 B2

1    word "hope."  I'm an optimist.  I use the word "hope."  Yes, in

2    TROPIC you hoped it would work.  These patients had no other

3    way, no other drug available to them to increase their survival.

4    You hope that any cancer drug works.  But that does not get to

5    the level of a reasonable expectation of success.

6              JUDGE KAISER:  The point of the phase III trial, as

7    you say, is to figure out whether there actually is an increase in

8    survival from this regimen that you are testing.  And I guess I'm

9    struggling with it must be possible to have an expectation that

10   overall survival will be increased without having proven it for

11   sure through the mechanism of a phase III trial.  There must be

12   something short of a full-blown phase III trial and good results

13   from that trial that gets you to an expectation of increasing

14   survival.

15             I wonder in addition to that, I guess, the other predicate

16   to my question is there's a reason you do a phase III trial.  There

17   is something that Dr. Seth calls hope, but maybe the rest of us

18   would use a word that is a little bit more precise than that.  And

19   there is a reason why with this regimen you did a phase III trial

20   because you thought there was a decent chance of getting an

21   increase in overall survival, and that's why you are doing the trial,

22   to see if that chance actually pans out.  So where is the line for

23   sort of reasonable expectation of success there?

24             MR. MINION:  Your Honor, I think that raises the good

25   question what does the chance have to be?  If you have a

62

Case IPR2016-00712
Patent 8,927,592 B2

1    10 percent chance that the trial is going to give you increased

2    overall survival, is that a reasonable expectation of success?  I

3    submit that that is not.  A 10 percent chance of working, you are

4    betting, you have a reasonable expectation of failure.  And we

5    have in the record Ratain 2005, Ratain and Sargent 2009, they

6    looked at these questions, they looked at going from a study like

7    Pivot to phase III success of showing overall survival, and even

8    in going from breast cancer to breast cancer, you had three out of

9    four -- a 25 percent objective response rate.  They are not

10   predictive at all.  You cannot go from phase II and have any

11   reasonable prediction of what's going to happen in phase III in

12   this area.  And that is going from breast cancer to breast cancer.

13   Here we are going from breast cancer to prostate cancer.

14           So I think you have to have more than that.  In other

15   areas maybe you can have a higher expectation, you can say,

16   look, they are running this phase III study, they have this

17   evidence, I reasonably expect that it's going to turn out the way it

18   is.  In those cases, then you have a reasonable expectation of

19   success.  But in this area with this data, with all the failures in the

20   prior art, you cannot have that expectation.

21           And if I could briefly turn to the premedication aspect

22   of these claims.

23           JUDGE MURPHY:  Judge Kaiser or Judge Hulse?

24           JUDGE HULSE:  Sorry, I had a question.  So I know

25   that you are relying on the fast-tracking by the FDA as evidence

63

Case IPR2016-00712
Patent 8,927,592 B2

1    of I think long-felt need, but can't we look at that also -- I mean,

2    isn't that also evidence of the FDA saying, well, there must be

3    some reasonable expectation here of this working, otherwise why

4    would we fast-track it?  What is the standard for fast-tracking a

5    phase III clinical trial?

6           MR. MINION:  Well, that was after the data was

7    known.  That was after they had the TROPIC data known.  They

8    showed the FDA the survival benefit obtained, and the FDA said

9    we need this drug, we need to get it approved right away.  We are

10   going to fast-track it.  I think it's the second fastest oncology drug

11   ever approved.  So this was after the fact.  So it doesn't inform the

12   reasonable expectation of success.

13          JUDGE MURPHY:  Go ahead.

14          MR. MINION:  On the premedication claims, let's start

15   with the idea of what was known in the art at the time as to the

16   need for premedication in regards to cabazitaxel therapy.  And it

17   just so happens that we have a study that was designed to look at

18   that.  And that's on slide 27, Your Honors.  This is the Mita

19   reference.  In the introduction the authors note the principal

20   objectives of this phase I and pharmacokinetic study of XRP6258

21   were to -- this is the first principal objective, characterize the

22   toxicities of XRP6258 administered without premedication.

23   Their conclusion, based on the results of this study, XRP6258

24   administration does not require premedication, thus resulting in

25   significant administration and convenience advantages.  That's

64

Case IPR2016-00712
Patent 8,927,592 B2

1   from January 2009.  That's a clear teaching away in the prior art

2   from the claimed methods.

3         Now, you are going to hear in a moment from Mr. Reed

4   that in the Pivot study there were some hypersensitivity reactions.

5   And the authors characterized those as rare.  There were 345 total

6   cycles of administration of cabazitaxel and there were only five

7   instances of hypersensitivity.  And two of those were mild.  So

8   99 percent of the time that cabazitaxel was administered in Pivot

9   there were no hypersensitivity reactions.

10        But let's assume for a moment that based on that data, as

11  Mylan suggests, they would ignore -- a POSA would ignore the

12  teachings of Mita and say we are going to do some sort of

13  premedication for these patients.  What are they going to do?

14  Well, on slide 28 Dr. Seth answers that question.  He says a

15  POSA in 2009, before TROPIC, most of my colleagues would

16  premedicate before administration of cabazitaxel similar to how

17  we would premedicate before docetaxel.  I believe POSAs would

18  use the same premedication on docetaxel in cabazitaxel before

19  TROPIC.

20        Well, what is that premedication?  On the next slide,

21  slide 29, Dr. Seth testified the specific premedication we use for

22  the docetaxel chemotherapy is dexamethasone.  That is consistent

23  with what we see on slide 30, which is the FDA approved label

24  for Taxotere.  That's docetaxel.  And the FDA approved

65

Case IPR2016-00712
Patent 8,927,592 B2

1  premedication regimen is oral dexamethasone alone.  No

2  antihistamine.  No H2 antagonist.

3         JUDGE MURPHY:  But your opponent introduced

4  evidence suggesting that there was an alternative premedication

5  regimen that did include what you are including in the claim you

6  amended.

7         MR. MINION:  That's exactly right.  And that

8  premedication regimen was known for paclitaxel, Your Honor.

9  That's the first bullet point they'll show.  Mr. Reed is also going

10  to point to some older docetaxel studies that follow that paclitaxel

11  regimen from the '90s and also a small study in Japan.

12         And I want to comment on paclitaxel.  The specific

13  problem with paclitaxel and why it requires the three-component

14  premedication is due to its low solubility, in order to formulate

15  paclitaxel to make taxol, you have to use a specific surfactant

16  called Cremophor.  And it's the Cremophor that leads to the high

17  hypersensitivity reactions.  So when we are talking about 4

18  percent or 1 percent hypersensitivity reactions in Pivot, with

19  paclitaxel, you see 41 percent of hypersensitivity reactions even

20  after giving the three-component premedication regimen.

21         And what Mita says in the conclusion on slide 31, with

22  regard to the tolerance and administration profile, XRP6258

23  seems advantageous when compared with docetaxel and

24  paclitaxel.  Its solubility is comparable with that of docetaxel,

25  allowing a polysorbate-based formulation that does not require

Case IPR2016-00712
Patent 8,927,592 B2

1   Cremophor and therefore, results in reduced instance of

2   hypersensitivity reaction.

3           Now, what we see or why is it that cabazitaxel shows a

4   lower instance of hypersensitivity compared to docetaxel?  Well,

5   both drugs, as Mita notes, they have the same or comparable

6   solubility.  A POSA knows from Mita and the Taxotere label that

7   the amount of polysorbate in those formulations is the same.  The

8   concentration is the same.  But what you see on the next slide,

9   slide 32, you have a dosage of 75 milligrams per meters squared

10  of docetaxel.  Now, Mita was 10 to 25 milligrams per meter

11  squared.  So you are giving at least a third less of the intravenous

12  formulation.  Therefore, you are giving a third less of the

13  polysorbate and you are getting less hypersensitivity.  And you

14  see that from slide 33, Dr. Seth, cabazitaxel was thought to be

15  from the Mita paper to be less hypersensitivity.

16          Now, Mylan points, says --

17          JUDGE MURPHY:  Counsel, just so you know, you are

18  into your -- we can add another minute or so to Mr. Reed to make

19  it even.

20          MR. MINION:  That would be great, Your Honor.

21  Thank you.  One more point.  We are talking about nausea and

22  vomiting.  What Mylan says, well, even though in the

23  FDA-approved regimen, there is no extra premedication beyond

24  dexamethasone, that Pivot teaches there is nausea and vomiting

67

Case IPR2016-00712
Patent 8,927,592 B2

1    and therefore, you would add additional components to the

2    dexamethasone regimen for cabazitaxel.

3            But again, if we look at Dr. Seth's testimony, slide 34,

4    he concluded that there was a favorable safety profile for

5    cabazitaxel in terms of nausea and vomiting in Pivot as compared

6    to docetaxel.  So it gets to the point here we have patients who are

7    coming off of docetaxel and their premedication regimen was

8    dexamethasone alone.  Now they are going to be given

9    cabazitaxel.  Mita teaches less hypersensitivity and Pivot teaches

10   less nausea and vomiting.  Why would you give up the stated

11   significant advantageous aspect of not premedicating and add

12   additional components to that?  And we submit that that means

13   there's no motivation in the art.

14           I would like to reserve the rest of my time, Your Honor.

15           JUDGE MURPHY:  Thank you.

16           Mr. Reed, I added two minutes.  So you'll still have --

17   patent owner will have five minutes.

18           MR. REED:  I appreciate that.  And I'm going to spend

19   a minute or two on rebuttal to what Mr. Solander had to say about

20   the original claims and then hopefully spend the bulk of my time

21   on the proposed substitute claims.

22           With respect to the original claims, Mr. Solander

23   seemed to suggest yet another new standard.  This one he phrased

24   as the measure of success for reasonable expectation of success

25   would be whether the benefits outweigh the risks and suggested

68

Case IPR2016-00712
Patent 8,927,592 B2

1   that perhaps a phase II trial would be sufficient.  It's interesting,

2   Mr. Minion, in the context of the proposed substitute claims,

3   likewise referenced a phase II trial.  That's a little bit of the

4   pattern that we've seen in terms of what the standard is according

5   to patent owner.  Is it this?  Is it that?  Is it the other?  Is it a

6   successful phase III trial?  Is it FDA approval?  Is it a successful

7   phase II trial?

8          But at the end of the day, if you look at the patent, and

9   we are talking about administering this to a patient, interestingly,

10  the patient is defined explicitly in the '592 patent in column 4,

11  lines 6 and 7, patient as used herein includes both human and

12  animals.  In one embodiment the patient is a human.  Most of

13  what we've heard today is whether you would give this to a

14  human patient.  And they had the chance to amend their claims.

15  They could have imported explicitly the therapeutic effective

16  amount as you had suggested in some of your questions, Judge

17  Murphy.  They could have imported a claim limitation that it be a

18  human patient.  They didn't.  And so the question really for

19  patentability boils down to was there utility.  And the utility

20  certainly would encompass animal studies.  Not just human

21  studies.  So there's definitely in the prior art sufficient utility

22  demonstrated by the anticancer activity that we have seen.

23          Now, I am going to shift gears a little, unless there are

24  questions about the original claims, and talk about the proposed

25  substitute claims.  And if you have our slides, included in our

69

Case IPR2016-00712
Patent 8,927,592 B2

1  original set of slides, you go kind of towards the back and you

2  look at slide 36 where the language of proposed substitute claim

3  31 appears, and Mr. Minion aptly described the two limitations

4  that they seek to import into the substitute claims that were not

5  there in the original claims.  The purported changes include this

6  so-called limitation about therapeutic efficacy.  And I'll spend a

7  fair amount of time on that before I get to the pretreatment

8  regimen that is discussed.

9          Looking at slide 37 and recalling that in the institution

10  decision the Board considered whether the original language was

11  a limitation and in doing so addressed a few issues that, again, are

12  relevant to this question now of whether the new preamble is

13  limiting.  As an initial point, this importation of "the patient in

14  need thereof" we've heard from patent owner is an attempt to

15  import a requirement of intent, that the practitioner must intend to

16  have a clinical benefit that outweighs the risks and that that intent

17  requires knowledge.  Whether it be phase III results or phase II

18  results, that knowledge is necessary in order to have the intent.

19  And the intent is required by this new preamble.

20          I would say this with respect to the prior art, the same

21  purpose, and as you pointed out, Your Honor, in the Winquist and

22  TROPIC listing disclosures as the primary objective, the primary

23  end point of that TROPIC study, the phase III trial was overall

24  survival.  So it was always the intent of the many, many

25  physicians who were administering cabazitaxel according to the

70

Case IPR2016-00712
Patent 8,927,592 B2

1    method set forth in Winquist and the TROPIC listing to achieve

2    increased overall survival.  That intent requirement, that purpose

3    is satisfied.

4           Of course it's Black Letter Law that inherent results of a

5    prior art method can't render the method patentable.  We see that

6    most often in the context of anticipation.  Here we are looking at

7    an obviousness case rather than anticipation.  But it still holds

8    that what is in a certain physician's mind cannot be patentable.  If

9    a certain doctor knows and a different doctor doesn't know the

10   results of the phase III trial, can one doctor be infringing and the

11   other doctor not be infringing?  Certainly not.  So a claim to

12   performing this prior art method with knowledge of the results

13   runs afoul of at least Section 101.

14          JUDGE MURPHY:  Well, they are characterizing it as

15   the requirement would be there's insufficient evidence of an

16   expectation of a successful result in terms of increasing overall

17   survival, in effect, reading an efficacy limitation as part of the

18   new preamble.  What is your response on the law as to whether

19   that's appropriate or inappropriate?

20          MR. REED:  As a matter of fact, if that was their goal

21   in amending this claim, they failed.  They didn't do it.  They

22   could have written in some of the language you suggested about a

23   therapeutic amount.  They didn't do it.  What they chose to do is

24   they chose to add this phrase "a patient in need thereof."  And as

25   a matter of law, our position is that just like the original

71

Case IPR2016-00712
Patent 8,927,592 B2

1   preamble, there is no guarantee that every patient is going to

2   receive this therapeutic benefit.  Some will, some won't.  Because

3   of that, it cannot be a limitation of the claim.

4          And second of all, because the method does not change

5   depending on the knowledge, you do these steps identically, those

6   two factors played a big role in the institution decision in finding

7   that the preamble was not a limitation and they remain

8   unchanged.  There's no difference in the method steps recited.

9          Now, what they appear to try to do here with their

10   amendment is change the description of the patient population to

11   whom this method is directed.  And that doesn't change the steps

12   taken.  So if you look back at the institution decision, as a matter

13   of law what that means is that it is not a limitation.

14          JUDGE MURPHY:  The patent owner is relying on the

15   *Janssen* and *Rappaport* cases.  So focusing on *Janssen* in

16   particular, how do you distinguish that or not?  I mean, they are

17   saying, look, we added in the body of the claim "a patient in need

18   thereof" to refer back to the preamble, which by definition,

19   provides antecedent basis makes that a claim limitation.  So do

20   you agree with that or not?  And even if you don't agree with it,

21   what is the limitation?

22          MR. REED:  So as a matter of law, the *Janssen* case

23   was distinguishable from this case, as we distinguished in our

24   opposition to the motion to amend, on the basis that there it was

25   necessary to define patient population and that provided the

72

Case IPR2016-00712
Patent 8,927,592 B2

1   antecedent basis from the preamble here, the antecedent basis, so

2   to speak, the patient population is defined in a different element.

3   It's defined in terms of a patient that has prostate cancer that has

4   progressed during or after docetaxel.  That isn't changed by this

5   idea of increasing overall survival.

6          As the experts both seem to agree, every patient that has

7   prostate cancer is in need of increasing survival.  So whether you

8   have this "patient in need thereof" language or not does not affect

9   the patient population to whom this method is directed.  So that is

10  distinct from the *Janssen* case where the claim element required a

11  definition of the patient population.  Here that patient population

12  is already defined and this doesn't add anything to it.  It cannot be

13  an additional limitation that shows up there.

14         So the fact that not every patient will experience a

15  therapeutic effect combined with the fact that the method steps do

16  not change simply means that this isn't a limitation.  There is no

17  therapeutic requirement, a therapeutic effect required by the

18  proposed language.  So the motion to amend should be denied as

19  moot.

20         To the extent that there were some therapeutic effect

21  required for purposes of this claim language now, we certainly

22  have at least a reasonable expectation of success.  And this goes

23  right back to what we spent significant time talking about earlier

24  with respect to the Mita and Attard disclosure in prostate cancer,

25  the Beardsley and Pivot disclosure in the context of breast cancer,

73

Case IPR2016-00712
Patent 8,927,592 B2

1    and the fact that Beardsley points out that a phase III trial was

2    underway in prostate cancer based on breast cancer.  As much as

3    they would like to distinguish the two cancers, the fact is that the

4    TROPIC study, the phase III study was begun on the basis of the

5    Pivot phase II clinical trials in breast cancer.

6            So turning now to the question of the pretreatment or

7    premedication regimen, in the simplest of terms, a pretreatment

8    regimen is when a patient is going to the infusion center to have

9    chemotherapy, they will first get medicines or a combination of

10   medicines that are going to help them in advance of the

11   chemotherapy.  First you get the infusion.  Sometimes it's an oral

12   dosage of a different medicine because you know what's coming.

13   Chemotherapy wreaks havoc on the body.  And to preemptively

14   prepare the patient for that, you give them medicines in advance.

15   These premedications are to fight off what is inevitably coming,

16   the nausea, the vomiting, other side effects.  In order to prevent

17   these side effects, they receive this pretreatment regimen before

18   the actual chemotherapy.  So that's what they are adding in here.

19   They are adding in here this pretreatment regimen of three

20   specific medicines.  And we know from the earlier discussions

21   that every element from the prior claims besides these three

22   medicines in combination is disclosed in Winquist and TROPIC.

23   And so now we are looking just specifically at the addition of the

24   pretreatment regimen.

Case IPR2016-00712
Patent 8,927,592 B2

1          First off, Pivot teaches pretreatment.  Pivot explicitly

2    teaches the use of an antihistamine.  And then to quote in the

3    Beardsley reference -- excuse me, in the Pivot reference, no

4    prophylactic antiemetic drugs were allowed at the first cycle.  In

5    other words, you don't preemptively treat for emesis, which is

6    vomiting and nausea, before the first cycle.  In case of nausea,

7    vomiting, patients could receive preventive antiemetic treatment

8    in compliance with the conventional antiemetic protocol of the

9    center for subsequent cycles.

10          They don't even think it's necessary to spell out what

11   you do to treat the nausea and vomiting.  It's conventional.  It's

12   whatever the center already does, that's what you are going to use.

13   That's the level of selecting the premedications that we are talking

14   about here.  It's not like choosing an antihistamine and a corticoid

15   and an H2 antagonist are far out there, novel, completely different

16   ideas than what had been practiced for years in the realm of

17   chemotherapy.

18          JUDGE MURPHY:  What is your response to their

19   pointing out the other evidence that suggests for cabazitaxel in

20   particular, that one of the benefits was, at least in many patients,

21   apparently you didn't need such pretreatment and there is the

22   suggestion to not doing it?

23          MR. REED:  Sure.  They suggest this suggestion

24   appears in Mita, which is Exhibit 1012.  And if you look closely

25   at Mita, it's also informative because it talks about what would

75

Case IPR2016-00712
Patent 8,927,592 B2

1    and would not be given.  And in Mita on page 724 it says, much

2    like Pivot, by the way, no prophylactic treatment to prevent

3    hypersensitivity reaction or emesis was administered during the

4    first course.  These treatments were provided for subsequent

5    courses if clinically indicated.  Not could be.  Were provided.

6            And again, at the end of this Mita publication, the part

7    that Mr. Minion quoted where it said based on the results of the

8    study, administration does not require premedication, the very

9    next paragraph says that this cabazitaxel can be characterized by

10   convenient administration with less premedication.  Not no

11   premedication.  In order to conduct this phase I study, they were

12   trying to minimize the amount of premedication so they could

13   study the toxicity of the new compound cabazitaxel that was

14   being tested here.  But both Mita and Pivot explicitly talk about if

15   your patient has these side effects, go ahead and treat them.  And

16   you just use, you know, what you are already using for these side

17   effects.  The types of materials that we are talking about here are

18   an antihistamine, Benadryl.  It's an over-the-counter drug that's

19   available in a variety of forms.

20           The corticoid which is included in both the taxol or

21   paclitaxel, kind of first generation taxane pretreatment regimen,

22   as well as the Taxotere or docetaxel pretreatment regimen, the

23   corticoid was given throughout the history of the taxanes.  And

24   then the third component here is the H2 antagonist which is

76

Case IPR2016-00712
Patent 8,927,592 B2

1    something along the lines of zantac, a heartburn medicine, over

2    the counter.  Again, a very common medicine.

3            So would a person of ordinary skill in the art know that

4    if you are facing nausea, vomiting, hypersensitivity reactions,

5    these are the medicines you give?  Absolutely.  They are already

6    in their arsenal.  They use them all the time in treating patients.

7    And so if a patient experiences nausea and vomiting, what do the

8    articles say?  The articles say treat them like you know how to do.

9    Give them these medicines to preemptively combat those side

10   effects in subsequent rounds.

11           And this idea of subsequent rounds is important because

12   as a matter of claim construction, the proposed claims that talk

13   about administering the pretreatment regimen prior to cabazitaxel

14   doesn't necessarily mean prior to the first round of chemotherapy.

15   It's not that when you first present at the infusion center you have

16   to get this on the first round.  If you do have nausea following

17   that first round, you come back in next time, it's likely that you

18   will get those pretreatments in advance of round two and three

19   and so on.  And that's something that is obvious.  It is what those

20   in the art were doing and would do this combination of three

21   drugs.  They were known to be used in combination and they

22   were known to be used to prevent hypersensitivity reaction,

23   nausea and vomiting, especially when administering taxanes as

24   they had been.

77

Case IPR2016-00712
Patent 8,927,592 B2

1        Now, a person would have good reason to use the

2    claimed premedications.  And if you look at slide 40, there's kind

3    of a summary here of what a person of ordinary skill in the art

4    would consider in terms of the motivation.  We have the Pivot

5    reference which explicitly motivates the use of premedications to

6    prevent emesis, which is vomiting and nausea, and HSR, which is

7    hypersensitivity reactions.  In fact, Pivot says that nausea and

8    vomiting are two of the most common side effects and that

9    conventional, that was the word they used, anti-premedication

10   should be used.

11       In addition, Pivot talks about a 4 percent rate of HSR,

12   hypersensitivity reactions.  That's grades 3 and 4.  And there

13   might be some quibble about whether grade 3 counts as severe or

14   not, but a 4 percent rate of grade 3 and 4 hypersensitivity

15   reactions is significant.  Dr. Sartor, talking about hypersensitivity

16   reactions, characterized it as a true disaster.  Last thing you want

17   to do is give a patient medicine for cancer and have them have

18   some kind of bronchial spasm that ends their life.  If there is a

19   method -- this is a quote from Dr. Sartor: If there is a method to

20   help control hypersensitivity reactions, then we use that.  Four

21   percent of people with a bad hypersensitivity is a crazy high

22   number.  It scares the hell out of me.

23       There are side effects to using drugs.  Certainly those of

24   skill in the art were aware of those side effects and they were

25   aware of how to treat those side effects.

78

Case IPR2016-00712
Patent 8,927,592 B2

1         Lastly, and focusing again on the teaching in Mita,

2   slide 41, Mita does teach that premedications were provided to

3   prevent hypersensitivity reactions and emesis if clinically

4   indicated.  It may be that not every patient experiences those side

5   effects.  Not every patient would need the pretreatment regimen

6   here.  But there were those who did, and it would be obvious to

7   use these medicines to treat them.

8         There is not a teaching away.  In fact, considering that

9   Pivot came some years after Mita, Pivot actually used an

10   antihistamine in every patient.  From the get-go, right out of the

11   gate, every patient got the antihistamine as part of the

12   pretreatment regimen despite the fact that in Mita it said that

13   premedications were not required.  So that was not a clear

14   teaching away.  Those in the art, actually, despite what Mita said

15   about less premedication, they went ahead and included it as the

16   pretreatment regimen and of course said others could be added.

17         And perhaps most importantly, when we are talking

18   here about these pretreatment medicines, Dr. Sartor agrees none

19   of these medications are dangerous.  They are common,

20   well-known medicines that are used, and a person of ordinary

21   skill in the art would be using them to treat these very side

22   effects.

23         I see that I'm out of time.  So unless you have questions

24   and grant me more time, I think I'll finish.

Case IPR2016-00712
Patent 8,927,592 B2

1       JUDGE MURPHY:  Judge Hulse, Judge Kaiser,

2   anything else for Mr. Reed?

3       JUDGE HULSE:  Nothing for me.

4       JUDGE KAISER:  No, thank you.

5       JUDGE MURPHY:  Thank you, Mr. Reed.

6       Mr. Minion, five minutes.

7       MR. MINION:  Thank you, Your Honor.  I'll start with

8   the slide 41 that Mr. Reed was last on.  And I think this is really

9   instructive, it really proves our point, patent owner's point, is that

10  Mita said we aren't going to preemptively give antiemetic drugs,

11  and we will give them, we will allow -- or premedication of any

12  kind for hypersensitivity or emesis, but we will do so if clinically

13  indicated.  But the point is it wasn't clinically indicated.  There

14  were no patients with severe hypersensitivity reactions.  There

15  were no patients with severe nausea and vomiting.

16      And the same is true for Pivot.  Pivot said we aren't

17  going to preemptively treat patients with antiemetics.  We are not

18  going to premedicate them for that purpose.  If there is a problem,

19  you can use conventional antiemetics.  Again, there were no cases

20  of severe nausea and vomiting if Pivot.  So we don't even know if

21  any premedications were used after the first point.

22      But this concept of you are not going to preemptively

23  give these premedications, you are not going to preemptively give

24  this -- practice this claim, but if a POSA figures out there is a

25  problem with a particular patient in terms of hypersensitivity and

80

Case IPR2016-00712
Patent 8,927,592 B2

1   nausea, vomiting, then you are going to start thinking about

2   premedicating them later on.  Well, as the law is very clear,

3   where a problem has not been previously recognized in the art,

4   the solution to that problem is not obvious.  And I think that's the

5   situation here.  There is no concern over the prior art that would

6   suggest the solution.

7          And importantly, in terms of pretreatment with nausea

8   and vomiting, if the POSA did believe there to be a problem in

9   the art, if we go to patent owner's slide 35, I asked Dr. Seth in

10  2009 if you were going to premedicate for nausea and vomiting,

11  what would you use?  He testified potentially you could use

12  Zofran, compazine and Kytril.  Those are not H2 antagonists.

13  Those are not antihistamines.  Those are not corticoids.  These are

14  newer, more effective antiemetic compounds known as of 2008.

15  So even if you did recognize a problem and you wanted to

16  premedicate, according to Dr. Seth you would not choose the

17  claimed three-component premedication.

18         And that's certainly true for H2 antagonists.  Mr. Reed

19  alluded to the idea that H2 antagonists were part of conventional

20  antiemetic protocols.  And we are short on time, but in their brief

21  they rely on the NCCN guidelines for this premise of the H2

22  antagonist being suggested as premedication.  Well, nowhere in

23  the NCCN guidelines are H2 antagonists recommended as

24  premedication.

81

Case IPR2016-00712
Patent 8,927,592 B2

1          The only reference to H2 antagonists, this is on patent

2     owner's slide 36 marked by the red arrow, this is in terms of

3     breakthrough emesis.  So this is in circumstances where

4     premedication for nausea and vomiting is given and the patient,

5     after administration of chemotherapy, has an issue with nausea

6     and vomiting, here are the suggestions of what you do.  And the

7     last suggestion is if a patient has dyspepsia, consider antacid

8     therapy, H2 blocker or proton pump inhibitor.  H2 blocker here,

9     that's the H2 antagonist, that's the only mention of H2 antagonist

10    in the entire guidelines.

11         But that doesn't get them to a motivation to combine or

12    a motivation to add H2 antagonists as premedication, one,

13    because this isn't even talking about premedication; and two,

14    dyspepsia wasn't a problem in the prior art.  Again, if you turn to

15    the next slide, Your Honors, slide 37, I asked Dr. Seth, Are you

16    aware of any instances reported in the prior art of dyspepsia

17    following the administration of cabazitaxel?  I do not recall that.

18    Is dyspepsia a common occurrence in relation to docetaxel

19    administration?  I cannot recall that.

20         And really what this all boils down to, Mylan's

21    arguments for unpatentability, is this notion that the

22    premedication regimen was known and could be used, but that's

23    not enough to render the claims unpatentable.  The Federal

24    Circuit recently reaffirmed obviousness concerns whether a

25    skilled artisan not only could have made but would have been

82

Case IPR2016-00712
Patent 8,927,592 B2

1    motivated to make the combinations or modifications of prior art

2    to arrive at the claimed invention.  And there simply is no such

3    motivation here.

4              Thank you, Your Honors.

5              JUDGE MURPHY:  Okay, Mr. Minion.  Thank you.  I

6    appreciate it.  Counsel, I want to thank you both, thank everyone

7    for all their hard work.  There is a lot of evidence in this case, a

8    lot of issues to go through.  So I appreciate your help today.  And

9    on behalf of Judge Hulse and Judge Kaiser, we thank you for the

10   presentations.  So the matter is submitted.  We will issue our

11   decision in due course.  I think the due date is the latter part of

12   September.  So it will take a while to get through the record, but

13   the matter is submitted and we will issue our decision in due

14   course.  So we are adjourned.

15             (Whereupon, the proceedings at 4:11 p.m., were

16   concluded.)

# EXHIBIT N

Trials@uspto.gov                                          Paper 99
Tel: 571-272-7822                          Entered:  September 21, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

MYLAN LABORATORIES LIMITED,
Petitioner,

v.

AVENTIS PHARMA S.A.,
Patent Owner.
_____

Case IPR2016-00712
Patent 8,927,592 B2
_____

Before BRIAN P. MURPHY, TINA E. HULSE, and
CHRISTOPHER M. KAISER, *Administrative Patent Judges.*

MURPHY, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73(a)*

IPR2016-00712
Patent 8,927,592 B2

## I.      INTRODUCTION

Mylan Laboratories Limited ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–5 and 7–30 of U.S. Patent No. 8,927,592 (Ex. 1001, "the '592 patent").  Paper 3 ("Petition" or "Pet.").  Petitioner supported its challenge with the Declaration of Dr. Rahul Seth.  Ex. 1002. Aventis Pharma S.A. ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 7 ("Prelim. Resp.").  On September 22, 2016, we instituted an *inter partes* review of claims 1–5 and 7–30 of the '592 patent.  Paper 9 ("Institution Decision").

After institution, Patent Owner filed a Response (Paper 21, "PO Resp.") and a Contingent Motion to Amend claims 27–30 of the '592 patent (Paper 22, "MTA").  Patent Owner supported its Response and MTA with the Declaration of Dr. Alton Oliver Sartor (Ex. 2176), the Declaration of Mr. Michael Tate (Ex. 2149), and the Declaration of Mr. Art Lathers (Ex. 2231).

Petitioner filed a Reply (Paper 42, "Reply") and Opposition to Patent Owner's MTA (Paper 43, "MTA Opp."[1]).  Petitioner supported its Reply and MTA Opposition with the Reply Declaration of Dr. Seth (Ex. 1043), and the Declaration of Mr. Robert McSorley (Ex. 1044).[2]

---

[1] Petitioner filed the MTA Opposition under seal, subject to the Board's ruling on Petitioner's Motion to Seal (Paper 45).  Petitioner filed a redacted public version of the MTA Opposition as Paper 44.

[2] Petitioner filed Dr. Seth's Reply Declaration and Mr. McSorley's Declaration under seal, subject to the Board's ruling on Petitioner's Motion to Seal (Paper 45).  Petitioner filed redacted public versions of the declarations using the same respective exhibit numbers.

IPR2016-00712
Patent 8,927,592 B2

Patent Owner filed a Reply to Petitioner's Opposition to Patent Owner's MTA.  Paper 53 ("MTA Reply").[3]  Patent Owner supported its MTA Reply with the Reply Declaration of Dr. Sartor (Ex. 2259) and the Declaration of Patricia Matthews, RN, BSN (Ex. 2234).

Patent Owner filed a Motion to Exclude Exhibits 1089–1090 (Paper 61), Petitioner filed an Opposition (Paper 77 (under seal), Paper 78 (public version)), and Patent Owner filed a Reply (Paper 86).

Petitioner filed a Motion to Exclude Exhibits 2170, 2171, and 2179 and certain paragraphs in Exhibits 2001, 2176, and 2149 (Paper 64 (under seal), Paper 68 (public version)), Patent Owner filed an Opposition (Paper 72 (under seal), Paper 73 (public version)), and Petitioner filed a Reply (Paper 89 (under seal), Paper 95 (public version)).

Patent Owner filed Observations (Paper 80) on the cross-examination testimony of Dr. Seth (Ex. 2258) regarding Petitioner's Reply (Paper 42), and Petitioner filed a response to Patent Owner's Observations (Paper 93). Patent Owner also filed Observations (Paper 81 (under seal), Paper 82 (public version)) on the cross-examination testimony of Mr. McSorley (Ex. 2261) regarding Petitioner's Reply (Paper 42), and Petitioner filed a response to Patent Owner's Observations (Paper 92 (under seal), Paper 94 (public version)).

Petitioner filed Observations (Paper 84) on the cross-examination testimony of Dr. Sartor (Ex. 1098) with respect to Patent Owner's MTA, and Patent Owner filed a Response (Paper 90).

---

[3] Patent Owner filed the MTA Reply under seal, subject to the Board's ruling on Patent Owner's Motion to Seal (Paper 54).  Patent Owner filed a redacted public version of the MTA Reply as Paper 52.

3

IPR2016-00712
Patent 8,927,592 B2

An oral hearing was held on June 13, 2017, and a transcript of the oral hearing is of record.  Paper 98 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73(a) regarding the patentability of the challenged claims.  In this case, the claimed treatment method, administering a 20 to 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone to docetaxel-refractory metastatic prostate cancer patients, was disclosed more than one year before the earliest effective filing date to which the '592 patent might be entitled.[4]  Therefore, for the reasons that follow and based on our review of the complete trial record, we determine Petitioner has shown by a preponderance of the evidence that claims 1–5 and 7–30 of the '592 patent are unpatentable.  We further determine that Patent Owner's Contingent Motion to Amend claims 27–30 is *denied*.

### A.  Real Parties in Interest and Related Proceedings

Petitioner identifies (i) Mylan Laboratories Limited, the Petitioner and a wholly-owned subsidiary of Mylan Inc., (ii) Mylan Pharmaceuticals Inc., which is a wholly-owned subsidiary of Mylan Inc., (iii) Mylan Inc., which is an indirectly wholly owned subsidiary of Mylan N.V., and (iv) Mylan N.V. as real parties in interest.  Pet. 11.

Patent Owner identifies Patent Owner, Aventis Pharma S.A., Sanofi, the ultimate parent company of Aventis Pharma S.A., and Sanofi-Aventis U.S. LLC, an affiliate of Aventis Pharma S.A., as real parties in interest. Paper 6, 2.

_____

[4] We do not make a determination of the earliest effective filing date, because the references qualify as prior art regardless of that date.

4

IPR2016-00712
Patent 8,927,592 B2

Petitioner and Patent Owner identify the following as related district court proceedings in the District of New Jersey regarding the '592 patent: *Sanofi-Aventis U.S. LLC v. Mylan Laboratories Limited*, No. 15-03392; *Sanofi-Aventis U.S. LLC v. Apotex Corp*, C. A. No. 15-01835; *Sanofi-Aventis U.S. LLC v. Breckenridge Pharmaceutical, Inc.*, C. A. No. 15-01836; *Sanofi-Aventis U.S. LLC v. Accord Healthcare, Inc.*, C. A. No. 15-02520; *Sanofi-Aventis U.S. LLC v. BPI Labs, LLC*, C. A. No. 15-02521; *Sanofi-Aventis U.S. LLC v. Dr. Reddy Laboratories, Inc*., C. A. No. 15-02522; *Sanofi-Aventis U.S. LLC v. Glenmark Generics Inc.*, C. A. No. 15-02523; *Sanofi-Aventis U.S. LLC v. Fresenius Kabi USA, LLC*, C. A. No. 15-02631; *Sanofi-Aventis U.S. LLC v. Actavis LLC*, C. A. No. 15-03107; *Sanofi-Aventis U.S. LLC v. BPI Labs, LLC*, C. A. No. 15-02521.  Pet. 12; Paper 6, 2–3.

Petitioner further identifies IPR2016-00627 as an earlier challenge to U.S. Patent No. 5,847,170 directed to the compound cabazitaxel.  Pet. 12. We denied institution in IPR2016-00627 (Paper 10) and Petitioner's request for rehearing (Paper 12).

### B.  Grounds of Unpatentability

We instituted an *inter partes* review of claims 1–5 and 7–30 of the '592 patent on the following grounds of unpatentability under 35 U.S.C. § 103:

IPR2016-00712
Patent 8,927,592 B2

| Reference[s] | Statutory Basis | Challenged Claims |
|---|---|---|
| Winquist (Ex. 1009)[5] and TROPIC Listing (Ex. 1008)[6] in view of Attard (Ex. 1021)[7] and Beardsley (Ex. 1022)[8] | § 103 | 1, 2, 5, 12, 13, 17–20, 22–25, 27–29 |
| Winquist, TROPIC Listing, and Didier (Ex. 1011)[9] | § 103 | 3, 4 |
| Winquist, TROPIC Listing, and Mita (Ex. 1012)[10] | § 103 | 7–9 |
| Winquist, TROPIC Listing, and Tannock (Ex. 1013)[11] | § 103 | 10, 11, 14, 16 |

---

[5] Eric Winquist et al., *Open clinical uro-oncology trials in Canada*, THE CANADIAN JOURNAL OF UROLOGY, 15(1), 3942–49 (February 2008) ("Winquist"). Ex. 1009.

[6] Sanofi-Aventis, *XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC)*, CLINICALTRIALS.GOV (October 23, 2008) ("TROPIC Listing"). Ex. 1008.

[7] Gerhardt Attard et al., *Update on tubulin-binding agents*, PATHOLOGIE BIOLOGIE 54, 72–84 (Elsevier 2006) ("Attard"). Ex. 1021.

[8] Emma K. Beardsley and Kim N. Chi, *Systemic therapy after first-line docetaxel in metastatic castration-resistant prostate cancer*, Curr. Op. SUPPORT PALLIAT. CARE 2, 161–66 (Wolters Kluwer Health 2008) ("Beardsley"). Ex. 1022.

[9] U.S. Patent No. 7,241,907 B2, issued July 10, 2007 to Didier et al. ("Didier"). Ex. 1011.

[10] Alain C. Mita et al., *Phase I and Pharmacokinetic Study of XRP6258 (RPR116258A), a Novel Taxane, Administered as a 1-Hour Infusion Every 3 Weeks in Patients with Advanced Solid Tumors*, CLIN. CANCER RES. 2009:15(2), 723–730 (January 15, 2009) ("Mita"). Ex. 1012.

[11] Ian F. Tannock et al., *Docetaxel plus Prednisone or Mitoxantrone plus Prednisone for Advanced Prostate Cancer*, N. ENGL. J. MED., 351:15, 1502–1512 (October 7, 2004) ("Tannock"). Ex. 1013.

IPR2016-00712
Patent 8,927,592 B2

| Reference[s] | Statutory Basis | Challenged Claims |
|---|---|---|
| Winquist, TROPIC Listing, and Pivot (Ex. 1010)[12] | § 103 | 21, 26, 30 |
| Winquist, TROPIC Listing, Pivot, and Tannock | § 103 | 15 |

Paper 9, 22–23.

### C. The '592 Patent

The '592 patent, titled "Antitumoral Use of Cabazitaxel," issued January 6, 2015, from an application filed April 26, 2012. Ex. 1001. The '592 patent claims priority through an international application to a series of provisional applications, the earliest of which is dated October 29, 2009. Ex. 1001, (60), (63). The '592 patent is directed to the use of cabazitaxel in the treatment of prostate cancer, particularly metastatic castration resistant prostate cancer ("mCRPC"). *Id.* at 1:19–26. Because cancer cells may develop resistance to docetaxel ("Taxotere®"[13]), administering cabazitaxel is intended to treat prostate cancer in patients with advanced metastatic disease that has progressed despite previous treatment with a docetaxel-based regimen. *Id.* at 2:61–67. Cabazitaxel is preferably administered in combination with a corticoid, such as prednisone or prednisolone, at a daily dose of 10 mg orally. *Id.* at 3:2–5.

---

[12] X. Pivot et al., *A multicenter phase II study of XRP6258 administered as a 1-h i.v. infusion every 3 weeks in taxane-resistant metastatic breast cancer patients*, ANNALS OF ONCOLOGY, 19, 1547–1552 (April 23, 2008) ("Pivot"). Ex. 1010.

[13] Taxotere® is the brand name for docetaxel. We also refer to "Taxotere" in this Decision.

7

IPR2016-00712
Patent 8,927,592 B2

The chemical name for cabazitaxel is 4α-acetoxy-2α-benzoyloxy-5β,
20-epoxy-lβ-hydroxy-7β, 10β-dimethoxy-9-oxo-ll-taxen-13α-yl(2R,3S)-3-
tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate.  *Id.* at 4:28–31.
Cabazitaxel is a taxane compound, the chemical structure of which is shown
below:



*Id.* at 4:8–26.  Example 1 of the '592 patent describes a large-scale (phase
III) comparative clinical trial of mCRPC patients whose disease had
progressed during or after docetaxel treatment, the docetaxel-refractory
patients being treated with either 25 mg/m$^2$ of cabazitaxel or 12 mg/m$^2$
mitoxantrone, and 10 mg/day of prednisone.  *Id.* at 10:30–48.  Patients
receiving cabazitaxel and prednisone demonstrated a median overall survival
that was 2.4 months longer than those receiving mitoxantrone and
prednisone.  *Id.* at 11:28–37, 11:45–54.  The claimed method is directed to
administering cabazitaxel and a corticoid to prostate cancer patients whose
disease has progressed in spite of previous docetaxel treatment.  *Id.* at 5:33–
67, 18:54–58, 20:25–30.

8

IPR2016-00712
Patent 8,927,592 B2

### D. Challenged Claims

Petitioner challenges claims 1–5 and 7–30 of the '592 patent.

Independent claims 1 and 27 are illustrative and are reproduced below:

> 1. A method for treating a patient with prostate cancer that has progressed during or after treatment with docetaxel, comprising administering to said patient a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, in combination with a corticoid.

> 27. A method of increasing the survival of a patient with a castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel, comprising administering a dose of 20 to 25 mg/m2 of cabazitaxel, or hydrate or solvate thereof, to the patient in combination with prednisone or prednisolone.

## II.   ANALYSIS OF THE '592 PATENT CLAIMS

### A. Claim Construction

We determine that only the following claim terms require express construction for purposes of this Decision. *See, e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'" (citation omitted)).

#### 1. Claim 1: "A method for treating a patient"

Petitioner argues that the preamble phrase in claim 1, "a method for treating," is a non-limiting statement of the purpose of the claimed method, or, at most, should be construed as "a method intended to benefit a patient." Pet. 17–19.  In its Preliminary Response, Patent Owner opposed Petitioner's

9

IPR2016-00712
Patent 8,927,592 B2

proposed construction, arguing that the preamble is limiting and should be
construed to mean "a method that produces a therapeutic effect in a patient."
Prelim. Resp. 15–18.  In our Institution Decision, we construed "a method
for treating a patient" in claim 1 as a non-limiting statement of the purpose
of the claimed method.  Paper 9, 7–10.  At most, the phrase would be
construed as "a method intended to benefit a patient."  *Id.* (citing *Bristol-
Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375–76
(Fed. Cir. 2001) (The preamble language "a method of treating a patient,"
"does not result in a manipulative difference in the steps of the claim," and
the recited method steps "are performed the same way regardless [of]
whether or not the patient experiences a [therapeutic effect].")).

Patent Owner's Response applies the Board's construction from the
Institution Decision and does not argue for a different construction.  PO
Resp. 14; Reply 1.  Therefore, we maintain our construction of the preamble
as non-limiting for the reasons given in our Institution Decision.  Paper 9, 7–
10.

### 2.  *Claim 27:  "A method of increasing the survival of a patient"*

Petitioner argues that the preamble phrase in claim 27, "[a] method of
increasing the survival of [a patient]," is a non-limiting statement of the
purpose of the claimed method or, at most, should be construed as "a method
intended to increase the survival of a patient."  Pet. 19–20.  In its
Preliminary Response, Patent Owner opposed Petitioner's proposed
construction, arguing that the preamble is limiting and should be construed
to mean "a method that prolongs the life of a patient as compared to no
treatment or palliative treatment, where that method has been demonstrated

10

IPR2016-00712
Patent 8,927,592 B2

to provide a statistically significant increase in overall survival." Prelim.
Resp. 19.  In our Institution Decision, we construed the preamble in claim 27
as a non-limiting statement of the purpose of the claimed method for the
same reasons expressed above regarding "a method for treating a patient" in
claim 1.  Paper 9, 10.  At most, the phrase would be construed as "a method
intended to increase the survival of a patient."  *Id.*

    Patent Owner's Response applies the Board's construction from the
Institution Decision and does not argue for a different construction.  PO
Resp. 14; Reply 1.  Therefore, we maintain our construction of the preamble
as non-limiting for the reasons given in our Institution Decision.  Paper 9,
10.

### 3.  *Prosecution History of Independent Claims 1 and 27*

    A review of the amendments made to independent claims 1 and 27
during prosecution of the '592 patent application provides further context for
considering the parties' dispute, discussed in Section II.B., below, over
whether a POSA would have had a reasonable expectation of success in
achieving the treatment method claimed in the '592 patent.

    On April 26, 2012, patent applicant filed proposed independent
method of treatment claims 1 and 24 (later amended and issued as claim 27).
Ex. 1004 (Part 13), 2397–2402.  Claim 1 as originally filed recited:

> 1.  A method for treating prostate cancer in a patient in
> need thereof comprising administering to said patient a
> compound of formula [cabazitaxel chemical structure]
> which may be in base form or in the form of a hydrate or
> a solvate, in combination with prednisone or prednisolone.

*Id.* at 2397.  Dependent claims 8 and 9, which depended directly or
indirectly from claim 1, recited administering cabazitaxel at "a dose of

11

IPR2016-00712
Patent 8,927,592 B2

between 15 and 25 mg/m$^2$" and "a dose of 25 mg/m$^2$, respectively. *Id.* at 2398. Claim 24 as originally filed recited:

> 24. A method of increasing the survival of a patient with hormone refractory metastatic prostate cancer, comprising administering a *clinically proven effective amount* of a compound as defined in claim 1 to the patient in combination with prednisone or prednisolone.

*Id.* at 2399 (emphasis added). The '592 patent uses lexicography to define "clinically proven" to mean "clinical efficacy results that are sufficient to meet FDA approval standards." Ex. 1001, 4:1–3. The '592 patent further defines "effective amount" to mean "an amount of a pharmaceutical compound, such as cabazitaxel, that produces an effect on the cancer to be treated." *Id.* at 3:65–67.

On March 17, 2014, following an earlier amendment, claim 1 was amended as follows:

> 1. (Currently amended) A method for treating prostate cancer in a patient in need thereof comprising administering to said patient <u>an effective amount of</u> a compound of formula [cabazitaxel chemical structure] which may be in base form or in the form of a hydrate or a solvate, in combination with <u>a corticoid</u> . . . .

Ex. 1004 (Part 2), 280. Patent applicant also added new claims 34, 37, 40, and 43 depending directly or indirectly from claim 1, which recited administering cabazitaxel at "a dose of 25 mg/m$^2$." *Id.* at 282–83. Claim 24 remained in its original, un-amended form. *Id.* at 282. Patent applicant argued that the claims were patentable over Mita and Tannock, *inter alia*, because the phase III clinical trial results presented in the application (*see* Ex. 1001, Example 1, 10:28–17:33) showed "a <u>statistically significant</u> longer

12

IPR2016-00712
Patent 8,927,592 B2

overall survival compared to patients receiving . . . mitoxantrone plus prednisone." Ex. 1004, 285.  Patent applicant further argued that Mita's disclosure of a phase I safety and dosing study for cabazitaxel, which showed evidence of anticancer activity at a dose of 25 mg/m$^2$ in one docetaxel-refractory mCRPC patient, was insufficient to establish a reasonable expectation of "successfully treat[ing]" such patients.  *Id.* at 285–86.

The Examiner continued to reject the claims over Beardsley (anticipation under § 102(b)) and Mita, Tannock, and Beardsley (obviousness § 103).  *Id.* at 252–268.

On July 10, 2014, applicant's representatives conducted a personal interview with the Examiner.  *Id.* at 230.  Applicant's representatives presented a draft Rule 132 Declaration by Dr. Sartor, who also attended the interview, to demonstrate "the unpredictability and failure of other taxanes in Phase III clinical trials despite demonstrating efficacy in Phase I and Phase II clinical trials."  *Id.*  The Examiner agreed that submission of the Rule 132 Declaration and amendments to independent claims 1 and 24 to recite "1) treatment of prostate cancer in patients who had progressed during or after docetaxel treatment and 2) administering a dose of 20 to 25 mg/m$^2$ cabazitaxel . . . in combination with a corticoid" would render the claims allowable.  *Id.*

On July 16, 2014, patent applicant filed another amendment to application claim 1 (issued claim 1) and claim 24 (issued claim 27) as follows:

> 1.  (Currently Amended) A method for treating ~~prostate cancer in~~ a patient <u>with prostate cancer that has progressed</u>

IPR2016-00712
Patent 8,927,592 B2

during or after treatment with docetaxel, ~~in need thereof~~ comprising administering to said patient a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, ~~an effective amount of a compound of formula [cabazitaxel chemical structure] which may be in base form or in the form of a hydrate or a solvate~~, in combination with a corticoid.

24.   (Currently Amended) A method of increasing the survival of a patient with a castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel, comprising administering a ~~clinically proven effective amount~~ dose of 20 to 25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof, ~~a compound as defined in claim 1~~ to the patient in combination with prednisone or prednisolone.

Ex. 1004 (Part 1), 138, 140.

In claim 1, patent applicant deleted "in need thereof" in the preamble (*id.* at 138), a phrase Patent Owner adds to the body of proposed substitute claim 31 in the MTA (MTA, 27). Patent applicant also deleted "an effective amount" from the body of claim 1 and replaced it with "a dose of 20 to 25 mg/m$^2$" of cabazitaxel. Ex. 1004 (Part 1), 138. Similarly, in claim 24, patent applicant deleted "clinically proven effective amount" and replaced it with a "dose of 20 to 25 mg/m$^2$" of cabazitaxel. *Id.* at 140. The deletions removed the lexicographically-defined limitations of producing "an effect on the cancer to be treated" ("effective amount" in clam 1) and achieving "clinical efficacy results that are sufficient to meet FDA approval standards" ("clinically proven effective amount" in claim 24), respectively, and replaced them with a 20 to 25 mg/m$^2$ dosage range. Ex. 1001, 3:65–4:3, 10:47–48, 11:1–13:66, 17:31–18:29, Figs. 1–7.

14

IPR2016-00712
Patent 8,927,592 B2

In remarks, patent applicant argued that the absence of the 20 to 25 mg/m$^2$ dosage range in the prior art was important evidence rebutting the Examiner's rejections. Ex. 1004 (Part 1), 145 ("Importantly, the doses of cabazitaxel and prednisone are not disclosed in Beardsley. . . . Beardsley does not describe *any* dose of cabazitaxel, let alone an *effective* amount of cabazitaxel."); *id.* at 148 ("the doses of cabazitaxel and prednisone are not disclosed [in Beardsley]").  Patent applicant further argued that the cited art was insufficient to justify a reasonable expectation that the claimed method "would successfully treat prostate cancer."  *Id.* at 147.  A Notice of Allowance ensued.  *Id.* at 91–94.  The Examiner was persuaded by patent applicant's arguments and evidence, particularly Dr. Sartor's Rule 132 Declaration statements that the prior art, while disclosing "promising early clinical results, . . . failed to predict whether therapies would ultimately provide a clinically meaningful benefit to the desired patient populations and that mCRPC was known to be a particularly challenging and unpredictable indication."  *Id.* at 93.

As indicated by patent applicant's final claim language, achieving a clinically effective treatment is not a limitation of the '592 method claims. *See Bristol-Myers Squibb Co.*, 246 F.3d at 1375 ("The express dosage amounts are material claim limitations; the statement of the intended result of administering those amounts [an antineoplastically effective amount] does not change those amounts or otherwise limit the claim."); *see also id.* at 1376 ("We therefore affirm the district court's interpretation of claims 5 and 8 as limited only to the actual steps of those claims, without regard to the result of performing the claimed steps" [to effect regression of a taxol-

15

IPR2016-00712
Patent 8,927,592 B2

sensitive tumor]).  In sum, the independent method claims of the '592 patent
are limited to the step(s) of:

- administering a 20–25 mg/m$^2$ dose of cabazitaxel (or its hydrate
  or solvate);

- in combination with a corticoid (claim 1), such as prednisone or
  prednisolone (claim 27);

- to a docetaxel-refractory prostate cancer patient (claim 1); or

- to a docetaxel-refractory mCRPC patient (claim 27).

The recited method steps, although they must have utility, are
performed without regard to whether the claimed method results in a
clinically effective treatment.

### B. Ground 1:  Asserted Obviousness of Claims 1, 2, 5, 12, 13, 17–20, 22–25, and 27–29 over Winquist and the TROPIC Listing in View of Attard and Beardsley

Petitioner asserts that the subject matter of claims 1, 2, 5, 12, 13, 17–
20, 22–25, and 27–29 of the '592 patent would have been obvious to a
person of ordinary skill in the art (hereafter "POSA") based on the combined
teachings of Winquist and the TROPIC Listing in view of the knowledge of
a POSA.[14]  Pet. 25–38.  Winquist and the TROPIC Listing together disclose

___

[14] The parties provide largely similar descriptions of a POSA.  *Compare* Pet.
9–10 *with* PO Resp. 14.  Patent Owner acknowledges that any differences
should not affect the outcome of this case.  PO Resp. 14; Reply 1.  We
agree.  For purposes of this decision, we adopt and apply Patent Owner's
description of a POSA as an oncologist or medical doctor specializing in
oncology who would have had experience in the treatment of prostate
cancer, including metastatic prostate cancer, in evaluating therapies for
prostate cancer, and who would have had access to information regarding
pharmacokinetics and mechanisms of drug resistance.  PO Resp. 14 (citing

16

IPR2016-00712
Patent 8,927,592 B2

the same treatment protocol described in Example 1 of the '592 patent ("the TROPIC Study"), more than one year before the earliest effective priority date to which the '592 patent may be entitled (October 29, 2009). Pet. 1–2, 6–7 (citing Ex. 1008; Ex. 1009), 25–27 (citing Ex. 1002 ¶¶ 115–121); Ex. 1001, (60), 10:30–48. In our Institution Decision, we amended the ground to add "in view of Attard and Beardsley," two prior art references cited and discussed by Petitioner that reflect the knowledge of a POSA. Paper 9, 16 (citing *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1312–13 (Fed. Cir. 2015) (noting that governing statutory provisions do not limit the Board's authority to proceed with AIA trial proceedings only on the specific statutory grounds alleged in the petition)).

Patent Owner does not dispute that Winquist and the TROPIC Listing are prior art under 35 U.S.C. § 102(b) (pre-AIA). PO Resp. 37–41. Patent Owner's Response to the Petition asserts that a POSA would not have had a reasonable expectation of successfully treating docetaxel-refractory prostate cancer patients with cabazitaxel. PO Resp. 16–43. Patent Owner further asserts that evidence of secondary considerations supports the non-obviousness of the challenged '592 patent claims. *Id.* at 50–56. We address the parties' arguments below.

### 1. Winquist

Winquist is a February 2008 disclosure of open, uro-oncology clinical trials in Canada that qualifies as prior art under 35 U.S.C. § 102(b) (pre-AIA). Ex. 1009, 3942. The format of each entry is the same; a descriptive

---

Ex. 2176 ¶ 28). We also rely on the cited references as reflecting the level of ordinary skill in the art at the time of the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

IPR2016-00712
Patent 8,927,592 B2

title of the clinical trial followed by an identification of the trial and the entity coordinating it, the trial design, patient population, sample size, and primary endpoint. *Id.* Winquist discloses a randomized phase III clinical trial coordinated by Sanofi-Aventis involving treatment of mCRPC patients previously treated with docetaxel (the TROPIC Study). *Id.* at 3948.

Significantly, and unlike the prior art considered by the Examiner during prosecution, Winquist discloses the administration of a 25 mg/m$^2$ dose of cabazitaxel to mCRPC patients: "A randomized, open-label multicentre study of XRP-6258 [cabazitaxel] at 25 mg/m$^2$ in combination with prednisone every 3 weeks compared to mitoxantrone in combination with prednisone for the treatment of hormone-refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen." *Id.* The primary endpoint is overall survival. *Id.*

With regard to independent claims 1 and 27 of the '592 patent, Winquist does not disclose expressly that the prostate cancer "has progressed during or after treatment with docetaxel" (*id.*; Pet. 25–26), but Petitioner contends that progression after treatment with docetaxel was implicit and would have been understood by a POSA. Pet. 25–26 (citing Ex. 1002 ¶¶ 65, 94 (95), 117).

2. *The TROPIC Listing*

The TROPIC Listing was published in the ClinicalTrials.gov database of the National Library of Medicine, and it was archived by The Internet Archive on October 23, 2008. Ex. 1026, Ex. A. The TROPIC Listing also qualifies as prior art under 35 U.S.C. § 102(b). The TROPIC Listing discloses the same phase III clinical trial reported in Winquist (the Sanofi-Aventis TROPIC Study), a "randomized, open-label, multi-center study

18

IPR2016-00712
Patent 8,927,592 B2

comparing the safety and efficacy of XRP6258 [cabazitaxel] plus prednisone to mitoxantrone plus prednisone in the treatment of hormone refractory metastatic prostate cancer previously treated with a Taxotere [docetaxel]-containing regimen." Ex. 1008, 1; Ex. 1002 ¶¶ 118–120.  The TROPIC Listing, like Winquist, discloses that cabazitaxel is to be administered every three weeks and that expected patient enrollment is 720 patients.  Ex. 1008, 1–2; Ex. 1009, 3948.  The TROPIC Listing expressly states that patients must have a "[d]ocumented progression of disease (demonstrating at least one visceral or soft tissue metastatic lesion, including a new lesion) . . . [or] rising PSA levels or appearance of [a] new lesion," after previous treatment with docetaxel.  Ex. 1008, 2.  The primary outcome, as also reported in Winquist, is overall survival.  *Id*. at 1; Ex. 1009.  The TROPIC Listing notes the start date of the clinical trial was December 2006.  Ex. 1008, 2.

With regard to independent claims 1 and 27 in the '592 patent, the TROPIC Listing, unlike Winquist, does not disclose an administration dose of cabazitaxel.  *Id.*; Pet. 7.

### *3. Attard and Beardsley*

Attard is a review article reporting, *inter alia*, on a phase I dosing study for cabazitaxel, which was originally reported in Mita (Ex. 1012).  Ex. 1021, 75 (Col. 1 ¶ 2 n.23).  Mita discloses administration of a 15 mg/m$^2$ dose to one prostate cancer patient and a 25 mg/m$^2$ dose to a docetaxel-refractory metastatic prostate cancer patient.  Ex. 1012, 727 (Col. 1 ¶ 2).  Attard reports that Mita's phase I cabazitaxel study showed two objective responses in CRPC patients, and noted that one of the patients was docetaxel refractory (25 mg/m$^2$ dose).  Ex. 1021, 75 (Col. 1 ¶ 2 n.23).  Attard also describes

19

IPR2016-00712
Patent 8,927,592 B2

cabazitaxel (XRP6258) as showing improvement over paclitaxel and docetaxel with "higher therapeutic indices" and "activity against resistant tumours." *Id.* at 74.

Beardsley reports on a phase II clinical trial of cabazitaxel administered to docetaxel-resistant metastatic breast cancer patients, which was originally reported in Pivot (Ex. 1010). Ex. 1022, 163 (Col. 2 ¶¶ 4–5). Pivot administered an initial cabazitaxel dose of 20 mg/m$^2$, then escalated the dose to 25 mg/m$^2$ in patients who did not experience a significant adverse event during the first treatment cycle. Ex. 1010, 1548 (Col. 2 ¶ 3). Beardsley reports that the objective response rate to cabazitaxel treatment in docetaxel-refractory metastatic breast cancer patients was 14% in the Pivot study. Ex. 1022, 163 (Col. 2 ¶ 4). Beardsley further reports that while a phase II clinical trial with cabazitaxel had not been performed in CRPC patients, "given its activity in the docetaxel refractory setting described above, this agent is currently being investigated in a phase III multi-center, randomized superiority trial comparing 3-weekly XRP6258 with prednisone to mitoxantrone with prednisone in patients with castrat[ion] resistant metastatic prostate cancer previously treated with docetaxel-containing treatment." *Id.* (Col. 2 ¶ 5).

### 4. Analysis of Independent Claims 1 and 27

A claimed invention is unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103(a). Obviousness under 35 U.S.C. § 103 requires an assessment of (1) the "level of ordinary skill in the pertinent art," (2) the

IPR2016-00712
Patent 8,927,592 B2

"scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of nonobviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).  A party who petitions the Board for a determination of obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).  We assess Petitioner's evidence and argument, weighed against Patent Owner's evidence and argument, according to the standard articulated above.

### a. *Winquist and the TROPIC Listing disclose all method step limitations*

As stated previously, the independent method claims of the '592 patent are limited to the step(s) of:

- administering a 20–25 $mg/m^2$ dose of cabazitaxel (or its hydrate or solvate);

- in combination with a corticoid (claim 1), such as prednisone or prednisolone (claim 27);

- to a docetaxel-refractory prostate cancer patient (claim 1) or a docetaxel-refractory mCRPC patient (claim 27).

Winquist discloses the same treatment protocol as the Sanofi-Aventis TROPIC Study, also described in Example 1 of the '592 patent, namely

21

IPR2016-00712
Patent 8,927,592 B2

administering a 25 mg/m² dose of cabazitaxel in combination with prednisone every three weeks to mCRPC patients previously treated with docetaxel. Ex. 1009; Ex. 1001, 10:30–48. The TROPIC Listing describes the same TROPIC Study protocol and discloses the only limitation of claims 1 and 27 arguably not expressly disclosed in Winquist, that a patient's prostate cancer "has progressed during or after treatment with docetaxel." Ex. 1008, 2 ("Documented progression of disease" after previous treatment with a docetaxel-containing regimen); Pet. 26–27 (citing Ex. 1002 ¶¶ 118–121). We also credit Dr. Seth's testimony that a POSA, an oncologist experienced in treating mCRPC, would have understood Winquist as disclosing treatment of mCRPC patients who experienced disease progression during or after docetaxel treatment, because if the previous docetaxel treatment had stopped the cancer from progressing, second-line treatment with cabazitaxel would be unnecessary. Ex. 1002 ¶ 117.

Dr. Sartor testified that Winquist and TROPIC Listing expressly teach administration of the recited 25 mg/m² dose of cabazitaxel in docetaxel-resistant mCRPC patients as a new cycle every three weeks, in combination with prednisone. Ex. 1041, 62:8–18, 73:10–15, 96:17–22, 150:6–152:6. Dr. Sartor also testified that Winquist and the TROPIC Listing disclosed a treatment regimen for mCRPC patients that had progressed during or after treatment with docetaxel. Ex. 1041, 59:7–20, 65:2–18, 67:23–68:6, 83:10–15, 87:13–88:4, 93:9–17. Patent Owner does not contend otherwise. PO Resp. 37–41. Petitioner also provides a claim chart identifying where each recited limitation is disclosed in Winquist and the TROPIC Listing. Pet. 35–38.

IPR2016-00712
Patent 8,927,592 B2

Therefore, we find Petitioner has established by a preponderance of the evidence that Winquist and the TROPIC Listing disclose all of the method steps recited in independent claims 1 and 27 of the '592 patent.

### b. *Motivation to combine*

A preponderance of the evidence establishes that a POSA would have had good reason to combine the teachings of Winquist and the TROPIC Listing and would have read the two references together. Pet. 26–27 (citing Ex. 1002 ¶¶ 118–120). Winquist and the TROPIC Listing disclose the same treatment method being used in the same clinical trial for treating the same patient population – the Sanofi-Aventis TROPIC Study. *Id.* Petitioner relies on Attard and Dr. Seth's Declaration testimony for the proposition that "it was known in the art that anticancer activity against docetaxel-resistant, castration-resistant prostate cancer was observed in patients treated with cabazitaxel," further reinforcing a POSA's understanding that Winquist and the TROPIC Listing should be read together as administering 25 mg/m$^2$ cabazitaxel (and prednisone) to treat the same docetaxel-refractory mCRPC patient population. Pet. 27 (citing Ex. 1002 ¶¶ 66–69; Ex. 1021, 74–75 (Table 3)). Beardsley also makes reference to Pivot's phase II clinical study of cabazitaxel among docetaxel-refractory metastatic breast cancer patients as providing motivation for the TROPIC Study, further reinforcing the point. *Id.* at 28 (citing Ex. 1002 ¶¶ 70–72; Ex. 1022, 163). As Dr. Seth testifies:

> By 2008, cabazitaxel had been validated by both Phase I and Phase II clinical studies as a drug to treat metastatic cancers, including docetaxel-resistant cancers. It was known that a Phase III trial was underway administering cabazitaxel with prednisone for treating castration-resistant metastatic prostate cancer that had previously been treated with docetaxel.

23

IPR2016-00712
Patent 8,927,592 B2

Ex. 1002 ¶ 70.  Petitioner's cited evidence is highly persuasive that a POSA in 2008 would have known that Winquist and the TROPIC Listing disclosed the same ongoing phase III clinical trial – the TROPIC Study – and would have read the two references together.

Dr. Sartor, Patent Owner's expert, confirmed that Winquist and the TROPIC Listing describe the same treatment regimen actually being used in the TROPIC Study and that a POSA would have read the two references together.  Ex. 1041, 57:2–8, 94:14–95:4, 97:5–100:4.  Patent Owner implicitly acknowledges the sufficiency of Petitioner's evidence establishing a motivation to combine the teachings of Winquist and the TROPIC Listing. *Compare* PO Resp. 16–46, *with* PO Resp. 47–49.  Therefore, we are satisfied that Petitioner has established by a preponderance of the evidence that a POSA in 2008 would have combined the teachings of Winquist and the TROPIC Listing and read the two references together.

> c. *Reasonable expectation of success in achieving the claimed method of treatment*

The fundamental dispute between Petitioner and Patent Owner concerns the relevant standard for evaluating whether a POSA would have had a reasonable expectation of "success" in achieving the claimed method. It devolves into a claim construction dispute.  Unlike the prior art before the Examiner during prosecution of the '592 patent claims, Winquist expressly discloses the same 25 mg/m$^2$ dose of cabazitaxel for treating docetaxel-refractory mCRPC patients described in Example 1 of the '592 patent.  This is not surprising given that Winquist discloses the same TROPIC Study treatment protocol.  Faced with this evidence, Patent Owner attempts to raise the bar for the standard of "success" required to prove obviousness of the

24

IPR2016-00712
Patent 8,927,592 B2

claimed method.  We are not persuaded by Patent Owner's argument and evidence.

> ### i)    Relevant standard for "success"

Petitioner contends a POSA reasonably would have concluded from Winquist and the TROPIC Listing, in view of the knowledge of a POSA, that a 25 mg/m$^2$ dose of cabazitaxel administered with prednisone every three weeks would have anti-cancer activity in docetaxel-refractory mCRPC patients.  Pet. 27–29 (citing Ex. 1002 ¶¶ 66–72, 120–122).  Thus, evidence of anti-cancer activity in the target patient population – not clinical efficacy – equates to "success" in Petitioner's analysis.  Petitioner also argues that absolute predictability is not required.  *Id.* at 29 (citing *Pfizer*, 480 F.3d at 1364; *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)).  Petitioner further emphasizes that the "method for treating" preamble in claim 1 and the "method of increasing the survival" preamble in claim 27 are not claim limitations.  *Id.* at 17–20, 29, 33.  We agree the preambles are not limiting, as stated in our claim construction analysis in Section II.A., above.

Patent Owner contends that while "predictability is a touchstone of obviousness," predictability "refers not only to the expectation that the prior art elements are capable of being physically combined, but also that the combination would have worked for its intended purpose."  PO Resp. 15 (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009); also citing *In re Cyclobenzaprine*, 676 F.3d 1063, 1071–72 (Fed. Cir. 2012) (disclosure of PK values insufficient without a showing that a POSA would reasonably expect those values to yield a therapeutically effective formulation)).  Based on this premise, Patent Owner

25

IPR2016-00712
Patent 8,927,592 B2

argues that Petitioner does not address "the surprise in the field" or the risks of cabazitaxel therapy, and that Petitioner's evidence is insufficient to have allowed a POSA to reasonably expect that cabazitaxel's clinical benefit in docetaxel-refractory mCRPC patients would outweigh the risks of such treatment.  PO Resp. 17–19.  Patent Owner defines "success" in the context of the '592 patent claims as "a treatment for prostate cancer that provides a clinical benefit in patients previously treated with docetaxel, where the side effects of that treatment are not such that administering it would be inappropriate for those patients notwithstanding the benefit."  *Id.* at 20.

Petitioner replies that the '592 patent claims do not recite a treatment method that has achieved (i) FDA approval (a "clinically proven" treatment as defined in the '592 patent specification (Ex. 1001, 4:1–3)), (ii) a successful phase III trial, or iii) an actual increase in survival of a patient. Reply 1.  Petitioner further argues that, because the '592 patent claims "do not recite a required result regarding efficacy or safety, Petitioner need not establish a reasonable likelihood of a successful phase III trial or FDA approval to demonstrate obviousness."  *Id.* at 3.  We agree.

Patent Owner's argument is misplaced because it implicitly defines "success" as a clinically effective treatment where clinical benefit outweighs potential risks to the patient in the context of a phase III clinical trial designed for FDA approval.  As we explained in our claim construction analysis, the '592 patent claims are not limited to a clinically effective treatment.  A close examination of the legal foundation of Patent Owner's argument reveals significant fault lines.

*DePuy Spine* involved the question of whether a hypothetical medical device claim to a pedicle screw for stabilizing spinal column segments

26

IPR2016-00712
Patent 8,927,592 B2

would have been obvious over a combination of prior art references. *DePuy Spine*, 567 F.3d at 1324–25. The issue was raised in the context of defendant's ensnarement defense to patent owner's allegation of infringement under the doctrine of equivalents. *Id.* The Federal Circuit's consideration of whether prior art mechanical elements would have been combinable to achieve the hypothetically claimed pedicle screw, and whether such a prior art device would have worked for its intended purpose of stabilizing spinal column segments, has little bearing on the method of treatment claims at issue in the present case. *DePuy Spine*, moreover, involved a prior art teaching away that would have rendered the proposed combination inoperative. *See* Reply 2 (citing *DePuy Spine*, 567 F.3d at 1326–27). Here, there is a clear motivation to combine Winquist and the TROPIC Listing because the references describe the same clinical study, administering 25 mg/m$^2$ of cabazitaxel in combination with prednisone every 3 weeks to the same patient population, which was also referenced in Beardsley. Unlike the *DePuy Spine* case, there is no evidence of a teaching away from the asserted combination of Winquist and the TROPIC Listing.

*In re Cyclobenzaprine* also is distinguishable because the patent in that case specifically recited a method that "provides [a] therapeutically effective plasma concentration over a period of 24 hours to treat muscle spasm associated with painful musculoskeletal conditions." 676 F.3d at 1066. The Federal Circuit reversed the district court's determination of obviousness because the prior art did not teach sufficiently "whether any particular PK profile . . . would produce a therapeutically effective formulation." *Id.* at 1070; *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1303 (Fed. Cir. 2006) ("A therapeutically effective

27

IPR2016-00712
Patent 8,927,592 B2

amount is one that elicits any one or all of the effects often associated with in vivo biological activity of natural EPO, such as those listed in the specification.").  Here, in contrast to *In re Cyclobenzaprine* and *Amgen*, the '592 patent does not recite a comparable "therapeutically effective" limitation, and Winquist does disclose administration of the recited 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone to mCRPC patients previously treated with docetaxel.

The appropriate test for obviousness requires "a motivation to combine accompanied by a reasonable expectation of achieving what is claimed in the patent-at-issue." *Intelligent Bio-Systems Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).  In *Intelligent Bio-Systems*, the Federal Circuit underscored the importance of considering "the appropriate scope of the patent's *claimed invention* in evaluating the reasonable expectation of success."  821 F.3d at 1367.  Consistent with the claim amendments made by the '592 patent applicant during prosecution, the claims at issue here do not recite an FDA-approved clinically effective treatment.  Reply 6–7.  As stated above, the claims were amended to replace limitations reciting an "effective amount" (claim 1) and a "clinically proven effective amount" (claim 27) with a recited dosage range of 20 to 25 mg/m$^2$ of cabazitaxel.  Ex. 1004 (Part 1), 138, 140.  There is no recitation in the '592 patent claims of administering a therapeutically effective amount of cabazitaxel in combination with prednisone or a comparable recitation requiring a particular therapeutic effect, clinical benefit, or result.  Reply 6–7 (distinguishing *Coal. For Affordable Drugs V LLC v. Biogen MA Inc.*, Case IPR2015-01136, slip op. at 9-10 (PTAB Sept. 2, 2015) ( Paper 23)).  Petitioner, therefore, need not establish a POSA reasonably would have

28

IPR2016-00712
Patent 8,927,592 B2

expected successful phase III clinical trial results, FDA approval of
cabazitaxel and prednisone combination therapy, or an actual increase in
patient survival, to demonstrate obviousness of claims 1 and 27. *Id.* at 3
(citing *In re Montgomery*, 677 F.3d, 1375, 1380 (Fed. Cir. 2012) (claims to a
method for treating or preventing a stroke do not create "an efficacy
requirement"); *Intelligent Bio-Systems*, 1367–68 (quantitative removal
irrelevant to reasonable expectation because not a claim requirement)); *see
also id.* at 7 (citing *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed.
Cir. 2013) ("There is no requirement that one of ordinary skill have a
reasonable expectation of success in developing Combigan®.  Rather, the
person of ordinary skill need only have a reasonable expectation of success
of developing the claimed invention."); *Astrazeneca LP v. Apotex, Inc.*, 633
F.3d 1042, 1064–65 (Fed. Cir. 2010) (lacking FDA approval does not
demonstrate lack of drug utility)).

Patent Owner further contends that Winquist and the TROPIC Listing
cannot render unpatentable the claims of the '592 patent because "disclosure
of a protocol for testing a hypothesis without any evidence of efficacy or
safety is insufficient to show that the method itself is useful for the claimed
patients."  PO Resp. 37 (citing *Biogen*, Case IPR2015-01136, slip op. at 9–
10 (PTAB Sept. 2, 2015) (Paper 23)).  To the contrary, not only did the
*Biogen* decision acknowledge that it would be inappropriate to engraft an
efficacy or FDA approval requirement onto the obviousness analysis, *Biogen*
is distinguishable because the prior art failed to disclose the "therapeutically

IPR2016-00712
Patent 8,927,592 B2

effective amount" limitation recited in the method of treatment claims at issue. *Biogen*, IPR2015-01136, 6–7.[15]

For the reasons given above, we determine that a reasonable expectation of success in the context of the '592 patent claims may be satisfied by evidence that a POSA reasonably would have expected a 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone, as disclosed in Winquist and the TROPIC Listing, to have anti-cancer activity in docetaxel-refractory mCRPC patients.

*ii)     A preponderance of the evidence supports finding a reasonable expectation of success*

Petitioner has established by a preponderance of the evidence that a POSA would have had a reasonable expectation of successfully achieving the claimed treatment method based upon the teachings of Winquist and the TROPIC Listing, in view of Attard, Beardsley, and the knowledge of a POSA.  Winquist teaches administration of a 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone, the same 25 mg/m$^2$ dose taught by Mita as exhibiting "anti-cancer activity" when administering cabazitaxel to a docetaxel-refractory metastatic prostate cancer patient.  Ex. 1012, 727 (Col. 1 ¶ 2).  Mita notes a significant decrease in prostate-specific antigen and a "confirmed partial response" in the docetaxel-refractory patient, two of the same measures reported in the analysis of the TROPIC Study in the '592 patent.  Ex. 1001, 11:8–9, 11:26–64.  Dr. Seth explains that the RECIST guidelines define a partial response as a reduction of the largest diameter of

---

[15] We further note the *Biogen* decision is not precedential and, therefore, not binding on this panel.

IPR2016-00712
Patent 8,927,592 B2

the cancerous lesion by at least 30%.  Ex. 1002 ¶¶ 27, 69; Ex. 1043 ¶ 15; Ex. 1051, 983–84.  Attard reports favorably on the Mita study and teaches a POSA that cabazitaxel shows improvement over paclitaxel and docetaxel as evidenced by higher therapeutic indices and "activity against [taxane] resistant tumors."  Ex. 1021, 74–75.

Petitioner further emphasizes that in 2008 a POSA would have known (i) anti-cancer activity had been observed in a docetaxel-refractory mCRPC patient treated with cabazitaxel (Attard, Ex. 1021, 75/Mita, Ex. 1012, 727), (ii) the safety profile of cabazitaxel was "very favorable" compared to paclitaxel and docetaxel (Pivot, Ex. 1010, 1551), (iii) cabazitaxel was known to target the same tubulin binding site as docetaxel, shown to be effective in breast and prostate cancers (Attard, Ex. 1021, 74–75), (iv) cabazitaxel's 14% objective response rate in docetaxel-refractory metastatic breast cancer patients was a motivation for carrying out the phase III clinical trial in mCRPC patients previously treated with docetaxel (Beardsley, Ex. 1022, 163/Pivot, Ex. 1010, 1550), and (v) assessing overall survival was the "primary endpoint" of the TROPIC Study reported in Winquist and the TROPIC Listing (Winquist, Ex. 1009, 3948/TROPIC Listing, Ex. 1008, 1). Pet. 27–28, 33–34 (citing Ex. 1002 ¶¶ 66–72, 110, 132, 222; Ex. 1008, 1; Ex. 1009, 3948; Ex. 1010, 1548, 1551; Ex. 1021, 72, 74–75, Table 3; Ex. 1022, 163).  Winquist also taught a POSA that, as of October 23, 2008, the phase III TROPIC Study had been ongoing since December 2006, a favorable indicator according to Dr. Seth.  Ex. 1002 ¶ 122.  Dr. Seth concludes that, based on the available knowledge regarding administration of cabazitaxel in docetaxel-resistant prostate and breast cancer patients, described above, a POSA – a clinical oncologist with experience treating

31

IPR2016-00712
Patent 8,927,592 B2

mCRPC patients and knowledge of drug resistance mechanisms – would have reasonably concluded that the treatment method disclosed in Winquist and the TROPIC Listing "would yield intrinsic anti-cancer activity, and would produce therapeutic or other medical benefits similar to those for which docetaxel had been previously administered—for example, an increase in overall survival." *Id.* ¶¶ 120–121; *see also* Reply 28 (citing Ex. 1008, 1–2; Ex. 1009, 3948).

Patent Owner contests Petitioner's reasonable expectation of success arguments and evidence. PO Resp. 16–46. However, Patent Owner's argument and evidence regarding the alleged surprise in the field, risks of administering cabazitaxel, and unpredictability of the clinical trial results from the TROPIC Study, including whether those clinical results would be sufficient for FDA approval, are based on a legally irrelevant standard of "success" to the extent Patent Owner implies that "success" requires achieving clinical trial results sufficient for FDA approval. Patent Owner's analysis also effectively excludes Winquist and the TROPIC Listing as prior art. Examples abound.

Patent Owner's evidence that Dr. Sartor was "surprised when he reviewed the *data*" from the TROPIC Study for the first time, as were others when he "presented the *results* publicly," and that "prediction of a *positive phase III study* was 'an impossible endeavor,'" speaks to therapeutic efficacy proven by statistically significant data taken from successful phase III clinical trial results needed for FDA approval. PO Resp. 16 (emphases added) (citing Ex. 2004, 1711 (Col. 1 ¶ 2); Ex. 2176 ¶¶ 93, 185, 187). Providing statistically significant data and results to establish a clinically effective treatment for FDA approval is neither a requirement of the '592

32

IPR2016-00712
Patent 8,927,592 B2

patent claims nor the appropriate measure of success.  Therefore, such

evidence is entitled to little weight.

Further undercutting Patent Owner's argument, Dr. Sartor admitted

that he incorrectly concluded that Winquist and the TROPIC Listing are not

prior art:

> Q.  The TROPIC listing is one of the pieces of prior art
> that you viewed as appropriate to consider in evaluating
> the validity of the 592 patent; is that correct?
> A.  I didn't think it was prior art when you just put it in a
> listing.  It's not relevant to me to put it in a listing.  So I
> didn't -- I honestly don't think that's part of the prior art
> when you list a clinical trial.  What does that mean?  It
> means nothing.
>
> Q.  When you were reaching your opinions in this
> proceeding regarding the validity of the 592 patent, is it
> correct that you did not evaluate the TROPIC listing as a
> prior art reference?
> A.  I didn't really care if they listed it or not. It was
> irrelevant to my opinion. . . .
>
> Q.  With that understanding, when you reached your
> opinions in this case, in this proceeding, did you
> understand that the TROPIC listing was prior art to the 592
> patent?
> A. I don't think it is.  I think it's just a listing.  That listing
> had no relevance to my opinion whatsoever, and I was
> very surprised that someone who's an oncologist would
> say so.  I mean I was actually kind of shocked. So I
> wouldn't call it the prior art.  I'd just call it a listing.

Ex. 1041, 43:18–45:11 (objections to form omitted).  With regard to

Winquist, which disclosed administering 25 mg/m$^2$ of cabazitaxel in

combination with prednisone to treat docetaxel-refractory mCRPC patients,

IPR2016-00712
Patent 8,927,592 B2

and Pivot, which disclosed administering 20–25 mg/m$^2$ of cabazitaxel to treat docetaxel-refractory metastatic breast cancer patients, Dr. Sartor testified as follows:

> Q.  When you reached your opinions in this proceeding, did you understand that the Winquist reference is prior art to the 592 patent?
> A.  Not in my mind.  In somebody else's mind.
>
> Q.  When you reached your opinions in this proceeding, did you have an understanding of the Pivot reference as prior art to the 592 patent?
> A.  It was alleged to be a portion of the prior art. And I think that that was a debatable issue.

*Id.* at 45:12–24 (objections to form omitted).

Dr. Sartor's analysis is undermined by his apparent dismissal of highly relevant clinical trial listings as prior art.  *See Montgomery*, 677 F.3d at 1378–80 (published protocol for ongoing phase III study was prior art that anticipated claims).  Thus, we give little weight to Patent Owner's cited evidence regarding the asserted surprise in the field and Dr. Sartor's opinion that a POSA would not have had a reasonable expectation of successful treatment in a phase III clinical trial from reading Winquist and the TROPIC Listing in view of Attard (reporting on the Mita study) and Beardsley (reporting on the Pivot study).  *See PO Resp.* 21–43 (citing, *inter alia*, Ex. 2176 ¶¶ 45 (a POSA "would need clinical data showing that the medicine provides a specific clinical benefit to the patient, such as those described in the specification of the '592 patent"), 101 ("The multiple failed phase III studies discussed above . . . demonstrate the unpredictability in the art and that a POSA would ***not*** have had a reasonable expectation of success."),

34

IPR2016-00712
Patent 8,927,592 B2

110–111 ("In the context of initiating a phase III study . . . [a] POSA
reviewing Attard and Mita, alone or in combination . . . would have been
left with great uncertainty as to whether cabazitaxel in combination with a
corticoid would be a successful treatment for prostate cancer patients
worsening during or after docetaxel."), 133 ("Pivot, an open-label, single-
arm study, with no data from previous phase II studies . . . would not provide
a POSA with a reasonable expectation of success in a phase III trial in a
different cancer type."), 171 ("a POSA would not have reasonably expected
success for cabazitaxel in prostate cancer simply based on the fact that
Sanofi was performing the TROPIC study.").  Dr. Sartor's opinions rely on
Patent Owner's incorrect standard for "success" and a misconception
regarding the relevant prior art.

 Patent Owner also asserts that in view of the risks associated with
cabazitaxel therapy:

> Mylan, at minimum, needs to demonstrate that a POSA
> would have had a reasonable expectation that
> administering 20-25 mg/m$^2$ of cabazitaxel in combination
> with a corticoid to the claimed patients was efficacious and
> that the regimen's efficacy outweighed the harm to those
> patients.  That is, Mylan's references needed to show that
> there was a reasonable expectation that administering 20-
> 25 mg/m$^2$ of cabazitaxel in combination with a corticoid
> to the claimed patients would be *sufficiently safe and*
> *effective to be useful to physicians as a treatment for*
> *prostate cancer worsening after docetaxel*.

*Id.* at 18 (emphasis added).  According to Petitioner, governing precedent is
to the contrary and provides that the standard for proving obviousness is
lower than the standard for proving efficacy and safety sufficient to warrant
FDA approval.  Reply 7 (citing *Allergan*, 726 F.3d at 1292 ("Motivation to

35

IPR2016-00712
Patent 8,927,592 B2

combine . . . cannot be limited to those reasons the FDA sees fit to consider in approving drug applications."); *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1064–65 (Fed. Cir. 2010) (lacking FDA approval does not demonstrate lack of drug utility)).  Moreover, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."  *Pfizer*, 480 F.3d at 1364.

Patent Owner cites Dr. Seth's deposition testimony for the proposition that Mita and Pivot were not designed to assess the efficacy and risks associated with administration of cabazitaxel, and that more data from a larger clinical study was needed "for a POSA to determine if cabazitaxel would be sufficiently effective in the claimed patients such that the potential benefit would outweigh the harm."  PO Resp. 18–20.  First, Patent Owner's proposed standard engrafts inappropriate safety and efficacy constraints onto the utility of the claimed method as a measure of "success."  *See Bristol-Myers Squibb*, 246 F.3d at 1378 ("the claims only require the administration of specific amounts of [the compound recited in the challenged claims] and not the achievement of a particular result.").  Second, as explained by Dr. Seth, the reported incidences of neutropenia and other side effects of cabazitaxel were not so high as to require a proven survival benefit as a treatment prerequisite.  Ex. 1043 ¶ 26; Ex. 1012, 726 (Table 3); Ex. 1010, 1550–51.  Therefore, we give little weight to Patent Owner's evidence and argument regarding the necessity to weigh the potential clinical benefits against the risks of cabazitaxel administration (diarrhea, nausea, fatigue, neutropenia, and sensory neuropathy), particularly when the prior art discloses the claimed treatment method and its utility as having anti-cancer

36

IPR2016-00712
Patent 8,927,592 B2

activity in docetaxel-resistant mCRPC and breast cancer patients.  For the same reasons, we give little weight to Patent Owner's criticisms of Dr. Seth's testimony in support of Petitioner's Reply, which are effectively rebutted by Petitioner.  *See* Paper 80 (Observations on the Cross-Examination of Dr. Seth); Paper 93 (Response to Observations on the Cross-Examination of Dr. Seth).

Patent Owner further contends it is contradictory for Petitioner to argue that cabazitaxel's similarities with docetaxel disposed it to have activity against prostate cancer and breast cancer but that its differences allowed it to overcome at least some mechanisms of docetaxel resistance. PO Resp. 21–23, 29–33.  Patent Owner emphasizes other tubulin-binding compounds, such as larotaxel that "failed in three separate phase III studies." *Id.* at 22–23; *see also id.* at 29–33 (discussing failure of phase III studies and failure to achieve FDA regulatory approval).  We reiterate, achievement of successful phase III study results for FDA approval is not the appropriate standard for measuring success.  We also credit Petitioner's evidence that cabazitaxel was designed to retain the tubulin-binding activity known to make docetaxel lethal to cancer cells while simultaneously reducing its affinity for the so-called P-gp pump (P-glycoprotein pump). Pet. 8 (citing Ex. 1010, 1547–48), 22–23 (citing Ex. 1002 ¶¶ 66–69); Reply 8 (citing Ex. 1002 ¶¶ 60, 66–69, 77; Ex. 1021, 75).  Such information would have been known to a POSA – a clinical oncologist with experience treating metastatic prostate cancer and access to information regarding pharmacokinetics and mechanisms of drug resistance – as a major mechanism of docetaxel resistance.  As explained by Dr. Seth, a POSA would have believed cabazitaxel was (like docetaxel) active against both breast and prostate

IPR2016-00712
Patent 8,927,592 B2

cancer. Ex. 1043 ¶ 25; *see also* Ex. 1050, 354. Moreover, preclinical and clinical studies confirmed that cabazitaxel was active against docetaxel-resistant prostate and breast cancer. Ex. 1010, 1550 (Col. 2 ¶ 3)–1551 (Col. 1 ¶ 1, Table 3); Ex. 1022, 163 (Col. 2 ¶¶ 4–5).

Patent Owner's remaining arguments are similarly unavailing because, as explained above, Patent Owner applies an inappropriate measure of success in its analysis. *See e.g.*, PO Resp. 28 (positive patient response in phase I study insufficient to prove "cabazitaxel would successfully treat prostate cancer"), 31 ("phase II studies in oncology are poorly predictive of phase III success"), 38 ("Dr. Seth admitted a POSA could not predict beforehand whether a phase III trial was going to be successful or a failure."), 39 (regarding Winquist and the TROPIC Listing, "mere existence of a phase III study was not indicative of success"), 42 ("none of the references cited by Mylan disclose any data on the ability of cabazitaxel to increase the overall survival of any patients").

For the reasons given above, we determine Petitioner has shown by a preponderance of the evidence that a POSA, based on Winquist and the TROPIC Listing in view of Attard, Beardsley, and the knowledge of a POSA, would have had a reasonable expectation of success in achieving the method of treatment recited in claims 1 and 27 of the '592 patent.

### d. Secondary Considerations

Secondary considerations, when present, must "be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) (citation omitted). Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results,

IPR2016-00712
Patent 8,927,592 B2

commercial success, copying, licensing, and praise. *See Graham*, 383 U.S. at 17; *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). Patent Owner bears the burden of producing objective evidence of nonobviousness in rebuttal to Petitioner's evidence of obviousness. *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

For objective evidence of nonobviousness to carry substantial weight, "its proponent must establish a nexus between the evidence and the merits of the *claimed invention.*" *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). A patent owner may establish a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016). We note some tension in applicable Federal Circuit precedent regarding the standard for establishing an appropriate nexus. On the one hand, "[w]here the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," i.e., "there must be a nexus to some aspect of the claim not already in the prior art." *Kao*, 639 F.3d at 1068–69. On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP*, 829 F.3d at 1331. A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence;

39

IPR2016-00712
Patent 8,927,592 B2

proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* Ultimately, the fact finder must weigh the secondary considerations evidence presented in the context of whether the claimed invention as a whole would have been obvious to a POSA. *Id.* at 1331–32.

Patent Owner presents argument and evidence of long-felt need, failure of others, unexpected properties, praise, commercial success, and copying. PO Resp. 50–56. Patent Owner's objective evidence of non-obviousness is tied to the commercial success and recognition of Jevtana®, the successful phase III clinical trial results from the TROPIC Study that led to expedited FDA review and approval of Jevtana®, and the assertion that it was unexpected for cabazitaxel therapy to provide a statistically significant survival benefit and reduced side effects in docetaxel-refractory mCRPC patients. PO Resp. 50–56 (citing Ex. 2176 ¶¶ 93, 185, 187–189, 192–195, 198, 200–202, 204–207, 209–214, 216–219, 221). Patent Owner also produces evidence that clinical administration of Jevtana® according to its FDA-approved labeling satisfies the limitations of independent claims 1 and 27, as well as several dependent claims, of the '592 patent. PO Resp. 54 n.2 (citing Ex. 2150, 1; Ex. 2176 ¶¶ 192–195).

Petitioner offers rebuttal evidence contesting Patent Owner's secondary considerations evidence and the asserted nexus to the claimed treatment method. Reply 17–23.

We have considered Petitioner's evidence of the obviousness of claims 1 and 27, set forth above, in conjunction with Patent Owner's objective evidence of non-obviousness and Petitioner's rebuttal evidence.

40

IPR2016-00712
Patent 8,927,592 B2

On balance, we conclude that Patent Owner's secondary considerations evidence does not outweigh Petitioner's strong evidence of obviousness.

### (i)    Presumption of nexus

We begin with the observation that the clinical administration of Jevtana® is an embodiment of the claimed treatment method.  Ex. 2176 ¶¶ 192–195.  Petitioner does not directly contest this testimony, but raises related arguments that we address below.  Reply 4–5, 17–18.  Therefore, we credit Dr. Sartor's cited Declaration testimony and begin by presuming a nexus between alleged long-felt need, failure of others, unexpected results, praise, commercial success, and copying and the administration of Jevtana® to docetaxel-refractory mCRPC patients.  The presumption shifts the burden of producing rebuttal evidence to Petitioner.  *WBIP*, 829 F.3d at 1329.

The Board,  a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to the evidence presented.  *See Gnosis S.p.A. v. S. Alabama Med. Sci. Found.*, Case IPR2013-00118, slip op. at 43 (PTAB June 20, 2014) (Paper 64); *see also Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received.").  In rendering our decision, we have assigned weight to the evidence as appropriate in view of the entire record before us.  For the reasons that follow, we determine Petitioner's evidence effectively rebuts the presumption of nexus and the weight to be given Patent Owner's objective evidence of non-obviousness.

41

IPR2016-00712
Patent 8,927,592 B2

     *(ii)*   *Claimed method disclosed in the prior art*

The claimed treatment method is fully disclosed in the prior art. Pet. 7–9 (citing Ex. 1008; Ex. 1009, 3948; Ex. 1010, 1547–49, 1551; Ex. 1012, 724, 729); Reply 4–5 (citing, *inter alia*, Ex. 1041, 59:7–20, 62:8–18, 65:2–18, 67:23–68:6, 71:16–25; 73:10–15; 83:10–15, 87:13–88:4, 93:9–17, 96:17–22, 97:7–100:4; 150:6–152:6). The same treatment method described in the '592 patent, specifically the administration of a 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone to docetaxel-refractory mCRPC patients, as set out in the TROPIC Study, was disclosed in the prior art Winquist and TROPIC Listing references. This is not a case where isolated claim limitations are disclosed individually in different prior art references and the claimed combination itself provides the nexus to the merits of the invention. *See WBIP*, 829 F.3d at 1330; *see also* Reply 5 (citing, *inter alia*, *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1353–1354 (Fed. Cir. 2012) (method of treating gastric acid disorder by administering an obvious formulation "cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations")).

First, a POSA would have read Winquist and the TROPIC Listing together because they disclose the same clinical study. Winquist and the TROPIC Listing disclose the same treatment method being used in the same clinical trial for treating the same patient population – the Sanofi-Aventis TROPIC Study. Ex. 1002 ¶¶ 118–120; *see also* Ex. 1041, 94:14–95:4 ("I would anticipate that if they [a POSA] had the available information, they would read both."). Second, a POSA would have understood Winquist, which discloses administering a 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone to mCRPC patients "previously treated with a

Taxotere [docetaxel]-containing regimen" (Ex. 1009, 3948), as disclosing the treatment of prostate cancer that "has progressed during or after treatment with docetaxel," as recited in claims 1 and 27.  Ex. 1002 ¶¶ 65, 117 ("It is implicit in treatment of a patient with mCRPC who has been previously . . .  treated with docetaxel that such treatment is necessary because progression occurred during or after docetaxel treatment.").  Dr. Sartor also testifies that a patient previously treated with docetaxel, as stated in Winquist, would not have been treated with a follow-on taxane such as cabazitaxel "until there's evidence of progression."  Reply 4 (citing Ex. 1041, 59:7-20, *see also id.* at 93:9–17 ("If the patient had not progressed, then he likely would not be treated with cabazitaxel.").  Thus, the method steps recited in claims 1 and 27 are not disclosed in isolation in the prior art; they are disclosed in the same combination claimed and exemplified in the '592 patent.

In short, Petitioner's evidence effectively rebuts the legal presumption of a nexus between the administration of Jevtana® to treat mCRPC patients and "some aspect of the claim not already in the prior art."  *Kao*, 639 F.3d at 1068–69.

### (iii)   *Commercial success*

Patent Owner relies on a presumed nexus between the '592 patent claims and the commercial success of Jevtana®.  PO Resp. 55–56. Petitioner responds that Patent Owner has listed "at least eight different patents" in the FDA Orange Book for Jevtana®, of which six have expired, and that Patent Owner fails to explain why Jevtana®'s commercial success is attributable to the treatment method of the '592 patent rather than to prior

IPR2016-00712
Patent 8,927,592 B2

art elements of the expired patents.  Reply 17–18 (citing Ex. 1044 ¶¶ 17–22, 124–30).  We reproduce Mr. McSorely's chart of Orange Book-listed patents, below.

**Figure A**

**Other Jevtana® Orange Book Listed Patents**

| U.S. Patent No. | Filing Date | Issue Date | Expiration Date | Assignee |
|---|---|---|---|---|
| 5,438,072 | 11/22/93 | 8/1/95 | 11/22/13 | Rhone-Poulenc Rorer S.A. |
| 5,698,582 | 3/3/95 | 12/16/97 | 7/3/12 | Rhone-Poulenc Rorer S.A. |
| 5,847,170 | 3/26/96 | 12/8/98 | 3/26/16 | Rhone-Poulenc Rorer S.A. |
| 6,331,635 | 4/28/98 | 12/18/01 | 3/26/13 | Aventis Pharma S.A. |
| 6,372,780 | 1/3/01 | 4/16/02 | 3/26/13 | Aventis Pharma S.A. |
| 6,387,946 | 9/25/01 | 5/14/02 | 3/26/13 | Aventis Pharma S.A. |
| 7,241,907 | 9/17/04 | 7/10/07 | 12/10/25 | Aventis Pharma S.A. |
| 8,927,592 | 4/26/12 | 1/6/15 | 10/27/30 | Aventis Pharma S.A. |

Ex. 1044 ¶ 19, Attachment 4.1.  As shown in the Orange Book patent chart, above, Patent Owner has listed seven earlier-issued patents covering Jevtana®, six of which have now expired and one of which does not expire until December 10, 2025.  *Id.*; *see also* Ex. 1059, 1027.  The first three listed patents, for example, disclose taxane compounds and compositions.  Ex. 180; Ex. 1081; Ex. 1082.

We agree with Petitioner that the presumed nexus between Jevtana®'s commercial success and the '592 patent claims is undercut by the Patent Owner's failure to acknowledge or address the seven prior art Orange Book-listed patents for Jevtana®.  Mr. Tate affirmatively states in his declaration, and confirms in his deposition testimony, that he was not asked to provide any opinion on a nexus between the commercial success of Jevtana® and the claims of the '592 patent.  Ex. 2149 ¶ 25 n.49; Ex. 1042,

44

64:19–65:20, 78:14–8.  He testifies that he relied on Dr. Sartor to establish such a nexus.  Ex. 1042, 65:21–66:8; *see also* Ex. 2149 ¶¶ 25–27, Schedule 3.

Dr. Sartor provides only a conclusory statement:  "In my opinion, Jevtana®'s success is attributable to the inventions claimed in the '592 patent, which reflect the results of the TROPIC study that led to FDA approval."  Ex. 2176 ¶ 219; *see also id.* ¶¶ 221–222.  Dr. Sartor does not discuss any of the other Orange Book patents for Jevtana®, whether Jevtana®'s commercial success may be tied to the inventions of those patents, such as the composition patents, or why Jevtana®'s commercial success should be attributable solely to the claimed treatment method of the '592 patent.  Dr. Sartor, moreover, testifies that he understood the invention of the '592 patent to be cabazitaxel and its utility.  Ex. 1041, 143:25–144:23.  Dr. Sartor further testifies that, in his opinion, the 25 mg/m$^2$ dose of cabazitaxel "is critical," but he readily acknowledges that the critical dose was disclosed in the prior art Winquist reference.  *Id.* at 150:25–151:17.  Dr. Sartor also admitted that, although the critical dose was disclosed in Winquist, he "didn't view this as part of the prior art."  *Id.* at 151:18–152:6.  As with Patent Owner's no-reasonable-expectation-of success argument, such inconsistency undermines Patent Owner's commercial success argument.

"Where market entry by others was precluded [due to blocking patents], the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak."  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005) ("[f]inancial

IPR2016-00712
Patent 8,927,592 B2

success is not significantly probative of [whether the claimed invention was non-obvious in light of prior art] in this case because others were legally barred from commercially testing the [relevant] ideas" by other patents covering the product). Six of the Jevtana® Orange Book patents have now expired, and, as in *Galderma* and *Merck*, market access by others previously was precluded. Ex. 1059, 1027 ("EXCLUSIVITY EXPIRATION DATE JUN 17, 2015"). Therefore, for this additional reason, any inference of non-obviousness from Jevtana®'s commercial success is weak.

In sum, we are persuaded that Petitioner's evidence and argument effectively rebuts the presumption of nexus between the commercial success of Jevtana® and the claimed treatment method of the '592 patent.

### *(iv)    Long-felt need*

Patent Owner argues that there was a need to treat critically ill mCRPC patients whose disease had progressed after docetaxel therapy, and that cabazitaxel "was the first therapy to show a survival benefit with patients that progressed after docetaxel." PO Resp. 50 (citing Ex. 2071, 1; Ex. 2176 ¶¶ 198, 200–202; Ex. 2177, 43:11–17). Patent Owner emphasizes that, based on the successful phase III clinical trial data from the TROPIC Study, the FDA accelerated approval of Jevtana® in only 11 weeks. *Id.* at 50–51 (citing Ex. 2059, 1 (¶ 3); Ex. 2068, 1). Patent Owner provides objective evidence that the accelerated approval of Jevtana® "fill[ed] a critical gap among patients with the most advanced stage of prostate cancer and is the first therapeutic option for these patients shown to prolong survival." *Id.* (citing Ex. 2068, 1).

Petitioner challenges Patent Owner's evidence by trying to shift the focus onto later-approved drugs that have since overtaken Jevtana® in

46

IPR2016-00712
Patent 8,927,592 B2

treating mCRPC patients and in terms of sales.  Reply 18–19 (citing Ex.
1041, 187:21–189:14, 191:8–193:12, 194:12–195:9, 196:6–23, 197:6–199:5,
200:15–201:18, 204:5–205:6, 222:6–16, 225:17–21; Ex. 1043 ¶ 34; Ex.
1044 ¶¶ 34–51; Ex. 1069).  Petitioner also derides the alleged need as
"'kicking the can down the road.'"  *Id.* at 18 (citing Ex. 1041, 200:9–21).
We are not persuaded by Petitioner's rebuttal evidence regarding long-felt
need.

Patent Owner's evidence, on this record, demonstrates the importance
of the phase III clinical trial results in motivating FDA fast-track approval
for Jevtana®.  At the time of its approval, Jevtana® was the first FDA-
approved therapy for treating docetaxel-refractory mCRPC patients.  PO
Resp. 50–51 (citing Ex. 2059, 1; Ex. 2068, 1; Ex. 2071, 1; Ex. 2176 ¶¶ 200–
202; Ex. 2177, 43:11–17).  The fact that later-approved drugs may have been
an improvement over Jevtana® in the treatment of such critically ill patients
is beside the point.  We do, however, reiterate that the weight we give to
Patent Owner's evidence of long-felt need is tempered by Petitioner's
evidence that the TROPIC Study treatment protocol, the results of which
provided the impetus for FDA fast-track approval, was disclosed in the prior
art along with evidence of anti-cancer activity in docetaxel-refractory
mCRPC and metastatic breast cancer patients.  Ex. 1008; Ex. 1009, 3948;
Ex. 1010; Ex. 1012, 723, 727.  In addition, and as discussed above,
Petitioner has provided persuasive evidence to rebut the presumed nexus
between the '592 patent's claimed treatment method and the success of
Jevtana®.

### (v)    Failure of others

Our analysis of long-felt need applies equally to Patent Owner's evidence of the failure of others to increase survival of docetaxel-refractory mCRPC patients prior to the approval of Jevtana®.  PO Resp. 51 (citing, *inter alia*, Ex. 1022, 162–63; Ex. 2008, 1; Ex. 2026, 77–79; Ex. 2041, 808; Ex. 2096, 2973 (Col. 2 ¶ 2) (discussing two decades of efforts to overcome taxane resistance); Ex. 2176 ¶¶ 204–207).  Petitioner's response is essentially the same as the response it proffered in rebuttal to Patent Owner's long-felt need evidence, with like effect.  Reply 19.

### (vi)    Unexpected results

Patent Owner argues it was unexpected that cabazitaxel therapy would "prolong overall survival" in docetaxel-refractory mCRPC patients, with reduced side effects, as shown in the TROPIC Study.  PO Resp. 52–54 (citing Ex. 2176 ¶¶ 39, 93, 185, 187–89, 209–214; Ex. 2177, 43:11–17, 45:16–46:2).  In addition to a long-felt need and the failure of others, referenced immediately above, Patent Owner emphasizes that the positive results of the TROPIC Study were particularly unexpected in light of the lack of a phase II study in prostate cancer and the fact that the disease had progressed in patients after receiving a taxane (docetaxel) therapy.  *Id.* at 52 (citing Ex. 2176 ¶¶ 185, 188–89, 210).  With regard to side effects, Patent Owner sets up a logical tautology from its characterization of Petitioner's argument that, if a POSA would have expected cabazitaxel to act similarly to docetaxel, then a POSA would not have expected cabazitaxel therapy to have a "lower incidence of side effects such as neuropathy, alopecia [hair loss], nail changes and dysgeusia [altered taste sensation] than docetaxel." *Id.* at 54 (citing Ex. 2176 ¶¶ 211–214).

IPR2016-00712
Patent 8,927,592 B2

Petitioner responds with Dr. Sartor's acknowledgment that critical features of the claimed invention, particularly the 25 mg/m$^2$ dose of cabazitaxel and the docetaxel-refractory patient population, were disclosed in the prior art Winquist (Ex. 1009) and TROPIC Listing (Ex. 1008) references. Reply 20 (citing Ex. 1041, 150:25–151:17, 152:22–153:10). Therefore, Petitioner argues, there is no basis to attribute any prolonged survival to a claimed feature not already disclosed in the prior art. *Id.*

We view the evidence of unexpected results as neutral in this case. On the one hand, the results of the TROPIC Study were unexpected enough to result in FDA fast-track approval of the first therapy for docetaxel-refractory mCRPC patients. On the other hand, a statistically significant increase in overall survival of a patient population is not a claim limitation of the '592 patent claims. The claimed method also was disclosed in the prior art (Winquist and TROPIC Listing), and Attard (Ex. 1021, 74–75) and Beardsley (Ex. 1022, 163) note the positive anticancer activity and partial responses to cabazitaxel therapy in docetaxel-refractory phase I (mCRPC) and phase II (metastatic breast cancer) patients. Beardsley expressly notes that the results in docetaxel-refractory patients were sufficient to permit moving directly to the phase III TROPIC Study, which compared cabazitaxel plus prednisone therapy to palliative mitoxantrone plus prednisone therapy in docetaxel-refractory mCRPC patients.[16] Ex. 1022,

---

[16] We give no weight to Petitioner's unsupported argument that Patent Owner failed to compare cabazitaxel therapy survival rates to docetaxel re-challenge survival rates. Reply 20. As Dr. Sartor explains, mitoxantrone plus prednisone therapy was the *de facto* standard of care for docetaxel-refractory patients at the time of the earliest possible priority date of the '592 patent. Ex. 1027, 557; Ex. 2176 ¶ 39.

49

163 (Col. 2 ¶ 5). Beardsley's explanation effectively undermines Patent Owner's argument that the TROPIC Study results were particularly unexpected given the absence of a phase II clinical trial in mCRPC patients.

As stated previously, Petitioner's evidence is sufficient to establish that a POSA would have had a reasonable expectation that the TROPIC Study protocol disclosed in Winquist and the TROPIC Listing would result in anticancer activity. Winquist and the TROPIC Listing also note that prolonging patient survival ("overall survival") was the primary endpoint of the study, which had been ongoing since 2006. Ex. 1008, 2; Ex. 1002 ¶ 122. Patent Owner's additional evidence, regarding alleged reduced side effects resulting from cabazitaxel therapy in comparison to docetaxel therapy, does not alter our view of the unexpected results evidence. We credit Dr. Seth's testimony that Pivot disclosed a "favorable" safety profile for cabazitaxel therapy in comparison to docetaxel, including side effects such as nausea, vomiting, and sensory neuropathy. Ex. 1043 ¶ 31; Ex. 1010, 1551.

Therefore, on balance, we determine the unexpected results evidence does not support Patent Owner's nonobviousness argument in this case.

### (vii)  Praise for Jevtana®

Patent Owner again relies on the evidence of FDA fast-track approval in support of its argument that Jevtana® received praise. PO Resp. 54 (citing Ex. 2059, 1). Patent Owner provides evidence of post-approval articles and press releases praising Jevtana® as a "major success in second line chemotherapy for advance[d] prostate cancer," based on its increase in overall patient survival in the TROPIC Study. *Id.* (citing Ex. 2071, 1 (Col. 1), 3). Others praised Jevtana® for giving patients more time to live and

IPR2016-00712
Patent 8,927,592 B2

allowing them to "carry on doing the things they enjoy despite their cancer."
*Id.* at 55 (citing Ex. 2115, 2).

Petitioner responds that the news article cited by Patent Owner,
Exhibit 2115, also states that the "Cancer Drugs Fund plans to axe drug
[Jevtana] from its approved list" because "it is not cost-effective and doesn't
offer 'sufficient clinical benefit.'" Reply 21 (citing Ex. 2115, 1–2).
Petitioner again argues absence of a nexus to a novel feature of the '592
patent claims, and it also argues the "buzz" surrounding Jevtana®'s approval
was not as significant as the "big buzz" received by later drugs approved to
treat the same patient population. *Id.* (citing Ex. 1041, 201:19–202:14).

Patent Owner's evidence establishes a modicum of industry praise for
Jevtana® upon FDA approval and thereafter. However, as with our analysis
of long-felt need, failure of others, and unexpected results, the weight we
give to Patent Owner's evidence of praise is tempered by Petitioner's
evidence that the TROPIC Study treatment protocol, the results of which
provided the impetus for FDA fast-track approval, was disclosed in the prior
art along with evidence of anti-cancer activity in docetaxel-refractory
mCRPC and metastatic breast cancer patients. Ex. 1008; Ex. 1009, 3948;
Ex. 1010; Ex. 1012, 723, 727. In addition, and as discussed above,
Petitioner has provided persuasive evidence to rebut the presumed nexus
between the '592 patent's claimed treatment method and the success of
Jevtana®.

### (viii)  Copying

Patent Owner provides only a cursory, conclusory assertion that nine
competitors are accused of infringing the '592 patent claims in district court
litigation to support its copying argument. PO Resp. 56 (citing Paper 6, 2–3;

IPR2016-00712
Patent 8,927,592 B2

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 759
(N.D. W.Va. 2004) (generic manufacturer's decision to copy a drug is
probative of nonobviousness)).  Patent Owner does not offer any direct
evidence of alleged copying.  *Id.*  Therefore, Patent Owner's conclusory
argument does not support an inference of non-obviousness.

> *e. Conclusion*

When we balance Petitioner's strong evidence of obviousness against
the objective evidence of nonobviousness, we determine that a
preponderance of the evidence supports Petitioner's position that claims 1
and 27 of the '592 patent are unpatentable for obviousness over Winquist
and the TROPIC Listing, in view of Attard and Beardsley.

> *5. Dependent Claims 2, 5, 12, 15–26, and 28–30*

Petitioner argues that dependent claims 2, 5, 12, 15–26, and 28–30
recite additional limitations that would have been obvious to a POSA based
on Winquist, the TROPIC Listing, and Pivot.[17]  Pet. 29–32, 34–38, 43–45.
Petitioner supports its arguments with claim charts for most of the claims,
which contain citations to Winquist, the TROPIC Listing, and Dr. Seth's
Declaration.  *Id.* at 35–38 (citing Ex. 1008; Ex. 1009; Ex. 1002).  Having
reviewed the complete trial record, we are persuaded Petitioner has proved
by a preponderance of the evidence that Winquist, the TROPIC Listing, and

---

[17] We note dependent claims 15–16, 21, 26, and 30 referenced in this section
were raised in other instituted grounds.  Paper 9, 21–23.  Because Patent
Owner addresses the cabazitaxel dosage limitations recited in those
dependent claims together with the cabazitaxel dosage limitations recited in
claims 12, 18, 22, 24, and 28 (PO Resp. 44–45), for convenience we address
the claims reciting cabazitaxel dosage limitations together in this section.

IPR2016-00712
Patent 8,927,592 B2

Pivot disclose the elements recited in dependent claims 2, 5, 12, 15–26, and 28–30.  Pet. 29–32, 34–38, 42–45; Ex. 1002 ¶¶ 49–50, 61–62, 123, 126–130, 136–137, 139, 154, 157–160.

For example, Winquist and the TROPIC Listing disclose administration of cabazitaxel in combination with a corticoid to castration-resistant, metastatic prostate cancer patients (claims 2, 20, and 24).  Ex. 1008, 1–2; Ex. 1009, 3948; Ex. 1002 ¶¶ 123, 127–130.  Winquist and the TROPIC Listing also disclose repeating the administration of cabazitaxel as a new cycle every three weeks (claims 5, 19, 23, 25, and 29).  Ex. 1008, 1; Ex. 1009, 3948; Ex. 1002 ¶ 137.  They further disclose administering cabazitaxel in combination with prednisone (claims 24 and 27).  Ex. 1008, 1; Ex. 1009, 3948; Ex. 1002 ¶¶ 126, 129, 135.  To the extent not stated expressly above, we adopt Petitioner's arguments and evidence in support of our findings that Winquist, the TROPIC Listing, and Pivot disclose the limitations recited in claims 2, 5, 12, 15–26, and 28–30 of the '592 patent.  Pet. 25–38, 43–45.  Motivation to combine and reasonable expectation of success are addressed in Section II.B.4, above, and further in response to Patent Owner's arguments, below.

Patent Owner challenges Petitioner's proofs regarding whether a POSA would have had a reasonable expectation of success in administering the cabazitaxel doses recited in claims 12, 15–16, 18, 21–22, 24, 26, 28, and 30.  PO Resp. 44–45.  Claims 12, 16, 18, 22, 24, and 28 recite administration of a 25 mg/m$^2$ dose of cabazitaxel, and claims 15, 21, 26, and 30 recite a 20 mg/m$^2$ cabazitaxel dose.  Petitioner argues that Winquist discloses administration of the 25 mg/m$^2$ dose, and Pivot discloses administration of the 20 mg/m$^2$ dose that was well tolerated in docetaxel-refractory metastatic

53

IPR2016-00712
Patent 8,927,592 B2

breast cancer patients.  Pet. 36–38 (citing Ex. 1009, 3948; Ex. 1002 ¶ 139), 43–46 (citing Ex. 1002 ¶¶ 157–158, 160; Ex. 1010, 1547–48, 1550).

Pivot discloses administering cabazitaxel "at 20 mg/m$^2$, given as a 1-h i.v. infusion on day 1 every 3 weeks."  Ex. 1010 at 1548 (Col. 2 ¶ 3).  Pivot explains that the 20 mg/m$^2$ dose was the "recommended dose for phase II and III studies" based on earlier phase I studies.  *Id.* at 1548 (Col. 1 ¶ 2); *see also* Ex. 1002 ¶ 157 ("Pivot . . . provides reasons for this dose.").  Pivot further discloses that cabazitaxel was initially administered at a 20 mg/m$^2$ dose, and thereafter "escalation up to 25 mg/m$^2$ from cycle 2, in selected patients, on the basis of their good tolerance in cycle 1, was feasible in 20 patients (28%) with no evident increase in the overall incidence of subsequent AEs [adverse events] in this group."  Ex. 1010, 1550 (Col. 1 ¶ 2).  Based on the study data, in which 72% of taxane-refractory metastatic breast cancer patients were treated at a dose of 20 mg/m$^2$ and 28% of patients at a 25 mg/m$^2$ dose, Pivot concluded that cabazitaxel "was active and well tolerated in . . . patients with taxane-resistant disease."  *Id*. at 1547 ("Conclusions"); *see also id.* at 1548–49.  Therefore, Pivot discloses the active and well-tolerated use of both 20 and 25 mg/m$^2$ doses of cabazitaxel in docetaxel-refractory metastatic breast cancer patients.

Patent Owner argues that a POSA would not have expected any clinical benefit to outweigh known toxic side effects from administering cabazitaxel at a dose of 25 mg/m$^2$ or even at the lower 20 mg/m$^2$ dose.  PO Resp. 44–45 (citing Ex. 2176 ¶¶ 172–174; Ex. 2177, 72:17–73:2, 73:14–23, 130:14–131:2; Ex. 2229, 2).  Patent Owner particularly emphasizes the risk of life-threatening neutropenia in the absence of clinical trial data, arguing it would have been "unreasonable for a POSA to expect that this dose of

54

cabazitaxel [20 mg/m$^2$] would prolong overall survival prior to the results of TROPIC described in the '592 patent." *Id.* at 44. For the reasons given in Section II.B.4, above, Patent Owner uses the incorrect standard for measuring a reasonable expectation of success in achieving the claimed invention. We further note the '592 patent does not describe any clinical trial results for a 20 mg/m$^2$ dose of cabazitaxel, even though dependent claims 15, 21, 26, and 30 recite a 20 mg/m$^2$ dose. This fact tends to undercut Patent Owner's argument that clinical trial results are necessary to support a reasonable expectation of success.

We also are not persuaded by Patent Owner's argument of no reasonable expectation of success in view of potentially toxic side effects, particularly because Winquist and Pivot disclose the administration of the recited cabazitaxel doses, and Pivot describes how an experienced oncologist would manage the emergence of side effects with dose control, antihistamines, and antiemetics. Ex. 1010, 1548 (Col. 2 ¶ 3). Pivot expressly discloses that the recommended dose of 20 mg/m$^2$ cabazitaxel was well tolerated in most patients and that a substantial number of patients were escalated up to a 25 mg/m$^2$ dose without dose-limiting adverse events such as severe neutropenia. *Id.*; *see also id.* at 1547 ("XRP6258 [cabazitaxel] was active and well tolerated in this group of MBC patients with taxane-resistant disease."), 1551 ("The safety profile of XRP6258 was very favorable when compared with the known safety profile of the marketed taxanes or other compounds under development."). The potential for severe side effects in such desperately ill patients was not enough to prevent Patent Owner from selecting the higher 25 mg/m$^2$ cabazitaxel dose for administration in the large phase III TROPIC Study disclosed in Winquist. Ex. 1009.

IPR2016-00712
Patent 8,927,592 B2

We credit Dr. Seth's testimony that "Pivot's two doses (20 and 25 mg/m$^2$) were in agreement with the Phase I data regarding safe doses reported in Mita, as well as the Phase III doses reported in Winquist and the TROPIC Listing." Ex. 1043 ¶ 30.  Moreover, Dr. Sartor testifies that when he treats mCRPC patients, even today, he prescribes drugs that are not approved by the FDA for such a treatment indication, which means there are no phase III clinical trial results available.  Ex. 1041, 180:22–182:15, 183:23–184:4, 185:8–22.  He testifies that he treats a small percentage of patients with "non-FDA-approved therapies" when "they're not in a clinical trial," that he does so without the benefit of any phase III clinical data, and that he thinks "that's probably typical of other oncologists" as well.  *Id.* at 182:16–183:10, 183:23–185:7.  Dr. Sartor's candid acknowledgement that treatment of advanced prostate cancer patients with off-label drugs is a type of "desperation oncology," further undercuts Patent Owner's argument that side effects and lack of phase III clinical trial data would have made it unreasonable for a POSA to administer a 20 mg/m$^2$ or 25 mg/m$^2$ dose of cabazitaxel to treat docetaxel-refractory mCRPC patients.

Based on the complete trial record, we determine Petitioner has proved by a preponderance of the evidence that dependent claims 2, 5, 12, 15–26, and 28–30 of the '592 patent are unpatentable as obvious under 35 U.S.C. § 103.

### C. *Ground 2:  Asserted Obviousness of Claims 3 and 4 over Winquist, the TROPIC Listing, and Didier*

Claim 3 depends from claim 1 and recites cabazitaxel "in the form of an acetone solvate." Ex. 1001, 18:61–62.  Claim 4 depends from claim 3

56

IPR2016-00712
Patent 8,927,592 B2

and further recites "the acetone solvate contains between 5% and 8% by weight of acetone." *Id.* at 18:63–64. The '592 patent describes a solvate as "a molecular complex characterized by the incorporation of the crystallization solvent [acetone] into the crystal of the molecule of the active principle." Ex. 1001, 4:40–47. The acetone solvate form of cabazitaxel is used to prepare a premix for subsequent dilution in an aqueous perfusion solution at the time of intravenous administration. *Id.* at 5:12–29.

Petitioner acknowledges that Winquist and the TROPIC Listing do not disclose an acetone solvate form of cabazitaxel. Pet. 38. Petitioner, however, relies on Didier's teaching of the preparation of an acetone solvate form of cabazitaxel where the "mean value of the content of acetone is 7%." *Id.* at 38–39 (citing Ex. 1011, 2:39–42). Claim 2 of Didier teaches an acetone solvate form of cabazitaxel "comprising from about 5 to about 7 percent by weight of acetone." Ex. 1011, 4:1–5. Didier also states that cabazitaxel "exhibits noteworthy anticancer and antileukemic properties," which suggests the potential use of an acetone solvate form of the drug for cancer treatment. Ex. 1011, 1:22–23; Ex. 1002 ¶ 141.

Petitioner, relying on Dr. Seth's testimony, argues that a POSA would have known that non-aqueous solvates, such as acetone, could improve the water solubility of highly lipophilic taxanes. Pet. 39 (citing Ex. 1002 ¶¶ 80–81 (discussing Liu[18])). Given that the TROPIC Listing discloses cabazitaxel administration by intravenous infusion (Ex. 1008, 2), Petitioner argues a POSA would have had strong reasons to prepare cabazitaxel in a solvate

---

[18] Liu, *Water-Insoluble Drug Formulation*, Chapter 15, 525–68 (CRC Press 2000) ("Liu"). Ex. 1025.

IPR2016-00712
Patent 8,927,592 B2

form to "enable the drug's dissolution into an aqueous solution suitable for intravenous infusion into a patient."  Pet. 39 (citing Ex. 1002 ¶ 142). Petitioner argues that Didier would have motivated a POSA to select acetone as the solvate of choice for cabazitaxel, at a 7% acetone weight ratio and with a reasonable expectation of success, because Didier expressly discloses and validates this particular crystalline form of cabazitaxel.  *Id.* at 39–40 (citing Ex. 1002 ¶ 142; Ex. 1011, 2:39–42, 4:1–5).

Patent Owner challenges Petitioner's evidence, particularly Liu, as failing to support a motivation for a POSA to select Didier's acetone solvate form of cabazitaxel for use in the intravenous treatment method disclosed in the TROPIC Listing.  PO Resp. 47–49.  Patent Owner argues that Liu does not support Dr. Seth's opinion because, when a highly lipophilic drug such as cabazitaxel presents a solubility problem, Liu suggests the use of other techniques including co-solvents, pro-drugs, emulsions, surfactants, and liposomes rather than alteration of the solid state form of the drug compound (e.g., forming a solvate) to achieve the requisite solubility.  *Id.* at 47–48 (citing Ex. 1025, 526–27; Ex. 2069).  Patent Owner further argues that Liu's list of solvents, including acetone, are not suitable for pharmaceutical preparations due to "potential toxicity" and do not support Petitioner's asserted motivation to combine.  *Id.* at 48 (citing Ex. 1025, 529, 531; Ex. 2057, 67381, 67383).

We are persuaded by a preponderance of the evidence that a POSA would have been motivated by the teachings of Didier, with a reasonable expectation of success, to use an acetone solvate form of cabazitaxel at a weight ratio of approximately 7% to solubilize cabazitaxel for intravenous administration.  Although Patent Owner emphasizes the general teaching of

58

IPR2016-00712
Patent 8,927,592 B2

Liu that alternate solubility techniques were available to solubilize lipophilic molecules, Patent Owner does not effectively rebut the fact that the claimed acetone solvate form of cabazitaxel, and a method for preparing it, is expressly disclosed in Didier.  Moreover, as to Liu, a reference does not teach away if it expresses a general preference for an alternative approach from among known options available to a POSA, particularly if the reference does not "criticize, discredit, or otherwise discourage the solution claimed." *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).  Liu's statement that alteration of a molecule's solid state "may have little effect on its solubility" is not a criticism, disparagement, or other teaching away from the use of an acetone solvate form of cabazitaxel.  Liu goes on to note that disrupting the crystal lattice structure to increase solubility "can be done by altering the crystal form (polymorphs or solvates/hydrates)."  Ex. 1025, 527–28.  Such a teaching is entirely consistent with the teachings of Didier and the knowledge of a POSA that formation of an acetone solvate was a known option, among others, for improving solubility of lipophilic molecules.

We acknowledge Patent Owner's evidence regarding "potential toxicity" of solvents such as acetone used to formulate a drug product (Ex. 1025; Ex. 2057), but the cited FDA guidance considers acetone to be a Class 3 solvent that "may be regarded as less toxic and of lower risk to human health" than Class 1 or Class 2 solvents, which are to be avoided altogether or very strictly limited.  Ex. 2057, 67380–81.  The FDA guidance states that "Class 3 includes no solvent known as a human health hazard at levels normally accepted in pharmaceuticals." *Id.* at 67381.  In short, low levels of acetone – "50 mg per day or less" – in a pharmaceutical product "would be acceptable without justification." *Id.*  The FDA Guidance provides

59

IPR2016-00712
Patent 8,927,592 B2

meaningful context for Liu's general comment regarding the "potential toxicity" of "other solvates" apart from hydrates and anhydrous solid state forms. Ex. 1025, 531. Patent Owner does not provide evidence to suggest that the levels of acetone in Didier's acetone solvate form of cabazitaxel (a 5% to 7 % weight ratio, Ex. 1011, 4:1–5) would run afoul of the FDA Guidance for acceptable acetone levels if administered intravenously at a 25 mg/m$^2$ dose as disclosed in Winquist and the TROPIC Listing.

We also credit Dr. Seth's testimony that "it was well known in the art as of October 29, 2009 that non-aqueous solvates, including acetone solvates, could be used to make soluble forms of taxanes suitable for intravenous delivery." Ex. 1002 ¶ 80; Ex. 2177, 176:6–177:2. Although hydrates and anhydrous forms of taxanes also were known (PO Resp. 48–49), we are persuaded by Dr. Seth's testimony that any question regarding potential toxicity from the use of acetone solvates did not amount to a teaching away from their use in favor of hydrates and anhydrous crystalline forms. Ex. 2177, 177:4–19 ("a POSA in 2009, acetone most likely would be the most readily available usage."), 179:23–180:7 ("[I]n 2009 we were -- I had used acetone in my fellowship at Stony Brook"), 180:26–181:10 ("[I]n 2009 that's a fair statement to say that a POSA could choose probably ethanol versus acetone. It would be a 50/50 choice."). Dr. Seth's testimony also persuades us, on balance, that the use of an acetone solvate form of cabazitaxel for intravenous delivery, as disclosed in Winquist and the TROPIC Listing, would not have presented a toxicity problem of such magnitude that it would tip the evidentiary scales in favor of Patent Owner on this issue.

IPR2016-00712
Patent 8,927,592 B2

Therefore, for the reasons given above, we determine Petitioner has proved by a preponderance of the evidence that dependent claims 3 and 4 of the '592 patent are unpatentable as obvious under 35 U.S.C. § 103.

### D.  Ground 3:  Asserted Obviousness of Claims 7–9 Over Winquist, the TROPIC Listing, and Mita

Petitioner argues that the pharmacokinetic ("PK") profile limitations recited in dependent claims 7–9 of the '592 patent would have been obvious to a POSA based on Winquist, the TROPIC Listing, and Mita.  Pet. 40–41. Claims 7–9 each depend from claim 1.  Petitioner notes that Mita expressly discloses the AUC and $C_{max}$ concentrations recited in claims 7 and 8, respectively, and a plasma clearance rate that falls within the range recited in claim 9.  *Id.* (citing Ex. 1002 ¶¶ 104, 145–148; Ex. 1012, 729).  Petitioner argues that claims 7–9 recite pharmacokinetic parameters that are merely the result of administering cabazitaxel at a dose of 25 mg/m$^2$ every three weeks. *See* Ex. 1002 ¶ 56, discussing Ex. 1001, 18:36–49.  As stated previously, Winquist and the TROPIC Listing together disclose administration of a 25 mg/m$^2$ intravenous dose of cabazitaxel every three weeks.  The testimony of Dr. Seth supports a finding that such administration necessarily results in the PK profile distribution ranges recited in claims 7–9.  Ex. 1009, 3948; Ex. 1002 ¶¶ 124–125.

Patent Owner does not address the substance of Ground 3 in its Response.  *See* PO Resp. 21.

We agree with Petitioner's argument and analysis and adopt the underlying evidence in support as our own fact findings.  Pet. 40–41. Therefore, we determine Petitioner has proved by a preponderance of the

61

IPR2016-00712
Patent 8,927,592 B2

evidence that dependent claims 7–9 of the '592 patent are unpatentable as obvious under 35 U.S.C. § 103.

### E.  Asserted Obviousness of Dependent Claims 10, 11, 13, and 14

We first address claims 10 and 11, then turn our attention to claims 13 and 14.

#### 1.  Claims 10 and 11

Claim 10 depends from claim 1 and recites an additional method step of "monitoring blood counts and measuring neutrophil levels in the patient." Claim 11 depends from claim 10 and adds "discontinuing cabazitaxel treatment in a patient with a neutrophil count of ≤1,500cells/mm$^3$." Neutrophils are a type of white blood cell produced by bone marrow, and neutrophil counts are monitored during treatment.  Ex. 1002 ¶ 61.

Petitioner argues that the subject matter of claims 10 and 11 would have been obvious over Winquist, the TROPIC Listing, and Tannock.  Pet. 41–42.  Patent Owner does not address the substance of claims 10 and 11 in its Response.  *See* PO Resp. 21.  We address Petitioner's evidence below.

Tannock discloses the results of a phase III clinical study comparing administration of (i) docetaxel and prednisone with (ii) mitoxantrone and prednisone, in mCRPC patients.  Ex. 1013, 1502–1503.  Tannock teaches that neutrophil counts need to be monitored during therapy and a dose reduction or treatment delay should be implemented if the neutrophil count is less than 1,500 cells/mm$^3$.  Ex. 1013, 1503 (Col. 2 ¶ 2)–1504 (Col. 2 ¶ 2); Ex. 1002 ¶ 150.  According to Tannock, "[a] dose reduction or treatment delay was . . . stipulated for patients who had an absolute neutrophil count of less than 1500 per cubic millimeter."  Ex. 1013, 1504 (Col. 2 ¶ 2).

62

IPR2016-00712
Patent 8,927,592 B2

Dr. Seth testifies that it was "well known in the art that administering taxanes to patients often results in reduced neutrophil counts, and that care must be taken to monitor neutrophil levels in patients undergoing chemotherapy with taxanes for this reason." Ex. 1002 ¶ 151 (referencing ¶¶ 61–62 and citing Ex. 1010, 1550 ("[n]eutropenia was the most common grade 3/4 hematological [adverse effect]" in administration of cabazitaxel.)). Dr. Seth further testifies that a POSA "would have readily appreciated the need to monitor neutrophil levels and discontinue or postpone treatment if they fell below 1,500 cells per cubic millimeter when administering a taxane, as taught by Tannock." *Id.* (citing Ex. 1013, 1503–1504).  We credit Dr. Seth's testimony, which is fully supported by the teachings of Tannock. Therefore, we determine that it would have been obvious to a POSA in view of Tannock to monitor blood counts and measure neutrophil count levels during cabazitaxel therapy in accordance with Winquist and the TROPIC Listing, and to discontinue or postpone treatment if the neutrophil count was less than 1,500 cells/mm³.

### 2. *Claims 13 and 14*

Claim 13 depends from claim 1 and recites a Markush group of corticoids "consisting of prednisone and prednisolone."  Claim 14 depends from claim 13 and recites a corticoid dose of "10 mg/day."  Petitioner argues that the subject matter of claim 13 would have been obvious over Winquist and the TROPIC Listing and the subject matter of claim 14 obvious over Winquist, the TROPIC Listing, and Tannock.  Pet. 31, 42–43.

Patent Owner argues that Petitioner has not shown why a POSA would have used prednisone in combination with cabazitaxel, let alone at a

IPR2016-00712
Patent 8,927,592 B2

dose of 10 mg/day.  PO Resp. 45–46.  We address the parties' arguments
below.

Winquist and the TROPIC Listing expressly teach administering
cabazitaxel in combination with prednisone, although a prednisone dose is
not specified.  Ex. 1009, 3948; Ex. 1008, 1.  Dr. Seth testifies that combining
taxanes, such as docetaxel, with prednisone for the treatment of prostate
cancer was well known in the art.  Ex. 1002 ¶ 62.  Tannock teaches treating
metastatic prostate cancer with docetaxel and prednisone, the prednisone
being administered at a dose of 10 mg/day.  Ex. 1013 at 1502, 1504 (Col. 1
¶ 3).  According to Tannock, a 10 mg/day dose of prednisone provides
palliative care (pain relief) to some patients with prostate cancer.  *Id*. at 1503
(Col. 1 ¶ 2); Ex. 1002 ¶ 153.  Dr. Seth testifies that a POSA would have used
the same 10 mg/day dose of prednisone described in Tannock to maintain
palliative relief in mCRPC patients treated with cabazitaxel.  Ex. 1002
¶¶ 152–153.

Patent Owner invokes the risk of side effects from long-term
corticosteroid use, the availability of alternatives to prednisone such as
estramustine, and the availability of other prednisone dosing regimens to
argue that the subject matter of claims 13 and 14 would not have been
obvious to a POSA.  PO Resp. 45–46.  Dr. Sartor testifies that the only
available data on the use of cabazitaxel in prostate cancer, reported in Attard
and Mita, "was of cabazitaxel alone, not in combination with a corticoid."
Ex. 2176 ¶ 176.  Dr. Sartor further testifies that a POSA would have been
aware that docetaxel in combination with estramustine "and without
prednisone" was shown to have provided an overall survival benefit in
mCRPC patients.  *Id.*  Dr. Sartor provides similar testimony regarding the

64

use of mitoxantrone in combination with hydrocortisone. *Id.* ¶ 177. We are not persuaded by these arguments because Winquist and the TROPIC Listing disclose administration of cabazitaxel and *prednisone* to treat docetaxel-refractory mCRPC patients, not cabazitaxel and estramustine, cabazitaxel alone, or some other combination. *See* Ex. 1043 ¶ 11. In short, the combination treatment recited in claim 13 is expressly disclosed in the prior art.

We also are not persuaded that long-term side effects or the uncertainty of whether prednisone would provide a palliative benefit (Ex. 2176 ¶ 176) would have been sufficient for a POSA to override the express teaching of Winquist and the TROPIC Listing to administer cabazitaxel in combination with prednisone. As stated previously, Tannock taught that a 10 mg/day dose of prednisone provides palliative care (pain relief) to some patients with prostate cancer. Ex. 1013, 1503 (Col. 1 ¶ 2); Ex. 1002 ¶ 153. As Petitioner notes, Patent Owner's arguments are also undercut by prior art evidence of the routine administration of prednisone with mitoxantrone in post-docetaxel mCRPC patients. Ex. 1041, 235:2–236:4; Ex. 1043 ¶¶ 11–13; Ex. 2083, 307 (Col. 2 ¶ 2); Ex. 2111, 1, 9–12, 14, 27; Ex. 2176 ¶¶ 36, 38–39; Ex. 2177, 46:22–47:19. Therefore, we find a preponderance of the evidence establishes that it would have been obvious in view of Winquist, the TROPIC Listing, and Tannock for a POSA to treat docetaxel-refractory mCRPC patients with cabazitaxel in combination with 10 mg/day prednisone for palliative relief. Ex. 1002 ¶ 153.

For the reasons given above, we determine Petitioner has proved by a preponderance of the evidence that dependent claims 10, 11, 13, and 14 of the '592 patent are unpatentable as obvious under 35 U.S.C. § 103.

IPR2016-00712
Patent 8,927,592 B2

### III.   PATENT OWNER'S CONTINGENT MOTION TO AMEND

We have concluded that claims 1–5 and 7–30 of the '592 patent are unpatentable.  Therefore, we address Patent Owner's contingent motion to enter proposed substitute claims 31–34.  MTA 1, App. (claims 31–34).  For the reasons that follow, Patent Owner's motion is denied.

As the moving party, Patent Owner bears the burden of proving patentability of each proposed substitute claim.  37 C.F.R. § 42.20(c); *see Nike, Inc. v. Adidas AG,* 812 F.3d 1326, 1334 (Fed. Cir. 2016) ("[T]he Board permissibly interpreted [37 C.F.R. § 42.20(c)] as imposing the burden of proving patentability of a proposed substitute claim on the movant:  the patent owner.").  Specifically, Patent Owner has the burden of proving that the substitute claims are patentably distinct over the prior art of record in the proceeding.  *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1307–08 (Fed. Cir. 2015); *MasterImage 3D, Inc. v. RealD Inc.*, Case IPR2015–00040 (PTAB July 15, 2015) (Paper 42) (precedential); *Idle Free Systems, Inc. v. Bergstrom, Inc.*, Case IPR2012–00027 (PTAB June 11, 2013) (Paper 26) (informative); *but see In re Aqua Products*, No. 2015–1177, 2016 WL 4375651, at *1 (Fed. Cir. Aug. 12, 2016) (granting rehearing *en banc* to address burdens of persuasion and production regarding motions to amend under 35 U.S.C. § 316(d) and vacating *In re Aqua Products*, 823 F.3d 1369 (Fed. Cir. 2016)).  For the reasons explained below, we conclude that Patent Owner has not met its burden with respect to the proposed substitute claims.

IPR2016-00712
Patent 8,927,592 B2

A. *Proposed Substitute Claim 31*

Proposed substitute claim 31 is reproduced below, with added text underlined and deleted text indicated by a single strike-through, followed by a clean version of the final claim language:

> 31. (substitute for Claim 27, if found unpatentable) A method of increasing [the] survival [of a patient] comprising administering to a patient in need thereof (i) an antihistamine, (ii) a corticoid, (iii) an $H_2$ antagonist, and (iv) a dose of 20 to 25 mg/m2 of cabazitaxel, or a hydrate or solvate thereof, wherein said antihistamine, said corticoid, and said $H_2$ antagonist are administered prior to said dose of 20 to 25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof, in combination with prednisone or prednisolone, wherein said patient has [with a] castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel [, comprising administering a dose of 20 to 25 mg/m2 of cabazitaxel, or a hydrate or solvate thereof, to the patient in combination with prednisone or prednisolone].

> 31.   A method of increasing survival comprising administering to a patient in need thereof (i) an antihistamine, (ii) a corticoid, (iii) an $H_2$ antagonist, and (iv) a dose of 20 to 25 mg/m of cabazitaxel, or a hydrate or solvate thereof, wherein said antihistamine, said corticoid, and said $H_2$ antagonist are administered prior to said dose of 20 to 25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof, in combination with prednisone or prednisolone, wherein said patient has castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment  with docetaxel.

MTA, App'x.  Substitute claim 31, as compared to claim 27, still requires administering a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or

67

IPR2016-00712
Patent 8,927,592 B2

solvate thereof, in combination with prednisone or prednisolone to a patient with castration resistant or hormone refractory metastatic prostate cancer (mCRPC) that has progressed during or after treatment with docetaxel (docetaxel refractory). Substitute claim 31 amends the preamble to recite a "method of increasing survival" followed by "comprising administering to a patient in need thereof," the construction of which is disputed by the parties. MTA 1, 7–8; MTA Opp. 2–6; MTA Reply 1–3. Substitute claim 31 further limits original claim 27 by reciting the administration of an antihistamine, a corticoid, and an $H_2$ antagonist prior to administering the 20 to 25 mg/m$^2$ dose of cabazitaxel (hereafter "the premedication regimen"). MTA 2.

Patent Owner states that the proposed substitute claims add elements to claims 27–30 of the '592 patent and do not remove any limitations. *Id.* at 1–2. Therefore, Patent Owner contends, the proposed substitute claims are not broader than the original claims. *Id.*; 35 U.S.C. § 316(d)(3); 37 C.F.R. § 42.121(a)(2). We agree. The proposed substitute claims are not broader than claims 27–30, and Petitioner does not contend otherwise. *See generally* MTA Opp.

Substitute claims 32–34 depend directly from substitute claim 31, and they are substantively identical to original claims 28–30, except for substitute claim 33. *Id.* Substitute claim 33 is further amended to require that administration of the antihistamine, corticoid, and $H_2$ antagonist also occur as a new cycle every three weeks. *Id.* Patent Owner's proposed substitute claims 31–34 also represent a one-for-one substitution of original claims 27–30 in compliance with our rules. 37 C.F.R. § 42.121(a)(3).

IPR2016-00712
Patent 8,927,592 B2

### B. Claim Construction

In inter partes review, the claims of an unexpired patent are interpreted using the broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016).  Under that standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

We determine that only the following claim phrase requires explicit construction for purposes of deciding Patent Owner's contingent motion to amend claims 27–30.  *See, e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*"A method of increasing survival comprising administering to a patient in need thereof"*

Patent Owner argues that the preamble in substitute claim 31, "[a] method of increasing survival," is limiting as a "statement of intentional purpose for how the method is to be performed."  MTA, 7 (citing *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003)).  Patent Owner's claim construction attempts to tie "administering to a patient in need *thereof*" back to the preamble, such that the preamble means "a method that prolongs the life of a patient as compared to no treatment or palliative

69

IPR2016-00712
Patent 8,927,592 B2

treatment." *Id.* at 8; MTA Reply 1.  From this claim construction, Patent
Owner argues the substitute claims are patentable because the prior art does
not contain survival data necessary to teach a POSA that the claimed method
would increase "overall survival" in docetaxel-refractory mCRPC patients.
MTA 10–17.  Patent Owner's claim construction and reliance on *Jansen* is
misplaced.

     *Jansen* is distinguishable from the present case because it was an
infringement case that required the court to construe the subject claim "so as
to sustain [its] validity, if possible."  *Whittaker Corp. v. UNR Indus.*, 911
F.2d 709, 712 (Fed. Cir. 1990) (citing *ACS Hosp. Sys., Inc. v. Montefiore
Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984)).  In contrast, in an *inter partes*
review, a claim must be given its broadest reasonable interpretation.  In
*Jansen*, moreover, the patent owner argued that the claimed method of
treating anemia covered administration of the recited vitamin composition to
those "in need thereof," which, according to the patent owner, meant "all
people," i.e., even people who did not know they needed to prevent or treat
anemia.  *Jansen*, 342 F.3d at 1331, 1333–34.  The court rejected patent
owner's infringement contention and "strictly construed" the claims to
define the patient population needing treatment, particularly in view of
prosecution amendments that added the preamble and the "in need thereof"
phrase to gain allowance of the claims.  *Id.*  The court concluded that the
vitamin composition "must be administered to a human with a recognized
need to treat or prevent macrocytic-megaloblastic anemia."  *Id.* at 1334.  In
contrast, here, substitute claim 31 (and original claim 27) already defines a
patient needing treatment in the body of the claim as a docetaxel-refractory
mCRPC patient.

IPR2016-00712
Patent 8,927,592 B2

We agree with Petitioner's analysis that, in contrast to *Jansen*, to the extent "a patient in need thereof" refers to the preamble phrase "a method of increasing survival," it merely provides additional description of the patient in need of treatment, not some "intentional purpose" for how the treatment method is to be practiced in a defined patient population.  MTA Opp. 3–4. *Jansen*, moreover, does not support Patent Owner's implicit proposal that the preamble imposes a claim requirement that the method must result in an increase in "overall survival" in a population of patients.  *See, e.g.*, MTA 10 ("No Prior Art Disclosed or Suggested 20–25 mg/m$^2$ of Cabazitaxel . . . Would Increase Overall Survival."), 13 ("[P]hase I and II studies for cabazitaxel could not have determined whether cabazitaxel prolonged overall survival. . . .  [T]umor responses and PSA reductions were not validated surrogates for overall survival in CRPC.").  The preamble in substitute claim 31 describes a patient in need of "increasing survival"; it does not impose achieving a clinically-defined result of "overall survival" or "median survival" of a patient population.  *See* Ex. 1001, 11:4–5 ("overall survival (OS):  the time from inclusion [in] the study to the date of death"), 11:29–31 ("patients receiving cabazitaxel demonstrated statistically significant longer overall survival (OS) compared to mitoxantrone (p<0.0001)."), 11:35–37 ("The median survival for patients in the cabazitaxel group was 15.1 months in comparison to 12.7 months in the mitoxantrone group.").

*Rapoport* and *Glenmark* also do not support Patent Owner's proposed claim construction.  MTA 7; MTA Reply 2.  In *Rapoport*, there was no dispute that the preamble was a limitation of the treatment method ("limited to treatment of the underlying sleep apnea disorder itself"), because

71

IPR2016-00712
Patent 8,927,592 B2

otherwise the claim term "'to a patient in need of *such treatment*' would not have proper antecedent basis." *Rapoport v. Dement*, 254 F.3d 1053, 1059 (Fed. Cir. 2001) (emphasis added). Limiting the claim to an intent to treat sleep apnea disorder itself, rather than more broadly encompassing treatment of anxiety secondary to sleep apnea, as proposed by patent applicant, was based on the specific language of the claim and specification at issue, which are distinguishable from the language of substitute claim 31. *Id.* at 1058–59. Similarly, the intent requirement in *Glenmark* was based on the specific language of that claim and preamble, which provided antecedent basis for several claim terms, and without which the claim lacked a complete description of the type of patient to be treated. *Sanofi v. Glenmark Pharms. Inc.*, No. 14-264, 2015 WL 5092631, at *10 (D. Del. Aug. 28, 2015).

Patent Owner also argues that the preamble is limiting because Patent Owner "relies on" increased survival to "distinguish prior art." MTA 8. Patent Owner, thus, invites the Board to treat its claim construction arguments prospectively as a prosecution disclaimer. However, "the PTO is under no obligation to accept a claim construction proffered as a prosecution history disclaimer." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014); *see also In re Lockwood*, 679 F. App'x 1021, 1027 (Fed. Cir. 2017) (quoting *Tempo Lighting*). We decline to do so here.

To the extent the preamble in substitute claim 31 may be considered limiting at all, it refers only to a patient in need of increased survival, i.e., a docetaxel-refractory mCRPC patient, the type of terminally-ill patient already defined in the body of the claim ("wherein said patient has castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel"). *See* Ex. 1043 ¶ 10

72

IPR2016-00712
Patent 8,927,592 B2

("one of the purposes of administering a taxane (such as docetaxel or
cabazitaxel) to a patient with mCRPC that has progressed during or after
docetaxel is to prolong the survival of that patient."); Ex. 2176 ¶¶ 35
("mCRPC was an incurable condition; therefore, the goals of therapy were
to . . . attempt prolongation of life."), 162 (same).  As Dr. Sartor testified at
deposition, "virtually all" docetaxel-refractory mCRPC patients are in need
of a method of increasing survival.  Ex. 1098, 431:4–17.  Furthermore, as we
stated in Section II.A.3., above, *Bristol-Myers Squibb* is relevant precedent
and stands for the proposition that a method of treatment preamble stating
the intended purpose of the treatment does not impose a result limitation on
the recited method steps.  *See* 246 F.3d at 1375–76 (affirming district court's
construction of the method of treatment claims "as limited only to the actual
steps of those claims, without regard to the result of performing the claimed
steps").  Therefore, Patent Owner's argument that the preamble of substitute
claim 31 imposes an "intentional purpose" or result ("overall survival")
limitation on the recited method steps is unpersuasive and contrary to
Federal Circuit precedent.

For the reasons given above, we decline to adopt Patent Owner's
proposed claim construction.

### C. Obviousness of the Substitute Claims

Patent Owner's nonobviousness argument comprises two components.

Patent Owner first argues, as previously noted, that the prior art does
not disclose or suggest that 20–25 mg/m$^2$ of cabazitaxel in combination with
prednisone or prednisolone would increase overall survival.  MTA 10–18.
Patent Owner's first argument is based on Patent Owner's proposed claim

IPR2016-00712
Patent 8,927,592 B2

construction, which we have declined to adopt.  The argument also reflects the errant approach of implicitly defining a reasonable expectation of "success" as requiring a clinically effective treatment, where *clinical results* establish an increase in overall survival in the context of a phase III clinical trial designed for FDA approval.  *Id.* at 12–13 ("These references merely state that the primary endpoint of the TROPIC Study is overall survival. . . . However, no results of the [phase III] study were reported."), 13 ("[P]hase I and II studies for cabazitaxel could not have determined whether cabazitaxel prolonged overall survival"), 14 ("These [other CRPC] therapies . . . failed to prolong overall survival in phase III studies."), 16 ("Mita . . . and Pivot . . . failed to provide a POSA with a reasonable expectation that cabazitaxel therapy could prolong overall survival of mCRPC patients who had failed docetaxel therapy.").  We again reject the argument for the same reasons given in Section II.B.4., above.

Patent Owner's second argument is that a POSA would not have been motivated to use the claimed premedication regimen prior to cabazitaxel therapy.  *Id.* at 18–24.  Patent Owner argues that a POSA would not have been so motivated because what was known about cabazitaxel therapy did not suggest "a concern over hypersensitivity reactions or fluid retention with respect to cabazitaxel administration."  *Id.* at 19 (citing Ex. 2176 ¶¶ 241–245, 247, 250).  Patent Owner further emphasizes a lack of motivation because the levels of hypersensitivity reactions and fluid retention observed in docetaxel and paclitaxel patients were "far greater" than those observed in cabazitaxel patients as reported in Mita and Pivot.  *Id.* at 20–23 (citing Ex. 2176 ¶¶ 246, 249, 252–256).  If anything, Patent Owner argues, the prior art teaches away from administering the claimed premedication regimen

IPR2016-00712
Patent 8,927,592 B2

because of known side effects due to premedication with $H_2$ antagonists. *Id.* at 20, 23–24 (citing Ex. 2176 ¶¶ 257–262).

Petitioner persuasively establishes that the recited premedication regimen – administration of an antihistamine, a corticoid, and an $H_2$ antagonist – was well known as a prophylactic treatment for potential hypersensitivity reactions ("HSRs") in paclitaxel (Taxol) and docetaxel (Taxotere) therapies.  MTA Opp. 10 (citing Ex. 1043 ¶¶ 44–46), 15–19 (citing Ex. 1043 ¶¶ 52–55, 64–69).  We agree with Petitioner that a person of ordinary skill would have been motivated to use the same prior art taxane premedication regimen to decrease the risk of HSRs associated with cabazitaxel treatment.  As Petitioner points out, Pivot reported a 4% rate of severe (grades 3–5) hypersensitivity reactions in metastatic breast cancer patients receiving cabazitaxel therapy after antihistamine (anti-$H_1$) pretreatment, a rate Dr. Sartor characterized as a "crazy high number." Paper 84 ("Observ.") ¶ 11 (citing Ex. 1041, 216:15–19); *see also* Ex. 1010, 1550 (Col. 2 ¶ 1), 1551 (Col. 2 ¶ 2).  Therefore, although the rate of HSRs may have been lower when compared to paclitaxel and docetaxel therapy, we are persuaded a POSA still would have been motivated to prevent severe hypersensitivity reactions to cabazitaxel therapy by using a more thorough premedication regimen than the stand-alone antihistamine disclosed in Pivot. Ex. 1043 ¶¶ 64, 68–69.

An established taxane premedication regimen, comprising an antihistamine, corticoid, and $H_2$ antagonist used in connection with both paclitaxel (Taxol) and docetaxel (Taxotere) therapies, was known and available as a predictable use according to its established function of preventing or treating hypersensitivity reactions in prostate and breast cancer

IPR2016-00712
Patent 8,927,592 B2

patients.  *Id.*; *see KSR*, 550 U.S. at 420 (claimed subject matter may be proved obvious when "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.").  The Taxol Label (paclitaxel) states that "to avoid the occurrence of severe hypersensitivity reactions, all patients treated with TAXOL should be premedicated with corticosteroids (such as dexamethasone), diphenhydramine [an antihistamine] and $H_2$ antagonists (such as cimetidine or ranitidine)."  Ex. 2093, 24; *see also id.* at 39.  Dr. Sartor testified that this "broad type of regimen had been kicked around" by 2008 for use in taxane therapy.  Ex. 1041, 211:22-23.  Dr. Seth confirms the Taxol pretreatment regimen was known, and states that a POSA "would similarly be motivated to use the same three premedication drugs in cabazitaxel treatment of mCRPC as in paclitaxel treatments, to obtain a similar reduction in HSRs."  Ex. 1043 ¶¶ 55, 64.

Patent Owner argues that the need for the Taxol pretreatment regimen was "attributable to the presence of Cremophor in the formulation" of Taxol. MTA 22–23 (citing Ex. 2093, 1, 27; Ex. 2089, 347; Ex. 2225, 18). However, multiple prior art references teach the use of the same Taxol pretreatment regimen to prevent HSRs in patients undergoing Taxotere (docetaxel) therapy, the formulation of which (like cabazitaxel) contains polysorbate 80 instead of Cremophor.  MTA Opp. 15–16 (citing Ex. 1043 ¶¶ 53–54, 65–67; Ex. 1046; Ex. 1047; Ex. 1048).  We discuss those references below.

Takenaka (Ex. 1046), published in 2008, describes a study administering 30 mg/m$^2$ docetaxel in combination with estramustine for the treatment of mCRPC.  Ex. 1043 ¶ 52; Ex. 1046, 106.  Takenaka states that

IPR2016-00712
Patent 8,927,592 B2

"[d]examethasone 24 mg [a corticoid], diphenhydramine 50 mg [an antihistamine], and ranitidine 50 mg [$H_2$ antagonist] were administered before the [docetaxel] infusion to prevent a hypersensitivity reaction." Ex. 1046, 106 (Col. 2 ¶ 3); *see* Ex. 1001, 6:56–61, 7:15–21; Ex. 1043 ¶ 66. Notably, the full, three-part pretreatment regimen was indicated and used with a much lower docetaxel dose (30 mg/m$^2$) than the standard 75 mg/m$^2$ infusion dose indicated on the Taxotere label. Ex. 1024, 1. Takenaka's teaching to use the Taxol three-part pretreatment regimen (Ex. 2093, 24, 39) to prevent HSRs in low-dose docetaxel therapy, weighs against Patent Owner's argument that a POSA would not have used the pretreatment regimen with a 25 mg/m$^2$ dose of cabazitaxel because of a presumed lower concentration of polysorbate 80. Ex. 1043 ¶¶ 65–66.

Trudeau (Ex. 1047), published in 1996, reports that 60% of metastatic breast cancer patients experienced HSRs when docetaxel was administered without pretreatment, but "the use of a premedication regimen of oral dexamethasone and IV $H_1$ and $H_2$ blockers prevented significant HSRs." Ex. 1047, 422 (Col. 1 ¶ 3), 424 (Col. 2 ¶ 2); Ex. 1043 ¶¶ 53, 67. Hudis (Ex. 1048), also published in 1996, similarly reports on docetaxel treatment in metastatic breast cancer patients where, after observing two HSRs among the first six patients, "a variety of pretreatment regimens that incorporated diphenhydramine [an antihistamine], corticosteroids, and cimetidine [an $H_2$ blocker] were used." Ex. 1048, 59 (Col. 2 ¶ 4). Accordingly, we credit Dr. Seth's testimony that a POSA would have considered the use of the claimed pretreatment regimen of a corticosteroid, an antihistamine, and an $H_2$ antagonist as a well-known option for prevention of taxane-induced HSRs. Ex. 1043 ¶¶ 54, 65.

77

IPR2016-00712
Patent 8,927,592 B2

Patent Owner also contends that Mita would have taught away from using the claimed pretreatment regimen in connection with cabazitaxel therapy.  MTA 19–20 (citing Ex. 1012; Ex. 2224, 2; Ex. 2176 ¶¶ 243–45, 248).  Patent Owner relies on Mita's statement that "[b]ased on the results of this study, [cabazitaxel] does not require premedication, thus resulting in significant administration and convenience advantages."  Ex. 1012, 729.  Mita was a relatively small dosing and PK study, and Dr. Sartor's opinion states only that Mita "does not suggest that premedication was necessary for the safe administration of cabazitaxel."  Ex. 2176 ¶ 251.  Dr. Sartor does not state that Mita would have taught a POSA not to use a three-part premedication regimen, such as that used for the administration of paclitaxel and docetaxel, to prevent or treat HSRs in connection with cabazitaxel therapy.

Patent Owner's argument also does not address persuasively the larger phase II cabazitaxel study disclosed in Pivot, which used an antihistamine pretreatment.  MTA 19–20.  Notwithstanding the earlier statement in Mita, Pivot teaches the use of an antihistamine pretreatment regimen in an effort to reduce allergic reactions.  Ex. 1010, 1548 (Col. 2 ¶ 3).  Pivot discloses that when administering cabazitaxel, the most common grade 3–5 non-hematological adverse event was HSR.  *Id.* at 1550.  Dr. Seth states that a 4% rate of serious (grade 3 or higher) HSRs would be of concern to a POSA and would warrant the use of the claimed pretreatment regimen.  Ex. 1043 ¶ 68.  Furthermore, Pivot discloses one patient withdrawal due to "grade 4 allergic reaction."  Ex. 1010, 1550 (Col. 2 ¶ 2).  The grade 4 allergic reaction "would certainly qualify as an HSR," and prevention of such allergic reactions "would be a strong motivation to use a paclitaxel-type regimen of

78

IPR2016-00712
Patent 8,927,592 B2

an antihistamine, a corticoid, and an $H_2$ antagonist." Ex. 1043 ¶ 68.

Accordingly, when Mita is put in context with the Pivot study, we are

persuaded Mita does not teach away from the use of the claimed

premedication regimen to mitigate HSRs in patients receiving cabazitaxel

therapy.

Dr. Sartor agrees that a 4% rate of grade 3 or higher HSRs would have

been serious enough to merit the use of preventative premedication.  Ex.

1041, 215:6–216:19.  Dr. Sartor explains that, when considering

premedication for taxanes, preventing HSRs is of paramount concern: "I

think when you're looking at safety, you really want to be very cautious

because, I mean, the last thing you want to do is give the drug to somebody

and they have a hypersensitivity reaction and die.  And that's a true

disaster." *Id.* at 211:23–212:4.  In particular, the HSR rate disclosed by Pivot

(4%) would provide a strong motivation to use premedication, because, as

Dr. Sartor explains, "4 percent of people with a bad hypersensitivity is a

crazy high number, scares the hell out of me." *Id.* at 216:15–19.  Dr. Sartor

further explains that none of the claimed premedication drug products are

dangerous:

> Q. Aren't $H_2$ antagonists extremely risky medications?
> A. No. Why would you say that?
>
> Q. What about Benadryl?  Is that an extremely risky
> medication?
> A. No.
>
> Q. What about dexamethasone?
> A. In the way we use it, it's not extremely risky. And it's
> all about the risk/benefit anyway. We always incur risks.
> We're going to incur risks when we go get on the elevator.

IPR2016-00712
Patent 8,927,592 B2

> But, you know, it's about the proper amount of risk and
> the benefit that it can be prescribed.   Hypersensitivity
> reactions -- I don't want to be too distracting, but I had a
> guy nearly die. …   Anyway, the bottom line is it's a serious
> matter because we're talking about real health here.  When
> I look at the safety of Benadryl, I've had people get sleepy
> on Benadryl.  I've never had any real harm done.

*Id.* at 217:20–219:5.  Dr. Sartor also testified that "when we administer an agent known to be associated with hypersensitivity reactions, if there's a method to help control those, then we use that."  *Id*. at 211:5–8.  Thus, Dr. Sartor's testimony weighs against Patent Owner's teaching away argument and tends to confirm that preventing HSRs in patients receiving cabazitaxel therapy would have motivated a POSA to practice the method of the substitute claim, including the known taxane premedication regimen, with a reasonable expectation of success.

Accordingly, the administration of the premedication regimen when administering cabazitaxel and prednisone for treating mCRPC patients, as recited in substitute claims 31–34, would have been obvious to a POSA in view of the Winquist, the TROPIC Listing, Pivot, and any one of Takenaka, Hudis, Trudeau, and the Taxol Label.  Ex. 1043 ¶ 68.

For the reasons given above, we determine Patent Owner has not proved by a preponderance of the evidence that proposed substitute claims 31–34 are patentable.

IPR2016-00712
Patent 8,927,592 B2

## IV.   MOTIONS TO EXCLUDE

Petitioner and Patent Owner each move to exclude certain evidence.

Patent Owner filed a Motion to Exclude Exhibits 1089–1090.  Paper
61.  Petitioner filed an Opposition (Paper 77 (under seal), Paper 78 (public
version)), and Patent Owner filed a Reply (Paper 86).  Exhibit 1089 is titled
"Cabazitaxel IMS 2009-10 DollarsDoses (Confidential)," and Exhibit 1090
is titled "Cabazitaxel IMS 2011-16 DollarsDoses (Confidential)."  These
exhibits are cited in Mr. McSorley's Declaration in connection with sales
figures, in dollars and prescriptions, of prostate cancer drugs.  Ex. 1044,
105–120.  Mr. McSorley relies on Exhibits 1089 and 1090 for his
Attachments 7.0–7.7 and 8.0–8.7, which are cited in Exhibit 1044 at ¶¶ 24–
27, 48, 53, 57–58, 70.A (Figure H), 71.A (Figure I), 74.

We do not rely on Exhibit 1089 or Exhibit 1090, or on Mr.
McSorley's Declaration in connection with Exhibits 1089 or 1090 to support
our decision.  Therefore, Patent Owner's Motion to Exclude Exhibits 1089
and 1090 is denied as moot.

 Petitioner filed a Motion to Exclude Exhibits 2170, 2171, and 2179
and certain related paragraphs in Mr. Tate's Declaration, Exhibit 2149.
Paper 64 (under seal); Paper 68 (public version).  Patent Owner filed an
Opposition (Paper 72 (under seal), Paper 73 (public version)), and Petitioner
filed a Reply (Paper 89 (under seal), Paper 95 (public version)).  The
exhibits are described as "Market Share with Docetaxel in Prior Treatment,
Brand Impact by Alpha Impact Rx (June 2016)" (Ex. 2170), "Monthly
Jevtana Prostate Cancer Treatment Report: August 2014 Results,
BrandImpact by AlphaImpact Rx and Symphony Health Solutions

81

IPR2016-00712
Patent 8,927,592 B2

(September 2014)" (Ex. 2171), and "Underlying data for Market Share with Docetaxel in Prior Treatment, BrandImpact by AlphaImpact Rx (June 2016)" (Ex. 2179).  Mr. Tate references the exhibits in connection with sales and market share data in support of Patent Owner's commercial success argument.  For the reasons explained in Section II.B.4.d., above, we do not address the substance of Exhibits 2170, 2171, 2179 or the related paragraphs of Mr. Tate's Declaration in our decision.  Therefore, Petitioner's Motion to Exclude Exhibits 2170, 2171, 2179, and the related paragraphs in Exhibit 2149 is denied as moot.

Petitioner also moves to exclude certain paragraphs of Dr. Sartor's original declaration filed in support of Patent Owner's Preliminary Response (Ex. 2001) and his Declaration filed in support of Patent Owner's Response and MTA (Ex. 2176).  Paper 64, 14–15.  We do not rely on or reference Exhibit 2001 in our decision.  Therefore, Petitioner's Motion to Exclude paragraphs 83 and 98 of Exhibit 2001 is denied as moot.

Petitioner contests the admissibility of paragraphs 63, 65, 90, 103–110, 152, 155, 167, and 207 of Exhibit 2176.  We do not reference paragraphs 63, 65, 90, 103–109, 152, 155, or 167 in this Decision.  Therefore, Petitioner's motion as to those paragraphs is denied as moot.

To the extent we reference paragraphs 110 and 207 of Exhibit 2176 in this Decision, the citations are only for purposes of setting out Patent Owner's position.  We do not address the substance of the testimony in those paragraphs.  Therefore, Petitioner's Motion to Exclude paragraphs 110 and 207 of Exhibit 2176 is denied as moot.

IPR2016-00712
Patent 8,927,592 B2

## V.    CONCLUSION

For the reasons given above, we determine Petitioner has shown by a preponderance of the evidence that claims 1–5 and 7–30 of the '592 patent are unpatentable.

We further determine Patent Owner has not proved by a preponderance of the evidence that proposed substitute claims 31–34 are patentable.  Therefore, Patent Owner's Contingent Motion to Amend claims 27–30 with proposed substitute claims 31–34 is *denied*.

We further deny the parties' motions to exclude evidence as moot.

This is a Final Written Decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

## VI.    ORDER

Accordingly, it is

ORDERED that claims 1–5 and 7–30 of the '592 patent have been proved to be unpatentable by a preponderance of the evidence;

FURTHER ORDERED that proposed substitute claims 31–34 have not been shown to be patentable.  Therefore, Patent Owner's Contingent Motion to Amend claims 27–30 with proposed substitute claims 31–34 is denied.

IPR2016-00712
Patent 8,927,592 B2

For PETITIONER:

Steven W. Parmelee
Michael T. Rosato
Jad A. Mills
Wendy Devine
Matthew Reed
Nellie Amjadi
WILSON SONSINI GOODRICH & ROSATI
sparmelee@wsgr.com
mrosato@wsgr.com
jmills@wsgr.com
wdevine@wsgr.com
mreed@wsgr.com
namjadi@wsgr.com

For PATENT OWNER:

Dominic A. Conde
Whitney L. Meier
William E. Solander
Joshua I. Rothman
FITZPATRICK CELLA HARPER & SCINTO
dconde@fchs.com
wmeier@fchs.com
wsolander@fchs.com
jrothman@fchs.com

# EXHIBIT O

Trials@uspto.gov                                               Paper 112
Tel: 571-272-7822                           Entered: October 22, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

MYLAN LABORATORIES LIMITED,
Petitioner,

v.

AVENTIS PHARMA S.A.,
Patent Owner.

———————————————

Case IPR2016-00712
Patent 8,927,592 B2

———————————————

Before ZHENYU YANG, TINA E. HULSE, and
CHRISTOPHER M. KAISER, *Administrative Patent Judges*.

KAISER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION ON REMAND
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73(a)*

IPR2016-00712
Patent 8,927,592 B2

# INTRODUCTION

## A. *Background*

Mylan Laboratories Limited ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–5 and 7–30 of U.S. Patent No. 8,927,592 (Ex. 1001, "the '592 patent"). Paper 3 ("Petition" or "Pet."). Petitioner supported its challenge with the Declaration of Dr. Rahul Seth. Ex. 1002. Aventis Pharma S.A. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 7 ("Prelim. Resp."). On September 22, 2016, the Board instituted an *inter partes* review of claims 1–5 and 7–30 of the '592 patent. Paper 9 ("Institution Decision").

After institution, Patent Owner filed a Response (Paper 21, "PO Resp.") and a Contingent Motion to Amend claims 27–30 of the '592 patent (Paper 22, "MTA"). Patent Owner supported its Response and MTA with the Declaration of Dr. Alton Oliver Sartor (Ex. 2176), the Declaration of Mr. Michael Tate (Ex. 2149), and the Declaration of Mr. Art Lathers (Ex. 2231).

Petitioner filed a Reply (Paper 42, "Reply") and Opposition to Patent Owner's MTA (Paper 43, "MTA Opp."[1]). Petitioner supported its Reply and MTA Opposition with the Reply Declaration of Dr. Seth (Ex. 1043), and the Declaration of Mr. Robert McSorley (Ex. 1044).[2]

---

[1] Petitioner filed the MTA Opposition under seal, subject to the Board's ruling on Petitioner's Motion to Seal (Paper 45). Petitioner filed a redacted public version of the MTA Opposition as Paper 44.
[2] Petitioner filed Dr. Seth's Reply Declaration and Mr. McSorley's Declaration under seal, subject to the Board's ruling on Petitioner's Motion to Seal (Paper 45). Petitioner filed redacted public versions of the declarations using the same respective exhibit numbers.

IPR2016-00712
Patent 8,927,592 B2

Patent Owner filed a Reply to Petitioner's Opposition to Patent Owner's MTA. Paper 53 ("MTA Reply"). [3]  Patent Owner supported its MTA Reply with the Reply Declaration of Dr. Sartor (Ex. 2259) and the Declaration of Patricia Matthews, RN, BSN (Ex. 2234).

Patent Owner filed Observations (Paper 80) on the cross-examination testimony of Dr. Seth (Ex. 2258) regarding Petitioner's Reply (Paper 42), and Petitioner filed a response to Patent Owner's Observations (Paper 93). Patent Owner also filed Observations (Paper 81 (under seal), Paper 82 (public version)) on the cross-examination testimony of Mr. McSorley (Ex. 2261) regarding Petitioner's Reply (Paper 42), and Petitioner filed a response to Patent Owner's Observations (Paper 92 (under seal), Paper 94 (public version)).

Petitioner filed Observations (Paper 84) on the cross-examination testimony of Dr. Sartor (Ex. 1098) with respect to Patent Owner's MTA, and Patent Owner filed a Response (Paper 90).

An oral hearing was held on June 13, 2017, and a transcript of the oral hearing is of record. Paper 98 ("Tr.").

On September 21, 2017, the Board issued a Final Written Decision (Paper 99, "Dec."), in which it concluded that Petitioner had shown by a preponderance of the evidence that claims 1–5 and 7–30 of the '592 patent were unpatentable and that Patent Owner had not shown by a preponderance of the evidence that proposed claims 31–34 were patentable.  On November

---

[3] Patent Owner filed the MTA Reply under seal, subject to the Board's ruling on Patent Owner's Motion to Seal (Paper 54).  Patent Owner filed a redacted public version of the MTA Reply as Paper 52.

IPR2016-00712
Patent 8,927,592 B2

17, 2017, Patent Owner appealed to the Court of Appeals for the Federal
Circuit.  Paper 103.

On appeal, Patent Owner argued that the Board erred in denying its
MTA.  *Sanofi Mature IP v. Mylan Labs. Ltd.*, 757 F. App'x 988, 989 (Fed.
Cir. 2019).  The Federal Circuit agreed, vacating the denial of the MTA and
remanding.  *Id.*

On remand, Petitioner submitted a brief setting forth the issues for us
to decide and its arguments on those issues.  Paper 109 ("Pet. Remand Br.").
Patent Owner filed a responsive brief.  Paper 110 ("PO Remand Br.").
Petitioner filed a reply.  Paper 111 ("Pet. Remand Reply").

We have jurisdiction under 35 U.S.C. § 6, and we issue this Final
Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For
the reasons discussed below, we conclude that Petitioner has not established
by a preponderance of the evidence that proposed claims 31–34 are
unpatentable.  Accordingly, we grant Patent Owner's Motion to Amend
claims 27–30 by replacing them with proposed claims 31–34.

B.  *The Issues on Remand*

When Patent Owner appealed the earlier Final Written Decision, it
noted that "the issues on appeal" included

> the Board's determination of unpatentability of claims 21 and
> 30 of U.S. Patent No. 8,927,592 ("the '592 patent") under
> 35 U.S.C. § 103, including the Board's determination and
> application of its construction of terms in those claims; the
> Board's denial of Patent Owner's Contingent Motion to Amend
> claims 27-30 with proposed substitute claims 31-34, including
> the Board's determination and application of its construction of
> terms in proposed substitute claims 31-34; the constitutionality
> of the inter partes review proceeding as raised in *Oil States
> Energy Services, LLC v. Greene's Energy Group*, 639 F. App'x

4

IPR2016-00712
Patent 8,927,592 B2

> 639 (Fed. Cir. May 4, 2016), *cert. granted*, 85 U.S.L.W. 3578
> (U.S. June 12, 2017) (No. 16-712) that the Board's findings in
> this proceeding and this proceeding itself violate due process;
> and any finding or determination supporting or related to these
> issues, as well as all other issues decided adversely to Aventis
> in any orders, decisions, rulings and opinions, all of which,
> taken together or independently, caused prejudicial harm to
> Aventis related to these issues.

Paper 103, 1–2.

Despite this extensive list of "issues on appeal," the Federal Circuit's decision on appeal addressed only the denial of the MTA. *Sanofi*, 757 F. App'x at 994 ("[W]e *vacate* the Board's denial of Sanofi's contingent motion to amend and its construction of the proposed substitute claims and we *remand* for further consideration consistent with this opinion."). Because the Federal Circuit did not otherwise disturb the Board's findings and conclusions, we need only decide whether to grant Patent Owner's MTA. Accordingly, except to the extent that they are contradicted by any statement herein, we maintain the analysis, findings, and conclusions reached in the earlier Final Written Decision, which we incorporate by reference. *See* Paper 99.

In opposing the MTA, Petitioner argues that the proposed claims are unpatentable on the following grounds:

IPR2016-00712
Patent 8,927,592 B2

| Statutory Ground | Basis | Challenged Claims |
|---|---|---|
| § 103(a) | Winquist,[4] TROPIC Listing,[5] Pivot,[6] and NCCN[7] | 31–34 |
| § 103(a) | Winquist, TROPIC Listing, Pivot, NCCN, and Mita[8] | 31–34 |
| § 103(a) | Winquist, TROPIC Listing, Pivot, and any one of Takenaka,[9] Hudis,[10] Trudeau,[11] or the Taxol Label[12] | 31–34 |

---

[4] Eric Winquist et al., *Open clinical uro-oncology trials in Canada*, THE CANADIAN JOURNAL OF UROLOGY, 15(1), 3942–49 (Feb. 2008) (Ex. 1009, "Winquist").

[5] Sanofi-Aventis, *XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC)*, CLINICALTRIALS.GOV (Oct. 23, 2008) (Ex. 1008, "TROPIC Listing").

[6] X. Pivot et al., *A multicenter phase II study of XRP6258 administered as a 1-h i.v. infusion every 3 weeks in taxane-resistant metastatic breast cancer patients*, ANNALS OF ONCOLOGY, 19, 1547–52 (Apr. 23, 2008) (Ex. 1010, "Pivot").

[7] NCCN CLINICAL PRACTICE GUIDELINES IN ONCOLOGY: ANTIEMESIS (Feb. 5, 2008) (Ex. 1045, "NCCN").

[8] Alain C. Mita et al., *Phase I and Pharmacokinetic Study of XRP6258 (RPR116258A), a Novel Taxane, Administered as a 1-Hour Infusion Every 3 Weeks in Patients with Advanced Solid Tumors*, CLIN. CANCER RES. 2009:15(2), 723–30 (Jan. 15, 2009) (Ex. 1012, "Mita").

[9] Atsushi Takenaka et al., *Combination chemotherapy with weekly docetaxel and estramustine for hormone refractory prostate cancer in Japanese patients*, INT'L J. UROLOGY, 15, 106–09 (2008) (Ex. 1046, "Takenaka").

[10] Clifford A. Hudis et al., *Phase II and Pharmocologic Study of Docetaxel as Initial Chemotherapy for Metastatic Breast Cancer*, J. CLIN. ONCOLOGY, 14, 58–65 (Jan. 1996) (Ex. 1048, "Hudis").

[11] Maureen E. Trudeau et al., *Docetaxel in Patients with Metastatic Breast Cancer: A Phase II Study of the National Cancer Institute of Canada-Clinical Trials Group*, J. CLIN. ONCOLOGY, 14, 422–28 (Feb. 1996) (Ex. 1047, "Trudeau").

[12] MEAD JOHNSON ONCOLOGY PRODUCTS, TAXOL® (PACLITAXEL) INJECTION (Feb. 10, 2000) (Ex. 2093, "Taxol Label").

IPR2016-00712
Patent 8,927,592 B2

| Statutory Ground | Basis | Challenged Claims |
|---|---|---|
| § 103(a) | Winquist, TROPIC Listing, Pivot, Mita, and any one of Takenaka, Hudis, Trudeau, or the Taxol Label | 31–34 |
| § 103(a) | Consent Form,[13] Pivot, and any one of NCCN, Takenaka, Hudis, Trudeau, or the Taxol Label | 31–34 |
| § 103(a) | Consent Form, Pivot, Mita, and any one of NCCN, Takenaka, Hudis, Trudeau, or the Taxol Label | 31–34 |
| § 102(b) | Public Use in the TROPIC Study | 31–34 |
| § 101 | Lack of Eligible  Subject Matter | 31–34 |

MTA Opp. 7–21, 22–25; Pet. Remand Br. 7–25; Pet. Remand Reply 1–7.

C. The '592 Patent

The '592 patent, titled "Antitumoral Use of Cabazitaxel," issued January 6, 2015, from an application filed April 26, 2012. Ex. 1001. The '592 patent claims priority through an international application to a series of provisional applications, the earliest of which is dated October 29, 2009. Ex. 1001, at [60], [63]. The '592 patent is directed to the use of cabazitaxel in the treatment of prostate cancer, particularly metastatic castration resistant prostate cancer ("mCRPC"). Id. at 1:19–26. Because cancer cells may develop resistance to docetaxel ("sold under the brand name 'Taxotere®'"[14]), administering cabazitaxel is intended to treat prostate

---

[13] Sanofi Aventis, *Minimum Information Required for Written Subject Information: A Randomized, Open Label Multi-Center Study of XRP6258 At 25 mg/m$^2$ in Combination With Prednisone Every 3 Weeks Compared to Mitoxantrone in Combination With Prednisone For the Treatment of Hormone Refractory Metastatic Prostate Cancer Previously Treated With A Taxotere®-Containing Regimen* (Oct. 16, 2006) (Ex. 2182, "Consent Form").
[14] Ex. 1001, 2:23.

IPR2016-00712
Patent 8,927,592 B2

cancer in patients with advanced metastatic disease that has progressed despite previous treatment with a docetaxel-based regimen. *Id.* at 2:61–67. Cabazitaxel is preferably administered in combination with a corticoid, such as prednisone or prednisolone, at a daily dose of 10 mg orally. *Id.* at 3:2–5.

The chemical name for cabazitaxel is 4α-acetoxy-2α-benzoyloxy-5β, 20-epoxy-lβ-hydroxy-7β, 10β-dimethoxy-9-oxo-ll-taxen-13α-yl(2R,3S)-3-tert-butoxycarbonylamino-2-hydroxy-3-phenylpropionate. *Id.* at 4:28–31. Cabazitaxel is a taxane compound, the chemical structure of which is depicted in the figure reproduced below:



*Id.* at 4:8–26. The figure above shows the chemical structure of cabazitaxel. *Id.* Example 1 of the '592 patent describes a large-scale (phase III) comparative clinical trial of mCRPC patients whose disease had progressed during or after docetaxel treatment, the docetaxel-refractory patients being treated with either 25 mg/m$^2$ of cabazitaxel or 12 mg/m$^2$ mitoxantrone, and 10 mg/day of prednisone. *Id.* at 10:30–48. Patients receiving cabazitaxel and prednisone demonstrated a median overall survival that was 2.4 months longer than those receiving mitoxantrone and prednisone. *Id.* at 11:28–37, 11:45–54. The claimed method is directed to administering cabazitaxel and

IPR2016-00712
Patent 8,927,592 B2

a corticoid to prostate cancer patients whose disease has progressed in spite of previous docetaxel treatment. *Id.* at 5:33–67, 18:54–58, 20:25–30.

### D. Proposed Claims

Patent Owner proposes replacing claims 27–30 with claims 31–34.

The proposed claims recite:

> 31. A method of increasing survival comprising administering to a patient in need thereof (i) an antihistamine, (ii) a corticoid, (iii) an $H_2$ antagonist, and (iv) a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate or solvate thereof, wherein said antihistamine, said corticoid, and said $H_2$ antagonist are administered prior to said dose of 20 to 25 mg/m$^2$ of cabazitaxel, or hydrate or solvate thereof, in combination with prednisone or prednisolone, wherein said patient has castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel.

MTA 27.

> 32. The method according to claim 31, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

*Id.*

> 33. The method according to claim 31, comprising repeating the administration of said antihistamine, said corticoid, said $H_2$ antagonist, and said cabazitaxel, or hydrate or solvate thereof, as a new cycle every 3 weeks.

*Id.* at 28.

> 34. The method according to claim 31, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

*Id.*

IPR2016-00712
Patent 8,927,592 B2

ANALYSIS

A. *Claim Construction*

In an *inter partes* review, we construe claim terms in an unexpired patent according to their broadest reasonable construction in light of the specification of the patent in which they appear.[15]  37 C.F.R. § 42.100(b) (2017); *see Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016) (upholding the use of the broadest reasonable interpretation standard). Claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  "[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'"  *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

On remand, we have been instructed to treat the preamble of claim 31 "as an additional limitation of" the claim that "require[s] 'increasing survival'" as the "intentional purpose . . . for which the [recited] method must be performed."  *Sanofi*, 757 F. App'x at 993–94 (quoting *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003)).  As instructed, we adopt that construction of the preamble of claim 31.

---

[15] A recent amendment to this rule does not apply here because the Petition was filed before November 13, 2018.  *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 100(b) effective November 13, 2018).

IPR2016-00712
Patent 8,927,592 B2

### B. Preliminary Issues

In deciding a motion to amend, "if a patent owner files a motion to amend . . . and that motion meets the requirements of 35 U.S.C. § 316(d) (i.e., proposes a reasonable number of substitute claims, and the substitute claims do not enlarge scope of the original claims of the patent or introduce new matter)," then we must "determine whether the substitute claims are unpatentable by a preponderance of the evidence." Memorandum, "Guidance on Motions to Amend in view of *Aqua Products*" (Nov. 21, 2017) (available at http://go.usa.gov/xU6YV). "[I]f the entirety of the evidence of record before [us] is in equipoise as to the unpatentability of one or more substitute claims, [we] will grant the motion to amend with respect to such claims." *Id.*

For the reasons given in the earlier Final Written Decision, which were not disturbed on appeal, we find (1) that proposed substitute claims 31–34 are not broader than claims 27–30, which they replace, and (2) that Patent Owner has complied with our rules by proposing a reasonable number of substitute claims. Dec. 68. The record does not contain any argument that the proposed claims introduce new matter. MTA 1–25; MTA Opp. 1–25; MTA Reply 1–12; Pet. Remand Br. 1–25; PO Remand Br. 1–25; Pet. Remand Reply 1–7. Accordingly, we conclude that Patent Owner's MTA meets the requirements of 35 U.S.C. § 316(d). We therefore proceed to consider whether the evidence of record shows that the proposed claims are unpatentable.

### C. Asserted Obviousness of Proposed Claims

Petitioner argues that the subject matter of the proposed claims would have been obvious to a person of ordinary skill in the art given the teachings

IPR2016-00712
Patent 8,927,592 B2

of several different combinations of the prior art of record.  MTA Opp. 7–
21, 22–25; Pet. Remand Br. 7–25; Pet. Remand Reply 1–7.

   1. *Requirement to Prove Reasonable Expectation of Success*

  "An invention is not obvious just 'because all of the elements that
comprise the invention were known in the prior art.'"  *Broadcom Corp. v.
Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013) (quoting *Power-One,
Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1351 (Fed. Cir. 2010)).  Instead,
"a finding of obviousness at the time of invention requires a 'plausible
rational[e] as to why the prior art references would have worked together.'"
*Id.* (quoting *Power-One*, 599 F.3d at 1352).  In addition to a reason to
combine the prior-art references, proving obviousness requires showing that
a person of ordinary skill in the art would have had "a reasonable
expectation of achieving what is claimed in the patent-at-issue."  *Intelligent
Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed.
Cir. 2016).

  Although both parties agree that proving the obviousness of the
proposed claims requires showing such a reasonable expectation of success,
they disagree about what is required to make such a showing.  Because the
preamble of claim 31 recites only the "intentional purpose . . . for which the
[recited] method must be performed," *Sanofi*, 757 F. App'x at 993,
Petitioner argues that a reasonable expectation of success would be shown if
the evidence of record proves that a person of ordinary skill in the art
reasonably would have expected to be able to carry out the recited method
steps with the intent of increasing survival.  Pet. Remand Br. 15–18.  Patent
Owner argues that a reasonable expectation of success would be shown only
if the evidence of record proves that a person of ordinary skill in the art

IPR2016-00712
Patent 8,927,592 B2

reasonably would have expected carrying out the recited method steps to result in increased survival.  PO Remand Br. 2–5.  Patent Owner is correct with respect to the applicable standard for showing a reasonable expectation of success.

In *Sanofi v. Glenmark Pharmaceuticals Inc.*, the trial court was presented with a claim reciting a limitation setting forth the intended purpose for which its method must be performed and faced with the question of how the party challenging the validity of the claim could prove that a person of ordinary skill in the art would have had a reasonable expectation of success. 204 F. Supp. 3d 665, 671–72, 687–96 (D. Del. 2016).  Specifically, the claim at issue required performing the recited method steps with the intended purpose of "decreasing a risk of cardiovascular hospitalization." *Id.* at 671–72.  The court concluded that showing a reasonable expectation of success required proving that a person of ordinary skill in the art "would . . . have had a reasonable expectation that [the recited method] would reduce the risk of cardiovascular hospitalization."  *Id.* at 691.  The Federal Circuit affirmed that this was the correct standard to apply.[16]  *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 647 (Fed. Cir. 2017).

---

[16] Petitioner argues that, in affirming the application of this standard, the Federal Circuit did not require it to be applied, merely finding that the appellants had accepted the standard.  Pet. Remand Reply 2.  This is incorrect.  Although the Federal Circuit stated that the appellants had "accept[ed] the legal framework" applied in the case, the same appellants also argued that the trial court had "adopted an incorrect legal standard" and had applied "too high a standard for proving a reasonable expectation of success."  875 F.3d at 646–47.  Because of these arguments, it was necessary for the Federal Circuit to decide what the legal standard for proving a reasonable expectation of success should be, and it did so by affirming the standard applied by the district court.

IPR2016-00712
Patent 8,927,592 B2

Petitioner argues that applying the *Sanofi* standard would "impermissibly engraft[] increased survival results onto the scope of claims that merely require an intended purpose, not results." Pet. Remand Br. 15. Petitioner is correct that the proposed claims do not require the achievement of any particular results, but Petitioner is wrong to suggest that the *Sanofi* standard requires proof of such results. The Federal Circuit clearly distinguished the standard actually applied in *Sanofi*—a reasonable expectation that the recited method would reduce the risk of cardiovascular hospitalization—from a hypothetical standard in which the district court would have "demand[ed] known certainty as to the objective of reduced hospitalization." *Sanofi*, 875 F.3d at 647. Accordingly, to prove a reasonable expectation of success with respect to a claim that recites a limitation setting forth achieving a particular result as the intended purpose for which a recited method must be performed, what is required is not proof that the recited method would actually bring about the recited result, but rather proof that a person of ordinary skill in the art would have had a reasonable expectation that performing the recited method would bring about the recited result.

Here, the Federal Circuit has instructed us to interpret the proposed claims as reciting an intended purpose of increasing survival. *Sanofi*, 757 F. App'x at 993–94. Thus, proving the obviousness of the challenged claims does not require proving that performing the method recited in the proposed claims would actually increase survival, but it does require proving that a person of ordinary skill in the art reasonably would have expected the performance of the recited method to increase survival.

14

IPR2016-00712
Patent 8,927,592 B2

> ### 2. Whether a Reasonable Expectation of Success Has Been Shown

On the issue of whether a person of ordinary skill in the art would have expected the method recited in the proposed claims to increase survival, there is evidence of record both to support Petitioner's position and to refute it, but the preponderance of the evidence does not support Petitioner's position.

> #### a. Evidence That Is Neutral with Respect to a Finding that a Person of Ordinary Skill in the Art Would Have Expected Increased Survival

As an initial matter, we note that the mere fact that the TROPIC study, a phase III clinical trial of cabazitaxel with the purpose of investigating overall survival, was underway at the time of the effective filing date of the '592 patent does not prove that a person of ordinary skill in the art would have expected treatment with cabazitaxel to increase survival. In *Sanofi v. Glenmark*, as discussed above, the claims recited a limitation requiring as a purpose for which the recited method must be performed the reduction of risk of cardiovascular hospitalization, and a phase III clinical trial was ongoing with the primary endpoint of "the time to first hospitalization for cardiovascular reasons or death from any cause." 204 F. Supp. 3d at 679. The district court found that the existence of this phase III trial did not support finding a reasonable expectation that the treatment being tested would result in a reduction in the risk of cardiovascular hospitalization. *Id.* at 691–92. Instead, the district court described the phase III trial as providing merely "a hypothesis that requires further testing," and the court proceeded to evaluate the other evidence of record to determine whether a person of ordinary skill in the art reasonably would have expected the

15

IPR2016-00712
Patent 8,927,592 B2

treatment in question to reduce the risk of cardiac hospitalization. *Id.* at 689–96. The phase III study at issue here was similar, seeking to test the hypothesis that treatment with cabazitaxel would increase overall survival, rather than reasonably suggesting that an increase in overall survival was to be expected. Ex. 1008, 1; Ex. 1009, 3948; *see* Ex. 2258, 41:8–42:6 (at time of TROPIC study, person of ordinary skill in the art would "hope" for increased survival, rather than "expect[ing]" it). Accordingly, we find that the existence of a phase III study here similar to that at issue in *Sanofi v. Glenmark* does not speak to the question of whether a person of ordinary skill in the art would have expected the treatment recited in the proposed claims to increase survival.

> b. Evidence Supporting a Finding that a Person of Ordinary Skill in the Art Would Have Expected Increased Survival

There is some evidence of record that supports a finding that a person of ordinary skill in the art would have expected the treatment method recited in the proposed claims to have resulted in an increase in survival.

> *(1) Dr. Seth's Personal Belief at the Time*

Dr. Seth, Petitioner's declarant, testified that, at the beginning of the TROPIC study, "we expected [cabazitaxel] to get FDA approval and it would increase overall survival." Pet. Remand Br. 13–14 (quoting Ex. 2258, 80:12–81:12). He also testified that "I thought we definitely would see a survival benefit" and that "we would see a definite benefit versus mitoxantrone." *Id.* We note that Dr. Seth in this testimony is referring to his personal expectations, not to the expectations of a person of ordinary skill in the art. To the extent that Dr. Seth resembled a person of ordinary skill in the art, however, this testimony supports a finding that a person of ordinary

16

IPR2016-00712
Patent 8,927,592 B2

skill in the art would have expected the treatment regimen in the TROPIC study to increase survival.

> ### (2) Dr. Seth's Testimony that a Person of Ordinary Skill in the Art Would Have Thought Cabazitaxel Would Work

Dr. Seth offers some testimony that speaks directly about the beliefs of a person of ordinary skill in the art. First, Dr. Seth testified that "the drug was known and was felt to be working at 20 or 25 mg/m$^2$." Pet. Remand Br. 13–14 (quoting Ex. 2258, 43:17–20). Because Dr. Seth explains that, by "working" he means "effective in controlling [DRmCRPC] which would lead to an overall survival," this testimony also supports a finding that a person of ordinary skill in the art would have expected cabazitaxel treatment to lead to an increase in survival.

Petitioner also argues that Dr. Seth's testimony, "20 to 25 mg/m$^2$, they would feel like it would work," was a statement that a person of ordinary skill in the art would have expected cabazitaxel to increase survival at the specified dose. Pet. Remand Br. 13–14 (purporting to quote Ex. 2258, 45:18–20). This argument misrepresents Dr. Seth's testimony as more certain about what a person of ordinary skill in the art would feel than it actually is. Dr. Seth's actual testimony was, "I can't really say what a [person of ordinary skill in the art] would feel, but 20 to 25 milligrams per meter squared, I feel we would feel that [would work]." Ex. 2258, 45:18–20. This testimony is quite equivocal; at most, it weakly supports a finding that a person of ordinary skill in the art would have expected cabazitaxel treatment to lead to an increase in survival.

IPR2016-00712
Patent 8,927,592 B2

     c. Evidence Opposing a Finding that a Person of
       Ordinary Skill in the Art Would Have Expected
       Increased Survival

In opposition to the evidence discussed above, the record also contains significant evidence that supports a finding that a person of ordinary skill in the art would not have expected the treatment method recited in the proposed claims to have resulted in an increase in survival.

     *(1) Dr. Seth's and Dr. Sartor's Testimony that a
       Person of Ordinary Skill in the Art Would Have
       Hoped For, but Not Expected, Increased
       Survival*

Both Dr. Seth and Dr. Sartor, Patent Owner's declarant, testify that, at the time of the effective filing date of the '592 patent, clinicians hoped that treatment with cabazitaxel would extend their patients' lives. Ex. 1041, 115:12–116:9 (in 2008, Dr. Sartor "hoped that the patients that [he was] giving cabazitaxel would have an extended life because of it"); Ex. 2258, 51:6–20 (Dr. Seth stating that, "when you control your disease, you are in turn hoping that they get a progression-free survival which would lead to an increase in overall survival"). Petitioner argues that both Dr. Seth and Dr. Sartor testified that this hope for an increase in survival was the same as an expectation that the treatment would increase survival. Pet. Remand Br. 13 (citing Ex. 1041, 115:12–116:9; Ex. 2258, 30:13–31:2). But neither declarant's testimony actually supports this view.

Dr. Sartor clearly agrees with the statement that he "hoped" his patients would have their lives extended by cabazitaxel treatment, but he just as clearly disagrees with the statement that he "intended" the treatment to have that effect, testifying that the results of the TROPIC study showing an increase in survival "surprised, delighted, [and] shocked" him. Ex. 1041,

IPR2016-00712
Patent 8,927,592 B2

115:12–116:9.  Dr. Seth testifies that "hope" and "expectation" are different terms, with "expectation" having a purely legal meaning and "hope" being the word that oncologists prefer.  Ex. 2258, 30:13–31:2.  To Dr. Seth, "hope" and "expectation" are such different concepts that he took issue with the continued use of the term "expectation" in the deposition questions presented to him.  *Id.*; *see also id.* at 41:8–15 (in response to a question about whether a person of ordinary skill in the art "would expect" an increase in survival, responding that the person of ordinary skill in the art "would hope" to see such a result).  Thus, given the evidence of record here, the fact that a person of ordinary skill in the art would have ***hoped*** that the method recited in the proposed claims would increase survival does not support a conclusion that that person also would have ***expected*** such a result.  *See also OSI Pharms., LLC v. Apotex Inc.*, No. 2018-1925, 2019 WL 4892078, at *8 (Fed. Cir. Oct. 4, 2019) ("[H]ope that a potentially promising drug will treat a particular cancer is not enough to create a reasonable expectation of success . . . ."); *Coalition for Affordable Drugs V LLC v. Biogen MA Inc.*, IPR2015-01136, Paper 23, 10–13 (PTAB Sept. 2, 2015) (because "a 'hope' may or may not come to pass," the existence of a hope that a drug "will turn out to be useful for treating [a particular condition]" does not support finding a reasonable expectation of success).

> (2) *Evidence that a Person of Ordinary Skill in the Art Understood that Cabazitaxel Could Control mCRPC*

There is some evidence in the record that treatment with cabazitaxel could control mCRPC, but the parties disagree about whether an expectation that the recited treatment method would control cancer would have given rise to an expectation that the same method would have increased survival.

For example, Petitioner directs us to evidence that Mita demonstrated a six-month period of progression-free survival. Pet. Remand Reply 3 (citing Paper 84, 2–3 (citing Ex. 1012, 727)). [17] Petitioner also directs us to evidence that Pivot taught a median overall survival of docetaxel-resistant metastatic breast cancer patients of 12.3 months. *Id.* (citing Ex. 1010, 1547). Petitioner argues that "controlling mCRPC long enough increases survival," so the demonstration of disease control in the prior art means that a person of ordinary skill in the art would have expected an increase in survival with cabazitaxel treatment. *Id.* Patent Owner disagrees, arguing that an expectation of anti-cancer activity does not necessarily give rise to an expectation of an increase in survival. PO Remand Br. 6–9.

We agree with Patent Owner. There is significant evidence of record that the indications of disease control in Mita were known by those of ordinary skill in the art not to correlate with increased survival. In Mita, the anti-cancer response in the patient showing the six-month progression-free survival to which Petitioner refers was shown by a drop in the level of prostate-specific antigen (PSA) and a partial radiologic response. Ex. 1012, 725, 727. Dr. Sartor testifies that "it was well known . . . that PSA reductions were of questionable value, not necessarily indicative of the efficacy of a treatment, and may not reflect disease progression with certain agents." Ex. 2176 ¶ 80. This testimony is supported by multiple pieces of documentary evidence in the record. Ex. 1013, 1507, Table 3 (PSA level improvements did not correlate with overall survival improvements); Ex. 2006, 673 ("it is worthwhile to consider the limitations of the PSA

---

[17] We remind Petitioner that our rules do not permit this type of incorporation by reference. 37 C.F.R. § 42.6.

IPR2016-00712
Patent 8,927,592 B2

response as a predictor of a survival benefit"); Ex. 2020, 217 (noting that
PSA levels can fluctuate due to factors other than anti-cancer effect);
Ex. 2030, 307 ("the only validated phase III endpoint in advanced prostate
cancer, particularly CRPC, is overall survival"); Ex. 2111, 10–11 (reporting
no increase in overall survival despite significant incidence of PSA
reductions over 50%); Ex. 2126, 3944 ("surrogacy for any PSA-based
endpoint could not be demonstrated").

    As for the overall survival shown in Pivot, the evidence of record does
not support a finding that a median overall survival of docetaxel-resistant
metastatic breast cancer patients of 12.3 months would have been interpreted
as an increase in survival.  First, Pivot did not report the overall survival for
a control group or any other group whose results could be compared with the
12.3-month result.  Ex. 1010, 1547–52.  Accordingly, there is no way to
determine from Pivot itself whether the overall survival reported in Pivot
represented an increase, a decrease, or no significant change in overall
survival.  Petitioner argues that Dr. Sartor's testimony that he would
attribute success to cabazitaxel if it caused a patient to live for nine months
means that the 12.3-month overall survival reported in Pivot must have
represented an increase in survival.  Paper 84 ¶ 4 (citing Ex. 1098, 400:4–
401:24).  But Dr. Sartor's testimony expressly referred to how he would
view a nine-month survival at the time of his testimony in 2017, not how he
would have done so on the effective filing date of the '592 patent.  Ex. 1098,
399:25–401:24.  Accordingly, this testimony says nothing about whether a
person of ordinary skill in the art would have interpreted Pivot's results in
such a way as to expect increased survival.

IPR2016-00712
Patent 8,927,592 B2

*(3) Evidence of Skepticism Regarding the TROPIC Study*

Given all this evidence that a person of ordinary skill in the art would have hoped that the TROPIC study would show an increase in survival but would not have expected such a result, we credit Dr. Sartor's testimony that "it was a challenge to get the [TROPIC] study off the ground" because "some thought there was insufficient data with cabazitaxel in prostate cancer to safely move forward with a phase III study." Ex. 2176 ¶ 93. We also credit Dr. Sartor's testimony that, when the results of the TROPIC study ultimately were announced, "[p]ractitioners who had been aware of the existence of the study were surprised by the results." *Id.* ¶ 187.

d. Conclusion

We have weighed all the evidence discussed above, and we find that the preponderance of evidence of record does not show that, at the time of the effective filing date of the '592 patent, a person of ordinary skill in the art reasonably would have expected the treatment regimen recited in the proposed claims to have resulted in an increase in patient survival. Accordingly, we conclude that the evidence of record does not establish the obviousness of the proposed claims on any ground.

*D. Asserted Anticipation of Proposed Claims*

Petitioner argues that "[c]laims 31–34 are anticipated under 35 U.S.C. § 102(b) by the public use of the claimed methods in the TROPIC Study." MTA Opp. 21–22. Patent Owner argues, *inter alia*, that the invention of the proposed claims was not subject to the public-use bar at the time of the TROPIC study because "there is no evidence indicating that anyone

IPR2016-00712
Patent 8,927,592 B2

involved with TROPIC (including the inventor) had determined that the claimed methods would work for their intended purpose." MTA Reply 12.

The public-use bar under 35 U.S.C. § 102(b)[18] acts as a bar to patentability when the invention was in public use more than one year before the date of the patent application and was ready for patenting. *Invitrogen Corp. v. Biocrest Mfg. L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). An invention is ready for patenting if either of two conditions applies: the invention has been reduced to practice or "the inventor ha[s] prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68 (1998).

Petitioner asserts that the invention of the proposed claims "was 'ready for patenting' before 2009," but Petitioner does not develop this argument or cite any evidence to support it. MTA Opp. 22. Nevertheless, we have considered whether the evidence of record supports a finding that the invention of the proposed claims was "ready for patenting" at the time of the TROPIC study. We determine that it does not.

Proof of readiness for patenting due to reduction to practice requires proof that the inventor had "determined that the invention would work for its intended purpose." *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008) (quoting *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007)). As discussed extensively above, the purpose of the

---

[18] The '592 patent cites a filing date of April 26, 2012, and it claims priority to applications filed as early as 2009. Ex. 1001, at [22], [60], [63]. Regardless of which of these is the effective filing date of the '592 patent, no date later than April 26, 2012, is possible. Accordingly, the pre-AIA version of 35 U.S.C. § 102 applies to the '592 patent.

IPR2016-00712
Patent 8,927,592 B2

TROPIC study was to determine whether treatment of mCRPC with cabazitaxel would increase survival. *See, e.g.*, Ex. 2182, 2 ("The aim of this study is to determine whether [cabazitaxel] in combination with prednisone improves overall survival . . ."). The existence of a phase III study to determine whether the claimed treatment method would achieve the intended purpose is strong evidence that the inventor had not yet determined that the invention would work for its intended purpose. *Omeprazole*, 536 F.3d at 1373–74. In the absence of any relevant evidence to the contrary cited by Petitioner, we find that the invention recited in the proposed claims had not yet been reduced to practice at the time of the TROPIC study.

This leaves the issue of whether the claimed invention was ready for patenting by virtue of "the inventor ha[ving] prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68. Neither party directs us to any evidence regarding this issue. MTA Opp. 22; MTA Reply 12. Further, we cannot find any evidence supporting a finding that, at the time of the TROPIC study itself, there was any description of the invention recited in the proposed claims that included the premedication steps. Petitioner relies solely on De Bono[19] for details regarding the practice followed in the TROPIC study, including the use of a premedication regimen comprising "an antihistamine, corticosteroid, . . . and histamine H2-antagonist." MTA Opp. 21 (quoting Ex. 2055, 1150). But De Bono was not published until after the TROPIC study had been completed. Ex. 2055, 1147

---

[19] Johann Sebastian de Bono et al., *Prednisone plus cabazitaxel or mitoxantrone for metastatic castration-resistant prostate cancer progressing after docetaxel treatment: a randomised open-label trial*, THE LANCET, 376, 1147–54 (Oct. 2, 2010) (Ex. 2055, "De Bono").

IPR2016-00712
Patent 8,927,592 B2

(showing "cutoff for the final analysis" of the TROPIC study as September 25, 2009; showing publication date of October 2, 2010 for De Bono). Accordingly, De Bono was not a "description[] of the invention that [was] sufficiently specific to enable a person skilled in the art to practice the invention," *Pfaff*, 525 U.S. at 67–68, at the time of the TROPIC study, the alleged public use of the claimed invention. As for documents in the record available at the time of the TROPIC study, Winquist, the TROPIC listing, and the patient consent form all lack any disclosure of the premedication steps recited in the proposed claims. Ex. 1008, 1–3; Ex. 1009, 3948; Ex. 2182, 1–8. Because the evidence of record does not support a finding that, at the time of the alleged public use, either (1) the invention of the proposed claims had been reduced to practice or (2) that "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention," *Pfaff*, 525 U.S. at 67–68, we find that the invention was not ready for patenting. Accordingly, the TROPIC study did not constitute a public-use bar to the proposed claims under 35 U.S.C. § 102(b).

### E. Asserted Lack of Patent-Eligible Subject Matter

Petitioner argues that the proposed claims "are directed to a non-patent eligible mental process: intending to increase survival of a patient while administering a prior art method." Pet. Remand Br. 25. Patent Owner disagrees, arguing that the proposed claims "are directed to a specific method of treatment for specific patients using a specific compound at specific doses to achieve a specific outcome." PO Remand Br. 25.

IPR2016-00712
Patent 8,927,592 B2

### 1. *Principles of Law*

Section 101 defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. But courts have long held that laws of nature, natural phenomena, and abstract ideas are not patentable. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70–71 (2012) (citing *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). These ineligible concepts are implicit exceptions to the statutory categories. *Id.* at 71.

The Supreme Court articulated a two-step subject-matter eligibility test in *Mayo* and *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014). *Alice/Mayo* step one asks whether a claim is "directed to" a judicial exception. *Alice*, 573 U.S. at 217. In *Alice/Mayo* step two, we consider "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 79, 78). Step two is described as a search for an "inventive concept." *Id.*

The USPTO has published guidance on patent subject-matter eligibility. 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (USPTO Jan. 7, 2019) ("Guidance"). Step 1 of the USPTO's eligibility analysis asks whether the claimed subject matter falls within the four statutory categories of invention. *Id.* at 53–54. Under Step 2A, Prong One, of the Guidance, we determine if the claim recites a judicial exception, including particular groupings of abstract ideas (i.e., mathematical concepts, certain methods of organizing human activity, or mental processes). *Id.* at 52–53. If so, we then analyze the claim to

26

IPR2016-00712
Patent 8,927,592 B2

determine whether the recited judicial exception is integrated into a practical application of that exception under Step 2A, Prong Two, of the Guidance. *Id.* at 53–55.  Only if we conclude that the judicial exception is not integrated into a practical application do we conclude that the claim is directed to the judicial exception.  In that case, we proceed to Step 2B and look to whether the claim adds a specific limitation beyond the judicial exception that is not "well-understood, routine, conventional activity in the field," or whether the claim simply appends well-understood, routine, conventional activities previously known to the industry, specified at a high level of generality, to the judicial exception.  *Id.* at 56.

### 2. *USPTO Step 1*

There are four categories of subject matter that Congress has deemed appropriate for patenting: processes, machines, manufactures, and compositions of matter.  35 U.S.C. § 101.  These "four categories together describe the exclusive reach of patentable subject matter.  If a claim covers material not found in any of the four statutory categories, that claim falls outside the plainly expressed scope of § 101 even if the subject matter is otherwise new and useful."  *In re Nuijten*, 500 F.3d 1346, 1354 (Fed. Cir. 2007).

Here, claim 31 recites the process step of administering a particular premedication regimen, followed by the process step of administering a particular drug treatment regimen, to a particular type of patient with the intended purpose of increasing survival.  MTA 27.  Claims 32–34 further restrict the process of claim 31 by narrowing the range of allowable doses or requiring a particular schedule for the repetition of claim 31's process steps. *Id.* at 27–28.  Accordingly, each of the proposed claims recites a process,

IPR2016-00712
Patent 8,927,592 B2

which is "a mode of treatment of certain materials to produce a given result." *Gottschalk v. Benson*, 409 U.S. 63, 70 (1972).

### 3.    USPTO Step 2A, Prong One

Having determined that the proposed claims fall within the four categories of § 101, we next must analyze whether the proposed claims recite a judicial exception to those four categories.  Guidance, 84 Fed. Reg. at 51.  The Guidance organizes the abstract-idea exception into the following subject-matter groupings: mathematical concepts, certain methods of organizing human activity (e.g., a fundamental economic practice), and mental processes.  *Id.* at 52.  The grouping of mental processes includes "concepts performed in the human mind (including an observation, evaluation, judgment, [or] opinion)."  *Id.*

Claim 31 recites the limitation "[a] method of increasing survival," which the Federal Circuit has instructed us to interpret as "requir[ing] 'increasing survival'" as the "intentional purpose . . . for which the [recited] method must be performed."  *Sanofi*, 757 F. App'x at 993–94; MTA 27.  Petitioner argues that this limitation recites a method step that is a "purely mental" abstract idea.  Pet. Remand Br. 25.

For the purpose of this analysis, we agree.  As the state of mind that must be adopted during the performance of the other steps of the claimed process, the "intentional purpose" limitation is in some sense a process step.  And it certainly is "performed in the human mind," as the step of possessing a particular intentional purpose is incapable of being performed in any other way.  Accordingly, under Step 2A, Prong One, we find that claim 31 recites an abstract idea: a mental process.  Because claims 32–34 incorporate the limitations of claim 31, 37 C.F.R. § 1.75(c), they also recite an abstract idea.

IPR2016-00712
Patent 8,927,592 B2

### 4. USPTO Step 2A, Prong Two

Reciting an abstract idea, however, is not the same as being directed to an abstract idea. The difference between the two concepts is that claims that recite an abstract idea but integrate it into a practical application are not directed to an abstract idea. Guidance, 84 Fed. Reg. at 53–55. Thus, having found that the claims recite a mental process, which is a type of abstract idea, we must proceed to determine whether the claims integrate that process into a practical application.

Claim 31 recites a method in which a patient with "castration resistant or hormone refractory, metastatic prostate cancer that has progressed during or after treatment with docetaxel" is treated by first administering a particular premedication regimen (comprising "(i) an antihistamine, (ii) a corticoid, [and] (iii) an $H_2$ antagonist"), then administering "a dose of 20 to 25 $mg/m^2$ of cabazitaxel, or a hydrate or solvate thereof, . . . in combination with prednisone or prednisolone." MTA 27. These limitations, taken as a whole, integrate the mental process step of possessing a particular intended purpose (increasing survival) into an overall method of treatment. When a claim integrates a mental process step into a method of treatment, that claim is not directed to an abstract idea. *Vanda Pharms. Inc. v. West-Ward Pharms.*, 887 F.3d 1117, 1134 (Fed. Cir. 2018) (finding that a claim reciting the mental process step of "determining whether the patient is a CYP2D6 poor metabolizer" was nonetheless "directed to a method of using iloperidone to treat schizophrenia"). Accordingly, we find that claim 31 is not directed to the abstract idea that it recites. Because claims 32–34 further limit the process of claim 31, the same is true of those claims.

IPR2016-00712
Patent 8,927,592 B2

None of the proposed claims is directed to a judicial exception to the four categories of § 101, and all of the proposed claims fall within the four categories of § 101. Accordingly, there is no need for us to proceed to determine whether any claim adds a specific limitation beyond the judicial exception that is not "well-understood, routine, conventional activity in the field." We conclude that the proposed claims are not ineligible subject matter.

## CONCLUSION

For the reasons given in the earlier Final Written Decision, we determine Petitioner has shown by a preponderance of the evidence that claims 1–5 and 7–30 of the '592 patent are unpatentable, and we deny the parties' motions to exclude evidence.

For the reasons given above, we determine that the evidence of record does not prove that proposed substitute claims 31–34 are unpatentable. Therefore, we grant Patent Owner's Contingent Motion to Amend claims 27–30 by replacing them with proposed substitute claims 31–34.

| Reference(s) | Basis | Claims | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Winquist, TROPIC Listing, Attard, and Beardsley | § 103 | 1, 2, 5, 12, 13, 17–20, 22–25, 27–29 | 1, 2, 5, 12, 13, 17–20, 22–25, 27–29 | |
| Winquist, TROPIC Listing, and Didier | § 103 | 3, 4 | 3, 4 | |
| Winquist, TROPIC Listing, and Mita | § 103 | 7–9 | 7–9 | |

IPR2016-00712
Patent 8,927,592 B2

| Reference(s) | Basis | Claims | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Winquist, TROPIC Listing, and Tannock | § 103 | 10, 11, 14, 16 | 10, 11, 14, 16 | |
| Winquist, TROPIC Listing, and Pivot | § 103 | 21, 26, 30 | 21, 26, 30 | |
| Winquist, TROPIC Listing, Pivot, and Tannock | § 103 | 15 | 15 | |

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | 27–30 |
| Substitute Claims Proposed in the Amendment | 31–34 |
| Substitute Claims: Motion to Amend Granted | 31–34 |
| Substitute Claims: Motion to Amend Denied | |
| Substitute Claims: Not Reached | |

ORDER

It is hereby

ORDERED that Petitioner has proven by a preponderance of the evidence that claims 1–5 and 7–30 of U.S. Patent No. 8,927,592 B2 are unpatentable;

FURTHER ORDERED that proposed substitute claims 31–34 have not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Contingent Motion to Amend claims 27–30 by replacing them with proposed substitute claims 31–34 is granted;

IPR2016-00712
Patent 8,927,592 B2

FURTHER ORDERED that, pursuant to 35 U.S.C. § 318(b), upon expiration of the time for appeal of this decision, or the termination of any such appeal, a certificate shall issue canceling claims 1–5 and 7–30 of U.S. Patent No. 8,927,592 B2 and adding proposed claims 31–34; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2016-00712
Patent 8,927,592 B2

PETITIONER:

Steven W. Parmelee
Michael T. Rosato
Jad A. Mills
Wendy Devine
Matthew Reed
Nellie Amjadi
WILSON SONSINI GOODRICH & ROSATI
sparmelee@wsgr.com
mrosato@wsgr.com
jmills@wsgr.com
wdevine@wsgr.com
mreed@wsgr.com
namjadi@wsgr.com


PATENT OWNER:

Daniel J. Minion
Dominick A. Conde
VENABLE LLP
DMinion@Venable.com
DConde@Venable.com

# EXHIBIT P

Case 1:20-cv-00804-RGA   Document 268-1   Filed 04/15/22   Page 675 of 764 PageID #: 4956

*The* NEW ENGLAND JOURNAL *of* MEDICINE

> ## ORIGINAL ARTICLE

# Docetaxel plus Prednisone or Mitoxantrone plus Prednisone for Advanced Prostate Cancer

Ian F. Tannock, M.D., Ph.D., Ronald de Wit, M.D., William R. Berry, M.D.,
Jozsef Horti, M.D., Anna Pluzanska, M.D., Kim N. Chi, M.D.,
Stephane Oudard, M.D., Christine Théodore, M.D.,
Nicholas D. James, M.D., Ph.D., Ingela Turesson, M.D., Ph.D.,
Mark A. Rosenthal, M.D., Ph.D., and Mario A. Eisenberger, M.D.,
for the TAX 327 Investigators

### ABSTRACT

From the Department of Medical Oncology
and Hematology, Princess Margaret Hos-
pital and University of Toronto, Toronto
(I.F.T.); the Department of Medical Oncol-
ogy, Erasmus University Medical Centre,
Rotterdam, the Netherlands (R.W.); Raleigh
Hematology Oncology Associates, Cary,
N.C. (W.R.B.); the Department of Chemo-
therapy and Clinical Pharmacology, Nation-
al Institute of Oncology, Budapest, Hunga-
ry (J.H.); the Department of Chemotherapy,
Medical University, Lodz, Poland (A.P.);
BC Cancer Agency, Vancouver, B.C., Cana-
da (K.N.C.); Hôpital Européen Georges
Pompidou, Paris (S.O.); Institut Gustav
Roussy, Villejuif, France (C.T.); Cancer Re-
search UK Institute for Cancer Studies, Bir-
mingham, United Kingdom (N.D.J.); the
Section of Oncology, Uppsala University
Hospital, Uppsala, Sweden (I.T.); Cancer
Trials Australia, Victoria, Australia (M.A.R.);
and the Sydney Kimmel Comprehensive
Cancer Center, Johns Hopkins University,
Baltimore (M.A.E.). Address reprint re-
quests to Dr. Tannock at the Department
of Medical Oncology and Hematology,
Princess Margaret Hospital, 610 Universi-
ty Ave., Toronto, ON M5G 2M9, Canada,
or at ian.tannock@uhn.on.ca.

N Engl J Med 2004;351:1502-12.
*Copyright © 2004 Massachusetts Medical Society.*

**BACKGROUND**

Mitoxantrone plus prednisone reduces pain and improves the quality of life in men
with advanced, hormone-refractory prostate cancer, but it does not improve survival.
We compared such treatment with docetaxel plus prednisone in men with this disease.

**METHODS**

From March 2000 through June 2002, 1006 men with metastatic hormone-refractory
prostate cancer received 5 mg of prednisone twice daily and were randomly assigned to
receive 12 mg of mitoxantrone per square meter of body-surface area every three weeks,
75 mg of docetaxel per square meter every three weeks, or 30 mg of docetaxel per square
meter weekly for five of every six weeks. The primary end point was overall survival.
Secondary end points were pain, prostate-specific antigen (PSA) levels, and the quality
of life. All statistical comparisons were against mitoxantrone.

**RESULTS**

As compared with the men in the mitoxantrone group, men in the group given doce-
taxel every three weeks had a hazard ratio for death of 0.76 (95 percent confidence in-
terval, 0.62 to 0.94; P=0.009 by the stratified log-rank test) and those given weekly
docetaxel had a hazard ratio for death of 0.91 (95 percent confidence interval, 0.75 to
1.11; P=0.36). The median survival was 16.5 months in the mitoxantrone group, 18.9
months in the group given docetaxel every 3 weeks, and 17.4 months in the group giv-
en weekly docetaxel. Among these three groups, 32 percent, 45 percent, and 48 percent
of men, respectively, had at least a 50 percent decrease in the serum PSA level (P<0.001
for both comparisons with mitoxantrone); 22 percent, 35 percent (P=0.01), and 31
percent (P=0.08) had predefined reductions in pain; and 13 percent, 22 percent
(P=0.009), and 23 percent (P=0.005) had improvements in the quality of life. Adverse
events were also more common in the groups that received docetaxel.

**CONCLUSIONS**

When given with prednisone, treatment with docetaxel every three weeks led to superi-
or survival and improved rates of response in terms of pain, serum PSA level, and qual-
ity of life, as compared with mitoxantrone plus prednisone.

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.                     MYLAN - EXHIBIT 1013

Prostate cancer is the most common cancer among men, with approximately 220,000 cases and 29,000 deaths annually in the United States.[1] About 10 to 20 percent of men with prostate cancer present with metastatic disease, and in many others, metastases develop despite treatment with surgery or radiotherapy.

Treatment of metastatic prostate cancer is palliative. In about 80 percent of men, primary androgen ablation leads to symptomatic improvement and a reduction in serum levels of prostate-specific antigen (PSA), but in all patients the disease eventually becomes refractory to hormone treatment. The options then include symptomatic care with narcotic analgesics, radiotherapy to dominant sites of bone pain, treatment with bone-seeking isotopes such as strontium-89, and cytotoxic chemotherapy. Bisphosphonates may reduce skeletal complications,[2-4] and low-dose prednisone or hydrocortisone may be palliative in some patients.[5,6]

Chemotherapy can reduce serum PSA levels in patients with hormone-refractory prostate cancer and relieves pain in some patients, but tolerability is of concern, particularly since most patients are elderly and many have other medical problems.[7] A randomized trial showed that mitoxantrone plus low-dose prednisone relieved pain and improved the quality of life more frequently than did prednisone alone.[8,9] Consistent benefits of mitoxantrone plus a corticosteroid were observed in other randomized trials, but none found that this approach improved survival.[10-12] These trials established mitoxantrone plus a corticosteroid as the treatment of reference for hormone-refractory prostate cancer.

Phase 2 studies of the taxane docetaxel have reported PSA responses (defined as a reduction in serum PSA levels of at least 50 percent) in up to 50 percent of patients.[13-16] Studies of docetaxel plus either estramustine or calcitriol have shown PSA responses in up to 80 percent of patients.[17-19] However, outcomes of single-group studies are subject to bias.[20]

We conducted a phase 3 study, the TAX 327 Study, comparing docetaxel (given either every three weeks or weekly) plus daily prednisone with mitoxantrone plus prednisone. The docetaxel regimens were selected on the basis of their dose equivalence (a dose intensity of 25 mg per square meter of body-surface area per week and a maximal cumulative dose of 750 mg per square meter) and their activity and tolerability in phase 2 studies. The primary hypothesis was that treatment with docetaxel plus prednisone would improve overall survival as compared with mitoxantrone plus prednisone.

## METHODS

### PATIENTS

This randomized, nonblinded, phase 3 study involved centers in 24 countries. Eligible patients had histologically or cytologically confirmed adenocarcinoma of the prostate with clinical or radiologic evidence of metastatic disease, had had disease progression during hormonal therapy, and were receiving primary androgen-ablation therapy as maintenance therapy. At least four weeks had to have elapsed between the withdrawal of antiandrogens (six weeks in the case of bicalutamide) and enrollment, so as to avoid the possibility of confounding as a result of the response to antiandrogen withdrawal.[21,22] Another requirement was disease progression, as indicated by increasing serum levels of PSA on three consecutive measurements obtained at least one week apart or findings on physical examination or imaging studies.

Eligible patients had a Karnofsky performance-status score of at least 60 percent, no prior treatment with cytotoxic agents (except estramustine) or radioisotopes, no history of another cancer within the preceding five years (except basal or squamous-cell skin cancer), no brain or leptomeningeal metastases, no symptomatic peripheral neuropathy of grade 2 or higher, and no other serious medical condition. At least four weeks had to have elapsed between prior surgery or radiotherapy (limited to no more than 25 percent of the bone marrow) and enrollment. Prior treatment with corticosteroids was allowed. Normal cardiac function was required. Laboratory criteria for eligibility included a neutrophil count of at least 1500 per cubic millimeter, a hemoglobin level of at least 10.0 g per deciliter, a platelet count of at least 100,000 per cubic millimeter, a total bilirubin level below the upper limit of the normal range for each institution, and serum alanine aminotransferase, aspartate aminotransferase, and creatinine levels that were no more than 1.5 times the upper limit of the normal range.

A clinical history was obtained, and a physical examination, with radiographic imaging, computed tomography, and bone scanning, was performed within 14 days before randomization. Blood tests including measurement of serum PSA, electrocardiography, and an evaluation of the left ventricular ejection fraction by means of a multiple gated

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

acquisition scan or echocardiography were performed. Pain, analgesic intake, and the quality of life were assessed at baseline. Pain was assessed by means of the Present Pain Intensity (PPI) scale from the McGill–Melzack questionnaire, which uses verbal descriptors; scores can range from 0 to 5, with higher scores indicating greater pain.[23] Patients recorded their daily PPI score and analgesic use in a diary. A daily analgesic score was calculated by assigning a score of 4 for a standard dose of a narcotic analgesic (e.g., 10 mg of morphine) and a score of 1 for a standard dose of a nonnarcotic analgesic. Patients were required to have stable levels of pain for at least seven days before randomization, defined by a daily variation of no more than 1 in the PPI score or of no more than 25 percent in the analgesic score. The quality of life was assessed with the Functional Assessment of Cancer Therapy–Prostate (FACT-P) questionnaire; scores on this self-administered questionnaire can range from 0 to 156, with higher scores indicating a better quality of life.[24,25]

All patients provided written informed consent, and the study was approved by all institutional review boards in accordance with the international standards of good clinical practice. An independent data and safety monitoring committee was established.

### RANDOMIZATION AND TREATMENT

Randomization was centralized with the use of a stratified, permuted-block allocation scheme according to the baseline pain level (pain was classified as present, as defined by a median PPI score of at least 2 or a mean analgesic score of at least 10, or as absent, as defined by a median PPI score of less than 2 and a mean analgesic score of less than 10) and the baseline Karnofsky performance-status score (70 percent or less vs. 80 percent or more). Patients who were randomly assigned to the docetaxel groups received either 75 mg of docetaxel (Taxotere, Aventis) per square meter as a 1-hour intravenous infusion on day 1 every 21 days or 30 mg of docetaxel per square meter as a 30-minute intravenous infusion on days 1, 8, 15, 22, and 29 of a 6-week cycle. Patients who were randomly assigned to the standard-therapy group received 12 mg of mitoxantrone (Novantrone, Immunex and Wyeth–Ayerst) per square meter as a 30-minute infusion on day 1 every 21 days. All patients received 5 mg of prednisone (or prednisolone, if prednisone was not available) orally twice daily starting on day 1. Premedication with dexamethasone was required in the docetaxel groups (8 mg given 12 hours, 3 hours, and 1 hour before the docetaxel infusion in the group treated every three weeks and 8 mg given 1 hour before docetaxel in the group treated weekly). Antiemetic medication was prescribed according to local practice.

Up to 10 cycles of treatment were planned for the group given docetaxel every three weeks and the mitoxantrone group and up to 5 cycles (of six weeks each) in the weekly-docetaxel group. Treatment delays of up to two weeks and up to two dose reductions were allowed. Dose reductions were specified for patients who had had grade 4 neutropenia for at least seven days, an infection, or grade 3 or 4 neutropenia with an oral temperature of at least 38.5°C. A dose reduction or treatment delay was also stipulated for patients who had an absolute neutrophil count of less than 1500 per cubic millimeter (for those on three-week schedules) or less than 1000 per cubic millimeter (for those receiving weekly docetaxel) on a treatment day and for those with grade 3 or 4 thrombocytopenia. Treatment with granulocyte colony-stimulating factor was allowed for patients with febrile neutropenia. Systemic corticosteroids (other than dexamethasone and prednisone) and bisphosphonates were not permitted.

### FOLLOW-UP AND OUTCOMES

Physical examinations and baseline blood tests were repeated at three-week intervals. Imaging studies to determine the extent of disease were performed at intervals of six to nine weeks and repeated after four weeks to identify those with a response.

The primary end point was overall survival. Secondary end points were predefined reductions in pain, an improvement in the quality of life, a reduction in serum PSA levels of at least 50 percent, and objective tumor responses.

Patients with a PPI score of at least 2, an analgesic score of at least 10, or both (averaged over the previous week) at baseline were assessed for the pain response at three-week intervals. A pain response was defined as a two-point reduction in the PPI score from baseline without an increase in the analgesic score or as a reduction of at least 50 percent in the analgesic score without an increase in the PPI score, either of which was maintained for at least three weeks. Pain progression was defined as an increase in the PPI score of at least one point from the nadir, an increase from baseline of at least

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

25 percent in the analgesic score, or a requirement for palliative radiotherapy.

Serum PSA was measured every three weeks, and a response (for patients with a baseline PSA level of at least 20 ng per milliliter) was defined as a reduction from baseline of at least 50 percent that was maintained for at least three weeks, whereas PSA progression was defined as an increase from the nadir of either at least 25 percent for men with no PSA response or at least 50 percent for all others. The duration of the PSA response and the pain response was defined as the time between the first and last evaluations at which the response criteria were met. For patients with at least one bidimensionally measurable lesion, tumor response was evaluated with the use of World Health Organization criteria.[26]

The quality of life was assessed with the FACT-P questionnaire at baseline, every three weeks during therapy, and every month after the completion of therapy. All patients who answered the questionnaire at baseline were included in the evaluation, and the FACT-P score was compared with the baseline value for each of these patients. Patients were defined as having a quality-of-life response if they had a 16-point improvement in their FACT-P score, as compared with baseline, on two measurements obtained at least three weeks apart.

Adverse events were classified according to the Common Toxicity Criteria of the National Cancer Institute (version 2). Serious adverse events were fatal or life-threatening, required or prolonged hospitalization, resulted in persistent or substantial disability or incapacity, or were considered important medical events. Treatment was stopped for any of the following reasons: completion of planned treatment, progression of disease, severe adverse events, or withdrawal of consent.

### STATISTICAL ANALYSIS

There were three comparisons of interest between the docetaxel and mitoxantrone groups: docetaxel given every three weeks was compared with mitoxantrone, weekly docetaxel was compared with mitoxantrone, and the combined docetaxel groups were compared with mitoxantrone. The study was designed to detect with 90 percent power a hazard ratio of 0.75 for death in the docetaxel groups as compared with the mitoxantrone group, with a two-sided type I error of 0.05 and with the data analyzed according to the intention to treat. The sample size was established as 1002 patients, and

analysis was planned after 535 deaths had occurred. To allow for multiple comparisons, a P value of 0.04 was considered to indicate statistical significance for the comparison of the combined docetaxel groups with the mitoxantrone group, and a P value of 0.0175 was considered to indicate statistical significance for the comparison of each docetaxel group with the mitoxantrone group (all P values were two-sided), thus ensuring an overall significance level of 0.05.

In the primary analysis, overall survival was analyzed by means of the Kaplan–Meier method, with log-rank comparisons stratified according to the level of pain and the Karnofsky performance-status score. Pain, PSA, tumor, and quality-of-life responses were compared by means of the Cochran–Mantel–Haenszel test. All randomized patients were included in the analysis of survival, and all treated patients were included in the evaluation of adverse effects.

Hazard ratios for death were calculated after adjustment for any chance imbalance in potential prognostic factors between the groups. The following factors were entered into a full stratified Cox proportional-hazards model and a backward selection model in which nonsignificant factors were eliminated sequentially at a P level of 0.10: age (less than 65 years vs. 65 years or older); visceral involvement (yes vs. no); liver involvement (yes vs. no); number of prior hormonal therapies (two or fewer vs. more than two); prior estramustine (yes vs. no); presence of rising serum PSA levels alone, as compared with the presence of other indications of progression; baseline hemoglobin level; and baseline serum level of alkaline phosphatase. One planned interim analysis of safety was conducted after the recruitment of 120 patients. No interim analysis for efficacy was performed.

The study was designed by Dr. Tannock in collaboration with Aventis personnel, and the protocol was finalized after being reviewed by the other study cochairs, Drs. de Wit and Eisenberger. The data were collected and maintained by Aventis, but the cochairs handled all questions regarding the management of the study. Only the data and safety monitoring committee saw the results of the interim safety analysis; no analysis was undertaken nor were the results seen by Aventis, the study cochairs, or any other investigator until the predefined number of events had occurred. The protocol contained a plan for analysis and publication at that time. All data were provided to the cochairs at the comple-

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

tion of the study. Aventis personnel undertook the statistical analysis. The article was drafted by Dr. Tannock and modified after being reviewed by the cochairs and other coauthors. Aventis reviewed the manuscript, but its final content was entirely determined by the investigators.

## RESULTS

### CHARACTERISTICS OF THE PATIENTS AND TREATMENT

A total of 1006 patients underwent randomization from March 2000 through June 2002. The da-

**Table 1. Baseline Characteristics of the Patients.***

| Characteristic | Docetaxel Every 3 Wk | Weekly Docetaxel | Mitoxantrone Every 3 Wk |
|---|---|---|---|
| No. randomized | 335 | 334 | 337 |
| Ineligible (%) | 12 | 12 | 12 |
| Age | | | |
| Median (yr) | 68 | 69 | 68 |
| Range (yr) | 42–92 | 36–92 | 43–86 |
| ≥75 Yr (%) | 20 | 21 | 20 |
| Gleason score (%) | | | |
| ≤7 | 42 | 40 | 42 |
| 8–10 | 31 | 31 | 28 |
| Not available | 26 | 29 | 30 |
| Prior treatment (%) | | | |
| Prostatectomy | 19 | 24 | 21 |
| Radiotherapy | 52 | 44 | 51 |
| Estramustine | 19 | 18 | 20 |
| Hormonal manipulations (%)† | | | |
| 1 | 9 | 8 | 6 |
| 2 | 68 | 72 | 69 |
| >2 | 23 | 21 | 25 |
| Karnofsky performance-status score ≤70% (%) | 13 | 12 | 14 |
| Pain (%)‡ | 45 | 45 | 46 |
| Serum PSA | | | |
| Median (ng/ml) | 114 | 108 | 123 |
| ≥20 ng/ml (%) | 87 | 84 | 89 |
| Extent of disease (%) | | | |
| Bone metastases | 90 | 91 | 92 |
| Visceral disease | 22 | 24 | 22 |
| Measurable lesions | 40 | 39 | 40 |
| Evidence of progression at entry (%)§ | | | |
| Bone scan | 71 | 69 | 69 |
| Increase in measurable lesions | 28 | 30 | 28 |
| Increase in nonmeasurable lesions | 13 | 16 | 15 |
| Increased PSA | 72 | 66 | 68 |

* All patients were included in the intention-to-treat analysis. Because of rounding, not all percentages total 100.
† Hormonal manipulation was defined as bilateral orchiectomy or hormone therapy.
‡ Pain was defined by a score of 2 or more on the Present Pain Intensity scale or an analgesic score of at least 10.
§ Patients may have more than one indication for progression of disease.

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

DOCETAXEL VERSUS MITOXANTRONE FOR PROSTATE CANCER

tabase was locked on August 6, 2003, after the requisite number of deaths, specified in the statistical plan, had occurred.

The baseline characteristics of the patients were well balanced among the three treatment groups (Table 1). The median age was 68 years; about 20 percent of the patients were at least 75 years old. About 45 percent had pain, and about 40 percent had measurable soft-tissue lesions. The most common indicators of disease progression before study entry were an increasing serum PSA level and evidence of an increase in bone metastases on bone scanning.

Only nine patients (1 percent) did not receive chemotherapy and prednisone (Table 2). Patients tended to receive more cycles of the regimen in which docetaxel was given every three weeks than of the regimen in which mitoxantrone was given every three weeks. Most patients received the prescribed doses on schedule, with 8 to 12 percent requiring a dose reduction and 21 to 34 percent requiring at least one chemotherapy infusion to be delayed. Twenty percent of the patients who were randomly assigned to receive mitoxantrone subsequently received docetaxel, and 27 percent of those in the group given docetaxel every three weeks received subsequent mitoxantrone, as did 24 percent of those in the weekly-docetaxel group.

### EFFICACY

The median duration of follow-up was similar among the three groups: 20.8 months in the group given docetaxel every 3 weeks and 20.7 months in the other two groups. There were 166 deaths (50 percent; hazard ratio for death, 0.76; 95 percent confidence interval, 0.62 to 0.94) in the group given docetaxel every three weeks and 190 deaths (57 percent; hazard ratio, 0.91; 95 percent confidence interval, 0.75 to 1.11) in the group given weekly docetaxel, as compared with 201 deaths (60 percent) in the mitoxantrone group. When the two docetaxel groups were combined and compared with the mitoxantrone group, the hazard ratio for death was 0.83 (95 percent confidence interval, 0.70 to 0.99; P=0.04). As compared with the survival rate in the mitoxantrone group, the survival rate was significantly higher (P=0.009) in the group given docetaxel every three weeks but not in the group given weekly docetaxel (P=0.36). The median duration of survival was 18.9 months (95 percent confidence interval, 17.0 to 21.2) in the group given docetaxel every 3 weeks, 17.4 months (95 per-

| Table 2. Treatment.* | | | |
| --- | --- | --- | --- |
| Variable | Docetaxel Every 3 Wk | Weekly Docetaxel | Mitoxantrone Every 3 Wk |
| No. randomized | 335 | 334 | 337 |
| No. treated with chemotherapy | 332 | 330 | 335 |
| No. treated with prednisone | 332 | 330 | 335 |
| No. of cycles | | | |
|   Median | 9.5 | 4 | 5 |
|   Range | 1–11 | 1–6 | 1–11 |
| ≥1 Infusion delayed (%) | 24 | 34 | 21 |
| Dose reduction (%) | 12 | 9 | 8 |
| Major protocol violation (%) | 7 | 8 | 7 |
| Reasons for stopping treatment (%) | | | |
|   Completed treatment | 46 | 35 | 25 |
|   Progression of disease | 38 | 35 | 56 |
|   Adverse event | 11 | 16 | 10 |
|   Withdrawal of consent | 1 | 6 | 3 |
|   Death | 1 | 2 | 2 |
|   Other | 4 | 6 | 5 |
| Crossover to other drug (%) | 27 | 24 | 20 |

\* Percentages relate to the number of patients treated in each group. Because of rounding, not all percentages total 100.



No. at Risk

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Docetaxel every 3 wk | 335 | 296 | 217 | 104 | 37 | 5 |
| Weekly docetaxel | 334 | 297 | 200 | 105 | 29 | 4 |
| Mitoxantrone | 337 | 297 | 192 | 95 | 29 | 3 |

**Figure 1.** Kaplan–Meier Estimates of the Probability of Overall Survival in the Three Groups.

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

**Table 3.** Response to Treatment, as Measured by Decreases in Pain, PSA Level, and Tumor Burden and Improvements in the Quality of Life.*

| Variable | Docetaxel Every 3 Wk | Weekly Docetaxel | Mitoxantrone Every 3 Wk |
|---|---|---|---|
| **Pain†** | | | |
| No. who could be evaluated | 153 | 154 | 157 |
| Response (%) | | | |
|     Rate | 35 | 31 | 22 |
|     95% CI | 27–43 | 24–39 | 16–29 |
|     P value | 0.01 | 0.08 | |
| Duration (mo)‡ | | | |
|     Median | 3.5 | 5.6 | 4.8 |
|     95% CI | 2.4–8.1 | 2.8–6.8 | 4.4–indeterminate |
| **≥50% Reduction in serum PSA** | | | |
| No. who could be evaluated | 291 | 282 | 300 |
| Response (%) | | | |
|     Rate | 45 | 48 | 32 |
|     95% CI | 40–51 | 42–54 | 26–37 |
|     P value | <0.001 | <0.001 | |
| Duration (mo)‡ | | | |
|     Median | 7.7 | 8.2 | 7.8 |
|     95% CI | 7.1–8.6 | 6.3–11.5 | 5.4–10.5 |
| **Tumor response** | | | |
| No. who could be evaluated | 141 | 134 | 137 |
| Response (%) | | | |
|     Rate | 12 | 8 | 7 |
|     95% CI | 7–19 | 4–14 | 3–12 |
|     P value | 0.11 | 0.59 | |
| **Quality of life** | | | |
| No. who could be evaluated | 278 | 270 | 267 |
| Response (%)§ | | | |
|     Rate | 22 | 23 | 13 |
|     95% CI | 17–27 | 18–28 | 9–18 |
|     P value | 0.009 | 0.005 | |

\* P values are for comparisons with the mitoxantrone group. CI denotes confidence interval.

† A pain response was defined as a two-point reduction in the Present Pain Intensity (PPI) score without an increase in the analgesic score or a reduction of at least 50 percent in the analgesic score without an increase in the PPI score, which was maintained for at least three weeks.

‡ Data on 54 percent and 63 percent of patients were censored in the Kaplan–Meier analysis of the median duration of pain and PSA response, respectively. The chief reason for data censoring was further antitumor therapy after progression of disease as defined by other criteria.

§ A response was defined by a 16-point improvement from baseline in the Functional Assessment of Cancer Therapy–Prostate (FACT-P) score on two measurements obtained at least three weeks apart.

cent confidence interval, 15.7 to 19.0) in the group given weekly docetaxel, and 16.5 months (95 percent confidence interval, 14.4 to 18.6) in the mitoxantrone group. Kaplan–Meier survival curves for the three groups are shown in Figure 1.

The result of the sensitivity analysis, in which survival was adjusted for possible imbalances in potential prognostic factors, was consistent with the primary result. The hazard ratio for death in the group given docetaxel every three weeks, as compared with the mitoxantrone group, was 0.76 without adjustment and 0.74 and 0.75 after adjustment in the full stratified and backward Cox proportional-hazards models, respectively. As expected, visceral involvement, a high baseline alkaline phosphatase level, and a low hemoglobin level were negative prognostic factors in the multivariate models, whereas a rising serum PSA as the sole indicator of progression was a favorable factor. Post hoc analysis indicated that a high Gleason score (8, 9, or 10) was an adverse prognostic factor for survival. The survival benefit of docetaxel given every three weeks was consistent across subgroups defined according to the presence or absence of pain at baseline, the Karnofsky performance-status score (70 percent or less vs. 80 percent or more), and age (younger than 65 years vs. 65 years or older) (data not shown).

A reduction in pain was more frequent among patients receiving docetaxel every three weeks than among those treated with mitoxantrone (35 percent vs. 22 percent, P=0.01) (Table 3), but the percentage of patients with reduced pain in the weekly docetaxel group (31 percent) did not differ significantly from that of the mitoxantrone group. The median duration of reduced pain was 3.5 to 5.6 months and did not differ significantly among the groups.

Rates of PSA response were significantly higher in the docetaxel groups (45 percent in the group given docetaxel every three weeks and 48 percent in the group given weekly docetaxel, P<0.001 for both comparisons) than in the mitoxantrone group (32 percent) (Table 3). The median duration of the PSA response ranged from 7.7 to 8.2 months and did not differ significantly among the three groups.

Although patients with measurable soft-tissue lesions who received docetaxel every three weeks had a somewhat higher rate of tumor response than such patients who received mitoxantrone every three weeks (12 percent vs. 7 percent, P=0.11), this difference was not significant (Table 3).

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

DOCETAXEL VERSUS MITOXANTRONE FOR PROSTATE CANCER

## ADVERSE EVENTS

The incidence of grade 3 and 4 neutropenia was relatively low, and febrile neutropenia was rare (Table 4). Two patients died from sepsis during treatment, one in the docetaxel group and one in the mitoxantrone group. There was a higher incidence of cardiac events among patients who received mitoxantrone (Table 4). Most other types of adverse events were more frequent among patients receiving docetaxel, and there was no trend toward a lower frequency with weekly docetaxel than with docetaxel given every three weeks. Low-grade adverse events that occurred in at least 15 percent of patients in one of the groups included fatigue, nausea or vomiting or both, alopecia, diarrhea, nail changes, sensory neuropathy, anorexia, changes in taste, stomatitis, dyspnea, tearing, peripheral edema, and epistaxis (Table 4). More patients in the docetaxel groups than in the mitoxantrone group had at least one serious adverse event, with rates of 26 percent among those in the group given docetaxel every three weeks, 29 percent among those given weekly docetaxel, and 20 percent among those given mitoxantrone. Five deaths were probably related to treatment, three of them in the mitoxantrone group.

More patients in the mitoxantrone group stopped treatment because of disease progression than was the case in the docetaxel groups, and more stopped treatment because of completion of treatment or adverse events in the docetaxel groups (Table 2). Adverse events that led to the discontinuation of treatment included fatigue, musculoskeletal or nail changes, sensory neuropathy, and infection in the docetaxel groups and cardiac dysfunction in the mitoxantrone group.

## QUALITY OF LIFE

The quality of life was evaluated in 815 patients, a group that made up the intention-to-treat population from countries in which a local translation of the FACT-P was available (Table 3). The percentage of patients who had an improvement in the quality of life was similar in the two docetaxel groups (22 percent in the group given docetaxel every three weeks and 23 percent in the group given weekly docetaxel) and significantly higher than that in the mitoxantrone group (13 percent; P=0.009 and P=0.005, respectively). Figure 2 shows the greatest changes in the scores and the median changes in the scores for individual domains of the FACT-P during treatment. The greatest benefit in the docetaxel groups was in the subscale representing

prostate-specific concerns (including weight loss, appetite, pain, physical comfort, and bowel and genitourinary function).

**Table 4.** Adverse Events of Any Grade, or of Grade 3 or 4, That Occurred or Worsened during Treatment.

| Adverse Event | Docetaxel Every 3 Wk (N=332) | Weekly Docetaxel (N=330) | Mitoxantrone Every 3 Wk (N=335) |
|---|---|---|---|
| | *percent* | | |
| Grade 3 or 4 anemia | 5 | 5 | 2 |
| Grade 3 or 4 thrombocytopenia | 1 | 0 | 1 |
| Grade 3 or 4 neutropenia | 32* | 2† | 22 |
| Febrile neutropenia | 3 | 0 | 2 |
| Impaired LVEF‡ | 10† | 8† | 22 |
| Major decrease | 1† | 2* | 7 |
| Fatigue | 53† | 49† | 35 |
| Grade 3 or 4 | 5 | 5 | 5 |
| Alopecia | 65† | 50† | 13 |
| Nausea, vomiting, or both | 42 | 41 | 38 |
| Diarrhea | 32† | 34† | 10 |
| Nail changes | 30† | 37† | 7 |
| Sensory neuropathy | 30† | 24† | 7 |
| Anorexia | 17 | 21* | 14 |
| Change in taste | 18† | 24† | 7 |
| Stomatitis | 20† | 17† | 8 |
| Myalgia | 14 | 14 | 13 |
| Dyspnea | 15* | 14† | 9 |
| Tearing | 10† | 21† | 1 |
| Peripheral edema | 19† | 12† | 1 |
| Epistaxis | 6 | 17† | 2 |
| ≥1 Serious adverse event | 26 | 29 | 20 |
| Treatment-related death | 0.3 | 0.3 | 1 |

* P≤0.05 by Fisher's exact test for the comparison with the mitoxantrone group.

† P≤0.0015 by Fisher's exact test for the comparison with the mitoxantrone group. A Bonferroni adjustment for multiplicity was used to obtain the nominal significance level of 0.0015 (approximately 0.05÷34), on the basis of two tests being carried out on the 17 adverse events, with at least 20 events in at least one of the three treatment groups.

‡ A major decrease in the left ventricular ejection fraction (LVEF) was defined as a decrease of at least 10 percent in the absolute value to below the lower limit of the normal range.

## DISCUSSION

In this phase 3 study, two schedules of docetaxel administered with prednisone were compared with mitoxantrone plus prednisone, the standard chemotherapy for hormone-refractory prostate cancer. The median overall survival was higher for the group that received docetaxel every three weeks

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 2.** Greatest Change and Median Change from Baseline in Normalized Scores on the Functional Assessment of Cancer Therapy–Prostate Questionnaire for Individual Domains of the Quality of Life during Treatment.

than for the mitoxantrone group, but not for the group that received weekly docetaxel. These differences were not influenced by adjustment for potential prognostic factors, and there were consistent trends in survival in the intention-to-treat population and in various subgroups. Overall, as compared with the mitoxantrone group, the docetaxel groups had better pain control and quality of life and more frequent PSA responses, but at the cost of a higher incidence of adverse effects.

The characteristics of the patients in this study are typical of those seen in oncology practices. Most patients were elderly and had received at least two types of hormonal manipulation. Most had bone metastases and a high serum PSA level, and about half had substantial pain. All these patients had a short life expectancy. Four published phase 3 studies have evaluated mitoxantrone plus prednisone for hormone-refractory prostate cancer.[9-12] In our study, patients in the mitoxantrone group had a PSA response rate of 32 percent and a rate of pre-

defined reduction in pain of 22 percent. In prior studies of symptomatic patients alone, mitoxantrone plus prednisone resulted in PSA response rates of 34 percent[9] and 29 percent,[12] whereas one study of asymptomatic patients reported a 48 percent response rate.[10] Rates of reduction in pain of 38 percent[9] and 39 percent[12] have been reported, but these studies used less strict response criteria than we did. The median survival among patients in the mitoxantrone group in our study was 16.5 months, as compared with 10 to 12.5 months in the Canadian and Cancer and Leukemia Group B studies[9,11,12] and 21 months in a study of asymptomatic patients.[10] Mitoxantrone plus prednisone remains an appropriate treatment for patients with hormone-refractory prostate cancer who might be susceptible to the toxic effects of docetaxel. However, treatment with mitoxantrone plus a corticosteroid has not improved survival over that afforded by a corticosteroid alone.[9-11]

Previous experience with docetaxel in the treat-

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

DOCETAXEL VERSUS MITOXANTRONE FOR PROSTATE CANCER

ment of hormone-refractory prostate cancer is limited to phase 2 studies. The PSA response ranged from 38 to 46 percent for docetaxel alone[13-16] and up to 80 percent for docetaxel combined with estramustine or calcitriol.[17-19] The rate of objective reduction in pain after treatment with docetaxel alone was 48 percent in the only study that evaluated pain.[13] In our study, the rates of PSA response were 45 percent in the group given docetaxel every three weeks and 48 percent in the group given weekly docetaxel, and the respective rates of pre-defined (and stringent) reductions in pain were 35 percent and 31 percent, all of which, except for the response of pain in the weekly-docetaxel group, were significantly higher than the rates in the mitoxantrone group. More important, we found a significant improvement in overall survival for docetaxel as compared with mitoxantrone. A similar improvement in survival for docetaxel plus estramustine in comparison with mitoxantrone plus prednisone was found in a phase 3 study by the Southwest Oncology Group that is reported in this issue of the *Journal*.[27]

Safe use of docetaxel requires premedication with dexamethasone. Since the docetaxel group received about twice the dose of corticosteroids that the mitoxantrone group received, the better results in the docetaxel group may have been due in part to the higher dose of corticosteroids.[5,6,9-11] This seems unlikely because with prednisone or hydrocortisone alone, the rate of PSA response in large phase 3 studies was in the range of 16 to 24 percent and was generally transient.[5,9-11,28] In symptomatic patients, prednisone or hydrocortisone treatment was inferior to chemotherapy plus corticosteroid in reducing pain and other symptoms.[9,10,28] Intensive treatment with dexamethasone was reported to have no effect on hormone-refractory prostate cancer in one small study.[29]

Serious adverse events occurred among 26 percent of patients in the group given docetaxel every three weeks and 29 percent of the group given weekly docetaxel, as compared with 20 percent in the mitoxantrone group. However, hematologic events were rare in all three groups, and most patients received the prescribed doses of the assigned drug on schedule. Although neutropenia was most common in the group given docetaxel every three weeks, infection was rare. There was a higher incidence of cardiotoxicity in the mitoxantrone group, but it was rarely of clinical importance. Most adverse events associated with docetaxel were of low grade and were bothersome rather than life-threatening; loss of sensation in the fingers and toes proved particularly annoying to some patients.

We designed this study to include a schedule with lower doses of docetaxel given weekly to assess whether a weekly regimen was better tolerated than treatment every three weeks. We found no evidence of a lower rate of adverse events or improved outcomes with the weekly schedule. Treatments given at intervals of three weeks are more convenient for most patients and we think should remain the standard with docetaxel.

Significantly more patients satisfied the stringent criterion of a 16-point improvement from baseline in the total FACT-P score in the docetaxel groups (22 percent in the group given docetaxel every three weeks and 23 percent in the weekly docetaxel group) than in the mitoxantrone group (13 percent). This result suggests that docetaxel has superior palliative effects despite the increase in toxicity. It is likely that the improvement in the quality of life would have been greater if our study had been restricted to symptomatic patients. Overall, the aspects of the quality of life that are assessed by the FACT-P questionnaire were maintained or improved during treatment, with the greatest benefit occurring for prostate-cancer–specific concerns.

Our findings provide evidence that cytotoxic chemotherapy can significantly prolong survival among men with hormone-refractory prostate cancer. Our data suggest that docetaxel plus prednisone is the preferred option for most patients with hormone-refractory prostate cancer.

Supported by Aventis.

We are indebted to the men who participated in this study; to the study contributors; to investigators who recruited patients, including D. Campos (Argentina); H. Gurney and M. Stockler (Australia); M. Rauchenwald (Austria); T. Gil, Y. Humblet, and A. van Oosterom (Belgium); D. Herchenhorn (Brazil); S. Ernst, L. Lacombe, M. Moore, F. Saad, D. Soulieres, P. Venner, and E. Winquist (Canada); M. Urban (Czech Republic) P. Kellokumpu-Lehtinen (Finland); G. Deplanque, B. Duclos, I. Krakowski, and L. Mignot (France); J. Breul and R. Paul (Germany); I. Bodrogi (Hungary); S. Bracarda (Italy); G. Chahine (Lebanon); J.L. Bruins and J.A. Witjes (the Netherlands); T. Demkow and K. Bar (Poland); O. Kariakine and M. Matveev (Russia); I. Andrasina (Slovak Republic); D. Vorobiof (South Africa); J. Bellmunt and J.-R. Germa (Spain); A. Widmark (Sweden); A. Horwich, T. Roberts, and J. Wylie (United Kingdom); and L. Baez, W. Dugan, and N. Tirumali (United States); to the members of the Data and Safety Monitoring Committee — D. Osoba (Canada), F. Boccardo (Italy), M. Parmar (United Kingdom), and N. Dawson and E. Klein (United States) — and to C. Beauchard (study manager), N. Yateman and S. Thompson (statisticians), M. Kopreski (safety), and E. Borghi, S. Yao, and A. Yver (clinical directors), who were key Aventis personnel.

Dr. Tannock reports having received grant support from Immunex; Drs. De Wit and Rosenthal consulting fees from Aventis; Drs. Berry, Oudard, and Turesson consulting fees and lecture fees from Aventis; and Drs. Chi, James, and Eisenberger consulting fees, lecture fees, and grant support from Aventis.

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

DOCETAXEL VERSUS MITOXANTRONE FOR PROSTATE CANCER

**REFERENCES**

**1.** American Cancer Society (ACS). Cancer facts & figures 2003. (Accessed September 13, 2004, at http://www.cancer.org/docroot/STT/stt_0_2003.asp?sitearea=STT&level=1.)
**2.** Oades GM, Coxon J, Colston KW. The potential role of bisphosphonates in prostate cancer. Prostate Cancer Prostatic Dis 2002;5:264-72.
**3.** Saad F, Gleason DM, Murray R, et al. A randomized, placebo-controlled trial of zoledronic acid in patients with hormone-refractory metastatic prostate carcinoma. J Natl Cancer Inst 2002;94:1458-68.
**4.** Dearnaley DP, Sydes MR, Mason MD, et al. A double-blind, placebo-controlled, randomized trial of oral sodium clodronate for metastatic prostate cancer (MRC PR05 Trial). J Natl Cancer Inst 2003;95:1300-11.
**5.** Fossa SD, Slee PH, Brausi M, et al. Flutamide versus prednisone in patients with prostate cancer symptomatically progressing after androgen-ablative therapy: a phase III study of the European Organization for Research and Treatment of Cancer genitourinary group. J Clin Oncol 2001;19:62-71.
**6.** Tannock I, Gospodarowicz M, Meakin W, Panzarella T, Stewart L, Rider W. Treatment of metastatic prostatic cancer with low-dose prednisone: evaluation of pain and quality of life as pragmatic indices of response. J Clin Oncol 1989;7:590-7.
**7.** Martel CL, Gumerlock PH, Meyers FJ, Lara PN Jr. Current strategies in the management of hormone refractory prostate cancer. Cancer Treat Rev 2003;29:171-87.
**8.** Osoba D, Tannock IF, Ernst DS, Neville AJ. Health-related quality of life in men with metastatic prostate cancer treated with prednisone alone or mitoxantrone and prednisone. J Clin Oncol 1999;17:1654-63.
**9.** Tannock IF, Osoba D, Stockler MR, et al. Chemotherapy with mitoxantrone plus prednisone or prednisone alone for symptomatic hormone-resistant prostate cancer: a Canadian randomized trial with palliative end points. J Clin Oncol 1996;14:1756-64.
**10.** Berry W, Dakhil S, Modiano M, Gregurich M, Asmar L. Phase III study of mitoxantrone plus low dose prednisone versus low dose prednisone alone in patients with asymptomatic hormone refractory prostate cancer. J Urol 2002;168:2439-43.
**11.** Kantoff PW, Halabi S, Conaway M, et al. Hydrocortisone with or without mitoxantrone in men with hormone-refractory prostate cancer: results of the Cancer and Leukemia Group B 9182 study. J Clin Oncol 1999; 17:2506-13.
**12.** Ernst DS, Tannock IF, Winquist EW, et al. Randomized, double-blind, controlled trial of mitoxantrone/prednisone and clodronate versus mitoxantrone/prednisone and placebo in patients with hormone refractory prostate cancer and pain. J Clin Oncol 2003; 21:3335-42.
**13.** Beer TM, Pierce WC, Lowe BA, Henner WD. Phase II study of weekly docetaxel in symptomatic androgen-independent prostate cancer. Ann Oncol 2001;12:1273-9.
**14.** Berry W, Dakhil S, Gregurich MA, Asmar L. Phase II trial of single-agent weekly docetaxel in hormone-refractory, symptomatic, metastatic carcinoma of the prostate. Semin Oncol 2001;28:Suppl 15:8-15.
**15.** Friedland D, Cohen J, Miller R Jr, et al. A phase II trial of docetaxel (Taxotere) in hormone-refractory prostate cancer: correlation of antitumor effect to phosphorylation of Bcl-2. Semin Oncol 1999;26:Suppl 17:19-23.
**16.** Picus J, Schultz M. Docetaxel (Taxotere) as monotherapy in the treatment of hormone-refractory prostate cancer: preliminary results. Semin Oncol 1999;26:Suppl 17:14-8.
**17.** Savarese DM, Halabi S, Hars V, et al. Phase II study of docetaxel, estramustine, and low-dose hydrocortisone in men with hormone-refractory prostate cancer: a final report of CALGB 9780. J Clin Oncol 2001; 19:2509-16.
**18.** Petrylak DP. Chemotherapy for androgen-independent prostate cancer. Semin Urol Oncol 2002;20:Suppl 1:31-5.
**19.** Beer TM, Eilers KM, Garzotto M, Egorin MJ, Lowe BA, Henner WD. Weekly high-dose calcitriol and docetaxel in metastatic androgen-independent prostate cancer. J Clin Oncol 2003;21:123-8.
**20.** Chen TT, Chute JP, Feigal E, Johnson BE, Simon R. A model to select chemotherapy regimens for phase III trials for extensive-stage small-cell lung cancer. J Natl Cancer Inst 2000;92:1601-7.
**21.** Kelly WK, Slovin S, Scher HI. Steroid hormone withdrawal syndromes: pathophysiology and clinical significance. Urol Clin North Am 1997;24:421-31.
**22.** Wirth MP, Froschermaier SE. The antiandrogen withdrawal syndrome. Urol Res 1997;25:Suppl 2:S67-S71.
**23.** Melzack R. The McGill Pain Questionnaire: major properties and scoring methods. Pain 1975;1:277-99.
**24.** Esper P, Mo F, Chodak G, Sinner M, Cella D, Pienta KJ. Measuring quality of life in men with prostate cancer using the Functional Assessment of Cancer Therapy–prostate instrument. Urology 1997;50:920-8.
**25.** Kornblith AB, Herndon JE II, Zuckerman E, Godley PA, Savarese D, Vogelzang NJ. The impact of docetaxel, estramustine, and low dose hydrocortisone on the quality of life of men with hormone refractory prostate cancer and their partners: a feasibility study. Ann Oncol 2001;12:633-41.
**26.** WHO criteria. In: WHO handbook for reporting results of cancer treatment. Geneva: World Health Organization, 1979. (Offset publication no. 48.)
**27.** Petrylak DP, Tangen CM, Hussain MHA, et al. Docetaxel and estramustine compared with mitoxantrone and prednisone for advanced refractory prostate cancer. N Engl J Med 2004;351:1513-20.
**28.** Small EJ, Meyer M, Marshall ME, et al. Suramin therapy for patients with symptomatic hormone-refractory prostate cancer: results of a randomized phase III trial comparing suramin plus hydrocortisone to placebo plus hydrocortisone. J Clin Oncol 2000; 18:1440-50.
**29.** Weitzman AL, Shelton G, Zuech N, et al. Dexamethasone does not significantly contribute to the response rate of docetaxel and estramustine in androgen independent prostate cancer. J Urol 2000;163:834-7.

*Copyright © 2004 Massachusetts Medical Society.*

**JOURNAL EDITORIAL FELLOW**

The *Journal's* editorial office invites applications for a one-year research fellowship beginning in July 2005 from individuals at any stage of training. The editorial fellow will work on *Journal* projects and will participate in the day-to-day editorial activities of the *Journal* but is expected in addition to have his or her own independent projects. Please send curriculum vitae and research interests to the Editor-in-Chief, 10 Shattuck St., Boston, MA 02115 (fax, 617-739-9864), by January 15, 2005.

The New England Journal of Medicine
Downloaded from nejm.org at UNIVERSITY OF WASHINGTON on August 10, 2015. For personal use only. No other uses without permission.
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

# EXHIBIT Q



Available online at www.sciencedirect.com



Pathologie Biologie 54 (2006) 72–84

PATHOLOGIE
BIOLOGIE

http://france.elsevier.com/direct/PATBIO/

Review

# Update on tubulin-binding agents

# Mise au point sur les agents antimicrotubules

Gerhardt Attard, Alastair Greystoke, Stan Kaye, Johann De Bono *

*Institute of Cancer Research and Royal Marsden Hospital, Downs Road, Sutton, Surrey SM2 5PT, UK*

Received 4 March 2005; accepted 24 March 2005

Available online 03 May 2005

## Abstract

The clinical and commercial success of the taxanes and vinca alkaloids resulted in a drive to improve on current formulations and discover new compounds that target the microtubule. These strategies are all aimed at improving on (1) anti-tumour activity, (2) toxicity profile and (3) pharmacology. Drugs undergoing clinical development include the novel semi-synthetic taxane derivatives (DJ-927, XRP6258 and XRP9881), the epothilones, the dolastatins, vinflunine and the combretastatin analogues. In several cases, some improvements in tumour response rates have been seen but randomised trials need to be completed before the role of specific novel tubulin-binding agents can be established.
© 2005 Elsevier SAS. All rights reserved.

## Résumé

Le succès clinique et commercial des taxanes et des vinca-alcaloïdes a eu pour effet de stimuler l'amélioration des formules courantes et de découvrir de nouveaux composants qui ciblent le microtubule. Ces stratégies visent toutes à améliorer : (1) l'activité anti-tumeur, (2) le profil de toxicité et (3) la pharmacologie. Parmi les médicaments en cours de développement clinique se trouvent les nouveaux dérivés semisynthétiques de taxanes (DJ-927, XRP6258, XRP9881), les épothilones, les dolastatins, le vinflunine et les combretastatines analogues. Dans plusieurs cas, certaines améliorations du taux de réponse tumorale ont été constatées mais des essais randomisés doivent avoir lieu avant que le rôle spécifique des nouveaux agents antimicrotubules soit établi.
© 2005 Elsevier SAS. All rights reserved.

*Keywords:* Tubulin-binding; Taxanes; Vinca alkaloids; Dolastatins; Vinflunine; Combretastatin analogues

*Mots clés :* Antimicrotubules ; Taxanes ; Vinca-alcaloïdes ; Épothilones ; Dolastatins ; Vinflunine ; Combretastatines analogues

## 1. Introduction

The role of drugs such as the taxanes and vinca alkaloids in the treatment of a wide range of malignancies is well established. Vinca alkaloids (vincristine and vinblastine) have been part of the standard of care of haematological cancers (including lymphoma) for 30 years. The first taxane, paclitaxel, was approved for the treatment of ovarian cancer 10 years ago; since then it has found an important role in the treatment of breast and other cancers. The alternative taxane, docetaxel (75 mg/m$^2$) given three-weekly with prednisone (TAX327 trial) or estramustine was recently shown to lead to superior survival and improved rates of response in terms of pain, serum PSA level, and quality of life, as compared with mitoxantrone plus prednisone in patients with castration resistant prostate cancer (CRPC) [1,2]. Docetaxel containing regimens have shown superior activity over other chemotherapy regimens in both the first-line treatment of [3] and after failure of anthracyclines in, metastatic breast cancer [4–6]. The clinical and commercial success of these drugs has resulted in a drive to discover new agents that target the microtubule. Screening programs of naturally occurring compounds have led to the discovery of new classes of tubulin-binding drugs and ongoing drug development programs have tried to improve on the currently available drugs.

---

* Corresponding author.
  *E-mail address:* jdebono@icr.ac.uk (J. De Bono).

0369-8114/$ - see front matter © 2005 Elsevier SAS. All rights reserved.
doi:10.1016/j.patbio.2005.03.003

MYLAN - EXHIBIT 1021

## 2. Molecular tubulin dynamics

The mechanism of action of tubulin-binding drugs has been extensively researched. Soluble tubulin exists in the cell as a heterodimer of one molecule of α-Tubulin and one molecule of β-Tubulin. There are currently six known isotypes of α-tubulin and seven of β-tubulin in addition to a variety of known post-translational modifications [7]. During polymerisation, the heterodimers link together to form protofilaments. Thirteen of these protofilaments organised in a hollow cylinder make up the backbone of the microtubule [8]. Microtubules exist in an unstable equilibrium whereby free dimers are constantly incorporated into the polymerised structures and microtubule dimers are released into the soluble tubulin pool. This equilibrium is under the control of several factors, including microtubule-associated proteins (MAPs) [9]. Two patterns of microtubule dynamics—treadmilling and dynamic instability—that maintain this equilibrium have been reported. In treadmilling, tubulin units incorporated into the microtubule at the "plus" end are removed from the opposite "minus" end with no net change in microtubule length [10]. Dynamic instability describes periods of relative stability interposed with rapid growth and shortening of the microtubule [8]. By binding to tubulin and interfering with heterodimerisation, drugs like taxanes and vincas disrupt microtubule dynamics without appreciably changing microtubule mass [11].

Microtubules are essential components of the cell cytoskeleton and their plastic nature gives them an important role in a number of cellular functions. They are critical for the movement of organelles during interphase and during mitosis, form the mitotic spindle that transports daughter chromosomes to separate poles of the dividing cell. Neurones rely heavily on microtubules for transport of organelles, transmitters and receptors along their long axonal processes during interphase [12]. Drugs that interfere with microtubule function lead to failure of alignment of the daughter chromosomes and their bipolar attachment to the mitotic spindle. The cell fails to pass through the checkpoints that exist to ensure that mitosis proceeds appropriately, leading to mitotic arrest at the metaphase/anaphase transition, followed by apoptosis [13]. This has been suggested as the primary anti-neoplastic mechanism of action of tubulin-binding drugs. However, it has also been postulated that at least part of the anti-tumour effect of these agents is related to their effect on microtubules in interphase cells.

## 3. Why develop novel tubulin-binding drugs?

The four main reasons for developing novel tubulin-binding drugs are to achieve improvements in (1) antitumour activity, (2) toxicity profile, (3) pharmacology and (4) drug formulation (Table 1). A number of novel agents have been developed and are currently under investigation in clinical trials.

Table 1
Why develop new tubulin targeted drugs?

| |
|---|
| I. Improve toxicity |
| II. Improve anti-tumour efficacy |
| III. Improve pharmacology |
| IV. Improve formulation |
| V. Commercial reasons |

Improvements in anti-tumour activity could be achieved by selectively increasing delivery to the tumour cell, for example by using immunoconjugates or novel delivery systems. Greater anti-tumour activity could also be seen with agents that circumvent tumour cell resistance mechanisms. Several resistance mechanisms have been described in cell line studies but their clinical relevance is not fully understood. They include reduced drug accumulation due to increased drug efflux by multi-drug resistant (MDR) protein pumps [14], mutations that stabilise tubulin assembly [15], mutations in tubulin-binding sites, altered expression of tubulin isotypes [16] and altered binding of MAPs [8,17,18]. Resistance could thus be overcome with compounds that are not substrates for efflux pumps or with drugs that bind to novel sites on the tubulin dimer. Currently approved drugs bind to beta-tubulin and new compounds that bind to alpha tubulin [19] may have a different spectrum of activity. Also, since different cells express different patterns of isotype distribution, drugs that bind differentially to tubulin isotypes may share a similar mechanism of action but could differ in their toxicity and efficacy profiles. This suggests that it may be possible to develop drugs with better therapeutic indices and toxicity profiles and in fact, anti-tumour activity against a number of taxane and vinca resistant tumours has been reported with some novel agents. However, since both normal and malignant rapidly-dividing cells are dependent on microtubules during mitosis, all tubulin-binding drugs are likely to cause myelosuppression and/or gastro-intestinal toxicity at high doses. Selective cytotoxicity may therefore not be feasible with these agents. Similarly, attempts to reduce neurotoxicity with drugs that have less of an impact on interphase proteins may also be decrease anticancer activity. In fact, the development of drugs showing more potent preclinical cytotoxicity rarely translates into improved clinical benefit as dose-response curve shifts will usually also increase toxicity. Similarly, improvements in the toxicity profile of these drugs may only be achieved by sacrificing anticancer efficacy. It has therefore been suggested that major improvements in anticancer efficacy with drugs that target tubulin will not be easily achievable [20].

Nonetheless, improvements in the pharmacology and formulation of currently available tubulin-binding drugs are feasible. Several agents being investigated in clinical trials have been reported to show improved bioavailability and central nervous system penetration. Although these may improve anti-tumour activity, they may also increase the risk of gastro-intestinal and neurological toxicities respectively. Modifications in the affinity of these agents for ABC transporters or CYP3A4 enzymes could also be useful to decrease pharma-

cogenetic variability. These strategies will give clinical benefit but they are unlikely to reverse resistance or greatly increase these drugs' spectrum of activity. This review of the agents currently in clinical development will highlight these challenges.

## 4. Tubulin-binding drugs

Tubulin-binding drugs can be classified according to the site on tubulin they bind to (Table 2). Most of these agents target the taxane-binding site. These include the taxanes, the epothilones, discodermolide, eleutherobin and launilamide. The other two sites currently targeted therapeutically are the vinca binding site, by agents including the cryptophycin analogues, dolastatins, maytansinoid immunoconjugates, vinflunine and halichondrin B analogues, and the colchicine-binding site, by agents such as Combretastatin A4 and its analogues. Drugs that bind to the colchicine domain have been reported to show promise as vascular-targeting agents. For some agents, the precise binding site has not been fully characterised. Finally, the microtubule can also be targeted by a number of novel agents that do not directly target tubulin, such as therapeutics targeting the microtubule-associated proteins and the immunoconjugates. These agents will now be discussed in turn.

## 5. Taxanes

Since the recognition of the cytotoxic activity of paclitaxel (Taxol™; Bristol-Myers Squibb, Princeton, NJ) and the

subsequent description of its unique mechanism of action, a number of novel taxanes have been developed [21]. Docetaxel (Taxotere™; Aventis, Collegeville, PA), the first analogue to reach the clinic and receive marketing approval, also has significant clinical activity in a wide range of tumours, slightly improved water solubility and less neurotoxicity than the parent compound. Several new taxanes being tested in the clinic—such as DJ-927, BMS-275183, XRP6258 and XRP9881—show improvements on the limitations of these two currently approved taxanes as evidenced, to a varying degree, by higher therapeutic indices, activity against resistant tumours, improved penetration across the blood–brain barrier and greater water solubility (Table 3).

Due to its poor water solubility, paclitaxel is currently commercially available in a formulation containing Cremophor EL (CrEL) (castor oil) and dehydrated ethanol (1:1, vol/vol). The use of this solvent has been associated with acute hypersensitivity reactions as well as with pharmacokinetic alterations of paclitaxel itself. CrEL micelles can entrap paclitaxel in the plasma compartment thereby preventing accumulation of paclitaxel in erythrocytes and thus, reducing the free drug fraction available for cellular partitioning in target tissues [22]. This may contribute to the non-linearity of paclitaxel plasma distribution in patients. Docetaxel is more soluble in water and is formulated using Tween 80 and ethanol. Tween 80, albeit less toxic than CrEL, may also be responsible for some toxic effects. New water-soluble taxanes and novel delivery systems, such as liposomes, albumin nanoparticles or poly-amino acids, have therefore been developed to eliminate the need for currently used solvents.

One of the major limitations of the currently used taxanes is the development of drug resistance. Taxanes are a sub-

Table 2
Classification of tubulin-binding drugs

| Compound | Origin | Binding site | Clinical development |
|---|---|---|---|
| **Taxanes** | Needles of Taxus species | Taxane binding site on beta tubulin | Paclitaxel and docetaxel approved for a number of indications |
| | | | Novel taxanes and new formulations of paclitaxel undergoing investigation in dose-finding and efficacy studies |
| **Epothilones** | Myxobacterium (*S. cellulosum*) | Taxane binding site | Epothilone B and its synthetic derivatives in efficacy studies for a number of indications Epothilone D in phase I/II studies |
| **Discodermolide** | Seaweed (*D. dissolute*) | Overlaps with taxane-binding site | Pulmonary toxicity concerns in dose-finding studies have delayed clinical development |
| **Eleutherobin** | Soft coral *Eleutherobia* species | Probably taxane-binding site | Shortage of compound has delayed its study but synthetitic manufacture may soon allow clinical evaluation |
| **Launilamide** | Marine sponge | Possible taxane-binding site | Too unstable to warrant clinical development. More stable analogues in preclinical development |
| **Vinca alkaloids** | Periwinkle plant | Vinca binding site | Vinblastine, vincristine, vindesine and vinorelbine approved for a number of indications viflunine in randomised efficacy studies |
| **Cryptophycin analogues** | Blue–green alga Nostoc | Overlaps with vinca binding site | Clinical development delayed due to toxicities |
| **Dolastatins** | Shell-less marine mollusk (*D. auricularia*) | Overlaps with vinca binding site | Low therapeutic index may make development beyond phase II studies unworthwhile |
| **Halichondrin B** | Marine sponges of the genera *Halichondria* and *Axinella* | Possibly overlap with vinca binding site | Synthetic analogues in dose-finding studies |
| **Combretastatin-A4-phosphate** | African plant (*C. caffrum*) | Colchicine binding site | Dose finding studies completed. Toxicity a concern |

Table 3
Novel agents in clinical development targeting the taxane-binding site on beta tubulin

| | P-gp substrate | Oral | Dose schedule | MTD | Activity in taxane-refractory tumours | DLT |
|---|---|---|---|---|---|---|
| XRP6258 | No | – | IV infusion over 1 h three-weekly | 20 mg/m$^2$ | CRPC | Neutropaenia |
| XRP9881 | No | – | IV infusion over 1 h three-weekly | 90 mg/m$^2$ | Modest | Neutropaenia |
| DJ-927 | No | +++ | Single oral three-weekly dose | 27 mg/m$^2$ (heavily pretreated) 35 mg/m$^2$ (lightly pretreated) | Minor responses | Neutropaenia |
| BMS-275138 | No | +++ | / | / | ? | Neutropaenia |
| Epothilone B | No | – | 5 min IV infusion every 3 weeks | Ongoing | Range of tumour types include NSCLC | Diarrhoea |
| BMS-247550 | No | – | | | | Neutropaenia |
| BMS-310705 | No | – | 15 min IV infusion every 3 weeks | 40 mg/m$^2$ | Ovarian, bladder, stomach, breast and NSCLC | Neutropaenia, vomting, neuropathy |
| Epothilone D (KOS-826) | No | – | IV over 90 min on days 1, 8, and 15 of a 4 week cycle | ?? | Heavily pretreated testicular, ovarian, pancreatic, breast | Neuropathy |

strate for the MDR membrane-associated P-glycoproetin (P-gp) efflux pump, which is expressed by tumour cells of the MDR+ phenotype. This has proven to be a major mechanism of both constitutive and acquired resistance to taxanes in cell lines [14] but its clinical relevance is not fully understood. Efforts have been made to synthesise new derivatives that are not substrates for P-gp in an attempt to offer a broader spectrum of activity and/or overcome the emergence of drug resistance. XRP6258 (RPR-116258A) and XRP9881 (RPR-109881A) are two new semi-synthetic taxoid compounds derived from 10-deacetyl baccatin III, the major natural taxoid extracted from the needles of Taxus species, which were selected on the basis of their minimal affinity for P-gp and greater penetration of the blood–brain barrier. They have shown activity in MDR+ cells and greater in vitro potency than docetaxel. The dose limiting toxicity (DLT) of both these compounds is neutropaenia. Non-haematological toxicities are mild and include alopecia, diarrhoea, fatigue and neuropathy. The pharmacokinetic profile of these 2 agents shows similarities to that of docetaxel, although apparently, with a longer elimination half life. The recommended administration of both compounds is by intravenous (IV) infusion over 1 h.

XRP6258 was investigated in phase I studies in a three-weekly schedule and the maximum tolerated dose (MTD) was reached at 20 mg/m$^2$. Two objective responses, both in CRPC, were seen. One of the patients was docetaxel refractory [23]. Anti-tumour activity was reported in tumours classically resistant to taxanes, such as osteosarcoma, [24] and in tumours with acquired resistance following prior treatment with taxanes [23]. This indicates that this agent may overcome some forms of paclitaxel tumour resistance.

At dose-finding evaluation, XRP9881 was found to have a number of advantages over the approved taxanes. These included a reproducible toxicity profile, detectable levels of XRP9881 in cerebrospinal fluid shortly after the end of a 1-h infusion and objective partial responses in a range of tumour types (including three patients with non-small cell lung cancer (NSCLC)) [25–27]. The recommended phase II dose was 90 mg/m$^2$ over 1 h every 3 weeks. This compound has been taken forward at this dose in a phase II single-arm study in metastatic breast cancer and a response rate of 25% was seen in taxane-resistant patients [28]. However, despite anticancer activity in patients with tumours resistant to paclitaxel and docetaxel, the MTDs of XRP6258 and XRP9881 are limited by myelosuppression and this may restrict the extent of tumour cell kill that can be achieved.

Paclitaxel is a schedule dependent drug and its efficacy may be improved by prolonged tumour exposure. An oral taxane allows this in a convenient and cost-effective way. DJ-927 is a novel semi-synthetic taxane that is orally bioavailable. It is now being investigated in phase II studies. DJ-927 is a poor substrate for P-gp and related mechanisms of resistance, and anti-tumour activity against P-gp expressing human cancer cell lines and xenografts has been reported [29]. Its oral bioavailability eliminates the need for formulation with CrEL and is comparable to that achieved when administered intravenously. Pharmacokinetic studies in human phase I studies indicate dose proportional absorption within the 6–40 mg/m$^2$ dose range. The terminal elimination half-life calculated for the higher dose groups (18–40 mg/m$^2$) is, on average, approximately 170 h [30]. The DLT, neutropaenia lasting over 5 days, defined an MTD of 27 mg/m$^2$ in heavily pretreated and 35 mg/m$^2$ in lightly pretreated patients when given as a single oral three-weekly dose [30]. Neuropathy has been reported but remains uncommon to date. Minimal alopecia was seen. Toxicity was reversible and occurred at a dose above 18 mg/m$^2$. In phase I studies, responses were observed in taxane-refractory breast and transitional cell bladder cancer [30].

BMS-275138 is another oral taxane that is currently being investigated in phase I clinical trials. It has a 24% mean absolute oral bioavailability and a low P-gp affinity. The mean AUC is 4595 ng h/ml with an interpatient variability of 56%.

A correlation between the AUC and the severity of the side effects has been observed, as most patients with a DLT requiring dose reduction, had an AUC higher than 5600 ng h/ml. The recommended dose for future phase II trials is reported to be 200 mg/m$^2$ [31].

New formulations of paclitaxel that do not require solution in CrEL can be administered without premedication, in smaller volumes and more rapidly. One such agent is ABI-007 (Abraxane™), a novel nanoparticle albumin-stabilised paclitaxel that exploits a receptor-mediated (gp60) pathway to achieve high intracellular tumour concentrations of the active ingredient, paclitaxel [32]. When administered three-weekly intravenously over 30 min, the MTD was reached at 100 mg/m$^2$ in heavily pretreated and 150 mg/m$^2$ in lightly pretreated patients confirming that tis novel formulation allows the delivery of a higher dose intensity [33]. The agent was investigated at this dose in a randomised phase III study in metastatic breast cancer and a statistically significant improvement in objective response rate and time to tumour progression when compared to paclitaxel was found [34]. Grade 4 neutropaenia occurred less frequently with Abraxane (9%) than with paclitaxel (22%) but more grade 3 neuropathy was seen (10% for Abraxane versus 2% for paclitaxel) [34]. The recommended phase II dose for weekly administration (three doses, 1 week of rest) is reported as 125 mg/m$^2$ and activity has been reported with this schedule in taxane-refractory metastatic breast cancer [35]. ABI-007 has a longer elimination half-life than paclitaxel and this may be explained by improved red blood cell penetration and temporary storage of ABI-007, with subsequent release of paclitaxel as plasma levels decrease. Other potential advantages of ABI-007 include selective tumour uptake due to increased vessel permeability [32], albumin-receptor mediated transport and cellular uptake [34]. ABI-007 appears to be less myelotoxic but more neurotoxic than paclitaxel. The efficacy of ABI-007 in a range of other solid tumours types, including metastatic melanoma, NSCLC, ovarian cancer and cervical cancer is undergoing investigation in phase II clinical trials [36].

DO/NDR/02 is another novel paclitaxel formulation in which the drug is delivered as nanomicelles using a polymeric carrier eliminating the need for solution in CrEL. In a phase I trial of this agent, the MTD was reached at 375 mg/m$^2$ and the DLT was myelosuppression. Only mild neuropathy was seen. PK analysis has shown a linear correlation between the mean AUC and dose. Five out of 10 heavily pretreated breast cancer patients showed an objective response [37].

Another approach to improve on the therapeutic index of taxanes is conjugation to certain fatty acids. In preclinical models, data indicate preferential uptake of such conjugates into tumours compared to normal tissue [38]. This is thought to be due to the increased requirement of certain fatty acids, for use as biochemical precursors and as energy sources, by tumour cells [38]. DHA-paclitaxel (Taxoprexin™) is a novel conjugate formed by covalently linking the natural fatty acid docosahexaenoic acid (DHA) to paclitaxel. When adminis-tered by 2-h IV infusion every 2 weeks, it has been reported to be well tolerated with predictable toxicity and the DLT of myelosuppression [39]. The recommended phase II dose was 1100 mg/m$^2$. No patient developed alopecia or worse than grade 1 peripheral neuropathy. The half-life was found to be about seven times longer, the volume of distribution 100 times smaller and the clearance 300 times slower than paclitaxel 175 mg/m$^2$ administered by 3-h IV infusion [39]. Extensive binding to plasma proteins may explain, in part, this unique PK profile [40]. DHA-paclitaxel has also been investigated in combination with carboplatin. The DLT was myelosuppression [41]. The recommended phase II dose was DHA-paclitaxel 880 mg/m$^2$ and carboplatin AUC5 three-weekly [41]. Grade 3 peripheral neuropathy was seen in one patient after four courses of treatment [41]. Interestingly, no alopecia was seen and this would be a significant advantage for several patients—hair loss may lead some women to refuse treatment with taxanes [41].

However, despite these modest improvements, the fundamental mechanism of the anticancer activity of these new taxanes remains unchanged and they are unlikely to make a dramatic impact on patient outcome.

## 6. Epothilones

Two cytoxic compounds (Epothilone A and B) derived from the myxobacterium *Sorangium cellulosum* were found to inhibit microtubule polymerisation at nanomolar concentrations [42]. The epothilones at the most advanced stage of clinical study is the natural epothilone B (EPO906) and the analogues BMS-247550, BMS-310705 and epothilone D (KOS-682) (Table 3).

A number of properties could explain the anticancer activity of epothilones against taxane-resistant disease. In preclinical models, epothilones are more resistant to MDR mechanisms than taxanes [43]. The epothilones competitively inhibit the binding of paclitaxel to mammalian brain tubulin, suggesting that the two types of compounds share a common binding site on tubulin, despite the lack of structural similarities [44].

Epothilone B (Patupilone™, EPO-906) has been evaluated in phase I studies as a 5-min IV infusion once a week [45] and once every 3 weeks [46]. The DLT with both schedules was diarrhoea [45,46]. The maximum dose attained with weekly administration was 2.5 mg/m$^2$. Dose limiting diarrhoea was seen at 6 mg/m$^2$ with the three-weekly schedule but attempts to administer higher doses are ongoing utilising anti-diarrhoeals [47]. The other main toxicities with this compound have been nausea and vomiting, abdominal cramps and fatigue. Little myelotoxicity has been reported at the doses tested to date. In these two phase I trials, tumour responses were seen in colorectal cancer as well as a variety of other tumour types, including breast and ovarian cancer, NSCLC, and carcinoid tumours. Based on these results, phase II studies in numerous indications have been initiated [47,48] and

efficacy has been documented in platinum refractory ovarian cancer and NSCLC [49].

Semi-synthetic derivatives of epothilone B, such as BMS-247550, have also been studied in the clinic. Phase I studies of BMS-247550 administering this agent as a 1-h infusion once every 3 weeks (MTD 40 mg/m$^2$) [50] or a 1-h infusion once a day for 5 days every 3 weeks (MTD 6 mg/m$^2$) have been conducted [51]. The DLT observed was neutropaenia rather than diarrhoea as was seen with epothilone B. Peripheral neuropathy was also reported with cumulative dosing. Other severe non-haematological toxicities included fatigue, anorexia and stomatitis. This compound has now completed phase II studies and whilst no response was seen in colorectal cancer (where neuropathy was dose limiting) [52] or melanoma, [53] anticancer activity has been reported in NSCLC, [54] prostate cancer, [55] renal cancer, [56] pancreatic cancer [57] and taxane-resistant breast [58]. A Phase III study of BMS-247550 in combination with capecitabine as second-line therapy for patients with relapsed metastatic breast cancer is underway.

Another water-soluble analogue of epothilone B, BMS-310705 has also completed phase I clinical trials. When administered intravenously over 15 min once every 3 weeks, the recommended phase II dose was 40 mg/m$^2$ [59]. Dose limiting neutropaenia, vomiting and a moderately severe sensory neuropathy were seen at higher doses. PK data show increases in AUC are dose related. Tumour responses were reported in ovarian, bladder, stomach and breast cancer and NSCLC [59].

Epothilone D (KOS-826) is an active intermediate in the biosynthetic pathway of epothilone B. The phase I evaluation of KOS-862 administered by IV infusion over 90 min looked at a number of dosing schedules: a single dose every 3 weeks, a daily dose for the first 3 days of a 3 week cycle, [60] a fixed dose every 3 weeks, a weekly dose for 3 weeks every 4 [61] and a continuous infusion over both 24 and 72 h every 2 weeks [62]. Severe neurotoxicity was seen with a single dose of 185 mg/m$^2$ every 3 weeks, including gait impairment, cognitive/perceptual abnormalities, sensory neuropathies, and fatigue. A dose of 150 mg/m$^2$ once every 3 weeks was better tolerated but also resulted in a high incidence of neurological complications. Daily administration for 3 days every 3 weeks was better tolerated and the MTD was 40 mg/m$^2$. Neurotoxicity was observed 1–2 days after treatment, resolved over the next 2–7 days and did not appear to be cumulative. Mild myelosuppression was occasionally observed [60]. Analysis of the pharmacokinetics of KOS-862 administered three-weekly or daily for 3 days every 3 weeks indicated that the AUC increased linearly with dose regardless of schedule of administration. The mean half-life was approximately 10 h. Responses were observed in heavily pretreated patients with testicular, ovarian, pancreatic and breast cancer [60]. Development of this compound has been taken forward in a phase II study as second-line treatment in patients with colorectal carcinoma administered every 3 weeks.

## 7. Discodermolide

Discodermolide (XAA296A) is another novel compound, isolated from the seaweed *Discodermia dissolute*, that binds to microtubules more potently than paclitaxel and in a mutually exclusive manner. This suggests its binding site is the same as or overlaps with the taxane-binding site [63]. Synergistic anticancer activity with NSCLC cell lines has been reported with paclitaxel. It has been postulated that discodermolide and paclitaxel cause conformational changes in the microtubule that alter the binding of one another [64]. This agent has been evaluated in dose-finding early clinical trials. The maximum dose administered to date at a fixed rate of 0.77 mg/ml per min was 25 mg/m$^2$ and the most common toxicities observed include fatigue, diarrhoea, nausea/vomiting, hepatic enzyme evaluation and severe thrombophlebitis necessitating administration of the drug centrally [65]. Severe pulmonary toxicity in three patients who received a cumulative dose of more than 50 mg/m$^2$ has raised safety concerns that have resulted in a premature halt to recruitment [65].

## 8. Eleutherobin

Eleutherobin is another marine cytotoxic, first isolated in 1997, from the soft coral species *Eleutherobia* [66]. It stabilises microtubules by binding to a similar site to paclitaxel and preclinically, has shown broad spectrum cytotoxicity in vitro. As it is a natural product, its study has been hampered by lack of compound availability. However, screens of marine organisms have identified several analogues. It is hoped that the synthetic manufacture of these compounds will soon support the clinical evaluations of this sub-class of agents [67].

## 9. Cryptophycin

The cryptophycins are compounds initially identified in 1990 in extracts from the blue–green alga Nostoc [68]. They are a family of macrolides that bind to tubulin, probably at a site that overlaps with the vinca alkaloid binding site [68]. However, their mechanism of action appears to be different to that of the vinca binding drugs. They inhibit the polymerisation of microtubules, preventing dynamic instability, possibly by the secondary formation of a cryptophycin-tubulin stabilising cap at the microtubule end. This "end-poisoning" means that very few molecules of cryptophycin are required to have a large effect on microtubule dynamics [69]. Cryptophycins are cytotoxic at extremely low doses when compared to paclitaxel and the vinca alkaloids (picomolar concentrations) and are not substrates for the P-gp efflux pump [68].

A synthetic cryptophycin analogue, Cryptophycin-52 (Cr-52), has been investigated clinically due to both its potent preclinical anticancer activity and in vivo stability [70]. In a

phase I trial, Cr-52 (also known as LY-355703) was administered as a 2-h infusion in two schedules: once every 3 weeks and on days 1, 8 and 15 of a 28-day cycle. The DLT was neuropathy and myalgia in the former schedule and the recommended dose for phase II studies was 1.48 mg/m². The weekly schedule had to be abandoned after neuropathy was seen at doses as low as 1 mg/m². This suggests toxicity is a reflection of cumulative dose rather than a function of dose intensity [70]. In a further phase I trial, whereby Cr-52 was administered as a 2-h infusion on days 1 and 8 of a 3-week cycle, the DLTs were also constipation, neuropathy and myalgia [71]. A response was seen in a NSCLC patient and this led to a phase II trial in patients with NSCLC using this schedule and a dose of 1.5 mg/m². Severe neurotoxicity was seen and the dose was adjusted to 1.125 mg/m². No objective responses were seen in this trial, but 10 out of 26 patients received more than four cycles of therapy [72]. Cr-52 appears too toxic to be developed further. However, due to the novel mechanism by which the cryptophycins inhibit microtubules, further clinical study of cryptophycin analogues is anticipated.

## 10. Dolastatins

The Dolastatins are naturally occurring peptides that were first isolated from the shell-less marine mollusk *Dolabella auricularia*. These antimitotic agents appear to exert their activity by interacting with tubulin and inducing apoptosis. Their tubulin-binding site appears to be similar to that of the vinca alkaloids, although, since they are non-competitive inhibitors of vinblastine binding, it is likely that the binding sites overlap rather than being identical [73,74]. Dolastatin-10 and dolastatin-15 exhibit the most promising antiproliferative properties of the naturally occurring dolastatins and have been evaluated in a number of clinical trials.

The MTD in phase I trials of Dalostatin-10 given as an IV push once every 3 weeks was 400 μg/m² for patients with minimal prior treatment (two or fewer prior chemotherapy regimens) and 325 μg/m² for patients who were heavily pretreated (more than two prior chemotherapy regimens) [75]. The MTD was prolonged neutropenia with a late nadir: occurring on average on day 19 [75]. Drug exposure (AUC) portended neutropenia, but not the other toxicities [75]. Phase II trials in melanoma, [76] castration refractory prostate cancer [77], platinum refractory ovarian carcinoma [78] and colorectal carcinoma [79] were negative and the development of this compound has been discontinued. Another dolastatin evaluated in the clinic is TZT-1027, a semi-synthetic analogue of dolastatin-10. In phase I trials this has been administered as a 1-h infusion once every 3 weeks, [80] weekly × 3 [81] and on days 1 and 8 of a three-weekly schedule [82]. The DLT with all three dosing schedules was neutropenia [80–82]. Other non-haematological toxicities regularly seen were nausea and vomiting, pain at the injection site, myalgia and constipation [80–82].

Cemadotin (LU 103793), a synthetic analogue of dolastatin-15, showed no anticancer activity in patients with metastatic breast cancer [83] and NSCLC when evaluated at a dose of 2.5 mg/m² per day over 5 min for 5 consecutive days every 3 weeks [84]. Hypertension has been reported with this dose schedule and also when cemadotin was administered as a continuous 24-h IV infusion [85]. In addition, reversible cardiac ischaemia was seen with the latter regimen [86]. The cardiotoxic effects of cemadotin were completely avoided by administering it as a 5-day continuous IV infusion. The DLT for all three regimens was reversible dose-related neutropaenia. Thus, cardiovascular toxicity appears to be associated with the magnitude of the peak blood levels of the parent drug or its metabolites, whereas myelotoxicity is related to the duration of time that blood levels exceed a threshold concentration [87]. Similarly, dose escalation of synthadotin (SYN-D; ILX651), a third generation dolastatin-15, has been limited by myelotoxicity. The schedule that maximised dose intensity without compromising safety was administration by 30-min IV infusion on days 1–5 every 3 weeks reaching an MTD of 27.3 mg/m² per day [88]. Efficacy studies are underway in melanoma and NCSLC [88]. Despite the dolastatins showing promising anti-proliferative activity in vitro, myelosuppression has limited dose escalation in clinical trials and myelotoxicity has been shown to occur in vitro at a concentration 25- to 100-fold lower than that required for anti-neoplastic activity [89]. It, therefore, appears unlikely that significant improvements in anticancer activity will be seen at safe doses.

## 11. Vinflunine

Chemical alteration of vinorelbine has produced a semi-synthetic alkaloid, vinflunine, with greater potency in xenograft models. This compound has less affinity for the microtubules involved in axonal transport than those involved in mitosis, [90] suggesting that it might be less neurotoxic than the other vinca alkaloids. In preclinical models, it is much slower to induce resistance than vinorelbine [91] and significant in vivo anti-vascular activity was noted within 4 h of administration [92]. A phase I trial of vinflunine reported grade 4 neutropenia in 3 out of 5 patients treated at 400 mg/m² although dose limiting haematological criteria were not reached. The DLTs seen at the three highest dose levels were stomatitis, oesophagitis, abdominal pain, constipation, neutropenic sepsis and hypertension. Of concern, 90 min after receiving 400 mg/m², a patient developed grade 3 cardiac dysfunction confirmed on echocardiogram. This responded to medical treatment [93]. A phase II trial of vinflunine as second-line treatment in metastatic breast cancer after anthracycline-taxane failure, using a dose of 320 mg/m² administered as a 20-min IV infusion every 3 weeks, reports a partial response in 18 out of 53 evaluable patients (34%) and stable disease in 18 patients (34%). From 19 out of 45 patients with a progression free interval less than 3 months

after taxane exposure, seven patients (36.8%) achieved a partial response [94]. The toxicities seen were similar to the phase I study with neutropenia, constipation and abdominal pain prevailing. No grade 3 or greater neuropathy was seen [94]. Similarly encouraging results were seen with the same dose in patients with NSCLC who had failed first-line platinum containing treatment [95]. Based on these reports of anticancer activity in refractory disease, phase III trials in a number of tumour types are anticipated [94,95].

## 12. Halichondrin B

Halichondrin B is a cytotoxic that was isolated from a variety of marine sponges of the genera *Halichondria* and *Axinella* in the 1980s [96]. However, a scarcity of the natural compound made clinical trials unrealistic. This led to the development of synthetic Halichondrin and simplified analogues that retain similar potency to the original compound [97]. E7389 is a simplified analogue of Halichondrin B. Phase I evaluation of E7389 administered as an IV infusion once every 3 weeks is currently ongoing and the only DLT reported to date was a grade 3 rise in alkaline phosphotase at 0.5 mg/m$^2$ [98].

The mechanism of action of Halichondrin and its analogues has yet to be definitively elucidated. They are inhibitors of the vinca alkaloids suggesting that they bind to the vinca binding site, but as they are non-competitive, the binding sites are unlikely to be identical. A similar pattern of inhibition is seen with the Dolostatins, suggesting that they might bind at the same site on the microtubule. Evidence against this theory is that Dolostatins protect against depolymerisation by Colchicine whilst Halichondrin does not [96].

## 13. Immunoconjugates

Conjugates of monoclonal antibodies with cytotoxic agents, immunoconjugates, represent novel delivery modalities for highly potent cytotoxic agents. They allow selective delivery of cytotoxic agents by targeting against antigens preferentially expressed on the surface of malignant cells [99]. This strategy could reduce toxicity whilst not impeding anticancer activity and could allow the administration of very potent cytotoxic drugs with a small therapeutic index that have proven too toxic to be delivered via conventional systemic administration routes. DM1 is a tubulin-binding agent with extremely potent cytotoxic activity [100]. It is a derivative of the natural microbial fermentation product ansamitocin P-3 and was evaluated in phase I and II studies in the 1970s [101–103]. However, despite complete and partial regressions of advanced non-Hodgkin's lymphoma, melanoma, thymoma, acute lymphocytic leukemia, and ovarian and breast carcinomas its severe toxic effects, particularly nausea, vomiting, diarrhea, elevations of hepatic function tests and, less commonly, weakness and lethargy precluded further devel-

opment [101–103]. Cantuzumab Mertansine (SB-408075, huC242-DM1) is a tumour-activated immunoconjugate derived from the conjugation of DM1 to the humanised monoclonal antibody HuC242 [100]. This antibody binds specifically to the extracellular domain of a tumour-associated carbohydrate epitope of CanAg (a novel glycoform of MUC1), which is strongly expressed in most pancreatic, biliary, and colorectal cancers as well as in a large proportion of NSCLC (40%), gastric (55%), uterine (45%), and bladder (40%) cancers [100]. In contrast, only minimal immunostaining of normal tissues has been reported [100]. Once cantuzumab mertansine is bound to the external domain of CanAg, the complex is internalised, and the DM1 molecules are released intracellularly by cleavage of the DM1-huC242 disulfide linkage [100]. The first-in-human phase I evaluation of Cantuzumab mertansine was by three-weekly IV infusion at a rate of 1 mg/min increased to 3 mg/min if hypersensitivity reactions were not observed. The recommended dose for phase II studies using this regimen was 235 mg/m$^2$ [100]. Acute, transient, and reversible elevations of hepatic transaminases were the principal toxic effects. Nausea, vomiting, fatigue, and diarrhea were common but rarely severe at the highest dose levels. Dose, peak concentration, and area under the concentration–time curve correlated with the severity of transaminase elevation [100]. The high prevalence of strong expression (3+) of CanAg in tumours from patients enrolled on this study (68%) backed up preclinical findings [100]. The MTD with weekly administration was determined to be 115 mg/m$^2$ allowing a 30% higher dose density than the three-weekly schedule. Similarly to three-weekly administration, the DLT was acute, reversible elevation of hepatic transaminases but less peripheral neuropathy was noted in this study [104]. Both studies reported a long terminal elimination half-life of about 40 h [100,104]. Evidence of anti-tumour activity was seen in these trials and efficacy analysis in NSCLC is ongoing [104].

The immunoconjugate MLN2704 is composed of DM1 coupled to the deimmunised anti-PSMA monoclonal antibody MLN591 [105]. PSMA, an integral membrane protein, is expressed predominantly in prostate epithelial cells [106] and overexpression is associated with prostate cancer progression [107]. Its expression has also been documented in the neovasculature of other types of solid tumours [108]. Similar to Cantuzumab mertansine, binding of MLN2704 to PSMA results in internalisation and subsequent cleavage of the DM1-MLN2704 disulfide bonds to release DM1 intracellularly. At last reporting, the MTD had not been established but anti-tumour activity was reported at well tolerated doses of MLN2704 [109]. A number of other interesting targets for immunoconjugates are being evaluated preclinically, including CD138+ that is highly expressed on the majority of multiple myeloma (MM) cells and some other blood malignancy cell and is targeted by B-B4-DM1 [99].

## 14. Anti-vascular tubulin-binding drugs

Tumours need to recruit an extensive blood supply to provide the oxygen and nutrients required for their rapid cell

division and growth [110]. Disruption of this blood supply has proved to be an effective target for cancer therapy [111]. Two primary mechanisms to disrupt tumour vasculature have been explored: one is the inhibition of the recruitment of new microvessels by the neoplastic cell and the other is the targeting of more established tumour blood vessels [112] utilising the pathophysiological differences between them and normal vessels to reduce toxicity. The taxanes [113] and vinca alkaloids [114] may exert some of their anti-neoplastic mechanism by weak anti-vascular effects. However, this only occurs at high and potentially toxic doses. A number of novel tubulin-binding compounds that may target tumour vasculature at clinically attainable doses, are now being evaluated.

Microtubule targeting agents that derive their anti-neoplastic activity solely from inhibition of the mitotic cycle do not impact cells not actively dividing when intracellular drug therapeutic levels are reached, and these cells may survive and acquire drug resistance mutations. Disruption of tumour blood supply is therefore an important strategy as it results in death of cells regardless of their phase in the cell cycle. However, as evidenced in animal models, pure anti-vascular agents cause central necrosis but have no effect on peripheral tumour cells that derive their blood supply from normal blood vessels rather than a newly established network. They are therefore most effective when administered in combination with radiotherapy or cytotoxics. The dual anti-vascular and cytotoxic mechanism of action of some microtubule binding agents, many of which bind to the colchicine-binding site may therefore be advantageous. Colchicine is not a useful anticancer drug because of its poor therapeutic index. It was hoped that three structurally related compounds that bind to the colchicine-binding domain on tubulin—Combretastatin-A4-Phosphate (CA4P), ZD6126 and AVE8062A—currently in clinical development, may have an improved therapeutic index. Early clinical trials, however, indicate that significant vascular and cardiac toxicities remain of concern [115–118].

CA4P is a prodrug of a compound derived from the African plant *Combretum caffrum*. It inhibits microtubule polymerisation, is toxic to proliferating endothelial cells in vitro and causes reversible vascular shutdown in established tumours in vivo, consistent with an anti-vascular mechanism of action [119]. This compound has been investigated in phase I clinical studies in a number of schedules and it is not yet clear which will be adopted for further development. It is administered intravenously over 10 min. The MTD for weekly administration 3 weeks out of 4 was 68 mg/m$^2$ and the DLT was reversible ataxia [120]. When admininistered three weekly, the MTD was reached at a dose of 90 mg/m$^2$ and QTc prolongation and ECG changes consistent with an acute coronary syndrome were seen and probably related to CA4P [115]. CA4P may affect action potential repolarisation and K$^+$ currents in the ventricular myocardium, possibly by an inhibitory action on HERG channels [115]. In another phase I study investigating daily administration for 5 days repeated every 3 weeks, the DLT was cardiopulmonary toxicity (syn-

cope and dyspnoea or hypoxia) noted at 75 mg/m$^2$. Other toxicities included hypotension, ataxia, dyspnoea, nausea and vomiting, headache, and transient sensory neuropathy [116]. In all the phase I studies, a frequently noted side-effect was severe pain at sites of known tumour experienced up to 5 h after administration of CA4P. This corresponds to the timing of anti-vascular effect in animal models and imaging studies and is likely to be due to tumour ischaemia [120]. Efficacy studies in thyroid, gastro-intestinal and ovarian cancer and combination phase Ib studies with Carboplatin are underway [121]. Tumour blood flow imaging, by techniques such as DCE-MRI or positron emitting $^{15}$O tomography (PET), can be used to determine the biological effect of these anti-vascular agents, correlating PK-PD relationships in order to determine the biologically effective dose and the most appropriate schedule [122]. These forms of assessment are increasingly commonly included in early clinical trials of compounds such as CA4P.

ZD6126 is a water-soluble prodrug analogue of colchicine. In phase I trials investigating weekly and three-weekly schedules, the DLTs were abdominal pain and gastro-intestinal symptoms. However, asymptomatic cardiac toxicities (rises in serum cardiac troponin levels and reversible impairment of left ventricular function) were also seen [117] and have led to a halt in development of this drug. AVE8062A is a water-soluble analogue of Combretastatin, which has been administered as a 30-min infusion weekly for 3 weeks every 28 days [118]. The main toxicity observed was asymptomatic systolic hypotension necessitating cohort expansion at 30 mg/m$^2$. At this dose, the drug plasma levels reached have shown anti-vascular and cytotoxic activity in animal models [118]. It is unclear whether this dose is sufficiently high to achieve significant anticancer activity in humans. Overall, the toxicities that prohibited development of colchicines appear to occur with other unrelated compounds that bind to the same domain on tubulin and suggesting that these agents will not prove to be a useful therapeutic options.

## 15. Selective targeting of the mitotic spindle

A more targeted approach to preventing cell division than the unsettling of microtubule dynamic equilibrium could be the inhibition of proteins associated with spindle formation. Such agents could disrupt mitosis as effectively as tubulin-binding drugs but spare the microtubules' interphase functions, thus avoiding the side-effect of neuropathy. Kinesin spindle protein (KSP)/Eg5 is one such target—its inhibition blocks centrosome separation and the formation of a bipolar spindle in mitosis [123]. The DLT in phase I studies of SB-715992, a KSP inhibitor, administered three-weekly (45 patients—MTD 18 mg/m$^2$) [124] or weekly (30 patients—MTD 7 mg/m$^2$) [125] was dose-related neutropaenia. No significant alopecia, thrombocytopaenia, neurotoxicity or gastro-intestinal toxicity was seen [124,125]. Phase II studies in multiple tumour types, including NSCLC, CRPC,

breast, ovarian, prostate and colorectal cancer have been commenced. This agent is also being further evaluated in phase Ib combination trials, including combinations with docetaxel. There is however concern that specifically targeting the mitotic spindle alone may decrease anticancer activity. Although the clinical relevance is unclear, the observation that docetaxel may cause S phase rather than G2/M phase arrest in some models suggests that some of its anticancer activity is derived from inhibition of cells in interphase [126].

Threonine/serine kinases are also potential targets for disruption of the mitotic spindle. In particular, Aurora Kinases are thought to be responsible for the correct attachment and orientation of the spindle to the kinetochores. It is envisaged that aurora kinase inhibitors will soon be entering the clinic [127]. Due to their more targeted mechanism of action, these new drugs may find a role in combination with the other tubulin-binding drugs. There may be a synergistic anticancer effect that is not compromised by the increased toxicity one would expect with combinations of drugs acting on the same target. However, improvements in efficacy may only be achieved at the cost of worse toxicities and although novel inhibitors of MAPs may not cause neuropathy, myelosuppression will remain a dose and combination limiting factor.

## 16. Conclusion

The identification of new tubulin-targeting compounds has led to a greater understanding of tubulin polymerisation, microtubule dynamics and the mechanism of action of drugs such as paclitaxel. Microtubule-targeted drugs can synergise with one another and novel agents could also have a role in combination with currently available tubulin-binding drugs. Improved formulations are close to licensing and could impact patient care. One may question the value of developing novel tubulin-binding drugs since major improvements on currently approved drugs are unlikely. Over the past 10 years, there has been a shift in investment from the development of traditional cytotoxics to that of molecularly targeted therapies that are selectively cytotoxic. However, although a number of these targeted agents, such as trastuzumab and cetuximab, have already received marketing approval, it is unlikely they will entirely replace cytotoxic drugs in the near future and their likely value will remain in combination with established therapeutic strategies such as drugs that target tubulin.

## References

[1] Tannock IF, De Wit R, Berry WR, Horti J, Pluzanska A, Chi KN, et al. Docetaxel plus prednisone or mitoxantrone plus prednisone for advanced prostate cancer. New Engl J Med 2004;351(15):1502–12.

[2] Petrylak DP, Tangen CM, Hussain MH, Lara Jr. PN, Jones JA, Taplin ME, et al. Docetaxel and estramustine compared with mitoxantrone and prednisone for advanced refractory prostate cancer. New Engl J Med 2004;351(15):1513–20.

[3] Chan S, Friedrichs K, Noel D, Pinter T, Van Belle S, Vorobiof D, et al. Prospective randomized trial of docetaxel versus doxorubicin in patients with metastatic breast cancer. J Clin Oncol 1999;17(8):2341–54.

[4] Nabholtz JM, Falkson C, Campos D, Szanto J, Martin M, Chan S, et al. Docetaxel and doxorubicin compared with doxorubicin and cyclophosphamide as first-line chemotherapy for metastatic breast cancer: results of a randomized, multicenter, phase III trial. J Clin Oncol 2003;21(6):968–75.

[5] Nabholtz JM, Senn HJ, Bezwoda WR, Melnychuk D, Deschenes L, Douma J, et al. Prospective randomized trial of docetaxel versus mitomycin plus vinblastine in patients with metastatic breast cancer progressing despite previous anthracycline-containing chemotherapy. 304 Study Group. J Clin Oncol 1999;17(5):1413–24.

[6] Sjostrom J, Blomqvist C, Mouridsen H, Pluzanska A, Ottosson-Lonn S, Bengtsson NO, et al. Docetaxel compared with sequential methotrexate and 5-fluorouracil in patients with advanced breast cancer after anthracycline failure: a randomised phase III study with crossover on progression by the Scandinavian Breast Group. Eur J Cancer 1999;35(8):1194–201.

[7] Luduena RF. Multiple forms of tubulin: different gene products and covalent modifications. Int Rev Cytol 1998;178:207–75.

[8] Jordan MA, Wilson L. Microtubules as a target for anticancer drugs. Nat Rev 2004;4(4):253–65.

[9] Itoh TJ, Hotani H. Microtubule-stabilizing activity of microtubule-associated proteins (MAPs) is due to increase in frequency of rescue in dynamic instability: shortening length decreases with binding of MAPs onto microtubules. Cell Struct Funct 1994;19(5):279–90.

[10] Rodionov VI, Borisy GG. Microtubule treadmilling in vivo. Science 1997;275(5297):215–8.

[11] Jordan MA. Mechanism of action of antitumor drugs that interact with microtubules and tubulin. Curr Med Chem Anti-Cancer Agents 2002; 2(1):1–17.

[12] Shea TB, Beermann ML. Respective roles of neurofilaments, microtubules, MAP1B, and tau in neurite outgrowth and stabilization. Mol Biol Cell 1994;5(8):863–75.

[13] Jordan MA, Wendell K, Gardiner S, Derry WB, Copp H, Wilson L. Mitotic block induced in HeLa cells by low concentrations of paclitaxel (Taxol) results in abnormal mitotic exit and apoptotic cell death. Cancer Res 1996;56(4):816–25.

[14] Greenberger LM, Lothstein L, Williams SS, Horwitz SB. Distinct P-glycoprotein precursors are overproduced in independently isolated drug-resistant cell lines. Proc Natl Acad Sci USA 1988;85:3762–76.

[15] Hari M, Wang Y, Veeraraghavan S, Cabral F. Mutations in alpha- and beta-tubulin that stabilize microtubules and confer resistance to colcemid and vinblastine. Mol Cancer Ther 2003;2(7):597–605.

[16] Ranganathan S, Dexter DW, Benetatos CA, Chapman AE, Tew KD, Hudes GR. Increase of βIII- and βIVa-tubulin in human prostate carcinoma cells as a result of estramustine resistance. Cancer Res 1996;56:2584–9.

[17] Kavallaris M, Tait AS, Walsh BJ, He L, Horwitz SB, Norris MD, et al. Multiple microtubule alterations are associated with Vinca alkaloid resistance in human leukemia cells. Cancer Res 2001;61:5803–9.

[18] Zhang CC, Yang J-M, White E, Murphy M, Levine A, Hait WN. The role of MAP4 expression in the sensitivity to paclitaxel and resistance to Vinca alkaloids in p53 mutant cells. Oncogene 1998;16:1617–24.

[19] Uckun FM, Mao C, Jan ST, Huang H, Vassilev AO, Sudbeck EA, et al. SPIKET and COBRA compounds as novel tubulin modulators with potent anticancer activity. Curr Opin Investig Drugs 2000;1(2):252–6.

[20] Rowinsky EK. Taxane analogues: distinguishing royal robes from the "Emperor's New Clothes". Clin Cancer Res 2002;8(9):2759–63.

[21] Horwitz SB, Cohen D, Rao S, Ringel I, Shen HJ, Yang CP. Taxol: mechanisms of action and resistance. J Natl Cancer Inst Monogr 1993;15:55–61.

[22] Sparreboom A, van Zuylen L, Brouwer E, Loos WJ, de Bruijn P, Gelderblom H. Cremophor EL-mediated alteration of paclitaxel distribution in human blood: clinical pharmacokinetic implications. Cancer Res 1999;59:1454.

[23] Mita AC, Denis LJ, Goetz AD, Rowinsky EK, Ochoa L, Forouzesh B, et al. Phase I and pharmacokinetic study of RPR 116258A, a novel taxane derivative, administered as a 1-h infusion every 3 weeks in patients with advanced solid tumors. 2005 (in press).

[24] Gian VG, Johnson TJ, Marsh RW, Schuhmacher C, Lynch JW. A phase II trial of paclitaxel in the treatment of recurrent or metastatic soft tissue sarcomas or bone sarcomas. J Exp Ther Oncol 1996;1(3): 186–90.

[25] Gelmon KA, Latreille J, Tolcher A, Genier L, Fisher B, Forand D, et al. Phase I dose-finding study of a new taxane, RPR 109881A, administered as a 1-h intravenous infusion days 1 and 8 to patients with advanced solid tumors., D'Aloisio S, Vernillet L, Daigneault L, Lebecq A, Besenval M, Eisenhauer E. J Clin Oncol 2000;18(24): 4098–108.

[26] Sessa C, Cuvier C, Caldiera S, Bauer J, Van Den Bosch S, Monnerat C, et al. Phase I clinical and pharmacokinetic studies of the taxoid derivative RPR 109881A administered as a 1-h or a 3-h infusion in patients with advanced solid tumors. Ann Oncol 2002;13(7): 1140–50.

[27] Kurata T, Shimada Y, Tamura T, Yamamoto N, Hyodo I, Saeki T, et al. Phase I and pharmacokinetic study of a new taxoid, RPR 109881A, given as a 1-h intravenous infusion in patients with advanced solid tumors. J Clin Oncol 2000;18(17):3164–71.

[28] Dieras VC, Limantani SA, Lortholary A, Tubiana-Hulin M, Ferrero JM, Von Minckwitz G, et al. A multicentre, non randomized phase II study with RPR 109881A in metastatic breast cancer (MBC) patients (pts). Proc Am Soc Clin Oncol 2003;22:141 abstr 565.

[29] Shionoya M, Jimbo T, Kitagawa M, Soga T, Tohgo A. DJ-927, a novel oral taxane, overcomes P-glycoprotein-mediated multidrug resistance in vitro and in vivo. Cancer Sci 2003;94(5):459–66.

[30] Beeram M, Takimoto CH, Gadgeel S, Garrison M, Hill M, Jakubowitz J, et al. Phase I and Pharmacokinetics (PK) of DJ-927, an oral taxane, in patients (Pts) with advanced cancers. J Clin Oncol 2004; 22(S14):2028.

[31] Broker LE, De Vos FY, Gall H, Gietema JA, Voi M, Cohen MB, et al. A phase I trial of the novel oral taxane BMS-275183 in patients with advanced solid tumors. J Clin Oncol 2004;22(S14):2029.

[32] Desai N, Trieu V, Yao R, Labao E, Soon-Shiong P. Increased endothelial transcytosis of nanoparticle albumin-bound paclitaxel (ABI-007) by gp60-receptors: a pathway inhibited by taxol. SABCS; 2004 abstr 1071.

[33] Ibrahim NK, Desai N, Legha S, Soon-Shiong P, Theriault RL, Rivera E, et al. Phase I and pharmacokinetic study of ABI-007, a Cremophor-free, protein-stabilized, nanoparticle formulation of paclitaxel. Clin Cancer Res 2002;8(5):1038–44.

[34] O'Shaughnessy J, Tjulandin S, Davidson N, Shaw H, Desai N, Hawkins MJ, et al. ABI-007 (Abraxane), a nanoparticle albumin-bound (nab) paclitaxel, demonstrates superior efficacy vs. taxol in MBC: a phase III trial. SABCS; 2003 abstr no 44.

[35] OShaughnessy JA, Blum JL, Sandbach JF, Savin M, Fenske E, Hawkins MJ. Weekly nanoparticle albumin paclitaxel (Abraxane) results in long-term disease control in patients with taxane-refractory metastatic breast cancer. SABCS; 2004 abstr no 1070.

[36] ABI 007. Drugs RD 2004;5(3):155–9.

[37] Bapsy PP, Raghunadharao D, Majumdar A, Ganguly S, Roy A, Uppal G, et al. DO/NDR/02 a novel polymeric nanoparticle paclitaxel: results of a phase I dose escalation study. J Clin Oncol 2004;22(S14):2026.

[38] Bradley MO, Webb NL, Anthony FH, Devanesan P, Witman PA, Hemamalini S, et al. Tumor targeting by covalent conjugation of a natural fatty acid to paclitaxel. Clin Cancer Res 2001;7(10):3229–38.

[39] Wolff AC, Donehower RC, Carducci MK, Carducci MA, Brahmer JR, Zabelina Y, et al. Phase I study of docosahexaenoic acid-paclitaxel: a taxane-fatty acid conjugate with a unique pharmacology and toxicity profile. Clin Cancer Res 2003;9(10):3589–97.

[40] Sparreboom A, Wolff AC, Verweij J, Zabelina Y, Van Zomeren DM, McIntire GL, et al. Disposition of docosahexaenoic acid-paclitaxel, a novel taxane, in blood: in vitro and clinical pharmacokinetic studies. Clin Cancer Res 2003;9(1):151–9.

[41] Harries M, O'Donnell A, Scurr M, Reade S, Cole C, Judson I, et al. Phase I/II study of DHA-paclitaxel in combination with carboplatin in patients with advanced malignant solid tumours. Br J Cancer 2004; 1(9):1651–5 91.

[42] Gerth K, Bedorf N, Hofle G, Irschik H, Reichenbach H. Epothilones A and B: antifungal and cytotoxic compounds from Sorangium cellulosum (Myxobacteria). Production, physico-chemical and biological properties. J Antibiot (Tokyo) 1996;49(6):560–3.

[43] Bollag DM, McQueney PA, Zhu J, Hensens O, Koupal L, Liesch J, et al. Epothilones, a new class of microtubule-stabilizing agents with a taxol-like mechanism of action. Cancer Res 1995;55(11):2325–33.

[44] Bode CJ, Gupta Jr. ML, Reiff EA, Suprenant KA, Georg GI, Himes RH. Epothilone and paclitaxel: unexpected differences in promoting the assembly and stabilization of yeast microtubules. Biochemistry 2002;41(12):3870–4.

[45] Rubin EH, Siu LL, Beers S, Moore MJ, Thompson C, Becker M, et al. A phase I and pharmacologic trial of weekly Epothilone B in patients with advanced malignancies. ASCO; 2001 abstr no 270.

[46] Calvert PM, O'Neill V, Twelves C, Azzabi A, Hughes A, Bale C, et al. A phase I clinical and pharmacokinetic study of EPO906 (Epothilone B), given every 3 weeks, in patients with advanced solid tumors. ASCO; 2001 abstr no 429.

[47] Oesterlind K, Sanchez J, Zatloukal P, Perry M, Hamm J, Belani C, et al. A phase I/II dose-escalation trial of patupilone (EPO906) administered every 3 weeks in patients with non-small cell lung cancer (NSCLC). Ann Oncol 2004;15(S3) abstr no 631.

[48] Rothermel J, Wartmann M, Chen T, Hohneker J. EPO906 (epothilone B): a promising novel microtubule stabilizer. Semin Oncol 2003; 30(3 Suppl 6):51–5.

[49] Mani S, McDaid H, Hamilton A, Hochster H, Cohen MB, Khabelle D, et al. Phase I clinical and pharmacokinetic study of BMS-247550, a novel derivative of epothilone B, in solid tumors. Clin Cancer Res 2004;10(4):1289–98.

[50] Kaye S, Oza A, Gore M, Huinink W, Smit W, Gibbon D, et al. Preliminary results from a phase II trial of EPO906 in patients with advanced refractory ovarian cancer. Eur J Cancer 2002;38(7):S43.

[51] Abraham J, Agrawal M, Bakke S, Rutt A, Edgerly M, Balis FM, et al. Phase I trial and pharmacokinetic study of BMS-247550, an epothilone B analog, administered intravenously on a daily schedule for 5 days. J Clin Oncol 2003;21(9):1866–73.

[52] Eng C, Kindler HL, Nattam S, Ansari RH, Kasza K, Wade-Oliver K, et al. A phase II trial of the epothilone B analog, BMS-247550, in patients with previously treated advanced colorectal cancer. Ann Oncol 2004;15(6):928–32.

[53] Pavlick AC, Millward M, Farrell K, Hamilton A, Broseus A, Haas N, et al. A phase II study of epothilone B analog (EpoB)-BMS 247550 (NSC#710428) in stage IV malignant melanoma (MM). J Clin Oncol 2004;22(S14):7542.

[54] Vansteenkiste JF, Breton J-L, Sandler A, Lara P, Paz-Ares L, Bonomi P, et al. A randomized phase II study of epothilone analog BMS-247550 in patients (pts) with non-small cell lung cancer (NSCLC) who have failed first-line platinum-based chemotherapy. Proc Am Soc Clin Oncol 2003;22:626 abstr no 2519.

[55] Kelly WK, Galsky MD, Small EJ, Oh W, Chen I, Smith D, et al. Multi-institutional trial of the epothilone B analogue BMS-247550 with or without estramustine phosphate (EMP) in patients with progressive castrate-metastatic prostate cancer (PCMPC): updated results. J Clin Oncol 2004;22(S14):4509.

[56] Zhuang SH, Menefee M, Kotz H, Agrawal M, Poruchynsky M, Hung E, et al. A phase II clinical trial of BMS-247550 (ixabepilone), a microtubule-stabilizing agent in renal cell cancer. J Clin Oncol 2004;22(S14):4550.

[57] Whitehead RP, McCoy SA, Rivkin SE, Gross HM, Conrad ME, Abbruzzese JL. A phase II trial of epothilone B analogue BMS-247550 (NSC #710428) in patients with advanced pancreas cancer: a Southwest Oncology Group Study. J Clin Oncol 2004;22(S14):4012.

[58] Low A, Wedam SB, Brufsky A, Berman A, Croarkin E, Parks R, et al. A phase 2 trial of BMS-247550 (ixabepilone), an epothilone B analog, given daily × 5 in breast cancer. J Clin Oncol 2004;22(S14):545.

[59] Mekhail T, Chung C, Holden S, Bukowski RM, Eckhardt SG, Cunningham M, et al. Phase I trial of novel epothilone B analog BMS-310705 IV q 21 days. Proc Am Soc Clin Oncol 2003;22:29 abstr no 515.

[60] Piro LD, Rosen LS, Parson M, Cropp GF, McDaid H, Han J, et al. KOS-862 (epothilone D): a comparison of two schedules in patients with advanced malignancies. Proc Am Soc Clin Oncol 2003;22: 135 abstr no 539.

[61] Spriggs D, Dupont J, Pezzulli SJ, Larkin RG, Johnson AL, Hannah G, et al. KOS-862 (epothilone D): phase I dose-escalating and pharmacokinetic study in patients with advanced malignancies. Proc Am Soc Clin Oncol 2003;22:223 abstr 894.

[62] Holen KD, Syed S, Hannah AL, Binger K, Wood L, Zhou Y, et al. Phase I study using continuous intravenous (CI) KOS-862 (Epothilone D) in patients with solid tumors. J Clin Onc 2004; 22(14S):2024.

[63] Hung DT, Nerenberg JB, Schreiber SL. Distinct binding and cellular properties of synthetic (+)- and (−)-discodermolides. Chem Biol 1994;1(1):67–71.

[64] Honore S, Kamath K, Braguer D, Horwitz SB, Wilson L, Briand C, et al. Synergistic suppression of microtubule dynamics by discodermolide and paclitaxel in non-small cell lung carcinoma cells. Cancer Res 2004;64(14):4957–64.

[65] Mita A, Lockhart AC, Chen T-L, Bochinski K, Curtright J, Cooper W, et al. A phase I pharmacokinetic (PK) trial of XAA296A (Discodermolide) administered every 3 weeks to adult patients with advanced solid malignancies. J Clin Oncol 2004;22(S14):2025.

[66] Long BH, Carboni JM, Wasserman AJ, Cornell LA, Casazza AM, Jensen PR, et al. Eleutherobin, a novel cytotoxic agent that induces tubulin polymerization, is similar to paclitaxel (Taxol). Cancer Res 1998;58(6):1111–5.

[67] Roberge M, Cinel B, Anderson HJ, Lim L, Jiang X, Xu L, et al. Cell-based screen for antimitotic agents and identification of analogues of rhizoxin, eleutherobin, and paclitaxel in natural extracts. Cancer Res 2000;60(18):5052–8.

[68] Eggen M, Georg GI. The cryptophycins: their synthesis and anticancer activity. Med Res Rev 2002;22(2):85–101.

[69] Panda D, DeLuca K, Williams D, Jordan MA, Wilson L. Antiproliferative mechanism of action of cryptophycin-52: kinetic stabilization of microtubule dynamics by high-affinity binding to microtubule ends. Proc Natl Acad Sci USA 1998;95(16):9313–8.

[70] Sessa C, Weigang-Kohler K, Pagani O, Greim G, Mora O, De Pas T, et al. Phase I and pharmacological studies of the cryptophycin analogue LY355703 administered on a single intermittent or weekly schedule. Eur J Cancer 2002;38(18):2388–96.

[71] Stevenson JP, Sun W, Gallagher M, Johnson R, Vaughn D, Schuchter L, et al. Phase I trial of the cryptophycin analogue LY355703 administered as an intravenous infusion on a day 1 and 8 schedule every 21 days. Clin Cancer Res 2002;8(8):2524–9.

[72] Edelman MJ, Gandara DR, Hausner P, Israel V, Thornton D, DeSanto J, et al. Phase 2 study of cryptophycin 52 (LY355703) in patients previously treated with platinum based chemotherapy for advanced non-small cell lung cancer. Lung Cancer 2003;39(2):197–9.

[73] Bai RL, Pettit GR, Hamel E. Binding of dolastatin-10 to tubulin at a distinct site for peptide antimitotic agents near the exchangeable nucleotide and vinca alkaloid sites. J Biol Chem 1990;265(28):17141–9.

[74] Bai RL, Friedman SJ, Pettit GR, Hamel E. Dolastatin-15, a potent antimitotic depsipeptide derived from *Dolabella auricularia*. Interaction with tubulin and effects of cellular microtubules. Biochem Pharmacol 1992;43(12):2637–45.

[75] Pitot HC, McElroy Jr. EA, Reid JM, Windebank AJ, Sloan JA, Erlichman C, et al. Phase I trial of dolastatin-10 (NSC 376128) in patients with advanced solid tumors. Clin Cancer Res 1999;5(3):525–31.

[76] Margolin K, Longmate J, Synold TW, Gandara DR, Weber J, Gonzalez R, et al. Dolastatin-10 in metastatic melanoma: a phase II and pharmokinetic trial of the California Cancer Consortium. Investig New Drugs 2001;19(4):335–40.

[77] Vaishampayan U, Glode M, Du W, Kraft A, Hudes G, Wright J, et al. Phase II study of dolastatin-10 in patients with hormone-refractory metastatic prostate adenocarcinoma. Clin Cancer Res 2000;6(11): 4205–8.

[78] Hoffman MA, Blessing JA, Lentz SS. A phase II trial of dolastatin-10 in recurrent platinum-sensitive ovarian carcinoma: a Gynecologic Oncology Group study. Gynecol Oncol 2003;89(1):95–8.

[79] Saad ED, Kraut EH, Hoff PM, Moore Jr. DF, Jones D, Pazdur R, et al. Phase II study of dolastatin-10 as first-line treatment for advanced colorectal cancer. Am J Clin Oncol 2002;25(5):451–3.

[80] Schoffski P, Thate B, Beutel G, Bolte O, Otto D, Hofmann M, et al. Phase I evaluation of the three-weekly administration of TZT-1027 in patients with solid tumors. Proc Am Soc Clin Oncol 2003;22: 211 abstr no 845.

[81] Nobuyuki Y, Masahiro A, Masaaki K, Masahiro F, Hisanobu N. Phase I study of TZT-1027, an inhibitor of tubulin polymerization, given weekly × 3 as a 1-h intravenous infusion in patients (pts) with solid tumors. ASCO; 2002 abstr no 420.

[82] De Jonge MJ, Madretsma S, Van der Gaast A, Van Doorn L, Lems A, Boot I, et al. TZT-1027, a novel dolastatin-10 derivative: phase I and pharmacologic study of day 1 and 8 IV administration every 3 weeks in patients (pts) with advanced solid tumors. Proc Am Soc Clin Oncol 2003;22:153 abstr no 613.

[83] Kerbrat P, Dieras V, Pavlidis N, Ravaud A, Wanders J, Fumoleau P. Phase II study of LU 103793 (dolastatin analogue) in patients with metastatic breast cancer. Eur J Cancer 2003;39(3):317–20.

[84] Marks RS, Graham DL, Sloan JA, Hillman S, Fishkoff S, Krook JE, et al. A phase II study of the dolastatin-15 analogue LU 103793 in the treatment of advanced non-small-cell lung cancer. Am J Clin Oncol 2003;26(4):336–7.

[85] Villalona-Calero MA, Baker SD, Hammond L, Aylesworth C, Eckhardt SG, Kraynak M, et al. Phase I and pharmacokinetic study of the water-soluble dolastatin-15 analog LU103793 in patients with advanced solid malignancies. J Clin Oncol 1998;16(8):2770–9.

[86] Mross K, Berdel WE, Fiebig HH, Velagapudi R, Von Broen IM, Unger C. Clinical and pharmacologic phase I study of Cemadotin-HCl (LU103793), a novel antimitotic peptide, given as 24-h infusion in patients with advanced cancer. A study of the Arbeitsgemeinschaft Internistische Onkologie (AIO) Phase I Group and Arbeitsgruppe Pharmakologie in der Onkologie und Haematologie (APOH) Group of the German Cancer Society. Ann Oncol 1998;9(12):1323–30.

[87] Supko JG, Lynch TJ, Clark JW, Fram R, Allen LF, Velagapudi R, et al. A phase I clinical and pharmacokinetic study of the dolastatin analogue cemadotin administered as a 5-day continuous intravenous infusion. Cancer Chemother Pharmacol 2000;46(4):319–28.

[88] Hammond LA, Ruvuna F, Cunningham CC, Ebbinghaus S, Rubin E, Mita A, et al. Phase (Ph) I evaluation of the dolastatin analogue synthadotin (SYN-D; ILX651): pooled data analysis of three alternate schedules in patients (pts) with advanced solid tumors. J Clin Oncol 2004;22(S14):3068.

[89] Jacobsen SE, Ruscetti FW, Longo DL, Keller JR. Antineoplastic dolastatins: potent inhibitors of hematopoietic progenitor cells. J Natl Cancer Inst 1991;83(22):1672–7.

[90] Ngan VK, Bellman K, Panda D, Hill BT, Jordan MA, Wilson L. Novel actions of the antitumor drugs vinflunine and vinorelbine on microtubules. Cancer Res 2000;60(18):5045–51.

[91] Etievant C, Kruczynski A, Barret JM, Tait AS, Kavallaris M, Hill BT. Markedly diminished drug resistance-inducing properties of vinflunine (20′,20′-difluoro-3′,4′-dihydrovinorelbine) relative to vinorelbine, identified in murine and human tumour cells in vivo and in vitro. Cancer Chemother Pharmacol 2001;48(1):62–70.

[92] Holwell SE, Hill BT, Bibby MC. Antivascular effects of vinflunine in the MAC 15A transplantable adenocarcinoma model. Br J Cancer 2001;84:290–5.

[93] Bennouna J, Fumoleau P, Armand JP, Raymond E, Campone M, Delgado FM, et al. Phase I and pharmacokinetic study of the new vinca alkaloid vinflunine administered as a 10-min infusion every 3 weeks in patients with advanced solid tumours. Ann Oncol 2003; 14(4):630–7.

[94] Fumoleau P, Campone M, Vorobiof D, Casado M, Ruff P, Cortes-Funes H, et al. Phase II study of i.v. vinflunine as second line in patients with metastatic breast cancer after anthracycline-taxane failure. J Clin Oncol 2004;22(14S):542.

[95] Bennouna J, Tan EH, O'Brien M, Kosmidis P, Breton JL, Ottensmeier C, et al. Phase II study of IV Vinflunine (VFL) as second line treatment of patients (pts) with advanced non-small-cell lung cancer (NSCLC) previously treated with a platinum based regimen. J Clin Oncol 2004;22(S14):7139.

[96] Bai RL, Paull KD, Herald CL, Malspeis L, Pettit GR, Hamel E. Halichondrin B and homohalichondrin B, marine natural products binding in the vinca domain of tubulin. Discovery of tubulin-based mechanism of action by analysis of differential cytotoxicity data. J Biol Chem 1991;266(24):15882–9.

[97] Towle MJ, Salvato KA, Budrow J, Wels BF, Kuznetsov G, Aalfs KK, et al. In vitro and in vivo anticancer activities of synthetic macrocyclic ketone analogues of halichondrin B. Cancer Res 2001;61(3):1013–21.

[98] Synold TW, Lawrence J, Xi B, Colevas AD, Lewis MD, Doroshow JH. Human pharmacokinetics of E7389 (Halichondrin B analog), a novel anti-microtubule agent undergoing phase I investigation in the California Cancer Consortium (CCC). Proc Am Soc Clin Oncol 2003;22: 144 abstr 575.

[99] Tassone P, Goldmacher VS, Neri P, Gozzini A, Shammas MA, Whiteman KR, et al. Cytotoxic activity of the maytansinoid immunoconjugate B-B4-DM1 against CD138+ multiple myeloma cells. Blood 2004;104(12):3688–96.

[100] Tolcher AW, Ochoa L, Hammond LA, Patnaik A, Edwards T, Takimoto C, et al. Cantuzumab mertansine, a maytansinoid immunoconjugate directed to the CanAg antigen: a phase I, pharmacokinetic, and biologic correlative study. J Clin Oncol 2003;21(2):211–22.

[101] Chabner BA, Levine AS, Johnson BL, Young RC. Initial clinical trials of maytansine, an antitumor plant alkaloid. Cancer Treat Rep 1978; 62:429–33.

[102] Blum RH, Kahlert T. Maytansine. A phase I study of an ansa macrolide with antitumor activity. Cancer Treat Rep 1978;62:435–8.

[103] Cabanillas F, Rodriguez V, Hall SW, Burgess MA, Bodey GP, Freireich EJ. Phase I study of maytansine using a 3-day schedule. Cancer Treat Rep 1978;62:425–8.

[104] Helft PR, Schilsky RL, Hoke FJ, Williams D, Kindler HL, Sprague E, et al. A phase I study of cantuzumab mertansine administered as a single intravenous infusion once weekly in patients with advanced solid tumors. Clin Cancer Res 2004;10(13):4363–8.

[105] Henry MD, Wen S, Silva MD, Chandra S, Milton M, Worland PJ. A prostate-specific membrane antigen-targeted monoclonal antibody-chemotherapeutic conjugate designed for the treatment of prostate cancer. Cancer Res 2004;64(21):7995–8001.

[106] Israeli RS, Powell CT, Corr JG, Fair WR, Heston WD. Expression of the prostate-specific membrane antigen. Cancer Res 1994;54(7):1807–11.

[107] Marchal C, Redondo M, Padilla M, Caballero J, Rodrigo I, Garcia J, et al. Expression of prostate specific membrane antigen (PSMA) in prostatic adenocarcinoma and prostatic intraepithelial neoplasia. Histol Histopathol 2004;19(3):715–8.

[108] Liu H, Moy P, Kim S, Xia Y, Rajasekaran A, Navarro V, et al. Monoclonal antibodies to the extracellular domain of prostate-specific membrane antigen also react with tumor vascular endothelium. Cancer Res 1997;57(17):3629–34.

[109] Galsky MD, Eisenberger M, Moore-Cooper S, Kelly WK, Slovin S, Morales A, et al. Phase I trial of MLN2704 in patients with castrate-metastatic prostate cancer (CMPC). J Clin Oncol 2004;22(14):4592.

[110] Vaupel P, Kallinowski F, Okunieff P. Blood flow, oxygen and nutrient supply, and metabolic microenvironment of human tumors: a review. Cancer Res 1989;49(23):6449–65.

[111] Thorpe PE. Vascular targeting agents as cancer therapeutics. Clin Cancer Res 2004;10(2):415–27.

[112] Siemann DW, Chaplin DJ, Horsman MR. Vascular-targeting therapies for treatment of malignant disease. Cancer 2004;100(12):2491–9.

[113] Belotti D, Vergani V, Drudis T, Borsotti P, Pitelli MR, Viale G, et al. The microtubule-affecting drug paclitaxel has antiangiogenic activity. Clin Cancer Res 1996;2(11):1843–9.

[114] Baguley BC, Holdaway KM, Thomsen LL, Zhuang L, Zwi LJ. Inhibition of growth of colon 38 adenocarcinoma by vinblastine and colchicine: evidence for a vascular mechanism. Eur J Cancer 1991; 27(4):482–7.

[115] Cooney MM, Radivoyevitch T, Dowlati A, Overmoyer B, Levitan N, Robertson K, et al. Cardiovascular safety profile of combretastatin-A4-phosphate in a single-dose phase I study in patients with advanced cancer. Clin Cancer Res 2004;10(11):96–100.

[116] Stevenson JP, Rosen M, Sun W, Gallagher M, Haller DG, Vaughn D, et al. Phase I trial of the antivascular agent combretastatin A4 phosphate on a 5-day schedule to patients with cancer: magnetic resonance imaging evidence for altered tumor blood flow. J Clin Oncol 2003; 21(23):4428–38.

[117] Lorusso PM, Gadgeel S, Wozniak A, Barge A, McKinley M, McKinlay T, et al. A phase I dose escalation trial of ZD6126, a novel vascular targeting agent, in patients with cancer refractory to other treatments. Clin Cancer Res 2001;7(S8):36.

[118] Tolcher AW, Forero L, Celio P, Hammond LA, Patnaik A, Hill M, et al. Phase I, pharmacokinetic, and DCE-MRI correlative study of AVE8062A, an antivascular combretastatin analogue, administered weekly for 3 weeks every 28-days. Proc Am Soc Clin Oncol 2003;22: 208 abstr 834.

[119] Holwell SE, Cooper PA, Thompson MJ, Pettit GR, Lippert 3rd LW, Martin SW, et al. Anti-tumor and anti-vascular effects of the novel tubulin-binding agent combretastatin A-1 phosphate. Anticancer Res 2002;22(6):3933–40.

[120] Rustin GJ, Galbraith SM, Anderson H, Stratford M, Folkes LK, Sena L, et al. Phase I clinical trial of weekly combretastatin A4 phosphate: clinical and pharmacokinetic results. J Clin Oncol 2003;21(15):2815–22.

[121] Bilenker JH, Stevenson JP, Rosen MA, Gallagher M, Flaherty KT, Algazy KM, et al. Phase Ib trial of combretastatin A-4 phosphate (CA4P) in combination with carboplatin in patients with advanced cancer. Proc Am Soc Clin Oncol 2003;22:222 abstr 889.

[122] Leach MO, Brindle KM, Evelhoch JL, Griffiths JR, Horsman MR, Jackson A, et al. Assessment of antiangiogenic and antivascular therapeutics using MRI: recommendations for appropriate methodology for clinical trials. Br J Radiol 2003;76:S87–91.

[123] Sakowicz R, Finer JT, Beraud C, Crompton A, Lewis E, Fritsch A, et al. Antitumor activity of a kinesin inhibitor. Cancer Res 2004;64(9): 3276–80.

[124] Chu QS, Holen KD, Rowinsky EK, Wilding G, Volkman JL, Orr JB, et al. Phase I trial of novel kinesin spindle protein (KSP) inhibitor SB-715992 IV Q 21 days. J Clin Oncol 2004;22(S14):2078.

[125] Burris HA, Lorusso P, Jones S, Guthrie TM, Orr JB, Williams DD, et al. Phase I trial of novel kinesin spindle protein (KSP) inhibitor SB-715992 IV days 1, 8, 15 q 28 days. J Clin Oncol 2004;22(S14): 2004.

[126] Kolfschoten GM, Hulscher TM, Duyndam MC, Pinedo HM, Boven E. Variation in the kinetics of caspase-3 activation, Bcl-2 phosphorylation and apoptotic morphology in unselected human ovarian cancer cell lines as a response to docetaxel. Biochem Pharmacol 2002;63(4): 733–43.

[127] Harrington EA, Bebbington D, Moore J, Rasmussen RK, Ajose-Adeogun AO, Nakayama T, et al. VX-680, a potent and selective small-molecule inhibitor of the Aurora kinases, suppresses tumor growth in vivo. Nat Med 2004;10(3):262–7.

# EXHIBIT R

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use TAXOTERE safely and effectively.  See full prescribing information for TAXOTERE.**

**TAXOTERE (docetaxel) Injection Concentrate, Intravenous Infusion (IV). Initial U.S. Approval: 1996**

---

**WARNING**
*See full prescribing information for complete boxed warning*
- Treatment-related mortality increases with abnormal liver function, at higher doses, and in patients with NSCLC and prior platinum-based therapy receiving TAXOTERE at 100 mg/m$^2$ ( 5.1)
  - Should not be given if bilirubin > ULN, or if SGOT and/or SGPT > 1.5 x ULN concomitant with alkaline phosphatase > 2.5 x ULN. LFT elevations increase risk of severe or life-threatening complications. Obtain LFTs before each treatment cycle ( 8.6)
  - Should not be given if neutrophil counts are < 1500 cells/mm$^3$. Obtain frequent blood counts to monitor for neutropenia ( 4)
  - Severe hypersensitivity, including very rare fatal anaphylaxis, has been reported in patients who received dexamethasone premedication. Severe reactions require immediate discontinuation of TAXOTERE and administration of appropriate therapy ( 5.3)
  - Contraindicated if history of severe hypersensitivity reactions to TAXOTERE or to drugs formulated with polysorbate 80 ( 4)
  - Severe fluid retention may occur despite dexamethasone ( 5.10)

---

-----------------------------RECENT MAJOR CHANGES---------------------
Indications and usage ( 1), dosage and administration ( 2), warnings and precautions ( 5), adverse reactions( 6), 09/28/07

-----------------------------INDICATIONS AND USAGE-----------------------
Taxotere is a microtubule inhibitor used for:
**Breast Cancer (BC):** single agent for locally advanced or metastatic BC after chemotherapy failure; and with doxorubicin and cyclophosphamide as adjuvant treatment of operable node-positive BC ( 1.1)
**Non-Small Cell Lung Cancer (NSCLC):** single agent for locally advanced or metastatic NSCLC after platinum therapy failure; and with cisplatin for unreasectable, locally advanced or metastatic untreated NSCLC ( 1.2)
**Hormone Refractory Prostate Cancer (HRPC):** with prednisone in androgen independent (hormone refractory) metastatic prostate cancer ( 1.3)
**Gastric Adenocarcinoma (GC):** with cisplatin and fluorouracil for untreated, advanced GC, including the gastroesophageal junction ( 1.4)
**Squamous Cell Carcinoma of the Head and Neck Cancer (SCCHN):** with cisplatin and fluorouracil for induction treatment of locally advanced SCCHN ( 1.5)

-----------------------DOSAGE AND ADMINISTRATION-----------------------
Administer under supervision of qualified physicians experienced in using antineoplastic agents. Facilities to manage possible complications must be available.
Administer IV over 1 hr every 3 weeks. PVC equipment is not recommended.
- BC: locally advanced or metastatic: 60-100 mg/m$^2$ single agent ( 2.1)
- BC adjuvant: 75 mg/m$^2$ administered 1 hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ every 3 weeks for 6 cycles ( 2.1)

- NSCLC: after platinum therapy failure: 75 mg/m$^2$ single agent ( 2.2)
- NSCLC: chemotherapy-naive: 75 mg/m$^2$ followed by cisplatin 75 mg/m$^2$ ( 2.2)
- HRPC: 75 mg/m$^2$ with 5 mg prednisone twice a day continuously ( 2.3)
- GC: 75 mg/m$^2$ followed by cisplatin 75 mg/m$^2$ (both on day 1 only) followed by fluorouracil 750 mg/m$^2$ per day as a 24-hr IV (days 1-5), starting at end of cisplatin infusion ( 2.4)
- SCCHN: 75 mg/m$^2$ followed by cisplatin 75 mg/m$^2$ IV  (day 1), followed by fluorouracil 750 mg/m$^2$ per day as a 24-hr IV (days 1-5), starting at end of cisplatin infusion; for 4 cycles ( 2.5)
- SCCHN: 75 mg/m$^2$ followed by cisplatin 100 mg/m$^2$ IV (day 1), followed by fluorouracil 1000 mg/m$^2$ per day as a 24-hr IV (days 1-4); for 3 cycles ( 2.5)
**Premedication Regimen** ( 2.6)
- Oral corticosteroids such as dexamethasone 16 mg per day (*e.g.*, 8 mg twice a day) for 3 days starting 1 day before administration
- HRPC: oral dexamethasone 8 mg, at 12, 3, and 1 hrs before treatment
**Dosage adjustments during treatment** see full prescribing information ( 2.7)

--------------------DOSAGE FORMS AND STRENGTHS---------------------
- Single dose vial 80 mg/2 mL and diluent, 20 mg/0.5 mL and diluent ( 3)

------------------------------CONTRAINDICATIONS-----------------------------
- Hypersensitivity to Taxotere or polysorbate 80 ( 4)
- Neutrophil counts of < 1500 cells/mm$^3$ ( 4)

----------------------WARNINGS AND PRECAUTIONS------------------------
- Acute myeloid leukemia ( 5.6)
- Fetal harm can occur when administered to a pregnant woman.  Women of childbearing potential should be advised not to become pregnant when taking TAXOTERE ( 5.7)
- Asthenia ( 5.12)

------------------------------ADVERSE REACTIONS-----------------------------
Most common adverse reactions are infections, neutropenia, anemia, febrile neutropenia, hypersensitivity, thrombocytopenia, neuropathy, dysgeusia, dyspnea, constipation, anorexia, nail disorders, fluid retention, asthenia, pain, nausea, diarrhea, vomiting, mucositis, alopecia, skin reactions, myalgia ( 6)

Other adverse reactions, including serious adverse reactions have been reported ( 6)

**To report SUSPECTED ADVERSE REACTIONS, contact sanofi-aventis U.S. LLC at 1-800-663-1610 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch***

----------------------------DRUG INTERACTIONS--------------------------
- Compounds that induce, inhibit, or are metabolized by P450-3A4 ( 7)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling**

**Revised: 09/28/07**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**WARNING**
**1  INDICATIONS AND USAGE**
   1.1   Breast Cancer
   1.2   Non-Small Cell Lung Cancer
   1.3   Prostate Cancer
   1.4   Gastric Adenocarcinoma
   1.5   Head and Neck Cancer
**2  DOSAGE AND ADMINISTRATION**
   2.1   Breast Cancer
   2.2   Non-Small Cell Lung Cancer
   2.3   Prostate Cancer
   2.4   Gastric Adenocarcinoma
   2.5   Head and Neck Cancer
   2.6   Premedication Regimen
   2.7   Dose Adjustments During Treatment
   2.8   Administration Precautions
   2.9   Preparation and Administration
   2.10  Stability
**3  DOSAGE FORMS AND STRENGTHS**
**4  CONTRAINDICATIONS**
**5  WARNINGS AND PRECAUTIONS**
   5.1   Toxic Deaths
   5.2   Premedication Regimen
   5.3   Hypersensitivity Reactions
   5.4   Hematologic Effects
   5.5   Hepatic Impairment
   5.6   Acute Myeloid Leukemia
   5.7   Pregnancy
   5.8   General
   5.9   Cutaneous
   5.10  Fluid Retention
   5.11  Neurologic
   5.12  Asthenia
**6  ADVERSE REACTIONS**
   6.1   Clinical Trials Experience
   6.2   Post Marketing Experiences

MYLAN - EXHIBIT 1024

7   DRUG INTERACTIONS
8   USE IN SPECIFIC POPULATIONS
    8.1   Pregnancy
    8.3   Nursing Mothers
    8.4   Pediatric Use
    8.5   Geriatric Use
    8.6   Hepatic Impairment
10  OVERDOSAGE
11  DESCRIPTION
12  CLINICAL PHARMACOLOGY
    12.1   Mechanism of Action
    12.3   Human Pharmacokinetics
13  NONCLINICAL TOXICOLOGY
    13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
14  CLINICAL STUDIES
    14.1   Breast Cancer

14.2   Adjuvant Treatment of Breast Cancer
14.3   Non-Small Cell Lung Cancer (NSCLC)
14.4   Prostate Cancer
14.5   Gastric Adenocarcinoma
14.6   Head and Neck Cancer
15  REFERENCES
16  HOW SUPPLIED/STORAGE AND HANDLING
    16.1   How Supplied
    16.2   Storage
    16.3   Handling and Disposal
17  PATIENT COUNSELING INFORMATION

*Sections or subsections omitted from the full prescribing information are not listed

1
2                                **FULL PRESCRIBING INFORMATION**
3

---

4   **WARNING**
5   The incidence of treatment-related mortality associated with TAXOTERE therapy is increased in
6   patients with abnormal liver function, in patients receiving higher doses, and in patients with
7   non-small cell lung carcinoma and a history of prior treatment with platinum-based
8   chemotherapy who receive TAXOTERE as a single agent at a dose of 100 mg/m$^2$ *[see Warnings*
9   *and Precautions (5.1)]*.

10  TAXOTERE should generally not be given to patients with bilirubin > upper limit of normal
11  (ULN), or to patients with SGOT and/or SGPT >1.5 x ULN concomitant with alkaline
12  phosphatase >2.5 x ULN. Patients with elevations of bilirubin or abnormalities of transaminase
13  concurrent with alkaline phosphatase are at increased risk for the development of grade 4
14  neutropenia, febrile neutropenia, infections, severe thrombocytopenia, severe stomatitis, severe
15  skin toxicity, and toxic death. Patients with isolated elevations of transaminase >1.5 x ULN also
16  had a higher rate of febrile neutropenia grade 4 but did not have an increased incidence of toxic
17  death. Bilirubin, SGOT or SGPT, and alkaline phosphatase values should be obtained prior to
18  each cycle of TAXOTERE therapy and reviewed by the treating physician.

19  TAXOTERE therapy should not be given to patients with neutrophil counts of <1500 cells/mm$^3$.
20  In order to monitor the occurrence of neutropenia, which may be severe and result in infection,
21  frequent blood cell counts should be performed on all patients receiving TAXOTERE.

22  Severe hypersensitivity reactions characterized by generalized rash/erythema, hypotension
23  and/or bronchospasm, or very rarely fatal anaphylaxis, have been reported in patients who
24  received the recommended 3-day dexamethasone premedication. Hypersensitivity reactions
25  require immediate discontinuation of the TAXOTERE infusion and administration of appropriate
26  therapy *[see Warnings and Precautions (5.2)]*. TAXOTERE must not be given to patients who
27  have a history of severe hypersensitivity reactions to TAXOTERE or to other drugs formulated
28  with polysorbate 80 *[see Contraindications (4)]*.

29  Severe fluid retention occurred in 6.5% (6/92) of patients despite use of a 3-day dexamethasone
30  premedication regimen. It was characterized by one or more of the following events: poorly
31  tolerated peripheral edema, generalized edema, pleural effusion requiring urgent drainage,
32  dyspnea at rest, cardiac tamponade, or pronounced abdominal distention (due to ascites) *[see*
33  *Warnings and Precautions (5.10)]*.

---

34

## 1.  INDICATIONS AND USAGE

### 1.1  Breast Cancer

- TAXOTERE is indicated for the treatment of patients with locally advanced or metastatic breast cancer after failure of prior chemotherapy.
- TAXOTERE in combination with doxorubicin and cyclophosphamide is indicated for the adjuvant treatment of patients with operable node-positive breast cancer.

### 1.2  Non-Small Cell Lung Cancer

- TAXOTERE as a single agent is indicated for the treatment of patients with locally advanced or metastatic non-small cell lung cancer after failure of prior platinum-based chemotherapy.
- TAXOTERE in combination with cisplatin is indicated for the treatment of patients with unresectable, locally advanced or metastatic non-small cell lung cancer who have not previously received chemotherapy for this condition.

### 1.3  Prostate Cancer

- TAXOTERE in combination with prednisone is indicated for the treatment of patients with androgen independent (hormone refractory) metastatic prostate cancer.

### 1.4  Gastric Adenocarcinoma

- TAXOTERE in combination with cisplatin and fluorouracil is indicated for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who have not received prior chemotherapy for advanced disease.

### 1.5  Head and Neck Cancer

- TAXOTERE in combination with cisplatin and fluorouracil is indicated for the induction treatment of patients with locally advanced squamous cell carcinoma of the head and neck (SCCHN).

## 2.  DOSAGE AND ADMINISTRATION

TAXOTERE (docetaxel) Injection Concentrate should be administered under the supervision of a qualified physician experienced in the use of antineoplastic agents.  Appropriate management of complications is possible only when adequate diagnostic and treatment facilities are readily available.

### 2.1  Breast Cancer

- The recommended dose of TAXOTERE is 60-100 mg/m$^2$ administered intravenously over 1 hour every 3 weeks.
- In the adjuvant treatment of operable node-positive breast cancer, the recommended TAXOTERE dose is 75 mg/m$^2$ administered 1-hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ every 3 weeks for 6 courses. Prophylactic G-CSF may

be used to mitigate the risk of hematological toxicities *[see Dosage Adjustments During Treatment (2.7)]*.

## 2.2  Non-Small Cell Lung Cancer

- For treatment after failure of prior platinum-based chemotherapy, TAXOTERE was evaluated as monotherapy, and the recommended dose is 75 mg/m$^2$ administered intravenously over 1 hour every 3 weeks. A dose of 100 mg/m$^2$ in patients previously treated with chemotherapy was associated with increased hematologic toxicity, infection, and treatment-related mortality in randomized, controlled trials *[see Boxed Warning, Dosage Adjustments During Treatment (2.7), Warnings and Precautions (5), Clinical Studies (14)]*.

- For chemotherapy-naïve patients, TAXOTERE was evaluated in combination with cisplatin. The recommended dose of TAXOTERE is 75 mg/m$^2$ administered intravenously over 1 hour immediately followed by cisplatin 75 mg/m$^2$ over 30-60 minutes every 3 weeks *[see Dosage Adjustments During Treatment (2.7)]*.

## 2.3  Prostate cancer

- For hormone-refractory metastatic prostate cancer, the recommended dose of TAXOTERE is 75 mg/m$^2$ every 3 weeks as a 1 hour intravenous infusion. Prednisone 5 mg orally twice daily is administered continuously *[see Dosage Adjustments During Treatment (2.7)]*.

## 2.4  Gastric adenocarcinoma

- For gastric adenocarcinoma, the recommended dose of TAXOTERE is 75 mg/m$^2$ as a 1 hour intravenous infusion, followed by cisplatin 75 mg/m$^2$, as a 1 to 3 hour intravenous infusion (both on day 1 only), followed by fluorouracil 750 mg/m$^2$ per day given as a 24-hour continuous intravenous infusion for 5 days, starting at the end of the cisplatin infusion.  Treatment is repeated every three weeks. Patients must receive premedication with antiemetics and appropriate hydration for cisplatin administration *[see Dosage Adjustments During Treatment (2.7)]*.

## 2.5  Head and Neck Cancer

Patients must receive premedication with antiemetics, and appropriate hydration (prior to and after cisplatin administration).  Prophylaxis for neutropenic infections should be administered. All patients treated on the TAXOTERE containing arms of the TAX323 and TAX324 studies received prophylactic antibiotics.

- Induction chemotherapy followed by radiotherapy (TAX323)

    For the induction treatment of locally advanced inoperable SCCHN, the recommended dose of TAXOTERE is 75 mg/m$^2$ as a 1 hour intravenous infusion followed by cisplatin 75 mg/m$^2$ intravenously over 1 hour, on day one, followed by fluorouracil as a continuous intravenous infusion at 750 mg/m$^2$ per day for five days. This regimen is administered every 3 weeks for 4 cycles.  Following chemotherapy, patients should receive radiotherapy.  *[see Dosage Adjustments During Treatment (2.7)]*.

4

- Induction chemotherapy followed by chemoradiotherapy (TAX324)

  For the induction treatment of patients with locally advanced (unresectable, low surgical cure, or organ preservation) SCCHN, the recommended dose of TAXOTERE is 75 mg/m$^2$ as a 1 hour intravenous infusion on day 1, followed by cisplatin 100 mg/m$^2$ administered as a 30-minute to 3 hour infusion, followed by fluorouracil 1000 mg/m$^2$/day as a continuous infusion from day 1 to day 4. This regimen is administered every 3 weeks for 3 cycles. Following chemotherapy, patients should receive chemoradiotherapy *[see Dosage Adjustments During Treatment (2.7)]*.

## 2.6  Premedication Regimen

- All patients should be premedicated with oral corticosteroids (see below for prostate cancer) such as dexamethasone 16 mg per day (e.g., 8 mg BID) for 3 days starting 1 day prior to TAXOTERE administration in order to reduce the incidence and severity of fluid retention as well as the severity of hypersensitivity reactions *[see Boxed Warning, Warnings and Precautions (5)]*.

- For hormone-refractory metastatic prostate cancer, given the concurrent use of prednisone, the recommended premedication regimen is oral dexamethasone 8 mg, at 12 hours, 3 hours and 1 hour before the TAXOTERE infusion *[see Warnings and Precautions (5)]*.

## 2.7  Dosage Adjustments During Treatment

- Breast Cancer

Patients who are dosed initially at 100 mg/m$^2$ and who experience either febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than 1 week, or severe or cumulative cutaneous reactions during TAXOTERE therapy should have the dosage adjusted from 100 mg/m$^2$ to 75 mg/m$^2$. If the patient continues to experience these reactions, the dosage should either be decreased from 75 mg/m$^2$ to 55 mg/m$^2$ or the treatment should be discontinued. Conversely, patients who are dosed initially at 60 mg/m$^2$ and who do not experience febrile neutropenia, neutrophils <500 cells/mm$^3$ for more than 1 week, severe or cumulative cutaneous reactions, or severe peripheral neuropathy during TAXOTERE therapy may tolerate higher doses. Patients who develop ≥grade 3 peripheral neuropathy should have TAXOTERE treatment discontinued entirely.

- Combination Therapy with TAXOTERE in the Adjuvant Treatment of Breast Cancer

TAXOTERE in combination with doxorubicin and cyclophosphamide should be administered when the neutrophil count is ≥1,500 cells/mm$^3$. Patients who experience febrile neutropenia should receive G-CSF in all subsequent cycles. Patients who continue to experience this reaction should remain on G-CSF and have their TAXOTERE dose reduced to 60 mg/m². Patients who experience Grade 3 or 4 stomatitis should have their TAXOTERE dose decreased to 60 mg/m². Patients who experience severe or cumulative cutaneous reactions or moderate neurosensory signs and/or symptoms during TAXOTERE therapy should have their dosage of TAXOTERE

5

reduced from 75 to 60 mg/m². If the patient continues to experience these reactions at 60 mg/m², treatment should be discontinued.

- **Non-Small Cell Lung Cancer**

*Monotherapy with TAXOTERE for NSCLC treatment after failure of prior platinum-based chemotherapy*

Patients who are dosed initially at 75 mg/m² and who experience either febrile neutropenia, neutrophils <500 cells/mm³ for more than one week, severe or cumulative cutaneous reactions, or other grade 3/4 non-hematological toxicities during TAXOTERE treatment should have treatment withheld until resolution of the toxicity and then resumed at 55 mg/m². Patients who develop ≥grade 3 peripheral neuropathy should have TAXOTERE treatment discontinued entirely.

*Combination therapy with TAXOTERE for chemotherapy-naïve NSCLC*

For patients who are dosed initially at TAXOTERE 75 mg/m² in combination with cisplatin, and whose nadir of platelet count during the previous course of therapy is <25,000 cells/mm³, in patients who experience febrile neutropenia, and in patients with serious non-hematologic toxicities, the TAXOTERE dosage in subsequent cycles should be reduced to 65 mg/m². In patients who require a further dose reduction, a dose of 50 mg/m² is recommended. For cisplatin dosage adjustments, see manufacturers' prescribing information.

- **Prostate Cancer**

*Combination therapy with TAXOTERE for hormone-refractory metastatic prostate cancer*

TAXOTERE should be administered when the neutrophil count is ≥1,500 cells/mm³. Patients who experience either febrile neutropenia, neutrophils <500 cells/mm³ for more than one week, severe or cumulative cutaneous reactions or moderate neurosensory signs and/or symptoms during TAXOTERE therapy should have the dosage of TAXOTERE reduced from 75 to 60 mg/m². If the patient continues to experience these reactions at 60 mg/m², the treatment should be discontinued.

- **Gastric or Head and Neck Cancer**

*TAXOTERE in combination with cisplatin and fluorouracil in gastric cancer or head and neck cancer*

Patients treated with TAXOTERE in combination with cisplatin and fluorouracil must receive antiemetics and appropriate hydration according to current institutional guidelines. In both studies, G-CSF was recommended during the second and/or subsequent cycles in case of febrile neutropenia, or documented infection with neutropenia, or neutropenia lasting more than 7 days. If an episode of febrile neutropenia, prolonged neutropenia or neutropenic infection occurs despite G-CSF use, the TAXOTERE dose should be reduced from 75 to 60 mg/m². If subsequent episodes of complicated neutropenia occur the TAXOTERE dose should be reduced from 60 to 45 mg/m². In case of Grade 4 thrombocytopenia the TAXOTERE dose should be reduced from 75 to 60 mg/m². Patients should not be retreated with subsequent cycles of TAXOTERE until neutrophils recover to a level >1,500 cells/mm³ and platelets recover to a level >100,000 cells/mm³. Discontinue treatment if these toxicities persist. *[see Warnings and Precautions (5)].*

Recommended dose modifications for toxicities in patients treated with TAXOTERE in combination with cisplatin and fluorouracil are shown in Table 1.

**Table 1 - Recommended Dose Modifications for Toxicities in Patients Treated with TAXOTERE in Combination with Cisplatin and Fluorouracil**

| Toxicity | Dosage adjustment |
|---|---|
| Diarrhea grade 3 | First episode: reduce fluorouracil dose by 20%.<br>Second episode: then reduce TAXOTERE dose by 20%. |
| Diarrhea grade 4 | First episode: reduce TAXOTERE and fluorouracil doses by 20%.<br>Second episode: discontinue treatment. |
| Stomatitis/mucositis grade 3 | First episode: reduce fluorouracil dose by 20%.<br>Second episode: stop fluorouracil only, at all subsequent cycles.<br>Third episode: reduce TAXOTERE dose by 20%. |
| Stomatitis/mucositis grade 4 | First episode: stop fluorouracil only, at all subsequent cycles.<br>Second episode: reduce TAXOTERE dose by 20%. |

Liver dysfunction:

In case of AST/ALT >2.5 to ≤5 x UNL and AP ≤2.5 x UNL, or AST/ALT >1.5 to ≤5 x UNL and AP >2.5 to ≤5 x UNL, TAXOTERE should be reduced by 20%.

In case of AST/ALT >5 x UNL and/or AP >5 x UNL TAXOTERE should be stopped.

The dose modifications for cisplatin and fluorouracil in the gastric cancer study are provided below:

Cisplatin dose modifications and delays

Peripheral neuropathy: A neurological examination should be performed before entry into the study, and then at least every 2 cycles and at the end of treatment. In the case of neurological signs or symptoms, more frequent examinations should be performed and the following dose modifications can be made according to NCIC-CTC grade:

• Grade 2: Reduce cisplatin dose by 20%.

• Grade 3: Discontinue treatment.

Ototoxicity: In the case of grade 3 toxicity, discontinue treatment.

Nephrotoxicity: In the event of a rise in serum creatinine ≥grade 2 (>1.5 x normal value) despite adequate rehydration, CrCl should be determined before each subsequent cycle and the following dose reductions should be considered (see Table 2).

For other cisplatin dosage adjustments, also refer to the manufacturers' prescribing information.

7

| Table 2 – Dose Reductions for Evaluation of Creatinine Clearance | |
| --- | --- |
| **Creatinine clearance result before next cycle** | **Cisplatin dose next cycle** |
| CrCl ≥60 mL/min | Full dose of cisplatin was given.  CrCl was to be repeated before each treatment cycle. |
| CrCl between 40 and 59 mL/min | Dose of cisplatin was reduced by 50% at subsequent cycle.  If CrCl was >60 mL/min at end of cycle, full cisplatin dose was reinstituted at the next cycle.<br><br>If no recovery was observed, then cisplatin was omitted from the next treatment cycle. |
| CrCl <40 mL/min | Dose of cisplatin was omitted in that treatment cycle only.<br><br>If CrCl was still <40 mL/min at the end of cycle, cisplatin was discontinued.<br><br>If CrCl was >40 and <60 mL/min at end of cycle, a 50% cisplatin dose was given at the next cycle.<br><br>If CrCl was >60 mL/min at end of cycle, full cisplatin dose was given at next cycle. |

CrCl = Creatinine clearance

Fluorouracil dose modifications and treatment delays
For diarrhea and stomatitis, see Table 1.
In the event of grade 2 or greater plantar-palmar toxicity, fluorouracil should be stopped until recovery. The fluorouracil dosage should be reduced by 20%.
For other greater than grade 3 toxicities, except alopecia and anemia, chemotherapy should be delayed (for a maximum of 2 weeks from the planned date of infusion) until resolution to grade ≤1 and then recommended, if medically appropriate.
For other fluorouracil dosage adjustments, also refer to the manufacturers' prescribing information.

## 2.8   Administration Precautions

TAXOTERE is a cytotoxic anticancer drug and, as with other potentially toxic compounds, caution should be exercised when handling and preparing TAXOTERE solutions. The use of gloves is recommended. Please refer to ***Handling and Disposal (16.3)***.
If TAXOTERE Injection Concentrate, initial diluted solution, or final dilution for intravenous infusion should come into contact with the skin, immediately and thoroughly wash with soap and water. If TAXOTERE Injection Concentrate, initial diluted solution, or final dilution for intravenous infusion should come into contact with mucosa, immediately and thoroughly wash with water.
Contact of the TAXOTERE concentrate with plasticized PVC equipment or devices used to prepare solutions for infusion is not recommended. In order to minimize patient exposure to the

8

1   plasticizer DEHP (di-2-ethylhexyl phthalate), which may be leached from PVC infusion bags or
2   sets, the final TAXOTERE dilution for infusion should be stored in bottles (glass,
3   polypropylene) or plastic bags (polypropylene, polyolefin) and administered through
4   polyethylene-lined administration sets.

5   TAXOTERE Injection Concentrate requires <u>two</u> dilutions prior to administration. Please follow
6   the preparation instructions provided below. **Note:** Both the TAXOTERE Injection Concentrate
7   and the diluent vials contain an overfill to compensate for liquid loss during preparation.  This
8   overfill ensures that after dilution with the **<u>entire</u>** contents of the accompanying diluent, there is
9   an initial diluted solution containing 10 mg/mL docetaxel.

10  The table below provides the fill range of the diluent, the approximate extractable volume of
11  diluent when the entire contents of the diluent vial are withdrawn, and the concentration of the
12  initial diluted solution for TAXOTERE 20 mg and TAXOTERE 80 mg (see Table 3).

13

14          **Table 3 – Initial Dilution of TAXOTERE Injection Concentrate**

| Product | Diluent 13% (w/w) ethanol in water for injection Fill Range (mL) | Approximate extractable volume of diluent when entire contents are withdrawn (mL) | Concentration of the initial diluted solution (mg/mL docetaxel) |
|---|---|---|---|
| Taxotere® 20 mg/0.5 mL | 1.88 – 2.08  mL | 1.8 mL | 10 mg/mL |
| Taxotere® 80 mg/2 mL | 6.96 – 7.70 mL | 7.1 mL | 10 mg/mL |

15

16  ## 2.9   Preparation and Administration

17  A. Initial Diluted Solution

18  1. TAXOTERE vials should be stored between 2 and 25°C (36 and 77°F). If the vials are stored
19     under refrigeration, allow the appropriate number of vials of TAXOTERE Injection
20     Concentrate and diluent (13% ethanol in water for injection) vials to stand at room
21     temperature for approximately 5 minutes.

22  2. Aseptically withdraw the entire contents of the appropriate diluent vial (approximately 1.8 mL
23     for TAXOTERE 20 mg and approximately 7.1 mL for TAXOTERE 80 mg) into a syringe by
24     partially inverting the vial, and transfer it to the appropriate vial of TAXOTERE Injection
25     Concentrate. **<u>If the procedure is followed as described, an initial diluted solution of 10 mg</u>**
26     **<u>docetaxel/mL will result</u>**.

27  3. Mix the initial diluted solution by repeated inversions for at least 45 seconds to assure full
28     mixture of the concentrate and diluent. Do not shake.

29  4. The initial diluted TAXOTERE solution (10 mg docetaxel/mL) should be clear; however,
30     there may be some foam on top of the solution due to the polysorbate 80. Allow the solution to
31     stand for a few minutes to allow any foam to dissipate. It is not required that all foam dissipate
32     prior to continuing the preparation process.

33     The initial diluted solution may be used immediately or stored either in the refrigerator or at
34     room temperature for a maximum of 8 hours.

9

B. Final Dilution for Infusion

1. Aseptically withdraw the required amount of initial diluted TAXOTERE solution (10 mg docetaxel/mL) with a calibrated syringe and inject into a 250 mL infusion bag or bottle of either 0.9% Sodium Chloride solution or 5% Dextrose solution to produce a final concentration of 0.3 to 0.74 mg/mL.

If a dose greater than 200 mg of TAXOTERE is required, use a larger volume of the infusion vehicle so that a concentration of 0.74 mg/mL TAXOTERE is not exceeded.

2. Thoroughly mix the infusion by manual rotation.

3. As with all parenteral products, TAXOTERE should be inspected visually for particulate matter or discoloration prior to administration whenever the solution and container permit. If the TAXOTERE initial diluted solution or final dilution for intravenous infusion is not clear or appears to have precipitation, these should be discarded.

The final TAXOTERE dilution for infusion should be administered intravenously as a 1-hour infusion under ambient room temperature and lighting conditions.

**2.10  Stability**

TAXOTERE infusion solution, if stored between 2 and 25°C (36 and 77°F) is stable for 4 hours. Fully prepared TAXOTERE infusion solution (in either 0.9% Sodium Chloride solution or 5% Dextrose solution) should be used within 4 hours (including the 1 hour i.v. administration).

**3.  DOSAGE FORMS AND STRENGTHS**

**TAXOTERE 80 mg/2 mL**

TAXOTERE (docetaxel) Injection Concentrate 80 mg/2 mL: 80 mg docetaxel in 2 mL polysorbate 80 and Diluent for TAXOTERE 80 mg (13% (w/w) ethanol in water for injection). Both items are in a blister pack in one carton.

**TAXOTERE 20 mg/0.5 mL**

TAXOTERE (docetaxel) Injection Concentrate 20 mg/0.5 mL: 20 mg docetaxel in 0.5 mL polysorbate 80 and Diluent for TAXOTERE 20 mg (13% (w/w) ethanol in water for injection). Both items are in a blister pack in one carton.

**4.  CONTRAINDICATIONS**

TAXOTERE is contraindicated in patients who have a history of severe hypersensitivity reactions to docetaxel or to other drugs formulated with polysorbate 80.

TAXOTERE should not be used in patients with neutrophil counts of <1500 cells/mm$^3$.

**5.  WARNINGS AND PRECAUTIONS**

TAXOTERE should be administered under the supervision of a qualified physician experienced in the use of antineoplastic agents. Appropriate management of complications is possible only when adequate diagnostic and treatment facilities are readily available.

**5.1  Toxic Deaths**

- Breast Cancer

TAXOTERE administered at 100 mg/m$^2$ was associated with deaths considered possibly or probably related to treatment in 2.0% (19/965) of metastatic breast cancer patients, both previously treated and untreated, with normal baseline liver function and in 11.5% (7/61) of

patients with various tumor types who had abnormal baseline liver function (SGOT and/or SGPT >1.5 times ULN together with AP >2.5 times ULN). Among patients dosed at 60 mg/m$^2$, mortality related to treatment occurred in 0.6% (3/481) of patients with normal liver function, and in 3 of 7 patients with abnormal liver function. Approximately half of these deaths occurred during the first cycle. Sepsis accounted for the majority of the deaths.

- **Non-Small Cell Lung Cancer**

TAXOTERE administered at a dose of 100 mg/m$^2$ in patients with locally advanced or metastatic non-small cell lung cancer who had a history of prior platinum-based chemotherapy was associated with increased treatment-related mortality (14% and 5% in two randomized, controlled studies). There were 2.8% treatment-related deaths among the 176 patients treated at the 75 mg/m$^2$ dose in the randomized trials. Among patients who experienced treatment-related mortality at the 75 mg/m$^2$ dose level, 3 of 5 patients had a PS of 2 at study entry *[see Boxed Warning, Clinical Studies (14), and Dosage and Administration (2.2)].*

## 5.2   Premedication Regimen

All patients should be premedicated with oral corticosteroids (see below for prostate cancer) such as dexamethasone 16 mg per day (*e.g.*, 8 mg BID) for 3 days starting 1 day prior to TAXOTERE to reduce the severity of fluid retention and hypersensitivity reactions *[see Dosage and Administration (2.6)].* This regimen was evaluated in 92 patients with metastatic breast cancer previously treated with chemotherapy given TAXOTERE at a dose of 100 mg/m$^2$ every 3 weeks.

The pretreatment regimen for hormone-refractory metastatic prostate cancer is oral dexamethasone 8 mg, at 12 hours, 3 hours and 1 hour before the TAXOTERE infusion *[see Dosage and Administration (2.6)].*

## 5.3   Hypersensitivity Reactions

Patients should be observed closely for hypersensitivity reactions, especially during the first and second infusions. Severe hypersensitivity reactions characterized by generalized rash/erythema, hypotension and/or bronchospasm, or very rarely fatal anaphylaxis, have been reported in patients premedicated with 3 days of corticosteroids. Severe hypersensitivity reactions require immediate discontinuation of the TAXOTERE infusion and aggressive therapy. Patients with a history of severe hypersensitivity reactions should not be rechallenged with TAXOTERE.

Hypersensitivity reactions may occur within a few minutes following initiation of a TAXOTERE infusion. If minor reactions such as flushing or localized skin reactions occur, interruption of therapy is not required. All patients should be premedicated with an oral corticosteroid prior to the initiation of the infusion of TAXOTERE *[see Boxed Warning, Premedication Regimen (2.6)].*

## 5.4   Hematologic Effects

Neutropenia (<2000 neutrophils/mm$^3$) occurs in virtually all patients given 60-100 mg/m$^2$ of TAXOTERE and grade 4 neutropenia (<500 cells/mm$^3$) occurs in 85% of patients given 100 mg/m$^2$ and 75% of patients given 60 mg/m$^2$. Frequent monitoring of blood counts is, therefore, essential so that dose can be adjusted. TAXOTERE should not be administered to patients with neutrophils <1500 cells/mm$^3$.

11

Febrile neutropenia occurred in about 12% of patients given 100 mg/m$^2$ but was very uncommon in patients given 60 mg/m$^2$. Hematologic responses, febrile reactions and infections, and rates of septic death for different regimens are dose related and are described in *Clinical Studies (14)*.

Three breast cancer patients with severe liver impairment (bilirubin >1.7 times ULN) developed fatal gastrointestinal bleeding associated with severe drug-induced thrombocytopenia. In gastric cancer patients treated with TAXOTERE in combination with cisplatin and fluorouracil (TCF), febrile neutropenia and/or neutropenic infection occurred in 12% of patients receiving G-CSF compared to 28% who did not.  Patients receiving TCF should be closely monitored during the first and subsequent cycles for febrile neutropenia and neutropenic infection *[see Adverse Reactions (6.0) and Dosage Adjustments (2.7)]*.

In order to monitor the occurrence of myelotoxicity, it is recommended that frequent peripheral blood cell counts be performed on all patients receiving TAXOTERE. Patients should not be retreated with subsequent cycles of TAXOTERE until neutrophils recover to a level >1500 cells/mm$^3$ and platelets recover to a level > 100,000 cells/mm$^3$.

A 25% reduction in the dose of TAXOTERE is recommended during subsequent cycles following severe neutropenia (<500 cells/mm$^3$) lasting 7 days or more, febrile neutropenia, or a grade 4 infection in a TAXOTERE cycle *[see Dosage and Administration (2.7)]*.

### 5.5   Hepatic Impairment
*[see Boxed Warning, Use in Specific Populations (8.6)]*.

### 5.6   Acute Myeloid Leukemia
Treatment-related acute myeloid leukemia (AML) or myelodysplasia has occurred in patients given anthracyclines and/or cyclophosphamide, including use in adjuvant therapy for breast cancer.  In the adjuvant breast cancer trial *[(TAX316), see Clinical Studies (14)]* AML occurred in 3 of 744 patients who received TAXOTERE, doxorubicin and cyclophosphamide and in 1 of 736 patients who received fluorouracil, doxorubicin and cyclophosphamide.   In the TAXOTERE, doxorubicin and cyclophosphamide (TAC) treated patients, the risk of delayed myelodysplasia or myeloid leukemia requires hematological follow-up *[see Adverse Reactions (6)]*.

### 5.7   Pregnancy
Pregnancy Category D

TAXOTERE can cause fetal harm when administered to pregnant women. Studies in both rats and rabbits at doses ≥0.3 and 0.03 mg/kg/day, respectively (about 1/50 and 1/300 the daily maximum recommended human dose on a mg/m$^2$ basis), administered during the period of organogenesis, have shown that TAXOTERE is embryotoxic and fetotoxic (characterized by intrauterine mortality, increased resorption, reduced fetal weight, and fetal ossification delay). The doses indicated above also caused maternal toxicity.

There are no adequate and well-controlled studies in pregnant women using TAXOTERE. If TAXOTERE is used during pregnancy, or if the patient becomes pregnant while receiving this drug, the patient should be apprised of the potential hazard to the fetus or potential risk for loss of the pregnancy. Women of childbearing potential should be advised to avoid becoming pregnant during therapy with TAXOTERE *[see Use In Specific Populations (8.1)]*.

### 5.8   General

Responding patients may not experience an improvement in performance status on therapy and may experience worsening. The relationship between changes in performance status, response to therapy, and treatment-related side effects has not been established.

### 5.9   Cutaneous

Localized erythema of the extremities with edema followed by desquamation has been observed. In case of severe skin toxicity, an adjustment in dosage is recommended *[see Dose Adjustments During Treatment (2.7)]*. The discontinuation rate due to skin toxicity was 1.6% (15/965) for metastatic breast cancer patients. Among 92 breast cancer patients premedicated with 3-day corticosteroids, there were no cases of severe skin toxicity reported and no patient discontinued TAXOTERE due to skin toxicity.

### 5.10  Fluid Retention

Severe fluid retention has been reported following TAXOTERE therapy *[see Boxed Warning, Premedication Regimen (2.6)]*. Patients should be premedicated with oral corticosteroids prior to each TAXOTERE administration to reduce the incidence and severity of fluid retention *[see Premedication Regimen (2.6)].* Patients with pre-existing effusions should be closely monitored from the first dose for the possible exacerbation of the effusions.

When fluid retention occurs, peripheral edema usually starts in the lower extremities and may become generalized with a median weight gain of 2 kg.

Among 92 breast cancer patients premedicated with 3-day corticosteroids, moderate fluid retention occurred in 27.2% and severe fluid retention in 6.5%. The median cumulative dose to onset of moderate or severe fluid retention was 819 mg/m$^2$. 9.8% (9/92) of patients discontinued treatment due to fluid retention: 4 patients discontinued with severe fluid retention; the remaining 5 had mild or moderate fluid retention. The median cumulative dose to treatment discontinuation due to fluid retention was 1021 mg/m$^2$. Fluid retention was completely, but sometimes slowly, reversible with a median of 16 weeks from the last infusion of TAXOTERE to resolution (range: 0 to 42+ weeks). Patients developing peripheral edema may be treated with standard measures, *e.g.*, salt restriction, oral diuretic(s).

### 5.11  Neurologic

Severe neurosensory symptoms (paresthesia, dysesthesia, pain) were observed in 5.5% (53/965) of metastatic breast cancer patients, and resulted in treatment discontinuation in 6.1%. When these symptoms occur, dosage must be adjusted. If symptoms persist, treatment should be discontinued *[see Dose Adjustments During Treatment (2.7)]*. Patients who experienced neurotoxicity in clinical trials and for whom follow-up information on the complete resolution of the event was available had spontaneous reversal of symptoms with a median of 9 weeks from onset (range: 0 to 106 weeks). Severe peripheral motor neuropathy mainly manifested as distal extremity weakness occurred in 4.4% (42/965).

**5.12  Asthenia**

Severe asthenia has been reported in 14.9% (144/965) of metastatic breast cancer patients but has led to treatment discontinuation in only 1.8%. Symptoms of fatigue and weakness may last a few days up to several weeks and may be associated with deterioration of performance status in patients with progressive disease.

# 6.  ADVERSE REACTIONS

Adverse reactions are described for TAXOTERE according to indication.

## 6.1  Clinical Trial Experience

- Breast Cancer

*Monotherapy with TAXOTERE for locally advanced or metastatic breast cancer after failure of prior chemotherapy*

TAXOTERE 100 mg/m$^2$: Adverse drug reactions occurring in at least 5% of patients are compared for three populations who received TAXOTERE administered at 100 mg/m$^2$ as a 1-hour infusion every 3 weeks: 2045 patients with various tumor types and normal baseline liver function tests; the subset of 965 patients with locally advanced or metastatic breast cancer, both previously treated and untreated with chemotherapy, who had normal baseline liver function tests; and an additional 61 patients with various tumor types who had abnormal liver function tests at baseline. These reactions were described using COSTART terms and were considered possibly or probably related to TAXOTERE. At least 95% of these patients did not receive hematopoietic support. The safety profile is generally similar in patients receiving TAXOTERE for the treatment of breast cancer and in patients with other tumor types (See Table 4).

**Table 4 - Summary of Adverse Reactions in Patients Receiving TAXOTERE at 100 mg/m$^2$**

| Adverse Reaction | All Tumor Types Normal LFTs* n=2045 % | All Tumor Types Elevated LFTs** n=61 % | Breast Cancer Normal LFTs* n=965 % |
|---|---|---|---|
| **Hematologic** | | | |
| Neutropenia | | | |
| <2000 cells/mm$^3$ | 95.5 | 96.4 | 98.5 |
| <500 cells/mm$^3$ | 75.4 | 87.5 | 85.9 |
| Leukopenia | | | |
| <4000 cells/mm$^3$ | 95.6 | 98.3 | 98.6 |
| <1000 cells/mm$^3$ | 31.6 | 46.6 | 43.7 |
| Thrombocytopenia | | | |
| <100,000 cells/mm$^3$ | 8.0 | 24.6 | 9.2 |
| Anemia | | | |
| <11 g/dL | 90.4 | 91.8 | 93.6 |
| <8 g/dL | 8.8 | 31.1 | 7.7 |

14

| Adverse Reaction | All Tumor Types Normal LFTs* n=2045 % | All Tumor Types Elevated LFTs** n=61 % | Breast Cancer Normal LFTs* n=965 % |
|---|---|---|---|
| Febrile Neutropenia*** | 11.0 | 26.2 | 12.3 |
| **Septic Death** | 1.6 | 4.9 | 1.4 |
| **Non-Septic Death** | 0.6 | 6.6 | 0.6 |
| **Infections** | | | |
| Any | 21.6 | 32.8 | 22.2 |
| Severe | 6.1 | 16.4 | 6.4 |
| **Fever in Absence of Infection** | | | |
| Any | 31.2 | 41.0 | 35.1 |
| Severe | 2.1 | 8.2 | 2.2 |
| **Hypersensitivity Reactions** | | | |
| Regardless of Premedication | | | |
| Any | 21.0 | 19.7 | 17.6 |
| Severe | 4.2 | 9.8 | 2.6 |
| With 3-day Premedication | n=92 | n=3 | n=92 |
| Any | 15.2 | 33.3 | 15.2 |
| Severe | 2.2 | 0 | 2.2 |
| **Fluid Retention** | | | |
| Regardless of Premedication | | | |
| Any | 47.0 | 39.3 | 59.7 |
| Severe | 6.9 | 8.2 | 8.9 |
| With 3-day Premedication | n=92 | n=3 | n=92 |
| Any | 64.1 | 66.7 | 64.1 |
| Severe | 6.5 | 33.3 | 6.5 |
| **Neurosensory** | | | |
| Any | 49.3 | 34.4 | 58.3 |
| Severe | 4.3 | 0 | 5.5 |
| **Cutaneous** | | | |
| Any | 47.6 | 54.1 | 47.0 |
| Severe | 4.8 | 9.8 | 5.2 |
| **Nail Changes** | | | |
| Any | 30.6 | 23.0 | 40.5 |
| Severe | 2.5 | 4.9 | 3.7 |
| **Gastrointestinal** | | | |
| Nausea | 38.8 | 37.7 | 42.1 |
| Vomiting | 22.3 | 23.0 | 23.4 |

| Adverse Reaction | All Tumor Types Normal LFTs* n=2045 % | All Tumor Types Elevated LFTs** n=61 % | Breast Cancer Normal LFTs* n=965 % |
|---|---|---|---|
| Diarrhea | 38.7 | 32.8 | 42.6 |
| Severe | 4.7 | 4.9 | 5.5 |
| **Stomatitis** | | | |
| Any | 41.7 | 49.2 | 51.7 |
| Severe | 5.5 | 13.0 | 7.4 |
| **Alopecia** | 75.8 | 62.3 | 74.2 |
| **Asthenia** | | | |
| Any | 61.8 | 52.5 | 66.3 |
| Severe | 12.8 | 24.6 | 14.9 |
| **Myalgia** | | | |
| Any | 18.9 | 16.4 | 21.1 |
| Severe | 1.5 | 1.6 | 1.8 |
| **Arthralgia** | 9.2 | 6.6 | 8.2 |
| **Infusion Site Reactions** | 4.4 | 3.3 | 4.0 |

1  *Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated
2  elevations of transaminases or alkaline phosphatase up to 5 times ULN
3  **Elevated Baseline LFTs: SGOT and/or SGPT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times
4  ULN
5  ***Febrile Neutropenia: ANC grade 4 with fever >38$^o$C with IV antibiotics and/or hospitalization
6
7  **Hematologic** *[see Warnings and Precautions (5.4)].*
8  Reversible marrow suppression was the major dose-limiting toxicity of TAXOTERE. The
9  median time to nadir was 7 days, while the median duration of severe neutropenia
10 (<500 cells/mm$^3$) was 7 days. Among 2045 patients with solid tumors and normal baseline LFTs,
11 severe neutropenia occurred in 75.4% and lasted for more than 7 days in 2.9% of cycles.
12 Febrile neutropenia (<500 cells/mm$^3$ with fever >38$^o$C with IV antibiotics and/or hospitalization)
13 occurred in 11% of patients with solid tumors, in 12.3% of patients with metastatic breast cancer,
14 and in 9.8% of 92 breast cancer patients premedicated with 3-day corticosteroids.
15 Severe infectious episodes occurred in 6.1% of patients with solid tumors, in 6.4% of patients
16 with metastatic breast cancer, and in 5.4% of 92 breast cancer patients premedicated with 3-day
17 corticosteroids.
18 Thrombocytopenia (<100,000 cells/mm$^3$) associated with fatal gastrointestinal hemorrhage has
19 been reported.
20
21 **Hypersensitivity Reactions**
22 Severe hypersensitivity reactions are discussed in the ***Boxed Warning, Warnings and***
23 ***Precautions (5.3)*** sections. Minor events, including flushing, rash with or without pruritus, chest
24 tightness, back pain, dyspnea, drug fever, or chills, have been reported and resolved after
25 discontinuing the infusion and appropriate therapy.

16

**Fluid Retention** *[see Boxed Warning, Warnings and Precautions (5.10), Premedication Regimen (2.6)].*

**Cutaneous**

Severe skin toxicity is discussed in ***Warnings and Precautions (5.9)***. Reversible cutaneous reactions characterized by a rash including localized eruptions, mainly on the feet and/or hands, but also on the arms, face, or thorax, usually associated with pruritus, have been observed. Eruptions generally occurred within 1 week after TAXOTERE infusion, recovered before the next infusion, and were not disabling.

Severe nail disorders were characterized by hypo- or hyperpigmentation, and occasionally by onycholysis (in 0.8% of patients with solid tumors) and pain.

**Neurologic** *[see Warnings and Precautions (5.11)].*

**Gastrointestinal**

Gastrointestinal reactions (nausea and/or vomiting and/or diarrhea) were generally mild to moderate. Severe reactions occurred in 3-5% of patients with solid tumors and to a similar extent among metastatic breast cancer patients. The incidence of severe reactions was 1% or less for the 92 breast cancer patients premedicated with 3-day corticosteroids.

Severe stomatitis occurred in 5.5% of patients with solid tumors, in 7.4% of patients with metastatic breast cancer, and in 1.1% of the 92 breast cancer patients premedicated with 3-day corticosteroids.

**Cardiovascular**

Hypotension occurred in 2.8% of patients with solid tumors; 1.2% required treatment. Clinically meaningful events such as heart failure, sinus tachycardia, atrial flutter, dysrhythmia, unstable angina, pulmonary edema, and hypertension occurred rarely. 8.1% (7/86) of metastatic breast cancer patients receiving TAXOTERE 100 mg/m$^2$ in a randomized trial and who had serial left ventricular ejection fractions assessed developed deterioration of LVEF by ≥10% associated with a drop below the institutional lower limit of normal.

**Infusion Site Reactions**

Infusion site reactions were generally mild and consisted of hyperpigmentation, inflammation, redness or dryness of the skin, phlebitis, extravasation, or swelling of the vein.

**Hepatic**

In patients with normal LFTs at baseline, bilirubin values greater than the ULN occurred in 8.9% of patients. Increases in SGOT or SGPT >1.5 times the ULN, or alkaline phosphatase >2.5 times ULN, were observed in 18.9% and 7.3% of patients, respectively. While on TAXOTERE, increases in SGOT and/or SGPT >1.5 times ULN concomitant with alkaline phosphatase >2.5 times ULN occurred in 4.3% of patients with normal LFTs at baseline. (Whether these changes were related to the drug or underlying disease has not been established).

1 **Hematologic and Other Toxicity: Relation to dose and baseline liver chemistry**
2 **abnormalities**
3 Hematologic and other toxicity is increased at higher doses and in patients with elevated baseline
4 liver function tests (LFTs). In the following tables, adverse drug reactions are compared for three
5 populations: 730 patients with normal LFTs given TAXOTERE at 100 mg/m$^2$ in the randomized
6 and single arm studies of metastatic breast cancer after failure of previous chemotherapy;
7 18 patients in these studies who had abnormal baseline LFTs (defined as SGOT and/or
8 SGPT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN); and 174 patients
9 in Japanese studies given TAXOTERE at 60 mg/m$^2$ who had normal LFTs (see Tables 5 and 6).

10

11 **Table 5 - Hematologic Adverse Reactions in Breast Cancer Patients Previously Treated**
12 **with Chemotherapy Treated at TAXOTERE 100 mg/m$^2$ with Normal or Elevated Liver**
13 **Function Tests or 60 mg/m$^2$ with Normal Liver Function Tests**

| Adverse Reaction | TAXOTERE 100 mg/m$^2$ | | TAXOTERE 60 mg/m$^2$ |
|---|---|---|---|
| | Normal LFTs* n=730 % | Elevated LFTs** n=18 % | Normal LFTs* n=174 % |
| **Neutropenia** | | | |
| Any        <2000 cells/mm$^3$ | 98.4 | 100 | 95.4 |
| Grade 4    <500 cells/mm$^3$ | 84.4 | 93.8 | 74.9 |
| **Thrombocytopenia** | | | |
| Any        <100,000 cells/mm$^3$ | 10.8 | 44.4 | 14.4 |
| Grade 4    <20,000 cells/mm$^3$ | 0.6 | 16.7 | 1.1 |
| **Anemia    <11 g/dL** | 94.6 | 94.4 | 64.9 |
| **Infection*** | | | |
| Any | 22.5 | 38.9 | 1.1 |
| Grade 3 and 4 | 7.1 | 33.3 | 0 |
| **Febrile Neutropenia**** | | | |
| By Patient | 11.8 | 33.3 | 0 |
| By Course | 2.4 | 8.6 | 0 |
| **Septic Death** | 1.5 | 5.6 | 1.1 |
| **Non-Septic Death** | 1.1 | 11.1 | 0 |

14 *Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated
15 elevations of transaminases or alkaline phosphatase up to 5 times ULN

16 **Elevated Baseline LFTs: SGOT and/or SGPT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times
17 ULN

18 ***Incidence of infection requiring hospitalization and/or intravenous antibiotics was 8.5% (n=62) among the
19 730 patients with normal LFTs at baseline; 7 patients had concurrent grade 3 neutropenia, and 46 patients had
20 grade 4 neutropenia.

21 ****Febrile Neutropenia: For 100 mg/m$^2$, ANC grade 4 and fever >38°C with IV antibiotics and/or hospitalization;
22 for 60 mg/m$^2$, ANC grade 3/4 and fever >38.1°C

23

18

**Table 6 - Non-Hematologic Adverse Reactions in Breast Cancer Patients Previously Treated with Chemotherapy Treated at TAXOTERE 100 mg/m$^2$ with Normal or Elevated Liver Function Tests or 60 mg/m$^2$ with Normal Liver Function Tests**

| Adverse Reaction | TAXOTERE 100 mg/m$^2$ | | TAXOTERE 60 mg/m$^2$ |
|---|---|---|---|
| | Normal LFTs* n=730 % | Elevated LFTs** n=18 % | Normal LFTs* n=174 % |
| **Acute Hypersensitivity Reaction Regardless of Premedication** | | | |
| Any | 13.0 | 5.6 | 0.6 |
| Severe | 1.2 | 0 | 0 |
| **Fluid Retention*** Regardless of Premedication** | | | |
| Any | 56.2 | 61.1 | 12.6 |
| Severe | 7.9 | 16.7 | 0 |
| **Neurosensory** | | | |
| Any | 56.8 | 50 | 19.5 |
| Severe | 5.8 | 0 | 0 |
| **Myalgia** | 22.7 | 33.3 | 3.4 |
| **Cutaneous** | | | |
| Any | 44.8 | 61.1 | 30.5 |
| Severe | 4.8 | 16.7 | 0 |
| **Asthenia** | | | |
| Any | 65.2 | 44.4 | 65.5 |
| Severe | 16.6 | 22.2 | 0 |
| **Diarrhea** | | | |
| Any | 42.2 | 27.8 | NA |
| Severe | 6.3 | 11.1 | |
| **Stomatitis** | | | |
| Any | 53.3 | 66.7 | 19.0 |
| Severe | 7.8 | 38.9 | 0.6 |

*Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated elevations of transaminases or alkaline phosphatase up to 5 times ULN

** Elevated Baseline Liver Function: SGOT and/or SGPT >1.5 times ULN concurrent with alkaline phosphatase >2.5 times ULN

***Fluid Retention includes (by COSTART): edema (peripheral, localized, generalized, lymphedema, pulmonary edema, and edema otherwise not specified) and effusion (pleural, pericardial, and ascites); no premedication given with the 60 mg/m$^2$ dose

NA = not available

19

In the three-arm monotherapy trial, TAX313, which compared TAXOTERE 60, 75 and 100 mg/m$^2$ in advanced breast cancer, the overall safety profile was consistent with the safety profile observed in previous TAXOTERE trials. Grade 3/4 or severe adverse reactions occurred in 49.0% of patients treated with TAXOTERE 60 mg/m$^2$ compared to 55.3% and 65.9% treated with 75 and 100 mg/m$^2$ respectively.   Discontinuation due to adverse reactions was reported in 5.3% of patients treated with 60 mg/m$^2$ vs. 6.9% and 16.5% for patients treated at 75 and 100 mg/m$^2$ respectively. Deaths within 30 days of last treatment occurred in 4.0% of patients treated with 60 mg/m$^2$ compared to 5.3% and 1.6% for patients treated at 75 and 100 mg/m$^2$ respectively.

The following adverse reactions were associated with increasing docetaxel doses: fluid retention (26%, 38%, and 46% at 60, 75, and 100 mg/m$^2$ respectively), thrombocytopenia (7%, 11% and 12% respectively), neutropenia (92%, 94%, and 97% respectively), febrile neutropenia (5%, 7%, and 14% respectively), treatment-related grade 3/4 infection (2%, 3%, and 7% respectively) and anemia (87%, 94%, and 97% respectively).

*Combination therapy with TAXOTERE in the adjuvant treatment of breast cancer*

The following table presents treatment emergent adverse reactions (TEAEs) observed in 744 patients, who were treated with TAXOTERE 75 mg/m² every 3 weeks in combination with doxorubicin and cyclophosphamide (see Table 7).

**Table 7 - Clinically Important Treatment Emergent Adverse Reactions Regardless of Causal Relationship in Patients Receiving TAXOTERE in Combination with Doxorubicin and Cyclophosphamide (TAX316).**

| | TAXOTERE 75 mg/m²+ Doxorubicin 50 mg/m²+ Cyclophosphamide 500 mg/m² (TAC) n=744 % | | Fluorouracil 500 mg/m²+ Doxorubicin 50 mg/m²+ Cyclophosphamide 500 mg/m² (FAC) n=736 % | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any** | **G 3/4** | **Any** | **G 3/4** |
| **Anemia** | 91.5 | 4.3 | 71.7 | 1.6 |
| **Neutropenia** | 71.4 | 65.5 | 82.0 | 49.3 |
| **Fever in absence of infection** | 46.5 | 1.3 | 17.1 | 0.0 |
| **Infection** | 39.4 | 3.9 | 36.3 | 2.2 |
| **Thrombocytopenia** | 39.4 | 2.0 | 27.7 | 1.2 |
| **Febrile neutropenia** | 24.7 | N/A | 2.5 | N/A |
| **Neutropenic infection** | 12.1 | N/A | 6.3 | N/A |
| **Hypersensitivity reactions** | 13.4 | 1.3 | 3.7 | 0.1 |
| **Lymphedema** | 4.4 | 0.0 | 1.2 | 0.0 |
| **Fluid Retention*** | 35.1 | 0.9 | 14.7 | 0.1 |
| Peripheral edema | 26.9 | 0.4 | 7.3 | 0.0 |
| Weight gain | 12.9 | 0.3 | 8.6 | 0.3 |
| **Neuropathy sensory** | 25.5 | 0.0 | 10.2 | 0.0 |

| | TAXOTERE 75 mg/m$^2$+ Doxorubicin 50 mg/m$^2$+ Cyclophosphamide 500 mg/m$^2$ (TAC) n=744 % | | Fluorouracil 500 mg/m$^2$+ Doxorubicin 50 mg/m$^2$+ Cyclophosphamide 500 mg/m$^2$ (FAC) n=736 % | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any** | **G 3/4** | **Any** | **G 3/4** |
| **Neuro-cortical** | 5.1 | 0.5 | 6.4 | 0.7 |
| **Neuropathy motor** | 3.8 | 0.1 | 2.2 | 0.0 |
| **Neuro-cerebellar** | 2.4 | 0.1 | 2.0 | 0.0 |
| **Syncope** | 1.6 | 0.5 | 1.2 | 0.3 |
| **Alopecia** | 97.8 | N/A | 97.1 | N/A |
| **Skin toxicity** | 26.5 | 0.8 | 17.7 | 0.4 |
| **Nail disorders** | 18.5 | 0.4 | 14.4 | 0.1 |
| **Nausea** | 80.5 | 5.1 | 88.0 | 9.5 |
| **Stomatitis** | 69.4 | 7.1 | 52.9 | 2.0 |
| **Vomiting** | 44.5 | 4.3 | 59.2 | 7.3 |
| **Diarrhea** | 35.2 | 3.8 | 27.9 | 1.8 |
| **Constipation** | 33.9 | 1.1 | 31.8 | 1.4 |
| **Taste perversion** | 27.8 | 0.7 | 15.1 | 0.0 |
| **Anorexia** | 21.6 | 2.2 | 17.7 | 1.2 |
| **Abdominal Pain** | 10.9 | 0.7 | 5.3 | 0.0 |
| **Amenorrhea** | 61.7 | N/A | 52.4 | N/A |
| **Cough** | 13.7 | 0.0 | 9.8 | 0.1 |
| **Cardiac dysrhythmias** | 7.9 | 0.3 | 6.0 | 0.3 |
| **Vasodilatation** | 27.0 | 1.1 | 21.2 | 0.5 |
| **Hypotension** | 2.6 | 0.0 | 1.1 | 0.1 |
| **Phlebitis** | 1.2 | 0.0 | 0.8 | 0.0 |
| **Asthenia** | 80.8 | 11.2 | 71.2 | 5.6 |
| **Myalgia** | 26.7 | 0.8 | 9.9 | 0.0 |
| **Arthralgia** | 19.4 | 0.5 | 9.0 | 0.3 |
| **Lacrimation disorder** | 11.3 | 0.1 | 7.1 | 0.0 |
| **Conjunctivitis** | 5.1 | 0.3 | 6.9 | 0.1 |

1  * COSTART term and grading system for events related to treatment.
2
3  Of the 744 patients treated with TAC, 36.3% experienced severe TEAEs compared to 26.6% of
4  the 736 patients treated with FAC.  Dose reductions due to hematologic toxicity occurred in 1%
5  of cycles in the TAC arm versus 0.1% of cycles in the FAC arm. Six percent of patients treated
6  with TAC discontinued treatment due to adverse reactions, compared to 1.1% treated with FAC;
7  fever in the absence of infection and allergy being the most common reasons for withdrawal

21

among TAC-treated patients. Two patients died in each arm within 30 days of their last study treatment; 1 death per arm was attributed to study drugs.

**Fever and Infection**

Fever in the absence of infection was seen in 46.5% of TAC-treated patients and in 17.1% of FAC-treated patients. Grade 3/4 fever in the absence of infection was seen in 1.3% and 0% of TAC- and FAC-treated patients respectively.  Infection was seen in 39.4% of TAC-treated patients compared to 36.3% of FAC-treated patients. Grade 3/4 infection was seen in 3.9% and 2.2% of TAC-treated and FAC-treated patients respectively. There were no septic deaths in either treatment arm.

**Gastrointestinal events**

In addition to gastrointestinal events reflected in the table above, 7 patients in the TAC arm were reported to have colitis/enteritis/large intestine perforation vs. one patient in the FAC arm. Five of the 7 TAC-treated patients required treatment discontinuation; no deaths due to these events occurred.

**Cardiovascular events**

More cardiovascular events were reported in the TAC arm vs. the FAC arm; dysrhythmias, all grades (7.9% vs. 6.0%), hypotension, all grades (2.6% vs. 1.1%) and CHF (2.3% vs. 0.9%, at 70 months median follow-up). One patient in each arm died due to heart failure.

**Acute Myeloid Leukemia (AML)**

Treatment-related acute myeloid leukemia or myelodysplasia is known to occur in patients treated with anthracyclines and/or cyclophosphamide, including use in adjuvant therapy for breast cancer.  AML occurs at a higher frequency when these agents are given in combination with radiation therapy. AML occurred in the adjuvant breast cancer trial (TAX316). The cumulative risk of developing treatment-related AML at 5 years in TAX316 was 0.4% for TAC-treated patients and 0.1% for FAC-treated patients.  This risk of AML is comparable to the risk observed for other anthracyclines/cyclophosphamide containing adjuvant breast chemotherapy regimens.

- Lung Cancer

*Monotherapy with TAXOTERE for unresectable, locally advanced or metastatic NSCLC previously treated with platinum-based chemotherapy*

TAXOTERE 75 mg/m$^2$: Treatment emergent adverse drug reactions are shown in Table 8. Included in this table are safety data for a total of 176 patients with non-small cell lung carcinoma and a history of prior treatment with platinum-based chemotherapy who were treated in two randomized, controlled trials. These reactions were described using NCI Common Toxicity Criteria regardless of relationship to study treatment, except for the hematologic toxicities or where otherwise noted.

22

**Table 8 - Treatment Emergent Adverse Reactions Regardless of Relationship to Treatment in Patients Receiving TAXOTERE as Monotherapy for Non-Small Cell Lung Cancer Previously Treated with Platinum-Based Chemotherapy\***

| Adverse Reaction | TAXOTERE 75 mg/m$^2$ n=176 % | Best Supportive Care n=49 % | Vinorelbine/ Ifosfamide n=119 % |
|---|---|---|---|
| **Neutropenia** | | | |
| Any | 84.1 | 14.3 | 83.2 |
| Grade 3/4 | 65.3 | 12.2 | 57.1 |
| **Leukopenia** | | | |
| Any | 83.5 | 6.1 | 89.1 |
| Grade 3/4 | 49.4 | 0 | 42.9 |
| **Thrombocytopenia** | | | |
| Any | 8.0 | 0 | 7.6 |
| Grade 3/4 | 2.8 | 0 | 1.7 |
| **Anemia** | | | |
| Any | 91.0 | 55.1 | 90.8 |
| Grade 3/4 | 9.1 | 12.2 | 14.3 |
| **Febrile Neutropenia\*\*** | 6.3 | NA[†] | 0.8 |
| **Infection** | | | |
| Any | 33.5 | 28.6 | 30.3 |
| Grade 3/4 | 10.2 | 6.1 | 9.2 |
| **Treatment Related Mortality** | 2.8 | NA[†] | 3.4 |
| **Hypersensitivity Reactions** | | | |
| Any | 5.7 | 0 | 0.8 |
| Grade 3/4 | 2.8 | 0 | 0 |
| **Fluid Retention** | | | |
| Any | 33.5 | ND[††] | 22.7 |
| Severe | 2.8 | | 3.4 |
| **Neurosensory** | | | |
| Any | 23.3 | 14.3 | 28.6 |
| Grade 3/4 | 1.7 | 6.1 | 5.0 |
| **Neuromotor** | | | |
| Any | 15.9 | 8.2 | 10.1 |
| Grade 3/4 | 4.5 | 6.1 | 3.4 |
| **Skin** | | | |
| Any | 19.9 | 6.1 | 16.8 |
| Grade 3/4 | 0.6 | 2.0 | 0.8 |

23

| Adverse Reaction | TAXOTERE 75 mg/m$^2$ n=176 % | Best Supportive Care n=49 % | Vinorelbine/ Ifosfamide n=119 % |
|---|---|---|---|
| **Gastrointestinal** | | | |
| Nausea | | | |
| Any | 33.5 | 30.6 | 31.1 |
| Grade 3/4 | 5.1 | 4.1 | 7.6 |
| Vomiting | | | |
| Any | 21.6 | 26.5 | 21.8 |
| Grade 3/4 | 2.8 | 2.0 | 5.9 |
| Diarrhea | | | |
| Any | 22.7 | 6.1 | 11.8 |
| Grade 3/4 | 2.8 | 0 | 4.2 |
| **Alopecia** | 56.3 | 34.7 | 49.6 |
| **Asthenia** | | | |
| Any | 52.8 | 57.1 | 53.8 |
| Severe*** | 18.2 | 38.8 | 22.7 |
| **Stomatitis** | | | |
| Any | 26.1 | 6.1 | 7.6 |
| Grade 3/4 | 1.7 | 0 | 0.8 |
| **Pulmonary** | | | |
| Any | 40.9 | 49.0 | 45.4 |
| Grade 3/4 | 21.0 | 28.6 | 18.5 |
| **Nail Disorder** | | | |
| Any | 11.4 | 0 | 1.7 |
| Severe*** | 1.1 | 0 | 0 |
| **Myalgia** | | | |
| Any | 6.3 | 0 | 2.5 |
| Severe*** | 0 | 0 | 0 |
| **Arthralgia** | | | |
| Any | 3.4 | 2.0 | 1.7 |
| Severe*** | 0 | 0 | 0.8 |
| **Taste Perversion** | | | |
| Any | 5.7 | 0 | 0 |
| Severe*** | 0.6 | 0 | 0 |

1  *Normal Baseline LFTs: Transaminases ≤1.5 times ULN or alkaline phosphatase ≤2.5 times ULN or isolated
2  elevations of transaminases or alkaline phosphatase up to 5 times ULN
3  **Febrile Neutropenia: ANC grade 4 with fever >38°C with IV antibiotics and/or hospitalization
4  ***COSTART term and grading system
5  †Not Applicable; †† Not Done

*Combination therapy with TAXOTERE in chemotherapy-naïve advanced unresectable or metastatic NSCLC*

Table 9 presents safety data from two arms of an open label, randomized controlled trial (TAX326) that enrolled patients with unresectable stage IIIB or IV non-small cell lung cancer and no history of prior chemotherapy. Adverse reactions were described using the NCI Common Toxicity Criteria except where otherwise noted.

**Table 9 - Adverse Reactions Regardless of Relationship to Treatment in Chemotherapy-Naïve Advanced Non-Small Cell Lung Cancer Patients Receiving TAXOTERE in Combination with Cisplatin**

| Adverse Reaction | TAXOTERE 75 mg/m$^2$ + Cisplatin 75 mg/m$^2$ n=406 % | Vinorelbine 25 mg/m$^2$ + Cisplatin 100 mg/m$^2$ n=396 % |
|---|---|---|
| **Neutropenia** | | |
| Any | 91 | 90 |
| Grade 3/4 | 74 | 78 |
| **Febrile Neutropenia** | 5 | 5 |
| **Thrombocytopenia** | | |
| Any | 15 | 15 |
| Grade 3/4 | 3 | 4 |
| **Anemia** | | |
| Any | 89 | 94 |
| Grade 3/4 | 7 | 25 |
| **Infection** | | |
| Any | 35 | 37 |
| Grade 3/4 | 8 | 8 |
| **Fever in absence of infection** | | |
| Any | 33 | 29 |
| Grade 3/4 | < 1 | 1 |
| **Hypersensitivity Reaction*** | | |
| Any | 12 | 4 |
| Grade 3/4 | 3 | < 1 |
| **Fluid Retention**** | | |
| Any | 54 | 42 |
| All severe or life-threatening events | 2 | 2 |
| Pleural effusion | | |
| Any | 23 | 22 |
| All severe or life-threatening events | 2 | 2 |
| Peripheral edema | | |
| Any | 34 | 18 |
| All severe or life-threatening events | <1 | <1 |
| Weight gain | | |
| Any | 15 | 9 |

25

| Adverse Reaction | TAXOTERE 75 mg/m$^2$ + Cisplatin 75 mg/m$^2$ n=406 % | Vinorelbine 25 mg/m$^2$ + Cisplatin 100 mg/m$^2$ n=396 % |
|---|---|---|
| All severe or life-threatening events | <1 | <1 |
| **Neurosensory** | | |
| Any | 47 | 42 |
| Grade 3/4 | 4 | 4 |
| **Neuromotor** | | |
| Any | 19 | 17 |
| Grade 3/4 | 3 | 6 |
| **Skin** | | |
| Any | 16 | 14 |
| Grade 3/4 | <1 | 1 |
| **Nausea** | | |
| Any | 72 | 76 |
| Grade 3/4 | 10 | 17 |
| **Vomiting** | | |
| Any | 55 | 61 |
| Grade 3/4 | 8 | 16 |
| **Diarrhea** | | |
| Any | 47 | 25 |
| Grade 3/4 | 7 | 3 |
| **Anorexia**\*\* | | |
| Any | 42 | 40 |
| All severe or life-threatening events | 5 | 5 |
| **Stomatitis** | | |
| Any | 24 | 21 |
| Grade 3/4 | 2 | 1 |
| **Alopecia** | | |
| Any | 75 | 42 |
| Grade 3 | <1 | 0 |
| **Asthenia**\*\* | | |
| Any | 74 | 75 |
| All severe or life-threatening events | 12 | 14 |
| **Nail Disorder**\*\* | | |
| Any | 14 | <1 |
| All severe events | <1 | 0 |
| **Myalgia**\*\* | | |
| Any | 18 | 12 |
| All severe events | <1 | <1 |

1    \* Replaces NCI term "Allergy"
2    \*\* COSTART term and grading system
3

Deaths within 30 days of last study treatment occurred in 31 patients (7.6%) in the docetaxel+cisplatin arm and 37 patients (9.3%) in the vinorelbine+cisplatin arm. Deaths within 30 days of last study treatment attributed to study drug occurred in 9 patients (2.2%) in the docetaxel+cisplatin arm and 8 patients (2.0%) in the vinorelbine+cisplatin arm.

The second comparison in the study, vinorelbine+cisplatin versus TAXOTERE+carboplatin (which did not demonstrate a superior survival associated with TAXOTERE, *[see Clinical Studies (14)]*) demonstrated a higher incidence of thrombocytopenia, diarrhea, fluid retention, hypersensitivity reactions, skin toxicity, alopecia and nail changes on the TAXOTERE+carboplatin arm, while a higher incidence of anemia, neurosensory toxicity, nausea, vomiting, anorexia and asthenia was observed on the vinorelbine+cisplatin arm.

- Prostate Cancer

*Combination therapy with TAXOTERE in patients with prostate cancer*

The following data are based on the experience of 332 patients, who were treated with TAXOTERE 75 mg/m² every 3 weeks in combination with prednisone 5 mg orally twice daily (see Table 10).

**Table 10 - Clinically Important Treatment Emergent Adverse Reactions (Regardless of Relationship) in Patients with Prostate Cancer who Received TAXOTERE in Combination with Prednisone (TAX327)**

| Adverse Reaction | TAXOTERE 75 mg/m² every 3 weeks + prednisone 5 mg twice daily n=332 % | | Mitoxantrone 12 mg/m² every 3 weeks + prednisone 5 mg twice daily n=335 % | |
|---|---|---|---|---|
| | Any | G 3/4 | Any | G 3/4 |
| Anemia | 66.5 | 4.9 | 57.8 | 1.8 |
| Neutropenia | 40.9 | 32.0 | 48.2 | 21.7 |
| Thrombocytopenia | 3.4 | 0.6 | 7.8 | 1.2 |
| Febrile neutropenia | 2.7 | N/A | 1.8 | N/A |
| Infection | 32.2 | 5.7 | 20.3 | 4.2 |
| Epistaxis | 5.7 | 0.3 | 1.8 | 0.0 |
| Allergic Reactions | 8.4 | 0.6 | 0.6 | 0.0 |
| Fluid Retention* | 24.4 | 0.6 | 4.5 | 0.3 |
| Weight Gain* | 7.5 | 0.3 | 3.0 | 0.0 |
| Peripheral Edema* | 18.1 | 0.3 | 1.5 | 0.0 |
| Neuropathy Sensory | 30.4 | 1.8 | 7.2 | 0.3 |
| Neuropathy Motor | 7.2 | 1.5 | 3.0 | 0.9 |
| Rash/Desquamation | 6.0 | 0.3 | 3.3 | 0.6 |
| Alopecia | 65.1 | N/A | 12.8 | N/A |

27

| | TAXOTERE 75 mg/m$^2$ every 3 weeks + prednisone 5 mg twice daily n=332 % | | Mitoxantrone 12 mg/m$^2$ every 3 weeks + prednisone 5 mg twice daily n=335 % | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any** | **G 3/4** | **Any** | **G 3/4** |
| **Nail Changes** | 29.5 | 0.0 | 7.5 | 0.0 |
| **Nausea** | 41.0 | 2.7 | 35.5 | 1.5 |
| **Diarrhea** | 31.6 | 2.1 | 9.6 | 1.2 |
| **Stomatitis/Pharyngitis** | 19.6 | 0.9 | 8.4 | 0.0 |
| **Taste Disturbance** | 18.4 | 0.0 | 6.6 | 0.0 |
| **Vomiting** | 16.9 | 1.5 | 14.0 | 1.5 |
| **Anorexia** | 16.6 | 1.2 | 14.3 | 0.3 |
| **Cough** | 12.3 | 0.0 | 7.8 | 0.0 |
| **Dyspnea** | 15.1 | 2.7 | 8.7 | 0.9 |
| **Cardiac left ventricular function** | 9.6 | 0.3 | 22.1 | 1.2 |
| **Fatigue** | 53.3 | 4.5 | 34.6 | 5.1 |
| **Myalgia** | 14.5 | 0.3 | 12.8 | 0.9 |
| **Tearing** | 9.9 | 0.6 | 1.5 | 0.0 |
| **Arthralgia** | 8.1 | 0.6 | 5.1 | 1.2 |

*Related to treatment

- Gastric Cancer

*Combination therapy with TAXOTERE in gastric adenocarcinoma*

Data in the following table are based on the experience of 221 patients with advanced gastric adenocarcinoma and no history of prior chemotherapy for advanced disease, who were treated with TAXOTERE 75 mg/m$^2$ in combination with cisplatin and fluorouracil (see Table 11).

**Table 11 - Clinically Important Treatment Emergent Adverse Reactions Regardless of Relationship to Treatment in the Gastric Cancer Study**

| | TAXOTERE 75 mg/m$^2$ + cisplatin 75 mg/m$^2$ + fluorouracil 750 mg/m$^2$ n=221 | | Cisplatin 100 mg/m$^2$ + fluorouracil 1000 mg/m$^2$ n=224 | |
|---|---|---|---|---|
| **Adverse Reaction** | **Any %** | **G3/4 %** | **Any %** | **G3/4 %** |
| **Anemia** | 96.8 | 18.2 | 93.3 | 25.6 |
| **Neutropenia** | 95.5 | 82.3 | 83.3 | 56.8 |

| Adverse Reaction | TAXOTERE 75 mg/m$^2$ + cisplatin 75 mg/m$^2$ + fluorouracil 750 mg/m$^2$ n=221 | | Cisplatin 100 mg/m$^2$ + fluorouracil 1000 mg/m$^2$ n=224 | |
|---|---|---|---|---|
| | Any % | G3/4 % | Any % | G3/4 % |
| Fever in the absence of infection | 35.7 | 1.8 | 22.8 | 1.3 |
| Thrombocytopenia | 25.5 | 7.7 | 39.0 | 13.5 |
| Infection | 29.4 | 16.3 | 22.8 | 10.3 |
| Febrile neutropenia | 16.4 | N/A | 4.5 | N/A |
| Neutropenic infection | 15.9 | N/A | 10.4 | N/A |
| Allergic reactions | 10.4 | 1.8 | 5.8 | 0 |
| Fluid retention* | 14.9 | 0 | 4.0 | 0.4 |
| Edema* | 13.1 | 0 | 3.1 | 0.4 |
| Lethargy | 62.9 | 21.3 | 58.0 | 17.9 |
| Neurosensory | 38.0 | 7.7 | 24.6 | 3.1 |
| Neuromotor | 8.6 | 3.2 | 7.6 | 2.7 |
| Dizziness | 15.8 | 4.5 | 8.0 | 1.8 |
| Alopecia | 66.5 | 5.0 | 41.1 | 1.3 |
| Rash/itch | 11.8 | 0.9 | 8.5 | 0.0 |
| Nail changes | 8.1 | 0.0 | 0.0 | 0.0 |
| Skin desquamation | 1.8 | 0.0 | 0.4 | 0.0 |
| Nausea | 73.3 | 15.8 | 76.3 | 18.8 |
| Vomiting | 66.5 | 14.9 | 73.2 | 18.8 |
| Anorexia | 50.7 | 13.1 | 54.0 | 11.6 |
| Stomatitis | 59.3 | 20.8 | 61.2 | 27.2 |
| Diarrhea | 77.8 | 20.4 | 49.6 | 8.0 |
| Constipation | 25.3 | 1.8 | 33.9 | 3.1 |
| Esophagitis/dysphagia/ odynophagia | 16.3 | 1.8 | 13.8 | 4.9 |
| Gastrointestinal pain/cramping | 11.3 | 1.8 | 7.1 | 2.7 |
| Cardiac dysrhythmias | 4.5 | 2.3 | 2.2 | 0.9 |
| Myocardial ischemia | 0.9 | 0.0 | 2.7 | 2.2 |
| Tearing | 8.1 | 0 | 2.2 | 0.4 |
| Altered hearing | 6.3 | 0 | 12.5 | 1.8 |

Clinically important TEAEs were determined based upon frequency, severity, and clinical impact of the adverse reaction.

*Related to treatment

1       •   Head and Neck Cancer

2

3   *Combination therapy with TAXOTERE in head and neck cancer*

4   Table 12 summarizes the safety data obtained from patients that received induction
5   chemotherapy with TAXOTERE 75 mg/m$^2$ in combination with cisplatin and fluorouracil
6   followed by radiotherapy (TAX323; 174 patients) or chemoradiotherapy (TAX324;
7   251 patients). The treatment regimens are described in Section 14.6.

8

9     **Table 12 – Clinically Important Treatment Emergent Adverse Reactions (Regardless of**
10     **Relationship) in Patients with SCCHN Receiving Induction Chemotherapy with**
11     **TAXOTERE in Combination with cisplatin and fluorouracil followed by radiotherapy**
12           **(TAX323) or chemoradiotherapy (TAX324)**

| Adverse Reaction (by Body System) | TAX323 (n=355) | | | | TAX324 (n=494) | | | |
|---|---|---|---|---|---|---|---|---|
| | TAXOTERE arm (n=174) | | Comparator arm (n=181) | | TAXOTERE arm (n=251) | | Comparator arm (n=243) | |
| | Any % | G3/4 % | Any % | G3/4 % | Any % | G3/4 % | Any % | G3/4 % |
| **Neutropenia** | 93.1 | 76.3 | 86.7 | 52.8 | 94.8 | 83.5 | 84.2 | 56.0 |
| **Anemia** | 89.1 | 9.2 | 87.8 | 13.8 | 90.0 | 12.4 | 86.0 | 9.5 |
| **Thrombocytopenia** | 23.6 | 5.2 | 47.0 | 18.2 | 27.5 | 4.0 | 30.9 | 10.7 |
| **Infection** | 27.0 | 8.6 | 26.0 | 7.7 | 23.1 | 6.4 | 27.6 | 5.3 |
| **Febrile neutropenia*** | 5.2 | N/A | 2.2 | N/A | 12.1 | N/A | 6.6 | N/A |
| **Neutropenic infection** | 13.9 | N/A | 8.3 | N/A | 11.7 | N/A | 8.3 | N/A |
| **Cancer pain** | 20.7 | 4.6 | 16.0 | 3.3 | 17.1 | 8.8 | 20.2 | 11.1 |
| **Lethargy** | 40.8 | 3.4 | 38.1 | 3.3 | 61.4 | 4.8 | 55.6 | 10.3 |
| **Fever in the absence of infection** | 31.6 | 0.6 | 36.5 | 0 | 29.5 | 3.6 | 27.6 | 3.3 |
| **Myalgia** | 9.8 | 1.1 | 7.2 | 0 | 6.8 | 0.4 | 7.0 | 1.6 |
| **Weight loss** | 20.7 | 0.6 | 26.5 | 0.6 | 14.3 | 1.6 | 14.0 | 2.1 |
| **Allergy** | 6.3 | 0 | 2.8 | 0 | 2.0 | 0 | 0.4 | 0 |
| **Fluid retention**** | 20.1 | 0 | 14.4 | 0.6 | 13.1 | 1.2 | 7.0 | 1.6 |
| **Edema only** | 12.6 | 0 | 6.6 | 0 | 12.0 | 1.2 | 5.8 | 1.2 |
| **Weight gain only** | 5.7 | 0 | 6.1 | 0 | 0.4 | 0 | 0.8 | 0.4 |
| **Dizziness** | 2.3 | 0 | 5.0 | 0.6 | 15.9 | 4.0 | 15.2 | 1.6 |
| **Neurosensory** | 17.8 | 0.6 | 10.5 | 0.6 | 13.9 | 1.2 | 14.4 | 0.4 |
| **Altered hearing** | 5.7 | 0 | 9.9 | 2.8 | 12.7 | 1.2 | 18.5 | 2.5 |
| **Neuromotor** | 2.3 | 1.1 | 3.9 | 0.6 | 8.8 | 0.4 | 10.3 | 1.6 |
| **Alopecia** | 81.0 | 10.9 | 43.1 | 0 | 67.7 | 4.0 | 43.6 | 1.2 |
| **Rash/itch** | 11.5 | 0 | 6.1 | 0 | 19.9 | 0 | 16.0 | 0.8 |
| **Dry skin** | 5.7 | 0 | 1.7 | 0 | 4.8 | 0.4 | 3.3 | 0 |
| **Desquamation** | 4.0 | 0.6 | 5.5 | 0 | 2.4 | 0 | 4.5 | 0.4 |
| **Nausea** | 47.1 | 0.6 | 51.4 | 7.2 | 76.5 | 13.9 | 79.8 | 14.0 |
| **Stomatitis** | 42.5 | 4.0 | 47.0 | 11.0 | 65.7 | 21.1 | 67.5 | 27.2 |
| **Vomiting** | 26.4 | 0.6 | 38.7 | 5.0 | 56.2 | 8.4 | 62.6 | 10.3 |

| Adverse Reaction (by Body System) | TAX323 (n=355) | | | | TAX324 (n=494) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | TAXOTERE arm (n=174) | | Comparator arm (n=181) | | TAXOTERE arm (n=251) | | Comparator arm (n=243) | |
| | Any % | G3/4 % | Any % | G3/4 % | Any % | G3/4 % | Any % | G3/4 % |
| Diarrhea | 32.8 | 2.9 | 23.8 | 4.4 | 47.8 | 7.2 | 40.3 | 3.3 |
| Constipation | 16.7 | 0.6 | 16.0 | 1.1 | 27.1 | 1.2 | 37.9 | 0.8 |
| Anorexia | 16.1 | 0.6 | 24.9 | 3.3 | 40.2 | 12.4 | 34.2 | 11.5 |
| Esophagitis/dysphagia/ Odynophagia | 12.6 | 1.1 | 18.2 | 2.8 | 25.1 | 12.7 | 26.3 | 9.5 |
| Taste, sense of smell altered | 10.3 | 0 | 5.0 | 0 | 20.3 | 0.4 | 16.9 | 0.8 |
| Gastrointestinal pain/cramping | 7.5 | 0.6 | 8.8 | 0.6 | 14.7 | 4.8 | 10.3 | 1.6 |
| Heartburn | 6.3 | 0 | 6.1 | 0 | 12.7 | 1.6 | 12.8 | 0.8 |
| Gastrointestinal bleeding | 4.0 | 1.7 | 0 | 0 | 5.2 | 0.4 | 2.1 | 0.4 |
| Cardiac dysrhythmia | 1.7 | 1.7 | 1.7 | 0.6 | 6.0 | 2.8 | 4.5 | 2.5 |
| Venous*** | 3.4 | 2.3 | 5.5 | 1.7 | 3.6 | 2.4 | 4.9 | 3.7 |
| Ischemia myocardial | 1.7 | 1.7 | 0.6 | 0 | 1.6 | 1.2 | 1.2 | 1.2 |
| Tearing | 1.7 | 0 | 0.6 | 0 | 1.6 | 0 | 2.1 | 0 |
| Conjunctivitis | 1.1 | 0 | 1.1 | 0 | 1.2 | 0 | 0.4 | 0 |

Clinically important treatment emergent adverse reactions based upon frequency, severity, and clinical impact.
*Febrile neutropenia: grade ≥2 fever concomitant with grade 4 neutropenia requiring i.v. antibiotics and/or hospitalization.
**Related to treatment.
*** Includes superficial and deep vein thrombosis and pulmonary embolism

## 6.2   Post-marketing Experiences

The following adverse reactions have been identified from clinical trials and/or post-marketing surveillance.  Because they are reported from a population of unknown size, precise estimates of frequency cannot be made.

**Body as a whole**: diffuse pain, chest pain, radiation recall phenomenon.

**Cardiovascular**: atrial fibrillation, deep vein thrombosis, ECG abnormalities, thrombophlebitis, pulmonary embolism, syncope, tachycardia, myocardial infarction.

**Cutaneous**: very rare cases of cutaneous lupus erythematosus and rare cases of bullous eruptions such as erythema multiforme, Stevens-Johnson syndrome, toxic epidermal necrolysis.  In some cases multiple factors may have contributed to the development of these effects. Severe hand and foot syndrome has been reported.

**Gastrointestinal**: abdominal pain, anorexia, constipation, duodenal ulcer, esophagitis, gastrointestinal hemorrhage, gastrointestinal perforation, ischemic colitis, colitis, intestinal

obstruction, ileus, neutropenic enterocolitis and dehydration as a consequence to gastrointestinal events have been reported.

**Hematologic**: bleeding episodes.  Disseminated intravascular coagulation (DIC), often in association with sepsis or multiorgan failure, has been reported.  Very care cases of acute myeloid leukemia and myelodysplasic syndrome have been reported in association with TAXOTERE when used in combination with other chemotherapy agents and/or radiotherapy.

**Hypersensitivity**: rare cases of anaphylactic shock have been reported.  Very rarely these cases resulted in a fatal outcome in patients who received premedication.

**Hepatic**: rare cases of hepatitis, sometimes fatal primarily in patients with pre-existing liver disorders, have been reported.

**Neurologic**: confusion, rare cases of seizures or transient loss of consciousness have been observed, sometimes appearing during the infusion of the drug.

**Ophthalmologic**: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported. Rare cases of transient visual disturbances (flashes, flashing lights, scotomata) typically occurring during drug infusion and in association with hypersensitivity reactions have been reported. These were reversible upon discontinuation of the infusion.

**Hearing**: rare cases of ototoxicity, hearing disorders and/or hearing loss have been reported, including cases associated with other ototoxic drugs.

**Respiratory**: dyspnea, acute pulmonary edema, acute respiratory distress syndrome, interstitial pneumonia. Pulmonary fibrosis has been rarely reported.  Rare cases of radiation pneumonitis have been reported in patients receiving concomitant radiotherapy.

**Renal**: renal insufficiency.

## 7.  DRUG INTERACTIONS

There have been no formal clinical studies to evaluate the drug interactions of TAXOTERE with other medications. *In vitro* studies have shown that the metabolism of docetaxel may be modified by the concomitant administration of compounds that induce, inhibit, or are metabolized by cytochrome P450 3A4, such as cyclosporine, terfenadine, ketoconazole, erythromycin, and troleandomycin. Caution should be exercised with these drugs when treating patients receiving TAXOTERE as there is a potential for a significant interaction.

## 8.  USE IN SPECIFIC POPULATIONS

### 8.1   Pregnancy

Pregnancy Category D.

***[see Warnings and Precautions (5.7)]***

### 8.3   Nursing Mothers

It is not known whether TAXOTERE is excreted in human milk. Because many drugs are excreted in human milk, and because of the potential for serious adverse reactions in nursing infants from TAXOTERE, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

### 8.4   Pediatric Use

The safety and effectiveness of docetaxel in pediatric patients have not been established.

### 8.5   Geriatric Use

In general, dose selection for an elderly patient should be cautious, reflecting the greater frequency of decreased hepatic, renal, or cardiac function and of concomitant disease or other drug therapy in elderly patients.

In a study conducted in chemotherapy-naïve patients with NSCLC (TAX326), 148 patients (36%) in the TAXOTERE+cisplatin group were 65 years of age or greater. There were 128 patients (32%) in the vinorelbine+cisplatin group 65 years of age or greater. In the TAXOTERE+cisplatin group, patients less than 65 years of age had a median survival of 10.3 months (95% CI: 9.1 months, 11.8 months) and patients 65 years or older had a median survival of 12.1 months (95% CI : 9.3 months, 14 months). In patients 65 years of age or greater treated with TAXOTERE+cisplatin, diarrhea (55%), peripheral edema (39%) and stomatitis (28%) were observed more frequently than in the vinorelbine+cisplatin group (diarrhea 24%, peripheral edema 20%, stomatitis 20%). Patients treated with TAXOTERE+cisplatin who were 65 years of age or greater were more likely to experience diarrhea (55%), infections (42%), peripheral edema (39%) and stomatitis (28%) compared to patients less than the age of 65 administered the same treatment (43%, 31%, 31% and 21%, respectively).

When TAXOTERE was combined with carboplatin for the treatment of chemotherapy-naïve, advanced non-small cell lung carcinoma, patients 65 years of age or greater (28%) experienced higher frequency of infection compared to similar patients treated with TAXOTERE+cisplatin, and a higher frequency of diarrhea, infection and peripheral edema than elderly patients treated with vinorelbine+cisplatin.

Of the 333 patients treated with TAXOTERE every three weeks plus prednisone in the prostate cancer study (TAX327), 209 patients were 65 years of age or greater and 68 patients were older than 75 years. In patients treated with TAXOTERE every three weeks, the following TEAEs occurred at rates ≥10% higher in patients 65 years of age or greater compared to younger patients: anemia (71% vs. 59%), infection (37% vs. 24%), nail changes (34% vs. 23%), anorexia (21% vs. 10%), weight loss (15% vs. 5%) respectively.

In the adjuvant breast cancer trial (TAX316), TAXOTERE in combination with doxorubicin and cyclophosphamide was administered to 744 patients of whom 48 (6%) were 65 years of age or greater. The number of elderly patients who received this regimen was not sufficient to determine whether there were differences in safety and efficacy between elderly and younger patients.

Among the 221 patients treated with TAXOTERE in combination with cisplatin and fluorouracil in the gastric cancer study, 54 were 65 years of age or older and 2 patients were older than 75 years.  In this study, the number of patients who were 65 years of age or older was insufficient to determine whether they respond differently from younger patients.  However, the incidence of serious adverse reactions was higher in the elderly patients compared to younger

patients.   The incidence of the following adverse reactions (all grades, regardless of relationship): lethargy, stomatitis, diarrhea, dizziness, edema, febrile neutropenia/neutropenic infection occurred at rates ≥10% higher in patients who were 65 years of age or older compared to younger patients.  Elderly patients treated with TCF should be closely monitored.

Among the 174 and 251 patients who received the induction treatment with TAXOTERE in combination with cisplatin and fluorouracil (TPF) for SCCHN in the TAX323 and TAX324 studies, 18 (10%) and 32 (13%) of the patients were 65 years of age or older, respectively.

These clinical studies of TAXOTERE in combination with cisplatin and fluorouracil in patients with SCCHN did not include sufficient numbers of patients aged 65 and over to determine whether they respond differently from younger patients.  Other reported clinical experience with this treatment regimen has not identified differences in responses between elderly and younger patients.

**8.6   Hepatic Impairment**

Patients with bilirubin >ULN should generally not receive TAXOTERE. Also, patients with SGOT and/or SGPT >1.5 x ULN concomitant with alkaline phosphatase >2.5 x ULN should generally not receive TAXOTERE.

## 10. OVERDOSAGE

There is no known antidote for TAXOTERE overdosage. In case of overdosage, the patient should be kept in a specialized unit where vital functions can be closely monitored. Anticipated complications of overdosage include: bone marrow suppression, peripheral neurotoxicity, and mucositis. Patients should receive therapeutic G-CSF as soon as possible after discovery of overdose. Other appropriate symptomatic measures should be taken, as needed.

In two reports of overdose, one patient received 150 mg/m$^2$ and the other received 200 mg/m$^2$ as 1-hour infusions. Both patients experienced severe neutropenia, mild asthenia, cutaneous reactions, and mild paresthesia, and recovered without incident.

In mice, lethality was observed following single IV doses that were ≥154 mg/kg (about 4.5 times the recommended human dose on a mg/m$^2$ basis); neurotoxicity associated with paralysis, non-extension of hind limbs, and myelin degeneration was observed in mice at 48 mg/kg (about 1.5 times the recommended human dose on a mg/m$^2$ basis). In male and female rats, lethality was observed at a dose of 20 mg/kg (comparable to the recommended human dose on a mg/m$^2$ basis) and was associated with abnormal mitosis and necrosis of multiple organs.

## 11. DESCRIPTION

Docetaxel is an antineoplastic agent belonging to the taxoid family. It is prepared by semisynthesis beginning with a precursor extracted from the renewable needle biomass of yew plants. The chemical name for docetaxel is (2R,3S)-N-carboxy-3-phenylisoserine,N-*tert*-butyl ester, 13-ester with 5β-20-epoxy-1,2α,4,7β,10β,13α-hexahydroxytax-11-en-9-one 4-acetate 2-benzoate, trihydrate. Docetaxel has the following structural formula:

Docetaxel is a white to almost-white powder with an empirical formula of $C_{43}H_{53}NO_{14} \bullet 3H_2O$, and a molecular weight of 861.9. It is highly lipophilic and practically insoluble in water. TAXOTERE (docetaxel) Injection Concentrate is a clear yellow to brownish-yellow viscous solution. TAXOTERE is sterile, non-pyrogenic, and is available in single-dose vials containing 20 mg (0.5 mL) or 80 mg (2 mL) docetaxel (anhydrous). Each mL contains 40 mg docetaxel (anhydrous) and 1040 mg polysorbate 80.

TAXOTERE Injection Concentrate requires dilution prior to use. A sterile, non-pyrogenic, single-dose diluent is supplied for that purpose. The diluent for TAXOTERE contains 13% ethanol in water for injection, and is supplied in vials.

## 12. CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

Docetaxel is an antineoplastic agent that acts by disrupting the microtubular network in cells that is essential for mitotic and interphase cellular functions. Docetaxel binds to free tubulin and promotes the assembly of tubulin into stable microtubules while simultaneously inhibiting their disassembly. This leads to the production of microtubule bundles without normal function and to the stabilization of microtubules, which results in the inhibition of mitosis in cells. Docetaxel's binding to microtubules does not alter the number of protofilaments in the bound microtubules, a feature which differs from most spindle poisons currently in clinical use.

### 12.3  Human Pharmacokinetics

The pharmacokinetics of docetaxel have been evaluated in cancer patients after administration of 20-115 mg/m$^2$ in phase I studies. The area under the curve (AUC) was dose proportional following doses of 70-115 mg/m$^2$ with infusion times of 1 to 2 hours. Docetaxel's pharmacokinetic profile is consistent with a three-compartment pharmacokinetic model, with half-lives for the $\alpha$, $\beta$, and $\gamma$ phases of 4 min, 36 min, and 11.1 hr, respectively. The initial rapid decline represents distribution to the peripheral compartments and the late (terminal) phase is due, in part, to a relatively slow efflux of docetaxel from the peripheral compartment. Mean values for total body clearance and steady state volume of distribution were 21 L/h/m$^2$ and 113 L, respectively. Mean total body clearance for Japanese patients dosed at the range of 10-90 mg/m$^2$ was similar to that of European/American populations dosed at 100 mg/m$^2$, suggesting no significant difference in the elimination of docetaxel in the two populations.

35

A study of $^{14}$C-docetaxel was conducted in three cancer patients. Docetaxel was eliminated in both the urine and feces following oxidative metabolism of the *tert*-butyl ester group, but fecal excretion was the main elimination route. Within 7 days, urinary and fecal excretion accounted for approximately 6% and 75% of the administered radioactivity, respectively. About 80% of the radioactivity recovered in feces is excreted during the first 48 hours as 1 major and 3 minor metabolites with very small amounts (less than 8%) of unchanged drug.

A population pharmacokinetic analysis was carried out after TAXOTERE treatment of 535 patients dosed at 100 mg/m$^2$. Pharmacokinetic parameters estimated by this analysis were very close to those estimated from phase I studies. The pharmacokinetics of docetaxel were not influenced by age or gender and docetaxel total body clearance was not modified by pretreatment with dexamethasone. In patients with clinical chemistry data suggestive of mild to moderate liver function impairment (SGOT and/or SGPT >1.5 times the upper limit of normal [ULN] concomitant with alkaline phosphatase >2.5 times ULN), total body clearance was lowered by an average of 27%, resulting in a 38% increase in systemic exposure (AUC). This average, however, includes a substantial range and there is, at present, no measurement that would allow recommendation for dose adjustment in such patients. Patients with combined abnormalities of transaminase and alkaline phosphatase should, in general, not be treated with TAXOTERE.

Clearance of docetaxel in combination therapy with cisplatin was similar to that previously observed following monotherapy with docetaxel. The pharmacokinetic profile of cisplatin in combination therapy with docetaxel was similar to that observed with cisplatin alone.

The combined administration of docetaxel, cisplatin and fluorouracil in 12 patients with solid tumors had no influence on the pharmacokinetics of each individual drug.

A population pharmacokinetic analysis of plasma data from 40 patients with hormone-refractory metastatic prostate cancer indicated that docetaxel systemic clearance in combination with prednisone is similar to that observed following administration of docetaxel alone.

A study was conducted in 30 patients with advanced breast cancer to determine the potential for drug-drug-interactions between docetaxel (75 mg/m²), doxorubicin (50 mg/m²), and cyclophosphamide (500 mg/m²) when administered in combination. The coadministration of docetaxel had no effect on the pharmacokinetics of doxorubicin and cyclophosphamide when the three drugs were given in combination compared to coadministration of doxorubicin and cyclophosphamide only. In addition, doxorubicin and cyclophosphamide had no effect on docetaxel plasma clearance when the three drugs were given in combination compared to historical data for docetaxel monotherapy.

*In vitro* studies showed that docetaxel is about 94% protein bound, mainly to $\alpha_1$-acid glycoprotein, albumin, and lipoproteins. In three cancer patients, the *in vitro* binding to plasma proteins was found to be approximately 97%. Dexamethasone does not affect the protein binding of docetaxel.

*In vitro* drug interaction studies revealed that docetaxel is metabolized by the CYP3A4 isoenzyme, and its metabolism can be inhibited by CYP3A4 inhibitors, such as ketoconazole, erythromycin, troleandomycin, and nifedipine. Based on *in vitro* findings, it is likely that CYP3A4 inhibitors and/or substrates may lead to substantial increases in docetaxel blood concentrations. No clinical studies have been performed to evaluate this finding *[see Drug Interactions (7)].*

## 13. NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term animal studies have not been performed to evaluate the carcinogenic potential of docetaxel.

Docetaxel has been shown to be clastogenic in the *in vitro* chromosome aberration test in CHO-$K_1$ cells and in the *in vivo* micronucleus test in mice administered doses of 0.39 to 1.56 mg/kg (about 1/60th to 1/15th the recommended human dose on a mg/m$^2$ basis). Docetaxel did not induce mutagenicity in the Ames test or the CHO/HGPRT gene mutation assays. Docetaxel produced no impairment of fertility in rats when administered in multiple IV doses of up to 0.3 mg/kg (about 1/50th the recommended human dose on a mg/m$^2$ basis), but decreased testicular weights were reported. This correlates with findings of a 10-cycle toxicity study (dosing once every 21 days for 6 months) in rats and dogs in which testicular atrophy or degeneration was observed at IV doses of 5 mg/kg in rats and 0.375 mg/kg in dogs (about 1/3rd and 1/15th the recommended human dose on a mg/m$^2$ basis, respectively). An increased frequency of dosing in rats produced similar effects at lower dose levels.

## 14. CLINICAL STUDIES

### 14.1 Breast Cancer

The efficacy and safety of TAXOTERE have been evaluated in locally advanced or metastatic breast cancer after failure of previous chemotherapy (alkylating agent-containing regimens or anthracycline-containing regimens).

- Randomized Trials

In one randomized trial, patients with a history of prior treatment with an anthracycline-containing regimen were assigned to treatment with TAXOTERE (100 mg/m$^2$ every 3 weeks) or the combination of mitomycin (12 mg/m$^2$ every 6 weeks) and vinblastine (6 mg/m$^2$ every 3 weeks). 203 patients were randomized to TAXOTERE and 189 to the comparator arm. Most patients had received prior chemotherapy for metastatic disease; only 27 patients on the TAXOTERE arm and 33 patients on the comparator arm entered the study following relapse after adjuvant therapy. Three-quarters of patients had measurable, visceral metastases. The primary endpoint was time to progression. The following table summarizes the study results (See Table 13).

1    **Table 13 - Efficacy of TAXOTERE in the Treatment of Breast Cancer Patients Previously**
2    **Treated with an Anthracycline-Containing Regimen (Intent-to-Treat Analysis)**

| Efficacy Parameter | Docetaxel (n=203) | Mitomycin/ Vinblastine (n=189) | p-value |
|---|---|---|---|
| Median Survival | 11.4 months | 8.7 months | |
| Risk Ratio*, Mortality (Docetaxel: Control) | 0.73 | | p=0.01 Log Rank |
| 95% CI (Risk Ratio) | 0.58-0.93 | | |
| Median Time to Progression | 4.3 months | 2.5 months | |
| Risk Ratio*, Progression (Docetaxel: Control) | 0.75 | | p=0.01 Log Rank |
| 95% CI (Risk Ratio) | 0.61-0.94 | | |
| Overall Response Rate | 28.1% | 9.5% | p<0.0001 |
| Complete Response Rate | 3.4% | 1.6% | Chi Square |

3    *For the risk ratio, a value less than 1.00 favors docetaxel.

4

5    In a second randomized trial, patients previously treated with an alkylating-containing regimen
6    were assigned to treatment with TAXOTERE (100 mg/m$^2$) or doxorubicin (75 mg/m$^2$) every
7    3 weeks. 161 patients were randomized to TAXOTERE and 165 patients to doxorubicin.
8    Approximately one-half of patients had received prior chemotherapy for metastatic disease, and
9    one-half entered the study following relapse after adjuvant therapy. Three-quarters of patients
10   had measurable, visceral metastases. The primary endpoint was time to progression. The study
11   results are summarized below (See Table 14).

12

38

**Table 14 - Efficacy of TAXOTERE in the Treatment of Breast Cancer Patients Previously Treated with an Alkylating-Containing Regimen (Intent-to-Treat Analysis)**

| Efficacy Parameter | Docetaxel (n=161) | Doxorubicin (n=165) | p-value |
|---|---|---|---|
| Median Survival | 14.7 months | 14.3 months | |
| Risk Ratio*, Mortality (Docetaxel: Control) | 0.89 | | p=0.39 Log Rank |
| 95% CI (Risk Ratio) | 0.68-1.16 | | |
| Median Time to Progression | 6.5 months | 5.3 months | |
| Risk Ratio*, Progression (Docetaxel: Control) | 0.93 | | p=0.45 Log Rank |
| 95% CI (Risk Ratio) | 0.71-1.16 | | |
| Overall Response Rate | 45.3% | 29.7% | p=0.004 Chi Square |
| Complete Response Rate | 6.8% | 4.2% | |

*For the risk ratio, a value less than 1.00 favors docetaxel.

In another multicenter open-label, randomized trial (TAX313), in the treatment of patients with advanced breast cancer who progressed or relapsed after one prior chemotherapy regimen, 527 patients were randomized to receive TAXOTERE monotherapy 60 mg/m$^2$ (n=151), 75 mg/m$^2$ (n=188) or 100 mg/m$^2$ (n=188). In this trial, 94% of patients had metastatic disease and 79% had received prior anthracycline therapy. Response rate was the primary endpoint. Response rates increased with TAXOTERE dose: 19.9% for the 60 mg/m$^2$ group compared to 22.3% for the 75 mg/m$^2$ and 29.8% for the 100 mg/m$^2$ group; pair-wise comparison between the 60 mg/m$^2$ and 100 mg/m$^2$ groups was statistically significant (p=0.037).

- Single Arm Studies

TAXOTERE at a dose of 100 mg/m$^2$ was studied in six single arm studies involving a total of 309 patients with metastatic breast cancer in whom previous chemotherapy had failed. Among these, 190 patients had anthracycline-resistant breast cancer, defined as progression during an anthracycline-containing chemotherapy regimen for metastatic disease, or relapse during an anthracycline-containing adjuvant regimen. In anthracycline-resistant patients, the overall response rate was 37.9% (72/190; 95% C.I.: 31.0-44.8) and the complete response rate was 2.1%.

TAXOTERE was also studied in three single arm Japanese studies at a dose of 60 mg/m$^2$, in 174 patients who had received prior chemotherapy for locally advanced or metastatic breast cancer. Among 26 patients whose best response to an anthracycline had been progression, the response rate was 34.6% (95% C.I.: 17.2-55.7), similar to the response rate in single arm studies of 100 mg/m$^2$.

## 14.2  Adjuvant Treatment of Breast Cancer

A multicenter, open-label, randomized trial (TAX316) evaluated the efficacy and safety of TAXOTERE for the adjuvant treatment of patients with axillary-node-positive breast cancer and no evidence of distant metastatic disease.  After stratification according to the number of positive lymph nodes (1-3, 4+), 1491 patients were randomized to receive either TAXOTERE 75 mg/m$^2$ administered 1-hour after doxorubicin 50 mg/m$^2$ and cyclophosphamide 500 mg/m$^2$ (TAC arm), or doxorubicin 50 mg/m$^2$ followed by fluorouracil 500 mg/m$^2$ and cyclosphosphamide 500 mg/m$^2$ (FAC arm).  Both regimens were administered every 3 weeks for 6 cycles.  TAXOTERE was administered as a 1-hour infusion; all other drugs were given as IV bolus on day 1. In both arms, after the last cycle of chemotherapy, patients with positive estrogen and/or progesterone receptors received tamoxifen 20 mg daily for up to 5 years.  Adjuvant radiation therapy was prescribed according to guidelines in place at participating institutions and was given to 69% of patients who received TAC and 72% of patients who received FAC.

Results from a second interim analysis (median follow-up 55 months) are as follows: In study TAX316, the docetaxel-containing combination regimen TAC showed significantly longer disease-free survival (DFS) than FAC (hazard ratio=0.74; 2-sided 95% CI=0.60, 0.92, stratified log rank p=0.0047). The primary endpoint, disease-free survival, included local and distant recurrences, contralateral breast cancer and deaths from any cause.  The overall reduction in risk of relapse was 25.7% for TAC-treated patients. (See Figure 1).

At the time of this interim analysis, based on 219 deaths, overall survival was longer for TAC than FAC (hazard ratio=0.69, 2-sided 95% CI=0.53, 0.90).  (See Figure 2).  There will be further analysis at the time survival data mature.

**Figure 1 - TAX316 Disease Free Survival K-M curve**



40

**Figure 2 - TAX316 Overall Survival K-M Curve**



The following table describes the results of subgroup analyses for DFS and OS (See Table 15).

**Table 15 - Subset Analyses-Adjuvant Breast Cancer Study**

| Patient subset | Number of patients | Disease Free Survival | | Overall Survival | |
|---|---|---|---|---|---|
| | | Hazard ratio* | 95% CI | Hazard ratio* | 95% CI |
| **No. of positive nodes** | | | | | |
| Overall | 744 | 0.74 | (0.60, 0.92) | 0.69 | (0.53, 0.90) |
| 1-3 | 467 | 0.64 | (0.47, 0.87) | 0.45 | (0.29, 0.70) |
| 4+ | 277 | 0.84 | (0.63, 1.12) | 0.93 | (0.66, 1.32) |
| **Receptor status** | | | | | |
| Positive | 566 | 0.76 | (0.59, 0.98) | 0.69 | (0.48, 0.99) |
| Negative | 178 | 0.68 | (0.48, 0.97) | 0.66 | (0.44, 0.98) |

*a hazard ratio of less than 1 indicates that TAC is associated with a longer disease free survival or overall survival compared to FAC.

## 14.3  Non-Small Cell Lung Cancer (NSCLC)

The efficacy and safety of TAXOTERE has been evaluated in patients with unresectable, locally advanced or metastatic non-small cell lung cancer whose disease has failed prior platinum-based chemotherapy or in patients who are chemotherapy-naïve.

- Monotherapy with TAXOTERE for NSCLC Previously Treated with Platinum-Based Chemotherapy

Two randomized, controlled trials established that a TAXOTERE dose of 75 mg/m$^2$ was tolerable and yielded a favorable outcome in patients previously treated with platinum-based chemotherapy (see below). TAXOTERE at a dose of 100 mg/m$^2$, however, was associated with unacceptable hematologic toxicity, infections, and treatment-related mortality and this dose

should not be used *[see Boxed Warning, Warnings and Precautions (5.4), Dosage Adjustment During Treatment (2.7)]*.

One trial (TAX317), randomized patients with locally advanced or metastatic non-small cell lung cancer, a history of prior platinum-based chemotherapy, no history of taxane exposure, and an ECOG performance status ≤2 to TAXOTERE or best supportive care. The primary endpoint of the study was survival. Patients were initially randomized to TAXOTERE 100 mg/m$^2$ or best supportive care, but early toxic deaths at this dose led to a dose reduction to TAXOTERE 75 mg/m$^2$. A total of 104 patients were randomized in this amended study to either TAXOTERE 75 mg/m$^2$ or best supportive care.

In a second randomized trial (TAX320), 373 patients with locally advanced or metastatic non-small cell lung cancer, a history of prior platinum-based chemotherapy, and an ECOG performance status ≤2 were randomized to TAXOTERE 75 mg/m$^2$, TAXOTERE 100 mg/m$^2$ and a treatment in which the investigator chose either vinorelbine 30 mg/m$^2$ days 1, 8, and 15 repeated every 3 weeks or ifosfamide 2 g/m$^2$ days 1-3 repeated every 3 weeks. Forty percent of the patients in this study had a history of prior paclitaxel exposure. The primary endpoint was survival in both trials. The efficacy data for the TAXOTERE 75 mg/m$^2$ arm and the comparator arms are summarized in Table 16 and Figures 3 and 4 showing the survival curves for the two studies.

**Table 16 - Efficacy of TAXOTERE in the Treatment of Non-Small Cell Lung Cancer Patients Previously Treated with a Platinum-Based Chemotherapy Regimen (Intent-to-Treat Analysis)**

| | TAX317 | | TAX320 | |
|---|---|---|---|---|
| | **Docetaxel 75 mg/m$^2$ n=55** | **Best Supportive Care/75 n=49** | **Docetaxel 75 mg/m$^2$ n=125** | **Control (V/I) n=123** |
| Overall Survival Log-rank Test | p=0.01 | | p=0.13 | |
| Risk Ratio[††], Mortality (Docetaxel: Control) 95% CI (Risk Ratio) | 0.56 (0.35, 0.88) | | 0.82 (0.63, 1.06) | |
| Median Survival 95% CI | 7.5 months* (5.5, 12.8) | 4.6 months (3.7, 6.1) | 5.7 months (5.1, 7.1) | 5.6 months (4.4, 7.9) |
| % 1-year Survival 95% CI | 37%*[†] (24, 50) | 12% (2, 23) | 30%*[†] (22, 39) | 20% (13, 27) |
| Time to Progression 95% CI | 12.3 weeks* (9.0, 18.3) | 7.0 weeks (6.0, 9.3) | 8.3 weeks (7.0, 11.7) | 7.6 weeks (6.7, 10.1) |
| Response Rate 95% CI | 5.5% (1.1, 15.1) | Not Applicable | 5.7% (2.3, 11.3) | 0.8% (0.0, 4.5) |

* p≤0.05; [†] uncorrected for multiple comparisons; [††] a value less than 1.00 favors docetaxel.

1   Only one of the two trials (TAX317) showed a clear effect on survival, the primary endpoint;
2   that trial also showed an increased rate of survival to one year. In the second study (TAX320) the
3   rate of survival at one year favored TAXOTERE 75 mg/m$^2$.
4
5   **Figure 3 - TAX317 Survival K-M Curves - TAXOTERE 75 mg/m$^2$ vs. Best Supportive**
6                                                    **Care**



7

**Figure 4 - TAX320 Survival K-M Curves - TAXOTERE 75 mg/m$^2$ vs. Vinorelbine or Ifosfamide Control**



Patients treated with TAXOTERE at a dose of 75 mg/m$^2$ experienced no deterioration in performance status and body weight relative to the comparator arms used in these trials.

- **Combination Therapy with TAXOTERE for Chemotherapy-Naïve NSCLC**

In a randomized controlled trial (TAX326), 1218 patients with unresectable stage IIIB or IV NSCLC and no prior chemotherapy were randomized to receive one of three treatments: TAXOTERE 75 mg/m$^2$ as a 1 hour infusion immediately followed by cisplatin 75 mg/m$^2$ over 30-60 minutes every 3 weeks; vinorelbine 25 mg/m$^2$ administered over 6-10 minutes on days 1, 8, 15, 22 followed by cisplatin 100 mg/m$^2$ administered on day 1 of cycles repeated every 4 weeks; or a combination of TAXOTERE and carboplatin.

The primary efficacy endpoint was overall survival. Treatment with TAXOTERE+cisplatin did not result in a statistically significantly superior survival compared to vinorelbine+cisplatin (see table below). The 95% confidence interval of the hazard ratio (adjusted for interim analysis and multiple comparisons) shows that the addition of TAXOTERE to cisplatin results in an outcome ranging from a 6% inferior to a 26% superior survival compared to the addition of vinorelbine to cisplatin. The results of a further statistical analysis showed that at least (the lower bound of the 95% confidence interval) 62% of the known survival effect of vinorelbine when added to cisplatin (about a 2-month increase in median survival; Wozniak et al. JCO, 1998) was maintained. The efficacy data for the TAXOTERE+cisplatin arm and the comparator arm are summarized in Table 17.

44

**Table 17 - Survival Analysis of TAXOTERE in Combination Therapy for Chemotherapy-Naïve NSCLC**

| Comparison | Taxotere+Cisplatin n=408 | Vinorelbine+Cisplatin n=405 |
|---|---|---|
| Kaplan-Meier Estimate of Median Survival | 10.9 months | 10.0 months |
| p-value[a] | 0.122 | |
| Estimated Hazard Ratio[b] | 0.88 | |
| Adjusted 95% CI[c] | (0.74, 1.06) | |

[a] From the superiority test (stratified log rank) comparing TAXOTERE+cisplatin to vinorelbine+cisplatin

[b] Hazard ratio of TAXOTERE+cisplatin vs. vinorelbine+cisplatin. A hazard ratio of less than 1 indicates that TAXOTERE+cisplatin is associated with a longer survival.

[c] Adjusted for interim analysis and multiple comparisons.

The second comparison in the study, vinorelbine+cisplatin versus TAXOTERE+carboplatin, did not demonstrate superior survival associated with the TAXOTERE arm (Kaplan-Meier estimate of median survival was 9.1 months for TAXOTERE+carboplatin compared to 10.0 months on the vinorelbine+cisplatin arm) and the TAXOTERE+carboplatin arm did not demonstrate preservation of at least 50% of the survival effect of vinorelbine added to cisplatin. Secondary endpoints evaluated in the trial included objective response and time to progression. There was no statistically significant difference between TAXOTERE+cisplatin and vinorelbine+cisplatin with respect to objective response and time to progression (see Table 18).

**Table 18 - Response and TTP Analysis of TAXOTERE in Combination Therapy for Chemotherapy-Naïve NSCLC**

| Endpoint | TAXOTERE+Cisplatin | Vinorelbine+Cisplatin | p-value |
|---|---|---|---|
| Objective Response Rate (95% CI)[a] | 31.6% (26.5%, 36.8%) | 24.4% (19.8%, 29.2%) | Not Significant |
| Median Time to Progression[b] (95% CI)[a] | 21.4 weeks (19.3, 24.6) | 22.1 weeks (18.1, 25.6) | Not Significant |

[a] Adjusted for multiple comparisons.

[b] Kaplan-Meier estimates.

## 14.4  Prostate Cancer

The safety and efficacy of TAXOTERE in combination with prednisone in patients with androgen independent (hormone refractory) metastatic prostate cancer were evaluated in a randomized multicenter active control trial. A total of 1006 patients with Karnofsky Performance Status (KPS) ≥60 were randomized to the following treatment groups:

- TAXOTERE 75 mg/m$^2$ every 3 weeks for 10 cycles.
- TAXOTERE 30 mg/m$^2$ administered weekly for the first 5 weeks in a 6-week cycle for 5 cycles.
- Mitoxantrone 12 mg/m$^2$ every 3 weeks for 10 cycles.

All 3 regimens were administered in combination with prednisone 5 mg twice daily, continuously.

45

In the TAXOTERE every three week arm, a statistically significant overall survival advantage was demonstrated compared to mitoxantrone. In the TAXOTERE weekly arm, no overall survival advantage was demonstrated compared to the mitoxantrone control arm. Efficacy results for the TAXOTERE every 3 week arm versus the control arm are summarized in Table 19 and Figure 5.

**Table 19 - Efficacy of TAXOTERE in the Treatment of Patients with Androgen Independent (Hormone Refractory) Metastatic Prostate Cancer (Intent-to-Treat Analysis)**

|  | TAXOTERE every 3 weeks | Mitoxantrone every 3 weeks |
| --- | --- | --- |
| Number of patients | 335 | 337 |
| Median survival (months) | 18.9 | 16.5 |
| 95% CI | (17.0-21.2) | (14.4-18.6) |
| Hazard ratio | 0.761 | -- |
| 95% CI | (0.619-0.936) | -- |
| p-value* | 0.0094 | -- |

*Stratified log rank test. Threshold for statistical significance = 0.0175 because of 3 arms.

**Figure 5 - TAX327 Survival K-M Curves**



### 14.5  Gastric Adenocarcinoma

A multicenter, open-label, randomized trial was conducted to evaluate the safety and efficacy of TAXOTERE for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who had not received prior chemotherapy for advanced disease.  A total of 445 patients with KPS >70 were treated with either TAXOTERE (T) (75 mg/m$^2$ on day 1) in combination with cisplatin (C) (75 mg/m$^2$ on day 1) and fluorouracil (F) (750 mg/m$^2$ per day for 5 days) or cisplatin (100 mg/m$^2$ on day 1) and fluorouracil (1000 mg/m$^2$ per day for 5 days).  The length of a treatment cycle was 3 weeks for the TCF arm and 4 weeks for the CF arm. The demographic characteristics were balanced between the two treatment arms. The median age was 55 years, 71% were male, 71% were Caucasian, 24% were

65 years of age or older, 19% had a prior curative surgery and 12% had palliative surgery. The median number of cycles administered per patient was 6 (with a range of 1-16) for the TCF arm compared to 4 (with a range of 1-12) for the CF arm.  Time to progression (TTP) was the primary endpoint and was defined as time from randomization to disease progression or death from any cause within 12 weeks of the last evaluable tumor assessment or within 12 weeks of the first infusion of study drugs for patients with no evaluable tumor assessment after randomization. The hazard ratio (HR) for TTP was 1.47 (CF/TCF, 95% CI: 1.19-1.83) with a significantly longer TTP (p=0.0004) in the TCF arm. Approximately 75% of patients had died at the time of this analysis. Overall survival was significantly longer (p=0.0201) in the TCF arm with a HR of 1.29 (95% CI: 1.04-1.61). Efficacy results are summarized in Table 20 and Figures 6 and 7.

**Table 20 - Efficacy of TAXOTERE in the treatment of patients with gastric adenocarcinoma**

| Endpoint | TCF n=221 | CF n=224 |
|---|---|---|
| Median TTP (months) | 5.6 | 3.7 |
| (95%CI) | (4.86-5.91) | (3.45-4.47) |
| Hazard ratio[†] | 0.68 | |
| (95%CI) | (0.55-0.84) | |
| *p-value | 0.0004 | |
| Median survival (months) | 9.2 | 8.6 |
| (95%CI) | (8.38-10.58) | (7.16-9.46) |
| Hazard ratio[†] | 0.77 | |
| (95%CI) | (0.62-0.96) | |
| *p-value | 0.0201 | |
| Overall Response Rate (CR+PR)  (%) | 36.7 | 25.4 |
| p-value | 0.0106 | |

*Unstratified log-rank test

[†]For the hazard ratio (TCF/CF), values less than 1.00 favor the TAXOTERE arm.

Subgroup analyses were consistent with the overall results across age, gender and race.

**Figure 6 - Gastric Cancer Study (TAX325) Time to Progression K-M Curve**



**Figure 7 - Gastric Cancer Study (TAX325) Survival K-M Curve**



## 14.6 Head and Neck Cancer

- Induction chemotherapy followed by radiotherapy (TAX323)

The safety and efficacy of TAXOTERE in the induction treatment of patients with squamous cell carcinoma of the head and neck (SCCHN) was evaluated in a multicenter, open-label, randomized trial (TAX323).  In this study, 358 patients with inoperable locally advanced

48

SCCHN, and WHO performance status 0 or 1, were randomized to one of two treatment arms. Patients on the TAXOTERE arm received TAXOTERE (T) 75 mg/m$^2$ followed by cisplatin (P) 75 mg/m$^2$ on Day 1, followed by fluorouracil (F) 750 mg/m$^2$ per day as a continuous infusion on Days 1-5. The cycles were repeated every three weeks for 4 cycles. Patients whose disease did not progress received radiotherapy (RT) according to institutional guidelines (TPF/RT). Patients on the comparator arm received cisplatin (P) 100 mg/m$^2$ on Day 1, followed by fluorouracil (F) 1000 mg/m$^2$/day as a continuous infusion on Days 1-5. The cycles were repeated every three weeks for 4 cycles. Patients whose disease did not progress received RT according to institutional guidelines (PF/RT). At the end of chemotherapy, with a minimal interval of 4 weeks and a maximal interval of 7 weeks, patients whose disease did not progress received radiotherapy (RT) according to institutional guidelines. Locoregional therapy with radiation was delivered either with a conventional fraction regimen (1.8 Gy-2.0 Gy once a day, 5 days per week for a total dose of 66 to 70 Gy) or with an accelerated/hyperfractionated regimen (twice a day, with a minimum interfraction interval of 6 hours, 5 days per week, for a total dose of 70 to 74 Gy, respectively). Surgical resection was allowed following chemotherapy, before or after radiotherapy.

The primary endpoint in this study, progression-free survival (PFS), was significantly longer in the TPF arm compared to the PF arm, p=0.0077 (median PFS: 11.4 vs. 8.3 months respectively) with an overall median follow up time of 33.7 months. Median overall survival with a median follow-up of 51.2 months was also significantly longer in favor of the TPF arm compared to the PF arm (median OS: 18.6 vs. 14.2 months respectively). Efficacy results are presented in Table 21 and Figures 8 and 9.

**Table 21 - Efficacy of TAXOTERE in the induction treatment of patients with inoperable locally advanced SCCHN (Intent-to-Treat Analysis)**

| ENDPOINT | TAXOTERE+ Cisplatin+ Fluorouracil n=177 | Cisplatin+ Fluorouracil n=181 |
|---|---|---|
| Median progression free survival (months) (95%CI) | 11.4 (10.1-14.0) | 8.3 (7.4-9.1) |
| Adjusted Hazard ratio (95%CI) *p-value | 0.71 (0.56-0.91) 0.0077 | |
| Median survival (months) (95%CI) | 18.6 (15.7-24.0) | 14.2 (11.5-18.7) |
| Hazard ratio (95%CI) **p-value | 0.71 (0.56-0.90) 0.0055 | |
| Best overall response (CR + PR) to chemotherapy (%) (95%CI) | 67.8 (60.4-74.6) | 53.6 (46.0-61.0) |
| ***p-value | 0.006 | |
| Best overall response (CR + PR) to study treatment [chemotherapy +/- radiotherapy] (%) (95%CI) | 72.3 (65.1-78.8) | 58.6 (51.0-65.8) |
| ***p-value | 0.006 | |

A Hazard ratio of less than 1 favors TAXOTERE+Cisplatin+Fluorouracil
* Stratified log-rank test based on primary tumor site
** Stratified log-rank test, not adjusted for multiple comparisons
*** Chi square test, not adjusted for multiple comparisons

**Figure 8 - TAX323 Progression-Free Survival K-M Curve**



**Figure 9 - TAX323 Overall Survival K-M Curve**



* Induction chemotherapy followed by chemoradiotherapy (TAX324)

The safety and efficacy of TAXOTERE in the induction treatment of patients with locally advanced (unresectable, low surgical cure, or organ preservation) SCCHN was evaluated in a randomized, multicenter open-label trial (TAX324).  In this study, 501 patients, with locally advanced SCCHN, and a WHO performance status of 0 or 1, were randomized to one of two treatment arms.  Patients on the TAXOTERE arm received TAXOTERE (T) 75 mg/m² by IV infusion on day 1 followed by cisplatin (P) 100 mg/m² administered as a 30-minute to three-hour IV infusion, followed by the continuous IV infusion of fluorouracil (F) 1000 mg/m²/day from day 1 to day 4.  The cycles were repeated every 3 weeks for 3 cycles.  Patients on the comparator arm received cisplatin (P) 100 mg/m² as a 30-minute to three-hour IV infusion on day 1 followed by the continuous IV infusion of fluorouracil (F) 1000 mg/m²/day from day 1 to day 5. The cycles were repeated every 3 weeks for 3 cycles.

All patients in both treatment arms who did not have progressive disease were to receive 7 weeks of chemoradiotherapy (CRT) following induction chemotherapy 3 to 8 weeks after the start of the last cycle.  During radiotherapy, carboplatin (AUC 1.5) was given weekly as a one-hour IV infusion for a maximum of 7 doses.  Radiation was delivered with megavoltage equipment using once daily fractionation (2 Gy per day, 5 days per week for 7 weeks for a total dose of 70-72 Gy).  Surgery on the primary site of disease and/or neck could be considered at anytime following completion of CRT.

The primary efficacy endpoint, overall survival (OS), was significantly longer (log-rank test, p=0.0058) with the TAXOTERE-containing regimen compared to PF [median OS: 70.6 versus 30.1 months respectively, hazard ratio (HR)=0.70, 95% confidence interval (CI)= 0.54 – 0.90]. Overall survival results are presented in Table 22 and Figure 10.

**Table 22 - Efficacy of TAXOTERE in the induction treatment of patients with locally advanced SCCHN (Intent-to-Treat Analysis)**

| ENDPOINT | TAXOTERE+ Cisplatin+ Fluorouracil n=255 | Cisplatin+ Fluorouracil n=246 |
|---|---|---|
| Median overall survival (months) (95% CI) | 70.6 (49.0-NE) | 30.1 (20.9-51.5) |
| Hazard ratio: (95% CI) *p-value | 0.70 (0.54-0.90) 0.0058 | |

A Hazard ratio of less than 1 favors TAXOTERE+cisplatin+fluorouracil
* un-adjusted log-rank test
NE - not estimable

**Figure 10 - TAX324 Overall Survival K-M Curve**



## 15. REFERENCES

1. NIOSH Alert: Preventing occupational exposures to antineoplastic and other hazardous drugs in healthcare settings. 2004. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2004-165.

2. OSHA Technical Manual, TED 1-0.15A, Section VI: Chapter 2. Controlling Occupational Exposure to Hazardous Drugs. OSHA, 1999. http://www.osha.gov/dts/osta/otm/otm_vi/otm_vi_2.html

3. American Society of Health-System Pharmacists. (2006) ASHP Guidelines on Handling Hazardous Drugs. *Am J Health-Syst Pharm.* 2006;63:1172-1193

4. Polovich, M., White, J. M., & Kelleher, L.O. (eds.) 2005. Chemotherapy and biotherapy guidelines and recommendations for practice (2nd. ed.) Pittsburgh, PA: Oncology Nursing Society.

## 16. HOW SUPPLIED/STORAGE AND HANDLING

### 16.1  How Supplied

TAXOTERE Injection Concentrate is supplied in a single-dose vial as a sterile, pyrogen-free, non-aqueous, viscous solution with an accompanying sterile, non-pyrogenic, Diluent (13% ethanol in water for injection) vial. The following strengths are available:

TAXOTERE 80 mg/2 mL                    (NDC 0075-8001-80)
TAXOTERE (docetaxel) Injection Concentrate 80 mg/2 mL: 80 mg docetaxel in 2 mL polysorbate 80 and Diluent for TAXOTERE 80 mg (13% (w/w) ethanol in water for injection). Both items are in a blister pack in one carton.

TAXOTERE 20 mg/0.5 mL                    (NDC 0075-8001-20)
TAXOTERE (docetaxel) Injection Concentrate 20 mg/0.5 mL: 20 mg docetaxel in 0.5 mL polysorbate 80 and Diluent for TAXOTERE 20 mg (13% (w/w) ethanol in water for injection). Both items are in a blister pack in one carton.

### 16.2  Storage

Store between 2 and 25°C (36 and 77°F). Retain in the original package to protect from bright light. Freezing does not adversely affect the product.

### 16.3  Handling and Disposal

Procedures for proper handling and disposal of anticancer drugs should be considered. Several guidelines on this subject have been published[1-4].

**17. PATIENT COUNSELING INFORMATION**

**Patient Information Leaflet**
**Questions and Answers About Taxotere® Injection Concentrate**
(generic name = docetaxel)
(pronounced as TAX-O-TEER)

---

*What is Taxotere?*

Taxotere is a medication to treat breast cancer, non-small cell lung cancer, prostate cancer, stomach cancer, and head and neck cancer. It has severe side effects in some patients. This leaflet is designed to help you understand how to use Taxotere and avoid its side effects to the fullest extent possible. The more you understand your treatment, the better you will be able to participate in your care. If you have questions or concerns, be sure to ask your doctor or nurse. They are always your best source of information about your condition and treatment.

---

*What is the most important information about Taxotere?*

• Since this drug, like many other cancer drugs, affects your blood cells, your doctor will ask for routine blood tests. These will include regular checks of your white blood cell counts. People with low blood counts can develop life-threatening infections. The earliest sign of infection may be fever, so if you experience a fever, tell your doctor right away.

• Occasionally, serious allergic reactions have occurred with this medicine. If you have any allergies, tell your doctor before receiving this medicine.

• A small number of people who take Taxotere have severe fluid retention, which can be life-threatening. To help avoid this problem, you must take another medication such as dexamethasone (DECKS-A-METH-A-SONE) prior to each Taxotere treatment. You must follow the schedule and take the exact dose of dexamethasone prescribed (see schedule at end of brochure). If you forget to take a dose or do not take it on schedule you must tell the doctor or nurse prior to your Taxotere treatment.

• If you are using any other medicines, tell your doctor before receiving your infusions of Taxotere.

---

*How does Taxotere work?*

Taxotere works by attacking cancer cells in your body. Different cancer medications attack cancer cells in different ways.

Here's how Taxotere works: Every cell in your body contains a supporting structure (like a skeleton). Damage to this "skeleton" can stop cell growth or reproduction. Taxotere makes the "skeleton" in some cancer cells very stiff, so that the cells can no longer grow.

### *How will I receive Taxotere?*

Taxotere is given by an infusion directly into your vein. Your treatment will take about 1 hour. Generally, people receive Taxotere every 3 weeks. The amount of Taxotere and the frequency of your infusions will be determined by your doctor.

As part of your treatment, to reduce side effects your doctor will prescribe another medicine called dexamethasone. Your doctor will tell you how and when to take this medicine. It is important that you take the dexamethasone on the schedule set by your doctor. If you forget to take your medication, or do not take it on schedule, make sure to tell your doctor or nurse **BEFORE** you receive your Taxotere treatment. **Included with this information leaflet is a chart to help you remember when to take your dexamethasone.**

### *What should be avoided while receiving Taxotere?*

Taxotere can interact with other medicines. Use only medicines that are prescribed for you by your doctor and **be sure** to tell your doctor all the medicines that you use, including nonprescription drugs.

### *What are the possible side effects of Taxotere?*

**Low White Blood Cell Count** – Many cancer medications, including Taxotere, cause a temporary drop in the number of white blood cells. These cells help protect your body from infection. Your doctor will routinely check your white blood cell count and tell you if it is too low. Although most people receiving Taxotere do not have an infection even if they have a low white blood cell count, the risk of infection is increased.

**Fever is often one of the most common and earliest signs of infection. Your doctor will recommend that you take your temperature frequently, especially during the days after treatment with Taxotere. If you have a fever, tell your doctor or nurse immediately.**

**Low Red Blood Cell Count –** Taxotere can cause a drop in the number of red blood cells. These cells carry oxygen to different parts of the body.  Your doctor will routinely check your red blood cell count and tell you if it is too low.

**Allergic Reactions** – This type of reaction, which occurs during the infusion of Taxotere, is infrequent. If you feel a warm sensation, a tightness in your chest, or itching during or shortly after your treatment, tell your doctor or nurse immediately.

**Fluid Retention** – This means that your body is holding extra water. If this fluid retention is in the chest or around the heart it can be life-threatening. Shortness of breath may be a sign of fluid retention in the chest or around the heart. If you notice swelling in the feet and legs or a slight weight gain, this may be the first warning sign. Fluid retention usually does not start immediately; but, if it occurs, it may start around your 5th treatment. Generally, fluid retention will go away within weeks or months after your treatments are completed.

Dexamethasone tablets may protect patients from significant fluid retention. It is important that you take this medicine on schedule. If you have not taken dexamethasone on schedule, you must tell your doctor or nurse before receiving your next Taxotere treatment.

**Gastrointestinal** – Diarrhea has been associated with TAXOTERE use and can be severe in some patients. Constipation can also occur. Nausea and/or vomiting are common in patients receiving TAXOTERE. Severe inflammation of the bowel can also occur in some patients and may be life threatening.

**Hepatic** – Elevations in liver enzymes can occur.

**Hair Loss** – Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows, and eyelashes). Hair loss will begin after the first few treatments and varies from patient to patient. Once you have completed all your treatments, hair generally grows back.

Your doctor or nurse can refer you to a store that carries wigs, hairpieces, and turbans for patients with cancer.

**Fatigue** – A number of patients (about 10%) receiving Taxotere feel very tired following their treatments. If you feel tired or weak, allow yourself extra rest before your next treatment. If it is bothersome or lasts for longer than 1 week, inform your doctor or nurse.

**Muscle Pain** – This happens about 20% of the time, but is rarely severe. You may feel pain in your muscles or joints. Tell your doctor or nurse if this happens. They may suggest ways to make you more comfortable.

**Rash** – This side effect occurs commonly but is severe in about 5%. You may develop a rash that looks like a blotchy, hive-like reaction. This usually occurs on the hands and feet but may also appear on the arms, face, or body. Generally, it will appear between treatments and will go away before the next treatment. Inform your doctor or nurse if you experience a rash. They can help you avoid discomfort.

**Odd Sensations** – About half of patients getting Taxotere will feel numbness, tingling, or burning sensations in their hands and feet. If you do experience this, tell your doctor or nurse. Generally, these go away within a few weeks or months after your treatments are completed. About 14% of patients may also develop weakness in their hands and feet.

**Nail Changes** – Color changes to your fingernails or toenails may occur while taking Taxotere. In extreme, but rare, cases nails may fall off. After you have finished Taxotere treatments, your nails will generally grow back.

**Eye Changes** – Excessive tearing, which can be related to conjunctivitis or blockage of the tear ducts, may occur.

If you are interested in learning more about this drug, ask your doctor for a copy of the package insert.

56

1

**Every three-week injection of TAXOTERE for breast, non-small cell lung and stomach, and head and neck cancers**
**Take dexamethasone tablets, 8 mg twice daily.**

*Dexamethasone dosing:*

**Day 1** Date: _____   Time: _____ AM _____ PM

**Day 2** Date: _____   Time: _____ AM _____ PM
**(Taxotere Treatment Day)**

**Day 3** Date: _____   Time: _____ AM _____ PM

2

**Every three-week injection of TAXOTERE for prostate cancer**
**Take dexamethasone 8 mg, at 12 hours, 3 hours and 1 hour before TAXOTERE infusion.**

*Dexamethasone dosing:*

Date: _____   Time: _____

Date: _____   Time: _____
**(Taxotere Treatment Day)**
                   Time: _____

3

4    sanofi-aventis U.S. LLC

5    Bridgewater, NJ 08807

6    www.sanofi-aventis.us

7

8    © sanofi-aventis U.S. LLC

# EXHIBIT S


ELSEVIER

# RANDOMIZED PHASE II STUDY COMPARING PACLITAXEL AND CARBOPLATIN VERSUS MITOXANTRONE IN PATIENTS WITH HORMONE-REFRACTORY PROSTATE CANCER

AURÉLIE CABRESPINE, LAURENT GUY, ELHANI KHENIFAR, HERVÉ CURÉ, JOËL FLEURY,
FRÉDÉRIQUE PENAULT-LLORCA, FABRICE KWIATKOWSKI, CHANTAL BARTHOMEUF,
PHILIPPE CHOLLET, AND JACQUES-OLIVIER BAY

## ABSTRACT

**Objectives.** Mitoxantrone/prednisone was the 2002 palliative reference treatment for hormone-refractory prostate cancer (HRPC). Paclitaxel and carboplatin has demonstrated antitumor activity in HRPC. The therapeutic benefit of such treatment was compared with that of mitoxantrone.

**Methods.** A randomized Phase II study was conducted that included 40 patients with HRPC who had not undergone chemotherapy. Patients in arm A received paclitaxel (175 mg/m$^2$ every 3-week cycle) and carboplatin (area under the curve of 5 every 3-week cycle). Patients in arm B received mitoxantrone (12 mg/m$^2$ every 3-week cycle). All the patients treated were receiving low-dose prednisone. The primary endpoint was the prostate-specific antigen response.

**Results.** The prostate-specific antigen response to paclitaxel and carboplatin was significantly greater (40% [95% confidence interval 18.5% to 61.5%] versus 10% [95% confidence interval 1% to 32%], $P = 0.031$) and more durable (8.6 versus 2 months, $P = 0.015$) than the response to mitoxantrone. A tendency was noted for patients with measurable disease who were receiving paclitaxel and carboplatin to have a somewhat greater objective response rate than those who received mitoxantrone (23% [95% confidence interval 5.3% to 55%] versus no objective response, $P = 0.060$). The median overall survival was 14.5 months for the paclitaxel and carboplatin arm compared with 11.1 months for the mitoxantrone arm. The group given paclitaxel and carboplatin had significantly greater rates of sensitive neuropathy (50% versus 0%, $P = 0.00026$).

**Conclusions.** The 3-week regimen of paclitaxel and carboplatin induced a greater and more durable prostate-specific antigen response than did mitoxantrone for HRPC treatment. The major additive toxicity induced was peripheral neuropathy due to paclitaxel. Investigations with paclitaxel and carboplatin regimens merit large Phase III studies.   UROLOGY **67:** 354–359, 2006. © 2006 Elsevier Inc.

**P**rostate cancer is the most frequently diagnosed malignancy and the second leading cause of cancer-related death of men in industrialized countries.[1,2] In advanced disease, androgen

*This work was supported in part by Bristol Myers Squibb, the Ligue contre le Cancer (Comité du Puy de Dôme), and a regional Projet Hospitalier de Recherche Clinique (PHRC).*

*From the Centre Jean Perrin, UMR484 INSERM, and Hôpital Gabriel Montpied, Service d'Urologie, Clermont-Ferrand, France; Centre Hospitalier, Vichy, France; Clinique des Dômes and Laboratoire de Pharmacognosie/Biotechnologies, Faculté de Pharmacie, Clermont-Ferrand, France*

*Reprint requests: Jacques-Olivier Bay, Centre Jean Perrin, 58 rue Montalembert, Clermont-Ferrand 63011 Cedex 1, France. E-mail: Jacques-Olivier.Bay@cjp.fr*

*Submitted: June 8, 2005, accepted (with revisions): August 18, 2005*

suppression therapy remains the best treatment. After a median response of 12 to 24 months, patients develop progressive hormone-refractory prostate cancer (HRPC).[3,4]

The standard first-line chemotherapy for HRPC treatment usually consists of mitoxantrone/prednisone.[5] However, no survival advantage has been reported. The need for new therapies with a survival advantage and greater antitumor effect is obvious. Taxanes represent a suitable therapeutic option. Two large studies have demonstrated improvement in overall survival (OS) in patients treated with a 3-week schedule of docetaxel[6] or docetaxel/estramustine[7] versus mitoxantrone/prednisone. These studies led to docetaxel every 3 weeks becoming the standard therapy for HRPC in 2004. Paclitaxel

© 2006 ELSEVIER INC.
**354** ALL RIGHTS RESERVED

was also studied and showed antitumor activity in various administration schedules.[9,10]

To improve the results in patients with HRPC, paclitaxel had been used in combination with carboplatin and estramustine. This rationale was based on the platelet-sparing mechanism of the paclitaxel/carboplatin combination[10,11] and the synergistic antimicrotubule activity of paclitaxel and estramustine.[12,13] Successful Phase II studies have evaluated this association.[14,15] However, because of frequent gastrointestinal and thromboembolic events,[16] the use of estramustine is still debated.

To estimate better the therapeutic benefit of paclitaxel and carboplatin (P-C) without estramustine, we conducted a prospective randomized Phase II study comparing this combination with the use of mitoxantrone.

## MATERIAL AND METHODS

*PATIENT SELECTION*

Patients had histologically confirmed adenocarcinoma of the prostate and a relapse of their disease after previous treatment with androgen deprivation (prostate-specific antigen [PSA] increase of more than 50% within 3 months, with a threshold PSA value of 5 ng/mL). None of the patients had undergone previous cytotoxic chemotherapy other than estramustine. Patients were required to have a life expectancy of more than 3 months and a Karnofsky performance status of more than 70%. Inadequate hepatic or renal function, cardiac failure, preexisting peripheral neuropathy (grade 3 or 4), uncontrolled central nervous system disease, active uncontrolled infection, and a history or presence of other cancer aside from controlled cutaneous carcinoma were the exclusion criteria. Prior radiotherapy concerning less than 25% of bone marrow reserve within 4 weeks before entry was allowed. The ethics committees approved the protocol, and all patients provided informed consent before study enrollment.

*TREATMENT PLAN*

The first arm was given paclitaxel and carboplatin. Paclitaxel 175 mg/m$^2$ was delivered by 3-hour intravenous infusion on day 1 every 21 days. Premedications were administered intravenously 30 minutes before each paclitaxel infusion and consisted of 20 mg methylprednisone, 5 mg dexchlorpheniramine, and 300 mg cimetidine or 50 mg ranitidine. Carboplatin was administered by a 1 to 2-hour intravenous infusion, and the dose was calculated according to an area under the curve of 5, delivered intravenously on day 1 every 21 days. The second arm was mitoxantrone 12 mg/m$^2$ administered intravenously on day 1 of every 3-week cycle. All the patients treated were receiving low-dose prednisone. Treatment was continued until disease progression or excessive toxicity. Patients concurrently received ongoing hormonal therapy to maintain their castrated status without antiandrogen, which was discontinued within 3 months before registration to eliminate patients who might benefit from antiandrogen withdrawal. Randomization was centralized with the use of a permuted-block allocation.

*RESPONSE AND TOXICITY EVALUATION*

The PSA levels were determined in the same laboratory at baseline, within 2 weeks before starting chemotherapy, and at every cycle. The response assessment was based on the guidelines of the PSA Working Group.[17] A PSA response was de-

fined as a PSA decline of greater than 50% from the baseline value, confirmed by a second value 4 or more weeks later. PSA progression was defined as three consecutive increases in the serum PSA concentration of more than 50% greater than the baseline level. In patients whose PSA level decreased but did not reach the response criteria, progressive disease was considered to have occurred when the PSA level increased 25% greater than the nadir and was confirmed.

The World Health Organization response criteria[18] were applied to assess measurable disease every three cycles by thoracic-abdominal-pelvic scan. A complete response was defined as total involution of the tumor, and a partial response as a 50% or more reduction in the product of the two largest diameters of each measurable lesion without development of a new tumor. Tumor progression was defined as a 25% or more increase in the product of the two largest diameters of a measurable lesion, development of a new lesion, or the reappearance of a lesion that had previously disappeared. Patients were considered stable in the absence of criteria favoring a complete or partial response or progression. A second scan was performed to confirm a complete or partial response. Changes in bone lesions were assessed every three cycles by bone scintigraphy and were classified as improvement (visual improvement in osseous lesions), stable (no new osseous lesions), or progression (appearance of new lesions). Toxicity was graded according to the National Cancer Institute's Common Toxicity Criteria (version 2) at each 3-week visit.

*STATISTICAL ANALYSIS*

Descriptive statistics (median and range) were used to characterize the population. The primary endpoint was the PSA response in the two chemotherapy groups. The secondary endpoints were the presence of measurable disease and osseous disease response, OS, time to PSA progression, and toxicity. The relationship between the treatment arm and the proportion of chemotherapy response or adverse events of any grade were assessed with the chi-square test. The time to PSA progression and OS were correlated with the treatment arm using the Kaplan-Meier method. OS was calculated from study enrollment to death or the last follow-up visit. Patients who died without documented disease progression were censored on the day of death or the last follow-up visit. Statistical significance was established at $P < 0.05$, with the data analyzed according to the intention to treat. An interim analysis was scheduled when 20 patients were enrolled in each treatment arm.

## RESULTS

*PATIENT CHARACTERISTICS*

Between March 2002 and December 2004, 40 patients were enrolled (Table I). Of the 40 patients, 20 were randomly assigned to P-C and 20 to mitoxantrone. No significant differences were found in the baseline characteristics between the two treatment arms (chi-square test, $P > 0.05$). In each treatment arm, the inclusion Gleason score was determined only for 9 patients who underwent prostate biopsy. Prior treatment included prostatectomy, local or palliative radiotherapy, and hormonal manipulation.

Patients received a median of 6 courses (range 1 to 14) of P-C and a median of 3 courses (range 3 to 12) of mitoxantrone. Three patients were not assessed for the chemotherapy response in the P-C

### TABLE I.   Baseline patient characteristics (n = 40)

| Characteristic | Paclitaxel and Carboplatin | Mitoxantrone |
|---|---|---|
| Number of patients (%) | 20 (50) | 20 (50) |
| Median age (yr) | | |
|   Diagnosis | 63 (51–74) | 64 (49–71) |
|   Inclusion | 68 (52–80) | 67 (50–76) |
| Median PSA (ng/mL) | | |
|   Diagnosis | 83 (10.1–4000) | 57 (4.3–1000) |
|   Inclusion | 95.7 (11.3–2328) | 105 (25.6–1146) |
| Median Gleason score | | |
|   Diagnosis | 7 (5–9) | 7 (3–10) |
|   Inclusion | 8 (7–9) | 8 (7–10) |
| Metastasis at diagnosis (%) | 11 (55) | 14 (70) |
| Extent of disease at inclusion (%) | | |
|   Bone | 17 (85) | 18 (90) |
|   Measurable disease | 13 (65) | 14 (70) |
|     Lung/Liver | 1 (8) | 5 (36) |
|     Nodes | 10 (77) | 10 (71) |
|     Local recurrence | 2 (15) | 4 (28) |
| Prior treatment | | |
|   Prostatectomy (%) | 2 (10) | 1 (5) |
|   Radiotherapy (%) | | |
|     Local | 7 (35) | 3 (15) |
|     Palliative | 3 (15) | 2 (10) |
|   Hormonal manipulation (%) | | |
|     Surgical castration | 2 (10) | 2 (10) |
|     Estramustine | 5 (25) | 5 (25) |
|     Line of hormonal therapy | | |
|       ≤2 | 9 (45) | 9 (45) |
|       >2 | 11 (55) | 11 (55) |
|     Median duration (mo) | 29.1 (6.6–19) | 34.4 (7.7–72.6) |

KEY: PSA = prostate-specific antigen.
Data in parentheses are ranges, unless otherwise noted.

### TABLE II.   Clinical outcome

| Variable | Paclitaxel and Carboplatin | Mitoxantrone | P Value* |
|---|---|---|---|
| PSA decrease (%) | 40 (18.5–61.5) | 10% (1–32) | 0.031[†] |
|   >80% decrease | 3/20 | 0/20 | |
|   ≥50% decrease | 5/20 | 2/20 | |
| Measurable disease (%) | 23 (5.3–55) | 0 | 0.14[‡] |
|   Complete response | 1/13 | 0/14 | |
|   Partial response | 2/13 | 0/14 | |
| Bone metastasis (%) | 23.5 (7.4–53.4) | 11% (1.2–35.8) | NS |
|   Improvement | 4/17 | 2/18 | |

KEY: PSA = prostate-specific antigen; NS = not significant.
Data in parentheses are 95% confidence intervals; other data presented as patients per total.
* Intent-to-treat analysis.
[†] Statistically significant.
[‡] Near statistical significance.

arm because of two withdrawals after one cycle of treatment (one toxicity-related death and one allergic shock) and one death before treatment.

### CLINICAL OUTCOMES

According to the intention-to-treat analysis, the PSA response correlated significantly with P-C treatment ($P = 0.031$). As detailed in Table II, a PSA decline of greater than 50% occurred more frequently in the P-C arm than in the mitoxantrone arm (40% [95% confidence interval 18.5% to 61.5%] versus 10% [95% confidence interval 1% to 32%]). Although patients with measurable disease who received P-C had a somewhat greater objective response rate than those who received mitoxantrone (23% [95% confidence interval 5.3% to

**TABLE III.**   *Toxicities of paclitaxel-carboplatin and mitoxantrone*

| Toxicity | Paclitaxel and Carboplatin (%) | | | Mitoxantrone (%) | | | P Value |
|---|---|---|---|---|---|---|---|
| | Grade 1–2 | Grade 3–4 | Total | Grade 1–2 | Grade 3–4 | Total | |
| Alopecia | 3 (15) | 2 (10) | 5 (25) | 1 (5) | | 1 (5) | NS |
| Anemia | 4 (20) | 3 (15) | 7 (35) | 8 (40) | 1 (5) | 9 (45) | NS |
| Neutropenia | 3 (15) | | 3 (15) | 2 (10) | | 2 (10) | NS |
| Cardiovascular | | 1 (5) | 1 (5) | | | 0 | NS |
| Thrombocytopenia | 5 (25) | | 5 (25) | | | 0 | 0.056* |
| Infection | | 1 (5) | 5 (25) | | | 0 | NS |
| Asthenia | 7 (35) | | 7 (35) | 6 (30) | | 6 (30) | NS |
| Dyspnea | 5 (25) | | 5 (25) | 1 (5) | 1 (5) | 2 (10) | NS |
| Drug reaction | | 1 (5) | 1 (5) | | | 0 | NS |
| Constipation | 1 (5) | | 1 (5) | 3 (15) | | 3 (15) | NS |
| Diarrhea | 1 (5) | | 1 (5) | 3 (15) | | 3 (15) | NS |
| Sensitive neuropathy | 6 (30) | 4 (20) | 10 (50) | | | 0 | 0.00026† |
| Nausea, vomiting | 6 (30) | 3 (15) | 9 (45) | 9 (45) | | 9 (45) | NS |

KEY: NS = not significant.
* Near statistical significance.
† Statistically significant.

55%] versus no objective response), this difference just failed to reach statistical significance ($P = 0.060$). Patients who have received P-C seemed to present with more bone improvement than those who received mitoxantrone (23% versus 11%).

The time to PSA progression was significantly influenced by the chemotherapy arm ($P = 0.015$). The median time to PSA progression was longer in the P-C group than in the mitoxantrone group (8.6 months, range 0.99 to 27.32, versus 2 months, range 1.45 to 8.25).

The median follow-up was similar between the two groups: 7.5 months in the P-C group and 6.3 months in the mitoxantrone group. Although the median OS was greater in the P-C arm (14.5 months versus 11.1 months), we found no statistically significant correlation between the chemotherapy arm and OS.

*TOXICITY*

Compared with the mitoxantrone group, the P-C group had significantly greater rates of sensitive neuropathies of any grade (50% versus 0%, $P = 0.00026$, Table III). Hematologic toxicity such as anemia (35% versus 45%) and neutropenia (15% versus 10%) were similar in both treatment groups. However, patients receiving P-C presented with a greater rate of thrombocytopenia (25% versus 0%, $P = 0.056$). Ten patients, all in the P-C group, stopped their treatment because of toxicity (one thrombocytopenia, one septic shock, one drug reaction and seven sensitive neuropathies).

**COMMENT**

Several studies have contributed to the evolution of the use of mitoxantrone for HRPC. The results of a randomized Phase III study led to Food and Drug Administration approval of mitoxantrone/prednisone for the palliative treatment of HRPC in 1996.[5] Consequently, mitoxantrone/prednisone became the reference treatment of HRPC. In our study, the PSA response rate in the mitoxantrone group (10%) was lower than in previous studies, which had reported PSA response rates of 18.7% to 48%.[5,18,19] However, although the rate of PSA response was lower in our study, the median OS of 11.1 months for patients treated with mitoxantrone was similar to that reported by other studies (range 10 to 12.3 months),[5,18,19] except for the recent study by Tannock *et al.*[6] (16.5 months). Because of the lack of demonstrated OS improvement, mitoxantrone/prednisone remains a palliative treatment for HRPC.

The P-C regimen was tested in two previous studies. Kelly *et al.*[14] reported a PSA decrease of more than 50% in 67% of patients with HRPC and a 45% objective response rate of measurable disease using a weekly regimen of paclitaxel, carboplatin every 28 days, and daily estramustine. A similar regimen in Japanese patients with HRPC resulted in 100% with a PSA level that decreased greater than 50% and a 61.1% objective response rate of measurable lesions.[14] Our combination therapy used a 3-week schedule of P-C to improve the comfort of patients and no estramustine to avoid thromboembolic toxicity. This regimen resulted in a PSA decrease of greater than 50% in 40% of patients and a 23% objective response rate of measurable disease. As with the PSA response, the OS was shorter (14.5 months in the P-C arm) than the 19.9 and 24 months in published studies.[14,15] Weekly paclitaxel was associated with greater rates of grade 3 and 4 hematologic toxicity, such as throm-

bocytopenia (25% to 28.1%), anemia (59.4%), and leukopenia (37.5%).[15] Estramustine in combination with paclitaxel versus paclitaxel alone was evaluated in patients with HRPC.[21] The addition of estramustine was responsible for a 20% increase in the PSA decline without a difference in OS. However, 7% of patients treated with estramustine-containing regimens experience thromboembolic complications.[16] Although these data point to a possible contribution of estramustine, decreased toxicity remains important in prostate cancer largely present in elderly men with medical co-morbidities. Overall, the 3-week P-C regimen without estramustine seems to be more convenient for patients, with less toxicity, but also appears to be less efficient than the prior regimen of weekly paclitaxel, monthly carboplatin, and daily estramustine.

The comparison of mitoxantrone with P-C revealed that the PSA response was significantly greater and more durable with P-C. Although the measurable and osseous disease responses were greater in the P-C arm, the differences were not significant. Because many patients with metastatic prostate cancer do not have measurable disease and changes in the size of osseous lesions are difficult to interpret, these evaluations do not represent surrogate endpoints in the evaluation of chemotherapy response as efficiently as the PSA response. Only a tendency toward improvement was noted in median OS by 3.4 months with P-C. This tendency would have been more significant if the trial had been continued. However, during the course of the study, the accepted standard treatment had changed. It appeared unethical to continue the study beyond the interim analysis, as initially planned. Hematologic toxicity was similar for both chemotherapy regimens, except for more frequent thrombocytopenia with P-C. However, this thrombocytopenia was low grade (grade 1 to 2). Sensitive neuropathies were related to the P-C arm and represent the major reason for treatment cessation. These results underline the major problem of induced neuropathy with paclitaxel-based regimens,[21] and the difficulty of balancing the toxic effects of peripheral neuropathy with the therapeutic benefits of the drug.

Two recent studies of docetaxel as monotherapy,[6] or in association with estramustine,[7] demonstrated significantly prolonged OS in HRPC compared with mitoxantrone,[6] leading to docetaxel becoming the standard first-line chemotherapy for HRPC. The median OS of docetaxel 75 mg/m$^2$ every 3 weeks was 18.9 months or 17.5 months in association with estramustine. Although the OS was lower with P-C treatment, the PSA response of 45% to 50% observed with docetaxel alone or in combination with estramustine was similar to the rate observed in our study. The median duration of the PSA response was 6.3 to 7.7 months compared

with 8.6 months in our study. Although recent findings with docetaxel led it to become the first-line HRPC chemotherapy, additional studies with the P-C regimen based on our study results might be interesting. Therefore, because basic studies have indicated only partial cross-resistance between paclitaxel and docetaxel,[23,24] and because the 3-week regimen of P-C seems to have a PSA response similar to docetaxel, this P-C regimen could be used as an alternative to docetaxel in second-line therapy.

## CONCLUSIONS

The results of the current Phase II interim analysis provide evidence that a 3-week regimen of P-C induced a greater and more durable PSA response than mitoxantrone for HRPC treatment. The major additive toxicity induced was peripheral neuropathy, caused by paclitaxel. Investigations with P-C regimen are merited.[8,20,22]

### REFERENCES

1. Hill C, and Doyon F: The frequency of cancer in France in year 2000, and trends since 1950. Bull Cancer **92**: 7–11, 2005.
2. Jemal A, Murray T, Ward E, et al: Cancer statistics. CA Cancer J Clin **55**: 10–30, 2005.
3. Carroll PR, Kantoff PW, Balk SP, et al: Second International Conference on Newer Approaches to Androgen Deprivation Therapy (ADT) in Prostate Cancer: overview consensus statement—newer approaches to androgen deprivation therapy in prostate cancer. Urology **60**(3 suppl 1): 1–6, 2002.
4. Chodak GW, Keane T, Klotz L, et al: Critical evaluation of hormonal therapy for carcinoma of the prostate. Urology **60**: 201–208, 2002.
5. Tannock IF, Osoba D, Stockler MR, et al: Chemotherapy with mitoxantrone plus prednisone or prednisone alone for symptomatic hormone-resistant prostate cancer: a Canadian randomized trial with palliative end points. J Clin Oncol **14**: 1756–1764, 1996.
6. Tannock IF, de Wit R, Berry WR, et al: Docetaxel plus prednisone or mitoxantrone plus prednisone for advanced prostate cancer. N Engl J Med **351**: 1502–1512, 2004.
7. Petrylak DP, Tangen CM, Hussain MH, et al: Docetaxel and estramustine compared with mitoxantrone and prednisone for advanced refractory prostate cancer. N Engl J Med **351**: 1513–1520, 2004.
8. Roth BJ, Yeap BY, Wilding G, et al: Taxol in advanced, hormone-refractory carcinoma of the prostate: a phase II trial of the Eastern Cooperative Oncology Group. Cancer **72**: 2457–2460, 1993.
9. Trivedi C, Redman B, Flaherty LE, et al: Weekly 1-hour infusion of paclitaxel: clinical feasibility and efficacy in patients with hormone-refractory prostate carcinoma. Cancer **89**: 431–436, 2000.
10. Guminski AD, Harnett PR, and deFazio A: Carboplatin and paclitaxel interact antagonistically in a megakaryoblast cell line—a potential mechanism for paclitaxel-mediated sparing of carboplatin-induced thrombocytopenia. Cancer Chemother Pharmacol **48**: 229–234, 2001.
11. Fujiwara K, Yamauchi H, Suzuki S, et al: The platelet-sparing effect of paclitaxel is not related to changes in the pharmacokinetics of carboplatin. Cancer Chemother Pharmacol **47**: 22–26, 2001.

12. Speicher LA, Barone L, and Tew KD: Combined anti-microtubule activity of estramustine and Taxol in human prostatic carcinoma cell lines. Cancer Res **52**: 4433–4440, 1992.

13. Hudes GR, Nathan F, Khater C, *et al:* Phase II trial of 96-hour paclitaxel plus oral estramustine phosphate in metastatic hormone-refractory prostate cancer. J Clin Oncol **15**: 3156–3163, 1997.

14. Kelly WK, Curley T, Slovin S, *et al:* Paclitaxel, estramustine phosphate, and carboplatin in patients with advanced prostate cancer. J Clin Oncol **19**: 44–53, 2001.

15. Urakami S, Igawa M, Kikuno N, *et al:* Combination chemotherapy with paclitaxel, estramustine and carboplatin for hormone refractory prostate cancer. J Urol **168**: 2444–2450, 2002.

16. Lubiniecki GM, Berlin JA, Weinstein RB, *et al:* Thromboembolic events with estramustine phosphate-based chemotherapy in patients with hormone-refractory prostate carcinoma: results of a meta-analysis. Cancer **101**: 2755–2759, 2004.

17. Bubley GJ, Carducci M, Dahut W, *et al:* Eligibility and response guidelines for phase II clinical trials in androgen-independent prostate cancer: recommendations from the Prostate-Specific Antigen Working Group. J Clin Oncol **17**: 3461–3467, 1999.

18. Miller AB, Hoogstraten B, Staquet M, *et al:* Reporting results of cancer treatment. Cancer **47**: 207–214, 1981.

19. Kantoff PW, Halabi S, Conaway M, *et al:* Hydrocortisone with or without mitoxantrone in men with hormone-refractory prostate cancer: results of the Cancer and Leukemia Group B 9182 study. J Clin Oncol **17**: 2506–2513, 1999.

20. Ernst DS, Tannock IF, Winquist EW, *et al:* Randomized, double-blind, controlled trial of mitoxantrone/prednisone and clodronate versus mitoxantrone/prednisone and placebo in patients with hormone-refractory prostate cancer and pain. J Clin Oncol **21**: 3335–3342, 2003.

21. Berry WR, Hathorn JW, Dakhil SR, *et al:* Phase II randomized trial of weekly paclitaxel with or without estramustine phosphate in progressive, metastatic, hormone-refractory prostate cancer. Clin Prostate Cancer **3**: 104–111, 2004.

22. Kuroi K, and Shimozuma K: Neurotoxicity of taxanes: symptoms and quality of life assessment. Breast Cancer **11**: 92–99, 2004.

23. Verweij J, Clavel M, and Chevalier B: Paclitaxel (Taxol) and docetaxel (Taxotere): not simply two of a kind. Ann Oncol **5**: 495–505, 1994.

24. Urakami S, Yoshino T, Kikuno N, *et al:* Docetaxel-based chemotherapy as second-line treatment for paclitaxel-based chemotherapy-resistant hormone-refractory prostate cancer: a pilot study. Urology **65**: 543–548, 2005.