# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| SANOFI-AVENTIS U.S. LLC and SANOFI MATURE IP, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 20-804 (RGA) CONSOLIDATED |
| v. | ) ) | |
| APOTEX CORP., *et al.*, | ) ) | |
| Defendants. | ) | |

## SUPPLEMENTAL VALIDITY REPORT OF PETER S. NELSON, M.D.

## I.     <u>Introduction</u>

1.      I have been asked by counsel for plaintiffs Sanofi-Aventis U.S. LLC and Sanofi Mature IP (collectively, "Sanofi") to respond to new arguments set forth in the March 19, 2021 Reply Expert Report of Mark J. Ratain, M.D. for U.S. Patent Nos. 10,716,777 and 10,583,110 ("the '777 and '110 patents") ("Ratain Reply Report") and the opinions regarding the '777 and '110 patents in the August 18, 2022 Supplemental Opening Expert Report of Mark J. Ratain, M.D. ("Ratain Supp. Report") for U.S. Patent No. 8,927,592 ("the '592 patent").  I have based my opinions on my general knowledge of clinical and experimental therapy for prostate cancer, Dr. Ratain's reports and the references cited therein, and the documents set forth in Exhibit 1.[1]

## II.    <u>Responses to Dr. Ratain's Assertions Regarding Increasing Survival</u>

2.      I understand that the Court has construed "increasing survival" as "increasing any of overall survival, tumor progression-free survival, pain progression-free survival, or prostate specific antigen (PSA) progression-free survival as compared to any other treatment that may be available to the patient (including no treatment)."[2]  I have applied this construction in reaching the opinions contained herein.

3.      For all the reasons set forth in my February 26, 2021 Rebuttal Validity Report ("Rebuttal Report") (¶¶ 86-182) and set forth below, it is my opinion that a POSA would not have reasonably expected the claimed cabazitaxel treatment methods to increase either overall survival or any PFS metric as compared to any other alternative treatment or no treatment at all.

---

[1] Exhibit 1 identifies the abbreviations for references used in this report.
[2] The scientific literature refers to "survival" when referring to overall survival.  In light of the Court's construction, I will specify overall survival where needed herein.

A.    **Responses to Dr. Ratain's Assertions Regarding Overall Survival**

4.    Dr. Ratain opines that because two objectives of terminal cancer care are improving quality and quantity of life, a POSA administering any therapy to a patient would be motivated "to try to increase" quantity of life and that this goal in conjunction with the existence of the TROPIC study would have motivated a POSA to administer cabazitaxel therapy to the claimed patients "with the intent of increasing survival given the poor alternative of mitoxantrone and prednisone." Ratain Supp. Report at ¶ 58. I disagree. While the two primary goals of treatment for mCRPC are improving a patient's quality of life through pain and symptom control and/or increasing the quantity of life, a POSA understood that the intent of administering any particular treatment depends on the available data. A POSA also would have kept in mind the potential for a therapy to worsen quality of life. Since extending quantity of life was such a difficult task for patients with mCRPC by October 2009, and multiple drugs had failed to show a benefit for overall survival despite anecdotal reductions in pain, PSA, measurable tumor size, or even increases in PFS (Rebuttal Report at ¶¶ 56-57, 122-125, 131-141),[3] a POSA could not have intended to increase quantity of life without data supporting a reasonable expectation that overall survival would be increased.

5.    Dr. Ratain mischaracterizes my opinions on obviousness as requiring a phase III study to have an intent of increasing survival. Ratain Reply Report at ¶¶ 19, 59. A completed phase III study would not have been necessary, but Dr. Ratain relies upon references discussing the existence of the phase III TROPIC study of cabazitaxel (i.e., brief descriptions of the study), the first comparative study of cabazitaxel in any patient type. Thus, a POSA evaluating that

---

[3] While many of these studies were even earlier in the disease state before patients had received docetaxel, a POSA would have understood post-docetaxel mCRPC as an even more challenging patient population to treat. Rebuttal Report at ¶ 117.

prior art would have also considered the existence of other negative phase III studies in mCRPC and the earlier phase data supporting those studies in assessing what conclusions and expectations to draw about the existence of the TROPIC study and the potential outcomes.

6.      Dr. Ratain also opines that investigators enrolling patients in the TROPIC study were practicing the asserted claims and that investigators would have expected that the cabazitaxel treatment would increase survival.  Ratain Supp. Report ¶ 61.  I disagree.  TROPIC was randomized, meaning it was not known in advance whether a patient would receive mitoxantrone or cabazitaxel.  It was also unknown whether cabazitaxel would be better, worse, or the same as mitoxantrone with respect to overall survival or PFS.  Indeed, the purpose of the TROPIC study was to determine whether cabazitaxel therapy could increase overall survival as compared to mitoxantrone therapy (an equivalent to no treatment for overall survival because it had never been shown to increase quantity of life).  The existence of the TROPIC study itself with such minimal supporting data (a single responding patient with mCRPC previously treated with docetaxel), in view of the many negative mCRPC clinical trials with survival endpoints, would not have motivated a POSA to administer cabazitaxel (with or without prednisone) with the intent of increasing overall survival or PFS (as compared to any alternative treatment or no treatment).  Rebuttal Report at ¶¶ 164-171.  A POSA would not have understood that the TROPIC investigators intended to increase survival of their patients by administering cabazitaxel therapy.

7.      Dr. Ratain states that the activity of cabazitaxel in the TROPIC study was "more predictable than that of most chemotherapy drugs, given its similarity to docetaxel."  Ratain Reply Report at ¶ 52.  To the extent that Dr. Ratain is implying that taxanes would be expected to act similarly, I disagree for the reasons set forth in my Rebuttal Report (¶¶ 88, 95-107).  In

3

addition, the TROPIC study included patients that had progressed during or shortly after docetaxel therapy.  Cabazitaxel would have been expected to be of no benefit to these patients if it was expected to have the same activity as docetaxel.  Ross at 525 ("[I]t appears unlikely that docetaxel alone would provide any benefit in patients who have just progressed while receiving docetaxel . . . .").  With respect to the TROPIC study, a POSA would have expected cabazitaxel therapy to be less active in post-docetaxel mCRPC patients than another chemotherapy with a different mechanism of action.  *See, e.g.*, Attard at 76 ("[D]espite these modest improvements, the fundamental mechanism of the anticancer activity of these new taxanes remains unchanged and they are unlikely to make a dramatic impact on patient outcome.").

8.      Dr. Ratain further opines that "in a hypothetical world," if a drug "reproducibly reduces PSA, tumor size, or pain in multiple patients," it "would demonstrate a statistically significant increase in survival if the trial were sufficiently large."  Ratain Reply Report at ¶ 49. A POSA considering whether to administer a therapy with the intent of increasing survival would consider existent data, not hypothesize about an infinitely large study, which may or may not reveal a nominal increase in survival.  Those hypotheticals would not have motivated a POSA to administer a therapy with the intent to increase survival.  Furthermore, the mCRPC literature discussed in my Rebuttal Report demonstrates that many drugs were reported to reduce tumor size, pain, and/or PSA but did not show increases in overall survival and/or increases in PFS as compared to other treatments.  Rebuttal Report at ¶¶ 130-141.  In fact, GVAX and DN-101 had more deaths (i.e., worse overall survival) than the comparator.  Rebuttal Report at ¶¶ 131-132.

9.      The lung cancer publication by Temel *et al*. cited by Dr. Ratain (Ratain Reply Report at ¶ 16) does not indicate that a drug that has some palliative benefit for mCRPC

4

increases overall survival.  Temel did not assess a single therapy but rather an approach of including palliative care teams (which would have included various treatments and nonmedical approaches for improving quality of life) for newly diagnosed metastatic non-small-cell lung cancer as compared to standard treatment, where palliative care teams would typically be involved later in the course of the patient's disease.  Temel at 734-35.  The early use of palliative care teams improved quality of life and mood, which the authors hypothesized accounted for the observed overall survival benefit.  Temel at 739.  The authors note that limitations of the study include that it was performed at a single tertiary care site with a team of specialized physicians, which limited generalization to other cancers.  Temel at 741.  With respect to mCRPC, mitoxantrone is a prototypical example of a drug that had been shown to increase pain PFS but not to increase overall survival.  Rebuttal Report at ¶¶ 60-61.  Thus, for mCRPC, a POSA would not assume an improvement in palliation would lead to an increase in overall survival.

### B. Responses to Dr. Ratain's Assertions Regarding Treatment of "Docetaxel Sensitive" Patients

10.     Dr. Ratain opines that a POSA would have had a reasonable expectation of success of increasing overall survival in patients that received minimal docetaxel and would still be considered docetaxel-sensitive.  Ratain Supp. Report ¶¶ 68-73.  I disagree.  As an initial matter, Dr. Ratain states that docetaxel resistance was "well-defined" as progression "during docetaxel treatment."  Ratain Reply Report ¶ 27.  Literature at the time did not consider docetaxel resistance so narrowly.  As noted in my Rebuttal Report, clinical studies referred to patients as being refractory or resistant if there was progression within a few months after stopping docetaxel; the studies did not require progression during docetaxel treatment.  Rebuttal Report at ¶ 81; Loriot at 704 (describing patients as docetaxel-resistant if there was progression within 60 days following docetaxel).

5

11. Dr. Ratain points to the fact that some patients in Mita had not previously been treated with docetaxel as making it "obvious to administer cabazitaxel to patients that had never received docetaxel (and thus had not developed resistance to docetaxel) and those that had previously received docetaxel, but were not resistant." Ratain Reply Report at ¶¶ 62-63. I disagree. Mita was a phase I dose-ranging study in a variety of tumor types, which enrolled patients between 1999-2001 before docetaxel had been approved for use in mCRPC and therefore when docetaxel itself was still an experimental treatment for prostate cancer. Mita at 724, 726; Goetz (presenting preliminary results for 14 patients). A POSA would not draw any inferences about the fact that Mita enrolled patients who had not received docetaxel as suggesting that cabazitaxel therapy was appropriate to administer to (let alone with a reasonable expectation of increasing survival of) docetaxel-naïve or sensitive patients by October 2009, five years after docetaxel became the accepted standard of care for mCRPC.

12. Dr. Ratain also hypothesizes that the docetaxel-naïve patient in Mita with a partial response to 15 mg/m$^2$ of cabazitaxel might have had the same response if he had received small doses of docetaxel. Ratain Reply Report at ¶ 56. A POSA would not have speculated in this way because there would have been no way to predict the effect of docetaxel on the patient's cancer. That patient could have just as easily (if not more likely) developed resistance and/or toxicities to docetaxel that would have made further chemotherapy, let alone treatment with 15 mg/m$^2$ of cabazitaxel, inappropriate and/or ineffective.

13. Dr. Ratain also asserts that a POSA would have been motivated to administer cabazitaxel, which was in general administered in lower doses than docetaxel, for patients who could not or chose not to tolerate docetaxel but were still docetaxel-sensitive. Ratain Reply Report at ¶¶ 63-65. I disagree. Cabazitaxel was an experimental drug with little available

6

clinical data on its safety, particularly for men with mCRPC that had already received docetaxel and had disease progression.  The reported side effects of cabazitaxel were similar to docetaxel, including neutropenia, nausea, diarrhea, and neurosensory symptoms.  Mita at 726-27; Pivot at 1550; Taxotere® Label at 11-13, 27-28.   Dr. Ratain points to fluid retention and pleural effusion in particular as a reason to select cabazitaxel for docetaxel-sensitive patients.  Ratain Reply Report at ¶ 65.  In the TAX 327 study, mitoxantrone caused less fluid retention and edema than docetaxel, making it a better (FDA-approved) option than cabazitaxel for patients unable to take docetaxel for that reason.  Taxotere® Label at 27-28.  A POSA concerned enough about fluid retention and pleural effusion to stop docetaxel would not have wanted to administer additional taxane therapy with experimental cabazitaxel, which had been reported to cause edema and pleural effusion in some patients (Pivot at 1550, Table 2) even if the risk was lower.

14.     Dr. Ratain notes that docetaxel may be stopped after 10 cycles even though the patient has not progressed because that was the limit of the pivotal clinical studies.  Ratain Reply Report at ¶ 64.  However, it was not uncommon for patients receiving docetaxel who were tolerating therapy and not progressing to continue beyond 10 cycles, particularly because there were no other life-prolonging options before October 2009.  Petrylak 2004 at 1515 (patients in SWOG9916 trial could receive up to 12 cycles of docetaxel); Sternberg 2009 at 1265-66 (patients could receive up to 12 cycles of docetaxel, range 1-13).  I have personally continued my patients beyond 10 cycles of docetaxel, and I know other oncologists have done so as well.

15.     Dr. Ratain also refers to obscure types of patients that he claims would be docetaxel-sensitive yet still fall within the claims.  Ratain Supp. Report at ¶ 70.  For example, he identifies patients on clinical trials who received adjuvant docetaxel after a prostatectomy.  Ratain Supp. Report at ¶¶ 70, 72.  Patients receive prostatectomy for their localized prostate

cancer in attempt to cure the disease. Adjuvant therapy (after the surgery) is an attempt to prevent disease recurrence. These are not patients with metastatic prostate cancer, let alone patients with metastases who have become castration-resistant.

16.     The asserted claims state that the patient "has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel." A POSA reviewing this claim language would understand it to mean patients had mCRPC and received docetaxel for that mCRPC. In fact, outside of clinical studies, systemic chemotherapy was only recommended for patients that already had mCRPC. NCCN Prostate Cancer Guidelines 2009 at CabRef0002915-20, CabRef0002925, CabRef0002945-46.

17.     Kibel reported a patient death from adjuvant docetaxel leading the authors to conclude "we do not recommend adjuvant docetaxel outside the confines of a clinical trial." Kibel at 1780. Kibel also notes that neoadjuvant docetaxel studies (i.e., docetaxel prior to prostatectomy and therefore not for metastatic or CRPC patients) had not achieved the primary endpoint of a pathological complete response. Kibel at 1780. Any use of docetaxel by October 2009 for prostate cancer that was not mCRPC would have been very limited.

18.     Dr. Ratain also hypothesizes about patients who lose health insurance mid-docetaxel therapy or have other health reasons for stopping docetaxel like heart surgery and then have disease progression. Ratain Supp. Report at ¶ 70. To the extent these hypothetical patients responded well to docetaxel without progression and were able to tolerate further therapy, docetaxel retreatment would be an appropriate option; a POSA would not have been motivated to administer experimental cabazitaxel therapy to such patients.

19.     I also disagree that a POSA would have expected docetaxel-sensitive patients to have increased overall survival "by treatment with an active taxane, either docetaxel or

8

cabazitaxel" and that a POSA would understand "cabazitaxel may be a superior taxane to docetaxel, such that a lower dose of cabazitaxel may have fewer side effects," and that "cabazitaxel was expected to be as good or better than docetaxel."  Ratain Reply Report at ¶¶ 65, 73; Ratain Supp. Report at ¶ 70.  There was no evidence that cabazitaxel would be "superior" or equivalent to docetaxel for the treatment of mCRPC, and certainly none with respect to overall survival or PFS, by October 2009.

20.     Dr. Ratain essentially asserts that cabazitaxel would have been expected to improve overall survival as compared to no treatment simply because it is a taxane with some anticancer activity, which is contradicted by the existence of hundreds of taxanes that had been evaluated that were never shown to improve overall survival or PFS as compared to any other alternative treatment or no treatment by October 2009.  Rebuttal Report at ¶¶ 88, 95-107.  Docetaxel had been evaluated in several phase II studies in prostate cancer and multiple controlled clinical studies for prostate cancer where it was shown to increase overall survival repeatedly, whereas for cabazitaxel there was no data at all from a prostate cancer clinical study and no comparative clinical data for any tumor type.  Pienta & Smith at 303-07.

21.     Even considering docetaxel-naïve patients for the sake of Dr. Ratain's assertions, there were only two partial responses in men with mCRPC in a single phase I study (Mita).  Mita does not describe the trajectory of these patients' disease prior to receiving cabazitaxel, making it impossible to determine if these patients experienced a meaningful increase in any time-based progression metric, let alone form a reasonable expectation as to whether any other mCRPC patient with progression during or after docetaxel treatment would have an increase in pain, tumor, or PSA-PFS as compared to no treatment or any alternative treatment.

9

22.     In view of the little data provided in Mita for only one patient falling within the claims and two total mCRPC patients, the well-known heterogeneity of mCRPC, the lack of a surrogate endpoint for overall survival, the repeated failure of other drugs that had shown partial responses in tumor size, pain, PSA, and/or increases in PFS to increase overall survival, the poor success rates of late stage oncology clinical studies with survival endpoints, and the uncertainty about the appropriate dose of cabazitaxel in view of its hematologic toxicity, a POSA would not have reasonably expected cabazitaxel therapy to increase overall survival or PFS as compared to no treatment or any alternative treatment for men with mCRPC, including men that had not previously received docetaxel, men that had received some docetaxel but were still docetaxel-sensitive for whatever reason, and especially not for men who were docetaxel-resistant. Rebuttal Report at ¶¶ 51-58, 120-125, 130-141, 167, 169-70, 176-178.  A POSA would have had even less of an expectation of success for cabazitaxel doses of 15-20 mg/m$^2$ in patients previously treated with docetaxel because there had been no confirmed partial responses reported at a cabazitaxel dose lower than 25 mg/m$^2$ in any patient previously treated with docetaxel,[4] and a POSA could not have predicted whether the docetaxel-naïve patient with a partial response to 15 mg/m$^2$ of cabazitaxel in Mita would have responded to cabazitaxel or needed a higher dose if he had progressed despite docetaxel.  Rebuttal Report at ¶¶ 117, 177.  For these reasons, the overall survival results reported in TROPIC and PROSELICA were surprising and unexpected in view of the knowledge of a POSA in October 2009.

---

[4] This is despite 13 patients receiving 20 mg/m$^2$ of cabazitaxel in Mita and 7 patients receiving 20 mg/m$^2$ in Lortholary.  Mita at 726, Table 2; Lortholary.  Mita did not even report any grade 3 or 4 neutropenia at the 20 mg/m$^2$ dose.  Mita at 726, Table 3.  Pivot reported grade 4 neutropenia in 35 patients, but 20 of those were likely dose-escalated to 25 mg/m$^2$.  Pivot at 1550, Table 2.

23.     The fact that docetaxel retreatment had some anticancer activity for some very select patients (no overall survival data reported)[5] would not have suggested to a POSA that cabazitaxel, a different drug, would increase overall survival or PFS in those patients.

24.     I also disagree with Dr. Ratain that docetaxel retreatment was an appropriate comparison for cabazitaxel or closer prior art than mitoxantrone and prednisone for patients that had progressed ***during or after*** docetaxel.  Ratain Supp. Report ¶¶ 79-80.[6]  The literature cautioned that such retreatment was unlikely to be active in patients who progress during or shortly after docetaxel.  Ross at 525 ("unlikely that docetaxel alone would provide any benefit in patients who have just progressed while receiving docetaxel"); Loriot at 706 (the strategy of docetaxel retreatment "is less likely to be active in patients exhibiting disease progression within 3 months after completion of docetaxel").  Mitoxantrone/prednisone was a recognized reference treatment for mCRPC patients that had already received taxane chemotherapy, the control arm of multiple clinical studies, and had been accepted as an appropriate comparator for the TROPIC study.  Rebuttal Report at ¶¶ 66-69.  Even if it would be ethically permissible to compare cabazitaxel to docetaxel retreatment in men that had progressed during or after treatment with docetaxel (which it would not), the overall survival data reported for cabazitaxel in the TROPIC and PROSELICA clinical studies indicates that cabazitaxel would be superior.  The FIRSTANA study Dr. Ratain relies upon is not to the contrary; the patients in that study had not previously received docetaxel and therefore fall outside of the claims.  Oudard at 3189.

---

[5] The Di Lorenzo study had very stringent criteria for enrollment: patients had to have had a partial or complete PSA response to first line docetaxel and progression after at least five months of biochemical stabilization with no objective progression.  Di Lorenzo 2010 at 235.

[6] TROPIC primarily enrolled patients that had received more than 225 mg/m$^2$ of docetaxel, who according to Dr. Ratain, are less likely to be docetaxel-sensitive. '777 patent at col. 10, ll. 49-63, Fig. 3 (59 patients in the study out of 755 received less than 225 mg/m$^2$ of docetaxel).

25.     Although the NCCN Prostate Cancer Guidelines 2022 state that docetaxel rechallenge/retreatment can be "considered" or "attempted," for some patients "who have not shown definitive evidence of progression on prior docetaxel therapy," docetaxel retreatment has a category 2A recommendation whereas cabazitaxel has a category 1 recommendation.  NCCN Prostate Cancer Guidelines 2022 at PROS-I 2, MS-61.  Category 1 means the recommendation is based upon high-level evidence and Category 2A is based on upon lower-level evidence.  NCCN Prostate Cancer Guidelines 2022 at CAT-1.

26.     Putting aside patients that may or may not have been sensitive to docetaxel, it was surprisingly and unexpectedly shown in the TROPIC study that cabazitaxel increases overall survival of "docetaxel-refractory" patients that had progressed during treatment with docetaxel. '777 patent at col. 11, ll. 45-50, col. 12, ll. 49-67 (Table 2), Figure 3.  No survival benefit would have been expected for docetaxel in such mCRPC patients, and no other drug had been shown to improve overall survival in this population by October 2009.

## C.     Responses to Dr. Ratain's Assertions on Comparison to Mitoxantrone

27.     I disagree with Dr. Ratain that mitoxantrone and prednisone was a "poor alternative" for cabazitaxel in the TROPIC study.  Ratain Supp. Report at ¶ 58.  Mitoxantrone and prednisone had been acknowledged as a de facto community standard for patients with mCRPC that had progressed during or after treatment with docetaxel, mitoxantrone therapy had been shown to increase PFS, and mitoxantrone had been reported to reduce PSA, pain, and/or tumor size in more post-docetaxel mCRPC patients than had been reported for cabazitaxel. Rebuttal Report at ¶¶ 60-69, 127.  Numerous experimental therapies were reported not to significantly improve upon mitoxantrone.  Rebuttal Report at ¶¶ 69-70, 128.

28.     Dr. Ratain relies on selected PFS values for mitoxantrone in retrospective assessments of patients who received mitoxantrone after docetaxel or paclitaxel and attempts to

12

compare those median PFS values to the PFS of the single responding docetaxel-refractory mCRPC patient in Mita.  Ratain Supp. Report at ¶ 67.  That single patient had disease progression after 8 cycles, ~21 weeks or 5.25 months starting from cycle 1.  Mita at 727.  This comparison is not one a POSA would have attempted to make, and even if a POSA were to attempt to compare the Mita patient's PFS to results for mitoxantrone in other clinical studies, that would not have provided a reasonable expectation that cabazitaxel would increase any type of PFS or overall survival as compared to mitoxantrone.

29.     Cross-study comparisons of medians are generally insufficient to form comparative inferences because patient populations, inclusion and exclusion criteria, baseline characteristics, definitions of response and progression, and frequency of measurements often differ from study to study.  *See, e.g.*, Markman at 455-56 (noting that patients can differ substantially from study to study and that two clinical studies of the same regimen with the same entry criteria can commonly produce strikingly different results).  This is particularly problematic for small, retrospective studies because of selection bias and the well-known heterogeneity of mCRPC.  Selecting a single patient that received a drug and attempting to compare that patient's PFS to a median of patients who received a different drug is even more problematic because it is unknown whether that single patient would have been an outlier in the clinical study being used for comparison.  For example, there were 4 patients in the TROPIC study on the mitoxantrone arm that did not have disease progression at 18 months, and no such patients on the cabazitaxel arm.  '777 patent at Fig. 2.

30.     Berthold 2008 assessed patients in the TAX 327 study of docetaxel who crossed over to receive mitoxantrone after receiving docetaxel (and vice versa).  Berthold 2008 at 1749.  Berthold reported a range in PSA-PFS for patients receiving docetaxel once every three weeks

before receiving mitoxantrone of 2.2-4.4 months and for patients receiving weekly docetaxel before receiving mitoxantrone a range in PSA-PFS of 2.1-9.3 months.  Berthold 2008 at 1751, Table 3.  Dr. Ratain focuses only on the group receiving docetaxel on a 3-weekly schedule before receiving mitoxantrone, but elsewhere refers to the asserted claims encompassing patients that received experimental regimens of docetaxel, including weekly docetaxel.  Ratain Supp. Report at ¶¶ 67, 70-72.  Furthermore, there is no indication in Mita whether the single docetaxel-refractory mCRPC patient with a partial response would have received docetaxel on a weekly or 3-weekly schedule.  The Mita study enrolled patients between 1999 and 2001, prior to the FDA approval of docetaxel in mCRPC on a 3-weekly schedule.  Mita at 726.  Assuming cross-study comparisons are appropriate (which they are not) and focusing on Berthold 2008, this patient could have had weekly docetaxel, and if he had received mitoxantrone instead, the PSA-PFS could have been longer with mitoxantrone (up to 9 months) than with cabazitaxel (5.25 months).

31.     Oh is also a retrospective study with only 35 patients receiving mitoxantrone after receiving taxane therapy.  Oh at 1235.  The patients, seen between 1998 to 2004 (largely before docetaxel's FDA approval for prostate cancer), could have received paclitaxel or docetaxel on either a weekly or 3-weekly schedule, and the taxanes could have been given in combination with other drugs including platinum agents, estramustine, "and/or novel therapeutic agents."  Oh at 1236.  Mitoxantrone therapy was typically given every three weeks and could have included or excluded steroids, but other concomitant chemotherapy is not mentioned.  Oh at 1236.  Oh reports a PFS of 6.1 weeks for patients receiving mitoxantrone after taxanes (on whatever schedule and in combination with other drugs).  Oh at 1238, Table II.  This appears to be limited to PSA-PFS because the response criteria and definition of progression were limited to PSA.  Oh at 1236.  The authors also note that a weakness of the study was the reliance on PSA "because it

14

remains unclear whether PSA correlates completely with objective progression or survival." Oh at 1240. Oh also notes that the patients receiving taxanes before mitoxantrone were younger at diagnosis than the patients who received mitoxantrone before taxanes and also had shorter times from diagnosis to chemotherapy and from hormone therapy to chemotherapy. Oh at 1236-37. The patients receiving mitoxantrone after taxanes were also younger than the patients assessed in Berthold 2008. Oh at 1237, Table 1; Berthold 2008 at 1750, Table 1. This suggests that the patients who received mitoxantrone after taxanes in Oh had generally more aggressive and faster progressing disease than the patients evaluated in Berthold 2008. Lin at 2866-69 (finding that younger men with high grade and stage III and IV disease were more likely to die of prostate cancer compared to older men and hypothesizing that young men may have "biologically more aggressive disease"); Ribeiro at 605-06 (finding that younger age (60 or less) was associated with shorter time to progression and overall survival in men with metastatic prostate cancer treated with first line hormonal manipulation).

32.    In addition, a POSA would have understood that the general PFS medians in clinical studies of mitoxantrone may not be appropriate for comparison for a patient with a partial response. For example, in Rosenberg, which evaluated patients with mCRPC who had at least two cycles of taxane chemotherapy and disease progression during or within 60 days of taxane therapy, 8 patients had a confirmed PSA reduction of 50% (often referred to as a PSA response). Rosenberg at 557, 560. The median time to that reduction was 7 weeks (ranging from 3-19 weeks), and the median duration of PSA response was 5.9 months (ranging from 2.7-8.2 months). Rosenberg at 560. This indicates that some patients receiving mitoxantrone after taxane therapy had a PSA-PFS more than 8 months, which is longer than the PSA-PFS reported for the patient of interest in Mita. Others had noted from the pivotal trials in taxane-naïve

15

patients that mitoxantrone therapy "demonstrated significant pain relief for an average of 8 months" in approximately one third of patients.  Pienta & Smith at 307.

33.     A POSA would not have been able to form any reasonable expectations about the relative PFS for cabazitaxel as compared to mitoxantrone therapy from the limited data in Mita (or any other prior art data for cabazitaxel) in view of the available mitoxantrone clinical studies. It was therefore unexpected and surprising that cabazitaxel at 25 mg/m$^2$ with dose reductions to 20 mg/m$^2$ was shown to improve PFS (in addition to overall survival) as compared to mitoxantrone (both in combination with prednisone) in the TROPIC study.

34.     I disagree with Dr. Ratain (Reply Report at ¶ 17) that the overall survival Kaplan-Meier curves crossing in Figure 1 of the asserted patents indicates some patients had their survival decreased by cabazitaxel as compared to mitoxantrone.  The patients enrolled in the TROPIC study were very sick patients who had disease progression despite receiving medical or surgical castration and despite receiving docetaxel chemotherapy.  Some of those patients were unlikely to survive much more than a few months whether they received mitoxantrone, cabazitaxel, or any other treatment then-available.  TROPIC Listing at CabRef002476 (life expectancy required to be > 2 months).  Furthermore, to the extent the cabazitaxel deaths were due to complications of neutropenia (e.g., infection), mitoxantrone had also been reported to cause neutropenia in post-docetaxel patients.  Rosenberg at 561 (grade 3 or 4 neutropenia in 63% of patients and febrile neutropenia and neutropenic infection in 4 patients).  Accordingly, the patients receiving cabazitaxel therapy that died prior to the overall survival curves crossing at 3 months may have died even sooner if they received mitoxantrone instead given the statistically significant increase in overall survival observed in TROPIC.

### D.   Responses to Dr. Ratain's Assertions on Cabazitaxel Dose Reductions

35.    Dr. Ratain hypothesizes that a POSA would have been motivated to use lower doses of cabazitaxel in combination with other chemotherapies like carboplatin with the intent of increasing survival.  Ratain Reply Report at ¶ 61.  I disagree.  Very little was known about cabazitaxel as a single agent for the treatment of mCRPC that had progressed during or after docetaxel, let alone combinations with other chemotherapies.  The TROPIC study was the first time cabazitaxel had been studied in combination with anything else (prednisone) for prostate cancer.  Platinum chemotherapy, like any chemotherapy, has its own toxicity profile that would need to be assessed in combination with cabazitaxel.  For example, it was reported that cisplatin combined with docetaxel and paclitaxel caused increased sensory neuropathy.  Hilkens at 417, 421.  Carboplatin was reported to increase the hematologic toxicity of paclitaxel.  Zimpfer-Rechner at 533, 536.  Before combining cabazitaxel with another chemotherapy, a POSA would have anticipated a dose-ranging phase I or II study to determine the doses of both drugs that could be administered safely.  Without comparative clinical data, a POSA would not have been motivated to administer any dose of cabazitaxel in combination with another chemotherapy with the intent of increasing survival.

### III.   Responses to Dr. Ratain's Assertions Regarding Premedication

36.    My Rebuttal Report (¶¶ 188-221) explains why a POSA would not have been motivated to administer an $H_2$ antagonist prior to cabazitaxel.  Dr. Ratain's principal argument in reply is that because a POSA would be aware of the potential risk of HSRs with taxanes, "H2 antagonists were included as pretreatment for new taxanes in development, such as larotaxel." Ratain Reply Report ¶ 68.  This is not reflected in the literature.  For example, another taxane in development at the same time as larotaxel and cabazitaxel, milataxel, did not require premedication.  In the introduction of a phase II clinical study report of milataxel in patients with

17

advanced colorectal cancer, the authors explained that "[u]nlike the paclitaxel and docetaxel, milataxel does not require formulation with polysorbate 80 or cremophor, which can result in hypersensitivity reactions." Ramanathan at 454. Indeed, despite the absence of premedication or concomitant corticosteroid use, the authors note that "[h]ypersensitivity reactions were not observed with milataxel administration." Ramanathan at 457. Ramanathan also contradicts Dr. Ratain's suggestion (Ratain Reply Report ¶ 71) that a POSA would have expected HSRs from taxane chemotherapy independent of exposure to cremophor or large amounts of polysorbate 80.

37.     Nor were $H_2$ antagonists included as pretreatment in the clinical development of docetaxel for CRPC despite awareness of their use as pretreatment with paclitaxel and the potential risk for HSRs following docetaxel administration. In the two pivotal phase III clinical studies on docetaxel in patients with CRPC, premedication consisted of dexamethasone alone. Tannock 2004 at 1504; Petrylak 2004 at 1515. Between these two studies, around 1000 patients were treated with docetaxel, yet not a single HSR was reported.

38.     Dr. Ratain cites to only a single study of docetaxel for prostate cancer in which the investigators utilized a three-component premedication regimen that included $H_2$ antagonists. Ratain Reply Report ¶ 73 (citing Takenaka). Takenaka would not have motivated a POSA to employ this regimen prior to cabazitaxel administration. Takenaka reports on combination chemotherapy with weekly docetaxel and estramustine, a regimen that was being studied as an option for Japanese men with CRPC in the early 2000's (the Takenaka study was started in March 2003). Takenaka at 106. However, following U.S. FDA approval of docetaxel for mCRPC in 2004 based on the TAX327 study that demonstrated a survival advantage for docetaxel in combination with prednisone given every 3 weeks (reported in Tannock 2004), investigators in Japan then turned to consider whether this new dosing regimen was "feasible"

18

for Japanese patients.  *See* Shimazui at 603-604; *see also* Miyoshi at 183 ("In Japan, there are few reports about the regimen of docetaxel every 3 week for HRPC.  Therefore, we evaluated the efficacy and safety of docetaxel every 3 weeks for HRPC in Japanese patients.").

39.     As explained in Shimazui, after August 2004, when the treatment protocol was changed from weekly docetaxel with estramustine to docetaxel with prednisone every three weeks, the three-component premedication, which included $H_2$ antagonists for docetaxel administration was no longer given "because of the daily steroid treatment."  Shimazui at 604; *see also* Miyoshi at 183 ("All patients were premedicated with 8mg dexamethasone IV before docetaxel, 4mg dexamethasone given orally in the evening of day 1, and 8mg dexamethasone given orally twice daily on day 2.").  Thus, a POSA would have understood as of October 2009 that the daily administration of prednisone with taxane chemotherapy lessened the need for premedication for HSRs.[7]  Accordingly, a POSA would have focused on prior taxane studies in prostate cancer and not in other cancers where treatment does not include concomitant corticosteroid use, particularly since it was known that cabazitaxel was being administered in combination with prednisone in the TROPIC study.

40.     This reduced need for docetaxel premedication is reflected in the FDA-approved label for Taxotere®: "For hormone-refractory metastatic prostate cancer, given the concurrent use of prednisone, the recommended premedication regimen is oral dexamethasone 8 mg, at 12 hour, 3 hours and 1 hour before the TAXOTERE infusion" as compared to a 3 day (8 mg BID) for other cancers.  Taxotere® Label at 5.  This is another reason why I disagree that a POSA would

---

[7] Prior to its incorporation as combination therapy with docetaxel for use in treating CRPC, prednisone was successfully used as a premedication for docetaxel.  *See, e.g.*, Ferrero at 282 ("Premedication with prednisone 50 mg p.o. was given 12 and 1 h prior to docetaxel infusion and 12 h after docetaxel infusion.  No other premedications were routinely used.").

specifically look to the paclitaxel prior art "[i]n determining what pretreatment regimen to use [with cabazitaxel]" (Ratain Reply Report ¶ 75), as those paclitaxel studies did not include patients with prostate cancer who were also taking prednisone. Moreover, a POSA would have understood the need for premedication for docetaxel to be much different than that for paclitaxel (due to its formulation with cremophor) by looking at studies directly comparing the two (whether as single agents or in combination). In such comparative studies, premedication for paclitaxel included antihistamines in addition to dexamethasone whereas premedication for docetaxel did not. *See, e.g.*, Jones at 5543; Khoo at 1798; Kubota at 1136; Azzoli at 2694; Sparano at Supp. Appx. 2. The fact that each of these investigators chose to utilize different premedication regimens in a comparative study—where one wishes to eliminate as many variables as possible—is reflective of the point that one does not administer additional medications (such as antihistamines) without a demonstrated need.

41.     Dr. Ratain cites to two other new references in reply that discuss the results of docetaxel studies wherein an $H_2$ antagonist premedication was used. Ratain Reply Report ¶ 73 (citing Trudeau and Kaye). Trudeau and Kaye report on older phase II studies of high dose docetaxel ($100 \text{ mg/m}^2$) outside of prostate cancer. Kaye reports on patients involved in three separate phase II studies of docetaxel in patients with advanced ovarian cancer. In Kaye, despite the investigators clearly being aware of the potential for HSRs as well as the three-component paclitaxel premedication, "[n]o routine premedication was given." Kaye at S14. Premedication was given "generally" to "patients who experience an acute HSR to docetaxel . . . before administration of subsequent courses." Kaye at S14. Despite the lack of premedication and concomitant corticosteroids, the authors report that "acute HSRs occurred rarely in all the trials."

20

Kaye at S16, S14 ("Severe acute hypersensitivity reactions occurred in approximately 5% of patients.").

42.    In Trudeau, patients were initially given no premedication, but the protocol was modified to include $H_1$ antagonists at first and then $H_2$ antagonists.  Trudeau at 423.  The authors report fewer severe HSRs in patients receiving $H_2$ antagonist premedication; however, the patients who did not receive $H_2$ antagonist premedication were administered a 100 mg/m$^2$ dose of docetaxel, whereas most of the patients who received $H_2$ antagonist premedication were treated at the lower 75 mg/m$^2$ dose (13 of 18 patients).  Trudeau at 423 ("Docetaxel was initially given at a dose of 100 mg/m$^2$ to the first 35 patients.  The starting dose was subsequently reduced to 75 mg/m$^2$ for the remaining patients because of a high rate of febrile neutropenia."), 425, Table 3.  Thus, a POSA in 2009 would have concluded that the reduced severity of HSRs in those patients is most likely due to the significant dose reduction and not the $H_2$ antagonist, especially in light of the later docetaxel study reports in prostate cancer discussed above.  In any event, neither Kaye nor Trudeau led to the use of $H_2$ antagonist premedication for docetaxel in the treatment of prostate cancer and therefore a POSA would not have been motivated to use such a regimen when administering cabazitaxel.

43.    Dr. Ratain overstates my opinions when he asserts that I "acknowledge[d] in [my] Rebuttal Report, hypersensitivity reactions were a known risk of chemotherapy treatment, especially for taxanes."  Ratain Reply Report ¶ 68.  While I agree that it was known that HSRs were known to occur in connection with IV administration of certain taxanes, I disagree that a POSA would have considered hypersensitivity reactions as a "risk" to a patient receiving cabazitaxel for treatment of mCRPC who has progressed during or after docetaxel without additional data.  The patients in Pivot had breast cancer and were not receiving steroids in any

form.  Pivot at 1548.  The fact that HSRs were observed in Pivot—albeit rarely—does not suggest that such reactions will occur in men with mCRPC who are also taking prednisone and who had previously tolerated treatment with docetaxel.  In fact, a POSA reviewing the prior art studies on cabazitaxel, including Pivot, in light of the wealth of clinical data on docetaxel in prostate cancer would not have expected severe HSRs to occur with cabazitaxel/prednisone administration, especially if oral dexamethasone premedication was utilized.

44.     At most, a POSA would have chosen to administer the standard docetaxel premedication regimen of oral dexamethasone when considering administering cabazitaxel to a patient with mCRPC whose cancer has progressed during or after docetaxel treatment.  Dr. Ratain's assertion that an $H_2$ antagonist would be included simply because such drugs had been included with other taxane regimens (Ratain Reply Report at ¶ 68) assumes that there are no costs or risks associated with $H_2$ antagonist premedication, which is certainly not true.  Dr. Ratain attempts to downplay a reported correlation between the use of $H_2$ antagonists as a premedication for docetaxel and incidence of hand-foot syndrome ("HFS") as "hypothesis-generating."  Ratain Reply Report ¶ 74 (discussing Kawaguchi).  I disagree that a POSA would have been as dismissive.  Dr. Ratain misses the point in noting that there is no plausible pharmacological mechanism which would support the notion that the $H_2$ antagonist was a cause of HFS.  Ratain Reply Report ¶ 74.  $H_2$ antagonists are notorious for their drug-drug interactions. *See, e.g.*, Singla at 182 ("Clinically pharmacological intervention [to prevent HSRs] may be less desirable than a safer and better-tolerated formulation.  Several possible mechanisms exist by which the various drugs administered, either to support patients during paclitaxel administration, or to treat their cancer or the side effects of chemotherapy could contribute to interactions that may affect paclitaxel efficacy or toxicity. . . . [C]ertain $H_2$-receptor antagonist[s] such as

22

cimetidine and ranitidine [are] well known inhibitors of the cytochrome P-450 metabolic

pathway . . . and the later is thought to be involved in the metabolism of paclitaxel . . . ,

suggesting the potential for interaction.").  If Dr. Ratain were correct that a POSA would have

believed the observed HFS in Kawaguchi was associated with the higher docetaxel doses (Ratain

Reply Report ¶ 74), then a POSA would have to consider the same true for HSRs and

correspondingly understand that the risk of HSRs with cabazitaxel (at low doses such as 20

$mg/m^2$) would also be lower.  As of October 2009, the effects of $H_2$ antagonists on the

pharmacology of cabazitaxel were unknown as they had not yet been administered together.

45.     Dr. Ratain also attempts to downplay the findings of Kawaguchi et al. by stating

that he is "not aware of any studies that have tried to confirm these preliminary retrospective

findings."  Ratain Reply Report ¶ 74.  At the same time, though, Dr. Ratain asserts that a POSA

would have been motivated to use an $H_2$ antagonist as premedication for cabazitaxel to minimize

risk of HSRs without a single clinical study establishing their effectiveness for that purpose.

Ratain Reply Report ¶¶ 73, 75.  Indeed, in 2009, the role of $H_2$ antagonists as premedication was

considered "controversial."  Foti at 415.  In Foti, the authors describe a case of a patient who

developed an HSR to ranitidine used as premedication before general anesthesia and reviews the

literature on reports of similar occurrences.  Foti at 414-15.  Foti cites, for example, a 2005

article by Demirkan et al. also reviewing such reports who concluded that "although the

incidences of anaphylactic reactions induced by these drugs [H2 antagonists] are low, clinicians

should be aware of this possibility of life threatening risk."  Demirkan at 208.  Although

Demirkan estimated the frequency of HSRs to $H_2$ antagonists to be between 0.2% and 0.7% of

all reported adverse events, the authors note that those percentages were from a database of

reports from all types of physicians.  Demirkan at 205.  Moreover, Foti notes that "[i]t cannot be

ruled out that [HSRs] due to ranitidine may be underestimated and more frequent than expected" as an "[HSR] to ranitidine during premedication is likely to be erroneously attributed to other drugs either contained in the same premedication protocol or given after the premedication (e.g., anesthetic or chemotherapeutic drugs.)"  Foti at 415.  The authors conclude that "[t]he protective role of H2-receptor antagonists as premedication is still unclear and should be carefully reconsidered on the basis of the available controversial evidence and the possible risk of hypersensitivity reactions."  Foti at 414.

## **SUPPLEMENTATION AND REBUTTAL**

I hereby reserve any rights that I may have to supplement this report and/or rebut any expert testimony in response to the opinions stated herein.

_____          9-23-2022
Peter S. Nelson, M.D.                              Date

# EXHIBIT B



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SANOFI-AVENTIS U.S. LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 20-804-RGA |
| v. | ) | (Consolidated) |
| | ) | |
| ACTAVIS LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**REPLY EXPERT REPORT OF MARK J. RATAIN, M.D.**</u>

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    THE PERSON OF ORDINARY SKILL IN THE ART .................................. 1

III.   THE PRIORITY DATE ................................................................................ 2

IV.   THE CLAIMS OF THE '110 AND '777 PATENTS WOULD HAVE BEEN
       OBVIOUS TO A POSA ................................................................................ 5

      A.     BACKGROUND ON MCRPC THAT HAD PROGRESSED DURING
            OR AFTER TREATMENT WITH DOCETAXEL BY OCTOBER 2009 .......... 5

      B.     THE ASSERTED PATENTS ARE NOT DIRECTED TO INCREASING
            SURVIVAL RELATIVE TO MITOXANTRONE ................................................ 8

      C.     THE PRIOR ART RENDERS OBVIOUS ADMINISTRATION OF
            CABAZITAXEL WITH THE INTENT TO INCREASE SURVIVAL
            WITH A REASONABLE EXPECTATION OF SUCCESS ............................... 11

            1.     DR. NELSON DOES NOT RELY ON THE COURT'S CLAIM
                   CONSTRUCTION ................................................................... 11

            2.     PRECLINICAL INDICATIONS THAT CABAZITAXEL
                   WOULD INCREASE SURVIVAL ........................................... 13

            3.     PRIOR ART CLINICAL STUDIES INDICATING THAT
                   CABAZITAXEL WOULD INCREASE SURVIVAL ........................... 14

            4.     PIVOT ................................................................................... 21

            5.     TROPIC ................................................................................ 21

      D.     REASONABLE EXPECTATION AT STARTING DOSE OF 20 MG/M$^2$
            WITH REDUCTIONS TO 15 MG/M$^2$ ......................................................... 23

      E.     MOTIVATION TO ADMINISTER CABAZITAXEL TO PATIENTS
            NOT RESISTANT TO DOCETAXEL ............................................................ 28

      F.     A POSA WOULD BE MOTIVATED TO USE AN H**2** ANTAGONIST
            AS PART OF A PRETREATMENT REGIMEN WHEN
            ADMINISTERING CABAZITAXEL TO MCRPC PATIENTS ..................... 31

      G.     A POSA WOULD HAVE BEEN MOTIVATED TO ADMINISTER 5
            MG DEXCHLORPHENIRAMINE AND 8 MG DEXAMETHASONE
            WITH AN H**2** ANTAGONIST PRIOR TO CABAZITAXEL ......................... 36

      H.     SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS ..................... 36

V.     THE CLAIMS OF THE '110 AND '777 PATENTS LACK WRITTEN
       DESCRIPTION .......................................................................................... 38

A.     THERE IS NO EVIDENCE OF POSSESSION OF METHODS OF INCREASING SURVIVAL WITHOUT ADMINISTRATION OF CABAZITAXEL COMBINED WITH A CORTICOID ..................................... 38

B.     THERE IS NO EVIDENCE OF POSSESSION OF METHODS OF INCREASING SURVIVAL FOR DOSES OTHER THAN 25 MG/M$^2$ ............ 39

VI.    THE CLAIMS OF THE '110 PATENT AND '777 PATENT ARE NOT ENABLED ...................................................................................................... 41

A.     THE LEGAL STANDARD FOR ENABLEMENT ............................................ 41

B.     THE AMOUNT OF DIRECTION OR GUIDANCE PRESENTED .................. 42

C.     THE BREADTH OF THE CLAIMS .................................................................. 43

D.     THE PRESENCE OR ABSENCE OF WORKING EXAMPLES ..................... 44

E.     THE PREDICTABILITY OR UNPREDICTABILITY OF THE ART AND THE STATE OF THE ART ...................................................................... 45

F.     THE QUANTITY OF EXPERIMENTATION NECESSARY AND THE LEVEL OF SKILL IN THE ART ..................................................................... 45

VII.   CONCLUSION .......................................................................................................... 48

## I.        INTRODUCTION

1.        I, Mark J. Ratain, M.D., provided an expert report on January 29, 2021, regarding the issues of obviousness, subject matter eligibility, written description, and enablement of U.S. Patent No. 10,583,110 ("the '110 patent") and U.S. Patent No. 10,716,777 ("the '777 patent") (together, the "Asserted Patents" or "Sanofi Patents") (my "Opening Report" or "ROR").  On February 26, 2021, I understand that Peter S. Nelson, M.D., provided a Rebuttal Validity Report in which Dr. Nelson offered opinions in response to my Opening Report (the "Nelson Rebuttal Report" or "NRR").  At the request of Apotex Corp., Apotex, Inc., Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories, Ltd., Mylan Laboratories Ltd. and Sandoz, Inc. (collectively, "Defendants"), I have been asked to review the Nelson Rebuttal Report and provide my opinions in response.

2.        Exhibit A to my Opening Report is the list of materials I considered in preparing that report.  Exhibit B to my Opening Report is a copy of my curriculum vitae dated January 14, 2021.  In forming the opinions described in this report, I relied on the materials in my Opening Report (including Exhibit A to my Opening Report), as well as materials referenced in Dr. Nelson's Rebuttal Report.  In addition, I relied on my knowledge, training, and experience, and the documents cited in this report.

3.        My qualifications have not changed substantively since I provided my Opening Report.  Since my Opening Report, I have updated my curriculum vitae, which is attached as Exhibit C to this report.

## II.       THE PERSON OF ORDINARY SKILL IN THE ART

4.        Dr. Nelson states that "[a]s stated in my Opening Reports, in my opinion, a [person of ordinary skill in the art] POSA was a medical oncologist or medical doctor specializing in oncology.  He or she would have experience in treating and evaluating treatments

for prostate cancer and have access to information regarding pharmacokinetics and mechanisms of cancer drug resistance." Nelson Rebuttal Report ("NRR"), ¶ 9. Compared to the understanding of Sanofi's definition of the POSA reflected in my Opening Report, this definition appears to add "access to information regarding pharmacokinetics and mechanisms of cancer drug resistance." *Compare id. with* ROR, ¶ 86. Regardless, this additional information does not substantially change the definition of the POSA and my opinions in this report and in my Opening Report would not change if I were to adopt Dr. Nelson's definition.

## III.     THE PRIORITY DATE

5.      Dr. Nelson agrees with me that the first provisional application disclosing the premedication regimen claimed in the '110 and '777 patents is Application Number 61/293,903, filed January 11, 2010. NRR, ¶ 40. Dr. Nelson states he understands the filing of this application was a "constructive reduction to practice" of the claimed inventions. *Id.*

6.      As stated in my opening report, I understand that a party can establish an earlier priority date for their patent by claiming priority to an earlier patent application that provides written support for the claims. ROR, ¶ 46. I further understand that a party can also establish an earlier priority date by showing (1) "conception," (2) "reasonable diligence," and (3) "reduction to practice." I understand that conception is the notion of conceiving of the alleged invention, or in other words, performing the mental part of the inventive act, with a definite and permanent idea of the complete and operative invention as it is supposed to be subsequently applied. I understand "reasonable diligence" refers to reasonable efforts to reduce the alleged invention to practice. I understand that reduction to practice means, in essence, a working prototype of the alleged invention or successfully carrying out the alleged invention (this is "actual reduction to practice") or filing a patent application disclosing the alleged invention (this is "constructive reduction to practice").

2

7.      First, regarding conception, Dr. Nelson states that he "understand[s] from counsel that the claimed inventions were conceived by Dr. Sunil Gupta in October 2009."  NRR, ¶ 39. Dr. Nelson does not describe any evidence of conception he may have considered; instead, he appears to have assumed it at the request of Sanofi's counsel.  I have not seen evidence that Dr. Gupta conceived of the alleged inventions in October 2009, as described in my Opening Report.  ROR, ¶¶ 46-51, 60-62.  To the extent Dr. Gupta claims he conceived of the alleged invention as of October 2009, I have not seen any evidence corroborating that claim.  Thus, it remains my opinion that Sanofi is not entitled to a priority date any earlier than January 2010.

8.      Second, regarding reduction to practice, I did not see any assertion in Dr. Nelson's report that Sanofi or Dr. Gupta achieved an "actual" reduction to practice before January 11, 2010, which would require administration of cabazitaxel with the claimed premedication regimen with the intention to increase survival.  NRR, ¶¶ 39-44.  Instead, Dr. Nelson relies upon Application No. 61/293,903, filed January 11, 2010, as "constructive reduction to practice."  *Id.*, ¶ 40.  Dr. Nelson agrees with me that this '903 application is the first application listed in the '110 and '777 patents that describes the claimed premedication regimen. *Id.*  I therefore understand that unless Sanofi establishes an earlier conception date and reasonable diligence, January 11, 2010 is the earliest priority date for the alleged inventions in the '110 and '777 patents.

9.      Third, Dr. Nelson stated that he was asked to consider:

>       whether regulatory and patent submissions would corroborate
>       testimony from Dr. Gupta that he was reasonably diligent in
>       seeking FDA approval of cabazitaxel, so that physicians could
>       actually practice the claimed methods, from the time prior to the
>       Sanofi-Aventis Press Release 2009 on December 21, 2009 to
>       January 11, 200 when patent application No. 61/293,903 was filed.

*Id.*, ¶ 42.  There are several flaws and omissions in Dr. Nelson's analysis.

10.     As an initial matter, I do not understand how Dr. Nelson could ascertain whether any evidence confirms "testimony from Dr. Gupta that he was reasonably diligent" when Dr. Nelson did not cite any such testimony by Dr. Gupta.  Next, I understand the inquiry involves reasonable diligence in reducing the alleged invention to practice, not in seeking FDA approval. Dr. Nelson did not state that he considered any other type of diligence—only diligence in seeking FDA approval.  In my opinion, FDA approval was not required to reduce the alleged invention to practice.

11.     Moreover, it appears Dr. Nelson considered only one set of related "regulatory and patent submissions."  NRR, ¶ 42.  First, Dr. Nelson mentions at paragraph 43 of his Rebuttal Report the Sanofi-Aventis Press Release 2009, which is neither a regulatory nor patent submission.  *Id.*, ¶ 43 (citing Sanofi-Aventis Press Release (CabRef0012803-804) (Dec. 21, 2009)).  Second, Dr. Nelson mentions an FDA News Release (SA_JEV_0182854-855).  That news release is not a regulatory or patent submission, either.  Third, Dr. Nelson states that he "understand[s] that Sanofi's actions to obtain regulatory approval were sufficiently diligent for Sanofi to be granted patent-term extension," and he cites three documents relating to patent term extension for U.S. Patent No. 5,847,170 ("the '170 patent").  NRR, ¶ 43 (citing SA_JEV_0001122-238, SA_JEV_0001248-250, SA_JEV_0001256-257).  Dr. Nelson states he "understand[s] from counsel that in order to receive a full patent term extension … , Sanofi must have acted with 'due diligence.'"  *Id*.  Dr. Nelson provides no support for his conclusory statement, other than what he has been told by Sanofi's counsel.

12.     Furthermore, the documents Dr. Nelson cites relate to the '170 patent, which is not asserted in this case.  I further understand that the '170 patent discloses the cabazitaxel compound, so it does not seem relevant to the assessment of diligence in seeking to reduce the

methods claimed in the '110 and '777 patents to practice. And I did not see any analysis by Dr. Nelson regarding whether Sanofi or Dr. Gupta was diligent in trying to reduce the inventions claimed in the '110 and '777 patents to practice from before December 21, 2009 through January 11, 2010. Thus, it remains my opinion that Sanofi is not entitled to a priority date earlier than January 11, 2010 for the claimed inventions, which require administration of cabazitaxel with the claimed premedication regimens with an intention to increase survival. However, regardless of which priority date I rely on—whether October 2009, or January 11, 2010—my other opinions would not change.

## IV.   THE CLAIMS OF THE '110 AND '777 PATENTS WOULD HAVE BEEN OBVIOUS TO A POSA

### A.   Background On mCRPC That Had Progressed During Or After Treatment With Docetaxel By October 2009

13.    I have considered Dr. Nelson's statements regarding the background of metastatic castrate-resistant prostate cancer (mCRPC) that had progressed during or after treatment with docetaxel. *See* NRR, ¶¶ 45-75. While I do not disagree with his factual statements, they need to be put in the proper context.

14.    Section VI.A of Dr. Nelson's Rebuttal Report is entitled "Background on mCRPC That Had Progressed During or After Treatment with Docetaxel by October 2009." I disagree that all of the references cited in this section relate to mCRPC that has progressed during or after treatment with docetaxel. For example, the SWOG99-16 trial that compared docetaxel plus estramustine to mitoxantrone and prednisone excluded patients previously treated with taxanes. Petrylak, et al., "Docetaxel and Estramustine Compared with Mitoxantrone and Prednisone for Advanced Refractory Prostate Cancer," N. Eng. J. Med., 351:1513-20 (2004) ("Petrylak 2004") (SA_JEV_1154900-907) at SA_JEV_1154901.

15.     Dr. Nelson also cites studies of mitoxantrone, both in patients with and without prior docetaxel, including CCI-NOV22 and CALGB9182.  NRR, ¶¶ 60-61.  But CCI-NOV22 and CALGB9182 demonstrate that mitoxantrone improves survival, specifically progression-free survival (PFS).  *See.e.g.*, Kantoff, et al., "Hydrocortisone With or Without Mitoxantrone in Men with Hormone-Refractory Prostate Cancer: Results of the Cancer and Leukemia Group B 9182 Study," J. Clin. Oncol., 17:2506–13 (1999) ("Kantoff 1999") (SA_JEV_3163405-415) at SA_JEV_3163405.  He also cites evidence (*e.g.*, TAX327, Rosenberg, Berger; *see, e.g.*, NRR, ¶¶ 64-67) that mitoxantrone relieves pain, necessarily prolonging pain-PFS in some patients. Similarly, mitoxantrone decreases PSA, necessarily prolonging PSA-PFS in some patients (*see also* NRR, ¶ 127).  But the fact that section VI.A. of Dr. Nelson's Rebuttal Report cites multiple studies in which an investigational therapy was compared to mitoxantrone does not mean that the asserted claims are directed to comparisons with mitoxantrone only.  I do not believe that the asserted claims, as construed by the Court, require mitoxantrone as a comparator (*see*, *e.g.*, § VI.B., *infra*), but these studies do in fact provide evidence that these other therapies were not "failures," as Dr. Nelson characterizes them.

16.     Dr. Nelson states that "[t]herapy that does not extend life, but rather reduces pain and/or other symptoms, is known as palliative care."  NRR, ¶ 50.  I note that this is only one definition of palliative care used in the art.  Palliative care sometimes refers to any therapy that is non-curative, regardless of whether survival is increased.  *See, e.g.*, Audrey, et al., "What oncologists tell patients about survival benefits of palliative chemotherapy and implications for informed consent: qualitative study," BMJ, 337:a752 at 1 (2008) (describing "palliative chemotherapy" for "incurable cancer").  And even purely palliative care (*i.e.*, symptom management) has been shown to extend life, even though the therapy is directed to quality, not

quantity, of life. *See, e.g.*, Temel, et al., "Early palliative care for patients with metastatic non-small-cell lung cancer," N. Engl. J. Med., 363(8):733-742 at 733 (Aug. 2010) (explaining, for example, that "median survival was longer among patients receiving early palliative care (11.6 months vs. 8.9 months, P=0.02)").

17.    Dr. Nelson defined overall survival ("OS") as a "clinical study endpoint" that is "typically reported as the median time to death for the patients in the particular study arm." NRR, ¶ 55. Dr. Nelson then stated that "a finding of increased overall survival in a clinical study demonstrates that the therapy will prolong the life of individual patients." *Id.* It is not clear to me whether he is suggesting that such a study demonstrates that the drug will prolong the life for (1) *all* patients or (2) only for *some* patients. I disagree that a finding of increased OS in a randomized clinical trial demonstrates that the therapy necessarily will prolong the life of all patients. Even if there is a statistically significant difference in OS, it is almost certain that not all patients benefited from the experimental treatment. Indeed, the TROPIC data reflected in the '110 and '777 patents show the survival curves for mitoxantrone and cabazitaxel crossing due to early deaths in the cabazitaxel group, which explicitly demonstrates that there were some patients whose survival *decreased* due to administration of cabazitaxel. *See, e.g.*, '110 patent at Fig. 1; *see also* FDA Medical Review (SA_JEV_3154241-330) at SA_JEV_3154293-297.

18.    As to whether a finding of increased OS means that life will be prolonged for *some* patients, a properly designed study may show a high statistical probability that a population of patients lived longer on one drug than on another. But a study showing increased OS in one study arm over another does not establish what percentage of patients actually have a "prolong[ed] . . . life." As mentioned above, in the context of chemotherapies and taxanes in

particular, it is likely that some patients experience a shorter life due to toxicity or other adverse effects resulting from the life-threatening toxicities of the drug.

19.     In paragraph 72, I note that Dr. Nelson appears to be drawing conclusions based on individual patients.  NRR, ¶72.  This is inconsistent with his general position that Phase 3 clinical trial data is required for the POSA to form a reasonable expectation of success regarding administration of cabazitaxel with the intent to increase OS or PFS.

**B.     The Asserted Patents Are Not Directed To Increasing Survival Relative To Mitoxantrone**

20.     I have reviewed Section VI.B. of Dr. Nelson's report and it does not change my opinions regarding the invalidity of the claims.

21.     Dr. Nelson states that I did not define "resistant" or "refractory."  NRR, ¶77.  It is my opinion the POSA would understand the meaning of those terms.  I note that the '110 patent states that "cancer may become resistant to the agents used … ."  '110 patent at 2:15-16.  I assume that Dr. Nelson does not contend that the '110 patent is ambiguous.  Moreover, I note that Dr. Nelson's own report uses the terms "resistant" and "refractory."  *See, e.g.*, NRR, ¶ 80 ("resistance"), ¶ 49 ("hormone-refractory").  Dr. Nelson also states that, "a POSA understands from the specification that the claims to increasing survival of a patient with mCRPC that has progressed during or after treatment with docetaxel are directed to increasing survival of patients for whom docetaxel is no longer considered a good option because further benefit is not expected, i.e., 'patients who are not catered for by a taxane-based treatment.'"  *Id.*, ¶ 77.  Dr. Nelson does not explain this conclusion regarding the POSA's alleged views.  *Id.*  I do not see any requirement in the asserted claims that docetaxel "is no longer considered a good option because further benefit is not expected."  *Id.*  Rather, the claims require only that the "patient has

castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel." *See, e.g.*, '110 patent at claim 1; *see also* '777 patent at claim 1.

22.     In paragraph 80, Dr. Nelson states that the fact that TROPIC patients received three doses of docetaxel "suggests that the TROPIC study was intended to include patients who received enough docetaxel to develop taxane resistance." NRR, ¶ 80. Dr. Nelson did not cite any support for his implied claim that three doses of docetaxel can cause resistance.

23.     A POSA would not understand the claim term "increasing survival" to entail a comparison to mitoxantrone. NRR, ¶ 84. The inherent comparator is no treatment. Under the Court's claim construction, the increase in survival occurs "in an individual patient." *Id.*, ¶¶ 37, 84. The claim requires the administering physician to have the "intentional purpose" of increasing the individual patient's survival. A POSA would understand this to mean an intent to extend the patient's survival (as construed by the Court) over what the patient would have experienced in the absence of treatment. My opinions here are based on the express claim language, which does not reference mitoxantrone as a comparator. *See, e.g.*, '110 patent at claim 1; *see also* '777 patent at claim 1. In addition, although Dr. Nelson references the specification, the portions he cites do not show an explicit disclaimer or intent on the part of the inventors to require mitoxantrone as the comparison for purposes of "increasing survival." *See* NRR, ¶¶ 76-78. Dr. Nelson does not appear to cite anything in the prosecution history at all, let alone involving an express definition of some term such that the claims would be read by the POSA as requiring a comparison to mitoxantrone. I further note that the fact that the POSA might "know those docetaxel studies used mitoxantrone plus prednisone as the comparator arm," *Id.*, ¶ 78, is irrelevant. My understanding is that requirements or limitations generally should not be

imported into the claim language from the specification, including from studies described in the specification.

24.     Even if the increase in survival were to be compared to an extrinsic comparator to practice the claims, mitoxantrone would not be the exclusive extrinsic comparator.  While some patients within the scope of the claims may have otherwise received mitoxantrone, there was no clear standard of care for such patients, particularly those for whom mitoxantrone is contraindicated.  *See, e.g.*, Berry, W. & M. Eisenberger, "Achieving Treatment Goals for Hormone-Refractory Prostate Cancer with Chemotherapy," The Oncologist, 10(suppl3):30-39 (2005) at 35 ("Vinorelbine may be particularly well suited for elderly patients and for those with contraindications to mitoxantrone or docetaxel.").  To the extent an extrinsic comparator is required, the '110 and '777 patents do not explicitly identify that comparator as a part of the claimed methods, nor explicitly identify the comparator in the specification, suggesting the claims may be indefinite.

25.     The specification also indicates to a POSA that mitoxantrone is not intended to be the exclusive extrinsic comparator from which a survival benefit is measured.  The specification discloses that cabazitaxel did not show statistically significant (p=0.5192) superiority to mitoxantrone with respect to pain-PFS.  '777 patent at 12:21-25.  Thus, the POSA would understand mitoxantrone to be the comparator when the claims include increasing pain-PFS, yet the specification demonstrates that cabazitaxel did not increase pain-PFS compared to mitoxantrone.

## C.      The Prior Art Renders Obvious Administration Of Cabazitaxel With The Intent To Increase Survival With A Reasonable Expectation Of Success

### 1.      Dr. Nelson Does Not Rely On The Court's Claim Construction

26.      Dr. Nelson proffers several opinions that pertain to claim construction rather than the factual obviousness of the claimed methods, in conflict with the claim constructions entered by the Court.  He opines that the claims are "directed to . . . 'patients who are not catered for by a taxane-based treatment,'" which he asserts means docetaxel-resistant patients, while elsewhere acknowledging that the claims reach the full scope of mCRPC patients whose cancer has worsened during or after treatment with docetaxel.  NRR, ¶¶ 36, 77, 80.  He also states that "increasing survival" incorporates a comparison to mitoxantrone specifically and implies that the term does not reach comparisons to no treatment or other prior art treatments such as docetaxel rechallenge, adding a limitation absent from the construction entered by the Court.  *Id.*, ¶¶ 37-38, 84-85.  A POSA would not understand these limitations to be present in the claim language in light of the specification.

27.      Docetaxel resistance is a well-known and well-defined phenomenon in the art, usually defined based on the RECIST criteria for patients with measurable disease, or two consecutive PSA rises at least one week apart, during docetaxel treatment, and described in the patents.  *Id.*, ¶¶ 76, 81; *see also id.*, ¶ 87 (referring to docetaxel resistance"), ¶ 91 (citing Galletti article on paclitaxel and docetaxel resistance, demonstrating it was a known phenomenon (SA_JEV_0182856-878), ¶ 92 (citing Patterson (SA_JEV_3163230-239)); Pal, et al., "Management of Docetaxel Failures in Metastatic Castrate-Resistant Prostate Cancer," Urol. Clin. North. Am. 2012 Nov; 39(4), at 3.  ., 39(4):1-14 (Nov. 2012) at 3.  XX):. Progression after docetaxel treatment, for example because treatment was stopped due to toxicity, completion of 8-10 cycles, or sufficient treatment success such that a drug holiday would be warranted, is not

predictive of further inability of docetaxel to effect a disease response, as seen in the ASCENT study.  ROR, ¶ 148.  Docetaxel-refractory disease is that which definitively exhibits docetaxel resistance (e.g., nonresponsive to docetaxel rechallenge).

28.     A POSA would not understand the claims to be limited to docetaxel-resistant or docetaxel-refractory patients, even if the TROPIC study criteria were designed to include primarily these patients.  *Id.*, ¶ 186.  Moreover, I understand that the TROPIC study criteria were amended in July 2017 to require higher previous doses of docetaxel for enrollment ($\geq$225 mg/m$^2$ cumulative dose), but the final analysis included 59 patients who had received fewer than 225 mg/m$^2$ of docetaxel and thus were less likely to be docetaxel-refractory.  FDA Medical Review at §5.3.8 (SA_JEV_3154273); '777 patent at Fig. 3.  Of course, the fact that 59 patients who had received less than 225 mg/m$^2$ of docetaxel as prior treatment were enrolled in the TROPIC study—despite the availability of further docetaxel, supports my opinion that a POSA would have had a  reasonable expectation of success for increasing survival with cabazitaxel.  Regardless, the claims are broader than the TROPIC study criteria, and the specification would not instruct a POSA that the claims were limited to docetaxel-resistant patients, as a subset of patients who had received prior docetaxel and progressed during or after treatment with docetaxel.  Dr. Nelson's argument that the specification focuses on an "unmet medical need" in "patients who are not catered for by a taxane-based treatment" ignores the key preceding language, noting that the need is present "especially for," not exclusively for, such patients.  NRR, ¶¶ 76-77; '110 patent at Abstract, 1:21-24, 2:22-29.  The "especially" language also undermines Dr. Nelson's argument of an equivalence between docetaxel-resistant patients and patients with exposure to any amount of prior docetaxel; the specification does not equate these two categories and merely states that both relate to the invention.

### 2.     Preclinical Indications That Cabazitaxel Would Increase Survival

29.     Dr. Nelson opines that the prior art did not provide a reasonable expectation of success, where success involves administration with intent to increase survival as compared to mitoxantrone.  NRR, ¶ 86.  As noted above, Dr. Nelson's proposed limitations to mitoxantrone as a comparator and to patients with docetaxel-resistant disease improperly narrow the scope of the claims, and he does not contest that a POSA would have reasonably expected cabazitaxel to increase survival as compared to no treatment.  ROR, ¶ 192; NRR, ¶ 166.

30.     Dr. Nelson agrees that cabazitaxel was known to have reduced affinity for the drug efflux pump, P-glycoprotein (P-gp), a known mechanism of docetaxel resistance, but denies that a POSA would have "assumed" that this biochemical property was clinically significant. NRR, ¶ 87.  Dr. Nelson does not address the preclinical data in conjunction with Mita's Phase 1 study, which showed a substantial tumor response and PSA response, leading to improved tumor- and PSA-PFS, in a docetaxel-refractory patient.  ROR, ¶ 184.  The preclinical demonstration of activity in docetaxel-resistant cell lines would have suggested to a POSA that this response in Mita was not a fluke; cabazitaxel was clinically active in docetaxel-resistant disease, and it was reasonable to expect that at least some other patients who had progressed during or after docetaxel treatment would respond similarly.  *Id.*, ¶¶ 184-185.

31.     Dr. Nelson compares the preclinical data for cabazitaxel to that of larotaxel, and proceeds to state that "larotaxel did not increase overall survival or PFS" in Phase 3 studies in three different non-prostate cancers.  NRR, ¶ 103.  But the comparators used for the three larotaxel studies were capecitabine, gemcitabine, and 5-fluorouracil, all active controls.  Dr. Nelson suggests that 5-fluorouracil is comparable to mitoxantrone, citing a study that compared a three-drug cocktail containing 5-fluorouracil to mitoxantrone in metastatic breast cancer, but he does not assert that mitoxantrone (or 5-fluorouracil) is a "reference treatment" for breast cancer.

13

Nor does he have any basis for asserting that larotaxel did not increase survival over mitoxantrone.  He notes that separate clinical studies did not prove superiority of larotaxel over an active control.  But it is not valid to compare these study results and conclude anything about the superiority of larotaxel to mitoxantrone in mCRPC, or vice versa.

32.     Nor does the development history of milataxel show that it was unreasonable to expect cabazitaxel to increase survival in "individual patients."  NRR, ¶¶ 106-107.  Milataxel was originally envisioned as an orally administrable taxane with activity in paclitaxel-resistant tumors.  *See* Sampath, et al., "MAC-321, a novel taxane with greater efficacy than paclitaxel and docetaxel *in vitro* and *in vivo*," Mol. Cancer Ther., 2:873-884 (2003); *see also* Lockhart, et al., "Phase I trial of oral MAC-321 in subjects with advanced malignant solid tumors," Cancer Chemother. Pharmacol., 60:203-209 (2007).  Dr. Nelson cites a study of milataxel in colorectal cancer, but he has not noted the important contextual fact that *no* taxane had been demonstrated to be effective in the treatment of colorectal cancer, in contrast to the well-known success of docetaxel in mCRPC.  Swanton, et al., "Chromosomal Instability, Colorectal Cancer and Taxane Resistance," Cell Cycle, 5(8):818-823 (April 2006).  A POSA would not understand the development history of milataxel to cast doubt on the ability of cabazitaxel to increase survival, since cabazitaxel would not have been expected to be effective in colorectal cancer.

### 3.     Prior Art Clinical Studies Indicating That Cabazitaxel Would Increase Survival

33.     Dr. Nelson argues that the results reported in Mita would not have provided a reasonable expectation that cabazitaxel therapy would increase survival "as compared to mitoxantrone."  NRR, ¶ 109, 119.  But Mita would have provided such a reasonable expectation as compared to no treatment, and Dr. Nelson does not opine otherwise.  The responses observed in Mita demonstrated that cabazitaxel had the capacity to overcome docetaxel resistance and

mCRPC heterogeneity to a sufficient degree to provide a PFS benefit to at least some mCRPC patients previously treated with docetaxel.

34.     Dr. Nelson suggests that the "further context" provided by Fumoleau and Lortholary would temper a POSA's expectations of cabazitaxel. *Id.*, ¶¶ 110-112.  But neither Fumoleau nor Lortholary reported any negative results in prostate cancer, and a POSA would not consider the results of either study to cast doubt on the teachings of Mita.  As Dr. Nelson notes, Phase 1 studies are not designed or powered to detect population efficacy over a comparator. *Id.*, ¶ 110.

35.     Dr. Nelson asserts that a POSA would not extrapolate from the two mCRPC patients with responses in Mita to predict how other patients within the scope of the claims would respond.  NRR, ¶¶ 120-121.  The claims recite "a patient," however, not a population of patients or a statistically significant, large, randomized clinical trial sufficient for FDA approval.  Two of the eight prostate cancer patients in Mita experienced an objective response; Mita provides evidence that cabazitaxel increases survival, not that all patients will have increased survival.

36.     Dr. Nelson asserts that "reductions in PSA" are "not a validated surrogate for clinical benefit" (NRR, ¶ 122), or "a predictor of a survival benefit" (*id.*, ¶¶ 123-125 (referring to overall survival)), but he does not define "clinical benefit" or contest that a reduction in PSA inherently tends to increase PSA-progression free survival.  These PSA reductions were "associated with both improved quality or quantity of life."  ROR, ¶ 93.

37.     I agree with Dr. Nelson that Mita "makes no comparison as to . . . mitoxantrone therapy or any other therapy" regarding the two mCRPC responders' survival.  NRR, ¶ 126.  But both of the responders described in Mita experienced increased PFS and PSA-PFS over what

they would have experienced without treatment; in the absence of treatment, tumors grow and PSA increases.

38.     Dr. Nelson cites a study ("Hahn") of pemetrexed in patients with prior taxane-based chemotherapy that concluded that the drug's activity was comparable to that of mitoxantrone. NRR, ¶¶ 128, 158. This study also emphasized the utility of docetaxel re-treatment in many patients progressing after prior docetaxel, stating: "Investigators have recently demonstrated PSA response rates up to 90% with docetaxel re-treatment in metastatic CRPC patients who demonstrated an initial response to first-line docetaxel therapy and were allowed to take a treatment break.  These reports indicate that patients who enter an elective treatment break due to choice or toxicity remain chemosensitive and possess a fundamentally different biology than true docetaxel-resistant patients."  SA_JEV_3163315-320 at SA_JEV_3163318.

39.     Dr. Nelson cites studies of various drugs that did not demonstrate increased survival against various comparators in Phase 3 trials despite promising signals in preclinical studies and Phase 1 and Phase 2 trials.  NRR ,¶¶ 130-141.  None of these drugs' development histories would have suggested to a POSA that cabazitaxel would not increase survival in mCRPC patients who had previously received docetaxel.  Many of the trials were conducted in docetaxel-naïve populations.  And in many of the trials, the drug under investigation did increase survival, as construed by the Court.

40.     The ASCENT-2 trial comparing calcitriol and docetaxel versus docetaxel alone was conducted in docetaxel-naïve patients.  I cited the calcitriol studies in my Opening Report to show that docetaxel re-treatment increases survival in the claimed population.  ROR, ¶ 148.  A POSA would not draw any conclusions regarding cabazitaxel on the basis of the failure of calcitriol to meet its Phase 3 primary endpoint.

41.     Dr. Nelson also cites two Phase 1/2 studies of GVAX, which demonstrated that multiple patients had an increase in PSA-PFS, as well as a news article (Mulcahy) regarding two unpublished Phase 3 studies of GVAX.  However, neither of the Phase 3 trials were conducted in patients with prior docetaxel (*see* "GVAX Vaccine for Prostate Cancer vs Docetaxel & Prednisone in Patients with Metastatic Hormone-Refractory Prostate Cancer," available at: https://clinicaltrials.gov/ct2/show/NCT00089856 and "Docetaxel in Combination with GVAX® Immunotherapy Versus Docetaxel and Prednisone in Prostate Cancer Patients."  These two trials compared a) GVAX to docetaxel and prednisone and b) GVAX plus docetaxel to docetaxel and prednisone.  Thus, I do not see any relevance of these Phase 3 trials to the obviousness analysis in this case.

42.     Dr. Nelson also discusses sipuleucel-T as "an example of a therapy that reduced PSA in individual patients in early studies but did not increase PFS in controlled studies."  NRR, ¶ 133.  He also notes, "Sipuleucel was eventually approved for mCRPC (but not post-docetaxel) after a further placebo controlled phase III study that was designed to assess overall survival as its primary endpoint showed prolonged overall survival."  *Id.* Thus, sipuleucel-T is not a failure, and is approved as the product Provenge® "for the treatment of asymptomatic or minimally symptomatic metastatic castrate-resistant (hormone-refractory) prostate cancer" (*see* PROVENGE® Package Insert (CabRef0013684-685) regardless of prior treatment (*e.g.*, including patients who have progressed after receiving docetaxel).

43.     Dr. Nelson also suggests that the prior art regarding atrasentan is relevant to a POSA's expectation of success for cabazitaxel. NRR, ¶ 135.  Given that cabazitaxel and atrasentan have little in common, I do not agree with his argument.  Further, I note that in fact atrasentan was demonstrated to increase PSA-PFS in a randomized placebo-controlled Phase 2

trial ("Carducci"), although it is unclear that any patients in this study had previously received docetaxel. Carducci, "Effect of Endothelin-A Receptor Blockade With Atrasentan on Tumor Progression in Men With Hormone-Refractory Prostate Cancer: A Randomized, Phase II, Placebo-Controlled Trial," J. Clin. Oncol., 21:679-89 (2003) (SA_JEV_3163296-306). The subsequent Phase 3 trial (also discussed by Dr. Nelson) excluded patients with prior chemotherapy, but actually did show an increase in PSA-PFS, although the study was too small to demonstrate that the magnitude of that increase was statistically significant. Carducci, A Phase 3 Randomized Controlled Trial of the Efficacy and Safety of Atrasentan in Men with Metastatic Hormone-Refractory Prostate Cancer, '110(9) Cancer 1959-66 (2007) ("Carducci 2007") (SA_JEV_0182794-801).

44.     Dr. Nelson cites additional examples (NRR, ¶ 136), although he does not explain how the cited papers would be considered by a POSA in the context of whether cabazitaxel would increase survival (as construed by the Court) for patients with mCRPC previously treated with docetaxel. Like those discussed above, many of these studies were conducted in patients who had not received docetaxel (*e.g.*, the suramin studies), and the drugs under study have no pharmacological relationship to cabazitaxel. I disagree with Dr. Nelson that these studies are relevant to a POSA in the context of considering the obviousness of the asserted claims.

45.     Dr. Nelson also discusses the extensive prior art regarding satraplatin. NRR, ¶ 137. This drug is not a taxane, and whether or not satraplatin was a "failure" is not clearly relevant to a POSA's expectation of success for a taxane. But I do note that satraplatin was demonstrated to increase pain-PFS in a randomized clinical trial, where about half of participants had received prior docetaxel. Sternberg, et al., "Multinational, Double-Blind, Phase III Study of Prednisone and Either Satraplatin or Placebo in Patients With Castrate-Refractory Prostate

Cancer Progressing After Prior Chemotherapy: The SPARC Trial," J. Clin. Oncol., 27:5431-5438 (2009) (SA_JEV_0173668-675).  Thus, even though satraplatin has never received FDA approval, the prior art demonstrates that satraplatin administration achieves the intended use of the asserted claims, an increase in survival.

46.     Dr. Nelson extensively discusses dasatinib (NRR, ¶ 140), although the relevance of this discussion to his nonobviousness opinion is not apparent to me.  Dasatinib demonstrated antitumor activity in mCRPC as a single agent, but when combined with docetaxel did not increase survival.  *Id*.  This simply reflects a poor drug development strategy, as noted by the authors of the cited study, who wrote: "The challenge of combining a molecularly targeted agent with docetaxel chemotherapy, despite several phase 3 efforts with various promising agents, has not been overcome.  This consistent finding across many agents suggests that a fundamental conceptual flaw exists in the approach."  Araujo 2013, SA_JEV_3163459-468 at SA_JEV_3163467.  The notion that the strategy was a failure—as opposed to the drug—is supported by another paper by the same author as the paper cited by Dr. Nelson (Araujo, et al., "Long-term use of dasatinib in patients with metastatic castration-resistant prostate cancer after receiving the combination of dasatinib and docetaxel," Cancer Management & Research, 5:25-30 (2013)), which demonstrated two patients who had prolonged PFS and OS with dasatinib alone (after previously being treated with the combination of docetaxel and dasatinib).

47.     Another agent discussed by Dr. Nelson is bevacizumab, in the context of CALGB 90401, a study in which I was involved.  NRR, ¶ 141. While bevacizumab did not increase overall survival, it did increase PFS by 2.4 months (9.9 months versus 7.5 months, p < 0.001).  I also note that Dr. Nelson cited a disclosure in March 2010 to support his opinion, which I understand is not prior art.  NRR, ¶ 141; SA_JEV_3142960-962.  But he did not cite the full

19

publication that unequivocally demonstrates that bevacizumab increases PFS when administered with docetaxel. Kelly, et al., "Randomized, Double-Blind, Placebo-Controlled Phase III Trial Comparing Docetaxel and Prednisone With or Without Bevacizumab in Men With Metastatic Castration-Resistant Prostate Cancer: CALGB 90401," J. Clin. Oncol., 30:1534-1540, at 1534 (2012).

48.     Dr. Nelson also discussed another study that was not disclosed in the prior art, the Phase 3 placebo-controlled trial of sunitinib ("Michaelson 2014"). NRR, ¶ 141. Again, this trial was not a failure, as sunitinib increased PFS (5.6 versus 4.1 months, $p < 0.001$). Michaelson, et al., "Randomized, Placebo-Controlled, Phase III Trial of Sunitinib Plus Prednisone Versus Prednisone Alone in Progressive, Metastatic, Castration-Resistant Prostate Cancer," J. Clin. Oncol., 32(2):76-82 (2014) (SA_JEV_0182941-948).

49.     Dr. Nelson also discussed a number of other small trials that demonstrated reduction in PSA, tumor size, or pain in a few patients. NRR, ¶ 130. He appears to be arguing that these results were generally not followed by a subsequent randomized trial with statistically significant results. *Id.* However, he does not address the complexity of decision-making by pharmaceutical companies, which would consider multiple issues, including the magnitude of the likely benefit, the size of the requisite clinical trial to gain regulatory approval, the cost of the requisite clinical trial, the competitive landscape, and potential intellectual property issues, among other considerations. However, a POSA would understand that in a hypothetical world where a drug of interest could be studied in a randomized clinical trial of any size (without concern for the cost of the trial), a drug that reproducibly reduces PSA, tumor size, or pain in multiple patients (*i.e.*, as demonstrated in the trials cited by Dr. Nelson) would demonstrate a statistically significant increase in survival if the trial were sufficiently large. On the other hand,

pharmaceutical and biotechnology companies must prioritize their resources, and thus would not pursue a Phase 3 trial of a drug if the cost of the trial did not justify the potential revenues from the drug, particularly for larger companies with many investigational agents in their pipeline.

### 4. Pivot

50.     Dr. Nelson contends that a POSA would not have "extrapolated" the results from Pivot to post-docetaxel mCRPC.  NRR, ¶ 144; CabRef0002984-989.  But many drugs believed to overcome taxane resistance have been studied in both breast and prostate cancer, which are the two most common metastatic cancers for which taxanes are administered.  Dr. Nelson's response to Beardsley's disclosure that the Pivot results prompted the TROPIC study is to assert that it is "conjecture," but the best explanation for the unusual clinical development sequence is that the clinical developers of cabazitaxel reasonably "extrapolated" from Pivot rather than conducting a separate study in the target indication.  Dr. Nelson argues that the objective response rate observed in Pivot may not necessarily imply to a POSA that cabazitaxel would increase survival as compared to mitoxantrone.  NRR, ¶ 143 n.17.  Whether or not that is true, Pivot provides additional evidence that the findings in Mita were real and reproducible.

### 5. TROPIC

51.     The heading of the section of Dr. Nelson's report on the TROPIC study states that "The Existence of the TROPIC Study Would Not Have Provided a Reasonable Expectation of Increasing Survival." NRR at 68.  Dr. Nelson specifies that he is referring to a reasonable expectation of increasing survival "as compared to mitoxantrone."  NRR, ¶ 166.  Dr. Nelson does not offer any opinion regarding a POSA's expectation as compared to no treatment, based on the existence of the TROPIC study. NRR, ¶ 166. He states in conclusory fashion that he disagrees with my argument, but he does not seem to disagree with the conclusion that the existence of the trial implies an expectation that cabazitaxel would be at least as good as

mitoxantrone, which increases PFS over no treatment.  He states that it was "unknown whether cabazitaxel would be better, worse, or the same as mitoxantrone with respect to any metric" (*id.*), but that is not relevant to my understanding of the asserted claims.

52.     Dr. Nelson notes that TROPIC was supported by "little data," but one reason TROPIC was conducted despite the lack of a Phase 2 study was that cabazitaxel's activity was more predictable than that of most chemotherapy drugs, given its similarity to docetaxel.  *See* Pivot at CabRef0002984-985. Dr. Nelson also notes high failure rates in Phase 2 oncology trials, but he does not define failure, and his cited examples of failure from earlier in the report include a number of drugs that increased PFS, which is not "failure" for purposes of the standard of the patent, even if the increase in PFS would not, in the end, be sufficient for FDA approval. NRR, ¶ 87.  For this reason, Dr. Nelson's opinion that the TROPIC study was expected to be "yet another failure" (*id.*, ¶ 168) (and his surprise when the study met its primary endpoint (*id.*, ¶ 171)) is of limited applicability, since he would have included within the umbrella of "failure" a result in which cabazitaxel increased OS, but not to a magnitude sufficient for FDA approval (which requires a p-value of less than 0.05 in a sufficiently powered study).  A POSA would have also considered another possible outcome that would constitute failure from Dr. Nelson's perspective: an increase in PFS without an increase in OS, since OS was the primary endpoint of the study.  Such a result would not be sufficient for FDA approval, although it would clearly demonstrate that cabazitaxel increased survival (as construed by the Court) relative to mitoxantrone.  Thus, it is unclear to me as to how Dr. Nelson's opinion as to what constitutes a "success" or "failure" is connected to the claims of the patent.

53.     Dr. Nelson argues that the TROPIC results were "surprising and unexpected," but the New Jersey court in the prior litigation found otherwise.  ROR, ¶ 219.  Dr. Nelson's

description of the result of TROPIC, that "cabazitaxel therapy at a starting dose of 25 mg/m$^2$ with dose reductions to 20 mg/m$^2$ in combination with prednisone increased progression-free and overall survival as compared to mitoxantrone in combination with prednisone" (NRR, ¶ 173), is technically accurate but may be misleading in that the study was not powered or designed to detect the effect of the 20 mg/m$^2$ dose on the survival endpoints. The PROSELICA study also post-dates the priority date of the patent, and its results are not disclosed in the patents. Regardless, given the responses observed in Mita and Pivot at the 15, 20, and 25 mg/m$^2$ doses, it would not have been surprising or unexpected that these doses increased survival (as construed by the Court) in individual mCRPC patients who had progressed during or after treatment with docetaxel.

### D.    Reasonable Expectation At Starting Dose Of 20 Mg/M$^2$ With Reductions To 15 mg/m$^2$

54.    Dr. Nelson states that he disagrees with me that "a POSA would have reasonably expected 15-25 mg/m$^2$, 15 mg/m$^2$, 20 mg/m$^2$, or 25 mg/m$^2$ of cabazitaxel to increase survival as compared to mitoxantrone." NRR, ¶ 175. Dr. Nelson has injected his own view of the claims, however, when he references a comparison to mitoxantrone. *Id.*; *see also* NRR § VI.B. The asserted claims do not mention mitoxantrone, nor does the Court's claim construction. *See, e.g.*, ROR § V.

55.    Dr. Nelson also recites various dosages described in the prior art. Regarding Mita, Dr. Nelson asserts that "Mita did not recommend that dose for further study because of febrile and grade 4 neutropenia." NRR, ¶ 176. It is more accurate to say that Mita teaches that the 20 mg/m$^2$ dose was recommended, not that Mita affirmatively recommended against the 25 mg/m$^2$ dose. Mita (CabRef0002898-905) at CabRef0002901. In the end, Mita still teaches the POSA regarding dosages of 10, 15, 20 and 25 mg/m$^2$, with one patient experiencing a confirmed

partial response at 15 mg/m$^2$ and another patient that was "docetaxel refractory" with a partial response at 25 mg/m$^2$. *Id.* at CabRef0002902. Dr. Nelson states that Pivot "reported that only 28% of patients could escalate to 25 mg/m$^2$" because of adverse events at lower doses. NRR, ¶ 176. This, however, concedes that Pivot teaches doses up to 25 mg/m$^2$ in some patients, and all patients in Pivot were previously treated with a taxane. ROR, ¶ 109. Pivot teaches that 20 patients were able to escalate to 25 mg/m$^2$ without an increase in overall incidence of adverse events. *Id.*, ¶ 111. Pivot concluded that cabazitaxel "appears to be active in docetaxel- or paclitaxel-resistant breast cancer[.]" Pivot at CabRef0002988. Thus, Dr. Nelson's positions do not change the fact that the POSA knew of both the dose ranges including 15-25 mg/m$^2$ and the effect of cabazitaxel at such doses.

56.     Dr. Nelson nevertheless argues that the 80-year old patient in Mita had not previously received docetaxel. NRR, ¶ 177. That patient had received a dose of 15 mg/m$^2$. Mita at CabRef0002902. Notably, however, the asserted claims of the '110 and '777 patents are not limited to patients that are docetaxel-refractory. It is possible for mCRPC to progress after treatment with docetaxel in patients that are not docetaxel-refractory or docetaxel-resistant. *See, e.g.,* FDA Medical Review at §6.1.2 (SA_JEV_3154275-276); *see also id.* at SA_JEV_3154276 ("***Reviewer Comment:*** *The trial initially allowed enrollment of patients who had received less than 225 mg/m$^2$ of docetaxel; however, the applicant amended to the trial to exclude these patients. This reviewer agrees with this strategy, as these patients may not be considered refractory or resistant to docetaxel and could potentially be re-treated with docetaxel.*"). Thus, the POSA would understand the response for the 80-year old patient that had not received docetaxel could be similar to the response a patient may have if, for whatever reason, the patient had received, for example, only one dose of docetaxel and had not developed any resistance to

24

docetaxel as a result, and had subsequently seen disease progression.  Regarding Pivot, Dr. Nelson asserts that "all responding women *could* have received 25 mg/m$^2$."  NRR, ¶ 177 (emphasis added).  This appears to be speculation, as Pivot does not state that all responding women *did* receive a dose of 25 mg/m$^2$.

57.     Next, Dr. Nelson asserts the POSA "would have thought that the starting dose of 25 mg/m$^2$ of cabazitaxel in TROPIC could be too high."  NRR, ¶ 178.  He cites a dose of 30 mg/m$^2$ as alleged evidence.  *Id.*  While I agree that "possibl[e] deaths from complications" from a treatment would decrease survival relative to other options, all taxanes were known to have potential toxicity, and Mita and Pivot demonstrate that cabazitaxel achieved at least partial responses in studies including doses of 15-25 mg/m$^2$.  Thus, the fact that some patients had adverse events or could "possibly" have complications resulting in death would not dissuade the POSA from considering cabazitaxel treatment.

58.     Dr. Nelson also states "it was surprising and unexpected to a POSA in October 2009" that administering 15-20 mg/m$^2$ doses would "increase survival" relative to mitoxantrone, citing the PROSELICA study. NRR, ¶ 179.  Again, Dr. Nelson improperly limits his analysis to a comparison with mitoxantrone.  Further, Dr. Nelson did not explain why he cited a 2017 paper by Eisenberg regarding the 2011-2017 PROSELICA trial in the context of the alleged knowledge of the POSA in 2009.  *See* Eisenberger (SA_JEV_3163381-393) at SA_JEV_3163381 (published in 2017); Clinicaltrials.gov (NCT01308580) (showing the study was first posted in 2011 and the last update was posted in 2017).

59.     Regarding dose reductions, Dr. Nelson asserts that a POSA could not expect dose reductions to increase survival "prior to any controlled data for cabazitaxel[.]"  NRR, ¶ 180.  To the extent Dr. Nelson intended to state that only Phase 3 clinical trial data could justify an

expectation of success for the POSA, I disagree that Phase 3 clinical trial data are required. Smaller studies, including Phase 1 and 2 studies, can also support a reasonable expectation of success. *See, e.g.*, ROR §§ VII.B.2. and VII.C.2.  The pertinent analysis is not whether "dose reductions" increase survival relative to no treatment, but whether cabazitaxel increases survival. Dr. Nelson admits docetaxel and paclitaxel have dose reduction information in their labels (NRR, ¶ 180), which supports the fact that the POSA would understand that drugs, including taxanes, can have efficacy across a range of doses.  I disagree that a Phase 3 study at a higher dose is required before it would be obvious to the POSA to use a lower dose with a reasonable expectation of success.

60.      Dr. Nelson also asserts that I "speculate[] that a POSA could reduce the dose of cabazitaxel for patients with hepatic impairment."  NRR, ¶ 181.  It is not "speculation" that the POSA "could" reduce the dose for patients with hepatic impairment.  Furthermore, it would be medically appropriate to reduce the dose of a taxane for such patients.  Eklund, J.W. & M.F.Mulcahy, "Chemotherapy Dosing in the Setting of Liver Dysfunction," Oncology, 19(8):1057-1063 (July 2005) at 4-6 (describing dose reductions for taxanes).  As mentioned in my opening report, the Taxotere label teaches such dose reductions, and Dr. Nelson has not explained why the mere ability of the POSA to reduce a dose—to simply provide a lower quantity of drug to the patient—was speculative in any way.  *See, e.g.*, *id.*; *see also* ROR, ¶¶ 126-128, 178, 202.  I further note that, when it comes to lack of enablement, Dr. Nelson claims the "POSA would have been capable of modifying the dose schedules, *doses*, or combinations of cabazitaxel therapy according to the characteristics of a particular patient[.]"  NRR, ¶ 258.  The fact that Mita, Pivot, and TROPIC may have excluded patients with hepatic impairment does not mean the POSA lacked the ability to reduce doses when risk factors suggesting dose reductions

were present.  In addition, Dr. Nelson appears to assume the prior art must show the POSA *would* have been motivated to administer cabazitaxel to patients with hepatic impairment.  I understand the standard for obviousness to be whether the prior art discloses the claimed methods, and methods for treating mCRPC patients with cabazitaxel and premedication were obvious as of October 2009, and certainly by December 2009 (*see, e.g.*, ROR, ¶ 193).  I understand the standard is about whether the claimed methods were obvious, not whether an oncologist actually would have performed them (and I disagree, in any event, that the POSA would not have administered a lower dose of cabazitaxel to a patient with significant hepatic impairment).

61.    Lastly, Dr. Nelson states that whether the POSA would reduce the dose of cabazitaxel if administered in combination with carboplatin was also "speculat[ion]."  NRR, ¶ 182.  Although not expressly cited in my Opening Report, paragraph 177, the prior art included other taxane combinations with carboplatin, such as "Cabrespine, Randomized Phase II Study Comparing Paclitaxel and Carboplatin Versus Mitoxantrone in Patients with Hormone-Refractory Prostate Cancer," Urology, 67:354-359 (2006) (SA_JEV_3142380-396).  ROR, ¶ 39.  Combining carboplatin with docetaxel was also known.  ROR, ¶ 129 (citing Ross, et al., "A Phase 2 Study of Carboplatin Plus Docetaxel in Men With Metastatic Hormone-refractory Prostate Cancer Who Are Refractory to Docetaxel," Cancer, 112(3):521-26 (2008) ("Ross 2008") (CabRef0012961-66)); *see also id.*, ¶ 165 (citing Kenji 2007's disclosure of carboplatin administered with paclitaxel).  There is ample basis for this combination (and indeed, others have studied it, *see* Corn, et al., "Cabazitaxel plus carboplatin for the treatment of men with metastatic castration-resistant prostate cancers: a randomised, open-label, phase 1–2 trial," Lancet Oncol., 20:1432-43 (2019) (CabRef0012874-885), showing it is not "hypothetical" at all).  Even though

27

the combination of carboplatin and cabazitaxel was not the subject of "published clinical studies" as of October 2009, or January 2010, that does not mean the POSA would not have been motivated to reduce the dose of cabazitaxel if it was administered in combination with other drugs.

### E.   Motivation To Administer Cabazitaxel To Patients Not Resistant To Docetaxel

62.    Dr. Nelson asserts that I "fail[] to address the fact that a POSA would not have been motivated to administer cabazitaxel to patients expected to be docetaxel sensitive." NRR, ¶ 183. My understanding of the obviousness inquiry is reflected in my Opening Report. ROR, ¶¶ 151-155. As stated there, I understand the inquiry to involve assessing the scope and content of the prior art, any differences between the prior art and the claimed subject matter, and whether the claimed subject matter is obvious. *Id.*, ¶ 151. I further understand the POSA is presumed to know all available prior art. *Id.* Dr. Nelson does not contest that the POSA would be aware of, *e.g.*, Mita, which teaches the administration of cabazitaxel to a patient previously treated with docetaxel and that was "docetaxel refractory." *Id.*, ¶¶ 103-107, 159-160; *see also* ROR §§ VI-VII. It is my understanding that merely arguing the POSA would have chosen FDA-approved docetaxel over unapproved cabazitaxel does not rebut allegations of obviousness premised upon prior art showing the claimed limitations. Notably, the investigators in the Mita study did administer cabazitaxel to a patient who had not previously been treated with docetaxel.

63.    Regardless, I disagree with Dr. Nelson's comments on motivation as well. For example, the POSA knew that docetaxel at the doses reflected in the Taxotere label raises toxicity concerns, which could provide a motivation not to use docetaxel. *See, e.g.*, CabRef0003460-516, §§ 5, 6. Docetaxel was also known to cause fluid retention, including pleural effusions, and causes a high degree of neutropenia in many patients. Thus, the POSA

could have chosen cabazitaxel at the 15 mg/m$^2$ dose over docetaxel in order to avoid the known side effects known of docetaxel. In addition, the prior art also included providing cabazitaxel to a docetaxel-naïve patient, showing it was known and therefore obvious to administer cabazitaxel to patients that had never received docetaxel (and thus had not developed resistance to docetaxel) and those that had received docetaxel previously, but were not resistant. *See, e.g.*, Mita at CabRef0002902.

64.     In addition, there are additional reasons for discontinuing docetaxel besides those mentioned by Dr. Nelson. Dr. Nelson mentions "three common reasons for discontinuing docetaxel: (1) progression or lack of response while on treatment (indicating refractory disease), (2) unacceptable toxicity, or (3) the patient responds well for so long that the physician decides to give the patient a drug holiday (with the intention or possibility of administering docetaxel again later)." NRR, ¶ 184. In addition to those reasons, (4) some patients may be sensitive to the drug but simply not wish to experience the side effects (*i.e.*, when comfort wins out despite lack of toxicity concerns), and thus may withdraw from docetaxel treatment; and (5) a patient might also complete a prescribed number of cycles and stop taking docetaxel despite a response and lack of resistance. For example, Section 14.4 of the 2007 label for Taxotere discloses that the clinical study had compared 10 cycles of Taxotere with 10 cycles of mitoxantrone (both administered every three weeks). CabRef0003504-505; *see also* FDA Medical Review (SA_JEV_3154267) (section 5.3.5 describing 10 cycles of treatment). And Ansari explains, "[b]ased on the results of these studies, the National Institute for Health and Clinical Excellence (NICE) committee approved ten cycles of three-weekly docetaxel chemotherapy[.]" CabRef0012836-841 at CabRef0012837. Patients that completed 10 cycles of docetaxel would

eventually experience progression after stopping treatment and would thus be candidates to be administered cabazitaxel according to the claimed methods.

65.      Regarding Nelson category (2), Dr. Nelson states that cabazitaxel "had the same overall taxane mechanism of action as docetaxel."  NRR, ¶ 185. I understand the obviousness inquiry assesses whether the claimed methods are obvious to the POSA in view of the prior art, not whether a practicing oncologist or the POSA would have "considered [cabazitaxel] an option."  I further note that Dr. Nelson's statements about the similarities of docetaxel and cabazitaxel suggest the POSA could reasonably expect success in increasing survival by using cabazitaxel, "another taxane," based upon experience or data relating to docetaxel, which has "the same overall taxane mechanism of action as docetaxel." *Id*  Moreover, I disagree with Dr. Nelson regarding whether the POSA would understand that any patient that did not tolerate docetaxel toxicity could not tolerate cabazitaxel toxicity.  The POSA would understand that cabazitaxel may be a superior taxane to docetaxel, such that a lower dose of cabazitaxel may have fewer side effects.  And the POSA would not expect fluid retention and pleural effusions from cabazitaxel.  Thus, cabazitaxel would be preferred in mCRPC patients suffering from pleural effusions (*e.g*, patients with congestive heart failure).

66.      For Nelson category (3), I again note that administration of cabazitaxel was known in the prior art and it is not my understanding that the POSA must be motivated to choose cabazitaxel over docetaxel. *See, e.g.*, ROR §§ III.D.2, VI.-VII.  The claims are obvious in view of the cabazitaxel prior art; I am not using docetaxel prior art as a reference and then substituting cabazitaxel, in which case I understand the law would require a motivation to combine cabazitaxel with the prior art docetaxel methods.  Rather, I rely on references teaching administration of cabazitaxel. *See, e.g.*, Mita; ROR §§ VI.-VII.  I cited several examples in my

Opening Report, including Mita and others, and the TROPIC Listing also teaches administration of cabazitaxel to patients that had progressed after treatment with docetaxel.  *See, e.g.*, ROR §§ VI.D., VII.  Indeed, I note that the descriptions at ClinicalTrials.gov (2006) and ClinicalTrials.gov (2008) mention "previous[] treat[ment] with a Taxotere-containing regimen," but they do not state that all patients in TROPIC were docetaxel-resistant.  CabRef0002472-473 ("ClinicalTrials.gov (2006)"); CabRef0002474-476 ("ClinicalTrials.gov (2008)"); *see also* ROR, ¶ 19 (pointing out that the majority of patients treated in TROPIC were not "docetaxel-refractory").

67.    In addition, I understand the Court's claim construction for mCRPC "that has progressed during or after treatment with docetaxel" is mCRPC "that has worsened during or after treatment with docetaxel."  ROR, ¶ 87.  In view of the Court's construction, there is no express claim requirement that the patient be docetaxel-resistant.  Thus, in view of the foregoing, I maintain my opinions that the disclosures in Mita and TROPIC teach, and therefore render obvious, the administration of cabazitaxel to patients previously treated with docetaxel but that may still be docetaxel-sensitive.

**F.    A POSA Would Be Motivated To Use An H2 Antagonist As Part Of A Pretreatment Regimen When Administering Cabazitaxel To mCRPC Patients**

68.    A POSA would be motivated to use an H2 antagonist as a premedication when administering cabazitaxel to mCRPC patients previously treated with docetaxel.  As Dr. Nelson acknowledges in his Rebuttal Report, hypersensitivity reactions were a known risk of chemotherapy treatment, especially for taxanes.  *See, e.g.*, NRR, ¶ 198.  Pretreatment regimens were also known to be used for patients undergoing chemotherapy treatment to help minimize any risk of a sensitivity reaction.  *See, e.g.*, Pivot; Yamamoto 2009; Kenji 2007 (CabRef0012755-756).  Generally aware of these risks with taxanes, H2 antagonists were

included as pretreatment for new taxanes in development, such as larotaxel. *See generally* Yamamoto 2009 (CabRef0013322-329). Regardless of whether that risk was lessened with cabazitaxel—as Dr. Nelson argues—the prior art taught a POSA that the risk was still present with cabazitaxel. *See* Pivot at CabRef0002987; Mita at CabRef0002899-2900. As such, that risk would motivate a POSA to use a pretreatment regimen with cabazitaxel patients.

69. I understand that the Patent Trial and Appeal Board for the United States Patent and Trademark Office ("PTAB") made these exact same findings when invalidating dependent claims to U.S. Patent No. 9,827,592 ("'592 patent"). That is, I understand that, in its original Final Written Decision, the PTAB held that "although the rates of [hypersensitivity reactions] may have been lower when compared to paclitaxel and docetaxel therapy, we are persuaded a POSA still would have been motivated to prevent severe hypersensitivity reactions to cabazitaxel therapy by using a more thorough premedication regimen than the stand-alone antihistamine disclosed in Pivot." Final Written Decision ("FWD"), IPR2016-00712, at 75 (Sept. 21, 2017); *see also id.* at 75-80. The PTAB also relied on statements from Dr. Sartor, who I understand was Sanofi's expert witness before the PTAB and in the prior New Jersey litigation, who agreed that "a 4% rate of grade 3 or higher [hypersensitivity reactions] would have been serious enough to merit the use of preventative premedication." *Id.* at 79-80. I understand that the PTAB held dependent claims directed to the same premedication regimen obvious. *See id.* at 75-80.

70. I also understand that while the PTAB issued a second Final Written Decision on remand from an appeal to the Federal Circuit, it maintained the "analysis, findings, and conclusions reached in the earlier Final Written Decision" which it incorporated by reference. Remand FWD, IPR2016-00712 at 5 (Oct. 22, 2019). I understand that a POSA's motivation to use a pretreatment regimen was not an issue for appeal or an issue that contradicted the findings

in the PTAB's second Final Written Decision. Therefore, Dr. Nelson's statements run contrary to findings made by the PTAB on the same issue.

71.    Dr. Nelson argues that the risk of hypersensitivity reactions in mCRPC patients being treated with cabazitaxel is lessened due to the lower amount of polysorbate 80 as a result of the lower dosage amounts with cabazitaxel treatment as compared to docetaxel. First, Dr. Nelson's position ignores the fact that polysorbate 80 is not the sole cause for sensitivity reactions in patients undergoing chemotherapy treatment. Second, Dr. Nelson acknowledges that cabazitaxel treatment would still expose a patient to polysorbate 80. NRR, ¶ 205 ("Thus, a POSA would have been less concerned about administering cabazitaxel in a polysorbate 80 formulation than administering docetaxel."). First of all, I disagree that a POSA as defined by Dr. Nelson would have such a detailed understanding of formulation-related drug hypersensitivity. But if a POSA did have such an understanding, there would still be some concern, even if the POSA expected the risk to be less than that for docetaxel. *See also* Yamamoto.

72.    I understand that the PTAB also addressed the same argument Dr. Nelson makes in his Rebuttal Report regarding the presence of polysorbate 80. Specifically, the PTAB found that Takenaka taught a pretreatment regimen consisting of 24 mg dexamethasone, 50 mg diphenhydramine and 50 mg ranitidine (an $H_2$ antagonist) was administered prior to a 30 mg/m$^2$ infusion of docetaxel. FWD at 77. This indicated pretreatment regimen was used with a much lower taxane dose than the labeled Taxotere dose of 75 mg/m$^2$. I understand that the PTAB found that this weighed against the same arguments Dr. Nelson makes here regarding the lower amount of polysorbate 80 administered as a result of the low cabazitaxel dosages.

73.   Dr. Nelson also argues that the use of Cremophor as an excipient was known to result in hypersensitivity reactions (NRR, ¶ 194) and that given cabazitaxel does not contain any Cremophor, a POSA would not be motivated to administer a pretreatment regimen containing an H2 antagonist.  As Dr. Nelson recognizes, it was known in the prior art that use of cabazitaxel comes with risk of hypersensitivity reactions and it is with that knowledge that a POSA would be motivated to minimize that risk to any given patient.  *See, e.g.*, NRR, ¶ 198.  I understand that Sanofi also presented this same argument to the PTAB and the PTAB rejected it.  FWD at 76.  Docetaxel, like cabazitaxel, is also formulated without Cremophor, but multiple prior art references teach the use of pretreatment regimens, including H2 antagonists, prior to administration of docetaxel.  *See, e.g.,* Takenaka, et al., "Combination chemotherapy with weekly docetaxel and estramustine for hormone refractory prostate cancer in Japanese patients," Int'l J. Urology, 15:106-109 (2008); Trudeau, et al., "Docetaxel in Patients with Metastatic Breast Cancer: A Phase II Study of the National Cancer Institute of Canada-Clinical Trials Group," J. Clin. Oncol., 14:422-428 (1996) (CabRef0012981-987); *see also* FWD at 76-77; Kaye, et al., "Docetaxel in Advanced Ovarian Cancer: Preliminary Results from Three Phase II Trials," Eur. J. Cancer, 31A(Suppl. 4):S14-S17 at S14 (1995).

74.   Dr. Nelson further argues that the prior art taught away from the use of H2 antagonists due to an increased risk of the occurrence of hand-foot syndrome (HFS), citing one abstract from 2009 that has never been published as a peer-reviewed publication.  NRR, ¶ 219 (citing "H2 Blockers Increase Risk of Docetaxel-Induced Skin Toxicity," Reactions Weekly, 4:1257 (June 20, 2009) (SA_JEV_3142904) (reporting on May 2009 ASCO abstract by Kawaguchi, et al)  While I agree that this finding is hypothesis-generating, I am not aware of any studies that have tried to confirm these preliminary retrospective findings, and also note that

this study was limited to women with breast cancer who often receive much higher doses of docetaxel, or docetaxel in combination with other drugs (e.g., capecitabine) that are known to increase the risk of docetaxel-induced HFS.  The abstract does not disclose whether or not there was an association between administration of H2 antagonists and dose of docetaxel or administration of capecitabine. Thus, I disagree that a POSA would consider this report as "teaching away."  This opinion is supported by the only citation of this putative teaching, notably by the same group of Japanese investigators.  In that subsequent publication regarding the use of gemcitabine and paclitaxel (which is generally administered after premedication with an H2 antagonist (*see, e.g.*, Taxol Label (SA_JEV_0182705-747)), the putative teaching is cited for its finding that "Retrospective analysis of 1,000 Japanese breast cancer patients showed that the incidence of grade 2 or higher hand–foot syndrome with docetaxel was 16%, which increased to 40% with the docetaxel–capecitabine combination."  Aogi, et al., "The efficacy and safety of gemcitabine plus paclitaxel combination first-line therapy for Japanese patients with metastatic breast cancer including triple-negative phenotype," Cancer Chemother. Pharmacol., 67:1007-1015 (2011).  Furthermore, there is no plausible pharmacological mechanism which would support the notion that the H2 antagonist was a cause of HFS, and likely was just associated with the use of higher docetaxel doses or the usual practice of a physician who often prescribed capecitabine with docetaxel.

75.     In determining what pretreatment regimen to use, a POSA would look to the prior art and the various pretreatment regimens used for chemotherapy drugs, including taxanes.  H2 antagonists were commonly used when treating patients with paclitaxel, another taxane, for example. *See generally* Kenji 2007 (CabRef0012755-756); Juan 2002 (CabRef0012790-795); Taxol Label.  Therefore, a POSA, motivated to use a pretreatment regimen when administering

cabazitaxel to an mCRPC patient would have also been motivated to use an H2 antagonist as part of that regimen.

### G.     A POSA Would Have Been Motivated To Administer 5 mg Dexchlorpheniramine And 8 mg Dexamethasone With An H2 Antagonist Prior To Cabazitaxel

76.     As discussed above, and as explained in my Opening Report, a POSA would have been motivated to administer a pretreatment regimen prior to cabazitaxel in mCRPC patients to minimize the risk of hypersensitivity and other adverse reactions as much as possible.  It was well known that pretreatment regimens included an antihistamine such as dexchlorpheniramine, a corticoid such as dexamethasone and an H2 antagonist, and in fact Dr. Nelson cites to various references which disclose the same.  *See* NRR, ¶ 226; *see also* Kenji 2007 (CabRef0012755-765); Yamamoto 2009 (CabRef0013322-329); Juan 2002 (CabRef0012790-765).  Dr. Nelson argues that a POSA would not have been motivated to administer those specific dosages for those premedications because the prior art also taught administration of those same drugs using different dosages.  I understand that when the prior art discloses a range which would encompass the claimed range or claimed value, a patentee must show that the claimed range or value is critical to the invention.  Dr. Nelson has not provided any opinions arguing that the dosages for these premedications are critical in any way and it is my opinion that they are not; they are commonly used dosages for these drugs and have been administered as such specifically with other taxanes. In fact, during his deposition, Dr. Sunil Gupta acknowledged that the details of the premedication regime were not critical.  Gupta Dep. Tr. at 95:15-22.  The claimed premedication regimen of the '110 patent would therefore have been obvious to a POSA in view of the prior art.

### H.     Secondary Considerations Of Nonobviousness

77.     Dr. Nelson's Rebuttal Report does not contain a section addressing secondary considerations of nonobviousness.  *See generally* NRR; *see also id.*, i-iii (table of contents).  His

report does not contain a systematic analysis of secondary considerations of nonobviousness under a different heading, either. I understand from counsel for the Defendants that secondary considerations of nonobviousness can include unexpected results, commercial success, licensing, copying, praise by others, and long-felt but unresolved need. I did not see any analysis at all in Dr. Nelson's Rebuttal Report regarding most of the factors. In paragraph 168, Dr. Nelson references "known failures of other drugs to prolong life and/or increase PFS in men with mCRPC[.]" NRR, ¶ 168. Without more specific analysis, I am not able to fully respond to Dr. Nelson. However, I note that the '170 patent, which is not asserted in this case, describes the cabazitaxel compound, and Mita and other prior art describe administration of cabazitaxel for the treatment of mCRPC. Dr. Nelson has not described any alleged failures, and I am aware of none, where someone attempted to develop a method for administering or treating a patient with the known compound cabazitaxel but failed to do so.

78.     Dr. Nelson also claims that the TROPIC results showing an increase in PFS and OS as compared to mitoxantrone were "surprising and unexpected, further supporting the nonobviousness of the asserted claims." NRR, ¶ 173. Similarly, he states that "it was surprising and unexpected to a POSA in October 2009 that administering a starting dose of 20 mg/m$^2$ with dose reductions to 15 mg/m$^2$ would increase survival as compared to mitoxantrone as demonstrated by the PROSELICA study." *Id.*, ¶ 179. I disagree it was surprising for the reasons described in my Opening Report regarding the obviousness of the claims. *See, e.g.*, ROR, §VII.

79.     Lastly, Dr. Nelson mentions in a footnote that "[o]thers similarly praised Jevtana® … ." NRR, ¶171 n.20 (citing "New hope in advanced prostate cancer: Alberta, Saskatchewan and Ontario fund coverage for JEVTANA® (Cabazitaxel)," Press Release (Oct. 4, 2012) (SA_JEV_0182923-24)). This article, however, is a Sanofi press release, so it does not

constitute praise "by others."  The quote from Bob Shiell, "Executive Director, Prostate Cancer

Canada Network (PCCN) Calgary," is generic and Dr. Nelson has not connected the statement to

the claimed methods.  Thus, it does not support the alleged nonobviousness of the asserted

claims.

## V.      THE CLAIMS OF THE '110 AND '777 PATENTS LACK WRITTEN DESCRIPTION

### A.      There Is No Evidence Of Possession Of Methods Of Increasing Survival Without Administration Of Cabazitaxel Combined With A Corticoid

80.      Dr. Nelson cannot point to anything within the four corners of the patents-in-suit

describing methods shown to increase survival of men with mCRPC that has progressed during

or after docetaxel treatment where cabazitaxel is administered without a corticoid.  *See* NRR,

¶¶ 230-32.  Instead, he cites general statements in the common specification disclosing that

"[c]abazitaxel may be administered in combination with a corticoid," and that "[i]n some

embodiments, the effective amount of cabazitaxel produces at least one therapeutic effect

selected from the group consisting of an increase in overall survival."  *Id*., ¶¶ 231, 232 (quoting

'110 patent at 3:28-30, 5:41-42; '777 patent at 3:31-33, 5:44-45).  Dr. Nelson thus appears to

concede that there is nothing in the common specification expressly describing methods shown

to increase survival of men with mCRPC that has progressed during or after docetaxel treatment

where cabazitaxel is administered without a corticoid.  Even if cabazitaxel treatment without

combined administration of a corticoid is obvious from these passages, I have been advised that

showing obviousness is not enough to satisfy the written description requirement; rather, the

specification must show the inventors were in possession of the full scope of the claimed

invention.  More importantly, these statements do not actually describe methods of administering

cabazitaxel without a corticoid to increase survival in a patient with mCRPC that has progressed

during or after docetaxel treatment.

81.     As I have outlined in paragraphs 246-254 of my Opening Report, Sanofi has

argued (and Dr. Gupta has testified) in this case and in the prior New Jersey Litigation that a

POSA could not have a reasonable expectation that a method of administering cabazitaxel would

increase survival without clinical data beyond what was present in the prior art.  If Sanofi's and

Dr. Gupta's positions and testimony are to be accepted, then it is my opinion that a POSA

looking over the common specification of the '110 and '777 patents would not believe that Dr.

Gupta had within his possession methods of increasing survival of men with mCRPC that has

progressed during or after docetaxel treatment where cabazitaxel is administered without a

corticoid.  Simply put, there are no data whatsoever supporting claims directed to methods of

increasing survival where cabazitaxel is administered without a corticoid.

82.     I recognize that the claims of the patents-in-suit include within their scope

methods of increasing survival where cabazitaxel is administered with a corticoid (*see* NRR ¶

231), but I have been advised by counsel for Defendants that the full scope of the claims must be

described and enabled in the common specification and, as I have explained, they are not if

Sanofi's positions on reasonable expectation of success are to be accepted by the Court.

**B.     There Is No Evidence Of Possession Of Methods Of Increasing Survival For Doses Other Than 25 mg/m$^2$**

83.     At paragraph 234 of his Rebuttal Report, Dr. Nelson references the following

portions of the common specification as allegedly describing methods of increasing survival in a

patient with mCRPC that has progressed during or after docetaxel treatment with cabazitaxel

doses other than a dose of mg/m$^2$:

> In some aspects of the invention, cabazitaxel is administered at a
> dose (defined for each administration) of between 20 and 25
> mg/m$^2$.

'110 patent at 3:15-17 (*see also* '777 patent at 3:18-20).

39

In some aspects of the invention, cabazitaxel may be administered by intravenous infusion at a dose of between 15 and 25 mg/m$^2$, this administration cycle of the antitumour agent being repeated at an interval of 3 weeks between each cabazitaxel administration, which interval may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding cabazitaxel administration.

'110 patent at 3:21-27 (*see also* '777 patent at 3:24-30).

Example 2

Table 6 illustrates an example of a dose modification for adverse reactions in patients treated with cabazitaxel.

TABLE 6

| Toxicity | Dose Modification |
|---|---|
| Prolonged grade ≥3 neutropenia (greater than 1 week) despite appropriate medication including G-CSF | |
| Febrile neutropenia | |
| Grade >3 diarrhea or persisting diarrhea despite appropriate medication, fluid and electrolytes replacement | |

Discontinue cabazitaxel treatment if a patient continues to experience any of these reactions at 20 mg/m$^2$.

'110 patent at 16:13-37 (*see also* '777 patent at 17:28-51). However, none of these portions of the common specification actually describe (or even mention) methods of administering cabazitaxel at 15-25 mg/m$^2$—or at any other dose—to increase survival of a patient with mCRPC that has progressed during or after docetaxel treatment. The first passage just mentions that in some aspects of the alleged invention, cabazitaxel is administered between 20-25 mg/m$^2$, while the second passage mentions that cabazitaxel may be administered as an infusion between 15-25

mg/m$^2$ in cycles.  Example 2 simply includes a chart discussing dose reduction to 20 mg/m$^2$ at certain toxicities and says nothing about a dose of 15 mg/m$^2$.  None of these portions of the specification actually describe methods of increasing a patient's survival with any dosage of cabazitaxel beyond 25 mg/m$^2$.

84.     At paragraph 236 of his report, Dr. Nelson relies on Example 1 as alleged evidence that the specification "specifically describes methods shown to increase survival of men with mCRPC that has progressed during or after treatment with docetaxel that include the administration of 20 mg/m$^2$."  Example 1 discloses that 9.8% of patients in the cabazitaxel arm of the study summarized were dose reduced ('110 patent at 15:36-41; '777 patent at 16:47-52); however, it does not mention a reduction to a certain dose, let alone to the 20 mg/m$^2$ dose.  Dr. Nelson also points to Example 2 as support for increasing survival at doses beyond 25 mg/m$^2$, but that disclosure does not explicitly state that those cabazitaxel patients who were dose reduced in the Example 1 study summary were in fact dose reduced to 20 mg/m$^2$ dose.

85.     Furthermore, Example 1 does not break out any survival data for the subset of patients who were dose reduced compared to those who were not.  Thus, there is simply no description in Example 1, or anywhere else in the common specification, of methods of increasing survival in a patient with mCRPC that has progressed during or after docetaxel treatment with doses of cabazitaxel lower than the 25 mg/m$^2$ dose.

## VI.   The Claims Of The '110 Patent And '777 Patent Are Not Enabled

### A.   The Legal Standard For Enablement

86.     As I explained in my opening report, it is my understanding from counsel for Defendants that claims are not enabled when, as of the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation.  The factors to be considered in determining whether a disclosure would require undue

41

experimentation include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.  *See* ROR, ¶ 264.

87.     Throughout his Rebuttal Report, Dr. Nelson opines that the "claimed inventions must be deemed credible to a POSA in light of the specification."  NRR, ¶ 17.  Thus, I understand that Dr. Nelson is not using the correct legal standard for enablement.

88.     Dr. Nelson argues that a POSA reading the specification would have "deemed credible" the claimed methods: 1) "with or without prednisone"; 2) with "doses of 15-25 mg/m$^2$"; and 3) with "schedules other than strictly every three weeks."  NRR, ¶¶ 251, 253, 255.

89.     In my opinion, to the extent claims 1-6 of the '110 patent and claims 1-6 of the '777 patent are not obvious over the prior art (*see* Section IV, *supra*), the claims are invalid for lack of enablement because undue experimentation would be required to practice the full scope of the claims, as discussed below.

### B.     The Amount of Direction or Guidance Presented

90.     Dr. Nelson argues that the specification describes how to administer cabazitaxel therapy (intravenous infusion), including how to monitor and evaluate therapy, provides exemplary formulations, exemplary schedules (for example, every three weeks), exemplary doses (15-25 mg/m$^2$), exemplary premedication regimens, and other medications for preventing or controlling adverse events.  NRR, ¶ 240.  As explained in my Opening Report, the specification only provides efficacy data for an every 3-week schedule of a 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone.  ROR, ¶ 270.  The specification does not provide any information about other doses or dosing schedules that would enable the broader doses or dosing schedules set forth in the claims.  With regard to premedication regimens,

dexchlorpheniramine is not even available parenterally in the United States because it is not an FDA-approved product, and there is no evidence that oral dexchlorpheniramine (which is available) would be effective. *Id.*, ¶ 50.

### C.     The Breadth Of The Claims

91.     Dr. Nelson opined that "[i]n view of the nature of the invention and the guidance and presence of working examples in the specification, I find the breadth of the claims reasonable and not supportive of a finding that undue experimentation would be required to practice the claims." NRR, ¶ 246. I disagree. As explained in my Opening Report, claims 1-6 of the '110 patent and 1-6 of the '777 patent are directed to treatment of patients with mCRPC with a pretreatment regimen followed by cabazitaxel. ROR, ¶¶ 266, 292. To practice these claims, a physician does not have to use cabazitaxel in combination with a corticoid in treating a patient. The specification, however, does not describe any clinical studies or data describing or showing the efficacy of the administration of cabazitaxel in the absence of co-administration of the corticoid prednisone. Instead, the '110 and '777 patents describe clinical data regarding the administration of cabazitaxel at a dose of 25 mg/m$^2$ with prednisone (the latter of which is not a claim limitation). *See, e.g.*, '110 patent at claims 1, 4.

92.     Furthermore, claims 1, 2, 3, 5, and 6 of the '110 and are directed to a range of doses of cabazitaxel. ROR, ¶ 266. As discussed above, the written specification only provides efficacy data for a dose of 25 mg/m$^2$ in combination with prednisone. *Id.*, ¶ 256.

93.     In particular, claims 1 and 2 of the '110 patent do not expressly limit to any particular dose of cabazitaxel. For these claims, ***any*** dose of cabazitaxel can be used. ROR, ¶ 257. For example, a dose of 1 mg/m$^2$ or 100 mg/m$^2$ could be used. *Id.*, ¶ 269.

94.     Claim 3 of the '110 patent recites "wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15-25 mg/m$^2$." Although this claim recites a range of cabazitaxel doses, as

discussed above, the written specification only provides efficacy data for a dose of 25 mg/m$^2$ in combination with prednisone.  ROR, ¶ 270.

95.     Claim 6 of the '110 patent recites "wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15 mg/m$^2$."  Although this claim recites a specific dose of cabazitaxel, notably, there are no efficacy data provided in the '110 patent for this dose.  ROR, ¶ 271.

96.     With regard to the '777 patent, claim 2 (which depends from claim 1) and claim 5 (which depends from claim 4) further recite "where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$."  Although these claims recite a specific dose of cabazitaxel, notably, there are no efficacy data provided in the '777 patent for this dose.  ROR, ¶ 295.

97.     Claims 1-6 of the '777 patent also do not specify any dose schedule (*e.g.*, every three weeks), and therefore any dose schedule may be used to practice the claims.  ROR, ¶ 292. The specification only describes a 3-week dose schedule, which may be prolonged by 1-2 weeks:

> In one aspect of the invention, cabazitaxel is administered by perfusion to the patient according to an intermittent program with an interval between each administration of 3 weeks, which may be prolonged by 1 to 2 weeks depending on the tolerance to the preceding administration.

*Id.*, ¶ 296; '777 patent at 5:55-60.

### D.     The Presence Or Absence Of Working Examples

98.     Dr. Nelson argues that "[t]he specification contains a working example (Example 1) from the TROPIC study demonstrating that cabazitaxel therapy is life-prolonging compared to mitoxantrone therapy in men with mCRPC that has progressed during or after treatment with docetaxel."  NRR, ¶ 243.  But Example 1 only provides efficacy data for a 3-week dosing schedule of a 25 mg/m$^2$ dose of cabazitaxel in combination with prednisone (and prednisone is

not required by the asserted claims).   No other examples provide any information about a dosing

schedule that would enable the broader doses or dosing schedules set forth in the claims.

**E.      The Predictability Or Unpredictability Of The Art And The State Of The Art**

99.      Dr. Nelson argues that the specification is enabling because it "describes the

results of the phase III TROPIC clinical study, the first clinical study of cabazitaxel in prostate

cancer specifically, and the first controlled study of cabazitaxel (the only way to assess

comparative endpoints like PFS and overall survival) in any patient type."  NRR, ¶ 249.

However, the inventor of the patents-in-suit, Dr. Gupta, testified, as Sanofi's corporate

representative, that he does not know what would happen if the frequency of administering

cabazitaxel were changed to a 1-week, 2-week, or 4-week dosage schedule.  12/10/2020 Gupta

Dep. Tr. at 103-104.

100.      Dr. Nelson asserts that I have not explained why a POSA would not have found it

"credible" that cabazitaxel doses of 15-20 mg/m$^2$ or schedules other than every three weeks

would be effective.  NRR, ¶ 256.  He also asserts that I have not provided any evidence that such

dosing schedules are not effective while pointing to the subsequent PROSELICA, ConCab and

Prosty II Trials.  *Id.*  However, the claims are broader than the eligibility criteria and the specific

treatment regimens utilized in those trials.  In general, the method of the claims includes

administration of one dose of cabazitaxel to a patient that has mCRPC that has progressed during

or after treatment with docetaxel.  Indeed, in the broadest claims, a patient can be administered a

single dose of 1 mg/m$^2$ or 100 mg/m$^2$ of cabazitaxel alone.

**F.      The Quantity Of Experimentation Necessary And The Level Of Skill In The Art**

101.      Dr. Nelson argues that "[a] POSA would be familiar with clinical study design

and interpretation.  In view of the guidance in the specification and the TROPIC data, a POSA

would have been capable of modifying dose schedules, doses, or combinations of cabazitaxel therapy according to the characteristics of a particular patient with the intent of increasing the survival of that patient."  NRR, ¶ 258.  If this were true, a POSA could modify dose schedules, doses, or combinations with just the prior art (Mita), including the disclosure of the TROPIC study.  A POSA would not need the results of the TROPIC study.

102.    However, Dr. Nelson's argument is at odds with inventor Dr. Gupta's deposition testimony.  As discussed in my Opening Report, Dr. Gupta testified that a Phase 3 clinical trial would be required to evaluate additional doses of cabazitaxel alone in the treatment of mCRPC in order to practice the full scope of the claims.  *See* ROR, ¶ 272.  Dr. Gupta explained that he first proposed the TROPIC trial to his senior management in late 2005, and it was not until October 2009, roughly four years later, that the results were available.  6/30/2016 Gupta Dep. Tr. at 51:21-52:8.

103.    In addition, during prosecution of the '110 patent, Sanofi represented to the Examiner that "if the claim recited that the cabazitaxel is administered with the intent of increasing overall survival, one skilled in the art could not have that intent without having an expectation of success and one skilled in the art could not have an expectation of success without data from a clinical trial, *e.g.*, the TROPIC Trial, that cabazitaxel increases overall survival." March 2018 Interview Summary.  The Court has construed the preamble of the claims as reciting a "method of increasing survival with the intentional purpose of increasing such survival in an individual patient in need of such a method of increasing survival."  ROR, ¶ 87; ECF No. 215. Therefore, while I disagree with Sanofi that a POSA would need data from the TROPIC trial to have an expectation of success, if the Court accepts Sanofi's argument on obviousness, then a Phase 3 clinical trial would be required to evaluate whether cabazitaxel could be successfully

administered without a corticoid (*i.e.*, prednisone) in treating mCRPC.  ROR, ¶ 273.  Moreover, under Sanofi's logic, as argued to the Patent Office, additional studies would be needed to evaluate different doses (*e.g.*, 10 mg/m$^2$, 15 mg/m$^2$, 20 mg/m$^2$) and a different dosing schedule of cabazitaxel.  *Id.*

104.    Thus, if the Court accepts Sanofi's arguments on obviousness, then all of the asserted claims of the '110 patent and '777 patent are invalid for lack of enablement because undue experimentation would be required to practice the full scope of the claims.

**VII.   CONCLUSION**

106.    I declare under the penalty of perjury under the laws of the United States that the foregoing statements are true and correct and this expert report was executed by me on this 19th day of March, 2021.

Mark J. Ratain, M.D.

# EXHIBIT C



**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| SANOFI-AVENTIS U.S. LLC and<br>SANOFI MATURE IP, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 20-804 (RGA) |
| | ) | Consolidated |
| ACTAVIS LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REBUTTAL VALIDITY REPORT OF PETER S. NELSON, M.D.**

**Table of Contents**

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF MY OPINIONS.........................................................................2

III.    INSTRUCTIONS ON THE LAW .......................................................................2

        A.      Obviousness .............................................................................................3

        B.      Written Description..................................................................................4

        C.      Enablement ...............................................................................................4

IV.     ASSERTED CLAIMS AND CLAIM CONSTRUCTION...................................5

V.      INVENTION DATE ...........................................................................................7

VI.     NONOBVIOUSNESS .........................................................................................9

        A.      Background on mCRPC That Had Progressed During or After
                Treatment with Docetaxel by October 2009............................................9

        B.      The Asserted Patents Are Directed to Increasing Survival as
                Compared to Mitoxantrone for Men with mCRPC That Had
                Progressed During or After Treatment with Docetaxel ........................25

        C.      The Prior Art Did Not Disclose Administration of Cabazitaxel with
                the Intent of Increasing Survival or Provide a Reasonable
                Expectation of Increasing Survival .......................................................29

                1.      Cabazitaxel's Taxane Status and Activity in Preclinical
                        Models of Taxane Resistance Would Not Have Provided a
                        Reasonable Expectation of Increasing Survival .......................30

                2.      The Phase I Clinical Data for Cabazitaxel Would Not Have
                        Provided a Reasonable Expectation of Increasing Survival ....40

                3.      A POSA Would Not Have Extrapolated from Pivot's
                        Breast Cancer Data to mCRPC That Had Progressed
                        During or After Treatment with Docetaxel..............................61

                4.      The Existence of the TROPIC Study Would Not Have
                        Provided a Reasonable Expectation of Increasing Survival ....68

i

D.   A POSA Would Not Have Had a Reasonable Expectation of Increasing Survival by Administering a Starting Dose of 20 mg/m$^2$ with Reductions to 15 mg/m$^2$ of Cabazitaxel ............................................74

E.   A POSA Would Not Have Been Motivated to Administer Cabazitaxel to Patients Not Resistant to Docetaxel ...............................................76

F.   A POSA Would Not Have Been Motivated to Administer an H$_2$ Antagonist Prior to Cabazitaxel as Required by the Asserted Claims ..................................................................................................................78

    1.   None of the Cabazitaxel Clinical Studies Used or Suggested Using an H$_2$ Antagonist Premedication .....................................79

    2.   A POSA Considering Premedication for Cabazitaxel Would Have Looked to the Taxotere® Label ..............................................81

    3.   A POSA Would Not Have Been Motivated to Combine the Paclitaxel or Larotaxel Literature Selected by Dr. Ratain with Cabazitaxel Literature to Select an H$_2$ Antagonist Premedication ..................................................................................................85

    4.   The Art Taught Away from H$_2$ Antagonists Because They Could Make Side Effects Worse ....................................................87

G.   A POSA Would Not Have Been Motivated to Select 5 mg Dexchlorpheniramine and 8 mg Dexamethasone to Add to an H$_2$ Antagonist Prior to Cabazitaxel as Required by the '110 Patent ...........................89

VII.   THE ASSERTED CLAIMS HAVE WRITTEN DESCRIPTION SUPPORT IN THE SPECIFICATION ....................................................................90

A.   With or Without Prednisone ...................................................................91

B.   Doses of Cabazitaxel Beyond 25 mg/m$^2$ ...............................................91

VIII.   THE ASSERTED CLAIMS ARE ENABLED BY THE SPECIFICATION ...................92

A.   Nature of the Invention ..........................................................................93

B.   Direction or Guidance Presented ...........................................................93

C.   Presence or Absence of Working Examples ...........................................94

D.   Breadth of the Claims ............................................................................94

E.   Unpredictability and State of the Art .....................................................95

ii

F.	Quantity of Experimentation Necessary and Level of Skill in the Art ....................................................................................................................97

I.      **INTRODUCTION**

1.      I am the same Peter S. Nelson, M.D. who previously submitted an Opening

Infringement Report regarding U.S. Patent Nos. 10,716,777 ("the '777 patent") and 10,583,110

("the '110 patent") (the "asserted patents") to each of defendants Actavis LLC, Apotex Corp. and

Apotex Inc., Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd., Mylan

Laboratories Limited, and Sandoz Inc. on January 29, 2021 (collectively, my "Opening

Reports") in connection with the above-captioned patent litigation.

2.      My Opening Reports set forth my education, knowledge, and experience as it

relates to the subject matter of this proceeding, and I incorporate my qualifications herein by

reference.  I have not testified or sat for deposition in any cases since my Opening Reports.  My

compensation for this proceeding is also set forth in my Opening Reports and is not dependent

on the opinions I provide or the outcome of this case.

3.      I have been asked by counsel for plaintiffs Sanofi-Aventis U.S. LLC and Sanofi

Mature IP (collectively, "Sanofi") to respond to the January 29, 2021 Opening Expert Report of

Mark J. Ratain, M.D. ("Ratain Report") and to provide my opinions regarding the validity of

claims 1-6 of the '777 and '110 patents ("the asserted claims").  Specifically, I have been asked

to respond to Dr. Ratain's assertions that the asserted claims are invalid for obviousness, lack of

written description, and lack of enablement.  The absence of a response to any particular

paragraph or aspect of the Ratain Report should not be taken as an indication that I agree with it.

I expect to testify as an expert witness on these issues.

## II.   <u>SUMMARY OF MY OPINIONS</u>

4.      For the reasons explained in detail below, I disagree with the opinions of Dr. Ratain that the asserted claims of the '777 and '110 patents are invalid for obviousness, lack of written description, and lack of enablement.  It is my opinion that those claims are not obvious, meet the standard for written description, and are enabled.

5.      To the extent any new information is made available to me after I sign this report, I will evaluate that information to determine whether it has any impact on the opinions and conclusions set forth in my report.  If necessary and permitted, I will update my report to take that information into consideration.  If called to testify, I also expect to provide a tutorial explaining the scientific principles underlying my opinions.  I intend to prepare demonstratives at the appropriate time to help illustrate my testimony at trial.

6.      I have based my opinions on my general knowledge of clinical and experimental therapy for prostate cancer that I have acquired from more than 30 years of medical education, training, research, and practice, my study of the asserted patents, the Ratain Report and the references cited therein, and the documents I reference herein.  A list of the materials I have reviewed in connection with reaching the opinions in this report is set forth in Exhibit 1.

## III.   <u>INSTRUCTIONS ON THE LAW</u>

7.      Counsel for Sanofi has provided me with an understanding of the legal principles relevant to the case to help form my opinions.

8.      I understand that issued patents are entitled to a presumption of validity.  I further understand that to prove invalidity, the challenger must show by clear and convincing evidence

2

that a patent claim is invalid, including invalidity for obviousness, lack of written description, and lack of enablement.

9.      I also understand from counsel that I should consider the claims and their validity through the eyes of a hypothetical person of ordinary skill in the art ("POSA") to which the patent pertains.  As stated in my Opening Reports, in my opinion, a POSA was a medical oncologist or medical doctor specializing in oncology.  He or she would have experience in treating and evaluating treatments for prostate cancer and have access to information regarding pharmacokinetics and mechanisms of cancer drug resistance.

10.     I understand that Dr. Ratain has opined that a POSA would be "an individual (or team) with a high level of education, such as a medical degree (M.D.), or comparable degree and several years of experience treating patients with cancer, including prostate cancer.  The person (or team) of ordinary skill in the art would have a working knowledge of clinical study design and interpretation."  Ratain Report at ¶ 85.  As acknowledged by Dr. Ratain, his definition of a POSA is similar to mine, and the opinions set forth herein would not change if his definition of a POSA were used instead.

A.      **Obviousness**

11.     I understand that an invention is invalid for obviousness if the differences between the invention and the prior art are such that the subject matter of the claims as a whole would have been obvious at the time the invention was made to a POSA.

12.     I understand from counsel that a party asserting obviousness must prove that a POSA had a motivation to select and combine the teachings of the prior art references to arrive at the claimed invention with a reasonable expectation of success.

3

13.     I understand from counsel that obviousness of patent claims is examined at the time of the invention based on the prior art but without the benefit of the patent application. That is, the specification of the '777 and '110 patents is not available as prior art.

**B.     Written Description**

14.     I understand from counsel that the specification of the patent must reasonably convey to a POSA that the inventor was in possession of the claimed subject matter as of the filing date. Put another way, the specification must demonstrate that the inventor had invented the claimed subject matter as of the filing date.

15.     I understand from counsel that "possession" of the claimed invention can be shown by description of the claimed invention with all of its limitations using such descriptive means as words, structures, figures, diagrams, and formulas that fully set forth the claimed invention.

16.     I understand from counsel that, contrary to obviousness, analysis of written description is performed by looking at the patent specification.

**C.     Enablement**

17.     I understand from counsel that the assertions of utility of the claimed inventions must be deemed credible to a POSA in light of the specification.

18.     I understand from counsel that the specification must also provide sufficient information to allow a POSA to practice the claimed subject matter without undue experimentation as of the filing date.

19.     I understand that whether experimentation is considered undue depends on an analysis of certain factors such as the quantity of experimentation necessary, the amount of

4

direction or guidance presented, the presence or absence of working examples, the nature of the invention, the state of the prior art, the level of skill in the art, the unpredictability of the art, and the breadth of the claims.

20.    I further understand from counsel that, contrary to obviousness, enablement considers the patent specification.

21.    I also understand from counsel that it is permissible to rely upon post-filing evidence to demonstrate enablement.

IV.    **ASSERTED CLAIMS AND CLAIM CONSTRUCTION**

22.    I understand that Sanofi is asserting claims 1-6 of both the '777 and '110 patents. These asserted claims are set forth below.

23.    Claim 1 of the '777 patent: A method of increasing survival comprising administering to a patient in need thereof a dose of 20 to 25 mg/m$^2$ of cabazitaxel, or a hydrate of solvate thereof, in combination with an H$_2$ antagonist, wherein the H$_2$ antagonist is administered to the patient prior to administering the dose of cabazitaxel, and wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

24.    Claim 2 of the '777 patent: The method of claim 1, where the cabazitaxel, or hydrate of solvate thereof, is administered at a dose of 20 mg/m$^2$.

25.    Claim 3 of the '777 patent: The method of claim 1, where the cabazitaxel, or hydrate of solvate thereof, is administered at a dose of 25 mg/m$^2$.

26.    Claim 4 of the '777 patent: The method of claim 1, where the H$_2$ antagonist is administered at least 30 minutes prior to administering the dose of cabazitaxel.

5

27.     Claim 5 of the '777 patent: The method of claim 4, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 20 mg/m$^2$.

28.     Claim 6 of the '777 patent: The method of claim 4, where the cabazitaxel, or hydrate or solvate thereof, is administered at a dose of 25 mg/m$^2$.

29.     Claim 1 of the '110 patent: A method of increasing survival comprising administering to a patient in need thereof (1) cabazitaxel, or a hydrate of solvate thereof, as a new cycle every three weeks and (2) dexchlorpheniramine administered at a dose of 5 mg, dexamethasone administered at a dose of 8 mg, and an H$_2$ antagonist, each administered prior to the administration of said cabazitaxel, or hydrate of solvate thereof, wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel.

30.     Claim 2 of the '110 patent: The method according to claim 1, wherein the dexchlorpheniramine, dexamethasone, and H$_2$ antagonist are administered 30 minutes prior to administration of said cabazitaxel, or hydrate of solvate thereof.

31.     Claim 3 of the '110 patent: The method according to claim 2, wherein the dose of said cabazitaxel, or hydrate or solvate thereof is 15-25 mg/m$^2$.

32.     Claim 4 of the '110 patent: The method according to claim 3, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 25 mg/m$^2$.

33.     Claim 5 of the '110 patent: The method according to claim 3, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 20 mg/m$^2$.

34.     Claim 6 of the '110 patent: The method according to claim 3, wherein the dose of said cabazitaxel, or hydrate or solvate thereof, is 15 mg/m$^2$.

6

35.     I understand that the Court has issued a claim construction order construing

certain terms of the asserted patents, attached as Exhibit 2.  I have applied these constructions in

reaching the opinions contained herein.

36.     I understand that the parties agreed that "castration resistant metastatic prostate

cancer that has progressed during or after treatment with docetaxel" means "castration resistant

metastatic prostate cancer that has worsened during or after treatment with docetaxel."

37.     I understand that the parties agreed that "a method of increasing survival . . . to a

patient in need thereof" means "a method of increasing survival with the intentional purpose of

increasing such survival in an individual patient in need of such a method of increasing

survival."

38.     I understand that the Court has construed "increasing survival" as "increasing any

of overall survival, tumor progression-free survival, pain progression-free survival, or prostate

specific antigen (PSA) progression-free survival." [1]

## V.     INVENTION DATE

39.     I understand from counsel that the claimed inventions were conceived by Dr.

Sunil Gupta in October 2009.

---

[1] Prior art publications frequently refer to "survival benefit," "survival advantage," or "survival"
when they are referring to overall survival.  *See, e.g*., Ramiah, *Clinical Endpoints for Drug
Development in Prostate Cancer*, 18 Curr. Opin. Urol. 303-08 (2008) (SA_JEV_0183150-55)
("Ramiah") at 304 ("survival advantage"); Pienta & Smith, *Advances in Prostate Cancer
Chemotherapy: A New Era Begins*, 55 CA Cancer J. Clin. 300-318 (2005) (SA_JEV_0183117-
35) ("Pienta & Smith") at 300 ("survival advantage"), 303 ("survival"), 304 ("survival benefit").
Because the Court has construed "increasing survival" to include progression-free survival, I
specify overall survival where needed herein for clarity.

7

40.     I understand that the asserted patents claim priority from seven applications listed on the face of each patent, the earliest of which was filed on October 29, 2009.  Dr. Ratain asserts that the first patent application to describe the claimed inventions was application No. 61/293,903 filed on January 11, 2010.  Ratain Report at ¶¶ 47-48.  I agree.  I further understand from counsel that the filing of patent application No. 61/293,903 constitutes what is referred to as "constructive reduction to practice" of the claimed inventions.

41.     Dr. Ratain relies upon a press release from Sanofi issued on December 21, 2009 announcing that the FDA had accepted Sanofi's request for fast track designation to allow "a rolling submission of a New Drug Application ("NDA") for cabazitaxel in second-line prostate cancer."  Ratain Report at ¶ 121, citing CabRef0012803-04 ("Sanofi-Aventis Press Release 2009").  In particular, Dr. Ratain relies on the statement in the Sanofi-Aventis Press Release 2009 that the "primary endpoint of the Phase III TROPIC study, which was overall survival, met statistical significance."  Sanofi-Aventis Press Release 2009 at CabRef0012804.  Dr. Ratain cites further news articles that merely repeat information from the Sanofi-Aventis Press Release 2009. Ratain Report at ¶¶ 122-125.

42.     I was asked by counsel to consider whether regulatory and patent submissions would corroborate testimony from Dr. Gupta that he was reasonably diligent in seeking FDA approval of cabazitaxel, so that physicians could actually practice the claimed methods, from the time prior to the Sanofi-Aventis Press Release 2009 on December 21, 2009 to January 11, 2010 when patent application No. 61/293,903 was filed.

43.     As noted in the Sanofi-Aventis Press Release 2009, Sanofi had requested and was granted fast track designation from the FDA.  Sanofi-Aventis Press Release 2009 at CabRef0012804.  By that time, Sanofi had already begun rolling NDA submissions for

8

cabazitaxel. *Id*. This ultimately led to the approval of Jevtana® (cabazitaxel) in June 2010, months ahead of the FDA's September 2010 goal date. FDA News Release, *FDA Approves New Treatment for Advanced Prostate Cancer* (June 17, 2010) (SA_JEV_0182854-55). I also understand that Sanofi's actions to obtain regulatory approval were sufficiently diligent for Sanofi to be granted patent-term extension for U.S. Patent No. 5,847,170, which covers the cabazitaxel molecule. Application for Patent Term Extension Under 35 U.S.C. § 156 (Aug. 10, 2010) (SA_JEV_0001122-238); Notice of Final Determination and Requirement for Election (Oct. 30, 2013) (SA_JEV_0001248-50); Patent Term Extension Certificate for U.S. Patent No. 5,847,170 (Feb. 4, 2014) (SA_JEV_0001256-57). I understand from counsel that in order to receive a full patent term extension during the period of regulatory review, Sanofi must have acted with "due diligence."

44.     The remainder of my report below assumes an invention date by the end of October 2009. This means I assumed that the Sanofi-Aventis Press Release 2009 and the other articles identified by Dr. Ratain that repeated information in that press release were not prior art.

# VI.     NONOBVIOUSNESS

## A.     Background on mCRPC That Had Progressed During or After Treatment with Docetaxel by October 2009

45.     In 2009, prostate cancer was the most common non-skin cancer in men in the United States and the second leading cause of cancer deaths. American Cancer Society, *Cancer*

*Facts & Figures 2009* (SA_JEV_3142963-3034) at 10, 19.  The prognosis and treatment

depends largely on the cancer stage.[2]

46.     Most patients present with disease confined to the prostate gland, also referred to

as localized disease.  Localized disease is frequently treated with curative intent by removing the

prostate gland (prostatectomy) or by radiation.  Androgen ablation, which is also known as

androgen suppression or androgen deprivation, to lower levels of male hormones that promote

prostate cancer growth may also be prescribed, but generally chemotherapy is not given to

patients with localized disease.

47.     Some patients will present with metastases, which is cancer detected outside of

the prostate gland, on initial diagnosis.  Additionally, some patients that had localized disease

initially will develop metastases over time, even if previously treated with prostatectomy or

radiation.

48.     Patients with recurrent disease despite primary surgical or radiation therapy and

patients with metastatic disease upon diagnosis are typically treated with systemic therapies.  The

first such therapy is typically androgen ablation by surgical or medical castration to drastically

lower levels of testosterone, which results in a reduction of tumor volume and symptom

improvements, but unfortunately, is not curative.

49.     Prostate cancer that has worsened despite castration levels of testosterone is

referred to as castration-resistant prostate cancer.  This has also been referred to historically in

the literature as hormone-refractory or androgen-independent prostate cancer, but today

---

[2] I incorporate as if set forth herein the sections titled "General Background on Prostate Cancer," "Background on the Clinical Development of Cabazitaxel," and "Sanofi's Jevtana® Product" in my Opening Reports.

10

castration-resistant is the preferred terminology.  The asserted patents use castration-resistant and hormone-refractory interchangeably.  '777 patent at col. 4, ll. 19-20; '110 patent at col. 4, ll. 16-17.  For consistency I will use castration-resistant in this report.

50.     Nearly all men with metastatic prostate cancer progress to castration-resistant prostate cancer ("mCRPC"), which is an incurable condition.  Pienta & Smith at 300.  The primary goals of therapy for mCRPC patients are generally to prolong the lives of such patients and to improve their quality of life through symptom control.  Therapy that does not extend life, but rather reduces pain and/or other symptoms, is known as palliative care.

51.     Analyzing whether a therapy provides clinical benefit to patients with mCRPC presents unique challenges compared to other solid tumors.  This is in part because most patients with metastatic prostate cancer have metastases in the bone that are not objectively measurable by standard imaging techniques like MRI, CT, and nuclear medicine bone scans.  Pienta & Smith at 303.  That means it is not possible to administer a therapy to most mCRPC patients and clearly determine if the tumors reduce in size.  There was controversy as to whether mCRPC patients who have measurable metastases in soft tissue locations like the liver and lung were "representative of advanced prostate cancer patients in general who only had metastases to bone." Id. at 303.

52.     In light of this challenge, prostate specific antigen ("PSA") has historically been used as a biomarker for prostate cancer.  PSA is a protein produced by prostate epithelial cells, including prostate cancer cells.  Many cases of prostate cancer are initially detected by an abnormal PSA level in the blood.  An increase or reduction in PSA levels may be one of the factors that physicians consider in evaluating whether the patient's cancer has worsened or is improving.  However, PSA levels can fluctuate before and after treatment and have never been

11

established as a surrogate for patient benefit.  Ramiah at 303-06; Novantrone® Label 2008 (SA_JEV_3142738-78) ("Novantrone® Label") at 11 ("[T]he clinical significance of a fall in prostate-specific antigen (PSA) concentrations after chemotherapy is unclear.").  PSA changes had not been a basis for drug approval for prostate cancer.  *See* D'Amico, *US Food and Drug Administration Approval of Drugs for the Treatment of Prostate Cancer: A New Era Has Begun*, 32(4) J. Clin. Oncol. 362-64 (2014) (SA_JEV_0182827-29) at 363, Table 1.

53.     Another metric for mCRPC is a patient's cancer-related pain if the patient has such pain.  Pain response can be measured by having patients fill out a questionnaire or by tracking how much pain medication a patient was taking.  An increase or reduction in cancer-related pain may be another factor that physicians consider when evaluating whether the prostate cancer has worsened or is improving.  However, this is necessarily limited to patients reporting cancer-related pain when a treatment is started, which excludes many mCRPC patients who do not report such pain.  Ramiah at 305.  It is also important to distinguish between pain related to the cancer and pain associated with drug toxicities.  Quality of life surveys are considered "problematic given their subjectivity, lack of standardization, inherent biases in comparison with control arms, and the need to balance quantity of life improvements with quality of life improvements."  *Id*.

54.     Progression-free survival ("PFS") is a composite clinical study endpoint measuring the time until the patient's cancer progresses (time to progression) *or* the patient dies. For example, in Example 1 of the asserted patents, PFS is defined as the time from inclusion in the study to the time of progression or death, when the progression is either an increase in PSA, tumor size, or pain.  '110 patent at col. 11, ll. 32-35; '777 patent col. 11, ll. 32-35.  The focus of PFS is the period of time before the cancer worsens.  Time until death is included because it is

12

the ultimate form of cancer progression. Time to progression and PFS must be measured in randomized studies as compared to another treatment (or placebo), and are typically reported as the medians for the population of patients in the study. Pazdur, *Endpoints for Assessing Drug Activity in Clinical Trials*, 13(suppl 2) The Oncologist 19-21 (2008) (SA_JEV_3142901-03) ("Pazdur") at 20. Improvement in PFS is indicative of patients having stable disease for longer periods of time before progression as compared to another treatment.

55. Overall survival, the clinical study endpoint measuring how long patients live, has been the gold standard clinical endpoint in mCRPC for FDA approval for prostate cancer because of its objective nature and undeniable value to patients. Ramiah at 303; Pazdur at 19. Example 1 of the asserted patents defines "overall survival" as the time from inclusion in the study to the date of death. '110 patent at col. 11, ll. 19-20; '777 patent at col. 11, ll. 19-20. In my experience, this is a typical definition and is the definition a POSA would have understood from reading the patents. Overall survival is evaluated in a randomized, controlled study and is typically reported as the median time to death for the patients in the particular study arm. A treatment shown to increase overall survival in a population of patients in a controlled clinical study is understood as prolonging life (i.e., increasing the life expectancy) of individual patients as compared to those patients receiving the control arm therapy from the clinical study. In other words, a finding of increased overall survival in a clinical study demonstrates that the therapy will prolong the life of individual patients.

56. Unfortunately, none of PSA reduction, tumor size reduction, pain reduction (through reduction in pain medication or improvement on questionnaire), or PFS had been established prospectively as surrogates for prolonging life (i.e., increasing overall survival). Ramiah at 303, 307; Armstrong & George, *New Drug Development in Metastatic Prostate*

13

*Cancer*, 26 Urologic Oncol.: Seminars & Original Investigations 430-37 (2008)
(SA_JEV_0182762-69) at 430 (challenges to drug development in mCRPC include "the lack of established surrogates for overall survival.").

57.     In other words, a POSA could not predict whether a drug shown to reduce PSA levels, to reduce measurable tumor size, to reduce pain, and/or to increase PFS (as compared to some other treatment) would prolong the lives of patients before that drug had been demonstrated to increase overall survival in a clinical study.  This was a known challenge to clinical development of new drugs in advanced prostate cancer and contributed to a number of drugs that seemed promising in early clinical studies moving into expensive, large, randomized phase III trials only to falter when overall survival was not increased.  Ramiah at 303, 307; Section VI.C.2 below.

58.     Prior to 2004, no therapy had been shown to prolong life in patients with mCRPC despite many clinical studies with that goal.  Pienta & Smith at 302-03.  Response rates in measurable disease were so low that mCRPC was referred to as "unresponsive to cytotoxic agents."  *Id.* at 303.  The "almost universal absence in randomized phase III trials of a statistically significant survival benefit of so-called responders compared with those who have disease progression," led to a focus on improvement of symptoms and palliative care.  Yagoda & Petrylak, *Cytotoxic Chemotherapy for Advanced Hormone-Resistant Prostate Cancer*, 71(3) Cancer Suppl. 1098-1109 (1993) at 1098, 1107 (reviewing 26 clinical trials of chemotherapies in CRPC and noting low response rates and no demonstrated overall survival advantage).

59.     One potential palliative treatment, mitoxantrone in combination with a corticosteroid (also called a corticoid), was originally approved by the FDA for the treatment of adult acute myeloid leukemia.  *Novantrone Gets FDA Nod for Use in Advanced Prostate Cancer*,

14

Cancer Network (Dec. 1, 1996) (SA_JEV_2178186-87), available at

https://www.cancernetwork.com/view/novantrone-gets-fda-nod-use-advanced-prostate-cancer.

Due to its relatively low toxicity and data suggesting potential palliative benefit in patients with

mCRPC, mitoxantrone was investigated in two randomized, controlled studies in patients with

mCRPC. Tannock, *Chemotherapy with Mitoxantrone Plus Prednisone or Prednisone Alone for*

*Symptomatic Hormone-Resistant Prostate Cancer: A Canadian Randomized Trial with Palliative*

*End Points*, 14 J. Clin. Oncol. 1756-1764 (1996) (CabRef0013313-21) ("Tannock 1996") at

1756; Kantoff, *Hydrocortisone With or Without Mitoxantrone in Men with Hormone-Refractory*

*Prostate Cancer: Results of the Cancer and Leukemia Group B 9182 Study*, 17 J. Clin. Oncol.

2506–13 (1999) ("Kantoff 1999") at 2506.

   60. The first study, CCI-NOV22, evaluated the use of mitoxantrone plus prednisone

in comparison to prednisone alone in mCRPC patients. Tannock 1996 at 1756-57. The primary

endpoint of this study was palliation, which was defined as "a 2-point reduction in the 6-point

present pain intensity scale of the McGill-Melzack Pain Questionnaire." *Id.* at 1757. Secondary

endpoints included duration of palliative response (as defined by the primary endpoint of a

reduction in pain) and "survival" (referring to overall survival). *Id.* Secondary endpoints also

included a 50% reduction in analgesic score without an increase in pain. *Id*. at 1757. A higher

percentage of patients receiving mitoxantrone plus prednisone (29%) achieved palliation

compared to those receiving prednisone alone (12%). *Id.* at 1759. The duration of palliative

response was significantly increased in patients receiving mitoxantrone compared to those

receiving prednisone alone (43 weeks and 18 weeks, respectively). *Id.* Additional patients met

the secondary criteria of palliative response by experiencing at least a 50% reduction in

analgesics. *Id.* If both metrics of pain reduction were included, 38% of patients receiving

15

mitoxantrone experienced palliative benefit as compared to 21% of patients receiving prednisone. *Id.* It was also reported that 33% of patients receiving mitoxantrone experienced a PSA response ($\geq$ 50% decrease in PSA) compared to 22% of patients receiving prednisone alone, which was not considered to be significantly different. *Id.* Despite the palliative effects reported, "[t]here was no significant difference in overall survival" in patients who received mitoxantrone plus prednisone compared to those receiving prednisone alone. *Id.* at 1760; *see also* Tannock, *Docetaxel plus Prednisone or Mitoxantrone plus Prednisone for Advanced Prostate Cancer*, 351 N. Eng. J. Med. 1502-12 (2004) (CabRef0003438-48) ("Tannock 2004") at 1502 ("Mitoxantrone plus prednisone reduces pain and improves the quality of life in men with advanced, hormone-refractory prostate cancer, but it does not improve survival."). Tannock 1996 concluded that there was "a higher probability of palliation for patients with symptomatic hormone-resistant prostate cancer" when treated with mitoxantrone plus prednisone versus prednisone alone. Tannock 1996 at 1762.

61. The second study, CALGB9182, evaluated mitoxantrone plus hydrocortisone versus hydrocortisone alone in men with mCRPC. Kantoff 1999 at 2506. The primary endpoint of this study was overall survival; the hope was that the reductions in pain and PSA previously reported would lead to a prolongation of life. Time to disease progression (as defined by worsening of performance status, the appearance of two or more new lesions on the bone scan, or an increase in PSA $\geq$100% above pretreatment levels), time to treatment failure (progression, unacceptable toxicity, or refusal to continue), best response to treatment, quality of life, and decrease in PSA were also evaluated. *Id.* at 2508. Mitoxantrone did not increase overall survival despite a "small but statistically significant increase" in both time to disease progression and time to treatment failure between the mitoxantrone plus hydrocortisone arm (3.7 months)

16

and the hydrocortisone alone arm (2.3 months).  *Id.* at 2506, 2508.  A higher percentage of patients receiving mitoxantrone achieved a PSA response compared to those who received hydrocortisone alone (38% versus 22%).  *Id.* at 2509.  Although "mitoxantrone lack[ed] sufficient activity in HRPC to translate into a survival benefit," the higher frequency of PSA declines and increased time to disease progression "support[ed] the use of [mitoxantrone and hydrocortisone] as a palliative combination in HRPC."  *Id.* at 2510-11.  The authors noted that while further therapeutic options were needed, the mitoxantrone combination could be used as a control arm in phase III trials.  *Id.* at 2512.

62.     As a result of these studies showing that mitoxantrone plus a corticoid relieves pain, prolongs time to progression, and improves quality of life as compared to a corticoid alone, the FDA approved the use of mitoxantrone for mCRPC.  Novantrone® Label at 9-12.  Mitoxantrone therapy was therefore the comparator therapy for the pivotal phase III clinical studies of docetaxel that led to its approval (brand name Taxotere®) in 2004 as the first life-prolonging treatment for mCRPC.  Pienta & Smith at 304-307; *see also* FDA News Release, *FDA Approves New Indication for Taxotere-- Prostate Cancer* (May 19, 2004) (SA_JEV_0184064-65); '777 patent at col. 1l, 64-66; '110 patent at col. 1, ll. 63-65 ("[T]he combination of mitoxantrone with corticoids was recognized as the reference treatment for hormone-resistant prostate cancer.").

63.     The SWOG9916 trial compared docetaxel in combination with estramustine to mitoxantrone in combination with prednisone in men with mCRPC.  Pienta & Smith at 304-05; Petrylak, *Docetaxel and Estramustine Compared with Mitoxantrone and Prednisone for Advanced Refractory Prostate Cancer*, 351 N. Eng. J. Med. 1513-20 (SA_JEV_1154900-907) (2004) ("Petrylak 2004") at 1513.  The primary endpoint was overall survival, and secondary

17

endpoints included PFS, objective response rate, and PSA response rate.  Petrylak 2004 at 1513,

1515.  The PSA response rates were 50% for docetaxel arm and 27% for the mitoxantrone arm,

and the objective response rate in patients with measurable disease were 17% for the docetaxel

arm and 11% for the mitoxantrone arm.  *Id.* at 1513.  The docetaxel and estramustine

combination significantly increased overall and progression-free survival.  *Id.* at 1513, 1518.

64.     In the TAX327 study, docetaxel in combination with prednisone (every three

weeks and a weekly schedule) was compared to mitoxantrone in combination with prednisone.

Pienta & Smith at 305; Tannock 2004 at 1503 (noting that mitoxantrone plus a corticosteroid

was "established" as the "treatment of reference for hormone-refractory prostate cancer").  The

PSA response rates were 45% for docetaxel every three weeks and 32% for mitoxantrone, and

the objective response rate in patients with measurable disease was 12% for docetaxel every

three weeks and 7% for mitoxantrone.  Tannock 2004 at 1508.  The docetaxel every three week

schedule, but not the weekly schedule significantly increased overall survival as compared to

mitoxantrone.  *Id.* at 1507-08.

65.     Because it was the first therapy shown to prolong life in mCRPC, docetaxel

became the first-line standard of care, but it is not curative.  The cancer becomes resistant to

docetaxel over time, which limits the extent and duration of its effectiveness causing nearly all

patients to have disease progression either during or after treatment.  Rosenberg, *Activity of*

*Second-Line Chemotherapy in Docetaxel-Refractory Hormone-Refractory Prostate Cancer*

*Patients, Randomized Phase 2 Study of Ixabepilone or Mitoxantrone and Prednisone*, 110(3)

Cancer 556-63 (2007) (SA_JEV_1000926-33) ("Rosenberg") at 557.

66.     Because of its established palliative benefits, mitoxantrone then became a de facto community standard for patients that had progressed during or after treatment with docetaxel and became the reference treatment for further studies in such patients.  Rosenberg at 557.[3]

67.     For example, in a randomized phase II study comparing ixabepilone and mitoxantrone in patients with mCRPC whose disease progressed during or within 60 days of completing at least two cycles of taxane-based chemotherapy, 20% of patients receiving mitoxantrone achieved a PSA response, and 2 out of 21 patients with measurable disease had a partial response (reduction in tumor size).  Rosenberg at 560.  Preliminary results of a randomized phase II study comparing (1) irofulven plus prednisone or (2) irofulven plus capecitabine and prednisone to (3) mitoxantrone plus prednisone in mCRPC patients who progressed during or within three months of docetaxel treatment reported no PSA responses in the mitoxantrone group, but the RECIST (measurable tumor size reduction) response rate was 13% for mitoxantrone.  Berger, *Results of a Randomized Phase II Study of Irofulven in Hormone-Refractory Prostate Cancer Patients that Have Failed Firstline Docetaxel Treatment*, 25 (18 Suppl.) J. Clin. Oncol. Abstr. 5068 (2007).

68.     In addition, the investigators of the TAX327 study analyzed patients who received docetaxel, progressed, and then crossed over to mitoxantrone.  Berthold, *Survival and PSA Response of Patients in the TAX 327 Study Who Crossed Over to Receive Docetaxel After Mitoxantrone or Vice Versa*, 19 Annals of Oncol. 1749-53 (2008) ("Berthold 2008") at 1749. The authors noted that mitoxantrone was "often given after progression on docetaxel."  *Id.* at

---

[3] I have significant experience using mitoxantrone in such patients and have had patients who responded very well to mitoxantrone following progression during or after treatment with docetaxel with disease progression prolonged by as much as 9 months.

1750.  9.8% of patients previously receiving docetaxel every three weeks and 22.2% of patients

previously receiving docetaxel on a weekly schedule had a PSA decline of at least 50% on

second-line mitoxantrone.  *Id*. at 1751.  The authors noted some uncertainty about the choice of

control arm in second-line chemotherapy studies, but noted that prednisone alone or

mitoxantrone plus prednisone could be reasonable control arms.  *Id.* at 1752.

      69.    Consistent with its recognition as a reference treatment used after docetaxel

therapy, other clinical studies in patients previously treated with docetaxel used mitoxantrone in

combination with prednisone as a control arm, not docetaxel retreatment.  *See, e.g.*,:

- Cetuximab in combination with mitoxantrone and prednisone v. mitoxantrone in combination with prednisone in men with mCRPC and one prior docetaxel-containing regimen, NCT00661492 first posted on clinicaltrials.gov[4] as of April 18, 2008, https://web.archive.org/web/20090912181252/https://clinicaltrials.gov/ct2/show/NCT00661492

- Rilotumumab (AMG 102 ) in combination with mitoxantrone and prednisone v. mitoxantrone in combination with prednisone in men with mCRPC and previous taxane-based therapy, NCT00770848 first posted on clincialtrials.gov as of October 2008, https://web.archive.org/web/20090912181252/https://clinicaltrials.gov/ct2/show/NCT00661492

- Siltuximab (CNTO 328) in combination with mitoxantrone and prednisone v. mitoxantrone in combination with prednisone in men with mCRPC with disease progressing or within 6 months of stopping docetaxel based therapy, NCT00385827 first posted on clinicaltrials.gov as of October 2006, https://web.archive.org/web/20090512183647/http://clinicaltrials.gov/ct2/show/record/NCT00385827

      70.    None of these drugs were reported to improve upon mitoxantrone therapy.

Neither overall or progression-free survival was improved by the addition of rilotumumab to

---

[4] Clinicaltrials.gov is a National Institutes of Health National Library of Medicine website containing clinical study information.

mitoxantrone and prednisone.  Ryan, *Targeted MET Inhibition in Castration-Resistant Prostate Cancer: a Randomized Phase II Study and Biomarker Analysis with Rilotumumab Plus Mitoxantrone and Prednisone*, 19(1) Clin. Cancer Res. 215-24 (2012) at 215, 217-218.  There was also no improvement in PSA or objective response rate.  *Id.* at 218.  Similarly, the time to progression and overall survival were not improved by the addition of cetuximab to mitoxantrone.  Fleming, *Associate of Rash with Outcomes in a Randomized Phase II Trial Evaluating Cetuximab in Combination with Mitoxantrone Plus Prednisone After Docetaxel for Metastatic Castration-Resistant Prostate Cancer*, 10(1) Clinical Genitourinary Cancer 6-14 (2012) at 6.  Objective response rates (2 v. 4%), PSA response rates (7.7 v. 17.6%), and PFS (4.2 v. 5.5 months) all favored the mitoxantrone control arm suggesting that outcomes with cetuximab were worse.  *Id.* at 8.  The siltuximab study was prematurely stopped by the data monitoring committee for an imbalance in patient characteristics favoring the mitoxantrone control arm that made it "very unlikely" that the study could achieve its primary endpoint of improving PFS.  Fizazi, *Randomised Phase II Study of Siltuximab (CNT 328), an Anti-IL-6 Monoclonal Antibody, in Combination with Mitoxantrone/Prednisone Versus Mitoxantrone/Prednisone Alone in Metastatic Castration-Resistant Prostate Cancer*, 48 Eur. J. Cancer 85-93 (2012) at 87.  The median PFS was 228 days for the mitoxantrone plus prednisone control arm and only 97 days for the siltuximab plus mitoxantrone and prednisone arm, and the time to clinical deterioration and overall survival were numerically greater for the control arm. *Id*.  The PSA response rate was also higher in the control arm (26.1 v. 15.6%).  *Id*.  The PFS definition did not consider rising PSA as evidence of progression, but when the more conventional definition of PFS incorporating rising PSA was applied, there was still no improvement for the siltuximab combination.  *Id*. at 87, 90-91.  While the authors considered the

21

results to be inconclusive, they state that no further clinical evaluation of the regimen was planned. *Id.* at 92.  These studies demonstrate difficulty in improving upon mitoxantrone in the post-docetaxel setting.

71.     Docetaxel retreatment was also an option for selected patients who responded particularly well to docetaxel the first time it was given, although like mitoxantrone, docetaxel retreatment had not been shown to prolong life.  Beardsley, *Systemic Therapy After First-Line Docetaxel in Metastatic Castration-Resistant Prostate Cancer*, 2 Current Opinion in Supportive & Palliative Care 161-66 (2008) (CabRef0002404-09) ("Beardsley") at 162.

72.     Ansari 2008 reviewed a database of mCRPC patients that had received docetaxel chemotherapy, and reports on 10 patients receiving docetaxel a second time.  Ansari, *Docetaxel Chemotherapy for Metastatic Hormone Refractory Prostate Cancer as First-Line Palliative Chemotherapy and Subsequent Re-Treatment: Birmingham Experience*, 20 Oncology Reports 891-96 (2008) (CabRef0012836-41) ("Ansari 2008") at 892.  Forty-two patients in a database were identified as having received docetaxel chemotherapy with an aim of administering ten cycles, and patients who progressed after an initial biochemical response (meaning limited to patients who responded initially) "were offered re-treatment." *Id*. at 893.  Ansari does not report what the 32 other patients who did not receive docetaxel a second time received.  In addition, the 10 patients that received docetaxel a second time had a median treatment-free interval of 24 weeks, with some patients receiving docetaxel for a second time as long as 41 weeks (nearly a year) after stopping first-line treatment, which suggests that at least some of the 10 select patients did not have progressive disease for significant periods of time after stopping docetaxel. *Id*. at 893.  One of the three patients who received docetaxel a third time was able to go 47 weeks after stopping second-line docetaxel, nearly another year. *Id*. at 893-94.  Dr. Ratain states in his report

22

that in the absence of treatment, a typical patient would be expected to progress within about 2 months post-docetaxel.  Ratain Report at ¶ 92.

73.     Fitzpatrick 2009 similarly discusses uncontrolled and retrospective studies where docetaxel was reported to produce PSA responses in patients who had previously responded to docetaxel and concludes that "retreatment with docetaxel at relapse may be a therapeutic option for mCRPC patients who responded well to first-line docetaxel treatment."  Fitzpatrick, *Treatment Decisions for Advanced Genitourinary Cancers: From Symptoms to Risk Assessment*, 8 European Urology Supplements 738-46 (2009) (CabRef012899-907) ("Fitzpatrick 2009") at 741-42, 744.  Fitzpatrick 2009 discusses Sanofi's retrospective TRIADE study on the reintroduction of docetaxel at relapse in 50 patients "who initially responded well to first-line docetaxel treatment," with a PSA response (reduction by $\geq 50\%$) rate of 48% with 14 patients living longer than two years.  *Id*. at 741.  Fitzpatrick 2009 does not suggest using docetaxel retreatment as a control arm for unselected patients with progression during or after docetaxel therapy.  Fitzpatrick 2009 notes clinical studies in the post-docetaxel setting, including of cabazitaxel, sunitinib, and abiraterone, all of which used either mitoxantrone or prednisone as a comparator.  *Id*. at 741.  Fitzpatrick 2009 also acknowledges that second-line treatments for mCRPC are "a significant unmet need."  *Id*.

74.     Beer 2008 is directed to cyclical or intermittent chemotherapy with weekly docetaxel doses of 36 mg/m$^2$ with or without the experimental therapy DN-101 (high-dose calcitriol).  Beer, *Intermittent Chemotherapy in Men with Metastatic Androgen-Independent Prostate Cancer*, 112(2) Cancer 326-30 (2008) (CabRef12850-54) ("Beer 2008") at 326.  This is not the FDA-approved schedule or dose of docetaxel.  Patients who had a PSA response and a PSA level $\leq 4$ ng/mL, i.e., patients who responded very well, were given the option of having

23

intermittent chemotherapy where treatment was suspended until the PSA level rose by 50% and was ≥ 2 ng/mL or there was other evidence of progression, at which time treatment resumed. Beer 2008 at 327-28. This protocol therefore allowed for an early suspension of docetaxel in patients with a substantial response before patients developed resistance. Out of 250 patients randomized to the original study comparing weekly docetaxel plus DN-101 to weekly docetaxel alone, 45 patients (18%) received this intermittent chemotherapy, and 38 completed the first treatment holiday. Beer 2008 at 328. 45.5% of patients evaluable for a PSA response to treatment resumption had a subsequent PSA response, and 45.5% had stable PSA for at least 12 weeks. Beer 2008 at 329. The authors state that their strategy is a "practical method . . . in a subset of [CRPC] patients whose disease is very sensitive to docetaxel." Beer 2008 at 330. Beer 2008 acknowledges that that the role of intermittent chemotherapy "remains to be fully defined," and that the impact on "duration of survival and quality of life remains to be fully defined." Beer 2008 at 330.

75. However, the studies supporting docetaxel retreatment in certain patients who respond well initially to docetaxel do not establish it as a standard of care for *unselected* patients who progressed during or after docetaxel treatment. Docetaxel retreatment was in particular not accepted as an appropriate therapeutic option for patients who had progressed during or shortly after their initial course of docetaxel, which indicates development of resistance to docetaxel, or patients with poor tolerability to the drug. None of the docetaxel retreatment publications cited by Dr. Ratain supports the use of docetaxel as a comparator in a clinical study evaluating a new second line treatment in patients whose cancer had progressed during or after treatment with docetaxel. In view of the limited options for these patients, the need for a life-prolonging option

24

for mCRPC patients that had progressed despite receiving docetaxel was "urgent."  Beardsley at

161.

> **B.** **The Asserted Patents Are Directed to Increasing Survival as Compared to Mitoxantrone for Men with mCRPC That Had Progressed During or After Treatment with Docetaxel**

76.     The asserted patents are directed to an "unmet medical need" for patients with

mCRPC, "especially for patients who are not catered for by a taxane-based treatment."  '777

patent at col. 1, ll. 22-28, col. 2, ll. 24-30; '110 patent at col. 1, ll. 21-28, col. 2, ll. 22-28.  The

specification of the asserted patents[5] describes "patients who are not catered for by a taxane-

based treatment" as "patients who have been previously treated with a docetaxel-based regimen."

'777 patent at col. 3, ll. 1-5; '110 patent at col. 2, l. 65-col. 3, l. 2.  The specification further

specifies that the patients can have prostate cancer that progressed during or after treatment with

docetaxel.  '777 patent at col. 6, ll. 4-5; '110 patent at col. 6, ll. 1-2.  The specification also

explains that the cancer may become resistant to taxanes and describes taxane resistance

mechanisms proposed in the literature.  '777 patent at col. 2, ll. 16-23; '110 patent at col. 2, ll.

15-21.

77.     Dr. Ratain states that the asserted claims "do not require that the patient be known

to be resistant or refractory to docetaxel," but does not define either of those terms.  Ratain

Report at ¶ 17.  While the claims are not limited to patients that have cancer progression during

docetaxel treatment or who never responded to docetaxel at all, a POSA understands from the

specification that the claims to increasing survival of a patient with mCRPC that has progressed

---

[5] I understand that the specifications of the '777 and '110 patents are substantively identical to each other.  I refer to the "specification" of the asserted patents throughout as singular.

25

during or after treatment with docetaxel are directed to increasing survival of patients for whom docetaxel is no longer considered a good option because further benefit is not expected, i.e., "patients who are not catered for by a taxane-based treatment."

78.     The specification also notes that the combination of mitoxantrone with corticosteroids had been "recognized as the reference treatment" for mCRPC, and that docetaxel clinical trials "made it possible to treat" such mCRPC patients after it had been shown to improve "survival" (referring to increased overall survival, since mitoxantrone had already been shown to improve PFS). '777 patent at col. 1, l. 61-col. 2, l. 5; '110 patent at col. 1, l. 63-col. 2, l. 4. As noted above, a POSA would know those docetaxel studies used mitoxantrone plus prednisone as the comparator arm.

79.     The specification includes the design and results of the phase III TROPIC clinical study comparing cabazitaxel at a starting dose of 25 mg/m$^2$ (with dose reductions to 20 mg/m$^2$) administered every three weeks in combination with 10 mg/day of prednisone to mitoxantrone 12 mg/m$^2$ administered every three weeks also in combination with 10 mg/day of prednisone in men with mCRPC that had progressive disease during or after receiving at least 225 mg/m$^2$ of prior docetaxel treatment. '777 patent at col. 10, l. 45-col. 17, l. 49; '110 patent at col. 10, l. 45-col. 16, l. 35.

80.     Because docetaxel was indicated at a dose of 75 mg/m$^2$ every three weeks for prostate cancer, this means that patients had to have previously received at least three cycles of docetaxel. Taxotere[®] Label Sept. 2007 (CabRef0003460-516) ("Taxotere[®] Label") at 4. The requirement of TROPIC that patients receive at least three cycles of docetaxel suggests that the TROPIC study was intended to include patients who received enough docetaxel to develop taxane resistance. In fact, the median cumulative dose of docetaxel treatment for the cabazitaxel

26

arm of the study was 576 mg/m$^2$, indicating that, on average, the patients receiving cabazitaxel had received more than 7 cycles of docetaxel. '777 patent at col. 11, ll. 10-12; '110 patent at col. 11, ll. 10-12.

81.     30% of the patients on the cabazitaxel arm had progressed during docetaxel, 42% progressed less than three months after the last docetaxel dose, and 27% of patients had progressed more than 3 months after the last docetaxel dose. '777 patent at col. 12, ll. 53-65; '110 patent at col. 12, l. 56-col. 13, l. 15. A POSA would have understood that the three-month period may reflect the interval between clinical evaluation and restaging with medical imaging to monitor the disease, suggesting that the patients stopped receiving docetaxel, and when they went for full re-evaluation again (around three month intervals) there was disease progression. *See, e.g.*, Scher, *Design and End Points of Clinical Trials for Patients with Progressive Prostate Cancer and Castrate Levels of Testosterone: Recommendations of the Prostate Cancer Clinical Trials Working Group*, 26(7) J. Clin. Oncol. 1148-1159 (2008) (CabRef0013284-312) ("Scher 2008") at CabRef0013294, CabRef0013310 (recommending 12-week intervals); Tannock 2004 at 1504 (patients scanned every six to nine weeks with repetition after four weeks to confirm a response); Petrylak 2004 at 1515 (imaging repeated every six cycles, and "if positive," every three cycles; PSA progression required confirmation at least four weeks later). Those patients may very well have had disease progression much sooner than three months if they had been monitored more frequently. For example, Beer *et al*. described patients with progression within 60 days of docetaxel cessation as "refractory." Beer, *Phase II Study of KOS-862 in Patients with Metastatic Androgen Independent Prostate Cancer Previously Treated with Docetaxel*, 25 Invest. New Drugs 565-70 (2007) (SA_JEV_3142905-10) ("Beer 2007") at 566; *see also* Rosenberg at 556-57 (describing patients as "taxane-refractory" when they progressed "during or

27

within 60 days of cessation of taxane chemotherapy"); Berger (describing patients as having "failed treatment with docetaxel based regimens" when patients had progression "during or within 3 months of prior docetaxel").

82.     The patients enrolled in the TROPIC study were not limited to those who responded to docetaxel treatment, let alone the very specific type of patient that might be considered as a candidate for docetaxel retreatment.  Instead, a POSA would have understood that it was highly unlikely that candidates for docetaxel retreatment would have been enrolled.  Patients retreated with docetaxel were typically those who stopped docetaxel not because of progression or an unacceptable side effect, but because they were doing so well on docetaxel that the patient could take a drug holiday and be administered docetaxel again.  Such a patient would not have been randomized to receive mitoxantrone, a drug not shown to increase overall survival, or cabazitaxel, an experimental drug for which not even a phase II study in prostate cancer had been conducted (*see* below Section VI.C.4).  If a patient was a candidate for docetaxel retreatment because docetaxel was expected to provide further benefit, it would not have been in the patient's best interest to be enrolled on the TROPIC study.

83.     In the TROPIC study, cabazitaxel therapy was shown to prolong life (a difference in overall survival between the two arms) and to increase PFS as compared to mitoxantrone therapy.  '777 patent at col. 11, l. 38-col. 12, l. 34; '110 patent at col. 11, l. 39- col. 12, l. 34.

84.     The Court's claim construction for "increasing survival" includes the comparative clinical study endpoints of overall survival and PFS.  These endpoints require a comparator — i.e., with the intent of increasing overall survival or PFS of a patient receiving cabazitaxel as compared to something else.  In view of the TROPIC study, the description of mitoxantrone as a recognized "reference treatment," the description of the "technical problem" to be solved as

28

providing a therapeutic option for patients "who are not catered for by a taxane-based treatment," and the fact that no other comparator is identified in the specification, a POSA would understand "increasing survival" in the asserted claims to refer to increasing survival as compared to mitoxantrone plus prednisone.  This is also consistent with the use of mitoxantrone plus prednisone as a standard of care after docetaxel failure in patients that had progression during or after treatment with docetaxel, like the patients enrolled in the TROPIC study.  *See, e.g.*, Rosenberg at 557.

85.     Docetaxel retreatment is not described in the specification at all.  Docetaxel also would not have been considered an appropriate comparator for patients enrolled in the TROPIC study, at least because the study included patients that progressed during docetaxel.  Physicians would not have randomized those patients to receive docetaxel again as continued treatment in that setting would be futile and not in the best interest of the patient.

### C.     The Prior Art Did Not Disclose Administration of Cabazitaxel with the Intent of Increasing Survival or Provide a Reasonable Expectation of Increasing Survival

86.     Dr. Ratain identifies various pieces of information in the prior art for cabazitaxel, including its preclinical activity in models of taxane resistance, its clinical activity in phase I clinical studies, its clinical activity in a phase II clinical study of taxane-resistant metastatic breast cancer, and the existence of the phase III TROPIC clinical study.  None of this information considered either alone or all together in view of the entirety of the prior art taught or suggested to a POSA to administer cabazitaxel to an individual mCRPC patient who had progressed during or after treatment with docetaxel with the intent of increasing overall or

29

progression-free survival of the patient as compared to mitoxantrone with a reasonable expectation of success.

### 1. Cabazitaxel's Taxane Status and Activity in Preclinical Models of Taxane Resistance Would Not Have Provided a Reasonable Expectation of Increasing Survival

87.     Dr. Ratain notes cabazitaxel's discovery in models of taxane resistance, and focuses in particular on the overexpression of the drug efflux pump p-glycoprotein ("p-gp") that had been associated with multi-drug resistance.  Ratain Report at ¶¶ 100-01, 105, 107, 112, 133. However, taxane resistance was known to be complicated, and a POSA would not have assumed that cabazitaxel could overcome docetaxel resistance in prostate cancer patients based on its reported lower affinity to p-gp or the available preclinical data Dr. Ratain points to in Attard, *Update on Tubulin-Binding Agents*, 54 Pathologie Biologie 72-84 (2006) (CabRef0002391-403) ("Attard"), Mita, *Phase I and Pharmacokinetic Study of XRP6258 (RPR 116258A), a Novel Taxane, Administered as a 1-Hour Infusion Every 3 Weeks in Patients with Advanced Solid Tumors*, 15(2) Clin. Cancer Res. 723-30 (2009) (CabRef0002897-905) ("Mita"), and Pivot, *A Multicenter Phase II Study of XRP6258 Administered as a 1-H I.V. Infusion Every 3 Weeks in Taxane-Resistant Metastatic Breast Cancer Patients*, 19 Annals of Oncol. 1547-52 (2008) (CabRef0002984-89) ("Pivot").

88.     Dr. Ratain also refers to cabazitaxel as an "active taxane," groups all taxanes together in discussing dosing and premedication, and suggests that a survival benefit would have been reasonably expected from cabazitaxel because it is "another taxane."  Ratain Report at ¶¶ 126, 186, 187.  This analysis assumes all taxanes would behave similarly and overlooks the

30

existence of many other taxanes that failed clinically, including taxanes designed to overcome taxane resistance.

89.     Mita describes XRP6258, cabazitaxel, as a member of the taxane class of compounds.  Mita at 723.  The mechanism of action of cabazitaxel, like other taxanes, is the stabilization of microtubules that ultimately interferes with cell division (also called mitosis).  *Id*. at 723.  When the cells cannot divide properly, they will die.  The hope for cytotoxic chemotherapy is to kill more of the rapidly dividing cancer cells than normal cells.

90.     Mita reports that cabazitaxel was "more potent than docetaxel" in cancer cell lines that were resistant to docetaxel because of p-gp overexpression, but I note that these are not prostate cancer cells lines.  *Id*. at 723.  P388 and HL60 are leukemia cells, Calc18 are breast cancer cells, and KB cells were reported to be human epidermoid carcinoma cells.[6]  Mita further reports that cabazitaxel retained activity against p-gp expressing B16/TXT melanoma xenograft models, but not against Calc18/TXT and P388/VCR models that "express higher levels of ABCB1 mRNA," that is, higher levels of the mRNA that codes for p-gp.  *Id*. at 724.  Attard notes that cabazitaxel was selected for its "minimal affinity for p-gp" and activity in multidrug resistance cells.  Attard at 75.  Pivot similarly reports that cabazitaxel was selected for its "low affinity" to p-gp and activity in cell lines with acquired resistance to drugs (including docetaxel) and in vivo antitumor activity in resistant models such as B16/TXT melanoma.  Pivot at 1547-48.  None of these references reports preclinical activity for cabazitaxel in taxane-resistant prostate cancer models or suggest it will have activity against drug resistance mechanisms unrelated to p-gp.

---

[6] KB cells were later reported to be a misidentified subline of HeLa cervical cancer cells.

91.     It was well understood by October 2009 that taxane resistance is a "very complex phenomenon involving different molecular mechanisms," including overexpression of efflux pumps such as p-gp, alterations in tubulin (the target of taxanes), alterations in various signaling pathways, alterations in the cell cycle, and alterations in the control of programmed cell death. Galletti, *Paclitaxel and Docetaxel Resistance: Molecular Mechanisms and Development of New Generation Taxanes*, 2 Chem. Med. Chem. 920-42 (2007) (SA_JEV_0182856-78) ("Galletti") at 939.  While the "contribution of the distinct resistance phenotypes as well as their role in clinical oncology have yet to be fully evaluated," it was known that "resistance can often be mediated by more than one mechanism in a single cell at the same time." *Id.*; *see also* Vrignaud, *Preclinical Antitumor Activity of Cabazitaxel, a Semisynthetic Taxane Active in Taxane-Resistant Tumors*, 19 Clin. Cancer Res. 2973-83 (2013) (SA_JEV_0183308-26) ("Vrignaud") at 2980 ("[m]echanisms of resistance to taxanes in patients have not been fully elucidated, and resistance appears not to be mediated by a single mechanism.").

92.     This is illustrated in Takeda, where two paclitaxel-resistant hormone refractory prostate cancer cell lines were reported, and results showed different mechanisms of resistance in each, with overexpression of p-gp not playing an important factor in one of the cell lines. Takeda, *The Establishment of Two Paclitaxel-Resistant Prostate Cancer Cell Lines and the Mechanisms of Paclitaxel Resistance with Two Cell Lines*, 67 The Prostate 955-67 (2007) (SA_JEV_0183262-74) ("Takeda") at 960.  Takeda also reported that gene expression changes in paclitaxel-resistant hormone refractory prostate cancer cell lines were different than those that were altered in resistant breast cancer cells, "suggesting that different mechanisms are involved in becoming paclitaxel-resistance in different cancers." *Id.* at 965.  Others reported that docetaxel resistance in prostate cancer was not dependent on overexpression of p-gp and

32

identified mechanisms of resistance relating to overexpression of genes relating to cell

proliferation and apoptosis.  Patterson, *Novel Role of Stat1 in the Development of Docetaxel*

*Resistance in Prostate Tumor Cells*, 25 Oncogene 6113-22 (2006) at 6113, 6119.  Thus, a POSA

would have understood that there could be multiple mechanisms of resistance to docetaxel or

paclitaxel within the same cancer cell and certainly multiple mechanisms in different cells within

the same patient that may not all be addressed by a drug that only addresses p-gp overexpression.

A POSA also would have understood that resistance mechanisms can differ from one cancer to

another such that activity in taxane-resistant leukemia or breast cells may not translate to activity

in taxane-resistant CRPC cells.

93.     Additionally, taxane resistance mechanisms such as p-gp had largely been studied

in cell cultures, and its clinical relevance to mCRPC had not been established in patients.

Galletti at 923, 939; Attard at 73.  Cabral *et al*. performed experiments seeking to develop

paclitaxel resistance through a process that the authors considered more "clinically relevant" than

the processes that tended to result in overexpression of p-gp.  Cabral, *Factors Determining*

*Cellular Mechanisms of Resistance to Antimitotic Drugs*, 4 Drug Resistance Updates 3-8 (2001)

(SA_JEV_0182788-93) ("Cabral") at 3-4.  Cabral found that most of the resulting cell lines had

alterations in microtubules, not overexpression of p-gp.  Cabral at 3-4, 6.

94.     Even if a POSA were focused on the p-gp mechanism of resistance to docetaxel,

cabazitaxel was a known substrate for this efflux pump even if it had a lower affinity than

docetaxel.  Mita at 723.  Cabazitaxel did not retain activity against the docetaxel-resistant models

Calc18/TXT and P388/VCR that had expressed higher levels of RNA coding for PGP (ABCB1

mRNA).  *Id*. at 723-24.  Thus, even focusing on p-gp, cabazitaxel's preclinical activity in some

33

models of resistance did not indicate that cabazitaxel would overcome p-gp mediated docetaxel resistance in human prostate cancer patients.

95.     Furthermore, while there were two FDA-approved taxanes in 2009 (docetaxel and paclitaxel)[7] it was known that many companies had unsuccessfully attempted to develop other taxanes, including for taxane-resistant cancers, which had activity in preclinical models of resistance.  Vrignaud at 2974; Kingston, *Tubulin-Interactive Natural Products as Anticancer Agents*, 72 J. Nat. Prod. 507-15 (2009) (SA_JEV_0182900-08) at 507, 511 (reporting that Bristol Myers Squibb, Bayer, Wyeth, and Daiichi Sankyo were working with new taxane compounds, yet none of these other new taxanes were clinically successful).  For example, Galletti identifies nine taxanes as having entered clinical development (while discussing more than 60 molecules), but only cabazitaxel was ultimately successful.  Galletti at 930, Table 1.  Thus, a POSA would have been informed by the number of failed taxane compounds and understood that clinical success of a specific taxane in any particular cancer type could not be expected based on the drug being a member of the taxane drug class, let alone in a cancer type that had already failed another taxane.

96.     For example, it took Sanofi years of research and development effort, having synthesized and screened around 450 compounds, to select larotaxel and cabazitaxel for clinical development.  Vrignaud at 2974.  Larotaxel had similar preclinical activity as cabazitaxel.  Both compounds had activity in resistant cell lines and xenograft (in vivo) models.  Attard at 75; Sessa, *Phase I and Pharmacokinetic Studies of the Taxoid Derivative RPR 109881A*

---

[7] Docetaxel is sold under the brand name Taxotere®, and paclitaxel is available in two different formulations, Taxol® and Abraxane®.

*Administered as a 1-Hour or 3-Hour Infusion in Patients with Advanced Solid Tumors*, 13 Annals of Oncol. 1140-50 (2002) (SA_JEV_0183217-27) ("Sessa") at 1140; Diéras, *Phase II Multicenter Study of Larotaxel (XRP9881), a Novel Taxoid, in Patients with Metastatic Breast Cancer Who Previously Received Taxane-Based Therapy*, 19 Annals of Oncol. 1255-60 (2008) (CabRef0002522-27) ("Diéras") at 1255; Pivot at 1547-48.

97.     Larotaxel was the subject of more extensive clinical testing than cabazitaxel. Uncontrolled phase I trials of larotaxel had reported that "[o]bjective responses were observed in several tumor types."  Zatloukal, *Randomized Multicenter Phase II Study of Larotaxel (XRP9881) in Combination with Cisplatin or Gemcitabine as First-Line Chemotherapy in Nonirradiable Stage IIIB or Stage IV Non-Small Cell Lung Cancer*, 3(8) J. Thorac. Oncol. 894-901 (2008) (SA_JEV_0183409-16) ("Zatloukal") at 895.

98.     In a phase II trial evaluating 50 mg/m$^2$ of larotaxel in combination with cisplatin (Arm A) and larotaxel with gemcitabine (Arm B) as a first-line therapy in non-small cell lung cancer, response rates were higher for patients receiving the combination with cisplatin, 26.7% versus the combination with gemcitabine, 18.2%.  Zatloukal at 894-95, 897.  There was no control arm without larotaxel.  The authors reported that both combinations of larotaxel "were effective and manageable."  *Id.* at 894, 900.

99.     In another uncontrolled phase II study of larotaxel at 90 mg/m$^2$, patients with metastatic breast cancer previously treated with a taxane were divided by their response to prior taxane therapy.  Diéras at 1256.  Patients were considered "nonresistant" if they had only one taxane previously and had a complete or partial response without progression during that treatment.  *Id.*  The overall response rate, the primary endpoint, was 42% in the nonresistant group and 19% in the resistant group.  *Id.* at 1257.  The median time to progression in the treated

35

population was 5.4 months for the nonresistant patients and 1.6 months in the resistant patients. *Id*. at 1258. Three patients died within 30 days of receiving larotaxel. *Id*. One such patient experienced neutropenic infection after a history of chemotherapy-induced neutropenia. *Id*.

100. Also published in 2008 was the interim analysis of an uncontrolled phase II study of larotaxel in combination with trastuzumab in patients with HER2 positive metastatic breast cancer. Diéras*, Larotaxel (L) in Combination with Trastuzumab in Patients with HER2+ Metastatic Breast Cancer (MBC): Interim Analysis of an Open Phase II Label Study*, 26(15S) J. Clin. Oncol. (Meeting Abstracts) Suppl. 1070 (May 2008) (SA_JEV_0004471). Eleven of 26 evaluable patients had a confirmed partial response, and thirteen of those 26 patients had previously received a taxane. *Id*.

101. Larotaxel went on to three large randomized, controlled clinical studies, all of which failed to show an increase in overall or progression-free survival.

- Larotaxel vs. capecitabine in patients with metastatic breast cancer progressing after taxanes and anthracycline therapy (https://clinicaltrials.gov/ct2/show/NCT00081796?term=larotaxel&rank=7) (SA_JEV_3142911-15)

- Larotaxel vs. 5-FU in patients with pancreatic cancer previously treated with gemcitabine (https://clinicaltrials.gov/ct2/show/NCT00417209?term=larotaxel&rank=2) (SA_JEV_3142794-801)

- Larotaxel plus cisplatin vs. gemcitabine plus cisplatin in first line treatment of patients with locally advanced/metastatic bladder cancer (https://clinicaltrials.gov/ct2/show/NCT00625664?term=larotaxel&rank=4) (SA_JEV_3142779-784).

102. In the study of larotaxel compared to capecitabine in patients with metastatic breast cancer progressing after taxanes and anthracycline therapy, larotaxel "did not reach superiority versus capecitabine," which resulted in early termination. Sanofi-Aventis SEC Form

36

20-F (Dec. 31, 2006) at 39, available at

http://www.sec.gov/Archives/edgar/data/1121404/000119312507072848/d20f.htm.

(CabRef0002999-3001); *A Randomized, Open-Label, Phase 3 Study of Larotaxel IV Every 3 Weeks Versus Capecitabine (Xeloda®) Tablets Twice Daily for 2 Weeks in 3-Week Cycles in Patients with Metastatic Breast Cancer (MBC) Progressing After Taxanes and Anthracycline Therapy (EFC6089)*, available at https://www.sanofi.com/en/science-and-innovation/clinical-trials-and-results/our-disclosure-commitments/pharma/-/media/Project/One-Sanofi-Web/Websites/Global/Sanofi-COM/Home/common/docs/clinical-study-results/EFC6089_summary.pdf (SA_JEV_3142874-78) ("Larotaxel Phase III Breast Results"). The capecitabine control group had longer PFS than larotaxel, the primary endpoint.  Larotaxel Phase III Breast Results at 3.  Furthermore, due to adverse events, there were more permanent withdrawals as patients treated with larotaxel experienced a higher incidence of neutropenia and diarrhea.  Larotaxel Phase III Breast Results at 4.

103.    The study comparing larotaxel with 5-FU (fluorouracil) in patients with advanced pancreatic cancer once again showed that larotaxel did not increase overall survival or PFS.  Van Cutsem, *A Phase III Study Comparing Larotaxel to 5-FU (Continuous Intravenous 5-FU or Capecitabine) in Patients with Advanced Pancreatic Cancer (APC) Previously Treated with a Gemcitabine Containing Regimen*, 21(6S) Annals of Oncol. Oral Presentations vi12-vi13 Abstr. O-0007 (July 2010) (SA_JEV_0183297-98).  During the study the dose of larotaxel had to be lowered from 90 mg/m$^2$ to 75 mg/m$^2$ because of toxicities, and there were higher levels of toxicities reported for larotaxel than 5-FU, including neutropenia, complicated neutropenia, myalgia, sensory neuropathy, and diarrhea.  *Id.*

104.    The last study comparing larotaxel administered with cisplatin versus gemcitabine with cisplatin in patients with locally advanced/metastatic bladder cancer was also prematurely discontinued.  Sternberg, *Larotaxel with Cisplatin in the First-Line Treatment of Locally Advanced/Metastatic Urothelial Tract or Bladder Cancer: A Randomized, Active-Controlled, Phase III Trial (CILAB)*, 85 Oncology 208-15 (2013) (SA_JEV_0183251-58) at 208.  The recommended dose of larotaxel and cisplatin was reduced by the data monitoring committee due to noted toxicity, predominantly infections.  *Id*. at 210-11.  Due to the reduction in dose that was necessary and the lack of efficacy of larotaxel when compared with comparators in the pancreatic and breast cancer phase III trials, "it was deemed unlikely that the [bladder cancer] trial would meet is primary efficacy endpoint."  *Id*.  The data collected in the study indicated worse progression free survival with larotaxel than compared with the comparator, and with no difference in overall survival.  *Id*. at 213.  Sanofi stopped clinical development of larotaxel based on this evidence.  *Id.* at 210-11.[8]

105.    Perhaps foreshadowing larotaxel's ultimate failure, Attard was not impressed by the available data for larotaxel by 2006, stating that with respect to both larotaxel and cabazitaxel, "the fundamental mechanism of the anticancer activity of these new taxanes remains unchanged and they are unlikely to make a dramatic impact on patient outcome."  Attard at 76.

---

[8] While the larotaxel studies were not versus mitoxantrone, mitoxantrone as a single agent was compared to a combination of 5-fluorouracil, epirubicin, and cyclophosphamide in metastatic breast cancer and found to have no significant differences in terms of response, time to progression, or survival.  Heidemann, *Is First-Line Single-Agent Mitoxantrone in the Treatment of High-Risk Metastatic Breast Cancer Patients as Effective as Combination Chemotherapy? No Difference in Survival, but Higher Quality of Life Were Found in a Multicenter Randomized Trial*, 13 Annals of Oncol. 1717-29 (2002) ("Heidemann") at 17.

Attard also cautioned that larotaxel (and cabazitaxel) was "limited by myelosuppression[9] and this may restrict the extent of tumour cell kill that can be achieved." *Id*. at 75.

106.    Milataxel is another taxane that was reported to overcome p-gp based resistance to paclitaxel and docetaxel in a variety of preclinical models.  Ramanthan, *A Phase II Study of Milataxel: A Novel Taxane Analogue in Previously Treated Patients with Advanced Colorectal Cancer*, 51 Cancer Chemother. Pharmacol. 453-58 (2008) (SA_JEV_0183144-49) at 454.  In phase I studies there had been two responses in breast cancer patients, and in a phase II study in non-small cell lung cancer the response rate was 13%.  *Id.* at 457.  Milataxel was evaluated in a phase II study of chemotherapy treated metastatic colorectal cancer where it was revealed to have life threatening side effects (neutropenic sepsis developed in six patients, resulting in two deaths), and produced no objective responses in any patient.  *Id.* at 453-54, 457.  The authors stated that the specific mechanism causing taxane resistance remained elusive and suggested that xenograft and preclinical models "are poor predictors of clinical activity in colon cancer."  *Id.* at 457.  Milataxel was never approved for any indication.

107.    These examples illustrate that taxanes can show activity in models of resistance and even anecdotal responses in individual patients yet fail clinically in controlled (or uncontrolled) studies because they lack sufficient activity and/or are too toxic.  As noted by Attard, "[o]ne may question the value of developing novel tubulin-binding drugs since major improvements on currently approved drugs are unlikely."  Attard at 81.

---

[9] Myelosuppression is a reduction in bone marrow activity leading to lower levels of red blood cells, white blood cells, and platelets.  Low levels of white blood cells called neutrophils that help fight infection is referred to as neutropenia.

108.     Thus, a POSA would not have reasonably expected cabazitaxel to increase overall or progression-free survival as compared to mitoxantrone in men with mCRPC that had progressed during or after docetaxel in view of the available preclinical data or cabazitaxel's status as an "active taxane."  Furthermore, if all "active taxanes" were expected to act similarly, then cabazitaxel would not have been reasonably expected to increase survival in patients resistant to docetaxel.

### 2.     The Phase I Clinical Data for Cabazitaxel Would Not Have Provided a Reasonable Expectation of Increasing Survival

109.     Dr. Ratain focuses much of his obviousness argument on the Mita study.  I disagree with Dr. Ratain that Mita discloses that cabazitaxel "results in increased survival" or would have motivated a POSA to administer cabazitaxel to an individual mCRPC patient that had progressed during or after docetaxel with a reasonable expectation that the patient would have an increase in survival.  Ratain Report at ¶¶ 160, 184-85.  As explained below, the uncontrolled phase I data provided in Mita and discussed in other references such as Attard would not have provided a reasonable expectation that cabazitaxel therapy would increase survival as compared to mitoxantrone therapy in an individual patient with mCRPC that had progressed during or after treatment with docetaxel when considered in the context of the prior art as a whole.

110.     Mita reports the results of one of three phase I studies of cabazitaxel from which data had been published by October 2009.  The two other phase I studies provide further context to cabazitaxel's activity and safety profile.  A POSA understood that phase I studies in oncology, like those for cabazitaxel, are designed to investigate the side effects of the drug, pharmacokinetics, the doses (if any) that can be administered relatively safely to humans, and to

determine doses for further phase II efficacy studies should the drug not prove overly toxic.

Mokbel, *Concise Notes in Oncology for MRCP and MRCS* (3d ed. 2005) (CabRef0002906-09)

("Mokbel") at 7.  While preliminary indications of antitumor activity will be reported, phase I

studies enroll a variety of highly pretreated cancer patients, and the goal of phase I studies is not

to evaluate efficacy, nor are they powered to do so.

      111.    Fumoleau was a phase I and pharmacokinetic study evaluating increasing doses of

cabazitaxel on days 1, 8, 15, and 22 every five weeks in twenty-five patients with a variety of

advanced solid tumors.  Fumoleau, *Phase I and Pharmacokinetics (PK) Study of RPR116258A*

*Given as a Weekly 1-Hour Infusion at Day 1, Day 8, Day 15, Day 22 Every 5 Weeks in Patients*

*(pts) with Advanced Solid Tumors*, 7(11) Clin. Cancer Res. 3710s (abstr. 282) (2001)

(SA_JEV_3142871-73) ("Fumoleau").  Fifteen of the patients had breast cancer, and six of the

patients were men.  *Id*.  The maximum tolerated dose was 12 mg/m$^2$, at which two out of six

patients had dose limiting grade 3 diarrhea.  *Id*.  Neutropenia was the main hematologic toxicity

and reached grade 3 at 8.4 mg/m$^2$.  *Id*.  There were "[t]wo confirmed partial responses in breast

cancer patients after taxoid failure."  *Id*.  Fumoleau does not indicate whether patients with

prostate cancer were included; if they were there, such patients did not respond.

      112.    Lortholary was a phase I and pharmacokinetic study evaluating increasing doses

of cabazitaxel administered every three weeks in sixteen patients with a variety of advanced solid

tumors.  Lortholary, *Phase I and Pharmacokinetics (PK) Study of RPR 116258A Given as a 1-*

*Hour Infusion in Patients (Pts) with Advanced Solid Tumors*, 6 (Suppl) Clin. Cancer Res. 4579s-

80s (abstr. 569) (Nov. 2000) (CabRef0002519-21) ("Lortholary").  Ten of the patients were men.

*Id*.  The doses administered ranged from 10 mg/m$^2$ to 30 mg/m$^2$, and 30 mg/m$^2$ was determined

to be the maximum tolerated dose because three patients receiving that dose experienced dose

limiting toxicities, all neutropenia.  *Id*.  One patient died from septic shock with neutropenia despite prophylactic G-CSF[10] after receiving 30 mg/m$^2$.  *Id*.  There were no confirmed partial responses, only a "minor response" (that is, not meeting criteria for a partial response) in a patient with non-small cell lung cancer.  *Id*.  Lortholary does not indicate whether patients with prostate cancer were included; if they were, no such patient responded.

113.    Goetz is an abstract reporting initial results of the phase I study that is reported in Mita.  Goetz, *Phase I and Pharmacokinetic Study of RPR116258A, a Novel Taxane Derivative, Administered Intravenously over 1 Hour Every 3 Weeks*, 20 Clin. Pharmacol. Proceedings of ASCO Abstr. 419 (2001) (CabRef0002849-50).  Goetz is a phase I and pharmacokinetic study evaluating increasing doses of cabazitaxel administered every three weeks.  *Id*.  At publication only fourteen patients (of Mita's 25) had been enrolled, nine of which were male.  *Id*.  Grade 4 neutropenia occurred in a patient who received 25 mg/m$^2$ and grade 3 diarrhea in patients at 15 mg/m$^2$ and 25 mg/m$^2$.  *Id*.  There was one unconfirmed partial response in a patient with bladder cancer and "minor responses" in one patient with prostate cancer and one with osteosarcoma.  *Id*. No confirmed partial responses are reported.

114.    Mita reports the results of a phase I and pharmacokinetic study of increasing doses of cabazitaxel administered every three weeks to 25 patients with a variety of advanced solid tumors.  Mita at 724.  Eight of the patients were female, and eight patients had previously received taxane-based therapy.  *Id*. at 725.  Eight of the patients had prostate cancer (details on prior treatment not provided), eight had colon or rectal cancer, two patients had an unknown

---

[10] G-CSF is granulocyte colony stimulating factor, which is used to promote the production of white blood cells.

primary tumor, one patient had head and neck cancer, one had melanoma, one had non-small cell lung cancer, one had osteosarcoma, one had pancreatic cancer, one had renal cancer, and one had urothelial cancer. *Id.* The doses administered ranged from 10 to 25 mg/m$^2$, with the rate of toxicity exceeding the predefined limits of tolerability at 25 mg/m$^2$. *Id.* at 725-26. Specifically, one patient experienced febrile neutropenia (indicating infection), and two patients experienced protracted grade 4 neutropenia lasting for more than 5 days. *Id.* at 726.

115.    Mita states that "[e]vidence of anticancer activity due to XRP6258 was noted in two patients." *Id.* at 727. Both of these patients had mCRPC, but only one of them had previously received docetaxel. *Id.* Mita states that one patient with bladder cancer had an unconfirmed partial response, and that one patient with osteosarcoma and one with prostate cancer had "minor responses," but does not state whether any of these patients had previously received a taxane. *Id.* A POSA would not have given much, if any weight to these unconfirmed and minor responses as they do not constitute evidence of anticancer activity. For example, the therapeutic antibody pertuzumab was reported in a phase I study to have an unconfirmed partial response in a man with CRPC, but in a phase II study of 68 men with CRPC, no PSA declines of more than 50% were observed. De Bono, *Open-Label Phase II Study Evaluating the Efficacy and Safety of Two Doses of Pertuzumab in Castrate Chemotherapy-Naïve Patients with Hormone-Refractory Prostate Cancer*, 25 J. Clin. Oncol. 257-62 (SA_JEV_2177960-66) at 257-58.

116.    One patient with a partial response in Mita was an 80-year old man with measurable disease that experienced a reduction in his target lesion, a reduction in PSA from 62 to 21 ng/mL, and decreased bone-pain after four courses of 15 mg/m$^2$ of cabazitaxel. Mita at 727. He had not previously received docetaxel and therefore falls outside the asserted claims.

43

The patient declined further treatment after his sixth course, "at which time his response persisted." *Id*. Mita does not explain why the patient declined further treatment, which likely would have been tolerability related. Mita also does not state how long the patient lived or the duration of the response other than from after cycle 4 to cycle 6. Mita is also vague as to what aspect of the response "persisted" at cycle 6. *Id*. Mita does not describe the trajectory of the patient's disease prior to receiving cabazitaxel, that is, whether his PSA levels, his pain, or his measurable disease had been steadily increasing.

117.    A POSA could not predict whether that 80-year old man would have responded to cabazitaxel at all if that patient had previously received docetaxel, let alone whether cabazitaxel would have increased the survival of such a patient. Cancer cells evolve and mutate over time to "promote self-survival and perpetuation." Pienta & Smith at 316. Patients with CRPC have cancer cells that have developed the ability to grow and proliferate despite castration-levels of testosterone. With each additional treatment the patient receives, the remaining cancer cells that are not killed off find ways to evade the treatment leading to eventual progression. "The pliability of cancer cells to mutate into several different phenotypes in an attempt to find one that will survive and colonize at the metastatic site is a tremendous hurdle to overcome in the pursuit of better cancer therapies." *Id*. If the 80-year old man had previously received docetaxel and progressed, that patient could have developed various mechanisms of taxane resistance including alterations in tubulin, increased expression of the p-gp efflux pump, or something else that would not have been addressed by cabazitaxel at all because it had the same mechanism of action on microtubules as docetaxel. That 80-year old patient may also have developed toxicities on docetaxel such that he would decline further chemotherapy. A POSA could also not have predicted whether the dose of 15 mg/m$^2$ of cabazitaxel the 80-year old man received would have

44

been sufficient to cause a partial response or significantly reduce PSA had he previously received and progressed despite docetaxel, let alone any increase in survival.[11]  I note that no patient is reported as responding at a dose level of 20 mg/m$^2$.  That it would be more challenging to treat a patient that had progressed despite docetaxel as compared to a docetaxel-naïve patient is consistent with the lower response rates reported for larotaxel in metastatic breast cancer patients resistant to taxanes as compared to nonresistant patients.  Diéras at 1257 (42% v 19% in response rate); *see also* Rosenberg at 562 (contrasting the "modest" 17% PSA response rate with ixabepilone in post-docetaxel patients with results in chemotherapy-naïve mCRPC patients).

118.    The other patient in Mita with a confirmed partial response was a 50-year old man with docetaxel refractory mCRPC with measurable disease that also had a PSA decline from 415 to 44 ng/mL after receiving 25 mg/m$^2$.  Mita at 727.  He experienced progressive disease after eight courses.  *Id*.  Mita suggests that the 50-year old man had not previously received mitoxantrone.  Mita does not state at what cycle this 50-year old man experienced the reduction in PSA or reduction in tumor size or the duration of those reductions.  Mita does not say how long this patient lived.  Mita also does not describe the trajectory of the patient's disease prior to receiving cabazitaxel, that is whether his PSA levels, his pain, or his measurable disease had been steadily increasing.

119.    The discussion of the phase I data in Attard does not provide any further basis on which to expect an improvement in survival for cabazitaxel as compared to mitoxantrone.  Attard

---

[11] As noted above in Section VI.C.1, cabazitaxel was a substrate for p-gp, albeit a weaker substrate than docetaxel.  Mita at 723.  For example, in a patient over-expressing p-gp because of prior docetaxel treatment, higher levels of cabazitaxel might have been needed to make up for the cabazitaxel being removed from the cancer cells by the p-gp efflux pump.

is a review published before Mita.[12]  A POSA interested in cabazitaxel would have gone to the

primary publications of Mita, Lortholary, and Fumoleau to learn more about cabazitaxel's

activity and tolerability in humans.  Attard notes the two CRPC patients in Mita with objective

responses, including the one docetaxel-refractory patient.  Attard at 75.  Attard notes that

antitumor activity was "reported in tumours classically resistant to taxanes, such as

osteosarcoma, and in tumours with acquired resistance following prior treatment with taxanes,"

and states that cabazitaxel "may overcome some forms of paclitaxel tumour resistance."  *Id*.

However, as with larotaxel, Attard also notes that the maximum tolerated dose of cabazitaxel is

limited by myelosuppression, meaning there may not be a dose that has sufficient anticancer

activity that does not dangerously lower blood cell counts.  *Id.*  Attard further states that because

"the fundamental mechanism of the anticancer activity" of new taxanes like cabazitaxel remains

unchanged, "they are unlikely to make a dramatic impact on patient outcome."  *Id*. at 75-76.

Contrary to Dr. Ratain's assertions, Attard does not suggest that cabazitaxel therapy will be

useful to treat men with mCRPC.  Ratain Report at ¶ 134.

120.    It would have been nearly impossible to predict how other mCRPC patients who

had progressed during or after treatment with docetaxel would respond to cabazitaxel based on

the one anecdotal partial response in Mita because mCRPC was known to be a heterogeneous

condition.  Mackinnon, *Molecular Biology Underlying the Clinical Heterogeneity of Prostate*

*Cancer, An Update*, 133 Arch. Pathol. Lab. Med. 1033-40 (2009) (SA_JEV_0182925-32)

("Mackinnon") at 1033-35.  It was understood that there were a variety of different types of

---

[12] It appears that the authors of Attard reviewed information from the Mita study before it was
published.  Attard at 82 (citing reference 23).

cancer cells within a single patient, which is one of the factors contributing to the development of resistance even in patients who respond initially to treatment, and also differences between patients. *Id.*; Pienta & Smith at 316; *see also* Cabral at 3 ("Tumor cells from patients are frequently very heterogeneous. . . ."). Between the various mechanisms proposed for the development of castration resistance and also taxane resistance, a POSA could not and would not have taken the single docetaxel-refractory patient in Mita with a partial response and reasonably expected or predicted that another such patient would have similar characteristics making the disease susceptible to a partial response with cabazitaxel treatment. *See* Pienta & Smith at 300-02; Mackinnon at 1034-35; Galletti at 939.

121.     In addition, the two partial responders[13] in Mita had measurable disease. As noted above, most men with mCRPC do not have measurable disease, and it was not known whether those patients who did were representative of men with unmeasurable disease predominantly in bone. Pienta & Smith at 303.

122.     While both patients also had reductions in PSA for unknown duration, as noted above (supra Section VI.A), that was not a validated surrogate for clinical benefit. For example, the label for mitoxantrone stated that "[t]he clinical significance of a fall in prostate-specific antigen (PSA) concentrations after chemotherapy is unclear." Novantrone® Label at 11. Tannock 2004 reported a 48% PSA response rate for weekly docetaxel, a 45% PSA response rate for docetaxel every three weeks, and a 32% response rate for mitoxantrone every three weeks (significantly in favor of docetaxel), but only docetaxel on the every three week schedule was

---

[13] While I disagree that a POSA would draw any conclusions from the 80-year old man who had not previously received docetaxel as to the effect of cabazitaxel on a mCRPC patient who had previously received docetaxel, I address both partial responders here for completeness.

reported to increase overall survival and pain response as compared to mitoxantrone. Tannock 2004 at 1508. Furthermore, despite a reduction of PSA being significantly higher for both docetaxel arms, the duration of the PSA response did not differ significantly between any of the arms. *Id.*

123.   It was also known that PSA levels can be influenced by factors other than an antitumor effect. Kaur, *Suramin's Development: What Did We Learn?*, 20 Investig. New Drugs 209-19 (2002) (SA_JEV_0184023-34) ("Kaur") at 217. Others had stated "it is worthwhile to consider the limitations of the PSA response as a predictor of a survival benefit. . . ." Beer, *Double-Blinded Randomized Study of High-Dose Calcitriol Plus Docetaxel Compared with Placebo Plus Docetaxel in Androgen-Independent Prostate Cancer: A Report from the ASCENT Investigators,* 25(6) J. Clin. Oncol. 669-74 (2007) (SA_JEV_0182772-77) ("Beer ASCENT") at 673.

124.   Dr. Ratain states that a PSA response is associated with improved quantity and quality of life, citing Ansari 2008. Ratain Report at ¶ 93. Ansari 2008 discusses "re-analysis" that is, post-hoc review, of data from the pivotal clinical studies of docetaxel and reports that a PSA decline of 30% or more in that analysis was "the best surrogate marker for overall survival." Ansari 2008 at 893. Ramiah discusses a similar analysis as showing that a PSA decline of 30% was a surrogate in one retrospective study of docetaxel that "required prospective validation," and in another study, a 30% reduction "showed the greatest degree of surrogacy," but did not account for the full overall survival benefit with docetaxel. Ramiah at 304. Because there had been no drug other than docetaxel shown to improve overall survival despite many drugs reducing PSA, the retrospective finding for docetaxel, did not establish PSA reductions as a surrogate for overall survival by 2009. In fact, when PSA reductions were analyzed

48

retrospectively in the TROPIC study, "[s]urrogacy for any PSA-based end point could not be demonstrated," and "the benefits of cabazitaxel in mediating a survival benefit are not fully captured by early PSA changes."  Halabi, *Prostate-Specific Antigen Changes as Surrogate for Overall Survival in Men with Metastatic Castration-Resistant Prostate Cancer Treated with Second-Line Chemotherapy*, 31(31) J. Clin. Oncol. 1-9 (2013) (SA_JEV_0184014-22) at 1.

125.    While there were post-hoc calculations trying to justify which level of PSA was most correlated with the survival benefit of docetaxel, any such correlations needed to be prospectively validated for docetaxel, and certainly other drugs, let alone in different settings such as mCRPC post-docetaxel.  *See* Ramiah at 303-04; *see also* Hussain, *Prostate-Specific Antigen Progression Predicts Overall Survival in Patients with Metastatic Prostate Cancer: Data from Southwest Oncology Group Trials 9346 (Intergroup Study 0162) and 9916*, 27 J. Clin. Oncol. 2450-56 (2009) (CabRef0012988-94) ("Hussain") at 2451 (noting that PSA decline surrogacy analysis will need separate validation in different prostate cancer settings).[14]  A POSA would not have reasonably expected a patient receiving a drug other than docetaxel to live longer simply because their PSA was reduced, whether by 30%, 50%, or more.  The Prostate Cancer Working Group 2 ("PCWG2") in 2008 did not recommend reporting PSA response rates "because these are of little value given the uncertain significance of a defined degree of decline from baseline, be it 50% or 30%, and no criterion has been shown prospectively to be a surrogate

---

[14] Hussain notes that PSA-progression at points in time (e.g., three and seven months) was "much more highly correlated with survival" for patients with the less advanced hormone-sensitive prostate cancer then men with CRPC.  Hussain at 2455.  The authors further acknowledge that "because this was a secondary analysis," their "findings need to be validated prospectively."  *Id.*

of clinical benefit."  Scher 2008 at CabRef0013295.[15]  Indeed, Dr. Ratain acknowledges that a PSA decrease of 30% "does not imply that overall survival was increased."  Ratain Report at ¶ 93.

126.    Mita does not make any predictions or comparisons as to how long the 80 and 50 year-old men with a partial response would have lived had they not received cabazitaxel or how long these men would have had stable disease before progression.  Mita of course makes no comparison as to the overall or progression free survival of these two men (or any of the patients receiving cabazitaxel) as compared to whether they had received mitoxantrone therapy or any other therapy.

127.    As noted above, mitoxantrone had been shown to reduce pain, to reduce PSA by at least 50%, to induce partial responses in measurable disease, and to increase PFS in larger, randomized clinical trials of men with mCRPC, including men who had previously received docetaxel.  Tannock 1996 at 1759 (33% PSA response, 29% pain response, increase in pain PFS); Kantoff 1999 at 2506, 2508-10 (38% PSA response, increase in PFS); Pienta & Smith at 305 (27% PSA response, 11% measurable disease response in SWOG9916); Tannock 2004 at 1508 (32% PSA response, 7% measurable disease response in TAX327); Rosenberg at 560 (20% PSA response, 9.5% measurable disease response in post-docetaxel patients); Berger 2007 (13% measurable disease response in post-docetaxel patients); Berthold 2008 at 1752 (15% PSA response in post-docetaxel patients).

---

[15] PCWG2 recommended not changing or discontinuing therapy based on early changes in PSA without other evidence of disease progression, and also noted that because of "the controversy surrounding the clinical significance of post-therapy changes in PSA, PCWG2 recommends expanding the focus of phase II trials from measures of response to measures of progression." Scher 2008 at CabRef0013285-87, CabRef0013293.

128.     Indeed, in a clinical study of pemetrexed in men with mCRPC that had progressed after one taxane-based chemotherapy regimen with four patients with PSA reductions by at least 50% and two patients with a confirmed partial response in their measurable disease, the authors concluded that the activity was only "modest" and "unlikely to add significant clinical benefit over that seen with traditional second-line chemotherapy agents such as mitoxantrone."  Hahn, *A Phase II Study of Pemetrexed as Second-Line Chemotherapy for the Treatment of Metastatic Castrate-Resistant Prostate Cancer (CRPC); Hoosier Oncology Group GU03-67*, 20 Annals of Oncol. 1971-76 (2009) ("Hahn") at 1971, 1973.  The authors noted other drugs evaluated in second-line mCRPC studies, including ixabepilone and vinorelbine, that also do not appear to "have any significant improvement compared with data from mitoxantrone studies." *Id*. at 1974.

129.     In light of the known anticancer activity of mitoxantrone, a POSA could not have reasonably expected cabazitaxel therapy to increase survival as compared to mitoxantrone in a patient with mCRPC that had progressed during or after treatment with docetaxel considering the two mCRPC patients in Mita with a partial response, only one of whom had previously received docetaxel.

130.     The difficulty in forming any reasonable expectations about cabazitaxel increasing progression free or overall survival is bolstered by the variety of other drugs that failed to increase PFS and/or overall survival in randomized, controlled trials despite multiple patients experiencing a reduction in PSA, tumor size, and or pain.

131.     One example is DN-101, a high-dose formulation of calcitriol.  Beer ASCENT at 669. An uncontrolled phase II study of high-dose calcitriol in combination with docetaxel reduced PSA by 50% in 81% of patients, which led to a controlled phase II study (ASCENT) to evaluate the efficacy and safety of the combination therapy of DN-101 with weekly docetaxel

51

compared to weekly docetaxel alone.  *Id.* at 670.  The addition of DN-101 did not statistically improve PSA response rate and there was no improvement in PSA progression-free survival (7.9 months for DN-101 treated patients vs. 7.6 months for placebo).  *Id.* at 671.  There was no improvement in tumor response, and the duration of tumor PFS could not be reliably assessed. *Id.*  The authors reported a "promising improvement" in overall survival in patients treated with DN-101 that merited further study.  *Id.* at 671-72.  A randomized, controlled phase III study called ASCENT-2 powered to evaluate overall survival of DN-101 plus weekly docetaxel compared to the FDA-approved regimen of docetaxel every three weeks was terminated early due to an imbalance of death, meaning there were more deaths in the DN-101 treatment arm.  *Id.* at 673; Susman, *ASCO: Calcitriol Fails in ASCENT-2 Prostate CA Trial*, MedPage Today (June 9, 2010), available at http://www.medpagetoday.com/MeetingCoverage/ASCO/20575 (SA_JEV_0183259-61) ("Susman 2010"); Williams, *Discontinued Drugs in 2008: Oncology Drugs*, 18(11) Expert Opin. Investig. Drugs 1581-94 (2009) (SA_JEV_0183395-408) at 1593; *see also* Novacea, Inc. SEC Form 8-K at 1.02 (April 4, 2008), available at http://www.sec.gov/Archives/edgar/data/1178711/000119312508077953/d8k.htm (SA_JEV_0183103-07) ("In November 2007, Novacea and Schering terminated the ASCENT-2 of Asentar™ due to an unexplained imbalance of deaths between the treatment and control arms of the trial").  When the study was stopped, results showed 81 deaths in the DN-101 arm and 48 deaths in the control group.  Susman 2010 at 2.  Ian Tannock commented on the unpredictability of the field: "[w]hat we can learn from ASCENT-2 is that even large randomized phase II trials may be poor predictors of results in phase III."  *Id.*  DN-101 was never shown to increase overall or progression-free survival as compared to any treatment and was never approved for any indication.

132.    Another example is GVAX, a platform using two prostate cancer cell lines, PC-3 and LNCaP, engineered to produce granulocyte-macrophage colony-stimulating factor ("GM-CSF") gene.  Small, *Granulocyte Macrophage Colony-Stimulating Factor-Secreting Allogeneic Cellular Immunotherapy for Hormone-Refractory Prostate Cancer*, 13 Clin. Cancer Res. 3883-91 (2007) (SA_JEV_0183241-50) at 3884, 3888.  GVAX works by activating the immune system to kill the tumor cells.  *Id.*  Results of an uncontrolled phase I/II study of GVAX in chemotherapy-naive patients with mCRPC reported a PSA decrease of > 25% in 11% of patients (6 out of 55 patients) and one patient with a PSA decrease from 10 to 0.1 ng/mL that lasted 267 days.  *Id.* at 3885-86, 3888.  That patient also had resolution of a bone lesion and developed no new lesions during the trial.  *Id.* at 1886.  Time to PSA progression was reported to be longer in patients receiving the higher dose compared with patients receiving the lower dose (3.7 months vs. 2.3 months).  *Id.* at 3888.  The authors hypothesized that survival times were increased as compared with predicted survival based on nomograms.  *Id.* at 3886.  Another uncontrolled phase I/II study reported a greater than 50% decline in one patient lasting 3.9 months, and the authors again hypothesized that the survival was increased as compared with predicted survival.  Higano, *Phase 1/2 Dose-Escalation Study of a GM-CSF-Secreting, Allogeneic, Cellular Immunotherapy for Metastatic Hormone-Refractory Prostate Cancer*, 113(5) Cancer 975-84 (2008) (SA_JEV_0182879-88) at 979, 981.  GVAX was moved into two phase III studies in mCRPC.  *Id.* at 983.  However, both were prematurely terminated.  Mulcahy, *Phase 3 Trial of Immunotherapy for Metastatic Prostate Cancer Terminated*, Medscape (October 17, 2008), available at http://www.medscape.com/viewarticle/582220 (SA_JEV_0182949-50).  The VITAL-2 study comparing the combination of GVAX and docetaxel to docetaxel plus prednisone in men with symptomatic mCRPC was terminated in 2008 because the Independent

Data Monitoring Committee's report showed an imbalance of deaths, with more patients dying on the GVAX arm. *Id.* at 1. Shortly after VITAL-2 was terminated, the other phase III clinical study (VITAL-1) was also terminated as a futility analysis indicated that improvement in overall survival, the primary endpoint of the study, was unlikely to be met (less than a 30% chance). *Id.* Thus, despite reductions in PSA in multiple patients, GVAX was never shown to increase overall or progression-free survival.

133. Sipuleucel-T, sold as Provenge®, is an example of a therapy that reduced PSA in individual patients in early studies but did not increase PFS in controlled studies. Phase I and II studies reported "one striking objective response," and PSA declines of over 50% in around 10% of patients. Small, *Placebo-Controlled Phase III Trial of Immunologic Therapy with Sipuleucel-T (APC8015) in Patients with Metastatic, Asymptomatic Hormone Refractory Prostate Cancer*, 24 J. Clin. Oncol. 3089-94 (2006) ("Small 2006") at 3089-90; Antonarakis, *Novel Targeted Therapeutics for Metastatic Castration-Resistant Prostate Cancer*, 291(1) Cancer Lett. 1-13 (2010), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4029098/ (published online August 29, 2009) (SA_JEV_3142933-57) ("Antonarakis 2010") at 13. A randomized, placebo-controlled phase III study of sipuleucel in 127 patients with mCRPC reported no significant difference in time to disease progression but suggested an increase in overall survival. Antonarakis 2010 at 13; Small 2006 at 3091. Results from a second randomized, placebo controlled phase II/III study with 98 patients with CRPC also showed that sipuleucel did not improve time to progression, the primary endpoint, or overall survival. Antonarakis 2010 at 13. Sipuleucel was eventually approved for mCRPC (but not post-docetaxel) after a further placebo controlled phase III study that was designed to assess overall survival as its primary endpoint showed prolonged overall survival. Kantoff, *Sipuleucel-T Immunotherapy for Castration-*

54

*Resistant Prostate Cancer*, 363 N. Eng. J. Med. 411-22 (2010) ("Kantoff 2010") at 411-12. However, consistent with the multiple controlled studies previously described, the results of the phase III trial showed that time to disease progression was not prolonged.  Kantoff 2010 at 415; Antonarakis 2010 at 13.

134.    Overall survival was even more unpredictable in October 2009 with additional drugs failing to increase overall survival in controlled studies despite anticancer activity in multiple mCRPC patients, more data than what was available for cabazitaxel.  While over 200 compounds had entered clinical development for advanced prostate cancer by 2006, only docetaxel had been shown to increase overall survival.  Armstrong & Carducci, *New Drugs in Prostate Cancer*, 16 Curr. Opin. Urol. 138-45 (2006) (SA_JEV_2178004-11) at 138.

135.    For example, atrasentan, a selective endothelial-A receptor antagonist, was reported to reduce PSA levels (between 4-47%) in 5 out of 11 (45%) patients in an uncontrolled study.  Carducci, *Atrasentan, an Endothelin-Receptor Antagonist for Refractory Adenocarcinomas: Safety and Pharmacokinetics*, 20(8) J. Clin. Oncol. 2171-80 (2002) (SA_JEV_3142916-25) ("Carducci 2002") at 2176.  Carducci 2002 also reported that 5 out of 15 (33%) patients with tumor-related pain reported alleviation of pain during treatment.  *Id* Another uncontrolled phase I study of atrasentan in Japanese patients with CRPC reported a 50% PSA reduction in one patient.  Fujisaka, *Phase 1 Study of Atrasentan (ABT627), Novel Endothelin Receptor-A Antagonist, in Japanese Patients with Hormone Refractory Prostate Cancer*, 24(18S) J. Clin. Oncol. (Abstr. 14602) (2006) (SA_JEV_3142958-59).  In a randomized, placebo-controlled phase II trial of atrasentan, the increase in time to PSA progression was statistically significant.  Carducci, *Effect of Endothelin-A Receptor Blockade With Atrasentan on Tumor Progression in Men With Hormone-Refractory Prostate Cancer: A*

55

*Randomized, Phase II, Placebo-Controlled Trial*, 21 J. Clin. Oncol. 679-89 (2003) at 683; *see also* Carducci, *A Phase 3 Randomized Controlled Trial of the Efficacy and Safety of Atrasentan in Men with Metastatic Hormone-Refractory Prostate Cancer*, 110(9) Cancer 1959-66 (2007) (SA_JEV_0182794-801) ("Carducci 2007") at 1960 (reporting that results of the phase II trial showed a "nonsignificant trend in delaying clinical disease progression was noted in favor of atrasentan"). However, in a larger placebo-controlled study, atrasentan did not significantly increase the time to disease progression or overall survival as compared to placebo. Carducci 2007 at 1962-63. In a later controlled phase III trial studying atrasentan in combination with docetaxel versus docetaxel and placebo in patients with mCRPC, the authors of Quinn 2013 reported that a phase I/II trial of atrasentan in combination with docetaxel in patients with mCRPC showed "reasonable activity" based on PSA. Quinn, *Docetaxel and Atrasentan Versus Docetaxel and Placebo for Men with Advanced Castration-Resistant Prostate Cancer (SWOG S0421): a Randomized Phase 3 Trial*, 14 Lancet Oncol. 893-900 (2013) (SA_JEV_0183136-143) ("Quinn 2013") at 893-94. Yet the phase III results showed that compared with the placebo group, progression-free survival and overall survival were not improved by adding atrasentan. *Id*. at 896-97.

136.    Another example is suramin, a polysulphonated napthylurea, which had been evaluated in numerous prostate cancer studies. Kaur at 209-10. In an uncontrolled phase II study of suramin in men with CRPC with 38 patients, three patients exhibited complete responses, three exhibited partial responses, and thirteen patients had PSA declines of 75% or more. *Id*. at 210. Later, in a phase I uncontrolled prostate cancer study, investigators reported that 77% of patients had a $\geq$ 50% decline in PSA and 55% of patients had a reduction of $\geq$ 75% in PSA. *Id* In a controlled phase III trial of patients with CRPC, the combination of suramin

and hydrocortisone was compared with hydrocortisone plus placebo.  *Id*.  Despite statistically significant PSA advantages, pain relief, and increased time to disease progression in the suramin arm, there were problems with toxicity and no increase in overall survival.  *Id*.  Suramin was ultimately not recommended for approval by the FDA.  Kaur  at 210.  The authors of Kaur suggest that early results may have been misleading because the effects of anti-androgen withdrawal (the response upon cessation of anti-androgen treatment), the palliative and anti-tumor activity of hydrocortisone, and fluctuation of PSA independent of antitumor effects were not fully understood or considered by the field.  *Id*. at 217.

137.   Satraplatin, a platinum chemotherapy, is an example of a drug that can prolong the time until disease progression but not prolong life.  An uncontrolled phase I study reported that after receiving two cycle of satraplatin, a mCRPC patient who had progression after multiple chemotherapies had no further need of analgesics and "complete relief of tumour pain due to retroperitoneal nodes."  Sessa, *Phase I Clinical and Pharmacokinetic Study of the Oral Platinum Analogue JM216 Given Daily for 14 Days*, 9 Annals of Oncol. 1315-22 (1998) at 1319.  An uncontrolled phase II study reported a PSA response in 10 patients (26%) and a tumor response in 2 patients with measurable disease (10%).  Latif, *Phase II Study of Oral Bis (Aceto) Ammine Dichloro (Cyclohexamine) Platinum (IV) (JM-216, BMS-182751) Given Daily X5 in Hormone Refractory Prostate Cancer (HRPC)*, 23 Investig. New Drugs 79-84 (2005) (SA_JEV_2177990-95) at 79.  The phase III SPARC clinical study of satraplatin plus prednisone compared to placebo plus prednisone in mCRPC with progression after one prior chemotherapy reported a statistically significant increase in PFS, but not overall survival, which was ultimately insufficient to support regulatory approval.  Beardsley at 162-63.  Beardsley acknowledged that "the clinical significance of this difference in PFS is open to interpretation."  *Id*. at 162.

138.    The unpredictability as to whether a drug shown to reduce PSA, reduce measurable tumor size, or reduce pain in a few patients would increase survival endpoints as compared to another therapy in a controlled study continued well after October 2009 and is confirmed by further negative studies.

139.    For example, in an uncontrolled phase II study in men with chemotherapy naïve CRPC, lenalidomide, a thalidomide analog sold under the brand name Revlimid® for certain myelomas and lymphomas, was reported to reduce PSA levels in thirteen (48%) patients, with three patients experiencing a decline of more than 50%.  Nabhan, *Lenalidomide Monotherapy in Chemotherapy-Naïve Castration-Resistant Prostate Cancer Patients: Final Results of a Phase II Study*, 12(1) Clin. Genitourinary Cancer 27-32 (2014) at 27.  PSA reductions and partial responses were also reported in an uncontrolled phase I study in combination with docetaxel.  *Id.* at 31.  However, a phase III study evaluating the combination of docetaxel and prednisone with lenalidomide as compared to docetaxel and prednisone was terminated early because the survival was worse for the patients receiving lenalidomide; PFS was longer in the control arm.  Petrylak, *Docetaxel and Prednisone With or Without Lenalidomide in Chemotherapy-Naïve Patients with Metastatic Castration-Resistant Prostate Cancer (MAINSAIL): A Randomised, Double-Blind, Placebo-Controlled Phase 3 Trial*, 16(4) Lancet Oncol. 417-25 (2015) at 417, 422-23.  The authors note the need for more stringent criteria before phase III studies are initiated and that the heterogeneity of mCRPC is a key factor in the clinical failures because preclinical models do not reflect human tumors.  *Id.* at 424.

140.    Dasatinib, a kinase inhibitor sold under the brand name Sprycel® for certain leukemias, was reported to reduce PSA levels by at least 50% in three patients in an uncontrolled phase II study, one of which had a "sustained" response remaining on dasatinib for more than 80

58

weeks.  Yu, *Phase II Study of Dasatanib in Patients with Metastatic Castration-Resistant Prostate Cancer*, 15(23) Clin. Cancer Res. 7421-28 (2009) at 7425.  A further uncontrolled study at a lower dose reported a patient with a PSA reduction of more than 50% and a partial response in measurable disease in another patient.  Yu, *Once-Daily Dasatinib: Expansion of Phase II Study Evaluating Safety and Efficacy of Dasatinib in Patients with Metastatic Castration-Resistant Prostate Cancer*, 77(5) Urology 1166-71 (2011) at 4.  In a phase III study comparing docetaxel plus dasatinib to docetaxel alone, there was no statistically significant difference in PFS or overall survival.  Araujo, *Docetaxel and Dasatinib or Placebo in Men with Metastatic Castration-Resistant Prostate Cancer (READY): a Randomised, Double-Blind Phase 3 Trial*, 14 Lancet Oncol. 1307-16 (2013) at 1311-12.  The authors note the limitations of uncontrolled phase II studies and the particular challenge raised by mCRPC, including its heterogeneity and absence of biomarkers for responding patients.  *Id* at 1314.

141.    Various drugs approved for other indications failed to increase overall survival in controlled studies in mCRPC despite the requisite antitumor activity in at least some patients in early phase studies needed to begin such randomized, controlled studies.  For example, bevacizumab, an antibody sold under the brand name Avastin®, in combination with docetaxel and prednisone failed to increase overall survival as compared to docetaxel in combination with prednisone.  Sa'Pinto & Hirschler, *Update-3 Roche's Avastin Fails in Prostate Cancer Study*, Reuters (Mar. 12, 2010), *available at* https://www.reuters.com/article/roche/update-3-roches-avastin-fails-in-prostatecancer- study-idUSLDE62B02V20100312 (SA_JEV_3142960-62).  Sunitinib, a kinase inhibitor sold under the brand name Sutent®, in combination with prednisone failed to increase overall survival compared to prednisone in men with mCRPC progressing after docetaxel.  Michaelson, *Randomized, Placebo-Controlled, Phase III Trial of Sunitinib Plus*

*Prednisone Versus Prednisone Alone in Progressive, Metastatic, Castration-Resistant Prostate Cancer*, 32(2) J. Clin. Oncol. 76- 82 (2014) (SA_JEV_0182941-48) at 78.  Ipilimumab, an antibody sold under the brand name Yervoy®, when administered after radiation, failed to increase overall survival compared to placebo in men with mCRPC previously treated with docetaxel.  *Bristol-Myers Squibb Reports Results for Phase 3 Trial of Yervoy® (Ipilimumab) in Previously-Treated Castration Resistant Prostate Cancer*, BMS Press Release (September 12, 2013), *available at* https://news.bms.com/news/r-and-d/2013/Bristol-Myers-Squibb-Reports-Results-for-Phase-3-Trial-of-Yervoy-Ipilimumab-in-Previously-Treated-Castration-Resistant-Prostate-Cancer/default.aspx. (SA_JEV_ 0182781-87).  In another phase III study, ipilimumab also failed to increase overall survival compared to placebo in men with mCRPC who had not previously received chemotherapy.  Beer, *Randomized, Double-Blind, Phase III Trial of Ipilimumab Versus Placebo in Asymptomatic or Minimally Symptomatic Patients with Metastatic Chemotherapy-Naïve Castration-Resistant Prostate Cancer*, 35(1) J. Clin. Oncol. 40-47 (2017) at 40.  The hormone therapy orteronel failed to increase overall survival in two phase III studies, one in men with mCRPC previously treated with docetaxel and the other in men who had not previously received chemotherapy.  Van Hook, *Orteronel for the Treatment of Prostate Cancer*, 10(5) Future Oncol. 803-11 (2014) (SA_JEV_0183299-307) at 803, 807-08; *Takeda Announces Termination of Orteronel (TAK-700) Development for Prostate Cancer in Japan, U.S.A. and Europe*, Takeda Latest News Release (June 19, 2014), *available at* http://www.takeda.com/news/2014/20140619_6615.html (SA_JEV_0183275-276).

142.    This real world unpredictability demonstrates that the uncontrolled phase I data available for cabazitaxel would not have allowed a POSA to reasonably expect cabazitaxel would increase overall or progression-free survival as compared to mitoxantrone therapy.

60

**3.     A POSA Would Not Have Extrapolated from Pivot's Breast Cancer Data to mCRPC That Had Progressed During or After Treatment with Docetaxel**

143.     Pivot was a single arm, uncontrolled study in 71 patients with taxane-resistant metastatic breast cancer, wherein the patients had a 14% objective response rate to cabazitaxel treatment.[16]  Pivot at 1547.  The authors do not make any conclusions or predictions about whether the breast cancer patients on the study experienced prolonged times until progression or death.[17]  The authors state that the results justify further clinical testing, but do not mention prostate cancer or any other tumor types.  Pivot at 1551.

144.     To the extent that a POSA would have viewed the results of Pivot as "positive" or "effective," by whatever measure Dr. Ratain is using (e.g., in ¶ 176 of his report), a POSA would not have extrapolated such results to patients having mCRPC that had progressed during or after treatment with docetaxel.

145.     It is a well understood principle of clinical medicine that a phase II study evaluates efficacy of a therapy for a particular indication.  Mokbel at 7; EMA, ICH Topic E8 General Considerations for Clinical Trials (1998) (SA_JEV_3143035-48) at 9.  While drugs may ultimately prove effective in multiple indications, activity cannot be generalized because "each independently arising tumor is a unique biological entity with its own pattern of

---

[16] Tumor response rates in single arm phase II studies "ha[ve] repeatedly been shown to be a poor surrogate" for time-to-event endpoints like overall survival or PFS.  Ratain & Sargent, *Optimising the Design of Phase II Oncology Trials: the Importance of Randomization*, 45 Eur. J. Cancer 275-80 (2009) at 275, 278.

[17] Mitoxantrone had also been shown to induce partial responses in metastatic breast cancer patients.  Heidemann at 1717, 1719, 1723 (mitoxantrone induced complete and partial remissions in 30 women (25%) with measurable metastatic breast cancer who had not previously received chemotherapy for their metastatic disease).

chemosensitivity."  Bissery, *Experimental Antitumor Activity of Taxotere (RP 56976, NSC 628503), a Taxol Analogue*, 51 Cancer Res. 4845-4852 (1991) (CabRef0000159-67) at 4851.  A clinical study in a particular tumor type is needed to determine whether a drug is effective for that tumor.  A POSA would therefore not have generalized from Pivot's reports in metastatic breast cancer patients to men with mCRPC.

146.     Breast and prostate cancer were known to differ significantly.  The National Comprehensive Cancer Network ("NCCN") practice guidelines in oncology for each cancer are instructive on the different breakdown of breast and prostate cancer patients and their respective treatment.

147.     Breast cancer stratification was well ahead of prostate cancer, with patients broken down into subtypes including ductal, lobular, mixed, metaplastic, tubular, or colloid. NCCN Guidelines Breast Cancer V.1.2009 (SA_JEV_0182951-3072) ("NCCN Breast") at SA_JEV_0182963.  Breast cancer patients were further distinguished based on molecular signature—specifically estrogen or progesterone receptor and HER2 status.  *Id*.  This classification system for breast cancer has allowed for more specific matching of treatments to patients.

148.     There were no such "robust subtypes of prostate cancer with different prognoses," like there were for breast cancer.  Taylor, *Integrative Genomic Profiling of Human Prostate Cancer*, 18(1) Cancer Cell 11-22 (2010) (SA_JEV_0183277-88) at 11-12.  Unfortunately, despite the heterogeneous mCRPC population, there were no accepted subtypes by October 2009 that permitted physicians to make more tailored treatment decisions.

149.     The recommended treatments for breast and prostate cancer differed significantly. Systemic chemotherapy was only recommended in metastatic, castration-resistant prostate

62

cancer.  NCCN Guidelines Prostate Cancer V.2.2009 (CabRef0002910-55) ("NCCN Prostate")
at CabRef0002915-20, CabRef0002925, CabRef0002945-46.  But in breast cancer, systemic
chemotherapy was recommended in a variety of settings—even for patients that were not
metastatic—such as adjuvant prior to surgery, and chemotherapy was offered before endocrine
therapy in some circumstances.  NCCN Breast at SA_JEV_0182964-68, SA_JEV_0182970-73,
SA_JEV_0182976-78.

     150.    Different chemotherapies were recommended for breast and prostate cancer.  The
recommended chemotherapies for prostate cancer in 2009 included docetaxel in combination
with prednisone or estramustine; mitoxantrone in combination with prednisone; or cisplatin or
carboplatin in combination with etoposide.  NCCN Prostate at CabRef0002920, CabRef0002927.
For breast cancer, the NCCN Guidelines recommended a variety of chemotherapy regimens in
the adjuvant setting and for metastatic disease, including docetaxel alone or in combination with
doxorubicin and cyclophosphamide, and a number of agents not recommended for prostate
cancer: doxorubicin, epirubicin, capecitabine, gemcitabine, cyclophosphamide, vinblastine,
fluorouracil, ixabepilone, vinorelbine, and combinations thereof.  NCCN Breast 2009 at
SA_JEV_0182989-92, SA_JEV_0182996-99.

     151.    There were also a number of therapies approved and used to treat metastatic
breast cancer that had disappointing CRPC clinical studies, further demonstrating that a POSA
could not look at anticancer activity in an uncontrolled phase II breast cancer study like Pivot
and form reasonable expectations about the drug's activity in mCRPC.

     152.    Ixabepilone is an epothilone which, like cabazitaxel, interferes with cell division
by binding microtubules.  Ixabepilone was approved for metastatic breast cancer under the brand
name Ixempra®.  Ixempra® Label 2007 (SA_JEV_3142837-70) at 2; NCCN Breast at

SA_JEV_0182996-99.  Beardsley describes the drug as having "significant toxicity and a low level of activity" in men with mCRPC.  Beardsley at 163.  A study comparing ixabepilone to mitoxantrone in men with mCRPC and disease progression during or within 60 days of completing taxane chemotherapy reported more patients on the mitoxantrone arm with PSA and objective responses and overall "similar" activity.  Rosenberg at 556-57, 560.

153.    Trastuzumab was approved in breast cancer, including as a single agent, under the brand name Herceptin®.  Herceptin® Label Jan. 2008 (SA_JEV_2177022-32) at 2.  A phase II study in CRPC reported "little efficacy," where two patients experienced a PSA reduction by less than 50%.  Ziada, *The Use of Trastuzumab in the Treatment of Hormone Refractory Prostate Cancer; Phase II Trial*, 60 The Prostate 332-37 (2004) (SA_JEV_2176926-31) at 332.

154.    Capecitabine was also approved as a single agent in metastatic breast cancer resistant to both paclitaxel and an anthracycline-containing regimen under the brand name Xeloda®.  Xeloda® Label Feb. 2003 (SA_JEV_2177055-93) at 14.  Capecitabine was reported to have "limited" activity in a phase II mCRPC study where three patients had a PSA response, but there were also three deaths during treatment.  Morant, *Capecitabine in Hormone Resistant Metastatic Prostatic Carcinoma – a Phase II Trial*, 90 Brit. J. Cancer 1312- 17 (2004) (SA_JEV_2176987-992) at 1312, 1316.  Further study of capecitabine as a single agent in mCRPC was not recommended.  *Id.* at 1316

155.    Gemcitabine was approved in combination with paclitaxel for metastatic breast cancer after failure of anthracyclines under the brand name Gemzar®.  Gemzar® Label April 2006 (SA_JEV_2177895-917) at 9.  A phase II study evaluating gemcitabine in combination with docetaxel in mCRPC reported that the combination had similar activity to docetaxel alone and added toxicity, and thus did not recommend further study of the regimen.  Garcia,

*Gemcitabine and Docetaxel in Metastatic, Castrate- Resistant Prostate Cancer*, 117(4) Cancer 752-57 (2011) (SA_JEV_2176975-80) at 752, 756-57.

156.    The inability to extrapolate a chemotherapy's activity from one cancer to another is further demonstrated by examples of drugs that were approved in other cancers but had disappointing prostate cancer results.

157.    Irinotecan was approved for metastatic colorectal cancer both in combination with 5-fluorouracil and leucovorin and as a single agent following fluorouracil therapy under the brand name Camptosar®.  Camptosar® Label July 2006 (SA_JEV_2176937-74) at 16.  A phase II mCRPC study of irinotecan reported no "significant activity" and no PSA or objective responses. Reese, *A Phase II Trial of Irinotecan in Hormone-Refractory Prostate Cancer*, 16 Investig. New Drugs 353-59 (1999) (SA_JEV_2177047-54) at 353, 356.

158.    Pemetrexed was approved as a single agent for locally advanced or metastatic nonsquamous non-small cell lung cancer following chemotherapy under the brand name Alimta®.  Alimta® Label Sept. 2008 (SA_JEV_2177940-59) at 2.  A clinical study of pemetrexed in mCRPC with progression after one taxane-based chemotherapy regimen reported four patients with PSA reductions and two patients with a confirmed partial response, but concluded that activity was modest and that it was "unlikely to add significant clinical benefit over that seen with traditional second-line chemotherapy agents such as mitoxantrone."  Hahn at 1791, 1793. Another phase II study in mCRPC with progression after first-line treatment with docetaxel reported the activity as "discouraging," with poor tolerability and two out of 19 patients having a PSA response.  Caffo, *Pemetrexed as Second-Line Chemotherapy For Castration-Resistant Prostate Cancer After Docetaxel Failure: Results from a Phase II Study*, 31 Urol. Oncol. 180-86

(2013) (SA_JEV_2176915-21) at 180, 182-84.  These results led to the conclusion that "no further studies of this drug should be performed in CRPC patients."  *Id.* at 180.

159.    Gefitinib was approved for treating non-small cell lung cancer after failure of platinum based and docetaxel chemotherapy under the brand name Iressa®.  Iressa® Label April 2004 at 7.  Two phase II studies reported that the drug was not active in CRPC.  Canil, *Randomized Phase II Study of Two Doses of Gefitnib in Hormone-Refractory Prostate Cancer: A Trial of the National Cancer Institute of Canada–Clinical Trials Group*, 23(3) J. Clin. Oncol. 455-60 (2005) at 455, 459 (no PSA or objective responses); Small, *A Phase II Trial of Gefitinib in Patients with Non-Metastatic Hormone-Refractory Prostate Cancer*, 100 BJU Int'l 765-69 (2007) at 765 (no PSA responses).

160.    Topotecan was approved for metastatic ovarian cancer after failure of initial chemotherapy, non-small cell lung cancer after failure of firs- line chemotherapy, and in combination with cisplatin for certain types of cervical cancer under the brand name Hycamtin®.  Hycamtin® Label June 2006 (SA_JEV_2177967-89) at 8.  A phase II study in mCRPC reported the drug to be "ineffective," because there were no confirmed tumor responses.  Klein., *SWOG-9510: Evaluation of Topotecan in Hormone Refractory Prostate Cancer: A Southwest Oncology Group Study*, 52(4) The Prostate 264-68 (2002) (SA_JEV_2177924-28) at 264, 267.

161.    The fact that the breast cancer patients in Pivot were taxane-resistant does not lead to a reasonable expectation that cabazitaxel would be active in taxane-resistant mCRPC patients.  As discussed above, taxane resistance in mCRPC was heterogenous and complex, with multiple potential mechanisms occurring within a cell, and within a single patient.  Supra Section VI.C.1.  Takeda also reported that resistant breast and prostate cancer cell lines had different gene expression patterns, indicating that the mechanisms for taxane resistance were not

consistent between breast and prostate cancer patients.  Takeda at 965.  Furthermore, a breast cancer patient and a prostate cancer patient who have each experienced disease progression after receiving docetaxel will likely have received different medications in the course of their treatments.  The breast cancer patient may or may not have received a hormone-based treatment prior to docetaxel and also may have received an anthracycline or capecitabine.  A patient's tolerance and response to subsequent treatments can be affected by those they have taken previously.

162.     Dr. Ratain also points to Beardsley as bridging the gap between the Pivot study in breast cancer and the TROPIC study.  Ratain Report at ¶¶ 135-37.  Beardsley is a review article by two physicians at the British Columbia Cancer Agency in Vancouver on a variety of different approaches under investigation for mCRPC patients that progressed during or after receiving first-line docetaxel.  Beardsley at 161.  Beardsley discusses multiple types of chemotherapy and a wide variety of targeted agents, but does not single out cabazitaxel as being more promising than any other therapy.  *See id*. at 163.  Beardsley does not provide any further data on cabazitaxel.  Beardsley notes that Sanofi had skipped a phase II study in prostate cancer.  *Id*.  Beardsley states that "given its activity" in the Pivot study, "this agent is currently being investigated" in the TROPIC study, and that the "projected completion date" is in May 2010.  *Id*.  The Beardsley authors are not affiliated with Sanofi.  A POSA would have understood that any statement about why Sanofi skipped a phase II study in prostate cancer after Pivot was conjecture.  Beardsley does not state or suggest that cabazitaxel is expected to increase survival in the TROPIC study.

### 4.     The Existence of the TROPIC Study Would Not Have Provided a Reasonable Expectation of Increasing Survival

163.     Dr. Ratain relies on various references disclosing the existence of the TROPIC study in support of obviousness, including Rodrigues, *Open Clinical Uro-oncology Trials in Canada*, 14(6) Canadian J. Urology 3779-3786 (2007) (CabRef0002991-98) (2007) ("Rodrigues"); Winquist, *Open Clinical Uro-oncology Trials in Canada*, 15(1) Canadian J. Urology 3942-3949 (2008) (CabRef0005051-60) ("Winquist"); The Gujarat Cancer & Research Institute, Annual Report (2007-2008) (CabRef0002709-2848) ("GCRI Report"); National Horizon Scanning Centre, *Cabazitaxel (XRP-6258) for Hormone Refractory, Metastatic Prostate Cancer – Second Line After Docetaxel*, Univ. Birmingham, 1-6 (Apr. 2009) (CabRef0002956-60) ("NHSC"); XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer (TROPIC), available at http://clinicaltrials.gov/archive/NCT00417079/2006_12_28 (CabRef0002472-73) ("Clinicaltrials.gov 2006"); XRP6258 Plus Prednisone Compared to Mitoxantrone Plus Prednisone in Hormone Refractory Metastatic Prostate Cancer, available at https://clinicaltrials.gov/archive/NCT00417079/2008_08_31 (CabRef0002474-76) ("Clinicaltrials.gov 2008").[18]

164.     These various descriptions of the TROPIC study do not provide any data for cabazitaxel and therefore provide no further basis to form a reasonable expectation about the ability of cabazitaxel to increase survival compared to mitoxantrone.  I therefore disagree that

---

[18] The two Clinicaltrials.gov listings contain essentially the same information about the TROPIC study.  The fact that the TROPIC study was ongoing through 2008 does not indicate that the study would have positive results, just that it had not been prematurely terminated for adverse effects or futility.

these clinical study descriptions "teach a method of treating" patients with mCRPC that had progressed during or after treatment with docetaxel, or that the existence of this study would have motivated a POSA to administer cabazitaxel to the patients of the asserted claims with the intent to increase survival. Ratain Report at ¶¶ 120, 167.

165.   A POSA would have known that cabazitaxel was being evaluated at a dose of 25 mg/m$^2$ every three weeks in combination with prednisone as compared to mitoxantrone in combination with prednisone in men with mCRPC previously treated with docetaxel and disease progression. Clinicaltrials.gov 2008; Winquist at 3948. The primary endpoint of the study was known to be overall survival, which means the hypothesis being evaluated in the TROPIC study is whether cabazitaxel therapy will turn out to prolong life as compared to mitoxantrone therapy. The study was happening because the result was unknown. The existence of the study and its primary endpoint does not mean that a positive result is reasonably expected or that patients were enrolled with a reasonable expectation of increasing their survival.

166.   I disagree with Dr. Ratain's argument that because mitoxantrone had been shown to increase at least pain PFS, cabazitaxel must have been at least reasonably expected to increase some subset of PFS in some patients. Ratain Report at ¶ 192. That argument is referring to an expectation as compared to no treatment, not to mitoxantrone. A POSA would not have reasonably expected that cabazitaxel would increase PFS as compared to mitoxantrone therapy. The TROPIC study was being conducted because it was unknown whether cabazitaxel would be better, worse, or the same as mitoxantrone with respect to any metric. There was an "urgent" unmet need for a life-prolonging treatment for mCRPC patients that had already progressed despite docetaxel treatment. Beardsley at 161. The mere possibility of benefit from cabazitaxel in these terminally ill patients who had few treatment options was sufficient to ethically conduct

the study with careful oversight such as an independent data monitoring committee, but it does not mean an increase in any aspect of PFS or overall survival was reasonably expected for cabazitaxel as compared to mitoxantrone.

167.    Furthermore, the TROPIC study was unusual in that it was supported by such little data.  There had only been a single man with mCRPC that had progressed during or after treatment with docetaxel with a partial response to cabazitaxel of unknown duration.  Sanofi took a risk by skipping a phase I or II study limited to men with prostate cancer, let alone the specific patient population enrolled in TROPIC.  More than 70% of oncology drugs fail in the phase II trial stage.  Kola & Landis, *Can the Pharmaceutical Industry Reduce Attrition Rates?*, 3 Nature Reviews Drug Discovery 711-15 (2004) (CabRef0002889-93) at 712; *see also* Booth, *From the Analyst's Couch: Oncology's Trials*, 2 Nature Reviews Drug Discovery 609-10 (2003) (SA_JEV_0004444-45) ("Booth") at 610 (reporting that from the top fifteen pharmaceutical companies, less than 40% of oncology drugs make it past phase II studies).  But even considering the Pivot phase II study (or assuming Sanofi had performed a phase II study in prostate cancer), a POSA would have known phase II trials in oncology were notoriously not predictive of phase III outcomes with survival-based endpoints.  Booth at 610; Ratain, *Phase II Oncology Trials: Let's Be Positive*, 11(16) Clin. Cancer Res. 5661-62 (2005) (CabRef0005135-36) ("Ratain 2005").  The unpredictability was known to be particularly high for advanced prostate cancer where drug after drug failed to increase overall survival in phase III studies despite showing anticancer activity in phase I and/or II studies in populations of men with prostate cancer.

168.    Thus, while the hope was that the TROPIC study would ultimately be positive, in view of the very minimal data available for cabazitaxel and the known failures of other drugs to

70

prolong life and/or increase PFS in men with mCRPC, the expectation at that time was that the study would more likely be yet another failure.

169.    Indeed, Dr. Ratain studied the positive predictive value of phase II oncology studies, that is, the likelihood of regulatory approval (usually based on survival outcomes) for a disease given a threshold response rate in phase II studies, and found that for a breast cancer study with an objective response rate greater than 10% but lower than 20%, like Pivot, the positive predictive value for approval in breast cancer was only 25%.[19]  Ratain 2005 at 5661-62. The chances of success would have been understood to be significantly lower if moving from a phase II study in breast cancer with a response rate of 14% to a survival-based outcome in a different tumor type, even more so considering the difficult nature of treating mCRPC.

170.    A review discussing various failed phase III clinical studies in men with mCRPC (all combinations with docetaxel) where overall survival was not improved stated that "accurate prediction of a positive phase III study is an impossible endeavor."  Antonarakis & Eisenberger, *Phase III Trials with Docetaxel-Based Combinations for Metastatic Castration-Resistant Prostate Cancer: Time to Learn from Past Experiences*, 31(14) J. Clin. Oncol. 1709-12 (2013) (SA_JEV_0183984-87) at 1711.  The authors conclude that phase III trials should not be conducted without "at least one phase II study that has met a prespecified rationally selected primary end point and its predefined metric for success."  *Id*.

---

[19] As an example, larotaxel had a higher response rate than Pivot of 19% in taxane-resistant patients, but it was known by October 2009 that larotaxel did not prolong overall or progression-free survival as compared to capecitabine when it advanced to a controlled study.  Supra Section VI.C.1.

71

171.     Fortunately for patients with advanced cancers, pharmaceutical companies such as Sanofi are willing to invest the considerable amount of money and resources to conduct phase III clinical studies despite the high likelihood of failure where, like here, there exists an urgent need for new treatment options with the hope of a breakthrough.  *See, e.g.*, Matrisian & Berlin, *The Past, Present, and Future of Pancreatic Cancer Clinical Trials*, ASCO Education Book e205-15 (2016) (discussing the conduct of 39 phase III studies in advanced-stage pancreatic cancer despite a "dismal 11%" success rate).  I was shocked when I heard of the positive overall survival results for cabazitaxel from the TROPIC study.  This was a very important clinical result with clear implications for patients—it was practice-changing.  I also recall that my oncology and urology colleagues were similarly surprised that cabazitaxel was shown to prolong life in men with mCRPC that had progressed during or after treatment with docetaxel, meeting the urgent unmet need that had existed since at least the approval of docetaxel in mCRPC in 2004.  *See* Malhotra, *Cabazitaxel: A Novel Drug for Hormone-Refractory Prostate Cancer*, 13(2) Mini Rev. Med. Chem. 1-6 (2013) (SA_JEV_0182933-39) at 1 (reporting cabazitaxel to be a "major success in second line chemotherapy").[20]

172.     The FDA expedited approval of Jevtana® (cabazitaxel) in just eleven weeks, granting a fast-track designation and priority review.  June 17, 2010 FDA News Release

---

[20] Others similarly praised Jevtana® for "provid[ing] patients with a better chance of survival when dealing with such a difficult illness." *New Hope in Advanced Prostate Cancer: Alberta, Saskatchewan and Ontario Fund Coverage for Jevtana® [Cabazitaxel]*, CNW Press Release (Oct. 4, 2012), http://www.newswire.ca/news-releases/new-hope-in-advanced-prostate-canceralberta-saskatchewan-and-ontario-fund-coverage-for-jevtana-cabazitaxel-510872201.html (SA_JEV_0182923-24) at 1 (quoting Bob Shiell, Executive Director, Prostate Cancer Canada Network (PCCN) Calgary).

(SA_JEV_0182854-55) at 1; July 19, 2010 Sanofi-aventis Press Release (SA_JEV_0182892-95) at 2.

173.     In view of the minimal data available for cabazitaxel by October 2009, the demonstration in TROPIC that cabazitaxel therapy at a starting dose of 25 mg/m$^2$ with dose reductions to 20 mg/m$^2$ in combination with prednisone increased progression-free and overall survival as compared to mitoxantrone in combination with prednisone was surprising and unexpected, further supporting the nonobviousness of the asserted claims.  '777 patent at Figures 1-3, col. 11, ll. 38-50, col. 12, ll. 30-35, col. 16, ll. 45-52, col. 17, ll. 1-24, col. 17, ll. 35-49; '110 patent at Figures 1-3, col. 11, ll. 40-53, col. 12, ll. 29-34, col. 15, ll. 36-41, col. 15, l. 45-col. 16, l. 10, col. 16, ll. 20-34; de Bono, *Prednisone Plus Cabazitaxel or Mitoxantrone for Metastatic Castration-Resistant Prostate Cancer Progressing After Docetaxel Treatment: A Randomised Open-Label Trial*, 376 Lancet 1147-54 (2010) (SA_JEV_0279887-94) at 1147-50, 1152.

174.     In addition, the PROSELICA study results demonstrating non-inferior overall survival for patients receiving a starting dose of 20 mg/m$^2$ of cabazitaxel with dose reductions to 15 mg/m$^2$ as compared to a starting dose of 25 mg/m$^2$ with reductions to 20 mg/m$^2$ were also unexpected by October 2009.  Eisenberger, *Phase III Study Comparing a Reduced Dose of Cabazitaxel (20 mg/m2) and the Currently Approved Dose (25 mg/m$^2$) in Postdocetaxel Patients With Metastatic Castration-Resistant Prostate Cancer—PROSELICA*, J. Clin. Oncol. 3198-3206 (2017) ("Eisenberger").  The PROSELICA results demonstrate that doses of 15-20 mg/m$^2$ of cabazitaxel also increase survival as compared to mitoxantrone, which a POSA could not have reasonably expected in view of the prior art in which it was not clear whether any patient had a response to 20 mg/m$^2$ of cabazitaxel.

73

**D.     A POSA Would Not Have Had a Reasonable Expectation of Increasing Survival by Administering a Starting Dose of 20 mg/m$^2$ with Reductions to 15 mg/m$^2$ of Cabazitaxel**

175.     I disagree with Dr. Ratain that a POSA would have reasonably expected 15-25 mg/m$^2$, 15 mg/m$^2$, 20 mg/m$^2$, or 25 mg/m$^2$ of cabazitaxel to increase survival as compared to mitoxantrone.

176.     The disclosures relating to the TROPIC study identified a 25 mg/m$^2$ dose of cabazitaxel.  Winquist at 3948.  None of the TROPIC disclosures identifies other doses of cabazitaxel.  While the single docetaxel-refractory mCRPC patient in Mita with a partial response received 25 mg/m$^2$, Mita did not recommend that dose for further study because of febrile and grade 4 neutropenia.  Mita at 726-29.  Pivot reported that only 28% of patients could escalate to 25 mg/m$^2$ because the remaining patients experienced a "significant" adverse event at their first cycle at a lower dose of 20 mg/m$^2$.  Pivot at 1548, 1550.  Pivot reported grade 3-4 neutropenia in 73% of patients, with 49% of patients experience grade 4 neutropenia, and 27% of patients having neutropenia lasting more than 5 days.  Pivot at 1550.  Attard cautioned that cabazitaxel's ability to kill tumor cells, i.e., its anticancer activity, could be restricted by its negative effects on blood counts.  Attard at 75.

177.     On the other hand, there had been no confirmed partial responses at a cabazitaxel dose lower than 25 mg/m$^2$ in any patient who had previously received docetaxel.  As explained above, the 80-year old man with mCRPC who experienced a partial response at 15 mg/m$^2$ in Mita had not previously received docetaxel, and a POSA could not have predicted whether this man would have responded to cabazitaxel at all had he progressed despite docetaxel, or whether a higher dose of cabazitaxel would have been needed to elicit a response.  Supra Section VI.C.2.  Furthermore, in Pivot, the response rate was 14%, but 28% of women were able to receive 25

74

mg/m$^2$, meaning that all responding women could have received 25 mg/m$^2$.  Pivot at 1550.  Thus, there was no evidence of anticancer activity in post-docetaxel patients at doses of 15-20 mg/m$^2$ of cabazitaxel.

178.    In view of the toxicity data, a POSA would have thought that the starting dose of 25 mg/m$^2$ of cabazitaxel in TROPIC could be too high, leading to premature discontinuation of treatment, reduction to lower but ineffective doses, or possibly deaths from complications associated with treatment (as reported in Lortholary at a 30 mg/m$^2$ dose), all of which would prevent cabazitaxel from increasing survival as compared to mitoxantrone.  But the lack of confirmed anticancer activity at doses below 25 mg/m$^2$ would not have allowed a POSA to reasonably expect those doses of cabazitaxel to increase survival as compared to mitoxantrone.

179.    As explained above, it was surprising and unexpected to a POSA in October 2009 that administering a starting dose of 20 mg/m$^2$ with dose reductions to 15 mg/m$^2$ would increase survival as compared to mitoxantrone as demonstrated by the PROSELICA study.  Supra Section VI.C.4;  Eisenberger at 3198.

180.    Dr. Ratain discusses dose reductions with other taxanes and oncology in general. Ratain Report at ¶¶ 174, 198, 212, 216.  The possibility of a dose reduction in patients that experience side effects does not indicate that prior to any controlled data for cabazitaxel, a POSA could have expected dose reductions to increase survival.  As noted by Dr. Ratain, docetaxel and paclitaxel have dose reduction information provided in their labels, but physicians use those lower doses only after a higher dose has established efficacy in the indication of interest.  Put another way, once a drug has been shown to increase overall or progression-free survival at a particular dose, a POSA can make dose adjustments on an individual patient basis and maintain

the intent to increase survival.  No such controlled data was available for cabazitaxel at any dose in any patient type.

181.    Dr. Ratain also speculates that a POSA could reduce the dose of cabazitaxel for patients with hepatic impairment.  Ratain Report at ¶¶ 128, 177, 180, 201, 204.  Mita and Pivot required patients to have adequate organ function, including specifically liver function.  Mita at 724; Pivot at 1548.  The TROPIC study excluded patients with inadequate organ function, which would include liver function.  Clinialtrials.gov 2008 at 3.  In view of these limitations on patient enrollment and the extremely limited data available for cabazitaxel, a POSA would not have been motivated to administer the drug to patients with hepatic impairment or have reasonably expected such administration to increase survival as compared to mitoxantrone.

182.    Dr. Ratain further speculates that a POSA would reduce the dose if cabazitaxel was combined with other drugs such as carboplatin.  Ratain Report at ¶¶ 177, 180, 201, 204.  Dr. Ratain provides no basis for this hypothetical cabazitaxel combination treatment.  There were no published clinical studies on combinations of cabazitaxel with carboplatin or any other drug for prostate cancer and therefore no information on dosing or toxicities.  Accordingly, a POSA would not have been motivated to administer cabazitaxel combination treatment at any dose to a man with mCRPC that had progressed during or after treatment with docetaxel.

### E.    A POSA Would Not Have Been Motivated to Administer Cabazitaxel to Patients Not Resistant to Docetaxel

183.    Dr. Ratain states that the reasonable expectation of increasing survival with cabazitaxel would have been stronger for patients that were "not known to be resistant to docetaxel."  Ratain Report at ¶ 186.  Yet, Dr. Ratain fails to address the fact that a POSA would not have been motivated to administer cabazitaxel to patients expected to be docetaxel sensitive.

76

184.    Generally, there would be three common reasons for discontinuing docetaxel: (1) progression or lack of response while on treatment (indicating refractory disease), (2) unacceptable toxicity, or (3) the patient responds well for so long that the physician decides to give the patient a drug holiday (with the intention or possibility of administering docetaxel again later).  I have explained above why a POSA would not have administered cabazitaxel therapy to the first group of patients with the intent of increasing survival without knowing the results of the TROPIC study.  Supra Section VI.C.

185.    For the second category of patients, patients who may or may not have developed resistance to docetaxel but could not tolerate the drug, cabazitaxel likely would not have been considered an option.  Patients with poor tolerance of docetaxel may not have received further chemotherapy at all, let alone cabazitaxel—another taxane compound.  Cabazitaxel was an experimental drug shown to induce a partial response in a single docetaxel-refractory mCRPC patient.  Supra Sections VI.C.  It had the same overall taxane mechanism of action as docetaxel.  Therefore, to the extent there was a side-effect associated with that mechanism of action with docetaxel, for example, neutropenia, cabazitaxel would not have been expected to be a better option.  Neutropenia was the dose-limiting toxicity for cabazitaxel reported in Mita.  Mita at 726.  Mitoxantrone was suggested specifically for men who could not tolerate docetaxel.  Pienta & Smith at 309.

186.    For the third category of patients that responded exceptionally well to docetaxel, cabazitaxel also would not have been considered a reasonable option.  For a patient whose docetaxel was paused to provide a break from chemotherapy and who did not experience progression within a few months of cessation (quick progression would suggest resistance), a POSA would not have been motivated to administer experimental cabazitaxel therapy instead of

77

FDA-approved docetaxel that the patient had already done well on.  Docetaxel retreatment would have been in the patient's best interest.

187.    Furthermore, a patient expected to respond to docetaxel retreatment would also have been expected to respond to mitoxantrone.  The minimal prior art data for cabazitaxel in at most two men with mCRPC—only one previously treated with docetaxel—would not have provided a reasonable expectation that cabazitaxel would increase survival as compared to mitoxantrone in such a "sensitive" patient.

### F.    A POSA Would Not Have Been Motivated to Administer an $H_2$ Antagonist Prior to Cabazitaxel as Required by the Asserted Claims

188.    $H_2$ antagonists inhibit histamine-stimulated gastric acid secretion.  Physician's Desk Reference Medical Dictionary 2000 (SA_JEV_3143049-52) at 3.  Typically, $H_2$ antagonists are used in the treatment of acid-related duodenal and gastric ulcerations and reflux oesophagitis.  *See id*.  However, the phase I and II studies of cabazitaxel did not report adverse events relating to gastric acidity, for example, ulcers, perforation, or dyspepsia; therefore, a POSA would not have seen a need for premedication with an $H_2$ antagonist for cabazitaxel. Pivot at 1550; Mita at 727; Lortholary; Fumoleau.

189.    If a POSA was concerned about nausea and vomiting potentially associated with cabazitaxel administration, they would have administered the well-known and more effective 5-HT3 antagonists such as ondansetron and/or medicines like prochlorperazine, metoclopramide, and lorazepam as reflected by the NCCN Guidelines on Antiemesis.  *See* NCCN Guidelines Antiemesis V.3.2008 (CabRef0013398-428) at CabRef0013403-05, CabRef0013415.  Thus, a POSA would not have been motivated to use an $H_2$ antagonist prior to cabazitaxel for stomach acid related conditions.

78

190.    Dr. Ratain focuses instead on hypersensitivity reactions ("HSRs") as the motivation for an $H_2$ antagonist premedication with cabazitaxel because $H_2$ antagonists had been included in some regimens for other taxanes.  However, no clinical studies of cabazitaxel utilized or suggested an $H_2$ antagonist premedication for that purpose.  To the extent a POSA had concerns about HSRs, a POSA would not have been motivated to select an $H_2$ antagonist in view of the entirety of the prior art.

191.    Furthermore, Dr. Ratain relies on references that a POSA would not have considered in selecting a premedication for cabazitaxel and therefore would not have combined with the cabazitaxel literature relied upon by Dr. Ratain.

### 1.    None of the Cabazitaxel Clinical Studies Used or Suggested Using an $H_2$ Antagonist Premedication

192.    To my knowledge, there is no literature disclosing the use of an $H_2$ antagonist prior to cabazitaxel treatment.

193.    Mita was designed to evaluate the toxicities of cabazitaxel without premedication. Mita at 724.  No prophylactic premedication treatment to prevent HSRs or nausea and vomiting was given for the first course of cabazitaxel, and corticosteroids were not permitted as a prophylactic for nausea or vomiting.  *Id*.  Mita discloses that only two patients "experienced grade 1 hypersensitivity reactions, characterized by flushing, dizziness, and chest tightness, which did not reoccur on retreatment in the absence of premedication."  *Id*. at 727.  This indicates that the reactions were transient and that no patients received premedication to prevent or counteract hypersensitivity reactions in the study.  *Id*. at 725.

194.    Mita discloses that cabazitaxel's solubility does not require the surfactant cremophor in the formulation.  *Id.* at 724, 729.  Cremophor was known to be associated with

79

HSRs to Taxol® (paclitaxel). Taxol® Label Feb. 2000 (SA_JEV_0182705) ("Taxol® Label") at 1, 22. The ability to avoid cremophor "results in reduced incidence of hypersensitivity reaction" for cabazitaxel. Mita at 729. Mita discloses that cabazitaxel has a similar solubility to docetaxel and can therefore be formulated in the same surfactant (polysorbate 80) as docetaxel in the same concentrations. Mita at 724, 729; Taxotere® Label at 35. Docetaxel, however, was indicated at a much higher dose for prostate cancer (75 mg/m$^2$) than the doses of cabazitaxel being studied at the time (20-25 mg/m$^2$), leading to the administration of less polysorbate 80 with each dose of cabazitaxel. Taxotere® Label at 4; Pivot at 1548; Winquist at 3948. Accordingly, to the extent the polysorbate 80 surfactant itself in cabazitaxel formulations was a concern for HSRs, the concern was lessened for cabazitaxel as compared to docetaxel.[21]

195.   Mita notes that no severe HSRs or fluid retention were observed and concludes that the low incidence of fluid retention "favors" cabazitaxel. *Id.* at 728-29. More significantly, Mita states "[b]ased on the results of this study, [cabazitaxel] administration does not require premedication, thus resulting in significant administration and convenience advantages." *Id.* at 729.

_____

[21] A POSA would have understood that the rate and severity of HSRs are related to the amount of surfactant administered with a particular chemotherapy. *See, e.g.*, Chao, *Paclitaxel in a Novel Formulation Containing Less Cremophor EL as First-Line Therapy for Advanced Breast Cancer: a Phase II Trial*, 23 Investigational New Drugs 171-77 (2005) at 176 ("Reduction of [cremophor] in the formulation helped to reduce the incidence of severe HSR . . . . ); U.S. Patent Publication No. 2009/0215883 at [0012-0013] (noting that "great efforts have been made to find formulations which prevent or decrease the use of [cremophor and polysorbate 80]"), at [0008] ("[T]he presence of polysorbate 80 causes known adverse side effects due to the incorporation of said tensoactive in high concentrations—which are necessary to maintain the drug in solution—into the blood stream.").

196.    Lortholary, another phase I study of cabazitaxel used only a 5 mg IV dose of dexchlorpheniramine (an antihistamine) for premedication and did not report HSRs.  Lortholary.

197.    Fumoleau, another phase I study examining administration of cabazitaxel every week for four weeks of a five-week cycle, did not utilize a premedication and reported that "[o]nly 3 cases of mild hypersensitivity reaction (gr 1) were observed."  Fumoleau.  Fumoleau does not suggest any premedication should be given.

198.    The Pivot study in metastatic breast cancer patients utilized an IV antihistamine anti-H1 premedication.  Pivot at 1548.  HSRs were reported in 4 patients (6%), with grade 3-5 HSRs occurring in 3 patients (4%).  *Id* at 1550.  One patient experienced a grade 4 reaction, which led to withdrawal from the study, indicating that two patients experienced a grade 3 HSR. *Id*.  Fluid retention was reported in 9% of patients (8% peripheral edema, 1% pleural effusion), but no severe adverse event occurred for fluid retention.  *Id*.  Pivot describes grade 3-5 adverse events as "rare."  *Id*.

199.    Pivot does not discuss adding or changing any drugs as a premedication or suggest that further premedication is necessary.  Instead, Pivot states that the safety profile of cabazitaxel is "very favorable" compared to the safety profile of marketed taxanes (paclitaxel and docetaxel).  *Id*. at 1551.

200.    None of the disclosures regarding the phase III TROPIC study identified by Dr. Ratain described any premedication regimen to be given with cabazitaxel for HSRs.

2.      **A POSA Considering Premedication for Cabazitaxel Would Have Looked to the Taxotere® Label**

201.    Because it was known (1) that cabazitaxel was formulated in the same polysorbate 80 surfactant as docetaxel in the same concentrations, and (2) that cabazitaxel was being

81

evaluated in men with mCRPC who had previously received docetaxel, a POSA would have considered what premedications were used with the prior docetaxel regimen. Mita at 724, 729; Taxotere® Label at 35; Winquist at 3948. A POSA would have looked to the FDA-approved regimen described in the Taxotere® Label, which the FDA had determined to be safe.

202.    The FDA-approved premedication for Taxotere® (docetaxel) was only oral dexamethasone (not an antihistamine or $H_2$ antagonist), even for doses of docetaxel as high as 100 mg/m$^2$. Taxotere® Label at 1, 3-5. The premedication regimen for mCRPC was dexamethasone 8 mg given at 12, 3, and 1 hours before docetaxel. *Id*. at 1, 5.

203.    The Taxotere® Label reported that this premedication was given to prevent HSRs and fluid retention. *Id*. at 5, 13. Despite a multiple day premedication with corticosteroids, the label reported that fluid retention occurred in 64% of breast cancer patients, with 6.5% of patients suffering from severe fluid retention. *Id*.at 15. Without premedication, fluid retention was observed in 59.7% of patients, while 8.9% patients of those were severe. *Id*. This is more fluid retention than was reported for cabazitaxel.

204.    In addition, the Taxotere® Label reported that regardless of premedication (including no premedication), 21% of patients (all tumor types, n=2045) with normal liver function tests had HSRs. *Id*. at 15. The label also reported that with a 3-day premedication, 15.2% of breast cancer patients reported hypersensitivity reactions. *Id*. Lastly, without premedication, 17.6% of breast cancer patients experienced hypersensitivity reactions. Taxotere® Label at 15. A POSA would recognize that these are all higher levels of HSRs than the 6% HSR rate reported for cabazitaxel in the breast cancer patients in Pivot premedicated with only an antihistamine. Pivot at 1550. Despite the higher levels of HSRs, the FDA approved using only oral dexamethasone as the premedication for docetaxel. Pivot at 1550.

82

205.   The higher levels of HSRs reported for docetaxel are consistent with the fact that docetaxel was indicated at a much higher dose than doses of cabazitaxel being studied at the time (75 mg/m$^2$ v. 20-25 mg/m$^2$).  Taxotere® Label at 1; Pivot at 1548.  Accordingly, because it was known that the ratio of drug to polysorbate 80 is the same (40 mg/mL), a POSA would have understood that patients administered 20-25 mg/m$^2$ cabazitaxel would receive about 33% the amount of polysorbate 80 in comparison to a cycle of docetaxel administration.  Taxotere® Label at 53; Mita at 724.  The amounts would be even lower for patients receiving only 15 mg/m$^2$ of cabazitaxel.  Thus, a POSA would have been less concerned about administering cabazitaxel in a polysorbate 80 formulation than administering docetaxel in a polysorbate 80 formulation in terms of HSRs from the intravenous formulation.

206.   In addition, the Taxotere® Label had a black box warning that it was contraindicated in patients with a history of severe hypersensitivity reactions to drugs formulated with polysorbate 80.  Taxotere® Label at 1.  The Taxotere® Label explains that patients should be observed for hypersensitivity reaction "especially during the first and second infusions," when HSRs are most likely to occur.  *Id.* at 11.

207.   A POSA would have understood that a patient who experienced severe HSRs on docetaxel therapy in the first one or two infusions would not be given docetaxel again, nor would that patient be given another drug formulated in polysorbate 80 such as cabazitaxel.  The asserted claims are directed to patients who have cancer progression during or after docetaxel treatment.  A POSA would have understood that the patients recited in the claims would have tolerated docetaxel therapy without severe HSRs in the first couple of infusions after receiving the dexamethasone premedication.  Otherwise there would be no motivation to administer cabazitaxel.

83

208.     Thus, a POSA considering administering cabazitaxel to a patient with mCRPC that had progressed during or after docetaxel would not have been motivated to add an $H_2$ antagonist to the FDA-approved regimen of dexamethasone (or to swap an $H_2$ antagonist for dexamethasone).

209.     Instead of the FDA-approved regimen, Dr. Ratain looks to a small study of docetaxel in unapproved combinations and doses.  Fernandez, *Prospective Randomized Phase II Study of Gemcitabine and Vinorelbine Versus Gemcitabine and Docetaxel Combination in Patients with Previously Untreated Advanced Non-Small Cell Lung Cancer*, 24 (18 Suppl) J. Clin. Oncol. 17052 (2006) (CabRef0012796) ("Fernandez 2006").

210.     Fernandez 2006 is a phase II study comparing regimens of gemcitabine (with vinorelbine v. with docetaxel) in patients with advanced lung cancer.  *Id*.  Patients were given a premedication of ranitidine 50 mg, diphenhydramine 25 mg, and dexamethasone 8 mg.  *Id.* Fernandez 2006 states that the gemcitabine/docetaxel combination "does not have a favourable safety profile, particularly in terms of pulmonary toxicity" and that the study was terminated.  *Id*. Accordingly, this docetaxel combination with gemcitabine was not approved by the FDA.  *See, e.g.*, Taxotere® Label.  The authors provide no reasoning as to why they chose a three-drug regimen nor the basis for any potential safety concerns that they may have had, but it certainly did not alter how physicians gave docetaxel to their mCRPC patients.  Therefore, Fernandez 2006 would not have motivated a POSA to administer an $H_2$ antagonist prior to cabazitaxel.

211.     I note that other researchers looking at this type of docetaxel combination with gemcitabine for lung cancer at higher doses of docetaxel than those studied by Fernandez 2006 (35 mg/m$^2$ v. 100 mg/m$^2$) used "standard dexamethasone premedication (8 mg orally before and after docetaxel administration)."  Georgoulias, *Vinorelbine Plus Cisplatin Versus Docetaxel Plus*

*Gemcitabine in Advanced Non-Small-Cell Lung Cancer: a Phase III Randomized Trial*, 23(13) J. Clin. Oncol. 2937-45 (2005) at 2938. All patients were also given the antiemetic ondansetron. *Id*. The authors did not report that further premedication was needed for HSRs; the toxicity profile was more favorable for the docetaxel/gemcitabine combination than the vinorelbine/cisplatin combination. *Id*. at 2940-41, 2943.

3.   **A POSA Would Not Have Been Motivated to Combine the Paclitaxel or Larotaxel Literature Selected by Dr. Ratain with Cabazitaxel Literature to Select an H$_2$ Antagonist Premedication**

212.   Dr. Ratain relies on multiple clinical studies of paclitaxel to support selection of an H$_2$ antagonist premedication with cabazitaxel. *See* Kenji, *Phase II Trial of Adjuvant Chemotherapy with Bi-Weekly Carboplatin Plus Paclitaxel in Patients with Completely Resected Non-Small Cell Lung Cancer*, 2 (8 Suppl. 4) J. Thoracic Oncol. S695-96 (2007) (CabRef0012755-756) ("Kenji 2007"); Juan, *Low-Dose Weekly Paclitaxel as Second-line Treatment for Advanced Non-small Cell Lung Cancer: a Phase II Study*, 32(11) Jpn J. Clin. Oncol. 449-54 (2002) (CabRef0012790-795) ("Juan 2002"); Harada, *Evaluation of Short-Time Premedication with d- Chlorpheniramine Maleate Injection for Paclitaxel-Induced Hypersensitivity Reaction*, 35(8) Jpn. J. Cancer Chemotherapy 1347-51 (CabRef0012785-789) ("Harada 2008"); and Kosmas & Tsavaris, *A Simplified Premedication Protocol for One-Hour Paclitaxel Infusion in Various Combinations*, 12(11) Med. Sci. Monit. C462-66 (2006) (CabRef0012742-747) ("Kosmas 2006").

213.   A POSA would have understood that Taxol® (paclitaxel) was indicated with a 3-component premedication comprising an antihistamine, a corticosteroid, and an H$_2$ antagonist because of the high levels of HSRs caused by the surfactant cremophor needed to dissolve the

85

drug.  Taxol® Label at 1, 22, 24; Straub, *Intravenous Hydrophobic Drug Delivery: A Porous Particle Formulation of Paclitaxel (AI-850)*, 22(3) Pharm. Res. 347-55 (2005) (SA_JEV_3142785-93) at 347.

214.    The Taxol® Label disclosed that 41% of patients receiving single agent Taxol® experienced HSRs despite receiving premedication.  Taxol® Label at 35.  That percentage is significantly higher than the levels of HSRs reported for cabazitaxel, which did not require cremophor.  In fact, Mita notes that because cabazitaxel could be formulated in polysorbate 80 without cremophor there was a "reduced incidence of hypersensitivity reaction[s]."  Mita at 729.  Thus, a POSA would not have been motivated to use with cabazitaxel the premedications described in the paclitaxel clinical studies identified by Dr. Ratain.

215.    Although allergic reactions to taxanes formulated without cremophor had been reported, which ten Tije hypothesized "*suggest[s] that some functionality of the taxane molecule contributes, in part to the observed effect*," a POSA also knew that a cremophor-free paclitaxel formulation was approved by the FDA with no premedication at all.  ten Tije, *Pharmacological Effects of Formulation Vehicles, Implications for Cancer Chemotherapy*, 42(7) Clin. Pharmacokinetics 665-85 (2003) (CabRef0012764-784) at 668, 680 (emphasis added); Abraxane® Label May 2007 (SA_JEV_2177000-019) at 17-18.  Thus, contrary to Dr. Ratain's opinion, the mere fact that cabazitaxel was a taxane would not have motivated a POSA to premedicate patients administered cabazitaxel with an $H_2$ antagonist, especially considering Mita's conclusion that a premedication was not required at all.  *See* Mita at 729.

216.    Dr. Ratain also cites Yamamoto 2009, a phase I larotaxel study in Japanese patients, as another example of a study that used an $H_2$ antagonist premedication. *See* Yamamoto, *Phase I Study of Larotaxel Administered as a 1-h Intravenous Infusion Every 3*

86

*Weeks to Japanese Patients with Advanced Solid Tumours*, 65 Cancer Chemother. Pharmacol. 129-136 (2009) (CabRef0013322-329) ("Yamamoto 2009"). I disagree that a POSA would have been motivated by Yamamoto 2009 to administer an $H_2$ antagonist prior to cabazitaxel treatment.

217.    Larotaxel, like cabazitaxel, was administered in a polysorbate 80 formulation at a concentration of 40 mg/mL. Sessa at 1142; Mita at 724. Yamamoto 2009 was a dose escalation study of larotaxel evaluating doses as high as 120 mg/m$^2$. Yamamoto 2009 at 131. That means that the patients enrolled in the study were potentially going to be exposed to polysorbate 80 levels at nearly five times the levels that patients receiving 25 mg/m$^2$ of cabazitaxel would be exposed to (a 6-fold difference for 20 mg/m$^2$ of cabazitaxel and 8-fold difference for 15 mg/m$^2$ of cabazitaxel).

218.    In view of the much higher levels of polysorbate 80 being administered with larotaxel and the low levels of HSRs reported for cabazitaxel with either no premedication or only an antihistamine, a POSA would not have combined Yamamoto 2009 with the cabazitaxel literature to select an $H_2$ antagonist premedication for cabazitaxel.

4.    **The Art Taught Away from $H_2$ Antagonists Because They Could Make Side Effects Worse**

219.    While $H_2$ antagonists are widely used and tolerated in the general population, patients undergoing chemotherapy are different. Chemotherapy patients may be immunocompromised with low levels of white blood cells and are at higher risk of drug-drug interactions because of the number of medications they are receiving (the chemotherapy itself plus other supportive medications). For example, a 2009 study indicated that using $H_2$ antagonists increased the risk of the docetaxel side effect palmar plantar erythrodysethia, also called hand-foot syndrome. *H2 Blockers Increase Risk of Docetaxel-Induced Skin Toxicity*, 4

87

Reactions Weekly 1257 (June 20, 2009) (SA_JEV_3142904) (reporting on May 2009 ASCO abstract by Kawaguchi *et al*). The use of $H_2$ antagonists as a premedication for docetaxel was reported to statistically significantly increase the incidence of hand-foot syndrome. *Id.* Kawaguchi reported that 19.6% of patients given an $H_2$ antagonist experienced hand-foot syndrome, while only 8.8% of patients that did not receive an $H_2$ antagonist experience the same side effect. *Id.*

220.    Hand-foot syndrome is known to be a painful dose-limiting toxicity. Nagore, *Antineoplastic Therapy-Induced Palmar Plantar Erythrodysesthesia ('Hand-Foot') Syndrome: Incidence, Recognition and Management*, 1(4) Am. J Clin. Dermatol. 225-34 (2000) (SA_JEV_3142879-89) at 226-27. There was no proven effective treatment for the side effect, and in some instances the only option was a reduction in dosage of their current chemotherapy or a complete discontinuation of the regimen. *Id.* at 231. The effects, however, could continue even after chemotherapy was stopped. *Id.* at 227, 229. Incidence had been reported in as many as 58% of patients receiving docetaxel. *Id.* at 231. Additionally, the Taxotere® Label acknowledged that "[s]evere hand and foot syndrome has been reported." Taxotere® Label at 31. It should also be noted that $H_2$ antagonists are not included in the premedication regimen in the Taxotere® Label. *Id.* at 1, 5.

221.    As described above (supra Section VI.F.1), the prior art did not identify a need to administer an $H_2$ antagonist with cabazitaxel. Considering the potential increase in skin toxicity associated with $H_2$ antagonists, a POSA had a specific reason not to administer an $H_2$ antagonist prior to cabazitaxel and would have been taught away from that combination.

**G.     A POSA Would Not Have Been Motivated to Select 5 mg Dexchlorpheniramine and 8 mg Dexamethasone to Add to an $H_2$ Antagonist Prior to Cabazitaxel as Required by the '110 Patent**

222.    I am not aware of any literature disclosing the use of a three-component premedication of an antihistamine, a corticoid, and an $H_2$ antagonist for cabazitaxel, let alone with 5 mg dexchlorpheniramine and 8 mg of dexamethasone specifically.

223.    Because cabazitaxel exposed patients to less polysorbate 80 than docetaxel and was known to be associated with lower levels of HSRs than docetaxel, a POSA would not have been motivated to administer three drugs as a premedication with cabazitaxel to a patient that had been able to tolerate administration of docetaxel with less premedication (dexamethasone). Supra Sections VI.F.1-2.

224.    Also as discussed above, a POSA would not have looked to Yamamoto 2009, Fernandez 2006, or the paclitaxel literature selected by Dr. Ratain for a cabazitaxel premedication.  Supra Sections VI.F.2-3.

225.    Even if a POSA were to administer an $H_2$ antagonist, an antihistamine, and a corticosteroid, Dr. Ratain does not explain why 5 mg dexchlorpheniramine and 8 mg of dexamethasone specifically would be selected to combine with an $H_2$ antagonist.

226.    Kenji 2007 reported that a premedication of "8 mg of dexamethasone, 5 mg of d-chlorpheniramine maleate and 50 mg of ranitidine were administered intravenously 30 minutes, before the patients receive paclitaxel."  *See* Kenji 2007 at CabRef0012756.  Juan 2002 discloses a premedication composed of "[d]examethasone (8 mg), dexchlorpheniramine (5 mg) and ranitidine (50 mg) were prescribed 30 min before paclitaxel infusion."  Juan 2002 at 450. Yamamoto 2009 stated that the antihistamine could be dexchlorpheniramine 5 mg,

89

diphenhydramine 25 mg, or "other antihistamines," and that the steroid could be dexamethasone 8 mg "or an equivalent steroid."  Yamamoto 2009 at 131.

227.    However, the other publications identified by Dr. Ratain disclose different doses of dexamethasone and different antihistamines.  For example, the FDA-approved regimen for docetaxel required a total of 24 mg of dexamethasone administered in 8 mg doses at 12, 3, and 1 hours before docetaxel.  Taxotere® Label at 1.  Kosmas 2006 utilized IV doses of 20 mg of dexamethasone and referred to other studies using even more dexamethasone, including additional doses of 12 mg at 12 and 6 hours prior to paclitaxel administration.  Kosmas 2006 at CR465.  Harada 2008 and Fernandez 2006 used diphenhydramine, and Kosmas 2006 reported that the antihistamine dimethindene maleate was preferable.  Kosmas 2006 at CR465; Harada 2008 at 1347; Fernandez 2006 at CabRef0012796.

228.    Dr. Ratain has not explained why, without knowledge of the claims of the '110 patent, a POSA would have been motivated to select the precise premedication of 5 mg dexchlorpheniramine, 8 mg dexamethasone, and an $H_2$ antagonist.

## VII.    THE ASSERTED CLAIMS HAVE WRITTEN DESCRIPTION SUPPORT IN THE SPECIFICATION

229.    Dr. Ratain asserts (1) that all asserted claims lack written description support because they do not require administration with prednisone and (2) that claims 1-3 and 5-6 of the '110 patent and claims 1, 2, 4, and 5 of the '777 patent lack written description support because they are not limited to a 25 mg/m$^2$ dose of cabazitaxel.  Ratain Report at ¶¶ 243-63.  For the reasons explained below, I disagree.

### A.   <u>With or Without Prednisone</u>

230.   Dr. Ratain's lack of written description argument is mainly directed to the asserted claims permitting but not requiring combination with prednisone.  Ratain Report at ¶ 247.

231.   The specification states that prednisone may optionally be combined with cabazitaxel.  For example, cabazitaxel "is preferably administered in combination with a corticoid chosen especially from prednisone and prednisolone."  '777 patent at col. 3, ll. 9-11; '110 patent at col. 3, ll. 6-9.  "Cabazitaxel may be administered in combination with a corticoid, such as prednisone or prednisolone."  '777 patent at col. 5, ll. 44-45; '110 patent at col. 5, ll. 41-42.

232.   The specification also refers to cabazitaxel providing an increase in survival without specifying combination with prednisone.  "In some embodiments, the effective amount of cabazitaxel produces at least one therapeutic effect selected from the group consisting of increase in overall survival . . . ."  '777 patent at col. 3, ll. 31-33; '110 patent at col. 3, ll. 28-30.

### B.   <u>Doses of Cabazitaxel Beyond 25 mg/m$^2$</u>

233.   Dr. Ratain also asserts that because the TROPIC study described in Example 1 of the specification utilized a starting dose of 25 mg/m$^2$ of cabazitaxel, there is no evidence in the specification that the inventor was in possession of claims encompassing other doses.  Ratain Report at ¶ 256.  I disagree.

234.   The specification describes doses of cabazitaxel including 15-25 mg/m$^2$.  '777 patent at col. 3, ll. 18-20, col. 3, ll. 24-30, col. 17, ll. 30-51; '110 patent at col. 3, ll.15-17, col. 3, ll. 21-27, col. 16, ll. 15-37.

235.    The specification also refers to "effective" and "therapeutically effective" amounts of cabazitaxel without specifying the dose.  For example, "the effective amount of cabazitaxel produces at least one therapeutic effect selected from the group consisting of increase in overall survival."  '777 patent at col. 3, ll. 28-32; '110 patent at col. 3, ll. 28-33.

236.    Example 1 of the specification demonstrates that cabazitaxel therapy increases survival as compared to mitoxantrone in men with mCRPC that has progressed during or after treatment with docetaxel that includes patients with a dose reduction from 25 mg/m$^2$ of cabazitaxel to 20 mg/m$^2$ of cabazitaxel.  '777 patent at col. 10, l. 45-col. 12, l. 67, col. 16, ll. 43-49, col. 17, ll. 22-23, col. 17, ll. 30-49; '110 patent at col. 10, l. 45-col. 13, l. 15, col. 15, ll. 34-36, col. 16, ll. 1-10, col. 16, ll. 15-35.  The specification therefore specifically describes methods shown to increase survival of men with mCRPC that has progressed during or after treatment with docetaxel that include the administration of 20 mg/m$^2$ of cabazitaxel.

237.    Example 2 of the specification provides dose modifications for adverse reactions for patients receiving cabazitaxel, including instructions to administer 20 mg/m$^2$.  '777 patent at col. 17, ll. 30-49; '110 patent at col. 16, ll. 15-35.

## VIII.   THE ASSERTED CLAIMS ARE ENABLED BY THE SPECIFICATION

238.    Dr. Ratain asserts (1) that all asserted claims are not enabled because they do not require administration with prednisone, (2) that claims 1-3 and 5-6 of the '110 patent and claims 1, 2, 4, and 5 of the '777 patent are not enabled because they are not limited to a 25 mg/m$^2$ dose of cabazitaxel, and (3) that claims 1-6 of the '777 patent are not enabled because they do not require a dose schedule of every three weeks.  Ratain Report at ¶¶ 266, 292.  For the reasons explained below, I disagree.

92

A. **Nature of the Invention**

239.    The asserted claims are directed to methods of increasing survival of men with

mCRPC that has progressed during or after treatment with docetaxel by administering

cabazitaxel after a premedication regimen that contains at least an $H_2$ antagonist.

B. **Direction or Guidance Presented**

240.    The direction and guidance on how to use the claimed inventions in the

specification is substantial.  The specification describes how to administer cabazitaxel therapy

(intravenous infusion), including how to monitor and evaluate therapy, provides exemplary

formulations (for example, those containing polysorbate 80), exemplary schedules (for example,

every three weeks), exemplary doses (15-25 mg/m$^2$), exemplary premedication regimens (for

example, an $H_2$ antagonist), and other medications for preventing or controlling adverse events

(for example, antiemetics such as ondansetron and G-CSF).  '777 patent at col. 3, ll. 24-30, col.

5, ll. 27-43, col. 5, ll. 52-67, col. 6, ll. 48-53, col. 7, ll. 1-9, col. 7, ll. 34-36, col. 7, ll. 58-64, col.

17, ll. 30-49; '110 patent at col 3, ll. 21-27, col. 5, ll. 24-40, col 5, ll. 49-64, col. 6, ll. 45-50, col.

6, l. 67-col. 7, l. 6, col. 7, ll. 33-36, col. 7, ll. 58-64, col. 16, ll. 15-35.

241.    The specification provides an exemplary schedule for cabazitaxel of every three

weeks, and further states that the schedule "may be prolonged by 1 to 2 weeks depending on the

tolerance to the preceding cabazitaxel administration."  '777 patent at col. 3, ll. 24-30, col. 5, ll.

52-60; '110 patent at col. 3, ll. 21-27, col. 5, ll. 49-57.

242.    Example 2 of the specification also provides dose modifications for adverse

reactions for patients receiving cabazitaxel, including instructions to delay treatment (i.e., not

administer the next cabazitaxel cycle after three weeks) and to reduce the dose, for example from 25 mg/m$^2$ to 20 mg/m$^2$.  '777 patent at col. 17, ll. 30-49; '110 patent at col. 16, ll. 15-35.

### C.     Presence or Absence of Working Examples

243.     The specification contains a working example (Example 1) from the TROPIC study demonstrating that cabazitaxel therapy is life-prolonging compared to mitoxantrone therapy in men with mCRPC that has progressed during or after treatment with docetaxel.  '777 patent at col. 10, l. 45-col. 12, l. 67; '110 patent at col. 10, l. 45-col. 13, l. 15.

244.     Furthermore, this example includes data from patients who received a dose reduction from 25 mg/m$^2$ of cabazitaxel to 20 mg/m$^2$ of cabazitaxel.  '777 patent at col. 16, ll. 43-49, col. 17, ll. 22-23, col. 17, ll. 30-49; '110 patent at col. 15, ll. 30-36, col. 16, ll. 1-10, col. 16, ll. 15-35.

245.     This data also includes patients who had doses delayed beyond the normal once every three week schedule, including some dose delays more than nine days.  '777 patent at col. 16, ll. 43-53, col. 17, ll. 18-23, col. 17, ll. 30-49; '110 patent at col. 15, ll. 32-41, col. 15, l. 64-col. 16, l. 10, col. 16, ll. 15-35.

### D.     Breadth of the Claims

246.     In view of the nature of the invention and the guidance and presence of working examples in the specification, I find the breadth of the claims reasonable and not supportive of a finding that undue experimentation would be required to practice the claims.

E.     **Unpredictability and State of the Art**

247.    As explained above in my obviousness analysis, the unpredictability as to whether cabazitaxel would increase survival as compared to mitoxantrone prior to the results of TROPIC was substantial.

248.    However, I disagree with Dr. Ratain's statement that the written description of the asserted patents "does not significantly add to the state of the art to enable the asserted claims." Ratain Report at ¶ 289.

249.    The specification of the asserted patents contains significant data and information about cabazitaxel therapy that is not in the prior art and therefore would not have been available to assess obviousness.  In particular, the specification describes the results of the phase III TROPIC clinical study, the first clinical study of cabazitaxel in prostate cancer specifically, and the first controlled study of cabazitaxel (the only way to assess comparative endpoints like PFS and overall survival) in any patient type.  While prior to the patent filing, it was only known that a single patient with mCRPC that had progressed during or after treatment with docetaxel had a partial response after being administered 25 mg/m$^2$ cabazitaxel without prednisone, the TROPIC data in the specification provides the results of cabazitaxel therapy in hundreds of patients, including assessments of tumor progression, pain progression, PSA progression, PFS, and overall survival, as well as data on side effects and dose delays and reductions (to 20 mg/m$^2$). This data demonstrated for the first time that cabazitaxel was life-prolonging as compared to mitoxantrone in mCRPC patients that had cancer progression during or after treatment with docetaxel, and for the first time gave a POSA a reasonable expectation that individual patients would live longer from receiving cabazitaxel therapy than they would have had they received

mitoxantrone therapy.  This data also showed for the first time that cabazitaxel therapy increased survival (both overall survival and PFS) as compared to mitoxantrone.

250.    Prednisone had never been shown to prolong life on its own or in combination with mitoxantrone.  Furthermore, both arms in the TROPIC study received combination therapy with prednisone, indicating to a POSA that the increase in survival shown for patients on the cabazitaxel arm was not a result of prednisone treatment.

251.    In view of at least this survival data provided in the specification, a POSA would have found the asserted utility of the claimed methods with or without prednisone credible.

252.    Example 1 includes data from patients who received a dose reduction from 25 mg/m$^2$ of cabazitaxel to 20 mg/m$^2$ of cabazitaxel.  '777 patent at col. 16, ll. 43-49, col. 17, ll. 22-23, col. 17, ll. 30-49; '110 patent at col. 15, ll. 30-36, col. 16, ll. 1-10, col. 16, ll. 15-35.  The specification therefore specifically describes methods shown to increase survival of men with mCRPC that has progressed during or after treatment with docetaxel that include administering 20 mg/m$^2$ of cabazitaxel.

253.    In view of the guidance in the specification and the TROPIC data, the assertions in the patents that doses of 15-25 mg/m$^2$ increase survival would have been deemed credible to a POSA.

254.    Furthermore, Example 1 includes data from patients who had doses delayed, including some dose delays more than nine days.  '777 patent at col. 16, ll. 43-53, col. 17, ll. 18-23, col. 17, ll. 30-49; '110 patent at col. 15, ll. 32-41, col. 15, l. 64-col. 16, l. 10, col. 16, ll. 15-35.  The specification therefore specifically describes methods shown to increase survival of men with mCRPC that has progressed during or after treatment with docetaxel by administering 20-25 mg/m$^2$ of cabazitaxel on a schedule other than precisely every three weeks.

96

255.    In view of the guidance in the specification and the TROPIC data, the assertions in the patents that schedules other than strictly every three weeks increase survival would have been deemed credible to a POSA.

256.    Dr. Ratain has not explained why a POSA would not have found credible that cabazitaxel doses of 15-20 mg/m$^2$ or schedules other than every three weeks would be effective. Nor has Dr. Ratain provided any evidence that such dosing schedules are not effective.  In fact, in the subsequent PROSELICA clinical study of cabazitaxel, it was demonstrated that a starting dose of 20 mg/m$^2$ with dose reductions to 15 mg/m$^2$ was non-inferior to a starting dose of 25 mg/m$^2$ with dose reductions to 20 mg/m$^2$.  Eisenberger at 3298, 3205; Jevtana® Label Dec. 2020 (SA_JEV_3163191-224) at 12-13.  Yachnin *et al*. further reported from a randomized phase II study that 25 mg/m$^2$ of cabazitaxel every three weeks and 10 mg/m$^2$ of cabazitaxel given weekly for five of six weeks did not have significantly different PFS and overall survival in men with mCRPC that had progressed during or after treatment with docetaxel.  Yachnin, *Weekly Versus 3-Weekly Cabazitaxel for the Treatment of Castration-Resistant Prostate Cancer: A Randomised Phase II Trial (ConCab)*, 97 European J. of Cancer 33-40 (2018) ("Yachnin") at 33-36; *see also* Kellokumpu-Lehtinen, *Biweekly Cabazitaxel as a Safe Treatment Option for Metastatic Castration Resistant Prostate Cancer (mCRPC) Patients Post-Docetaxel: Final Analysis of Prosty II Trial*, 34 (15 Suppl.) J. Clin. Oncol. Abstr. e16523 (2016) ("Kellokumpu-Lehtinen") (cabazitaxel 16 mg/m$^2$ every two weeks is "a manageable treatment option").

F.    <u>Quantity of Experimentation Necessary and Level of Skill in the Art</u>

257.    The specification states that cabazitaxel is "administered repeatedly according to a protocol that depends on the patient to be treated (age, weight, treatment history, etc.), which can

97

be determined by a skilled physician." '777 patent at col. 5, ll. 52-55; '110 patent at col. 5, ll. 49-52.  It would not have taken undue experimentation to practice the claimed inventions by administering cabazitaxel without prednisone, doses of cabazitaxel other than 25 mg/m$^2$, or on schedules other than every three weeks with the intent of increasing survival as compared to mitoxantrone of an individual mCRPC patient who had progressed during or after treatment with docetaxel in light of the guidance and clinical data in the specification.

258.    A POSA would be familiar with clinical study design and interpretation.  In view of the guidance in the specification and the TROPIC data, a POSA would have been capable of modifying dose schedules, doses, or combinations of cabazitaxel therapy according to the characteristics of a particular patient with the intent of increasing the survival of that patient.

259.    As noted above, subsequent phase II clinical studies have evaluated different doses and/or dose schedules.  For example, Yachnin reported no significant differences in overall or progression-free survival between 25 mg/m$^2$ of cabazitaxel every three weeks and 10 mg/m$^2$ of cabazitaxel given weekly for five of six weeks.  Yachnin at 33-36.  Kellokumpu-Lehtinen reported that cabazitaxel 16 mg/m$^2$ administered every two weeks was also "a manageable treatment option."

260.    In my opinion, such clinical practice is within the skill of a POSA and does not constitute undue experimentation.

## SUPPLEMENTATION AND REBUTTAL

I hereby reserve any rights that I may have to supplement this report and/or rebut

any expert testimony in response to the opinions stated herein.

_____
Peter S. Nelson, M.D.

2 - 26 - 2021
_____
Date

# EXHIBIT D



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHURE INCORPORATED and          )
SHURE ACQUISITION HOLDINGS,     )
INC.,                           )
                                )
            Plaintiffs,         )
                                )
      v.                        )        Civil Action No. 19-1343-RGA-CJB
                                )
CLEARONE, INC.,                 )
                                )
            Defendant.          )

**<u>MEMORANDUM ORDER</u>**

Presently pending in this patent infringement case is Defendant ClearOne, Inc.'s

("Defendant" or "ClearOne") letter motion to strike (the "Motion") certain material submitted by

Plaintiffs Shure Incorporated and Shure Acquisition Holdings, Inc. ("Plaintiffs" or "Shure") that

purportedly introduces new infringement and market theories.  (D.I. 484)[1]  Specifically,

ClearOne seeks to strike, pursuant to Federal Rules of Civil Procedure 26 and 37:  (1) the

Supplemental Report of Paul Hatch ("Hatch Supplemental Report"); (2) the Supplemental

Report of Ira Weinstein ("Weinstein Supplemental Report"); (3) paragraphs 15-16 of the

Supplemental Report of Thomas Vander Veen ("Vander Veen Supplemental Report"); and (4)

relevant material on pages 4-5 of Shure's Answering Brief in Opposition to ClearOne's Motion

---

[1]      Our Court has treated motions to strike as non-dispositive motions, which may be resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(A) and D. Del. LR 72.1(a)(2).  *See, e.g.*, *Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056, at *1 n.1 (D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 987 n.1 (D. Del. 2013) (citing cases).  This is in line with decisions of other courts in this Circuit, which have also treated such motions as non-dispositive, at least where the ultimate decision was not determinative of a party's claims (just as the decision is not here).  *See, e.g.*, *Hawkins v. Waynesburg Coll.*, Civil Action No. 07-5, 2007 WL 2119223, at *1 n.1 (W.D. Pa. July 20, 2007); *Reedy v. CSX Transp., Inc*., Civil Action No. 06-758, 2007 WL 1469047, at *1 n.1 (W.D. Pa. May 18, 2007).

for Summary Judgment of Non-Infringement ("Non-Infringement Opposition").  (D.I. 485 at 1)

For the reasons set forth below, the Court GRANTS ClearOne's Motion.

## I.      BACKGROUND

Shure filed this case on July 18, 2019.  (D.I. 1)  Fact discovery closed in November 2020.

(D.I. 62 at ¶ 3(a))  Shure's final infringement contentions, served in November 2020, accuse

various products that make up ClearOne's BMA CT line of array microphones (the "BMA CT")

of infringing United States Patent No. D865,723 (the "'723 patent").  (D.I. 485, ex. E)

That same month, ClearOne began to market a new audio equipment bundle for the

remote working professional, which included the Aura Xceed BMA (the "Xceed BMA").  (*Id.*,

ex. C at ¶ 12)  The external design as well as the internal microphone geometry of the Xceed

BMA are identical to that of the BMA CT, though the Xceed BMA has different firmware.  (*Id.*

at ¶ 13; *see also* D.I. 485 at 1; Tr. at 69-70)  In March 2021 (after all expert reports had been

submitted in the case), Shure requested discovery from ClearOne regarding the Xceed BMA.

(D.I. 485, ex. F; ClearOne's Hearing Presentation, Slide 107)  The parties thereafter met and

conferred with respect to Shure's request.  (*See* D.I. 498 at 1)

On April 12, 2021, the parties filed a Stipulation regarding the Xceed BMA (the

"Stipulation").  (D.I. 431)  Pursuant to the Stipulation, the parties agreed that the Xceed BMA is

externally identical to the BMA CT, and that its internal microphone geometry is identical to the

BMA CT.  (*Id.* at ¶ 5(a)-(b))  Further, the parties agreed that Shure could supplement its

infringement contentions to identify the Xceed BMA as an additional accused product, and that,

*inter alia*:

> Shure may supplement its expert reports to address the [] Xceed
> BMA by May 7, 2021, only to identify the [] Xceed BMA as an
> additional accused product, and present corresponding

infringement, market, and damages opinions, but Shure: (1) *cannot introduce new infringement, market, or damages theories;* nor (2) supplement its infringement, market, and damages opinions for any ClearOne product other than the [] Xceed BMA[.]

(*Id.* at ¶ 5(c) (emphasis added))[2]  The Court so ordered the Stipulation on the same date.

A few days later, on April 16, 2021, the parties filed various summary judgment and *Daubert* motions.  (D.I. 62 at ¶ 11)

On or about May 7, 2021, Shure served the Hatch Supplemental Report, the Weinstein Supplemental Report and the Vander Veen Supplemental Report, which each address the Xceed BMA.  (D.I. 485, exs. A-C; *see also* D.I. 498 at 2)  On May 14, 2021, Shure filed its answering brief in opposition to ClearOne's motion for summary judgment of non-infringement.  (D.I. 473)

ClearOne filed the instant Motion on May 24, 2021, (D.I. 484), and briefing was complete on June 4, 2021, (D.I. 509).  The Court heard oral argument on the motion (as well as on certain of the parties' summary judgment and *Daubert* motions) during a videoconference on June 9, 2021.  (D.I. 527 (hereinafter, "Tr."))  A 5-day trial is set to begin on November 1, 2021.  (D.I. 62 at ¶ 16)

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26[ ](e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  In considering whether to exclude evidence

---

[2]     ClearOne explains that it entered into the Stipulation to "avoid the need for additional discovery, a delayed trial, and/or a new case[,]" (D.I. 485 at 1; *see also* Tr. at 72), while Shure notes that it entered into the Stipulation "[i]n a good faith effort to resolve" any disputes regarding the Xceed BMA, (D.I. 498 at 1; *see also* Tr. at 88).

relating to an untimely or otherwise improper disclosure, the United States Court of Appeals for the Third Circuit has directed district courts to weigh certain factors, known as "the *Pennypack* factors":  (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply; and (5) the importance of the testimony sought to be excluded.  *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).  Because "[t]he exclusion of critical evidence is an extreme sanction," the Third Circuit has explained that it should be reserved for circumstances amounting to "willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks and citations omitted).

Additionally, pursuant to Federal Rule of Civil Procedure 16(f), the Court may impose sanctions (such as the exclusion of expert testimony) if, *inter alia*, a party "fails to obey a scheduling or other pretrial order."  Fed. R. Civ. P. 16(f)(1)(C); *see also Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, Civil Action No. 15-819-LPS-CJB, 2017 WL 11558096, at *4 (D. Del. Dec. 11, 2017); *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL 3216109, at *2 (D. Del. June 25, 2013).

## III.   DISCUSSION

ClearOne argues that the Hatch Supplemental Report and Weinstein Supplemental Report introduce new infringement and market theories regarding the Xceed BMA, and that paragraphs 15-16 of the Vander Veen Supplemental Report and certain portions of pages 4-5 of Shure's

Non-Infringement Opposition rely on these new theories. (D.I. 485 at 1-3) Thus, ClearOne

contends that these materials directly violate the Stipulation and should be stricken. (*Id.* at 1-2)

The Court first considers the Hatch Supplemental Report. Throughout this case, Shure's

infringement expert Mr. Hatch has opined that the ordinary observer is "a purchaser or IT

technician employed at a corporation, and/or an individual whose duties include, among other

things, the selection of fixtures or electronic devices for commercial spaces." (*Id.*, ex. G at ¶ 80;

*see also* D.I. 154, ex. F at ¶ 54)[3] In the Hatch Supplemental Report, Mr. Hatch expands upon

that definition:

> Thus, the ordinary observer in this case now also includes, in
> addition to the IT professional, the home-office user who would
> purchase the products at issue on their own or through the IT
> professional at their company.

(D.I. 485, ex. A at ¶ 15)[4] And Mr. Hatch then relies upon that definition to newly assert that

"given the nature of online shopping experiences, the home-office user purchasing the [] Xceed

BMA online . . . will be less likely to observe the product at a close enough level to appreciate

subtle design details." (*Id.* at ¶ 16)[5]

---

[3]    Infringement of a design patent is determined from the perspective of the ordinary
observer. *Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*, 836 F. App'x 895, 897-98 (Fed.
Cir. 2020).

[4]    ClearOne had also argued that the Hatch Supplemental Report further violated the
Stipulation because Mr. Hatch applied his new "ordinary observer" definition to *all* accused
products, not just the Xceed BMA. (D.I. 485 at 2 (citing *id.*, ex. A at ¶¶ 12-16); D.I. 509 at 1
n.1; Tr. at 76) During oral argument, however, Shure's counsel represented that the Hatch
Supplemental Report was not intended to extend the new "ordinary observer" definition to any
accused product other than the Xceed BMA. (Tr. at 90; *see also* D.I. 498 at 2)

[5]    ███████████████████████████████████████████████████████████
███████████████████████

The Court agrees with ClearOne that the Hatch Supplemental Report introduces a new infringement theory regarding the home-office user. (D.I. 485 at 1-2; Tr. at 74-76) Indeed, during oral argument, Shure's counsel seemed to acknowledge that the report includes new theories and opinions regarding the Xceed BMA. (Tr. at 91 ("Shure just became aware of the new end-purchaser in this case"); *id.* at 92 ("[The Xceed BMA] is intended for home office professionals [and] that person is not the corporate entity that . . . ClearOne markets the BMA CT to"); *id.* at 96 ("the definition of the ordinary observer here *changed* because of the type of product being sold") (emphasis added))[6] Therefore, the Hatch Supplemental Report violates the Stipulation's agreement that Shure's supplemental expert reports addressing the Xceed BMA "cannot introduce new infringement . . . theories[.]" (D.I. 431 at ¶ 5(c))

The Court next considers the Weinstein Supplemental Report. In that report, Shure's market expert, Mr. Weinstein, similarly opines that the "typical purchaser" of the Xceed BMA would be, *inter alia*, "an end-user seeking to equip a home office." (D.I. 485, ex. B at ¶ 11) Mr. Weinstein also expanded his definition of the market to include "a wide variety of manufacturers

---

[6]    Despite this, Shure makes a strained argument that this new theory somehow is not in violation of the parties' Stipulation. To that end, Shure: (1) points to the wording in the Stipulation that says that Shure may supplement its expert reports with regard to the Xceed BMA by, *inter alia*, presenting "corresponding infringement, market, and damages opinions" and then (2) argues that because its experts are here presenting opinions that "*correspond*[]" to the Xceed BMA, then these opinions "fall[] squarely within the scope of the parties' stipulation." (D.I. 498 at 4 (emphasis added); Tr. at 88-89) However, this argument obviously ignores the very next term of the Stipulation, which forbids Shure from "introduc[ing] new infringement, market, or damages theories[.]" (D.I. 431 at ¶ 5(c))

In its answering letter brief, Shure also briefly suggests that it should be excused for introducing new theories regarding the Xceed BMA because ClearOne failed to timely supplement its discovery responses regarding that product. (D.I. 498 at 1, 4) However, Shure did not develop this argument in its briefing (e.g., by specifically explaining how ClearOne failed in that regard). (Tr. at 71) Therefore, the Court does not find this argument persuasive.

offering AV devices intended for home office use, including USB microphones, USB speakerphones, USB webcams, personal USB videobars, and even USB headsets." (*Id.* at ¶ 15 & Tables 1-4)  The Weinstein Supplemental Report thus also introduces a new market theory in direct violation of the Stipulation's agreement that this is not permitted.  (D.I. 431 at ¶ 5(c); *see also* D.I. 485 at 2; Tr. at 78)  Again, during oral argument, Shure's counsel seemed to acknowledge the same.  (Tr. at 94-95 ("Unlike the BMA CT and BMA 360, which are products marketed for commercial buildings, the Xceed BMA is marketed for home office spaces, and therefore, the purchasers of these products . . . are *different*.") (emphasis added))[7]

Both parties appear to agree that because this disputed issue is one that was "expressly [addressed by the parties' S]tipulation, . . . the question of discovery timeliness does not arise" and thus the "Court need not consider the *Pennypack* factors at all[.]"  (D.I. 498 at 4 (Shure's answering letter brief noting this); *see also* D.I. 509 at 2 (ClearOne arguing that if Shure were "held to the Stipulation" then the *Pennypack* factors would not apply at all here); Tr. at 82, 96)  The Court agrees, since here, Shure did not violate Rule 26(e); instead, Shure violated a joint stipulation, which the Court ordered into effect on April 12, 2021.  (*See* April 12, 2021 Docket Entry)  The parties and the Court rely on such stipulations in cases like this, and those stipulations need to be enforced.  *See In re Gorsoan Ltd.*, No. 17-cv-5912 (RJS), 2020 WL 6891520, at *3 (S.D.N.Y. Nov. 23, 2020) (noting that "parties are encouraged to enter into voluntary stipulations to help streamline the [discovery] process" and that "such stipulations are

---

[7]     As for paragraphs 15 and 16 of the Vander Veen Supplemental Report, (D.I. 485, ex. C at ¶¶ 15-16), as well as the relevant portions of pages 4-5 of Shure's Non-Infringement Opposition, (D.I. 473 at 4-5), there is no dispute that they rely on the new theories and opinions in the Hatch Supplemental Report and Weinstein Supplemental Report.

regularly enforced"); *In re Sando*, 30 B.R. 474, 476 (E.D. Pa. 1983) ("Stipulations voluntarily

entered into by parties to litigation will be enforced by a court unless the stipulation violates

public policy or other extenuating circumstances exist.").  Therefore, pursuant to Rule 16(f),

because the Hatch Supplemental Report, the Weinstein Supplemental Report,[8] paragraphs 15 and

16 of the Vander Veen Supplemental Report and the relevant portions of pages 4-5 of Shure's

Non-Infringement Opposition all violate the Stipulation and the Court's order relating thereto,

they will be stricken (without need to resort to a *Pennypack* analysis).[9]

---

[8]      Shure did not argue that if ClearOne's Motion was granted, the Hatch
Supplemental Report and the Weinstein Supplemental Report should only be partially stricken.
Therefore, the Court strikes these reports in their entirety.  Accordingly, the Court need not
address a separate issue that ClearOne had raised with the Hatch Supplemental Report (i.e., that
it improperly introduced new images of the Xceed BMA next to an unaccused square surface
mounting kit).  (D.I. 485 at 2)

[9]      That said, even if the Court were to consider the *Pennypack* factors here, they too
weigh in favor of exclusion of the material at issue.  The "surprise" and "prejudice" factor goes
ClearOne's way.  As to "surprise," the introduction of the new theories in Shure's supplemental
expert reports surely did surprise ClearOne, since the Stipulation prohibited this.  (D.I. 485 at 3)
Moreover, allowing the new theories at this late juncture would "prejudice" ClearOne.  ClearOne
entered into the Stipulation to avoid the need for additional discovery regarding the Xceed BMA,
and introduction of Shure's new theories would require just such discovery.  (D.I. 509 at 2)  For
example, ClearOne would need to investigate how many sales of the accused products and
Shure's commercial embodiments have now been made to home-office users, and the parties
would need to take additional depositions of experts, party witnesses and third-party home office
users to develop evidence regarding the level of attention those users give to purchases of the
products.  (*Id.*; Tr. at 83-84)  ClearOne's expert would also need to gather evidence regarding the
many home office products that Mr. Weinstein newly identifies as competing in the market.
(D.I. 509 at 2)  Next, with regard to the "ability of the moving party to cure any such prejudice"
factor and the "extent to which allowing the testimony would disrupt the order and efficiency of
trial" factors, these also favor ClearOne.  The above-referenced discovery efforts, which would
be needed to effect a cure, would likely necessitate the disruption of the pending November 1,
2021 trial date.  (D.I. 485 at 3; Tr. at 84)  As to the "bad faith or willfulness in failing to comply"
factor, while the Court cannot say that Shure's violation of the Stipulation was done in bad faith,
at a minimum, this factor should not favor Shure, since Shure has not provided a good
explanation for how its experts' new theories regarding the Xceed BMA actually comport with
the Stipulation's terms.  (D.I. 485 at 3)  Lastly, with respect to the "importance of the testimony
sought to be excluded" factor, if these new theories were that important, then Shure seemingly

IV.     **CONCLUSION**

For the foregoing reasons, ClearOne's Motion is GRANTED.  The Hatch Supplemental

Report, the Weinstein Supplemental Report, paragraphs 15 and 16 of the Vander Veen

Supplemental Report and the relevant material on pages 4-5 of Shure's Non-Infringement

Opposition relating to the Xceed BMA are STRICKEN, and Shure may not rely on this material

in this case.

Because this Memorandum Order may contain confidential information, it has been

released under seal, pending review by the parties to allow them to submit a single, jointly

proposed, redacted version (if necessary) of the Memorandum Order.  Any such redacted version

shall be submitted no later than **September 15, 2021** for review by the Court.  It should be

accompanied by a motion for redaction that shows that the presumption of public access to

judicial records has been rebutted with respect to the proposed redacted material, by including a

factually-detailed explanation as to how that material is the "kind of information that courts will

protect and that disclosure will work a clearly defined and serious injury to the party seeking

closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir.

2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a

publicly-available version of its Memorandum Order.


Dated:  September 10, 2021                              *Christopher J. Burke*
                                                      Christopher J. Burke
                                                      UNITED STATES MAGISTRATE JUDGE


would not have entered into the Stipulation (which prohibited Shure from introducing them).
(D.I. 509 at 2)  Moreover, if Shure believes that these new theories really *are* that important, then
it has a remedy:  Shure is free to bring a new case against ClearOne accusing the Xceed BMA.
(D.I. 485 at 3; Tr. at 98-99)

# EXHIBIT E



| From: | Meier, Whitney L. |
|---|---|
| To: | Mahmood, Tiffany; Rapalino, Emily L.; nbelgam@skjlaw.com; eormerod@skjlaw.com; Ruzich, Richard T.; Auten, Stephen R.; Shrestha, Roshan P.; jcp@pmhdelaw.com; mch@pmhdelaw.com; DGattuso@proctorheyman.com; "Reed, Matt (MReed@wsgr.com)"; "Devine, Wendy"; Hanson, Tina; Powell III, G. Edward; David Moore; BPalapura@potteranderson.com; ttimlin@potteranderson.com; DG-Cabazitaxel-DE; Alul, Andrew M.; Dykhuis, Art; Robinson, Kathryn; jshaw@shawkeller.com; kkeller@shawkeller.com; Nate Hoeschen; dfry@shawkeller.com; dwiesen@goodwinproctor.com; Zalcenstein, Aviv A; Broussard, Joel; dlavender@taftlaw.com; Barabas, James; frodriguez@windelsmarx.com |
| Cc: | Solander, William E.; Minion, Daniel J.; Scerbo, Michael S.; Jones, Candice R.; "dfahnestock@mnat.com"; Blumenfeld, Jack; Adams, Katherine E. |
| Subject: | Sanofi-Aventis U.S. LLC, et al. v. Actavis LLC, et al., Consolidated C.A. No. 20-804 |
| Date: | Friday, March 26, 2021 5:59:23 PM |

Counsel,

Pursuant to paragraph 11(a) of the Scheduling Order (D.I. 66), Plaintiffs object to the new arguments and references contained in Dr. Ratain's reply expert report identified below that were not identified in Defendants' interrogatory responses prior to the close of fact discovery in this case and/or should have been identified in Dr. Ratain's opening report.

**Arguments:**

1. Palliative care extends life. (e.g., paragraph 16)
2. Docetaxel resistance requires progression during docetaxel treatment. (e.g., paragraph 27)
3. The TROPIC study could be conducted despite lack of phase II data because cabazitaxel's activity was more predictable than most chemotherapy drugs. (e.g., paragraph 52)
4. A POSA would have been motivated to use a reduced dose of cabazitaxel to combine with carboplatin in light of Cabrespine and Kenji. (e.g., paragraph 61)
5. A POSA would have been motivated to use 15 mg/m$^2$ of cabazitaxel to avoid docetaxel side effects. (e.g., paragraph 63)
6. A POSA would have been motivated to use cabazitaxel over docetaxel to avoid fluid retention, particularly in patients with pleural effusions (e.g, patients with congestive heart failure). (e.g., paragraph 65)
7. A POSA would have been motivated to use an H2 antagonist over Takenaka, Trudeau, and Kaye (see list below). (e.g., paragraphs 72-73)

**References:**

1. Aogi, et al., "*The efficacy and safety of gemcitabine plus paclitaxel combination first-line therapy for Japanese patients with metastatic breast cancer including triple-negative phenotype,*" Cancer Chemother. Pharmacol., 67:1007-1015 (2011)
2. Audrey, et al., "*What oncologists tell patients about survival benefits of palliative chemotherapy and implications for informed consent: qualitative study,*" BMJ, 337:a752 (2008)
3. Berry, W. & M. Eisenberger, "*Achieving Treatment Goals for Hormone-Refractory Prostate Cancer with Chemotherapy,*" The Oncologist, 10(suppl3):30-39 (2005)
4. Corn, et al., "*Cabazitaxel plus carboplatin for the treatment of men with metastatic castration-resistant prostate cancers: a randomised, open-label, phase 1–2 trial,*" Lancet Oncol., 20:1432-43 (2019)
5. Eklund, J.W. & M.F.Mulcahy, "*Chemotherapy Dosing in the Setting of Liver Dysfunction,*" Oncology, 19(8):1057-1063 (July 2005)
6. FDA Medical Review SA_JEV_3154241-3154330
7. Kaye, et al., "*Docetaxel in Advanced Ovarian Cancer: Preliminary Results from Three Phase II Trials,*" Eur. J. Cancer, 31A(Suppl. 4):S14-S17 (1995)

8. Pal, et al., "*Management of Docetaxel Failures in Metastatic Castrate-Resistant Prostate Cancer*," Urol. Clin. North. Am. 2012 Nov; 39(4)

9. Takenaka, et al., "*Combination chemotherapy with weekly docetaxel and estramustine for hormone refractory prostate cancer in Japanese patients*," Int'l J. Urology, 15:106-109 (2008)

10. Temel, et al., "*Early palliative care for patients with metastatic non- small-cell lung cancer*," N. Engl. J. Med., 363(8):733-742 at 733 (Aug. 2010)

11. Trudeau, et al., "*Docetaxel in Patients with Metastatic Breast Cancer: A Phase II Study of the National Cancer Institute of Canada-Clinical Trials Group*," J. Clin. Oncol., 14:422-428 (1996)

Best regards,

**Whitney L. Meier, Esq.**

**Venable | Fitzpatrick**

**t** 212.218.2379

Venable LLP, Rockefeller Center, 1270 Avenue of the Americas, 24th Floor

New York, NY 10020


WLMeier@Venable.com **|** www.Venable.com


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT F



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SANOFI-AVENTIS U.S. LLC, et al.,    )
                                    )
            Plaintiffs,             )
                                    )   C.A. No. 20-804-RGA
        v.                          )   (Consolidated)
                                    )
ACTAVIS LLC, et al.,                )   **CONFIDENTIAL, SUBJECT TO**
                                    )   **PROTECTIVE ORDER**
            Defendants.             )


**<u>OPENING EXPERT REPORT OF MARK J. RATAIN, M.D.</u>**

**TABLE OF CONTENTS**

                                                                                      **Page**

I.      INTRODUCTION ................................................................................................... 1

II.     QUALIFICATIONS ............................................................................................... 2

III.    THE ASSERTED PATENTS ................................................................................. 6

        A.      The Specification of the Asserted Patents ................................................. 6

        B.      The '110 Patent ......................................................................................... 8

                1.      The '110 Patent Claims .................................................................. 9

                2.      The '110 Patent File History ........................................................ 10

                3.      Priority Date for the '110 Patent Claims ...................................... 16

        C.      The '777 Patent ....................................................................................... 18

                1.      The '777 Patent Claims ................................................................ 19

                2.      The '777 Patent File History ........................................................ 19

                3.      Priority Date for the '777 Patent Claims ...................................... 20

        D.      Related Litigation .................................................................................... 21

                1.      The '592 Patent ............................................................................ 22

                2.      The New Jersey Litigation ........................................................... 22

                3.      IPR of the '592 Patent ................................................................. 25

IV.     THE PERSON OF ORDINARY SKILL IN THE ART ....................................... 31

V.      CLAIM CONSTRUCTION .................................................................................. 33

VI.     BACKGROUND .................................................................................................. 33

        A.      Treatment of Metastatic Prostate Cancer ................................................ 33

        B.      Treatment Goals for Patients With Metastatic Castration-Resistant
                Prostate Cancer (mCRPC) ...................................................................... 34

        C.      Overview of Taxanes ............................................................................... 37

        D.      Development of Cabazitaxel:  Sanofi's Clinical Trials ............................ 40

                1.      Phase 1 Clinical Trial: Mita ......................................................... 40

                2.      Phase 2 Clinical Trial: Pivot ....................................................... 42

                3.      Phase 3 Clinical Trial: TROPIC ................................................. 44

        E.      Dosing of Taxanes .................................................................................. 47

        F.      Additional Taxane Related Disclosures ................................................... 49

ii

|  |  | 1. | Attard ................................................................................ | 49 |
|--|--|--|--|--|
|  |  | 2. | Beardsley........................................................................... | 50 |
|  |  | 3. | Tannock 2004 .................................................................... | 51 |
|  | G. | | Premedication Regimens ......................................................... | 52 |
|  | H. | | Docetaxel Re-Treatment ......................................................... | 53 |
| VII. | | | THE CLAIMS OF THE '110 AND '777 PATENTS WOULD HAVE BEEN OBVIOUS TO A POSA ........................................................ | 57 |
|  | A. | | The Legal Standard for Obviousness....................................... | 57 |
|  | B. | | Claims 1-6 of the '110 Patent Would Have Been Obvious ............ | 58 |
|  |  | 1. | A POSA Would Have Been Motivated to Combine the Prior Art to Arrive at the Claimed Methods................................... | 59 |
|  |  | 2. | A POSA Would Have Had a Reasonable Expectation of Success in Practicing Claims 1-6........................................ | 67 |
|  | C. | | Claims 1-6 of the '777 Patent Would Have Been Obvious ............ | 71 |
|  |  | 1. | A POSA Would Have Been Motivated to Combine the Prior Art to Arrive at the Claimed Methods................................... | 71 |
|  |  | 2. | A POSA Would Have Had a Reasonable Expectation of Success in Practicing Claims 1-6........................................ | 79 |
|  | D. | | Secondary Considerations........................................................ | 79 |
|  |  | 1. | There Are No Unexpected Results Based on TROPIC ........... | 80 |
| VIII. | | | THE CLAIMS OF THE '110 AND '777 PATENTS ARE DIRECTED TO INELIGIBLE SUBJECT MATTER ....................................... | 81 |
|  | A. | | The Legal Standard for Patent Eligibility ............................. | 81 |
|  | B. | | Claims 1-6 of the '110 Patent are Ineligible Under § 101 ............ | 82 |
|  |  | 1. | Step One.......................................................................... | 82 |
|  |  | 2. | Step Two ......................................................................... | 87 |
|  |  | 3. | Dependent Claims............................................................ | 88 |
|  | C. | | Claims 1-6 of the '777 Patent are Ineligible Under § 101 ............ | 88 |
| IX. | | | THE CLAIMS OF THE '110 AND '777 PATENTS LACK WRITTEN DESCRIPTION............................................................ | 89 |
|  | A. | | The Legal Standard for Written Description ....................... | 89 |
|  | B. | | Claims 1-6 of the '110 Patent and Claims 1-6 of the '777 Patent Are Invalid for Lack of Written Description ......................... | 90 |
|  |  | 1. | The Written Description Does Not Support Administration of Cabazitaxel Without a Corticoid............................................ | 90 |

      2.     The Written Description Does Not Support Administration of Any Dose Other than a 25 mg/m$^2$ Dose of Cabazitaxel ................................. 94

X.    THE CLAIMS OF THE '110 PATENT AND '777 PATENT ARE NOT ENABLED ........................................................................................... 96

    A.    The Legal Standard for Enablement ...................................... 96

    B.    Claims 1-6 of the '110 Patent Are Not Enabled ................................. 97

        1.     The Breadth of the Claims ...................................... 97

        2.     Quantity of Experimentation Necessary ..................... 98

        3.     The Amount of Direction or Guidance Presented.................... 99

        4.     The Presence or Absence of Working Examples.................. 100

        5.     The Nature of the Invention.................................... 102

        6.     The Relative Skill of Those in the Art ........................ 102

        7.     The Predictability or Unpredictability of the Art.................. 102

        8.     The State of the Art................................................ 103

    C.    Claims 1-6 of the '777 Patent Are Not Enabled ............................. 104

XI.    SUPPLEMENTAL OPINIONS........................................................ 106

XII.    COMPENSATION ...................................................................... 107

XIII.    PRIOR TESTIMONY.................................................................... 107

## I.      INTRODUCTION

1.      I, Mark J. Ratain, M.D., have been asked to render opinions regarding U.S. Patent No. 10,583,110 ("the '110 Patent") and U.S. Patent No. 10,716,777 ("the '777 Patent") (together, the "Asserted Patents" or "Sanofi Patents").  One or more of defendants Actavis LLC, Apotex Corp., Apotex, Inc., Mylan Laboratories Ltd., Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories, Ltd. and Sandoz, Inc. (collectively, "Defendants") have asked me to provide an opinion regarding the following issues:

- Whether claims 1-6 of the '110 Patent and claims 1-6 of the '777 Patent would have been obvious over the prior art to a person of ordinary skill in the art ("POSA");

- Whether claims 1-6 of the '110 Patent and claims 1-6 of the '777 Patent are directed to ineligible subject matter;

- Whether claims 1-6 of the '110 Patent and claims 1-6 of the '777 Patent lack sufficient written description; and

- Whether claims 1-6 of the '110 Patent and claims 1-6 the '777 Patent are not enabled.

2.      I understand that there is a dispute about the relevant priority date for the patents. Specifically, I understand that Defendants contend that because the earliest provisional application did not describe the claimed pre-medication regimen, the priority date for the patents is January 11, 2010.  I also understand that Sanofi asserts that the claims of the '110 and '777 Patents were conceived and reduced to practice no later than October 29, 2009 and are therefore entitled to a priority date of October 29, 2009.  In my opinion, the claims would be obvious regardless of which priority date is adopted, or, alternatively, they would be invalid for lack of written description and enablement.  In my analysis, I have assumed a priority date of October 29, 2009, except where I explicitly note otherwise.

practice, a physician uses clinical judgment to determine whether continuation of therapy is appropriate. In the absence of therapy, the tumor is expected to continue to grow, and the vast majority of patients will progress within 2 months. However, if treatment causes the tumor to decrease (as determined by the first scan after starting treatment), the PFS will necessarily be longer than 2 months, and generally at least 4 months.

93.     The management of patients with mCRPC differs from most other cancers in that the majority of patients do not have measurable disease, but do have quantifiable disease on the basis of a serum PSA. *See* Howard I. Scher et al., *Design and End Points of Clinical Trials for Patients with Progressive Prostate Cancer and Castrate Levels of Testosterone: Recommendations of the Prostate Cancer Clinical Trials Working Group*, J. CLIN. ONCOL., Vol. 26, 1148-59 (CabRef0013284-312) (2008) ("Scher 2008"). It was (and remains) standard practice to monitor the serum PSA on a regular basis for patients on treatment, and multiple definitions have been proposed for the definition of PSA response and PSA progression. *See* Scher 2008; Maha Hussain et al., *Prostate-Specific Antigen Progression Predicts Overall Survival in Patients with Metastatic Prostate Cancer: Data from Southwest Oncology Group Trials 9346 (Intergroup Study 0162) and 9916*, J. CLIN. ONCOL., Vol. 27, 2450-2456 (CabRef0012988-94) (2009) ("Hussain 2009"). The interval from start of a specific treatment to progression is often referred to as the PSA-PFS, and in the absence of treatment the PSA will increase with time. Any treatment that reduces the PSA substantially (e.g., 30% or more) in a patient will inherently increase the time until the PSA progresses relative to not treating the patient, although that does not imply that the overall survival was increased. Nonetheless, a PSA response is highly valued by patients and is associated with both improved quality and quantity of life. Jawaher Ansari et al., *Docetaxel chemotherapy for metastatic hormone refractory*

*prostate cancer as first-line palliative chemotherapy and subsequent re-treatment: Birmingham experience*, ONCOLOGY REPORTS, Vol. 20, 891-96 (CabRef0012836-41), 892-93 (CabRef0012837-38) (2008) ("Ansari 2008") at 892-93; Mita 2009 at 727, CabRef0002902.

94.     Another important goal of treatment is reducing pain in the significant proportion of patients with mCRPC who require opioids, often due to bone metastases, which was the primary endpoint in the trial leading to mitoxantrone's approval for the treatment of mCRPC. *See* Tannock 1996 at 1756, CabRef0013313.  A number of pain scales have been developed to measure pain as an endpoint in clinical trials, although not all of these are used in routine practice.  In this context, the notion of pain progression has been used, as well as the notion of pain-PFS, the time from start of treatment to pain progression.  Many patients with pain receive relief (usually only partial) with treatment, and have an improved quality of life relative to how they felt prior to the treatment, despite the toxicities of the treatment itself.  These responding patients have an increase in their time to pain progression relative to the alternative of not receiving treatment, since in the absence of treatment, patients will have a steady increase in their pain and opioid requirements.

## C.     Overview of Taxanes

95.     Below I describe some relevant aspects of what was known in the art regarding taxanes and their therapeutic uses as of October 29, 2009.

96.     Taxanes are a class of chemotherapy agents that work by inhibiting mitosis (the effective division of the cell), specifically by disrupting the function of microtubules (a structure necessary for mitosis).  Because of their mechanism of action, all taxanes cause neutropenia (a decrease in the blood cells most important for defending against bacterial infection), as they do not differentiate between tumor cells and rapidly dividing normal cells (*e.g.*, neutrophils).  Four taxanes (as well as generic versions of paclitaxel and docetaxel) are currently approved by FDA:

37

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct and this expert report was executed by me on this 29th day of January, 2021.

_____

Mark J. Ratain, M.D.

# EXHIBIT G

| From: | Mahmood_Tiffany |
|---|---|
| To: | Howard_Whitney Meier; Shrestha_Roshan P. |
| Cc: | DeJong_Kevin J; Rapalino_Emily L.; Wiesen_Daryl L; DG-Cabazitaxel-DE; DGattuso@proctorheyman.com; jcp@pmhdelaw.com; mch@pmhdelaw.com; Johnson, Aaron; Alul, Andrew M.; Adams, Katherine E.; Solander, William E.; Minion, Daniel J.; Blumenfeld, Jack; Fahnestock_Derek |
| Subject: | RE: Sanofi v. Apotex, Sandoz (cabazitaxel): D.I. 302, 091522 Mem. Order |
| Date: | Wednesday, September 21, 2022 7:35:41 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

Whitney,

We disagree that Sanofi is entitled under the amended scheduling order (D.I. 267) to serve a supplemental report on validity given that the scheduling order explicitly limits the validity reports "solely to issues pertinent to U.S. patent No. 8,927,592," which has now been dismissed from the case. Furthermore, there is no need to "respond to new arguments in Dr. Ratain's supplemental" report given our offer to withdraw that report if Sanofi does not serve a responsive report. Likewise, there is no justification for Sanofi to serve a report responding to Dr. Ratain's reply report on the '110 and '777 patents; Sanofi never before objected to any allegedly "new arguments" in that report at the time it was served or at any point thereafter, and the time to serve validity reports with respect to those patents is long over. Defendants reserve all rights with respect to any supplemental validity report Sanofi serves, including the right to move to strike and to preclude testimony on any opinions expressed therein, and the right to serve a reply report.

Best regards,

**Tiffany Mahmood**



Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 459 7170
f  +1 646 558 4073
TMahmood@goodwinlaw.com



---

**From:** Howard, Whitney Meier <wmhoward@venable.com>
**Sent:** Wednesday, September 21, 2022 12:12 PM
**To:** Shrestha, Roshan P. <rshrestha@taftlaw.com>
**Cc:** DeJong, Kevin J <KDeJong@goodwinlaw.com>; Mahmood, Tiffany <TMahmood@goodwinlaw.com>; Rapalino, Emily L. <ERapalino@goodwinlaw.com>; Wiesen, Daryl L <DWiesen@goodwinlaw.com>; DG-Cabazitaxel-DE <DG-Cabazitaxel-DE@goodwinlaw.com>; DGattuso@proctorheyman.com <DGattuso@hegh.law>; jcp@pmhdelaw.com; mch@pmhdelaw.com; Johnson, Aaron <AJohnson@Taftlaw.com>; Alul, Andrew M. <AAlul@taftlaw.com>; Adams, Katherine E. <KEAdams@Venable.com>; Solander, William E. <WSolander@Venable.com>; Minion, Daniel J. <DMinion@Venable.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** RE: Sanofi v. Apotex, Sandoz (cabazitaxel): D.I. 302, 091522 Mem. Order

***EXTERNAL***
Counsel,

Sanofi intends to serve a report on Friday pursuant to the amended scheduling order (D.I. 267) to respond to new arguments in Dr. Ratain's supplemental and reply reports.  Sanofi is willing to withdraw Dr. Nelson's opening infringement report for the '592 patent in view of the Court's Memorandum Order from last Thursday (D.I. 302), but Sanofi reserves all rights to serve infringement reports on the '592 patent should the Court's dismissal of the '592 patent be reversed.

Best regards,

Whitney Meier Howard, Esq.
Venable | Fitzpatrick
t 212.218.2379
Venable LLP, Rockefeller Center, 1270 Avenue of the Americas, 24th Floor
New York, NY 10020

WMHoward@Venable.com | www.Venable.com

---

**From:** Shrestha, Roshan P. <rshrestha@taftlaw.com>
**Sent:** Tuesday, September 20, 2022 4:23 PM
**To:** Howard, Whitney Meier <wmhoward@venable.com>; Adams, Katherine E. <KEAdams@Venable.com>; Solander, William E. <WSolander@Venable.com>; Minion, Daniel J. <DMinion@Venable.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Cc:** DeJong, Kevin J <KDeJong@goodwinlaw.com>; Mahmood, Tiffany <TMahmood@goodwinlaw.com>; Rapalino, Emily L. <ERapalino@goodwinlaw.com>; Wiesen, Daryl L <DWiesen@goodwinlaw.com>; DG-Cabazitaxel-DE <DG-Cabazitaxel-DE@goodwinlaw.com>; DGattuso@proctorheyman.com <DGattuso@hegh.law>; jcp@pmhdelaw.com; mch@pmhdelaw.com; Johnson, Aaron <AJohnson@Taftlaw.com>; Alul, Andrew M. <AAlul@taftlaw.com>
**Subject:** Sanofi v. Apotex, Sandoz (cabazitaxel): D.I. 302, 091522 Mem. Order

**Caution: External Email**

Counsel:

In view of the Court's Memorandum Order from last Thursday (D.I. 302), Defendants believe the supplemental reports authorized under Paragraph 6.a. of the amended scheduling order (D.I. 267) are moot except as set forth in the Stipulated Order from last Friday (D.I. 304).  Please let us know if Sanofi agrees.  If Sanofi does not plan on serving a supplemental rebuttal report on invalidity this Friday, Defendants will agree to withdraw Dr. Ratain's supplemental opening report served on August 18.  Likewise, please let us know if Sanofi is willing to withdraw Dr. Nelson's opening infringement report on the '592 patent.

If needed, Defendants can make themselves available to meet and confer on this issue on Wednesday—please let us know.

- Roshan

**Taft /**   **Roshan P. Shrestha, Ph.D.**
Partner
rshrestha@taftlaw.com
Dir: 312.840.4339
Tel: 312.527.4000   |   Fax: 312.966.8573
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601-3713

**Taft Bio**



**Download vCard**
**taftlaw.com**

Jaffe is joining Taft, effective Dec 31, 2022.
Learn more **here.**

This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

**********************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
**********************************************************************