IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SANOFI-AVENTIS U.S. LLC and<br>SANOFI MATURE IP,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>SANDOZ INC.,<br><br>　　　　　　　Defendant. | )<br>)<br>)　C.A. No. 20-804 (RGA)<br>)　CONSOLIDATED<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

REDACTED - PUBLIC VERSION

## PLAINTIFFS' POST TRIAL BRIEF REGARDING INFRINGEMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com

*Attorneys for Plaintiffs Sanofi-Aventis LLC
and Sanofi Mature IP*

OF COUNSEL:

William E. Solander
Daniel J. Minion
Whitney Meier Howard
Joshua Calabro
Katherine E. Adams
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY  10020
(212) 307-5500

January 31, 2023

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................1

II.     BACKGROUND .......................................................................................................2

III.    ARGUMENT .............................................................................................................4

        A.      Legal Standards..............................................................................................4

        B.      Sandoz's Cabazitaxel Product Will Induce Infringement of the
                Asserted Claims of the '777 Patent...............................................................5

                1.      Sandoz Has Knowledge of the '777 Patent.........................................5

                2.      Undisputed Limitations.......................................................................6

                3.      Disputed Limitation - "A method of increasing survival . . .
                        in a patient in need thereof" ...............................................................8

                        a)      The Court Should Reject Sandoz's Extreme
                                Standards for Meeting the Intent Element of the
                                Asserted Claims ........................................................................8

                        b)      Sandoz Will Encourage and Promote the
                                Administration of Its Cabazitaxel Product with the
                                Intent of Increasing Survival....................................................9

                        c)      The *Grunenthal* and *Acorda* Cases Are Readily
                                Distinguishable ......................................................................17

        C.      The Use of Sandoz's Cabazitaxel Product Will Directly Infringe
                the Asserted Claims of the '777 Patent.......................................................19

IV.     CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics Inc. v. Apotex Inc.*,
No. 07-cv-4937-GEB-MCA, 2011 WL 4074116 (D.N.J. Sept. 6, 2011), *aff'd*,
476 F. App'x 746 (Fed. Cir. 2012) .................................................................................18, 19

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015)........................................................................................4, 20

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
365 U.S. 336 (1961)................................................................................................................4

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010)........................................................................................ *passim*

*Braintree Lab'ys, Inc. v. Breckenridge Pharm., Inc.*,
688 F. App'x 905 (Fed. Cir. 2017) ........................................................................................14

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016)....................................................................................................6

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006)..............................................................................................4

*Eli Lilly & Co. v. Teva Parenteral Meds.*,
845 F.3d 1357 (Fed. Cir. 2017).....................................................................................4, 14, 20

*Eli Lilly and Co. v. Actavis Elizabeth LLC*,
435 F. App'x 917 (Fed. Cir. July 29, 2011)............................................................................4

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)................................................................................................................4

*Grunenthal GmbH v. Alkem Labs. Ltd.*,
919 F.3d 1333 (Fed. Cir. 2019)........................................................................................17, 18

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
222 F.3d 951 (Fed. Cir. 2000)................................................................................................6

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
572 U.S. 915 (2014)................................................................................................................4

*Mylan Lab'ys Ltd. v. Aventis Pharma S.A.*,
IPR2016-00712, Paper 112 (P.T.A.B. Oct. 22, 2019), *aff'd sub nom., Mylan*
*Lab'ys Ltd. v. Sanofi Mature IP*, 833 F. App'x 825 (Fed. Cir. Jan. 15, 2021) .........................9

*Realtime Adaptive Streaming LLC v. Netflix Inc.*,
No. 17-cv-1692-CFC-SRF, 2018 WL 6521978 (D. Del. Dec. 12, 2018) .................................6

*Salix Pharm., Ltd. v. Norwich Pharm., Inc*.,
No. 20-cv-430-RGA, 2022 WL 3225381 (D. Del. Aug. 10, 2022) ...........................11, 15, 17

*Sanofi v. Glenmark Pharm. Inc., USA*,
204 F. Supp. 3d 665 (D. Del. 2016), *aff'd sub nom.*, *Sanofi v. Watson Labs.
Inc*., 875 F.3d 636 (Fed. Cir. 2017) ...................................................................................17

*Sanofi v. Watson Labs. Inc*.,
875 F.3d 636 (Fed. Cir. 2017)....................................................................................5, 11, 15

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l, Ltd.*,
887 F.3d 1117 (Fed. Cir. 2018).........................................................................................5, 11

*Wrinkl, Inc. v. Facebook, Inc.*,
No. 20-cv-1345-RGA, 2021 WL 4477022 (D. Del. Sept. 30, 2021)........................................5

**Statutes**

35 U.S.C. § 271(a) ...................................................................................................................20

35 U.S.C. § 271(b) ..................................................................................................................4, 17

**Regulations**

21 C.F.R. § 201.56(b)(1).............................................................................................................10

21 C.F.R. § 201.57(c)(2)..............................................................................................................10

**Rules**

Fed. Cir. R. 36.........................................................................................................................9, 18

Fed. R. Evid. 201(b)......................................................................................................................6

## I.      <u>INTRODUCTION</u>

The asserted claims of U.S. Patent No. 10,716,777 ("the '777 patent") cover the administration of 20 mg/m$^2$ of cabazitaxel and an H$_2$ antagonist premedication to a patient with metastatic castration-resistant prostate cancer ("mCRPC") that has progressed during or after treatment with docetaxel with an intentional purpose of increasing survival.  Sanofi demonstrated at trial by a preponderance of the evidence that the product label that will accompany Sandoz's generic cabazitaxel product will induce healthcare providers (physicians) to infringe these claims.

Sandoz alleges that it has "carved-out" Sanofi's patented use from its label.  Not so. Although Sandoz has removed information that appears in Sanofi's JEVTANA® (cabazitaxel) label, the omitted information relates to the 25 mg/m$^2$ dose of cabazitaxel.  The data and instructions for the 20 mg/m$^2$ dose remain.  Indeed, it is undisputed that Sandoz's label will instruct healthcare providers to administer Sandoz's cabazitaxel product to patients with mCRPC that has progressed during or after treatment with docetaxel at a dose of 20 mg/m$^2$ and with an H$_2$ antagonist premedication 30 minutes before administering each dose of cabazitaxel in accordance with the asserted claims.

The only dispute is whether Sandoz's label will encourage, recommend and/or promote the use of its cabazitaxel product by healthcare providers with the intentional purpose of increasing survival of patients as compared to any other treatment that may be available to the patient (including no treatment).  As the record evidence shows, the only efficacy data in Sandoz's label teaches healthcare providers that a 20 mg/m$^2$ dose of cabazitaxel increases overall survival of patients with mCRPC whose cancer has worsened after receiving docetaxel.  Thus, Sandoz's label encourages and will inevitably lead healthcare providers to practice the claimed methods with the requisite intent.

1

## II.   **BACKGROUND**

The patients who receive Sanofi's JEVTANA® cabazitaxel product, and those who will receive Sandoz's cabazitaxel product, are men with advanced, metastatic prostate cancer.  Tr. 69:5-22 (Nelson); 149:24-150:3 (Stadler).  The standard treatment for men with metastatic prostate cancer is lowering testosterone levels through hormone therapy.  Plaintiffs' Proposed Findings of Fact Regarding Infringement ("FOF") ¶ 6; Tr. 70:13-22 (Nelson); 149:24-150:15 (Stadler).  This has been known to lead to dramatic improvements, but unfortunately is not curative.  *Id.*  Over time, the tumor resists testosterone suppression and the cancer progresses to a state that is termed "castration-resistant metastatic prostate cancer," or mCRPC.  *Id.*  For many years, no treatment had been shown to increase overall survival, i.e., prolong life (time to death) after resistance to castration therapy.  Tr. 70:22-71:1 (Nelson); 150:11-151:1 (Stadler).

In 2004, docetaxel, a taxane compound, was approved by the U.S. Food & Drug Administration ("FDA") for the treatment of mCRPC after it was shown to increase overall survival as compared to mitoxantrone therapy.  FOF ¶ 7; Tr. 71:2-10 (Nelson); 151:2-7 (Stadler); 242:6-14 (Ratain).  Docetaxel chemotherapy immediately became the new standard of care for patients with mCRPC.  FOF ¶ 7; Tr. 72:20-73:1 (Nelson); *see* 151:16-20 (Stadler); PTX-1023 at 304 (Pienta & Smith).  Unfortunately, the mCRPC in patients will ultimately progress due to the development of resistance to docetaxel.  FOF ¶ 8; Tr. 73:2-6 (Nelson); 152:7-12 (Stadler); 246:21-247:10 (Ratain).  Prior to JEVTANA®, there was no therapy that had been shown to prolong the lives of such patients that had progressed on or after treatment with docetaxel.  FOF ¶ 9; Tr. 73:7-14 (Nelson); 189:10-21 (Stadler).  The treatments used were instead primarily palliative, i.e., meant to improve symptoms such as pain.  *Id.*  Mitoxantrone, a chemotherapy with a different mechanism of action from taxanes, was used as a standard of care in this

2

population for palliative reasons.  FOF ¶ 10; Tr. 73:7-14 (Nelson); *see* 240:17-25 (Ratain).

Mitoxantrone had been shown to improve quality of life and pain, and to improve some metrics

of progression-free survival, but it had never been shown to prolong life.  FOF ¶ 10; Tr. 73:7-14

(Nelson); 240:17-25 (Ratain).

JEVTANA® was approved by the FDA in 2010 based on the phase III TROPIC clinical

study demonstrating that patients receiving cabazitaxel on average live longer than patients

receiving standard mitoxantrone therapy.  FOF ¶ 11; Tr. 73:25-74:5, 75:10-17, 75:18-22

(Nelson); 162:11-14, 180:18-181:6 (Stadler); JTX-012 at 1152 (de Bono).  The approval of

JEVTANA® was practice-changing as it was the first life-prolonging treatment for men with

mCRPC that had progressed during or after treatment with docetaxel.  Tr. 75:18-22 (Nelson);

180:18-181:6 (Stadler).  Subsequent to the approval of JEVTANA®, Sanofi conducted the

PROSELICA non-inferiority study comparing the overall survival of men receiving a 20 mg/m$^2$

starting dose of cabazitaxel to those receiving a 25 mg/m$^2$ starting dose.  FOF ¶ 12; Tr. 76:8-12

(Nelson); 183:1-9 (Stadler).  PROSELICA proved that the 20 mg/m$^2$ dose retains the overall

survival advantage that had been shown for the 25 mg/m$^2$ dose in TROPIC.  FOF ¶ 12; Tr. 76:8-

12 (Nelson); 183:1-9 (Stadler); JTX-032 at 3200 (Eisenberger).  Information and data from both

the TROPIC and PROSELICA trials are included in the JEVTANA® label, and JEVTANA® is

approved at both the 25 mg/m$^2$ and 20 mg/m$^2$ doses based on those studies.  FOF ¶ 13; Tr. 76:25-

77:6, 80:19-81:3 (Nelson); 162:20-25 (Stadler); JTX-021 at 3, 25-27 (JEVTANA® Label).

Sandoz's label includes only the PROSELICA trial and recommends only the 20 mg/m$^2$ dose.

FOF ¶ 13; Tr. 80:19-81:3, 81:15-17 (Nelson); 162:20-25, 163:25-164:2 (Stadler); DTX-2273.6,

DTX-2273.19-20 (Sandoz's label).

## III.    ARGUMENT

### A.    Legal Standards

Infringement is a question of fact, and Sanofi bears the burden of proving infringement

by a preponderance of the evidence, i.e., "more likely than not."  *Eli Lilly & Co. v. Teva*

*Parenteral Meds.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017).  A party may be liable for infringement

even if it does not directly infringe the patent if it "actively induces infringement."  35 U.S.C.

§ 271(b).  Inducement is predicated on direct infringement by another party.  *Aro Mfg. Co. v.*

*Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Limelight Networks, Inc. v. Akamai*

*Techs., Inc.*, 572 U.S. 915, 920-21 (2014); *Eli Lilly v. Teva Parenteral Meds.*, 845 F.3d at 1363-

64.  Where no single actor performs all the steps of a method claim, "direct infringement only

occurs if the acts of one are attributable to the other such that a single entity is responsible for the

infringement," e.g., when the single actor directs or controls the acts of another.  *Eli Lilly v. Teva*

*Parenteral Meds.*, 845 F.3d at 1364 (quotations omitted); *Akamai Techs., Inc. v. Limelight*

*Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015).

To establish inducement, a patent owner must show that the accused infringer had actual

knowledge of the patent or was willfully blind to its existence.  *Global-Tech Appliances, Inc. v.*

*SEB S.A.*, 563 U.S. 754, 765-66 (2011).  In addition, "[i]nducement requires that the alleged

infringer knowingly induced infringement and possessed specific intent to encourage another's

infringement."  *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1056 (Fed. Cir. 2010)

(quotations omitted) (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)

(*en banc* in relevant part)).

In the Hatch-Waxman context, "the sale of a product specifically labeled for use in a

patented method constitutes inducement to infringe that patent[.]"  *Eli Lilly and Co. v. Actavis*

*Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. July 29, 2011). When proof of specific intent depends on the label accompanying the marketing of a drug inducing infringement by physicians, "[t]he label must encourage, recommend, or promote infringement." *Vanda Pharms. Inc. v. West-Ward Pharms. Int'l, Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018). If a proposed drug label contains language that instructs and/or encourages users to perform the patented method, even if the language may be applied to non-infringing uses, it will "inevitably lead some consumers to practice the claimed method" and thus induce infringement. *AstraZeneca*, 633 F.3d at 1060.

    **B.**    <u>**Sandoz's Cabazitaxel Product Will Induce Infringement of the Asserted Claims of the '777 Patent**</u>

        **1.**    <u>**Sandoz Has Knowledge of the '777 Patent**</u>

    It is undisputed that Sandoz had knowledge of the '777 patent prior to the Second Amended Complaint (the current applicable pleading), prior to final approval of its product, and prior to its actual induced infringement of the asserted claims. FOF ¶ 16; D.I. 62[1] (First Amended Complaint, dated July 31, 2020); PTX-1224 (Patent Amendment related to the '777 patent submitted by Sandoz to the FDA in October 2020); D.I. 248 (Second Amended Complaint, dated Aug. 30, 2021); Tr. 143:6-18 (Seitz); *Wrinkl, Inc. v. Facebook, Inc.*, No. 20-cv-1345-RGA, 2021 WL 4477022, at *6-*7 (D. Del. Sept. 30, 2021) (for knowledge of post-suit indirect infringement, the plaintiff may "allege knowledge since the filing of the original complaint"); *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 643 (Fed. Cir. 2017) ("If and when [defendants] receive FDA approval and market dronedarone with the label at issue, they will know of the [patent-at-issue] (they already do) and that a medical provider's administration of

---

[1] Unless otherwise noted, references to docket numbers herein are to No. 20-804-RGA (D. Del.).

the drug to the claimed class of patients is an act of infringement.").

Sandoz also had knowledge of the '777 patent before it was first asserted.  FOF ¶ 20.
Sanofi sued Sandoz for infringement of U.S. Patent No. 10,583,110 ("the '110 patent") on June
12, 2020.  D.I. 1.[2]  Sandoz has been aware of the claims that issued as claims 1-6 of the '777
patent, since at least June 29, 2020, when Sanofi notified Sandoz that Sanofi had paid the issue
fee for a patent application in the same family as the '110 patent and that Sanofi expected it to
issue promptly so that it could be incorporated into the case.  FOF ¶ 17; D.I. 29.  The following
day, June 30, 2020, the Issue Notification was posted by the USPTO, which included the patent
number and projected issue date of the '777 patent.[3]  FOF ¶ 18.  The First Amended Complaint
adding the '777 patent stated that the patent was listed in the Orange Book, and Sandoz's answer
admitted "that the Orange Book lists the '777 patent as purportedly associated with NDA No.
201023."  FOF ¶ 19; D.I. 62 ¶ 106; D.I. 83 ¶ 106.  Sandoz's corporate witness, Mr. Gregory
Seitz, testified that Sandoz "monitors the Orange Book" and that Sandoz "would have been
notified" when the "Orange Book was updated" with the '777 patent.  FOF ¶ 19; Tr. 143:19-
144:10 (Seitz).

### 2.    Undisputed Limitations

The methods of the asserted claims of the '777 patent as construed by the Court have four
elements: (1) "A method of increasing survival comprising administering . . . to a patient in need

---

[2] The '777 patent is a continuation of the '110 patent.  FOF ¶ 17.

[3] Sanofi respectfully requests the Court take judicial notice of the June 30, 2020 Issue
Notification from the file history of the '777 patent, attached hereto as Exhibit 1, as the facts are
matters of public record not subject to any reasonable dispute.  Fed. R. Evid. 201(b); *Realtime
Adaptive Streaming LLC v. Netflix Inc.*, No. 17-cv-1692-CFC-SRF, 2018 WL 6521978, at *11
(D. Del. Dec. 12, 2018) (taking judicial notice of the file histories of the asserted patents, citing
*Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016) and *Hockerson-Halberstadt, Inc. v.
Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)).

thereof"; (2) "a dose of 20 mg/m² of cabazitaxel, or a hydrate or solvate thereof";[4] (3) "in combination with an H₂ antagonist, wherein the H₂ antagonist is administered to the patient [at least 30 minutes] prior to administering the dose of cabazitaxel"; (4) "wherein said patient has castration resistant metastatic prostate cancer that has progressed during or after treatment with docetaxel."  Sandoz presented no evidence disputing inducement of elements (2), (3), or (4).

Sandoz's label instructs healthcare providers to: (i) administer 20 mg/m² cabazitaxel as an intravenous infusion every 3 weeks in combination with 10 mg/day oral prednisone, and (ii) administer an H₂ antagonist at least 30 minutes prior to administering each dose of cabazitaxel. FOF ¶ 22; Tr. 84:8-17, 85:2-10 (Nelson); 160:3-8 (Stadler); DTX-2273.6.  Sandoz's product will be "indicated in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer previously treated with a docetaxel-containing regimen." FOF ¶ 23; Tr. 82:4-10 (Nelson); 159:6-11 (Stadler); DTX-2273.6.  Healthcare providers understand that a patient with mCRPC previously treated with docetaxel receives Sandoz's cabazitaxel product because his cancer has progressed.  FOF ¶ 24; Tr. 82:11-15, 83:11-83:25 (Nelson); *see also* 305:10-16 (Ratain).  This understanding is stated explicitly in the Patient Information section of Sandoz's label.[5]  FOF ¶ 25; Tr. 82:16-83:1, 83:19-25 (Nelson).  In response to the question "What is Cabazitaxel Injection," Sandoz's label explains that Sandoz's product is for men with castration resistant prostate cancer "that has spread to other parts of the body [i.e., metastatic] and that has worsened (progressed) after treatment with other medicines

---

[4] Claims 1 and 4 include a 20-25 mg/m² dose limitation, but doses other than 20 mg/m² have no bearing on the issue of infringement here.

[5] The Patient Information section is read by healthcare providers, and Sandoz's label instructs healthcare providers to tell their patients to read it.  FOF ¶ 26; DTX2273.20; Tr. 83:11-18, 84:1-7 (Nelson); *see* 158:21-159:3, 181:24-182:16 (Stadler).

that included docetaxel." FOF ¶ 25; DTX2273.22-23. Dr. Stadler agreed that this is consistent with how cabazitaxel is used. FOF ¶ 25; Tr. 182:5-16 (Stadler).

### 3. Disputed Limitation - "A method of increasing survival . . . in a patient in need thereof"

#### a) The Court Should Reject Sandoz's Extreme Standards for Meeting the Intent Element of the Asserted Claims

The Court construed the phrase "[a] method of increasing survival . . . to a patient in need thereof" as "[a] method of increasing survival with the ***intentional purpose*** of increasing such survival in an individual patient in need of such a method of increasing survival." FOF ¶ 27; D.I. 215 (emphasis added). The phrase "increasing survival" was construed as "increasing any of: overall survival, tumor progression-free survival, pain progression-free survival, or prostate specific antigen (PSA) progression-free survival as compared to any other treatment that may be available to the patient (including no treatment)." FOF ¶ 27; D.I. 215.

Dr. Stadler opined that while he may have a "goal" of increasing overall survival, he would not have an "intentional purpose." Tr. 166:24-167:11, 175:3-9, 177:7-13 (Stadler). At trial, Dr. Stadler distinguished between the term "goal," which he uses to mean "a hope," and the phrase "intentional purpose," which he uses to mean an "expectation that one will have an outcome that would mean in the majority, or the vast majority of patients," and "a high probability or a high expectation." Tr. 155:11-21, 167:7-11 (Stadler). This unsupported high bar for "intentional purpose" lacks basis in the Court's claim construction and contradicts the testimony of Sandoz's expert on validity, Dr. Ratain. In Dr. Ratain's opinion, "intentional purpose [does not] mean an expectation that one will have an outcome in the vast majority of patients," but rather "the term 'intentional purpose' is a goal of treatment based on reason." Tr. 344:3-11 (Ratain). Whereas Dr. Stadler discounts PROSELICA overall survival data from hundreds of patients in Sandoz's label and FDA approval based on that data alone (see

discussion below), Dr. Ratain opines "that the observation of a single response to a drug in a Phase I study can provide sufficient information for which a POSA can administer that drug to another patient with the intentional purpose of increasing survival."  Tr. 345:5-10 (Ratain). Sandoz cannot have differing interpretations of "intentional purpose" for infringement and validity.

Sanofi submits that neither of Sandoz's experts' disparate standards for the level of evidence necessary to form an intentional purpose of increasing survival is correct.  As the PTAB correctly stated on remand when considering whether the prior art would have provided a POSA with such an intentional purpose when evaluating this exact claim limitation in the '777 patent's parent application's claims (a decision affirmed by the Federal Circuit), "proving the obviousness of the challenged claims does not require proving that performing the method recited in the . . . claims would actually increase survival, but it does require proving that a person of ordinary skill in the art reasonably would have expected the performance of the recited method to increase survival."  D.I. 107-1, Exhibit F (*Mylan Lab'ys Ltd. v. Aventis Pharma S.A.*, IPR2016-00712, Paper 112 at 14 (P.T.A.B. Oct. 22, 2019), *aff'd sub nom., Mylan Lab'ys Ltd. v. Sanofi Mature IP*, 833 F. App'x 825 (Fed. Cir. Jan. 15, 2021) (Fed. Cir. R. 36)).  In other words, the requisite level of clinical evidence sufficient for healthcare providers to have the intent of increasing survival is a reasonable expectation that the claimed method will result in such an increase.

### b) Sandoz Will Encourage and Promote the Administration of Its Cabazitaxel Product with the Intent of Increasing Survival

Sandoz's label instructs healthcare providers to administer its cabazitaxel product to patients having terminal cancer who are in need of a method of increasing survival because their cancer has worsened despite docetaxel treatment.  FOF ¶ 28; Tr. 87:3-10 (Nelson); 182:5-16

(Stadler). Sandoz's label also encourages and promotes the administration of the claimed dose of cabazitaxel and premedication to a claimed patient with the intentional purpose of increasing survival. FOF ¶ 47; Tr. 92:17-95:2 (Nelson).

Healthcare providers' treatment decisions are primarily driven by weighing the benefits vs. the risks of a particular therapy. FOF ¶ 29; Tr. 87:11-19 (Nelson); 153:3-9, 155:24-25, 165:14-21 (Stadler). Healthcare providers considering whether to prescribe Sandoz's cabazitaxel product will be aware from Sandoz's label of the risks associated with a cytotoxic chemotherapy like cabazitaxel, including risk of death. FOF ¶ 30; Tr. 87:25-88:12 (Nelson); DTX-2273.11 (noting that 22 patients in the 20 mg/m$^2$ arm of the PROSELICA trial died within 30 days of receiving cabazitaxel). Thus, healthcare providers will understand from Sandoz's label that cabazitaxel has great potential for harm that must be carefully weighed against any potential benefit. FOF ¶ 30; Tr. 88:13-18 (Nelson); *see also* 167:12-19, 168:14-20 (Stadler); 239:1-16 (Ratain: "chemotherapy is poison"); DTX-2273.7 ("Cabazitaxel Injection is a hazardous drug.").

Given these risks, healthcare providers will review Sandoz's label to understand the potential benefits of treatment with Sandoz's cabazitaxel product. FOF ¶¶ 29, 31. While the Indications and Usage section of Sandoz's label merely states that cabazitaxel is indicated for "treatment of patients" and, therefore, does not inform healthcare providers as to the specific benefits of cabazitaxel treatment, both experts agreed that healthcare providers will not stop reading at the indication section to understand those benefits.[6] FOF ¶¶ 29, 31; Tr. 78:17-79:2

---

[6] Sandoz overstates the import of the term "treatment" in the indication. *See, e.g.*, Tr. 37:1-18, 532:4-12. An indication for "treatment" simply conforms with the FDA's requirements for prescription drug labeling (applicable to products like cabazitaxel for which an NDA is submitted after June 20, 2006) that the Indications and Usage section "must state that the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of symptoms associated with a recognized disease or condition." 21 C.F.R. §§ 201.56(b)(1),

(Nelson); 158:21-159:3 ("the clinical trials sections" "support[] the indication and usage"),

181:24-182:4 (Stadler); *see also* Tr. 223:22-224:11 (Gupta).  Indeed, it is undisputed that

healthcare providers would not prescribe a cancer treatment without first reviewing the entire

label to determine the benefits and risks of the medication.  FOF ¶ 29; Tr. 78:17-79:2 (Nelson);

158:21-159:3, 181:24-182:4 (Stadler).

  The experts' testimony that the entire label will be read by healthcare providers is in line

with Federal Circuit caselaw.  *Sanofi v. Watson Labs.*, 875 F.3d at 645-46 (relying on the

Clinical Studies section for "elaboration of the class of patients for whom the drug is indicated to

achieve the stated objective, i.e., reduced hospitalization"); *Vanda Pharm.*, 887 F.3d at 1131

(relying on language in the Pharmacokinetics section of the label to find that it recommends

performing the patented method).  Thus, it is undisputed that healthcare providers will review the

available clinical data in the Clinical Studies section of the label to determine the specific

benefits of cabazitaxel treatment and will do so regardless of whether other sections such as the

indication or dosing sections cross-reference it.  FOF ¶¶ 29, 31, 32; Tr. 88:19-24, 89:15-19

(Nelson); 158:21-159:3, 160:15-19, 182:17-21 (Stadler: "I also relied on the clinical trials

sections that supports the indications and usage."); DTX-2273.19-20; *Salix Pharm., Ltd. v.

Norwich Pharm., Inc.*, No. 20-cv-430-RGA, 2022 WL 3225381, at *12 (D. Del. Aug. 10, 2022)

("[T]he law does not require the indication section of a label to specifically direct the reader to

look at other sections in order for those other sections to be considered.").

---

201.57(c)(2); *see also* Tr. 188:24-189:9 (Dr. Stadler agreeing that he is not aware today of "any
drugs directed to treating the underlying cancer that have an indication that includes the words
'increasing survival'"); Tr. 223:22-224:11 (Inventor Dr. Gupta confirming that the reason for the
indication of "treatment" rather than "increasing survival" in the JEVTANA® label was
"driven . . . largely by FDA guidelines and requirements, so that in the indication statement for
cabazitaxel, and one can look at any other product approved by the FDA, does not include
mention of the [clinical trial] end point.").

The benefit information provided in the Clinical Studies section of Sandoz's label is overall survival data from the PROSELICA study, which investigated non-inferiority of the 20 mg/m$^2$ dose compared to the 25 mg/m$^2$ dose with respect to overall survival.  FOF ¶ 33; Tr. 88:19-89:7 (Nelson); 182:17-183:9 (Stadler); DTX-2273.19-20.  Sandoz's label indicates that the overall survival benefit, i.e. the life-prolonging benefit, is the major efficacy outcome.  FOF ¶ 33; Tr. 88:19-89:7 (Nelson); 185:1-5 (Stadler); DTX-2273.19 ("Overall survival (OS) was the major efficacy outcome.").  As explained below, from the non-inferiority design and overall survival endpoint of the PROSELICA study, as described in Sandoz's label, healthcare providers will readily understand that 20 mg/m$^2$ doses of cabazitaxel increase overall survival as compared to no treatment or another treatment.

A non-inferiority study has two arms in which patients are enrolled.  FOF ¶ 34; Tr. 76:8-16, 90:17-91:2 (Nelson); JTX-007 at 20 (Pazdur).  In the first arm of the study—the control arm—study patients are given a therapy previously known to be active (i.e. one that has been proven to have a beneficial effect).  *Id.*  In the second arm of the study—the comparative arm—the study patients are given a different therapy, formulation, or dosage amount.  *Id.*  The outcomes of the two arms are then compared to determine whether the patients in the comparative arm did no worse than the patients in the active control arm with respect to the specified beneficial effect.  FOF ¶ 35; Tr. 76:8-16, 90:17-91:2 (Nelson).  If that is the case, the study met its endpoint, and the comparative therapy can be considered non-inferior to the active control therapy such that healthcare providers can use the comparative therapy in place of the active control therapy.  FOF ¶ 35; Tr. 76:8-16, 90:17-91:2, 117:24-118:5, 126:23-127:3, 129:16-21 (Nelson).

In the PROSELICA study, the active control arm is a 25 mg/m$^2$ dose of cabazitaxel, and the comparative arm is a 20 mg/m$^2$ dose of cabazitaxel. FOF ¶ 36; Tr. 75:23-76:12, 88:19-89:7 (Nelson); 160:15-19, 183:1-6 (Stadler); DTX-2273.19-20. The two arms are being compared with respect to overall survival. FOF ¶ 36; Tr. 88:19-89:7 (Nelson); 185:1-5 (Stadler). Since overall survival is the study's endpoint, healthcare providers will understand that the 25 mg/m$^2$ control arm must have previously been demonstrated to increase overall survival as compared to another treatment or no treatment and that the non-inferiority study was conducted to ensure that an overall survival benefit seen in the control arm (25 mg/m$^2$ dose) will be maintained in the comparator arm (20 mg/m$^2$ dose). FOF ¶ 37; Tr. 90:2-91:19, 99:10-100:2, 125:22-126:4, 126:14-17 (Nelson); *see* 160:17-24, 183:10-184:3, 185:12-20, 187:25-188:17 (Stadler). This is illustrated below in comparison between the explanation of non-inferiority studies in Pazdur (JTX-007) and the language in Sandoz's label:

Pazdur at 20: "Patient benefit can be described as superior survival or noninferior survival after consideration of toxicity and the magnitude of benefit. A **noninferiority analysis** ensures that a **survival advantage** associated with an approved drug will not be lost with a new agent."

Sandoz's label at DTX-2273.19: "The efficacy and safety of cabazitaxel were evaluated in a **noninferiority**, multicenter, randomized, open-label study (PROSELICA, NCT01308580). A total of 1200 patients with metastatic castration-resistant prostate cancer, previously treated with a docetaxel-containing regimen were randomized to receive either cabazitaxel 25 mg/m$^2$ (n=602) or 20 mg/m$^2$ (n=598) dose. **Overall survival (OS)** was the major efficacy outcome."

Thus, healthcare providers would understand that the design of the PROSELICA study necessarily requires an overall survival advantage to have been shown for the control arm (25 mg/m$^2$) in a previous trial as compared to something, either no treatment or another treatment, or else it could not have served as an active control. FOF ¶ 38; Tr. 90:17-91:2 (Nelson); *see also*

13

183:1-9, 187:18-24 (Stadler).  Sandoz's label also states that there were 600 men treated with the 25 mg/m$^2$ dose, and healthcare providers will understand that it would have been ethically impossible to enroll such a large number of patients in that active control arm of the PROSELICA study if there were not some previously proven clinical benefit for that therapy—here, overall survival.  FOF ¶ 39; Tr. 90:2-16 (Nelson); *see* 184:10-15, 184:22-25 (Stadler).  Put another way, if 25 mg/m$^2$ ***had not*** already been shown to increase overall survival as compared to another treatment or no treatment, it would not have been possible nor ethical to enroll 1200 patients (in need of increased survival) in a study that could only then show that 20 mg/m$^2$ ***also did not*** increase overall survival.  Dr. Stadler acknowledged that "[m]ost physicians prescribing cabazitaxel, in seeing the PROSELICA data, would make the inference that there was a prior study demonstrating efficacy of the 25 mg/m$^2$ dose," and that "from the label, one can make an inference that cabazitaxel 25 mg/m$^2$ had some benefit in this population."[7]  FOF ¶ 40; Tr. 185:11-15, 187:2-7, 188:7-9 (Stadler); *see also* 91:3-7 (Nelson).  When asked whether this "benefit" is "in terms of increasing survival," Dr. Stadler responded, "One could make that inference, I guess, but there's nothing here in the label to that effect."  FOF ¶ 40; Tr. 187:2-10 (Stadler).  The fact that Sandoz's label does not contain the words "increasing survival," as Dr. Stadler notes, is not determinative; a label is not required to exactly track the claim language for a finding of induced infringement.  *Braintree Lab'ys, Inc. v. Breckenridge Pharm., Inc.*, 688 F.

---

[7] Sanofi need not prove that every healthcare provider administering Sandoz's cabazitaxel product will review the entirety of the label and understand from it that 20 mg/m$^2$ dose increases overall survival as compared to another treatment or no treatment. *See Eli Lilly v. Teva Parenteral Meds.*, 845 F.3d at 1369 ("[E]vidence that the product labeling that Defendants seek would inevitably lead ***some physicians*** to infringe establishes the requisite intent for inducement.") (emphasis added); *AstraZeneca*, 633 F.3d at 1057 (affirming grant of preliminary injunction for induced infringement where "the proposed label would cause some users to infringe the asserted method claims").

App'x 905, 909-10 (Fed. Cir. 2017) (finding infringement of claims to purgation when the indication was for fully cleansing the colon); *AstraZeneca*, 633 F.3d at 1057 (relying on downward titration information and the recommended starting and highest doses to find implicit instructions for once daily administration); *Salix Pharm., Ltd.*, 2022 WL 3225381, at *18 ("Even when a proposed label does not exactly track the claim language, a package insert containing directives that will 'inevitably lead some consumers to practice the claimed method' provides sufficient evidence for a finding of specific intent.") (quoting *AstraZeneca*, 633 F.3d at 1060). As such, inferences drawn by a physician based on information in the label can be the basis for the encouragement required for inducement. *Sanofi v. Watson Labs.*, 875 F.3d at 646 ("Inducement law permits the required factual inferences about intended effects to rest on circumstantial evidence . . . without the kind of explicit limiting commands that [Defendants] suggest a label must contain. . . . Unlike in *Takeda*, the inference in the present case is based on interpreting the label's express statement of indications of use and the internally referred-to elaboration of those indications."). In any event, the label repeatedly refers to overall survival, which is one measure of survival explicitly included in the Court's claim construction. D.I. 215; DTX-2273.19-20.

Moreover, healthcare providers will understand that because the PROSELICA study, as described in Sandoz's label, demonstrated that the 20 mg/m$^2$ dose was non-inferior to the 25 mg/m$^2$ dose with respect to overall survival, the 20 mg/m$^2$ dose must also increase overall survival of patients as compared to another treatment or no treatment. FOF ¶ 41; Tr. 91:13-19 (Nelson); 186:12-188:17 (Stadler). Dr. Stadler testified that it is "fair to conclude that 20 mg/m$^2$ . . . having similar survival as 25 mg/m$^2$ would have a survival benefit in at least some patients." FOF ¶ 42; Tr. 187:18-24 (Stadler); *see also* Tr. 91:13-19 (Nelson).

15

In sum, due to the non-inferiority design of the PROSELICA study in Sandoz's label describing the endpoint of overall survival as the "major efficacy outcome," and the results therein showing that the endpoint was met, healthcare providers will understand that both the 25 mg/m$^2$ and 20 mg/m$^2$ doses of cabazitaxel must increase overall survival as compared to another treatment or no treatment. And based on this information in Sandoz's label, healthcare providers administering Sandoz's product will reasonably expect that their individual patients will live longer when receiving Sandoz's product at a 20 mg/m$^2$ dose as compared to another treatment or no treatment. FOF ¶ 43; Tr. 93:1-12, 104:16-25 (Nelson). It is undisputed that the only efficacy data in Sandoz's label to support approval of Sandoz's product is related to overall survival. FOF ¶ 44; Tr. 91:20-24, 123:4-6 (Nelson); 182:17-21 (Stadler). This tells healthcare providers that the only benefit that can be weighed against the potential toxicities and side effects when deciding to prescribe Sandoz's cabazitaxel product is to prolong a patient's life (i.e., increasing overall survival). FOF ¶ 44; Tr. 91:25-92:5, 132:19-133:11 (Nelson); *see also* 182:17-21 (Stadler). This will clearly encourage and promote the use of Sandoz's product for that intentional purpose.

Dr. Stadler testified that while healthcare providers will have a goal of increasing overall survival, this will not be the ***only*** use for Sandoz's product because the term "treatment" in the indication for Sandoz's cabazitaxel product also include uses such as relieving pain or improving performance or functional status. Tr. 152:13-22, 159:15-21 (Stadler). As noted above, however, healthcare providers will undisputedly find only one form of efficacy data showcased in Sandoz's label, the overall survival data from the PROSELICA study. FOF ¶ 44; Tr. 91:20-24, 123:4-6 (Nelson); 182:17-21 (Stadler). Nowhere in Sandoz's label will healthcare providers find any data regarding, e.g., pain relief, functional status improvement, or any other potential

treatment goals outside the Court's claim construction for "survival."  FOF ¶ 45; Tr. 93:13-24, 132:19-133:11 (Nelson); 190:24-191:8 (Stadler); *see also* Tr. 538:20-539:10 (Sandoz's counsel conceding that Sandoz's label contains no data on other treatment benefits).  Therefore, healthcare providers, taking the full scope of the benefits and risks into consideration, will be encouraged to use Sandoz's product specifically to prolong a patient's life as compared to another treatment or no treatment – the *only* "treatment" benefit supported anywhere in Sandoz's label.  FOF ¶ 46; Tr. 93:13-24, 94:19-95:2, 132:19-133:11 (Nelson).

As this Court has correctly observed, "the law does not require that a label expressly limit a drug only to a specific use in order to induce infringement of a method of treatment claim.  The label must merely 'encourage, recommend, or promote' an infringing use."  *Sanofi v. Glenmark Pharm. Inc., USA*, 204 F. Supp. 3d 665, 680 (D. Del. 2016) (citation omitted), *aff'd sub nom.*, *Sanofi v. Watson Labs. Inc*., 875 F.3d at 646 ("Section 271(b), on inducement, does not contain the 'substantial noninfringing use' restriction of section 271(c), on contributory infringement."); *AstraZeneca*, 633 F.3d at 1060.  Where "the label itself recommends infringement, the potential for substantial non-infringing uses does not negate . . . intent to induce infringement."  *Salix Pharm., Ltd.*, 2022 WL 3225381, at *12.  As described above, Sandoz's label will encourage, recommend and/or promote an infringing use of Sandoz's product, i.e., the administration of 20 mg/m$^2$ cabazitaxel to a claimed patient along with the claimed premedication with the intentional purpose of increasing overall survival.

  c)  **The *Grunenthal* and *Acorda* Cases Are Readily Distinguishable**

Sandoz raised two cases during its closing argument, neither of which are applicable here.  In *Grunenthal*, the NDA holder's tapentadol hydrochloride product was approved for two indications, "moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults," the latter of which is a type of polyneuropathic

pain.  *Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1338 (Fed. Cir. 2019).  The patent

claims were limited to treating polyneuropathic pain.  *Id.* at 1336.  The ANDA filers filed

"Section viii" statements, whereby they did not include the indication for DPN *or* the DPN

studies that supported that approval.  *Id.* at 1339-40.  As a result, the ANDA filers' proposed

labels included data only on the treatment of a different type of pain (i.e., nociceptive pain).  *Id.*

at 1339.  The NDA holder relied solely on the indication of the proposed labels, arguing that the

indication for severe chronic pain would cause at least some users to infringe because

polyneuropathic pain is a common form of severe chronic pain.  *Id.* at 1340.  In finding that

specific intent could not be inferred from the general language in the indication, the Federal

Circuit noted the specific carve out of clinical data related to polyneuropathic pain in the ANDA

labels.  *Id.*

        Here, in contrast, Sanofi is not relying solely on the indication to show inducement, but

the entirety of the label.  And Sandoz has not filed a "Section viii" statement, removed an

indication, or even removed overall survival data from its label.  Unlike *Grunenthal* where there

was no clinical data regarding the claimed use, the only remaining clinical data in Sandoz's label

relates to an infringing use.  None of Dr. Stadler's purported other uses alleged to fall within

"treatment" are even mentioned, let alone promoted by Sandoz's label.

        The *Acorda* case similarly rested on a lack of data.  Two types of claims were at issue:

(1) methods of reducing somnolence (drowsiness) and (2) methods of reducing the peak plasma

concentration ($C_{max}$), both comprising administering tizanidine multiparticulates to patients with

food.  *Acorda Therapeutics Inc. v. Apotex Inc.*, No. 07-cv-4937-GEB-MCA, 2011 WL 4074116,

at *1-*4 (D.N.J. Sept. 6, 2011), *aff'd*, 476 F. App'x 746 (Fed. Cir. 2012) (Fed. Cir. R. 36).  The

Court confirmed settled law that "labels that give recommendations that would lead inevitably to

18

infringement can give rise to an inference of specific intent," but found that the ANDA filer's label did not do so. *Id.* at *15, *20. The label did not instruct administration with food, nowhere stated that somnolence is reduced when the claimed capsules were given with food, contained no clinical trial evidence of that effect, and identified no benefit of reducing $C_{max}$ when the capsules were given in the fed state. *Id.* at *18-*19. The only information on the reduction of $C_{max}$ when administered with food was in the context of the dangers of switching from capsules to tablets in the fed state. *Id.* at *19. Indeed, the FDA had not permitted a statement linking reduction in somnolence or $C_{max}$ with the fed state. *Id.* at *18, *19.

Sandoz's label is nothing like the proposed label in *Acorda*. Sandoz's label includes clinical data showing the overall survival benefit of giving the recommended dose of cabazitaxel as compared to another treatment or no treatment. There is no evidence that Sandoz's product will be given for purposes that exclude increasing overall survival despite its potentially fatal toxicity, and there is no encouragement in the label for any such use.

## C.   The Use of Sandoz's Cabazitaxel Product Will Directly Infringe the Asserted Claims of the '777 Patent

The healthcare provider who selects Sandoz's cabazitaxel product will review the label and based on that, write the prescription for both the cabazitaxel and the premedication regimen. FOF ¶ 48; Tr. 85:11-15 (Nelson). Both Sandoz's product and the $H_2$ antagonist premedication will be administered intravenously by the same individual, typically a highly trained oncology nurse under the prescribing healthcare provider's direction. FOF ¶ 49; Tr. 85:16-86:1 (Nelson); 151:11-15 (Stadler). The nurse will never give a different dose of cabazitaxel or premedication than what the prescribing healthcare provider specified because they are not legally able or licensed to do so. FOF ¶ 49; Tr. 86:2-9 (Nelson).

19

As discussed in Section III.A. above, direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity, e.g., when the single entity directs or controls the acts of another.  *Akamai Techs., Inc.*, 797 F.3d at 1022; *Eli Lilly v. Teva Parenteral Meds.*, 845 F.3d at 1364.  With Sandoz's cabazitaxel product, the relationship between the individual who infuses the cabazitaxel and premedication and the prescribing healthcare provider, if they are not the same person, is one of direction and control because the physician supervises and controls the entire process, including the dosage, manner, and timing of administration, which the administering individual must follow.  FOF ¶ 50; Tr. 86:2-9 (Nelson).

Healthcare providers prescribe 20 mg/m$^2$ cabazitaxel today with the intentional purpose of increasing individual patients' lives (i.e. increasing their overall survival), and they will do the same with Sandoz's product after reviewing Sandoz's label.  FOF ¶ 51; Tr. 92:17-93:20, 105:23-106:2 (Nelson).  Dr. Stadler acknowledged that "one of the goals of treatment with cabazitaxel is overall survival improvement," and testified at deposition that a treatment goal was the same as an intentional purpose.  FOF ¶ 52; Tr. 175:10-19, 176:6-13, 176:20-22, 177:2-6 (Stadler).  As long as the intentional purpose of healthcare providers includes increasing overall survival, that is an infringing use.  In other words, if healthcare providers intend to increase overall survival and also to improve quality of life, they are still directly infringing.

## IV.   CONCLUSION

For the foregoing reasons, Sanofi has proven by a preponderance of the evidence that Sandoz's label will induce infringement of the asserted claims of the '777 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*

Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com

*Attorneys for Plaintiffs Sanofi-Aventis LLC*
*and Sanofi Mature IP*

OF COUNSEL:

William E. Solander
Daniel J. Minion
Whitney Meier Howard
Joshua Calabro
Katherine E. Adams
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY  10020
(212) 307-5500

January 31, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2023, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on January

31, 2023, upon the following in the manner indicated:

Dominick T. Gattuso, Esquire                              *VIA ELECTRONIC MAIL*
Elizabeth A. DeFelice, Esquire
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE  19801
*Attorneys for Defendant Sandoz Inc.*

Daryl L. Wiesen, Esquire                                  *VIA ELECTRONIC MAIL*
Emily Rapalino, Esquire
Kevin J. DeJong, Esquire
Tara R. Melillo, Esquire
Sarah J. Fischer, Esquire
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
*Attorneys for Defendant Sandoz Inc.*

Tiffany Mahmood, Esquire                                  *VIA ELECTRONIC MAIL*
Autumn Soucy, Esquire
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY  10018
*Attorneys for Defendant Sandoz Inc.*

Eric Levi, Esquire                                            *VIA ELECTRONIC MAIL*
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC  20036
*Attorneys for Defendant Sandoz Inc.*

Laura A. Lydigsen, Esquire                                    *VIA ELECTRONIC MAIL*
Mark H. Remus, Esquire
Joshua James, Esquire
CROWELL & MORING
455 North Cityfront Plaza Dr., Suite 3600
Chicago, IL  60611-5599
*Attorneys for Defendant Sandoz Inc.*

*/s/ Derek J. Fahnestock*
_____
Derek J. Fahnestock (#4705)

2